1  ROB BONTA
   Attorney General of California
2  PAUL STEIN
   Supervising Deputy Attorney General
3  ANDREW Z. EDELSTEIN
   ANNA RICH
4  EDWARD P. WOLFE
   ROBIN GOLDFADEN
5  SEBASTIAN BRADY
   WILLIAM BELLAMY
6  MARIA F. BUXTON
   Deputy Attorneys General
7  State Bar No. 318563
    455 Golden Gate Avenue, Suite 11000
8   San Francisco, CA 94102-7004
    Telephone: (415) 510-3873
9   Fax: (415) 703-5480
    E-mail: Maria.Buxton@doj.ca.gov
10 *Attorneys for Plaintiff State of California*

11 *Additional Counsel Listed on Signature Page*

12                IN THE UNITED STATES DISTRICT COURT

13              FOR THE NORTHERN DISTRICT OF CALIFORNIA

14                     SAN FRANCISCO DIVISION

15

16

17 **STATE OF CALIFORNIA; STATE OF**          Case No. **3:25-cv-06310-MMC**
   **NEW YORK; STATE OF ARIZONA;**
18 **STATE OF COLORADO; STATE OF**            **PLAINTIFF STATES' NOTICE OF**
   **CONNECTICUT; STATE OF**                  **MOTION AND MOTION FOR STAY OR**
19 **DELAWARE; DISTRICT OF**                  **PRELIMINARY INJUNCTION**
   **COLUMBIA; STATE OF HAWAI'I;**
20 **STATE OF ILLINOIS; OFFICE OF THE**       Date: October 3, 2025
   **GOVERNOR** ex rel. Andy Beshear, in his  Time: 9:00 a.m.
21 official capacity as Governor of the        Courtroom: 7
   Commonwealth of Kentucky; **STATE OF**     Judge: Maxine M. Chesney
22 **MAINE; STATE OF MARYLAND;**              Trial Date: None set
   **COMMONWEALTH OF**                        Action Filed: July 28, 2025
23 **MASSACHUSETTS; STATE OF**
   **MICHIGAN; STATE OF MINNESOTA;**
24 **STATE OF NEVADA; STATE OF NEW**
   **JERSEY; STATE OF NEW MEXICO;**
25 **STATE OF OREGON; STATE OF**
   **RHODE ISLAND; STATE OF**
26 **WASHINGTON; STATE OF**
   **WISCONSIN,**
27
                              Plaintiffs,
28

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS,** in her official capacity as U.S. Secretary of Agriculture; **U.S. DEPARTMENT OF AGRICULTURE'S OFFICE OF INSPECTOR GENERAL,**

                    Defendants.

# TABLE OF CONTENTS

**Page**

Notice of Motion and Motion For a § 705 Stay or
Preliminary Injunction ................................................................................................. 1

Introduction ................................................................................................................. 2

Background .................................................................................................................. 4

I.  States administer SNAP, a critical hunger prevention program, and collect
sensitive data on millions of people in the process, subject to strict use and
disclosure restrictions. ................................................................................. 4

II.  The federal government launches a campaign to amass Americans' private
information, and USDA demands SNAP data from States. ........................... 5

III.  USDA has never adequately explained the need for a national SNAP
database. .................................................................................................... 7

Argument .................................................................................................................... 8

I.  Plaintiff States are likely to succeed on their claims that USDA's demand
violates the Administrative Procedure Act. ................................................. 9

A.  USDA's demand pursuant to its SORN is final agency action. ................. 9

B.  USDA's demand is arbitrary and capricious. .......................................... 10

C.  USDA's demand is contrary to law. ...................................................... 16

II.  USDA's demand is ultra vires. .................................................................. 21

III.  Plaintiff States will suffer irreparable harm absent a temporary injunction
or stay. ....................................................................................................... 21

IV.  The balance of harms and public interest support an injunction or stay. ........... 24

i

# TABLE OF AUTHORITIES

**Page**

CASES

*All. for the Wild Rockies v. Pena*
865 F.3d 1211 (9th Cir. 2017).................................................................. 2, 7, 9, 11

*California v. HHS*
No. 25-cv-5536-VC, 2025 WL 2356224 (N.D. Cal. Aug. 12, 2025) ...................................... 6

*City & Cnty. of San Francisco v. U.S.C.I.S.*
981 F.3d 742 (9th Cir. 2020)................................................................... 13, 22, 25

*City and Cnty. of San Francisco v. U.S.C.I.S.*
408 F. Supp. 3d 1057 (N.D. Cal. 2019) ............................................................... 24

*City of Arlington v. FCC*
569 U.S. 290 (2013) ................................................................................. 21

*Dep't of Com. v. New York*
588 U.S. 752 (2019) ................................................................................. 15

*DHS v. Regents of the Univ. of Calif.*
591 U.S. 1 (2020) ................................................................................ 11, 12

*Doe #1 v. Trump*
957 F.3d 1050 (9th Cir. 2020)........................................................................ 21

*Drakes Bay Oyster Co. v. Jewell*
747 F.3d 1073 (9th Cir. 2014)........................................................................ 25

*E. Bay Sanctuary Covenant v. Biden*
993 F.3d 640 (9th Cir. 2021).................................................................. 22, 23, 25

*Encino Motorcars, LLC v. Navarro*
579 U.S. 211 (2016) ................................................................................. 11

*Greater Birmingham Ministries v. Sec'y of State for Ala.*
105 F.4th 1324 (11th Cir. 2024)...................................................................... 17

*Hall v. U.S. Dep't of Agric.*
984 F.3d 825 (9th Cir. 2020).......................................................................... 4

*Immigr. Defs. L. Ctr. v. Noem*
--- F.4th ---- (9th Cir. July 18, 2025)....................................................... 9, 22, 25

*Ipsen Biopharmaceuticals, Inc. v. Azar*
943 F.3d 953 (D.C. Cir. 2019) ........................................................................ 9

ii

1

<u>**TABLE OF AUTHORITIES**</u>
(continued)

2

<u>Page</u>

3

*La. Pub. Serv. Comm'n v. FCC*
    476 U.S. 355 (1986) .................................................................................. 21

4

5

*Magassa v. Mayorkas*
    52 F.4th 1156 (9th Cir. 2022) ..................................................................... 9

6

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*
    463 U.S. 29 (1983) ......................................................................... 10, 12, 14

7

8

*Nat'l Urb. League v. Ross*
    977 F.3d 770 (9th Cir. 2020) ....................................................................... 9

9

10

*Ohio v. EPA*
    603 U.S. 279 (2024) .................................................................................. 10

11

*Pallek v. Rollins*
    No. 1:25-cv-1650 (ECF No. 11-1) (D.D.C. May 30, 2025) .................... 6, 16

12

13

*Roberts v. Austin*
    632 F.2d 1202 (5th Cir. 1980) ................................................................... 19

14

15

*S.F. Herring Ass'n v. Dep't of the Interior*
    946 F.3d 564 (9th Cir. 2019) ..................................................................... 10

16

*U.S. Army Corps of Eng'rs v. Hawkes Co.*
    578 U.S. 590 (2016) ............................................................................... 9, 10

17

18

*Washington v. Trump*
    ---- F.4th ---- (9th Cir. July 23, 2025) ................................................. 22, 23

19

*West Virginia v. EPA*
    597 U.S. 697 (2022) .................................................................................. 18

20

21

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008) ........................................................................................ 9

22

23

**STATUTES**

24

United States Code, Title 5
    § 552a(a)(8) .............................................................................................. 20
    § 552a(o) .................................................................................................. 21
    § 705 .......................................................................................................... 1
    § 706(2)(A) .......................................................................................... 10, 16
    § 706(2)(C) ............................................................................................... 16
    § 706(2)(D) ............................................................................................... 16

25

26

27

28

## TABLE OF AUTHORITIES
### (continued)

**Page**

United States Code, Title 7
§ 2013(a)(2) .................................................................................................. 23
§ 2020 .......................................................................................................... 17
§ 2020(x) ............................................................................................. 8, 11, 14
§ 2020(x)(2)(B)–(C) ..................................................................................... 18
§ 2020(x)(2)(C)(iv) ...................................................................................... 11
§ 2020(a)(1) .............................................................................................. 4, 14
§ 2020(a)(3)(A),(B) ..................................................................................... 17
§ 2020(a)(3)(B)(i) ...................................................................................... 5, 18
§ 2020(e)(8)(A) ............................................................................................ 18
§ 2025(a) ........................................................................................................ 4
§ 2025(c) ...................................................................................................... 14

United States Code, Title 44
§ 3501 *et seq.* ............................................................................................... 19
§ 3502(10) .................................................................................................... 19
§§ 3507–08 .................................................................................................. 20
§ 3507(a)(3) .................................................................................................. 20
§ 3507(h)(3) .................................................................................................. 20

Administrative Procedure Act (APA) ....................................................... *passim*

Computer Matching and Privacy Protection Act of 1988 ................... 6, 16, 20, 21

Food and Nutrition Act of 2008 ............................................................. 5, 8, 18

Paperwork Reduction Act (PRA) ............................................................... 19, 20

SNAP Act .............................................................................................. 3, 5, 17, 18

COURT RULES

Federal Rules of Civil Procedure,
Rule 65 ...................................................................................................... 1, 25

OTHER AUTHORITIES

87 Fed. Reg. 59633 (Oct. 3, 2022) ................................................................. 11

88 Fed. Reg. 11,403 (Feb. 23, 2023) .............................................................. 12

90 Fed. Reg. 13,681 ......................................................................................... 2

# TABLE OF AUTHORITIES
### (continued)

**Page**

Code of Federal Regulations, Title 5
 § 1320(c) ................................................................................................ 20
 § 1320.8(a)(1) ....................................................................................... 20
 § 1320.8(b)(3) ....................................................................................... 20
 § 1320.9(b) ............................................................................................ 20

Code of Federal Regulations, Title 7
 § (v) ....................................................................................................... 5
 § 271.3(a) .............................................................................................. 4
 § 271.4(a) .............................................................................................. 4
 § 272.1(c)(1) .................................................................................... 5, 18
 § 272.1(c)(1)(vi) ................................................................................. 18
 § 272.1(c)(1)(vii) ......................................................................... 18, 19
 § 272.8, and .......................................................................................... 7
 § 272.11 ........................................................................................ 8, 14
 § 272.14 ................................................................................................ 8
 § 272.16 ................................................................................................ 8
 § 273.2(b) .............................................................................................. 5
 § 273.2(f)(1) .......................................................................................... 5
 § 273.2(f)(1)(i) ...................................................................................... 5
 §§ 275.1–.24 ......................................................................................... 4
 §§ 275.10–.14 ............................................................................ 5, 12, 14
 § 276.4 ................................................................................................ 10

