1  ROB BONTA
   Attorney General of California
2  PAUL STEIN
   Supervising Deputy Attorney General
3  ANDREW Z. EDELSTEIN
   ANNA RICH
4  EDWARD P. WOLFE
   ROBIN GOLDFADEN
5  SEBASTIAN BRADY
   WILLIAM BELLAMY
6  MARIA F. BUXTON
   Deputy Attorneys General
7  State Bar No. 318563
    455 Golden Gate Avenue, Suite 11000
8   San Francisco, CA 94102-7004
    Telephone:  (415) 510-3873
9   Fax:  (415) 703-5480
    E-mail:  Maria.Buxton@doj.ca.gov
10 *Attorneys for Plaintiff State of California*

11

12              IN THE UNITED STATES DISTRICT COURT

13            FOR THE NORTHERN DISTRICT OF CALIFORNIA

14                   SAN FRANCISCO DIVISION

15

16

17 **STATE OF CALIFORNIA; STATE OF**        Case No. **3:25-cv-06310-MMC**
   **NEW YORK; STATE OF ARIZONA;**
18 **STATE OF COLORADO; STATE OF**          **DECLARATION OF MARIA F. BUXTON**
   **CONNECTICUT; STATE OF**                **IN SUPPORT OF PLAINTIFF STATES'**
   **DELAWARE; DISTRICT OF**                **MOTION FOR STAY OR**
19 **COLUMBIA; STATE OF HAWAI'I;**          **PRELIMINARY INJUNCTION**
   **STATE OF ILLINOIS; OFFICE OF THE**
20 **GOVERNOR** ex rel. Andy Beshear, in his
   official capacity as Governor of the
21 Commonwealth of Kentucky; **STATE OF**
   **MAINE; STATE OF MARYLAND;**
22 **COMMONWEALTH OF**
   **MASSACHUSETTS; STATE OF**
23 **MICHIGAN; STATE OF MINNESOTA;**
   **STATE OF NEVADA; STATE OF NEW**
24 **JERSEY; STATE OF NEW MEXICO;**
   **STATE OF OREGON; STATE OF RHODE**
25 **ISLAND; STATE OF WASHINGTON;**
   **STATE OF WISCONSIN,**
26
                            Plaintiffs,
27
          v.
28

---

Declaration of Maria F. Buxton in Support of Plaintiff States' Motion for A Stay or Preliminary Injunction
(Case No. 3:25-cv-06310-MMC)

1

2

3

4

5

**UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS,** in her official capacity as U.S. Secretary of Agriculture; **U.S. DEPARTMENT OF AGRICULTURE'S OFFICE OF INSPECTOR GENERAL,**

Defendants.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF MARIA F. BUXTON**

I, Maria F. Buxton, declare as follows:

1.      I am a Deputy Attorney General in the Office of the Attorney General of California and one of the attorneys responsible for representing the State of California in the above-captioned action. I offer this declaration in support of the Motion for a Preliminary Injunction or Stay filed by the States of California, New York, Arizona, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, Oregon, Rhode Island, Washington, Wisconsin, the District of Columbia, the Commonwealth of Massachusetts, and the Office Of The Governor ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky (collectively, Plaintiffs or Plaintiff States). I have personal knowledge of the facts stated herein and could competently testify thereto if called upon to do so.

2.      A true and correct copy of the declaration of Rachel Frisk, then-Director for the Program Administration and Nutrition Division of the Supplemental Nutrition Assistance Program (SNAP) at USDA's Food and Nutrition Service (USDA FNS), submitted at ECF No. 101-3 in *United States v. City of Jackson*, No. 3:12-cv-790 (S.D. Miss.) on March 19, 2024, is attached here to as **Exhibit A**.

3.      A true and correct copy of the United States' opening brief in *Mississippi v. JXN Water*, No. 24-60309 (5th Cir. Aug. 19, 2024), ECF No. 53, is attached here to as **Exhibit B**.

4.      A true and correct copy of the United States' reply brief in *Mississippi v. JXN Water*, No. 24-60309 (5th Cir. Nov. 7, 2024), ECF No. 66, is attached here to as **Exhibit C**.

5.      A true and correct copy of the article by William Turton, Christopher Bing & Avi Asher-Schapiro, *The IRS Is Building a Vast System to Share Millions of Taxpayers' Data with ICE*, ProPublica (July 15, 2025) (accessed Aug. 15, 2025), is attached here to as **Exhibit D** and is publicly available at https://www.propublica.org/article/trump-irs-share-tax-records-ice-dhs-deportations.

6.      A true and correct copy of the article by Jenna McLaughlin, *DOGE keeps gaining access to sensitive data. Now it can cut off billions to farmers*, NPR (updated July 11, 2025)

1   (accessed Aug. 15, 2025), is attached here to as **Exhibit E** and is publicly available at

2   https://www.npr.org/2025/07/10/nx-s1-5455779/doge-usda-farmers-data.

3        7.    A true and correct capture of the USDA website entitled *SNAP Eligibility for Non-*

4   *Citizens* captured by Web Archive on February 2, 2025 (accessed Aug. 17, 2025) is attached here to

5   as **Exhibit F** and is publicly available at

6   https://web.archive.org/web/20250202100047/https://www.fns.usda.gov/snap/recipient/eligibility/no

7   n-citizen#expand.

8        8.    A true and correct capture of the USDA website entitled *SNAP Eligibility for Non-*

9   *Citizens* captured by Web Archive on February 22, 2025 (accessed Aug. 17, 2025) is attached here

10  to as **Exhibit G** and is publicly available at

11  https://web.archive.org/web/20250222190554/https://www.fns.usda.gov/snap/recipient/eligibility/n

12  on-citizen.

13       9.    A true and correct copy of the USDA's System of Records Notice, published at 90 Fed.

14  Reg. 26,521, 26,522 (June 23, 2025), is attached here to as **Exhibit H** and is publicly available at

15  https://www.govinfo.gov/content/pkg/FR-2025-06-23/pdf/2025-11463.pdf.

16       10.   A true and correct copy of an email from Bradley Humphreys, a U.S. Department of

17  Justice attorney representing Defendants in this matter, to Plaintiffs' counsel at 12:46 P.M. on

18  August 13, 2025 is attached here to as **Exhibit I**.

19       11.   A true and correct copy of an email from Bradley Humphreys, a U.S. Department of

20  Justice attorney representing Defendants in this matter, to Plaintiffs' counsel at 6:00 P.M. on

21  August 13, 2025 is attached here to as **Exhibit J**.

22       12.   A true and correct copy of the declaration of Rachel Frisk, Director for the Program

23  Administration and Nutrition Division of SNAP at USDA's FNS, submitted at ECF No. 111-1 in

24  *United States v. City of Jackson*, No. 3:12-cv-790 (S.D. Miss.) on April 30, 2024, is attached here

25  to as **Exhibit K**.

26       13.   A true and correct copy of the Comment letter submitted by several Plaintiff States

27  regarding USDA's proposed SORN on July 18, 2025 is attached here to as **Exhibit L** and is

28

2

1    publicly available at https://oag.ca.gov/system/files/attachments/press-

2    docs/State%20AGs%20Comment%20on%20SORN%20FNS-2025-11463%5B94%5D.PDF.

3        14.    A true and correct copy of the Notice of Filing of Certified List of the Contents of the

4    Administrative Record, submitted at ECF No. 33 in *Pallek v. Rollins*, No. 1:25-cv-1650 (D.D.C.) on

5    August 15, 2025, is attached here to as **Exhibit M**.

6

7        I declare under penalty of perjury of the laws of the United States of America that the

8    foregoing is true and correct.

9        Executed on August 18, 2025, in San Francisco, California.

10

11                                              _____

12                                              Maria F. Buxton

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Maria F. Buxton in Support of Plaintiff States' Motion for a Preliminary Injunction or a Stay
(Case No. 3:25-cv-06310-MMC)

# EXHIBIT A

# EXHIBIT C

**Declaration of Rachel Frisk**
**(February 26, 2024)**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
(Northern Division)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| and the STATE OF MISSISSIPPI, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 3:12-cv-790-HTW-LGI |
| | ) | (Clean Water Act Case) |
| v. | ) | |
| | ) | |
| | ) | |
| THE CITY OF JACKSON, MISSISSIPPI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:22-cv-00686-HTW-LGI |
| | ) | (Safe Drinking Water Act Case) |
| v. | ) | |
| | ) | |
| | ) | |
| | ) | |
| THE CITY OF JACKSON, MISSISSIPPI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF RACHEL FRISK

I, Rachel Frisk, do hereby state and declare as follows:

1.     I am Director for the Program Administration and Nutrition Division ("PAND")

of the Supplemental Nutrition Assistance Program ("SNAP") at the United States Department of

Agriculture ("USDA" or "the Department") Food and Nutrition Service ("FNS"), Alexandria,

1

Virginia. I have held my current position since August 2022.

2.      As the Director of PAND, I am responsible for the State Administration Branch, Quality Control Branch, and Nutrition Education Branch of SNAP which concern, in part, SNAP recipient ("household") and State administration matters. Additionally, I oversee the rulemaking and statutory and regulatory enforcement processes for these branches.

3.      The statements made in this declaration are based on knowledge that I have acquired in the performance of my official duties, including information provided to me by USDA FNS' SNAP staff and attorneys from the USDA Office of the General Counsel ("OGC"), and my knowledge of the issues being litigated in the above-captioned matter.

4.      FNS administers the nutrition assistance programs of USDA. The mission of FNS is to provide children and needy families with better access to food and a more healthful diet through its food assistance programs and comprehensive nutrition education efforts.

5.      The mission of SNAP is "to safeguard the health and well-being of the Nation's population by raising the levels of nutrition among low-income households." 7 U.S.C. § 2011. The program is administered by the USDA FNS. 7 C.F.R. § 271.3. Assistance is focused on increasing the food purchasing power of eligible households by supplementing the funds those households have to spend on food with SNAP benefits. 7 U.S.C. § 2013.

6.      SNAP's administration is accomplished through partnerships with State Agencies. "State Agency" refers to the agency of State government, including its local offices, which has "the responsibility for the administration of the federally aided public assistance programs within such State." 7 U.S.C. § 2012(s)(1). For SNAP, the State Agencies serve as the administrators of the program. *See generally* 7 U.S.C. § 2020. It is the State Agency that conducts eligibility

2

determinations for applicant households. 7 U.S.C. § 2020(a)(1).

7.      It is therefore the State Agency that collects applications and maintains and controls information obtained from applicant households, such as names, addresses, income, and household size. USDA does not collect, maintain, or control information obtained from the household and does not have the authority to require States to share such information with USDA outside of what is specifically required by the Act and corresponding regulations, such as for payment accuracy quality control reviews. *E.g.* 7 U.S.C. § 2025(c); 7 C.F.R. § 275 Subpart C.

8.      To participate in SNAP, a State Agency must first submit a State Plan of Operation. 7 U.S.C. § 2020(d); *see* 7 C.F.R. § 272.2. The State Plan of Operation is comprised of three core components; the Federal/State Agreement ("FSA"), the Budget Projection Statement, and the Program Activity Statement; and various attachments. 7 C.F.R. § 272.2(a)(2).

9.      The FSA is the legal agreement between the State and USDA by which the State elects to operate and administer SNAP in accordance with the Food and Nutrition Act of 2008, as amended ("the Act"), the regulations issued pursuant to the Act, and the FNS-approved State Plan of Operation. 7 C.F.R. § 272.2(a)(2). One such statutory and regulatory requirement that the State Agencies agree to follow concerns use and disclosure of information obtained from an applicant household.

10.     As part of the State Plan of Operation, State Agencies are required to implement safeguards which prohibit the use or disclosure of information obtained from applicant households except in limited, enumerated circumstances. 7 U.S.C. § 2020(e)(8). Those enumerated exceptions allow for the use and disclosure of information to:

        a.   persons directly connected with the administration or enforcement of the

3

provisions of the Act or its corresponding regulations, Federal assistance programs, or

federally-assisted State programs;

     b.   the Comptroller General of the United States for audit and examination

authorized by any other provision of law;

     c.   local, State or Federal law enforcement officials for the purpose of

investigating an alleged violation of the Act or its corresponding regulations;

     d.   agencies of the Federal Government for purposes of collecting the amount

of an overissuance of benefits from Federal pay; and

     e.   Federal, State, or local law enforcement officers if the officer furnishes the

State agency with the name of the household member and notifies the agency that the

individual they are seeking information on meets the statutory and regulatory criteria

of a "fleeing felon."

*Id.*

11.     If a State Agency were to disclose information obtained from households to any

other person or entity not listed above, the State could be disqualified from administering SNAP

and receiving SNAP funding. *See* 7 U.S.C. 2020(g); 7 C.F.R. 276.4. This would mean that

residents of the entire State could lose access to SNAP benefits.

12.     SNAP, and formerly the Food Stamp Program, struggles with fighting stigma

concerning receiving government assistance. This is often reflected in program participation

rates. While State participation rates vary wildly, FNS estimates that only 78 percent of eligible

people nationwide received SNAP benefits during October 2019 to February 2020. Should

information on applicant or recipient households be disclosed to others, particularly without the

4

household's consent, it could have a chilling effect on SNAP participation rates.

13.    While State Agencies are responsible for the administration of SNAP for households, USDA is responsible for the administration of SNAP for retailers. There are statutory and regulatory provisions concerning the use and disclosure of retailer information that are separate and distinct from those concerning household information. *See* 7 U.S.C. 2018(c); 7 C.F.R. 278.1(q). These retailer provisions also include separate penalties established for persons who disclose retailer information in violation of law or regulation. *Id.* Specifically, any person who publishes, divulges, discloses, or makes known any retailer information obtained under the Act to an extent not permitted by the Act or corresponding regulations shall be fined up to $1,000, imprisoned for up to one year, or both. *Id.*

14.    As such, both the Act and corresponding regulations establish requirements and penalties for use and disclosure of SNAP information onto the various entities and individuals assigned to collect, maintain, and control household and retailer information, respectively.

I declare under penalty of perjury, pursuant to 28 U.S.C. §1746, that the foregoing is true and correct.

RACHEL FRISK

Digitally signed by RACHEL FRISK
Date: 2024.02.26
11:33:18 -05'00'

RACHEL FRISK, Director
Program Administration & Nutrition Division
Supplemental Nutrition Assistance Program
U.S. Department of Agriculture
Alexandria, Virginia

# EXHIBIT B

No. 24-60309

_____

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

STATE OF MISSISSIPPI; UNITED STATES OF AMERICA,
*Plaintiffs–Appellants*,

v.

JXN WATER,
*Defendant–Appellee.*

_____

UNITED STATES OF AMERICA,
*Plaintiff,*

v.

CITY OF JACKSON, MISSISSIPPI,
*Defendant.*

_____

On appeal from the United States District Court for the
Southern District of Mississippi
Nos. 3:12-cv-790, 3:22-cv-686 (Hon. Henry T. Wingate)

_____

**OPENING BRIEF FOR THE UNITED STATES**

_____

Of Counsel:

MINA KIM
*Deputy Assistant General
Counsel*

SARAH MERRILL
VIRGINIA HENNING
*Attorneys*
U.S. Dept. of Agriculture

TODD KIM
*Assistant Attorney General*

JOHN SMELTZER
KARL FINGERHOOD
ANGELA MO
EZEKIEL A. PETERSON
*Attorneys*
Environment & Natural Resources Div.
U.S. Department of Justice
P.O. Box 7415
Washington, D.C. 20044
(202) 598-6399
ezekiel.a.peterson@usdoj.gov

# CERTIFICATE OF INTERESTED PERSONS

No. 24-60309

*State of Mississippi; United States of America*
*v.*
*JXN Water*

Under Circuit Rule 28.2.1, Appellant is a governmental party that need not furnish a certificate of interested persons.

s/ *Ezekiel A. Peterson*
EZEKIEL A. PETERSON

Counsel for the United States

## STATEMENT REGARDING ORAL ARGUMENT

Appellant believes that oral argument would be both appropriate and helpful to the Court in ensuring full consideration of the issues presented.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .........................................i

STATEMENT REGARDING ORAL ARGUMENT .................................ii

TABLE OF AUTHORITIES...................................................................v

GLOSSARY ......................................................................................ix

INTRODUCTION................................................................................1

STATEMENT OF JURISDICTION.......................................................3

STATEMENT OF THE ISSUE ............................................................4

PERTINENT STATUTES AND REGULATIONS ...................................4

STATEMENT OF THE CASE .............................................................4

    A.    Statutory and regulatory background ...................................4

    B.    Factual background ..............................................................7

        1.    The Jackson water crisis and the current lawsuits. ......................................................................7

        2.    The ITPM's request for confidential SNAP-recipient data. ...................................................9

        3.    The district court's decision. ........................................13

SUMMARY OF ARGUMENT ............................................................16

STANDARD OF REVIEW.................................................................20

ARGUMENT ...................................................................................20

I.    This Court has jurisdiction to review the disclosure order..................................................................................20

A.    The district court's order grants an injunction appealable under 28 U.S.C. § 1292(a)(1). ............................. 21

B.    The disclosure order is a collateral order appealable under 28 U.S.C. § 1291. ....................................... 25

C.    If this Court finds that it does not have appellate jurisdiction, it should treat and hear this case as a petition for a writ of mandamus. ....................................... 27

II.    The district court abused its discretion in ordering disclosure of confidential SNAP-recipient data because a municipal rate schedule is not a "federal assistance program." ........................................................................... 29

CONCLUSION ......................................................................... 39

CERTIFICATE OF COMPLIANCE ........................................... 40

CERTIFICATE OF DIGITAL SUBMISSION ............................ 41

CERTIFICATE OF SERVICE ................................................... 42

# TABLE OF AUTHORITIES

## Cases

*Apple, Inc. v. Samsung Electronics Co., Ltd.*,
727 F.3d 1214 (Fed. Cir. 2013) ........................................................... 27

*Barrios-Cantarero v. Holder*,
772 F.3d 1019 (5th Cir. 2014) ............................................................. 28

*Carder v. Continental Airlines, Inc.*,
636 F.3d 172 (5th Cir. 2011) .............................................................. 20

*Carson v. Am. Brands, Inc.*,
450 U.S. 79 (1981) .............................................................................. 21

*Cheapside Minerals, Ltd. v. Devon Energy Prod. Co., L.P.*,
94 F.4th 492 (5th Cir. 2024) ............................................................... 30

*Cheney v. U.S. Dist. Court for Dist. of Columbia*,
542 U.S. 367 (2004) ............................................................................ 28

*Cohen v. Beneficial Indus. Loan Corp.*,
337 U.S. 541 (1949) ............................................................................ 26

*Cooter & Gell v. Hartmarx Corp.*,
496 U.S. 384 (1990) ............................................................................ 20

*Gardner v. Westinghouse Broad. Co.*,
437 U.S. 478 (1978) ............................................................................ 22

*Hewlett-Packard Co. v. Quanta Storage, Inc.*,
961 F.3d 731 (5th Cir. 2020) .............................................................. 20

*In re Deepwater Horizon*,
793 F.3d 479 (5th Cir. 2015) ...................................... 21, 22, 25, 26, 27

*In re JPMorgan Chase & Co.*,
916 F.3d 494 (5th Cir. 2019) .............................................................. 28

*Lauro Lines s.r.l. v. Chasser*,
490 U.S. 495 (1989) ............................................................................ 26

*Leonard v. Martin,*
  38 F.4th 481 (5th Cir. 2022) ............................................................ 27

*Moore v. Tangipahoa Parish Sch. Bd.,*
  843 F.3d 198 (5th Cir. 2016) ............................................................ 22

*NPR Invs., L.L.C. ex rel. Roach v. United States,*
  740 F.3d 998 (5th Cir. 2014) ............................................................ 30

*People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205,*
  171 F.3d 1083 (7th Cir. 1999) .......................................................... 22

*Police Ass'n of New Orleans Through Cannatella v. City of New Orleans,*
  100 F.3d 1159 (5th Cir. 1996) .......................................................... 21

*Rollins v. Home Depot USA,*
  8 F.4th 393 (5th Cir. 2021) .............................................................. 34

*Russello v. United States,*
  464 U.S. 16 (1983) .......................................................................... 34

*Sec. & Exch. Comm'n v. Stanford Int'l Bank, Ltd.,*
  927 F.3d 830 (5th Cir. 2019) ............................................................ 33

*Thomas v. Hughes,*
  27 F.4th 363 (5th Cir. 2022) ............................................................ 20

*United States v. Oakland Cannabis Buyers' Co-op,*
  532 U.S. 483 (2001) ........................................................................ 38

*United States v. Wong Kim Bo,*
  472 F.2d 720 (5th Cir. 1972) ............................................................ 34

*Vantage Health Plan, Inc. v. Willis-Knighton Med. Ctr.,*
  913 F.3d 443 (5th Cir. 2019) ............................................................ 27

*Virginian R. Co. v. Railway Employees,*
  300 U.S. 515 (1937) ........................................................................ 38

*Will v. Hallock,*
  546 U.S. 345 (2006) ........................................................................ 25

## Statutes

7 U.S.C. § 2019(e)(3) (1976) ........................................................ 35

7 U.S.C. § 2020(d) ......................................................................... 5

7 U.S.C. § 2020(e)(8) ........................... 6, 12, 17, 18, 29, 30, 33, 34, 36, 38

7 U.S.C. § 2020(e)(8)(C) ......................................................... 18, 33

7 U.S.C. § 2020(i) (Supp. II 1978) ............................................. 35

7 U.S.C. §§ 2011–2036d ............................................................... 4

7 U.S.C. § 2011 ............................................................................ 23

28 U.S.C. § 959(b) ...................................................................... 33

28 U.S.C. § 1291 .............................................................. 3, 17, 25

28 U.S.C. § 1292(a)(1) .............................................. 3, 17, 21, 25

28 U.S.C. §§ 1331 .......................................................................... 3

Miss. Code Ann. § 43-1-19(1) ....................................................... 6

Jackon, Miss., Code of Ordinances § 122-273 ............................ 31

## Regulations and Federal Register Notices

2 C.F.R. § 200.203(a)(1) .............................................................. 30

7 C.F.R. § 272.1(c)(1)(i) (2023) .............................................. 6, 37

7 C.F.R. § 272.1(c)(1) (1979) ................................................ 35, 36

7 C.F.R. § 272.1(c)(1)(i) (1985) ................................................. 37

49 Fed. Reg. 48,677 .................................................................... 37

43 Fed. Reg. 47,846 .................................................................... 36

18-14 Miss. Code R. § 1.2 .............................................................. 6

18-14 Miss. Code R. § 1.11 ........................................................ 7

## GLOSSARY

ITPM            Interim Third-Party Manager

MDHS            Mississippi Department of Human Services

SNAP            Supplemental Nutrition Assistance Program

USDA            United States Department of Agriculture

# INTRODUCTION

In August 2022, high rainfall and extreme flooding overwhelmed the ailing Jackson, Mississippi, water-treatment plant, causing a catastrophic drop of pressure in the distribution system and preventing the plant from maintaining water pressure across the City. For a period of weeks, many residents had no running water, and most residents lost the ability to use water safely for any purpose. Prompted by that crisis, the United States sued the City to enforce the Safe Drinking Water Act. The district court consolidated the suit with a longstanding federal-and-state Clean Water Act enforcement action against the City's sewer system that resulted in a 2013 consent decree. The parties to the lawsuit agreed to a stipulated order under which the district court appointed an Interim Third-Party Manager (ITPM) to manage the City's municipal drinking water and sewer systems (JXN Water).

