1  ROB BONTA
   Attorney General of California
2  PAUL STEIN
   Supervising Deputy Attorney General
3  ANDREW Z. EDELSTEIN
   ANNA RICH
4  EDWARD P. WOLFE
   ROBIN GOLDFADEN
5  SEBASTIAN BRADY
   WILLIAM BELLAMY
6  MARIA F. BUXTON
   Deputy Attorneys General
7  State Bar No. 318563
     455 Golden Gate Avenue, Suite 11000
8    San Francisco, CA 94102-7004
     Telephone:  (415) 510-3873
9    Fax:  (415) 703-5480
     E-mail:  Maria.Buxton@doj.ca.gov
10 *Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA; STATE OF NEW YORK; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR** ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky; **STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF WASHINGTON; STATE OF WISCONSIN,**<br><br>Plaintiffs,<br><br>**v.** | Case No. **3:25-cv-06310-MMC**<br><br>**DECLARATION OF REBECCA PIAZZA IN SUPPORT OF PLAINTIFF STATES' MOTION FOR STAY OR PRELIMINARY INJUNCTION** |

1
2   **UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS,** in her official capacity as U.S. Secretary of Agriculture; **U.S. DEPARTMENT OF AGRICULTURE'S OFFICE OF INSPECTOR GENERAL**,
3
4
5                          Defendants.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# DECLARATION OF REBECCA PIAZZA

I, Rebecca Piazza, hereby declare as follows:

1. I am over the age of 18 and have personal knowledge of the following matters set forth in this declaration. If called as a witness, I would competently testify to them.

2. I am the former Senior Advisor for Technology and Delivery for the Food and Nutrition Service (FNS), within the U.S. Department of Agriculture (USDA), where I was responsible for ensuring the effective use of technology in the delivery of FNS benefits, including for the Supplemental Nutrition Assistance Program (SNAP) and other programs such as the Special Supplemental Nutrition Program for Women, Infants, and Children, commonly known as WIC. I held the Senior Advisor for Technology and Delivery position for approximately 3.5 years, and then in July 2024 moved into the role of Chief of Staff for FNS, a position I held until this past January.

3. Overall, I have worked in technology in the government and private sectors for more than 25 years. This experience includes serving as the Deputy Executive Director and later the Acting Executive Director of 18F, a digital consulting office within the General Services Administration's Technology Transformation Services. My private sector experience includes 18 years of technology consulting work for government clients at the federal, state, and local levels, including serving as Vice President of Delivery at a government technology consulting company and seven years with Booz Allen Hamilton, where I led projects to improve cybersecurity for the armed forces and the defense industrial base. In addition to my professional work experience, I hold a Bachelor of Science degree in computer science.

4. As a member of FNS's senior leadership for four years, I was closely familiar with USDA's and USDA FNS's policies and practices around the collection and safeguarding of data from state agencies that administer SNAP as well as the use and integration of technology to enhance the delivery of services.

5. Based on my experience, USDA FNS has historically and consistently operated in accordance with three inter-related principles: (1) prioritizing the security of any data collected on individuals, by employing rigorous security measures to protect against security breaches; (2)

following federal guidelines dictating that federal agencies minimize the amount of personally identifying information they collect, collecting only what is necessary to carry out the agency's duties; (3) avoiding the aggregation or collection of personally identifiable information of the entire registry of program applicants, participants, or household members in a centralized database maintained by USDA. These central tenets were widely understood across the agency. They served as guideposts for the administration of all of FNS's programs and were effectively de facto policy.

6. In line with the general policy and practice I have described above, to my knowledge, USDA has never before demanded or otherwise attempted to collect, from states or other sources, personally identifiable information for the entire inventory of applicants or participants in SNAP or other FNS programs. To date, the USDA has not maintained a centralized database of personally identifiable information (PII) for all SNAP participants, nor has it done so for any of the other nutrition security programs that FNS administers.

