IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

**STATE OF CALIFORNIA; STATE OF NEW YORK; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR** ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky**; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF WASHINGTON; STATE OF WISCONSIN,**

                                    Plaintiffs,

            **v.**

**UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS,** in her official capacity as U.S. Secretary of Agriculture**; U.S. DEPARTMENT OF AGRICULTURE'S OFFICE OF INSPECTOR GENERAL,**

                                    Defendants.

Case No. **3:25-cv-06310-MMC**

**DECLARATION OF RYAN GILLETTE**

**DECLARATION OF RYAN GILLETTE**

I, Ryan Gillette, declare as follows:

1.      I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

**Professional and Agency Background**

2.      The California Department of Social Services (CDSS) is responsible for the administration of public social services, except health care services and medical assistance, throughout California.

3.      I am currently employed by CDSS as Chief Data Officer and Deputy Director of the Research, Automation, and Data Division (RADD) and have held this position since November 2021. RADD is responsible for the development, implementation, and evaluation of policies and procedures regarding CDSS' data, research and evaluation efforts, federal and state reporting, program integrity functions, automation projects, and data practices.

4.      Prior to my employment with CDSS, I served as a Director of the Public Sector Practice for Social Finance Inc. between January 2019 and November 2021. I was a Program Director of the Harvard Kennedy School of Government Performance Lab from 2014 to 2019 and a Social Impact Bond Government Innovation Fellow from 2012 to 2014. I was a Research Analyst for the National Bureau of Economic Research from 2008 to 2011 and Research Assistant at Harvard University from 2008 to 2009.

5.      I have a Masters in Public Policy, with an area of concentration in Social and Urban Policy, from Harvard Kennedy School of Government and a Bachelor of Economics and Russian Language from Middlebury College.

6.      As Chief Data Officer and Deputy Director of RADD, I oversee managers and staff ensuring the accurate, timely, and efficient collection and management of CDSS enterprise data assets, and deploying that data through research, analysis, and visualizations to support the efficient, effective, and equitable delivery of government social services. RADD manages major

1

statewide initiatives to streamline and automate eligibility determination and benefit administration for key safety net programs, and leads efforts such as human-centered design, data governance, automation and continuous quality improvement, data visualization, and analysis.

**CalFresh Data and Datasharing Background**

7.    Among the social services programs administered or overseen by CDSS is the CalFresh Program. CalFresh is California's version of the federal Supplemental Nutrition Assistance Program (SNAP). CalFresh provides monthly nutrition benefits to eligible low-income individuals and families through Electronic Benefits Transfer (EBT) loaded onto participants' EBT cards, which can be used like a debit card to purchase groceries at participating retail vendors.

8.    CalFresh is overseen by CDSS and is administered by the state's 58 counties.

9.    CalFresh individual payee and recipient data is contained within the California Statewide Automated Welfare System (CalSAWS), an integrated, automated system that manages eligibility for public benefits programs across the entire state of California.

10.    BenefitsCal is an online portal that Californians can use to apply for and manage public benefits for which they have qualified including CalFresh.

11.    CalSAWS contains highly sensitive, personally identifiable information about Californians who have applied for and/or received both federal and state public benefits. This can include income; household membership (including anyone with whom an applicant purchases and prepares food); immigration status; and other personal data.

12.    Some of that highly sensitive personally identifiable information is passed along to the EBT system, which in turn contains additional, highly confidential data about individual Californians.

13.    The EBT system is the benefit delivery system that allows CalFresh, CalWorks, and other program participants to use EBT cards to access nutrition and cash benefits. It is run by CDSS with technical support from the California Health and Human Services Agency's Office of Technology Solutions Integration ("OTSI").

14.    Personally identifiable information contained within the EBT system includes

2

first and last names, home address, dates of birth, Social Security numbers, telephone and email contact information, language spoken, and individual bank account and routing numbers. For some individuals, EBT data includes Medi-Cal codes that indicate factors such as disability or immigration status. EBT transaction data records show where and when a payee used an EBT card: for example, if an EBT card holder routinely shops at a particular grocery store at a particular time, that information will be reflected in the EBT transaction history.

15.     In my work, I treat CalFresh and other public benefits data, especially data containing personally identifiable information, with utmost care to protect Californians' privacy and confidentiality. I am informed and believe that my colleagues share this practice of care for privacy and confidentiality. In accordance with state and other applicable rules and procedures, we ensure that personally identifiable information is secure by, for example, only allowing authorized data usage in secured locations, conducting regular trainings on data security, and ensuring that data is only accessed from official workstations and laptops that meet technological control standards. Among other practices, we make sure to only access, copy, download, or export the minimum necessary amount of personally identifiable information that is required to perform any specific business function.

16.     As part of my job, I routinely review and approve responses to requests for CalFresh data, including from federal oversight entities, other California state agencies, researchers, and others with legitimate interests in this information.

17.     As provided in our CalFresh State Plan of Operations, prior to providing sensitive data, we typically enter into a written Data Use Agreement (DUA). These agreements typically include a detailed description of the purposes for which the data is being used, the specific confidentiality and information security controls that the requestor must follow (e.g., who is allowed to access the data, technological security standards, and how to destroy or return the data after they are no longer needed for the business purpose for which they were obtained), and how to handle a privacy breach. If the scope of a request for data seems disproportionate in comparison to the purposes for which the data is being requested, or to otherwise pose unnecessary risks to Californians' privacy and security, or to otherwise violate California privacy

1    laws, CDSS will deny that request.

2        18.    The United States Department of Agriculture (USDA) and its sub-agency, Food

3    and Nutrition Service (FNS) oversee the States' administration of SNAP.  CDSS has a

4    longstanding relationship with FNS, and is committed to working with FNS to ensure that the

5    SNAP program is administered correctly and benefits are properly granted or denied. To that end,

6    CDSS provides data to FNS upon request, when consistent with legal authority. FNS's requests

7    have historically been narrow in scope and clearly congruent with the purposes of administration

8    of the SNAP program.

9        19.    For example, every month, CDSS randomly selects a statistically valid sample of

10   CalFresh cases for review pursuant to federal SNAP Quality Control System (SNAP-QCS)

11   purposes. The SNAP-QCS process is one of the main ways that CDSS and USDA ensure that

12   participants are receiving the correct benefits for which they are eligible, and to verify that

13   decisions to deny, terminate, or suspend a household from SNAP were correct.

14       20.    The data that USDA collects as part of the SNAP-QCS process is clearly defined

15   in the federal statute and USDA regulations, and covered by a Privacy Impact Assessment that

16   unequivocally stated that access to data within USDA would be tightly controlled, limited to

17   quality control purposes, and that no data would be shared outside USDA. (Exhibit A.) According

18   to USDA's SNAP-QCS Privacy Impact Assessment, "[o]nly those state and federal employees

19   with eAuth Level 2 credentials and who have been authorized through the FNS-674 process to

20   access SNAP-QCS may use the system and perform work that is directly related to SNAP QCS."

21   SNAP data collected is limited to use "as part of the SNAP-QCS process," and is not externally

22   disclosed ("Information is not shared outside [USDA].").

23       21.    USDA has previously described SNAP as having "one of the most rigorous

24   quality control systems in the federal government." That assessment is consistent with my

25   experience. (https://www.fns.usda.gov/snap/qc).

26       22.    In complying with external audits, inspections, evaluations, or other oversight

27   requests relating to CalFresh, CDSS evaluates all incoming requests for data in accordance with

28   confidentiality and privacy policies and best practices, which include determining the minimum

4

necessary amount of personal information needed to accomplish the purpose of the audit, and limiting access to data accordingly. An inspector's access to data is ordinarily limited according to the specific purposes required by the audit, inspection, or evaluation.

23.    When CDSS provides data to external entities for any purpose, it is ordinarily both limited to a representative subset of CalFresh recipients, and/or anonymized. For example, we might replace identifying information with hashes if it is not needed for oversight purposes.

24.    If an organization, including the federal government, asks for personally identifiable information, CDSS questions the requestor regarding what information is actually needed in order to accomplish the intended purpose, and we limit the information provided accordingly.

25.    I am familiar with the USDA's interim final rule implementing the SNAP National Accuracy Clearinghouse (NAC), a datasharing program authorized by the 2018 Agriculture Improvement Act for the purpose of ensuring that SNAP participants are not improperly receiving benefits in multiple states simultaneously. Since USDA's October 3, 2022 promulgation of an interim final rule describing the results of a NAC pilot program and setting forth rules and an October 4, 2027 compliance deadline, CDSS has been actively engaged with USDA to ensure that the NAC is used for the limited statutory purpose of preventing interstate duplicate participation, while protecting vulnerable individuals (such as domestic violence victims) and complying with relevant privacy laws. For example, NAC has agreed with states' request to develop a system that hashes certain PII to reduce risk.  There is extensive information online about the system, available to the public and to the States.

26.    USDA's approach so far in developing the NAC is in stark contrast with the Trump administration's announcement in its March 20, 2025 Executive Order on "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos," (the "Information Silos EO"). (https://www.whitehouse.gov/presidential-actions/2025/03/stoppingwaste-fraud-and-abuse-by-eliminating-information-silos/). The EO's demands, which include that the federal government have "unfettered access to comprehensive data from all State programs that receive Federal funding, including, as appropriate, data […] maintained in third-party databases," lack any

reference to, or provision for, the privacy and confidentiality concerns that my colleagues and I routinely take into account when making decisions about how, with whom, and for what purposes to share Californians' sensitive personal data.

**Office of Inspector General Data Demands to CDSS**

27.      On or around March 7, 2025, CDSS received an engagement letter from the USDA Office of Inspector General (OIG) informing CDSS that the OIG planned to initiate an inspection with the objective to "determine whether the State of California used FNS [Food and Nutrition Services] SNAP administrative funds to provide benefits to participants." The letter, dated March 5, 2025, stated that the scope of the inspection would cover fiscal year 2024 SNAP administrative funds.

28.      I am informed and believe, on or around March 12, 2025, the OIG announced an onsite visit to CDSS would take place the week of March 24, 2025. Prior to its visit, the OIG provided a list of agenda items by email on March 18, 2025. While most of these items focused, as stated in the OIG engagement letter, on the use of federal administrative funds, three new agenda items were related to data extracts and data access. Specifically, the OIG asked to understand, have a walkthrough of, and discuss data extracts and/or system access to CalSAWS. This was a surprising request because the data OIG was asking about involves only individual benefit records; neither CDSS nor counties' use of federal administrative funds is in any way recorded in CalSAWS.

29.      Providing only four business days' notice prior to an on-site visit and a long list of data demands is not an ordinary practice for auditors. Preparation for an audit is a time-intensive process, and pulling together the data necessary to respond to a request such as this can take weeks to prepare.

30.      The OIG conducted its initial on-site visit to CDSS on March 24, March 25, March 26, and March 27, 2025. CDSS provided OIG with thorough answers to all of their inquiries relating to use of administrative funds, explaining that the CalFresh systems are set up in such a way that the federal funds intended to pay for the program's administrative costs could not possibly be diverted to pay for individual CalFresh benefits, as OIG's engagement letter

6

1    suggested might be happening.

2         31.    One session on March 24, 2025, focused on the CalSAWS data system. During

3    this meeting, the OIG began asking questions that went well beyond the original engagement

4    letter's stated objective of determining whether the State of California had used USDA SNAP

5    administrative funds to provide benefits to CalFresh participants. These questions included, for

6    example, what fields would be in California's system if OIG were to look at it for eligibility; how

7    the input into the system works and who enters the data; whether OIG could have a data

8    dictionary; how CalSAWS was connected to the EBT vendor; whether the names of applicants go

9    to a national list; whether the state is able to link particular expenses to an individual; and other

10   details about the California's database and the other systems it interacts with. CDSS staff

11   complied with all of these requests for information.

