IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA; STATE OF NEW YORK; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAIʻI; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR** ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky; **STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF WASHINGTON; STATE OF WISCONSIN,** | |
| Plaintiffs, | |
| v. | Case No. **3:25-cv-06310-MMC** |
| **UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS,** in her official capacity as U.S. Secretary of Agriculture**; U.S. DEPARTMENT OF AGRICULTURE'S OFFICE OF INSPECTOR GENERAL,** | |
| Defendants. | |

**DECLARATION OF EASHA CANADA**

## DECLARATION OF EASHA CANADA

Easha Canada, declares under penalty of perjury, pursuant to 28 U.S.C. Section 1746, as follows:

1. I am a resident of the State of Connecticut. I am over the age of 18 and understand the obligations of an oath.

**Professional and Agency Background**

2. I am the Deputy Commissioner for the Connecticut Department of Social Services ("DSS"). I have been employed in this position with DSS since February 2023. In my capacity as Deputy Commissioner, I am responsible for the administration and service delivery to Connecticut residents applying for benefits associated with the Supplemental Nutrition Assistance Program (SNAP), Medicaid Husky A for low income families with dependent children, Medicaid Husky C for individuals over 65 and those with disabilities, Medicaid Husky D for low income individuals aged 19 - 65, and the State Administered General Assistance (SAGA) programs. I make this declaration based on personal knowledge, upon information and belief, and on my review of information and records gathered by agency staff.

3. DSS is statutorily designated in Connecticut General Statutes section 17b-2 as the state agency responsible for "the administration of (1) the Connecticut energy assistance program pursuant to the Low Income Home Energy Assistance Act of 1981; (2) the state plan for vocational rehabilitation services for the fiscal year ending June 30, 1994; (3) the refugee assistance program pursuant to the Refugee Act of 1980; (4) the legalization impact assistance grant program pursuant to the Immigration Reform and Control Act of 1986; (5) the temporary assistance for needy families program pursuant to the Personal Responsibility and Work Opportunity Reconciliation Act of 1996; (6) the Medicaid program pursuant to Title XIX of the Social Security Act; (7) the

supplemental nutrition assistance program pursuant to the Food and Nutrition Act of 2008; (8) the state supplement to the Supplemental Security Income Program pursuant to the Social Security Act; (9) the state child support enforcement plan pursuant to Title IV-D of the Social Security Act; (10) the state social services plan for the implementation of the social services block grants and community services block grants pursuant to the Social Security Act; and (11) services for persons with autism spectrum disorder."

    4.  Among other statutory duties, pursuant to section 17b-3 of the Connecticut General Statutes, the Department has the power and duty to "(1) Administer, coordinate and direct the operation of the department; . . . (4) establish and develop programs and administer services to achieve the purposes of the department as established by statute; . . . (9) promote economic self-sufficiency where appropriate in the department's programs, policies, practices and staff interactions with recipients; (10) act as advocate for the need of more comprehensive and coordinated programs for persons served by the department (11) plan services and programs for persons served by the department; . . . (15) encourage and facilitate effective communication and coordination among federal, state, municipal and private agencies; (16) inquire into the utilization of state and federal government resources which offer solutions to problems of the delivery of social services; (17) conduct, encourage and maintain research and studies relating to social services development; (18) prepare, review and encourage model comprehensive social service programs; (19) maintain an inventory of data and information and act as a clearing house and referral agency for information on state and federal programs and services; . . . The Commissioner of Social Services is authorized to do all things necessary to apply for, qualify for and accept any federal funds made available or allotted under any federal act for social service development, or any other projects, programs or activities which may be established by federal law, for any of the

purposes or activities related thereto, and said commissioner shall administer any such funds allotted to the department in accordance with federal law."

5. Among the programs administered by DSS is the Supplemental Nutrition Assistance Program ("SNAP"), which issues monthly electronic benefits that can be used to purchase food at authorized retail stores.

**SNAP in Connecticut**

6. SNAP is a key part of Connecticut's efforts to address hunger by supplementing the food budget of low-income families so they can purchase healthy food. In 2024, and upon information and belief, an average total population of over 489,000 individuals received SNAP benefits in Connecticut each month, including over 168,000 children under 19 years of age and over 72,000 individuals sixty-five years of age or older. Upon information and belief, more than $870 million in SNAP benefits were issued through State Fiscal Year 2025 (July 1, 2024 through June 3, 2025).

