IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA; STATE OF NEW YORK; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR** ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky; **STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF WASHINGTON; STATE OF WISCONSIN,** | |
| Plaintiffs, | |
| v. | Case No. **3:25-cv-06310-MMC** |
| **UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS,** in her official capacity as U.S. Secretary of Agriculture**; U.S. DEPARTMENT OF AGRICULTURE'S OFFICE OF INSPECTOR GENERAL,** | |
| Defendants. | |

**DECLARATION OF MICHAEL COLE**

## DECLARATION OF MICHAEL COLE

I, **Michael Cole**, declare under penalty of perjury, pursuant to 28 U.S.C. Section 1746, as follows:

1.      I am a resident of the Commonwealth of Massachusetts. I am over the age of 18 and understand the obligations of an oath.

### Professional and Agency Background

2.      I am the Chief Operating Officer of the Massachusetts Department of Transitional Assistance (DTA), a position I have held since 2024. Between 2014 and 2024, before assuming my current role, I held several titles within DTA, including Deputy Commissioner for Policy and Programs, and Assistant Commissioner for Organizational Effectiveness.

3.      I make this declaration based on personal knowledge and on my review of information and records gathered by agency staff.

4.      DTA operates as the Commonwealth's primary agency for administering public assistance programs, with a statutory mission to assist and empower low-income individuals and families to meet their basic needs, improve their quality of life, and achieve long-term economic self-sufficiency. DTA administers a comprehensive portfolio of both state- and federally-funded programs, including the Supplemental Nutrition Assistance Program (SNAP), which provides 100% federally-funded food assistance to, among others, families with children, older adults, and persons with disabilities; the Healthy Incentives Program (HIP), a state-funded initiative that incentivizes SNAP recipients to purchase local produce; SUN Bucks, a federal program launched in 2024 providing grocery benefits to families with school-aged children during summer months;

Transitional Aid to Families with Dependent Children (TAFDC), a state- and federally-funded program operating under the federal Temporary Assistance for Needy Families (TANF) block grant that provides financial assistance and employment programming with work requirements; Emergency Aid to the Elderly, Disabled, and Children (EAEDC), a state-funded program serving elderly and disabled adults and children; and optional state-funded State Supplemental Payments (SSP) to Supplemental Security Income (SSI). The agency operates employment services through its "Pathways to Work" programs, which connect TAFDC and SNAP clients to career pathways, education, and training opportunities designed to promote economic mobility and sustained employment. DTA maintains rigorous program integrity standards through advanced analytics and fraud detection practices. As of August 2025, DTA operates through a workforce of approximately 1,940 employees, with over 80% deployed across 21 local transitional assistance offices throughout the Commonwealth, supported by specialized units including program integrity investigators, administrative hearing officers, and policy specialists.

  5. Among the programs administered by DTA is SNAP, which issues monthly electronic benefits that can be used to purchase food at authorized retail stores.

**SNAP in Massachusetts**

  6. SNAP is a key part of Massachusetts's efforts to address hunger by supplementing the food budget of low-income families so they can purchase healthy food—indeed, SNAP is, by far, the Commonwealth's largest anti-hunger program. Thus far in 2025, an average of 1.1 million people received SNAP benefits in Massachusetts each month, including 342,000 children and 261,500 elderly individuals. Since the beginning of federal fiscal year 2025, DTA has issued approximately $220 million per month in SNAP benefits in Massachusetts.

2

7. DTA administers the SNAP program in Massachusetts pursuant to Mass. Gen. Laws ch. 18, § 1 *et seq.* Pursuant to federal law, DTA administers SNAP on behalf of the United States Department of Agriculture (USDA) and is responsible for the issuance, control, and accountability of SNAP benefits and Electronic Benefit Transaction (EBT) cards; ensuring program integrity; and supervising local transitional assistance offices' day-to-day administration of SNAP, including processing applications for SNAP benefits and certifying eligible applicant households. 7 U.S.C. § 2020(a)(1); 7 C.F.R. § 271.4; 7 C.F.R. § 274.2.

8. For Federal Fiscal Year 2025, DTA budgeted approximately $213 million to pay for SNAP administration. This spending is expected to generate approximately $106 million in SNAP federal financial participation.

**USDA's Unprecedented Request for Massachusetts's SNAP data**

9. As part of the SNAP application process, DTA collects sensitive personally identifiable information (PII) from applicants and recipients, including but not limited to home addresses, dates of birth, Social Security Numbers, citizenship and immigration status, household income, and resource information.

