IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA; STATE OF NEW YORK; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR** ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky; **STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF WASHINGTON; STATE OF WISCONSIN,** | |
| Plaintiffs, | |
| v. | Case No. **3:25-cv-06310-MMC** |
| **UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS,** in her official capacity as U.S. Secretary of Agriculture**; U.S. DEPARTMENT OF AGRICULTURE'S OFFICE OF INSPECTOR GENERAL,** | |
| Defendants. | |

**DECLARATION OF SARAH ADELMAN**

## **DECLARATION OF SARAH ADELMAN**

I, Sarah Adelman, declare under penalty of perjury, pursuant to 28 U.S.C. Section 1746, as follows:

**Professional and Agency Background**

1. I am a resident of New Jersey. I am over the age of 18 and understand the obligations of an oath.

2. I am currently the Commissioner of the New Jersey Department of Human Services ("NJDHS"). I have been employed as Commissioner since January 2021. Prior to becoming the NJDHS Commissioner, I served as the NJDHS's Deputy Commissioner overseeing the Developmental Disabilities, Aging Services, and Medicaid Divisions. Before that, I served in management roles at a statewide health care organization.

3. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with agency staff, or from my review of relevant documents and information.

4. NJDHS is New Jersey's largest agency, serving approximately 2.1 million New Jersey residents. NJDHS is New Jersey's largest agency, serving approximately 2.1 million New Jersey residents. DHS serves many people in New Jersey including but not limited to older residents, individuals, and families with low incomes; people with developmental disabilities, or late-onset disabilities; people who are blind, visually impaired, deaf, hard of hearing, or deaf-blind; parents needing child care services, child support and/or healthcare for children; people who are dealing with addiction and mental health issues; and families facing catastrophic medical expenses for their children. Through DHS's eight divisions, the agency provides numerous programs and

services designed to give eligible individuals and families assistance with economic and health challenges.

5. NJDHS's Division of Family Development ("NJDFD") supervises four programs to support New Jersey families, including New Jersey's Supplemental Nutrition Assistance Program ("NJ SNAP"), which helps provide food assistance to families with low incomes through the issuance of monthly electronic benefits that can be used to purchase food at authorized stores.

**SNAP in New Jersey**

6. NJ SNAP is a key part of New Jersey's efforts to address hunger by supplementing the food budget of low-income families so they can purchase healthy food. In the 2024 calendar year, approximately $2 billion in NJ SNAP benefits were issued. As of May 2025, there were 824,020 persons receiving NJ SNAP, representing 441,199 households; 346,088 children; and 177,110 elderly individuals. NJ SNAP plays a critical role, through federal funding, to support New Jersey families in need of food assistance.

7. Pursuant to federal law, NJDHS is responsible for the issuance, control and accountability of SNAP benefits and Electronic Benefit Transaction ("EBT") cards; ensuring program integrity; and supervising New Jersey's 21 counties in their day-to-day administration of SNAP, including processing applications for SNAP benefits and certifying eligible applicant households. 7. U.S.C. § 2020(a)(1); 7 C.F.R. § 271.4; 7 C.F.R. § 274.2.

8. New Jersey expends approximately $364,000,000 in administrative costs to run NJ SNAP program each year, approximately $182,000,000 of which is reimbursed by the federal government.

2

**USDA's Unprecedented Request for New Jersey's SNAP data**

9. As part of the SNAP application process, New Jersey's county social services agencies (CSSAs) collect sensitive personally identifiable information ("PII") from applicants and recipients, including but not limited to, home addresses, dates of birth, Social Security Numbers, citizenship and immigration status, household income and resource information. N.J. Admin. Code § 10:87-2.11-2.14.

10. New Jersey strictly protects the confidentiality of its residents' SNAP data. New Jersey laws and regulations restrict the disclosure of "information obtained from [SNAP] applicant[s] or recipient households to persons directly connected with the administration or enforcement of the NJ SNAP program" and other means-tested welfare programs. N.J. Admin. Code § 10:87-1.14; *see also* N.J. Stat. § 44:10-47; N.J. Stat. § 47:4-4.

