IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA; STATE OF NEW YORK; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR** ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky**; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF WASHINGTON; STATE OF WISCONSIN,** | |
| Plaintiffs, | |
| v. | Case No. **3:25-cv-06310-MMC** |
| **UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS,** in her official capacity as U.S. Secretary of Agriculture**; U.S. DEPARTMENT OF AGRICULTURE'S OFFICE OF INSPECTOR GENERAL,** | |
| Defendants. | |

**DECLARATION OF WENDY DEMARCO**

## **DECLARATION OF WENDY DEMARCO**

WENDY DEMARCO, does hereby declare:

1. I am the Director of the Food and Nutrition Policy Bureau in the Division of Employment and Income Support Programs ("EISP") within the New York State Office of Temporary and Disability Assistance ("OTDA"). OTDA's mission is to help vulnerable New Yorkers meet their essential needs and advance economically by providing opportunities for stable employment, housing, and nutrition.

2. OTDA is responsible for supervising the 58 social services districts ("districts") that are responsible for administering the Supplemental Nutrition Assistance Program ("SNAP") in New York State and providing SNAP benefits to eligible low-income households to address hunger by supplementing the food budget of such households. The Food and Nutrition Bureau within OTDA is tasked with developing and overseeing policies and procedures related to providing monthly nutritional assistance benefits, including SNAP, for households as provided by section 95 of the New York Social Services Law.

3. Per 7 U.S.C. § 2011, SNAP was created as a result of "the policy of Congress, in order to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households," which benefits agricultural abundance and strengthens the agricultural economy of the United States.

4. As of May 2025, OTDA issued SNAP benefits to 2,962,913 New York residents, including vulnerable populations such as children, elderly individuals, and disabled individuals, with monthly benefits totaling $646,427,562. *See* OTDA, Temporary and Disability Assistance Statistics (May 2025), https://otda.ny.gov/resources/caseload/2025/2025-05-stats.pdf.

5.      New York State expends approximately $818 million in administrative costs to run its SNAP program each year, approximately $409 million of which is reimbursed by the federal government.

6.      Pursuant to federal law, the designated "State agency of each participating State" is responsible for issuance, control and accountability of SNAP benefits and Electronic Benefit Transaction ("EBT") cards; ensuring program integrity; and supervising districts' day-to-day administration of SNAP, including processing applications for SNAP benefits and certifying eligible applicant households. 7 U.S.C. § 2020(a)(1); 7 C.F.R. § 271.4; 7 C.F.R. § 274.2. OTDA handles these responsibilities for New York State.

7.      Many aspects of OTDA's administration of SNAP are governed by a statutorily-required State Plan of Operation, which Defendant USDA must approve on an annual basis for OTDA's participation in the Program. The requisites of the State Plan of Operation are set forth in 7 U.S.C. § 2020(e), including the need to promptly determine eligibility of each applicant household. OTDA must maintain and use an Income and Eligibility Verification System ("IEVS") to obtain wage and benefit information and use that information to verify eligibility for and the amount of SNAP benefits due to eligible households; and verify immigration status of applicants through the Systematic Alien Verification for Entitlements ("SAVE") database, which is maintained by the federal government. 7 C.F.R. §§ 272.8 and 272.11. OTDA's State Plan of Operation must also contain a Quality Control Sampling Plan to determine payment error rates as a method of ensuring Program integrity. *See generally*, 7 C.F.R. § 272.2; 7 CFR Part 275.

8.      As part of the SNAP application process, OTDA collects sensitive personally identifiable information ("PII") from applicants and recipients, including but not limited to, home addresses, dates of birth, Social Security Numbers, citizenship and immigration status,

household income and resource information. OTDA maintains such data in its Welfare Management System ("WMS") database.

9. The WMS database is a New York State-owned computerized information management system developed and maintained by the State pursuant to New York Social Services Law ("SSL") § 21(1). WMS is used to collect, store, validate and process confidential demographic and eligibility data relating to social services programs over which OTDA has oversight.

10. To issue SNAP benefits to eligible recipients, OTDA contracts with a third-party EBT provider, currently Fidelity Information Services ("Fidelity"), which processes benefit payments directly to recipients. EBT data maintained by Fidelity includes sensitive information such as names, addresses, dates of birth, Social Security Numbers, EBT card numbers, SNAP transaction information, and information about other public assistance benefits that individuals may receive.

