IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA; STATE OF NEW YORK; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI‘I; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR** ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky**; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF WASHINGTON; STATE OF WISCONSIN,**<br><br>                                              Plaintiffs,<br><br>         v.<br><br>**UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS,** in her official capacity as U.S. Secretary of Agriculture**; U.S. DEPARTMENT OF AGRICULTURE'S OFFICE OF INSPECTOR GENERAL,**<br><br>                                              Defendants. | Case No. **3:25-cv-06310-MMC** |

**DECLARATION OF CARLA REYES**

# DECLARATION OF CARLA REYES

**Carla Reyes**, declares under penalty of perjury, pursuant to 28 U.S.C. Section 1746, as follows:

1. I am a resident of the State of Washington. I am over the age of 18 and understand the obligations of an oath.

**Professional and Agency Background**

2. I am the Assistant Secretary of the Economic Services Administration of the Department of Social and Health Services. I make this declaration based on personal knowledge and on my review of information and records gathered by agency staff.

3. The Department of Social and Health Services (DSHS) is an agency of the State of Washington. It is composed of four Administrations and one Division, each with distinct roles within the agency. These are the Behavioral Health and Habilitation Administration, the Home and Community Living Administration, the Finance, Technology, and Analytics Administration, the Economic Services Administration, and the Division of Vocational Rehabilitation. DSHS's mission is: "We partner with people to access support, care, and resources." And its vision is: "People find human services to shape their own lives." This mission and vision are accomplished with a strategic plan, specific to each administration and division, which is available on our website at this URL: https://www.dshs.wa.gov/office-of-the-secretary/dshs-strategic-plan. DSHS has many duties that have been delegated to it by the Washington State Legislature, including cash and cash equivalent benefits programs, medical services, and other social service programs.

4.      Among the programs administered by DSHS is the Supplemental Nutrition Assistance Program (SNAP), which helps people with low incomes purchase food by providing monthly benefits to supplement their grocery budget.

**SNAP in Washington**

5.      SNAP is a key part of Washington's efforts to address hunger by supplementing the food budget of low-income families so they can purchase healthy food.

6.      At any given time, approximately 11 percent of Washington State's population, or just under 900,000 people, receive SNAP benefits including over 300,000 children. In Fiscal Year 2024, over one million Washington residents were recipients of SNAP at some point during the year, including over 400,000 children. More than $1.9 billion in SNAP benefits were issued in fiscal year 2024.

7.      Pursuant to federal law, DSHS is responsible for the issuance, control and accountability of SNAP benefits and Electronic Benefit Transaction (EBT) cards; ensuring program integrity; and supervising the day-to-day administration of SNAP, including processing applications for SNAP benefits and certifying eligible applicant households. 7. U.S.C. § 2020(a)(1); 7 C.F.R. § 271.4; 7 C.F.R. § 274.2.

8.      Washington expends approximately $259 million in administrative costs to run its SNAP program each year, approximately $129.5 of which is reimbursed by the federal government.

**USDA's Unprecedented Request for Washington's SNAP data**

9.      As part of the SNAP application process, DSHS collects sensitive personally identifiable information (PII) from applicants and recipients, including but not limited to, home

addresses, dates of birth, Social Security Numbers, citizenship and immigration status, household income and resource information.

10. Washington strictly protects the confidentiality of its residents' SNAP data. DSHS is prohibited by law from "disclosing the contents of any records, files, papers and communications, except for purposes directly connected with administration of" SNAP and other public benefits programs. Wash. Rev. Code § 74.04.060.

11. On May 6, 2025, U.S. Department of Agriculture/Food and Nutrition Service (USDA-FNS) Senior Policy Advisor for Integrity Gina Brand sent DSHS a letter stating that the USDA "must retain 'unfettered access to comprehensive data' from federally funded programs like SNAP". The letter further stated that the USDA "is taking steps to require all States to work through their processors" to obtain "[r]ecords sufficient to identify individuals as applicants for, or recipients of, SNAP benefits, including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers." USDA also indicated that it would seek "[r]ecords sufficient to calculate the total dollar value of SNAP benefits received by participants over time, with the ability to filter benefits received by date ranges." The letter further demanded that the requested data would cover the period beginning January 1, 2020, through present.

12. Fidelity Information Services (FIS) is DSHS's contractor for the purpose of administering SNAP EBT payments. To enable FIS to set up the accounts, DSHS sends data about recipients to FIS including their name, date of birth, social security number, client ID number, address, and phone number.

13. On May 9, 2025, DSHS received a letter from its vendor, FIS, informing it that FIS intended to cooperate with USDA and transmit records of Washington food benefit cardholders

3

and transaction data and asking for DSHS's written consent to transmit this data by May 14, 2025. DSHS, through counsel, informed FIS that it would not consent to the disclosure of SNAP data to the USDA. The same day, May 14, 2025, DSHS sent a letter to USDA stating that it refused to give FIS consent to share SNAP data, indicating that "DSHS does not agree that USDA may bypass [security agreements and protocols] by demanding information directly from DSHS's contractors."

