BRETT A. SHUMATE
Assistant Attorney General
ELIZABETH J. SHAPIRO
Deputy Branch Director
BRADLEY P. HUMPHREYS
Senior Trial Counsel
BENJAMIN S. KURLAND
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
*Counsel for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, | Case No. 3:25-cv-06310-MMC |
| Plaintiffs, | |
| v. | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR STAY OR PRELIMINARY INJUNCTION** |
| UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*, | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 2

I.      The SNAP Program ................................................................................. 2

II.     Executive Order 14,243 and USDA's Data Gathering Initiative ............ 5

III.    USDA's Nonsubstantive Change Request and System of Records Notice ...... 6

IV.     Recent Developments .............................................................................. 7

V.      Procedural History .................................................................................. 8

LEGAL STANDARD ........................................................................................... 8

ARGUMENT ........................................................................................................ 9

I.      The States are Unlikely to Succeed on the Merits of their Claims ........ 9

        A.      Plaintiffs' Claims are Not Ripe ................................................... 9

        B.      Plaintiffs are Unlikely to Establish that USDA's Data Request Violates the APA ........................................................................ 10

                1.      USDA's Data Request is Likely Not Arbitrary or Capricious ................ 10

                        i.      USDA has explained its data gathering initiative, and there is no change to any longstanding policy ......................... 10

                        ii.     USDA has considered and accounted for alleged security risks, chilling effect on participants, and burdens on the States ........ 11

                        iii.    Program integrity is a compelling interest ................. 13

                        iv.     USDA has considered the comments it received ........ 13

                2.      Plaintiffs are Unlikely to Establish that USDA's Gathering is Contrary to Law ................... 14

                        i.      The SNAP Act authorizes the gathering at issue ....... 14

                        ii.     Plaintiffs are unlikely to show the gathering violates the PRA ........ 18

                        iii.    Plaintiffs are unlikely to prevail on their Computer Matching Act Claim .......... 21

C.    The States Are Unlikely to Succeed on their Ultra Vires Claim. ......................... 22

II.    The States Fail to Show Irreparable Harm.............................................................. 23

III.    The Balance of the Equities Favors Defendants ................................................... 24

IV.    Plaintiffs' Proposed Injunction is Impermissibly Broad....................................... 24

V.    Plaintiffs Should Be Ordered to Post Substantial Security in Connection with Any
Preliminary Injunctive Relief and Any Preliminary Relief Should Be Stayed
Pending Any Appeal............................................................................................... 25

CONCLUSION............................................................................................................. 25

# TABLE OF AUTHORITIES

**CASES**

*Abbott Lab'ys v. Gardner*,
    387 U.S. 136 (1967) .................................................................................................... 9

*Alegent Health-Immanuel Med. Ctr. v. Sebelius*,
    34 F. Supp. 3d 160 (D.D.C. 2014) ............................................................................. 18

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*,
    771 F. Supp. 3d 717 (D. Md. 2025),
    *appeal dismissed*, No. 25-1291, 2025 WL 1111245 (4th Cir. Apr. 1, 2025) ........................... 22

*Ariz. Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) .................................................................................... 24

*Ass'n of Irritated Residents v. U.S. Env't Prot. Agency*,
    10 F.4th 937 (9th Cir. 2021) ........................................................................................ 9

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
    462 U.S. 87 (1983) ...................................................................................................... 10

*Bd. of Governors, Fed. Rsrv. Sys. v. MCorp Fin., Inc.*,
    502 U.S. 32 (1991) ...................................................................................................... 22

*Britt v. Naval Investigative Serv.*,
    886 F.2d 544 (3d Cir. 1989) ............................................................................. 16, 17, 18

*Cal. Rifle & Pistol Ass'n, Inc. v. L.A. Cnty. Sheriff's Dep't*,
    745 F. Supp. 3d 1037 (C.D. Cal. 2024) ..................................................................... 23

*City of New Bedford v. Locke*, Civ. A.,
    No. 10-10789, 2011 WL 2636863 (D. Mass. June 30, 2011),
    *aff'd sub nom.*, *Lovgren v. Locke*, 701 F.3d 5 (1st Cir. 2012) .................................. 19

*Darby v. Cisneros*,
    509 U.S. 137 (1993) .................................................................................................... 10

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
    36 F.4th 850 (9th Cir. 2022) ......................................................................................... 9

*FCC v. Fox Television Stations*,
    556 U.S. 502 (2009) .................................................................................................... 10

*Fed. Express Corp. v. U.S. Dep't of Com.*,
    39 F.4th 756 (D.C. Cir. 2022) .............................................................................. 22, 23

*Food & Drug Admin. v. Wages & White Lion Invs., LLC,*
    145 S. Ct. 898 (2025)................................................................................ 10, 11

*Hyatt v. OMB,*
    908 F.3d 1165 (9th Cir. 2018) ................................................................ 19

*Immigrant Defs. L. Ctr. v. Noem,*
    145 F.4th 972 (9th Cir. 2025) .................................................................. 8

*Kinney-Coastal Oil Co. v. Kieffer,*
    277 U.S. 488 (1928).................................................................................. 24

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League,*
    634 F.2d 1197 (9th Cir. 1980) ................................................................ 24

*Lopez v. Brewer,*
    680 F.3d 1068 (9th Cir. 2012) ................................................................ 8

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983).................................................................................... 10, 13

*Nken v. Holder,*
    556 U.S. 418 (2009).................................................................................. 8, 25

*Nuclear Regul. Comm'n v. Texas,*
    605 U.S. 665 (2025).................................................................................. 22

*Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11, Cheyenne,*
    393 U.S. 233 (1968).................................................................................. 22, 23

*Ohio Stands Up! v. U.S. Dep't of Health & Hum. Servs.,*
    564 F. Supp. 3d 605 (N.D. Ohio 2021),
    *aff'd,* No. 21-3995, 2022 WL 1576929 (6th Cir. May 19, 2022) ............ 19

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce,*
    128 F.4th 1089 (9th Cir. 2025) ................................................................ 9

*Regents of Univ. of Cal. v. Am. Broad. Cos., Inc.,*
    747 F.2d 511 (9th Cir. 1984) .................................................................. 24

*Steele v. United States,*
    144 F.4th 316 (D.C. Cir. 2025) .............................................................. 19

*Stormans, Inc. v. Selecky,*
    586 F.3d 1109 (9th Cir. 2009) ................................................................ 9

*Swenson v. U.S. Postal Serv.,*
    890 F.2d 1075 (9th Cir. 1989) ................................................................ 16

iv

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ......................................................................................... 21

*Trump v. CASA, Inc.,*
    145 S. Ct. 2540  (2025) .................................................................................... 24

*US W. Commc'ns v. MFS Intelenet, Inc.,*
    193 F.3d 1112 (9th Cir. 1999) ........................................................................... 9

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................................. 8

*Y.Y.G.M. SA v. Redbubble, Inc.,*
    75 F.4th 995 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 824 (2024) .................. 23

**STATUTES**

5 U.S.C. § 552a ................................................................................... 1, 6, 16, 22

5 U.S.C. § 702 ............................................................................................... 18

7 U.S.C. § 2011, *et seq.* ................................................................................. 2

7 U.S.C. § 2011 ............................................................................................... 2

7 U.S.C. § 2013 ............................................................................................... 2

7 U.S.C. § 2015 ............................................................................................... 3

7 U.S.C. § 2020 ..................................................................................... *passim*

44 U.S.C. § 3501, *et seq.* ............................................................................... 1

44 U.S.C. § 3506 ........................................................................................ 6, 20

44 U.S.C. § 3507 ........................................................................................... 19

44 U.S.C. § 3512 ........................................................................................... 19

**UNITED STATES CONSTITUTION**

U.S. Const. art. I, § 8 ....................................................................................... 8

**RULES**

Fed. R. Civ. P. 65 .......................................................................................... 25

　　　　　　　　DEFS.' OPP'N TO MOT. FOR PRELIM. INJ.

