1  ROB BONTA
   Attorney General of California
2  PAUL STEIN
   Supervising Deputy Attorney General
3  ANDREW Z. EDELSTEIN
   ANNA RICH
4  EDWARD P. WOLFE
   MARIA F. BUXTON
5  ROBIN GOLDFADEN
   WILLIAM BELLAMY
6  SEBASTIAN BRADY
   Deputy Attorneys General
7  State Bar No. 330904
    455 Golden Gate Avenue, Suite 11000
8   San Francisco, CA 94102-7004
    Telephone:  (415) 510-3592
9   Fax:  (415) 703-5480
    E-mail:  Sebastian.Brady@doj.ca.gov
10 *Attorneys for Plaintiff State of California*

11 *Additional counsel listed on signature page*

12                IN THE UNITED STATES DISTRICT COURT

13            FOR THE NORTHERN DISTRICT OF CALIFORNIA

14                    SAN FRANCISCO DIVISION

15

16

17 | **STATE OF CALIFORNIA; STATE OF NEW YORK; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR** ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky; **STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF WASHINGTON; STATE OF WISCONSIN,** | Case No. **3:25-cv-06310-MMC**  **PLAINTIFF STATES' REPLY IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**  Date: September 16, 2025 Time: 10:00 a.m. Courtroom: 7 Judge: Maxine M. Chesney Trial Date: None set  Action Filed: July 28, 2025 |
|---|---|

                                    Plaintiffs,

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS,** in her official capacity as U.S. Secretary of Agriculture; **U.S. DEPARTMENT OF AGRICULTURE'S OFFICE OF INSPECTOR GENERAL,**

Defendants.

# TABLE OF CONTENTS

**Page**

Introduction .......................................................................................................................... 1

Argument .............................................................................................................................. 1

I.    USDA's demand is ripe for challenge and threatens Plaintiffs with
irreparable harm. ....................................................................................................... 1

II.    Plaintiffs are likely to succeed on the merits. .......................................................... 5

    A.    USDA's data demand is arbitrary and capricious. ...................................... 5

        1.    USDA failed to acknowledge or explain its policy change
and neglected to acknowledge or address reliance interests. .......... 5

        2.    USDA ignored basic problems with its new approach. ................. 7

        3.    There is no rational connection between the facts on the
ground and USDA's demand. ......................................................... 8

    B.    USDA's demand is contrary to law. ......................................................... 10

        1.    The demand violates the SNAP Act and regulations. .................. 10

        2.    USDA's demand violates the Paperwork Reduction Act. .......... 13

    C.    USDA's demand is ultra vires.................................................................. 14

III.    The balance of equities favors Plaintiffs............................................................... 14

IV.    Remaining Issues .................................................................................................. 15

Conclusion ........................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page**

CASES

*Acosta v. Loc. Union 26, UNITE HERE*
 895 F.3d 141 (1st Cir. 2018) .......................................................................................11

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*
 559 F.3d 1046 (9th Cir. 2009) .......................................................................................3

*Aracely, R. v. Nielsen*
 319 F. Supp. 3d 110 (D.D.C. 2018) ...............................................................................5

*Bass v. First Pac. Networks, Inc.*
 219 F.3d 1052 (9th Cir. 2000) .....................................................................................15

*California v. Norton*
 311 F.3d 1162 (9th Cir. 2002) .......................................................................................8

*Citizens for Better Forestry v. USDA*
 341 F.3d 961 (9th Cir. 2003) .........................................................................................4

*Darby v. Cisneros*
 509 U.S. 137 (1993) ........................................................................................................4

*DHS v. Regents of the Univ. of Cal.*
 591 U.S. 1 (2020) ...........................................................................................................7

*Estes v. U.S. Dep't of the Treasury*
 219 F. Supp. 3d 17 (D.D.C. 2016) ................................................................................5

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*
 561 U.S. 477 (2010) ........................................................................................................3

*Greater Birmingham Ministries v. Sec'y of State for Alabama*
 105 F.4th 1324 (11th Cir. 2024) ..................................................................................11

*Hyatt v. OMB*
 908 F.3d 1165 (9th Cir. 2018) ...............................................................................2, 3, 13

*Imm. Defs. L. Ctr. v. Noem*
 145 F.4th 972 (9th Cir. 2025) .......................................................................................14

*Johnson v. Couturier*
 572 F.3d 1067 (9th Cir. 2009) .....................................................................................15

*League of California Cities v. FCC*
 118 F.4th 995 (9th Cir. 2024) .........................................................................................8

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*
    463 U.S. 29 (1983) ...................................................................................................8

*NFIB v. Sebelius*
    567 U.S. 519 (2012) .................................................................................................9

*Organized Vill. of Kake v. USDA*
    795 F.3d 956 (9th Cir. 2015) ...................................................................................6

*Orr v. Trump*
    778 F. Supp. 3d 394 (D. Mass. 2025) ....................................................................13

*Pallek v. Rollins*
    No. 1:25-cv-1650 (D.D.C. July 23, 2025) .......................................................5, 7, 8

*Pharm. Soc'y of State of N.Y., Inc. v. N.Y. State Dep't of Soc. Servs.*
    50 F.3d 1168 (2nd Cir. 1995) .................................................................................15

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*
    128 F.4th 1089 (9th Cir. 2025) ............................................................................2, 3

*S.F. Herring Ass'n v. Dep't of the Interior*
    946 F.3d 564 (9th Cir. 2019) ...............................................................................3, 4

*S.F. Unified Sch. Dist. v. AmeriCorps*
    2025 WL 974298 (N.D. Cal. Mar. 31, 2025) ..........................................................3

*Staacke v. U.S. Sec'y of Lab.*
    841 F.2d 278 (9th Cir. 1988) .................................................................................14

*Steele v. United States*
    144 F.4th 316 (D.C. Cir. 2025) ..............................................................................13

*Tax Analysts v. U.S. Dep't of Just.*
    845 F.2d 1060 (D.C. Cir. 1988) .............................................................................12

*Trump v. CASA, Inc.*
    145 S. Ct. 2540 (2025) ...........................................................................................15

*U.S. WeChat Users All. v. Trump*
    488 F. Supp. 3d 912 (N.D. Cal. 2020) ..............................................................6, 15

*Y.Y.G.M. SA v. Redbubble, Inc.*
    75 F.4th 995 (9th Cir. 2023).....................................................................................4

1

**TABLE OF AUTHORITIES**
(continued)

2
**Page**

3   **STATUTES**

4   United States Code, Title 5

5   § 705 ..............................................................................................................15

