Rob Bonta
Attorney General of California
Paul Stein
Supervising Deputy Attorney General
Andrew Z. Edelstein
Anna Rich
Edward P. Wolfe
Maria F. Buxton
Robin Goldfaden
William Bellamy
Sebastian Brady
Deputy Attorneys General
State Bar No. 330904
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 Telephone:  (415) 510-3592
 Fax:  (415) 703-5480
 E-mail:  Sebastian.Brady@doj.ca.gov
*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA; STATE OF NEW YORK; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAIʻI; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR** ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky; **STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF WASHINGTON; STATE OF WISCONSIN,** <br><br> Plaintiffs, <br><br> v. <br><br> **UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS,** in her official capacity as U.S. Secretary of | 3:25-cv-06310 <br><br><br> **SECOND DECLARATION OF SEBASTIAN BRADY IN SUPPORT OF PLAINTIFF STATES' REPLY IN SUPPORT OF PLAINTIFF STATES' MOTION FOR STAY OR PRELIMINARY INJUNCTION** |

Agriculture; **U.S. DEPARTMENT OF AGRICULTURE'S OFFICE OF INSPECTOR GENERAL,**

                                    Defendants.

**SECOND DECLARATION OF SEBASTIAN BRADY IN SUPPORT OF PLAINTIFF STATES' REPLY IN SUPPORT OF PLAINTIFF STATES' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

I, Sebastian Brady, declare under penalty of perjury that the following is true and correct:

1.    I am an attorney licensed to practice law in California. I am a Deputy in the California Attorney General's Office, and counsel to Plaintiff the State of California. I make this declaration in support of Plaintiff States' Reply in support of Plaintiff States' Motion for Stay or Preliminary Injunction.

2.    I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief, and as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

3.    Attached as Exhibit A is a true and correct copy of the transcript of a hearing held in *Pallek v. Rollins*, No. 1:25-cv-1650 (D.D.C) on July 23, 2025.

4.    Attached as Exhibit B is a true and correct copy of a letter dated August 20 from USDA that I am informed and believe Kentucky Governor Andy Beshear received.

5.    Attached as Exhibit C is a table setting out, for the Court's convenience, a comparison between some of Plaintiff States' annual federal SNAP administrative funding and the annualized amount USDA has threatened to withhold in federal SNAP administrative funding if those Plaintiff States do not comply with USDA's demand. For Plaintiff States' annual federal SNAP administrative funding, I compiled the figures in Plaintiff States' declarations elsewhere in the record. For the annualized amount USDA has threatened to withhold, I used the dollar figures per quarter included in the letters sent by USDA, which are also elsewhere in the record, and multiplied those figures by four to obtain the annualized amount.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

1

1

2  Executed on September 8, 2025 at San Francisco, CA.

3

4                                              _____/s/ Sebastian Brady_____

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NAMOD PALLEK, ET AL.,

               Plaintiffs,

     vs.

BROOKE L. ROLLINS, ET AL.,

          Defendants.

Civil Action
No. 1:25-cv-01650

July 23, 2025

Washington, D.C.

_____

TRANSCRIPT OF THE MOTIONS HEARING
BEFORE THE HONORABLE JIA M. COBB
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:    Madeline Wiseman, Esq.
                         NATIONAL STUDENT LEGAL DEFENSE NETWORK
                         1701 Rhode Island Ave NW
                         Washington, DC 20036

For the Defendants:    Bradley P. Humphreys, Esq.
                         U.S. DEPARTMENT OF JUSTICE
                         Civil Division, Federal Programs Branch
                         1100 L Street, NW
                         Washington, DC 20005

Court Reporter:        Stacy Johns, RPR, RCR
                         Official Court Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription

1              **P R O C E E D I N G S**

2              DEPUTY CLERK:  We're on the recorded in Civil Case

3      25-1650, Pallek, et al., versus Rollins, et al.

4              Starting with plaintiff's counsel, please approach the

5      podium and state your appearance for the record.

6              MS. WISEMAN:  Good afternoon, Your Honor.  Madeline

7      Wiseman on behalf of plaintiffs.

8              THE COURT:  Good afternoon.

9              MR. HUMPHREYS:  Good afternoon, Your Honor.  Bradley

10     Humphreys on behalf of defendants.

11             THE COURT:  Good afternoon.  Thank you for your

12     patience.  I had a hearing that went a little bit longer.

13             So we're here on plaintiff's motion for a TRO.  So

14     I'll start with plaintiffs.

15             I have some questions, and then if there's anything

16     else you want to highlight.

17             My plan is to ask the questions that I have and then

18     take a little bit of a break.  And then I understand that the

19     relevant date is starting tomorrow.  So I was hoping to rule on

20     the record today, if things go as planned.

21             I guess, let me ask you a question.  You haven't filed

22     a PI motion.  Do you intend to?

23             MS. WISEMAN:  Yes, Your Honor.  We would -- if Your

24     Honor were to either grant or deny the TRO motion, plaintiffs

25     would follow up with a motion for a preliminary injunction.

1      THE COURT:  As you know, if I granted this, it's

2    limited.  So I was curious what the plan was for two weeks

3    after this.

4      MS. WISEMAN:  Yes.  We would intend to file a motion

5    for a PI.

6      THE COURT:  I understand that starting tomorrow is the

7    date that the letter indicates that states need to start

8    providing this information, and there's a week window.

9      Other than just that data collection, is there

10   anything else that you anticipate is going to happen over the

11   next two weeks in terms of further disclosures?

12      MS. WISEMAN:  Yes, Your Honor.  The disclosure harm to

13   plaintiffs can really only be understood in the context of the

14   purposes that USDA has stated for this collection, and those

15   purposes are outlined in the letter.  And they are to act

16   pursuant to these executive orders and grant unfettered access

17   to this data across the federal government.

18      They are outlined in routine uses 8 and 11 in the

19   system of records notice, and those unlawful under the Privacy

20   Act routine uses would allow this data to be disclosed to state

21   governments, tribal governments, foreign governments who have

22   no obligation to keep it safe.

23      THE COURT:  I understand that.  But I guess there's

24   going to have to be some synthesizing of the data, creating of

25   the database.  Do you anticipate that the potential disclosures

```
 1    you're concerned about are going to be ones that realistically
 2    take place over the next 14 days?
 3            MS. WISEMAN:  Your Honor, the rush that USDA has taken
 4    with respect to this collection, I think makes it really hard
 5    to have any assurance that these disclosures wouldn't occur
 6    immediately.
 7            So it is plaintiff's position that the irreparable
 8    harm would be realized when this data is turned over and the
 9    USDA has the ability to re-disclose it pursuant to these
10    unlawful routine uses.
11            THE COURT:  I don't understand you to be suggesting
12    that the USDA can't obtain this information.  I know that there
13    are significant procedural issues that you're saying they
14    didn't comply with.  But just kind of assuming that they
15    followed the appropriate procedures, they are entitled to this
16    information about this federal government program, correct?
17            MS. WISEMAN:  It is certainly plaintiff's position
18    that USDA has authority in the SNAP statute to view staff data
19    and access it in some respects.  Our arbitrary and capricious
20    claim does go to this collection as a whole, with a claim that
21    USDA has not properly explained what it's doing, why it needs
22    to have this data, why -- it's stated rationale for this
23    collection of reducing waste and inefficiency is at odds with
24    the actions it's taking, which are having the effect of
25    duplicating work that states are statutorily and regulatorily
```

1    obligated to do and face penalties for failing to do.

