## DECLARATION OF BRIAN CAMPBELL

I, Brian Campbell, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am a resident of the District of Columbia. I am over the age of 18 and understand the obligations of an oath.

2. I currently serve as the Administrator of the Economic Security Administration (ESA) at the District of Columbia Department of Human Services (DHS). I make this declaration based on personal knowledge and on my review of information and records gathered by agency staff.

3. Among the programs administered by DHS ESA is the Supplemental Nutrition Assistance Program (SNAP), which issues monthly electronic benefits that can be used to purchase food at authorized retail stores.

4. SNAP is a key part of the District of Columbia's efforts to address hunger by supplementing the food budget of low-income families. In fiscal year 2024 (FY24), an average of 167,000 people received SNAP benefits in the District each month, including 47,000 children and 24,000 elderly individuals. More than $320 million in SNAP benefits were issued in FY24.

5. Pursuant to federal law, DHS is responsible for the issuance, control and accountability of SNAP benefits and Electronic Benefit Transaction (EBT) cards; ensuring program integrity; and supervising administration of SNAP, including processing applications for SNAP benefits and certifying eligible applicant households.  7. U.S.C. § 2020(a)(1); 7 C.F.R. § 271.4; 7 C.F.R. § 274.2.

6. The District expends approximately $90 million in administrative costs to run its SNAP program each year, approximately $44 million of which is reimbursed by the federal government.

7. As part of the SNAP application process, DHS collects sensitive personally identifiable information (PII) from applicants and recipients, including but not limited to, home addresses, dates of birth, Social Security Numbers, citizenship and immigration status information, and household income and resource information.

8. The District strictly protects the confidentiality of its residents' SNAP data in accordance with various governing laws and regulations. *See, e.g.*, 7 U.S.C. § 2020(e)(8); 7 C.F.R. § 271.2(c); D.C. Official Code § 4-209.04; D.C. Official Code § 7-241, *et seq.*; 5 U.S.C. § 552a(o)(1).

9. In the District's integrated application for SNAP and other public assistance benefits, the District represents repeatedly that it will treat applicants' information and records as confidential and that the information will only be used for purposes of the program for which they are applying, or specific exceptions set forth in the governing privacy laws and regulations. This includes a statement that: "*All information and documentation gathered for determining your Cash Assistance, Food Assistance, and Medical Assistance eligibility or other program related use is confidential. Each program provides safeguards, restricting the use and disclosure of information about you to purposes directly connected with the administration of the program. Releasing information concerning your eligibility to anyone not authorized to receive the information is a violation of Federal and D.C. law and may result in legal action. We will keep your eligibility information confidential, unless you give us permission (or we are permitted by law) to release information to others.*" It also includes the following Federal Privacy Act

statement that the U.S. Department of Agriculture (USDA) Food and Nutrition Service (FNS) mandates be included in applications for SNAP benefits: "*The collection of this information, including the SSN of each household member, is authorized under Food and Nutrition Act of 2008, as amended, 7 U.S.C. §§2011-2036. The information will be used to determine whether your household is eligible or continues to be eligible to participate in SNAP. We will verify this information through computer matching programs. This information will also be used to monitor compliance with program regulations and for program management. This information may be disclosed to other Federal and State agencies for official examination, and to law enforcement officials for the purpose of apprehending persons fleeing to avoid the law. If a SNAP claim arises against your household, the information on this application, including all SSNs, may be referred to Federal and State agencies, as well as private claims collection agencies, for claims collection action. Providing the requested information, including the SSN of each household member, is voluntary. However, failure to provide an SSN will result in the denial of SNAP benefits to each individual failing to provide an SSN. Any SSNs provided will be used and disclosed in the same manner as SSNs of eligible household members. If you do not have an SSN or cannot remember your SSN, we can help you obtain one. If you need help or have any questions, please contact the ESA Call Center at 202-727-5355.*"  *See* 7 C.F.R. § 273.2(b)(4). USDA-FNS reviewed the District's integrated benefits application during its development.

      10.     Beginning in May 2025, USDA has made several demands to states (including the District of Columbia) to obtain an unprecedented amount of data about SNAP applicants and recipients.

      11.     Among other actions, on July 9, the USDA Secretary Brooke L. Rollins sent DHS a demand for five years' worth of data on all SNAP applicants and recipients in the District. The

July 9, 2025 letter demanded the categories of records listed in a system of records notice (SORN) published June 23, 2025, and it directed states to produce the requested data no later than July 30, 2025. The categories of "routine uses" set forth in the SORN exceed the restrictions on disclosure and use of SNAP applicant and recipient information set forth in the SNAP law and regulations at 7 U.S.C. § 2020(e)(8) and 7 C.F.R. § 271.2(c).

