IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, et al., <br><br> Defendants. | Case No. 25-cv-06310-MMC <br><br> **ORDER GRANTING TEMPORARY RESTRAINING ORDER AS TO ALL PLAINTIFF STATES OTHER THAN STATE OF NEVADA; SETTING FURTHER BRIEFING SCHEDULE AND HEARING DATE** |

Before the Court is the "Motion for Stay or Preliminary Injunction," filed August 18, 2025, by twenty-one states and the District of Columbia (hereinafter, "Plaintiff States").[1] Defendant United States Department of Agriculture ("USDA") has filed opposition, to which Plaintiff States have replied. The matter was heard on September 16, 2025. Sebastian Brady and Paul Stein of the Office of the Attorney General of California appeared on behalf of the State of California and Mark Ladov, Special Counsel to the Attorney General of New York, appeared on behalf of the State of New York. Benjamin S. Kurland and Bradley P. Humphreys of the United States Department of Justice appeared on behalf of USDA.

//

---

[1] Plaintiff States, in the order set forth in the caption of the Complaint, are the State of California, the State of New York, the State of Arizona, the State of Colorado, the State of Connecticut, the State of Delaware, the District of Columbia, the State of Hawai'i, the State of Illinois, the Office of the Governor ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky, the State of Maine, the State of Maryland, the Commonwealth of Massachusetts, the State of Michigan, the State of Minnesota, the State of Nevada, the State of New Jersey, the State of New Mexico, the State of Oregon, the State of Rhode Island, the State of Washington, and the State of Wisconsin.

Having read and considered the parties' respective written submissions and the arguments made at the hearing, the Court, as discussed in detail below, will grant a temporary restraining order and will afford the parties leave to file supplemental briefing to be considered by the Court in connection with a further hearing on the instant motion.

## BACKGROUND

The Supplemental Nutrition Assistance Program ("SNAP") provides to eligible households monthly benefits that can be used to purchase food. "Congress created SNAP—formerly known as the food stamp program—to alleviate hunger and malnutrition by increasing the food purchasing power of low-income households." Hall v. U.S. Dep't of Agriculture, 984 F.3d 825, 831 (9th Cir. 2020) (internal quotation, citation, and alterations omitted). Each participating State determines eligibility and retains all SNAP applications, as well as other information regarding persons who qualify for benefits. See 7 U.S.C. § 2020(a)(1) (providing "[t]he state agency of each participating State shall have responsibility for certifying applicant households and issuing EBT [Electronic Benefit Transfer] cards"). The Food and Nutrition Service ("FNS"), a division within USDA, however, oversees the State agencies' compliance with SNAP requirements. See 7 C.F.R. § 275.6(a) (providing "FNS shall make determinations of the efficiency and effectiveness of State agencies' administration of SNAP" and, in so doing, "shall use all information that is available relating to State agencies' administration of [SNAP]").

On March 20, 2025, President Donald J. Trump issued Executive Order 14243, titled "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos," wherein "Agency Heads," e.g., the Secretary of Agriculture Brooke L. Rollins ("Secretary Rollins"), are directed to "ensure the Federal Government has unfettered access to comprehensive data from all State programs that receive Federal funding, including, as appropriate, data generated by those programs but maintained in third-party databases." See 90 FR 13681 § 3(c) (March 20, 2025). The Executive Order states that "all necessary steps" are to be taken "for the purposes of pursuing Administration priorities related to the identification and elimination of waste, fraud, and abuse," and that such priorities

"include[ ] authorizing and facilitating both the intra- and inter- agency sharing and consolidation of unclassified agency records." See id. § 3(a).

In light thereof, USDA is requiring each State agency to provide certain of its SNAP records to USDA. By the instant motion, Plaintiff States seek an order preliminary enjoining USDA from requiring production of the SNAP records and to preclude USDA from instituting or continuing noncompliance procedures.