Ctr. on Budget & Policy Priorities, *Policy Basics: The Supplemental Nutrition
 Assistance Program (SNAP)* (updated Nov. 25, 2024),
 https://www.cbpp.org/research/food-assistance/the-supplemental-nutrition-
 assistance-program-snap ..................................................................... 4

Exec. Order No. 14243, 90 Fed. Reg. 13,681 (Mar. 20, 2025)....................... 5

Privacy Impact Assessment, Anti-Fraud Locator using EBT Retailer Transaction
 (ALERT), USDA (April 14, 2020), available at
 https://www.usda.gov/sites/default/files/documents/fncs-alert-pia.pdf ................................. 8

*SNAP Quality Control*, USDA (June 30, 2025), https://www.fns.usda.gov/snap/qc .............. 8, 12

**NOTICE OF MOTION AND MOTION FOR A § 705 STAY OR PRELIMINARY INJUNCTION**

**PLEASE TAKE NOTICE** that on October 3, 2025 at 9:00 a.m., in Courtroom 7 of the above-entitled court, located at 455 Golden Gate Avenue, San Francisco, California, Plaintiffs the States of California, New York, Arizona, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, Oregon, Rhode Island, Washington, Wisconsin, the District of Columbia, the Commonwealth of Massachusetts, and the Office of The Governor ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky (collectively, Plaintiffs or Plaintiff States) will and hereby do move this Court pursuant to 5 U.S.C. § 705, Federal Rule of Civil Procedure 65, and Local Rules 7-1 and 7-2 for a stay or preliminary injunction that temporarily bars Defendants United States Department of Agriculture (USDA) and USDA Secretary Brooke Rollins from enforcing their demand for personal and sensitive data on Supplemental Nutrition Assistance Program (SNAP) applicants and recipients until Plaintiffs' challenges to the legality and constitutionality of the demand can be adjudicated.

Specifically, Plaintiffs respectfully move the Court for an order staying, under § 705 of the Administrative Procedure Act, or preliminarily enjoining both: (1) USDA's demand for SNAP applicant and recipient data from Plaintiffs; and (2) the institution of noncompliance procedures against Plaintiffs, which USDA has threatened could lead to significant funding cuts for States that refuse to comply with the data demand.

This motion is based on this notice; the accompanying Memorandum of Points and Authorities; the supporting declarations filed herewith; the Complaint for Declaratory and Injunctive Relief (ECF No. 1); this Court's file; and any other matters properly before the Court.

**INTRODUCTION**

In July, USDA sent States a letter demanding that they produce virtually *all* of the personal and sensitive data they maintain on food stamp applicants and recipients going back five years. This includes Social Security numbers (SSNs), dates of birth, and home addresses. The demand is unprecedented and unlawful. In the sixty years that States have partnered with the federal government to administer the Supplemental Nutrition Assistance Program (SNAP), USDA has never made such a sweeping demand for sensitive data. USDA further demanded that States provide this massive trove of personally identifying information (PII) in just three weeks, or risk noncompliance procedures that could lead to the suspension or disallowance of SNAP administrative funds provided to States.

USDA's demand comes amid an extraordinary campaign by the Trump administration to harvest and compile Americans' most sensitive information to advance the President's agenda on fronts that have nothing to do with preventing waste, fraud, or abuse in federal benefits programs. In February, the President issued an Executive Order commanding agencies to eliminate "information silos," gain "unfettered access" to state data collected through the administration of federally funded programs, and then share that information across the federal government. 90 Fed. Reg. 13,681. Since then, the Department of Government Efficiency (DOGE) reportedly has been compiling personal information covertly from a wide array of federal agencies into a database for use in a mass deportation campaign and other surveillance activities. Most recently, public reporting and litigation exposed an agreement between the Department of Health and Human Services (HHS) and the Department of Homeland Security (DHS) to give immigration authorities direct access to the most sensitive Medicaid data that States collect and share with HHS. The Social Security Administration and the IRS have reportedly taken similar steps.

In this context, USDA's stated justification for its unprecedented data grab—ensuring "program integrity"—is highly suspect. By law, States, not USDA, are responsible for verifying SNAP participant eligibility, including verifying immigration status. USDA has for decades relied on limited samples or anonymized data for auditing purposes, because federal law restricts USDA's access to PII, and USDA has no practical need for wide tranches of PII to perform its

2

oversight functions. USDA itself touts that SNAP has one of the most rigorous quality control systems in the federal government. Yet USDA now seeks to sharply depart from this long-standing practice and policy. Rather than offer reasons for doing so, it has steamrolled through every safeguard in its haste to eliminate "information silos"—silos that exist for legal and practical reasons—and create a "national SNAP information database." USDA has also brushed aside the significant data security risks inherent in compiling PII on such a massive scale and housing it in a single database, not to mention the enormous burdens this data collection will impose on Plaintiff States. Despite previously acknowledging that misuse or improper sharing of SNAP participant information would harm the program by damaging public trust and chilling participation, USDA is now poised to collect and share such information across the federal government for purposes unrelated to SNAP administration.

Faced with no good options, Plaintiff States filed this suit to challenge the legality of USDA's demand before they were forced to do anything irreversible. Given the pending litigation, Plaintiff States requested that USDA stay the disclosure deadline while the Court considered their claims. But USDA was undeterred. On August 12, it sent at least 16 Plaintiff States what it called an "advance notice," the first step in noncompliance procedures under the federal SNAP Act and related regulations. The notice declares that the Plaintiff States are "out of compliance with SNAP requirements" and threatens them with the "suspension or disallowance of Federal funding for State SNAP administrative expenses if [they] do[] not submit . . . the requested SNAP participant data" within mere days. If the Plaintiff States do not comply by August 19, USDA has threatened to serve Plaintiff States a "formal warning" and proceed with suspending or disallowing their federal administrative SNAP funding—which total $1.4 billion for California alone. Fernández Decl. CA Ex. A at 6.

This Court should intervene now to prevent USDA from pressing its unlawful demand for data—and using critical administrative funding as leverage—before the Court has a chance to address the merits of Plaintiffs' claims.

**BACKGROUND**

I.   **STATES ADMINISTER SNAP, A CRITICAL HUNGER PREVENTION PROGRAM, AND COLLECT SENSITIVE DATA ON MILLIONS OF PEOPLE IN THE PROCESS, SUBJECT TO STRICT USE AND DISCLOSURE RESTRICTIONS.**

SNAP benefits funded by the federal government "'alleviate . . . hunger and malnutrition' by 'increasing [the] food purchasing power' of low-income households." *Hall v. U.S. Dep't of Agric.*, 984 F.3d 825, 831 (9th Cir. 2020) (quoting 7 U.S.C. § 2011). These benefits helped over 41 million people avoid food insecurity last year.[1] Plaintiff States' SNAP programs collectively serve over twenty million individuals every month.[2]

While SNAP is overseen at the federal level by the Food and Nutrition Service (FNS), a component of USDA, 7 C.F.R. § 271.3(a), state agencies administer SNAP on the ground, processing applications and issuing SNAP benefits to eligible recipients. *Id.* § 271.4(a); *see* 7 U.S.C. § 2020(a)(1). States are also responsible for conducting mandated quality control review and management evaluations. 7 C.F.R. §§ 275.1–.24. States and the federal government each fund roughly 50% of the States' costs incurred administering SNAP. 7 U.S.C. § 2025(a). Given the size of Plaintiff States' SNAP caseload, the federal government's congressionally mandated share of States' administrative costs amounts to billions of dollars collectively each year.[3]

Through their work administering the program, state agencies collect and retain millions of records containing sensitive PII about SNAP applicants and recipients. SNAP applicants must provide, among other information, their name, address, household income, citizenship and/or

---

[1] *See* Ctr. on Budget & Policy Priorities, *Policy Basics: The Supplemental Nutrition Assistance Program (SNAP)* (updated Nov. 25, 2024), https://www.cbpp.org/research/food-assistance/the-supplemental-nutrition-assistance-program-snap.

[2] Fernández Decl. CA ¶ 10; Armijo Decl. NM ¶ 6; Morishige Decl. HI ¶ 5; Yaffe Decl. ME ¶ 5; Moore Decl. MN ¶ 4; Dennis Decl. KY ¶ 4; McClelland Decl. CO ¶ 5; Canada Decl. CT ¶ 6; López Decl. MD ¶ 4; Standridge Decl. WI ¶ 5; Merolla-Brito Decl. RI ¶ 6; DeMarco Decl. NY ¶ 4; Rodgers Decl. AZ ¶ 6; Hall Decl. DE ¶ 4; Cole Decl. MA ¶ 6; Haywood Decl. MI ¶ 5; Reyes Decl. WA ¶ 6; Carpenter-Seguin Decl. OR ¶ 5; Adelman Decl. NJ ¶ 6; Reagan Decl. IL ¶ 9.

[3] Armijo Decl. NM ¶ 8; Yaffe Decl. ME ¶ 7; Moore Decl. MN ¶ 6; Dennis Decl. KY ¶ 6; McClelland Decl. CO ¶ 7; Canada Decl. CT ¶ 8; López Decl. MD ¶ 8; Standridge Decl. WI ¶ 7; Merolla-Brito Decl. RI ¶ 8; DeMarco Decl. NY ¶ 5; Rodgers Decl. AZ ¶ 8; Hall Dec. DE ¶ 6; Cole Decl. MA ¶ 8; Haywood Decl. MI ¶ 7; Reyes Decl. WA ¶ 8; Carpenter-Seguin Decl. OR ¶ 5; Reyes Decl. WA ¶ 6; Adelman Decl. NJ ¶ 6; Reagan Decl. IL ¶ 11.

4

1    immigration status, and SSN. 7 C.F.R. § 273.2(b), (f)(1)(i), (v), (f)(1). And the electronic benefit

2    transfer (EBT) cards used by SNAP recipients contain information about their buying habits and

3    other personal information.

4          Federal law protects the confidentiality of this sensitive information. The SNAP Act itself

5    requires States to "prohibit the use or disclosure of information" from applicants, subject to

6    narrow exceptions for those "directly connected with" administering or enforcing the SNAP Act

7    or for law enforcement "for the purpose of investigating an alleged violation" of the SNAP Act. 7

8    U.S.C. § 2020(e)(8). Federal regulations further restrict disclosure to a limited list of recipients. 7

9    C.F.R. § 272.1(c)(1). And while USDA may inspect and audit certain state records, it may do so

10   only "subject to data and security protocols agreed to by the State agency" and USDA. 7 U.S.C.