One of the ITPM's tasks was to stabilize the systems' financial health. While raising rates overall, the ITPM seeks to implement a tiered rate schedule for JXN Water customers, under which participants in the Supplemental Nutrition Assistance Program (SNAP) would pay a lower meter-availability charge than other users. The

United States agrees that this is a good idea and proposed several alternatives to lawfully implement that policy. But the way the ITPM proposes doing so, which the district court adopted, contravenes the Food and Nutrition Act of 2008.

The order on appeal directs the United States and the State of Mississippi to disclose the names and addresses of all SNAP recipients in the area served by JXN Water, without those recipients' consent. Because SNAP is a means-tested program, the nonconsensual disclosure of an individual's SNAP status reveals the individual's financial status. Such a disclosure violates the Food and Nutrition Act, which protects SNAP recipients' privacy and prohibits the disclosure of confidential SNAP-recipient data subject to limited exceptions not relevant here.

The district court held that one statutory exception, for disclosures to other "federal assistance programs," applies here. But that is plainly wrong. A municipal utility rate schedule—even when implemented by a receiver appointed by a federal court—is not a "federal assistance program." The district court's unjustified expansion of an exception to the general bar on disclosure of private SNAP-recipient data threatens

to undermine trust in SNAP, chill SNAP participation rates, and subject SNAP recipients to stigma and predatory marketing. This Court should reverse and vacate the disclosure order, which will allow the parties and the district court to turn back to developing and implementing a legally durable solution to this problem.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1345. The district court entered the order on appeal on April 16, 2024, and the United States filed its notice of appeal on June 14, 2024, so the appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(B)(i). As explained further below, at 21–25, this Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because the district court's interlocutory order grants an injunction. In the alternative, this Court has jurisdiction under 28 U.S.C. § 1291 and the collateral-order doctrine, because the district court's order conclusively determines an important issue separate from the merits and is effectively unreviewable on appeal from final judgment.

## STATEMENT OF THE ISSUE

Federal law prohibits the disclosure of data obtained from SNAP recipients, except for limited purposes, including disclosure to persons connected with the administration or enforcement of "Federal assistance programs." 7 U.S.C. § 2020(e)(8)(A)(i).

The issue presented is whether the district court erred as a matter of law, and thus abused its discretion, when it held that a municipal utility rate schedule implemented by a court-appointed receiver is a "federal assistance program."

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are included in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory and regulatory background

The Food and Nutrition Act of 2008 (formerly known as the Food Stamp Act) establishes SNAP (formerly known as the Food Stamp Program) as a federal benefit program that helps low-income households afford nutritious food. *See* 7 U.S.C. §§ 2011–2036d. Generally, households eligible for SNAP are those for which "incomes

and other financial resources . . . are determined to be a substantial

limiting factor in permitting them to obtain a more nutritious diet." *Id.*

§ 2014(a).

The statute establishes a voluntary program administered by the

States. *Id.* §§ 2013(a), 2020(d). To be eligible to disburse benefits, States

must meet federal requirements and be approved by the United States

Department of Agriculture (USDA). *Id.* § 2020(d). Individual States are

then responsible for administering SNAP, including accepting and

approving applications to participate and keeping records of recipients.

*Id.* § 2020(a). USDA monitors each State's compliance. *Id.* § 2020(d)–(e).

If States fall out of compliance with the requirements of the Food and

Nutrition Act, then, after notifying the State of the lapse and giving the

State an opportunity to come back into compliance, USDA "shall

proceed to withhold from the State" funds to implement SNAP "as the

Secretary [of Agriculture] determines to be appropriate. *Id.* § 2020(g).

Under the Food and Nutrition Act, any State desiring to

participate in SNAP must submit a plan of operation specifying the

manner in which the program will be conducted in the State. 7 U.S.C. §

2020(d). State plans must contain specified elements, including

5

"safeguards which prohibit the use or disclosure of information obtained from applicant households." 7 U.S.C. § 2020(e)(8). The Act makes limited exceptions to this general prohibition on disclosing SNAP-recipient information. Relevant here, state programs "shall permit" the disclosure of such information to "[1] persons directly connected with the administration or enforcement of [SNAP], [2] other Federal assistance programs, [3] federally-assisted State programs providing assistance on a means-tested basis to low-income individuals, or [4] general assistance programs which are subject to joint processing requirements." 7 U.S.C. § 2020(e)(8); *see also* 7 C.F.R. § 272.1(c)(1)(i) (tracing the statutory requirement).

In Mississippi, the Mississippi Department of Human Services (MDHS) administers SNAP and keeps records of SNAP recipients. 18-14 Miss. Code R. § 1.2. Consistent with the requirements in the Food and Nutrition Act, Mississippi adopted laws prohibiting disclosure of information received from SNAP applicant households except as permitted by federal law. Miss. Code Ann. § 43-1-19(1) ("The records of the disbursement of funds or payments to recipients of [SNAP] shall only be disclosed pursuant to federal regulations regarding disclosure of

information for . . . Food Stamp Act programs."). To implement the state statutory requirement, MDHS has issued additional regulations prohibiting agency employees from disclosing the names and addresses or lists of SNAP applicants and recipients; an adult household member or other authorized representative must provide written consent before specific information may be disclosed to anyone else. 18-14 Miss. Code R. § 1.11(B)(1), (C). Even when USDA audits state programs, it does not request complete records on SNAP recipients but merely conducts a random sampling of households within a state. ROA.2417–18.

## B.    Factual background

### 1.    The Jackson water crisis and the current lawsuits.

In August 2022, excessive rainfall and extreme flooding overwhelmed the ailing Jackson, Mississippi, drinking-water system and prevented the plant from producing enough water to maintain water pressure across the city. ROA.638–39. Because of the low water pressure, most residents lost the ability to use water safely for any purpose. ROA.638–39. The City restored water pressure and service on September 6, 2022. ROA.2890.

This case comprises two consolidated lawsuits, both filed by the United States against the City of Jackson. *See* ROA.849–54 (consolidating cases). The first, S.D. Miss. No. 3:12-cv-790, is a longstanding Clean Water Act enforcement action brought by the United States and the State of Mississippi, on behalf of the Mississippi Department of Environmental Quality, in which the parties entered a consent decree in 2013. ROA.472–577. The consent decree was designed to ensure that the City's sewer system achieved and maintained compliance with the Clean Water Act and did not experience sewer overflows. ROA.480. The second case, S.D. Miss. No. 3:22-cv-686, is a Safe Drinking Water Act enforcement action that the United States filed in November 2022, after the August 2022 water crisis.

In November 2022, the parties agreed in a stipulated order to the district court's appointment of Ted Henifin as a federal receiver and Interim Third-Party Manager (ITPM) to temporarily operate, maintain, manage, and control the City of Jackson's water system. ROA.3186. In September 2023, the parties agreed in a second stipulated order entered by the district court that the ITPM would temporarily assume operational and managerial control of Jackson's sewer system.

8

ROA.1995. Under that order, the ITPM's authority would terminate upon motion by the United States after consultation with the State or four years after the order. ROA.2085–87. Both stipulated orders directed the ITPM to develop a financial management plan and to work with the City in developing any appropriate changes to user rates and the rate structure. ROA.2064; ROA.2058. The stipulated orders gave the ITPM, under specified conditions, the "full power and authority" to adjust the rates, rate structures, and fees paid by water and sewer users. ROA.2064; ROA.3190.

In accordance with the stipulated orders, the ITPM independently developed new water and sewer rates that he deemed appropriate to stabilize and rehabilitate the City's water and sewer systems. The new rates incorporated a 75 percent discount of the monthly meter-availability charge for low-income residents receiving SNAP benefits. The United States supports the discounted rate. ROA.2262.

## 2. The ITPM's request for confidential SNAP-recipient data.

In February 2024, the ITPM filed a motion requesting that the district court direct MDHS to release the name, address, phone number, and email address of SNAP-benefit recipients in 32 ZIP codes in the

9

Jackson area. ROA.2193–94. According to the ITPM, the "only practical way to timely implement th[e] rate classification" he had developed was to cross-reference the SNAP-recipient list with the City's accountholder list. ROA.2194.

Although the United States supports discounting the rate for SNAP recipients, the United States opposed the ITPM's motion because it would violate the law that protects SNAP-recipients' privacy. ROA.2223–2224. Nonetheless, the United States made clear that it "acknowledge[d] the good intentions of the ITPM" in implementing the rate and that it "remain[ed] willing to work with MDHS and the ITPM" to lawfully implement the rate. ROA.2224–25. After the ITPM filed the motion, the United States discussed several alternative proposals with the ITPM that would implement the discounted rate without compromising the privacy of SNAP recipients. ROA.2225.

MDHS—which is not a separately named party to either the Clean Water Act or Safe Drinking Water Act case—sent a letter to the court explaining that, although the agency was not a party to the suit, it opposed the motion principally on the grounds that disclosure to the receiver is not permitted by law and risks requiring MDHS to violate

10

USDA regulations, potentially resulting in the loss of funds for MDHS's to administer SNAP. ROA.2277–2280. The court heard oral argument from the ITPM, the United States, and MDHS. Shortly thereafter, the ITPM moved to withdraw its motion and stated his intention to amend the motion in response to some concerns raised by the United States and MDHS. ROA.2241–2242.

In March 2024, the ITPM filed a new motion asking the district court to order the United States to release a list containing the name and address of SNAP recipients in the Jackson area and to provide the ITPM with updated lists every quarter until the ITPM's authority lapses. ROA.2245–46.

The United States opposed the ITPM's new motion on three grounds. First, as the United States had previously explained in opposition to the ITPM's prior motion, the United States does not possess the requested SNAP information. ROA.2266. Rather, MDHS—which is not a named party to the suit—administers the SNAP program in Mississippi. ROA.2266. Second, the United States explained that it does not have the authority to demand SNAP information from MDHS for the purpose of complying with the court's order, because this is not

one of the enumerated exceptions to the prohibition on disclosure. ROA.2267–68. Third, the United States explained that MDHS could not disclose SNAP data to the ITPM consistent with federal law because, contrary to the ITPM's argument, he does not administer a "federal assistance program." ROA.2269–70 (citing 7 U.S.C. § 2020(e)(8)(A)(i)). Additionally, the United States observed that the harms from a blanket disclosure of SNAP recipients without their consent, such as a chilling effect on SNAP participation, would outweigh the potential benefits of disclosure even if it were lawful. ROA.2270–73.

The United States outlined several more durable, legal ways for the ITPM to identify low-income accountholders who participate in the SNAP program that would protect SNAP recipients' privacy and comply with federal law. ROA.2273. These alternatives focused on obtaining SNAP recipients' consent to release their data, which would enable JXN Water to realistically plan based on long-term participation rates and would avoid suddenly forcing accountholders off the reduced SNAP rate when the managership ends and JXN Water has no way to confirm that the accountholder still qualifies for SNAP benefits. These alternatives would be lawful and narrowly tailored to ensure that only consenting

accountholders would have their private SNAP data disclosed to the
ITPM. For instance, JXN Water could directly obtain consent from
accountholders by including in each bill a means for accountholders to
provide their consent for MDHS to confirm their SNAP status.
ROA.2273. JXN Water could pay MDHS to mail to SNAP recipients a
form consenting to MDHS disclosing their SNAP status, name, and
address to JXN Water. ROA.2274. Or JXN Water could accept direct
proof from SNAP recipients, such as a SNAP recertification notice.
ROA.2274.

### 3.   The district court's decision.

On April 16, 2024, the district court entered a four-page order
finding without elaboration that "[f]or good cause shown," the ITPM's
adopted rates "are a 'federal assistance program.'" ROA.2379. Thus, the
district court ordered "that the relevant federal and/or State agencies
implementing the SNAP program" must turn over the names and
addresses of SNAP recipients residing in specific ZIP codes in the
Jackson area "no later than April 30, 2024," and provide updated lists
on the first business day of each calendar quarter thereafter, as the
ITPM requested. ROA.2379. The court did not direct its order at any

13

specific federal or state agency, nor did it acknowledge that the United States does not have the SNAP data or that MDHS is not a named party to either suit. Indeed, the court did not directly address any of the United States's substantive arguments. ROA.2376–79.

On April 25, 2024, the ITPM agreed to a two-week extension of the deadline to turn over the SNAP data, until May 14, 2024. ROA.2381. On April 30 (the original deadline in the order), the United States filed a letter with the court explaining that USDA is not in possession of any current data on SNAP households in Jackson. ROA.2413–15. The letter noted that MDHS administers SNAP in Mississippi and that USDA does not directly collect, maintain, or control information from SNAP households. ROA.2413. USDA reviewed the information within its possession and only had outdated address information for, at most, seventeen households within the relevant area that it obtained in its most recent quality-control review process for Mississippi's SNAP program. ROA.2413–14; *see also* ROA.2417–18 (explaining that USDA has limited information because the quality-control review process

involves a random sampling of households within the State).[1] Because
neither the USDA nor any other federal agency possesses records that
would be responsive to the court's order, the United States explained
that it was complying with the court order and that it had no responsive
records to send to the ITPM. ROA.2413–14.

On May 14, 2024, out of an abundance of caution, the United
States moved the district court to stay its order pending appellate
review in the event that the court found the United States's compliance
with the SNAP order unsatisfactory or if the court intended to impose
additional relief compelling the State's disclosure. ROA.2425. The ITPM
initially opposed the United States's request but ultimately told the
court that he did not oppose a stay pending appeal. ROA.2451. On May
28, 2024, the district court held a hearing on the motion to stay the
SNAP order. At the hearing, the court heard testimony from a USDA
employee that administers the SNAP program and took the motion
under advisement.

---

[1] Upon further review, USDA determined that it inadvertently reported
the number of households in the relevant ZIP codes for which it had
data other than names and addresses and that it had name-and-
address data for only eight households, not seventeen. ROA.2504.

15

On June 14, 2024, the United States and the State of Mississippi filed notices of appeal as to the SNAP order. ROA.2468; ROA.2470. On July 1, 2024—the date that an updated list of SNAP recipients was due under the district court's order—the United States filed another letter with the district court explaining that it had again searched for responsive records and determined that it was not in possession of any such records because it was only in possession of outdated address information for six households in the relevant area. ROA.2504–05.

As of August 19, 2024, the district court has not ruled on the United States's motion to stay the SNAP order pending appellate review. The United States has not filed a similar motion in this Court because, as noted above, we maintain that the United States thus far has complied with the district court's order without disclosing SNAP-recipient data.

## SUMMARY OF ARGUMENT

The district court committed clear legal error, and thus abused its discretion, when it held that the ITPM's proposed municipal water and sewer rate schedule was a "federal assistance program" under 7 U.S.C.

§ 2020(e)(8)(A)(i) and ordered the federal and state agencies implementing SNAP to disclose confidential SNAP-recipient data.

1.     As a threshold matter, this Court has appellate jurisdiction to review the disclosure order. In compelling the "relevant federal and/or State agencies implementing the SNAP program" to "provide the ITPM" a list of the names and addresses of Jackson-area SNAP recipients, the district court granted an injunction subject to immediate appeal under 28 U.S.C. § 1292(a)(1). Alternatively, the order is a collateral order appealable under 28 U.S.C. § 1291 because it (1) conclusively determines the disputed question; (2) resolves an important issue separate from the merits of the case; and (3) is effectively unreviewable on appeal from a final judgment.

2.     This Court should reverse and vacate the disclosure order. The text, structure, and statutory history of the Food and Nutrition Act confirm that the ITPM's proposed rate schedule is a municipal matter, not a "federal assistance program" under 7 U.S.C. § 2020(e)(8)(A)(i); thus, the rate schedule does not come within that exception to the general rule that it is unlawful for the United States or the State to disclose confidential SNAP-recipient data to third parties.

The text of the Food and Nutrition Act plainly refers to "federal," not local or municipal, assistance programs. Federal programs are those enacted by Congress and administered by the federal government. A rate schedule for a municipal utility is not a "federal assistance program." Nothing in the statutory text suggests that the term "federal assistance program" encompasses municipal utility rates, even when those utilities are temporarily operated by a receiver appointed by a federal court.

Indeed, the structure of the Food and Nutrition Act confirms that Congress knew how to distinguish between federal, state, and local programs when it drafted the statute. Under a different exception, the Act permits disclosure of SNAP data to "*local, State, or Federal* law enforcement officials" for the purposes of investigating an alleged violation of the Act. 7 U.S.C. § 2020(e)(8)(C). But the section of the statute at issue here, 7 U.S.C. § 2020(e)(8)(A)(i), refers to *federal* assistance programs—explicitly omitting municipal or local programs. Even if the ITPM's municipal rate schedule might qualify as a "local" assistance program, it is certainly not a "federal" one.

The statutory history of the Food and Nutrition Act confirms that the exception allowing the disclosure of SNAP data to "federal assistance programs" applies only to national programs that are authorized by laws enacted by Congress, not municipal programs. The statute initially permitted disclosure of recipient data only to persons directly connected with the Food Stamp Program, but, in 1977, Congress amended the statute to allow for limited disclosure to persons directly connected with certain other federal means-tested assistance programs created by federal statute and administered by the Executive Branch, such as Aid to Families with Dependent Children and Supplemental Security Income. In 1982, Congress broadened the statute to its current language, permitting the disclosure of SNAP-recipient data to those who administer "federal assistance programs." So the statutory history shows that the term "federal assistance program" is meant to encompass only means-tested programs authorized *by federal statute*. Nothing in the statutory history shows that the statute was meant to permit the disclosure of SNAP data to municipal programs.

Because the district court's disclosure order is based on a clearly erroneous interpretation of the Food and Nutrition Act's "federal assistance program" exception, this Court should reverse and vacate the order.

## STANDARD OF REVIEW

This Court reviews the trial court's decision to grant injunctive relief for abuse of discretion. *Thomas v. Hughes*, 27 F.4th 363, 367 (5th Cir. 2022). A trial court's misinterpretation of the law or erroneous application of the law to the facts is an abuse of discretion. *Hewlett-Packard Co. v. Quanta Storage, Inc.*, 961 F.3d 731, 743 (5th Cir. 2020); *see also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990) ("A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law."). This Court reviews legal questions, including the district court's interpretation of a statute, de novo. *Carder v. Continental Airlines, Inc.*, 636 F.3d 172, 174 (5th Cir. 2011).

## ARGUMENT

## I. This Court has jurisdiction to review the disclosure order.

This Court has appellate jurisdiction to review the district court's order because the order grants an injunction or, in the alternative, is a

collateral order subject to direct appeal. If this Court finds that it does

not have direct appellate jurisdiction, it should treat this appeal as a

petition for mandamus.

### A.   The district court's order grants an injunction appealable under 28 U.S.C. § 1292(a)(1).

This Court has jurisdiction to hear appeals from interlocutory

orders "granting, continuing, modifying, refusing or dissolving

injunctions, or refusing to dissolve or modify injunctions." 28 U.S.C.

§ 1292(a)(1). An order need not be styled as an injunction to be

appealable under § 1292(a)(1). *See Carson v. Am. Brands, Inc.*, 450 U.S.

79, 84–85 (1981). A district court "grants" an injunction when an action

it takes is "directed to a party, enforceable by contempt, and designed to

accord or protect some or all of the substantive relief sought in the

complaint in more than a temporary fashion." *In re Deepwater Horizon*,

793 F.3d 479, 491 (5th Cir. 2015) (quoting *Police Ass'n of New Orleans

Through Cannatella v. City of New Orleans*, 100 F.3d 1159, 1166 (5th

Cir. 1996)). If the order does not expressly grant an injunction, the

appealing party must show that "serious, perhaps irreparable,

consequence" will result from the order to obtain interlocutory appellate

21

review. *In re Deepwater Horizon*, 793 F.3d at 492 (quoting *Gardner v. Westinghouse Broad. Co.*, 437 U.S. 478, 480 (1978)).

The district court's order here granted an injunction when it ordered the federal and state agencies implementing the SNAP program to "provide the ITPM a list . . . containing the name and address of recipients of SNAP benefits" residing in the Jackson area and to provide an updated list "on the first business day of each calendar quarter" for an indefinite time. ROA.2379. That order is both directed to a party—the United States—and enforceable by contempt.

The order is also designed to further the ITPM's goals and is thus designed to accord some of the substantive relief sought in the complaint. In cases in which the district court enters an initial order that allows it to maintain "a continuing supervisory function," subsequent injunctions "that flow[] directly from that original order" are "appealable regardless of finality." *Moore v. Tangipahoa Parish Sch. Bd.*, 843 F.3d 198, 200–01 (5th Cir. 2016) (quoting *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 171 F.3d 1083, 1086 (7th Cir. 1999)). Here, the district court's order appointing the ITPM and maintaining a continuing supervisory function was the original order

designed to ensure accord substantive relief sought in the complaint, and the recent SNAP order "is a subsequent injunction that flows directly from that original order." *Id.*

Moreover, the order threatens serious, irreparable harm to the public interest and the SNAP program. The disclosure of recipients' SNAP status, which itself reveals private financial information, could have a chilling effect on program participation, irreparably harming the United States's statutory duty under the Food and Nutrition Act. For example, in administering the program, Congress directed USDA to "safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. § 2011. In fulfilling that purpose and seeking to improve SNAP participation rates, USDA fights the stigma that recipients face when enrolling in the program. If information on recipients is disclosed to third parties without those individuals' consent, it could deter others from enrolling in the program. That would negatively affect SNAP participation rates and irreparably harm USDA's administration of the program. ROA.2238–39.

Additionally, the order could cause irreparable harm to the public interest and the SNAP program because the ITPM's request for a list of all SNAP-recipients residing within the Jackson area is overinclusive. The court's order directs the agencies to provide a list of the name and address of all recipients of SNAP benefits residing in the 32 ZIP codes that JXN Water serves. ROA.2379. Although the disclosure would help facilitate a benefit that most SNAP recipients presumably would seek, that disclosure reveals their financial status and is nonconsensual. Also, the disclosure order is not limited to persons who are named accountholders for municipal water and sewer services. In other words, the SNAP recipient and the JXN Water accountholder are not always the same person, especially where the SNAP recipients are renters or in situations where extended families or multiple families share a billing address. If JXN Water knows that a SNAP recipient lives at an address it serves and sends the accountholder a notice that they qualify for a reduced rate, then that could result in the involuntary and unwanted disclosure of a resident's SNAP status (and, by necessary inference, the recipient's financial status) to, for example, a landlord, a roommate or an extended family member.

The problems from over-disclosure are exacerbated by the fact that some SNAP recipients may not be responsible for a water or sewer bill, such as residents of drug and alcohol treatment facilities, residents of domestic-violence shelters, and homeless individuals. These SNAP recipients would face the risks attendant to disclosure of private and sensitive financial information (such as stigmatization and data breaches) yet receive no benefit under the ITPM's rate schedule.

In sum, this Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1) because the challenged order grants an injunction. The order commands the federal and state agencies administering SNAP to turn over data on SNAP recipients and contemplates prospective relief on an ongoing, quarterly basis. And serious ongoing harm would result from the order.