7. The National Accuracy Clearinghouse (NAC) is an illustrative example of FNS's commitment to and application of its privacy and data security principles. While I was at USDA FNS, I oversaw the implementation of the NAC, mandated by the Agriculture Improvement Act of 2018, to detect and prevent duplicate SNAP participation across states. The NAC has been adopted by 10 states and will be fully implemented by all SNAP jurisdictions by 2027. USDA FNS deliberately designed the NAC system to minimize the security risk to individuals. Among the features of the system that reflect this deliberate design is the use of a "privacy preserving record linkage" approach. This approach uses cryptography to allow the NAC system, which is hosted by USDA, to identify duplicate participation (i.e., instances of the same individual being issued SNAP benefits in more than one state) across states, without needing to collect any PII about participants from the state agencies. Another feature of the NAC system design to protect privacy and security was to delete even these deidentified records of individuals who were no longer SNAP recipients upon the next refresh of data from the individual's state agency, typically within one day of disenrolling.

8. Developing the NAC to work in this manner took longer than an approach that would have involved simply collecting participant PII from the states and territories and planning to have USDA use participants' PII to run comparisons and analyses. However, weighing the considerable security risks that collecting and centralizing such data would cause, the agency made the reasoned decision to take the more secure approach that minimized PII collection, even though it ultimately required more time to implement.

9. On multiple occasions I briefed congressional staff from the House and Senate Agriculture Committees on the progression of NAC's development and how we were weighing trade-offs between speed and security. Statements in the congressional record of the legislation creating the NAC reflected security concerns around the collection of large data sets. In particular, the record reflected awareness of prior data security breaches and, specifically, the risk that any large data set can become a target for hacking, identity theft, or other purposes that are not associated with the administration of SNAP. USDA and FNS shared the same concerns and understood the importance placed on building stringent privacy and security protections into the NAC. Reflecting this, FNS ensured that use of the data and system for NAC be only for the limited purpose identified in the legislation, and not for any other purpose; that data collection was minimized to data that had a clear, relevant, and necessary purpose; and that PII was not collected because there was a way to achieve the system's purpose without collecting PII.

10. The NAC is but one example of the above-described policy and practice in action. USDA FNS has long conducted quality control checks of state SNAP programs by collecting limited samples of state SNAP data, as codified in 7 C.F.R. §§ 275.10–14, which are the USDA's SNAP-implementing regulations. This process has generally been successful at identifying an accurate error rate of state programs, and poses a more limited security risk than collecting a larger tranche of State SNAP data.

11. I am aware of the new USDA FNS requirement for states to share more than five years of PII about SNAP applicants and recipients. I first learned of this new requirement when I

saw a May 6, 2025 letter from USDA to directors of state agencies that administer SNAP and have since continued to follow the matter.

12. I find the USDA's new requirement that states provide more than five years' worth of State SNAP data, including PII that includes social security number, dates of birth, and personal addresses, to be deeply concerning. While I recognize the importance of program integrity and operational efficiency in SNAP, this new data collection requirement represents an unprecedented and risky expansion of federal data collection and retention practices related to low-income Americans. The collection and centralization of such a vast quantity of PII from program applicants, participants, and household members sharply contravenes the policy and practice I describe above.

13. I reviewed the SORN entitled ''National Supplemental Nutrition Assistance Program (SNAP) Information Database'' that USDA FNS published in the Federal Register at 90 Fed. Reg. 26,521 on June 23, 2025. Several aspects of the SORN deeply concerned me and prompted me to submit a comment, which is not a common practice for me. A true and correct copy of the comment I submitted is attached here as Exhibit A.

14. As I explained in my comment, the collection of such a massive amount of PII is extremely risky from a security perspective. A repository of such data can become a target for hackers and other malicious actors, and any kind of security breach would be costly and would jeopardize the privacy of millions of individuals. Any kind of compromise of this data would irreparably damage the trust that individuals have in the SNAP program, which, in turn, would make eligible individuals less likely to apply for SNAP benefits. This would seriously harm USDA FNS's mission to deliver nutrition assistance to those in need.