12        32.    I am informed and believe that on or around April 9, 2025, CDSS received an

13   updated engagement letter from the OIG, dated April 2, 2025, which expanded the objective of

14   the inspection as follows: "Our objective will be to determine whether the State of California used

15   FNS SNAP administrative funds to provide benefits to participants. We will also perform

16   analytics on SNAP participant data to evaluate its quality and integrity."

17        33.    On or around April 9, 2025, the OIG emailed CDSS and requested CDSS provide

18   "CA participant data for Federal FY24. We would like *all data that is entered in the application*

19   *process*, including all required fields for SNAP." (Emphasis added.) This communication further

20   indicated that if the request were a "heavy lift," the OIG may be able to narrow data fields once a

21   data dictionary was provided or if California could provide a sample of 100 records with all

22   fields. The OIG specified that the request should include "any other data that the State adds to the

23   application for verification of information purposes (SAVE, IRS, Death Master List, etc)."

24        34.    On April 9, 2025, CDSS provided the requested data dictionary to OIG.

25        35.    On or around April 11, 2025, the OIG once again updated its data request by

26   email.  The OIG indicated it was seeking "CA participant data for Federal FY24. We would like

27   data that is entered in the application process, information about start and end dates, and any

28   verification data, both the input and resulting checks (for FY24 only – 10/1/2023 – 9/30/2024)."

7

Although the OIG indicated it may have additional requests, it identified the following as the

initial data points it was seeking to receive:

### APPLICATION INPUT INFORMATION
1.  Applicant's name
2.  Applicant's Date of Birth
3.  Applicant's address
4.  Applicant's SSN (and secondary SSN)
5.  Applicants Zip Code or County
6.  Phone
7.  Email
8.  Applicants Associated Household information
a.  Same data related to any children under 22, spouses, and parent data
9.  Language speak
10. Language read
11. 60+ receiving disability benefits
12. US citizen status
13. Non us citizen status
14. 18+ college student
15. Seasonal or migrant farm worker
16. Employment status
a.  Income amount
17. Unemployment benefits status and amount if receive
18. Money from other sources
19. Rent/own, shelter, homeless, etc
20. Current city live in
21. Live on native American reservation

### VERIFICATION INFORMATION (and fields that are retrieved from verifying data and determine if person can receive benefits (such as but not limited to: IRS, Death Master List, SAVE, etc)
22. Approved or denied
23. Any fields retrieved in verification process

### SNAP program information:
24. Applicant's Benefit or Case Status
25. SNAP Benefits Begin Date
26. SNAP Benefits End Date
27. Total SNAP benefit amount ($)

36.    On or around April 15, 2025, CDSS responded to the OIG data request by email

and offered to provide the OIG with a subset from California's 2024 SNAP QC data sample,

which FNS had already had permission to view and access to as part of the routine SNAP QC

process and would contain most of the requested data fields. CDSS also offered to provide data

for the rest of the 2024 QC samples of approximately 1800 individuals across 1025 cases. CDSS

further informed the OIG that it was unable to provide data in response to Item 23, seeking "any

fields retrieved in verification process" as that information was furnished by contract with other

state or federal entities not owned by CDSS and which cannot be re-disclosed.

8

37. On or around April 16, 2025, Keith Slagle, a senior auditor with the OIG, responded to CDSS by email and asked for the 100 QC samples to be provided immediately. Mr. Slagle declined CDSS's offers for the remainder of the SNAP QC sample cases. Instead, Mr. Slagle asked for CDSS to "start working on pulling the entire universe for these 17 data points." Mr. Slagle included a list of their original 27 data fields, narrowed down to include the following fields, and exclude the crossed out fields:

**APPLICATION INPUT INFORMATION**
1. *Applicant's name*
2. *Applicant's Date of Birth*
3. *Applicant's address*
4. *Applicant's SSN (and secondary SSN)*
5. *Applicants Zip Code or County*
6. *Phone*
7. *Email*
8. *Applicants Associated Household information*
a. *Same data related to any children under 22, spouses, and parent data*
9. ~~*Language speak*~~
10. ~~*Language read*~~
11. *60+ receiving disability benefits*
12. *US citizen status*
13. *Non us citizen status*
14. *18+ college student*
15. ~~*Seasonal or migrant farm worker*~~
16. ~~*Employment status*~~
a. ~~*Income amount*~~
17. ~~*Unemployment benefits status and amount if receive*~~
18. ~~*Money from other sources*~~
19. ~~*Rent/own, shelter, homeless, etc*~~
20. ~~*Current city live in*~~
21. ~~*Live on native American reservation*~~

**VERIFICATION INFORMATION** *(and fields that are retrieved from verifying data and determine if person can receive benefits (such as but not limited to: IRS, Death Master List, SAVE, etc)*
22. *Approved or denied*
23. ~~*Any fields retrieved in verification process*~~

**SNAP program information**:
24. *Applicant's Benefit or Case Status*
25. *SNAP Benefits Begin Date*
26. *SNAP Benefits End Date*
27. *Total SNAP benefit amount ($)*

38. My colleagues and I were startled and concerned by the scope of this request. In my experience, and upon information and belief, this request for the entire CalFresh caseload is completely unprecedented. It is the most expansive request for personal data that CDSS has ever received from FNS, USDA, the OIG, or any other entity.

9

39.    I am informed and believe that OIG's request for "the entire universe" of personally identifiable information data points for all individuals in the CalFresh caseload for an entire year is not how any oversight body has ever conducted quality control, audits, or any other program integrity purpose relating to SNAP in California. Throughout my tenure at CDSS, all oversight entities have been able to conduct necessary audits, reviews, investigations and all other oversight activities using limited data samples. Limited data samples are statistically valid ways to assess data quality or program integrity for the entire CalFresh program.

40.    Furthermore, the specific data fields that OIG requested do not make sense in light of the OIG's stated purposes of evaluating the "quality and integrity" of participant data. They had provided no explanation of why those seventeen data points were needed. Neither the inquiry into whether SNAP administrative funds had been improperly used to provide benefits to CalFresh participants, nor or performing analytics on SNAP participant data to evaluate its quality and integrity, require obtaining the entire CalFresh caseload's contact information, home address, and immigration status.

41.    OIG's request was also notable for the data fields it excluded. Normally, an inquiry into the quality and integrity of SNAP participant data would include collection of data relating to financial eligibility, such as income or shelter costs, but those data elements were not included in OIG's otherwise extraordinary request.

42.    In light of these concerns, on or around April 18, 2025, I emailed the OIG to ask them for more information regarding their authorization for such a broad disclosure of data, in order to evaluate and process the request. I asked for this authority given the unprecedented nature of the request for the full caseload with the enumerated set of data elements, and in line with CDSS's standard procedures around the disclosure of SNAP data. In addition, I asked the OIG to share more information about the stated expanded scope of the inspection and the type of analyses they planned to perform.

43.    On or about April 21, 2025, Brett Siefers, Director of the Audit and Business Operations Division of the OIG, responded to CDSS by email. As authority for the broad data request, Mr. Siefers cited the Inspector General Act, 5 U.S.C. section 406. Mr. Siefers stated,

10

1    "The request for SNAP participant data is related to the objective of this inspection as described

2    in the engagement letter." As it relates to the type of analyses the OIG intended to perform on the

3    requested data, Mr. Siefers indicated the OIG planned to "analyze the data for quality and

4    integrity." He stated that examples "could include, but not be limited to, validating field types

5    (zip codes should all be numeric numbers, not letters), validation of SSN formatting, reviewing

6    required fields for null or invalid, etc." Mr. Siefers further specified, "This is the approach we are

7    taking for all the States [sic] data as we conduct inspections across other States [sic]." Finally,

8    Mr. Siefers asked to meet with the vendor providing the actual information to the request. No

9    further information was given about the purpose of the analysis.

10         44.    Personally identifiable information for the entire CalFresh caseload is not needed

11    for an analysis like "validating field types." As CDSS explained to OIG, in the data  system that

12    CDSS uses, only numbers can be entered into the numeric fields such as the SSN field and the

13    ZIP code field. There are multiple ways that the verification of this information can be

14    accomplished without unnecessary disclosure of personally identifiable information. For example,

15    CDSS could provide summary statistics that showed the number of records in each variable that

16    had missing data, had missing digits for SSNs and ZIP codes, or any other validations requested.

17    Such summary statistics would provide the OIG sufficient data necessary to accomplish the stated

18    purpose of the data request in much simpler and more efficient manner.

19         45.    On or about April 23, 2025, I emailed the OIG and indicated that CDSS has never

20    been asked to produce this amount and type of requested data before, and that doing so is

21    complex. I indicated that CDSS would need to write a custom query to include this data from

22    across tens of thousands of variables stored across hundreds of different tables, a process that

23    would take significant time. Given the timeline previously identified by the OIG to issue its

24    report, and the stated purpose of the expanded objective, CDSS instead offered to provide OIG

25    with:

26         "[I]nformation and documentation that would address [OIG's] validation questions more
           quickly. For example, we can provide documentation demonstrating how a ZIP code is
27         validated at the time of entry by a client in BenefitsCal or when entered by an Eligibility
           Worker into CalSAWS. This documentation will show that the system will only accept valid
           ZIP codes, and will not allow an entry that includes a letter, special character, etc. Similarly
28         for an SSN, we can provide documentation showing the field in the system must contain

11

exactly nine numerical digits. If you provide us with a full list of validations you are hoping to perform, we can produce system documentation that shows how the system ensures data quality and integrity."

CDSS also offered to "explore the feasibility of running summary statistics on variables of interest for [OIG], including frequencies and cross tabs for categorical variables, which may be available on a faster timeline." And finally, CDSS noted that the 100 QC sample provided to the OIG was subjected to the same front-end validation as the rest of the CalFresh caseload, and offered to assist the OIG in reviewing those cases for quality and integrity.

46.    On or around April 24, 2025, Erin Grimm, Branch Chief of the Office of Analytics and Innovation  with OIG, responded to CDSS by email. Ms. Grimm insisted that OIG wanted to proceed with their data request for personally identifiable information of the entire CalFresh caseload, and stated that 2-3 weeks was reasonable despite the complex systems involved. Ms. Grimm provided no explanation for rejecting CDSS's alternative, narrower, and less burdensome methods for evaluating program data quality and integrity.

47.    I am informed and believe that the OIG conducted a second on-site visit to the CDSS between April 28 and May 1, 2025. No specific sessions were held regarding the expanded scope of the request for data.

48.    During the second site visit, on or around April 30, 2025, Ms. Grimm sent an email to CDSS asking if there were any follow-up questions regarding their request for personally identifiable information of the entire CalFresh caseload.

49.    On or around May 1, 2025, I responded to Ms. Grimm by email and stated "We are evaluating, and we will get back to you."

50.    My colleagues and I were concerned by the unprecedented breadth of the request for Californians' individual data, with no explanation about why the OIG needed such a vast quantity of personally identifiable information. We were troubled by OIG's rapidly shifting explanations and its seemingly arbitrary rejection of narrower, less burdensome alternatives that would minimize the amount of personal information to be shared. Finally, we were concerned that OIG's focus on collection of millions of individuals' contact information and immigration status information is inconsistent with the stated purposes of its inquiry.