7. Pursuant to federal law, Connecticut is responsible for the issuance, control and accountability of SNAP benefits and Electronic Benefit Transaction ("EBT") cards; ensuring program integrity; and supervising day-to-day administration of SNAP, including processing applications for SNAP benefits and certifying eligible applicant households. 7. U.S.C. § 2020(a)(1); 7 C.F.R. § 271.4; 7 C.F.R. § 274.2.

8. Connecticut expends approximately $157.7 million in administrative costs to run its SNAP program each year, approximately 50% of which is reimbursed by the federal government.

**USDA's Unprecedented Request for Connecticut's SNAP data**

9. As part of the SNAP application process, DSS collects sensitive personally identifiable information ("PII") from applicants and recipients, including but not limited to, home addresses, dates of birth, Social Security Numbers, citizenship and immigration status, household income and resource information.

10. Connecticut strictly protects the confidentiality of its residents' SNAP data.

11. On May 6, 2025, U.S. Department of Agriculture/Food and Nutrition Service ("USDA-FNS") Senior Policy Advisor for Integrity Gina Brand sent DSS a letter stating that the USDA "must retain 'unfettered access to comprehensive data' from federally funded programs like SNAP". The letter further stated that the USDA "is taking steps to require all States to work through their processors" to obtain "[r]ecords sufficient to identify individuals as applicants for, or recipients of, SNAP benefits, including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers." USDA also indicated that it would seek "[r]ecords sufficient to calculate the total dollar value of SNAP benefits received by participants over time, with the ability to filter benefits received by date ranges." The letter further demanded that the requested data would cover the period beginning January 1, 2020, through present.

12. On or about April 28, 2025, Connecticut's Department of Social Services was notified by its EBT vendor, Conduent, that it had received a request for confidential information from the USDA and DOGE. On or about May 6, 2025, the USDA sent a letter to "State Agency Directors" indicating, in part, that the USDA was "taking steps" to require all States to work through their processors to submit to FNS "at least" records sufficient to identify all individuals as applicants for, or recipients of, SNAP benefits "including but not limited to personally identifiable

4

information" as well as records to calculate total dollar values of SNAP benefits received by a participant, for the time period "beginning January 1, 2020, through present". On or about May 14, 2025, Deputy Commissioner Peter Hadler informed Conduent that it was not authorized to release information to the USDA without DSS authorization and approval. Upon information and belief, no such release of information has yet to occur in connection with USDA's underlying requests.

13. On June 23, 2025, the USDA published a System of Records Notice ("SORN") in the Federal Register notifying the public that it sought to create a large-scale "National Supplemental Nutrition Assistance Program (SNAP) Information Database."[1]

14. The SORN announced that the USDA intended to demand the following categories of records from "53 State agencies and their designated vendors and/or contractors": "records containing personally identifying information, including but not limited to SNAP participant name, Social Security Number (SSN), date of birth (DOB), residential address, Electronic Benefit Transaction (EBT) card number, and case record identifier number or other identifiers or data elements maintained by States, vendors, or contractors to identify SNAP recipients." *Id.* The SORN also states that USDA would collect "information derived from and associated with EBT transactions, including but not limited to records sufficient to calculate the total dollar value of SNAP benefits received by participants over time, such as applied amounts and benefit available dates." *Id.*

15. These categories of information will be collected for all "individuals who have received, are currently receiving, or have applied to receive SNAP benefits." *Id.*

---

[1] 90 Fed. Reg. 26,521 (June 23, 2025).

16. The USDA's actions are unprecedented. To my knowledge and upon information and belief, the USDA has never before sought to inspect or audit, let alone retain, this volume of personal and sensitive SNAP data.

17. In its privacy impact assessment, USDA states that the uses of the data in the database would be "to detect duplicate enrollments across states, verify immigration status eligibility, and perform other fraud prevention checks against other Federal agencies' datasets, thereby ensuring program integrity, including by verifying the eligibility of benefit recipients."[2]

18. These uses are duplicative of existing systems. DSS already conducts these checks, using systems such as the Systematic Alien Verification for Entitlement ("SAVE") program.

19. On July 9, the USDA Secretary Brooke L. Rollins sent DSS a demand for five years' worth of data on all SNAP applicants and recipients. The July 9 Letter demands the categories of records listed in the SORN and directs states to produce the requested data starting July 24 and no later than July 30, 2025.

20. DSS cannot share confidential SNAP participant data with a third party without executing an appropriate data sharing agreement, Memoranda of Understanding or similar document, and this has not occurred. Connecticut law restricts the use and disclosure of SNAP records to administering public benefits programs or for limited uses consistent with the SNAP Act or regulations. *See* Conn. Gen. Stat. § 17b-90.