10. Massachusetts strictly protects the confidentiality of its residents' SNAP data. Massachusetts laws relevant to the protection of this data include the following: the Fair Information Practices Act (Mass. Gen. Laws ch. 66A) and the regulations promulgated thereunder by the Executive Office for Administration and Finance (801 Mass. Code Regs. § 3.00 (2017)), which govern how a state agency collects, uses, maintains, and disseminates personal data; Mass. Gen. Laws ch. 93H, which, among other provisions, safeguards the personal information of residents of the Commonwealth; Mass. Gen. Laws ch. 66, § 17A, which requires

the confidentiality of DTA's records; and Mass. Gen. Laws ch. 18, § 11, which forbids the publications of lists of individuals who receive public assistance.

11.  On May 6, 2025, U.S. Department of Agriculture/Food and Nutrition Service (USDA-FNS) Senior Policy Advisor for Integrity Gina Brand sent DTA a letter stating that the USDA "must retain 'unfettered access to comprehensive data' from federally funded programs like SNAP." The letter further stated that the USDA "is taking steps to require all States to work through their processors" to obtain "[r]ecords sufficient to identify individuals as applicants for, or recipients of, SNAP benefits, including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers." USDA-FNS also indicated that it would seek "[r]ecords sufficient to calculate the total dollar value of SNAP benefits received by participants over time, with the ability to filter benefits received by date ranges." The letter further demanded that DTA produce such data for the period beginning January 1, 2020, through present.

12.  On May 9, 2025, DTA was notified by its SNAP EBT processor, Fidelity Information Services (FIS), that USDA-FNS was seeking to obtain SNAP participant data directly from FIS. On May 12, 2025, DTA informed FIS that it did not consent to the disclosure of any Massachusetts SNAP data to USDA-FNS. On May 15, 2025, DTA reiterated to FIS that it did not consent to FIS sharing any Massachusetts- or DTA-related data, including SNAP cardholder and transaction data, with USDA-FNS or any other entity. FIS responded to DTA that same day and confirmed they would not share such data without Massachusetts's consent.

13. On June 23, 2025, the USDA published a System of Records Notice (SORN) in the Federal Register notifying the public that it sought to create a large-scale "National Supplemental Nutrition Assistance Program (SNAP) Information Database."[1]

14. The SORN announced that the USDA intended to demand the following categories of records from "53 State agencies that administer SNAP and their designated vendors and/or contractors": "records containing personally identifying information, including but not limited to SNAP participant name, Social Security Number (SSN), date of birth (DOB), residential address, Electronic Benefit Transaction (EBT) card number, and case record identifier number or other identifiers or data elements maintained by States, vendors, or contractors to identify SNAP recipients."[2] The SORN also states that USDA would collect "information derived from and associated with EBT transactions, including but not limited to records sufficient to calculate the total dollar value of SNAP benefits received by participants over time, such as applied amounts and benefit available dates."[3]

15. These categories of information will be collected for all "individuals who have received, are currently receiving, or have applied to receive SNAP benefits."[4]

16. The USDA's actions are unprecedented. To my knowledge, the USDA has never before sought to inspect or audit, let alone retain, this volume of personal and sensitive SNAP data.

17. In its privacy impact assessment, USDA states that the uses of the data in the database would be "to detect duplicate enrollments across states, verify immigration status

---

[1] 90 Fed. Reg. 26,521 (June 23, 2025).
[2] *Id.*
[3] *Id.*
[4] *Id.*

5

eligibility, and perform other fraud prevention checks against other Federal agencies' datasets, thereby ensuring program integrity, including by verifying the eligibility of benefit recipients."[5]

18. These uses are duplicative of existing systems. DTA already conducts these checks, using systems such as the Systematic Alien Verification for Entitlement (SAVE) program. For non-citizens, DTA checks SAVE at application and recertification. DTA also checks SAVE when non-citizens report a change of immigration status during their certification period. DTA is also preparing to participate in the National Accuracy Clearinghouse (NAC), a federal clearinghouse designed to ensure that individuals do not improperly receive SNAP benefits from multiple states at the same time. 7 C.F.R. § 272.18. DTA's kickoff is scheduled for December 2025, with full implementation planned for July 2026. Finally, DTA matches its caseload with the following federal databases: USDA-FNS - Electronic Disqualified Recipient System (eDRS); Social Security Administration (SSA) for Identity (SVES), Death, and Prison Verification; and Public Assistance Reporting Information System (PARIS) for Interstate and Veterans to verify eligibility, detect fraud, and improve program integrity.

19. On July 9, 2025, the USDA Secretary Brooke L. Rollins sent DTA a demand for over five years' worth of data on all SNAP applicants and recipients. The July 9th letter demands the categories of records listed in the SORN and directs states to produce the requested data starting July 24, 2025, and no later than July 30, 2025.