11. To safeguard SNAP applicant information from disclosure, New Jersey also implements several applicable State policies, including the Data Security Policy, which is issued annually. The Data Security Policy provides that all New Jersey Division of Family Development ("DFD") and county staff have an obligation to "maintain client confidentiality . . . and adhere to any and all applicable Federal and State statutes, regulations, policies and procedures relating to [Federal tax information], confidential data, [personal identifying information], [personal health information], safeguarding and incident reporting." The policy also mandates the use of appropriate cybersecurity measures, which include periodic review and audit of those measures.

12. New Jersey's policy for its means-tested welfare programs also explicitly prohibits the disclosure of such information to "third parties unless (1) the applicant gives their express, written consent (2) the purpose of disclosure is related to program administration or (3) disclosure is ordered by a court of law . . . If a law enforcement officer is seeking (1) a fleeing felon or (2) a

3

probation/parole violator, [county social service agency] staff shall disclose limited information about SNAP . . . applicants/recipients."

13. On May 6, 2025, U.S. Department of Agriculture/Food and Nutrition Service ("USDA-FNS") Senior Policy Advisor for Integrity Gina Brand sent [State Agency] a letter stating that the USDA "must retain 'unfettered access to comprehensive data' from federally funded programs like SNAP." The letter further stated that the USDA "is taking steps to require all States to work through their processors" to obtain "[r]ecords sufficient to identify individuals as applicants for, or recipients of, SNAP benefits, including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers." USDA also indicated that it would seek "[r]ecords sufficient to calculate the total dollar value of SNAP benefits received by participants over time, with the ability to filter benefits received by date ranges." The letter further demanded that the requested data would cover the period beginning January 1, 2020, through present.

14. In April 2025, NJDHS was notified by its SNAP data vendor, Conduent, that USDA-FNS was seeking to obtain SNAP participant data directly from Conduent.

15. On June 23, 2025, the USDA published a System of Records Notice ("SORN") in the Federal Register notifying the public that it sought to create a large-scale ''National Supplemental Nutrition Assistance Program (SNAP) Information Database.''[1]

16. The SORN announced that the USDA intended to demand the following categories of records from "53 State agencies and their designated vendors and/or contractors": "records containing personally identifying information, including but not limited to SNAP participant

---

[1] 90 Fed. Reg. 26,521 (June 23, 2025).

4

name, Social Security Number (SSN), date of birth (DOB), residential address, Electronic Benefit Transaction (EBT) card number, and case record identifier number or other identifiers or data elements maintained by States, vendors, or contractors to identify SNAP recipients." *Id.* The SORN also states that USDA would collect "information derived from and associated with EBT transactions, including but not limited to records sufficient to calculate the total dollar value of SNAP benefits received by participants over time, such as applied amounts and benefit available dates." *Id.*

17. The SORN also implied that categories of information will be collected for all "individuals who have received, are currently receiving, or have applied to receive SNAP benefits." *Id.*

18. The USDA's actions are unprecedented. To my knowledge, the USDA has never before sought to inspect or audit, let alone retain, this volume of personal and sensitive SNAP data.

19. In its privacy impact assessment, USDA states that the uses of the data in the database would be "to detect duplicate enrollments across states, verify immigration status eligibility, and perform other fraud prevention checks against other Federal agencies' datasets, thereby ensuring program integrity, including by verifying the eligibility of benefit recipients."[2]

20. These uses are duplicative of existing systems. NJDHS already conducts these checks, using systems such as the Systematic Alien Verification for Entitlement ("SAVE") database, which allows registered entities, including state governments and relevant state agencies, to verify the immigration status of applicants seeking benefits, such as SNAP benefits. In addition,

---

[2] USDA, Cybersecurity and Priv. Operations Ctr., Priv. Div., USDA Privacy Impact Assessment Fiscal Year 2025 (July 23, 2025), https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

5

New Jersey is scheduled to become part of the National Accuracy Clearinghouse ("NAC"), a federal clearinghouse designed to ensure that individuals do not improperly receive SNAP benefits from multiple states at the same time, 7 C.F.R. § 272.18, by December 31, 2026.

21.     On July 9, the USDA Secretary Brooke L. Rollins sent NJDHS a letter demanding five years' worth of data on all SNAP applicants and recipients. More specifically, the July 9 Letter demanded the categories of records listed in the SORN and directed NJDHS to produce the requested data starting July 24 and no later than July 30, 2025.