11. OTDA protects the privacy and security of the sensitive information received from SNAP applicants and recipients in strict compliance with state and federal laws, including SSL § 21(3), which requires that "[i]nformation relating to persons applying for or receiving benefits under programs pursuant to this chapter shall be considered confidential and shall not be disclosed to persons or agencies other than those considered entitled to such information in accordance with section one hundred thirty-six of this chapter, when such disclosure is necessary for the proper administration of such programs".

12. In addition, New York State Public Officers Law § 96(1) states that "[n]o agency may disclose any record or personal information unless disclosure is:…(d) to officers or employees of another governmental unit if each category of information sought to be disclosed is

necessary for the receiving governmental unit to operate a program specifically authorized by statute and if the use for which the information is requested is not relevant to the purpose for which it was collected; or…(f) specifically authorized by statute or federal rule or regulations; or…"

13. Federal statute and regulation at 7 U.S.C. § 2020(e)(8) and 7 CFR § 272.1(c)(1), respectively, set forth safeguards prohibiting the use or disclosure of information obtained from SNAP applicant or recipient households, and only permit the disclosure of such information to specifically designated government agencies and parties for use in administering or enforcing the requirements of SNAP and other benefit programs.[1]

14. On May 6, 2025, U.S. Department of Agriculture/Food and Nutrition Service ("USDA-FNS") Senior Policy Advisor for Integrity Gina Brand send OTDA a letter stating that Defendant USDA "must retain 'unfettered access to comprehensive data' from federally funds programs like SNAP". The letter further stated that Defendant USDA "is taking steps to require all States to work through their processors" to obtain "[r]ecords sufficient to identify individuals

---

[1] Federal law specifically permits disclosure of protected SNAP data to those persons directly connected with the administration or enforcement of the provisions of the Food and Nutrition Act of 2008 or regulations, other federal assistance programs, federally-assisted State programs providing assistance on a means-tested basis to low income individuals, or general assistance programs subject to joint processing requirements; persons directly connected with the administration or enforcement of the programs which are required to participate in the State Income and Eligibility Verification System; persons directly connected with the verification of immigration status of aliens applying for SNAP benefits through the Systematic Alien Verification for Entitlements Program; persons directly connected with the administration of the Child Support Program and employees of the Health and Human Services as necessary to assist in establishing or verifying eligibility or benefits under titles II and XVI of the Social Security Act; employees of the United States Comptroller General's Office for audit examination; local, State, or federal law enforcement officials for the purposes of investigating an alleged violation of the Food and Nutrition Act of 2008 or regulation or for assistance in locating a household member fleeing prosecution or custody; and local educational agencies administering the National School Lunch Program or the School Breakfast Program.

as applicants for, or recipients of, SNAP benefits, including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers." Defendant USDA also indicated that it would seek "[r]ecords sufficient to calculate the total dollar value of SNAP benefits received by participants over time, with the ability to filter benefits received by date ranges." The letter further demanded that the requested data would cover the period beginning January 1, 2020, through the present.

15. On May 9, 2025, OTDA was notified by its EBT vendor, Fidelity, that Defendant USDA was seeking to obtain SNAP participant data directly from Fidelity. OTDA informed Fidelity that it did not consent to the disclosure of such data, and Fidelity subsequently assured OTDA that it would not turn this data over without OTDA's consent.

16. On June 23, 2025, Defendant USDA published a System of Records Notice ("SORN") in the Federal Register notifying the public that it sought to create a large-scale "National Supplemental Nutrition Assistance Program (SNAP) Information Database." 90 Fed. Reg. 26,521 (June 23, 2025). The SORN states that Defendant USDA will work with all State agencies and their designated vendors and/or contractors to transmit data on SNAP participants and transactions pursuant to provisions in 7 U.S.C. § 2020 and 7 CFR § 272.1. However, 7 U.S.C. § 2020(a)(3)(B)(i) states that "[a]ll records and the entire information systems in which records are contained...shall be made available for inspection and audit by the [USDA] Secretary, *subject to data and security protocols agreed to by the State agency and Secretary*." (emphasis added).