14. On May 15, 2025, we received an assurance from FIS through its counsel that FIS would not disclose any data to USDA without prior authorization from DSHS.

15. On June 23, 2025, the USDA published a System of Records Notice (SORN) in the Federal Register notifying the public that it sought to create a large-scale ''National Supplemental Nutrition Assistance Program (SNAP) Information Database.'' 90 Fed. Reg. 26,521 (June 23, 2025).

16. The SORN announced that the USDA intended to demand the following categories of records from "53 State agencies and their designated vendors and/or contractors": "records containing personally identifying information, including but not limited to SNAP participant name, Social Security Number (SSN), date of birth (DOB), residential address, Electronic Benefit Transaction (EBT) card number, and case record identifier number or other identifiers or data elements maintained by States, vendors, or contractors to identify SNAP recipients." *Id.* The SORN also states that the USDA would collect "information derived from and associated with EBT transactions, including but not limited to records sufficient to calculate the total dollar value of SNAP benefits received by participants over time, such as applied amounts and benefit available dates." *Id.*

17. These categories of information will be collected for all "individuals who have received, are currently receiving, or have applied to receive SNAP benefits." *Id.*

4

18. The USDA's actions are unprecedented. To my knowledge, the USDA has never before sought to inspect or audit, let alone retain, this volume of personal and sensitive SNAP data.

19. In its privacy impact assessment, USDA states that the uses of the data in the database would be "to detect duplicate enrollments across states, verify immigration status eligibility, and perform other fraud prevention checks against other Federal agencies' datasets, thereby ensuring program integrity, including by verifying the eligibility of benefit recipients."[1]

20. These uses are duplicative of existing systems. DSHS already conducts these checks, using systems such as the Systematic Alien Verification for Entitlement (SAVE) program. Washington is in the process of upgrading its system to participate in the National Accuracy Clearinghouse to prevent fraudulent access of benefits in multiple states at once. These programs generally work, and the incidence of fraud committed by beneficiaries in Washington's food benefits programs is low. FNS itself indicates on its website that "Payment errors are largely unintentional and may be on the part of the state agency or the SNAP household."[2] The Center on Budget and Policy Priorities notes that "[r]elatively few SNAP errors represent dishonesty or fraud on the part of recipients, such as lying to eligibility workers to get benefits."[3]

21. On July 9, the USDA Secretary Brooke L. Rollins sent DSHS a demand for five years' worth of data on all SNAP applicants and recipients. The July 9 letter demands the

---

[1] USDA, Cybersecurity and Priv. Operations Ctr., Priv. Div., USDA Privacy Impact Assessment Fiscal Year 2025 (July 23, 2025), https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf
[2] USDA, SNAP Quality Control, https://www.fns.usda.gov/snap/qc (last accessed August 14, 2025)
[3] Center on Budget and Policy Priorities, SNAP Includes Extensive Payment Accuracy System, (June 21, 2024), https://www.cbpp.org/research/food-assistance/snap-includes-extensive-payment-accuracy-system.

categories of records listed in the SORN and directs states to produce the requested data starting July 24 and no later than July 30, 2025.

22. DSHS cannot share confidential SNAP participant data with a third party without executing an appropriate data sharing agreement or Memoranda of Understanding or similar document, and this has not been done. DSHS must ensure, first, that the data will be protected from unauthorized disclosures and data breaches. Only by agreeing to certain security protocols can these goals be met. Second, DSHS must be assured that the data will be used exclusively for administration of the program.

23. Based on my years of experience working in Washington's social services programs, I believe that using data from SNAP for general law enforcement purposes, including immigration enforcement, would likely chill participation in these programs. These programs exist in order to help ensure that Washington residents, including children, have enough food to eat. If Washington's data is transferred to the federal government under the June 23 SORN, it is likely that some Washington residents who would be eligible for these benefits will not apply for them due to fears that they or their family members may become targets of the federal government's immigration enforcement or other law enforcement efforts. Such eligible residents who are discouraged from taking advantage of food benefit programs are likely to experience increased food insecurity.

24. This would undermine DSHS's mission and the fundamental purpose of these programs, which is to help people with low incomes make ends meet by providing monthly benefits to buy food. This would also undermine DSHS's outreach efforts to encourage participation in SNAP. Food security is associated with positive health outcomes and lower medical costs.

25. This same chilling effect would impact Washington's ability to access federal support for the National School Lunch Program and School Breakfast Program. Through a federal option called "direct certification" for its school lunch program, Washington currently certifies 242,340 children for federally funded free or reduced price meals due to their households' participation in SNAP. Any reduction in SNAP enrollment for families with schoolchildren therefore has a negative impact on federal eligibility for free or reduced-price meals.