**REGULATIONS**

7 C.F.R. § 271.3 ....................................................................................................... 2

7 C.F.R. § 271.4 ....................................................................................................... 3

7 C.F.R. Part 272 ................................................................................................... 20

7 C.F.R. § 272.1 .............................................................................................. *passim*

7 C.F.R. § 273.2 ................................................................................................ 3, 12

7 C.F.R. § 276.4 .............................................................................................. *passim*

7 C.F.R. § 276.7 .............................................................................................. *passim*

Privacy Act of 1974; System of Records Revision,
    86 Fed. Reg. 48,975 (Sept. 1, 2021) ............................................................ 17

Privacy Act; Proposed New System of Records,
    88 Fed. Reg. 11,403 (Feb. 23, 2023) ........................................................... 17

Agency Information Collection Activities: Supplemental Nutrition Assistance Program
    (SNAP) Forms: Applications, Periodic Reporting, and Notices,
    88 Fed. Reg. 62,527 (Sept. 12, 2023) .......................................................... 20

Submission for OMB Review; Comment Request,
    89 Fed. Reg. 13,679-02 (Feb. 23, 2024) ...................................................... 20

Exec. Order No. 14,243,
    90 Fed. Reg. 13,681 (Mar. 20, 2025) .............................................................. 5

Privacy Act of 1974; System of Records,
    90 Fed. Reg. 26,521 (June 23, 2025) .................................................... *passim*

**OTHER AUTHORITIES**

*Audit*, Merriam-Webster,
    https://www.merriam-webster.com/dictionary/audit ...................................... 15

FNS Memorandum to OMB, *Nonsubstantive Change Request – Supplemental Nutrition
    Assistance Program* OMB #0584-0064 (June 11, 2025),
    https://perma.cc/MZN4-AUAV ................................................................... 6, 13

*Inspect*, Merriam-Webster,
    https://www.merriam-webster.com/dictionary/inspect ................................... 15

OMB, Off. of Info. & Regulatory Affs. (June 13, 2024),
    https://perma.cc/C79G-SRAH ........................................................................ 6

OMB, Off. of Info. & Regulatory Affs. (July 1, 2025),
https://perma.cc/BE54-93CF ................................................................. 6, 21

Supplemental Nutrition Assistance Program ("SNAP"), U.S. Dep't of Agric., Putting Healthy
Food within Reach for Those in Need (updated May 27, 2025),
https://perma.cc/5KYW-MJ56 ........................................................................ 2

U.S. Dep't of Agric., Data Sharing Guidance,
https://perma.cc/3GDH-THAK ............................................................... *passim*

USDA, Supporting Statement – Part A for OMB Control Number 0584-0064,
https://perma.cc/U48S-DSRE (May 31, 2024) ......................................... 20

3:25-cv-06310-MMC                                    DEFS.' OPP'N TO MOT. FOR PRELIM. INJ.

**INTRODUCTION**

Across the federal government, the President has tasked agencies with detecting and eliminating the waste, fraud, and abuse, that bogs down critical entitlement programs. The Supplemental Nutrition Assistance Program ("SNAP") is critical to feeding millions of Americans, but data crucial to its administration is currently spread across the fifty-three States and territories, as well as several private companies that administer aspects of the program. As such, the U.S. Department of Agriculture ("USDA") has determined that, consistent with governing legal authority, it is necessary to gather and review certain data from the States who currently hold it.

Plaintiffs are several of those States that administer SNAP programs and currently hold the data USDA is requesting. They move the Court for a preliminary injunction to halt USDA's efforts based on alleged procedural deficiencies in USDA's data gathering initiative. But, contrary to their claims, USDA has abided by authority permitting the information gathering, justified its actions, and meticulously followed the procedures required by the Privacy Act, 5 U.S.C. § 552a, and the Paperwork Reduction Act ("PRA"), 44 U.S.C. § 3501, *et seq.* Plaintiffs, therefore, cannot establish entitlement to a preliminary injunction.

First, Plaintiffs have not exhausted their administrative remedies, as USDA's regulations provide them an opportunity to appeal a determination that they unjustifiably failed to comply with USDA's request. This undermines both their chance of success on the merits, and their claim to irreparable harm.

Furthermore, they are unlikely to succeed on their Administrative Procedure Act ("APA") claims, as USDA's data gathering initiative is neither arbitrary, capricious, nor contrary to law. USDA has identified lawful authority to gather the information in question and compelling reasons to do so. USDA has not changed any longstanding policy, and even if it had, USDA has presented more than enough explanation to institute its current policy. Further, USDA's data gathering initiative is in full compliance with the Privacy Act, the PRA, and SNAP's statute and regulations. For all these same reasons, Plaintiffs' *ultra vires* claim fails.

Plaintiffs also fail to show irreparable harm, or that the balance of equities tilts in their favor. Plaintiffs waited three weeks after filing their complaint to bring this motion, undermining their

claims to urgency and irreparable harm.  And Plaintiffs have not exhausted their administrative remedies, so any alleged harm is unfounded.  Even if USDA suspends or disallows certain funding after the administrative appeal process based on the States' noncompliance, the subsequent harm would be addressable through a monetary award of the funds withheld.  On the other side of the ledger, the President and USDA's initiatives to detect and combat the waste and fraud that saps programs like SNAP of resources are of the utmost urgency.  Restoring these programs to full health is of great public concern, tipping the balance of equities in the federal governments' favor.

## BACKGROUND

### I.    The SNAP Program

The Supplemental Nutrition Assistance Program, also known as "SNAP," is the successor to the Food Stamp Program and is the nation's largest nutrition assistance program.  *See* Food and Nutrition Act of 2008, 7 U.S.C. § 2011, *et seq.* ("FNA"); *see also* Supplemental Nutrition Assistance Program ("SNAP"), U.S. Dep't of Agric., Putting Healthy Food within Reach for Those in Need (updated May 27, 2025), https://perma.cc/5KYW-MJ56; Decl. of Shiela Corley ¶¶ 4–10 ("Corley Decl.").   Through SNAP, Congress sought to "alleviate . . . hunger and malnutrition," and to "permit low-income households to obtain a more nutritious diet."  7 U.S.C. § 2011.  Once enrolled in the program, eligible individuals and households receive monthly benefits on an electronic benefit transfer ("EBT") card, which can be used like a debit card at authorized retail food stores to purchase food.  Corley Decl. ¶ 8.

The program is run as a partnership between the federal government and the States, a term which includes the District of Columbia, Guam, and the United States Virgin Island.  At the federal level, USDA's Food and Nutrition Service ("FNS") is responsible for administering SNAP for retail food stores and issuing administrative rules.  *See* 7 U.S.C. § 2013(a), (c); 7 C.F.R. § 271.3.  FNS also oversees the States' administration of SNAP, including reviewing the States' Plans of Operations and their payment accuracy.  7 U.S.C. § 2020(d); Corley Decl. ¶ 10.

States, on the other hand, administer day-to-day operation of the program through their designated agencies.  *See* 7 U.S.C. § 2020(a).  This includes determining eligibility and benefit amounts, issuing benefits to eligible households, and ensuring program integrity with respect to

SNAP recipients.  *Id.* § 2020(a)(1); 7 C.F.R. § 271.4.  To issue benefits and funds to eligible households, State Agencies contract with vendors referred to as "EBT Processors" who issue electronic benefits through the EBT system.  Corley Decl. ¶ 9.

State Agencies confirm eligibility by collecting certain information from applicant households, as authorized by statute and regulation.  *See* 7 C.F.R. § 273.2(f); *see also* 7 U.S.C. § 2015(e), (l)–(o).  The SNAP statute requires State Agencies to safeguard this information by, for example, prohibiting disclosure except in certain circumstances.  7 U.S.C. § 2020(e)(8).  One such circumstance provides that States "shall permit" transmission to "persons directly connected with the administration or enforcement" of SNAP, as well as other "Federal assistance programs, or federally-assisted State programs," if the information is subsequently used for administration and enforcement.  *Id.* § 2020(e)(8)(A); *see also* 7 C.F.R. § 272.1(c)(1).

Additionally, the FNA requires State Agencies to keep records "as may be necessary to determine whether the program is being conducted in compliance" with SNAP requirements.  7 U.S.C. § 2020(a)(3)(A).  Pursuant to the FNA, "[a]ll records, and the entire information systems in which records are contained" must be made available to the USDA.  *Id.* § 2020(a)(3)(B); 7 C.F.R. § 272.1(e).

The FNA also provides USDA authority to ensure state compliance.  7 U.S.C. § 2020(g).  Before taking action, USDA must provide States with notice of noncompliance and must provide State Agencies "a specified period of time for the correction of such failure."  *Id.*  If the state does not come into compliance, USDA may refer the matter to the Attorney General to act and/or (regardless of referral to the Attorney General), USDA "shall proceed to withhold from the State such funds authorized" by the FNA.  *Id.*; *see also* Corley Decl. ¶ 36.