6   United States Code, Title 7

    § 2016a .............................................................................................................8
7   § 2020(x)(2)(A) .................................................................................................9
    § 2020(x)(2)(B) ...............................................................................................11
8   § 2020(x)(2)(C)(i) ...........................................................................................11
    § 2020(x)(2)(C)(iii) .........................................................................................11
9   § 2020(x)(2)(C)(iv) .........................................................................................11
    § 2020(a)(1) ......................................................................................................8
10  § 2020(a)(3) .....................................................................................................12
    § 2020(a)(3)(B) .........................................................................................10, 12
11  § 2020(a)(3)(B)(i) ...........................................................................................11
    § 2020(e)(8) .....................................................................................................12
12  § 2020(e)(8)(A) ...............................................................................................12
    § 2025(c) ...........................................................................................................8
13

14  United States Code, Title 44

15  § 3502(3)(A) ....................................................................................................13
    § 3506(c)(2)(A) ................................................................................................13
16  § 3512 ...............................................................................................................13

17  Paperwork Reduction Act (PRA) ...........................................................13, 14

18  SNAP Act ......................................................................................................9, 10

19  **OTHER AUTHORITIES**

20  Code of Federal Regulations, Title 5

21  § 1320.3(c) .......................................................................................................13

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES
### (continued)

**Page**

Code of Federal Regulations, Title 7
  § 272.2(c)(1)...................................................................................................12
  § 272.11.............................................................................................................9
  § 272.18.............................................................................................................9
  § 275.10–.14.......................................................................................................8
  § 275.10(a).........................................................................................................8
  § 275.10(b)(1).....................................................................................................7
  § 275.11(b).........................................................................................................7
  § 276.4(c)...........................................................................................................9
  § 276.7(j)............................................................................................................5
  § 277.16.............................................................................................................9
  § 277.16(b)(1).....................................................................................................9

Federal Register, Volume 87 59,633, 59,638 (Oct. 3, 2022) .......................................6, 9

*SNAP National Accuracy Clearinghouse*, USDA, https://www.fns.usda.gov/snap/nac (updated July 29, 2025)...........................................................................................................11

*SNAP Quality Control*, USDA (updated June 30, 2025), https://fns.usda.gov/snap/qc...................8

**INTRODUCTION**

For the first time ever, USDA has demanded that States turn over reams of private data on SNAP applicants and recipients. This sharply departs from USDA's prior policy and practice, yet USDA did not acknowledge this departure, much less explain it. USDA has also failed to address the substantial reliance interests it seeks to upend or the broader set of harms its new approach engenders. Its defense here largely boils down to a few documents created after it had made its decision, and its purported consideration of public comments it sought on a different aspect of its plan—again, after it had made its decision. Any of these failures alone would make the demand arbitrary and capricious; together, they make that conclusion inescapable. The demand also exceeds USDA's statutory authority in several ways—most blatantly because, as USDA concedes, Plaintiffs and USDA have not agreed to a data and security protocol as required by law.

USDA now seeks to bludgeon Plaintiffs into compliance before this Court can grant relief. The day after Plaintiffs filed this motion, USDA issued notices threatening to disallow billions of dollars in SNAP administrative funding from Plaintiffs—amounts that actually exceed the total federal SNAP administrative funding many Plaintiffs receive. Losing this funding would cripple Plaintiffs' ability to administer SNAP. Although USDA argues this motion is premature because an administrative appeal would automatically stay any disallowance, it has refused to agree to toll the effective date of any such disallowance—meaning it is claiming the right to withhold billions of dollars going back to September 19. In other words, USDA is forcing Plaintiffs to bet the farm if they wish to resist its lawless demands. This case is ripe for the Court's intervention. Without it, Plaintiffs—and their people—will be irreparably harmed.

**ARGUMENT**

**I.     USDA'S DEMAND IS RIPE FOR CHALLENGE AND THREATENS PLAINTIFFS WITH IRREPARABLE HARM.**

USDA's unprecedented demand for millions upon millions of SNAP records containing sensitive personally identifiable information (PII)—including social security numbers, dates of birth, home addresses, and much more—has remained fundamentally unchanged since it was first issued in May. What has changed is that, shortly after Plaintiffs filed this motion, USDA fired off

1

a batch of letters purporting to be formal warnings of noncompliance threatening to disallow billions of dollars in SNAP administrative funding if Plaintiffs fail to capitulate to this first-time-ever demand by September 19. *See* Brady Decl. Exs. A–P, ECF No. 67-1.[1] For many Plaintiffs, USDA is threatening to disallow more funds than Plaintiffs actually receive in federal SNAP administrative funding reimbursements, a coercive move that has dramatically increased the stakes for this motion. *See* 2nd Brady Decl. Ex. C. To put it mildly, losing this money would "'cause hardship to the plaintiffs.'" *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1113 (9th Cir. 2025). Indeed, it would irreparably harm them. S*ee* Pfs.' Mot. for Stay or Prelim. Inj. (Mot.) at 21–24, ECF No. 59.[2]

In its ripeness and irreparable harm arguments, USDA minimizes this looming harm by referencing the regulation staying disallowances during administrative appeals of disallowance decisions. Defs. Opp'n to Pfs.' Mot. (Opp'n) at 9, 23–24, ECF No. 72. But USDA has taken the position that this stay would not change or toll the final noncompliance date, effectively claiming the right to, after the administrative appeal, disallow funds not just prospectively, but going all the way back to the final noncompliance date—that is, as early as September 19, 2025—if Plaintiffs refuse to comply with the data demand by that date. Brady Decl. ¶¶ 9–10 & Ex. Q, ECF No. 67-1. Plaintiffs thus face an impossible choice: they can either (a) capitulate to the demand, invest the substantial resources necessary to respond, and turn over PII on millions of SNAP participants despite the demand's illegality, the attendant data security risks, and the fact that doing so will chill participation in SNAP, *see generally* Mot. at 23–24; or (b) refuse to comply and risk losing reimbursement for potentially all of their administrative costs not only going forward from a decision rejecting their appeal, but going all the way back to September 19.

This is precisely the situation where the Ninth Circuit has held challenges to data demands to be justiciable. In *Hyatt v. OMB*, the Ninth Circuit held that a plaintiff challenging an information collection requirement "'need not assume'" substantial "'risks [by withholding the

---

[1] USDA, for example, is threatening to disallow $338,326,748.10 from California, $275,375,223.87 from New York, and $133,800,507.01 from Illinois *each quarter*. *Id.* Exs. C & E; Ladov Decl. Ex. A.

[2] *See also* Campbell Decl. DC ¶¶ 15, 17–19, 25.

1   information] while waiting for [the agency] to drop the hammer in order to have [his] day in

2   court.'" 908 F.3d 1165, 1173 (9th Cir. 2018) (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co.*,

3   578 U.S. 590, 600 (2016)); *see also S.F. Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 582

4   (9th Cir. 2019) (plaintiffs need not "call the [agency's] bluff and engage in what the government

5   regards as unlawful behavior" to obtain review). Just so here.