2            So our arbitrary and capricious claim does at bottom

3    challenge the collection as a whole.  But the basis for our

4    harm is not USDA's access alone, if that answers your question.

5            THE COURT:  I want to really focus on the irreparable

6    harm prong of all of this.

7            As to the re-disclosure of plaintiff's information by

8    USDA, I understand the government to be saying that that would

9    not be irreparable because there are damages available under

10   the Privacy Act for when unauthorized or unlawful disclosures

11   happen.  There is a damages remedy if it was later determined

12   that any of your clients/plaintiffs had information disclosed

13   to someone, that the Court wouldn't have authority to claw it

14   back from.

15           Obviously, if it went to another government agency,

16   there could be a later order that ordered them to destroy the

17   information.  But if it went somewhere else, that there is a

18   damages remedy available.

19           What's your response to why that would wouldn't make

20   this harm something that could be addressed after a resolution

21   on the merits?

22           MS. WISEMAN:  The bell really can't be unrung, as Your

23   Honor notes.  And damages are not sufficient to redress

24   plaintiff's injury because the harm is in the violation of

25   their privacy, and damages simply cannot -- the harm is done

```
1   when this collection is realized and when any re-disclosure

2   happens.

3           So we are pursuing equitable relief under the APA to

4   prevent this disclosure from happening.  And the availability

5   of money damages does not preclude us from seeking that

6   equitable relief to prevent this from happening in the first

7   place.

8           THE COURT:  But that's the case with any type of

9   injury where there's money damages available.  Certainly

10  whatever injured the person has happened.  If you discriminate

11  against someone, you can't necessarily take away the harm, but

12  that can be compensated with money damages.

13          If there's a financial harm, there could be some

14  fallout from that that affects a business owner or something in

15  the short term, but it can later be compensated with money.

16          If there's a damages remedy available, what makes this

17  something that falls outside of the general view that if there

18  are money damages available then it's not considered

19  irreparable?

20          MS. WISEMAN:  I think it's the breadth of disclosure

21  and the breadth of authority that the USDA has claimed for

22  itself.  In the language of the SORN, it has really proclaimed

23  itself unbound by the protections of the SNAP statute that

24  plaintiffs relied on when they provided this information.  One

25  of our plaintiffs is MAZONE, a nationwide organization who
```

1    works to combat hunger.  And the distrust in SNAP that results

2    from the unlawful collection that USDA is pursuing is harm that

3    cannot be undone with money damages to an individual plaintiff

4    or with relief weeks or months down the line at final judgment.

5         THE COURT:  I understand the government also to be

6    making arguments, in terms of your -- let's just start with the

7    individual plaintiffs.  Do I have to make a determination that

8    their data is likely to be disclosed pursuant to any of these

9    routine uses?

10        MS. WISEMAN:  Well, Your Honor need only find a

11   substantial likelihood of irreparable harm.  So I don't believe

12   that you would need to find that that necessarily will occur.

13   But given all of the evidence we have of the authority USDA has

14   granted itself, the unbounded disclosures that these two

15   routine uses would permit USDA to make with no notice to the

16   individual plaintiffs would --

17        And the other thing I'll add, Your Honor, is, of

18   course, all of the reasons that USDA has given for its actions.

19   It is pursuing the administration's data collection goals.  It

20   is moving so quickly.  As Your Honor knows, we were set for a

21   hearing on an earlier temporary restraining order when it

22   appeared that this collection was going to proceed without any

23   procedures at all.  And halfway through the SORN comment

24   period, USDA sets this very aggressive one-week deadline for

25   states to turn over this data.  Some of the comments that have

1   been submitted on the SORN are states proclaiming uncertainty

2   about what data they're even to disclose.

3          So all of the evidence that is before Your Honor is

4   that USDA is rushing to make this happen to fulfill the

5   executive order mandate to grant this unfettered access.  And

6   all of this harm must be viewed in the light of the breadth of

7   those disclosures.

8          THE COURT:  I'm looking at the language of routine use

9   8 and 11.  I'm paraphrasing, so if I'm being disingenuous in my

10  paraphrasing, please don't hesitate to let me know.

11         But routine use 8 is essentially when the record

12  indicates a law violation of some sort.  And then 11 is to

13  support another federal agency or instrumentality that

14  administers or that has the authority to investigate or assist

15  USDA to investigate fraud, waste or abuse in federal benefits

16  programs.  Again, paraphrasing.

17         So I guess my question is I understand the defendants

18  to be suggesting or arguing, making various standing arguments.

19  I'm trying to figure out, do I have to determine that there's a

20  likelihood that your individual plaintiffs fall into a category

21  of people whose information is likely to be disclosed under

22  either of these routine uses.

23         MS. WISEMAN:  I don't think that Your Honor needs to

24  look at just the language of those routine uses and believe

25  that any of the plaintiff's records have the -- will have the

```
 1    potential to show a violation of law or -- because if I might
 2    zoom you out just one step --
 3              THE COURT:  Sure.
 4              MS. WISEMAN:  -- to at the top of page 5 of the SORN.
 5    So they're actually not page numbers on the SORN.
 6              THE COURT:  If you have just where it is in the
 7    docket, that would probably be easier.  Or if there's an
 8    exhibit number.
 9              MS. WISEMAN:  The pincite is 26522, the Federal
10    Register pincite.  Sorry about that, Your Honor.
11              THE COURT:  That's okay.
12              MS. WISEMAN:  So this is the -- okay, I'll wait until
13    you let me know.
14              THE COURT:  No, no.  Go ahead.
15              MS. WISEMAN:  Okay.  This is the language that
16    introduces the routine uses.  We have a fundamental
17    disagreement with USDA about what the SORN says.  And one thing
18    that USDA asks Your Honor to find that the SORN says is that
19    all disclosures would be limited by SNAP statute.  And that's
20    simply not what this SORN says.
21              So that language at the top of page -- apologies --
22    is:  Records created or stored in this system may be disclosed
23    pursuant to the routine uses outlined below to the extent such
24    uses are authorized by among other authorities.
25              And then there's the SNAP statute, federal SNAP
```

1    regulations and executive orders 14218 and 14243.  That is the

2    eliminating information silos executive order and the ending

3    taxpayer subsidization of open borders executive order.

4          So the SORN actually flips the presumption.  Instead

5    of the of disclosure being limited by the Snap statute, the

6    SORN authorizes disclosure pursuant to not just disclosures

7    permitted in the SNAP statute but any disclosure authorized by

8    those two executive orders and quote/unquote "other

9    authorities" that are not listed in the SORN.

10          So given the breadth of disclosures that this SORN

11   proclaims valid routine uses and given the -- the only kind of

12   problem with paraphrasing routine uses 8 and 11 is the sheer

13   number of verbs that are in them that give so much breadth to

14   this authority.