12. On July 23, 2025, USDA-FNS Senior Policy Advisor for Integrity Brand sent DHS another letter, reiterating the USDA's demand for information. She stated that the USDA was seeking data on "individuals who have received, are currently receiving, or have applied to receive SNAP benefits from January 1, 2020, through present date. Requested data elements shall include records sufficient to identify individuals as applicants for, or recipients of, SNAP benefits, including but not limited to all household group members' names, dates of birth, social security numbers, residential and mailing addresses used or provided, as well as all data records used to determine eligibility or ineligibility." The letter also noted that USDA is requesting "transactional records from each household . . . sufficient to calculate the total dollar value of SNAP received by recipients over time . . . as well as SNAP usage and retailer data."

13. On July 25, 2025, USDA-FNS Deputy Under Secretary Patrick A. Penn sent a letter to DHS stating that "[f]ailure to take the steps necessary to provide the relevant data to FNS may trigger noncompliance procedures codified in 7 U.S.C. 2020(g)."

14. DHS responded to USDA-FNS's July letters requesting production of the data on July 30, 2025. In its response, DHS outlined its concerns with both the scope and the timeline for the data production. Specifically, DHS was concerned that there were no standard data security protocols in place, such as a negotiated data sharing agreement or memorandum of understanding. In addition, the request, as interpreted by DHS, includes millions of elements

4

coming from an integrated eligibility system used for multiple public assistance programs. All of the data would need to be reviewed and culled for quality assurance and to ensure that only records related to federal SNAP benefits are provided to USDA-FNS. The amount of data USDA-FNS requested would far exceed the capacity of the Box system USDA-FNS designated for secure transfer of the data. Further, even if DHS were able to produce this data, due to the complexity of DHS's system used to determine SNAP eligibility, FNS would not be able to understand or use the data provided unless it also received training on the data fields, DHS's data model, and the data dictionary. Even with that training, based on past experience, DHS anticipates that USDA-FNS would also likely require front-end access to review DHS's system's actual usage for each data field, which would require DHS's most specialized staff to spend hundreds of hours coaching USDA-FNS on the meaning, purpose, and usage of each of the millions of data fields provided.

15. The SORN leaves DHS caught between its obligations to FNS and to SNAP recipients. DHS is obligated to share SNAP applicant and recipient information with FNS when FNS makes lawful requests for data that are necessary to operate and monitor the SNAP program, and for certain other enumerated exceptions set forth in law and regulation. DHS is also obligated, however, to fulfill the promises it makes to SNAP applicants and recipients to maintain the confidentiality of their PII and that their information will only be used for legally authorized purposes. Because FNS has not limited its data request to data reasonably necessary to conduct a particular oversight function (as it typically does), has indicated in the SORN its intent to use PII that DHS provides in a manner that appears to exceed authorized purposes, and has not provided adequate safeguards and measures for transmitting the vast quantity of data requested, DHS cannot share the data with FNS as requested without violating its duties to

SNAP applicants. There is simply no way to un-ring the bell with respect to the promises made to beneficiaries, sometimes years back, about the uses to which their data could be put. Recipients cannot return benefits and clean out their data from databases sought by the federal government.

16. Prior to any sharing, the parties should negotiate in good faith and memorialize their agreement in an appropriate data-sharing agreement, Memorandum of Understanding, or similar document that is faithful to promises made to beneficiaries when they applied.

17. Disclosing PII of SNAP applicants and recipients to USDA may have a chilling effect on SNAP participation in the District, as individuals who are reasonably fearful of having their personal data exposed will likely be deterred from filing applications. In particular, parents who do not have a qualifying citizenship or immigration status to receive SNAP for themselves, are able to apply for SNAP on behalf of their children with qualifying status. If parents are fearful that USDA-FNS is collecting and using their SNAP PII for purposes of immigration enforcement, they will not submit applications for their otherwise eligible children, thus depriving those children of food to which they are entitled.

18. Through a federal option called "direct certification" for its school lunch program, the District currently certifies almost 50,000 children for federally funded free or reduced price meals due to their households' participation in SNAP. Any reduction in SNAP enrollment for families with schoolchildren therefore has a negative impact on federal eligibility for free or reduced-price meals. The District would either need to pick up the full price of currently federally-funded or federally-subsidized meals or exclude eligible children from those programs, again putting the District in a difficult legal position as the District, by law, cannot make

expenditures beyond our approved budgets, which were drawn up in contemplation of federal subsidies.