In particular, on May 6, 2025, FNS wrote to the State agencies to inform them USDA was "taking steps to require all States to work through their processors to submit to the USDA the following data," for "the period beginning January 1, 2020, through present":

> 1. Records sufficient to identify individuals as applicants for, or recipients of, SNAP benefits, including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers.
>
> 2. Records sufficient to calculate the total dollar value of SNAP benefits received by participants over time, with the ability to filter benefits received by date ranges.

(See Gillette Decl. Ex. B ("May 6 letter").) As support for such request, FNS cited to two provisions in the SNAP Act, namely, 7 U.S.C. § 2020(a)(3) and § 2020(e)(8)(A). (See id.)[2] Although said letter did not include a deadline, it stated "[f]ailure to grant processor authorizations or to take the steps necessary to provide SNAP data to FNS may trigger noncompliance procedures codified at 7 U.S.C. § 2020(g)." (See id.)

Next, on June 23, 2025, USDA published in the Federal Register a "System of Records Notice" ("SORN"), in which USDA gave notice it would "create a new system of records," which system would be used "to validate the accuracy of eligibility determinations and strengthen SNAP and government program integrity," see 90 FR 26521-01, at 26521 (June 23, 2025), and that the "[i]nformation in this system" would be

---

[2] Sections 2020(a)(3) and 2020(e)(8)(A) are discussed in more detail below. The letter also cited 7 C.F.R. § 271.1(c)(1), which regulation, in essence, restates the provisions set forth in § 2020(e)(8)(A) in more specific detail.

3

1  "provided by the 53 State agencies that administer SNAP and their designated vendors
2  and/or contractors," see id. at 26522.[3]  As in the May 6 letter, the SORN asserts that the
3  legal authority for requiring the State agencies to provide such information is 7 U.S.C.
4  § 2020(a)(3) and § 2020(e)(8)(A).  See id. at 26521.  The SORN also states that the
5  records stored in the system "may be disclosed pursuant to the permitted routine uses
6  outlined [in the SORN]," which include that, "[w]hen a record on its face, or in conjunction
7  with other records, indicates a violation or potential violation of law . . ., the USDA/FNS
8  may disclose the record to the appropriate agency, whether Federal, foreign, State, local,
9  or tribal" (hereinafter, "Routine Use 8"), and that USDA may disclose the records "[t]o
10 support another Federal agency or to an instrumentality of any governmental jurisdiction
11 within or under the control of the United States (including any State or local governmental
12 agency) that administers . . . a Federal benefits program funded in whole or in part by
13 Federal funds, when disclosure is deemed reasonably necessary by USDA to prevent,
14 deter, discover, detect, investigate, examine, prosecute, sue with respect to, defend
15 against, correct, remedy, or otherwise combat fraud, waste, or abuse in such program"
16 (hereinafter, "Routine Use 11").  See id. at 26522-23.

17       On July 9, 2025, Secretary Rollins wrote to all State agencies, citing Executive
18 Order 14243 and the SORN, to inform them USDA was "requiring" them to submit to
19 USDA, no later than the close of business on July 30, 2025, the "SNAP data" identified in
20 the SORN.  (See Gillette Decl. Ex. C.)  Thereafter, on July 23, 2025, FNS sent a letter to
21 all State agencies, citing the May 6 letter, and likewise requiring the agencies to transmit
22 the SNAP data no later than July 30, 2025 (see id. Ex. D), and, on July 25, 2025, sent an

---

[3] The SORN describes the information to be provided as "records containing personally identifying information, including but not limited to SNAP participant name, Social Security Number (SSN), date of birth (DOB), residential address, [EBT] card number, and case record identifier number or other identifiers or data elements maintained by States, vendors, or contractors to identify SNAP recipients," as well as "information derived from and associated with EBT transactions, including but not limited to records sufficient to calculate the total dollar value of SNAP benefits received by participants over time, such as applied amounts and benefit available dates."  See id.

4

additional letter reminding the State agencies of the July 30 deadline and reiterating that a failure to comply "may trigger noncompliance procedures codified in 7 U.S.C. § 2020(g)" (see id. Ex. E).