11   § 2020(a)(3)(B)(i). USDA has historically abided by these restrictions, requesting only random

12   samples of States' SNAP caseloads for quality-control and oversight purposes. Buxton Decl. Ex.

13   K at 2; *see* 7 C.F.R. §§ 275.10–.14 (SNAP Quality Control System under which States provide

14   FNS a random sample of SNAP cases every month for review, subject to strict privacy

15   limitations). Further, as USDA's then-director of SNAP program administration recently swore in

16   court, "*USDA does not have the authority to require States . . . to share household information

17   with USDA* or any person outside of what is specifically delineated by the Food and Nutrition Act

18   . . . and corresponding regulations." *See* Buxton Decl. Ex. K at 3. In the United States' own

19   words, "[b]y enacting the data safeguards in the [SNAP] Act, Congress has already demonstrated

20   its awareness that unauthorized data disclosures would harm SNAP." Buxton Decl. Ex. C at 6.

21   **II.    THE FEDERAL GOVERNMENT LAUNCHES A CAMPAIGN TO AMASS AMERICANS'
22             PRIVATE INFORMATION, AND USDA DEMANDS SNAP DATA FROM STATES.**

23         Since inauguration, the Trump administration has moved quickly to build sprawling

24   databases of sensitive PII, especially about federal benefit recipients. As part of this effort,

25   President Trump issued an executive order directing federal agencies to eliminate so-called

26   "information silos" and ensure "unfettered access to comprehensive data from all State programs"

27   in furtherance of the Administration's goals. Exec. Order No. 14243, 90 Fed. Reg. 13,681 (Mar.

28   20, 2025) (hereinafter the "Information Silos EO"). Along these lines, the government, led by

1    DOGE, is reportedly working to build a massive database using records from the IRS, the Social

2    Security Administration, and HHS, among others, for the purpose of immigration enforcement

3    and other surveillance activities. Recently, Immigration and Customs Enforcement (ICE) and an

4    HHS subagency executed an agreement giving ICE direct access to a database containing

5    Medicaid beneficiary PII received from State agencies. *See California v. HHS*, No. 25-cv-5536-

6    VC, 2025 WL 2356224, at *1 (N.D. Cal. Aug. 12, 2025). This effort has since been enjoined by a

7    Court of this District. *Id.* at *2. The IRS is likewise reportedly preparing a program to give ICE

8    officers on-demand access to confidential tax data. Buxton Decl. Ex. D at 2.

9         USDA is actively participating in this government-wide effort. DOGE has previously

10   gained access to sensitive USDA systems, Buxton Decl. Ex. E at 2–10, and, in recent months,

11   USDA has quietly removed from its website multiple statements assuring people they could apply

12   for SNAP benefits "without immigration consequences." *Compare* Buxton Decl. Ex. F at 1, *with*

13   Buxton Decl. Ex. G at 1.

14        Then, in May, USDA sent state SNAP agencies a letter declaring that States and their

15   private SNAP payment processors are "SNAP information silo[s]" that USDA was working to

16   eliminate. Gillette Decl. Ex. B. Around then, States learned from their processors that USDA and

17   its "assigned [DOGE] team" were trying to obtain state SNAP data directly from them,

18   purportedly to "ensure program integrity." Reagan Dec. IL Ex. 1. After being sued for not

19   following the Privacy Act, among other laws, USDA announced it would publish a new "System

20   of Records Notice" (SORN) before collecting this data from States and their processors. *See*

21   Corley Decl. ¶ 14, *Pallek v. Rollins*, No. 1:25-cv-1650 (ECF No. 11-1) (D.D.C. May 30, 2025).

22        The new SORN, published on June 23, 2025, described a new "National Supplemental

23   Nutrition Assistance (SNAP) Information Database" (SNAP Database) that would contain troves

24   of personal data from States. The SORN also set forth numerous "routine uses" of the data,

25   including sharing it with other federal agencies and law enforcement, but disclosed few details

26   about ensuring information security. Buxton Decl. Ex. H at 2–3. USDA required public

27   comments on the SORN by July 23, 2025. *Id.* at 1. Then, on July 9—two weeks before public

28   comments were due—USDA demanded that States disclose five years' worth of personal SNAP

6

1  data. Gillette Decl. CA Ex. C at 1. States were directed to produce the data starting on July 24—

2  just one day after the SORN "comment period" closed—and no later than July 30. *Id.*

3      More than 400 public comments were submitted, the overwhelming majority of them

4  critical of the agency's action. Yet, on July 25, USDA sent another letter demanding that States

5  turn over the data and threatening noncompliance procedures if they failed to comply. *Id.* Ex. E at

6  1. Then, on August 12, after Plaintiff States initiated this lawsuit, USDA sent many state

7  governors an "advance notice" about noncompliance procedures and threatened to issue a "formal

8  warning" if States did not provide the data by August 15—just three days later.[4] This deadline

9  was later extended to August 19. Buxton Decl. Exs. I, J. If Plaintiff States do not comply by

10  August 19, USDA has given every indication that it will "pursue the suspension or disallowance

11  of Federal funding for State SNAP Administrative expenses and . . . take any other available legal

12  action." Gillette Decl. CA Ex. G at 1.

**III.    USDA HAS NEVER ADEQUATELY EXPLAINED THE NEED FOR A NATIONAL SNAP
DATABASE.**

15      USDA has been unclear about the purpose of the new SNAP Database and has never

16  explained why it needs to abandon the agency's long-standing policy *against* aggregating

17  sensitive PII from States. The new SORN claims the purpose of the database is to "leverage data-

18  sharing across Federal and State systems" for the purpose of "verifying eligibility based on

19  immigration status, identifying and eliminating duplicate enrollments, assisting states in

20  mitigating identity theft, and performing other eligibility and program integrity checks using

21  lawfully shared internal and interagency data." Buxton Decl. Ex. H.

22      As numerous public comments on the SORN noted, however, States already perform *all*

23  of these functions, making the SNAP Database entirely duplicative of existing systems. States are

24  obligated by federal regulation to adopt a compliant system for income eligibility verification, 7

25  C.F.R. § 272.8, and to this end are permitted to request information from several federal

---

26      [4] Armijo Decl. NM ¶¶ 32, 33; Yaffe Decl. ME ¶ 29; Moore Decl. MN ¶ 31; McClelland
Decl. CO ¶¶ 31–32; Canada Decl. CT ¶ 28; López Decl. MD ¶¶ 32–33; Standridge Decl. WI ¶ 28;
27  Merolla-Brito Decl. RI ¶¶ 30–31; DeMarco Decl. NY ¶¶ 43–44; Rodgers Decl. AZ ¶ 25–26; Cole
Decl. MA ¶ 24–25; Haywood Decl. MI ¶¶ 24–25; Reyes Decl. WA ¶ 35; Carpenter-Seguin Decl.
28  OR ¶¶ 30–31; Adelman Decl. NJ ¶¶ 36–37; Reagan Decl. IL ¶¶ 61–62.

1    databases, including the Social Security Administration and IRS, subject to strict safeguards.

2    States are also required to verify immigration eligibility for applicants claiming qualifying non-

3    citizen immigration status through the Systematic Alien Verification for Entitlements (SAVE)

4    Program, also provided for by regulation, *id.* § 272.11. Other existing systems also provide for

5    deceased matching and employment verification through the national database of new hires. *Id.*

6    §§ 272.14, 272.16.

7         The congressionally mandated National Accuracy Clearinghouse (NAC), *see* 7 U.S.C.

8    § 2020(x), which will be fully implemented by all SNAP jurisdictions by 2027, provides a near-

9    instantaneous means for identifying and eliminating duplicate enrollments. States send daily

10   matching elements for all their enrolled SNAP participants to allow for identification of

11   duplicates. The system also provides appropriate procedures for dealing with identified

12   duplicates. Likewise, FNS already receives daily electronic benefit transfer (EBT) transaction

13   data through a system that identifies suspicious retailers for analysis and investigation, but—

14   unlike the SNAP Database—it does not aggregate individuals' PII.[5]

15        These measures are effective: SNAP fraud rates are low, and USDA even today describes

16   SNAP as having "one of the most rigorous quality control systems in the federal government."

17   *SNAP Quality Control*, USDA (updated June 30, 2025), https://fns.usda.gov/snap/qc. These

18   systems also achieve this without either compromising data privacy and security (e.g., NAC uses

19   a secure unique identifier that States can link to participant PII without disclosing that PII

20   directly) or with strict limitations on data uses (e.g., SAVE strictly limits the use of submitted

21   data for verification of eligibility status). *See* Reagan Decl. ¶ 54. By contrast, the new SNAP

22   Database seeks to compile more sensitive data with fewer privacy and security protections.

23                                      **ARGUMENT**

24        The Administrative Procedure Act (APA) authorizes courts to "issue all necessary and

25   appropriate process to postpone the effective date of an agency action or to preserve status or

26   _____

27        [5] *See* Buxton Decl. Ex. L at 2 (citing USDA SORN, 75 Fed. Reg. 81,205 (Dec. 27, 2010));
     Privacy Impact Assessment, Anti-Fraud Locator using EBT Retailer Transaction (ALERT),
     USDA (April 14, 2020), available at https://www.usda.gov/sites/default/files/documents/fncs-
28   alert-pia.pdf.

8

1   rights pending conclusion of the review proceedings." 5 U.S.C. § 705. "[T]he factors considered

2   in determining whether to postpone agency action pursuant to § 705 'substantially overlap with'"

3   the preliminary injunction factors. *Immigr. Defs. L. Ctr. v. Noem*, --- F.4th ----, 2025 WL

4   2080742, at *7 (9th Cir. July 18, 2025). Thus, the moving party must show that (1) it is likely to

5   succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary

6   relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest.

7   *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under the "sliding scale" test for a

8   preliminary injunction, a court may grant a preliminary injunction upon a showing that there are

9   "serious questions" going to the merits—a lesser showing than likelihood of success on the

10  merits—"'if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two *Winter*

11  factors are satisfied.'" *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017).

12      As explained below, a stay or, or injunction barring, USDA's demand and the enforcement

13  of that demand through noncompliance procedures is urgently needed and amply justified.