## B. The disclosure order is a collateral order appealable under 28 U.S.C. § 1291.

Alternatively, the district court's order is appealable under 28 U.S.C. § 1291 as a collateral order. The collateral-order doctrine is a "practical construction" of § 1291 that provides for appellate jurisdiction over a small class of nonfinal orders. *In re Deepwater Horizon*, 793 F.3d at 483 (quoting *Will v. Hallock*, 546 U.S. 345, 349 (2006)). Orders are

appealable under the collateral-order doctrine when they "finally determine claims of right separable from, and collateral to, rights asserted in the action [and that are] too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495, 498 (1989) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)). An appellate court has jurisdiction under the collateral-order doctrine when an order: "(1) conclusively determine[s] the disputed question; (2) resolve[s] an important issue separate from the merits of the case; and (3) is effectively unreviewable on appeal from a final judgment." *In re Deepwater Horizon*, 793 F.3d at 484.

The district court's order satisfies all three criteria. It conclusively determines the disputed issue whether the ITPM operates a "federal assistance program," such that the United States can be required to turn over SNAP-recipient data. ROA.2379. The issue is separate from the merits of the cases, which are Clean Water Act and Safe Drinking Water Act enforcement actions. And orders like this one, that require the disclosure or unsealing of confidential information, are effectively

unreviewable on final judgment because irreparable harm occurs immediately upon the information's release. *See Vantage Health Plan, Inc. v. Willis-Knighton Med. Ctr.*, 913 F.3d 443, 448 (5th Cir. 2019) (holding that the collateral-order doctrine applies to interlocutory orders unsealing confidential information because those orders are "effectively unreviewable on appeal from a final judgment principally because a decision to unseal a document cannot be undone; once confidential information is released, there is no going back"); *see also Apple, Inc. v. Samsung Electronics Co., Ltd.*, 727 F.3d 1214, 1220 (Fed. Cir. 2013) (collecting cases).

## C. If this Court finds that it does not have appellate jurisdiction, it should treat and hear this case as a petition for a writ of mandamus.

Even if a party does not formally file a petition for a writ of mandamus, this Court may, in its discretion, treat the appeal as a petition for a writ of mandamus. *Leonard v. Martin*, 38 F.4th 481, 488 n.4 (5th Cir. 2022) (citing *In re Deepwater Horizon*, 793 F.3d at 491 n.12).

A party seeking mandamus must satisfy three conditions before the appellate court will issue the writ: (1) the petitioner seeking the

writ must have no other adequate means to attain the relief it desires; (2) the petitioner must satisfy the burden of showing that his right to the issuance of the writ is "clear and indisputable"; and (3) the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances. *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 380–81 (2004). To obtain a writ of mandamus, a petitioner must show that there has been a "usurpation of judicial power" or a "clear abuse of discretion that produces patently erroneous results." *In re JPMorgan Chase & Co.*, 916 F.3d 494, 500 (5th Cir. 2019) (cleaned up). A district court abuses its discretion when it makes a decision based on "legally erroneous interpretations of statutes or regulations." *Barrios-Cantarero v. Holder*, 772 F.3d 1019, 1021 (5th Cir. 2014).

If this Court determines that it lacks direct appellate jurisdiction, it should treat this appeal as a petition for a writ of mandamus because there would be no other remedy for the United States to obtain the relief that it seeks. And a writ of mandamus would be appropriate here. For the reasons explained below, the district court clearly abused its discretion when it held that the JXN Water's municipal water and

28

sewer rate programs were "federal assistance programs" and compelled

the United States and Mississippi to disclose confidential SNAP-

recipient data.

## II. The district court abused its discretion in ordering disclosure of confidential SNAP-recipient data because a municipal rate schedule is not a "federal assistance program."

The district court erred when it ordered the federal and state

agencies implementing SNAP to disclose confidential SNAP-recipient

data and held that the ITPM operated a "federal assistance program."

ROA.2379. The district court ordered the disclosure of confidential

SNAP-recipient data on the view that the ITPM's proposed rate

schedule was a "federal assistance program" that permitted disclosure

of the data under 7 U.S.C. § 2020(e)(8)(A)(i). In so holding, the district

court misconstrued the statute and thus abused its discretion. The text,

structure, and statutory history of the Food and Nutrition Act confirm

that the ITPM's proposed rate schedule is not a "federal assistance

program." This Court should reverse.

The text of the Food and Nutrition Act broadly prohibits the

disclosure of information obtained from SNAP households. 7 U.S.C.

§ 2020(e)(8). That statute requires a State's plan of operations for SNAP

to include "safeguards which prohibit the use or disclosure of information obtained from applicant households," subject to several limited exceptions. *Id.* Those exceptions include disclosure of SNAP data "to persons directly connected with the administration or enforcement of the [Food and Nutrition Act], regulations issued pursuant to [the Food and Nutrition Act], Federal assistance programs, or Federally-assisted State programs." *Id.* § 2020(e)(8)(A)(i).

The term "federal assistance program" is not defined in the statute, so this Court should interpret the term according to its "ordinary and natural meaning and the overall policies and objectives of the statute." *Cheapside Minerals, Ltd. v. Devon Energy Prod. Co., L.P.*, 94 F.4th 492, 499 (5th Cir. 2024) (quoting *NPR Invs., L.L.C. ex rel. Roach v. United States*, 740 F.3d 998, 1007 (5th Cir. 2014)). By the plain meaning of the statutory text, "federal assistance programs" refer to assistance programs that are administered by the federal government and operate under laws passed by Congress, in contrast with those administered by state, county, or municipal governments. For example, the General Services Administration maintains a "comprehensive" list of federal assistance programs. 2 C.F.R. § 200.203(a)(1). Some programs

30

on that list are Supplemental Security Income; the Special
Supplemental Nutrition Program for Women, Infants, and Children
(WIC); and Temporary Assistance for Needy Families. *See Assistance
Listings*, https://sam.gov/content/assistance-listings (last visited August,
19, 2024).

The ITPM's proposed municipal rate schedule, on the other hand,
is not a federal assistance program under the Act. The ITPM operates
the City of Jackson's *municipal* water and sewer systems. A proposed
rate schedule adopted by these municipal utilities is plainly not a
federal program. Indeed, the Jackson municipal Code of Ordinances,
not a federal law, gives JXN Water the authority to set utility rates. *See*
Jackon, Miss., Code of Ordinances § 122-273 ("The water service charge
system will be reviewed annually and revised periodically to reflect
actual treatment works operation and maintenance costs and debt
service requirements . . . ."). Nothing in the text of the Food and
Nutrition Act suggests the extraordinary conclusion that "federal
assistance programs" encompass municipal utilities. Rather, the plain
text of the statute applies only to assistance programs administered by
the federal government.

That a federal court has appointed a private party as a receiver to
operate the City of Jackson's municipal water and sewer systems does
not transform these systems into "federal" assistance programs. The
ITPM is only temporarily managing the City's water and sewer
systems, and the City will reassume control of its utilities after the
managership ends. Then, as now, the municipal water rates would
continue to be municipal rates (governed by state and local laws), not a
"federal assistance program."

Although the ITPM was appointed by a federal court, the ITPM is
not carrying out a federal duty, but rather the City of Jackson's duties.
Assumption of the City's duties under court order and with the federal
government's assent does not transform the duty into a "federal
assistance program," because a federal court does not create a
"program" when it directs a receiver to do something in a particular
matter. For example, if a district court appointed a receiver to manage a
defendant's assets and directed the receiver to sell a particular piece of
real property, the district court would not be establishing a "federal
program" with its order, much less a "federal assistance program." The
ITPM carries out discrete duties bound by state law; he does not

operate a "federal program." *See Sec. & Exch. Comm'n v. Stanford Int'l Bank, Ltd.*, 927 F.3d 830, 840 (5th Cir. 2019) ("Receivers appointed by a federal court are directed to 'manage and operate' the receivership estate 'according to the requirements of the valid laws of the State in which the property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.'" (quoting 28 U.S.C. § 959(b)).

The structure of the Food and Nutrition Act confirms that the ITPM's proposed rate schedule is not a "federal assistance program." Congress knew how to distinguish between federal and nonfederal programs. The Food and Nutrition Act—and the regulations implementing the Act—expressly distinguish between local, state, and federal authority. Indeed, the very same provision of the statute also includes an exception for "federally-assisted *State* programs." 7 U.S.C. § 2020(e)(8)(A)(i) (emphasis added). The Act also permits disclosure of SNAP data to "*local, State, or Federal* law enforcement officials" for the purpose of investigating an alleged violation of the Act. 7 U.S.C. § 2020(e)(8)(C) (emphasis added); *see also id.* § 2020(e)(8)(E) (similarly explicitly distinguishing between local, state, and federal officials).

33

But the text of the statute at issue here, 7 U.S.C.

§ 2020(e)(8)(A)(i), refers to *federal* assistance programs—explicitly

omitting municipal or local programs. The fact that the statute, in the

same subsection, distinguishes "federal" programs from "federally

assisted State" programs shows that Congress knew the difference

between federal and state programs when it drafted the statute.[2]

"[W]here Congress includes particular language in one section of a

statute but omits it in another section of the same Act, it is generally

presumed that Congress acts intentionally and purposely in the

disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16,

23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722

(5th Cir. 1972)). Congress knew how to distinguish between federal,

state, and local programs when it drafted the Act. The ITPM's

municipal water and sewer rate might qualify as a "local" program, but

it does not qualify as a "federal" one.

_____

[2] The ITPM has not argued below that the exception for "federally
assisted State programs" applies, so he has forfeited the argument and
cannot raise it on appeal. *Rollins v. Home Depot USA*, 8 F.4th 393, 397
(5th Cir. 2021) ("A party forfeits an argument by failing to raise it in the
first instance in the district court . . . .").

Third, the statutory history of the Food and Nutrition Act confirms that the exception allowing the disclosure of SNAP data to federal assistance programs applies to national programs that are authorized by laws enacted by Congress, not municipal programs such as the ITPM's proposed rate schedule.

Before 1977, the predecessor statute to the Food and Nutrition Act permitted the disclosure of food-stamp recipients only to "persons directly connected with the administration and enforcement of the provisions of the [Food Stamp Act of 1964] or the regulations issued pursuant to that Act." 7 U.S.C. § 2019(e)(3) (1976). USDA's implementing regulations accordingly only allowed the disclosure of information to "persons directly connected with the administration or enforcement of the provisions of the Food Stamp Act or regulations." 7 C.F.R. § 272.1(c)(1) (1979). But in 1977, Congress amended the Food Stamp Act to allow for data sharing between the Food Stamp program and certain other programs created by federal statute and administered by the Executive Branch, such as Aid to Families with Dependent Children and Supplemental Security Income. 7 U.S.C. § 2020(i) (Supp. II 1978).

In accordance with the statutory changes, USDA amended its regulations in 1978, permitting disclosure to persons directly connected "with other Federal or federally aided means-tested assistance programs such as Title IV-A [Aid to Families with Dependent Children (AFDC)], XIX (Medicaid), or XVI [Supplemental Security Income (SSI)]" of the Social Security Act. 7 C.F.R. § 272.1(c)(1) (1979); *see Food Stamp Program*, 43 Fed. Reg. 47,846, 47,884 (Oct. 17, 1978). USDA concluded that disclosure of such "food stamp case file information" should be permitted to "federally aided, means tested programs, such as AFDC, Medicaid, [and] SSI" in order "to achieve greater administrative efficiency." 43 Fed. Reg. at 47,847.

In 1982, Congress enacted the Food Stamp Act Amendments of 1982. Pub. L. No. 97-253, Tit. I, Subtit. E, 96 Stat. 772. In those amendments, Congress added text to 7 U.S.C. § 2020(e)(8) to further authorize disclosure of food-stamp data to those directly connected with the administration or enforcement of "Federal assistance programs, or federally-assisted State programs." *Id.* § 169, 96 Stat. 779.

In 1984, in response to that statutory change, USDA updated its relevant regulation by "insert[ing] broader statutory language" and

adding clarifying text in the regulation to explain that the relevant federal programs are "means-tested programs" of which "AFDC, Medicaid, and SSI" programs were "[e]xamples." *Food Stamp Program; Disclosure of Information and Noncompliance with Other Programs*, 49 Fed. Reg. 48,677, 48,678–79 (Dec. 14, 1984). As amended in 1984, the relevant regulatory text took its current form, authorizing the disclosure of information obtained from SNAP applicant or recipient households to persons directly connected with the administration or enforcement of the statutory and regulatory provisions governing SNAP (then, the Food Stamp Program), "other Federal assistance programs, [or] federally assisted State programs which provide assistance, on a means-tested basis, to low income individuals." 7 C.F.R. § 272.1(c)(1)(i) (1985); *see* 7 C.F.R. § 272.1(c)(1)(i) (2023).

In sum, Congress gradually broadened the allowable disclosure of SNAP data, but only incrementally and for purposes of administering means-tested programs enacted in federal law and administered by the Executive Branch. The City's municipal utility rate structure is no such program, nor is made so by the court's appointment of a receiver. The history of the Food and Nutrition Act and its implementing regulations

thus reinforces the conclusion that the district court's interpretation of the statute was incorrect.

* * *

The text, structure, and statutory history of the Food and Nutrition Act, make abundantly clear that the ITPM's proposed rate schedule is not a "federal assistance program" under 7 U.S.C. § 2020(e)(8)(A)(i). The district court's desire to assist the ITPM in administering the City's water supply was well intentioned. But equity does not give the court license to ignore the Act's limitations on disclosure. When acting as courts of equity, district courts have discretion "unless a statute clearly provides otherwise." *United States v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483, 496 (2001); *see also Virginian R. Co. v. Railway Employees*, 300 U.S. 515, 551 (1937) (stating that a court sitting in equity cannot "ignore the judgment of Congress, deliberately expressed in legislation"). Thus, a court cannot exercise its equitable power to "override Congress' policy choice, articulated in a statute, as to what behavior should be prohibited" or "reject the balance that congress has struck in a statute." *Oakland Cannabis*, 532 U.S. at 496. Indeed, the district court appeared to agree

on this point, given that it identified a specific statutory exception to the general disclosure ban in the Food and Nutrition Act.

But the ITPM's proposed rate schedule was at best a municipal program, not a "federal assistance program." The district court misconstrued the law when it held otherwise and abused its discretion by ordering the United States or the State to disclose confidential SNAP data.

## CONCLUSION

For these reasons, the district court's disclosure order should be reversed and vacated.

Respectfully submitted,

s/ *Ezekiel A. Peterson*
TODD KIM
*Assistant Attorney General*

Of Counsel:

MINA KIM
*Deputy Assistant General Counsel*

SARAH MERRILL
VIRGINIA HENNING
*Attorneys*
U.S. Dept. of Agriculture

August 19, 2024
90-5-1-1-09841

JOHN SMELTZER
KARL FINGERHOOD
ANGELA MO
EZEKIEL A. PETERSON
*Attorneys*
Environment & Natural Resources Div.
U.S. Department of Justice
P.O. Box 7415
Washington, D.C. 20044
(202) 598-6399
ezekiel.a.peterson@usdoj.gov

## CERTIFICATE OF COMPLIANCE

I hereby certify:

1.     This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Rule 32(f), this document contains 7,277 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

s/ *Ezekiel A. Peterson*
EZEKIEL A. PETERSON

Counsel for the United States

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)    all required privacy redactions have been made per 5th Cir. R. 25.2.13;

(2)    the electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1; and

(3)    the document has been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Defender Antivirus Version 1.417.92.0 (updated August 13, 2024), and according to the program is free of viruses.

s/ *Ezekiel A. Peterson*
EZEKIEL A. PETERSON

Counsel for the United States

41

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2024, I electronically filed the foregoing using the court's CM/ECF system, which will notify all registered counsel.

_s/ Ezekiel A. Peterson_____
EZEKIEL A. PETERSON

Counsel for the United States

# ADDENDUM

7 U.S.C. § 2011 ...................................................................... 2a

7 U.S.C. § 2020 ...................................................................... 3a

## 7 U.S.C. § 2011
*Congressional Declaration of Policy*

It is declared to be the policy of Congress, in order to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households. Congress finds that the limited food purchasing power of low-income households contributes to hunger and malnutrition among members of such households. Congress further finds that increased utilization of food in establishing and maintaining adequate national levels of nutrition will promote the distribution in a beneficial manner of the Nation's agricultural abundance and will strengthen the Nation's agricultural economy, as well as result in more orderly marketing and distribution of foods. To alleviate such hunger and malnutrition, a supplemental nutrition assistance program is herein authorized which will permit low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation.

That program includes as a purpose to assist low-income adults in obtaining employment and increasing their earnings. Such employment and earnings, along with program benefits, will permit low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation.

# 7 U.S.C. § 2020
*Administration*

. . .

## (e) Requisites of State plan of operation

The State plan of operation required under subsection (d) of this section shall provide, among such other provisions as may be required by regulation—

. . .

(8) safeguards which prohibit the use or disclosure of information obtained from applicant households, except that—

(A) the safeguards shall permit—

(i) the disclosure of such information to persons directly connected with the administration or enforcement of the provisions of this chapter, regulations issued pursuant to this chapter, Federal assistance programs, or federally-assisted State programs; and

(ii) the subsequent use of the information by persons described in clause (i) only for such administration or enforcement;

. . .

(C) notwithstanding any other provision of law, all information obtained under this chapter from an applicant household shall be made available, upon request, to local, State or Federal law enforcement officials for the purpose of investigating an alleged violation of this chapter or any regulation issued under this chapter;

. . .

3a

# EXHIBIT C

No. 24-60309

_____

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

STATE OF MISSISSIPPI; UNITED STATES OF AMERICA,
*Plaintiffs–Appellants*,

v.

JXN WATER,
*Defendant–Appellee.*

_____

UNITED STATES OF AMERICA,
*Plaintiff,*

v.

CITY OF JACKSON, MISSISSIPPI,
*Defendant.*

_____

On appeal from the United States District Court for the
Southern District of Mississippi
Nos. 3:12-cv-790, 3:22-cv-686 (Hon. Henry T. Wingate)

_____

**REPLY BRIEF FOR THE UNITED STATES**

_____

Of Counsel:

MINA KIM
*Assistant General Counsel*

SARAH MERRILL
VIRGINIA HENNING
*Attorneys*
U.S. Dept. of Agriculture

TODD KIM
*Assistant Attorney General*

JOHN SMELTZER
KARL FINGERHOOD
ANGELA MO
EZEKIEL A. PETERSON
*Attorneys*
Environment & Natural Resources Div.
U.S. Department of Justice
P.O. Box 7415
Washington, D.C. 20044
(202) 598-6399
ezekiel.a.peterson@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...........................................................................ii

INTRODUCTION....................................................................................... 1

ARGUMENT .............................................................................................2

I.    This Court has appellate jurisdiction. ..............................................2

    A.    The district court's order grants an injunction
        appealable under 28 U.S.C. § 1292(a)(1). ..............................3

    B.    The disclosure order is a collateral order
        appealable under 28 U.S.C. § 1291.........................................8

    C.    If this Court finds that it does not have appellate
        jurisdiction, it should treat and hear this case as
        a petition for a writ of mandamus. .......................................12

II.    The ITPM's municipal rate schedule is not a "federal
    assistance program." ......................................................................13

CONCLUSION ........................................................................................18

CERTIFICATE OF COMPLIANCE........................................................20

CERTIFICATE OF DIGITAL SUBMISSION .........................................21

CERTIFICATE OF SERVICE..................................................................22

# TABLE OF AUTHORITIES

## Cases

*In re Deepwater Horizon*,
  793 F.3d 479 (5th Cir. 2015)................................................................3

*In re JPMorgan Chase & Co.*,
  916 F.3d 494 (5th Cir. 2019).............................................................12

*Mohawk Indus., Inc. v. Carpenter*,
  558 U.S. 100 (2009).....................................................................10, 11

*Moore v. Tangipahoa Parish Sch. Bd.*,
  843 F.3d 198 (5th Cir. 2016)................................................................4

*Police Ass'n of New Orleans Through Cannatella v. City of New Orleans*,
  100 F.3d 1159 (5th Cir. 1996)..............................................................3

*Pursuing America's Greatness v. Fed. Election Comm'n*,
  831 F.3d 500 (D.C. Cir. 2016) ............................................................5

*Schlagenhauf v. Holder*,
  379 U.S. 104 (1964)...........................................................................12

*Sec. & Exch. Comm'n v. Stanford Int'l Bank, Ltd.*,
  927 F.3d 830 (5th Cir. 2019)..............................................................15

*Vantage Health Plan, Inc. v. Willin-KnightonMed. Ctr.*,
  913 F.3d 443 (5th Cir. 2019)................................................................8

*X Corp. v. Media Matters for America*,
  ___ F.4th ___, 2024 WL 4527047 ......................................................10

## Statutes

7 U.S.C. § 2020(e)(8)(C)........................................................................16

7 U.S.C. § 2020(i) (Supp. II 1978) .........................................................18

28 U.S.C. § 1291 .........................................................................3, 8, 11

28 U.S.C. § 1292(a)(1).................................................................. 1, 3, 7

42 U.S.C. § 5121(b)(6)...................................................................... 17

# INTRODUCTION

This Court should reverse and vacate the district court's order that the United States and Mississippi disclose confidential data about participants in the Supplemental Nutrition Assistance Program (SNAP). As a threshold matter, this Court has appellate jurisdiction. The district court granted an injunction by ordering the federal and state agencies implementing SNAP to provide a list, updated quarterly, of SNAP recipients in Jackson, Mississippi. Under the order, this obligation continues indefinitely. The Interim Third-Party Manager (ITPM) does not contest that the order meets most of the criteria for an appealable injunction under 28 U.S.C. § 1292(a)(1) but argues that the order will not cause the United States any serious harm. That is wrong. The order will seriously harm both the public and the United States in implementing the SNAP program because the order compels the nonconsensual release of private financial data, which will chill SNAP participation and risk harm to SNAP recipients if there are data breaches. *See* U.S. Br. at 23–25. Alternatively, this Court has appellate jurisdiction under the collateral-order doctrine and if not, it may treat this appeal as a mandamus petition. *Id*. at 25–29.

On the merits, the district court erred when it held that the ITPM's proposed rate schedule is a "federal assistance program." Nothing in the text of the statute compels the extraordinary conclusion that a municipal utility-rate schedule is a "federal assistance program." The ITPM presents several arguments that he administers a federal program, but none have merit. The ITPM is not executing a federal duty but, rather, the City of Jackson's duties. A federal court does not create a "federal program" when it appoints a receiver to carry out a discrete duty bounded by state or municipal law. *See* U.S. Br. at 32–33. And the mere fact that the ITPM receives federal funds does not transform his rate schedule into a "federal assistance program." This Court should reverse and vacate the district court's order.

## ARGUMENT

### I.   This Court has appellate jurisdiction.

In his brief, the ITPM argues that this Court lacks appellate jurisdiction by minimizing the substantial harms to the SNAP program that would follow from a nonconsensual release of private data. Ans. Br. 42–47. The ITPM also characterizes the district court's order as a discovery order. Ans. Br. 47–48. Both arguments are wrong. This Court

has appellate jurisdiction because the district court's order would cause
serious harm and is either an injunction appealable under 28 U.S.C.
§ 1292(a)(1) or a collateral order appealable under 28 U.S.C. § 1291.