15. This risk is borne out in recent events. For example, as discussed in my comment letter, in 2023, the Centers for Medicare & Medicaid Services (CMS) suffered a data breach that compromised data from millions of individuals. The point of entry for the data breach was the MoveIt program that CMS was using to transfer large quantities of data. This is the same program

that USDA FNS is proposing to use now to transmit SNAP applicant and participant data, including PII.

16. As another example of a significant federal data breach, the Office of Personnel Management (OPM) in 2015 suffered a data breach which affected approximately 21.5 million individuals. This breach cost $350 million to remediate. The 2015 OPM data breach is illustrative of the multi-million-dollar liability that would occur in the event of a similar security breach affecting the new SNAP database. In 2024, SNAP served an average of 41.7 million people per month, almost twice as many participants as were affected by the 2015 OPM data breach.

17. Just this month it was revealed that the U.S. federal court filing system was breached. News articles report that the information compromised extended to documents that were nominally filed under seal, which may have included the names of witnesses and defendants who were cooperating with law enforcement.

18. While I was not involved in the design of the CMS, OPM or U.S. federal court systems, I trust that they followed federal security guidelines for protecting databases that contain PII or other sensitive or confidential information. Still they were breached. These data breaches are cautionary examples that illustrate that large federal databases containing PII or similar data can be high-risk targets for hackers; even the best systems can still be breached; and any security compromise of those databases can affect millions of individuals' privacy.

19. The only certain way to protect against breaches like these is to not collect, store, or centralize such information. USDA FNS's new data requirement does just this, and in an unprecedented way. This is my most fundamental concern. The benefit of collecting this data is not justified by the risk that this collection poses. The risks include identity theft for the individuals whose PII is made vulnerable, reputational harm to the program, and substantial financial liabilities to the agency. Had these risks been adequately considered, I do not think these collections would have been pursued.

20. In SNAP's 60-year history, USDA has never needed nor sought anywhere near the same scope of PII that the Department is now requiring. The vast quantities of PII that USDA is

seeking far exceed what USDA has shown to need to fulfill its oversight role. The new requirement lacks clear justification and departs from policy and practice as well as relevant federal laws, such as the Privacy Act and the Paperwork Reduction Act, as I understand them.

21. I have also reviewed the Privacy Impact Assessment that USDA published regarding the SNAP ID Database. That document indicates that the USDA plans to use the same MoveIt file transfer tool that was implicated in the major 2023 data breach affecting CMS, which I describe above in paragraph 15. Given the scale of this system and the sensitivity of SNAP data, relying on a file transfer tool with a recent high-profile vulnerability raises serious concerns about the robustness of USDA's risk management strategy for this system. The Privacy Impact Assessment also acknowledges, but does not address or adequately demonstrate there will be mitigation of, the many serious security risks presented by the collection of personally identifying SNAP data into a central database. In line with the general policy and practice described above, I would expect USDA to take more robust measures to address the security and privacy concerns outlined in the Privacy Impact Assessment and explain that mitigation in the Privacy Impact Assessment.

22. After reviewing the "routine uses" section of the SORN associated with the new requirement, I have significant concerns regarding the breadth of the authorized uses of the data. Three of the enumerated routine uses (uses 9, 10, and 11) represent a marked departure from precedent. They have not appeared in any of the four most recent SORNs published by FNS. This raises serious questions about both the necessity and the rationale for such an expansion of the routine uses. In particular, routine use 11 is drafted so broadly that USDA can assert it has discretion to use the data across a wide spectrum of purposes, many of which fall outside the scope of prior practice and beyond those that would be reasonably anticipated by the public. Finally, once data is collected, how it may be used can change. If this data aggregation and centralization is permitted, FNS has the ability to update the SORN to enable additional uses to be authorized.

I declare under penalty of perjury under the laws of the United States that, to the best of

my knowledge, the foregoing is true and correct.