12

Decl. of Alexis Fernández Garcia ISO Mot. for Prelim. Inj.  (Case No. 3:25-cv-6310)

**USDA's May 6 Letter**

51.     On May 6, 2025, CDSS received a letter addressed to all State SNAP agency directors (the "USDA Policy Letter"), including CDSS's director, informing us that USDA intended to effectuate the Information Silos EO. (Exhibit B.) Citing the Information Silos EO, the May 6 letter stated that USDA "must retain 'unfettered access to comprehensive data'" from SNAP programs, claiming that "[t]his is the only way to eliminate 'bureaucratic duplication and inefficiency' and enhance 'the Government's ability to detect overpayments and fraud.'" It claimed that USDA will use the information it gathers "to ensure program integrity, including by verifying the eligibility of benefit recipients."

52.     The USDA Policy Letter also notified the State agencies that it would be "taking steps to require all states to work through their processors to submit at least the following data to [USDA]": (1) "Records sufficient to identify individuals as applicants for, or recipients of, SNAP benefits, including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers"; and (2) "Records sufficient to calculate the total dollar value of SNAP benefits received by participants over time, with the ability to filter benefits received by date ranges."  It continued, "[r]equested data will cover the period beginning Jan. 1, 2020, through the present[.]" The letter ends by saying that "[f]ailure to grant processor authorizations or to take the steps necessary to provide SNAP data to [USDA] may trigger noncompliance procedures codified at 7 USC 2020(g)."

53.     To that end, USDA claimed that federal law authorizes USDA to "obtain SNAP data from state agencies and, by extension, their contractors." Therefore, USDA "is working with several SNAP payment processors to consolidate SNAP data[.]"

54.     On or around May 7, 2025, Ms. Grimm from the OIG sent CDSS an email asking again about the timeline to provide the personally identifiable information of the entire CalFresh caseload.

55.     The May 6 USDA Policy Letter confirmed my and my colleagues' concerns that USDA was engaged in an unprecedented attempt to gain "unfettered" access to Californians' personal data, without any commitment to prevent improper interagency datasharing, or any other

13

limiting principles.

**OIG Continues to Push for CalFRESH data after the May 6 USDA Letter**

56.     On May 13, 2025, CDSS explained to OIG that, while it was attempting to cooperate with the OIG's demands, it was concerned about complying with the request, including because it wanted to ensure that it and OIG were complying with state and federal privacy laws. CDSS asked that OIG provide information about the data and security protocols it would apply to data received in response to its request. CDSS further asked for assurances that the data it provided would not be shared with any individual outside of OIG and that the data would not be redisclosed to DOGE or other federal agencies.

57.     In its response, OIG refused to provide such assurances. Instead, it asserted that any requests for the data it receives "would be processed pursuant to the Privacy Act."

58.     OIG also referred CDSS to a systems of records notice (SORN), published in the Federal Register at 87 Fed. Reg. 62066 (Oct. 13, 20222), amending the USDA OIG's systems of records  The SORN does not treat data as classified, and while it does limit access to those with "an official 'need to know,'" it makes data subject to disclosure for nearly 20 so-called "routine uses," including uses that are so broad that they encompass uses that do not appear to be "compatible with the purpose for which [the data] was collected." *See* 87 Fed. Reg. at 62076–77; 5 U.S.C. § 552a(a)(7) (definition of "routine use").

59.     In response, CDSS again asked for assurances "that this data will only be accessed by authorized OIG users and only used for the limited purpose of this inspection."

60.     OIG responded on June 6, 2025, and explained only that "OIG is performing analytics on SNAP participant data to evaluate its quality and integrity. The data collected by each State on participants is used to determine the eligibility of a participant to receive funds through USDA's federally funded SNAP program. Data of poor or low quality can impact eligibility determinations. We are NOT reviewing the data to determine full eligibility, but rather we are focused on the quality of the data so that, ultimately, the USDA program agency (Food and Nutrition Service) can make appropriate eligibility determinations on reliable information."

61.     CDSS explained to OIG that only numbers can be entered into numeric fields

14

like ZIP code and social security number, and therefore PII for the entire SNAP caseload is not needed to "validat[e] field types." Moreover, ensuring that these fields only contain numbers can be done in a variety of ways without disclosing PII for millions of individuals. For example, CDSS could provide summary statistics that showed the number of records in each variable that had missing data, had missing digits for SSNs and ZIP codes, or any other validations requested. Not only does this avoid sharing the PII of millions of Californians, it is more efficient for all parties and actually fulfills OIG's stated purpose.

62.     OIG has yet to provide an explanation for why its otherwise-sweeping data request does not seek data fields that are key to determining a household's eligibility, such as income amount and deductions.

63.     I participated in an online meeting with representatives from OIG and CDSS on June 20, 2025. CDSS explained in more detail its concerns and confusion over OIG's broad request, including its concern that it had received insufficient assurances that OIG would not re-disclose the data to another agency. OIG claimed that they had no plans to share the data with other entities, but did not indicate that it couldn't be shared with other entities, and specifically indicated that under certain circumstances, data – including PII – could be shared with the Attorney General. And when it followed up via email, OIG declined to represent in writing that they had no plans to share the data.

**USDA Data Demands to CDSS's EBT Vendor**

64.     Meanwhile, USDA has pursued a different method to try to obtain similar data— that is, many years' worth of Californians' personally identifiable information—by going after a third party vendor.

65.     In order to administer CalFresh benefits via EBT cards, California, through OTSI, has contracted with Fidelity Information Services, LLC ("Fidelity"), the contractor that maintains EBT data for CalFresh, among other federal and state public benefit programs.

66.     I am aware that OTSI and Fidelity have entered into an extensive written EBT Services Contract (the "Agreement"). As part of its commercial responsibilities under the Agreement, Fidelity has access to a vast quantity of raw EBT data (described in paragraph 14

above) for individual Californian cardholders. In the Agreement, Fidelity promises to maintain confidential SNAP program data "in strict confidence" and to refrain from "disclos[ing] any Confidential Information, except to authorized employees, contractors, or agents requiring such information, as authorized in writing by the other party[.]" Agreement § 15.1. The Agreement further states that "[t]he use or disclosure by either party of any Confidential Information concerning the other party for any purpose not directly connected with the administration of the disclosing party's responsibilities with respect to Service(s) provided under this Contract is prohibited except by prior written consent of the other party." Agreement § 15.2. It provides that any publication or disclosure of Confidential Information to others "may cause immediate and irreparable harm." Agreement § 15.4.

67.     On or around May 5, 2025, upon information and belief, Fidelity informed OTSI that it was recently contacted by USDA and its assigned Department of Government Efficiency ("DOGE") team in connection with the Information Silos EO. Fidelity indicated it had not shared any proprietary, confidential, or personally identifiable information with the USDA or DOGE.

68.     On or about May 9, 2025, Fidelity stated that the USDA made a formal request for records regarding SNAP cardholder and transaction data and requested written consent by May 14, 2025. CDSS informed Fidelity that it did not consent to such disclosure.

69.     On May 14, I am informed and believe that, after a phone call, Fidelity emailed that it would agree to provide at least forty-eight hours' written notice prior to sharing any confidential information with USDA or others.

70.     As with the USDA OIG request, I am informed and believe that this request from USDA to EBT contractors is completely unprecedented. USDA has never before asked for this large a quantity of personally identifiable information for all SNAP participants—in this case, more than five years' worth. Nor has USDA ever before made a demand for personal data by directly contacting a state vendor, without first apprising CDSS of the request.

71.     To the extent that Fidelity were to comply with a USDA request for caseload data, it is not clear whether Fidelity has the technological capability to secure and minimize exposure of personally identifiable information that they uniquely possess. Nor I am not aware of

16

1   any confirmation by USDA as to  whether it would allow Fidelity to secure and minimize transfer

2   of personally identifiable information.

3        72.    On July 9, 2025, CDSS received a letter from the Secretary of USDA (the "July

4   9 Letter"). (Exhibit C.)

5        73.    Among other things, the July 9 Letter states that "[t]o ensure efficient

6   implementation of this system, and to ensure USDA has a complete and accurate database, we

7   are requiring collection of SNAP data from EBT processors or State agencies beginning on July

8   24, 2025, with submissions to USDA no later than the close of business on July 30, 2025."

9        74.    Further, the July 9 letter states that the "required data" are listed in the SORN

10  under the heading "Categories of Records in the System." They are: "records containing

11  personally identifying information, including but not limited to SNAP participant name, Social

12  Security Number (SSN), date of birth (DOB), residential address, Electronic Benefit Transaction

13  (EBT) card number, and case record identifier number or other identifiers or data elements

14  maintained by States, vendors, or contractors to identify SNAP recipients" and "information

15  derived from and associated with EBT transactions, including but not limited to records

16  sufficient to calculate the total dollar value of SNAP benefits received by participants over time,

17  such as applied amounts and benefit available dates." The Letter does not provide a time period

18  for this data.

19       75.    On July 23, 2025, one week before the deadline it set to produce data,

20  Defendant USDA sent state agencies another letter with further details about its demand.

21  (Exhibit D.)

22       76.    The agency clarified, for the first time in this July 23 letter, that it is demanding

23  data on "individuals who have received, are currently receiving, or have applied to receive

24  SNAP benefits from January 1, 2020, through present date. Requested data elements shall

25  include records sufficient to identify individuals as applicants for, or recipients of, SNAP

26  benefits, including but not limited to all household group members' names, dates of birth, social

27  security numbers, residential and mailing addresses used or provided, as well as all data records

28  used to determine eligibility or ineligibility."

77.     Additionally, the July 23 letter noted that USDA is requesting "transactional records from each household . . . sufficient to calculate the total dollar value of SNAP received by recipients over time . . . as well as SNAP usage and retailer data." *See* Exhibit D. In other words, it appears that USDA is not only demanding PII of all applicants, but also PII of household members, as well as records showing how recipients used their benefits and at which grocery stores. The letter further directs States to transmit their data via the commercial platform, Box.

78.     On July 25, 2025, USDA sent state agency directors another letter, reminding them of the July 9 demand and the July 30, 2025 deadline to comply. (Exhibit E.) The letter stated: "Failure to take the steps necessary to provide the relevant data to FNS may trigger noncompliance procedures codified in 7 U.S.C. 2020(g)."

79.     On July 29, I sent USDA a letter in response to their demand. (Exhibit F.)

80.     I am informed and believe that, on August 12, 2025, USDA sent a letter to Governor Newsom's Office via email. (Exhibit G.)

**Disclosure of Mass CalFresh Personal Data is Burdensome, Unnecessary and Risky**

81.     In my view, based on my experience and knowledge of applicable privacy and security laws and practices, the requests of OIG and USDA-FNS, and their demand on Fidelity, the state EBT contractor, are extraordinary and unnecessary for purposes of administration of the SNAP program.

82.     Because USDA is asking for more personal information than is needed to perform any of its stated administrative purposes, its request violates basic principles of privacy and confidentiality that I otherwise apply to all requests for CalFresh data, which keep disclosure of personally identifiable information to a minimum.

83.     Already, USDA and OIG's extraordinary demands for Californians' personal data has consumed a great deal of my and other CDSS staff's time and attention. Compliance with OIG's extraordinary demands for one year's worth of Californians' personal data would be even more burdensome and time-consuming for CDSS. Producing this quantity of data for CDSS' entire caseload would take, at minimum, six to eight weeks. Compliance with USDA's demands

18

Decl. of Alexis Fernández Garcia ISO Mot. for Prelim. Inj.  (Case No. 3:25-cv-6310)

would take, at a minimum three to six months, although USDA's demand is somewhat ambiguous. The information requested from both agencies is not contained within a single data file, but instead is spread across hundreds of data tables. Moreover, the data that USDA and OIG are requesting is unusually complicated because it includes a period of time between when CalSAWS made a transition from legacy data systems to a new statewide data system.

84.     Collection and preparation of this type of caseload data requires both time and expertise.  In order to properly collect and prepare this quantity of complex data, CDSS would have to rely on external technical consultants. The data technology vendor typically used charges $174 per hour for this type of specialized work. I estimate it would take these data experts approximately 100 hundred billable hours to develop, test, and deliver a response to USDA's extraordinary request. Moreover, such a response would take hundreds of additional, non-billable hours to run code and check for errors, which would delay the response further. Any small error could cause the program to stall after hours of runtime, requiring the coder to find and fix the issue, and re-run the program.

85.     In addition to the prospective administrative burden, I am deeply concerned that transferring large quantities of caseload data to USDA poses substantial risks to individual Californians' data privacy interests. USDA's behavior connected with these data demands has been aberrant and inconsistent with the stated purpose of preventing improper payments. And USDA has not provided any of the safeguards or assurances that I would ordinarily expect to accompany a substantial demand of personally identifiable information. USDA has not provided a privacy impact statement or anything else that would assuage my concerns about transferring a massive amount of Californians' personal data.

86.     Based on my observations of USDA's interactions with CDSS and Fidelity, and my review of the Information Silos EO and the USDA Policy Letter implementing that EO, I have reason to believe that any personal information will not be used by USDA only for purposes of program integrity. Based on their irregular data requests, and USDA's refusal to confirm its plans for use of the data, described above, I also have reason to believe that USDA will share Californians' personal information outside of the federal agency, including with DOGE, or the

19

1    Department of Homeland Security.

2    87.    My concerns about improper disclosure of data have been amplified by reports

3    that the U.S. Department of Health and Human Services transferred millions of Californians'

4    private Medicaid records to the Department of Homeland Security, without the state Medicaid

5    agency's prior knowledge. *See* Kimberly Kindy and Amanda Seitz, Trump Administration Gives

6    Personal Data of Immigrant Medicaid Enrollees to Deportation Officials, AP NEWS (June 14,

7    2025), https://apnews.com/article/medicaid-deportation-immigrants-trump-

8    4e0f979e4290a4d10a067da0acca8e22?utm_source=copy&utm_medium=share.

9    88.    Additionally, I am aware that the combination of application data, including

10   immigration status, name, and home address, with the purchase location data stored by CDSS's

11   EBT vendor, Fidelity, could provide the federal government with access to virtually real-time

12   information about where specific individuals are shopping for groceries. I am informed and

13   believe this could be used as an unprecedented surveillance tool.

14   89.    Based on my training and experience as a data expert who routinely handles and

15   makes decisions about access to highly sensitive PII obtained from members of the public, I

16   believe that USDA's actions here raise red flags that cannot be ignored. The context within which

17   PII is used or disclosed is an essential aspect of any privacy risk assessment, yet USDA has failed

18   to provide information about the use or disclosure of the PII which it is requesting that would

19   satisfy any ordinary assessment of privacy risks.

20   **Disclosure of Mass CalFresh Personal Data Would Undermine California's Reliance**

21   **Interests**

22   90.    CDSS relies on its vendors' and the federal government's adherence to all

23   applicable confidentiality and privacy laws and procedures in order to provide appropriate

24   assurances when communicating with members of the public.

25   91.    USDA has previously assured noncitizens that they can apply for or receive

26   SNAP without affecting their ability to remain in the United States.  USDA has further assured

27   noncitizens that they may apply for SNAP on behalf of family members who are U.S. citizens, or

28   otherwise eligible for SNAP, without affecting immigration status.

92.     USDA has previously assured California and the public that information obtained from the National Accuracy Clearinghouse will only be used for the purpose of preventing multiple issuances of SNAP benefits to an individual by more than one State agency in a given month.

93.     CDSS likewise provides assurances to members of the public regarding the privacy and confidentiality of personally identifiable information held in the CalSAWS and CalFresh programs. For example, CDSS's website contains a privacy notice, which applies to personal information collected when people complete applications and forms for CDSS' various programs, states, in part, that the "information collected will not be shared with any other government agency, unless required or allowed by law." This notice is available at: https://cdss.ca.gov/notice-on-collection.

94.     The BenefitsCal website contains FAQs about how the information provided by applicants will be used. In response to the question, "Will you report my immigration status to the authorities?" the response provided is "No. It's only used to see if you are eligible for CalFresh. Authorities cannot use this information to deport you unless there is a criminal violation." This FAQ is available at: https://benefitscal.com/Help/faqs/afb-faqs/HCABQ?lang=en. Likewise, the website states that people's information will not be shared with immigration enforcement and that their immigration information is private and confidential.

95.     Nowhere in the CalFresh application do applicants consent to the disclosure demanded by USDA and OIG.

96.     Improper disclosure or interagency sharing of the vast universe of information requested by the OIG or the USDA would directly contradict these past assurances. Improper disclosure or interagency sharing would irreparably harm CDSS's ability to assure members of the public that the sensitive personal data they disclose upon application for CalFresh, and other programs within CalSAWS or the EBT card system, will be only disclosed as necessary to conduct audits, inspections, and reviews that support the purpose of the program.

I declare under penalty of perjury under the laws of the United States that, to the best of my

knowledge, the foregoing is true and correct.

Executed on August 16th, 2025, at Berkeley, California.

**RYAN GILLETTE**

# EXHIBIT A



# USDA Privacy Impact Assessment

## Fiscal Year 2025

Privacy Division (PD)
Cybersecurity and Privacy Operations Center (CPOC)
U.S. Department of Agriculture

USDA Privacy Impact Assessment
Fiscal Year 2025

## Template Revisions

| Date | Version | Notes |
|------|---------|-------|
| 09/06/2023 | 1.0 | Documented created. |
| 02/12/2025 | 1.1 | Removed "Gender" and "Sexual Orientation" from Biographical Information in accordance with Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." |

## Table of Contents

**Privacy Impact Assessment for the USDA IT System/Project**.................................................. 4

**Mission Area System/Program Contacts**................................................................... 4

**Abstract**................................................................................................ 5

**Overview**............................................................................................... 5

**Section 1: Authorities and Other Requirements** ..................................................... 7

**Section 2: Information Characterization** ............................................................ 8

    Identifying Numbers.................................................................................. 8

    Biographical Information............................................................................. 9

    Biometrics .......................................................................................... 9

    Distinguishing Features ............................................................................ 10

    Characteristics..................................................................................... 10

    Device Information.................................................................................. 10

    Medical and Emergency Information ................................................................. 10

    Specific Information and File Types................................................................. 10

    Privacy Impact Analysis ............................................................................ 11

**Section 3: Information Uses**.......................................................................... 13

    Privacy Impact Analysis ............................................................................ 13

**Section 4: Notice** ................................................................................... 16

    Privacy Impact Analysis ............................................................................ 16

**Section 5: Data Retention** ........................................................................... 18

    Privacy Impact Analysis ............................................................................ 18

**Section 6: Information Sharing** ...................................................................... 21

    Internal Information Sharing........................................................................ 21

    Internal Privacy Impact Analysis................................................................... 21

    External Information Sharing ....................................................................... 21

USDA | CPOC | PD

External Privacy Impact Analysis .......................................................................... 21

**Section 7: Redress** ........................................................................................ **24**
Privacy Impact Analysis ..................................................................................... 24

**Section 8: Auditing and Accountability** ....................................................... **27**

**Privacy Impact Assessment Review** .............................................................. **29**

**Responsible Officials' Signatures** .................................................... Error! Bookmark not defined.

## Privacy Impact Assessment for the USDA IT System/Project

| Detail | Information |
|---|---|
| System/Project Name | SNAP Information Database |
| Program Office | Office of Information Technology |
| Mission Area | Food, Nutrition, and Consumer Services |
| CSAM Number | 1176 - FNCS Infrastructure Services General Support System (FNCS I-GSS) |
| Date Submitted for Review | 06/01/2025 |

## Mission Area System/Program Contacts

| Role | Name | Email | Phone Number |
|---|---|---|---|
| MA Privacy Officer | Deea Coleman | Deea.Coleman@usda.gov | None |
| Information System Security Manager | John Rosselot, Jr. | John.Rosselotjr@usda.gov | None |
| System/Program Managers | Gina Brand | Gina.Brand@usda.gov | None |

## Abstract

The abstract provides the simplest explanation to the question "what does the project, application, or system do?" and will be published online to accompany the PIA link.

The SNAP Information Database is an initiative of USDA's Office of the Secretary that will leverage data-sharing across federal and state systems to identify and rectify any ineligible, duplicate, or fraudulent Supplemental Nutrition Assistance Program (SNAP) enrollments. In addition, this initiative will focus on detecting duplicate enrollments across states, verifying immigration status eligibility, and performing other fraud prevention checks using lawfully shared internal and interagency data across a number of Federal agencies. The SNAP Information Database will collect SNAP participant data (including personal information and transactional data) from all 53 SNAP state agencies via their Electronic Benefit Transfer (EBT) payment processors, through secure channels, to be stored in a database that is then used to perform integrity checks that include, but may not be limited to:

- Duplicate enrollment (multi-state);
- Identity and social security number (SSN) validation;
- Immigration status check;
- Age and household composition validation; and
- Inter-Agency data matches

Integrity checks will be executed using automated scripts and queries on the compiled database, using matching algorithms to minimize false positives. States will transmit data from 2020 to present, with quarterly updates thereafter.

A Privacy Impact Assessment (PIA) is required due to the storage and use of personally identifiable information by the SNAP Information Database.

## Overview

The overview is the most important section of the PIA. A thorough and clear overview gives the reader the appropriate context to understand the responses in the PIA.

The USDA Office of the Secretary will establish the SNAP Information Database in the Food and Nutrition Service (FNS) Amazon Web Services (AWS) environment. FNS' Office of Information Technology (OIT) maintains a secure AWS environment that is authorized under the FNS Infrastructure General Support System (FNS I-GSS) Authority to Operate (ATO).

Data will be sent via the secure MoveIt managed file transfer application. SNAP participant data to be contained in the SNAP Information Database will include detailed and sensitive personally identifiable information (PII) which is required to perform the integrity checks as designed, as well as financial data (e.g., amount of benefit received). Data from all participants since 2000 to present will be collected, with quarterly updates submitted by states or their EBT processors thereafter.

As part of the integrity initiative, USDA will leverage data-sharing across federal and state systems to identify and rectify any ineligible, duplicate, or fraudulent SNAP enrollments or transactions. This also includes sharing, where permitted by law and consistent with this notice, information with State agencies when necessary to investigate and rectify fraudulent or otherwise improper or illegal SNAP enrollments or transactions.

The collection of PII is authorized in 7 U.S.C. § 2204: USDA/FNS possesses the legal authority to collect and utilize SNAP beneficiary data for program administration and enforcement as provided, for example, in the Food and Nutrition Act of 2008 (7 U.S.C. 2011 et seq.) at 7 U.S.C. 2020(a)(3)(B), e(8)(A); 7 C.F.R. 272.1(c)(1), (e).

## Section 1: Authorities and Other Requirements

These questions identify all statutory and regulatory authorities for operating the project, application, or system, including the authority for collection, which SORN applies, if an ATO has been completed, and if there is Paperwork Reduction Act coverage:

1.1.    What legal authorities and/or agreements permit the collection of information by the project, application, or system?

7 U.S.C. § 2204. USDA/FNS possesses the legal authority to collect and utilize SNAP beneficiary data for program administration and enforcement as provided, for example, in the Food and Nutrition Act of 2008 (7 U.S.C. 2011 et seq.) at 7 U.S.C. 2020(a)(3)(B), e(8)(A); 7 C.F.R. 272.1(c)(1), (e)

1.2.    Has Authorization and Accreditation (A&A) been completed for the project, application, or system?

The SNAP Information Database does not have a complete A&A, however the AWS environment that will house the database has an ATO that expires 09/30/2025 and the annual A&A is ongoing.

1.3.    Which System of Records Notices (SORNs) apply to the information?

USDA/FNS-15, "National Supplemental Nutrition Assistance Program (SNAP) Information Database. https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system-of-records

1.4.    Is the collection of information covered by the Paperwork Reduction Act?

The Paperwork Reduction Act applies to this collection of information. Collection and recordkeeping of these elements was previously approved under OMB Control #0584-0064; a change request is in process to reflect the marginal increase in reporting burden necessary to populate the database.

## Section 2: Information Characterization

These questions define the scope of the information requested and collected, as well as the reasons for its collection as part of the project, application, or system being developed:

2.1.    What information is collected, used, disseminated, or maintained in the project, application, or system? Select all applicable Personally Identifiable Information (PII) and data elements that your project, application, or system collects, uses, disseminates, creates, or maintains. If additional sensitive PII is collected, used, disseminated, created, or maintained, list it in the text box at the end of this section.

**Note**: PII is defined as information that can be used to distinguish or trace an individual's identity, either alone or when combined with other information that is linked or linkable to a specific individual.

### Identifying Numbers

☒ Social Security Number ☐ Truncated or Partial Social Security Number ☐ Driver's License Number

☐ Passport Number ☐ License Plate Number ☐ Registration Number

☒ File or Case ID Number ☐ Student ID Number ☐ Federal Student Aid Number

☒ Employee Identification Number ☒ Alien Registration Number ☐ Department of Defense Identification Number

☐ Professional License Number ☐ Taxpayer Identification Number ☐ Business Taxpayer Identification Number (Sole Proprietor)

☒ EBT Card Number ☐ Business Credit Card Number (Sole Proprietor) ☐ Vehicle Identification Number

☐ Business Vehicle Identification Number (Sole Proprietor) ☐ Personal Bank Account Number ☐ Business Bank Account Number (Sole Proprietor)

☐ Personal Device Identifiers or Serial Numbers ☐ Business Device Identifiers or Serial Numbers (Sole Proprietor) ☐ Personal Mobile Phone Number

☐ Health Plan Beneficiary Number ☐ Business Mobile Phone Number (Sole Proprietor) ☐ Department of Defense Benefits Number

USDA | CPOC | PD

USDA Privacy Impact Assessment<br>Fiscal Year 2025

## Biographical Information

☒ Name (Including Nicknames)

☐ Business Mailing Address (Sole Proprietor)

☒ Date of Birth

☐ Ethnicity

☐ Business Phone or Fax Number (Sole Proprietor)

☐ Country of Birth

☐ City or County of Birth

☐ Group or Organization Membership

☐ Religion or Religious Preference

☒ Citizenship

☒ Immigration Status

☐ Home Phone or Fax Number

☒ Home Address

☒ ZIP Code

☒ Marital Status

☒ Spouse Information

☐ Child Information

☐ Military Service Information

☐ Race

☐ Nationality

☐ Mother's Maiden Name

☐ Personal Email Address

☐ Business Email Address

☐ Global Positioning System (GPS) or Location Data

☒ Employment Information

☐ Alias (Username or Screenname)

☐ Personal Financial Information (Including Loan Information)

☒ Education Information

☐ Resume or Curriculum Vitae

☐ Business Financial Information (Including Loan Information)

☐ Professional or Personal References

## Biometrics

☐ Fingerprints

☐ Hair Color

☐ DNA Sample or Profile

☐ Retina or Iris Scans

☐ Video Recording

## Distinguishing Features

☐ Palm Prints              ☐ Eye Color              ☐ Signatures
☐ Dental Profile           ☐ Photos

## Characteristics

☐ Vascular Scans           ☐ Height                 ☐ Weight
☐ Scars, Marks, or Tattoos ☐ Voice or Audio Recording

## Device Information

☐ Device Settings or       ☐ Cell Tower Records (e.g., ☐ Network Communication
Preferences (e.g., Security Logs, User Location, or Time)  Data
Level, Sharing Options, or
Ringtones)

## Medical and Emergency Information

☐ Medical or Health        ☐ Mental Health          ☐ Disability Information
Information                Information
☐ Workers' Compensation    ☐ Patient ID Number      ☐ Emergency Contact
Information                                          Information

## Specific Information and File Types

☐ Personnel Files          ☐ Law Enforcement        ☐ Credit History Information
                           Information

☐ Health Information       ☐ Academic or Professional ☐ Civil or Criminal History
                           Background Information      Information/Police Record

☐ Case Files               ☐ Security Clearance or  ☐ Taxpayer or Tax Return
                           Background Check           Information

[List additional information collected but not listed above here (for example, a personal phone number that is used as a business number).]

2.2.    What are the sources of the information in the project, application, or system?

This data is collected and maintained by 53 SNAP State agencies and EBT processors, under contract with the State. States and EBT processors will transmit this information to FNS for the SNAP Information Database.

2.2.1.  How is the information collected?

PII is collected by the States per the Food and Nutrition Act of 2008.

2.3.    Does the project, application, or system use information from commercial sources or publicly available data? If so, explain why it is used.

No

2.4.    How will the information be checked for accuracy? How often will it be checked?

USDA will cross check data against other Federal databases using matching algorithms to determine accuracy.

2.5.    Does the project, application, or system use third-party websites?

No

2.5.1.    What is the purpose of the use of third-party websites?

Not applicable.

2.5.1.1.What PII will be made available to the agency though the use of third-party websites?

None.

## Privacy Impact Analysis

2.6.    List the privacy risks and mitigations related to the characterization of the information.

**Privacy Risk**: Privacy Act risks associated with the characterization of SNAP Information Database information may include:

- **Over-collection of Data:** Misunderstanding classification of information may result in collecting more data than necessary, violating principles of data minimization and increasing exposure to risk.

- **Non-compliance with Regulations:** Failing to accurately characterize information can lead to non-compliance with privacy laws and regulations, resulting in legal penalties and reputational damage.

- **Lack of Individual Awareness:** If individuals are not informed about how their PII is characterized and used, it can lead to a lack of trust and potential backlash against the organization.

- **Failure to Honor Individual Rights:** Mischaracterization may lead to difficulties in fulfilling individual rights requests, such as access or deletion, if the organization does not accurately track how data is categorized and used.

**Mitigation**: Addressing risks through proper data characterization practices is essential for maintaining compliance with the Privacy Act and protecting individuals' personal information. By implementing the following mitigation actions, the SNAP Information Database can effectively characterize personal identifiable information (PII), manage privacy risks, and comply with the Privacy Act requirements.

- **Regular Data Inventory:** Conduct regular inventories of personal information to identify and categorize the types of data collected, stored, and processed by the organization.

- **Individual Consent for Sensitive Data:** Obtain explicit consent for the collection and processing of sensitive personal information, such as health or financial data, and ensure that individuals are aware of its characterization.

- **Regular Data Inventory:** Conduct regular inventories of personal information to identify and categorize the types of data collected, stored, and processed by the organization.

## Section 3: Information Uses

These questions delineate the use of information and the accuracy of the data being used.

3.1.    Describe why and how the information collected, used, disseminated and/or maintained will support the project, application, or system's business purpose.

The PII collected from the states and used by the SNAP Information Database is required to detect duplicate enrollments across states, verify immigration status eligibility, and perform other fraud prevention checks against other Federal agencies' datasets, thereby ensuring program integrity, including by verifying the eligibility of benefit recipients.

3.2.    Does the project, application, or system use technology to conduct electronic searches, queries, or analysis in an electronic database to discover or locate a predictive pattern or anomaly? If so, state how USDA plans to use such results..

USDA will use the SNAP data to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases. This is consistent with USDA's statutory authority and will ensure Americans in need receive assistance, while at the same time safeguarding taxpayer dollars from abuse. USDA will leverage data-sharing across Federal and State systems to identify and rectify any ineligible, duplicate, or fraudulent SNAP enrollments or transactions. This includes verifying eligibility based on immigration status, identifying and eliminating duplicate enrollments, assisting States in mitigating identity theft, and performing other eligibility and program integrity checks using lawfully shared internal and interagency data. This also includes sharing, where permitted by law and consistent with this notice, information with State agencies when necessary to investigate and rectify fraudulent or otherwise improper or illegal SNAP enrollments or transactions.

### Privacy Impact Analysis

3.3.    List the privacy risks and mitigations related to uses of the information.

**Privacy Risk**: Privacy act risks associated with the uses of information by the SNAP Information Database include:

- **Purpose Limitation:**  Using PII beyond its intended purpose can increase the risk of data exposure and violate privacy regulations.

- **Unauthorized Use of Data:** PII may be used for purposes other than those for which it was collected, violating privacy principles and individual expectations.

- **Data Misuse:** Employees or third parties may misuse PII, either intentionally or unintentionally, leading to breaches of confidentiality and trust.

- **Inadequate Consent:** If individuals are not adequately informed about how their data will be used, or if consent is not appropriately obtained, it can result in legal non-compliance and ethical concerns.

- **Overuse of Information:** Using PII beyond its intended purpose can increase the risk of data exposure and violate privacy regulations.

- **Loss of Data Control:** When PII is shared with third parties, there is a risk of losing control over how that data is used, potentially leading to unauthorized access or exploitation.

- **Increased Risk of Data Breaches:** The more PII is used and shared, the higher the risk of data breaches occurring, whether through hacking, accidental disclosures, or insider threats.

- **Negative Impact on Reputation:** Misusing PII can harm the agency's reputation, leading to loss of customer trust and potential business losses.

- **Failure to Honor Individual Rights:** Inadequate processes for managing the use of PII may result in the inability to fulfill individual rights requests, such as access, correction, or deletion.

- **Compliance Violations:** Using information in ways that are not compliant with privacy acts can lead to legal penalties, audits, and increased scrutiny from regulators.

**Mitigation**: By implementing some or all the following mitigation actions, the SNAP Information Database may better safeguard PII and ensure responsible use in compliance with Privacy Act requirements:

- **Monitoring and Auditing:** Regularly monitor and audit the use of personal information to ensure compliance with privacy policies and identify any unauthorized or inappropriate uses.

- **Data Minimization:** Collect and use only the minimum amount of PII necessary to achieve the intended purpose, reducing the risk of misuse.

- **Regular Training:** Provide regular training for employees on privacy laws and the importance of adhering to the defined uses of personal information to ensure compliance.

- **Individual Consent:** Obtain explicit consent from individuals before using their personal information, particularly for purposes that go beyond the original intent of collection.

- **Transparency:** Inform individuals about how their personal information will be used, including any potential secondary uses, through clear and accessible privacy notices.

- **Access Controls:** Implement access controls to restrict who can use personal information and for what purposes, ensuring that only authorized personnel have access to sensitive data.

- **Incident Response Plan:** Follow department incident response plan to address any misuse of PII, outlining procedures for reporting and mitigating such incidents.

- **Privacy Impact Assessments (PIAs):** Conduct PIAs for new projects or uses of PII to assess potential risks to privacy and implement measures to mitigate them.

- **Individual Rights Awareness:** Make individuals aware of their rights regarding their personal information, including the right to access, correct, or request deletion of their data.

## Section 4: Notice

These questions are intended to provide notice to the individual of the scope of information collected, the right to consent to uses of the information, and the right to decline to provide information.

4.1.    How does the project, application, or system provide notice to individuals prior to collection?

States provide notice at the point the individual applies for SNAP enrollment.

4.2.    What options are available for individuals to consent, decline, or opt out of the project?

Notice for an individual's consent, decline, or opt out of the data collection is the responsibility of the State administering the SNAP enrollment.

## Privacy Impact Analysis

4.3.    List the privacy risks and mitigations related to notice. Follow this format:

**Privacy Risk**: States will transmit their respective collected data, inclusive of PII, to the SNAP Information Database. As such, notice for the collection of PII falls within the state's responsibility. Privacy Act risks associated with notices include:

- **Inadequate Disclosure:** Notices may fail to adequately inform individuals about how their personal information will be collected, used, and shared, leading to misunderstandings about privacy practices.

- **Ambiguity:** If notices are unclear or overly complex, individuals may not fully understand their rights or the SNAP Information Database's data practices, leading to a lack of informed consent.

- **Non-Compliance with Regulations:** Failing to provide required notices as stipulated by the Privacy Act can result in legal penalties and regulatory scrutiny.

- **Insufficient Updates:** Notices that are not regularly updated to reflect changes in data practices or legal requirements can mislead individuals and result in privacy violations.

- **Lack of Accessibility:** Notices that are not easily accessible or understandable to all individuals, including those with disabilities or language barriers, can lead to exclusion and non-compliance.

- **Failure to Communicate Changes:** Not adequately informing individuals about changes to privacy practices or policies can lead to confusion and mistrust, especially if data practices evolve.

- **Over-collection of Data:** If notices do not clearly explain the purpose of data collection, individuals may be more likely to provide information that is not necessary, leading to potential data minimization violations.

- **Inconsistent Messaging:** Different notices provided by various states may contain conflicting information, causing confusion and undermining trust.

- **Underestimating Individual Rights:** Notices that do not clearly outline individuals' rights regarding their personal information can prevent them from exercising those rights effectively.

**Mitigation**: Implementing some or all the following mitigation actions, the SNAP Information Database, and by extension states, can better protect individual privacy rights and comply with privacy act requirements:

- **Clear Communication:** Ensure that privacy notices are written in clear, accessible language. Avoid legal jargon to make it understandable for all individuals.

- **Regular Updates:** Review and update privacy notices regularly to reflect changes in data practices, regulations, or business operations.

- **Feedback Mechanism:** Establish a process for individuals to ask questions or express concerns about privacy notices and practices, allowing for continuous improvement.

- **Individual Consent:** Implement mechanisms for obtaining explicit individual consent for data collection and processing and provide options for individuals to withdraw consent easily.

- **Transparency:** Clearly outline what personal data is being collected, the purpose of data collection, how it will be used, and who it will be shared with.

- **Data Minimization:** Limit data collection to only what is necessary for the stated purpose. Avoid collecting excessive or irrelevant data.

- **Individual Rights:** Inform individuals about their rights regarding their personal data, including access, correction, deletion, and the ability to object to processing.

- **Accessibility:** Make privacy notices easily accessible on websites and apps, ensuring they can be found without difficulty.

- **Third-Party Compliance:** Ensure that any third parties handling personal data adhere to the same privacy standards and practices as outlined in their privacy notices.

USDA | CPOC | PD                                              USDA Privacy Impact Assessment
                                                                         Fiscal Year 2025

## Section 5: Data Retention

These questions outline how long information will be retained after the initial collection.

5.1.    What information is retained and for how long?

Records are retained and disposed of in accordance with Section 11(a)(3)(B) of the FNA. Records may be retained for a period of not less than 3 years as specified in the FNA or applicable regulation, or for a longer period as required by litigation, investigation, and/or audit. Electronic records are retained by FNS employees and contractors at FNS offices.

5.2.    Has the retention schedule been approved by the USDA records office and the National Archives and Records Administration (NARA)? If so, indicate the name of the records retention schedule.

This system does not yet have a NARA-approved records schedule. All records in this system will be kept indefinitely unless otherwise required by law until NARA has approved a records schedule for this system.

### Privacy Impact Analysis

5.3.    List the privacy risks and mitigations related to data retention. Follow this format:

**Privacy Risk**: Privacy act risks associated with the retention of information within the SNAP Information Database include:

- **Excessive Data Retention:** Retaining PII longer than necessary can violate data minimization principles, increasing the risk of unauthorized access and exposure.

- **Data Breaches:** The longer PII is retained, the greater the risk of data breaches occurring, whether through hacking, accidental disclosures, or insider threats.

- **Non-compliance with Regulations:** Failing to adhere to legal requirements regarding data retention periods can lead to regulatory penalties and legal liabilities.

- **Obsolescence of Data:** Retained data may become outdated or irrelevant, leading to inaccuracies in decision-making or service delivery, which can affect individuals negatively.

- **Inadequate Disposal Procedures:** If the SNAP Information Database does not have secure methods for disposing PII that is no longer needed, it can lead to unintended exposure of sensitive data.

- **Inconsistent Retention Practices:** Different states or external federal agencies with which SNAP Information Database data is shared may follow varying retention practices, resulting in confusion and potential violations of privacy policies.

- **Failure to Honor Individual Requests:** Retaining information longer than necessary may hinder the SNAP Information Database's ability to fulfill individual requests for data deletion or access, leading to dissatisfaction and potential legal issues.

- **Increased Legal Risks:** Long retention periods can increase the risk of being involved in litigation, as older data may be subjected to subpoenas or discovery requests.

- **Reputation Damage:** Inadequate retention practices can lead to public relations issues and damage a department's reputation if PII is mishandled or exposed.

- **Lack of Accountability:** Without proper oversight of retention practices, there may be a lack of accountability for data management, increasing the risk of errors and privacy violations.

**Mitigation**: Implementing the following mitigation actions, the SNAP Information Database can ensure responsible retention of PII while complying with the Privacy Act.

- **Data Retention Policy:** Use NARA data retention policies that outlines how long different types of PII will be retained and the rationale for those timeframes.

- **Data Minimization:** Collect and retain only the PII that is necessary for the intended purpose, minimizing the risk associated with holding excessive data.

- **Regular Reviews:** Conduct regular reviews of stored data to ensure compliance with retention policies and to identify information that is no longer necessary for business purposes.

- **Access Controls:** Implement strict access controls to limit who can view and manage retained personal information, reducing the risk of unauthorized access.

- **Audit Trail:** Maintain an audit trail to document when data is collected, accessed, and disposed of, which can help demonstrate compliance with retention policies.

- **Compliance Checks:** Regularly conduct compliance checks to ensure that retention practices align with legal requirements and organizational policies.

- **Retention Schedule:** Follow a retention schedule that specifies the duration for retaining different types of records and when they should be reviewed or disposed of.

- **Secure Disposal Procedures:** Establish secure methods for the disposal of personal information that is no longer needed, such as shredding paper documents or using data-wiping software for electronic files.

- **Documentation and Training:** Ensure that employees are aware of and trained on the data retention policy, including the importance of compliance and the procedures for handling personal information.

- **Individual Rights Notification:** Inform individuals about their rights regarding data retention, including the right to request deletion of their personal information when it is no longer necessary for the purposes for which it was collected.

## Section 6: Information Sharing

These questions define the content, scope, and authority for information sharing.

### Internal Information Sharing

6.1.    With which internal organizations and/or systems is information shared, received, and/or transmitted? What information is shared, received, and/or transmitted, and for what purpose? How is the information transmitted?

Information will be shared internally with USDA personnel authorized to access and use this data.

### Internal Privacy Impact Analysis

6.2.    List the privacy risks and mitigations related to internal information sharing and disclosure. Follow this format:

**Privacy Risk**:  Minimal due to access controls that includes roles that are integrated into the USDA eAuthentication Application.

**Mitigation**:  All access will be managed using the USDA eAuthentication Application.

### External Information Sharing

6.3.    With which external organizations (outside USDA) is information shared, received, and/or transmitted?  What information is shared, received and/or transmitted, and for what purpose? How is the information transmitted?

Information will also be shared, where permitted by law and consistent with this notice, with Federal and State agencies when necessary to investigate and rectify fraudulent or otherwise improper or illegal SNAP enrollments or transactions.

Click or tap here to enter text.

### External Privacy Impact Analysis

6.4.    List the privacy risks and mitigations related to external information sharing and disclosure. Follow this format:

**Privacy Risk**: Privacy Act risks associated with sharing information externally include:

- **Unauthorized Access:** Sharing PII with third parties increases the risk of unauthorized access, especially if those parties do not have adequate security measures in place.

- **Data Breaches:** External sharing can lead to data breaches, either through hacking or inadvertent exposure, resulting in unauthorized individuals gaining access to sensitive information.

- **Loss of Control:** Once PII is shared externally, the SNAP Information Database and USDA may lose control over how that information is used, which can lead to misuse or unauthorized applications of the data.

- **Non-compliance with Regulations:** Sharing PII without proper consent or outside the parameters set by privacy laws can result in legal penalties and reputational damage.

- **Inconsistent Data Management Practices:** Different third parties may have varying practices for handling PII, leading to inconsistencies in data protection and increased risks.

- **Insufficient Due Diligence:** Failing to conduct proper due diligence on third parties before sharing PII can expose the SNAP Information Database to risks associated with partnering with unreliable or non-compliant entities.

- **Public Perception and Trust Erosion:** External sharing of PII, especially if not communicated transparently, can lead to public distrust and negative perceptions of the SNAP Information Database or agency.

- **Reputational Damage: I**f shared PII is misused or leads to negative outcomes for individuals, it can result in significant reputational harm to the SNAP Information Database or agency responsible for the data.

- **Limited Individual Awareness:** Individuals may not be fully aware of how their PII is being shared or the potential risks involved, leading to a lack of informed consent.

- **Legal Liability:**  The SNAP Information Database and USDA may face lawsuits or legal actions if individuals believe their PII has been mishandled or improperly disclosed, resulting in financial and operational impacts.

**Mitigation**: Implementing the following mitigation actions, the SNAP Information Database can manage the risk associated with external sharing and disclosure of personal information while complying with Privacy Act requirements.

- **Access Controls:** Implement strict access controls to ensure that only authorized personnel can share or disclose PII externally.

- **Security Measures:** Employ robust security measures, such as encryption and secure transfer protocols, when sharing personal data to protect it during transmission.

- **Data Sharing Policy:** Develop a clear policy outlining the conditions under which PII can be shared externally, including legal and compliance requirements (ex.: Computer Matching Agreements, SORNs, Business Agreements).

- **Due Diligence:** Conduct thorough due diligence on third parties before sharing personal data, ensuring their privacy standards and practices are comparable to the PA and USDA requirements.

- **Written Agreements:** Establish written agreements or contracts with third parties that outline their responsibilities for safeguarding shared data and compliance with privacy laws.

- **Need-to-Know Basis:** Limit the sharing of PII to only what is necessary for the intended purpose, adhering to the principle of data minimization.

- **Individual Consent:** Obtain explicit consent from individuals before sharing their personal information with third parties.

- **Transparency with Individuals:** Clearly inform individuals about potential external sharing of their personal data in privacy notices, including the types of entities with whom data may be shared and the purposes for sharing.

- **Access Controls:** Implement strict access controls to ensure that only authorized personnel can share or disclose PII externally.

- **Individual Consent:** Obtain explicit consent from individuals before sharing their personal information with third parties.

- **Regular Audits:** Conduct regular audits of data sharing practices and third-party compliance to ensure adherence to privacy policies and legal requirements.

- **Incident Response Plan:** Develop an incident response plan that outlines procedures for addressing potential data breaches or unauthorized disclosures related to external sharing.

## Section 7: Redress

These questions address the individual's ability to ensure the accuracy of the information collected about him or her.

7.1.    What are the procedures that allow individuals to gain access to their information?

Data being shared is already provided by individuals to SNAP State agencies for the purpose of determining a household's eligibility for SNAP benefits. Individuals may request data from their State agency who is responsible for collecting and maintaining it.

7.2.    What are the procedures for correcting inaccurate or erroneous information?

Any individual that receives a notice of adverse action from a State agency that would impact the household's eligibility or benefit allotment has the right to request a fair hearing per the regulations at 7 CFR 273.15. Existing regulations requires State agencies to present all information used to make a decision and provides procedures for the individual to dispute any inaccurate or erroneous information.

7.3.    How are individuals notified of the procedures for correcting their information?

State agencies must send a notice of adverse action to any individual based on any action by the State agency to reduce or terminate an individual's SNAP benefit based on a data match or any other source of information, per 7 CFR 273.13 of the regulations.

7.4.    If no formal redress is provided, what alternatives are available to the individual?

Not applicable.

### Privacy Impact Analysis

7.5.    List the privacy risks and mitigations related to redress. Follow this format:

**Privacy Risk**: Privacy Act risks associated with redress include:

- **Inadequate Processes:** If the processes for individuals to seek redress for privacy violations are unclear or cumbersome, it can deter individuals from exercising their rights and lead to unresolved complaints.

- **Lack of Transparency:** Not providing clear information about how redress mechanisms work can create confusion and mistrust among individuals regarding their rights and the agency's accountability.

- **Failure to Address Complaints:** The SNAP Information Database or agencies may not adequately address or resolve complaints related to privacy violations, leading to dissatisfaction and potential legal repercussions.

- **Delayed Responses:** Slow responses to redress requests can frustrate individuals and exacerbate feelings of mistrust and dissatisfaction, potentially leading to reputational harm.

- **Inconsistent Application:** If redress processes are applied inconsistently across different cases or agencies, it can lead to perceptions of unfairness and bias, undermining trust in the entire department.

- **Insufficient Recordkeeping:** Poor documentation of redress requests and outcomes can hinder an agency's ability to identify patterns of violations, learn from mistakes, and improve practices.

- **Legal Exposure:** Failing to provide adequate redress options may expose the SNAP Information Database or USDA to legal challenges, including lawsuits or regulatory scrutiny, especially if individuals feel their rights have been violated.

- **Reputation Damage:** Public knowledge of inadequate redress mechanisms can damage the department's reputation, leading to loss of customer trust and potential business impacts.

- **Lack of Accountability:** Without effective redress mechanisms, the SNAP Information Database or USDA may not be held accountable for privacy violations, which can perpetuate poor data handling practices.

- **Discrimination:** If redress mechanisms are not accessible to all individuals equally, it may lead to discrimination, where certain groups may find it harder to seek and obtain redress.

**Mitigation**: To mitigate redress risks, the SNAP Information Database must establish clear, accessible, and effective redress mechanisms, providing transparent information about the process, ensuring timely responses, and maintaining thorough documentation of all complaints and resolutions. Implementing the following mitigation actions, the SNAP Information Database can enhance redress mechanisms, ensuring individuals have effective means to address privacy concerns.

- **Establish Clear Procedures:** Develop and communicate clear procedures for individuals to submit complaints or requests for redress related to privacy violations.

- **User Awareness Campaigns:** Educate users about their rights under the privacy act and the available redress mechanisms through workshops, newsletters, or online resources.

- **Dedicated Point of Contact:** Appoint dedicated personnel who are responsible for handling redress requests and ensuring timely responses to complaints.

- **Timely Response Protocols:** Implement protocols for acknowledging and responding to redress requests promptly, ensuring that individuals feel heard and valued.

- **Investigation Processes:** Create structured process for investigating redress requests, including gathering necessary information and documenting findings.

- **Remediation Options:** Offer various remediation options, such as data correction, deletion, or compensation, depending on the nature of the complaint and the organization's policies.

- **Feedback Mechanisms:** Establish feedback channels for individuals to provide insights on the redress process, helping to improve the system continuously.

- **Regular Training:** Provide ongoing training for employees on handling privacy complaints and the importance of adhering to redress procedures.

- **Monitoring and Reporting:** Regularly monitor redress requests and outcomes to identify trends, potential issues, and areas for improvement in privacy practices.

- **Transparency in Outcomes:** Communicate the outcomes of redress requests to the individuals involved, ensuring transparency and fostering trust in the process.

## Section 8: Auditing and Accountability

These questions describe technical safeguards and security measures:

8.1.    How is the information in the system/project/program secured?

The SNAP Information Database will be housed within FNS' FedRAMP Amazon Web Services (AWS) environment, and will be protected in accordance with Federal requirements and USDA policy. Identification and authentication are implemented using multi-factor authentication for USDA users through the use of Personal Identity Verification (PIV) smartcards (LincPass). Logical access control to the SNAP Information Database is implemented via USDA eAuthentication Application.

The USDA eAuthentication Application is the system used by USDA agencies to enable FNCS staff, customers, and contractors to obtain accounts that allow them to access USDA web applications and services via the Internet. The USDA eAuthentication Service provides common authentication for web-based applications.  Authentication confirms a person's identity, and enables authorization to data and system resources through role-based access controls that identify the person's user system and data permissions.

Data will be encrypted in transit via the MoveIt file transfer application. Once in the SNAP Information Database, security controls and monitoring will be commensurate with USDA, Federal policy, requirements, and FNS' robust and structured information security control and monitoring program. Key features of FNS security program include:

- **Secure Architecture and Configuration:** Security engineers work with application developers and system administrators to ensure that effective security capabilities are implemented appropriately and operating as intended to protect FNS IT resources, in alignment with zero-trust principles. Security capability implementation and validation occur throughout the development process, leveraging FedRAMP cloud solutions, USDA security tools, and FNCS cyber capabilities.

- **Application Security Program:** FNS leverages a proactive approach for identifying, mitigating, and managing vulnerabilities in software applications and supporting platforms through secure coding practices, regular assessment, and continuous improvement. The SNAP Information Database will utilize USDA enterprise vulnerability scanning tools, as well as FNS static code analysis and dynamic application security testing capabilities. Identified vulnerabilities are formally tracked for resolution within mandated remediation timeframes, with regular reports provided to FNS IT and program leadership.

- **Audit Log Management Program:** FNS leverages a centralized strategy and capabilities for collecting, monitoring, and analyzing system and user activity logs to detect anomalies, support incident response, and maintain compliance with regulatory requirements. The SNAP Information Database will generate event logs that will be captured in regular reports and alerts to satisfy regulatory requirements and ensure that suspicious activity is detected, investigated, and addressed as appropriate.

- **Continuous Monitoring:** All FNS systems and applications are subject to a robust continuous monitoring program, to include regular access monitoring and recertification; periodic independent privacy and security assessment; secure configuration and compliance validation; contingency planning and response; and incident management and response.

8.2.    What procedures are in place to determine which users may access the program or system/project, and are they documented?

All users of FNS systems must follow the FNS User Access Request process prior to being granted access to a system. Access requests are approved by a supervisor, or contract officer representative (COR) for contractors, and a designated account manager for the system. Access control procedures for the SNAP Information Database will be documented in the system's Access Control (AC) Standard Operating Procedure (SOP).

8.3.    How does the program review and approve information sharing requirements?

Information sharing requirements will be reviewed before entering into a new sharing agreement. All information sharing agreements are reviewed on an annual basis, in conjunction with the annual security control assessment.

8.4.    Describe what privacy training is provided to users either generally or specifically relevant to the program or system/project.

All USDA users are required to take annual information security awareness training, which includes elements of privacy-related topics and rules of behavior for accessing USDA systems.

## Privacy Impact Assessment Review

Date approved by Privacy Office: 7/14/2025

Signed: Signatures on file

# EXHIBIT B



United States Department of Agriculture
Washington, D.C. 20250
May 6, 2025

Dear State Agency Directors,

On March 20, 2025, President Trump issued Executive Order 14243, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos*. Among myriad important directives, this Executive Order required agency heads to "take all necessary steps, to the maximum extent consistent with law, to ensure the Federal Government has unfettered access to comprehensive data from all State programs that receive Federal funding, including, as appropriate, data generated by those programs but maintained in third-party databases." The Department of Agriculture (USDA) is committed to effectuating this Executive Order with respect to all programs in its purview.

The Food and Nutrition Service (FNS) at USDA plays a key role in providing nutrition services to Americans in need through the Supplemental Nutrition Assistance Program (SNAP or the Program). SNAP, which is Federally funded, is administered by the States, districts, and territories through partnerships with FNS and several payment processors.

This distributed administration takes advantage of our federal system to enable States to meet the needs of their residents. However, as explained in the President's Executive Order, USDA must retain "unfettered access to comprehensive data" from federally funded programs like SNAP even if such data is "maintained in third-party databases." This is the only way to eliminate "bureaucratic duplication and inefficiency" and enhance "the Government's ability to detect overpayments and fraud."

At present, each State, district, territory, and payment processor is a SNAP information silo. These various entities maintain discrete collections of SNAP application, enrollment, recipient, and transaction data, each of which is necessary in ensuring the integrity of the Program. Thus, pursuant to the President's Executive Order and to confirm that SNAP is being administered appropriately and lawfully, USDA and FNS are working to eliminate these information silos.

7 U.S.C. 2020(a)(3) and (e)(8)(A) and 7 C.F.R. 272.1(c)(1) and (e) authorize USDA and FNS to obtain SNAP data from State agencies and, by extension, their contractors. FNS is therefore working with several SNAP payment processors to consolidate SNAP data. If they have not yet done so, your processors may reach out to you to provide notice of this partnership and data sharing.

FNS will use the data it receives from processors to ensure Program integrity, including by verifying the eligibility of benefit recipients. This is consistent with FNS's statutory authority and the President's Executive Order and will ensure Americans in need receive assistance, while at the same time safeguarding taxpayer dollars from abuse. Upon completion of its analysis, and to the extent necessary, FNS will follow up with State agencies regarding next steps.

Additionally, pursuant to, among other authorities, the President's Executive Order, 5 U.S.C. 553(a)(2), 7 U.S.C. 2020(a)(3), and 7 C.F.R. 272.1(e), USDA is taking steps to require all States to work through their processors to submit at least the following data to FNS, as applicable:

1. Records sufficient to identify individuals as applicants for, or recipients of, SNAP benefits, including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers.
2. Records sufficient to calculate the total dollar value of SNAP benefits received by participants over time, with the ability to filter benefits received by date ranges.

Requested data will cover the period beginning January 1, 2020, through present. Please contact me at gina.brand@usda.gov with any questions related to this data sharing request.

Failure to grant processor authorizations or to take the steps necessary to provide SNAP data to FNS may trigger noncompliance procedures codified at 7 U.S.C. 2020(g).

Thank you for your continued work to help address the needs of vulnerable Americans and safeguard taxpayer dollars.

Sincerely,

Digitally signed by GINA
BRAND
Date: 2025.05.06
18:28:56 -04'00'

Gina Brand
Senior Policy Advisor for Integrity
United States Department of Agriculture
Food, Nutrition, and Consumer Services

# EXHIBIT C



*Secretary Brooke L. Rollins*

July 9, 2025

Dear SNAP State Agencies,

On March 20, 2025, President Trump issued Executive Order 14243, Stopping Waste, Fraud, and Abuse by Eliminating Information Silos. This Executive Order required agency heads to "take all necessary steps, to the maximum extent consistent with law, to ensure the Federal Government has unfettered access to comprehensive data from all state programs that receive federal funding, including, as appropriate, data generated by those programs but maintained in third-party databases." The Department of Agriculture (USDA) is committed to effectuating this Executive Order with respect to all programs in its purview.

The Food and Nutrition Service (FNS) at USDA works in partnership with State agencies to provide nutrition assistance to Americans in need through the Supplemental Nutrition Assistance Program (SNAP). It is imperative that USDA eliminates bureaucratic duplication and inefficiency and enhances the Government's ability not only to have point-in-time information but also to detect overpayments and fraud. As noted in the May 6, 2025, announcement of the Department's plan to request these data from EBT processors, USDA is committed to ensuring appropriate and lawful participation in SNAP.

On June 23, 2025, pursuant to the provisions of the Privacy Act of 1974 and Office of Management and Budget (OMB) Circular No. A-108, USDA published a notice in the Federal Register that the department proposes to create a new system of records (SOR) entitled USDA/FNS-15, "National Supplemental Nutrition Assistance Program (SNAP) Information Database." This system is owned, administered, and secured by FNS, and the system's primary purpose is to strengthen SNAP and government program integrity.

In accordance with 5 USC 552a(e)(4) and (11), this system of records notice becomes effective upon publication in the Federal Register, except for the routine uses, which will become effective on July 23, 2025. To ensure efficient implementation of this system, and to ensure USDA has a complete and accurate database, we are requiring collection of SNAP data from EBT processors or State agencies beginning on July 24, 2025, with submissions to USDA no later than the close of business on July 30, 2025. The required data are listed in the notice section, "Categories of Records in the System."

Thank you for your continued work to help address the needs of vulnerable Americans and safeguard taxpayer dollars. If you or your staff have any questions, please have your staff contact the FNS Governmental Affairs Team at fnsgovaffairs@usda.gov.

Sincerely,

Brooke L. Rollins
Secretary
U.S. Department of Agriculture

# EXHIBIT D



United States Department of Agriculture
Washington, D.C. 20250
July 23, 2025

Dear State agency Directors,

On May 6, 2025, State agencies were advised of the United States Department of Agriculture's (USDA) intent to implement President Trump's March 20, 2025, Executive Order 14243, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos* through State data sharing to the Food and Nutrition Service (FNS). In the May 6, 2025, memo, States were advised that the USDA/FNS was working with Supplemental Nutrition Assistance Program (SNAP) payment processors to assist with data collection. As requested by State agencies, States are welcome to determine the most appropriate and feasible method to share the requested data with FNS. State agencies can work through their payment processor, a vendor of their own choosing, or with their State Information Technology team.

### Data Elements

The requested data elements are for individuals who have received, are currently receiving, or have applied to receive SNAP benefits from January 1, 2020, through present date. Requested data elements shall include records sufficient to identify individuals as applicants for, or recipients of, SNAP benefits, including but not limited to all household group members names, dates of birth, social security numbers, residential and mailing addresses used or provided, as well as all data records used to determine eligibility or ineligibility. It is understood that these data records will vary household to household, and may include earned and unearned income, absent parent(s), and other data used in the determination process. Please do not include supporting documents or case comments.

Additionally, transactional records from each household are also requested, and must be sufficient to calculate the total dollar value of SNAP received by recipients over time, with the ability to filter benefits received by date ranges, as well as SNAP usage and retailer data.

### Data Transmission

Each State agency shall transmit data to FNS via the platform called Box. Once you identify the individual who will be responsible for transmitting the data for your State agency, please send their name, title, and email address to SNAPDatabase@usda.gov. The State agency identified contact will then receive an email for account creation and access for data transmission.

Box is a secure platform which employs various security measures, including encryption, access controls, and compliance features to handle the sensitive data that States will be transmitting.

Data shall be transmitted to FNS no later than Wednesday, July 30, 2025.

***Follow-Up Steps***

Upon completion of data analysis, FNS will follow up with State agencies in respect to any applicable next steps of reconciliation.

For questions related to the required data elements and/or assistance with the transmission of data, please send inquiries to SNAPDatabase@usda.gov.

We look forward to expanding this partnership with our State partners to ensure and enhance Program integrity.

Sincerely,

Digitally signed
by GINA BRAND
Date: 2025.07.23
22:20:31 -04'00'

Gina Brand
Senior Policy Advisor for Integrity
United States Department of Agriculture
Food, Nutrition, and Consumer Services

# EXHIBIT E



**U.S. DEPARTMENT OF AGRICULTURE**

July 25, 2025

Dear State Agency Directors,

The Food and Nutrition Service (FNS) of the U.S. Department of Agriculture (USDA, Department) plays a key role, in conjunction with our State agency partners, providing Federally funded nutrition services to Americans in need through the Supplemental Nutrition Assistance Program (SNAP). The Department is dedicated to upholding the commitments of both President Trump and Secretary Rollins to strengthening government program integrity, as directed by Executive Order 14243, Stopping Waste, Fraud, and Abuse by Eliminating Information Silos.

To that end, USDA has established the SNAP Information Database. In accordance with Secretary Rollins' July 9, 2025, letter, and in order to ensure a complete and accurate database, State agencies must be compliant with the requirement of transmitting SNAP participant data to FNS no later than July 30, 2025. As a reminder, 7 U.S.C. 2020(e)(8)(A) provides that State data protections must allow for this disclosure.

State agencies should refer to the SNAP Data Sharing Guidance letter, published on July 23, 2025, to confirm the steps each State agency shall follow to transmit the data. Departmental staff stand ready to assist State partners with any technology challenges and/or provide clarifications as necessary to ensure State agency partners are compliant, and meet the July 30, 2025, deadline.

Failure to take the steps necessary to provide the relevant data to FNS may trigger noncompliance procedures codified in 7 U.S.C. 2020(g).

The Food and Nutrition Service thanks you for your dedication to improved program integrity and transparency in not only addressing the needs of vulnerable Americans, but safeguarding taxpayer dollars.

Sincerely,

Patrick A. Penn
Deputy Under Secretary
Food, Nutrition, and Consumer Services

# EXHIBIT F



CALIFORNIA HEALTH & HUMAN SERVICES AGENCY
# DEPARTMENT OF SOCIAL SERVICES
744 P Street • Sacramento, CA 95814 • *www.cdss.ca.gov*



**JENNIFER TROIA**
DIRECTOR

**GAVIN NEWSOM**
GOVERNOR

July 29, 2025

Gina Brand
Senior Policy Advisor for Integrity
United States Department of Agriculture
Food, Nutrition, and Consumer Services
gina.brand@usda.gov

SUBJECT:    RESPONSE TO USDA'S JULY 9 AND JULY 23, 2025 DATA REQUEST

Dear Gina Brand:

The California Department of Social Services (CDSS) is in receipt of the United States Department of Agriculture's (USDA) July 9, 2025 and July 23, 2025, letters requesting more than five and a half years of Supplemental Nutrition Assistance Program (SNAP) recipient and applicant data from the state.

As you may already be aware, California is now a plaintiff in a multi-state lawsuit challenging the legality of the USDA's creation of a new federal database and the agency's unprecedented demands for sensitive SNAP data. Even if the proposed data collection reflected in the National SNAP Information Database System of Records Notice were lawful, the USDA has not adhered to standard data protocols ahead of large-scale data transmissions, as laid out in the complaint.

In addition to the above-noted concerns, compliance by the July 30, 2025 deadline would be impossible for CDSS given the size of the request. Specifically, in California, which serves an average of 5.5 million SNAP participants per month, the request for five and a half years worth of data related to all SNAP recipients and applicants would take a minimum of three months and possibly more than six months to gather and provide given the breadth of the request, the need for clarification to address the ambiguities of the request, the need to collect data from multiple legacy automated systems, and other technical challenges.

In light of the foregoing, CDSS will not be sharing the requested data at this time. Moreover, for the reasons stated herein, CDSS respectfully urges that the USDA withdraw the requests for data delineated in the above-referenced letters, or, at a minimum, stay the deadline to submit the requested data pending resolution of the litigation referenced above. CDSS will continue to comply with federal and state law

Gina Brand
Page 2


relating to the award and administration of SNAP, as well as its approved State Plan of Operation.

Respectfully,

RYAN GILLETTE
Chief Data Officer
Research, Automation, and Data Division

# EXHIBIT G

**U.S. DEPARTMENT OF AGRICULTURE**

August 12, 2025

Governor Gavin Newsom
1021 O Street, Suite 9000
Sacramento, California 95814

Dear Governor Newsom,

On May 6, 2025, you were notified that the U.S. Department of Agriculture's (USDA) Food and Nutrition Service (FNS) would be collecting Supplemental Nutrition Assistance Program (SNAP) participant data from January 1, 2020, to present date and that failure to take the steps necessary to provide SNAP data to FNS may trigger noncompliance procedures codified at 7 USC 2020(g). On July 9, 2025, in a letter from Secretary Brooke Rollins, you were reminded of this collection, pursued in accordance with section 11(e)(8)(A) of the Food and Nutrition Act of 2008 (the Act), and informed that you were required to submit this data no later than the close of business July 30, 2025.  Again, on July 25, 2025, in a letter from me, you were reminded of this data collection, of the July 30, 2025 deadline, and that failure to take the steps necessary to provide the relevant data to FNS may trigger noncompliance procedures codified in 7 U.S.C. 2020(g). As of the date of this letter, FNS has not received this participant data and, as a result, the State of California is out of compliance with SNAP requirements.

As provided by 7 CFR 276.4, this letter serves as an advance notice that California could be subject to suspension or disallowance of Federal funding for State SNAP administrative expenses if it does not submit to FNS the requested SNAP participant data. Section 11(e)(8)(A) of the Act requires that California permits disclosure of this data "to persons directly connected with the administration or enforcement of the provisions of [the Act], [and] regulations issued pursuant to" the Act. The July 9th letter directed that the requested data to be submitted using a system owned, administered, and secured by FNS.

In order for FNS to determine that California has made adequate progress towards meeting the data collection requirements, by August 13, 2025, FNS must receive a description of the actions California will undertake in order to ensure that it will submit the requested data to FNS **no later than close of business Friday, August 15, 2025.**

If California fails to comply with the requirements outlined in this advance notification, the USDA may proceed with issuing a formal warning to pursue the suspension or disallowance of Federal funding for State SNAP Administrative expenses and may take any other available legal action.

As always, the USDA stands ready to provide technical assistance to you so that California may come into compliance with this requirement. You may request this assistance by contacting:

FNS Tech Team at SNAPdatabase@usda.gov.

Sincerely,

Patrick A. Penn
Deputy Under Secretary
Food, Nutrition, and Consumer Services