21. USDA's actions will have a predictable and imminent chilling effect on individuals' willingness to avail themselves of critically needed public benefits. The mere prospect that SNAP PII may get shared with other federal agencies, such as DOGE or DHS, for surveillance or broad-

---

[2] USDA, Cybersecurity and Priv. Operations Ctr., Priv. Div., USDA Privacy Impact Assessment Fiscal Year 2025 (July 23, 2025), https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

based immigration enforcement purposes will discourage individuals from participating in nutrition programs for which they are eligible and authorized to participate. This chilling effect will affect citizens, individuals who are not (or should not be) at risk of deportation, such as green card holders, and mixed-immigration status families with U.S. citizen children. The predictable chilling effects will harm Connecticut by causing loss of federal funding associated with any eligible individuals who avoid participating in SNAP.

22.     The predictable chilling effects will harm Connecticut by causing loss of federal funding associated with any eligible individuals who avoid participating in SNAP. Through a federal option called "direct certification" for its school lunch program, DSS currently certifies almost 110,000 children for federally funded free or reduced-price meals due to their households' participation in SNAP. Any reduction in SNAP enrollment for families with schoolchildren therefore has a negative impact on federal eligibility for free or reduced-price meals.

23.     On July 18, 2025, Connecticut, joined by several other states, submitted a comment letter outlining our objections to the USDA's creation of a vast National SNAP Information Database and the USDA's demand for state data.

24.     On July 23, 2025, USDA-FNS Senior Policy Advisor for Integrity Brand sent DSS another letter, reiterating the USDA's demand for information. She stated that the USDA was seeking data on "individuals who have received, are currently receiving, or have applied to receive SNAP benefits from January 1, 2020, through present date. Requested data elements shall include records sufficient to identify individuals as applicants for, or recipients of, SNAP benefits, including but not limited to all household group members' names, dates of birth, social security numbers, residential and mailing addresses used or provided, as well as all data records used to determine eligibility or ineligibility." The letter also noted that USDA is requesting "transactional

records from each household . . . sufficient to calculate the total dollar value of SNAP received by recipients over time . . . as well as SNAP usage and retailer data."

25. On July 25, 2025, USDA-FNS Deputy Under Secretary Patrick A. Penn sent a letter to DSS stating that "Failure to take the steps necessary to provide the relevant data to FNS may trigger noncompliance procedures codified in 7 U.S.C. 2020(g)."

26. On July 28, 2025, Connecticut joined by several other states, filed the present action in the Northern District of California challenging the USDA's actions.

27. On July 30, 2025, DSS sent USDA a letter expressing its concern with USDA's data demand. DSS requested an extension of the deadline until the litigation had been resolved in this letter. To date, USDA has not provided a response to this request.

28. On August 12, 2025, Deputy Under Secretary Penn sent a letter to Governor Lamont informing him that because FNS had not received the participant data "the State Connecticut is out of compliance with SNAP requirements." The letter further states that, "[a]s provided by 7 CFR 276.4, this letter serves as an advance notice that [State] could be subject to suspension or disallowance of Federal funding for State SNAP administrative expenses if it does not submit to FNS the requested SNAP participant data."

29. The August 12, 2025, letter further states: "In order for FNS to determine that Connecticut has made adequate progress towards meeting the data collection requirements, by August 13, 2025, FNS must receive a description of the actions Connecticut will undertake in order to ensure that it will submit the requested data to FNS no later than close of business Friday, August 15, 2025. If Connecticut fails to comply with the requirements outlined in this advance notification, the USDA may proceed with issuing a formal warning to pursue the suspension or disallowance

8

of Federal funding for State SNAP Administrative expenses and may take any other available legal action."

30. If USDA was to withhold SNAP administrative funds, Connecticut and DSS would face irreparable harm to its ability to effectively administer the SNAP critical nutrition assistance program. DSS would be forced to make immediate and dramatic cuts to essential staff positions, including eligibility workers, investigators, and/or program coordinators who ensure the proper distribution of benefits to vulnerable families throughout the State of Connecticut. Such reductions would create a cascading effect, forcing DSS to reduce or eliminate vital support programs such as nutritional education, employment training programs, or community outreach initiatives to assist SNAP recipients in achieving food security and economic stability. In addition, were such a withholding to occur, DSS would be required to allow SNAP services to deteriorate significantly or divert needed resources from other essential services such as healthcare, education, or public safety, thereby creating harmful collateral effects through the state and its infrastructure.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14 day of August, 2025, in Hartford, Connecticut.

*(signature)*
Easha Canada
Deputy Commissioner
Connecticut Department of Social Services