20. On July 23, 2025, USDA-FNS Senior Policy Advisor for Integrity Brand sent Massachusetts another letter, reiterating the USDA's demand of information. She stated that the USDA was seeking data on "individuals who have received, are currently receiving, or have applied to receive SNAP benefits from January 1, 2020, through present date. Requested data

---

[5] USDA, Cybersecurity and Priv. Operations Ctr., Priv. Div., USDA Privacy Impact Assessment Fiscal Year 2025 (July 23, 2025), https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf.

elements shall include records sufficient to identify individuals as applicants for, or recipients of, SNAP benefits, including but not limited to all household group members names, dates of birth, social security numbers, residential and mailing addresses used or provided, as well as all data records used to determine eligibility or ineligibility." The letter also noted that USDA is requesting "transactional records from each household . . . sufficient to calculate the total dollar value of SNAP received by recipients over time . . . as well as SNAP usage and retailer data."

21. On July 25, 2025, USDA-FNS Deputy Under Secretary Patrick A. Penn sent a letter to DTA stating that "[f]ailure to take the steps necessary to provide the relevant data to FNS may trigger noncompliance procedures codified in 7 U.S.C. 2020(g)."

22. On July 28, 2025, Massachusetts, joined by several other states, filed the present action in the Northern District of California challenging the USDA's actions.

23. On July 30, 2025, Massachusetts sent USDA a letter expressing its concern with USDA's data demand. Among other things, it stated that due to the sheer volume of data demanded, compliance by July 30, 2025, would be virtually impossible. DTA requested that USDA withdraw its requests for data, or, at a minimum, stay the deadline to submit the requested data pending resolution of this litigation. To date, USDA has not provided a response to this request.

24. On August 12, 2025, Deputy Under Secretary Penn sent a letter to Governor Maura Healey informing her that, because FNS had not received the participant data, "the State of Massachusetts is out of compliance with SNAP requirements." The letter further states that, "[a]s provided by 7 CFR 276.4, this letter serves as an advance notice that Massachusetts could be subject to suspension or disallowance of federal funding for State SNAP administrative expenses if it does not submit to FNS the requested SNAP participant data."

25. The August 12, 2025 letter further states: "In order for FNS to determine that Massachusetts has made adequate progress towards meeting the data collection requirements, by August 13, 2025, FNS must receive a description of the actions Massachusetts will undertake in order to ensure that it will submit the requested data to FNS no later than close of business Friday, August 15, 2025. If Massachusetts fails to comply with the requirements outlined in this advance notification, the USDA may proceed with issuing a formal warning to pursue the suspension or disallowance of federal funding for State SNAP Administrative expenses and may take any other available legal action."

**Harms that USDA-FNS's Unprecedented Data Request Will Cause to the Commonwealth, DTA, its Clients, and the Emergency Food Assistance System**

USDA-FNS Has Not Complied with Laws Governing Privacy and Data Security, Creating Risk to DTA's Clients and Applicants

26. DTA cannot share confidential SNAP participant data with a third party without executing an appropriate data sharing agreement, memorandum of understanding, or similar document, and this has not been done here. Indeed, federal law is clear that disclosure of such records to the Secretary of Agriculture is "subject to data and security protocols agreed to by the State agency and Secretary." 7 U.S.C. § 2020(a)(3)(B)(i). Here, USDA-FNS has not identified (or even approached DTA regarding) the data and security protocols that would serve as a prerequisite for any such large-scale transmission of this highly sensitive data (which includes PII).

27. With additional entities receiving and sharing their PII—especially the sharing of such data in the absence of the agreed-upon data and security protocols required under federal law—residents of the Commonwealth will face additional risk of benefit theft or other forms of identity theft, such as misuse of their SSNs.

8

### USDA-FNS's Unprecedented Data Request, and the Penalties that it has Threatened for Non-Compliance with the Same, Will Cause Irreparable Harm to the Commonwealth, its Residents, DTA, and the Emergency Food Assistance System

28. The disclosure of the PII of SNAP applicants and recipients to USDA may have a chilling effect on SNAP participation in Massachusetts, as individuals who are fearful of having their personal data shared will likely be deterred from filing applications, and may even close their SNAP cases. Citizens, green card holders, and others who are eligible for SNAP may stop applying for fear of being erroneously targeted in immigration enforcement actions.

29. Through the National School Lunch Program, 276,068 children are currently directly certified for free school meals in Massachusetts through their families' receipt of SNAP benefits. These children are considered categorically eligible for free school meals and do not need to fill out an application to qualify. Any reduction in SNAP enrollment for families with school-age children therefore has a negative impact on federal eligibility for free or reduced-price meals.

30. Decreased SNAP enrollment in Massachusetts will also lead to increased hunger in the Commonwealth and more reliance on its already overwhelmed emergency food assistance program.[6] SNAP is the largest anti-hunger program in the Commonwealth of Massachusetts. As a result, the withdrawal of otherwise eligible individuals and families from SNAP will have harmful downstream effects on the safety net programs that currently fill needs that SNAP does not cover.

---

[6] Emily Spatz, *'It's not realistic': New England food banks struggle to keep up with demand after federal government cuts $1 billion in funding*, Boston Globe (Mar.27, 2025), https://www.bostonglobe.com/2025/03/27/metro/trump-food-bank-hunger-food-insecurity/.

31. Food banks currently help many people facing hunger (e.g., because of unmet needs under SNAP). Massachusetts has four food bank distribution centers that source food to approximately 900 food pantries statewide. Data collected by one of these distribution centers show people often utilize food pantries to fill needs that are not fully addressed by income and nutrition assistance programs. A 2024 survey found that one in three households in Massachusetts reported having experienced food insecurity at some point in the last 12 months.[7] Even now, food banks and pantries are already stretched to capacity, struggling to meet demand. Any reduction in SNAP utilization by otherwise eligible individuals and families discouraged from accessing SNAP would likely shift such individuals and families to the already overburdened food bank system. Indeed, food banks have expressed concern about their ability to respond to rising food insecurity given threats to federal nutrition assistance programs *and* uncertainty created by USDA actions.[8]

32. SNAP is an economic driver for Massachusetts local businesses. The program injects nearly $3 billion into more than 5,500 Massachusetts businesses. SNAP is a multiplier program for households and local food systems that will be decimated--for every dollar in SNAP benefits received by a client in Massachusetts, $1.50 goes back into the local economy. Indeed, if otherwise eligible individuals and families are discouraged from enrolling in SNAP, then local farmers, grocery stores, and vendors will lose business. SNAP sales alone average 20% of grocery store, supercenter, and retail store sales within the Commonwealth. Massachusetts also operates HIP, a state funded program, that offers additional funds for Massachusetts SNAP

---

[7] The Greater Boston Food Bank, *The Cost of Hunger in Massachusetts*, The Greater Boston Food Bank's Fifth Statewide Food Access Report (2025), https://www.gbfb.org/wp-content/uploads/2025/06/GBFB_Food-Access-Report_2025_final.pdf.
[8] Amanda Beland, *Mass. food banks brace for double hit of federal food cuts, benefit changes*, wbur (July 22, 2025), https://www.wbur.org/news/2025/07/22/food-banks-snap-cuts-massachusetts.

clients purchasing local produce from farm vendors. As a result, the departure of otherwise eligible individuals and families from SNAP will have a particularly large impact on local farms.

33. If the federal government withholds SNAP administrative funds, as it has threatened, both the Commonwealth and the residents of Massachusetts will be irreparably harmed. As set forth above in paragraph 8, DTA is anticipating receiving approximately $106 million per year in federal funding for state administrative expenditures on SNAP. The loss of such funding would have a significant impact on the Commonwealth's budget. For example, to plug this gap, the Commonwealth could be forced to divert state resources from various assistance programs (including, for example, state-funded nutrition access programs similar to SNAP). Such cuts would harm untold numbers of vulnerable people throughout the Commonwealth.

### Compliance with the USDA-FNS's Unprecedented Request Would Cause DTA Irreparable Harm

34. Even if the data request was lawful, compliance would unduly burden DTA's already limited resources. Because USDA has demanded over 5 years' worth of data, DTA will need to obtain this information from millions upon millions of rows of data that currently exist in a multitude of different applications, environments, and even within past vendor accounts. To gather this data, DTA will need a task force of approximately 8-10 dedicated information technology professionals, which will cause DTA to deprioritize numerous other pressing and important projects. Diverting resources to this project will delay the move of DTA's eligibility system to the cloud to improve performance, interrupt technical updates to the SUN Bucks program, and impact the design, development, and implementation of the Commonwealth's

integrated eligibility and enrollment Common Portal. These resources would need to be dedicated to fulfilling this data request for at least one month, and likely longer.

35. Furthermore, these dedicated professionals would need to write and test a minimum of 7-8 large, complex queries to retrieve the data. While DTA's information technology resources can run some of these queries in lower (non-production) environments, other information will need to be run against DTA's production system. Running these queries against DTA's production system will cause significant strain on DTA's already overworked production environment, introducing interruptions to DTA's ability to determine eligibility for SNAP and perform maintenance on that eligibility system.

36. In addition, because some of the data requested is extremely sensitive and highly regulated, DTA (1) must adhere to the conditions imposed by relevant data owners (e.g., SSA); (2) is restricted from using certain applications to collect such data; and (3) will need to encrypt the data to ensure a secure and regulatorily-compliant file transfer. For example, with respect to any SSA data requested by USDA-FNS, DTA would need, at a minimum, permission from the SSA to share such data with USDA-FNS.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of August, 2025, in Boston, Massachusetts.

_M. A. Cole_
Michael Cole
Chief Operating Officer
Department of Transitional Assistance