22.     Unless sharing is expressly permitted by the law or by regulation, NJDHS cannot and does not share confidential SNAP participant data with third parties without executing appropriate data sharing agreements or Memoranda of Understanding. More specifically, NJDHS follows standard data security protocols, which include negotiating and executing a data sharing agreement or memorandum of understanding to govern the transfer, use, and retention of the data.

23.     Indeed, USDA-FNS has historically entered into memoranda of understanding with NJDHS when SNAP information is shared, including the Computer Matching Agreement ("CMA") executed on September 26, 2024, and the February 11, 2025 annual attestation by NJDHS to USDA-FNS regarding the utilization of the Social Security Administration Death Master file. Notably, the CMA's purpose was to allow USDA-FNS to "maintain [SNAP] program integrity . . . by providing information to assist State agencies with establishing or verifying the eligibility of individuals for SNAP benefits and determining the appropriate disqualification period to be imposed for a new intentional program violation."

24.     Disclosing the PII of SNAP applicants and recipients to USDA may have a chilling effect on SNAP participation in New Jersey, as individuals who are fearful of having their personal data shared will likely be deterred from filing applications. The mere prospect that SNAP PII may

be shared with other federal agencies like the Department of Governmental Efficiency ("DOGE") or the Department of Homeland Security ("DHS") will discourage individuals from participating in nutrition programs for which they are eligible and authorized to participate. This chilling effect will affect U.S. citizens, individuals who are not (and should not be) at risk of deportation or other immigration sanctions.

25. The chilling effect on SNAP participation will have a broader negative impact on New Jersey's ability to access federal support for National School Lunch Program and School Breakfast Program. These programs have an automatic enrollment process linked to participation in SNAP. Currently, New Jersey certifies 256,224 school-age children for federally-funded free or reduced-price meals due to their households' participation in SNAP. Any reduction in SNAP enrollment for families with school-age children therefore has a negative impact on federal eligibility for free or reduced-price meals.

26. Discouraging individuals and families from accessing public benefits for which they are eligible will ultimately transfer costs to the state and local governments as families rely on emergency services and public safety net programs, such as local food pantries. Food banks, for example, are already struggling to fill a growing nutrition gap in the face of other cutbacks in nutrition assistance from the federal government.

27. If there is a data breach that allows bad actors to access the PII of SNAP participants, those actors can exploit it in numerous damaging ways. SNAP participants would be vulnerable to identity theft, financial exploitation and extortion, social engineering, and phishing attacks in all aspects of their lives, including their receipt of SNAP benefits. Bad actors who gain access to someone's EBT card number and PIN can fraudulently spend benefits, sell them for cash, or use them to buy items for resale. In some cases, stolen identities are used to apply for benefits

under false pretenses, resulting in multiple fraudulent accounts. As a result of such fraud, the SNAP participant can face disqualification from SNAP, hefty fines, and even prison time.

28. On July 18, 2025, New Jersey, joined by several other states, submitted a comment letter outlining our objections to the USDA's creation of a vast National SNAP Information Database and the USDA's demand for state data.

29. On July 23, 2025, USDA-FNS Senior Policy Advisor for Integrity Brand sent NJDHS another letter, reiterating the USDA's demand of information. She stated that the USDA was seeking data on "individuals who have received, are currently receiving, or have applied to receive SNAP benefits from January 1, 2020, through present date. Requested data elements shall include records sufficient to identify individuals as applicants for, or recipients of, SNAP benefits, including but not limited to all household group members' names, dates of birth, social security numbers, residential and mailing addresses used or provided, as well as all data records used to determine eligibility or ineligibility." The letter also noted that USDA is requesting "transactional records from each household . . . sufficient to calculate the total dollar value of SNAP received by recipients over time . . . as well as SNAP usage and retailer data."

30. On July 25, 2025, USDA-FNS Deputy Under Secretary Patrick A. Penn sent a letter to NJDHS stating that "Failure to take the steps necessary to provide the relevant data to FNS may trigger noncompliance procedures codified in 7 U.S.C. 2020(g)."

31. On July 28, 2025, New Jersey, joined by several other states, filed the present action in the Northern District of California challenging the USDA's actions.

32. On July 30, 2025, NJDHS sent USDA-FNS a letter expressing its concern with USDA-FNS's data demand. As NJDHS explained in its letter, as a practical matter, the short deadlines with which to comply with the USDA-FNS' data demand are practically infeasible.

8

Simply put, due to the sheer breadth of SNAP data maintained by NJDHS, it would take a significant amount of time to cull and compile all of the information that USDA-FNS is demanding. Moreover, the particular NJDHS employees who are authorized to access that data have duties for other essential agency work.

33. NJDHS's letter also detailed the additional significant legal and logistical hurdles that would need to be resolved before NJDHS could act on the demand. For example, as of July 30, 2025 (and to date), there has been no clear guidance from USDA-FNS on "other identifiers or data elements maintained by states, vendors and/or contractors to identify SNAP recipients" or "information derived from and associated with EBT transactions." Furthermore, and contrary to historical practice, USDA-FNS had not as of July 30, and has not to date, entered into a memorandum of understanding governing the sharing of any data.

34. In addition, in order to gather and produce responsive data, DHS would be required to discuss the requisite work effort with its Information Technology ("IT") team, including the development of the relevant query to ensure that the correct data elements are pulled; the amount of time needed to run the query; where to store the sensitive data once the query results have been retrieved; and NJDHS's ability to transmit the data in the manner prescribed that is not a vehicle that has been utilized by NJDHS previously.

35. Furthermore, before transmitting this data, NJDHS is legally obligated to comply with notification requirements as set forth in federal regulations, which generally require New Jersey to assure applicants that it will use their information for eligibility purposes and that it will not be shared with third-parties, save for limited exceptions. *See* 7 C.F.R. 273.2(b)(2) ("The State agency must also notify all applicants on the application form that the alien status of applicant household members may be subject to verification by USCIS through the submission of

information from the application to USCIS, and that the submitted information received from USCIS may affect the household's eligibility and level of benefits."); 7 CFR 273.2(b)(4): "As a State agency, you must notify all households applying and being recertified for SNAP benefits [that] . . . [t]he collection of this information, including the social security number (SSN) of each household member, is authorized under Food and Nutrition Act of 2008, as amended, 7 U.S.C. 2011-2036. The information will be used to determine whether your household is eligible or continues to be eligible to participate in SNAP. We will verify this information through computer matching programs. This information will also be used to monitor compliance with program regulations and for program management.").

36. On August 12, 2025, Deputy Under Secretary Penn sent a letter to Governor Philip D. Murphy informing him that because FNS had not received the participant data "the State New Jersey is out of compliance with SNAP requirements." The letter further states that, "[a]s provided by 7 CFR 276.4, this letter serves as an advance notice that New Jersey could be subject to suspension or disallowance of Federal funding for State SNAP administrative expenses if it does not submit to FNS the requested SNAP participant data."

37. The August 12, 2025 letter further states: "In order for FNS to determine that New Jersey has made adequate progress towards meeting the data collection requirements, by August 13, 2025, FNS must receive a description of the actions New Jersey will undertake in order to ensure that it will submit the requested data to FNS no later than close of business Friday, August 15, 2025. If New Jersey fails to comply with the requirements outlined in this advance notification, the USDA may proceed with issuing a formal warning to pursue the suspension or disallowance of Federal funding for State SNAP Administrative expenses and may take any other available legal action."

38. Should USDA-FNS move forward with its threats to discontinue administrative funding to NJDHS, New Jersey will be irreparably harmed. Administrative funding supports approximately 2,000 full-time employees or employee equivalents at both the State and county level, who are dedicated to ensuring that NJ SNAP is administered efficiently and in accordance with the law. If administrative funding is reduced or discontinued, even temporarily, New Jersey will have to drastically alter administration of the program, including contemplating potential cuts to staff who are critical to supporting the NJ SNAP program.

39. Administrative funding also supports maintenance of New Jersey's databases and IT-related systems, which not only house NJ SNAP data, but also interface with State and federal systems, including SAVE, to ensure that NJ SNAP is administered in accordance with federal eligibility and verification requirements.

40. These impacts on staff and IT-related systems will in turn threaten NJDHS's ability to continue administering NJ SNAP in compliance with federal law and regulations, which in turn may subject NJDHS to further threats of funding loss based on noncompliance.

41. In short, not only will marginalized New Jerseyans face harm through disruption in services of this crucial program, but the State will also be forced to endure significant and irreparable pocketbook injuries to ensure that NJ SNAP can continue to serve New Jerseyans in accordance with both State and federal law.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of August, 2025, in Trenton, NJ.

_____
Sarah Adelman
Commissioner
New Jersey Department of Human Services