17. The SORN announced that Defendant USDA intended to demand the following categories of records from "53 State agencies and their designated vendors and/or contractors": "records containing personally identifying information, including but not limited to SNAP

participant name, Social Security Number (SSN), date of birth (DOB), residential address, Electronic Benefit Transaction (EBT) card number, and case record identifier number or other identifiers or data elements maintained by States, vendors, or contractors to identify SNAP recipients." 90 Fed. Reg. at 26,521. The SORN also states that Defendant USDA would collect "information derived from and associated with EBT transactions, including but not limited to records sufficient to calculate the total dollar value of SNAP benefits received by participants over time, such as applied amounts and benefit available dates." *Id.*

18. These categories of information will be collected for all "individuals who have received, are currently receiving, or have applied to receive SNAP benefits." *Id.*

19. Defendant USDA's actions are unprecedented. To my knowledge, Defendant USDA has never before sought to inspect or audit, let alone retain, this volume of personal and sensitive SNAP data.

20. In its privacy impact assessment, Defendant USDA states that the uses of the data in the database would be "to detect duplicate enrollments across states, verify immigration status eligibility, and perform other fraud prevention checks against other Federal agencies' datasets, thereby ensuring program integrity, including by verifying the eligibility of benefit recipients."[2]

21. These uses are duplicative of existing systems. OTDA already conducts these checks, using systems such as the Systematic Alien Verification for Entitlement ("SAVE") program and State Income and Eligibility System ("IEVS"). Additionally, OTDA is preparing to participate in the National Accuracy Clearinghouse ("NAC"), a federal clearinghouse designed

---

[2] USDA, Cybersecurity and Priv. Operations Ctr., Priv. Div., USDA Privacy Impact Assessment Fiscal Year 2025 (July 23, 2025), https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

to ensure that individuals do not improperly receive SNAP benefits from multiple states at the same time.

22. On July 9, 2025, Defendant Rollins sent OTDA a demand for five years' worth of data on all SNAP applicants and recipients. The July 9, 2025 letter demanded the categories of records listed in the SORN and directed states to produce the requested data starting July 24, 2025 and no later than July 30, 2025.

23. OTDA and Defendant USDA have not agreed to any data and security protocols regarding a potential audit or inspection to memorialize the confidentiality and information security safeguards regarding SNAP participant data and EBT transaction data for the purposes outlined in the SORN.

24. Before sharing confidential OTDA SNAP participant data with a third party, data sharing agreements or Memoranda of Understanding or similar documents must be executed memorializing the policies and procedures used to ensure that confidential SNAP data will be securely stored, transferred, and accessed in accordance with law, regulation, and governing data share agreements. Such documents set forth the purpose, allowable use, and legal authorities by which OTDA is permitted to share such data; how the recipient will safeguard the data; the retention and expiration dates upon which such data must be destroyed; and the technical requirements of the data exchange, including general interface, assumptions and risk, functional allocation, and secure transfer often memorialized in a technical document between OTDA and the New York State Office of Information Technology Services. These documents memorialize the process and procedures to ensure that, before being granted access to or review of confidential information, persons legally authorized and with a legitimate business purpose to

access such information have first completed confidentiality and security training and have signed non-disclosure agreements.

25. For example, OTDA entered into a January 23, 2014 Memorandum of Understanding and Confidentiality Statement with Defendant USDA regarding the Accenture State SNAP Recipient Fraud project and an October 25, 2024 Computer Matching Agreement with Defendant USDA regarding the Electronic Disqualified Recipient System.

26. The SORN does not adequately describe the data elements needed for transfers of "information derived from and associated with EBT transactions, including but not limited to records sufficient to calculate the total value of SNAP benefits received by participants over time, such as applied amounts and benefit available dates." Additionally, the SORN states that Defendants are seeking EBT card numbers for SNAP participants, yet no ascertainable information can be obtained from such card numbers. Rather, sharing EBT card numbers introduces a significant security risk in the event such data is breached, and criminals obtain the card numbers and decipher Personal Identification Numbers (PINs).

27. Compliance with the SORN would come at a considerable cost to OTDA. Substantial resources would be needed including: Division of Legal Affairs staff to negotiate a Memorandum of Understanding and data sharing agreement with Defendant USDA; Division of Legal Affairs staff to negotiate contract amendments with Fidelity to include authority for the release of SNAP participant and EBT transaction data; payment to Fidelity of any increased cost associated with such data transfer to Defendant USDA (which must be approved by the New York State Comptroller and New York State Attorney General); Food and Nutrition Bureau staff to interface with Defendant USDA; Plain Language, Accessibility and Innovative Design ("PLAID") unit staff to translate and revise consent language on SNAP initial and recertification

applications; and costs associated with printing and shipping revised SNAP initial and recertification paper applications to all 58 districts within New York State.

28. Additionally, New York State Office of Information Technology resources dedicated to OTDA would be needed in the form of staff developing an interface control document and managing oversight of the data transfer to Defendant USDA. Information technology resources are committed approximately 12 to 18 months in advance of every new project. Any reallocation of such resources would force OTDA to delay implementation of other SNAP requirements, such as participation in the NAC and making necessary system changes for implementation of new statutory requirements recently enacted under Public Law 119-21 (the "One Big Beautiful Bill Act") regarding Able-Bodied Adults without Dependents ("ABAWDs"), Heat & Eat, and non-citizen eligibility.

29. Additionally, disclosing PII of SNAP applicants and recipients to Defendant USDA may have a chilling effect on SNAP participation in New York State as individuals who are fearful of having their personal data shared may be deterred from filing applications. Defendant USDA has previously advised that asking for PII, such as citizenship or immigration status and Social Security Numbers, on SNAP applications may deter individuals from filing applications due to "fear and misinformation." *See* USDA, Memo to All SNAP Regional Directors re: Conforming to the Tri-Agency Guidance through Online Applications (Feb. 18, 2011), available at fns-prod.azureedge.us/sites/default/files/Tri-Agency_Guidance_Memo-021811.pdf (last visited Aug. 15, 2025).

30. There could be irreparable long-term effects and downstream costs for New York State and its residents if individuals are deterred from applying for SNAP benefits. Any disincentive to receiving SNAP benefits will have a perpetual consequence on the general health

and welfare of eligible individuals and families as SNAP participants are more likely to report excellent or very good health than other low-income non-participants, and receipt of SNAP is linked with reduced health care costs (including costs that will be passed along to New York State through its publicly-funded healthcare systems). *See* Center on Budget and Policy Priorities, SNAP is Linked with Improved Nutritional Outcomes and Lower Health Care Costs (Jan. 17, 2018), www.cbpp.org/research/snap-is-linked-with-improved-nutritional-outcomes-and-lower-health-care-costs.

31. Further, impermissible disclosure of SNAP participant PII maintained by OTDA to Defendant USDA and any subsequent redisclosure of such PII has potential negative consequences such as leaving victims of domestic violence at risk to discovery by abusers through the sharing of applicant and recipient addresses and putting SNAP recipients at risk to benefit theft by sharing information on EBT cards and transactions.

32. OTDA conducts extensive outreach in low-income areas across New York State with historically low SNAP enrollment through not-for-profit organizations to ensure eligible individuals and households are aware of the availability of SNAP benefits to reduce food insecurity and hunger. SNAP outreach programming supports potential applicants in making an informed decision about whether or not to apply and breaks down stigmas and myths associated with the receipt of SNAP benefits. For the 2026 federal fiscal year, the OTDA SNAP Outreach Plan expenditures are expected to total approximately $23.5 million.

33. To avoid a significant decrease in SNAP enrollment due to the above-mentioned chilling effects, OTDA will need to develop new outreach materials and expand outreach operations across New York State, despite having funding already programmed for the 2026 federal fiscal year, which begins October 1, 2025.

34. In 2025, the USDA Economic Research Service ("ERS") published an article entitled "Supplemental Nutrition Assistance Program (SNAP) -- Key Statistics and Research", which states that SNAP serves as an automatic stabilizer to the economy. As more individuals become eligible for SNAP and enroll in the Program during an economic downturn when unemployment and the poverty rate increase, SNAP benefits "support households' food spending and nonfood spending (by freeing up money that households would otherwise need to spend on food)" which "augments the income and spending of producers, processors, distributors, retailers, and their employees. Thus, SNAP benefits start a multiplier process that supports macroeconomic spending and production." According to this article, ERS has researched the multiplier impact of a hypothetical $1 billion increase in SNAP benefits and found that this expansion of benefits during a slowing economy would increase Gross Domestic Product by $1.54 billion. *See* USDA, Supplemental Nutrition Assistance Programs (SNAP) – Key Statistics and Research (July 24, 2025), primary.ers.usda.gov/topics/food-nutrition-assistance/supplemental-nutrition-assistance-program-snap/key-statistics-and-research.

35. In July 2019, ERS published a report entitled "The Supplemental Nutrition Assistance Program (SNAP) and the Economy: New Estimates of the SNAP Multiplier," which estimates the impact that a hypothetical $1 billion increase in SNAP assistance will have on Gross Domestic Product ("GDP"), employment, and incomes across different United States industries with a focus on agriculture. ERS' model estimates the GDP multiplier for SNAP to be 1.5, "supporting around 13,600 jobs and about $32 million of farm income." Thus, ERS found that $1 billion of additional monthly SNAP expenditures initially increases food spending from SNAP benefits "by the full $1 billion and causes the benefit recipients to repurpose $0.7 billion of non-SNAP funds that were intended for food spending in that month to nonfood items. This

leads to a $0.3 billion net increase in food spending and a $0.7 billion increase in spending on nonfood products." *See* The Supplemental Nutrition Assistance Program (SNAP) and the Economy: New Estimates of the SNAP Multiplier (July 2019), www.ers.usda.gov/sites/default/files/_laserfiche/publications/93529/ERR-265.pdf.

36. Given the foregoing research by ERS, a decline in SNAP participation would have detrimental downstream effects for retail food suppliers and local farmers throughout New York State.

37. On July 18, 2025, New York, joined by several other states, submitted a comment letter outlining several objections to the USDA's creation of a vast National SNAP Information Database and Defendant USDA's demand for state data.

38. In addition, on July 23, 2025, OTDA submitted a comment letter expressing its concerns about Defendant USDA's actions.

39. Also on July 23, 2025, USDA-FNS Senior Policy Advisor for Integrity Brand sent OTDA another letter, reiterating Defendant USDA's demand of information, stating that Defendant USDA was seeking data on "individuals who have received, are currently receiving, or have applied to receive SNAP benefits from January 1, 2020, through present date. Requested data elements shall include records sufficient to identify individuals as applicants for, or recipients of, SNAP benefits, including but not limited to all household group members' names, dates of birth, social security numbers, residential and mailing addresses used or provided, as well as all data records used to determine eligibility or ineligibility." The letter also noted that Defendant USDA is requesting "transactional records from each household . . . sufficient to calculate the total dollar value of SNAP received by recipients over time . . . as well as SNAP usage and retailer data."

40. On July 25, 2025, USDA-FNS Deputy Under Secretary Patrick A. Penn sent a letter to OTDA stating that "[F]ailure to take the steps necessary to provide the relevant data to FNS may trigger noncompliance procedures codified in 7 U.S.C. 2020(g)."

41. On July 28, 2025, New York, joined by several other states, filed the present action in the Northern District of California challenging Defendant USDA's actions.

42. On July 30, 2025, OTDA sent Defendant USDA a letter expressing its concern with Defendant USDA's data demand, and requesting an extension of the deadline until the litigation had been resolved. To date, Defendant USDA has not provided a response to this request.

43. On August 12, 2025, Deputy Under Secretary Penn sent a letter to the Governor of New York, advising that because FNS had not received the participant data "the State of New York is out of compliance with SNAP requirements." The letter further states that, "[a]s provided by 7 CFR 276.4, this letter serves as an advance notice that New York could be subject to suspension or disallowance of Federal funding for State SNAP administrative expenses if it does not submit to FNS the requested SNAP participant data."

44. The August 12, 2025 letter further states: "In order for FNS to determine that New York has made adequate progress towards meeting the data collection requirements, by August 13, 2025, FNS must receive a description of the actions New York will undertake in order to ensure that it will submit the requested data to FNS no later than close of business Friday, August 15, 2025. If New York fails to comply with the requirements outlined in this advance notification, the USDA may proceed with issuing a formal warning to pursue the suspension or disallowance of Federal funding for State SNAP Administrative expenses and may take any other available legal action."

45. New York State will be irreparably harmed if Defendant USDA suspends or disallows federal SNAP administrative funds. Of the approximate $818 million in annual administrative costs expended by New York State to operate its SNAP program, approximately $672 million is comprised of district costs, of which approximately $336 million is reimbursed by the federal government. Such federal funds largely support district level caseworker staffing to process applications, interview clients, make eligibility determinations, facilitate recertifications, and handle all matters of under care work. Any reduction in district staffing levels would negatively impact timely processing of SNAP applications, leading to potential delays in issuance of benefits to eligible households. Additionally, suspension or disallowance of federal SNAP administrative funds would negatively impact critical centralized OTDA functions, such as issuing SNAP benefits through EBT vendor Fidelity, sending required notices to applicants and recipients, maintenance of the SNAP legacy information technology system, the timely implementation of participation in the NAC due to fewer resources being dedicated to onboarding, and reduction in centralized staff who provide policy and operational oversight to the districts.

46. For the foregoing reasons, OTDA respectfully requests an Order approving Plaintiffs' requests for relief.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and accurate.

Date: August 18, 2025
Albany, New York

_____
WENDY DEMARCO