26. Washington also operates a program called "Sun Bucks", or Summer EBT, which helps families buy food for their school-aged children during the summer. Most children qualify for Sun Bucks if at any point since July 2024 they were either: 1) enrolled at a school that offers the National School Lunch Program or School Breakfast Program and individually approved for free or reduced-price meals at school; or 2) age 8-18 and a member of a household that receives benefits from the TANF or SNAP. Any decrease in SNAP enrollment will cause a decrease in the Sun Bucks program as well.

27. If there is a data breach of SNAP data a host of adverse consequences could follow. These could include benefit theft and identity theft. Recipients of SNAP who have had their identities stolen could suffer compromised financial accounts, adverse actions to their credit scores, and incur significant expenses attempting to remediate the damage. Additionally, PII associated with SNAP data could be used to locate victims of domestic violence subjecting them to threats to their physical safety.

28. In order to transmit the data that USDA is demanding, Washington would have significant technical issues to address. These include segregating out information pertaining to recipients of state-only programs that are maintained in the same data systems, identifying the minimum necessary data that would have to be transmitted to meet the USDA's demand,

developing queries to pull the appropriate data elements, performing quality assurance on the results of those queries, and performing any follow-up necessitated by the quality assurances. Especially because the time period for the data requested is so large, five years, and spans over time periods where different data storage structures were used and even data systems, this is a complicated and difficult request that is not easy to implement.

29. Significant legal work would have to be done too. As mentioned above, the data delivery would have to be preceded by entry of a document describing the precise data to be delivered, the form of delivery, the security protocols applicable to it, and procedures for its destruction or return once it is no longer needed. Negotiation of such an instrument would likely take weeks or months.

30. On July 18, 2025, Washington, joined by several other states, submitted a comment letter outlining our objections to the USDA's creation of a vast National SNAP Information Database and the USDA's demand for state data.

31. On July 23, 2025, USDA-FNS Senior Policy Advisor for Integrity Brand sent DSHS another letter, reiterating the USDA's demand of information. She stated that the USDA was seeking data on "individuals who have received, are currently receiving, or have applied to receive SNAP benefits from January 1, 2020, through present date. Requested data elements shall include records sufficient to identify individuals as applicants for, or recipients of, SNAP benefits, including but not limited to all household group members' names, dates of birth, social security numbers, residential and mailing addresses used or provided, as well as all data records used to determine eligibility or ineligibility." The letter also noted that USDA is requesting "transactional records from each household . . . sufficient to calculate the total dollar value of SNAP received by recipients over time . . . as well as SNAP usage and retailer data."

32. On July 25, 2025, USDA-FNS Deputy Under Secretary Patrick A. Penn sent a letter to DSHS stating that "Failure to take the steps necessary to provide the relevant data to FNS may trigger noncompliance procedures codified in 7 U.S.C. 2020(g)."

33. On July 28, 2025, Washington, joined by several other states, filed the present action in the Northern District of California challenging the USDA's actions.

34. On July 30, 2025, DSHS, through counsel, sent USDA a letter expressing its concern with USDA's data demand. It referenced the lawsuit filed by Washington and the other states, indicated that USDA did not have the legal authority to make the data request, that it had not adhered to standard protocols ahead of ongoing and large-scale data transmissions, and that the requested data could not be delivered on the time frame USDA was demanding in any event.

35. On August 12, 2025, Deputy Under Secretary Penn sent a letter to Governor Ferguson, informing him that because FNS had not received the participant data "the State of Washington is out of compliance with SNAP requirements." The letter further states that, "[a]s provided by 7 CFR 276.4, this letter serves as an advance notice that Washington could be subject to suspension or disallowance of Federal funding for State SNAP administrative expenses if it does not submit to FNS the requested SNAP participant data."

36. The August 12, 2025 letter further states: "In order for FNS to determine that Washington has made adequate progress towards meeting the data collection requirements, by August 13, 2025, FNS must receive a description of the actions Washington will undertake in order to ensure that it will submit the requested data to FNS no later than close of business Friday, August 15, 2025. If Washington fails to comply with the requirements outlined in this advance notification, the USDA may proceed with issuing a formal warning to pursue the suspension or

9

disallowance of Federal funding for State SNAP Administrative expenses and may take any other available legal action."

37. If USDA withholds SNAP administrative funds, DSHS could not continue to administer the program without additional funding from the Legislature. Fully half of Washington's administrative expenses for SNAP are reimbursed by the federal government, and DSHS does not currently have the financial capacity to maintain the program without federal administrative support. Without additional funding from the Legislature, Washington would also be forced to lay off staff and take other drastic cost-cutting measures. DSHS, and Washington State, is currently experiencing a significant budget cut caused by measures to address a more than $16 billion budget deficit during the 2025 legislative session. DSHS does not currently have the ability to make up another $129.5 million dollars of lost federal funding without ceasing to provide services.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 15th day of August, 2025, in Olympia, WA.

*[signature]*
CARLA REYES
Assistant Secretary
Washington State Department of
Social and Health Services