The relevant regulations permit USDA to either suspend or disallow funds, the difference being that suspension is a temporary withholding of all or a portion of the federal funds of a State's budget to administer SNAP, while disallowance is a denial by USDA of otherwise reimbursable administrative costs.  *See* 7 C.F.R. § 276.4(b), (c).  The administrative process for withholding funds is established by 7 C.F.R. § 276.4 and 7 C.F.R. § 276.7; *see also* Corley Decl. ¶¶ 37–44.

To suspend or disallow funds, USDA must first issue the noncompliant state written advance notice that USDA is considering acting and must provide the State with time to take corrective action. 7 C.F.R. § 276.4(d)(1). If the State fails to comply, USDA may issue a formal warning. *Id.* § 276.4(d)(2). The State then has 30 days to submit evidence that it is complaint or provide a corrective action proposal. *Id.* § 276.4(d)(2)(ii). Additionally, if the deficiency is one that cannot be corrected within 30 days, but the State is able to submit a corrective plan, USDA must hold the formal warning in abeyance pending completion of the proposed corrective plan. *Id.* § 276.4(d)(2)(iii). If, however, after the 30-day period, the State fails to come into compliance or submit a corrective plan, USDA can notify the State agency that it is unsatisfied with the State's response and that "administrative funds are being suspended or disallowed." *Id.* § 276.4(e). After receiving such notification, the State may appeal USDA's determination to an administrative Appeals Board. *Id.* § 276.4(f); *id.* § 276.7(a).

States have 10 days to file an appeal after receiving written notice of failure to come into compliance. *Id.* § 276.7(c). During the pendency of the appeal, USDA's action is automatically stayed. *Id.* § 276.7(e). After the State files its appeal, it has an additional 30 days to submit materials in support of its appeal. *Id.* § 276.7(g). The Appeals Board is then afforded 60 days from the time the state submits its additional information to schedule and conduct a hearing. *Id.* § 276.7(h). The Appeals Board then has 30 days after the hearing to issue a final determination. *Id.* § 276.7(i)(1). If the Board determines no hearing is necessary, it must issue its decision within 30 days of receiving the State's additional information. *Id.* In either case, the Appeal Board's final decision only takes effect 30 days after the Board's final decision. *Id.* Throughout the appeals process, both USDA and the State may request, and be granted upon a showing of good cause, an extension, except for an extension of the deadline to file an initial request for administrative review. *Id.* § 276.7(k)(1). The Appeals Board itself may also grant itself an extension of time. *Id.* § 276.7(k)(2). States that disagree with the Appeal Board's final determination may then seek *de novo* judicial review in federal district court. *Id.* § 276.7(j).

## II.    Executive Order 14,243 and USDA's Data Gathering Initiative

Household information necessary to oversee the SNAP program is siloed and diffuse.  It is spread across the federal government, the 53 States and territories, and the EBT Processors.  On March 20, 2025, President Trump issued Executive Order 14,243, aimed at combatting waste, fraud, and abuse across the federal government by eliminating such information silos.  Exec. Order No. 14,243, 90 Fed. Reg. 13,681 (Mar. 20, 2025) ("EO 14243").  As the Executive Order explained, "unnecessary barriers to Federal employees accessing Government data" creates information silos, which generate "bureaucratic duplication and inefficiency" impinging on the "Government's ability to detect overpayments and fraud."  *Id.* § 1.  Based on such inefficiencies, the Executive Order directed agency heads to "take all necessary steps, to the maximum extent consistent with law," to ensure Federal officials have access to unclassified information "for purposes of pursuing Administration priorities related to the identification and elimination of waste, fraud, and abuse." *Id.* § 3(a).  Noted specifically in the Executive Order are initiatives to provide "access to comprehensive data from all State programs that receive Federal funding, including, as appropriate, data generated by those programs but maintained in third-party databases."  *Id.* § 3(c).

Consistent with Executive Order 14,243's directive, USDA published a letter to all SNAP State Agency directors on May 6, 2025, announcing an initiative to gather SNAP information.  *See* U.S. Dep't of Agric., Data Sharing Guidance, https://perma.cc/3GDH-THAK ("May 6 Letter"); *see also* Corley Decl. ¶¶ 11–14; Decl. of Ryan Gillette, ECF No. 59-7, Ex. B ("Gillette Decl.").  The May 6 Letter begins by informing State directors of Executive Order 14,243 and that USDA is "committed to effectuating [] Executive Order [14243] with respect to all programs in its purview[,]" including SNAP.   May 6 Letter at 1.  To eliminate SNAP information silos, the May 6 Letter invokes the USDA's authority to gather and inspect information under 7 U.S.C. § 2020(a)(3) & (e)(8)(A); 7 C.F.R. § 272.1(c)(1); and 7 C.F.R. § 272.1(e).  *Id.* at 1–2.

The May 6 Letter is explicit about the purpose of gathering such information: USDA "will use the data it receives from processors to ensure Program integrity, including by verifying the eligibility of benefit recipients."  *Id.* at 2.  This "is consistent with FNS's statutory authority and the

1  President's Executive Order and will ensure Americans in need receive assistance, while at the

2  same time safeguarding taxpayer dollars from abuse." *Id.*

3  **III.    USDA's Nonsubstantive Change Request and System of Records Notice**

4      To facilitate the gathering of SNAP information from State Agencies and EBT Processors,

5  USDA completed two administrative processes.  First, it submitted a Nonsubstantive Change

6  Request to the Office of Management and Budget ("OMB").  *See* Corley Decl. ¶¶ 15–17; *see also*

7  FNS Memorandum to OMB, *Nonsubstantive Change Request – Supplemental Nutrition Assistance*

8  *Program* OMB #0584-0064 (June 11, 2025), https://perma.cc/MZN4-AUAV ("Nonsubstantive

9  Change Request").  The Paperwork Reduction Act ("PRA") requires Federal agencies to obtain

10  approval from OMB before collecting information from the public.  44 U.S.C. § 3506(c).  USDA

11  last submitted an information collection request for SNAP—and was approved by OMB—in 2024

12  for a three-year period expiring in June of 2027.  *See* OMB, Off. of Info. & Regulatory Affs.,

13  https://perma.cc/C79G-SRAH (June 13, 2024) ("Initial Approval").  USDA submitted the

14  Nonsubstantive Change Request to reflect the incremental additional burden of already reporting

15  the collected program information from States Agencies and EBT Processors to USDA.  *See*

16  Nonsubstantive Change Request at 3 (estimating an additional 20,410 annual burden hours over the

17  142,800,634 burden hours OMB previously approved).  OMB approved the Change Request on

18  July 1, 2025.  *See* OMB, Off. of Info. & Regulatory Affs., https://perma.cc/BE54-93CF (July 1,

19  2025) ("Change Approval").

20      Second, USDA created a new system of records to house the information it will be gathered.

21  As required by the Privacy Act, *see* 5 U.S.C. § 552a(e)(4), (11), USDA published a System of

22  Records Notice ("SORN") in the Federal Register, USDA/FNS–15, ''National Supplemental

23  Nutrition Assistance Program (SNAP) Information Database.''  90 Fed. Reg. 26,521 (June 23,

24  2025); Decl. of Maria F. Buxton, ECF No. 59-2, Ex. H ("Buxton Decl.").  The SORN explains that

25  USDA and FNS will use the data in the system "to ensure the integrity of Government programs,

26  including by verifying SNAP recipient eligibility against federally maintained databases, identifying

27  and eliminating duplicate enrollments, and performing additional eligibility and program integrity

28  checks."  SORN at 26,251.

The SORN includes eleven routine uses that allow for disclosure, but only "to the extent such uses are authorized by, among other authorities, 7 U.S.C. 2020(a)(3) and (e)(8), 7 CFR 272.1(c)(1) and (e), and Executive Orders 14218 and 14243." *Id.* at 26,522. The SORN became effective immediately, "except for the routine uses, which [would] become effective on July 23, 2025, unless USDA determines they must be changed as a result of public comment." *Id.* at 25,521. USDA received 457 comments, which it meticulously reviewed. *See* Corley Decl. ¶ 21. USDA is modifying Routine Use 8 in response to some public comments. *Id.* ¶ 22. USDA determined that other comments were unpersuasive or raised concerns already addressed in the SORN. *Id.*

## IV.    Recent Developments

USDA has continued to communicate with State Agency directors regarding USDA's intentions and upcoming deadlines. First, on July 9, 2025, USDA informed State Agencies that, "[t]o ensure efficient implementation of th[e] system, and to ensure USDA has a complete and accurate database," it would be requiring State Agencies and EBT Processors to begin transferring data by July 24, 2025, with a target completion date of July 30, 2025. Corley Decl. ¶¶ 24–25; Gillette Decl., Ex. C ("July 9 Letter").

On July 23, 2025, USDA wrote to the State Agency directors providing additional guidance on what data elements should be included and how data should be transmitted. Corley Decl. ¶¶ 26–27; Gillette Decl., Ex. D ("July 23 Letter"). That same day, USDA published a Privacy Impact Assessment for FY 2025, providing details regarding the intended data gathering and new system of records. Corley Decl. ¶ 23; Gillette Decl., Ex. A ("FY2025 Privacy Impact Assessment"). Finally, on July 25, 2025, USDA provided another letter to State Agency directors reminding them of the July 30, 2025 deadline. Corley Decl. ¶ 28; Gillette Decl, Ex. E ("July 25 Letter").

For the States that failed to comply with USDA's information request, USDA issued advance notifications pursuant to 7 C.F.R. § 276.4 on August 12, except for the District of Columbia, which received its advance notification on August 20, 2025. *See* Corley Decl. ¶¶ 45, 50; Pls.' Notice of Mot.& Mot. For Stay of Prelim. Inj., ECF No. 59 at 7 n.4 ("PI Mot."); Gillette Decl., Ex. G. The advance notification gave the States until August 15 (or August 25 for D.C.) to provide the requested information. At the request of several states, USDA later extended that deadline to

August 19, Corley Decl. ¶ 48.  On August 20, USDA sent formal warning letters, pursuant to 7 C.F.R. § 276.4(d)(2), to the State Agencies who still failed to comply.  *Id.* ¶ 48.  D.C. received its formal warning letter on August 26.  *Id.* ¶ 50.

## V.    Procedural History

Plaintiffs—a collection of nineteen states, the District of Columbia, and the Office of the Governor of Kentucky—filed the present action on July 28, 2025.  Compl., ECF No. 1 ("Compl.").  Their Complaint advances five causes of action.  Claims One, Two, and Three alleged violations of the APA.  *Id.* ¶¶ 295–351.  Claim Four advances an *ultra vires* cause of action.  *Id.* ¶¶ 352–56. Finally, Claim Five alleges a violation of the Spending Clause, U.S. Const. art. I, § 8, cl. 1.  *Id.* ¶ 357–65.  Based on these claims, Plaintiffs seek declaratory and injunctive relief, as well as costs, expenses, and attorneys' fees.  *Id.*, Prayer for Relief (1)–(8).

Three weeks later, Plaintiffs filed the present motion seeking a stay under APA Section 705 or a preliminary injunction.  PI Mot.  Plaintiffs' motion seeks relief related only to their APA and *ulta vires* claims.  Further, their proposed preliminary injunction would have the Court stay USDA's data gathering initiative wholesale, enjoin USDA from gathering data from both Plaintiffs and their EBT Processors, and prevent USDA from bringing administrative action against Plaintiffs. Proposed Order, ECF No. 59-1 ("Proposed Order").

## LEGAL STANDARD

To obtain the "extraordinary and drastic" remedy of a preliminary injunction, *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012), Plaintiffs must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The third and fourth factors "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The standard to postpone agency action pursuant to APA Section 705 "substantially overlap[s]" with the standard to obtain a preliminary injunction, *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 986 (9th Cir. 2025) (internal quotations and citations omitted), but presupposes the applicability of the APA to Plaintiffs' claims.

**ARGUMENT**

**I.    The States are Unlikely to Succeed on the Merits of their Claims**

**A.    Plaintiffs' Claims are Not Ripe.**

"The ripeness doctrine, [] aims to avoid premature and potentially unnecessary adjudication, [and] is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Ass'n of Irritated Residents v. U.S. Env't Prot. Agency*, 10 F.4th 937, 944 (9th Cir. 2021) (internal quotations and citations omitted).  Prudential ripeness focuses on "evaluat[ing] both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967)).  In the agency action context, Courts consider "whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1113 (9th Cir. 2025) (quoting *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 870 (9th Cir. 2022)).  Critical in this evaluation is whether the "the challenged action is final." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009) (quoting *US W. Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1118 (9th Cir. 1999)).

Here, Plaintiffs' claims are not ripe.  The FNA and its regulations outline a detailed administrative review process of USDA's decision to suspend or disallow funds.  *See* Background, Section I, *supra*.  That process is still in its early phases.  Critically for the factors the Court must evaluate, USDA's suspension or disallowance action is automatically stayed pending any appeal.  7 C.F.R. § 276.7(e).  As such, Plaintiffs face no hardship as the process plays out.

Further, as relevant to the second factor, judicial intervention at this stage would prematurely abridge the process.  Both the FNA and USDA's regulations affirm that Plaintiffs' claims, should they be unresolved in the administrative process, can be judicially reviewed.  *See* 7 U.S.C. § 2020(g); 7 C.F.R. § 276.7(j).  Meanwhile, as relevant to factors two and three, the regulations require USDA to work with the appellant states, *see* 7 C.F.R. § 276.4(d)(2)(i)(D), and provide opportunities for factual development, *see id.* § 276.7(g) (State permitted to submit

9

additional evidence); *id.* § 276.7(h) (providing hearing before a neutral third party).  The Appeals

Board also has independent authority to approve or deny a claim or adjust the claim award.  *Id.* §

276.7(i)(2).  In short, there is much for the administrative appeal in this matter to resolve, and

judicial review at this junction would circumvent that process.

Underscoring this determination is that agency action is not final under the APA until the

"aggrieved party has exhausted all administrative remedies expressly prescribed by statute or

agency rule."  *Darby v. Cisneros*, 509 U.S. 137, 146 (1993).  Plaintiffs have not exhausted their

administrative remedies.  As such, their claims are not ripe.

### B.  Plaintiffs are Unlikely to Establish that USDA's Data Request Violates the APA.

#### 1.  USDA's Data Request is Likely Not Arbitrary or Capricious.

Arbitrary and capricious review is highly deferential to the agency, and "a court is not to

substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State

Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Courts uphold agency action where the agency

"has considered the relevant factors and articulated a rational connection between the facts found

and the choice made."  *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105

(1983).  The ultimate question is whether the agency's action was reasonable.  *FCC v. Fox

Television Stations*, 556 U.S. 502, 514–15 (2009).

> *i.    USDA has explained its data gathering initiative, and there is no change to any
> longstanding policy.*

Plaintiffs first contend that USDA has abandoned a "long-standing policy and practice" of

relying solely on statistical samples.  *See* PI Mot. at 11–12.  But the APA requires only that

agencies provide a "reasoned explanation" for a change in policy or an "awareness that it is

changing position."  *Fox Television Stations*, 556 U.S. at 515.  There is no "heightened standard"

for such a decision and the agency is not required to justify its policy change by reasons more

substantial than those required to adopt a policy in the first instance.  *Id.* at 514.

Here, Plaintiffs have failed to establish that USDA had a policy in the first instance.  An

agency changes its position when it "acts inconsistently with an earlier position, performs a reversal

of its former views as to the proper course, or disavows prior inconsistent agency action as no

longer good law."  *Food & Drug Admin. v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 918

(2025) (internal quotations and citations omitted).  Plaintiffs have established none of these courses of action.  That USDA chose statistical sampling previously does not change that it has long had the statutory authority to request the data at issue.  Plaintiffs point to no definitive previous regulation or policy statement establishing a policy to only sample.

But even if such a policy existed, USDA has explained the reasons for conducting the data gathering initiative; shown awareness that it is gathering more information than previously; and considered the comments of those affected by the change.  *See, e.g.*, May 6 Letter at 1; SORN at 26,521; July 9 Letter.  Underscoring the reasonableness of USDA's goal of rooting out waste, fraud and abuse, initial evaluation of the data it has received from States that have complied has uncovered evidence of fraud, waste, and abuse that had previously gone undetected.  Corley Decl. ¶ 30.  This suffices under the APA.  *See Wages & White Lion Invs*, 145 S. Ct. at 918 ("the agency does not need to show that the reasons for the new policy are better than the reasons for the old one.  Nor must it provide a more detailed justification than what would suffice for a new policy created on a blank slate." (internal citations omitted)).

> ii.    *USDA has considered and accounted for alleged security risks, chilling effect on participants, and burdens on the States.*

Plaintiffs launch a three-part challenge to USDA's data gathering initiative, claiming that USDA has ignored important issues such as security risks, chilling effects on participants and the burden the effort will impose on states.  PI Mot. at 12–14.  But USDA has considered, and accounted for, each concern.

First, as to security risks, USDA has adopted policies and practices for storage, retention, and disposal of records held in the system in line with relevant regulations and standards.  SORN at 26,523.  The SORN discusses administrative and technical safeguards that protect the new system.  *Id.*  And USDA published a Privacy Impact Assessment, which discusses the ways in which USDA will secure the data held within the system and mitigate risks of data breach.  *See* FY2025 Privacy Impact Assessment at 5–6, 14–15, 18–20, 22–23, 27–28.  USDA received numerous comments from the public regarding safeguarding concerns and duly considered those concerns.  *See* Corley Decl. ¶ 22.  Plaintiffs, by contrast, point only to vague and speculative concerns regarding the possibility that bad actors not before this Court may try to hack into the new system of records.  *See*

1   PI Mot. at 12–13.  But these concerns are already addressed through USDA's adoption of technical

2   safeguards.  And, to the extent Plaintiffs second guess USDA's choice of the MoveIt platform, *id.* at

3   13, no platform is without its risk, including the current platform.  Plaintiffs' alternative preferences

4   do not establish that USDA entirely failed to consider this issue.

5          Next, Plaintiffs' contention that USDA failed to consider the alleged chilling effects on

6   potential SNAP applicants is without merit.  USDA has long had the statutory and regulatory

7   authority to gather this information.  And USDA considered the potential chilling effect on SNAP

8   participants.  USDA received numerous comments addressing this concern in various iterations,

9   including potential use for unlawful purposes, violations of privacy, and additional burdens on

10  SNAP households.  *See* Corley decl. ¶ 21.  USDA determined that these comments are unpersuasive

11  because the concerns are already addressed by the SORN including that USDA must abide by

12  federal such as the FNA and the Privacy Act."  Corley Decl. ¶ 22.

13         Plaintiffs also complain that USDA has not considered the additional burdens the data

14  gathering initiative will put on the States and territories.  PI Mot. at 13–14.  Contrary to Plaintiffs'

15  claims that it would take months to gather the information at issue, however, Plaintiffs concede that

16  States are already statutorily required to collect this information.  *See* PI Mot. at 4–5 (citing 7

17  C.F.R. § 273.2(b), (f)(1)(i), (v), (f)(1)); *see also* Compl. ¶ 65.  Thus, twenty-three States have

18  already complied with USDA's request by simply sending the information already in their

19  possession.  Corley Decl. ¶ 29.  Further, to the extent Plaintiffs need additional time, USDA has

20  consistently offered to confer with States throughout the process.  *See* May 6 Letter at 2; July 9

21  Letter at 1; July 23 Letter at 2; July 25 Letter at 1.  Both the advance notification and formal

22  warning letters also express USDA's willingness to work with States and accept evidence of actions

23  taken by the State to comply.  *See* Gillette Decl., Ex. G at 2 ("[a]s always, the USDA stands ready

24  to provide technical assistance to you so that California may come into compliance with this

25  requirement").

26         In addition, the administrative suspension and disallowance process, in which the States

27  have yet to engage, requires USDA to work with States to achieve compliance, *see* 7 C.F.R.

28  § 276.4(d)(2)(D), permits States to submit corrective action plans to resolve issues without resorting

to suspension and disallowance, *see id.* §§ 276.4(a), (b), (d), (e)(2), and affords the States a hearing by a neutral arbiter in the form of the Appeals Board to have any difficulties in complying with USDA's request heard, *id.* § 276.7(g), (h) (submitting additional information and hearing).

Finally, belying Plaintiffs' claim that USDA has not sufficiently considered this issue, USDA's Nonsubstantive Change Request estimated that it would take 20,410 annual burden hours for States Agencies and EBT Processors to comply with USDA's data gathering initiative over what was previously approved.  Nonsubstantive Change Request at 3.  As the Initial Approval estimated 142,800,634 burden hours, this increase represented only an insignificant .014 percent increase.  *Id.*

### iii.    Program integrity is a compelling interest.

Plaintiffs also claim that USDA has failed to provide a "'rational connection between the facts found and the choice made'" because USDA's goal of ensuring SNAP integrity is not supported by the "available facts."  PI Mot. at 14–15 (quoting *State Farm*, 463 U.S. at 43).  As they see it, the States do a good enough job ensuring eligibility, and the National Accuracy Clearinghouse ("NAC")—an interstate data exchange system, 7 U.S.C. § 2020(x)—suffices.

But ensuring program integrity is a compelling interest.  And, gathering SNAP household data pursuant to lawful authority and reviewing that data is a rational way to accomplish that goal.  Indeed, USDA has already identified instances of fraud, waste, and abuse pursuant to its initial reviews from complaint States.  Corley Decl. ¶ 30.  Further, Plaintiffs' preferred methods, State verification and an inter-state clearinghouse, do nothing to address the information silos that both the President and USDA have identified.  Finally, rather than brushing aside other mechanisms for accomplishing these goals, as Plaintiffs suggest, USDA's new system of records will provide a complementary tool to ensure that food assistance gets to those in need and is not abused through fraudulent claims or inadequate State oversight.  While Plaintiffs may prefer USDA to rely on State audit efforts, it is hardly arbitrary or capricious for USDA to improve its own capability to ensure taxpayer funds are being used properly.

### iv.    USDA has considered the comments it received

Plaintiffs claim that USDA has predetermined the outcome of the SORN comment process because the comment period for routine uses ended July 23.  PI Mot. at 15–16.  But this argument is

incorrect.  First, the comment period addressed only the SORN's routine uses.  SORN at 26,521.  In other words, USDA solicited comment on how USDA may share the information it gathered.  This has no effect on the process of gathering information in the first instance.  Further, as the SORN provides, the routine uses would go into effect July 23, 2024, "unless USDA determines they must be changed as a result of public comment."  *Id.*  Thus, that USDA committed to working efficiently in gathering the requested information while analyzing comments on the terms of the routine uses, is no reason to find that the result of the comments was "predetermined."  USDA in fact considered the comments it received.  Corley Decl. ¶ 22.  Indeed, USDA determined to amend Routine Use 8 based on the comments it received.  *Id.*  This alone defeats Plaintiffs claim.

### 2.  Plaintiffs are Unlikely to Establish that USDA's Gathering is Contrary to Law.

#### i.    *The SNAP Act authorizes the gathering at issue.*

Plaintiffs argue that USDA's data gathering initiative runs afoul of statutory limitations found within the FNA.  *See* PI Mot. at 17–19.  The FNA affirmatively requires States (1) to "keep such records as may be necessary to determine whether the program is being conducted in compliance" with the FNA and to provide "[a]ll records, and the entire information systems in which records are contained" to USDA for "inspection and audit[,]" 7 U.S.C. § 2020(a); and (2) to "disclos[e] [] such information to persons directly connected with the administration or enforcement of the provisions of [the FNA], regulations issued pursuant to this chapter, Federal assistance programs, or federally-assisted State programs," such as USDA, *id.* § 2020(e)(8)(A).  Accordingly, there is authority already authorizing the gathering of the relevant information from the States.  Plaintiffs' contrary arguments are unavailing.

First, Plaintiffs claim that USDA does not have the authority under Section 2020(a) because USDA has not sufficiently established the necessity of the data gathering initiative; "inspection and audit" does not mean giving "possession;" and the States and USDA lack a data and security protocols, as referenced in 7 U.S.C. § 2020(a)(3)(B).  PI Mot. at 17–18.  Taking these in turn, USDA has repeatedly explained the necessity and purpose of gathering this data.  *See* Argument, Sections I.B.1.i–ii, *supra*.  While Plaintiffs may prefer USDA to rely on State audit efforts, it is hardly contrary to the terms of Section 2020(a)(3) to request these records.  But Plaintiffs also

misread the statute.  The "necessary to determine" language modifies the records that the States

must keep in the first instance, pursuant to Section 2020(a)(3)(A), *not* the records that USDA may

inspect and audit, pursuant to Section 2020(a)(3)(B).  Instead, "[a]ll records" and indeed the "entire

information systems in which records are contained," must be made available to USDA.  7 U.S.C. §

2020(a)(3)(B).

Plaintiffs' arguments regarding "possession" of the records fairs no better.  The common

understanding of both "inspect" and "audit" involve an inspector's ability to actually review the

records in question.  *See Inspect*, Merriam-Webster, https://www.merriam-

webster.com/dictionary/inspect ("to view closely in critical appraisal : look over"); *Audit*, Merriam-

Webster, https://www.merriam-webster.com/dictionary/audit ("a formal examination of an

organization's or individual's accounts or financial situation").  In the digital age, the contention

that USDA needs to travel to each State to inspect the computer systems of each State Agency is

nonsensical.  No one would contend that the IRS could not ask taxpayers to submit audit records

electronically, and that instead the IRS needs to travel to the taxpayer.

Finally, it is true that Section 2020(a)(3)(B) refers to "data and security protocols agreed to

by the State agency and Secretary[,]" that the States and USDA have not yet put into place.  Should

the absence of such an agreement be determinative, USDA requests the opportunity to reach an

agreement through good faith negotiations.  To date, though, none of the plaintiff States has offered

to negotiate such an agreement as part of USDA's offers to work collaboratively with States.  And

the failure to reach such an agreement in good faith could itself be grounds for initiating an action

under Section 2020(g).

Second, Plaintiffs contend that "Congress has consistently acted to constrain USDA's ability

to amass and use SNAP data across multiple statutory enactments."  PI Mot. at 18.  The only

statutory provision identified in this section, however, is 7 U.S.C. § 2020(x)(2)(B)–(C).  That

section governs provision of information to the NAC, which is not here at issue.

Third, Plaintiffs claim that USDA has exceeded its authority to share information with law

enforcement authorities under the routine uses announced in the SORN.  PI Mot. at 19.  As noted

above, FNA requires States to safeguard information, but requires that the States disclose

information "to persons directly connected with the administration or enforcement of the provisions of this chapter, regulations issued pursuant to this chapter, Federal assistance programs, or federally-assisted State programs" so long as the information is used only for administration or enforcement of the program.  7 U.S.C. § 2020(e)(8)(A).  The SORN establishes two relevant instances in which USDA may share the information it gathers with outside authorities, Routine Use 8, SORN at 26,522, and Routine Use 11, *id.* at 26,523.  Neither is inconsistent with the FNA.

To determine whether a routine use is incompatible with its stated purpose, courts conduct a "dual inquiry into the purpose for the collection of the record in the specific case and the purpose of the disclosure."  *See* 5 U.S.C. § 552a(a)(7); *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 548–49 (3d Cir. 1989); *see also Swenson v. U.S. Postal Serv.*, 890 F.2d 1075, 1078 (9th Cir. 1989) ("The Third Circuit recently explained that compatibility requires more than mere relevance: 'There must be a more concrete relationship or similarity, some meaningful degree of convergence, between the disclosing agency's purpose in gathering the information and in its disclosure.'  We agree." (quoting *Britt*, 886 F.2d at 549)).

Plaintiffs also misconstrue the authorization of data sharing in 7 U.S.C. § 2020(e)(8)(A), contending that the paragraph limits disclosures to those involved in the "'administration or enforcement' of the SNAP program."  PI Mot. at 18 (quoting 7 U.S.C. § 2020(e)(8)(A)).  Plaintiffs' quotation omits additional critical language, which permits sharing to "persons directly connected with the administration or enforcement of. . . Federal assistance programs, or federally-assisted State programs[.]" 7 U.S.C. § 2020(e)(8)(A).

The statute therefore does not limit disclosure only to persons directly connected with the administration or enforcement of SNAP, as Plaintiffs have claimed.  Rather, by its plain terms, it also authorizes disclosure to any person directly connected with the administration of any Federal assistance program or federally assisted State programs.  Understood properly, therefore, there is a clear statutory authorization for Routine Use 11, which essentially restates the language in § 2020(e)(8)(A).  *See* SORN at 26,523.

Nor does Plaintiffs' reference to 7 C.F.R. § 272.1(c)(1) undermine this understanding.  Reflecting the terms of Section 2020(e)(8)(A), that regulation also permits USDA to disclose

information to "[p]ersons directly connected with the administration or enforcement of the provisions of the [FNA] or regulations, other *Federal assistance programs*, *federally-assisted State programs* . . ., or general assistance programs which are subject to the joint processing requirements[.]"  7 C.F.R. § 272.1(c)(1)(i) (emphasis added).  Subsections (vi) and (vii) address local, state, or federal law enforcement requests *to* USDA.  *See id.* § 272.1(c)(1)(vi), (vii).  But there is no indication in the regulation that these subsections were intended to be the exclusive situation in which evidence may be provided to law enforcement if, for example, another subsection, like Section 272.1(c)(1)(i), applied.

Moreover, even if the explicit statutory authorization were not enough, there is a "meaningful degree of convergence" between USDA's purpose in obtaining the information and the uses in Routine Use 11.  *Britt*, 886 F.2d at 549.  USDA's receipt of data is imperative, among other things, to "detect overpayments and fraud."  July 9 Letter.  Disclosing information to other Federal entities or instrumentalities to investigate fraud, waste, or abuse in Federal benefits programs is compatible with that purpose.

Similarly, there is no conflict between Routine Use 8 and the FNA.  Far from some new, expansive permission for disclosure, Routine Use 8 consists of standard language that already applies across multiple systems of records that USDA administers.  *See, e.g.*, Privacy Act; Proposed New System of Records, 88 Fed. Reg. 11,403, 11,405 (Feb. 23, 2023) (SORN for the National Accuracy Clearinghouse (NAC) System to Detect Duplicate Participation); Privacy Act of 1974; System of Records Revision, 86 Fed. Reg. 48,975, 48,977 (Sept. 1, 2021) (SORN for the Child and Adult Care Food Program).  But even putting its historical pedigree aside, Routine Use 8 is a common-sense application of the FNA's authorized use of SNAP data.

In addition to the statutory authorization to share data with "persons directly connected with the administration or enforcement" of any Federal assistance programs, or federally-assisted State programs, 7 U.S.C. § 2020(e)(8)(A), the FNA provides that, "all information obtained under this chapter from an applicant household shall be made available, upon request, to local, State or Federal law enforcement officials for the purpose of investigating an alleged violation of this chapter or any regulation issued under this chapter,"  7 U.S.C. § 2020(e)(8)(C).  Routine Use 8 faithfully interprets

those authorizations, allowing for the sharing of records to government authorities "[w]hen a record on its face, or in conjunction with other records, indicates a violation or potential violation of law." SORN at 26,522.

To the extent there are meaningful differences between the explicit statutory authorization in paragraph (e)(8)(C) and the text of Routine Use 8, the SORN explicitly limits the disclosure of data to circumstances consistent with the FNA. *Id.* And USDA is in the process of amending Routine Use 8 to eliminate potential disclosure to foreign governments. *See* Corley Decl ¶ 22. And, putting all that aside, it should be entirely uncontroversial that USDA would share information that, "on its face, or in conjunction with other records" indicates a potential violation of law. SORN at 26,522. That is consistent with USDA's purpose in gathering data from States to identify fraud, or abuse. *See* July 9 Letter. Accordingly, there is a "meaningful degree of convergence," and Routine Use 8 easily satisfies a compatibility analysis. *Britt*, 886 F.2d at 549–50.

Finally, to the extent that there are any questions regarding compatibility, Plaintiffs ignore the language in the SORN that disclosure is permitted under the routine uses only "to the extent such uses are authorized by, among other authorities, 7 U.S.C. 2020(a)(3) and (e)(8)[.]" SORN at 26,522. Thus, even if the routine uses could be interpreted to allow disclosures incompatible with the purposes for which the information was collected, it would be foreclosed by the clear limiting language in the SORN. Any assumption that disclosure in any specific instance would go beyond the limits established by the FNA is purely speculative and inconsistent with the plain language of the SORN.

### ii.    Plaintiffs are unlikely to show the gathering violates the PRA

Plaintiffs are unlikely to establish that USDA's data gathering initiative violates the PRA. *See* PI Mot. at 19–20. That claim faces two hurdles. First, the PRA does not create a private cause of action. *Alegent Health-Immanuel Med. Ctr. v. Sebelius*, 34 F. Supp. 3d 160, 170 (D.D.C. 2014). Seeking to circumvent this barrier, Plaintiffs attempt to shoehorn a PRA claim into the APA's causes of action. *See* Compl. ¶¶ 329–31. But APA review is unavailable "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Such is the situation here. The PRA impliedly forbids the relief sought because it provides for

18

review of the statute's requirements only when the issue is raised defensively in an enforcement

action. *See* 44 U.S.C. § 3512(b) ("The protection provided by this section may be raised in the form

of a complete defense, bar, or otherwise at any time during the agency administrative process or

judicial action applicable thereto."). For this reason, courts have routinely rejected attempts by

plaintiffs seeking judicial review outside the PRA's statutory scheme for alleged PRA violations

related to information collection. *See, e.g.*, *City of New Bedford v. Locke*, Civ. A. No. 10-10789,

2011 WL 2636863, at *9 (D. Mass. June 30, 2011), *aff'd sub nom.*, *Lovgren v. Locke*, 701 F.3d 5

(1st Cir. 2012); *Ohio Stands Up! v. U.S. Dep't of Health & Hum. Servs.*, 564 F. Supp. 3d 605, 613

(N.D. Ohio 2021), *aff'd*, No. 21-3995, 2022 WL 1576929 (6th Cir. May 19, 2022) (collecting

cases).

Reliance on the Ninth Circuit's decision in *Hyatt v. OMB*, 908 F.3d 1165 (9th Cir. 2018),

moreover, is unavailing. *Hyatt* addressed another provision in the statute, Section 3507, that bars

judicial review of "[t]he decision by [OMB] to approve or not act upon a collection of information

contained in an agency rule." *See id.* at 1170–71 (quoting 44 U.S.C. § 3507(d)(6)). And the court

was clear that the statute precludes judicial review—including actions brought through the APA—

where an OMB decision results in the issuance of an OMB control number. *See id.* at 1172. Here,

OMB has approved the relevant gathering of SNAP applicant data and issued a control number. *See*

Background, Section III, *supra*; Argument, Section III.B., *infra*. Thus, *Hyatt* confirms that judicial

review is precluded under the PRA, both considering § 3512(b), discussed above, and the bar to

review in § 3507(d)(6).[1]

---

[1] The D.C. Circuits' recent decision in *Steele v. United States*, supports *Hyatt*. 144 F.4th 316
(D.C. Cir. 2025). *Steele* examined a claim by two tax preparers that the IRS did not have statutory
authority under the Internal Revenue Code to require an application and fee to obtain or renew a
Preparer Tax Identification Number. The court determined that the plaintiffs' claim was not barred
by Section 3507(d)(6), and they could maintain an APA suit, because they challenged the agencies'
statutory authority, not compliance with the PRA. *Id.* at 321–24. As the court explained, "the PRA
does not authorize *what* information an agency may collect but rather governs the process
authorizing *how* any agency collects information that suits its objectives." *Id.* at 323. Because the
plaintiffs did not "question the validity of the Director's decision or allege defects in the PRA
process" their claim fell within the APA's cause of action. *Id.* Not so with Plaintiffs here, who
squarely challenge USDA's action on procedural grounds based on its decision to submit a
Nonsubstantive Change Request instead of a *de novo* PRA review. *See* PI Mot. at 19–20.

Second, even assuming Plaintiffs could maintain their PRA claim—which they cannot—Plaintiffs cannot establish that USDA violated the statute.  The PRA imposes a set of procedural requirements on agencies prior to sponsoring a new collection of information.  Specifically, an agency must provide 60-day and 30-day notices in the Federal Register seeking public comments on the collection and await approval from the OMB and a control number for the collection before collecting the information.  44 U.S.C. § 3506(c), (a).  Here, USDA complied with the relevant procedural requirements.

On September 12, 2023, USDA published a 60-day notice in connection with SNAP that stated that USDA would require the submission of "names, social security numbers, and date of births of all household members; addresses; and individual or household income information from households."  Agency Information Collection Activities: Supplemental Nutrition Assistance Program (SNAP) Forms: Applications, Periodic Reporting, and Notices, 88 Fed. Reg. 62,527 (Sept. 12, 2023).  It also noted that State Agencies would disclose "information obtained from SNAP application forms or contained in case files of participating SNAP households to certain persons," including *inter alia*, "those directly connected with: the administration of SNAP" and "the administration of other Federal or Federally assisted means-tested programs."  *Id.*  The 30-day notice, published on February 23, 2024, also described the information to be gathered and noted that "State Agencies must maintain records to ascertain whether the program is administered in compliance with Federal statutes and regulations . . . for a period of three years from the date of origin." Submission for OMB Review; Comment Request, 89 Fed. Reg. 13,679-02 (Feb. 23, 2024); *see also* USDA, Supporting Statement – Part A for OMB Control Number 0584-0064, https://perma.cc/U48S-DSRE (May 31, 2024) ("Information that State Agencies collect is generally not shared with any organization outside of the U.S. Department of Agriculture (USDA).").  The regulations cited by the 60- and 30-day notices include citations to the requirements on States at 7 C.F.R. Part 272, which make clear that "[e]ach State Agency shall keep such records and submit *such reports and other information* as required by FNS," 7 C.F.R. § 272.1(e) (emphasis added).  Thus, the public, including Plaintiffs, were on notice that the information being collected by States or their contractors in the SNAP applications was subject to disclosure to USDA.

1    Reflecting USDA's compliance with the procedural requirements of the PRA, USDA's

2   collection of information was approved and issued a control number on June 30, 2024, for a period

3   of three years.  *See* Initial Approval.  There is therefore no basis for Plaintiffs' claims that USDA

4   has failed to comply with the statute.  The 60- and 30-day notices described above already

5   anticipated collection of precisely the information at issue by State Agencies and provision of that

6   information to USDA.  That USDA now intends to collect more information than previously does

7   not create a new collection requiring new notice.[2]

8    Plaintiffs also take issue with USDA's Nonsubstantive Change Request approved by OMB

9   on July 1, 2025.  *See* PI Mot. at 20.  But that request was proper for the reasons described above—

10  *i.e.*, the submission of previously collected data to USDA is already contemplated by the 60- and

11  30-day notices.  Indeed, as OMB explained in its approval of the Change Request from USDA: "No

12  additional data collection or recordkeeping is sought through this change request.  Rather, the

13  change is limited to reporting these data elements to USDA."  Change Approval, ICR Summary of

14  the Burden.  As such, USDA properly fulfilled the requirements of the PRA through its initial

15  application in 2024 and modification through the Nonsubstantive Change Request.

16    *iii.   Plaintiffs are unlikely to prevail on their Computer Matching Act Claim*

17    Plaintiffs' "matching program" claim fails for multiple reasons.  First, they lack standing to

18  assert it, and must do so separately from their other claims, as standing is not dispensed in gross.

19  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  Plaintiffs' alleged harm is based on

20  potential loss of funds, not a theory of *parens patriae* standing.  *See* Compl. ¶¶ 245–94.  But

21  USDA's compliance with the Computer Matching Act is separate from its authority to gather data

22  under the FNA.  Plaintiffs suffer no injury caused by the alleged computer matching, as it is

23  undisputably not information regarding the States being matched).  Moreover, even if Plaintiffs had

24  standing to assert this claim, the Court should not address it as a prudential matter, because

25  Plaintiffs' alleged harm does not fall within the zone of interests of the Computer Matching Act.

26  The Privacy Act, of which the Computer Matching Act is a part, protects *individuals'* information,

27

28   [2] The creation of the new system of record does not turn the State Agencies' reporting into a new collection, *see* PI Mot. at 19, just as someone who "collects" baseball cards and then organizes them into a new storage box does not add to that collection.

21

1   not States. *Compare Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 771 F.

2   Supp. 3d 717, 794–95 (D. Md. 2025) ("the Privacy Act only protects information regarding

3   individuals[.]"), *appeal dismissed*, No. 25-1291, 2025 WL 1111245 (4th Cir. Apr. 1, 2025).

4        Even if this Court could, or should, address Plaintiffs' computer matching program claim,

5   Plaintiffs are unlikely to prevail on the merits.  In relevant part, Section 552a(a)(8) defines a

6   "matching program" as a comparison of "two or more automated systems of records" for the

7   purpose of "establishing or verifying the eligibility of, or continuing compliance with statutory and

8   regulatory requirements by, applicants for, recipients or beneficiaries of, . . . cash or in-kind

9   assistance payments under Federal benefits programs."  5 U.S.C. § 552a(a)(8).  Here, DHS has no

10   "matching program" in place.  For one, as explained in the Corley Declaration, the comparison of

11   data is not "automated."  Corley Decl. ¶¶ 31–35.  Moreover, USDA has shared data with DHS to

12   assist States with program integrity.  *Id*.  But it is the States' responsibility, not USDA's, to

13   "establish[] or verify[] eligibility" for SNAP benefits.  5 U.S.C.§ 552a(a)(8); Corley Decl. ¶ 34.

14   Section 552a(a)(o) therefore does not apply in these circumstances.

15       **C.  The States Are Unlikely to Succeed on their Ultra Vires Claim.**

16        Plaintiffs fail to establish they are likely to succeed on their *ultra vires* claim.  *See* PI Mot. at

17   21.  First, non-statutory *ultra vires* review is "unavailable if . . . a statutory review scheme provides

18   aggrieved persons 'with a meaningful and adequate opportunity for judicial review[.]'"  *Nuclear*

19   *Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) ("*NRC*") (quoting *Bd. of Governors, Fed. Rsrv.*

20   *Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)).  That Plaintiffs bring the same claims under the

21   APA demonstrates that *ultra vires* review is foreclosed.

22        Even if available, *ultra vires* review requires a plaintiff to satisfy among the most

23   demanding standards in the law.  An *ultra vires* claim is "essentially a Hail Mary pass—and in court

24   as in football, the attempt rarely succeeds."  *NRC*, 605 U.S. at 681–82.  Under an *ultra vires* theory,

25   "[t]he agency overstep must be 'plain on the record and on the face of the [statute].'"  *Fed. Express*

26   *Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022) (quoting *Oestereich v. Selective*

27   *Serv. Sys. Loc. Bd. No. 11, Cheyenne*, 393 U.S. 233, 238 n.7 (1968)) (second alteration supplied by

28   D.C. Circuit).  That overstep must amount to a "clear departure by the [agency] from its statutory

mandate" or be "blatantly lawless" agency action.  *Oestereich*, 393 U.S. at 238.  A plaintiff seeking to challenge agency action via a nonstatutory ultra vires action "must show more than the type of routine error in statutory interpretation or challenged findings of fact that would apply if Congress had allowed APA review."  *Fed. Express Corp.*, 39 F.4th at 765 (quotation marks omitted).  "In other words, *ultra vires* claimants must demonstrate that the agency has plainly and openly crossed a congressionally drawn line in the sand."  *Id.*

For all the reasons previously argued, USDA has not transgressed any legal bounds, let alone done so in such an egregious manner as to fulfill *ultra vires* review's stringent requirements.

## II.    The States Fail to Show Irreparable Harm

Plaintiffs claim they face irreparable harm if USDA suspends or disallows funding based on the States' noncompliance.  *See* PI Mot. at 21–24.  Several factors cut against this argument, first of which is Plaintiffs' own delay.  Plaintiffs originally filed suit on July 28, 2025.  *See* Compl.  At that time, USDA had already advised State Agencies several times of the deadline to transmit data and the potential consequences of noncompliance.  *See* May 6 Letter at 2; July 9 Letter; July 23 Letter at 2; July 25 Letter at 1.  Yet, Plaintiffs waited a full three weeks after filing suit, until August 18, 2025, to file their preliminary injunction motion.  Courts regularly consider delay in seeking an injunction as undermining the need for immediate relief.  *See Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1006 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 824 (2024); *Cal. Rifle & Pistol Ass'n, Inc. v. L.A. Cnty. Sheriff's Dep't*, 745 F. Supp. 3d 1037, 1069 (C.D. Cal. 2024).

Second, Plaintiffs still have an avenue to address their claims: an administrative appeal under 7 C.F.R. § 276.7.  USDA sent final warning letters to most noncompliant States on August 20, 2025 pursuant to 7 C.F.R. § 276.4(d)(2).  Corley Decl ¶¶ 49, 51.  States have 30 days, or until September 19, 2025, to comply.  7 C.F.R. § 276.4(e)(1).  States may then appeal any finding.  7 C.F.R. § 276.4(f).  The administrative appeal is considered state-by-state and includes a lengthy process of additional data submission, review by the Appeal Board, and a stay of USDA's suspension or disallowance action.  7 C.F.R. § 276.7(e).  Suspension or disallowance is simply not imminent.  Further, the Appeals Board has the authority to deny any suspension or disallowance, and to lower the amount of the suspension or disallowance "in such amounts and for such reasons as the Appeals Board or hearing official shall determine and declare."  *Id.* § 276.7(i)(2).  Therefore,

not only is it uncertain whether a suspension or disallowance will occur, it is also uncertain as to how each State will proceed through the appeal process, and, even if the suspension or disallowance were to occur, how much would be suspended or disallowed.  All this occurs before USDA can suspend or disallow any amount.

Finally, the result of suspension or disallowance proceedings is a monetary penalty.  Courts regularly find that "a party is not entitled to a preliminary injunction unless he or she can demonstrate more than simply damages of a pecuniary nature." *Regents of Univ. of Cal. v. Am. Broad. Cos., Inc.*, 747 F.2d 511, 519 (9th Cir. 1984); *see also L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980).  Put another way, "[i]rreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).  Here, should Plaintiffs succeed on the merits of their claim—which they cannot—the ultimate remedy would be award of the previously allotted funds.

## III.    The Balance of the Equities Favors Defendants

While Plaintiffs have failed to demonstrate they are irreparably harmed, the Government would be harmed by an injunction.  Plaintiffs' proposed injunction would limit the President's ability to effectuate the policies the American people elected him to pursue, including the President's ability to identify fraud, waste, and abuse in this critical program.

## IV.    Plaintiffs' Proposed Injunction is Impermissibly Broad

Plaintiffs seek an injunction not only on their own behalf, but also on behalf of the EBT Processors who separately hold information USDA seeks.  *See* Proposed Order at 2.  But EBT Processors are not parties to this case.  As the Supreme Court recently affirmed, "[t]he equitable tradition has long embraced the rule that courts generally 'may administer complete relief *between the parties.*'"  *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2557  (2025) (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)).

1

2   **V.    Plaintiffs Should Be Ordered to Post Substantial Security in Connection with
3          Any Preliminary Injunctive Relief and Any Preliminary Relief Should Be
          Stayed Pending Any Appeal**

4          To the extent the Court issues any injunctive relief, such relief be stayed pending the

5   disposition of any appeal that is authorized, or at a minimum, administratively stayed for a period of

6   seven days to allow the United States to seek an expedited stay from the Court of Appeals or

7   Supreme Court if an appeal is authorized.  For the reasons explained above, Defendants have, at a

8   minimum, satisfied the requirements for a stay of any injunction pending appeal.  *See Nken*, 556

9   U.S. at 434 (describing the standard for obtaining such a stay and noting the "substantial overlap"

10  between that standard and "the factors governing preliminary injunctions").

11         The Defendants also respectfully request that any injunctive relief be accompanied by a

12  bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary

13  injunction or a temporary restraining order only if the movant gives security in an amount that the

14  court considers proper to pay the costs and damages sustained by any party found to have been

15  wrongfully enjoined or restrained."

16                                    **CONCLUSION**

17         For the reasons outlined above, the Court should deny Plaintiffs' motion for a preliminary

18  injunction.

19

20                                          Respectfully submitted,

21                                          BRETT A. SHUMATE
                                           Assistant Attorney General
22                                          Civil Division

23                                          ELIZABETH J. SHAPIRO
                                           Deputy Branch Director
24                                          Civil Division, Federal Programs Branch

25

26                                          BENJAMIN S. KURLAND
                                           Trial Attorney
27                                          BRADLEY P. HUMPHREYS
                                           Senior Trial Counsel
28                                          United States Department of Justice

Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 598-7755
ben.kurland@usdoj.gov

*Counsel for Defendants*

DEFS.' OPP'N TO MOT. FOR PRELIM. INJ.