6       This is also precisely where courts have found irreparable harm justifying intervention. As

7   in *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, "the Government proposes

8   that [Plaintiffs] incur a sanction (such as a sizable fine) by ignoring [USDA] requests for

9   documents," and, if USDA rules in its own favor in Plaintiffs' administrative appeals—a good

10  bet—then "the [Plaintiffs] will win access to a [district court]." 561 U.S. 477, 490 (2010). Courts

11  "normally do not require plaintiffs to 'bet the farm . . . by taking the violative action' before

12  'testing the validity of the [agency action],'" as this is not "a 'meaningful' avenue of relief." *Id.* at

13  490–91. Yet that is precisely what USDA insists Plaintiffs must do—and—and putting Plaintiffs

14  "to a kind of Hobson's choice" in this manner is irreparable harm. *Am. Trucking Ass'ns, Inc. v.*

15  *City of Los Angeles*, 559 F.3d 1046, 1057 (9th Cir. 2009); *see, e.g.*, *S.F. Unified Sch. Dist. v.*

16  *AmeriCorps*, 2025 WL 974298, at *4 (N.D. Cal. Mar. 31, 2025) ("having to decide between two

17  losing options constitutes irreparable injury because 'very real penalty attaches to [Plaintiffs]

18  regardless of how they proceed'"). this is irreparable harm. *See Am. Trucking Ass'ns, Inc. v. City*

19  *of Los Angeles*, 559 F.3d 1046, 1057 (9th Cir. 2009) (irreparable harm where plaintiffs "are being

20  put to a kind of Hobson's choice").[3]

21      None of USDA's other arguments on ripeness or irreparable harm succeed, either. On

22  ripeness, USDA has "render[ed] its conduct ready for judicial review" because, by making its

23  unyielding data demand, it has "taken a definitive position." *Prutehi Litekyan: Save Ritidian*, 128

24  F.4th at 1113. Its demand has remained consistent since it was first issued, and it is already

25  collecting data pursuant to it. Corley Decl. ¶ 29, ECF No. 72-1. USDA also suggests that

26  _____

27      [3] This also undermines USDA's claim that there is no irreparable harm because
    "previously allotted funds" could just be re-awarded to Plaintiffs if they succeed on the merits of
    their claims. Opp'n at 24. Further, this argument ignores the extensive evidence of irreparable

28  harm that Plaintiffs would face before such relief. Mot. at 21–24.

3

1   Plaintiffs' requested relief would disrupt the process for administratively appealing a

2   disallowance determination. Opp'n at 9–10. But Plaintiffs are not challenging a particular

3   disallowance determination here: they are challenging the underlying data demand itself. And

4   because USDA's decision to make that demand is "at an administrative resting place," "[j]udicial

5   intervention would not interfere with further administrative action" as to that demand. *Citizens for*

6   *Better Forestry v. USDA*, 341 F.3d 961, 977 (9th Cir. 2003). Nor is it clear how "the opportunities

7   for factual development" presented in administrative appeals of individual disallowance

8   decisions, Opp'n at 9, could bear on Plaintiffs' challenge to the underlying demand.

9       USDA finally suggests on ripeness that Plaintiffs have failed to exhaust their administrative

10  remedies. Opp'n at 10. But "where the APA applies, an appeal to 'superior agency authority' is a

11  prerequisite to judicial review *only* when expressly required by statute . . . Courts are not free to

12  impose an exhaustion requirement as a rule of judicial administration where the agency action has

13  already become 'final.'" *Darby v. Cisneros*, 509 U.S. 137, 154 (1993). Because USDA's data

14  demand is final agency action under the APA, Mot. at 9–10—USDA does not even clearly argue

15  otherwise—there is no exhaustion requirement. In any event, "'parties need not await

16  enforcement proceedings before challenging final agency action where such proceedings carry the

17  risk of 'serious criminal and civil penalties.'" *S.F. Herring Ass'n*, 946 F.3d at 582.

18      On irreparable harm, USDA claims Plaintiffs waited too long before filing this motion,

19  Opp'n at 23, but "[t]he significance of the delay depends on context." *Y.Y.G.M. SA v. Redbubble,*

20  *Inc.*, 75 F.4th 995, 1006 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 824 (2024). Plaintiffs filed this

21  motion just days after USDA escalated the parties' dispute on August 12 by demanding full

22  compliance by August 15 (and then August 19) and refused Plaintiffs' request to pause the

23  demand pending litigation. Mot. at 7. "'[T]ardiness is not particularly probative in the context of

24  ongoing, worsening injuries.'" *Y.Y.G.M. SA*, 75 F.4th at 1006.

25      Moreover, going through the administrative process would further prejudice Plaintiffs.

26  Apparently, USDA envisions twenty-some administrative appeals (in front of itself) raising

27  various individual compliance issues. Opp'n at 23–24. And, after that appeal, USDA envisions

28  twenty-some district court actions for *de novo* review in as many different courts and several

circuits. *See* 7 C.F.R. § 276.7(j). This stands to create a nightmare of administrative appeals and separate district court actions, all proceeding while this Court concurrently adjudicates the legality of USDA's underlying demand. It makes no sense, as a matter of judicial economy or conservation of either side's resources, to force Plaintiffs to go through this administrative process *before* this Court has even had a chance to rule on Plaintiffs' request to stay USDA's demand in the first instance.

**II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.**

    **A.    USDA's data demand is arbitrary and capricious.**

        **1.    USDA failed to acknowledge or explain its policy change and neglected to acknowledge or address reliance interests.**

As Plaintiffs made clear, USDA's data demand departed from longstanding agency policy and practice to not collect and centralize large amounts of SNAP PII. Mot. at 11–12. USDA claims there was no such policy and practice in the first place, but that is flatly contradicted by Plaintiffs' evidence. *See id.* (describing this evidence). Indeed, in parallel litigation, USDA has already acknowledged that its demand for bulk PII represents a major shift, telling a sister court that its "plan is to continue oversight of the SNAP program as USDA has always done, except rather than on a sampling basis or through smaller audits[,] to really kick the tires on the data overall." 2nd Brady Decl. Ex. A (Oral Arg. Transcript, *Pallek v. Rollins*, No. 1:25-cv-1650 (D.D.C. July 23, 2025)). Whether USDA "has long had the statutory authority" to demand PII on such a massive scale, Opp'n at 11—a point Plaintiffs contest, *see infra*—does not change the fact that the previous policy of *not* demanding and compiling this data existed or that the current demand is a significant change from that policy. *See, e.g.*, Piazza Decl. ¶¶ 5–12, 20, ECF No. 59-3; Gillette Decl. CA ¶¶ 18–26, 70, ECF No. 59-7. Nor is it relevant to the inquiry that this policy was not promulgated in a formal agency rule, as USDA contends (without citation). Opp'n at 11; *see, e.g.*, *Estes v. U.S. Dep't of the Treasury*, 219 F. Supp. 3d 17, 28–29 (D.D.C. 2016) (relying on variety of documents, including litigation filings, in assessing whether agency had a policy); *cf. Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138–39 (D.D.C. 2018) (holding that "agency action need not be in writing to be judicially reviewable as a final action" and "[a] contrary rule

'would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing'").

Because it has abandoned its prior policy, USDA was required to "display[] 'awareness that it [wa]s changing position.'" *Organized Vill. of Kake v. USDA*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009)). But neither the system of record notice (SORN) nor the letters USDA cites, Opp'n at 11, contain a word of acknowledgment of the previous policy or that the new demand departed from this policy. This alone makes the data demand arbitrary and capricious.

USDA was also required to "provide[] 'good reasons' for the new policy, which, if the 'new policy rests upon factual findings that contradict those which underlay its prior policy,' must include 'a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy.'" *Organized Vill. of Kake*, 795 F.3d at 966. The fact that USDA's demand is purportedly aimed at "rooting out waste, fraud and abuse," and "ensuring program integrity," Opp'n at 11, 13, does not provide an explanation for this change in policy. USDA and Plaintiffs have always shared these aims and in fact have jointly built, among many other systems, the National Accuracy Clearinghouse (NAC) and the Performance Reporting System for just these purposes. *See* Mot. at 5, 8, 14–15. In building these systems, however, USDA previously concluded that it did not need years' worth of PII for *all* SNAP recipients and applicants to root out waste, fraud and abuse. In implementing the NAC, for example, USDA concluded that only "an individual's name, Social Security number, and date of birth" were necessary for this effort.[4] 87 Fed. Reg. 59,633, 59,638 (Oct. 3, 2022) (NAC interim final rule). USDA further concluded that, because of the privacy risks inherent in centralizing such a huge amount of PII, it could effectively implement a system whereby *States*, as opposed to the federal government, hold the identified data and USDA only receives de-identified data. *Id.* ("State agencies will use a privacy-preserving record linkage (PPRL) process to convert these data elements to a secure cryptographic hash before sharing the information to the NAC. The PPRL

---

[4] Compare this to USDA's demand here for essentially *all* SNAP applicant and recipient data. *See* Gillette Decl. CA Ex. D, ECF No. 59-7.

1    process allows the NAC to accurately match individuals, while preventing the collection and

2    storage of the names, Social Security numbers, and dates of birth in the NAC system.").

3    Similarly, USDA concluded in creating its quality control review process—which aims to provide

4    "[a] systematic method of measuring the validity of the SNAP caseload," 7 C.F.R.

5    § 275.10(b)(1)—that it need not receive more than one or two thousand cases from each State

6    annually. *Id.* § 275.11(b). In its data demand here, USDA did not even attempt to explain why it

7    was disregarding these conclusions underlying its previous policy.

8         Finally, an agency is "required to assess whether there [a]re reliance interests, determine

9    whether they [a]re significant, and weigh any such interests against competing policy concerns."

10   *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020). USDA's prior policy did engender

11   such reliance interests. Mot. at 12. USDA makes no mention of these interests in its opposition—

12   which is understandable, since it did not consider them before charging ahead with its unlawful

13   demand in the first place. That, too, makes the demand arbitrary and capricious.

### 2.    USDA ignored basic problems with its new approach.

15        As Plaintiffs have explained, USDA's data demand risks chilling participation in SNAP.

16   Mot. at 13, 23–24. USDA insists it considered this risk, but its arguments are disingenuous: while

17   it says it reviewed comments on its SORN about this issue, elsewhere in its brief USDA insists

18   that it only "solicited comment on how USDA may share the information it gathered," which "has

19   no effect on the process of gathering information in the first instance." Opp'n at 14; *see* Buxton

20   Decl. Ex. H at 26,521, ECF No. 59-2 (confirming this). Additionally, USDA never requested any

21   public comment until after it decided to demand this data (and after private parties had sued to

22   block this demand, *see* Compl., *Pallek v. Rollins*, No. 1:25-cv-1650 (ECF No. 1)).

23        As to the significant data security risks that accompany USDA's new policy, USDA claims

24   it considered these risks by pointing to the Privacy Impact Assessment it published. Opp'n at 11.

25   But this was published on July 23, 2025—after it had already demanded the relevant data twice.

26   Opp'n at 7; *see* May 6 Letter, Gillette Decl. Ex. B, ECF No. 59-7; July 9 Letter, Gillette Decl. Ex.

27   C, ECF No. 59-7. This "[p]ost hoc" evidence of consideration "does not provide assurance that

28   the agency actually considered" the relevant "effects of its action *before* the decision was made."

1    *California v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002) (emphasis added); *see League of*

2    *California Cities v. FCC*, 118 F.4th 995, 1013–14 (9th Cir. 2024) (per curiam) ("'It is a

3    foundational principle of administrative law that judicial review of agency action is limited to the

4    grounds that the agency invoked when it took the action.'").

5         Likewise, to the extent USDA asserts that it considered the burdens of its new demand, it

6    points only to its Nonsubstantive Change Request. Opp'n at 13. But that was issued in June,

7    Opp'n at 6, *after* USDA made its decision to demand this information. *See* May 6 Letter. Again,

8    such post hoc consideration "does not provide assurance that the agency actually considered" the

9    relevant "effects of its action before the decision was made." *Norton*, 311 F.3d at 1176.[5]

10         **3.    There is no rational connection between the facts on the ground and**
11              **USDA's demand.**

12         USDA has claimed its data demand—the kind of demand USDA has never once made

13    before in its history and in fact had a de facto policy against—is "to ensure Program integrity."

14    May 6 Letter. What precisely this means has varied over time, but none of its offerings provide a

15    "'rational connection'" with its demand here. *Motor Vehicle Mfrs. Assn. of United States, Inc. v.*

16    *State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). First it was "verifying the

17    eligibility of benefit recipients." May 6 Letter. Never mind that States are by statute assigned this

18    role. *See* 7 U.S.C. § 2020(a)(1). Then it was "to detect overpayments and fraud." July 9 Letter.

19    Never mind that Congress expressly required USDA to promulgate regulations requiring States to

20    take anti-fraud measures, *see* 7 U.S.C. § 2016a, or that Congress and USDA already have

21    mechanisms for detecting overpayments, *see* 7 U.S.C. § 2025(c); 7 C.F.R. § 275.10–.14

22    (providing for "Quality Control Reviews"); *see also id.* § 275.10(a) ("Reviews shall be conducted

23    on active cases to determine if households are eligible and receiving the correct allotment of

24    SNAP benefits."). And never mind that USDA claims it already has "one of the most rigorous

25    quality control systems in the federal government." *SNAP Quality Control*, USDA (updated June

26    ───────────────
    [5] USDA paused its demand after being sued for not following necessary procedures. *See*
27    Corley Decl. ¶¶ 13–14, *Pallek v. Rollins*, No. 1:25-cv-1650 (D.D.C. May 30, 2025) (ECF No. 11-
    1). But USDA made clear in this related litigation that this pause was just to allow USDA time to
28    "complete[] procedural steps to ensure that data received would be appropriately safeguarded and
    to satisfy all necessary legal requirements"—not to reconsider the data demand itself. *Id.* ¶ 13.

1    30, 2025), https://fns.usda.gov/snap/qc.

2         At other times, USDA's stated purpose was "identifying and eliminating duplicate

3    enrollments." Buxton Decl. H at 26,521. Never mind that Congress and USDA have established a

4    program "to prevent multiple issuances of [SNAP] benefits to an individual by more than 1 State

5    agency simultaneously." 7 U.S.C. § 2020(x)(2)(A) (establishing NAC); *see* 7 C.F.R. § 272.18.

6    And never mind that USDA previously found that "the rate of duplicate participation is low . . .

7    and that use of the NAC can effectively reduce duplicate participation." 87 Fed. Reg. 59,633,

8    59,636. USDA is apparently now checking States' data against the Department of Homeland

9    Security's SAVE database. Corley Decl. ¶ 31. Never mind that States are already required to run

10   a check against the SAVE database. 7 C.F.R. § 272.11. Finally, USDA repeatedly justified its

11   demand as implementing the Information Silos Executive Order. May 6 Letter; July 9 Letter;

12   Opp'n at 5, 13. Never mind that the Executive Order said nothing about SNAP specifically and

13   extended far beyond SNAP, sweeping in programs with vastly different statutory and regulatory

14   schemes governing data protection and federal agency access rights.

15        It gets worse, though. Frustrated by Plaintiffs' unwillingness to comply with its lawless

16   demand, USDA now threatens to withhold—based on a calculation bearing no resemblance to the

17   legally required process for "disallow[ing] costs . . . determined by [USDA] to be

18   nonreimbursable," 7 C.F.R. § 277.16(b)(1); *see* 7 C.F.R. § 276.4(c) (incorporating § 277.16)—the

19   precise federal SNAP administrative funding that enables States to conduct the functions that

20   maintain SNAP's program integrity. And not just some of it. As noted, for several States, USDA

21   is threatening to withhold amounts that far exceed what they actually receive each year in SNAP

22   administrative funding. *See supra* at 2 & n.1. Without this funding, the administration of SNAP—

23   SNAP program integrity—will be demonstrably worse. *See* Mot. at 22–23.[6]

24

25

26         [6] Plaintiffs have not relied on their Spending Clause claim to support this motion, but
     these outrageous disallowance threats (issued after the motion was filed) certainly constitute the
27   "gun to the head" warned against by the Supreme Court. *NFIB v. Sebelius*, 567 U.S. 519, 581–82
     (2012) (threatened loss of federal funding unconstitutional when it affords States "no real option
28   but to acquiesce").

                                                      9

**B.    USDA's demand is contrary to law.**

**1.    The demand violates the SNAP Act and regulations.**

USDA's data demand is contrary to law because it exceeds USDA's authority under the SNAP Act and regulations, and because USDA has granted itself permission to disclose the States' data in ways that conflict with existing restrictions on sharing SNAP applicant data.

USDA's demand conflicts with the express limitations set by Congress on the collection and use of state SNAP data. Mot. at 16–19. USDA's arguments to the contrary fail out of the gate because it acknowledges that there is no data and security protocol in place, Opp'n at 15, and any permissible data sharing between State agencies and USDA must be "subject to data and security protocols agreed to by the State agency and Secretary." 7 U.S.C. § 2020(a)(3)(B). That, by itself, demonstrates the demand is unlawful, and USDA offers no reason why a stay or preliminary injunction should not issue on that basis alone. First, it is simply not true that no State has offered to negotiate such a data protocol. *See* Opp'n at 15. When Plaintiff State Colorado expressly offered to negotiate such a protocol multiple times, USDA ignored it. 2nd McClelland Decl. CO ¶¶ 9–16; *see also* McClelland Decl. CO ¶ 19, ECF No. 59-8.[7] Second, where USDA is making the (unprecedented) demand and where Plaintiffs contest the demand on other grounds, the onus to reach a protocol is on USDA. USDA cannot issue a "take it or leave it" demand and then threaten to withhold the entire federal share of SNAP administrative funding (and more) without even proposing a data and security protocol. Third, USDA weakly suggests that if the Court finds this compliance failure to be "determinative," it should be given time to negotiate a data use and security protocol "in good faith"; of course, it *is* determinative, because it renders the demand contrary to law, and the demand must be stayed or enjoined while any negotiation takes place to prevent obvious, irreparable harm to Plaintiffs.

USDA's remaining arguments on Plaintiffs' "contrary to law" claim under the APA are similarly unavailing. As explained in the motion, Congress did not authorize—and in fact prohibited—the exact type of project that USDA is engaged in here: demanding that States turn

---

[7] Numerous other states responded to USDA's demands for this data by highlighting this statutory requirement as standard practice. *See, e.g.*, Ladov Decl. ¶ 7 & Ex. B.

1    over entire data systems (including the PII of SNAP participants) so that the federal government

2    may hold that data indefinitely without any agreed-upon protections in place.

3        USDA insists that its proposed data collection is needed to detect SNAP beneficiaries'

4    "duplicate participation (where an individual is receiving more than the one benefit to which they

5    may be entitled)." Corley Decl. ¶ 30; *see* Opp'n at 6, 13. But Congress already spoke directly on

6    the use of State data to detect duplicate benefits when it created the NAC.[8] Critically, Congress

7    *expressly prohibited the type of data collection sought by USDA here* when it created the NAC.

8    Congress instead directed that USDA "shall require that State agencies make available to the

9    [NAC] *only such information as is necessary*" to prevent duplicate SNAP benefits. 7 U.S.C.

10   § 2020(x)(2)(B) (emphasis added). Furthermore, this data "shall only be used for [that] purpose";

11   "shall not be retained for longer than is necessary to accomplish [that] purpose"; and "shall be

12   used in a manner that protects the identity and location of a vulnerable individual (including a

13   victim of domestic violence) that is an applicant for, or recipient of" SNAP benefits. *Id.*

14   § 2020(x)(2)(C)(i), (iii), (iv). USDA's opposition makes clear that it seeks data for the same

15   purpose served by the NAC but without complying with any of these statutory requirements.[9]

16       USDA further argues the SNAP statute gives it authority to closely examine State

17   programs. Opp'n at 15. True enough, but the States' obligation to make records "available for

18   inspection and audit," 7 U.S.C. § 2020(a)(3)(B)(i), does not give USDA a right to possess or

19   retain those records (unless a State agrees to that process as part of its statutorily mandated data

20   and security protocol). *See* Mot. at 17; *Greater Birmingham Ministries v. Sec'y of State for*

21   *Alabama*, 105 F.4th 1324, 1332–33 (11th Cir. 2024) (making a record available for inspection

22

23   ──────────
        [8] USDA suggests it has found previously undiscovered evidence of duplicate participation
24   in the data is has received from other States. Corley Decl. ¶ 30. This assertion is so vague as to be
     impossible to rebut. But NAC is still not implemented in every State and USDA's demanded data
     extends earlier than *any* State implemented NAC, so this assertion does not undercut Plaintiffs'
25   point that USDA's demand is unnecessary and improper in light of the resources being devoted to
     implement the NAC. *See SNAP National Accuracy Clearinghouse (NAC)*, USDA,
26   https://www.fns.usda.gov/snap/nac (updated July 29, 2025); *see also, e.g.*, Regan Decl. IL ¶ 54,
     ECF No. 59-12 (detailing resources committed to implementing NAC).
        [9] USDA notes that Congress has only acted to prevent USDA from amassing PII in the
27   NAC context. Opp'n at 15. This is, indeed, telling: in the one place where Congress has
     authorized a departure from the general sampling and audit model of quality control, it took pains
28   to ensure that USDA would not amass mountains of PII—exactly what USDA seeks to do here.

                                                    11

1  does not mean "copying an item or permanently handing it over"); *Acosta v. Loc. Union 26,*

2  *UNITE HERE*, 895 F.3d 141, 144 (1st Cir. 2018) (requirement to make records "available for

3  inspection" does not mean that reviewers are entitled to copy such records); *see also Tax Analysts*

4  *v. U.S. Dep't of Just.*, 845 F.2d 1060, 1067 (D.C. Cir. 1988) (statutory requirement that agency

5  records "be made available" afforded agency broad discretion in how to fulfill this obligation and

6  did not mandate delivery of records), *aff'd*, 492 U.S. 136 (1989).

7      Finally, USDA misapprehends Plaintiffs' objections to the system of records notice that it

8  issued to address glaring procedural deficiencies in its original collection plan. As explained, *see*

9  *supra* Argument § II.A, creating this system of records is improper because it duplicates existing

10  data systems that the States and USDA have long used to protect against fraud, waste, and abuse

11  in SNAP programs. In addition, in its SORN USDA claims the authority to put data in this system

12  of records to further "routine uses" that have been drafted so broadly that they would permit

13  USDA to share data with other federal agencies for purposes that violate the SNAP statute and

14  regulations. *See* Mot. at 19. USDA cannot get around the fact that, while 7 U.S.C.

15  § 2020(e)(8)(A) and 7 C.F.R. § 272.2(c)(1) only allow disclosures for purposes of administering

16  and enforcing SNAP and other federal benefit programs, Routine Use 8 allows, in addition to

17  these disclosures, sharing the demanded data where the information shows a possible violation of

18  *any* "law, whether civil, criminal or regulatory in nature," with *any* agency charged with

19  enforcing or administering those laws. Buxton Decl. Ex. H at 26,522. Recognizing this mismatch,

20  USDA argues that the Court should just trust it, because the SORN has language allowing

21  disclosure "'to the extent such uses are authorized by, among other authorities, 7 U.S.C.

22  § 2020(a)(3) and (e)(8).'" Opp'n at 18. But this is purely circular, as USDA apparently believes

23  such uses *are* consistent with these authorities. Moreover, this provides insufficient protection for

24  a system of records that will hold an unprecedented amount of PII from SNAP applicants and

25  beneficiaries across the nation. This is particularly true given USDA's disregard for its standard

26  data security procedures and protocols here, and the broader context of the current

27  Administration's unlawful approach to data aggregation and use. *See* Compl. ¶¶ 125–149. More

28  to the point, Congress has already told States that they need not merely take USDA at its word:

12

1  that is the point of requiring States and USDA to negotiate and agree to a data and security

2  protocol before making such data available for inspection and audit by USDA. 7 U.S.C.

3  § 2020(a)(3)(B). Without such an agreement in place, USDA may not demand this data or punish

4  Plaintiffs for not making it available—separate and apart from the various other reasons this

5  demand is unlawful.

6           **2.    USDA's demand violates the Paperwork Reduction Act.**

7           Plaintiffs are also likely to show that USDA's demand violates the Paperwork Reduction

8  Act (PRA). *See* Mot. at 19–20. Defendants argue that the PRA "impliedly forbids" review of

9  Plaintiffs' APA claim, apparently based on the PRA's "public protection provision," 44 U.S.C.

10 § 3512. But Plaintiffs' claim does not arise from that provision. And as the Ninth Circuit has

11 explained, Section 3512 "functions only as a defense to an enforcement action brought by an

12 agency" and "*is insufficient to defeat an APA claim*." *Hyatt*, 908 F.3d at 1173 (emphasis added);

13 *see also Orr v. Trump*, 778 F. Supp. 3d 394, 426 (D. Mass. 2025) (explaining that whether PRA

14 establishes a private right of action is irrelevant where plaintiffs assert APA claim alleging PRA

15 violations). None of USDA's cases contradict that binding authority. *See, e.g.*, *Steele v. United*

16 *States*, 144 F.4th 316, 322 (D.C. Cir. 2025) (rejecting "legal knot" in which the federal

17 government argued that a different provision of PRA also precluded APA review).

18          USDA claims it complied with the PRA because it followed notice-and-comment

19 procedures for a data collection in 2023 and early 2024, over a year before the current demand.

20 Opp'n at 20–21. But a "collection of information" is defined, as relevant here, as "requiring the

21 disclosure" of certain information. 44 U.S.C. § 3502(3)(A); *see* 5 C.F.R. § 1320.3(c). There have

22 been two distinct such requirements here: the requirement that SNAP applicants submit

23 information *to State agencies*, which appears to have complied with the PRA, and the instant

24 requirement that State agencies now submit to USDA all of their SNAP applicant and recipient

25 data going back years.[10] It is thus irrelevant whether the details of the first collection suggested

26 that the second collection might follow (which they did not); "*each* proposed collection of

---

27          [10] To correct USDA's metaphor, *see* Opp'n at 21 n.2, this is like having your friends
28 collect baseball cards in their houses and then, a year later, telling your friends to bring you the
   cards—on pain of losing billions of dollars.

13

1  information" is subject to notice and comment. 44 U.S.C. § 3506(c)(2)(A) (emphasis added).[11]

2  Because they are conducting a new collection without following the required PRA procedures,

3  USDA's demand is contrary to law.

4       Indeed, USDA's own descriptions of its efforts confirm that what it is doing constitutes a

5  collection. Though it studiously avoids using the word "collection," USDA uses some form of the

6  term "gather" dozens of times in its brief. *See, e.g.*, Opp'n at 1 ("USDA's data gathering

7  initiative"); *id.* at 6 ("To facilitate the gathering of SNAP information . . . ."). But of course,

8  gathering is just another word for collecting. *See Gather*, Merriam-Webster Dictionary ("1 : to

9  bring together : COLLECT").[12] Even more telling, USDA itself described this as a collection in

10  its July 9 demand letter. Gillette Decl. Ex. C, ECF No. 59-7 ("[W]e are requiring collection of

11  SNAP data from EBT processors or State agencies . . . .").

12       **C.   USDA's demand is ultra vires.**

13       Despite USDA's attempt to raise the standard for Plaintiffs' ultra vires claim with several

14  out-of-circuit quotations, Opp'n at 22–23, the standard in the Ninth Circuit is well-settled:

15  Plaintiffs must show that "a clear statutory mandate has been transgressed." *Staacke v. U.S. Sec'y*

16  *of Lab.*, 841 F.2d 278, 281 (9th Cir. 1988). For the reasons just explained, Plaintiffs are likely to

17  succeed in making that showing.[13]

18  **III.   THE BALANCE OF EQUITIES FAVORS PLAINTIFFS.**

19       USDA barely attempts to show it will suffer irreparable harm, just stating that granting

20  Plaintiffs relief "would limit the President's ability to effectuate" his preferred policies. Opp'n at

21  24. But "[i]t is well established that the mere existence of the Executive Branch's desire to enact a

22  policy is not sufficient to satisfy the irreparable harm prong." *Imm. Defs. L. Ctr. v. Noem*, 145

23  F.4th 972, 985 (9th Cir. 2025) (order). Moreover, USDA ignores all of the other tools—created

24  by Congress and itself—to "identify fraud, waste, and abuse in" SNAP. Opp'n; *see supra* at 8–9.

---

[11] Moreover, even accepting USDA's strained interpretation of a collection does not help it because USDA is not only seeking information that postdates the first collection; it seeks information going back years before that.

[12] https://www.merriam-webster.com/dictionary/gather.

[13] USDA argues that ultra vires review is unavailable because of the possibility of APA review here, which is perplexing, as USDA argues elsewhere that Plaintiffs are *not* entitled to APA review. Opp'n at 9–10.

14

1    This anemic offering cannot outweigh the enormous harms Plaintiffs face—especially because

2    interim relief here merely "maintains the status quo" that has existed for decades. *U.S. WeChat*

3    *Users All. v. Trump*, 488 F. Supp. 3d 912, 929 (N.D. Cal. 2020).

4    **IV.    REMAINING ISSUES**

5         USDA claims the requested relief is overbroad because it includes Plaintiffs' vendors.

6    Opp'n at 24. But Plaintiffs cannot receive "complete relief," *Trump v. CASA, Inc.*, 145 S. Ct.

7    2540, 2557 (2025), if USDA can just turn around and grab Plaintiffs' data from their vendors—an

8    end-run they have already attempted once. Mot. at 15–16.

9         USDA also asks this Court to require a bond if it grants injunctive relief, though not if it

10    stays USDA's demand under 5 U.S.C. § 705. Opp'n at 25. "Despite the seemingly mandatory

11    language, 'Rule 65(c) invests the district court with discretion as to the amount of security

12    required, if any.'" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009). Furthermore, "an

13    exception to the bond requirement has been crafted for, inter alia, cases involving the

14    enforcement of 'public interests' arising out of 'comprehensive federal health and welfare

15    statutes.'" *Pharm. Soc'y of State of N.Y., Inc. v. N.Y. State Dep't of Soc. Servs.*, 50 F.3d 1168,

16    1174 (2nd Cir. 1995). And USDA should not be allowed to collect their appellate litigation fees

17    via a bond. *See Bass v. First Pac. Networks, Inc.*, 219 F.3d 1052, 1055 (9th Cir. 2000). The Court

18    should exercise its discretion to waive a bond or require one in a nominal amount.

19         Finally, this Court should not stay any relief it grants, both because that would defeat the

20    purpose of preventing USDA from issuing final disallowances and potentially triggering massive

21    liability for Plaintiffs, and because, should the Court determine Plaintiffs are entitled to relief, it

22    will necessarily have also determined the factors governing stays pending appeal weigh against

23    USDA. Opp'n at 25 (recognizing "the 'substantial overlap' between [stay pending appeal]

24    standard and 'the factors governing preliminary injunctions'" (quoting *Nken v. Holder*, 556 U.S.

25    418, 434 (2009))).

26                                    **CONCLUSION**

27         For the foregoing reasons, this Court should grant Plaintiff States' Motion.

28

                                           15

1    Dated: September 8, 2025                         Respectfully submitted,

2                                                     ROB BONTA
                                                      Attorney General of California
3                                                     PAUL STEIN
                                                      Supervising Deputy Attorney General
4                                                     ANDREW Z. EDELSTEIN
                                                      ANNA RICH
5                                                     EDWARD P. WOLFE
                                                      MARIA F. BUXTON
6                                                     ROBIN GOLDFADEN
                                                      WILLIAM BELLAMY
7
                                                      _/s/ Sebastian Brady_
8                                                     SEBASTIAN BRADY
                                                      DEPUTY ATTORNEYS GENERAL
9                                                     _Attorneys for Plaintiff State of California_

10   SA2025302238

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff States' Reply ISO Motion for a Stay or Preliminary Injunction (Case No. 3:25-cv-06310-MMC)

1

***Additional Counsel for Plaintiffs***

2

LETITIA JAMES
Attorney General of New York
3   MARK LADOV
Special Counsel
4   JULIE DONA
Special Counsel
5   28 Liberty St.
New York, NY 10005
6   (212) 416-8240
mark.ladov@ag.ny.gov
7   *Attorneys for Plaintiff State of New York*

KRISTIN MAYES
Attorney General of Arizona
HAYLEIGH S. CRAWFORD (AZ No. 032326)
LUCI D. DAVIS (AZ No. 035347)
2005 N. Central Ave. Phoenix, AZ 85004
(602) 542-3333
Hayleigh.Crawford@azag.gov
Luci.Davis@azag.gov
ACL@azag.gov
*Attorneys for Plaintiff State of Arizona*

8

9   PHILIP J. WEISER
Attorney General of Colorado
10  DAVID MOSKOWITZ
Deputy Solicitor General
11  Colorado Department of Law
1300 Broadway, 10th Floor
12  Denver, CO 80203
Phone: (720) 508-6000
13  david.moskowitz@coag.gov
*Attorneys for Plaintiff State of Colorado*
14

WILLIAM TONG
Attorney General of Connecticut
JANELLE R. MEDEIROS
Special Counsel for Civil Rights
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Janelle.Medeiros@ct.gov
*Attorneys for Plaintiff State of Connecticut*

15  KATHLEEN JENNINGS
Attorney General of Delaware
16  IAN R. LISTON
Director of Impact Litigation
17  VANESSA L. KASSAB*
Deputy Attorney General
18  Delaware Department of Justice
820 N. French Street
19  Wilmington, DE 19801
(302) 683-8899
20  vanessa.kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*
21

BRIAN L. SCHWALB
Attorney General for the District of
Columbia
NICOLE S. HILL
Assistant Attorney General
Office of the Attorney General for the
District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov
*Attorneys for Plaintiff District of Columbia*

22  ANNE E. LOPEZ
Attorney General of Hawaiʻi
23  DAVID D. DAY
Special Assistant to the Attorney General
24  KALIKOʻONĀLANI D. FERNANDES
Solicitor General
25  425 Queen Street
Honolulu, HI 96813
26  (808) 586-1360
kaliko.d.fernandes@hawaii.gov
27  *Attorneys for Plaintiff State of Hawaiʻi*

KWAME RAOUL
Attorney General of Illinois
HARPREET K. KHERA
Bureau Chief, Special Litigation
SHERIEF GABER
Assistant Attorney General
115 S. LaSalle St., 35ᵗʰ Flr.
Chicago, Illinois 60603
(773) 590-7127
Harpreet.Khera@ilag.gov
*Attorneys for Plaintiff State of Illinois*

28

17

1

OFFICE OF THE GOVERNOR *ex rel*. Andy
Beshear, in his official capacity as
Governor of the Commonwealth of
Kentucky
S. TRAVIS MAYO
General Counsel
TAYLOR PAYNE
Chief Deputy General Counsel
LAURA C. TIPTON
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov
*Attorneys for Plaintiff Kentucky Governors'
Office*

AARON M. FREY
Attorney General of Maine
BRENDAN KRECKEL
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 0433-0006
Tel.:  207-626-8800
Fax:  207-287-3145
brendan.kreckel@maine.gov
*Attorneys for Plaintiff State of Maine*

ANTHONY G. BROWN
Attorney General of Maryland
JAMES C. LUH
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

ANDREA JOY CAMPBELL
Attorney General of Massachusetts
KATHERINE DIRKS
Chief State Trial Counsel
CASSANDRA THOMSON
Assistant Attorney General
Office of the Massachusetts Attorney
General
1 Ashburton Place Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
cassandra.thomson@mass.gov
*Attorneys for Plaintiff Commonwealth of
Massachusetts*

DANA NESSEL
Attorney General of Michigan
NEIL GIOVANATTI
BRYAN BEACH
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov
beachb@michigan.gov
*Attorneys for Plaintiff State of Michigan*

KEITH ELLISON
Attorney General of Minnesota
JOSEPH R. RICHIE
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

18

1

2  AARON D. FORD                                    MATTHEW J. PLATKIN
   Attorney General of Nevada                        Attorney General of New Jersey
3  HEIDI PARRY STERN (Bar. No. 8873)                 KASHIF T. CHAND (NJ BAR NO. 016752008)
   Solicitor General                                 Assistant Attorney General
4  Office of the Nevada Attorney General             New Jersey Office of the Attorney General,
   1 State of Nevada Way, Ste. 100                    Division of Law
5  Las Vegas, NV 89119                               124 Halsey Street, 5th Floor
   HStern@ag.nv.gov                                  Newark, NJ 07101
6  *Attorneys for Plaintiff State of Nevada*         Tel: (973) 648-2052
                                                     kashif.chand@law.njoag.gov
7                                                    *Attorneys for Plaintiff State of New Jersey*

8

9  RAÚL TORREZ                                       DAN RAYFIELD
   Attorney General of the State of New              Attorney General of Oregon
10 Mexico                                            SCOTT P. KENNEDY
   STEVEN PERFREMENT*                                Senior Assistant Attorney General
11 Senior Litigation Counsel                         Oregon Department of Justice
   New Mexico Department of Justice                  100 SW Market Street
12 408 Galisteo Street                               Portland, OR 97201
   Santa Fe, New Mexico 87501                        Tel (971) 453-9050
13 SPerfrement@nmdoj.gov                             Fax (971) 673-5000
   505-601-7727                                      Scott.Kennedy@doj.oregon.gov
14 *Attorneys for the State of New Mexico*           *Attorneys for Plaintiff State of Oregon*

15 PETER F. NERONHA                                  NICHOLAS W. BROWN
   Attorney General of Rhode Island                  Attorney General of Washington
16 MADELINE R. BECKER (RI BAR NO. 10034)             JENNIFER K. CHUNG, WSBA #51583
   Special Assistant Attorney General                WILLIAM MCGINTY, WSBA #41868
17 150 South Main Street                             Assistant Attorneys General
   Providence, RI 02903                              800 Fifth Avenue, Suite 2000
18 (401) 274-4400, Ext. 2151                         Seattle, WA 98104
   mbecker@riag.ri.gov                               206-464-7744
19 *Attorneys for Plaintiff State of Rhode Island*   jennifer.chung@atg.wa.gov
                                                     william.mcginty@atg.wa.gov
20                                                   *Attorneys for Plaintiff State of Washington*

21

22 JOSHUA L. KAUL
   Attorney General of Wisconsin
23 KARLA Z. KECKHAVER
   Assistant Attorney General
24 Wisconsin Department of Justice
   Post Office Box 7857
25 Madison, Wisconsin 53707-7857
   608-264-6365
26 karla.keckhaver@wisdoj.gov
   *Attorneys for Plaintiff State of Wisconsin*

27 * *pro hac vice forthcoming*

28

19

# CERTIFICATE OF SERVICE

Case Name:   ***California, et al. v. U.S.***          Case No.   **3:25-cv-06310-MMC**
                   ***Department of Agriculture***

I hereby certify that on <u>September 8, 2025</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

1. **PLAINTIFF STATES' REPLY IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**

2. **SECOND DECLARATION OF SEBASTIAN BRADY IN SUPPORT OF PLAINTIFF STATES' REPLY IN SUPPORT OF PLAINTIFF STATES' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

3. **DECLARATION OF ABBY MCCLELLAND**

4. **DECLARATION OF MARK LADOV**

5. **DECLARATION OF BRIAN CAMPBELL**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>September 28, 2025</u>, at San Francisco, California.


———————————————                    ———————————————
M. Mendiola                                              Signature
Declarant

SA2025302238
44790072.docx