15          For example, in routine use 11, the disclosure could

16   be deemed reasonably necessary by USDA to prevent, deter,

17   discover, detect, investigate, examine, prosecute, sue with

18   respect to, defend against, correct remedy, or otherwise combat

19   fraud, waste, or abuse in such programs.

20          So all of this evidence together and all of the

21   statements that we have from USDA are enough for a finding that

22   there's a substantial likelihood of unlawful re-disclosure.

23          THE COURT:  Then going back to irreparable harm.  If I

24   could just have you pin down -- because you agree that there

25   are damages available under the Privacy Act?

```
1              MS. WISEMAN:  Yes.

2              THE COURT:  So that in a typical case, a plaintiff can

3    be compensated for unlawful disclosure through some sort of

4    monetary remuneration.

5              If you could just nail down, because I don't think I

6    see it in the declarations, the specific harm that the

7    individual plaintiffs face or are likely to face that couldn't

8    be remedied by damages.

9              MS. WISEMAN:  You know, I'm not sure that my answer is

10   much different than it has been, Your Honor.  Which is that the

11   disclosure, itself, that breaks the trust that these

12   individuals have in SNAP and the trust that they placed in

13   turning these records over in order to obtain benefits to

14   afford food is a harm that simply cannot be remedied by money

15   damages.  Sometimes money just isn't enough.

16             And I think that the availability of money damages

17   does not foreclose the -- is not a -- mean that that's enough.

18             THE COURT:  Okay.  Turning to the informational

19   injury.  I understand your organizational plaintiffs to say

20   that they're potentially irreparably harmed by the failure to

21   complete the full ICR process.  Because they're being denied

22   information that's important to their mission.

23             Is that a good summary of the irreparable injury with

24   respect to the informational injury?

25             MS. WISEMAN:  It's not merely that it's important to
```

1    their mission, Your Honor; it is the timing of the denial.

2    Because this collection is happening now, the PRA procedures

3    are designed to ensure that this information exchange and this

4    interaction with the public in this ICR process occurs prior to

5    a collection.  And without this information, EPIC is not able

6    to fulfill its mission of watching what the government is

7    doing, educating the public, being part of this debate that's

8    going on about the broader data collection project.

9             MAZONE's work is being the nationwide expert on SNAP

10   and educating on-the-ground local advocates who work to enroll

11   people on SNAP.  And if MAZONE does not know what's going on

12   because it doesn't have the information USDA is required to

13   disclose through this process, MAZONE is not able to do that.

14   And that is a here-and-now injury that cannot be remedied weeks

15   and months down the line.

16            THE COURT:  Right.  But if I grant your requested

17   relief, which is essentially postponing or -- the

18   July 9th letter, for lack of a better term, how does that

19   temporary relief provide those organizations with the

20   information that you're saying they're being deprived?

21            MS. WISEMAN:  Well, it forestalls the injury that

22   would occur if the collection proceeds without the injury --

23   without the data that they are entitled to have before the

24   collection proceeds.  It is about the timing.

25            And so then, of course, the case would proceed to the

1   merits.  And if Your Honor finds that they indeed have failed

2   on the merits to comply with the PRA and go through this ICR

3   process, then the entire agency action would be set aside.  And

4   if USDA wants to proceed anew, it will understand that it can

5   only do that in complying with the PRA and going through that

6   ICR process.  And that would ensure that they get the

7   information in a timely fashion.

8           It is about the timing.

9           THE COURT:  I want to make sure I'm saying this -- is

10  it MAZONE?

11          MS. WISEMAN:  MAZONE.

12          THE COURT:  I'm sorry.  I wanted to make sure I was

13  pronouncing the organization.  MAZONE.

14          With respect to injury to their anti-hunger mission, I

15  understand you made the point earlier that if people who would

16  otherwise be eligible for these benefits are kind of scared off

17  from applying because of the data collection, they decide to

18  forego benefits, how does that map onto the organization's

19  irreparable injury?  Because it's not suing on behalf -- it's

20  not an associational standing.  How does that map onto their

21  irreparable injury?

22          MS. WISEMAN:  Because MAZONE's mission is to end

23  hunger.  A huge part of its mission is improving access to and

24  participation in SNAP.  And it has to, in light of these

25  unlawful actions and in light of the distrust that is being

1    sown, it has to reorient its priorities and abandon projects.

2            And the declaration of Abby Leibman lays out a

3    particular project that MAZONE was looking to sunset in order

4    to pursue other priorities to advance its mission that it is no

5    longer able to do because of the effect that this collection is

6    going to have on trust in SNAP.

7            THE COURT:  Are those not economic injuries?  Couldn't

8    that be remedied through damages as well?

9            MS. WISEMAN:  I understand your hesitation with

10   respect to that, with respect to that one, Your Honor.  The

11   real problem here is that this will lead people away from the

12   program, but that's not MAZONE itself.  I concede that that's

13   not MAZONE, itself.

14           THE COURT:  I think the last question that I had, I'm

15   just trying to work through kind of current state of the law

16   with respect to what I'll call the compatibility issue.  And I

17   understand that you're saying that the routine disclosures are

18   not compatible with the purpose for data collection under the

19   SNAP statute.  And I'm just trying to work through, is that the

20   right question.  Is it a question of whether it's compatible

21   with the purpose for which the state collected information from

22   the beneficiaries, or is it compatible with the reason that the

23   government is articulating it's collecting data pursuant to the

24   Privacy Act?

25           MS. WISEMAN:  I'm not 100 percent sure that I'm

1    following your question.

2           THE COURT:  You're saying that you're looking at the

3    SNAP statute and trying to figure out whether these routine

4    uses are compatible with that statute.  I'm wondering if that's

5    the right question.  Is that what, it has to be compatible with

6    the SNAP statute?  Or am I looking to the government's stated

7    reason for collecting the information and whether or not these

8    routine uses are compatible with its stated reason?

9           MS. WISEMAN:  It was the former, Your Honor.

10          THE COURT:  Okay.

11          MS. WISEMAN:  It was whether these routine uses that

12   are articulated in the SORN are compatible with the purpose for

13   which information was collected pursuant to the SNAP statute.

14          And if I'm not mistaken -- I'm sure Mr. Humphreys will

15   correct me if I am.  If I'm not mistaken, I believe the parties

16   are in alignment on that.

17          THE COURT:  Okay.  Anything else you want to say about

18   irreparable harm?

19          MS. WISEMAN:  I'm sure I will think of something.

20          THE COURT:  I will give you the last word.  It's your

21   motion so you'll get the last word.

22          MS. WISEMAN:  Thank you.

23          THE COURT:  All right.  I'll hear from the government.

24          Can I just ask you, it seems like there's a huge rush.

25   Can you just help me understand, what's the rush here?

```
 1          MR. HUMPHREYS:  The rush, Your Honor, is it's an
 2    important policy priority to ensure program integrity of the
 3    SNAP data.  I can tell you, this is not in the papers, really
 4    on the record, but following the Covid pandemic, there was a
 5    very high error of error rates in the data.  Part of this is to
 6    better oversee and administer the SNAP program, overall.
 7          I mean, it is also consistent with the President's
 8    directive to break down information silos.  But it's part of
 9    the agency's overall mission to protect and oversee the use of
10    federal funding.
11          THE COURT:  I'm going to ask you the same question
12    that I asked plaintiffs, because you're probably in a better
13    position to answer it.  And that is if I were not to grant this
14    TRO, the data collection is starting -- and I understand the
15    states have been required to provide information starting
16    tomorrow through the end of the month; is that correct?
17          MR. HUMPHREYS:  That's correct, Your Honor.
18          THE COURT:  If you could just help me understand, then
19    what happens.  Do you anticipate any further disclosures of
20    information over the next two weeks?  I'm assuming that there's
21    something you have to do with the data.  And the plaintiff is
22    saying that you're moving so fast that they think information
23    is going to be disclosed very quickly.  Do you have anything
24    that you can share about that?
25          MR. HUMPHREYS:  I certainly don't have any information
```

1    that is going to be further disseminated in the next two weeks.

2    I do think that your questions are the right ones, Your Honor,

3    because they sort of separate two separate events.  One is the

4    data that comes in from the states to USDA, which is the

5    process from July 24th to July 30th.  And then a separate

6    event, which may or may not ever happen, which we think is very

7    speculative, which is that these individual plaintiff's data

8    would ever be re-disclosed outside of USDA pursuant to the

9    routine uses.

10            If they were, we think they're lawful routine uses.

11    But just for the purposes of irreparable harm, those are two

12    separate events.  And the re-disclosure is not happening

13    tomorrow.  What's happening tomorrow is that the states are

14    beginning to submit data.

15            THE COURT:  Do you know what the next step is?  So

16    after the last day of the month, what's next?

17            MR. HUMPHREYS:  I don't, Your Honor.  I know the

18    agency is working on setting up a process very soon to allow

19    for data transfers.  But I do assume that there would be some

20    work that goes into collating that data, but I can't answer

21    definitively, Your Honor.

22            THE COURT:  So I will say just based on the text of

23    the July 9th letter, it looks as if USDA has already made its

24    decision of how it's moving forward.  And this is to

25    plaintiff's point that the agency is required to provide an

1    opportunity for interested persons to submit feedback, to

2    provide comments.  That's meaningless if it just means that you

3    have the ability to submit comments but they're not actually

4    read or considered.  And it doesn't seem like you've left much

5    time or room to consider.

6            So on July 9th -- am I right the comment period closed

7    today?

8            MR. HUMPHREYS:  It would be today, Your Honor.  But I

9    have an important -- I mean, it gets to the same point.

10           The 30 days that we're required to provide under the

11   Privacy Act only applies to the routine uses.  So nothing about

12   the statutory authorization to get the data from the states.

13           The consideration of those comments can go on after

14   July 23rd before that data may or may not be disclosed pursuant

15   to routine use.

16           That's point number one.  I think that's a red herring

17   because the data collection is separate from the 30 days in the

18   Privacy Act.

19           The second point, Your Honor, is that, as we pointed

20   out, USDA said this is a policy priority.  It's monitoring

21   these as they came in and devoting the resources to do it.

22   It's keeping close track.  I mean, it is not as if before

23   information were disclosed, if ever, under a routine use

24   that -- if a comment came in that changed its mind that, you

25   know, in its judgment decided -- that warranted departure from

1  the currently published proposed routine uses, that you could

2  make that change.

3          THE COURT:  Let me make sure I'm understanding.

4  You're saying that the first level in terms of the USDA getting

5  this information, that's going to happen kind of regardless of

6  what happens with the routine uses.  That's what's going on

7  now.

8          MR. HUMPHREYS:  We hope it will happen, Your Honor.

9          THE COURT:  Well, okay.

10         If I weren't involved in this at all, that's what the

11 plan is; that this information is being gathered.  That's level

12 one.

13         And then there's the second point about whether or not

14 that information would ever be disclosed pursuant to any of

15 those routine uses.  That's what the comment period is

16 collecting comments on.  That's what's being considered.  And

17 it's your position that the government could change course,

18 change its mind about whether and how it would apply those

19 routine uses or if it would apply.  That's separate and apart

20 from getting the information from the states in the first

21 instance.

22         MR. HUMPHREYS:  Yes, Your Honor.  We see it as two

23 very separate things.

24         THE COURT:  Okay.  So you're not suggesting, then -- I

25 mean, you agree that in order for this to have teeth, the

1   agency has to consider the comments.  You don't have to change

2   your mind, but reading them, giving people a meaningful

3   opportunity to respond means that there's someone on the other

4   end that's hearing those responses, correct?

5            MR. HUMPHREYS:  I mean, not necessarily, Your Honor.

6   I don't want to -- I mean, as we said in our brief, there is a

7   procedural requirement under the Privacy Act, the 30 days and

8   an opportunity to comment be provided for routine uses only.

9            I'm not aware of any case -- plaintiffs can correct me

10  if I'm wrong -- that have read into a substantive requirement

11  that the agency consider those comments.  However, I do

12  recognize that in other contexts, there's an implied

13  understanding that the agency will have to do so.

14           But in this instance, as we establish in our

15  declaration, USDA is reviewing those comments, is analyzing

16  them as they come in and will continue to do so through the

17  close of the comment period today.

18           THE COURT:  I'm just curious kind of what the next

19  steps are.  I think it's somewhat relevant.  Is there someone

20  that has this information, or is it still very much all a work

21  in progress and the government doesn't necessarily know what

22  the next steps are after the data is collected?  Meaning,

23  what's happening with this database?  What is the process, the

24  timeline?

25           MR. HUMPHREYS:  I don't know the timeline beyond

1    July 30th.  I think what I can tell you is the plan is to

2    continue oversight of the SNAP program as USDA has always done,

3    except rather than on a sampling basis or through smaller

4    audits to really kick the tires on the data overall.  That's

5    the overall plan, Your Honor.

6              THE COURT:  You're not, obviously, prepared to make

7    any representation that data won't be disclosed to any third

8    parties or outside of the USDA in the next two weeks; you can't

9    say that?

10             MR. HUMPHREYS:  I can't say that definitively.  I

11   think it would be lawful under the Privacy Act.  I can't make

12   that representation.

13             THE COURT:  I know that there's a dispute between the

14   parties -- and I'm kind of jumping all over the place -- about

15   whether plaintiffs can use the APA as a vehicle to bring

16   certain other claims.  Focusing on the Paperwork Reduction

17   Act --

18             MR. HUMPHREYS:  Can I go back on one point?

19             THE COURT:  Sure.

20             MR. HUMPHREYS:  I'm sorry to cut you off, Your Honor.

21   I think for plaintiffs to prevail for emergency injunctive

22   relief, it wouldn't be just that USDA had plans to unlawfully

23   disclose the information, some of the information generally.  I

24   think they would have to show a likelihood that these specific

25   individuals would have their information disclosed pursuant to

1    the routine use.

2          So with respect to these -- with routine use 8.  With

3    respect to these specific individuals, something on the face of

4    their information suggested unlawful behavior.

5          And then proposed routine use 11, I mean, that is

6    straight out of the authorization in the statute, itself.  We

7    don't think that's problematic at all.

8          But anyway, the larger point is it's not just will

9    USDA disclose any of the data that they receive, but will they

10   disclose the individual plaintiffs.  And there's nothing in the

11   record to suggest that that's the case.

12         THE COURT:  And then just because you mentioned

13   routine use 11, what is your position with respect to routine

14   use 8?

15         So you agree with plaintiff's response to my question

16   that when you're looking at compatibility and looking at

17   whether or not the routine uses are compatible with the SNAP

18   statute's authorization on how the state collects the data from

19   beneficiaries, that's the comparison?  Because the statute

20   provides --

21         MR. HUMPHREYS:  It's the purposes for which the data

22   was collected.

23         THE COURT:  By the state, not by the government?

24   That's what I'm confused on.

25         MR. HUMPHREYS:  I'm not actually sure either.  Because

1  when you're talking about collection, in a sense, that's the

2  Paperwork Reduction Act.  But I don't think we can necessarily

3  say that collection means the same thing for the Privacy Act.

4  It could very well be is it consistent with the purpose for

5  which it was collected by the agency.

6          I think there's some ambiguity there, but in our

7  briefing we focus on -- which I think are plaintiff's primary

8  arguments, which I think boils down to the proposed routine

9  uses would conflict with the limitations in the statute.  And

10  we certainly don't think that's the case with the prefatory

11  language.

12          If the statute, itself, explicitly prohibits sharing

13  data in a certain way, we would agree that the agency cannot

14  share data in that way, obviously.

15          THE COURT:  And then I think one of the issues, just

16  going to the routine uses.  I'm thinking of irreparable harm.

17  Let's say there was some argument that the USDA didn't have an

18  entitlement to this data.  I'm just giving a hypothetical.

19          If I later determined that the USDA had obtained this

20  data improperly, I could order it to destroy the data, or

21  whatever, and so I don't think that would be irreparable.  But

22  I understand one of plaintiff's arguments, that if this data is

23  disclosed to parties outside the USDA, I might not have any

24  authority to order them to do anything.  Or they're not bound

25  by the Privacy Act in the same way the government can.  So once

1   it's in their hands, they can disclose it further without any

2   safeguards.  What is your response to whether that type of harm

3   could be irreparable if this data somehow got in the hands of

4   some other entity that's not bound by the Privacy Act and thus

5   isn't safeguarded in the same way that the federal government

6   would have an obligation to keep this data?  And whether that's

7   something that in later litigation could be remedied.

8          MR. HUMPHREYS:  I suppose that's theoretically

9   possible in this very hypothetical situation, that if it gets

10  to a third party, the Court wouldn't necessarily have power

11  over.  Although, perhaps that entity could be joined or sued.

12         But I think for the purposes of irreparable harm, I

13  mean, that would just go into the damages calculation as in any

14  other case.  It's quantifiable.

15         THE COURT:  Anything else that you want to highlight

16  from the government's position?  And then I'll hear from

17  plaintiffs.

18         MR. HUMPHREYS:  Just a couple points, please, Your

19  Honor --

20         THE COURT:  Sure.

21         MR. HUMPHREYS:  -- on the informational injury.

22         USDA has explained exactly what's taking place.  The

23  statute expressly authorizes it.  The defendants published the

24  SORN which further explains nothing in our view is stopping

25  plaintiffs from meaningfully engaging in the public debate over

1    this issue, as is evidenced by this lawsuit.

2         But on the informational injury, plaintiff's theory

3    sort of flows from an alleged violation of the Paperwork

4    Reduction Act.  But even assuming that there is a new

5    collection such that an ICR process would be necessary -- and

6    we very much dispute that -- it's undisputed that there's no

7    additional information gathering by SNAP applicants.  The

8    additional burden for the purposes of the Paperwork Reduction

9    Act, which obviously focuses on the burden of paperwork,

10   applies only to the states.  So I'm not even sure that

11   plaintiffs are in the zone of interest of the Paperwork

12   Reduction Act injury here.  And states, obviously, aren't

13   plaintiffs.

14        Other than that, Your Honor, I'm happy to rest on our

15   papers.  Thank you so much.

16        THE COURT:  All right.  I said you could have the last

17   word.

18        MS. WISEMAN:  I believe I just have a couple points,

19   Your Honor.  Just on that final note that we just heard from

20   Mr. Humphreys on, I do want to flag the very different

21   information that comes out of an ICR process that is distinct

22   from the process that occurs under the Privacy Act pursuant to

23   the SORN.  And that includes information and an exchange with

24   the public, a consultation with the public, its comments to

25   evaluate whether the collection is necessary for the proper

1    performance of the functions of the agency.  That

2    justification, plaintiffs have not received.  And to minimize

3    the collections burden.

4         And on that note, I wanted to flag just very briefly a

5    comment from the Texas State SNAP Agency that is in favor of

6    the collection but notes that it would need -- completely lacks

7    clarity on how it is supposed to turn over information, what

8    information it's supposed to turn over and would need eight to

9    ten weeks to do so.  So that's after additional information is

10   provided.  So I think there's so much information that

11   plaintiffs don't have that is information they're entitled to

12   now that causes irreparable harm.

13        And just very briefly on the zone of interest, the

14   Paperwork Reduction Act was enacted to enhance openness in

15   government to ensure government accountability.  So these

16   organizational plaintiffs and individuals are absolutely in the

17   zone of interest of that statute.  And I think that

18   informational harm is separate and apart from the disclosure

19   harm pursuant to the routine uses.  That informational harm is

20   happening now.  There is an inability by MAZONE to tell people

21   what's going on with their data as of tomorrow.

22        And, as I flagged for Your Honor, that language

23   introducing the routine uses is much broader than it is

24   characterized in Monday night's brief from USDA.  And when

25   those routine uses are finalized, tomorrow when they go into

```
 1   effect, that is the language that will control.  And it gives

 2   USDA almost unbounded authority to re-disclose this information

 3   pursuant to administration priorities.

 4              And I believe my last point -- oh, and I'm going to

 5   have two more, I'm sorry, Your Honor.

 6              THE COURT:  Sure.

 7              MS. WISEMAN:  The safeguards that have been present in

 8   cases that have led courts away from a finding of irreparable

 9   harm when it comes down to a data disclosure are not present

10   here because of the breadth of these routine uses.

11              THE COURT:  Okay.  If you could just put a finer point

12   on that.

13              MS. WISEMAN:  So the language that is cited in USDA's

14   brief from Monday night notes that there have been -- there's

15   no irreparable harm when information goes to a small number of

16   people who are obligated to keep it confidential.  But that

17   long list of verbs that I forced Your Honor to endure hearing

18   me quote earlier and all of the breadth of discretion that's

19   given to USDA to make a judgment about whether something might

20   be potentially relevant to a violation of law or all of that

21   authority means that this can go to state governments, tribal

22   governments, foreign governments that, of course, have no

23   obligation to keep it confidential, instrumentalities of who

24   might be assisting in federal assistance programs, the breadth

25   there means that those safeguards are not present.
```

1    And lastly, USDA requested in their brief that this

2    motion be converted to a preliminary injunction.  And you asked

3    me at the outset if we intend to file a preliminary injunction

4    if Your Honor wanted to convert this to a preliminary

5    injunction.  I don't believe -- we wouldn't have an objection

6    to that.

7         THE COURT:  Part of what I'm thinking, too, and I want

8    to take like 10 minutes to just gather my thoughts and I'll

9    make a ruling.

10        I guess whether or not I grant or deny this TRO

11   request, would the parties be prepared to set a briefing

12   schedule on the merits today?  I don't even know if the

13   government's answered the complaint.  Are you anticipating

14   filing a motion to dismiss?  You've raised standing issues, so

15   I assume you are.

16        MR. HUMPHREYS:  We would, Your Honor.

17        THE COURT:  I'm wondering if, regardless, we get a

18   briefing schedule both for the motion to dismiss and potential

19   cross motions for summary judgment, which could be combined

20   with the motion to dismiss, which would include filing any

21   relevant portions of the administrative record.  And I can

22   resolve the merits very quickly.

23        If that's something the parties are open to, I don't

24   know why we would need to drag that part out.

25        MS. WISEMAN:  Plaintiffs are in full agreement, Your

1    Honor.  And I think that the merits being so wound up with the
2    sufficiency of the complaint, it's really right there.  So I
3    think that creating a schedule that contemplates all that Your
4    Honor just mentioned makes a lot of sense.

5          THE COURT:  Let's come back at 5:05.  So we'll take a
6    15 minute break.  Let's come back at 5:10.  Take a 20 minute
7    break, and then I'll come back and hopefully be prepared to
8    rule.

9       (A recess was taken at 4:51 PM)

10          THE COURT:  Thanks for you patience.  That took a
11    little bit longer than I thought.  I'm prepared to rule and
12    discuss next steps in this matter.

13          As the parties are aware, a TRO is an extraordinary
14    remedy, and its purpose is to preserve the relative positions
15    of the parties until a trial on the merits can be held.  To
16    obtain a TRO, plaintiffs have to establish:  One, a substantial
17    likelihood of success on the merits; two, that they would
18    suffer irreparable injury if the injunction were not granted;
19    three, that the injunction would not substantially injure other
20    interested parties; and four, that the public interest would be
21    furthered by the injunction.  When the government is the
22    opposing party, as it is here, the third and fourth factors
23    merge.

24          Our circuit has set a very high standard for
25    irreparable injury.  The injury must be both certain and great

1    and of such imminence that there is a clear and present need

2    for equitable relief.  And the injury must be, quote, "beyond

3    remediation."  That's from the Chaplaincy of Full Gospel

4    Churches case, 454 F.3d at 297.  It's a 2006 D.C. Circuit case.

5            If there is a possibility that adequate compensatory

6    or other corrective relief will be available at a later date in

7    the ordinary course of litigation, that does weigh heavily

8    against a claim of irreparable harm.

9            I think this is a difficult case.  Plaintiffs have

10   certainly raised strong arguments that, at minimum, that the

11   government has not jumped through correct procedural hoops.  I

12   haven't made a decision on that, but certainly there is a

13   colorable argument.  And I do think that plaintiffs likely have

14   standing as to at least some of their merits claims.  But my

15   concern is that plaintiffs have not identified the likely

16   irreparable harms to the particular plaintiffs who are before

17   me in this case.

18           So I am going to deny the TRO for that reason, and

19   I'll explain in a little bit more detail.  But consistent with

20   what we discussed, I'm prepared to set a schedule to resolve

21   this case very quickly on the merits.  Because I do understand

22   that things are moving quickly.

23           This denial is also without prejudice.  Again, things

24   are moving quickly.  If plaintiffs get additional information

25   and think that they can demonstrate irreparable harm that's

1    either not in the record now or that comes about based on

2    future events, you're free to refile, even if it's during the

3    pendency of our dispositive motions briefing.

4          So my ruling is not a ruling on the merits.  I'm just

5    finding that at this juncture based on the limited record

6    before me, I can't find that plaintiffs have cleared the very

7    high bar for irreparable harm.

8          My understanding of plaintiff's alleged irreparable

9    injuries fall into three categories, so I'm going to start with

10   the information injury, denial of information.

11         All plaintiffs, both the individual plaintiffs and

12   organizational plaintiffs, argue that they have been denied the

13   information they are entitled to through the Paperwork

14   Reduction Act's information collection review, which I'll call

15   ICR process.  Because defendants are not conducting a full ICR

16   process, they say that providing information to the public

17   about a proposed collection after the collection eviscerates

18   the benefits that Congress saw in obtaining public views before

19   a data collection and that they need this information to timely

20   and meaningfully participate in the ongoing debate about USDA's

21   data collection.

22         But plaintiff's position is that they can bring an APA

23   claim to challenge this violation under the PRA.  And if that's

24   the case, that means that their harm could be remedied in the

25   ordinary course of litigation.  If they prevail at summary

1  judgment and I find that the government violated the PRA by

2  conducting a collection without adhering to the right

3  procedural mechanisms, I could potentially -- again this is

4  subject to resolution of the parties debate, but based on the

5  plaintiff's position, I could find that the collection was

6  contrary to law or at least arbitrary and capricious.  I could

7  order that the offending agency action, the collection, be

8  vacated or set aside.  And that would remedy the plaintiff's

9  injury because the data collection about which they had been

10  denied information or denied an opportunity to participate in

11  public debate about would not exist.

12       The organizational plaintiffs argue that this

13  information is important to their advocacy work and that being

14  denied this information meaningfully curtails their ability to

15  monitor the government's actions and participate in the ongoing

16  debate, not just about SNAP data but about the administration's

17  broader data collection project.  And they do cite cases where

18  deprivation of information was found to be irreparable harm.

19       In those cases the remedy the plaintiffs sought was

20  access to the information in question.  In the Doctors for

21  America case, for example, that court found that the doctors

22  were irreparably harmed when the CDC took down online health

23  resources those doctors relied on to do their jobs.  And the

24  remedy was that the agencies had to put the web pages back up.

25       Here, looking to plaintiff's proposed order, they're

1    asking me to postpone the data collection and not to order USDA

2    to give plaintiffs information they would get during an ICR

3    process.  And again, the collection of the data in violation of

4    the procedural requirements is not, itself, irreparable.

5    Because, again, if plaintiffs turn out to be correct that it

6    was procedurally improper, that could be vacated or set aside.

7          And that's the same with any injury about informing

8    the public about what's happening with their data.  Again, if

9    you ultimately win on the merits, I could set aside -- and I

10   agree with your position on ultimate remedies in the case, I

11   could set aside the agency action.  So I'm not convinced that

12   in the next two weeks there's irreparable injury warranting a

13   TRO.

14         In terms of the harm to MAZONE's mission, the

15   organizational plaintiff argues that it faces immediate

16   irreparable harm to its anti-hunger mission because the

17   unlawful data collection will cause distrust in SNAP which

18   means that eligible recipients will forego benefits, new

19   applicants will not apply, and more people will go hungry.

20         And again, I take that point.  But the organization is

21   not arguing that it has associational standing to bring suit on

22   behalf of those individuals; it's arguing it has standing in

23   its own right.  And I'm not seeing how that distrust in SNAP

24   will impact MAZONE's operations such that there would be

25   irreparable injury, as opposed to harm that could be remedied

1    at the end of the litigation, which would be quite short,

2    because as we'll discuss shortly, we're going to set a briefing

3    schedule.

4          Finally, with respect to the individual plaintiffs who

5    are SNAP beneficiaries, they argue that they'll be harmed

6    irreparably by potential re-disclosure of their sensitive data

7    to others.  Plaintiffs argue that routine uses 8 and 11 permit

8    virtually limitless disclosure to any government body, foreign

9    or domestic, based on nothing more than the record's relevance

10   as determined by the USDA without review or notice and that

11   those re-disclosures would constitute irreparable harm.

12         Again, I find that plaintiffs at this stage, again,

13   based on the limited information, haven't cleared the high

14   hurdle for irreparable harm.

15         Several courts in this district have recently had

16   occasion to consider whether a disclosure of information that

17   violates the Privacy Act constitutes irreparable harm.  And

18   courts in this District have declined to find irreparable

19   injury where the challenged disclosure is not public but

20   instead is made to a small number of individuals who are,

21   themselves, obligated to keep that information confidential.

22   And when that is the case, the court can certainly remedy the

23   injury in the ordinary course of litigation by ordering the

24   small number of individuals who received the information to

25   return or destroy it.

1          But here, the June SORN, particularly routine uses 8

2     and 11, contemplates disclosure to many other entities, some of

3     which are not bound by the Privacy Act and some of which are

4     probably not even subject to the jurisdiction of this court,

5     for example, a foreign government.  So that I think cuts in the

6     plaintiff's favor and distinguishes some of the cases the

7     government has cited.

8          But on the other hand, the Privacy Act does provide a

9     remedy for unlawful disclosures, and that's damages.  And the

10    D.C. Circuit has held that the possibility of such compensatory

11    relief down the road weighs heavily against a claim of

12    irreparable harm.  I'm not resting my finding completely on

13    this because I think that there are some harms for which

14    damages, even if available, could be inadequate:  Physical

15    injury, liberty loss, other consequences.  But I am not seeing

16    anything in the declarations from individual plaintiffs or in

17    response to my questions today that identify some kind of

18    concrete, irreparable, likely to happen in the next couple of

19    weeks if the Court doesn't immediately act type injury.

20         I take the point that the records are sensitive and

21    that there's a potential under this SORN that contemplates that

22    they could possibly be disseminated in a way that might be

23    difficult to be clawed back.  But, again, in term terms of any

24    kind of harm that's likely to flow almost immediately such that

25    I need to intervene in an extraordinary remedy, I don't think

1    that plaintiffs have satisfied me that my intervention is
2    necessary at this point.
3         I've reviewed the declarations that the individual
4    plaintiffs submitted and they say that they're very concerned
5    and confused that the government is demanding this data and
6    that their privacy has been violated.  And some even say they
7    feel as if they have to choose between securing their personal
8    privacy and being able to feed themselves and their families.
9    And I think those concerns are valid and put plaintiffs in very
10   difficult, if not impossible, positions.
11        But, again, for a TRO, fear, anxiety, et cetera, is
12   just not a basis for me intervening at this stage.
13        One of the individual plaintiffs notes that she's
14   concerned about the possibility of skimming.  That's where
15   people use card readers to steal EBT numbers and then spend
16   other people's benefits.  And she's taken steps to protect
17   herself against it.  But for that to occur, that means first
18   that plaintiff's information has to be compromised in some way
19   and then that a third party would obtain that information.  I
20   think at this stage based on the record before me would be kind
21   of a hypothetical or contingent possibility of harm that I
22   can't use as a basis for a TRO.
23        In addition to all I've said, again, there's a high
24   bar for establishing irreparable harm.  I'm not quite persuaded
25   at this juncture that the re-disclosures plaintiffs are

1  concerned about are certain to occur or likely to occur even

2  within the next 14 days or so.  States are required to begin

3  submitting data tomorrow.  They have until July 30th to do so.

4  The SORN states that the purpose of this collection is to

5  create a new database.  So I don't have enough information

6  about the timeline to make a conclusion that I have to

7  intervene now to prevent some sort of irreparable harm or that

8  the disclosures that plaintiffs are worried about are likely to

9  occur within a narrow time frame.

10          So because of that, I'm denying, again, without

11  prejudice, plaintiff's motion for a TRO.  And, again, if

12  plaintiffs have more fulsome evidence that they want to present

13  of the irreparable harm, this is without prejudice of them

14  filing a subsequent motion.

15          All right.  Let's talk scheduling.  I think it makes a

16  sense to just set a schedule for dispositive motions, but I'll

17  hear from plaintiffs if you want to proceed a different way.

18          MS. WISEMAN:  Your Honor, if once we especially

19  understand when the administrative record could be produced, I

20  think we're --

21          THE COURT:  Okay.

22          MS. WISEMAN:  Can you hear me okay?

23          THE COURT:  Why don't you come up here.  I can, but I

24  think it's easier if you're closer.

25          MS. WISEMAN:  We're in favor, absolutely, of setting a

1    schedule for dispositive motions.  I'm curious to hear from

2    Mr. Humphreys on when he thinks an administrative record could

3    be produced.

4            THE COURT:  I could do it now or you guys can confer

5    and just contact chambers with the schedule.  What's easier?

6    Are you prepared to say when you could file the administrative

7    record?

8            MR. HUMPHREYS:  No, Your Honor.  I would have to

9    confer with my client.

10            THE COURT:  Can you-all file a proposed briefing

11    schedule by Friday?

12            MR. HUMPHREYS:  That would be fine with the

13    government, Your Honor.

14            MS. WISEMAN:  That's fine.

15            THE COURT:  So I will ask that the parties confer, and

16    just file a proposed briefing schedule by Friday, which is July

17    25th.  I'll enter it as soon as I get it, and we'll resolve

18    this case quickly.

19            Anything else from plaintiffs?

20            MS. WISEMAN:  No, Your Honor.

21            THE COURT:  Anything else from the government?

22            MR. HUMPHREYS:  No, thank you.

23            THE COURT:  Thanks everyone.  Thanks for staying a

24    little bit later.

25        (Proceedings concluded at 5:34 PM)

```
              C E R T I F I C A T E


    I, Stacy Johns, certify that the foregoing is an

    accurate transcription of the proceedings in the

    above-entitled matter.




    /s/ Stacy Johns              Date: July 24, 2025

    Stacy Johns, RPR, RCR
    Official Court Reporter
```

# EXHIBIT B

**U.S. DEPARTMENT OF AGRICULTURE**

August 20, 2025

Governor Andy Beshear
700 Capitol Avenue, Suite 100
Frankfort, Kentucky 40601

Dear Governor Beshear,

This formal warning is sent as a follow-up to our August 12, 2025 advance notification to Kentucky's Department of Health and Family Services for non-compliance with the U.S. Department of Agriculture's (USDA) requirement to submit Supplemental Nutrition Assistance Program (SNAP) enrollment data by July 30, 2025.

The advance notification followed USDA's several earlier requests[1] for SNAP enrollment data and required Department of Health and Family Services to come into compliance with Federal requirements at 7 U.S.C. 2020(e)(8)(A) by transmitting SNAP enrollment data no later than close of business Friday, August 15, 2025. In response to State requests, on August 14, 2025, USDA extended the deadline for compliance to August 19, 2025. Although many states have fully complied with the law and submitted SNAP enrollment data to USDA, as of the date of this letter, the Food Nutrition Service (FNS) has not received complete enrollment data from Department of Health and Family Services.

This letter serves as a formal warning under 7 C.F.R. § 276.4(d)(2) to Kentucky's Department of Health and Family Services for failure to comply with requirements for providing SNAP enrollment data. Unless Department of Health and Family Services can demonstrate compliance by transmitting the SNAP enrollment data for Kentucky, FNS will initiate a disallowance of Federal funding.

FNS will determine whether Department of Health and Family Services has demonstrated such compliance based on successful completion of either of the two actions outlined in this letter.

- Department of Health and Family Services must submit, within 30 days from receipt of this letter, evidence that it has complied.

- If Department of Health and Family Services is unable to provide such evidence of compliance, it must submit, within 30 days from receipt of this letter, a corrective action proposal that FNS finds acceptable. The corrective action proposal must demonstrate how and by what date it will comply with the data sharing requirements outlined in USDA Secretary Brooke Rollins' letter to State agencies on July 9, 2025. Department of Health and Family Services must also submit progress reports to FNS as set forth in the approved corrective action proposal.

---

[1] In letters dated May 6, 2025, July 9, 2025, and July 25, 2025, USDA informed Department of Health and Family Services this data collection.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

If Department of Health and Family Services fails to demonstrate compliance with the data sharing requirements to the satisfaction of FNS, FNS will disallow up to $30,585,395.85 for Department of Health and Family Services' SNAP administrative expenses for each quarter in which Department of Health and Family Services is out of compliance with the requirements of this letter, in accordance with 7 CFR 276.4. Because the data is needed to enhance the Government's ability to detect overpayments and fraud in SNAP, FNS has calculated this amount using Kentucky's Federal Fiscal Year (FFY) 2024 SNAP Quality Control payment error rate of 9.11%. As Department of Health and Family Services is aware, the SNAP Quality Control system measures how accurately State agencies determine eligibility and benefit amounts and, therefore, is the best measure available to FNS to estimate the cost of Department of Health and Family Services' noncompliance with USDA's data request. The amount of $30,585,395.85 represents 9.11% of Kentucky's FFY 2024 total allotments, divided by four.

The complete transmission of the required SNAP enrollment data is imperative to ensure FNS and the State agency have full insight into SNAP program integrity. In the absence of data, FNS lacks key information necessary to ensure effective stewardship of taxpayer dollars. FNS has already discovered from states that are complying with this statutory data sharing requirement that fraud or duplication in state distribution of federal funds has gone unreported and needs remediation. FNS stands ready to assist Department of Health and Family Services with resolving the deficiencies through continued technical assistance to ensure its data is transmitted in compliance with Federal requirements.

If Department of Health and Family Services wishes to discuss these matters further, please contact the FNS Tech Team at SNAPdatabase@usda.gov.


Sincerely,


Patrick A. Penn
Deputy Under Secretary
Food, Nutrition, and Consumer Services

# EXHIBIT C

|  | Approximate Annual Federal SNAP Administrative Funding Reimbursements | Annualized Amount Threatened by USDA |
|---|---|---|
| **Arizona**[i] | $74,759,000 | $178,142,515.88 |
| **California**[ii] | $1,400,000,000 | $1,353,306,992.40 |
| **Colorado**[iii] | $100,000,000 | $130,186,454.12 |
| **Connecticut**[iv] | $78,850,000 | $93,756,534.76 |
| **Illinois**[v] | $177,042,875 | $535,202,028.04 |
| **Kentucky**[vi] | $102,778,125 | $122,341,583.40 |
| **Maine**[vii] | $14,000,000 | $38,736,916.96 |
| **Maryland**[viii] | $115,000,000 | $205,733,521.80 |
| **Massachusetts**[ix] | $106,000,000 | $369,257,283.60 |
| **Michigan**[x] | $190,000,000 | $291,771,400.20 |
| **Minnesota**[xi] | $80,000,000 | $72,076,019.28 |
| **New Jersey**[xii] | $182,000,000 | $276,795,548.28 |
| **New Mexico**[xiii] | $31,200,000 | $150,165,741.24 |
| **New York**[xiv] | $409,000,000 | $1,101,500,895.48 |
| **Oregon**[xv] | $236,675,000 | $224,614,564.64 |
| **Rhode Island**[xvi] | $25,300,000 | $42,585,951.00 |
| **Washington**[xvii] | $129,500,000 | $116,386,975.12 |
| **Wisconsin**[xviii] | $97,431,908 | $61,307,113.20 |

[i] Rodgers Decl. AZ ¶ 8, ECF No. 59-5; Brady Decl. Ex. B, ECF No. 67-1.
[ii] Garcia Decl. CA Ex. A, ECF No. 59-6; Brady Decl. Ex. C.
[iii] McClelland Decl. CO ¶ 7, ECF No. 59-8; Brady Decl. Ex. O.
[iv] Canada Decl. CT ¶ 8, ECF No. 59-9; Brady Decl. Ex. D.
[v] Reagan Decl. IL ¶ 11, ECF No. 59-12; Brady Decl. Ex. E.
[vi] Dennis Decl. KY ¶ 6, ECF No. 59-13; 2nd Brady Decl. Ex. B.
[vii] Yaffe Decl. ME ¶ 7, ECF No. 59-14; Brady Decl. Ex. H.
[viii] López Decl. MD ¶ 8, ECF No. 59-15; Brady Decl. Ex. G.

ix Cole Decl. MA ¶ 8, ECF No. 59-16; Brady Decl. Ex. F.

x Haywood Decl. MI ¶ 7, ECF No. 59-17; Brady Decl. Ex. A.

xi Moore Decl. MN ¶ 6, ECF No. 59-18; Brady Decl. Ex. I.

xii Adelman Decl. NJ ¶ 8, ECF No. 59-19; Brady Decl. Ex. J.

xiii Armijo Decl. NM ¶ 8, ECF No. 59-20; Brady Decl. Ex. K.

xiv DeMarco Decl. NY ¶ 5, ECF No. 59-21; Ladov Decl. Ex. A.

xv Carpenter-Seguin Decl. OR ¶ 7, ECF No. 59-22; Brady Decl. Ex. P.

xvi Merolla-Brito Decl. RI ¶ 8, ECF No. 59-23; Brady Decl. Ex. L.

xvii Reyes Decl. WA ¶ 8, ECF No. 59-24; Brady Decl. Ex. M.

xviii Standridge Decl. WI ¶ 7, ECF No. 59-25; Brady Decl. Ex. N.