19. The impact of a data breach in the transfer of SNAP data could have catastrophic repercussions for vulnerable District families due to the highly sensitive nature of the data DHS ESA collects and maintains. The paper version of the District's integrated public benefits application form is 68 pages long. In it, applicants provide detailed information on their income, assets, residence, living situations, familial relationships, backgrounds, social security numbers, dates of birth, etc. The application is also used to apply for various medical assistance programs that are subject to the protections (and penalties for violation of) the federal Health Insurance Portability and Accountability Act of 1996 (HIPPA). In addition, EBT records include dates, times, locations, and amounts of benefits spent. If any of this highly sensitive data were to be compromised in the transfer and there were a data breach or other misuse of the data, SNAP applicants and recipients from the past five years could be at risk of harms including identity theft, having their EBT cards compromised, and benefits stolen. DHS could also face significant costs for breach notifications and penalties for violation of various federal and local privacy and security laws if non-SNAP related data were to be included in the data transfer due to lack of adequate time spent on quality assurance prior to transfer.

20. The data pull will require a specialized technical team to analyze the list of elements in the data-request letters and correlate each element to the thousands of data tables within the eligibility system to determine the appropriate field for each element. After the fields are determined, the team must map each field to determine the best way to relate the information and create a consolidated output. After this is done, the technical team must write code that will pull each field from the appropriate tables, records, and timeframes within the eligibility system.

The code must be tested to ensure the expected information is being returned. Once the tests are successful, a quality assurance specialist will need to review the data to ensure all information is tied to the correct individuals, the correct fields are being represented, and fields are displaying properly. Further, it will divert resources from other essential functions, directly impacting the SNAP program. The District's eligibility system already has a release schedule, which includes enhanced functionality, two years out. This would only serve to push that release schedule out further.

21. On August 20, 2025, Deputy Undersecretary Patrick Penn sent a letter to Mayor Bowser informing her that because FNS had not received the participant data, "[t]he District of Columbia is out of compliance with SNAP requirements." The letter further states that, "[a]s provided by 7 CFR 276.4, this letter serves as an advance notice that [t]he District of Columbia could be subject to suspension or disallowance of Federal funding for State SNAP administrative expenses if it does not submit to FNS the requested SNAP participant data."

22. The August 20, 2025 letter further states: "In order for FNS to determine that [t]he District of Columbia has made adequate progress towards meeting the data collection requirements, by August 22, 2025, FNS must receive a description of the actions [t]he District of Columbia will undertake in order to ensure that it will submit the requested data to FNS no later than close of business Monday, August 25, 2025. If [t]he District of Columbia fails to comply with the requirements outlined in this advance notification, the USDA may proceed with issuing a formal warning to pursue the suspension or disallowance of Federal funding for State SNAP Administrative expenses and may take any other available legal action."

23. On August 26, 2025, Deputy Undersecretary Penn sent a follow-up letter to Mayor Bowser that "serves as a formal warning under 7 C.F.R. § 276.4(d)(2) to [the] District of

Columbia's Department of Human Services for failure to comply with requirements for providing SNAP enrollment data." The letter warns that "[u]nless [the] Department of Human Services can demonstrate compliance by transmitting the SNAP enrollment data for [the] District of Columbia, FNS will initiate a disallowance of Federal funding."

24. The August 26, 2025 letter provides DHS 30 days from receipt of the letter to submit either "evidence that it has complied" with USDA-FNS's request for SNAP enrollment data or "a corrective action proposal that FNS finds acceptable." The letter further states that "FNS will disallow up to $13,868,514.17 for [DHS's] SNAP administrative expenses for each quarter in which [DHS] is out of compliance with the requirements of this letter." According to the letter, this disallowance amount was calculated using the District's "Federal Fiscal Year (FFY) 2024 SNAP Quality Control payment error rate of 17.38%," and that the "amount of $13,868,514.17 represents 17.38% of District of Columbia's FFY 2024 total allotments, divided by four."

25. Suspension or even delay of administrative funds will cripple the District's ability to administer the SNAP program. The District is not in a financial position to fill the federal government's program funding obligation. The District, aligning with federal guidance, has an integrated application (people can apply for SNAP, medical assistance, and cash assistance in a single application). As such, ESA operates with blended funding across multiple programs, using a random moment time survey to determine funding allocation. Suspension of administrative funding for SNAP would not only impact SNAP, but also the District's ability to administer Medicaid and TANF. Compliance with the federal demand could have long-term consequences too. Recent legislation (PL 119-21) also imposes both work requirements as well as a cost-sharing provision based upon the payment error rate. A suspension of administrative

funding would compromise the District's ability to comply with those two new provisions, thus further undermining the SNAP program and drawing even more FNS penalties and scrutiny. The aggregate effect, quite literally, could compromise the District's ability to administer a SNAP program altogether.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of September, 2025, in Washington, DC.

*Brian Campbell signature*

Brian Campbell
Administrator, Economic Security Administration
District of Columbia Department of Human Services