On July 28, 2025, Plaintiff States filed the instant action, "seeking a judicial declaration that the federal government's unprecedented demands are unlawful, and that any state SNAP data that is appropriately disclosed to the federal government may not be used or disclosed outside of USDA . . . for non-SNAP-related purposes." (See Compl. ¶ 21.) Plaintiff States seek such relief under the Administrative Procedure Act ("APA"), as well as under a claim titled "Ultra Vires" and a claim brought under the Spending Clause of the United States Constitution.

On August 18, 2025, Plaintiff States filed the instant motion.

Shortly thereafter, on August 20, 2025, FNS sent a "formal warning" to the Governor of each Plaintiff State, in which FNS asserted that it "will initiate a disallowance of Federal funding" if such Plaintiff State did not "transmit SNAP enrollment data" to USDA within 30 days, i.e., September 19, 2025. (See Brady Decl. Exs. A-P.)[4][5] The formal warning cites to 7 U.S.C. § 2020(e)(8)(A) as support for the demand. The formal warning also sets forth the amount FNS will disallow, which amount varies from Plaintiff State to Plaintiff State, e.g., "up to $338,326,748.10" in funding to California for each quarter of noncompliance and "up to $133,800,507.01" in funding to Illinois for each said quarter. (See Brady Decl. Exs. A-P.)

**DISCUSSION**

By the instant motion, Plaintiff States seek a preliminary injunction prohibiting USDA from demanding the SNAP data and from instituting noncompliance proceedings, i.e., disallowing funding as a consequence of noncompliance.

---

[4] The letter states that,"[i]n response to State requests," the July 30 deadline had been extended to August 19, 2025 (See id.)

[5] On August 20, 2025, the same formal warning was sent to the Mayor of the District of Columbia. (See Corley Decl. ¶ 51; Campbell Decl. ¶¶ 23-24.)

**A. Need for Preliminary Injunctive Relief**

Under the APA, an entity "adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof," see 5 U.S.C. § 702, and, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings," see 5 U.S.C. § 705.

"[T]he factors used to determine whether to issue a § 705 stay under the APA are the same equitable factors used to consider whether to issue a preliminary injunction." Immigrant Defenders Law Center v. Noem, 145 F.4th 972, 995 (2025).

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest," Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008), or, alternatively, that there are "[1] serious questions going to the merits, and [2] a balance of hardships that tips sharply toward the plaintiff," provided there also is a "[3] likelihood of irreparable injury and [4] that the injunction is in the public interest," see Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).

The Court next considers the requisite factors.

**1. Likelihood of Success on the Merits**

Plaintiff States argue they are likely to succeed on the merits of their APA claims and their ultra vires claim.[6]

    **a. Ultra Vires Claim**

Plaintiff States allege USDA has "acted ultra vires in demanding Plaintiff States' SNAP recipient data," because "no statute authorizes such a demand" in the absence of

---

[6] Plaintiff States do not base the instant motion on their claim under the Spending Clause.

6

1   "a data and security protocol agreed to by the Plaintiff States."  (See Comp. ¶ 354.)

2   As the Supreme Court explained earlier this year, an "ultra vires" claim, i.e., a "nonstatutory" claim, was recognized "[b]efore enactment of the APA," and could be brought "where an agency's action was ultra vires – that is, unauthorized by any law and in violation of the rights of the individual."  See Nuclear Regulatory Comm'n v. Texas, 605 U.S. 665, 680 (2025) (internal quotation and citation omitted).  Today, however, such a claim cannot be brought where, "as is usually the case," a "statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review."  See id. at 681.

Here, Plaintiff States have brought claims under the APA, and, consequently, they fail to show their ultra vires claim is likely to succeed, or, alternatively, that they have raised serious questions going to the merits of said claim.

### b. APA Claims

Under the APA, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be— (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law."  See 5 U.S.C. § 706.

Here, Plaintiff States allege USDA's demand is "contrary to law [and] without observance of procedure required by law" (see Compl. at 65:1-2; see also Compl. ¶ 34), as well as "arbitrary and capricious" (see Compl. at 71:1-2).

### (1) Finality

As relevant to the instant case, the challenged agency action, to be reviewable under the APA, must be "final agency action."  See 5 U.S.C. § 704.

"As a general matter, two conditions must be satisfied for agency action to be 'final':  [f]irst, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," Bennett v. Spear,

1  520 U.S. 154, 177-78 (1997) (internal quotation and citation omitted), and "second, the
2  action must be one by which rights or obligations have been determined, or from which
3  legal consequences will flow," id. at 178 (internal quotation and citation omitted).
4        Here, Plaintiff States assert, and USDA has not disagreed, that the demand for
5  SNAP data constitutes final agency action.  The Court agrees.  As noted, Secretary
6  Rollins wrote to the State agencies on July 9, 2025, to inform them that, in light of
7  Executive Order 14243 and the SORN, State agencies are "require[d]" to submit the
8  SNAP date to the USDA no later than July 30, 2025, i.e., a determination that is neither
9  tentative nor interlocutory.  (See Gillette Decl. Ex. C; Corley Decl. ¶ 24.)[7]  Additionally,
10 although the FNS's letter dated July 25, 2025, stated a failure to comply "may trigger
11 noncompliance procedures" (see Gillette Decl. Ex. E (emphasis added)), the statute
12 authorizing such procedures states that the Secretary of Agriculture, upon finding a
13 failure, "without good cause," to comply "shall proceed to withhold from the State . . .
14 funds authorized under [the SNAP Act]."  See 7 U.S.C. § 2020(g) (emphasis added).
15       In sum, the challenged action not only is final but also determines Plaintiff States'
16 obligations and the consequences flowing from a failure to comply therewith.

### (2) Ripeness

18  USDA argues that the APA claims are not ripe.
19  "Evaluating ripeness in the agency context requires considering (1) whether
20 delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention
21 would inappropriately interfere with further administrative action; and (3) whether the
22 courts would benefit from further factual development of the issues presented." See
23 Environmental Defense Center v. Bureau of Ocean Energy Management, 36 F.4th 850,
24 870 (9th Cir. 2022); see also id. at 867-71 (finding determination of whether agency
25 action is "final" and whether such action is "ripe" are separate questions).

---

[7] As set forth above, see n.4, the deadline to comply was extended by the USDA to August 19, 2025.

8

Here, the sole reason advanced by USDA as to why the APA claims are not ripe is that Plaintiff States have not availed themselves of an administrative review procedure set forth in the SNAP Act and a regulation implemented thereunder. See 7 U.S.C. § 2023(a)(3)-(5); 7 C.F.R. §§ 276.7. The cited administrative review procedure, however, is not mandatory, see 7 U.S.C. § 2023(a)(3) (providing State agency aggrieved by USDA action "may" seek administrative review); 7 C.F.R. § 276.7(a) (providing State agency "may" appeal claim asserted by FNS), and the Supreme Court has held that the failure to avail oneself of an administrative review procedure does not bar an APA claim where the review is "optional," see Darby v. Cisneros, 509 U.S. 137, 146-47 (1993) (holding, under APA, exhaustion of administrative remedies required only where "statute or rule clearly mandates").

Accordingly, the Court finds the APA claims are ripe, and next turns to the merits of those claims.

**(3) Whether USDA's Demand is Contrary to SNAP Act**

The Court begins with Plaintiff States' claim that the demands for data are contrary to the SNAP Act. In support of such argument, Plaintiff States cite two provisions in the SNAP Act, namely, 7 U.S.C. § 2020(a)(3) and § 2020(e)(8)(A).

The former provides:

(3) Records

    (A) In general

    Each State agency shall keep such records as may be necessary to determine whether the program is being conducted in compliance with [the SNAP Act] (including regulations issued under [the SNAP Act).

    (B) Inspection and audit

    All records, and the entire information systems in which records are contained, that are covered in subparagraph (A) shall—
        (i) be made available for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary . . . .

See 7 U.S.C. § 2020(a)(3).

The latter provides that each State agency shall have a "plan of operation" that provides:

> (8) safeguards which prohibit the use or disclosure of information obtained from applicant households, except that—
>
>> (A) the safeguards shall permit—
>>
>>> (i) the disclosure of such information to persons directly connected with the administration or enforcement of the provisions of this chapter, regulations issued pursuant to this chapter, Federal assistance programs, or federally-assisted State programs; and
>>>
>>> (ii) the subsequent use of the information by persons described in clause (i) only for such administration or enforcement[.]

See 7 U.S.C. § 2020(e)(8).

Plaintiff States argue that § 2020(a)(3) requires USDA to obtain an agreed protocol before demanding SNAP data from a State agency, that, because the Secretary has not entered into a protocol agreement with any State agency,[8] they cannot be required to submit the data or be sanctioned for failing to do so, and, consequently, that the demand for data is contrary to the SNAP Act. Plaintiff States additionally argue that they cannot be required to submit the data or be sanctioned for failing to do so, because, under § 2020(e)(8), they are required to safeguard all information obtained from applicant households and USDA has announced in the SORN that it has the right to provide the SNAP data it obtains from State agencies to a large number of other entities, see 9 CR at 26522-23 (Routine Uses 8 and 11), disclosures that exceed the limited purpose for which the State agencies are entitled to provide such data, see 7 U.S.C. § 2020(e)(8)(A) (permitting subsequent use by USDA only for "administration and enforcement" of SNAP ACT).

//

---

[8] The USDA acknowledges no such agreements exist. (See Def.'s Opposition at 15:15-16.)

At the hearing, USDA argued for the first time that it is entitled to seek information from State agencies solely under § 2020(e)(8)(A), and, consequently, that the lack of agreed protocols required under § 2020(a)(3) does not render the demand for SNAP data unlawful under the APA.[9]

The two sections do appear to be distinct, in that they cover different recipients and different material. The former applies only to the "Secretary," i.e., USDA, and covers "all records" and "entire information systems," see 7 U.S.C. § 2020(a)(3)(B), whereas the latter applies not only to USDA but also to other assistance programs and covers only a subset of the above-referenced records, namely, "information obtained from applicant households," see 7 U.S.C. § 2020(e)(8)(A).

As Plaintiff States have not had a meaningful opportunity to address USDA's new argument, however, the Court makes no finding at this time as to its merits and, as set forth later herein, will afford Plaintiff States an opportunity to file supplemental briefing thereon.[10] The Court next turns to Plaintiff States' APA claim to the extent it is based on § 2020(e)(8)(A).

Even if USDA's demand is governed only under § 2020(e)(8)(A), USDA is subject to strict restrictions placed on its use of the information so obtained, see 7 U.S.C. § 2020(e)(8)(A)(ii), and, as Plaintiff States point out, USDA has announced its intent to use such information in ways well beyond those permitted under § 2020(e)(8)(ii). In particular, as discussed above, USDA, in the SORN, has asserted the right to disclose the data to a large number of entities, including numerous entities that are not assistance programs, and for purposes other than the administration or enforcement of an

---

[9] As set forth above, the May 6 letter and the SORN cite both § 2020(a)(3) and §2020(e)(8)(A) as authority. In the formal warnings, however, sent shortly after the instant motion was filed, USDA cited as authority only § 2020(e)(8)(A).

[10] In light thereof, the Court does not address herein Plaintiff States' argument that, even if an agreed protocol had been obtained, USDA's right to "inspect[ ] and audit" the records does not encompass "possession" of such materials. (See Pls.' Mot. at 17:20-25.)

1  assistance program. See 9 FR at 26522-23 (Routine Uses 8 and 11).  As Plaintiff States
2  are required by law to safeguard information they obtain from applicant households and
3  are permitted to disclose such information only for the limited purposes discussed above,
4  they are, in effect, prohibited from disclosing it where the recipient announces in advance
5  an intent to use it for some other purpose.
6  　　　　Accordingly, the Court finds Plaintiff States are likely to show the SNAP Act
7  prohibits them from disclosing to USDA the information demanded in the formal warnings
8  and, consequently, that they have shown a likelihood of success on their claim that
9  USDA, in making such demand, acted in a manner contrary to law.

## (4) Other Claims Under the APA

11  　　　　The Court next addresses the other APA claims argued in Plaintiff States' motion,
12  and, as set forth on the record at the hearing, the Court, for the reasons stated at the
13  hearing, found Plaintiff States were unlikely to succeed or raise serious questions going
14  to the merits of such claims, which reasons the Court next summarizes.
15  　　　　As to Plaintiff States' claim that USDA has failed to provide an "explanation for the
16  change" in its "policy" pertaining to the scope of its demand for SNAP data, see Encino
17  Motorcars, LLC v. Navarro, 579 U.S. 211, 221-222 (2016) (setting forth agency's
18  obligation to explain change of policy), Plaintiff States have made an insufficient showing
19  that a policy pertaining to USDA's obtaining SNAP data existed prior to the subject
20  demand, let alone that a change in policy has occurred.
21  　　　　As to Plaintiff States' claim that USDA's decision to demand SNAP data "lacks any
22  rational connection between the facts found and the choice made" (see Pls.' Mot. at 14:9-
23  10 (internal quotation and citation omitted)); see also Encino Motorcars, 579 U.S. at 221
24  (setting forth "procedural requirement[ ]" that federal agency "must give adequate
25  reasons for its decisions"), Plaintiff States have made an insufficient showing that
26  USDA's decision lacked the requisite rational connection, the stated reason for the action
27  taken being the need, inter alia, to "verify[ ] SNAP recipient eligibility against federally
28  maintained data bases" and "identify[ ] and eliminat[e] duplicate enrollments," see 9 FR at

1    26521.

2    As to Plaintiff States' claim that USDA "ignored several important aspects of the
3    problem" (see Pls.' Mot. at 12:19-21) (internal quotation and citation omitted), in
4    particular, the possibility of computer hackers accessing USDA's database, the potential
5    chilling effect as to individuals seeking benefits, and the burden on State agencies to
6    submit the volume of SNAP data, see Motor Vehicle Manufacturers Ass'n v. State Farm
7    Mutual Automobile Ins. Co., 463 U.S. 29, 43 (1983) (holding agency's action is deemed
8    "arbitrary and capricious" when it "entirely fail[s] to consider an important aspect of the
9    problem"), there is an insufficient showing that those concerns were not considered.

10   As to Plaintiff States' claim that USDA did not consider the public comments
11   submitted in response to the SORN, see 5 U.S.C. § 552a(e)(11) (providing agency
12   publishing SORN must "provide an opportunity for interested persons to submit written
13   data, views, or arguments to the agency"), although the Secretary's letter of July 9, 2025,
14   requiring State agencies to comply with the demand preceded the July 23, 2025,
15   deadline for public comment, the deadline to comply was extended by more than three
16   weeks to August 19, 2025, thereby leaving adequate time for consideration of all
17   comments submitted.  Additionally, USDA has offered evidence that the comments were
18   considered (see Corley Decl. ¶ 21 (summarizing comments received and USDA's
19   consideration thereof)), and that, in light of those comments, USDA "is working to
20   implement [a] change" to the SORN, namely, to eliminate a portion of Routine Use 8 in
21   which the USDA claimed a right to disclose SNAP data to "foreign" governments (see
22   Corley Decl. ¶ 22).

23   As to Plaintiff States' claim that USDA failed to comply with the Paperwork
24   Reduction Act when it submitted to the Director of the Office of Management and Budget
25   ("OMB") a request for what USDA described as a nonsubstantive change, see 44 U.S.C.
26   § 3507 (setting forth process federal agency must follow before "conduct[ing] or
27   sponsor[ing] the collection of information), the decision of the OMB to approve such
28   request is not subject to judicial review, see 44 U.S.C. § 3507(d)(6).

Lastly, as to Plaintiff States' claim that the USDA failed to comply with the Computer Matching Act, USDA, in its opposition to the instant motion, made the argument that Plaintiff States lack standing to assert such claim, in that the Computer Matching Act protects the privacy of individuals who have provided information, see 5 U.S.C. § 552a(o), and Plaintiff States, in their reply, have not addressed the issue.[11]

### (5) Summary: Likelihood of Success on the Merits

The Court finds Plaintiff States have shown a likelihood of success on the merits of their claim that USDA's demand and threatened disallowance of funding are contrary to the SNAP Act and, in all other respects, have failed to make the requisite showing.

### 2. Likelihood of Irreparable Harm

The amount of SNAP funds the USDA has formally warned it will disallow if Plaintiff States do not comply equals, for at least 17 of the 22 Plaintiff States, the entirety, or close to it, of the amounts to which those States otherwise would be entitled (see Second Brady Decl. Ex. C), and the amounts proposed to be disallowed as to the other Plaintiff States are substantial as well

Further, Plaintiff States have offered declarations from their respective agency officials, who explain that having SNAP funds withheld is likely to require them to cut staffing and otherwise greatly reduce their ability to comply with their obligations under the SNAP Act to administer benefits, including, for example, the speed with which applications can be reviewed and required reports can be prepared.

No such declaration, however, was filed by any official on behalf of the State of Nevada. Further, the USDA has offered evidence that the State of Nevada, as of August 12, 2025, "had fully complied with USDA's request for SNAP data" (see Corley Decl. ¶ 29), and Plaintiff States have not submitted any evidence to the contrary. Under such

---

[11] Moreover, although not discussed at the hearing, there is no evidence to support a finding that USDA intends to act in violation of the strictures set forth in the Computer Matching Act, and, consequently, any contention USDA intends to do so is, at best, speculative.

circumstances, Plaintiff States have failed to show the State of Nevada is likely to incur a disallowance of any SNAP funding.

With respect to the remaining 21 Plaintiff States, USDA argues the claimed injuries identified in the above-referenced declarations can be remedied by a monetary award, namely, recovery of the withheld funds, and, consequently, do not constitute the irreparable harm required for preliminary injunction relief. The Ninth Circuit has held, however, that the "denial of reimbursements" by the federal government can constitute "irreparable" injury, as such denial can cause "economic injuries for which monetary damages are not available." See Washington v. Trump, 145 F.4th 1013, 1036-37 (9th Cir. 2025); see also East Bay Sanctuary Covenant v. Biden, 993 F.3d 640, 677 (9th Cir. 2021) (holding "significant change[s] in [organization's] programs" constitutes irreparable "intangible injury").

USDA next argues Plaintiff States have no need for preliminary relief because they have the option of seeking administrative relief whereby they would be entitled to a stay of the imposition of disallowances until such time as their administrative remedies are exhausted. See 7 C.F.R. § 276.7(e). As discussed above, however, Plaintiff States need not exhaust such optional administrative process before bringing their APA claims, see Darby, 509 U.S. at 154, and the Court finds a ruling requiring a party to pursue administrative remedies in lieu of preliminary relief would seriously undermine such party's right to proceed in court.[12]

Accordingly, the Court finds Plaintiff States, with the exception of the State of Nevada, have shown they are likely to incur irreparable harm if not provided injunctive

---

[12] The Court also finds unpersuasive USDA's argument that the filing of the instant motion three weeks after the filing of the Complaint signifies a lack of irreparable injury. The asserted three-week "delay" here is in no manner comparable to the lengthy periods of delay described in the authority cited by the USDA. See Y.Y.G.M. SA v. Redbubble, Inc., 75 F.4th 995, 1066 (9th Cir. 2022) (providing example of trademark holder that learned of infringement, yet waited three years to file suit and seek preliminary injunction; noting "any injury [the trademark holder] would suffer before trial on the merits would be a relatively short extension of the injury that [the trademark holder] knowingly suffered for three years before it filed suit").

relief.

### 3. Balance of Hardships/Public Interest

The two remaining factors are that the balance of hardships tips in the plaintiff's favor and that the injunction is in the public interest. See Winter, 555 U.S. at 20. Where, as here, the federal government is the defendant, "balancing the hardships and the public interest merge." See Immigrant Defenders Law Center, 145 F.4th at 994. Thus, a district court balances the public's interest asserted by the federal government in the particular case and the hardships to the plaintiff. See id.

The hardships to Plaintiff States are set forth above. The public interest asserted by the USDA is that "[the] proposed injunction would limit the President's ability to effectuate the policies the American people elected him to pursue, including the President's ability to identify fraud, waste, and abuse in this critical program." (See Opposition at 24:16-18.) "[T]he mere existence of the Executive Branch's desire to enact a policy," however, "is not sufficient to satisfy the irreparable harm prong." See Immigrant Defenders Law Center, 145 F.4th at 985. "If that were the case," the Ninth Circuit has explained, "no act of the [E]xecutive [B]ranch asserted to be inconsistent with a legislative enactment could be the subject of a preliminary injunction [and] [t]hat cannot be so." See id. Further, while eliminating fraud, waste, and abuse in a government assistance program is in the public interest, there is nothing in the record to suggest that something has happened to warrant altering the status quo at this time.[13]

Accordingly, the third and fourth factors weigh in favor of Plaintiff States, with the exception of the State of Nevada.

//
//

---

[13] For example, no evidence has been offered to show the SNAP data submitted by states that have complied with USDA's demand has revealed a significant amount of fraud by persons applying for SNAP benefits or a significant number of eligibility errors on the part of Plaintiff States.

16

**B. Form of Relief**

As discussed above, the Court finds all relevant factors support a grant of preliminary relief, and, in that regard, finds it preferable to first issue a temporary restraining order for the purpose of preserving the status quo and to afford the parties leave to file supplemental briefing to address the two issues set forth below.

First, the Court will afford Plaintiff States an opportunity to file a Supplemental Reply to address the USDA's argument, made for the first time at the hearing, that, pursuant to 7 U.S.C. § 2020(e)(8)(A), it is entitled to receive the entirety of the data it seeks without the need to obtain the agreed upon protocols required by 7 U.S.C. § 2020(a)(3)(B).

Second, because USDA, during literally the last minute of said hearing, suggested, for the first time, that if preliminary relief is granted, it be limited to enjoining USDA from using the SNAP data for certain of the purposes set forth in the SORN, the Court will afford the parties leave to address the propriety and workability of available alternative forms of relief, as well as the specific language of any such order.

**C. Remaining Issues**

USDA requests, in the event the Court enters an injunction, an order imposing a bond, as well as an order staying the injunction during the pendency of any appeal or, alternatively, administratively staying the injunction for seven days to afford USDA an opportunity to request a stay from an appellate court.  The Court does not address the parties' respective positions on these matters, as the Court, by the instant order, has not issued a preliminary injunction.

**CONCLUSION**

For the reasons stated above:

1. The Court finds Plaintiff States, other than the State of Nevada, have shown their entitlement to a temporary restraining order.  Specifically, with respect to all Plaintiff States other than the State of Nevada, the USDA is hereby TEMPORARILY ENJOINED from acting on the above-discussed formal warning letters, including by disallowing

SNAP funding.

2. To the extent Plaintiff States seek preliminary relief on behalf of the State of Nevada, the motion is hereby DENIED.

3. To the extent Plaintiff States seek a preliminary injunction on behalf of all other Plaintiff States, the Court sets the following briefing schedule and hearing:

    a. No later than September 26, 2025, Plaintiff States may file a Supplemental Reply, limited to ten pages in length exclusive of any exhibits, to address the USDA's argument that, pursuant to 7 U.S.C. § 2020(e)(8)(A), it is entitled to receive the data sought.

    b. No later than September 26, 2025, USDA may file a Supplemental Opposition, limited to ten pages in length exclusive of any exhibits, to address, in the event a preliminary injunction is granted, any form of relief as an alternative to that granted in the Temporary Restraining Order.

    c. No later than October 3, 2025, Plaintiff States may file a response, limited to ten pages in length exclusive of any exhibits, to any such supplemental opposition.

    d. The Court will conduct a hearing on Plaintiff States' motion for a preliminary injunction on Thursday, October 9, 2025, at 10:00 a.m.

**IT IS SO ORDERED.**

Dated: September 18, 2025

                                            MAXINE M. CHESNEY
                                            United States District Judge