I.      **PLAINTIFF STATES ARE LIKELY TO SUCCEED ON THEIR CLAIMS THAT USDA'S
        DEMAND VIOLATES THE ADMINISTRATIVE PROCEDURE ACT.**

        A.      **USDA's demand pursuant to its SORN is final agency action.**

17      Defendants' decision to demand vast quantities of personal SNAP data from Plaintiff

18  States, pursuant to its SNAP Database SORN, constitutes final agency action subject to challenge

19  under the APA. "To maintain a cause of action under the APA, a plaintiff must challenge 'agency

20  action' that is 'final.'" *Nat'l Urb. League v. Ross*, 977 F.3d 770, 776 (9th Cir. 2020). To be final,

21  "'[f]irst, the action must mark the consummation of the agency's decision-making process—it

22  must not be of a merely tentative or interlocutory nature. And second, the action must be one by

23  which rights or obligations have been determined, or from which legal consequences will flow.'"

24  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). The finality inquiry is

25  described as "pragmatic," focusing on the "'concrete consequences an agency action has or does

26  not have.'" *Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 956 (D.C. Cir. 2019); *see also*

27  *Hawkes Co.*, 578 U.S. at 599. Both criteria are satisfied here.

28      An agency's decision-making process is consummated when its position is "'definitive.'"

9

*Magassa v. Mayorkas*, 52 F.4th 1156, 1165 (9th Cir. 2022). Here, USDA's data demands under its new SORN have been definite and not tentative. USDA stated a definitive position in its May 6 letter that it "must retain 'unfettered access'" to the States' data; it confirmed that position multiple times in subsequent communications with the States; it specifically demanded compliance with its extraordinary requests; and it recently sent what it calls an "advance notice" to Plaintiff States,[6] the first step toward imposing financial penalties on them for failing to comply with the data demand. *See* Gillette Decl. Ex. G. Thus, the first criterion for final agency action is satisfied. *See S.F. Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 579 (9th Cir. 2019) (agency's "enforcement orders against individual[s] . . . 'crystalliz[ed] [the] agency position into final agency action.'").

Second, USDA's demand under its new SORN is an action "'by which rights or obligations have been determined, or from which legal consequences will flow.'" *Hawkes Co.*, 578 U.S. at 597. USDA's July 23 notice specifically demanded compliance with its extraordinary requests. Gillette Decl. Ex. D. And its August 12 letter makes clear that recipient States have already been deemed "out of compliance with SNAP requirements," and if they do not produce the demanded data within days, they risk "suspension or disallowance of Federal funding." Gillette Decl. Ex. G. In other words, the agency has made a decision and all that remains is enforcement of that decision. This "exposure to 'the risk of significant . . . civil penalties' satisfies" the second requirement for final agency action. *See, e.g.*, *S.F. Herring Ass'n*, 946 F.3d at 579.

**B.    USDA's demand is arbitrary and capricious.**

Under the APA, a court may set aside an arbitrary and capricious agency action. 5 U.S.C. § 706(2)(A). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024). An agency must offer "a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). An agency cannot simply ignore "an important aspect of the problem." *Id.* And while an agency may generally change policy, *some* legitimate

---

[6] 7 C.F.R. § 276.4 requires that USDA send "advance notice" to the state agency.

10

1    justification is required, and a more detailed explanation is required where prior policy has

2    engendered reliance interests. *See, e.g.*, *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30–32

3    (2020). An agency must, at a minimum, "show that there are good reasons for the new policy."

4    *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

5    　　　USDA's demand has every marker of arbitrary and capricious action. In pursuit of its

6    singular goal of taking possession of historic quantities of highly sensitive, protected PII, USDA

7    has reversed long-standing policy without justification, ignored the risks of its action, and offered

8    a justification belied by the facts.

9    　　　　　**1.　　Without explanation, USDA has abandoned its long-standing policy**
        **against collecting bulk PII on SNAP participants.**

10

11    　　　USDA's sudden demand for virtually *all* the sensitive SNAP PII States collect is a

12    dangerous, unnecessary, and unexplained break from its long-standing policy and practice. Again,

13    federal law and regulations strictly limit the use and sharing of SNAP participant information, and

14    USDA has had a long-standing policy and practice *not* to amass and centralize such data on its

15    end. Piazza Decl. ¶ 5; Buxton Decl. Ex. K at 2 ("USDA does not directly collect, maintain, or

16    control information from SNAP households . . . ."). In large part, this is due to security concerns

17    associated with amassing such sensitive data in one place, making it a target for hackers, who

18    have repeatedly breached federal agency data repositories. *See* Piazza Decl. ¶¶ 14–17.

19    　　　In line with this policy, USDA has never sought millions of SNAP participants' PII from

20    States. Gillette Decl. CA ¶ 70; Piazza Decl. ¶ 20. When the agency has sought SNAP participant

21    data in the past, it has required only statistically significant samples of data or accepted

22    anonymized data. Take, for example, the care USDA has taken in implementing NAC, a data

23    sharing program specifically authorized by Congress to ensure that SNAP participants do not

24    improperly receive benefits in multiple States simultaneously. *See* 7 U.S.C. § 2020(x). USDA

25    carefully designed this program so that PII will never be collected or compiled in a single federal

26    database, precisely because of the security risks such a compilation would create. Piazza Decl.

27

28

¶¶ 7–10; *see* 87 Fed. Reg. 59,633 (Oct. 3, 2022) (interim final rule).[7] Instead, NAC uses a unique identifier that States can link to participant PII without disclosing that PII directly. Piazza Decl. ¶ 7; *see, e.g.*, 88 Fed. Reg. 11,403 (Feb. 23, 2023) (describing NAC data protocol used "to protect sensitive participant and applicant data . . . and mitigate against the risk of PII . . . being exfiltrated."). And SNAP's long-standing quality control process, which USDA describes as "one of the most rigorous quality control systems in the federal government,"[8] only involves sending USDA limited samples of SNAP data rather than tranches of it. *See* 7 C.F.R. §§ 275.10–.14.

USDA's failure to justify its sudden abandonment of long-standing policy and practice in this regard is grounds for setting it aside under the APA. Indeed, the need for consideration and explanation here is heightened because of the reliance interests at stake. These include painstaking efforts taken by Plaintiff States to build public trust in SNAP and other critical safety net programs that they administer to promote public health and welfare. Fernández Decl. CA ¶¶ 29–37; Moore Decl. MN ¶ 21; Dennis Decl. KY ¶ 23; Reyes Decl. WA ¶ 24. As the Supreme Court has made clear, an agency acts in an arbitrary and capricious manner when it fails to acknowledge, let alone justify, a change in policy or practice that has engendered reliance interests such as these. *See Regents of the Univ. of Calif.*, 591 U.S. at 30–32.

## 2.    USDA was alerted to the grave security risks and other harms its collection causes but has ignored them.

In its rush to implement its new policy, USDA has blatantly ignored several "important aspect[s] of the problem"—namely, the security risks its collection will create, the chilling effect on SNAP participation, and the burden it imposes on States. *State Farm*, 463 U.S. at 43.

As FNS's former Senior Advisor for Technology and Delivery explained in her comment on the USDA's SORN, creation of the SNAP Database—which will "aggregate names, dates of birth, [SSNs], addresses, and program participation data for tens of millions of individuals, many of whom are children, seniors, and persons with disabilities"—"represents an unprecedented and

---

[7] Congress was particularly concerned with protecting "the identity and location of a vulnerable individual," such as domestic violence victims when creating the NAC, which USDA has not addressed in its SNAP Database SORN. 7 U.S.C. § 2020(x)(2)(C)(iv).

[8] *SNAP Quality Control*, USDA (June 30, 2025), https://www.fns.usda.gov/snap/qc.

1    risky expansion of federal data collection and retention practices related to low-income

2    Americans." Piazza Decl. ¶ 12; *id.* Ex. A. She explained, "[t]he sheer scale and sensitivity of this

3    dataset make it a prime target for malicious actors. If breached, it would represent a catastrophic

4    loss of public trust in the nation's safety net programs and could expose the federal government to

5    substantial liability." *Id.*; Cole Decl. MA ¶ 26–27. As an example of the risks, USDA plans to use

6    the MoveIt platform, which has recently been implicated in a massive data breach at another

7    federal agency. Piazza Decl. ¶ 15; *id.* Ex. A. The SORN and the Privacy Impact Assessment show

8    USDA still has not comprehended—much less addressed—the serious cybersecurity risks it is

9    creating. Piazza Decl. ¶¶ 15, 19, 21; Gillette Decl. CA Ex. A at 6. State SNAP administrators are

10   therefore reasonably concerned that "a new centralized SNAP database without assurances that

11   the transfer, storage and subsequent disclosures of data would be protected" would be "a tempting

12   target for fraudsters," and could expose millions to identity theft and benefit theft.[9]

13       USDA has also ignored the chilling effect that the SNAP Database will have on SNAP

14   participation. USDA itself has recognized that disclosing SNAP PII, "particularly without the

15   household's consent, . . . could have a chilling effect on SNAP participation rates." Buxton Decl.

16   Ex. A at 4. In the government's own words, "[t]hat would negatively affect SNAP participation

17   rates and irreparably harm USDA's administration of the program." Buxton Decl. Ex. B at 23.

18   Yet USDA has not effectively addressed the risk of chilling SNAP participation that its new effort

19   presents—a chill that will be drastically magnified if there is a breach or misuse of the data at

20   issue. *Cf. City & Cnty. of San Francisco v. U.S.C.I.S.*, 981 F.3d 742, 759–60 (9th Cir. 2020)

21   (failure to consider disenrollment in assistance programs was arbitrary and capricious).

22       The agency has also ignored the immense burden its demand places on States, which is

23   exacerbated by a near-impossible timeline to produce data, particularly for States with larger

24   caseloads. California, for example, has estimated that just collecting the data that USDA appears

25   to be demanding could take more than six months. Gillette Decl. CA ¶ 83. Colorado estimates it

26   ───────────────

         [9] Reagan Decl. ¶ 50; *see also, e.g.*, Reyes Decl. ¶ 27 ("Recipients of SNAP who have had
27   their identities stolen could suffer compromised financial accounts, adverse actions to their credit
     scores, and incur significant expenses attempting to remediate the damage."); DeMarco Decl.
28   ¶ 26; Armijo Decl. ¶ 27; Morishige Decl. ¶ 23; Moore Decl. ¶ 24; Dennis Decl. ¶ 23; McClelland
     Decl. ¶ 23; Reagan Decl. ¶ 50; Carpenter-Seguin Decl. ¶ 24; Adelman Decl. ¶ 27.

                                                13

1    would take "thousands of personnel hours" at significant cost to the State. McClelland Decl. CO

2    ¶ 24. Massachusetts estimates it would need a task force of 8-10 dedicated information

3    technology professionals. Cole Decl. MA ¶ 34.[10] Yet, USDA demanded that States produce the

4    data within three weeks (providing the details of the demand only one week before that deadline);

5    then, per its latest letter, in just three days. Gillette Decl. CA Exs. C, D, G. It has nowhere

6    acknowledged or mitigated the staff time and expense required of States to comply. In doing so,

7    the agency makes clear that it has not considered significant problems caused by its demand.

8            **3.    USDA's "program integrity" rationale is belied by the available facts.**

9        In addition to ignoring critical harms and risks posed by the new SNAP Database, USDA's

10    action lacks any "'rational connection between the facts found and the choice made.'" *Motor*

11    *Vehicle Mfrs. Assn. of United States, Inc.*, 463 U.S. at 43. Indeed, USDA's purported goal of

12    ensuring "the integrity of Government programs" is belied by every available fact, particularly

13    when measured against the scope of its demand. Buxton Decl. Ex. H. USDA's SORN states that

14    the agency will "use the SNAP data to ensure the integrity of Government programs, including by

15    verifying SNAP recipient eligibility against federally maintained databases . . . includ[ing]

16    verifying eligibility based on immigration status" *Id.* USDA ignores that Congress—and USDA

17    itself—have already established a detailed process for ensuring program integrity. *See* 7 U.S.C.

18    § 2025(c); 7 C.F.R. § 275.10–.14 (providing for "Quality Control Reviews"). It ignores that

19    Congress has expressly delegated eligibility verification to the administering States, *not* USDA, 7

20    U.S.C. § 2020(a)(1)—which make sense, since the nuances of SNAP eligibility are not uniform

21    across the 53 administering agencies. And it ignores that States *already* conduct eligibility checks

22    regarding immigration status using a federally maintained database. *See* 7 C.F.R. § 272.11.

23    Similarly, the SORN states that USDA intends to "leverage data-sharing across Federal . . .

24    systems to identify and rectify" any "duplicate enrollments." Buxton Decl. Ex. H at 2. Again,

25    Congress has already mandated a federal database for this purpose, which States are required to

26    ───────────────
          [10] *See also* Armijo Decl. NM ¶ 28; Morishige Decl. HI ¶ 24; Moore Decl. MN ¶ 25;
27    Moore Decl. MN ¶ 26; Dennis Decl. KY ¶ 24; López Decl. MD ¶ 24; Standridge Decl. WI ¶ 24;
      Merolla-Brito Decl. RI ¶ 24; DeMarco Decl. NY ¶¶ 27–28; Rodgers Decl. AZ ¶ 21; Haywood
28    Decl. MI ¶ 30; Reyes Decl. WA ¶ 28; Carpenter-Seguin Decl. OR ¶ 25; Adelman Decl. NJ ¶¶ 32–
      35.

1    participate in, called the NAC database. 7 U.S.C. § 2020(x).

2         The "significant mismatch between the decision the [USDA] made and the rationale [it]

3    provided" is particularly concerning given the surrounding circumstances. *Dep't of Com. v. New*

4    *York*, 588 U.S. 752, 783 (2019). USDA seeks far more data, including highly sensitive PII, than it

5    has ever before demanded in SNAP's 60-year history.[11] At the same time, USDA has recently

6    removed language from its website assuring SNAP applicants and recipients that their

7    information and that of their family members would not be used for immigration enforcement

8    purposes. *See* Buxton Decl. Exs. F, G. USDA's SORN also includes vague and expansive

9    "routine use" language that contemplates broad, uncontrolled disclosures to law enforcement

10   agencies and other federal agencies unrelated to SNAP. Buxton Decl. Ex. H at 2–3; Piazza Decl.

11   ¶ 22. And other federal agencies have already turned over similarly sensitive data to DOGE and

12   DHS. Therefore, when USDA says, in deliberately vague terms, that it intends to use this massive

13   database to "leverage data-sharing across Federal and State systems," Buxton Decl. Ex. H, one

14   can reasonably infer that it intends to use the data for purposes other than SNAP administration,

15   such as immigration enforcement, as other agencies have already. Courts "are 'not required to

16   exhibit a naiveté from which ordinary citizens are free.'" *Dep't of Com.*, 588 U.S. at 785.

17            **4.    USDA predetermined the outcome of the comment process.**

18        Lest there be any doubt that USDA did not consider the risks and harms its collection

19   would cause, the chronology of USDA's actions reveals that it ignored public input and

20   conducted a sham procedure with a predetermined outcome.

21        In its May 6 letter, prior to publishing any SORN, USDA first announced its intent to

22   eliminate the so-called "information silos" of "each state, district, territory, and payment

23   processor," and "consolidate" a massive quantity of data it intended to collect from the States.

24   Gillette Decl. CA Ex. B. at 1. It also revealed that it was *already* taking steps to gather that data

25   ─────────────────────

26   [11] Piazza Decl. ¶ 20; *see also* Armijo Decl. NM ¶ 15; Morishige Decl. HI ¶ 15; Yaffe
     Decl. ME ¶ 15; Moore Decl. MN ¶ 15; Dennis Decl. KY ¶ 14; McClelland Decl. CO ¶ 15;
27   Canada Decl. CT ¶ 16; López Decl. MD ¶ 15; Standridge Decl. WI ¶ 15; Merolla-Brito Decl. RI
     ¶ 16; DeMarco Decl. NY ¶ 19; Rodgers Decl. AZ ¶ 16; Hall Decl. DE ¶ 14; Cole Decl. MA ¶ 16;
28   Haywood Decl. MI ¶ 16; Carpenter-Seguin Decl. OR ¶ 15; Adelman Decl. NJ ¶ 18; Reagan Decl.
     IL ¶ 32.

15

1   from States' third-party vendors, attempting an end-run around States entirely. *Id.* Indeed, the day

2   *before* the May 6 letter, Plaintiff States' third-party EBT payment processors confirmed that FNS

3   had already contacted them directly to request SNAP data.[12]

4        Litigation ensued, and USDA then claimed it would publish a new SORN before collecting

5   any data, as required by the Privacy Act. Corley Decl. ¶ 14, *Pallek v. Rollins*, No. 1:25-cv-1650

6   (ECF No. 11-1) (D.D.C. May 30, 2025). This turned out to be a box-checking exercise, not a

7   serious effort to gather and respond to public comments. The agency published the SORN on

8   June 23, 2025, which *only* sought comment on the "routine uses" portion—the agency was

9   apparently not interested in the public's input on the data collection itself. *See* Buxton Decl. Ex. H

10  at 1. It set the deadline for public comments as July 23. *Id.* But on July 9, USDA reinstituted its

11  demand and directed States to produce the data between July 24—*one day* after the comment

12  period closed—and July 30, 2025.[13] Gillette Decl. CA Exs. D, F. USDA ultimately received 458

13  comments, the vast majority of which, including several from Plaintiff States, opposed the new

14  collection and alerted the agency to the serious risk and harms to reliance interests its actions will

15  cause. *See, e.g.*, Buxton Decl. Ex. L; Piazza Decl. Ex. A. USDA could not, and clearly did not,

16  meaningfully consider the public's comments in one day. Instead, it forged ahead with its

17  dangerous and unprecedented collection of State SNAP data, without regard for its impact.[14]

18      **C.   USDA's demand is contrary to law.**

19       USDA's demand for five years' worth of sensitive SNAP PII violates numerous federal

20  laws and regulations and is therefore contrary to law. 5 U.S.C. § 706(2)(A), (C), (D).

21

---

22      [12] Gillette Decl. CA ¶¶ 67–68; DeMarco Decl. NY ¶ 15; Rodgers Decl. AZ ¶ 12; Cole
Decl. MA ¶ 12; Haywood Decl. MI ¶ 12; Carpenter-Seguin Decl. OR ¶ 11; Reagan Decl. IL ¶¶

23  21–22, 25–28.
    [13] USDA's July 23 letter for the first time provided instructions for transmission of the

24  data. Also on July 23, USDA published a Privacy Impact Assessment, weeks after it had begun
seeking the States' data. Gillette Decl. CA Ex. A.

25      [14] USDA's failure to meaningfully consider public comments is demonstrated by the
certified Administrative Record (AR) filed by Defendants in the *Pallek* litigation. According to

26  the table of contents filed by USDA on the *Pallek* public docket, the only materials USDA
considered in this action are public documents already cited above. *See* Buxton Decl. Ex. M. The

27  AR contains a single page described as an "Analysis of SORN Comments," but to Plaintiffs'
knowledge, this "analysis" has resulted in no meaningful changes to USDA's data demand or any

28  consideration of the costs and burdens that these demands place on Plaintiff States and others. *Id.*

16

1.     **USDA's demand violates the SNAP Act and USDA's regulations.**

USDA's demand violates the SNAP Act's express limitations on USDA's authority to obtain personal information from States that administer the program. The SNAP Act provides that States must make "available for inspection and audit" by USDA "all records as may be *necessary to determine whether the [SNAP] program is being conducted in compliance with*" the SNAP Act, and "*subject to data and security protocols agreed to by the State agency and Secretary.*" 7 U.S.C. § 2020(a)(3)(A), (B) (emphasis added). Thus, USDA can only demand records that are: (1) "necessary to determine" whether the SNAP program is being conducted in compliance with the SNAP Act; (2) "made available for inspection and audit," not turned over wholesale; and (3) subject to data and security protocols agreed to by the States.

Failure to comply with any one of these limitations would be enough for a stay or injunction, but USDA's demand far exceeds all of them. *First*, USDA has never provided a plausible reason why the records it seeks are "necessary to determine" whether States are complying with the SNAP Act. And there is none. *See, supra*, Section III. USDA has no legitimate need to collect PII on such a massive scale to verify eligibility or check for overpayments. States already verify eligibility, including immigration status using the federal SAVE database. And Congress and USDA itself have already designated methods they deemed necessary to ensure program integrity, including by systematically collecting samples of data from States for quality control and identifying duplicate enrollments via the NAC database. *Id.*

*Second*, USDA demands that States not just make their records "available for inspection or audit," but also turn over *possession* of their SNAP data to USDA, a virtually irreversible action. This falls well outside of USDA's inspection and audit authority. *See*, *e.g.*, *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 105 F.4th 1324, 1333 (11th Cir. 2024) (noting that a right to "inspection" does not encompass a right to copy, take possession of, or receive via electronic disclosure); *see supra*, Section III (discussing how audits involve a limited sample of records).

*Third*, and finally, USDA has never obtained the Plaintiff States' agreement on data and security protocols as required by 7 U.S.C. § 2020. In fact, when Plaintiff State Colorado proposed draft data and security protocols, USDA never responded except to acknowledge receipt. *See*

17

McClelland Decl. CO ¶¶ 19, 27, 30. The SNAP Act clearly requires that States have a role in deciding how the SNAP data they collect from their residents is transferred, stored, and used. *See* 7 U.S.C. § 2020(a)(3)(B)(i). And Plaintiff States routinely require such agreements before sharing confidential SNAP participant data outside the State.[15] Yet, USDA's demand would require States to turn over troves of data without having any say in how it is handled or any assurance that it will not be misused, insecurely stored, or improperly shared.

In the same vein, Congress has consistently acted to constrain USDA's ability to amass and use SNAP data across multiple statutory enactments, which confirms that the present demand lies outside USDA's authority. *See West Virginia v. EPA*, 597 U.S. 697, 731–32 (2022) (explaining that the history of congressional action on a subject can inform the scope of the agency's delegated authority). For example, Congress drew strict limits on USDA's operation of the NAC, specifying, for example, that USDA could not require States to provide more data than necessary for the purpose of the NAC. *See* 7 U.S.C. § 2020(x)(2)(B)–(C).

Beyond these statutory violations, USDA's demand violates the prohibition on disclosing individuals' information to law enforcement agencies outside narrow circumstances. The SNAP Act requires States to establish "safeguards which prohibit the use or disclosure" of applicant information subject to narrow exceptions, one of which is for limited disclosures necessary to the "administration or enforcement" of the SNAP program. *Id.* § 2020(e)(8)(A).[16] Further, States may not disclose "information obtained from SNAP applicant or recipient households" except in eight prescribed scenarios. 7 C.F.R. § 272.1(c)(1). Such information can only be disclosed to federal law enforcement officials, in response to a written request from law enforcement, in two circumstances: (1) "for the purpose of investigating an alleged violation of the Food and Nutrition Act of 2008 or regulation"; or (2) for the purpose of apprehending a specific individual who is "fleeing to avoid prosecution or custody" for a felony. *Id.* § 272.1(c)(1)(vi), (vii). In the latter

---

[15] *See* Armijo Decl. NM ¶ 20; Morishige Decl. HI ¶ 19; López Decl. MD ¶ 19–20; DeMarco Decl. NY ¶¶ 24–25; Hall Decl. DE ¶ 24; Cole Decl. MA ¶ 26; Haywood Decl. MI ¶ 10; Reyes Decl. WA ¶ 29; Carpenter-Seguin Decl. OR ¶ 19; Adelman Decl. NJ ¶ 22; Reagan Decl. IL ¶ 42.

[16] Notably, Plaintiff States all currently operate under a USDA-approved State plan that does not contemplate the disclosure of data that USDA now demands.

18

1    scenario, a State "shall disclose only such information as is necessary to comply with" the

2    request. *Id.*; *see also Roberts v. Austin*, 632 F.2d 1202, 1213 (5th Cir. 1980) (prohibiting law

3    enforcement "from conducting a fishing expedition in food stamp files").

4        Contrary to these restrictions, USDA intends to disclose the SNAP data it collects from

5    States to *any* law enforcement agency, if there is any indication of a violation of *any* law. The

6    "routine uses" listed in the SORN include disclosing information about SNAP applicant or

7    recipient households to any other "public authority," so long as a "record, on its face or in

8    conjunction with other records, indicates a violation or potential violation of a law, whether civil,

9    criminal, or regulatory in nature." Buxton Decl. Ex. H at 2. Further, the SORN states the agency

10   intends to disclose the SNAP data to "support another Federal agency or instrumentality of any

11   governmental jurisdiction . . . that administers [or investigates] potential fraud, waste, or abuse in,

12   a Federal benefits program[.]" *Id.* at 3. This language is incredibly broad, potentially including

13   disclosure to numerous federal agencies for purposes *entirely unrelated* to SNAP. This routine

14   use is particularly unusual; it is not included in at least the past four SORNs USDA FNS has

15   published. Piazza Decl. ¶ 22. To date, USDA has never disclaimed its intention to use the data

16   collected from States in these ways, even after receiving comment letters, including one from

17   several Plaintiffs, explaining why such broad use is unlawful. Buxton Decl., Ex. L.

18           **2.    USDA's demand violates statutes governing agencies' collection of
                     data and the use of such data in computer matching programs.**
19

20       USDA's demand also violates the Paperwork Reduction Act (PRA), which requires that

21   federal agencies comply with certain procedures before they collect data from persons outside the

22   federal government, including state governments or agencies. *See* 44 U.S.C. § 3501 *et seq*.; *see*

23   *id.* § 3502(10) (including States under the definition of the term "person"). Before a federal

24   agency can collect data from ten or more persons, the PRA requires that the agency conduct a full

25   Information Collection Review (ICR), which requires that the agency conduct an "evaluation of

26   the need for the collection of information"; obtain review by the White House Office of

27   Management and Budget (OMB); and "[i]nform[] and provide[] reasonable notice to the potential

28   persons to whom the collection of information is addressed of," *inter alia*, the "way such

19

1    information is planned to be and/or has been used to further the proper performance of the

2    functions of the agency." 5 C.F.R. § 1320.8(a)(1), (b)(3); *see* 44 U.S.C. §§ 3507–08. If OMB

3    approves an information collection, it assigns a control number, which must then be displayed on

4    the collection. 44 U.S.C. § 3507(a)(3).

5    USDA did not follow these procedures here. USDA concedes that its new collection of

6    SNAP data falls under the PRA but purports to have met its obligations by treating States'

7    "reporting" of five years of SNAP PII as a "nonsubstantive change" to the collection of the

8    underlying data from households, which has already been approved by OMB. *See id.* § 3507(h)(3)

9    (barring "substantive" changes without OMB approval). But obtaining every individual record

10   from every State's SNAP database is plainly a new "collection of information" under the PRA.

11   *See* 5 C.F.R. § 1320(c) (collection of information "refers to the act of collecting or disclosing

12   information"). And as explained above, USDA is *collecting*, *i.e.*, taking possession of,

13   information from States here, not merely requiring States to "report" information to USDA. It

14   uses a new database—a new SNAP Database, rather than each States' individual system. And it

15   will be held by a new custodian—USDA, rather than States.

16   USDA was thus required to conduct a new ICR before demanding this data from States,

17   including OMB review and a notice and comment procedure. A proper ICR process would have

18   required, among other things, that USDA certify that the collection "[i]s not unnecessarily

19   duplicative of information otherwise reasonably accessible to the agency." 5 C.F.R. § 1320.9(b).

20   For the reasons explained above in Section III, USDA likely could not have made such a

21   certification, because it already has access to this data in an anonymized form and States already

22   check SNAP applicants' immigration status using federal data through the SAVE database.

23   Additionally, USDA has admitted that it intends to use the demanded SNAP data in at least

24   one computer matching program, but it has not met the requirements of the Computer Matching

25   and Privacy Protection Act of 1988 (Computer Matching Act).[17] In the Privacy Impact

26

_____

27   [17] "[M]atching program[s]" are "computerized comparison[s] of . . . two or more
     automated systems of records or a system of records with non-Federal records for the purpose of
     . . . verifying the eligibility of . . . applicants for, recipients or beneficiaries of, participants in . . .

28   cash or in-kind assistance or payments under Federal benefit programs." 5 U.S.C. § 552a(a)(8).

20

Assessment it released in conjunction with this data collection campaign, USDA revealed that it intends to "cross check [SNAP] data against other Federal databases using matching algorithms to determine accuracy." Gillette Decl. CA Ex. A at 11. USDA's SORN similarly concedes USDA intends to "leverage data-sharing across Federal and State systems," again indicating it intends to combine this data with data collected by other federal agencies. Buxton Decl. Ex. H at 2. The Computer Matching Act prohibits federal agencies from disclosing data "for use in a computer matching program except pursuant to a written agreement between the source agency and the recipient agency" that specifies, among other things, "the purpose and legal authority for conducting the program," "the justification for the program and the anticipated results, including a specific estimate of any savings," and "procedures for providing individualized notice at the time of application [to] applicants for" federal benefits like SNAP. 5 U.S.C. § 552a(o). USDA has provided no indication that it has entered into any such agreement. USDA's attempt to collect data from Plaintiff States for the purpose of using it in a computer matching program therefore violates the Computer Matching Act, and Plaintiffs should not be forced to comply with it.

## II.    USDA'S DEMAND IS ULTRA VIRES.

As a federal agency, USDA "has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Accordingly, any action it takes outside the bounds of its statutory authority is ultra vires. *See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). As explained above in Section I.C, the USDA's demand for five years' worth of SNAP participant data from States, upon threat of withholding States' federal funding, is not only unauthorized by statute, it contravenes existing law. Because Congress never authorized USDA to make such a sweeping demand for sensitive SNAP data, Plaintiffs are likely to succeed on their claim that USDA's actions are ultra vires.

## III.    PLAINTIFF STATES WILL SUFFER IRREPARABLE HARM ABSENT A TEMPORARY INJUNCTION OR STAY.

"'The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.'" *Doe #1 v. Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020). Section 705 likewise authorizes courts to "preserve status or

21

1    rights pending" review proceedings "to the extent necessary to prevent irreparable injury." 5

2    U.S.C. § 705; *see Immigr. Defs. L. Ctr.*, 2025 WL 2080742, at *7 (Section 705 and preliminary

3    injunction requirements overlap). Defendants have responded to this suit by threatening to

4    withhold potentially billions of dollars in SNAP administrative funding Plaintiff States have

5    planned for and depend on to help families feed themselves. Absent interim relief, this threatened

6    action will inflict an "economic harm" that cannot be remedied by later monetary damages, and

7    force "a significant change in [Plaintiff States' SNAP] program[s]," both of which "constitute

8    irreparable injuries." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021).

9         Cutting off SNAP administrative funding will have immediate, drastic impacts on Plaintiff

10    States' ability to administer their SNAP programs. Because of the size of the States' SNAP

11    caseloads and the fact that USDA funds roughly half of the States' administrative costs, the loss

12    of these federal funds could not be fully replaced by the States in the short- or even medium-term.

13    *See* Fernández Decl. CA ¶ 22; McClelland Decl. CO ¶ 33; Rodgers Decl. AZ ¶ 27; Cole Decl.

14    MA ¶ 33; Reyes Decl. WA ¶ 37. While "[e]conomic harm is not normally considered

15    irreparable," it is "when monetary damages are unavailable." *Washington v. Trump*, --- F.4th ----,

16    2025 WL 2061447, at *15 (9th Cir. July 23, 2025). Here, "[b]ecause Defendants are federal

17    officials and federal agencies, money damages are unavailable in this case." *Id.* Because Plaintiffs

18    States will "bear heavy financial costs" should USDA withhold these funds, they will suffer

19    irreparable harm absent an injunction. *City & Cnty. of San Francisco*, 981 F.3d at 762.

20         Beyond the immediate fiscal impact, Plaintiff States will also "suffer a significant change

21    in their programs" that constitutes an independent form of irreparable harm. *E. Bay Sanctuary*

22    *Covenant*, 993 F.3d at 677. Withholding SNAP administrative funds would directly impact

23    staffing within state SNAP agencies, limiting these agencies' ability to administer SNAP.[18] State

24    agencies will also be forced to substantially alter their operations to continue meeting other SNAP

25    administrative requirements, such as Quality Control Reviews. Fernández Decl. CA ¶ 22; Cole

---

26    [18] Fernández Decl. CA ¶ 22; Armijo Decl. NM ¶ 34; Morishige Decl. HI ¶ 30; Yaffe Decl.
      ME ¶¶ 23, 31; Moore Decl. MN ¶ 33; Dennis Decl. KY ¶ 33; McClelland Decl. CO ¶ 33; Canada
27    Decl. CT ¶ 30; López Decl. MD ¶ 34; Standridge Decl. WI ¶ 30; Merolla-Brito Decl. RI ¶ 32;
      Hall Decl. DE ¶ 22; Reyes Decl. WA ¶ 37; Carpenter-Seguin Decl. OR ¶ 32; Adelman Decl. NJ
28    ¶¶ 38–40; Reagan Decl. IL ¶ 63.

22

Decl. MA ¶ 33; Adelman Decl. NJ ¶¶ 38–40; McClelland Decl. CO ¶ 33; *see E. Bay Sanctuary Covenant*, 993 F.3d at 678 (finding irreparable harm where plaintiffs had to "'divert significant resources,' including 'staff time and organizational resources' to respond to the [challenged] Rule"); *Washington*, 2025 WL 2061447, at *15 (finding irreparable harm where "States would incur costs of developing new systems" in response to challenged executive action). State agencies will also have to reconsider plans to invest in technology updates to improve the efficiency and effectiveness of their operations. Fernández Decl. CA ¶¶ 24–25; *see E. Bay Sanctuary Covenant*, 993 F.3d at 678 (finding irreparable harm where plaintiff agency "ha[d] placed programmatic expansions on hold"). These harms will accrue even if Plaintiff States ultimately succeed in undoing USDA's unlawful withholding, as such relief will come too late to keep Plaintiff States from being forced to implement these changes in the interim.

Such programmatic cutbacks are likely to trigger further costs for Plaintiff States. Staffing cuts would diminish States' ability to enroll and deliver benefits. Fernández Decl. CA ¶ 23; DeMarco Decl. NY ¶ 5; Haywood Decl. MI ¶ 31. Beyond decreasing food security, this threatens other forms of federal funding that are keyed to SNAP enrollment, like school-based nutrition programs.[19] It also threatens possible cuts to *benefit* funding, which will soon be tied to States' error rates for the first time. Fernández Decl. CA ¶ 22; *see* 7 U.S.C. § 2013(a)(2).

Moreover, Plaintiff States cannot simply avoid funding cuts by acquiescing to USDA's demand. Even aside from the immense burden that collecting and producing the data will have on state agencies,[20] disclosing this data to USDA is likely to cause an irreversible chilling effect on SNAP participation, and in fact has already started affecting communities. In Colorado, "[c]ommunity outreach contacts who assist in educating community members on the SNAP

---

[19] Fernández Decl. CA ¶ 41; Armijo Decl. NM ¶ 21; Morishige Decl. HI ¶ 21; Yaffe Decl. ME ¶ 21; Moore Decl. MN ¶ 22; Dennis Decl. KY ¶ 21; McClelland Decl. CO ¶ 21; Canada Decl. CT ¶ 22; López Decl. MD ¶ 22; Standridge Decl. WI ¶ 21; Merolla-Brito Decl. RI ¶ 21; Hall Decl. DE ¶ 21; Cole Decl. MA ¶ 29; Reyes Decl. WA ¶ 25–26; Carpenter-Seguin Decl. OR ¶¶ 21–22; Adelman Decl. NJ ¶ 25; Reagan Decl. IL ¶¶ 45–46.

[20] *See, e.g.*, Gillette Decl. CA ¶¶ 83–84; Armijo Decl. NM ¶ 28; Morishige Decl. HI ¶ 24; Moore Decl. MN ¶ 25; Moore Decl. MN ¶ 26; Dennis Decl. KY ¶ 24; McClelland Decl. CO ¶ 24; López Decl. MD ¶ 24; Standridge Decl. WI ¶ 24; Merolla-Brito Decl. RI ¶ 24; DeMarco Decl. NY ¶¶ 27–28; Rodgers Decl. AZ ¶ 21; Cole Decl. MA ¶ 34–35; Haywood Decl. MI ¶ 30; Reyes Decl. WA ¶ 28; Seguin Decl. OR ¶ 25; Adelman Decl. NJ ¶¶ 32–35; Reagan Decl. IL ¶¶ 51–55.

23

program are already reporting concerns from potentially eligible households about submitting applications based on news reports about USDA's massive data request."[21] Illinois has already observed a drop in enrollments in its Summer EBT program for families with SNAP-eligible children "correlated with increasing fears about use of benefits data for immigration enforcement purposes." Reagan Decl. IL ¶ 47. USDA itself has recognized that disclosing data about SNAP applicants or recipients, "particularly without the household's consent, . . . could have a chilling effect on SNAP participation rates" which would "negatively affect SNAP participation rates" "irreparably." Buxton Decl. Ex. A at 4. Plaintiff States have invested in building trust with low-income communities to encourage eligible individuals to participate in SNAP. Fernández Decl. CA ¶¶ 29–37; Moore Decl. MN ¶ 21; Dennis Decl. KY ¶ 23; Reyes Decl. WA ¶ 24. That trust will be destroyed if residents learn that their state agencies disclosed their sensitive and personal information to the federal government despite overwhelming evidence that that data would be at serious risk of a data breach and that the government intended to disclose that data for non-SNAP administration purposes to which SNAP applicants never consented.[22] Reducing SNAP enrollments will, in turn, cause irreparable long-term harm and costs for Plaintiff States.[23]

## IV.   THE BALANCE OF HARMS AND PUBLIC INTEREST SUPPORT AN INJUNCTION OR STAY.

The balance of harms and the public interest, which merge where the federal government is a party, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014), favor enjoining or

---

[21] McClelland Decl. CO ¶ 20; *see also* López Decl. MD ¶ 21; Merolla-Brito Decl. RI ¶ 20; Standridge Decl. WI ¶ 20; Armijo Decl. NM ¶ 21; Morishige Decl. HI ¶ 20; Yaffe Decl. ME ¶ 20; Moore Decl. MN ¶ 21; Dennis Decl. KY ¶ 23; Canada Decl. CT ¶ 21; Hall Decl. DE ¶ 20; Cole Decl. MA ¶ 28; Haywood Decl. MI ¶ 26; Reyes Decl. WA ¶ 23; Carpenter-Seguin Decl. OR ¶ 20; Adelman Decl. NJ ¶ 24; Reagan Decl. IL ¶¶ 43–44.

[22] These "[g]overnmental administrative costs caused by changes in federal policy are [also] cognizable injuries" for Article III standing. *City and Cnty. of San Francisco v. U.S.C.I.S.*, 408 F. Supp. 3d 1057, 1123 (N.D. Cal. 2019).

[23] *See* Standridge Decl. WI ¶ 22 ("As families are deterred from enrolling due to fear of their data being shared, we expect to see significant stress on the state's limited emergency services, both public and private, and an uptick in families experiencing homelessness as they may have to make choices between paying for rent or buying food."); Merolla-Brito Decl. RI ¶ 22 (declining SNAP enrollment "would undermine Rhode Island's public health infrastructure and shift costs to state and municipal systems"); Armijo Decl. NM ¶ 21 (reduction in SNAP applications and enrollment would "increase our citizens' adverse public health outcomes, especially children, and, therefore, increase the burden on our hospitals and healthcare facilities statewide"); Morishige Decl. HI ¶ 22; Yaffe Decl. ME ¶ 22; Moore Decl. MN ¶ 23; Dennis Decl. KY ¶ 22; Cole Decl. MA ¶¶ 30–33; Haywood Decl. MI ¶¶ 27–28; Carpenter-Seguin Decl. OR ¶¶ 21–22; Adelman Decl. NJ ¶ 26; Reagan Decl. IL ¶¶ 48–49.

staying Defendants' action. Plaintiff States already face imminent, irreparable harms as a result of Defendants' actions. *See supra*. Those harms will also affect public welfare: if SNAP agencies lose federal administrative funding, wait times for processing applications will rise and state agencies can enroll fewer eligible people—meaning more hungry people. *Id.* Given these "adverse impacts" on "health and welfare," the balance of equities and public interest weigh in favor of preventing USDA from cutting Plaintiff States' administrative SNAP funding. *City & Cnty. of San Francisco*, 981 F.3d at 762. The nature of the APA claims that Plaintiffs move on weigh further in favor of the injunction, for "'[t]he public interest is served by compliance with the APA.'" *E. Bay Sanctuary Covenant*, 993 F.3d at 678 ("The government's failure to comply with the APA . . . weighs in favor of granting injunctive relief."). Finally, the various statutory violations inherent in the challenged action also weigh in favor of the injunction, as "the public has an interest in ensuring that the 'statutes enacted by [their] representatives are not imperiled by executive fiat.'" *Id.* at 679. In light of these various harms to the public interest and the stark harms facing the States, "the harms involved in denying the duly elected branches the policies of their choice" cannot tilt the balance in favor the federal government. *Immigr. Defs. L. Ctr.*, 2025 WL 2080742, at *14 (citing *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2562–63 (2025)).

USDA faces no hardship from a stay: existing systems enacted by Congress already carry out the SNAP Database's putative function, and States always have and will continue to perform rigorous eligibility screening and program integrity work—USDA's stated goal.

## CONCLUSION

For the foregoing reasons, to prevent the imminent and irreparable harm Plaintiffs face if USDA suspends or disallows federal funding for their SNAP programs, Plaintiff States request that this Court issue an order staying USDA's demand for SNAP data from the Plaintiff States and enforcement of that demand, under § 705 of the APA, or issue a preliminary injunction prohibiting enforcement of the demand against Plaintiff States under Rule 65.

1   Dated: August 18, 2025                          Respectfully submitted,

2                                                   ROB BONTA
                                                    Attorney General of California
3                                                   PAUL STEIN
                                                    Supervising Deputy Attorney General
4                                                   ANDREW Z. EDELSTEIN
                                                    ANNA RICH
5                                                   EDWARD P. WOLFE
                                                    ROBIN GOLDFADEN
6                                                   SEBASTIAN BRADY
                                                    WILLIAM BELLAMY

7

8

9                                                   _Maria Buxton_
                                                    MARIA F. BUXTON
10                                                  DEPUTY ATTORNEYS GENERAL
                                                    *Attorneys for Plaintiff State of California*
11

12
    LETITIA JAMES                                   KRISTIN MAYES
13  Attorney General of New York                    Attorney General of Arizona

14  */s/ Mark Ladov*                                */s/ Hayleigh S. Crawford*
    MARK LADOV                                       HAYLEIGH S. CRAWFORD (AZ NO. 032326)
15  Special Counsel                                  LUCI D. DAVIS (AZ NO. 035347)
    JULIE DONA                                       2005 N. Central Ave. Phoenix, AZ 85004
16  Special Counsel                                  (602) 542-3333
    28 Liberty St.                                   Hayleigh.Crawford@azag.gov
17  New York, NY 10005                               Luci.Davis@azag.gov
    (212) 416-8240                                   ACL@azag.gov
18  mark.ladov@ag.ny.gov                            *Attorneys for Plaintiff State of Arizona*
    *Attorneys for Plaintiff State of New York*
19

20  PHILIP J. WEISER                                WILLIAM TONG
    Attorney General of Colorado                     Attorney General of Connecticut
21
    */s/ David Moskowitz*                            */s/ Janelle R. Medeiros*
22  DAVID MOSKOWITZ                                  JANELLE R. MEDEIROS
    Deputy Solicitor General                         Special Counsel for Civil Rights
23  Colorado Department of Law                       165 Capitol Ave
    1300 Broadway, 10th Floor                        Hartford, CT 06106
24  Denver, CO 80203                                 (860) 808-5020
    Phone: (720) 508-6000                            Janelle.Medeiros@ct.gov
25  david.moskowitz@coag.gov                        *Attorneys for Plaintiff State of Connecticut*
    *Attorneys for Plaintiff State of Colorado*
26

27

28

                                        26

1

2 KATHLEEN JENNINGS
Attorney General of Delaware

BRIAN L. SCHWALB
Attorney General for the District of
Columbia

3 /s/ Vanessa L. Kassab
IAN R. LISTON
4 Director of Impact Litigation
VANESSA L. KASSAB*
5 Deputy Attorney General
Delaware Department of Justice
6 820 N. French Street
Wilmington, DE 19801
7 (302) 683-8899
vanessa.kassab@delaware.gov
8 Attorneys for Plaintiff State of Delaware

/s/ Nicole S. Hill
NICOLE S. HILL
Assistant Attorney General
Office of the Attorney General for the
District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov
Attorneys for Plaintiff District of Columbia

9

10 ANNE E. LOPEZ
Attorney General of Hawai'i

KWAME RAOUL
Attorney General of Illinois

11 /s/ Kaliko'onālani D. Fernandes
DAVID D. DAY
12 Special Assistant to the Attorney General
KALIKO'ONĀLANI D. FERNANDES
13 Solicitor General
425 Queen Street
14 Honolulu, HI 96813
(808) 586-1360
15 kaliko.d.fernandes@hawaii.gov
Attorneys for Plaintiff State of Hawai'i
16

/s/ Sherief Gaber
HARPREET K. KHERA*
Bureau Chief, Special Litigation
SHERIEF GABER
Assistant Attorney General
115 S. LaSalle St., 35th Flr.
Chicago, Illinois 60603
(773) 590-7127
Harpreet.Khera@ilag.gov
Attorneys for Plaintiff State of Illinois

17 OFFICE OF THE GOVERNOR *ex rel.* Andy
Beshear, in his official capacity as
18 Governor of the Commonwealth of
Kentucky
19
/s/ S. Travis Mayo
20 S. TRAVIS MAYO
General Counsel
21 TAYLOR PAYNE
Chief Deputy General Counsel
22 LAURA C. TIPTON
Deputy General Counsel
23 Office of the Governor
700 Capitol Avenue, Suite 106
24 Frankfort, KY 40601
(502) 564-2611
25 travis.mayo@ky.gov
taylor.payne@ky.gov
26 laurac.tipton@ky.gov
Attorneys for Plaintiff Kentucky Governors'
27 Office

AARON M. FREY
Attorney General of Maine

/s/ Brendan Kreckel
BRENDAN KRECKEL
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 0433-0006
Tel.: 207-626-8800
Fax: 207-287-3145
brendan.kreckel@maine.gov
Attorneys for Plaintiff State of Maine

28

27

ANTHONY G. BROWN
Attorney General of Maryland

*/s/ James C. Luh*
JAMES C. LUH
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

*/s/ Katherine Dirks*
KATHERINE DIRKS*
Chief State Trial Counsel
CASSANDRA THOMSON
Assistant Attorney General
Office of the Massachusetts Attorney
General
1 Ashburton Place Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
cassandra.thomson@mass.gov
*Attorneys for Plaintiff Commonwealth of
Massachusetts*

DANA NESSEL
Attorney General of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI
BRYAN BEACH
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov
beachb@michigan.gov
*Attorneys for Plaintiff State of Michigan*

KEITH ELLISON
Attorney General of Minnesota

*/s/ Joseph R. Richie*
JOSEPH R. RICHIE
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

AARON D. FORD
Attorney General of Nevada

*/s/ Heidi Parry Stern*
HEIDI PARRY STERN (Bar. No. 8873)
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov
*Attorneys for Plaintiff State of Nevada*

MATTHEW J. PLATKIN
Attorney General of New Jersey

*/s/ Kashif T. Chand*
KASHIF T. CHAND (NJ BAR NO. 016752008)
Assistant Attorney General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
kashif.chand@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

RAÚL TORREZ
Attorney General of the State of New
Mexico

*/s/ Steven Perfrement*
STEVEN PERFREMENT*
Senior Litigation Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
SPerfrement@nmdoj.gov
505-601-7727
*Attorneys for the State of New Mexico*

DAN RAYFIELD
Attorney General of Oregon

*/s/ Scott P. Kennedy*
SCOTT P. KENNEDY
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 453-9050
Fax (971) 673-5000
Scott.Kennedy@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*

PETER F. NERONHA
Attorney General of Rhode Island

*/s/ Madeline R. Becker*
MADELINE R. BECKER (RI BAR NO. 10034)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2151
mbecker@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

NICHOLAS W. BROWN
Attorney General of Washington

*/s/ Jennifer K. Chung*
JENNIFER K. CHUNG, WSBA #51583
WILLIAM MCGINTY, WSBA #41868
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
jennifer.chung@atg.wa.gov
william.mcginty@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Karla Z. Keckhaver*
KARLA Z. KECKHAVER
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-6365
karla.keckhaver@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*

* *pro hac vice forthcoming*

SA2025302238
44760991 3 29.docx

29

# CERTIFICATE OF SERVICE

Case Name:  **California, et al. v. U.S.**          Case No.   **3:25-cv-06310-MMC**
                  **Department of Agriculture**

I hereby certify that on <u>August 18, 2025</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

1.  **PLAINTIFF STATES' NOTICE OF MOTION AND MOTION FOR STAY OR PRELIMINARY INJUNCTION**

2.  **DECLARATION OF REBECCA PIAZZA IN SUPPORT OF PLAINTIFF STATES' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

3.  **DECLARATION OF MARIA F. BUXTON IN SUPPORT OF PLAINTIFF STATES' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

4.  **INDEX OF PLAINTIFF STATES' AGENCY DECLARATIONS SUBMITTED IN SUPPORT OF PLAINTIFFS' MOTION FOR A STAY OR PRELIMINARY INJUNCTION**

5.  **DECLARATION OF ANGELA RODGERS**

6.  **DECLARATION OF ALEXIS FERNÁNDEZ GARCIA**

7.  **DECLARATION OF RYAN GILLETTE**

8.  **DECLARATION OF ABBY MCCLELLAND**

9.  **DECLARATION OF EASHA CANADA**

10.  **DECLARATION OF THOMAS HALL**

11.  **DECLARATION OF SCOTT MORISHIGE**

12.  **DECLARATION OF KASEY REAGAN**

13.  **DECLARATION OF LESA DENNIS**

14.  **DECLARATION OF IAN YAFFE**

15.  **DECLARATION OF RAFAEL LOPEZ**

16.  **DECLARATION OF MICHAEL COLE**

17.   **DECLARATION OF DWAYNE HAYWOOD**

18.  **DECLARATION OF DR. SHANEEN MOORE**

19.   **DECLARATION OF SARAH ADELMAN**

20.  **DECLARATION OF KARI ARMIJO**

21.  **DECLARATION OF WENDY DEMARCO**

22.  **DECLARATION OF CLAIRE CARPENTER-SEGUIN**

23.  **DECLARATION OF KIMBERLY MEROLA-BRITO**

24.  **DECLARATION OF DEBRA STANDRIDGE**

25.   **DECLARATION OF CARLA REYES**

26.  **[PROPOSED] ORDER**

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter.  I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service.  In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

I further certify that on <u>August 18, 2025</u>, I have caused to be mailed in the Office of the Attorney General's internal mail system, the foregoing document(s) by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within three (3) calendar days to the following non-CM/ECF participants:

1.  **U.S. Department of Agriculture**
    **1400 Independence Avenue, S.W.**
    **Washington, D.C. 20250**

2.  **U.S. Department of Agriculture**
    **Secretary Brooke Rollins**
    **1400 Independence Avenue, S.W.**
    **Washington, D.C. 20250**

3.  **U.S. Department of Agriculture**
    **Office of Inspector General**
    **Room 117-W Jamie Whitten Bldg**
    **1400 Independence Avenue, S.W.**
    **Washington, D.C. 20250**

4.  **Civil Process Clerk**
    **United States Attorney's Office for**
    **the Northern District of California**
    **450 Golden Gate Avenue**
    **San Francisco, CA 94102**

5.  **Attorney General Pamela Bondi**
    **United States Department of**
    **Justice**
    **950 Pennsylvania Avenue NW**
    **Washington, DC 20530-0001**

In addition, I served the foregoing documents by transmitting a true copy via electronic mail, addressed as follows:

**Bradley Humphreys**
**U.S. Department of Justice**
**E-Mail: Bradley.Humphreys@usdoj.gov**

**Benjamin S Kurland**
**U.S. Department of Justice**
**E-Mail: Ben.Kurland@usdoj.gov**

//

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>August 18, 2025</u>, at San Francisco, California.

| | |
|---|---|
| _____ | _____ |
| M. Mendiola | Signature |
| Declarant | |

SA2025302238/ 44762038.docx