## A.   The district court's order grants an injunction appealable under 28 U.S.C. § 1292(a)(1).

The district court granted an injunction by ordering the federal
and state agencies implementing the SNAP program to "provide the
ITPM a list . . . containing the name and address of recipients of SNAP
benefits" residing in the Jackson area and to provide an updated list "on
the first business day of each calendar quarter" for an indefinite time.
ROA.2379. The ITPM does not contest that the district court's order is
"directed to a party, enforceable by contempt, and designed to accord or
protect some or all of the substantive relief sought in the complaint in
more than a temporary fashion." *In re Deepwater Horizon*, 793 F.3d 479,
491 (5th Cir. 2015) (quoting *Police Ass'n of New Orleans Through
Cannatella v. City of New Orleans*, 100 F.3d 1159, 1166 (5th Cir. 1996));
*see* Ans. Br. 48 (agreeing that the order is directed to parties and relates
to the substantive relief sought in the complaint). Nor does the ITPM
contest that, when a district court enters an initial order that allows it
to maintain "a continuing supervisory function," subsequent injunctions

3

"that flow[] directly from that original order" are "appealable regardless of finality." *Moore v. Tangipahoa Parish Sch. Bd.*, 843 F.3d 198, 200–01 (5th Cir. 2016) (citation omitted).

Instead, the ITPM argues that the order is not appealable under § 1292(a)(1) because the United States has not shown serious or irreparable consequences from the order. Ans. Br. 42. In making this argument, the ITPM minimizes the concerns of the United States in administering SNAP and brushes aside the serious risks attendant to the nonconsensual disclosure of private data.

First, it is not true that the United States will not suffer serious harm "because it has already complied with the Order." Ans. Br. 42. The order requires the United States to provide any name-and-address data for SNAP recipients in Jackson every quarter for an indefinite time. ROA.2379. So, while it is true that the United States did not have any responsive data in July and October 2024, it is conceivable that, on a future reporting date, the United States will receive responsive, up-to-date data during a review of Mississippi's SNAP program and will be compelled to release that confidential data to the ITPM. *See* ROA.2417–18 (explaining that the quality-control process involves a random

sampling of households within the State). Because the order contemplates the quarterly disclosure of confidential data for an indefinite period, the United States will suffer the serious harm associated with the disclosure of confidential data so long as the order remains in effect.

Second, the United States would suffer serious harm if MDHS were forced to comply with the order. The ITPM characterizes these harms as harms to the State, Ans. Br. 43, or to the public, Ans. Br. 46, but he fails to recognize that, since SNAP is a federal program, any harm to the public or the program would in turn harm the federal government. *Cf. Pursuing America's Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (holding that a federal agency's harm and the public interests "are one and the same" because "the government's interest *is* the public interest" (emphasis in original)).

Here, there would be serious harms to the SNAP program as a whole—and thus to the United States—were the State to disclose confidential SNAP-recipient data without the consent of the recipients. The ITPM dismisses the risk of a chilling effect on SNAP participation as "entirely speculative." Ans. Br. 44. But a declaration from the

Director for the Program Administration and Nutrition Division of SNAP explains that SNAP "struggles with fighting stigma concerning receiving government assistance" and that only "78 percent of eligible people nationwide received SNAP benefits during October 2019 to February 2020." ROA.2238. The release of one's SNAP status reveals private financial information. The declaration explains that, "[s]hould information on applicant or recipient households be disclosed to others, particularly without the household's consent, it could have a chilling effect on SNAP participation rates." ROA.2238–39. The United States does not need to conduct a study to understand that an unauthorized disclosure of confidential SNAP-recipient data would chill SNAP-participation rates. By enacting the data safeguards in the Food and Nutrition Act, Congress has already demonstrated its awareness that unauthorized data disclosures would harm SNAP. And, as the director for the administration of SNAP explains, the risk is much more than entirely speculative. ROA.2238–39.

The ITPM also attempts to brush aside any potential harms from the over-disclosure of SNAP recipients. The ITPM argues that the United States would suffer no harm from the over-disclosure of SNAP

recipients because the information would be received pursuant to a
confidentiality agreement and because the ITPM would receive the
information "for the sole and limited purpose of cross-referencing SNAP
recipients against JXN Water's customer rolls." Ans. Br. 45.

It is true that the ITPM is "not permitted to disclose beneficiary
status where the beneficiary is not the ratepayer." Ans. Br. 45. But this
does not eliminate the harms from the overinclusive, nonconsensual
disclosure of confidential data. The district court's order directs the
agencies to provide a list of the name and address of all recipients of
SNAP benefits residing in the 32 ZIP codes that JXN Water serves.
ROA.2379. All these SNAP recipients—many of whom are likely not
JXN Water customers—would face risks attendant to the disclosure of
private and sensitive financial information, such as stigmatization and
potential data breaches.

In sum, the disclosure order grants an injunction and is
appealable under 28 U.S.C. § 1292(a)(1). The ITPM does not contest
that the order is directed to a party, enforceable by contempt, and
designed to accord or protect some or all the substantive relief sought in
the complaint. And the order would cause serious, irreparable harm to

the United States because it would harm both the SNAP program and the public.

## B.   The disclosure order is a collateral order appealable under 28 U.S.C. § 1291.

The district court's order is also appealable under 28 U.S.C. § 1291 as a collateral order. The ITPM makes three arguments as to why the order is not appealable under § 1291, but none are correct.

First, the ITPM argues that the order "can be challenged after final judgment without affecting the United States." Ans. Br. 43. This argument ignores the facts that: (1) the order contemplates the quarterly disclosure of confidential data for an indefinite period; and (2) any additional disclosure by MDHS would also harm the public and the United States. This Court has explained that "secrecy is a one-way street" and that "once information is published, it cannot be made secret again." *Vantage Health Plan, Inc. v. Willin-Knighton Med. Ctr.*, 913 F.3d 443, 449 (5th Cir. 2019) (cleaned up). The United States cannot simply wait to challenge the disclosure order after final judgment because the order contemplates the release of confidential information every quarter, without any end date. Although the ITPM seeks to downplay the risk of injury to the United States and the SNAP

program, a later appeal from a final judgment cannot undo the ongoing risk of injury from complying with the disclosure order. Furthermore, the final judgment in this case might not be adverse to the United States such that the United States would have any right to appeal at that point.

Second, the ITPM argues that the order is "effectively a discovery order" and is thus not appealable under the collateral-order doctrine. Ans. Br. 47. But the order is not a discovery order. The parties never entered any formal discovery process—indeed, the district court has imposed several stays which explicitly *barred* discovery (ROA.2322)—and the disclosure order certainly was not made to compel discovery of evidence relevant to trial. *Cf.* Fed. R. Civ. Po. 26(c)(2) (authorizing orders to compel discovery). Rather, the disclosure order grants the ITPM substantive relief by directing the United States and the State to provide an updated SNAP-recipient list to the ITPM on an indefinite basis. *See* Ans. Br. 48 (agreeing that the disclosure order "relates to substantive relief sought in the complaint").

Even if this Court treats the disclosure order as a discovery order, it is still subject to appeal under the collateral-order doctrine. It is true

9

that discovery orders generally are not subject to appeal, even when compliance with a challenged order might cause the improper disclosure of confidential information. *See Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 108 (2009). But this Court has permitted some appeals of discovery orders under the collateral order doctrine in analogous circumstances. *See X Corp. v. Media Matters for America*, ___ F.4th ___, 2024 WL 4527047, at *2-3 (allowing appeal where order would infringe upon First Amendment rights).

The reluctance of courts to apply the collateral order doctrine to discovery orders, even when injury cannot be fully redressed on appeal from a final judgment, is motivated by two considerations: first, the concern that the exception should not be allowed to "swallow the general rule that a party is entitled to a single appeal." *X Corp.*, 2024 WL at *2 (citing *Mohawk*, 558 U.S. at 106). Second, in the case of an erroneous discovery order, some relief is generally available on appeal from a final judgment. For example, the appellate court can reverse a judgment founded on evidence that was not properly subject to discovery. *See Mohawk*, 558 at 109 ("Appellate courts can remedy the improper disclosure of privileged material in the same way they remedy

10

a host of other erroneous evidentiary rulings: by vacating an adverse

judgment and remanding for a new trial in which the protected

material and its fruits are excluded from evidence.").

Neither consideration arises here. Because the disclosure order

does not compel discovery of matters potentially relevant to trial, but

instead addresses a truly collateral concern, allowing interlocutory

appeal under the collateral order doctrine does not threaten to

"swallow" the general finality rule. *See Mohawk*, 558 U.S. at 106. And,

as explained above, the United States cannot effectively challenge the

order on final judgment. In sum, the order is plainly not a discovery

order. But even if the Court treats it as such, the order is still

appealable under these circumstances.

Third, the ITPM argues that the United States has not shown

serious or irreparable consequences from the order. Ans. Br. 42. As

discussed above, the order would cause serious, irreparable harm to the

United States based on the chilling effect on SNAP participation and

the nonconsensual over-disclosure of private financial information of

SNAP recipients. The order is thus a collateral order appealable under

28 U.S.C. § 1291.

11

## C. If this Court finds that it does not have appellate jurisdiction, it should treat and hear this case as a petition for a writ of mandamus.

Mandamus would be appropriate because the district court committed clear and indisputable error when it held that the ITPM's municipal water and sewer rate schedules were "federal assistance programs." The ITPM characterizes this case as presenting an "entirely unique situation" that will not recur or have importance beyond the immediate case. Ans. Br. 50. But, for the reasons explained above, the nonconsensual disclosure of SNAP recipients' private information has the potential to cause serious, long-term harm to both those recipients and the SNAP program. And even if this issue is unlikely to recur, the Supreme Court "recognizes use of the writ [of mandamus] as a one-time device to settle new and important problems that might have otherwise evaded expeditious review." *In re JPMorgan Chase & Co.*, 916 F.3d 494, 499 n.4 (5th Cir. 2019) (cleaned up) (quoting *Schlagenhauf v. Holder*, 379 U.S. 104, 111 (1964)). Mandamus would be appropriate here because of the serious harm attendant to the nonconsensual disclosure of private data and because, as explained below and in the opening brief, U.S. Br. 29–39, the district court clearly and indisputably erred.

## II.    The ITPM's municipal rate schedule is not a "federal assistance program."

The district court erred when it held that the ITPM's rate schedule for municipal utilities was a "federal assistance program" under 7 U.S.C. § 2020(e)(8)(A)(i). The ITPM argues that his rate schedule is a federal assistance program by cobbling together various ways that he interacts with the federal government, Ans. Br. 52, but it does not follow that his rate schedule is a federal assistance program. Rather, it is clear that a municipal utility rate schedule—even when administered by a federally appointed receiver—is not a "federal assistance program" because the underlying authority for setting the rates is found in local law. Adopting the ITPM's reasoning would allow disclosure to any entity purporting to assist SNAP recipients so long as it could point to a nexus with the federal government, federal funds, or federal courts—even if a program is neither administered by the federal government nor authorized by Congress.

As an initial matter, this Court need not define the precise contours of what is or is not a "federal assistance program." *See* Ans. Br. 55–56. Under any reasonable reading of the statute, the term "federal assistance program" applies to assistance programs administered by the

13

federal government, not municipal utilities. The very fact that the federal government cannot control, regulate, or otherwise administer the ITPM's rate schedule illustrates how far a municipal rate schedule is from a federal assistance program. For this reason, the ITPM has not shown and cannot show that his rate schedule is a federal assistance program. The ITPM claims to operate a federal assistance program for three reasons: (1) because he was appointed as a federal receiver by a federal court; (2) because he serves as a federal trustee and as an officer of the federal court rather than the city; and (3) because his efforts are aided by nearly $800 million in federal funding. Ans. Br. 52. None of these explanations stands up.

First, the fact that a receiver was appointed by a federal court does not confer authority on the receiver to establish a "federal assistance program." As we explained in our opening brief, U.S. Br. 32–33, the ITPM is not carrying out a federal duty, but rather the City of Jackson's duties. A federal court does not create a federal "program" when it directs a receiver to carry out a municipal function in a discrete matter.

Thus, the ITPM is also wrong when he argues that he administers a "federal assistance program" because he serves as an officer of a federal court rather than an officer of the city. The ITPM may have been appointed by a federal court, but he is not exercising "federal authority." Ans. Br. 53. Rather, he is exercising municipal duties. As a general matter, federal receivers often carry out discrete duties bound by state law. *Sec. & Exch. Comm'n v. Stanford Int'l Bank, Ltd.*, 927 F.3d 830, 840 (5th Cir. 2019). Here, the Jackon municipal Code of Ordinances—not federal law—gives JXN Water the authority to set utility rates. Jackson, Miss., Code of Ordinances § 122-273.

Finally, the ITPM does not administer a "federal assistance program" merely because he receives federal aid. State and local governments, and even private organizations, routinely receive federal aid. Under the ITPM's reasoning, any entity that receives a federal grant would operate a "federal assistance program" when engaging in an activity targets SNAP recipients. And under the same rationale, a private entity receiving a federal grant unrelated to SNAP could compel the disclosure of SNAP information to advertise discounts and products

15

to SNAP recipients. The text of the Food and Nutrition Act provides no support for such a capacious, unchecked reading of the statute.

Indeed, the fact that the Food and Nutrition Act distinguishes between "federal" authority on one hand and "local" and "State" authority on the other, shows that Congress knew how to draw the distinction. *See* Ans. Br. 57 (quoting 7 U.S.C. § 2020(e)(8)(C)). The ITPM argues that the Act provides "narrowly-tailored exceptions" that limit disclosure "for particular purposes and programs" and that the language here—limiting disclosure to "federal assistance programs"— means that the ITPM's rate schedule falls within the definition. Ans. Br. 57. But the term "federal assistance programs" is not "unqualified." Ans. Br. 57. It is qualified in that it limits disclosure to "federal" programs as opposed to "local" or "State" ones. *See* 7 U.S.C. § 2020(e)(8)(C). The ITPM implemented his rate schedule under local authority; it may qualify as a "local" program, but it is not a "federal" one.

The ITPM also argues that the text of the Robert T. Stafford Disaster Relief and Emergency Assistance Act supports his argument that the municipal rate schedule is a "federal assistance program." Ans.

Br. 59. In the Act, Congress declared that it intended "to provide an orderly and continuing means of assistance by the Federal Government to State and local governments in carrying out their responsibilities to alleviate the suffering and damage which result from such disasters by . . . providing Federal assistance programs for both public and private losses sustained in disasters . . . ." 42 U.S.C. § 5121(b)(6). Read in context, this congressional declaration is unexceptional. Congress merely stated its intent to aid disaster-stricken areas by providing federal assistance programs. The provision does not explain what constitutes a federal assistance program for purposes of the Food and Nutrition Act. Even if federal programs that dispense federal disaster relief funds were considered "federal assistance programs," the ITPM is not dispensing federal disaster relief funds through his municipal rate schedule. The ITPM also does not explain how that means that JXN Water's municipal rate schedule is also a federal assistance program.

Lastly, the ITPM is wrong in arguing that the statutory history of the Food and Nutrition Act shows Congress's intent to "remov[e] all limitations on disclosure tied to named programs or types of programs." Ans. Br. 58. Certainly, Congress has gradually broadened the scope of

17

the allowable disclosure of SNAP data. But there has always been a limitation on such disclosure: disclosure under this exception has only ever been permitted to "federal" assistance programs. *See* U.S. Br. 35–37. That term should be read as a modest expansion from the previous version of the statute, which permitted disclosure only to a limited number of specific federal assistance programs. 7 U.S.C. § 2020(i) (Supp. II 1978). Nothing in the statutory history suggests that the term "federal assistance programs" was ever meant to apply to programs outside of those enacted by Congress and administered by the executive branch. And, more fundamentally, nothing suggests that the term could reasonably be read to encompass a municipal utility rate schedule, even when implemented by a federally appointed receiver. The district court misconstrued the law and abused its discretion when it held otherwise.

## CONCLUSION

For these reasons, the district court's disclosure order should be reversed and vacated.

Respectfully submitted,

s/ *Ezekiel A. Peterson*

TODD KIM

Of Counsel:                                    *Assistant Attorney General*

MINA KIM                                       JOHN SMELTZER
*Deputy Assistant General*                     KARL FINGERHOOD
*Counsel*                                      ANGELA MO
                                               EZEKIEL A. PETERSON
SARAH MERRILL                                  *Attorneys*
VIRGINIA HENNING                               Environment & Natural Resources Div.
*Attorneys*                                    U.S. Department of Justice
U.S. Dept. of Agriculture                      P.O. Box 7415
                                               Washington, D.C. 20044
                                               (202) 598-6399
November 7, 2024                               ezekiel.a.peterson@usdoj.gov
90-5-1-1-09841

19

# CERTIFICATE OF COMPLIANCE

I hereby certify:

1.    This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because, excluding the parts of the document exempted by Rule 32(f), this document contains 3,577 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

s/ *Ezekiel A. Peterson*
EZEKIEL A. PETERSON

Counsel for the United States

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)    all required privacy redactions have been made per 5th Cir.
R. 25.2.13;

(2)    the electronic submission is an exact copy of the paper
document, 5th Cir. R. 25.2.1; and

(3)    the document has been scanned for viruses with the most
recent version of a commercial virus scanning program, Microsoft
Defender Antivirus Version 1.421.107.0 (updated November 5, 2024),
and according to the program is free of viruses.

s/ *Ezekiel A. Peterson*
EZEKIEL A. PETERSON

Counsel for the United States

# CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2024, I electronically filed the foregoing using the court's CM/ECF system, which will notify all registered counsel.

s/ *Ezekiel A. Peterson*
EZEKIEL A. PETERSON

Counsel for the United States

# EXHIBIT D



Ricardo Tomás for ProPublica

**Trump Administration**

# The IRS Is Building a Vast System to Share Millions of Taxpayers' Data With ICE

ProPublica has obtained the blueprint for the Trump administration's unprecedented plan to turn over IRS records to Homeland Security in order to speed up the agency's mass deportation efforts.

by <u>William Turton</u>, <u>Christopher Bing</u> and <u>Avi Asher-Schapiro</u>

July 15, 2025, 11:45 a.m. EDT

*ProPublica is a nonprofit newsroom that investigates abuses of power. Sign up to receive <u>our biggest stories</u> as soon as they're published.*

The Internal Revenue Service is building a computer program that would give deportation officers unprecedented access to confidential tax data.

ProPublica has obtained a blueprint of the system, which would create an "on demand" process allowing Immigration and Customs Enforcement to obtain the home addresses of people it's seeking to deport.

Last month, in a previously undisclosed dispute, the acting general counsel at the IRS, Andrew De Mello, refused to turn over the addresses of 7.3 million taxpayers sought by ICE. In an email obtained by ProPublica, De Mello said he had identified multiple legal "deficiencies" in the agency's request.

**Journalism That Holds Power to Account**

Sign up for ProPublica's Big Story newsletter and get our latest stories delivered straight to your inbox.

you@example.com

Get the Newsletter

✕

president's agenda. Soon after, the Department of Homeland Security, ICE's parent agency, and the IRS negotiated a "memorandum of understanding" that included specific legal guardrails to safeguard taxpayers' private information.

In his email, De Mello said ICE's request for millions of records did not meet those requirements, which include having a written assurance that each taxpayer whose address is being sought was under active criminal investigation.

"There's just no way ICE has 7 million real criminal investigations, that's a fantasy," said a former senior IRS official who had been advising the agency on this issue. The demands from the DHS were "unprecedented," the official added, saying the agency was pressing the IRS to do what amounted to "a big data dump."

In the past, when law enforcement sought IRS data to support its investigations, agencies would give the IRS the full legal name of the target, an address on file and an explanation of why the information was relevant to a criminal inquiry. Such requests rarely involved more than a dozen people at a time, former IRS officials said.

Danny Werfel, IRS commissioner during the Biden administration, said the privacy laws allowing federal investigators to obtain taxpayer data have never "been read to open the door to the sharing of thousands, tens of thousands, or hundreds of thousands of tax records for a broad-based enforcement initiative."

A spokesperson for the White House said the planned use of IRS data was legal and a means of fulfilling Trump's campaign pledge to carry out mass deportations of "illegal criminal aliens."

Taxpayer data is among the most confidential in the federal government and is protected by strict privacy laws, which have historically limited its transfer to law enforcement and other government agencies. Unauthorized disclosure of taxpayer return information is a felony that can carry a penalty of up to five years in prison.

The system that the IRS is now creating would give ICE automated access to home addresses en masse, limiting the ability of IRS officials to consider the legality of transfers. IRS insiders who reviewed a copy of the blueprint said it could result in immigration agents raiding wrong or outdated addresses.

"If this program is implemented in its current form, it's extremely likely that incorrect addresses will be given to DHS and individuals will be wrongly targeted," said an IRS engineer who examined the blueprints and who, like other officials, spoke on condition of anonymity for fear of retribution.

The dispute that ended in De Mello's ouster was the culmination of months of pressure on the IRS to turn over massive amounts of data in ways that would redefine the relationship between the agency and law enforcement and reduce taxpayers' privacy, records and interviews show.

In one meeting in late March between senior IRS and DHS officials, a top ICE official made a suggestion: Why doesn't Homeland Security simply provide the name and state of its targets and have the IRS return the addresses of everyone who matches that criteria?

The IRS lawyers were stunned. They feared they could face criminal liability if they handed over the addresses of individuals who were not under a criminal investigation. The conversation and news of deeper collaboration with ICE so disturbed career staff that it led to a series of departures in late March and early April across the IRS' legal, IT and privacy offices.

# Journalism That Holds Power to Account

Sign up for ProPublica's Big Story newsletter and get our latest stories delivered straight to your inbox.

system before the end of July, two people familiar with the matter said.

The DHS effort to obtain IRS data comes as top immigration enforcement leaders face escalating White House pressure to deport some 3,000 people per day, underlying to reports.

One federal agent tasked with assisting ICE on deportations said recent operations have been hamstrung by outdated addresses. Better information could dramatically speed up arrests. "Some of the leads that they were giving us were old," said the agent, who spoke on condition of anonymity because he was not authorized to speak with the press. "They're like from two administrations ago."

In early March, immigrants rights groups sued the IRS hoping to block the plan, arguing that the memorandum of understanding between DHS and the IRS is illegal. But a judge in early May ruled against them, saying the broader agreement complied with Section 6103, the existing law regulating IRS data sharing. That opened the door for engineers to begin building the system.

The judge did not address the technical blueprint, which didn't exist at the time of the ruling. But the case is pending, which means the new system could still come under legal review.

Until now, little was known about the push and pull between the two agencies or the exact technical mechanics behind the arrangement.

The plan has been shrouded in secrecy even within the IRS, with details of its development withheld from regular communications. Several IRS engineers and lawyers have avoided working on the project out of concerns about personal legal risk.

Asked about the new system, a spokesperson for IRS parent agency the Treasury Department said the memorandum of understanding, often called an MOU, "has been litigated and determined to be a lawful application of Section 6103, which provides for information sharing by the IRS in precise circumstances associated with law enforcement requests."

At a time when Trump is making threats to deport not only undocumented immigrants but also U.S. citizens, the scope of information-sharing with the IRS could continue to grow, according to documents reviewed by ProPublica and sources familiar with the matter: DHS has been looking for ways to expand the agreement that could allow Homeland Security officials to seek IRS data on Americans being investigated for various crimes.

Last month, an ICE attorney proposed updating the MOU to authorize new data requests on people "associated with criminal activities which may include United States citizens or lawful permanent residents," according to a document seen by ProPublica. The status of this proposal is unclear. De Mello, at the time, rejected it and called for senior Treasury Department leadership to personally sign off on such a significant change.

The White House described DHS' work with the IRS as a good-faith effort to identify and deport those who are living in the country illegally.

"ProPublica continues to degrade their already terrible reputation by suggesting we should turn a blind eye to criminal aliens present in the United States for the sake of trying to collect tax payments from them," White House spokesperson Abigail Jackson said in a statement after receiving questions about the blueprint from ProPublica.

She pointed to the April MOU as giving the government the authority to create the new system and added,

## Journalism That Holds Power to Account

Sign up for ProPublica's Big Story newsletter and get our latest stories delivered straight to your inbox.

# How the System Works

The new system would represent a sea change, allowing law enforcement to request enormous swaths of confidential data in bulk through an automated, computerized process.

The system, according to the blueprint and interviews with IRS engineers, would work like this:

First, DHS would send the IRS a spreadsheet containing the names and previous addresses of the people it's targeting. The request would include the date of a final removal order, a relevant criminal statute ICE is using to investigate the individual, and the tax period for which information is sought. If DHS fails to include any of this information, the system would reject the request.

The system then attempts to match the information provided by the DHS to a specific taxpayer identification number, which is the primary method by which the IRS identifies an individual in its databases.

If the system makes a match, it accesses the individual's associated tax file and pulls the address listed during the most recent tax period. Then the system would produce a new spreadsheet enriched with taxpayer data that contains DHS' targets' last known addresses. The spreadsheet would include a record of names rejected for lack of required information and names for which it could not make a match.

Tax and privacy experts say they worry about how such a powerful yet crude platform could make dangerous mistakes. Because the search starts with a name instead of a taxpayer identification number, it risks returning the address of an innocent person with the same name as or a similar address to that of one of ICE's targets. The proposed system assumes the data provided by DHS is accurate and that each targeted individual is the subject of a valid criminal investigation. In effect, the IRS has no way to independently check the bases of these requests, experts told ProPublica.

In addition, the blueprint does not limit the amount of data that can be transferred or how often DHS can request it. The system could easily be expanded to acquire all the information the IRS holds on taxpayers, said technical experts and IRS engineers who reviewed the documents. By shifting a single parameter, the program could return more information than just a target's address, said an engineer familiar with the plan, including employer and familial relationships.

Engineers based at IRS offices in Lanham, Maryland, and Dallas are developing the blueprint.

# "Gone Back on Its Word"

For decades, the American government has encouraged everyone who makes an income in the U.S. to pay taxes — regardless of immigration status — with an implicit promise that their information would be protected. Now that same data may be used to locate and deport noncitizens.

"For years, the IRS has told immigrants that it only cares that they pay their taxes," said Nandan Joshi, an attorney with the Public Citizen Litigation Group, which is seeking to block the data-sharing agreement in federal court. "By agreeing to share taxpayer data with ICE on a mass basis, the IRS has gone back on its word."

The push to share IRS data with DHS emerged while Elon Musk's DOGE reshaped the engineering staff of the IRS. Sam Corcos, a Silicon Valley startup founder with no government experience, pushed out more

## Journalism That Holds Power to Account

Sign up for ProPublica's Big Story newsletter and get our latest stories delivered straight to your inbox.

Sen. Ron Wyden, the ranking Democrat on the Senate Committee on Finance, which oversees the IRS, told ProPublica the system being built was ripe for abuse. It "would allow an outside agency unprecedented access to IRS records for reasons that have nothing to do with tax administration, opening the door to endless fishing expeditions," he said.

The Treasury Inspector General for Tax Administration, the department's internal watchdog, is already probing efforts by Trump and DOGE to obtain private taxpayer data and other sensitive information, ProPublica reported in April.

The Trump administration continues to add government agencies to its deportation drive.

DOGE and DHS are also working to build a national citizenship database, NPR reported last month. The database links information from the Social Security Administration and the DHS, ostensibly for the purpose of allowing state and local election officials to verify U.S. citizenship.

And in May, a senior Treasury Department official directed 250 IRS criminal investigative agents to help deportation operations, a significant shift for two agencies that historically have had separate missions.

McKenzie Funk contributed reporting, and Kirsten Berg and Alex Mierjeski contributed research.

---

**William Turton**

I am an investigative reporter focusing on the Department of Government Efficiency.


MORE STORIES    NEED TO GET IN TOUCH?

---

**Christopher Bing**    X   @   🦋   in

I cover the rapid intersection between technology and national security.


MORE STORIES    NEED TO GET IN TOUCH?

If you have a tip that warrants public scrutiny, heard an intriguing rumor or simply have advice about what I should be looking out for, I'd love to hear from you. I have significant experience unraveling complex and sensitive stories.

---

**Avi Asher-Schapiro**    X   in

I cover the Trump administration and Big Tech in Washington, D.C.

MORE STORIES    NEED TO GET IN TOUCH?

If you have tips about Big Tech and the Trump administration, please get in touch.

---

## What We're Watching

During Donald Trump's second presidency, ProPublica will focus on the areas most in need of scrutiny. Here are some of the issues our reporters will be watching — and how to get in touch with them securely.

## Journalism That Holds Power to Account

Sign up for ProPublica's Big Story newsletter and get our latest stories delivered straight to your inbox.

8/15/25, 4:33 PM
Case 3:25-cv-06310-MMC   Document 59-2   Filed 08/18/25   Page 104 of 171
The IRS Is Building a Vast System to Share Tax Records with ICE — ProPublica



**Learn more about our reporting team.** We will continue to share our areas of interest as the news develops.

---



**Sharon Lerner**

I cover health and the environment and the agencies that govern them, including the Environmental Protection Agency.

Contact Me

# Journalism That Holds Power to Account

Sign up for ProPublica's Big Story newsletter and get our latest stories delivered straight to your inbox.

**Melissa Sanchez**

I report on immigration and labor, and I am based in Chicago.

Contact Me



**Jesse Coburn**

I cover housing and transportation, including the companies working in those fields and the regulators overseeing them.

Contact Me





## Journalism That Holds Power to Account

Sign up for ProPublica's Big Story newsletter and get our latest stories delivered straight to your inbox.



## Journalism That Holds Power to Account

Sign up for ProPublica's Big Story newsletter and get our latest stories delivered straight to your inbox.

# EXHIBIT E

8/15/25, 4:36 PM
Case 3:25-cv-06310-MMC   Document 59-2   Filed 08/18/25   Page 108 of 171
DOGE has special access to sensitive financial data on millions of farmers : NPR



HOURLY NEWS
Play Live Radio
LISTEN LIVE
MY PLAYLIST



DONATE

**EXCLUSIVE**  **POLITICS**

# DOGE keeps gaining access to sensitive data. Now, it can cut off billions to farmers

UPDATED JULY 11, 2025 · 9:37 AM ET

 Jenna McLaughlin

**3-Minute Listen**          PLAYLIST    TRANSCRIPT



The Department of Government Efficiency, or DOGE, recently gained high-level access to a database that controls government payments and loans to farmers and ranchers across the U.S.
*Christian Blaza for NPR*

A staffer from the Department of Government Efficiency, or DOGE, recently got high-level access to view and change the contents of a payments system that controls tens of billions of dollars in government payments and loans to farmers and ranchers across the United States, according to internal access logs reviewed by NPR.

"When we talk about farm loan application records, there is no more personal information anywhere than in that database," Scott Marlow, a former senior official in the U.S. Department of Agriculture, told NPR. "The farmer's entire financial life and the life of their kids and their family, every time they've missed a payment, every time they've had a hard time, every time they've gotten in financial trouble … it's there."

Sponsor Message



**LAW**

**Supreme Court grants DOGE access to confidential Social Security records**

With DOGE's initial de facto leader, Elon Musk, engaged in an on-again, off-again feud with the president and no longer a constant presence in the White House, some of DOGE's work has faded from view. But DOGE very much continues in Musk's absence. In some cases, including at the USDA, the team's access appears to have only deepened in recent months. Indeed, sources across government agencies who spoke to NPR say the impacts of DOGE's plans and cuts have only just begun to play out.

## DOGE at USDA

A source working for the USDA provided evidence of DOGE's high-level access to the payments system called the National Payment Service. The access is a highly privileged level of permissions that the USDA employee says no other individual at the agency has and goes against normal access protocols. With that access, DOGE can view and modify data entries inside the system, giving them a view into sensitive personal information and the power to outright cancel loans.

It's unclear whether staffers previously employed by DOGE are now full-time employees at USDA. Another USDA employee who requested anonymity fearing retribution said that the group is now internally referred to as the "Efficiency Team," or the "E team."

The move is in line with an early command by Secretary of Agriculture Brooke Rollins to give DOGE "full access and transparency," though it may run counter to the agency's long-standing policies around data protection and privacy. DOGE's near unfettered access to sensitive data at other agencies like the Treasury Department and the Social Security Administration continues to be challenged in court due to privacy, security and legal concerns.



Secretary of Agriculture Brooke Rollins testifies before the Senate Appropriations Committee on May 6.
*Kevin Dietsch/Getty Images*

The news of DOGE's access and scope of potential use of farmers' personal and economic data comes at a time when the United States' agricultural producers face multiple financial challenges, including concerns over President Trump's tariffs, rising production costs and climate-related disasters.

The National Payment Service system is housed at the Farm Service Agency (FSA) — a part of the USDA primarily tasked with keeping American farmers and ranchers afloat with programs like disaster relief, conservation grants and loans.

Many across the political spectrum, including USDA insiders, acknowledge that the Farm Service Agency systems are complex and archaic and that some of its systems are in need of reform. But they say making changes would require a massive bureaucratic and political effort led by experts with intimate knowledge of USDA's programs and technology. Making changes quickly and haphazardly could lead to disruption of services to agriculture producers, which could be crippling, especially to small, family-owned farms.



**TECHNOLOGY**

**A whistleblower's disclosure details how DOGE may have taken sensitive labor data**

Those disruptions, along with potential violations of privacy, might provoke outrage from constituents in rural areas — many of whom make up an important part of Trump's political base.

NPR spoke to nine sources, including current USDA employees, former FSA officials, farm advocacy representatives and staffers on Capitol Hill who expressed concerns about DOGE's access to sensitive data on farmers and ranchers.

Given the complexities of USDA's programs, the myriad challenges facing farmers and the lack of oversight over DOGE's activities, it may be hard to unravel what the direct impacts of DOGE's activities are for years to come.

"Putting aside the serious privacy concerns, we've also seen what happens when DOGE gets its hands on federal assistance programs," said Sen. Ron Wyden, a Democrat from Oregon who frequently works on agricultural issues. "Funding gets cut off altogether with no warning or it comes in months too late. Letting DOGE staff — who have zero expertise in [agriculture] — call the shots on who gets a financial lifeline is an outright attack on rural America," he concluded in a statement provided to NPR.

## Sensitive data at the Farm Service Agency

in one of FSA's many other programs. FSA has 51 separate state offices and over 2,000 county offices.



**POLITICS**

**States sue Trump administration for sharing health data with DHS**

There's a fair amount of publicly available information about the farms and ranches that receive government subsidies, published on the FSA's website and tracked by state by advocacy organizations like the Environmental Working Group. Local FSA administrators gather a lot of data about efficiency, profits and productivity in their regions.

It's unclear why DOGE might need access to additional information.

But the data housed inside the National Payment Service system is almost certainly more detailed and sensitive than what is available publicly, particularly when it comes to private personal and financial data required to apply for an FSA loan.

"Basically, what's in the [National Payment Service system] is everything," said Marlow, who served as the deputy FSA administrator for farm programs under President Joe Biden. "I cannot understate the emphasis and the seriousness with which USDA had historically taken the handling of private information."

Farmers are already wary of sharing information with the government, according to the farmers and advocates interviewed by NPR. "Farmers tend to be more skeptical about sharing information and data," shared one farm advocacy expert who declined to speak on the record to protect the farmers their organization represents as well as ongoing efforts to secure funds from USDA. If farmers can't trust that their most sensitive information isn't being shared with outside parties, there's even less incentive to fully cooperate with government research like the five-year agricultural census conducted by USDA, the expert said.

In addition to sensitive personal and financial information tied to loans, the dataset may also include information that could be used to target people based on their race or immigration status. That could include demographic details about farmers and ranchers who applied for financial assistance after experiencing discrimination, a well-documented, decades-long problem that has led to a number of high profile lawsuits against USDA. There may also be some information about farms and ranches who employ seasonal workers under temporary immigration status.



A person walks with an umbrella as rain falls on the Department of Agriculture building in Washington, D.C., on April 11.

*Kayla Bartkowski/Getty Images*

Meanwhile, the payments system could expose business secrets or sensitive information about producers' outside contracts.

"Imagine if we had access to Domino's or PepsiCo's business plan and loan information," Vanessa García Polanco, the government relations director of the National Young Farmers' Coalition, told NPR. "That's a lot of information." García Polanco added that her organization is the most concerned about the Trump administration potentially abusing demographic information in a way that could harm small farms owned and operated by farmers of color.

It's unclear what DOGE is doing with the data it now has access to and how its employees are protecting it from theft.

NPR spoke to a whistleblower in April who shared evidence that someone may have removed sensitive data about federal labor investigations while DOGE was supposed to be on site at the National Labor Relations Board, just hours before someone with an IP address in Russia tried to log on to the internal government systems. If outside parties got access to sensitive data about U.S. agriculture, they could take advantage of that data to better understand U.S. food security and areas of vulnerability, or further consolidate agricultural businesses and land ownership.



**POLITICS**

**Democratic lawmakers press USDA for answers on sensitive data collection**

"USDA has a lot of data that people should be very concerned about protecting for a lot of different reasons," said one current USDA employee who requested anonymity due to ongoing fear of retaliation. "Farmers' financial and production data should be protected at all costs, for privacy reasons and because of competition. If you got access to disaster payments, you would be able to layer a lot of data and arrive at a lot of valuable conclusions about productivity and U.S. farmland, futures markets, and commodity prices. You can hedge a lot of bets and make a lot of money if you know what's happening with U.S. agriculture."

If DOGE were to combine that sensitive data with other sources of government information that it has sought access to, such as Internal Revenue Service and Social Security records, it could create an incredibly detailed dossier of farmers' and ranchers' lives, along with their networks and the people they employ, sell to and contract with.

"If [the Biden] administration had said, we're going to share all your information with somebody that has access to everything across the federal government, it would probably have resulted in people with pitchforks and torches outside my office," said Zach Ducheneaux, former administrator of the FSA and a rancher from South Dakota.

A USDA spokesperson confirmed that Wick and colleagues on the "Efficiency Team" are now full-time employees who are working to fulfill Trump's executive order on government efficiency. The spokesperson also confirmed the team "reviews many loans, guarantees and payments" for "fraud and national security

concerns" though did not go into detail on specific examples of evidence of malfeasance. The spokesperson insisted those reviews were "prompt and without undue delay to the program recipient."

"The abuse of USDA systems and data centers is a serious issue, and the USDA Efficiency Team has been immensely supportive due to their unmatched skillset in protecting our data and ensuring those that use their positions to access systems to defraud American taxpayers, will be held accountable," the spokesperson told NPR.

When asked for comment, the White House referred all questions to the USDA.

## Changing the data



If farmers don't think they'll receive loans or payments they were counting on, it could disrupt entire growing seasons.

*Christian Blaza for NPR*

For the agricultural community, what's perhaps even more concerning than DOGE's unfettered access to sensitive data is the capacity to change it or even deny and cancel payments.

The White House already appears to be heavily scrutinizing loans and payments to agricultural producers, further delaying meticulously planned agricultural work and provoking outrage from some Democratic lawmakers.

On April 29, a memo went out to USDA staffers notifying them that DOGE employees would be reviewing all farm loans and loan guarantees above $500,000, as well as any agricultural loans to "formal entities" ranging from corporations to small groups of individuals. USDA's loan officers already go through multiple years of training and the funds provided to farmers and ranchers across the country are authorized by Congress. NPR was provided a copy of that memo by another USDA official who requested anonymity because they said USDA staffers have been threatened with severe consequences for speaking to the media.

According to the USDA staffer who shared evidence of DOGE's access to the system, Wick's activities are not monitored or logged in a way that would allow others to detect unusual activity.

"If someone is able to go into the system and change the file itself, it's going to be very difficult to identify the impacts .... farmers are going to know they're not getting paid," explained Scott Marlow, but they might not know why or what went

wrong "unless the farmer was very aggressive about holding on to a hard copy of their file," he said.

Marlow and others have been urging farmers and ranchers they're working with to keep a close eye on their records, and keep hard copies of their files, to identify any problems or changes and be able to challenge them.

There are some changes that might already be underway.

For one, according to the USDA staffer who shared evidence of DOGE's growing access to the agency, there was a recent internal request made to identify and correct information about all loans disbursed to recipients whose birthdate is listed as "1900" within FSA's payment system. DOGE staffers did similar searches on Social Security databases to try and deny people benefits, asserting they had found evidence of fraud or proof that someone was "deceased" and still receiving payments, though very little evidence has surfaced for this kind of fraud.

Farmers have to fill out complex paperwork that makes its way through a series of agencies — starting at the local level and transiting through the IRS before a payment or loan is ultimately issued. That increases the chances of typos or paperwork errors, like incorrect birth data, which in turn could now lead to the loans being rejected.

In late May, over 200 loan recipients had their date of birth data voided, the USDA source explained, meaning that their loan accounts with FSA will likely be cancelled.

"Either they are trying to fix bad data…or they are stopping loans for people who did not have proper birth records or had some kind of error," the source continued.

Other changes made to loan terms or subsidiary payments might not take immediate effect for farmers and ranchers, as some payments are made seasonally.



**POLITICS**

**Elon Musk may be gone but DOGE isn't done remaking the federal government**

But some producers are already struggling thanks to other Trump administration moves and delays. And because of the complexities of how some FSA programs are run, they might not even know they were supposed to get government assistance.

If farmers don't think they'll receive loans or payments they were counting on, it could disrupt entire growing seasons.

If a farmer is delayed planting their crops by "even a day," said Ducheneaux, the former FSA administrator, "that [could've] been the one good day to get the crops in," he said. "And now you get a week and a half of rain. You're 10 growing days behind. We're behind the curve that actually impacts outcomes in the future. It's why these timely decisions are so critical."

Farmers are still reeling from the effects of disasters from years past.

"I met last week with a farmer who came into town who said, if we don't get assistance from the 2023 and 2024 disasters, I'm gone and all the guys in my area are gone. We're done," said Marlow. "They shared that they were having to make some very difficult decisions. So it was a very real and very immediate situation."

Further disruption to FSA payments and loans will only make things worse for farmers and ranchers during a challenging time, says Ducheneaux, the former FSA administrator.

"I'm a child of the farm financial crisis during the 1980s as a result of poorly carried out federal policy. My family nearly lost the ranch," he recalled. "We've all heard Secretary Rollins often say we are going to be 'farmer first,' ... but the

8/15/25, 4:36 PM
DOGE has special access to sensitive financial data on millions of farmers : NPR
Case 3:25-cv-06310-MMC    Document 59-2    Filed 08/18/25    Page 122 of 171

actions have to align with what you're saying," he said. "Otherwise, it creates further uncertainty."

*NPR's Michele Kelemen and Ximena Bustillo contributed reporting.*

*Are you a farmer or rancher impacted by recent changes at USDA? Do you have information or evidence to share about DOGE's access to data inside the federal government? Reach out to the author, Jenna McLaughlin, through encrypted communications on Signal at jennamclaughlin.54.*

doge    usda    farmers

## More Stories From NPR

# EXHIBIT F

The Wayback Machine - https://web.archive.org/web/20... Skip to main content w.fns.usda.gov/snap/recipie…

 An official website of the United States government   Here's how you know

**USDA**
**Food and Nutrition Service**
U.S. DEPARTMENT OF AGRICULTURE

MENU

# SNAP Eligibility for Non-Citizens

HOME    SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM (SNAP)    SNAP ELIGIBILITY

## Important

Applying for or receiving SNAP benefits does not make you a "public charge." **You can apply for or receive SNAP without immigration consequences.**

On Sept. 9, 2022, the Department of Homeland Security published the final rule "Public Charge Ground of Inadmissibility," which confirms that applying for or receiving SNAP will not make you a public charge and will not be considered in a public charge determination. This joint letter from FNS and the United States Citizenship and Immigration Services (USCIS) explains public charge and SNAP.



Non-citizens and their family members may be eligible to receive SNAP benefits. To get SNAP benefits, apply in the state where you currently live. You must meet certain requirements, including income and resource limits.

Most SNAP eligibility rules apply to all households, but there are a few special rules for non-citizens. If you are a U.S. citizen, you should refer to the general SNAP eligibility rules.

## Non-Citizen Eligibility

Only U.S. citizens and certain lawfully present non-citizens may receive SNAP benefits. SNAP is not and has never been available to undocumented non-citizens. Non-citizens like tourists and students are generally not eligible. Non-citizens who are eligible based on their immigration status must meet SNAP eligibility requirements, such as income and resource limits, and may also need to meet a waiting period. If you have specific questions, please contact your local SNAP office. Your local office can help you find out if you are eligible for SNAP.

| Eligible Non-citizen Groups | Eligibility Status |
|---|---|
| <ul><li>Refugees</li><li>Individuals granted asylum</li><li>Victims of severe trafficking</li><li>Deportation withheld</li><li>Amerasians</li><li>Cuban and Haitian entrants</li><li>Iraqi and Afghan special immigrants (SIV)</li><li>Certain American Indians born abroad</li><li>Hmong or Highland Laotian tribal members</li><li>Compacts of Free Association (COFA) citizens of the Federated States of Micronesia, the Republic of the Marshall Islands, and the Republic of Palau</li></ul> | Eligible immediately, with no waiting period, as long as they meet all other SNAP financial and non-financial eligibility requirements. |
| <ul><li>Lawful permanent residents (LPR) or Green Card holders</li><li>Those granted parole for a period of at least one year</li><li>Conditional entrants</li><li>Battered non-citizens</li></ul> | Eligible after a 5-year waiting period, as long as they meet all other SNAP financial and non-financial eligibility requirements.<br><br>Individuals in one of these groups may still be eligible for SNAP without a waiting period if they:<br><ul><li>Are a child under 18 years old</li><li>Are blind or disabled and receiving benefits for assistance for your condition</li><li>Were lawfully residing in the U.S. and 65 or older on Aug. 22, 1996</li><li>Have a U.S. Military connection</li><li>Are an Afghan granted parole</li><li>Are a Ukrainian granted parole</li></ul> |

| Eligible **Non-citizen Groups** | Eligibility Status |
|---|---|
| • Children under age 18 in any of the above groups in this table | Eligible immediately, with no waiting period, as long as they meet all other SNAP financial and non-financial eligibility requirements. |

# Frequently Asked Questions

| |
|---|
| Am I eligible for SNAP if I am not a citizen? |
| What is a waiting period? |
| What does a military connection mean? |
| Am I eligible if I am an Afghan national who was granted parole or re-parole? |
| Am I eligible if I am a Ukrainian national who was granted parole? |
| Does applying for SNAP impact my immigration status? |
| What if people in my household have different immigration statuses? If I am not eligible because of my immigration status, can I still apply for my children? |
| Do I have to provide proof of my immigration status? |
| Do I have to provide my Social Security number (SSN)? |
| What if I do not speak English? |
| Will my past immigration status affect my SNAP eligibility? |
| Will receiving SNAP make me a public charge? |
| Who is NOT eligible for SNAP based on immigration status? |

# Find Assistance

- To get more detailed information about SNAP or to apply for benefits, contact your local SNAP office.

- Some states have special programs that use the SNAP EBT card to distribute other nutrition benefits to certain non-citizens. These states are: California, Connecticut, Illinois, Maine, Minnesota, and Washington. FNS does not operate or fund these programs. Contact these states for more information.
- You or your family may be eligible for other nutrition assistance programs.
- The U.S. Citizenship and Immigration Services (USCIS) is the government agency that oversees lawful immigration to the United States. For information regarding immigration laws and programs, please visit www.uscis.gov    .

# Additional Resources for State Agencies

For the most comprehensive SNAP guidance relevant to non-citizens, please see the 2011 Guidance on Non-Citizen Eligibility.

| |
|---|
| Compacts of Free Association (COFA) citizens |
| Public Charge |
| Mixed immigration status households |
| Outreach |
| Sponsors |
| Other special circumstances |

Page updated: January 27, 2025

Return to top

**Home**                    **Programs**                    **Data & Research**

**Funding**                  **Newsroom**                    **Resources**

**Our Agency**

USDA.gov

WhiteHouse.gov

USA.gov

AskUSDA

Privacy Policy

Vulnerability Disclosure Policy

Non-Discrimination Statement

Accessibility Statement

FOIA

Plain Writing

Information Quality

Small Business Rights

## Sign up for Updates

Your Email Address: [                    ]

Sign Up


Food and Nutrition Service
U.S. DEPARTMENT OF AGRICULTURE

## Stay Connected

# EXHIBIT G

The Wayback Machine - https://web.archive.org/web/20...

An official website of the United States government  Here's how you know



**Food and Nutrition Service**
U.S. DEPARTMENT OF AGRICULTURE

Skip to main content

MENU

# SNAP Eligibility for Non-Citizens

HOME   SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM (SNAP)   SNAP ELIGIBILITY



## Eligibility

Only U.S. citizens and certain lawfully present non-citizens may receive SNAP benefits. SNAP is not and has never been available to undocumented non-citizens. Non-citizens like tourists and students are generally not eligible. To learn more about SNAP eligibility requirements, such as income and resource limits, questions should be directed to the applicant's local SNAP office.

| Eligible **Non-citizen Groups** | **Eligibility Status** |
|---|---|
| • Refugees<br>• Individuals granted asylum<br>• Victims of severe trafficking<br>• Deportation withheld<br>• Amerasians<br>• Cuban and Haitian entrants<br>• Iraqi and Afghan special immigrants (SIV)<br>• Certain American Indians born abroad<br>• Hmong or Highland Laotian tribal members<br>• Compacts of Free Association (COFA) citizens of the Federated States of Micronesia, the Republic of the Marshall Islands, and the Republic of Palau | Eligible immediately, with no waiting period, as long as they meet all other SNAP financial and non-financial eligibility requirements. |
| • Lawful permanent residents (LPR) or Green Card holders<br>• Those granted parole for a period of at least one year<br>• Conditional entrants<br>• Battered non-citizens | Eligible after a 5-year waiting period, as long as they meet all other SNAP financial and non-financial eligibility requirements.<br><br>Individuals in one of these groups may still be eligible for SNAP without a waiting period if they:<br><br>• Are a child under 18 years old<br>• Are blind or disabled and receiving benefits for assistance for your condition<br>• Were lawfully residing in the U.S. and 65 or older on Aug. 22, 1996<br>• Have a U.S. Military connection<br>• Are an Afghan granted parole<br>• Are a Ukrainian granted parole |
| • Children under age 18 in any of the above groups in this table | Eligible immediately, with no waiting period, as long as they meet all other SNAP financial and non-financial eligibility requirements. |

# Frequently Asked Questions

Am I eligible for SNAP if I am not a citizen?

| |
|---|
| [What is a waiting period?](#) |
| [What does a military connection mean?](#) |
| [Am I eligible if I am an Afghan national who was granted parole or re-parole?](#) |
| [Am I eligible if I am a Ukrainian national who was granted parole?](#) |
| [What if people in my household have different immigration statuses? If I am not eligible because of my immigration status, can I still apply for my children?](#) |
| [Do I have to provide proof of my immigration status?](#) |
| [Do I have to provide my Social Security number (SSN)?](#) |
| [What if I do not speak English?](#) |
| [Will my past immigration status affect my SNAP eligibility?](#) |
| [Who is NOT eligible for SNAP based on immigration status?](#) |

# Find Assistance

- To get more detailed information about SNAP or to apply for benefits, contact [your local SNAP office](#).
- Some states have special programs that use the SNAP EBT card to distribute other nutrition benefits to certain non-citizens. These states are: California, Connecticut, Illinois, Maine, Minnesota, and Washington. FNS does not operate or fund these programs. Contact these states for more information.
- You or your family may be eligible for [other nutrition assistance programs](#).
- The U.S. Citizenship and Immigration Services (USCIS) is the government agency that oversees lawful immigration to the United States. For information regarding immigration laws and programs, please visit [www.uscis.gov](#).

# Additional Resources for State Agencies

For the most comprehensive SNAP guidance relevant to non-citizens, please see the [2011 Guidance on Non-Citizen Eligibility](#).

| |
|---|
| [Compacts of Free Association (COFA) citizens](#) |

| | |
|---|---|
| [Mixed immigration status households](#) | |
| [Outreach](#) | |
| [Sponsors](#) | |
| [Other special circumstances](#) | |

Page updated: February 21, 2025

[Return to top](#)

## Home

## Programs

## Data & Research

## Funding

## Newsroom

## Resources

## Our Agency

USDA.gov

WhiteHouse.gov

USA.gov

AskUSDA

Privacy Policy

Vulnerability Disclosure Policy

Non-Discrimination Statement

Accessibility Statement

FOIA

Plain Writing

Information Quality

Small Business Rights

## Sign up for Updates

Your Email Address:

**Sign Up**


Food and Nutrition Service
U.S. DEPARTMENT OF AGRICULTURE

## Stay Connected

# EXHIBIT H

# Notices

Federal Register

Vol. 90, No. 118

Monday, June 23, 2025

This section of the FEDERAL REGISTER contains documents other than rules or proposed rules that are applicable to the public. Notices of hearings and investigations, committee meetings, agency decisions and rulings, delegations of authority, filing of petitions and applications and agency statements of organization and functions are examples of documents appearing in this section.

## DEPARTMENT OF AGRICULTURE

### Privacy Act of 1974; System of Records

**AGENCY:** Department of Agriculture (USDA), Food and Nutrition Service (FNS).

**ACTION:** Notice of a new system of records.

**SUMMARY:** Pursuant to the provisions of the Privacy Act of 1974 and Office of Management and Budget (OMB) Circular No. A–108, notice is hereby given that the United States Department of Agriculture (USDA) proposes to create a new system of records (SOR) entitled USDA/FNS–15, "National Supplemental Nutrition Assistance Program (SNAP) Information Database." This system is owned, administered, and secured by the Food and Nutrition Service (FNS). The primary purposes of this system are to validate the accuracy of eligibility determinations and strengthen SNAP and government program integrity.

**DATES:** In accordance with 5 U.S.C. 552a(e)(4) and (11), this system of records notice will become effective upon publication in the **Federal Register**, except for the routine uses, which will become effective on July 23, 2025, unless USDA determines they must be changed as a result of public comment. USDA will publish any changes to the system of records notice resulting from public comment.

**ADDRESSES:** Interested parties may submit written comments by one of the following methods:
• *Preferred:* Federal eRulemaking Portal at *http://www.regulations.gov* provides the ability to type short comments directly into the comment field on this web page or attach a file for lengthier comments. Follow the online instructions at that site for submitting comments.
• *By email:* [Insert email contact]

• *By mail:* [Insert mail contact], FNS, 1320 Braddock Place, Alexandria, VA 22314.

*Instructions:* All comment submissions must include the agency name and docket number for this rulemaking. All comments received will be posted without change to *http://www.regulations.gov,* including any personal information provided. However, comments containing profanity or inappropriate or abusive content may be rejected or redacted before posting.

*Docket:* For access to the docket to read background documents or comments received go to *http://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** For general questions, please contact: FNS Privacy Officer, Information Management Branch, Food and Nutrition Service, USDA, 1320 Braddock Pl, Alexandria, Virginia 22314; or via email at *SM.fn.Privacy-FNS@usda.gov.*

**SUPPLEMENTARY INFORMATION:**

## Background

Pursuant to, among other authorities, 7 U.S.C. 2020(a)(3) and (e)(8)(A) and 7 CFR 272.1(c)(1) and (e), FNS will work with all State agencies and their designated vendors and/or contractors to transmit data on SNAP participants and transactions for the purposes listed below. This system is consistent with and effectuates multiple executive orders, including but not limited to Executive Order 14243 of March 20, 2025, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos* and Executive Order 14218 of February 19, 2025, *Ending Taxpayer Subsidization of Open Borders.*

USDA and FNS will use the SNAP data in this system to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying and eliminating duplicate enrollments, and performing additional eligibility and program integrity checks specified herein.

The system of records notice explains how the records within the new system will be used and with whom they will be shared.

## Privacy Act

The Privacy Act of 1974 (the Privacy Act), 5 U.S.C. 552a, embodies fair

information principles in a statutory framework governing the means by which the United States Government collects, maintains, uses, and disseminates records about individuals. The Privacy Act applies to information that is maintained in a SOR. A SOR is a group of any records under the control of an agency for which information is retrieved by the name of an individual or by some identifying number, symbol, or other identifying particular assigned to the individual. In the Privacy Act, an individual is defined to encompass United States citizens and lawful permanent residents.

The Privacy Act requires each agency to publish in the **Federal Register** a description denoting the type and character of each SOR that the agency maintains, to publish the routine uses that are contained in each system in order to make agency record keeping practices transparent, and to notify individuals regarding the uses and locations of their records.

In accordance with 5 U.S.C. 552a(r), USDA has provided a report of this SOR to the Office of Management and Budget and to the relevant committees of Congress.

**SYSTEM NAME AND NUMBER:**

USDA/FNS–15, National SNAP Information Database.

**SECURITY CLASSIFICATION:**

Unclassified.

**SYSTEM LOCATION:**

The National SNAP Information Database is maintained in the FNS Amazon Web Service (AWS) cloud infrastructure environment that is used only by Federal employees and contractors. The data is processed and stored solely within the continental United States. The agency, U.S. Department of Agriculture, address is 1400 Independence Ave. SW, Washington, DC 20250 and the address of the third-party service provider is Microsoft, 1 Microsoft Way, Redmond, Washington 98052–6399.

**SYSTEM MANAGER(S):**

Director, Portfolio Management Division, Office of Information Technology, Food and Nutrition Service, 1320 Braddock Road, Alexandria, Virginia 22314. Telephone: (703) 305–2504.

**AUTHORITY FOR MAINTENANCE OF THE SYSTEM:**

7 U.S.C. 2020(a)(3) and (e)(8)(A); 7 CFR 272.1(c)(1) and (e); Executive Order (E.O.) 14243; Executive Order 14218.

**PURPOSE(S) OF THE SYSTEM:**

USDA will use the SNAP data to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases. This is consistent with USDA's statutory authority and will ensure Americans in need receive assistance, while at the same time safeguarding taxpayer dollars from abuse. USDA will leverage data-sharing across Federal and State systems to identify and rectify any ineligible, duplicate, or fraudulent SNAP enrollments or transactions. This includes verifying eligibility based on immigration status, identifying and eliminating duplicate enrollments, assisting States in mitigating identity theft, and performing other eligibility and program integrity checks using lawfully shared internal and interagency data. This also includes sharing, where permitted by law and consistent with this notice, information with State agencies when necessary to investigate and rectify fraudulent or otherwise improper or illegal SNAP enrollments or transactions.

**CATEGORIES OF INDIVIDUALS COVERED BY THE SYSTEM:**

Individuals who have received, are currently receiving, or have applied to receive SNAP benefits.

**CATEGORIES OF RECORDS IN THE SYSTEM:**

The system consists of records containing personally identifying information, including but not limited to SNAP participant name, Social Security Number (SSN), date of birth (DOB), residential address, Electronic Benefit Transaction (EBT) card number, and case record identifier number or other identifiers or data elements maintained by States, vendors, or contractors to identify SNAP recipients. The system also consists of information derived from and associated with EBT transactions, including but not limited to records sufficient to calculate the total dollar value of SNAP benefits received by participants over time, such as applied amounts and benefit available dates.

**RECORD SOURCE CATEGORIES:**

Information in this system is provided by the 53 State agencies that administer SNAP and their designated vendors and/or contractors. Information in this system is also provided by other Federal agencies with which USDA partners on program integrity efforts.

**ROUTINE USES OF RECORDS MAINTAINED IN THE SYSTEM, INCLUDING CATEGORIES OF USERS AND PURPOSES OF SUCH USES:**

Records created or stored in this system may be disclosed pursuant to the permitted routine uses outlined below to the extent such uses are authorized by, among other authorities, 7 U.S.C. 2020(a)(3) and (e)(8), 7 CFR 272.1(c)(1) and (e), and Executive Orders 14218 and 14243.

(1) To the Department of Justice or in a proceeding before a court or adjudicative body when: (a) USDA/FNS or any component thereof; or (b) any employee of USDA in his or her official capacity, or any employee of the agency in his or her individual capacity where the Department of Justice has agreed to represent the employee; or (c) the United States Government, is a party to litigation or has an interest in such litigation, and USDA determines that the records are both relevant and necessary to the litigation and the use of such records by the Department of Justice is deemed by USDA to be for a purpose that is compatible with the purpose for which USDA collected the records.

(2) In an appropriate proceeding before a court, grand jury, or administrative or adjudicative body or official, when the USDA/FNS or other Agency representing the USDA, determines that the records are both relevant and necessary to the proceeding; or in an appropriate proceeding before an administrative or adjudicative body when the adjudicator determines the records to be relevant and necessary to the proceeding.

(3) To a Member of Congress or to a Congressional staff member in response to an inquiry of the Congressional office made at the request of, and on behalf of, the individual about whom the record is maintained.

(4) To the National Archives and Records Administration or other Federal government agencies pursuant to records management activities being conducted under 44 U.S.C. 2904 and 2906.

(5) To another Federal agency or Federal entity, when USDA/FNS determines that information from this system of records is reasonably necessary to assist the recipient agency or entity in: (1) responding to a suspected or confirmed breach or (2) preventing, minimizing, or remedying the risk of harm to individuals, the recipient agency or entity (including its information systems, programs, and operations), the Federal Government, or national security, resulting from a suspected or confirmed breach.

(6) To appropriate agencies, entities, and persons when: (1) USDA/FNS suspects or has confirmed that there has been a breach of the system of records; (2) USDA/FNS has determined that as a result of the suspected or confirmed breach there is a risk of harm to individuals, USDA (including its information systems, programs, and operations), the Federal Government, or national security; and (3) the disclosure made to such agencies, entities, and persons is reasonably necessary to assist in connection with USDA's efforts to respond to the suspected or confirmed breach or to prevent, minimize, or remedy such harm.

(7) To contractors, grantees, experts, consultants, and the agents thereof, and others performing or working on a contract, service, grant, cooperative agreement, or other assignment for USDA, when necessary to accomplish an agency function related to this system of records. USDA and FNS will require individuals provided information under this routine use to comply with all applicable requirements and limitations of disclosure imposed by the Privacy Act.

(8) When a record on its face, or in conjunction with other records, indicates a violation or potential violation of law, whether civil, criminal or regulatory in nature, and whether arising by general statute or particular program statute, or by regulation, rule, or order issued pursuant thereto, USDA/FNS may disclose the record to the appropriate agency, whether Federal, foreign, State, local, or tribal, or other public authority responsible for enforcing, investigating, or prosecuting such violation or charged with enforcing or implementing the statute, or rule, regulation, or order issued pursuant thereto, if the information disclosed is relevant to any enforcement, regulatory, investigative or prosecutive responsibility of the receiving entity.

(9) To Federal and State Agencies responsible for: (1) the administration of SNAP; or (2) the administration of other Federal benefits programs to the extent permitted by applicable law when such information is necessary for the performance of lawful audit, oversight, or administrative functions.

(10) To the U.S. Department of the Treasury when disclosure of the information is relevant and necessary to review payment and award eligibility through the Do Not Pay Working System for the purposes of identifying, preventing, or recouping improper payments to an applicant for, or recipient of, Federal funds, including funds disbursed by a state (meaning a state of the United States, the District of

Columbia, a territory or possession of the United States, or a federally recognized Indian tribe) in a state-administered, federally funded program.

(11) To support another Federal agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States (including any State or local governmental agency), that administers, or that has the authority to investigate or assist USDA to investigate potential fraud, waste, or abuse in, a Federal benefits program funded in whole or in part by Federal funds, when disclosure is deemed reasonably necessary by USDA to prevent, deter, discover, detect, investigate, examine, prosecute, sue with respect to, defend against, correct, remedy, or otherwise combat fraud, waste, or abuse in such programs.

**POLICIES AND PRACTICES FOR STORAGE OF RECORDS:**

The National SNAP Information Database will be hosted in the FNS AWS Cloud infrastructure environment, which is FedRAMP certified. These records are electronic.

**POLICIES AND PRACTICES FOR RETRIEVAL OF RECORDS:**

Records may be indexed and retrieved by the name of the individual, SSN, EBT card number, case record identifier number, or any other identifier or data element used by any State, vendor, or contractor to identify SNAP recipients.

**POLICIES AND PRACTICES FOR RETENTION AND DISPOSAL OF RECORDS:**

Records are retained and disposed of in accordance with Section 11(a)(3)(B) of the FNA. Records may be retained for a period of not less than 3 years as specified in the FNA or applicable regulation, or for a longer period as required by litigation, investigation, and/or audit. Electronic records are retained by FNS employees and contractors at FNS offices. This system does not yet have a NARA-approved records schedule. All records in this system will be kept indefinitely unless otherwise required by law until NARA has approved a records schedule for this system.

**ADMINISTRATIVE, TECHNICAL, AND PHYSICAL SAFEGUARDS:**

*Administrative Safeguards:* The USDA safeguards records in this system according to applicable rules and policies, including all applicable USDA automated systems security and access policies. USDA has imposed strict controls to minimize the risk of compromising information in the system. Access to the computer system containing the records in this system is limited to those individuals who have a need to know the information for the performance of their official duties and who have appropriate clearances or permissions. Access is controlled through USDA eAuthentication service.

*Technical Safeguards:* The National SNAP Information Database will utilize a robust collection of technical safeguards to ensure the integrity of the platform. The National SNAP Information Database is designed to meet all technical safeguards required by its system categorization in National Institute of Standards and Technology (NIST) 800–53. The National SNAP Information Database will be hosted in a secure environment that uses perimeter security protection to prevent interference or access from outside intruders. When accessing the National SNAP Information Database, Secure Socket Layer (SSL)/Transport Layer Security (TLS) technology protects the user's information by using both server authentication and data encryption. Users will only access the National SNAP Information Database by USDA eAuthentication through Personal Identity Verification (PIV) Card and Personal Identification Number (PIN) entry or Login.gov. The National SNAP Information Database administrators will have a suite of security tools that can be used to increase the security of the system.

*Physical Safeguards:* The servers that host the National SNAP Information Database are stored in a USDA FedRAMP authorized data center with strict physical access control procedures in place to prevent unauthorized access.

**RECORD ACCESS PROCEDURES:**

Personal information contained in this system is provided by the State agency, or such agency's designated vendors and/or contractors, in the State where the individual is a SNAP participant or applicant. An individual may obtain information about a record in the system which pertains to the individual by submitting a written request to the systems manager listed above via letter or online at *https:// efoia-pal.usda.gov/*. If by mail, the letter should be marked "Privacy Act Request." Requests should include the name of the individual making the request, the name of the system of records, any other information specified in the system notice, and a statement of whether the requester desires to be supplied with copies by mail or electronically. Individuals may also directly contact the applicable State agency or local SNAP office. A request for information pertaining to an individual should contain the name, address, date of birth, and SSN of the individual, and any other information that will assist in locating the record.

**CONTESTING RECORD PROCEDURES:**

Individuals desiring to contest or amend information maintained in the system should direct their request to the system manager listed above or to the State agency or designated vendor/contractor that provided the data. The request should identify each record in question, state the amendment or correction desired, and state why the individual believes that the record is not accurate, relevant, timely, or complete. The individual may submit any documentation that would be helpful. Where consistent with the Privacy Act and this notice, requests sent to the system manager will be shared with the State agency in the State where the individual is a SNAP participant or applicant for resolution. Requests must follow the procedures set forth in 7 CFR 1.116 (Request for correction or amendment to record).

**NOTIFICATION PROCEDURES:**

Any individual may request information regarding this system of records, or information as to whether the system contains records pertaining to the individual, from the System Manager listed above: See RECORD ACCESS PROCEDURES.

**EXEMPTIONS PROMULGATED FOR THE SYSTEM:**

None.

**HISTORY:**

None.

James C. Miller,
*Administrator.*

[FR Doc. 2025–11463 Filed 6–20–25; 8:45 am]

**BILLING CODE 3410–30–P**

# CIVIL RIGHTS COLD CASE RECORDS REVIEW BOARD

**[Agency Docket Number: CRCCRRB–2025–0017–N]**

## Notice of Formal Determination on Records Release

**AGENCY:** Civil Rights Cold Case Records Review Board.

**ACTION:** Notice.

---

**SUMMARY:** The Civil Rights Cold Case Records Review Board received 4,701 pages of records from the National Archives and Records Administration (NARA), the Department of Justice, and the Federal Bureau of Investigation (FBI) related to five civil rights cold case incidents to which the Review Board assigned the unique identifiers 2023–

# EXHIBIT I

| | |
|---|---|
| **From:** | Humphreys, Bradley (CIV) |
| **To:** | Sebastian Brady; Kurland, Benjamin S (CIV) |
| **Cc:** | Maria Buxton; Paul Stein |
| **Subject:** | Re: New Lawsuit Against USDA |
| **Date:** | Wednesday, August 13, 2025 12:46:59 PM |

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Hi Sebastian,

USDA is willing to extend the deadline stated in the advance notice to Tuesday, August 19, but not beyond that.

USDA will comply with all regulatory requirements regarding any potential suspension or disallowance.

Thanks,
Brad

---

**From:** Sebastian Brady <Sebastian.Brady@doj.ca.gov>
**Sent:** Wednesday, August 13, 2025 2:15 PM
**To:** Humphreys, Bradley (CIV) <Bradley.Humphreys@usdoj.gov>; Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>
**Cc:** Maria Buxton <Maria.Buxton@doj.ca.gov>; Paul Stein <Paul.Stein@doj.ca.gov>
**Subject:** [EXTERNAL] RE: New Lawsuit Against USDA

Counsel:

In connection with the below request, can you please also confirm that your client will follow the mandatory procedures laid out in 7 CFR 276.4, which requires, at a minimum, a 30-day period after a final notice of noncompliance, before any funding-related action is taken? That will also bear on the need for interim relief.

Thank you,
Sebastian

---

**From:** Sebastian Brady
**Sent:** Tuesday, August 12, 2025 8:10 PM
**To:** Humphreys, Bradley (CIV) <Bradley.Humphreys@usdoj.gov>; Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>
**Cc:** Maria Buxton <Maria.Buxton@doj.ca.gov>; Paul Stein <Paul.Stein@doj.ca.gov>
**Subject:** RE: New Lawsuit Against USDA

Counsel:

We've learned that earlier today, your client sent an advance notice under 7 CFR 276.4 to California, along with several other Plaintiff States, demanding that the States provide the data it previously requested in three days—on Friday, August 15—and provide an explanation of steps they are taking to comply with the demand by tomorrow. The notice also threatens further proceedings under 7 CFR 276.4 if the States do not comply. Given that the validity of this data request is the subject of this litigation, we respectfully request that your client stay both deadlines until a reasonable period after the conclusion of this litigation. Alternatively, we request that your client stay both deadlines until a reasonable period after the Court can address a motion for a stay or preliminary injunction. Absent that, we will be forced to seek interim relief shortly.

Because of the timeline set forth in your client's letter, we request a response by 4pm Eastern tomorrow, August 13.

Best,
Sebastian

---

**From:** Sebastian Brady
**Sent:** Tuesday, July 29, 2025 12:49 PM
**To:** Humphreys, Bradley (CIV) <Bradley.Humphreys@usdoj.gov>; Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>
**Cc:** Maria Buxton <Maria.Buxton@doj.ca.gov>; Paul Stein <Paul.Stein@doj.ca.gov>
**Subject:** RE: New Lawsuit Against USDA

Hi Brad,

Thanks for letting us know. The summonses have now been issued, so we'll work on effectuating service.

Best,
Sebastian

---

**From:** Humphreys, Bradley (CIV) <Bradley.Humphreys@usdoj.gov>
**Sent:** Tuesday, July 29, 2025 12:32 PM
**To:** Sebastian Brady <Sebastian.Brady@doj.ca.gov>; Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>
**Cc:** Maria Buxton <Maria.Buxton@doj.ca.gov>; Paul Stein <Paul.Stein@doj.ca.gov>
**Subject:** RE: New Lawsuit Against USDA

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Hi Sebastian, and all,

Thanks for reaching out.  Ben and I will be handling this case, so you've come to the right place.  We're not able to waive service, unfortunately, but we can serve as points of contacts and discuss scheduling as needed.

Best,
Brad

---

**From:** Sebastian Brady <Sebastian.Brady@doj.ca.gov>
**Sent:** Tuesday, July 29, 2025 2:01 PM
**To:** Humphreys, Bradley (CIV) <Bradley.Humphreys@usdoj.gov>; Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>
**Cc:** Maria Buxton <Maria.Buxton@doj.ca.gov>; Paul Stein <Paul.Stein@doj.ca.gov>
**Subject:** [EXTERNAL] New Lawsuit Against USDA

Hi Bradley and Ben,

I'm a Deputy Attorney General with the California Department of Justice and I'm writing about a lawsuit that California and a number of other states filed yesterday against USDA, Secretary Rollins, and USDA-OIG that has some overlap with the *Pallek v. Rollins* matter.  We are still waiting for the court to issue the summonses, but will you accept service on behalf of these defendants?  I'm attaching the filed complaint here.

Best,
Sebastian


**Sebastian Brady**
Deputy Attorney General | Government Law Section
California Department of Justice
455 Golden Gate Avenue, Suite 11000 | San Francisco, CA 94102
Phone:  415.510.3592 | Fax:  415.703.5480
Sebastian.Brady@doj.ca.gov


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

# EXHIBIT J

| | |
|---|---|
| **From:** | Humphreys, Bradley (CIV) |
| **To:** | Sebastian Brady; Kurland, Benjamin S (CIV) |
| **Cc:** | Maria Buxton; Paul Stein |
| **Subject:** | RE: New Lawsuit Against USDA |
| **Date:** | Wednesday, August 13, 2025 6:00:49 PM |

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Sebastian,

You are correct the extension is for both deadlines.

Yes, confirmed that there would be no notice of suspension, if any, until at least 30 days following a formal warning, as stated in 7 CFR 276.4.

Best,
Brad

**From:** Sebastian Brady <Sebastian.Brady@doj.ca.gov>
**Sent:** Wednesday, August 13, 2025 5:21 PM
**To:** Humphreys, Bradley (CIV) <Bradley.Humphreys@usdoj.gov>; Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>
**Cc:** Maria Buxton <Maria.Buxton@doj.ca.gov>; Paul Stein <Paul.Stein@doj.ca.gov>
**Subject:** [EXTERNAL] RE: New Lawsuit Against USDA

Brad,

Thank you for the extension, which we understand to be an extension for Plaintiff States of both today's deadline and Friday's deadline noted in the letter (and in our email below), but please let us know if this is a misunderstanding by 6pm Eastern tonight.

On the second point, can you please confirm, more specifically, that USDA does not intend to suspend or disallow any Plaintiff States' SNAP funding before the expiration of 30 days after the issuance of any formal warning, as set out in 7 CFR 276.4. As noted, this will inform the need for emergency relief. We would appreciate confirmation on this point ASAP as well—by 12 noon Eastern tomorrow.

Thanks,
Sebastian

**From:** Humphreys, Bradley (CIV) <Bradley.Humphreys@usdoj.gov>
**Sent:** Wednesday, August 13, 2025 12:47 PM
**To:** Sebastian Brady <Sebastian.Brady@doj.ca.gov>; Kurland, Benjamin S (CIV)

<Ben.Kurland@usdoj.gov>
**Cc:** Maria Buxton <Maria.Buxton@doj.ca.gov>; Paul Stein <Paul.Stein@doj.ca.gov>
**Subject:** Re: New Lawsuit Against USDA

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Hi Sebastian,

USDA is willing to extend the deadline stated in the advance notice to Tuesday, August 19, but not beyond that.

USDA will comply with all regulatory requirements regarding any potential suspension or disallowance.

Thanks,
Brad

---

**From:** Sebastian Brady <Sebastian.Brady@doj.ca.gov>
**Sent:** Wednesday, August 13, 2025 2:15 PM
**To:** Humphreys, Bradley (CIV) <Bradley.Humphreys@usdoj.gov>; Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>
**Cc:** Maria Buxton <Maria.Buxton@doj.ca.gov>; Paul Stein <Paul.Stein@doj.ca.gov>
**Subject:** [EXTERNAL] RE: New Lawsuit Against USDA

Counsel:

In connection with the below request, can you please also confirm that your client will follow the mandatory procedures laid out in 7 CFR 276.4, which requires, at a minimum, a 30-day period after a final notice of noncompliance, before any funding-related action is taken? That will also bear on the need for interim relief.

Thank you,
Sebastian

---

**From:** Sebastian Brady
**Sent:** Tuesday, August 12, 2025 8:10 PM
**To:** Humphreys, Bradley (CIV) <Bradley.Humphreys@usdoj.gov>; Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>
**Cc:** Maria Buxton <Maria.Buxton@doj.ca.gov>; Paul Stein <Paul.Stein@doj.ca.gov>
**Subject:** RE: New Lawsuit Against USDA

Counsel:

We've learned that earlier today, your client sent an advance notice under 7 CFR 276.4 to California, along with several other Plaintiff States, demanding that the States provide the data it previously requested in three days—on Friday, August 15—and provide an explanation of steps they are taking to comply with the demand by tomorrow. The notice also threatens further proceedings under 7 CFR 276.4 if the States do not comply. Given that the validity of this data request is the subject of this litigation, we respectfully request that your client stay both deadlines until a reasonable period after the conclusion of this litigation. Alternatively, we request that your client stay both deadlines until a reasonable period after the Court can address a motion for a stay or preliminary injunction. Absent that, we will be forced to seek interim relief shortly.

Because of the timeline set forth in your client's letter, we request a response by 4pm Eastern tomorrow, August 13.

Best,
Sebastian

---

**From:** Sebastian Brady
**Sent:** Tuesday, July 29, 2025 12:49 PM
**To:** Humphreys, Bradley (CIV) <Bradley.Humphreys@usdoj.gov>; Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>
**Cc:** Maria Buxton <Maria.Buxton@doj.ca.gov>; Paul Stein <Paul.Stein@doj.ca.gov>
**Subject:** RE: New Lawsuit Against USDA

Hi Brad,

Thanks for letting us know.  The summonses have now been issued, so we'll work on effectuating service.

Best,
Sebastian

---

**From:** Humphreys, Bradley (CIV) <Bradley.Humphreys@usdoj.gov>
**Sent:** Tuesday, July 29, 2025 12:32 PM
**To:** Sebastian Brady <Sebastian.Brady@doj.ca.gov>; Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>
**Cc:** Maria Buxton <Maria.Buxton@doj.ca.gov>; Paul Stein <Paul.Stein@doj.ca.gov>
**Subject:** RE: New Lawsuit Against USDA

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Hi Sebastian, and all,

Thanks for reaching out.  Ben and I will be handling this case, so you've come to the right place.  We're not able to waive service, unfortunately, but we can serve as points of contacts and discuss scheduling as needed.

Best,
Brad

_____

**From:** Sebastian Brady <Sebastian.Brady@doj.ca.gov>
**Sent:** Tuesday, July 29, 2025 2:01 PM
**To:** Humphreys, Bradley (CIV) <Bradley.Humphreys@usdoj.gov>; Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>
**Cc:** Maria Buxton <Maria.Buxton@doj.ca.gov>; Paul Stein <Paul.Stein@doj.ca.gov>
**Subject:** [EXTERNAL] New Lawsuit Against USDA

Hi Bradley and Ben,

I'm a Deputy Attorney General with the California Department of Justice and I'm writing about a lawsuit that California and a number of other states filed yesterday against USDA, Secretary Rollins, and USDA-OIG that has some overlap with the *Pallek v. Rollins* matter.  We are still waiting for the court to issue the summonses, but will you accept service on behalf of these defendants?  I'm attaching the filed complaint here.

Best,
Sebastian


**Sebastian Brady**
Deputy Attorney General | Government Law Section
California Department of Justice
455 Golden Gate Avenue, Suite 11000 | San Francisco, CA 94102
Phone:  415.510.3592 | Fax:  415.703.5480
Sebastian.Brady@doj.ca.gov


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or

legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
(Northern Division)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| and the STATE OF MISSISSIPPI, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 3:12-cv-790-HTW-LGI |
| | ) | (Clean Water Act Case) |
| v. | ) | |
| | ) | |
| THE CITY OF JACKSON, MISSISSIPPI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:22-cv-00686-HTW-LGI |
| | ) | (Safe Drinking Water Act Case) |
| v. | ) | |
| | ) | |
| | ) | |
| THE CITY OF JACKSON, MISSISSIPPI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## SECOND DECLARATION OF RACHEL FRISK

I, Rachel Frisk, do hereby state and declare as follows:

1.      I am Director for the Program Administration and Nutrition Division ("PAND")

of the Supplemental Nutrition Assistance Program ("SNAP") at the United States Department of

Agriculture ("USDA" or "the Department") Food and Nutrition Service ("FNS"), Alexandria,

Virginia. I have held my current position since August 2022.

1

2.      As the Director of PAND, I am responsible for the State Administration Branch, Quality Control Branch, and Nutrition Education Branch of SNAP which concern, in part, SNAP recipient ("household") and State administration matters. Additionally, I oversee the rulemaking and statutory and regulatory enforcement processes for these branches.

3.      The statements made in this declaration are based on knowledge that I have acquired in the performance of my official duties, including information provided to me by USDA FNS' SNAP staff and attorneys from the USDA Office of the General Counsel ("OGC"), and my knowledge of the issues being litigated in the above-captioned matter.

4.      I am submitting this declaration at the request of the United States Department of Justice in response to this Court's Order, entered on April 14, 2024 [Dkt. No. 107]. I previously submitted a Declaration in this matter [Dkt. 93]. USDA does not directly collect, maintain, or control information from SNAP households and is not in possession of any current data on SNAP households. The only SNAP data from households in Mississippi that USDA is in possession of is severely limited and months out-of-date.

5.      USDA is the only federal agency implementing SNAP. In Mississippi, the state agency implementing SNAP is the Mississippi Department of Human Services ("MDHS").

6.      USDA obtains limited SNAP household data from the MDHS through payment accuracy quality control reviews ("QC reviews"). *See* 7 U.S.C. § 2025(c); 7 C.F.R. § 275 Subpart C. QC reviews evaluate States' administration of SNAP by examining a sample of their total SNAP caseloads to determine each State's rate of payment errors. *Id.*

7.      States conduct QC reviews by sampling a minimum number of their total caseload each month. The procedures States follow for their sampling are set pursuant to requirements at 7 C.F.R. § 275.11 and their FNS-approved sampling plan. *See* 7 C.F.R. § 272.2(e)(4).

2

8.      States generally have 115 days after the conclusion of each month to report their case findings for their monthly samples to USDA but may be granted additional time to submit that information for good cause. *See* 7 C.F.R. § 275.21(b)(2).

9.      For Mississippi, the most recent QC review data USDA has is from December 2023.

10.     Upon review of Fiscal Year 2024's first quarter QC data for Mississippi (October through December 2023), USDA currently has names and addresses for only 17 households that were located in the zip codes listed in the above-referenced Court Order.  In addition, because States randomly sample households for QC reviews each month, it is not possible to predict the number of households within the relevant zip codes that Mississippi will submit to USDA in each month for QC review purposes.

11.     As such, USDA is only in possession of the names and addresses for 17 SNAP households that were at one point located in the relevant zip codes, but that information ranges from four to six months old. In the time since that information was submitted to USDA, the SNAP households could have moved, become ineligible for SNAP by exceeding income requirements, voluntarily stopped participating in SNAP, or otherwise been removed from SNAP.

12.     Additionally, USDA does not have the authority to require States or the state agency implementing SNAP (*i.e.*, MDHS) to share household information with USDA or any person outside of what is specifically delineated by the Food and Nutrition Act (Act) and corresponding regulations, such as for payment accuracy quality control reviews. *E.g.* 7 U.S.C. § 2025(c); 7 C.F.R. § 275 Subpart C. USDA is unaware of any statutory or regulatory process for it to require MDHS to give it data beyond the delineated uses in the Act and corresponding regulations, even if required by Court order.

3

I declare under penalty of perjury, pursuant to 28 U.S.C. §1746, that the foregoing is true and correct.

RACHEL FRISK  Digitally signed by RACHEL FRISK
Date: 2024.04.30 16:34:49 -04'00'

_____
RACHEL FRISK, Director
Program Administration & Nutrition Division
Supplemental Nutrition Assistance Program
U.S. Department of Agriculture
Alexandria, Virginia

# EXHIBIT L



### State of California
### Office of the Attorney General

#### ROB BONTA
##### ATTORNEY GENERAL

*Via Federal eRulemaking Portal*
James C. Miller
Administrator
Food and Nutrition Service
U.S. Department of Agriculture
1320 Braddock Place
Alexandria, VA 22314

RE: Comments on USDA/FNS System of Record Notice Update: Docket No. FNS-2025-11463, USDA/FNS–15, Nat'l SNAP Info. Database, 90 Fed. Reg. 26521 (Jun. 23, 2025)

Dear Mr. Miller:

We, the Attorneys General for the States of California, Arizona, Colorado, Connecticut, Illinois, Maryland, Michigan, Minnesota, New Mexico, New Jersey, New York, Oregon, Rhode Island, and Washington (collectively "States") write to urge the U.S. Department of Agriculture and its Food and Nutrition Service (collectively "USDA") to withdraw or modify its proposal to create a National SNAP Information Database, as described in the System of Record Notice published at 90 Fed. Reg. 26,521 (SORN) (June 23, 2025). USDA's proposal to create a new Supplemental Nutrition Assistance Program (SNAP) participant database, populated by SNAP records, would necessarily require that States unlawfully turn over Americans' sensitive, personal information. Relevant to this comment, USDA's proposal would duplicate Congressionally mandated eligibility determinations already performed by the States, which is not only a profound threat to individuals' privacy, but also a waste of funds that could be used to fight hunger. Not only that, the SORN then purports to allow USDA to disclose individuals' personal information for any legal or regulatory enforcement purpose, in violation of the Privacy Act of 1974. Currently, such data can generally only be used for SNAP purposes, such as administering the program or enforcing SNAP-related laws and regulations. Simply put, USDA's unprecedented proposal improperly seeks to acquire SNAP participant data long held by the States, to do a job already done by the States, and then disclose that data in ways federal law prohibits the States from doing. USDA should rethink this flawed and unlawful proposal and instead work with the States to improve program efficiency and integrity through the robust processes already in place.

July 18, 2025
Page 2

**Legal and Factual Background**

SNAP is a federally-funded, state-administered program providing billions of dollars in food assistance to tens of millions of needy families across the country. Under The Food and Nutrition Act of 2008, 7 U.S.C. § 2011 *et seq.* (the "SNAP Act"), States determine the eligibility of SNAP recipients under criteria determined by USDA. 7 U.S.C. §§ 2014(b), 2020(a)(1); 7 C.F.R. §§ 273, 276.1(a)(4). Because States administer SNAP, many aspects of program regulation are governed by the statutorily-required State Plan of Operations, which USDA approves as a condition of providing funding. 7 U.S.C. § 2020(d). The SNAP Act specifies many elements to be included in the State Plan. *Id.* § 2020(e).

State Plans thus "establish procedures governing [program] operation" and pursuant to the plan, States must "promptly determine the eligibility of each applicant household." 7 U.S.C. § 2020(e)(2)(A), (3). States determine recipients' eligibility through a mandatory "income and eligibility verification system" and verify immigration status through another system maintained by the federal government. *See* 7 CFR §§ 272.8 & 272.11. States must also maintain "a system for monitoring and improving [their] administration of SNAP." 7 C.F.R. § 275.1. The State Plan must also contain a Quality Control Sampling Plan and plans on how to use the systems to verify income and immigration status. 7 C.F.R. § 272.2(d)(1)(i), (iv) & (vii). As USDA itself describes it, "[S]tates are responsible for ensuring recipient eligibility and monitoring their benefit use."[1]

While the States administer SNAP, USDA, in contrast, annually reviews "certain functions performed at the State agency level," performs "a management evaluation of at least two State Quality Control Systems," and validates States' "payment error rate[s]." 7 C.F.R. § 275.3(a), (c), & (d). USDA's current Quality Control process already assesses whether States' denials are accurate and whether the state's eligibility and benefits determinations are accurate; those processes are known as the Case and Procedural Error Rate (CAPER) and the Payment Error Rate (PER).[2] USDA also reviews, at least biennially, the State's own "Management Evaluation System." 7 C.F.R. § 275.3 (b).

USDA also maintains two systems to detect and prevent fraud. The first, the National Accuracy Clearinghouse, prevents people from fraudulently claiming benefits from multiple states, which States check when they determine eligibility. 7 C.F.R. § 272.18. USDA also maintains a point-in-time system for detecting EBT fraud, the Anti-Fraud Locator Using Electronic Benefits Transfer Retailer Transactions (ALERT). The ALERT system provides daily EBT transaction information to USDA to identify and stop fraud waste and abuse under a robust set of privacy protections.[3] Under this system, "Records will be available only to identified State agency personnel charged with SNAP enforcement."

Lastly, the SNAP Act contemplates that USDA can perform targeted inspections and audits of State programs, subject to privacy protections. 7 U.S.C. § 2020(a)(3)(A) provides that

---

[1]    https://www.fns.usda.gov/snap/fraud (visited July 9, 2025).

[2]    https://www.fns.usda.gov/snap/qc/caper (last visited July 11, 2025);
       https://www.fns.usda.gov/snap/qc/per (last visited July 12, 2025).

[3]    https://www.federalregister.gov/documents/2010/12/27/2010-32457/privacy-act-revision-of-privacy-act-systems-of-records.

July 18, 2025
Page 3

States must maintain "such records as may be necessary to determine whether the program is being conducted in compliance" with the SNAP Act and regulations. Those records and related systems shall "be made available for inspection and audit by the [USDA], subject to data and security protocols agreed to by the State agency and [USDA]." *Id.* § 2020(a)(3)(B).

Despite the existence of these oversight processes and anti-fraud systems, USDA states in its recently issued SORN that the "primary purposes" of the new SNAP database are "to validate the accuracy of eligibility determinations and strengthen SNAP and government program integrity." USDA cites two recent Executive Orders[4] and states that it will "will leverage data-sharing across Federal and State systems to identify and rectify" improper SNAP payments. "This includes verifying eligibility based on immigration status, identifying and eliminating duplicate enrollments, … and performing other eligibility and program integrity checks using lawfully shared internal and interagency data." Importantly, USDA cannot directly "rectify" benefits that it believes should not be paid. The SNAP Act and regulations provide that only States Agencies can terminate benefits and must afford a "fair hearing" to SNAP recipients whose benefits are terminated. 7 U.S.C. § 2020(e)(10); 7 C.F.R. § 273.15(a).

State Agencies' records of SNAP applicant and recipient data are subject to significant safeguards under the statutory administration scheme, and disclosure of States' SNAP data is only permitted under strictly limited circumstances. Federal law specifies that States are responsible for making their SNAP records "available for inspection and audit" by USDA, as noted above, but that access must be "subject to data and security protocols." 7 U.S.C. § 2020(a)(3)(B)(i). To permit this inspection and audit, the statute provides for certain delineated exceptions to the general prohibition on "the use or disclosure of information obtained from applicant households." *See e.g.* 7 U.S.C. § 2020(e)(8)(A). For example, one permitted disclosure is to "persons directly connected with the administration and enforcement" of SNAP and other assistance programs. Those persons, in turn, can use SNAP records "only for such administration or enforcement." *Id.* The SNAP Act includes other exceptions for disclosure to capture fleeing felons, recoup overpayments, or investigate or prosecute violations of the SNAP Act or regulations. *See id.* Consistent with the Act, USDA's regulations similarly limit the use or disclosure of SNAP-participant data. *See* 7 C.F.R. § 272.1(c)(1). For example, the regulations limit disclosure to "Local, State, or Federal law enforcement officials, upon their written request," but expressly limit such disclosure to "investigating an alleged violation of the [SNAP Act] or regulation." *Id.*, § 272(c)(1)(vi). Disclosures for other purposes are not allowed.

As part of the State Plan, and as mandated by the SNAP act, States must maintain similar limitations on disclosure of SNAP applicant and recipient data. California's State Plan, for example, incorporates its Food Stamp Manual, which provides that "[u]se or disclosure of information obtained from food stamp applicant or recipient households" is limited to "[p]ersons directly connected with the administration or enforcement of the provisions of the Food Stamp Act or regulations." § 63-201.311. Like the SNAP regulations, California's State Plan permits

---

[4]  Executive Order 14243 of March 20, 2025, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos* and Executive Order 14218 of February 19, 2025, *Ending Taxpayer Subsidization of Open Borders.*

July 18, 2025
Page 4

disclosures of SNAP data to law enforcement to "investigat[e] an alleged violation of the Food Stamp Act or regulations." § 63.313(a). Other States' plans have similar restrictions.[5] USDA approved California's State Plan and agreed "to act in accordance with the provisions of the Food and Nutrition Act of 2008, as amended, implementing regulations and the FNS approved State Plan of Operation" on September 27, 2024. USDA has approved other States' plans on the same or similar terms.

Consistent with the SNAP Act and regulations' limitations on disclosures of SNAP data, many States also have laws that similarly limit disclosure of data regarding applicants and recipients of SNAP and other benefits programs.[6]

Putting aside the conditions by which USDA can rightfully access State SNAP data, this SORN creates a system that ignores statutory limitations on sharing SNAP-applicant and recipient data. This includes multiple broadly worded "routine use" provisions purporting to authorize USDA to share data with various entities that do not appear to have any connection to benefits administration or enforcement. Of particular concern, one proposed routine use would allow disclosure of SNAP records to a government agency when "a record on its face, or in conjunction with other records," indicates a violation or potential violation of law, "whether civil, criminal, or regulatory in nature." Another routine use purports to allow disclosures to "investigate fraud, waste, or abuse" in other federal benefits programs. Unlike the limitations on disclosure described above, these broad provisions do not include any connection to the enforcement or administration of the SNAP Act or regulations, which violates the Privacy Act as discussed below.

### Discussion

USDA's proposed collection of State-held, SNAP-participant data is both novel and unnecessary, and its proposed disclosure of data to other agencies for non-SNAP related purposes exceeds what federal law allows.

### A.  USDA's proposed collection of SNAP applicant data is unnecessary, impracticable, and risks violating federal law.

USDA's proposed SNAP database is not needed to accomplish its professed purposes and will generate government waste and increase States' burdens, rather than reducing them. As discussed above, USDA's stated rationale for the database is "to validate the accuracy of eligibility determinations and strengthen SNAP and government program integrity." But as set out above, USDA and the States already have extensive processes and systems to determine and

---

[5]  For example, New York's SNAP Source Book contains nearly identical restrictions on disclosure of SNAP records as the SNAP regulations, including limiting disclosure to "persons directly connection with administration and enforcement" of federal benefits programs and law enforcement for "the purpose of investigating an alleged violation of the Food Stamp Act or regulations," following a "written request." Section 3(E), pp. 3-9-3-11.

[6]  *See*, *e.g*., Cal. Welf. & Inst. Code, § 10850; 503 Ill. Con. Stat. 5/11-9; Ore. Rev. Stat. 411.320; Col. Rev. Stat. § 26-1-114 & 10 Co. Code Reg. 2506-1 § 4.140.B.3; N.J. Admin. Code 10:87-1.14

July 18, 2025
Page 5

review eligibility and prevent fraud. USDA also has processes to determine payment error rates, including over- and under-payments, and it publishes the CAPER and PER annually.[7] The USDA itself describes SNAP as having "one of the most rigorous quality control systems in the federal government . . . leveraging both state agency reviews and federal reviews . . . ."[8]

The States' interest in avoiding duplicate eligibility determinations is not solely rooted in good policy. Federal law counsels for both an efficient and privacy-protective approach to collecting, maintaining and using peoples' data. The Paperwork Reduction Act was passed by Congress for the purpose of "ensur[ing] the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government." 44 U.S.C. § 3501(2). When collecting information, Congress wanted federal agencies to "minimize the paperwork burden" on States and "minimize costs to the Federal Government." OMB, which implements the act, has therefore directed agencies to "perform[] information resources management activities in an efficient, effective, economical, secure, and privacy-enhancing manner." OMB Circular A-130, *Managing Information as a Strategic Resource* (July 28, 2016). Thus, federal agencies "shall…reduce [their] [personally identifiable information] to the minimum necessary for the proper performance of authorized agency functions." *Id.* at ¶ 5(a)(1)(a)(ii). The Privacy Act of 1974 also directs federal agencies to minimize records concerning individuals. 5 U.S.C. § 552a(e)(1).

While the SORN does not provide specific details related to how the data collection will be facilitated or at what frequency, it would appear to cause significant administrative burden and cost to the States. This may include preparing data for transfer to USDA on an ongoing basis or establishing automated data transfer protocols integrated with the States' eligibility system. There is also a strong risk to recipients and efficient program administration posed by potential inconsistent determinations on eligibility between the federal and state or local levels, particularly when the household and income data maintained by the states can change more quickly than it could be updated in this proposed new system. As a related example, there have been public statements by the federal administration about comparing SNAP data to IRS data. Doing so would result in a faulty comparison due to misaligned data sets. SNAP qualification is calculated, and can change, on a monthly basis; it is based on anyone in a home who purchases or eats food together. By contrast, IRS data is based on annual income of legal households, such as spouses and dependents. Importantly, any increase in error rates caused by comparing misaligned data has potentially severe consequences under recently passed legislation and could cost States and families hundreds of millions in benefits.

And, as noted above, only States Agencies can determine eligibility or terminate benefits, and in the latter case, they must provide a "fair hearing" to aggrieved individuals. 7 U.S.C. § 2020(e)(10); 7 C.F.R. § 273.15(a).

As USDA is aware, it already has a more efficient and data-minimizing means of validating States' eligibility determinations and payments. Most obviously, USDA can and

---

[7]    https://www.fns.usda.gov/snap/qc/per (visited July 9, 2025);
       https://www.fns.usda.gov/snap/qc/CAPER (visited July 12, 2025).

[8]    https://www.fns.usda.gov/snap/qc (visited July 11, 2025).

July 18, 2025
Page 6

already does perform regular quality control *sampling* of SNAP data, which it also requires the States to do. 7 C.F.R. § 275.11 ("Each State agency shall develop a quality control sampling plan which demonstrates the integrity of its sampling procedures."). As described in a USDA-commissioned study, "[t]he current two-tier SNAP QC process relies on State reviews of SNAP cases to make error determinations followed by Federal re-reviews *of a subset of the cases*; the final error rates combine the results of the State and Federal reviews."[9]

The federal government has repeatedly defended the use of statistical sampling given the cost of case-by-case review. As a result, "courts have routinely permitted the use of statistical sampling to determine whether there has been a pattern of overpayments spanning a large number of claims where case-by-case review would be too costly." *Chaves County Home Health Service, Inc. v. Sullivan*, 931 F.2d 914, 919 (D.C. Cir. 1991).[10] Indeed, "[a]udit on an individual claim-by-claim basis of the many thousands of claims submitted each month by each state *would be a practical impossibility* as well as unnecessary." *State of Ga., Dept. of Human Resources v. Califano*, 446 F.Supp. 404, 410 (N.D. Ga. 1977) (emphasis added). In contrast to the "thousands of claims" that proved impracticable in *Califano*, California alone has over 5.5 million beneficiaries who receive SNAP benefits on a monthly basis. Nationwide, these numbers balloon well beyond what USDA could meaningfully review.

Even if USDA wished to perform a far more extensive quality control review of all SNAP participants, pursuant to an agreed data and security protocol, 7 U.S.C. § 2020(a))(3), the agency could do so while still complying with the Paperwork Reduction Act and OMB's privacy guidance. USDA could request deidentified data in samples to perform its reviews or exclude other unnecessary information, like addresses. As currently used with some systems – including the National Accuracy Clearinghouse, which collects much of the same information – States could use hashing algorithms to render certain data unreadable to the recipient, but capable of reidentification by the sender. Using hashing would comport with existing regulations: if the government has adequate reason to believe an individual is wrongfully collecting SNAP benefits, federal law enforcement could submit a "written request" for the specific individual's data as it is permitted to do "for the purpose of investigating an alleged violation of the [SNAP Act] or regulation." 7 C.F.R. § 272.1(c)(1)(vi). In other words, protecting privacy does not mean the government must let wrongdoers off the hook.

Conducting a quality control review as proposed in this SORN is also impracticable. USDA has studied the feasibility of performing all quality control reviews at USDA and identified numerous challenges. *See* Feasibility Study, *supra*, note 5. That study determined that consolidating review at the federal level "would involve a significant undertaking" that faced both legal and operational impediments. For example, "FNS would need to significantly expand its workforce to conduct QC reviews without the State tier of review." FNS would also need

---

[9]  Feasibility of Revising the SNAP Quality Control Review Process, USDA, FNS Office of Policy Support (Dec. 2019) (emphasis added).

[10] *See also Illinois Physicians Union v. Miller*, 675 F.2d 151, 155 (7th Cir.1982) (Medicaid); *Michigan Dep't of Edu. v. United States Dep't of Edu.*, 875 F.2d 1196, 1204–06 (6th Cir.1989) (vocational rehabilitation programs).

July 18, 2025
Page 7

access to various federal, state, and local systems, which likely would require legislative changes, data use agreements, and implicate "privacy requirements related to integrated eligibility systems [that] are stringent and do not currently allow this type of access in most instances." *Id.* As the study makes abundantly clear, performing quality control review is not as simple as creating a new database for all SNAP participant data and asking States for a current copy of their SNAP records.

**B. USDA's proposed broad disclosure to law enforcement is not a valid "routine use" under the Privacy Act.**

USDA's broad proposed "routine use" to disclose SNAP records to government agencies, if the records, alone or in conjunction with others, indicate even a potential violation of any law, runs afoul of the Privacy Act of 1974. The Act generally prohibits federal agencies from disclosing personal records without the individual's consent or some other statutory exception. 5 U.S.C. § 552a(b). USDA invokes the "routine use" exception in the act to assert in the SORN that it may share with any government agency any records potentially indicating a violation or potential violation of any law. This swings too broadly to fit within the Privacy Act's limits.

The Privacy Act limits routine uses to disclosures for "a purpose which is compatible with the purpose for which it was collected." *Id.* § 552a(a)(7). Thus, to be a valid routine use, the reason for disclosing records must match the reason for collecting them. "There must be a more concrete relationship or similarity, some meaningful degree of convergence, between the disclosing agency's purpose in gathering the information and in its disclosure." *Britt v. Naval Investigative Service*, 886 F.2d 544, 549–550 (3d Cir. 1989). In *Britt*, an NCIS investigator met with a reserve Marine Corps major's federal civilian supervisor for background on an investigation into military ordnance found in a private home. The investigator gave the supervisor his investigatory files, thinking the supervisor might find it "relevant" to employing the major at his federal civilian job. The major then sued under the Privacy Act. The Third Circuit held that the government failed to establish that the investigator's disclosure was a valid routine use because it was not related to the original purpose of collection—a criminal investigation into improperly requisitioned and stored ordnance.

Here, States collected SNAP participant's data for the purposes of administering SNAP benefits[11] and ultimately ameliorating hunger. SNAP data can therefore be used for any routine SNAP purpose, assuming it is properly disclosed in a SORN. But USDA appears to propose to disclose SNAP records for any law enforcement purpose, regardless of its connection to SNAP. To allow such a disclosure would, "by the mere publication of broad routine use purposes, evade the statutory requirement that disclosure must be compatible with the purpose for which the material was collected." *Britt,* 886 F.2d at 550; *see also Swenson v. U.S. Postal Serv.*, 890 F.2d 1075, 1078 (9th Cir. 1989) (EEOC complaint data not compatible with disclosure to congress about number of rural mail routes); *Covert v. Harrington,* 876 F.2d 751, 755 (9th Cir. 1989) (information collected for security clearance purposes is incompatible with disclosure for criminal investigation of subsequent actions); *Mazaleski v. Treusdell,* 562 F.2d 701, 713 n. 31

---

[11]    Thus, SNAP data can be used to prosecute SNAP fraudsters, including retailers or EBT skimmers, as a valid part of overseeing or administering the program.

July 18, 2025
Page 8

(D.C. Cir.1977) (derogatory information concerning a federal employee's dismissal not compatible with disclosure to prospective employer); *see also* S. Rep. No. 1183, 93d Cong., 2d Sess., *reprinted in* 1974 *U.S. Code Cong. & Admin. News* 6916, 6983 (Privacy Act intended to prevent "an agency from merely citing a notice of intended 'use' as a routine and easy means of justifying transfer or release of information.").

As OMB itself stated, in its original 1975 Guidelines and Responsibilities for Privacy Act Implementation:

> A record may also be disclosed to a law enforcement agency at the initiative of the agency which maintains the record when a violation of law is suspected; *provided*, that such disclosure has been established in advance as a 'routine use' and that misconduct is related to the purposes for which the records are maintained…."[12]

40 Fed. Reg. 28955 (July 9, 1975). More recently, OMB reiterated that "Routine uses shall be narrowly tailored to address a specific and appropriate use of the records…[and] may be appropriate…when the use is both related to and compatible with the original purpose for which the information was collected." OMB Circular No. A-108, *Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act.*

Indeed, both the States' original collection of SNAP records, and USDA's contemplated collection of those records from the States, did not occur in a vacuum. Instead, both these collections have or will occur pursuant to a regulatory regime that by-and-large limits disclosures of SNAP records to SNAP-related purposes only, with some very specific exceptions not relevant here. *See* 7 U.S.C. § 2020(e)(8); 7 C.F.R. § 272.1(c)(1). Unlike the broad purposes contemplated by USDA's new SORN, the existing SNAP law-enforcement exception permits disclosures only when "investigating an alleged violation of the [SNAP Act] or regulation[s]." 7 C.F.R. § 272(c)(1) (vi). Thus, the proposed "routine use" is not compatible with USDA's own regulatory framework regarding how SNAP records may be disclosed.

Lastly, the fact that applicants were told their personal data would only be used for SNAP purposes forecloses USDA's proposed broad "routine use" disclosures for general law enforcement. Like the Privacy Act, other privacy laws prohibit uses or disclosures of data that are incompatible with the original collection's purpose. *E.g.* Cal. Civ. Code § 17908.100(c); Tex. Bus. & Comm. Code § 541.101(b)(1). In determining compatible uses, these regimes often inquire into "the reasonable expectations of the consumer." Cal. Code Regs. § 7002(b); *see also* Tex. Bus. & Comm. Code § 541.201(a)(2) (allowing internal uses of data "reasonably aligned with the expectations of the consumer"). In other words, when collecting data from a person, it's not the collecting entities' subjective purpose that controls, but what the individual who provided their personal information reasonably thought those purposes could be. Otherwise, an entity's ulterior motives for collection would eviscerate protections in privacy laws, like the Privacy Act.

---

[12]   Discussing requests initiated by an agency under the related law enforcement exception to the Privacy Act, OMB noted that "blanket requests for all records pertaining to an individual are not permitted" either. 40 Fed. Reg. 28955.

July 18, 2025
Page 9

SNAP applicants are told their data will not be used for non-SNAP investigations, whether expressly or implicitly. New York's SNAP application, for example, requires applicants to specifically consent to "any investigation by" the state or local agencies administering SNAP, but only "in connection with my request for SNAP benefits."[13] California's application for SNAP is particularly explicit that immigration status will not be used for non-SNAP purposes:

> **Important Information for Noncitizens**
> You can apply for and get [benefits] for people who are eligible . . . [such as] immigrant parents may apply for . . . their U.S. citizen or qualified immigrant children, even though the parents may not be eligible.… Immigration information is private and confidential . . . [but may be] checked with the U.S. Citizenship and Immigration Services (USCIS). Federal law says the USCIS cannot use the information for anything else except cases of fraud.[14]

USDA has not previously expressed any concerns with the applications' language during any management review. California counties also reinforce the message that applicants' "personal information is protected and only used to determine your eligibility for benefits . . . with limited exceptions."[15] These assurances to applicants are not just required by law; they help ensure the success of the program by reassuring applicants that their data will not be used or re-disclosed for improper purposes. Without those assurances, many people may decide to forego applying for benefits and go hungry—a risk that is particularly acute for citizen or qualified-immigrant children of ineligible parents.

Indeed, even USDA has told applicants that their personal information won't be used for non-SNAP purposes. As recently as February 2, 2025, the USDA FNS website contained a section titled "SNAP Eligibility for Non-Citizens" that had a banner at the top of the page that said "**Important**" and then "You can apply for or receive SNAP without immigration consequences."[16] The website's FAQ stated, "you will not be deported, denied entry into the U.S., denied permanent resident status (Green Card holder), or the ability to become a U.S. citizen solely because you or a family member applied for or received SNAP."

To be clear, the States are not proposing that SNAP records cannot be disclosed for longstanding anti-fraud purposes. But to the extent that USDA's new SORN purports to allow new uses of SNAP records for enforcing other laws, that is not a "routine"—or lawful—use.

## Conclusion

The States remain committed to working with our federal partners to eliminate fraud and waste in benefits program using the mechanisms that already exist today, and to finding ways of improving those mechanisms that respect both the program's governing statutes and regulations

---

[13]   https://otda.ny.gov/programs/applications/4826.pdf (visited July 10, 2025).

[14]   https://www.cdss.ca.gov/cdssweb/entres/forms/English/SAWS2_PLUS.pdf (emphasis added)

[15]   https://www.sfhsa.org/services/food/calfresh/calfresh-immigrants-frequently-asked-questions (visited July 10, 2025).

[16]   See https://web.archive.org/web/20250202100047/https://www.fns.usda.gov/snap/recipient /eligibility/non-citizen (last visited July 17, 2025, but archived Feb. 2, 2025).

July 18, 2025
Page 10

and SNAP applicants' reasonable expectations of privacy. But, ultimately, the undersigned States urge the USDA not to lose sight of the fact that SNAP exists to fight hunger. The Privacy Act and other limitations on disclosure in the SNAP Act and its implementing regulations exist to protect people's privacy. Lawful recipients of these vital food benefits should not have to choose between protecting their privacy and getting enough to eat. Congress mandated that federal and state agencies accomplish both, and it gave them the tools to do so.

For the foregoing reasons, we urge USDA to withdraw the SORN set forth at USDA/FNS–15, Nat'l SNAP Info. Database, 90 Fed. Reg. 26521 (Jun. 23, 2025), and instead continue to work with the States to improve the efficiency and integrity of SNAP through the well-developed oversight processes already in place.

Sincerely,

ROB BONTA
*California Attorney General*

LETITIA JAMES
*New York Attorney General*

DAN RAYFIELD
*Oregon Attorney General*

KWAME RAOUL
*Illinois Attorney General*

RAÚL TORREZ
*New Mexico Attorney General*

PETER NERONHA
*Rhode Island Attorney General*

KEITH ELLISON
*Minnesota Attorney General*

NICK BROWN
*Washington Attorney General*

DANA NESSEL
*Michigan Attorney General*

ANTHONY G. BROWN
*Maryland Attorney General*

July 18, 2025
Page 11

WILLIAM TONG
*Connecticut Attorney General*

KRISTIN K. MAYES
*Arizona Attorney General*

PHILIP J. WEISER
*Colorado Attorney General*

MATTHEW J. PLATKIN
*New Jersey Attorney General*

# EXHIBIT M

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NAMOD PALLEK, *et al.*,

            Plaintiffs,

    v.

BROOKE L. ROLLINS, in HER official capacity as U.S. Secretary of Agriculture, *et al.*,

            Defendants.

Case No. 1:25-cv-01650-JMC

Judge Jia M. Cobb

## NOTICE OF FILING OF CERTIFIED LIST OF THE CONTENTS OF THE ADMINISTRATIVE RECORD

Defendants in the above-captioned action file this notice of the filing of a certified list of the contents of the administrative record pursuant to Local Civil Rule 7(n) and this Court's July 29, 2025 Minute Order. A certification of the completeness of the administrative record and the administrative record's table of contents accompany this filing. Defendants have produced the full contents of the administrative record to counsel for Plaintiffs.

Dated: August 15, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division, Federal Programs Branch

ELIZABETH J. BERMAN
Deputy Director
Federal Programs Branch

*/s/ Bradley P. Humphreys*
BRADLEY P. HUMPHREYS
Senior Trial Counsel

BENJAMIN S. KURLAND
Trial Attorney
Civil Division, Federal Programs Branch
United States Department of Justice
1100 L Street NW
Washington, DC 20005
Telephone: (202) 305-0878
Bradley.Humphreys@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NAMOD PALLEK *et al.* | **)** |
|  | **)** |
| Plaintiffs, | **)** |
|  | **)** |
| v. | **)** |
|  | **)** |
| BROOKE ROLLINS, in her official capacity | **)** |
| as U.S. Secretary of Agriculture, *et al.* | **)** |
|  | **)** |
| Defendants. | **)** |
|  | **)** |

Civil Action No. 1:25-cv-01650-JMC

## CERTIFICATION OF ADMINISTRATIVE RECORD

I, Shiela Corley, Chief of Staff for the Deputy Under Secretary for the Food, Nutrition, and Consumer Services, United States Department of Agriculture, hereby certify that the attached Administrative Record is a true, correct, and complete copy of the non-privileged documents that were directly or indirectly considered in connection with the promulgation of the June 23, 2025 Notice of a new System of Records (SORN), 90 Fed. Reg. 26521, and USDA's collection of SNAP recipient data from January 1, 2020 through the present.

In accordance with 28 U.S.C. § 1746, I hereby certify and declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

SHIELA CORLEY

Digitally signed by
SHIELA CORLEY
Date: 2025.08.15
11:41:53 -04'00'

Shiela Corley
Chief of Staff
Food, Nutrition, and Consumer Services
United States Department of Agriculture

| Administrative Record for *Pallek, et al. v. United States Department of Agriculture* | Date | Bates Number Range |
|---|---|---|
| 1. Food and Nutrition Act of 2008 | N/A | PALLEK-000001 – PALLEK-000004 |
| 2. OMB 0584-0064 Supporting Statement | 05-31-2024 | PALLEK-000005 – PALLEK-000030 |
| 3. OMB 0584-0064 Appendix A, Food and Nutrition Act of 2008, As Amended Through P.L. 116–94 | 02-06-2024 | PALLEK-000031 – PALLEK-000204 |
| 4. OMB 0584-0064 Appendix B, 7 CFR Parts 271 – 273 as of December 21, 2023 | 02-06-2024 | PALLEK-000205 – PALLEK-000498 |
| 5. OMB 0584-0064 Appendix D, Food Programs Reporting System (FPRS) | 02-06-2024 | PALLEK-000499 – PALLEK-000500 |
| 6. OMB 0584-0064 Appendix E, Burden Table | 02-06-2024 | PALLEK-000501 |
| 7. OMB 0584-0064 Appendix F, Burden Narrative | 02-06-2024 | PALLEK-000502 – PALLEK-000541 |
| 8. Executive Order 14243 | 03-25-2025 | PALLEK-000542 – PALLEK-000543 |
| 9. May 6th Letter | 05-06-2025 | PALLEK-000544 – PALLEK-000545 |
| 10. Nonsubstantive Change Request, OMB 0584-0064 | 06-11-2025 | PALLEK-000546 – PALLEK-000548 |
| 11. OMB 0584-0064 Appendix E; Burden Table, revised | 06-11-2025 | PALLEK-000549 |
| 12. Notice of a new system of records, 90 Fed. Reg. 26521 | 06-23-2025 | PALLEK-000550 – PALLEK-000552 |
| 13. Revised Nonsubstantive Change Request, OMB 0584-0064 | 06-24-2025 | PALLEK-000553 – PALLEK-000554 |
| 14. July 9th Letter | 07-09-2025 | PALLEK-000555 |
| 15. Public Comments on Notice of a new system of records, FNS-2025-0024-0001 | 06-30-2025 – 07-23-2025 | PALLEK-000556 |
| 16. Documents submitted as Public Comments on Notice of a new system of records, FNS-2025-0024-0001 | 07-16-2025 – 07-23-2025 | PALLEK-000557 – PALLEK-000624 |
| 17. July 23rd Letter | 07-23-2025 | PALLEK-000625 – PALLEK-000626 |
| 18. FY 2025 Privacy Impact Assessment | 07-23-2025 | PALLEK-000627 – PALLEK-000655 |
| 19. July 25th Letter | 07-25-2025 | PALLEK-000656 |
| 20. Analysis of SORN Comments | 08-14-2025 | PALLEK-000657 |