Executed on August 18, 2025, at Washington, D.C.

_____
Rebecca Piazza

# EXHIBIT A

‹ Back to Document Comments (/document/FNS-2025-0024-0001/comment)

Share ▾

 PUBLIC SUBMISSION

# Comment on FR Doc # 2025-11463

Posted by the **Food and Nutrition Service** on Jul 24, 2025

Docket (/docket/FNS-2025-0024) / Document (FNS-2025-0024-0001) (/document/FNS-2025-0024-0001) / Comment

**Comment**

I submit this comment as the former Senior Advisor for Technology and Delivery at the U.S. Department of Agriculture's Food and Nutrition Service (USDA FNS), where I was responsible for ensuring the effective use of technology in the delivery of FNS benefits, including for the Supplemental Nutrition Assistance Program (SNAP). In that role, I worked closely with state agencies, federal partners, and technology vendors to modernize systems while safeguarding program integrity and participant privacy. I offer the following concerns based on my experience in that role, additional relevant experience as the former Executive Director of 18F at the General Services Administration, and more than 25 years of experience designing and building civilian and military information systems.

I write to express significant concerns regarding the proposed establishment of the National SNAP Information Database, as outlined in Federal Register Notice 2025-11463. While I recognize the importance of program integrity and operational efficiency in SNAP, this system represents an unprecedented and potentially risky expansion of federal data collection and retention practices related to low-income Americans.

To date, the federal government has not maintained a centralized database of personally identifiable information (PII) for all SNAP participants. The proposed system would aggregate names, dates of birth, Social Security Numbers (SSNs), addresses, and program participation data for tens of millions of individuals, many of whom are children, seniors, and persons with disabilities. The sheer scale and sensitivity of this dataset make it a prime target for malicious actors. If breached, it would represent a catastrophic loss of public trust in the nation's safety net programs and could expose the federal government to substantial liability. The Office of Personnel Management (OPM) breach in 2015, which affected approximately 21.5 million individuals and cost over $350 million to remediate, serves as a cautionary precedent. The National SNAP Information Database could affect many more people, with proportionally higher costs and harm.

These concerns about data security are further reinforced by supporting information in the National SNAP

Give Feedback

Information Database's related Privacy Impact Assessment (PIA) (https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf), which indicates that the USDA plans to use the MoveIt file transfer tool to transmit participant data to the national database. MoveIt was implicated in a major 2023 data breach affecting the Centers for Medicare & Medicaid Services (CMS), compromising data from millions of individuals (https://www.cms.gov/newsroom/press-releases/cms-notifies-additional-individuals-potentially-impacted-moveit-data-breach). Given the scale of this system and the sensitivity of SNAP data, relying on a file transfer tool with a recent high-profile vulnerability raises serious concerns about the robustness of USDA's risk management strategy for this system.

Further, the SORN also provides a lack of clarity regarding the role of Microsoft, which is listed as a third-party service provider even though the system is hosted in Amazon Web Services (AWS) cloud infrastructure. Neither the SORN nor PIA specify whether Microsoft is providing software, identity management, analytics, or other services. Without a clear explanation, the public cannot evaluate whether this poses additional risks to sensitive data.

While program integrity is an important SNAP objective, it must not come at the expense of privacy, transparency, and public trust. The design of the proposed system raises concerns but, even if those concerns were addressed, the intent to establish it exposes the Federal government to significant financial risk and poses unprecedented and unacceptable risks to the individuals it is intended to serve.

Respectfully submitted,
Rebecca Piazza

**Comment ID**

FNS-2025-0024-0454



**Tracking Number**

mdg-q8d1-1cyt

**Comment Details**                                                  **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Jul 23, 2025

*Your Voice in Federal Decision Making*

About (/about) | Bulk Data Download (/bulkdownload) | Agencies (/agencies) | Learn (/learn) | Reports (/dotreports) | FAQ (/faq) | Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback