1  ROB BONTA
   Attorney General of California
2  PAUL STEIN
   Supervising Deputy Attorney General
3  ANDREW Z. EDELSTEIN
   ANNA RICH
4  EDWARD P. WOLFE
   ROBIN GOLDFADEN
5  SEBASTIAN BRADY
   WILLIAM BELLAMY
6  MARIA F. BUXTON
   Deputy Attorneys General
7  State Bar No. 318563
     455 Golden Gate Avenue, Suite 11000
8    San Francisco, CA 94102-7004
     Telephone:  (415) 510-3873
9    Fax:  (415) 703-5480
     E-mail:  Maria.Buxton@doj.ca.gov
10 *Attorneys for Plaintiff State of California*

11 *Additional Counsel Listed on Signature Page*

12                    IN THE UNITED STATES DISTRICT COURT

13                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

14                          SAN FRANCISCO DIVISION

15

16

17 | **STATE OF CALIFORNIA; STATE OF** | Case No. 3:25-cv-06310-MMC |
   | **NEW YORK; STATE OF ARIZONA;** | |
18 | **STATE OF COLORADO; STATE OF** | **AMENDED COMPLAINT FOR** |
   | **CONNECTICUT; STATE OF** | **DECLARATORY AND INJUNCTIVE** |
19 | **DELAWARE; DISTRICT OF** | **RELIEF** |
   | **COLUMBIA; STATE OF HAWAI'I;** | |
20 | **STATE OF ILLINOIS; OFFICE OF THE** | |
   | **GOVERNOR** ex rel. Andy Beshear, in his | |
21 | official capacity as Governor of the | Courtroom:  7 |
   | Commonwealth of Kentucky; **STATE OF** | Judge:    Maxine M. Chesney |
22 | **MAINE; STATE OF MARYLAND;** | Trial Date: None set |
   | **COMMONWEALTH OF** | Action Filed: July 28, 2025 |
23 | **MASSACHUSETTS; STATE OF** | |
   | **MICHIGAN; STATE OF MINNESOTA;** | |
24 | **STATE OF NEVADA; STATE OF NEW** | |
   | **JERSEY; STATE OF NEW MEXICO;** | |
25 | **STATE OF OREGON; JOSH SHAPIRO**, in | |
   | his official capacity as Governor of the | |
26 | Commonwealth of Pennsylvania; **STATE OF** | |
   | **RHODE ISLAND; STATE OF** | |
27 | **WASHINGTON; STATE OF WISCONSIN,** | |

28                                   Plaintiffs,

                                        1

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE; BROOKE ROLLINS, in
her official capacity as U.S. Secretary of
Agriculture; U.S. DEPARTMENT OF
AGRICULTURE'S OFFICE OF
INSPECTOR GENERAL,

                              Defendants.

# TABLE OF CONTENTS

Table of Contents ................................................................................................... 3

Introduction ......................................................................................................... 6

Jurisdiction and Venue ........................................................................................ 11

Parties ................................................................................................................. 11

    I.     Plaintiffs ................................................................................................ 11

    II.    Defendants ........................................................................................... 15

Background ......................................................................................................... 15

    I.     Plaintiff States serve millions of food-insecure residents through SNAP. ........... 15

          A.    To administer SNAP, state agencies collect applicants' highly sensitive personal information. .............................................................. 18

          B.    Plaintiff States use third-party vendors to administer EBT cards, and those vendors collect sensitive data on SNAP recipients, subject to strict confidentiality requirements. ........................................... 20

          C.    States periodically share some SNAP data with USDA, but never large swaths of PII or other sensitive data. ............................................... 21

          D.    As required by statute, States verify the eligibility and immigration status of SNAP applicants. .................................................................. 22

    II.    Federal law strictly limits the use and disclosure of personal information collected by state agencies about SNAP applicants and recipients. .................... 23

          A.    The SNAP Act and USDA's implementing regulations ........................... 23

          B.    The Privacy Act of 1974 ...................................................................... 24

          C.    The Computer Matching and Privacy Protection Act of 1988 ................. 26

          D.    The Paperwork Reduction Act & the E-Government Act ....................... 27

          E.    The Authority of OIG to Request Documents .......................................... 29

    III.    Defendants' demands are only one part of a campaign by the Trump administration to amass Americans' sensitive, personal data and misuse that data for unauthorized purposes. .................................................................. 30

          A.    President Trump has issued Executive Orders paving the way for DOGE and other federal agencies to gain access to sensitive federal benefit data. ..................................................................................... 30

          B.    Public reports reveal that DOGE is compiling sensitive personal information collected by federal agencies into a mass database. .............. 31

          C.    CMS recently demanded Medicaid data from States, then shared it with DHS and, after States sued, gave ICE unfettered access to state data. .................................................................................................. 34

          D.    On the insistence of DOGE, the IRS and DHS have already begun creating a system for sharing home addresses of deportation targets with DHS. ........................................................................................... 36

IV.   USDA has already taken steps to advance the administration's campaign to collect and misuse Americans' data. ........................................................ 37

    A.   DOGE has already begun accessing sensitive data systems at USDA. .......................................................................................... 37

    B.   USDA has recently erased guidance on its website promising that information provided by SNAP applicants would not be used for immigration enforcement. ...................................................... 38

V.   In an unprecedented move, USDA demanded five years' worth of personal information on SNAP applicants and recipients from Plaintiff States. ................. 40

    A.   USDA first attempted to obtain all SNAP participant data directly from Plaintiffs' EBT vendors, then changed course after being sued. ...... 40

    B.   USDA then issued a SORN notifying stakeholders of its intent to collect SNAP data, and hundreds of stakeholders submitted comments criticizing the proposal. .......................................... 42

    C.   USDA disregarded all comments and demanded SNAP data from Plaintiff States by July 30, 2025. .............................................. 44

    D.   USDA threatened States with noncompliance procedures if they do not comply by the agency's arbitrary deadline. ......................... 49

    E.   USDA has refused to commit that it will not immediately disclose SNAP data it collects outside the agency. ................................. 50

VI.   USDA-OIG Makes Unprecedented Demands for All SNAP Participant Data from Plaintiff States. ........................................................................ 50

    A.   USDA's Office of Inspector General .............................................. 50

    B.   OIG Demands all SNAP participant data for 2024 from California, Illinois, and Michigan. ................................................................. 51

VII.   Plaintiff States will be irreparably harmed if forced to disclose the demanded SNAP data. ........................................................................ 55

    A.   Proprietary Harms—Withholding of Administrative Funds, Burden on State Agencies, and Litigation Risk .......................................... 56

    B.   Chilling Effect Harm—Disclosure and misuse of data will cause a chilling effect on SNAP participation. ...................................... 57

    C.   Chilling Effect Harm—Disaster Response (California, New Jersey, Oregon, and Washington) ........................................................ 59

    D.   Chilling Effect Harm—School Lunch Program .................................... 59

    E.   Chilling Effect Harm—Safety Net Programs .................................... 60

    F.   Chilling Effect Harm—Deterioration of Public Health and Welfare. ....... 61

    G.   State Sovereignty Harms—Undermining Plaintiff States' Laws and Policies ................................................................................ 62

FIRST CLAIM
Violation of APA, 5 U.S.C. § 706(2) (c), (d) – Contrary to Law
& Without Observance of Procedure Required by Law ........................................ 65

SECOND CLAIM
Violation of APA, 5 U.S.C. § 706(2)(a) – Arbitrary and Capricious ......................... 71

THIRD CLAIM
Violation of APA, 5 U.S.C. § 706(2)(D) – Public Notice and Comment Requirement ............... 73

FOURTH CLAIM
Ultra Vires .................................................................................................................. 74

FIFTH CLAIM
Spending Clause, U.S. Const., art. I, § 8, cl. 1 – Lack of Clear Notice ........................ 75

PRAYER FOR RELIEF ................................................................................................ 77

**INTRODUCTION**

1.      The United States Department of Agriculture ("USDA") has made an unprecedented demand that Plaintiff States turn over sensitive and personal information about tens of millions of Americans who have applied for food assistance through the State-administered Supplemental Nutrition Assistance Program ("SNAP").  USDA's attempt to collect this information from Plaintiff States flies in the face of privacy and security protections in federal and state law.

2.      USDA makes this demand for the stated purpose of detecting "overpayments and fraud."  Instead, the move appears to be part of the federal government's well-publicized campaign to amass enormous troves of personal and private data, including information on taxpayers and Medicaid recipients, to advance goals that have nothing to do with combating waste, fraud, or abuse in federal benefit programs.  Plaintiff States therefore seek a judicial declaration that the demand is contrary to law, arbitrary and capricious, and exceeds the agency's authority, as well as injunctive relief preventing enforcement of the demand.

3.      For sixty years, States have been administering the federal hunger-prevention program known as SNAP.  The program serves as an essential safety net for millions of low-income Americans by providing benefits that can be used to purchase groceries for themselves and their children.

4.      In those sixty years, the federal government and state agencies have worked together to build a robust process whereby States ensure that only eligible individuals receive benefits.  In fact, USDA has described SNAP as having "one of the most rigorous quality control systems in the federal government."[1]

5.      Federal law delegates to States the role of administering SNAP day-to-day.  States are tasked with creating and processing applications for benefits, determining eligibility, granting benefits, terminating benefits where appropriate, and ensuring program accountability.  The federal government has a more limited role; it sets requirements for state plans, performs some quality control functions, and provides technical assistance to States to help them better implement their plans.

---

[1] *SNAP Quality Control*, USDA (June 30, 2025), https://www.fns.usda.gov/snap/qc.

6.     That quality control process requires some exchange of SNAP applicant and recipient data between States and the federal government.  The data States collect in administering SNAP is highly sensitive; it includes the home addresses, Social Security numbers, recent locations, citizenship and immigration status, and household income of millions of Americans.  And, because non-citizen parents may legally apply for benefits for their citizen children, States' SNAP data includes personal identifying information ("PII") and home addresses of non-citizen parents who have lawfully sought government assistance to feed their U.S. citizen children.

7.     Because of the sensitive nature of this data and federal privacy laws protecting it, the federal government has always asked States to share only what is necessary to conduct quality control checks, such as, for example, a statistically significant sample of data.  Likewise, Congress has created specific systems for States to use to vet eligibility and investigate fraud, and those systems have significant privacy protections and limitations on the use of State-submitted information. Even the federal government's own ability to access state SNAP records for inspection or audit is limited by statute.

8.     Never before, to Plaintiffs' knowledge, has the federal government demanded that States turn over PII on their entire SNAP caseloads, much less home address, social security number, immigration status, and day-to-day grocery purchase information for each and every SNAP applicant and recipient. That longstanding policy and practice, which reflects statutory limits, abruptly changed recently when USDA demanded that States turn over virtually all of their SNAP applicant and recipient data for the past five years, including detailed "transactional records from each household," citing vague "program integrity" concerns.  In doing so, USDA has exceeded its statutory authority and threatened the privacy of tens of millions of Americans.

9.     On May 6, 2025, USDA's Food and Nutrition Service ("FNS") issued a letter to all States, citing to a recent executive order titled "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos," [2] and announcing that, "each State, district, territory, and payment processor

_____

[2] Exec. Order No. 14,243, 90 Fed. Reg. 13,681 (Mar. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/stopping-waste-fraud-and-abuse-by-eliminating-information-silos/.

1   is a SNAP information silo" and that "USDA and FNS are working to eliminate these information

2   silos."

3        10.    USDA announced that it had already contacted States' third-party vendors which

4   administer SNAP payment systems, and that it planned to circumvent the States themselves and

5   collect States' SNAP data directly from those vendors.  USDA claimed the agency would use this

6   data to "ensure program integrity," including by verifying the eligibility of recipients, even

7   though Congress has delegated that task to the States.

8        11.    USDA also announced that it was "taking steps to require all states to work through

9   their processors" to submit to FNS personally identifiable information, including "names, dates of

10  birth, personal addresses used, and Social Security numbers" and total amount of benefits

11  received for **all** SNAP applicants and recipients **since January 2020**.  USDA cited to statutes and

12  regulations related to state recordkeeping and audit requirements, but none of them authorize such

13  a sweeping demand for personal information on SNAP applicants and recipients, especially

14  without any protections or restrictions on the use or disclosure of that data.

15       12.    The letter threatened States with noncompliance procedures—including potential

16  SNAP funding cuts—if they refused to comply.

17       13.    Privacy advocates promptly sued USDA for making this demand for sensitive PII

18  about tens of millions of Americans without completing the procedural steps required under

19  federal privacy laws like the Privacy Act.  *See Namod Pallek et al. v. Rollins et al.*, Case No.

20  1:25-cv-01650 (D.D.C. filed May 22, 2025).  In response to plaintiffs' motion for a temporary

21  restraining order, USDA stated that it had not yet collected any data pursuant to the demand, and

22  that it intended to publish a new System of Records Notice ("SORN"), as required by the Privacy

23  Act before proceeding further with the proposed data collection.

24       14.    On July 9, 2025, after publishing a SORN purporting to give notice of its new data

25  collection campaign, Defendant Secretary Rollins sent States another letter, reviving the USDA's

26  demand for five years' worth of data on all SNAP applicants and recipients, and again indicated

27  that the agency was demanding the same data from States' third-party payment processors.

28  Secretary Rollins again invoked the Information Silos Executive Order, which directs federal

1    agencies to gain "unfettered access" to state data and share that data across the federal

2    government.[3]  The July 9 Letter directed states to produce the data starting July 24 and no later

3    than July 30, 2025.  Public comments on the proposed SORN were not due until July 23, making

4    clear that USDA had no intention of modifying the proposed data collection based on any public

5    comments it received.

6       15.    At the same time as USDA was making its demands, some of the Plaintiff States were

7    subjected to a separate demand from USDA's Office of Inspector General ("OIG") for similar

8    data, including PII, that they maintained on SNAP recipients for the year 2024.  This request,

9    ostensibly part of a routine inspection of SNAP data "quality and integrity," was likewise beyond

10    any request from OIG that the affected States had ever received.  Moreover, OIG refused, without

11    sufficient explanation, to accept deidentified data or samples, or to enter into a confidentiality

12    agreement or data and security protocols contemplated by statute.  While Plaintiff States have no

13    objection to complying with a lawful OIG inspection, OIG must nevertheless follow appropriate

14    laws when seeking States' sensitive data about their residents.

15       16.    The actions of Defendants USDA and OIG have put Plaintiff States in an impossible

16    position.  On the one hand, Plaintiff States are required to keep personal information about SNAP

17    applicants and recipients strictly confidential; both federal and state law prohibit them from

18    disclosing personally identifying SNAP data unless strictly necessary for the administration of the

19    program, or other limited circumstances exist.  Even the federal government's oversight of this

20    confidential data is limited to USDA's inspection or audit of state records that are "necessary to

21    determine whether the program is being conducted in compliance" with the SNAP statute, and

22    even then "subject to data and security protocols agreed to by the State agency and [USDA]."  7

23    U.S.C. § 2020(a)(3)(B)(i).  Defendant OIG, in turn, has the authority to "access" records that are

24    "available to" USDA.  5 U.S.C. § 406(a)(1)(A).  OIG can also formally request or subpoena

25    additional information, but only as "necessary" to perform the functions of the Inspector General.

26    5 U.S.C. § 406(a)(3)-(4).  No statute authorizes Defendant USDA or OIG to demand, and take

27

28
    _____
        [3] *Id.*

9

possession of, *all* SNAP data collected by States, without any restrictions on the use or re-disclosure of that data.

17.    On the other hand, the federal government has threatened that it will institute noncompliance procedures if the Plaintiff States do not comply, which could include withholding administrative funding on which the Plaintiff States depend to run the program and help keep food on the table for millions of struggling Americans.  California, for example, receives roughly $1.3 billion a year to administer the program; other Plaintiff States receive tens of millions of dollars in administrative funding.  Any delay in that funding could be catastrophic for the State and the residents who rely on SNAP to meet their basic nutritional needs.  On July 26, USDA reiterated the threat from May, warning states that "[f]ailure to take the steps necessary to provide the relevant data to FNS may trigger noncompliance procedures specified in 7 U.S.C. § 2020(g)."

18.    Meanwhile, the federal government's stated justifications for its unprecedented data demands make no sense on their own terms and are belied by the available facts.  Defendant USDA has never needed, and does not need now, a wholesale transfer of sensitive and confidential PII about every SNAP applicant and recipient to prevent overpayments.  Further, recent events strongly indicate that the government's explanations are pretextual, and that its overriding purpose is not to ensure SNAP program "integrity," but to use the sensitive information it collects from States to advance the President's agenda on fronts that are wholly unrelated to SNAP program administration.

19.    As just one example, public reporting has recently revealed that the Department of Government Efficiency (DOGE) has been quietly amassing data from a wide array of state and federal sources, including the Social Security Administration, the Internal Revenue Service, and the Department of Health and Human Services ("HHS"), to build a searchable database on citizens and non-citizens alike for a variety of purposes, including to locate and deport people the administration wishes to remove from the United States.

20.    To that same end, HHS has already disclosed to the Department of Homeland Security a massive tranche of Medicaid data shared by several States with HHS as part of a routine audit.  And, just days after being sued by several States over the disclosure, HHS executed

10

1    an agreement to allow ICE *unfettered* access to its entire database of state Medicaid data,

2    containing some of the most sensitive data collected by States.

3        21.    Against this backdrop, Plaintiff States are deeply and justifiably concerned about

4    USDA's intent and what will happen to this data once it is in the hands of the federal government.

5    And, more fundamentally, Plaintiff States dispute that the federal government's demands are

6    lawful to begin with.  However, Plaintiff States' refusal to give up their data exposes them to

7    potential punitive action by the federal government, up to and including significant SNAP

8    funding cuts.  Therefore, Plaintiff States have no choice but to file the instant complaint seeking a

9    judicial declaration that the federal government's unprecedented demands are unlawful, and that

10   any state SNAP data that is appropriately disclosed to the federal government may not be used or

11   disclosed outside of USDA or OIG for non-SNAP-related purposes.

12                                **JURISDICTION AND VENUE**

13       22.    The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 2201(a).

14       23.    Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because the

15   California Attorney General and the State of California have offices at 455 Golden Gate Avenue,

16   San Francisco, California and at 1515 Clay Street, Oakland, California, and therefore reside in

17   this district, and no real property is involved in this action.  This is a civil action in which

18   Defendants are agencies of the United States or officers of such an agency.

19       24.    Assignment to the San Francisco Division of this District is proper pursuant to Civil

20   Local Rule 3-2(c)-(d) and 3-5(b) because Plaintiff the State of California maintains offices in San

21   Francisco County.

22                                        **PARTIES**

23   **I.    PLAINTIFFS**

24       25.    Plaintiff the State of California, by and through its Attorney General Rob Bonta, is a

25   sovereign State of the United States.  Attorney General Bonta is the chief law officer of the State

26   of California and head of the California Department of Justice.  He has the authority to file civil

27   actions to protect California's rights and interests and the resources of this State.  Cal. Const., art.

28   V, § 13; Cal. Gov't Code §§ 12510-11; *see Pierce v. Superior Court*, 1 Cal. 2d 759, 761-62

(1934) (the Attorney General "has the power to file any civil action or proceeding directly involving the rights and interests of the state").

26.    Plaintiff the State of New York, represented by and through its Attorney General Letitia James, is a sovereign State of the United States of America.  As the State's chief legal officer, the Attorney General is authorized to act on its behalf of the State in this matter.

27.    Plaintiff the State of Arizona joins this action by and through Attorney General Kristin Mayes, who is the chief law enforcement officer of the State and authorized to "[r]epresent this state in any action in a federal court."  Ariz. Rev. Stat. § 41-193(A)(3); *see* Ariz. Const. art. V, § 1(A).

28.    Plaintiff the State of Colorado is a sovereign State of the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado.  The Attorney General acts as the chief legal representative of the state and is authorized by Colo Rev. Stat. § 24-31-101 to pursue this action.

29.    Plaintiff the State of Connecticut is a sovereign State of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

30.    Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States.  It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government.  The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

31.    Plaintiff the State of Delaware is a sovereign State of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State."  *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del.

1941).  Attorney General Jennings also brings this action on behalf of the State of Delaware

pursuant to her statutory authority.  Del. Code Ann. tit. 29, § 2504.

32.     Plaintiff the State of Hawai'i, represented by and through its Attorney General Anne

E. Lopez, is a sovereign State of the United States of America.  The Attorney General is Hawaii's

chief legal officer and chief law enforcement officer and is authorized by Hawaii Revised Statues

§ 28-1 to pursue this action.

33.     Plaintiff the Office of the Governor, *ex rel.* Andy Beshear, brings this suit his official

capacity as Governor of the Commonwealth of Kentucky.  The Kentucky Constitution makes the

Governor the Chief Magistrate with the "supreme executive power of the Commonwealth," Ky.

Const. § 69, and gives the Governor, and only the Governor, the duty to "take care that the laws

be faithfully executed," Ky Const. § 81.  In taking office, Governor Beshear swears an oath that

he will support the Constitution of the United States and the Kentucky Constitution.  Ky. Const.

§ 228.

34.     Plaintiff the State of Illinois is a sovereign State of the United States of America. The

State of Illinois is represented in this action by the Attorney General of Illinois, who is the chief

legal officer of the State and is authorized to pursue this action on behalf of the State under

Article V, Section 15 of the Illinois Constitution and 15 Ill. Comp. Stat. § 205/4.

35.     Plaintiff the State of Maine is a sovereign State of the United States of America.

Maine is represented by Aaron M. Frey, the Attorney General of Maine.  The Attorney General is

authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

36.     Plaintiff the State of Maryland is a sovereign State of the United States of America.

Maryland is represented by Attorney General Anthony G. Brown, who is the chief legal officer of

Maryland.

37.     Plaintiff the Commonwealth of Massachusetts is a sovereign State of the United

States of America.  Massachusetts is represented by Attorney General Andrea Joy Campbell, the

Commonwealth's chief legal officer.

38.     Plaintiff the State of Michigan is a sovereign State of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

39.     Plaintiff the State of Minnesota is a sovereign State of the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota.  The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01.  The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Minnesota residents and to vindicate the State's sovereign and quasi-sovereign interests.

40.     Plaintiff the State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. 228.110 and Nev. Rev. Stat. 228.170.

41.     Plaintiff the State of New Jersey is a sovereign State of the United States of America, and by and through Attorney General Matthew Platkin, brings this action.  The Attorney General of New Jersey is the New Jersey's chief legal adviser and is authorized to act in federal court on behalf of the State on matters of public concern.  N.J. Stat. Ann. § 52:17A-4.

42.     Plaintiff the State of New Mexico is a sovereign State of the United States of America.  New Mexico is represented by Attorney General Raúl Torrez.  The Attorney General is New Mexico's chief law enforcement officer and is authorized to pursue this action pursuant to N.M. Stat. Ann. § 8-5-2(B).

43.     Plaintiff the State of Oregon is a sovereign State of the United States of America. Oregon is represented by Attorney General Dan Rayfield.  The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

44.     Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art.

IV, § 2. The Governor oversees all executive agencies in Pennsylvania and is authorized to bring suit on their behalf. 71 P.S. §§ 732-204(c), 732-301(6), 732-303.

45.    Plaintiff the State of Rhode Island is a sovereign State in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island and authorized to pursue this action on behalf of the State of Rhode Island. R.I. Gen. Laws § 42-9-6.

46.    Plaintiff the State of Washington, represented by and through its Attorney General Nicholas Brown, is a sovereign State of the United States of America.  The Attorney General is Washington's chief law enforcement officer and is authorized under Wash. Rev. Code § 43.10.030 to pursue this action.

47.    Plaintiff the State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin.  Attorney General Kaul is authorized to sue on behalf of the State.

## II.    DEFENDANTS

48.    Defendant United States Department of Agriculture ("USDA") is a department of the executive branch of the United States government, which, through its sub-agency the Food and Nutrition Service ("FNS"), is responsible for overseeing the States' administration of SNAP.

49.    Defendant Brooke Rollins is the Secretary of Agriculture and the head of USDA.  She is sued in her official capacity only.

50.    Defendant United States Department of Agriculture's Office of Inspector General ("OIG") is a department of the executive branch of the United States government, responsible for investigating allegations of crime against USDA's programs, and promoting the economy and efficiency of USDA's operations.

## BACKGROUND

## I.    PLAINTIFF STATES SERVE MILLIONS OF FOOD-INSECURE RESIDENTS THROUGH SNAP.

51.    First authorized in 1964 as the "Food Stamp Program," the Supplemental Nutrition Assistance Program ("SNAP") has long been the country's primary weapon against hunger and

an important safety net for low-income Americans.  The goal of SNAP is "to 'alleviate . . . hunger and malnutrition' by 'increasing [the] food purchasing power' of low-income households."  *Hall v. U.S. Dep't of Agric.*, 984 F.3d 825, 831 (9th Cir. 2020) (quoting 7 U.S.C. § 2011).  To achieve this end, SNAP provides monthly benefits to eligible households that can be used to buy food.  *Id.*

52.    In 2024, SNAP helped more than 41 million people avoid food insecurity.[4]  More than 62 percent of SNAP participants are in families with children, and more than 37 percent are in families with members who are elderly or have disabilities.[5]  Collectively, in a month, Plaintiff States provide more than 21 million individuals, in more than 12 million households, with food assistance through SNAP.[6]

53.    At the federal level, SNAP is overseen by FNS, a component of USDA.  7 C.F.R. § 271.3(a).

54.    The federal government funds SNAP benefits, and pays roughly half of administrative costs, but it is state agencies that are "responsible for the administration of the [SNAP] program," including "[c]ertification of applicant households" and "[i]ssuance, control, and accountability of SNAP benefits and [Electronic Benefit Transfer ('EBT')] cards."  7 C.F.R. § 271.4(a)(1), (2); *see also* 7 U.S.C. §§ 2020(a)(1), 2025(a); 7 C.F.R. § 277.4.

55.    States alone are responsible for creating and processing applications for benefits, making determinations on eligibility, issuing benefits, and ensuring program integrity.  7 U.S.C. § 2020(a)(1); *see also* 7 C.F.R. § 271.4.

56.    By law, it is likewise state agencies that are responsible for conducting quality-control reviews and management evaluations of their SNAP operations.  7 C.F.R. §§ 275.1-275.24 (Performance Reporting System).

57.    And it is States that contract directly with third-party electronic benefit transfer providers, which process benefit payments directly to benefit recipients.

---

[4] Center on Budget and Policy Priorities, *Policy Basics: The Supplemental Nutrition Assistance Program (SNAP)* (updated Nov. 25, 2024), https://www.cbpp.org/research/food-assistance/the-supplemental-nutrition-assistance-program-snap.
[5] *Id.*
[6] *SNAP Data Tables*, USDA (last updated July 14, 2025), https://www.fns.usda.gov/pd/supplemental-nutrition-assistance-program-snap.

16

1    58.    To be eligible for SNAP, households generally must earn less than 100 percent of the

2    federal poverty level based on net income.  *See* 7 C.F.R. § 273.9(a)(2).  SNAP benefits can be

3    used to buy most groceries and some prepared food at participating vendors, which include most

4    grocery and convenience stores.

5    59.    Some lawfully present non-citizens are permitted to receive SNAP benefits.  *See* 7

6    U.S.C. § 2015(f); 7 C.F.R. § 273.4.  In providing SNAP benefits for some of the nation's most

7    vulnerable immigrants, Congress recognized the critical nature of nutrition for healthy families

8    and communities.[7]

9    60.    Separately, individuals whose immigration status makes them ineligible to receive

10   SNAP benefits, but who have children who are eligible to receive SNAP benefits may apply for

11   and receive SNAP benefits on behalf of their eligible children.[8]

12   61.    The SNAP statute and implementing regulations restrict the ways in which SNAP

13   applicant data can be used or disclosed.  *See, e.g.*, 7 U.S.C. § 2020(e)(8); 7 C.F.R.

14   § 272.1(c)(1)(i), (iii).

15   62.    Plaintiff States each administer their own SNAP program.  For example, California's

16   SNAP program is called CalFresh.  Cal. Welf. & Inst. Code § 18900.2(a).  CalFresh is overseen

17   by the California Department of Social Services ("CDSS"), but the certification of applicant

18   households and the issuance of EBT cards is managed by California's 58 counties, as authorized

19   by federal law.  *See* 7 U.S.C. §§ 2012(s)(1), 2020(a)(2); *see also* Cal. Welf. & Inst. Code § 18902.

20   63.    CalFresh is the second largest social services program in California after Medi-Cal,

21   California's Medicaid program, and it provides an essential hunger safety net to an average of 5.5

22   million Californians per month.  Since the beginning of Federal Fiscal Year 2025, approximately

23   $1.07 billion in CalFresh benefits have been issued each month.  Annually, the federal

24

25   _____

     [7] In fact, after the Personal Responsibility and Work Opportunity Reconciliation Act of
     1996 stripped most lawfully present noncitizens of benefits eligibility, Congress recanted and

26   passed two successive laws in 1998 and 2002 restoring SNAP eligibility to the majority of these
     lawfully present noncitizens.  *See City of Chicago v. Shalala*, 189 F.3d 598, 601 n.1 (7th Cir.

27   1999).
     [8] *See SNAP Eligibility for Non-Citizens*, USDA Food & Nutrition Service (updated June

28   2, 2025), https://www.fns.usda.gov/snap/recipient/eligibility/non-citizen.

17

1  reimbursement of California's CalFresh administrative costs totaled approximately $1.3 billion.

2  Each month, approximately 1.9 million SNAP recipients in California are children.

3       64.    Similarly, in May 2025, approximately 1.7 million New York households,

4  representing over 2.9 million individuals, participated in SNAP.  Nearly one million of those

5  individuals were children.  In New Jersey, 441,199 households, representing 824,020 individuals,

6  participated in SNAP.

7       **A.    To administer SNAP, state agencies collect applicants' highly sensitive
             personal information.**

8

9       65.    In order to administer the SNAP program as required by federal law, the States create

10  and maintain millions of records containing sensitive, personal information about SNAP

11  applicants and recipients.

12      66.    As part of the SNAP benefits application process, individuals must provide extensive

13  personal information, including but not limited to name, home address, and social security

14  number ("SSN").  *See* 7 C.F.R. § 273.2(b), (f)(1)(v).  Such information is frequently referred to as

15  personally identifiable information, or "PII."  Applicants must also disclose their citizenship

16  and/or immigration status.  *See id.* § 273.2.  The application collects the same information from

17  ineligible individuals who are applying for benefits on behalf of their eligible children.

18      67.    State and federal laws require that States strictly protect the confidentiality of the data

19  they collect and maintain as part of administering SNAP.  For example, the SNAP statute requires

20  that States create "safeguards which prohibit the use or disclosure of information obtained from

21  applicant households" subject to several narrow exceptions, which permit, for example,

22  disclosure to "persons directly connected with the administration or enforcement" of SNAP.  7

23  U.S.C. § 2020(e)(8).  The law also permits disclosure to "law enforcement officials," but only

24  "upon request" and "for the purpose of investigating an alleged violation of" the SNAP statute or

25  its implementing regulations.  *Id.* § 2020(e)(8)(C).

26      68.    In California, state law protects the confidentiality of "all applications and records

27  concerning any individual" who has applied for public social services and prohibits the disclosure

28  of such information "for any purpose not directly connected with the administration of the

program." Cal. Welf. & Inst. Code § 10850(a); *see also id.* § 18909 (applying Section 10850 to CalFresh); Civ. Code §1798.24 ("An agency shall not disclose any personal information in a manner that would link the information disclosed to the individual to whom it pertains [listing narrow exceptions].").

69.     Other Plaintiff States have similar laws that restrict the use and disclosure of SNAP records to administering public benefits programs or for limited uses consistent with the SNAP Act or regulations, such as limited disclosures to law enforcement to prosecute SNAP fraud or capture wanted felons.[9]

70.     Given these federal and state laws requiring confidentiality, States represent to applicants that their data will only be used for the administration of SNAP benefits, with only narrow exceptions.  For example, one California county tells applicants that "personal information is protected and only used to determine your eligibility for benefits . . . with limited exceptions."[10]  California's application for SNAP is explicit that immigration status will not be used for non-SNAP purposes[11]:

> **Important Information for Noncitizens**
> You can apply for and get CalFresh benefits . . . for people who are eligible . . . .
> For example, immigrant parents may apply for CalFresh benefits . . . for their
> U.S. citizen or qualified immigrant children, even though the parents may not be
> eligible. . . .  Immigration information is private and confidential. The
> immigration status of noncitizens who are eligible and apply for benefits will be
> checked with the U.S. Citizenship and Immigration Services (USCIS). Federal
> law says the USCIS cannot use the information for anything else except cases of
> fraud.

---

[9] Ariz. Rev. Stat. 41-1959(A); Colo. Rev. Stat. Ann. § 26-1-114; 10 Colo. Code Regs. § 2506-1:4.140; Conn. Gen. Stat. § 17b-90; D.C. Code § 4-209.04(c); 305 Ill. Comp. Stat. § 5/11-9; Md. Code Ann., Hum. Servs. § 1-201; COMAR 07.01.07.01-.12; Md. Code Ann., Gen. Prov. §§ 4-301(a) & 4-307; R.I. Gen. Laws § 40-6-12 and 218 R.I.C.R. 20-00-1.1.7; 22 Me. Rev. Stat. Ann. § 42(2); Mass. Gen. Laws ch. 18, § 11; Mass. Gen. Laws ch. 66A; 801 Mass. Code Regs. § 3.00 (2017); 106 Mass. Code Regs. § 360.400 (2022); Mass. Gen. Laws ch. 66, § 17A; Mass. Gen. Laws ch. 93H; Mich. Comp. Laws § 400.35; Nev. Rev. Stat. Ann. § 422A.342; N.J. Admin. Code § 10:87-1.14; N.J. Stat. Ann. § 44:10-47; N.J. Stat. Ann. § 47:4-4; N.M. Admin. Code 8.100.100.14; N.Y. Soc. Serv. Law § 21(3); Or. Rev. Stat. Ann. § 411.320; R.I. Gen. Laws § 40-6-12; Wash. Rev. Code § 74.04.060; Wis. Stat. Ann. § 49.81(2); Wis. Admin. Code DHS § 252.20.

[10] *CalFresh for Immigrants: Frequently Asked Questions*, San Francisco Human Services Agency (last visited July 28, 2025), https://www.sfhsa.org/services/food/calfresh/calfresh-immigrants-frequently-asked-questions.

[11] *Application for CalFresh, Cash Aid, and/or Medi-Cal/Health Care Programs*, CDSS (last visited July 28, 2025), https://www.cdss.ca.gov/cdssweb/entres/forms/English/SAWS2_PLUS.pdf.

19

USDA has not previously expressed any concerns with this language during any management review.

71.    Many other Plaintiff States include similar privacy notices on their public benefits applications or in informational materials provided to applicants, all with the goal of ensuring applicants understand the purposes for which their personal information will be used.  And many counties and non-profits that assist applicants provide similar assurances to applicants that their data will not be used or re-disclosed for non-SNAP-related purposes.  Without those assurances, many people may decide to forego applying for benefits and go hungry, a risk that is particularly acute for citizen or qualified-immigrant children of ineligible parents.

**B.    Plaintiff States use third-party vendors to administer EBT cards, and those vendors collect sensitive data on SNAP recipients, subject to strict confidentiality requirements.**

72.    As part of administering the SNAP program, state agencies are responsible for issuing EBT cards.  *See* 7 C.F.R. § 271.4(a)(2).  An EBT card is a plastic, reusable card similar to a prepaid debit or gift card.  EBT cards are the exclusive means by which program participants may redeem their benefits in exchange for food at qualifying retail stores.  *See* 7 U.S.C. § 2016(f)(3)(B).  For example, a SNAP recipient may use their EBT card to buy approved food items at a grocery store that can process EBT payments.

73.    Plaintiff States' EBT Systems are databases in which benefits are stored and electronically accessed by cardholders at a point-of-sale terminal, ATM, or other device.

74.    Plaintiff States have contracted with one of two vendors, Fidelity Information Services ("Fidelity") or Conduent Inc., to provide EBT processing services, including managing the EBT System for their SNAP programs.  Plaintiff States' agreements with their EBT vendors all restrict the authority of vendors to disclose SNAP participant data absent consent from the State, except in very narrow circumstances.

75.    These EBT systems contain highly confidential data about individual SNAP beneficiaries.  Raw EBT data includes names, addresses, dates of birth, Social Security numbers, contact information, and individual bank account numbers.  EBT data also contains benefit codes that can be used to discern characteristics of clients that go beyond just personal identifying

information, and EBT systems include transaction data that shows where and when a payee used an EBT card. These EBT systems also include information about individuals who receive state-funded public benefits.

**C.    States periodically share some SNAP data with USDA, but never large swaths of PII or other sensitive data.**

76.    Plaintiff States treat SNAP applicant and recipient data—especially PII—with the utmost care. Among other things, many Plaintiff States implement a minimum-necessary practice whereby only data that is absolutely necessary to support a particular function may be accessed or disclosed.

77.    When Plaintiff States receive requests for SNAP data from the federal government, Plaintiff States often only provide representative subsets of SNAP data that are responsive to the request and/or anonymize the data.

78.    At times, in its role overseeing States' administration of the SNAP program, FNS has requested SNAP data from States in order to ensure that the program is administered correctly, and benefits are properly granted or denied.

79.    Plaintiff States have provided SNAP data to FNS in the past, as part of routine monitoring and oversight. These requests have historically been narrowly limited to samples of data and/or anonymized data that does not contain PII. The requests have also historically been clearly consistent with the purposes for which the information was originally collected, *i.e.*, to ensure proper administration of SNAP.

80.    One example is the federal SNAP Quality Control System ("SNAP-QCS"), which is one of several ways States and USDA ensure that recipients receive the correct benefits and that decisions to deny, terminate, or suspend households are correct. *See* 7 C.F.R. § 275.10. As laid out in these regulations, States provide a random sample of SNAP cases every month to be reviewed through the federal SNAP-QCS. *See* 7 C.F.R. §§ 275.11–.14. This process is subject to a detailed "Privacy Impact Assessment," which lays out who can conduct this quality control data analysis and how the data will be used.[12]

---

[12] Privacy Impact Assessment for the Supplemental Nutrition Assistance Program -
(continued…)

81.    USDA itself describes SNAP as having "one of the most rigorous quality control systems in the federal government."[13]

**D.    As required by statute, States verify the eligibility and immigration status of SNAP applicants.**

82.    States rely on the Systematic Alien Verification for Entitlement program, known as the SAVE program, to verify eligible noncitizen status in a safeguarded fashion.

83.    SAVE is a federal database administered by U.S. Citizenship and Immigration Services within the Department of Homeland Security ("DHS").  It allows registered entities, including state governments and relevant state agencies, to verify the immigration status of applicants seeking federally funded benefits, including SNAP benefits.[14]

84.    The SAVE program is deployed in the SNAP context with privacy in mind.  States enter into agreements with USCIS that contain "safeguards limiting release or redisclosure as required by State or Federal law or regulation as discussed in § 272.1(c) and as may be required by other guidelines published by the Secretary."  7 C.F.R. § 272.11(b)(v).  States must include the steps taken to comply with this limit on disclosure as part of their state SNAP plans.  *Id.* § 272.11(e).  State agencies are further restricted to using the SAVE Program only for limited purposes related directly to establishing eligibility and program integrity.  *Id.* § 272.11(c).

85.    Additionally, States take steps to prevent improper payments by using the National Accuracy Clearinghouse ("NAC"), a federal clearinghouse designed to ensure that individuals do not improperly receive SNAP benefits from multiple states at the same time.  7 C.F.R. § 272.18.

86.    USDA issued an interim final rule implementing the NAC on October 3, 2022, describing the results of a NAC pilot program and setting forth rules and an October 4, 2027 compliance deadline.  *See* 87 Fed. Reg. 59,633-01, 59,633 (Oct. 3, 2022).  Since then, Plaintiff States have been actively engaged with USDA to ensure that the NAC is used for the limited

---

Quality Control System (July 1, 2019), https://www.reginfo.gov/public/do/DownloadDocument?objectID=133879401.
[13] SNAP Quality Control (last updated June 30, 2025), https://www.fns.usda.gov/snap/qc.
[14] *See* SAVE, U.S. Citizenship and Immigration Services (last visited July 28, 2025), https://www.uscis.gov/save#:~:text=SAVE%20is%20an%20online%20service,of%20Homeland%20Security%20(DHS).

22

statutory purpose of preventing interstate duplicate participation, while protecting vulnerable individuals (such as domestic violence victims) from unauthorized disclosures of their personal information and complying with relevant privacy laws.  For example, NAC administrators have agreed to develop a system that hashes certain PII to reduce the risk of unauthorized disclosure of such information.  Federal regulations also require that each State and FNS enter into an agreement that ensures compliance with the Computer Matching and Privacy Protection Act of 1988, among other laws, before participating in NAC.  7 C.F.R. § 272.18(a)(3).

87.    At least one Plaintiff state, Illinois, has already implemented the NAC system effective January 2025, building NAC matching into its benefits application to perform a NAC match with the other States participating in the process.

88.    States also already provide point-in-time EBT transaction data to USDA using the Anti-Fraud Locator Using EBT Retailer Transactions ("ALERT") System.  ALERT provides pseudonymized daily transaction records from States' EBT processors to USDA to conduct analysis of patterns in the data which may indicate fraudulent activity by stores that accept SNAP benefits.

89.    The ALERT system has significant data and privacy protections to ensure sensitive data is only used for the specific purpose of the system and prohibits sharing ALERT data outside of USDA.[15]

## II.    FEDERAL LAW STRICTLY LIMITS THE USE AND DISCLOSURE OF PERSONAL INFORMATION COLLECTED BY STATE AGENCIES ABOUT SNAP APPLICANTS AND RECIPIENTS.

### A.    The SNAP Act and USDA's implementing regulations

90.    Congress created SNAP "to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households."  7 U.S.C. § 2011.  In doing so, Congress also expressly limited the transmission of personal data collected in the operation of SNAP.

---

[15] *See* Privacy Impact Assessment: Anti-Fraud Locator Using EBT Transaction, USDA (April 14, 2020), https://www.usda.gov/sites/default/files/documents/fncs-alert-pia.pdf.

91.    SNAP requires state agencies to certify applicant households and issue EBT cards and requires such agencies to keep records necessary to determine whether the conduct of the program complies with federal law.  7 U.S.C. § 2020(a)(1)-(3).  And while the Secretary of Agriculture may inspect and audit state records, such access is "subject to data and security protocols agreed to by the State agency and Secretary."  7 U.S.C. § 2020(a)(3)(B)(i).

92.    Federal regulations further limit the "[u]se or disclosure of information obtained from SNAP applicant or recipient households."  7 C.F.R. § 272.1(c)(1).

93.    Use or disclosure of such information is limited to, *inter alia*, persons directly connected with the SNAP program or "the verification of immigration status of aliens applying for SNAP benefits, through the Systematic Alien Verification for Entitlements (SAVE) Program, to the extent the information is necessary to identify the individual for verification purposes."  7 C.F.R. § 272.1(c)(1)(i), (iii).

94.    Congress also created the National Accuracy Clearinghouse to help detect improper duplicate benefits, as discussed above.  To do this, once NAC is fully implemented, states will report certain information to the NAC to see if individuals are simultaneously claiming benefits from multiple states.  In creating the NAC, Congress mandated strong privacy protections for this reporting of data to USDA.  First, "[t]he Secretary shall require that State agencies make available to [the NAC] only such information as is necessary for the [specified] purpose" of preventing duplicate benefits.  7 U.S.C. § 2020(x)(2)(B).  Second, the "information made available by State agencies … shall be used only for the purpose" of preventing multiple benefits.  *Id.* § 2020(x)(2)(C)(i).  Lastly, the data states provide "shall not be retained [by the NAC] for longer than is necessary to accomplish the purpose" of detecting and preventing duplicate benefits.  *Id.* § 2020(x)(2)(C)(iii).

**B.    The Privacy Act of 1974**

95.    Congress enacted the Privacy Act of 1974 to "provide certain safeguards for an individual against an invasion of personal privacy," by requiring government agencies to maintain accurate records and providing individuals with more control over the gathering, dissemination, and accuracy of information about themselves.  Pub. L. No. 93-579, § 2(b), 88 Stat. 1896 (1974).

24

1    This includes allowing individuals "to prevent records pertaining to [them] obtained by [federal]

2    agencies for a particular purpose from being used or made available for another purpose without

3    [their] consent." *Id*.

4         96.    To accomplish these purposes, the Privacy Act states, "[n]o agency shall disclose any

5    record which is contained in a system of records . . .  except pursuant to a written request by, or

6    with the prior written consent of, the individual to whom the record pertains," unless a statutory

7    exception applies.  5 U.S.C. § 552a(b).

8         97.    The Privacy Act lists thirteen exceptions to the bar on disclosure, only two of which

9    are even arguably relevant here.

10        98.    An agency may disclose the records it maintains "to another agency or to an

11   instrumentality of any governmental jurisdiction within or under the control of the United States

12   for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head

13   of the agency or instrumentality has made a written request to the agency which maintains the

14   record specifying the particular portion desired and the law enforcement activity for which the

15   record is sought."  5 U.S.C. § 552a(b)(7).  As OMB explained in its original July 1, 1975 Privacy

16   Act Guidelines, this exception requires that the "misconduct is related to the purposes for which

17   the records are maintained" and "blanket requests for all records pertaining to an individual are

18   not permitted" under this exception.  40 Fed. Reg. 28,949, 28,955 (Jul. 9, 1975).

19        99.    Additionally, an agency may disclose a record "for a routine use," defined as "the use

20   of such record for a purpose which is compatible with the purpose for which it was collected."

21   *Id.* § 552a(b)(3).  Any "routine use" must be detailed in the relevant System of Records Notice,

22   published in the Federal Register, and must be compatible with the purpose for which the data

23   was collected.  *Id*. §§ 552a(a)(7) & (e)(4)(D).

24        100.   No exception to the Privacy Act's bar on nonconsensual disclosure permits

25   Defendants to disclose SNAP applicant and recipient data to DOGE for the purpose of compiling

26   a mass database, or to DHS for immigration enforcement, or to any other federal agency for non-

27   SNAP-related purposes except in very narrow circumstances.

28

101.    Additionally, the Privacy Act requires federal agencies to follow specific procedures before they "maintain, collect, use, or disseminate," any covered information.  5 U.S.C. §§ 552a(a)(3), (e)–(f).

102.    When an agency "establish[es] or revis[es]" a "system of records" containing retrievable information about individuals, it must "publish in the Federal Register . . . a notice of the existence and character of the system of records."  5 U.S.C. § 552a(e)(4), (a)(5) (defining "system of records").

103.    This notice, commonly referred to as a System of Records Notice ("SORN"), must identify the agency's intended uses and disclosures of those records.  *Id.* § 552a(e)(4).

104.    At least 30 days before publishing a SORN, the agency must also publish notice in the Federal Register "of any new use or intended use of the information in the system" and provide an opportunity for interested parties to submit "written data, views, or arguments to the agency."  *Id.* § 552a(e)(11).  Thus, before an agency can establish or revise a system of records, it must provide notice and an opportunity for public comment at least 30 days in advance.

## C.    The Computer Matching and Privacy Protection Act of 1988

105.    The Computer Matching and Privacy Protection Act of 1988 created additional protections for individuals' personal information against federal agency use of computer matching programs.  Pub. Law No. 100-503, § 2, 102 Stat. 2507.

106.    The Act prohibits the disclosure of any "record which is contained in a system of records . . . to a recipient agency . . . for use in a computer matching program except pursuant to a written agreement between the source agency and the recipient agency" explaining, among other things, "the purpose and legal authority for conducting the program," "the justification for the program and the anticipated results, including a specific estimate of any savings," and "procedures for providing individualized notice at the time of application, and notice periodically thereafter as directed by the Data Integrity Board of such agency . . . to . . . applicants for and recipients of financial assistance or payments under Federal benefit programs."  *See* 5 U.S.C. § 552a(o).  Such agreements shall not be effective until 30 days after the agreement is submitted to the Congress and cannot remain effective for more than 18 months.

107.    The Act defines a "matching program" as "any computerized comparison of . . . two or more automated systems of records or a system of records with non-Federal records for the purpose of . . . verifying the eligibility of applicants for, recipients or beneficiaries of, participants in, or providers of services with respect to, cash or in-kind assistance or payments under Federal benefit programs[.]"  5 U.S.C. § 552a(a)(8).  SNAP is a "Federal benefit program" as defined by the same section.  *See id.* § 552a(12).

108.    The Act further forbids any agency from terminating, reducing, or making any final denial of any federal benefit payment to any individual as a result of such a matching program, until the agency has undergone certain procedures, including providing notice to the individual and an opportunity to contest the decision.  *Id.* § 552a(p).

109.    Finally, the Act prohibits a source agency from disclosing any records contained in a system of records to another agency for a matching program if the source agency has reason to believe that these requirements have not been met.  *Id.* § 552a(q).

110.    On information and belief, Defendants intend to conduct a computer matching program similar to the program that the IRS and DHS are engaged in building, according to public reporting.  *See, supra*, Section III.D.

111.    On information and belief, Defendants have failed to comply with the requirements of 5 U.S.C. § 552a(o) and (p).

**D.    The Paperwork Reduction Act & the E-Government Act**

112.    The Paperwork Reduction Act (PRA), 44 U.S.C. § 3501 *et seq.*, governs federal agencies' collection of information from or about members of the public.  Under the PRA, an agency shall not conduct or sponsor a collection of information unless the agency has complied with certain statutorily mandated steps.  44 U.S.C. § 3507.  These steps include conducting a review of the proposed collection to assess its necessity, how to efficiently use the information, and the burden imposed on the persons providing the information.  *Id.* §§ 3506(c)(1); 3507(a)(1).

113.    A collecting agency must also publish a notice in the Federal Register soliciting comments regarding necessity, minimizing burdens, and other topics.  *Id.* §§ 3506(c)(2); 3507(a)(1)(D).  One of those topics is "an estimate of the burden that shall result from the

27

collection of information." *Id*. § 3507(a)(1)(D)(ii)(V).  Burden is defined to include, among other things, "searching data systems," adjusting the existing ways to comply with any previously applicable instructions and requirements," and "completing and reviewing the collection of information." *Id*. § 3502(2).

114.    Following a 60-day public comment period, the agency must certify to OMB, using supporting records or public comments, that the proposed collection of information meets 10 criteria, including that it is "necessary for the proper performance of the functions of the agency," is "not unnecessarily duplicative of information otherwise reasonably accessible," the agency plans  to use "effective and efficient statistical survey methodology appropriate to the purpose" of the collection, and the proposed collection "reduces to the extent practicable and appropriate the burden on persons who shall provide information to or for the agency." *Id.* § 3506(c)(3).

115.    Finally, OMB must approve the proposed collection of information and provide the agency with a control number to be displayed on the documents soliciting the information.  *Id.* § 3507(a)(2) & (3).  Before making its decision, OMB must provide at least 30 days for public comment. *Id.* § 3507(b).

116.    On information and belief, Defendant USDA has failed to comply with these requirements.

117.    Defendant USDA has not published a notice regarding its proposed collection in the Federal Register, nor has it solicited comments.  Instead, USDA submitted a "Nonsubstantive Change Request" memorandum directly to OMB on June 11, 2025.  In its memorandum, USDA "request[ed] approval of nonsubstantive changes to a currently approved collection" of SNAP data performed by the States.  USDA explained that the "purpose" was "to add requirements to report to USDA a number of currently collected data elements related to SNAP certification and benefit issuance."[16]  USDA estimated it would take 20,000 additional hours for States to respond to these reporting requirements.

---

[16] FNS Memorandum to OMB, *Nonsubstantive Change Request – Supplemental Nutrition Assistance Program* OMB #0584-0064 (June 11, 2025), **Error! Hyperlink reference not valid.**https://www.reginfo.gov/ public/do/PRAViewDocument?ref_nbr=202506-0584-001.

118.   On information and belief, Defendant USDA has not adequately considered the duplicative nature of this collection, the stated purposes for which are already served by existing systems, described in Section I.D.

119.   While USDA published a related SORN in the Federal Register, described above, the SORN did not address the 10 criteria required by the Paperwork Reduction Act.

120.   Pursuant to the E-Government Act of 2002, Pub. L. No. 107-347, § 208 *et seq.*, federal agencies are also required to conduct and publicly post a privacy impact assessment for the agency's information collections and each of its electronic information systems.

**E.    The Authority of OIG to Request Documents**

121.   The laws concerning the maintenance, use, and disclosure of personal data by federal agencies also apply to Inspector Generals.

122.   The duties and responsibilities of Inspectors General include coordinating audits and investigations related to the programs and operations of their agency, taking steps to promote economy and efficiency in the administration of programs and operations, and preventing fraud and abuse.  5 U.S.C. § 404(a).

123.   Under 5 U.S.C. § 406, an Inspector General is authorized "to have timely access" to documents "available to the applicable establishment which relate to the programs and operations with respect to which that Inspector General has responsibilities."  5 U.S.C. § 406(a)(1)(A).  5 U.S.C. § 401(1) defines "establishment" to include the Department of Agriculture. Thus, under this provision, the Inspector General is limited to the documents and materials to which USDA itself has access under the SNAP Act, the Privacy Act, or other laws, and under the same conditions.

124.   Additionally, the Inspector General may "request such information or assistance as may be necessary for carrying out [their] duties and responsibilities . . . from any Federal, State, or local governmental agency or unit thereof."  5 U.S.C. § 406(a)(3).  Accordingly, Inspectors General can only request information necessary for carrying out their duties and responsibilities, which, as explained above, concern promoting efficiency and preventing fraud and abuse in the programs and operations of their agencies.

125.  Similarly, Inspectors General may issue subpoenas, but only to obtain documents and materials "necessary in the performance of the functions assigned" by statute.  5 U.S.C. § 406(a)(4).

III.   **DEFENDANTS' DEMANDS ARE ONLY ONE PART OF A CAMPAIGN BY THE TRUMP ADMINISTRATION TO AMASS AMERICANS' SENSITIVE, PERSONAL DATA AND MISUSE THAT DATA FOR UNAUTHORIZED PURPOSES.**

126.  Defendants' demands for SNAP data from states do not occur in a vacuum, but rather in the context of a number of similar moves by federal agencies to obtain and disclose highly sensitive PII, not for program purposes, but for the creation of a surveillance system to advance the President's agenda, including by facilitating the President's mass deportation efforts.  The President initiated this campaign by issuing several Executive Orders urging unprecedented data sharing between federal agencies and directing federal agencies to gain "unfettered access" to States' data for federally funded programs that States administer. Then, according to public reporting, DOGE began amassing Americans' data from agencies such as the IRS and the Social Security Administration.  It has since been revealed that at least the IRS and HHS have given ICE access to troves of sensitive personal information to use for immigration enforcement. Defendants' sweeping and unprecedented demands for five years' worth of PII on SNAP applicants and recipients appear to be another step in this Orwellian surveillance campaign.

### A.   President Trump has issued Executive Orders paving the way for DOGE and other federal agencies to gain access to sensitive federal benefit data.

127.  On January 20, 2025, President Trump issued an executive order to create DOGE, directing all federal agency heads to "establish within their respective Agencies a DOGE Team of at least four employees."  Exec. Order No. 14,158, 90 Fed. Reg. 8,441, § 2(c).  Agency heads were directed to consult with the head of DOGE when selecting this DOGE Team.  *Id.* Additionally, the agency heads "shall ensure that DOGE Team Leads coordinate their work with [DOGE] and advise their respective Agency Heads on implementing the President's DOGE Agenda."  *Id.*  The executive order also mandated that DOGE itself, not just the agency's DOGE Team, "ha[ve] full and prompt access to all unclassified agency records, software systems, and IT systems."  *Id.* § 4(a).

128.   On February 19, 2025, President Trump signed an Executive Order titled "Ending Taxpayer Subsidization of Open Borders."  Exec. Order No. 14,218, 90 Fed. Reg. 10,581 (hereinafter the "Open Borders EO").  The Open Borders EO directs executive agencies to "enhance eligibility verification systems, to the maximum extent possible, to ensure that taxpayer-funded benefits exclude any ineligible alien[.]"  *Id*. § 2(a)(ii).  Further, it commands agencies to "refer any improper receipt or use of Federal benefits to the Department of Justice and the Department of Homeland Security for appropriate action."  *Id.* § 2(c).  It also purports to give DOGE new authority to "recommend . . . enhance[d] eligibility verification systems" for public benefits.  *Id.* § 2(b)(ii).

129.   On March 20, 2025, the President issued Executive Order 14,243, titled "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos" (hereinafter "Information Silos EO").  90 Fed. Reg. 13,681.  The Information Silos EO directed agency heads to "take all necessary steps" to "ensure Federal officials designated by the President or Agency Heads (or their designees) have full and prompt access to all unclassified agency records [and data] . . . for purposes of pursuing Administration priorities related to the identification and elimination of waste, fraud, and abuse."  *Id.* § 3(a).  Such steps include "authorizing and facilitating both the intra- and inter-agency sharing and consolidation of unclassified agency records."  *Id.*

130.   Further, the Information Silos EO directed agency heads to "take all necessary steps" to ensure the federal government has "unfettered access to comprehensive data from all State programs that receive Federal funding, including, as appropriate, data generated by those programs but maintained in third-party databases."  *Id.* § 3(c).

**B.    Public reports reveal that DOGE is compiling sensitive personal information collected by federal agencies into a mass database.**

131.   In April 2025, multiple media outlets reported that DOGE had enlisted the technology company Palantir to build a massive repository of data pulled from multiple federal agencies, including the IRS, SSA, and HHS, among others, for the purpose of immigration enforcement.[17]

---

[17] *See* Priscilla Alvarez, *et al.*, *DOGE is Building a Master Database for Immigration Enforcement, Sources Say*, CNN (April 25, 2025),

(continued…)

It has also been reported that at least DHS and HHS have already adopted a key Palantir product called Foundry, which would streamline the implementation of such a project.[18]

132.  "Multiple sources" told one media outlet that DOGE seeks to "create a massive repository of data pulled from various agencies."[19]  News reports stated that "officials see the project as a way to overcome a major hurdle: quickly building 'targeting lists' that Immigration and Customs Enforcement can use to find, detain and deport migrants in the US."[20]

133.  In written responses to discovery in litigation over DOGE's access to sensitive personal information, three federal agencies identified employees of DOGE, or employees of other agencies who were then detailed to work for DOGE, who had access to information systems maintained by those agencies.[21]  One of the systems DOGE employees gained access to was the Center for Medicare & Medicaid's Integrated Data Repository, which contains Medicare and Medicaid data including "Social security number, gender, race/ethnicity, date of birth, geographic location, Medicare enrollment and entitlement information," "historic and current listing of residences," and sensitive medical treatment information.[22]  Some of these DOGE employees were simultaneously detailed to multiple agencies at the same time.

134.  According to other media reports and a whistleblower's complaint, DOGE staffers have also violated cybersecurity laws, protocols, and best practices that protect the integrity of PII.[23]  These violations include DOGE staffers gaining access permissions that were not logged and not monitored for compliance with security protocols.

https://www.cnn.com/2025/04/25/politics/doge-building-master-database-immigration; Makena Kelly & Vittoria Elliott, *DOGE Is Building a Master Database to Surveil and Track Immigrants* (April 18, 2025), https://www.wired.com/story/doge-collecting-immigrant-data-surveil-track/.
    [18] *See* Sheera Frenkel & Aaron Krolic, *Trump Taps Palantir to Compile Data on Americans*, New York Times (May 30, 2025), https://www.nytimes.com/2025/05/30/technology/trump-palantir-data-americans.html
    [19] *See* Priscilla Alvarez, *et al.*, *DOGE is Building a Master Database for Immigration Enforcement, Sources Say*, CNN (Apr. 25, 2025), https://www.cnn.com/2025/04/25/politics/doge-building-master-database-immigration.
    [20] *See id.*
    [21] Defs.' Resp. to Plfs' Disc., Ex. B, *AFL-CIO v. Dept. of Labor*, No. 1:25-cv-00339-JDB (D.D.C. Mar. 29, 2025), ECF No. 73-2.
    [22] System of Records Notice 09-70-0571, Medicare Integrated Data Repository, https://www.hhs.gov/foia/privacy/sorns/09700571/index.html.
    [23] Jenna McLaughlin, *A Whistleblower's Disclosure Details How DOGE May Have Taken Sensitive Labor Data*, NPR (Apr. 15, 2025), https://www.npr.org/2025/04/15/nx-s1-

(continued…)

135.   According to news reports relying on anonymous tips by three persons familiar with the matter, DOGE staffers have been using a third-party AI chat bot to analyze data.[24]  One of the sources told Reuters that DOGE staffers feed large amount of data into the AI then "ask [the AI chatbot questions], get it to prepare reports, [and] give data analysis."  Use of third-party generative AI by employees at USDA is prohibited by the agency.[25]  This prohibition applies to all USDA employees and contractors, including OIG.

136.   DOGE has been accused publicly of mishandling sensitive data and ignoring data security protocols.  For example, a letter sent by the ranking member of the House Oversight and Government Reform Committee to the Social Security Administration alleged, based on information provided by a former federal employee and whistleblower, that "individuals associated with DOGE have assembled backpacks full of laptops, each with access to different agency systems, that DOGE staff is using to combine databases that are currently maintained separately by multiple federal agencies."[26]  The letter went on to assert that "[s]uch a system would pose unprecedented operational security risks and undermine the zero-trust cybersecurity architecture that prevents a breach at one agency from spreading across the government."[27]

137.   Upon information and belief, DHS, with the assistance of DOGE and external entities, such as ICE contractor Palantir, are combining federal, state, and local databases of

---

5355896/doge-nlrb-elon-musk-spacex-security; Letter from Whistleblower Aid to Congress, Apr. 14, 2025, attaching Decl. of Daniel J. Berulis, Apr. 14, 2025, https://whistlebloweraid.org/wp-content/uploads/2025/06/2025_0414_Berulis-Disclosure-HELP-and-Oversight-with-Exhibits.pdf.

[24] Marisa Taylor & Alexandra Ulmer, *Musk's DOGE Expanding his Grok AI in U.S. Government*, Reuters (May 23, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/musks-doge-expanding-his-grok-ai-us-government-raising-conflict-concerns-2025-05-23/.

[25] In USDA's "Interim Guidance on the Use of Generative Artificial Intelligence at USDA," the department noted the risks of using AI and prohibited USDA employees and contractors from accessing publicly available, third-party Generative AI tools while in their official capacity or on government furnished equipment."  USDA later noted in a memo to OMB regarding USDA's "Compliance Plan for OMB Memoranda M-24-10" regarding generative AI, that the department presently "lack[s] the resources to review terms of service, assess the adequacy of guardrails, test the limitations of software, or even gather technical info such as the foundation model used."

[26] See Letter from Committee on Oversight and Government Reform to Assistant Inspector General for Audit, SSA, Michelle L. Anderson (April 17, 2025), https://oversightdemocrats.house.gov /sites/evo-subsites/democrats-oversight.house.gov/files/evo-media-document/2025-04-17.gec-to-ssa-oig-master-data.pdf.

[27] *Id.*

1  information into a single interoperable database for the purpose of "mass deportations" and other

2  large-scale immigration enforcement and mass surveillance purposes.[28]  This effort reportedly

3  includes databases of personal information that have never been used for immigration

4  enforcement or other purposes unrelated to the primary missions of the agencies that initially

5  collected the data.  Impacted federal agencies and programs reportedly include HHS, the Internal

6  Revenue Service, the Supplemental Nutrition Assistance Program, the Social Security

7  Administration, the U.S. Department of Housing and Urban Development, the U.S. Department

8  of Veterans Affairs, the U.S. Education Department, and the U.S. Postal Service.[29]

9      138.  Upon information and belief, Defendants' demands for state SNAP data are in service

10  of this same effort, involving DOGE, to amass Americans' information in order to advance the

11  President's agenda.

12      **C.    CMS recently demanded Medicaid data from States, then shared it with
           DHS and, after States sued, gave ICE unfettered access to state data.**

13

14      139.  On June 13, 2025, it was reported for the first time that the HHS had transferred, *en*

15  *masse*, sensitive Medicaid data files from California, Illinois, Washington, and the District of

16  Columbia, to DHS, without the States' consent.[30]

17      140.  According to reports, the shared data contains personal health records representing

18  millions of individuals, was personally identifiable, not anonymized, and included Medicaid

19  beneficiaries' immigration status, addresses, and social security numbers, among other details.

20  Senior HHS political appointees ordered that the data be shared immediately, over the objections

21  of career staff who advised that such a transfer of information would violate federal law, and the

22  HHS officials were given just 54 minutes to comply with the directive.

23

24
        _____

25      [28] *See* Muzaffar Chishti & Colleen Putzel-Kavanaugh, *Seeking to Ramp Up Deportations,
        the Trump Administration Quietly Expands a Vast Web of Data*, Migration Policy Institute (May
        29, 2025), https://www.migrationpolicy.org/article/trump-ice-data-surveillance.
26      [29] *Id.*
        [30] *See* Kimberly Kindy & Amanda Seitz, *Trump administration gives personal data of
27  *immigrant Medicaid enrollees to deportation officials*, Associated Press (Jul. 14, 2025),
        https://apnews.com/article/medicaid-deportation-immigrants-trump-
28  4e0f979e4290a4d10a067da0acca8e22.

141.  A DHS spokesperson confirmed receipt of the mass personal Medicaid data transfer from HHS.  In its statement to the Associated Press, DHS claimed that "Joe Biden flooded our country with tens of millions of illegal aliens," and that therefore "CMS and DHS are exploring an initiative to ensure that illegal aliens are not receiving Medicaid benefits that are meant for law-abiding Americans."

142.  HHS's disclosure of Medicaid personal data to DHS was far broader than would be needed for the identification and prevention of waste, fraud, and abuse.  HHS has never before enlisted DHS's participation in "oversight" of the Medicaid program in such a manner.

143.  News of the disclosure to DHS caused a public outcry, followed by a lawsuit by twenty states—including California, New York, New Jersey, and several other Plaintiff States—that is currently pending in the Northern District of California.  *California et al. v. U.S. Dep't of Health and Human Servs. et al.*, Case No. 3:25-cv-05536-VC (N.D. Cal. filed July 1, 2025).

144.  Days after the States' filed their lawsuit, ICE and CMS executed an agreement to give ICE *direct* access to the database of Americans' Medicaid data submitted by States to CMS, so that ICE can "receive information concerning the identity and location of aliens in the United States, such as address, telephone number, banking information…email address…or other information . . . ."

145.  In other words, ICE is brazenly attempting to use the information individuals submit to States in their Medicaid application and claims—to get basic medical care—in order to deport those individuals or their family members.  In doing so, ICE is using the federally maintained database as a vehicle to obtain state data that it could not otherwise demand from the states themselves.  The move is unprecedented.

146.  On information and belief, Defendants' demands for SNAP data from the Plaintiff States is a similar attempt to improperly collect and share this data with other federal agencies, that do not intend to use the data for any SNAP administration-related purpose.

**D.    On the insistence of DOGE, the IRS and DHS have already begun creating a system for sharing home addresses of deportation targets with DHS.**

147.    On July 15, 2025, ProPublica published a detailed account of documents it had obtained from the IRS revealing the agency's plan to build a computer program that would give ICE officers on-demand access to confidential tax data.[31]  Specifically, the system would allow ICE to obtain the home addresses of those it seeks to deport, using information provided by taxpayers for tax purposes.

148.    According to ProPublica's reporting, DOGE began pressuring the IRS to provide taxpayer data to ICE earlier this year, but the acting general counsel refused.  He was soon replaced by Andrew De Mello.  Soon after, IRS and DHS entered into a memorandum of understanding ("MOU") that allowed for inter-agency information sharing but provided for specific legal guardrails to safeguard taxpayers' information.[32] On or around June 25, ICE demanded that the IRS turn over the addresses of 7.3 million taxpayers, according to public reporting.[33]  De Mello refused, finding that this demand did not comply with the requirements of the agencies' MOU, including ICE's obligation to provide written assurance that each individual whose data was requested was under active criminal investigation.  Two days later he, too, was forced out of his job as general counsel of IRS.[34]

149.    ProPublica also learned that a top ICE official proposed to IRS that DHS provide the agency with all of its deportation targets, and IRS simply respond with the home addresses associated with those individuals.  ProPublica reports that IRS lawyers were alarmed by this suggestion, and its brazen illegality under taxpayer confidentiality statutes, and it caused a wave of departures in the agency's legal and privacy departments.  Nonetheless, ProPublica obtained a technical blueprint that appears to show that the IRS and DHS are now taking steps to carry out precisely that plan before the end of July 2025.[35]

---

[31] William Turton, Christopher Bing & Avi Asher-Schapiro, *The IRS Is Building a Vast System to Share Millions of Taxpayers' Data with ICE*, ProPublica (July 15, 2025), https://www.propublica.org/article/trump-irs-share-tax-records-ice-dhs-deportations.
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*

150.  In response to a request for comment, the White House confirmed that ICE plans to use this data to fulfill the President's campaign pledge to carry out mass deportations.[36]

## IV.    USDA HAS ALREADY TAKEN STEPS TO ADVANCE THE ADMINISTRATION'S CAMPAIGN TO COLLECT AND MISUSE AMERICANS' DATA.

151.  Under ordinary circumstances, USDA's data demand would be unreasonable and beyond the scope of its statutory oversight role.  However, USDA's demand comes in conjunction with other acts and public statements making it clear that the agency is not focused on efficient program administration and integrity but rather intent on sharing this information across the federal government, including for the purpose of assisting immigration enforcement.

### A.    DOGE has already begun accessing sensitive data systems at USDA.

152.  USDA is no exception to this administration's pervasive campaign against individual privacy.  On February 14, 2025, U.S. Secretary of Agriculture Brook Rollins announced that the agency was welcoming DOGE into USDA and giving them "full access and transparency" to the agency.[37]

153.  According to public reporting from July 15, 2025, a whistleblower from USDA recently provided evidence revealing that DOGE has gained high-level access to view and change the contents of USDA's National Payment Service, which controls billions of dollars in USDA payments to American farmers.[38]

154.  The National Payment Service contains highly sensitive information shared by farmers who apply for federal loans and other payments.  As one former senior USDA official explained, "When we talk about farm loan application records, there is no more personal information anywhere than in that database . . . .  The farmer's entire financial life and the life of

---

[36] *Id.*

[37] *Secretary Rollins Takes Bold Action to Stop Wasteful Spending and Optimize USDA to Better Serve American Agriculture*, USDA (Feb. 14, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/02/14/secretary-rollins-takes-bold-action-stop-wasteful-spending-and-optimize-usda-better-serve-american.

[38] Jenna McLaughlin, *DOGE keeps gaining access to sensitive data. Now it can cut off billions to farmers*, NPR (updated July 11, 2025), https://www.npr.org/2025/07/10/nx-s1-5455779/doge-usda-farmers-data.

1   their kids and their family, every time they've missed a payment, every time they've had a hard

2   time, every time they've gotten in financial trouble . . . it's there."[39]

3   155.  Allowing DOGE access to this information is a sharp break from USDA's

4   longstanding policy.  One former deputy FSA administrator commented, "I cannot understate the

5   emphasis and the seriousness with which USDA had historically taken the handling of private

6   information."[40]

7   156.  On July 15, 2025, U.S. Senator Tammy Baldwin from Wisconsin issued a letter to

8   Secretary Rollins, on behalf of Wisconsin farmers, demanding that DOGE's access be revoked.

9   She warned that DOGE's access to sensitive agricultural information is "an intrusion that not only

10  breaches [farmers'] privacy, but also raises serious concerns about the future of USDA payments,

11  our nation's food security, and the consolidation of farmland and processing operations."[41]

12  **B.    USDA has recently erased guidance on its website promising that**
    **information provided by SNAP applicants would not be used for**
13  **immigration enforcement.**

14  157.  Historically, and until very recently, USDA guidance materials have emphasized that

15  immigration status information provided by SNAP applicants would not be used for immigration

16  purposes, consistent with federal law and relevant policies.

17  158.  As recently as February 2, 2025, USDA FNS website contained a section titled

18  "SNAP Eligibility for Non-Citizens" that had a banner at the top of the page stating "Important"

19  in bold large type and said "You can apply for or receive SNAP without immigration

20  consequences."[42]  The website's FAQ stated, "you will not be deported, denied entry into the

21  U.S., denied permanent resident status (Green Card holder), or the ability to become a U.S.

22  citizen solely because you *or a family member* applied for or received SNAP."[43]  (emphasis

23  added).

---

24  [39] *Id.*
    [40] *Id.*
25  [41] Letter from Senator Tammy Baldwin to Brooke Rollins, Sec'y, USDA (July 15, 2025),
    https://www.documentcloud.org/documents/25998912-2025-07-15-final-letter-to-usda-regarding-
26  doge-access/.
    [42] *See SNAP Eligibility for Non-Citizens*, USDA (updated Jan. 27, 2025),
27  https://web.archive.org/web/20250202100047/https://www.fns.usda.gov/snap/recipient/eligibility
    /non-citizen.
28  [43] *Id.*

159.   As of February 22, 2025 that "Important" banner and the FAQ quoted above had been removed from the webpage.[44]  The changes also removed some other language, including an answer in a FAQ explaining to ineligible noncitizens that "you may apply for your eligible non-citizen or citizen children. Your income and resources still count to determine eligibility and benefit levels for the rest of your household members. Since you are not applying for SNAP, you do not need to provide your Social Security number or immigration status."

160.   On information and belief, no law, rule or regulation changed during this period in February to warrant removal of the text previously on the FNS website.

161.   The FNS website section on Program Guidance on Non-Citizen Eligibility previously contained a PDF document titled Supplemental Nutrition Assistance Program Guidance on Non-Citizen Eligibility, which contains the same assurances about immigration consequences associated with SNAP benefits.[45]  That PDF has now been removed.

162.   USDA's website also previously contained a factsheet for "immigrant serving institutions" stating that applying for or receiving Summer EBT, a program to subsidize groceries for parents of school-aged children while school is out of session, would not result in being "deported, denied entry to the country, or denied permanent status."[46]  That fact sheet has been removed.

163.   On information and belief, USDA removed these references on its website because it knows that SNAP applicant and recipient information will now be used for immigration-enforcement related purposes, contrary to law and long-standing policy and practice.

---

[44] *See SNAP Eligibility for Non-Citizens*, USDA (updated Feb. 21, 2025), https://web.archive.org/web/20250222190554/https://www.fns.usda.gov/snap/recipient/eligibility/non-citizen.
[45] *Supplemental Nutrition Assistance Program Guidance on Non-Citizen Eligibility*, USDA (June 2011), https://web.archive.org/web/20250208231044/https://fnsprod.azureedge.us/sites/default/files/resource-files/Non-Citizen%20Guidance_6-30-2011.pdf.
[46] *Summer EBT Factsheet for Immigrant Serving Institutions*, USDA (Jan. 2024), https://web.archive.org/web/20250202082329/https://www.fns.usda.gov/sebt/outreach-toolkit/factsheet-immigrant-serving-institutions.

**V.    IN AN UNPRECEDENTED MOVE, USDA DEMANDED FIVE YEARS' WORTH OF PERSONAL INFORMATION ON SNAP APPLICANTS AND RECIPIENTS FROM PLAINTIFF STATES.**

    **A.    USDA first attempted to obtain all SNAP participant data directly from Plaintiffs' EBT vendors, then changed course after being sued.**

164.    As noted above, Plaintiff States have contracted with one of two vendors, Fidelity Information Services ("Fidelity") or Conduent, to provide EBT processing services, including managing the EBT System for their SNAP programs.

165.    On or around May 5, 2025, Plaintiff States that contract with Fidelity received a letter from the firm stating that it had been contacted by USDA and USDA's DOGE team related to the recent Information Silos Executive Order, but had not provided any confidential data pursuant its contract with the relevant Plaintiff States.

166.    In late April or early May, Plaintiff States were informed by Conduent or Fidelity, depending on which firm the State contracts with, that USDA and/or DOGE had contacted them to request SNAP data. Pursuant to its agreement with those States, Conduent and Fidelity stated that it did not share any confidential or personally identifiable information with USDA or DOGE.

167.    On April 24, 2025, USDA made a verbal request for SNAP participant data from Conduent. USDA sought "audit"-level data for Conduent's entire customer base nationwide including account setup and maintenance files, which includes PII files, and six months of historical data. Conduent did not share the requested data and responded to USDA noting that the federal agency might want to reach out to the states directly.

168.    On May 6, 2025, USDA's Food and Nutrition Service sent a letter to all state SNAP agency directors, titled "FNS Data Sharing Guidance," informing them that USDA intended to effectuate the Information Silos EO recently issued by President Trump (the "May 6 Letter"). To that end, USDA claimed that federal law authorizes USDA to "obtain SNAP data from state agencies and, by extension, their contractors." Therefore, USDA "is working with several SNAP payment processors to consolidate SNAP data[.]" A true and correct copy of that letter is attached as Exhibit A.

169.   The May 6 Letter also notified the state agencies that USDA would be "taking steps to require all states to work through their processors to submit at least the following data to [USDA]": (1) "Records sufficient to identity individuals as applicants for, or recipients of, SNAP benefits, including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers"; and (2) "Records sufficient to calculate the total dollar value of SNAP benefits received by participants over time, with the ability to filter benefits received by date ranges."  It continued, "[r]equested data will cover the period beginning Jan. 1, 2020, through the present[.]"  The letter ends with a threat, stating that "[f]ailure to grant processor authorizations or to take the steps necessary to provide SNAP data to [USDA] may trigger noncompliance procedures codified at 7 USC 2020(g)."

170.   In the May 6 Letter, USDA acknowledged that it was engaged in rulemaking by promulgating the "data sharing guidance" therein.  The Letter cites to 5 U.S.C. § 553(a)(2), apparently claiming an exception to the notice and comment requirement for such rulemaking for "a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts."  5 U.S.C. § 553(a)(2).

171.   On May 9, 2025, Fidelity informed several Plaintiff States, including California, New York, and Illinois, that USDA had requested records regarding SNAP cardholder and transaction data and that Fidelity intended to cooperate with the request.  The vendor stated that it was nevertheless seeking the state agencies' consent for Fidelity to disclose information to USDA.

172.   Plaintiff States that received this communication from Fidelity individually engaged with Fidelity, explaining that they did not consent to the disclosure of their data to USDA.  On or around May 14-15, 2025, Fidelity assured these same Plaintiff States that it would not release data without the States' consent.

173.   Similarly, Plaintiff States that contract with Conduent, such as Connecticut and New Jersey, informed Conduent that it was not authorized to release information to USDA without the States' authorization and approval.  Conduent relayed that it did not share SNAP data when requested by USDA.

174. To Plaintiff States' knowledge, their EBT vendors have not, to date, released any SNAP participant data in connection with USDA's requests.

175. After the May 6 Letter, Privacy advocacy groups swiftly filed suit to enjoin the USDA from collecting SNAP data containing PII from state agencies. *See* Compl., *Pallek v. Rolllins*, No. 1:25-cv-1650 (ECF No. 1) (D.D.C. May 22, 2025). The complaint alleges that USDA's actions violated the Privacy Act, the Paperwork Reduction Act, and the Administrative Procedure Act.

176. When the plaintiffs moved for a temporary restraining order, a USDA official stated that USDA "has instructed EBT Processors to refrain from sending any data until USDA completed procedural steps to ensure that data received would be appropriately safeguarded and to satisfy all necessary legal requirements." Corley Decl. ¶ 13, *Pallek v. Rolllins*, No. 1:25-cv-1650 (ECF No. 11-1) (D.D.C. May 30, 2025). The official further represented that USDA planned to complete and publish a new System of Records Notice ("SORN"),[47] as required by the Privacy Act, before collecting any data under the May 6 Letter. *Id.* ¶ 14.

**B.      USDA then issued a SORN notifying stakeholders of its intent to collect SNAP data, and hundreds of stakeholders submitted comments criticizing the proposal.**

177. On June 23, 2025, USDA published a SORN in the Federal Register titled USDA/FNS–15, ''National Supplemental Nutrition Assistance Program (SNAP) Information Database.'' 90 Fed. Reg. 26,521 (June 23, 2025).

178. The SORN states: "Pursuant to, among other authorities, 7 U.S.C. 2020(a)(3) and (e)(8)(A) and 7 CFR 272.1(c)(1) and (e), FNS will work with all State agencies and their designated vendors and/or contractors to transmit data on SNAP participants and transactions for the purposes listed below. This system is consistent with and effectuates multiple executive orders, including but not limited to Executive Order 14243 of March 20, 2025, Stopping Waste,

---

[47] "[E]ach time an agency 'establish[es] or revis[es]' a system of records, it must publish a System of Records Notice ('SORN') in the Federal Register detailing, among other things, 'each routine use of the records contained in the system, including the categories of users and the purpose of such use.'" *AFSCME v. Soc. Sec. Admin.*, No. ELH-25-0596, 2025 WL 1206246, at *57 (D. Md. Apr. 17, 2025) (quoting 5 U.S.C. § 552a(e)(4)(D)).

1   Fraud, and Abuse by Eliminating Information Silos and Executive Order 14218 of February 19,

2   2025, Ending Taxpayer Subsidization of Open Borders." *Id.*

3       179.   The SORN announces that USDA intends to demand the following records from "53

4   State agencies and their designated vendors and/or contractors": "records containing personally

5   identifying information, including but not limited to SNAP participant name, Social Security

6   Number (SSN), date of birth (DOB), residential address, Electronic Benefit Transaction (EBT)

7   card number, and case record identifier number or other identifiers or data elements maintained

8   by States, vendors, or contractors to identify SNAP recipients." *Id.*

9       180.   The SORN also portends to collect "information derived from and associated with

10  EBT transactions, including but not limited to records sufficient to calculate the total dollar value

11  of SNAP benefits received by participants over time, such as applied amounts and benefit

12  available dates." *Id.*

13      181.   These categories of information will be collected for all "individuals who have

14  received, are currently receiving, or have applied to receive SNAP benefits." *Id.*

15      182.   The SORN lists the following sources from which USDA will collect this "data on

16  SNAP participants and transactions": "53 State agencies that administer SNAP and their

17  designated vendors and/or contractors. Information in this system is also provided by other

18  Federal agencies with which USDA partners on program integrity efforts." *Id.*

19      183.   In vague terms, the SORN explains that the data will be used "to ensure the integrity

20  of Government programs, including by verifying SNAP recipient eligibility against federally

21  maintained databases, identifying and eliminating duplicate enrollments, and performing

22  additional eligibility and program integrity checks specified herein."  It is unclear what is meant

23  by "ensure the integrity of Government programs" and "performing . . . program integrity

24  checks," and USDA has not provided additional detail to Plaintiff States. *Id.*

25      184.  As authority for the collection of SNAP data, the SORN cites 7 U.S.C. 2020(a)(3) and

26  (e)(8)(A); 7 CFR 272.1(c)(1) and (e), in addition to the Information Silos EO and the Open

27  Borders EO. *Id.*

28

185.    The SORN sets out eleven "routine uses" for which USDA intends to disclose the SNAP data it collects.  The eighth "routine use" announces that USDA intends to disclose the data "[w]hen a record on its face, or in conjunction with other records, indicates a violation or potential violation of law, whether civil, criminal or regulatory in nature . . . USDA/FNS may disclose the record to the appropriate agency, whether Federal, foreign, State, local, or tribal, or other public authority responsible for enforcing, investigating, or prosecuting such violation or charged with enforcing or implementing the statute, or rule . . if the information disclosed is relevant to any enforcement, regulatory, investigative or prosecutive responsibility of the receiving entity." *Id.*

186.    The SORN states that it became effective upon publication, except for the "routine uses," which would become effective after a 30-day comment period, ending on July 23, 2025. *Id.*

187.    Alarmed by several aspects of this SORN, California, Arizona, Colorado, Connecticut, Illinois, Maryland, Michigan, Minnesota, New Mexico, New Jersey, New York, Oregon, Rhode Island, and Washington submitted a comment letter to outlining their objections to the agency's proposal.  A true and correct copy of that letter is attached as Exhibit B.

188.    The States' letter explained that USDA's new database would unlawfully require States to turn over sensitive, personal information that was collected for SNAP-use only. Furthermore, USDA's proposal would duplicate Congressionally mandated eligibility determinations already performed by the States.  Lastly, the SORN purported to allow USDA to disclose individuals' personal information for any legal or regulatory enforcement purpose, which would be incompatible with the original purpose of collecting that data for SNAP purposes.  *See*, *e.g.*, *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 548-49 (3rd Cir. 1989).

**C.    USDA disregarded all comments and demanded SNAP data from Plaintiff States by July 30, 2025.**

189.    Hundreds of individuals, organizations, and state actors submitted negative comments on USDA's SORN.  A total of 458 comments on the SORN are available publicly.

190.    On information and belief, USDA did not, and never intended to, consider any comments to the SORN, including the comment letter submitted by the Plaintiff States (Exhibit B), as evidenced by the fact that the agency began attempting to collect data the day after the SORN went into effect.

191.    In recent court filings, USDA has claimed that it is tracking and reviewing comments and has acknowledged that the comments are overwhelmingly opposed to the SORN.  ECF No. 29-1, *Pallek et al. v.  Rollins et al.,* No. 1:25-cv-01650-JMC (D.D.C. July 21, 2025).  Yet, publicly, Defendant USDA has made no changes to its demand for data nor to its intended treatment of the data.  Defendant USDA's actions belie any claim that it has engaged in a meaningful notice and comment procedure.

192.    In fact, USDA did not wait to consider any comments from interested parties before acting on its SORN.  Just over two weeks after issuing its SORN, on July 9, 2025, the Secretary of USDA sent the States a new demand letter (the "July 9 Letter").  The July 9 Letter is attached here as Exhibit C.

193.    The July 9 Letter again cites the President's Information Silos Executive Order and states that USDA "is committed to effectuating this Executive Order," in particular the provision requiring agency heads to "take all necessary steps . . . to ensure the Federal Government has unfettered access to comprehensive data from all state programs that receive federal funding, including . . . data generated by those programs but maintained in third-party databases."

194.    It goes on to explain that USDA's goal is to "eliminate[] bureaucratic duplication and inefficiency and enhance[] the Government's ability not only to have point-in-time information but also to detect overpayments and fraud."

195.    The Letter cites to the SORN described above and acknowledges that the SORN would become fully effective on July 23, 2025, the last day for comments.

196.    Finally, it states "[t]o ensure efficient implementation of this system, and to ensure USDA has a complete and accurate database, we are requiring collection of SNAP data from EBT processors or State agencies beginning on July 24, 2025, with submissions to USDA no later than the close of business on July 30, 2025."

197.   The July 9 Letter states that the "required data" are listed in the SORN under the heading "Categories of Records in the System."  They are: "records containing personally identifying information, including but not limited to SNAP participant name, Social Security Number (SSN), date of birth (DOB), residential address, Electronic Benefit Transaction (EBT) card number, and case record identifier number or other identifiers or data elements maintained by States, vendors, or contractors to identify SNAP recipients" and "information derived from and associated with EBT transactions, including but not limited to records sufficient to calculate the total dollar value of SNAP benefits received by participants over time, such as applied amounts and benefit available dates."  The Letter does not provide a time period for this data.

198.   On information and belief, the May 6 Letter is the culmination of Defendant USDA's decision-making process, purports to place an obligation on the States to produce data, and constitutes a final agency action.

199.   In issuing this letter, USDA ignored the substantial burden that this unlawful data demand would place on the Plaintiff States, which are being asked to produce massive quantities of sensitive data on an impossibly short deadline.  USDA estimated that compliance would take States a total of 20,000 additional hours to comply.[48]  That is a vast underestimate.  In California, for example, state agency officials have estimated that collecting and producing the requested data would take a minimum of 3 months and possibly over 6 months due to the breadth and ambiguity of the request, the need to collect data from multiple legacy automated systems, and other technical challenges.  New Jersey's SNAP administrator also faces technical challenges as the requested data would need to be culled and compiled from across multiple sources, requiring months of work.  Texas's comment on USDA's SORN similarly observed that it would take "approximately 8-10 weeks (from the time additional FNS guidance is provided) to provide initial requested data and at least 8-12 weeks to develop and implement system requirements that will regularly interface with the new USDA/FNS-15",[49] in stark contradiction to USDA's estimate.

---

[48]  USDA Memo. to O.M.B., Nonsubstantive Change Request - Supplemental Nutrition Assistance Program (OMB # 0584-0064) (June 11, 2025), https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202506-0584-001.

[49]  Texas Health and Hum. Serv. Comm'n, Comment Letter On FNS-2025-0024 (July 21, (continued…)

200.   On July 23, 2025, one week before the deadline it set to produce data, Defendant USDA sent state agencies another letter with further details about its demand, attached hereto as Exhibit D.

201.   The agency clarified, for the first time, that it is demanding data on "individuals who have received, are currently receiving, or have applied to receive SNAP benefits from January 1, 2020, through present date.  Requested data elements shall include records sufficient to identify individuals as applicants for, or recipients of, SNAP benefits, including but not limited to all household group members' names, dates of birth, social security numbers, residential and mailing addresses used or provided, as well as all data records used to determine eligibility or ineligibility."

202.   Additionally, the letter noted that USDA is requesting "transactional records from each household . . . sufficient to calculate the total dollar value of SNAP received by recipients over time . . . as well as SNAP usage and retailer data."  *See* Exhibit D.  In other words, it appears that USDA is not only demanding PII of all applicants, but also PII of household members, as well as records showing how recipients used their benefits and at which grocery stores.

203.   The letter further directs States to transmit their data via the commercial platform, Box.

204.   The USDA's demand departs from past practice not only with respect to the breadth of information requested and lack of substantive protections, but also with respect to basic protocols undertaken.  For example, when New York's SNAP administration agency has transmitted data sets to USDA in the past—all of which have been much smaller than the set demanded here, and were shared for federally approved purposes—USDA and the state agency have executed data-sharing agreements and/or memoranda of understanding prior to transmission. USDA and the state agency have also resolved technical questions, including determining the appropriate data elements and proper data formatting, prior to transmission.  The rushed process undertaken here has not afforded USDA and state agencies time to follow these important steps.

2025),
https://www.regulations.gov/comment/FNS-2025-0024-0037.

1    Indeed, USDA has completely ignored the express statutory requirement that it may only inspect

2    state SNAP records pursuant to "data and security protocols *agreed to by the State agency and*

3    *Secretary.*" 7 U.S.C. § 2020(a)(3)(B)(i) (emphasis added).

4        205.   At least one Plaintiff State, Colorado, requested that USDA-FNS agree to data and

5    security protocols in connection with this data collection, and received no substantive response

6    from the agency.

7        206.   On July 23, USDA also published a Privacy Impact Assessment, in what appears to

8    be a rushed attempt at surface-level compliance with one of the requirements of the Paperwork

9    Reduction Act. [50]

10       207.   In it, USDA claims to have the authority to "collect and utilize SNAP beneficiary

11   data for program administration and enforcement as provided, for example, in the Food and

12   Nutrition Act of 2008 (7 U.S.C. 2011 et seq.) at 7 U.S.C. 2020(a)(3)(B), (e)(8)(A); 7 C.F.R.

13   272.1(c)(1), (e)."[51]  USDA misstates the authority granted by the cited provisions.

14       208.   USDA discloses that the uses of the data in the database would be "to detect duplicate

15   enrollments across states, verify immigration status eligibility, and perform other fraud prevention

16   checks against other Federal agencies' datasets, thereby ensuring program integrity, including by

17   verifying the eligibility of benefit recipients."[52]

18       209.   In its privacy impact assessment, Defendant USDA also reveals that it intends to

19   "cross check data against other Federal databases using matching algorithms to determine

20   accuracy," clearly describing a computer matching program.[53]  However, on information and

21   belief, USDA has not executed a computer matching agreement nor complied with the

22   requirements of the Computer Matching and Privacy Protection Act of 1988.

---

[50] USDA, Cybersecurity and Priv. Operations Ctr., Priv. Div., USDA Privacy Impact
Assessment Fiscal Year 2025 (July 23, 2025),
https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf
[51] *Id.*
[52] *Id.*
[53] *Id.*

48

210. USDA also states that it intends to share the data collected with Federal agencies "when necessary to investigate and rectify fraudulent or otherwise improper or illegal SNAP enrollments or transactions."[54]

211. Defendant USDA further reveals that it intends to use the data to "perform other fraud prevention checks against other Federal agencies' datasets," without providing further detail on how those datasets would be obtained or whether USDA would share SNAP data with other agencies in order to do so.[55] Again, to Plaintiffs' knowledge, USDA has not complied with the prerequisites to conducting a computer matching program, as this statement describes.

212. The purposes for which USDA states it will use the collected data are all duplicative of existing systems. The Privacy Impact Assessment states the data will be used to "detect duplicate enrollments across states, verify immigration status eligibility, and perform other fraud prevention checks against other Federal agencies' datasets, thereby ensuring program integrity."[56] States already conduct these checks, using systems such as NAC and SAVE, described in Section I.D.

213. Defendant USDA states that notice of this data collection will be provided to applicants by States "at the point the individual applies for SNAP enrollment."[57] Plaintiff States do not, nor have they been instructed to, notify SNAP applicants that their data may be turned over, wholesale, to the federal government in this manner.

214. Finally, USDA reveals in its Privacy Impact Assessment that, unlike in a routine audit, USDA intends to keep the data it collects from States indefinitely.

**D.    USDA threatened States with noncompliance procedures if they do not comply by the agency's arbitrary deadline.**

215. On July 25, 2025, USDA sent state agency directors another letter, reminding them of the July 9 demand and the July 30, 2025 deadline to comply. A true and correct copy of that letter is attached as Exhibit E.

---

[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.*

216.   The letter contained a thinly veiled threat to retaliate against States who do not (or cannot) comply with Defendant USDA's unlawful demand. It stated: "Failure to take the steps necessary to provide the relevant data to FNS may trigger noncompliance procedures codified in 7 U.S.C. 2020(g)."  *See* Exhibit E.

**E.     USDA has refused to commit that it will not immediately disclose SNAP data it collects outside the agency.**

217.   On July 24, 2025, representatives for Defendant USDA appeared in court for a hearing in the *Pallek* case about its demands for SNAP data.  *See Pallek et al. v.  Rollins et al.*, No. 1:25-cv-01650-JMC (D.D.C.).

218.   When asked by the court, "Do you know what the next step is? . . . after the last day of the month, what's next?" USDA's representative stated, "I don't, Your Honor.  I know the agency is working on setting up a process very soon to allow for data transfers.  But I do assume there would be some work that goes into collating that data . . . ."

219.   When asked by the court whether Defendant USDA was willing to represent that "data won't be disclosed to any third parties or outside USDA in the next two week," USDA's representative responded, "I can't say that definitively."

**VI.   USDA-OIG MAKES UNPRECEDENTED DEMANDS FOR ALL SNAP PARTICIPANT DATA FROM PLAINTIFF STATES.**

**A.     USDA's Office of Inspector General**

220.   Congress has established an Office of Inspector General in USDA ("OIG"), as it has in various other federal agencies.  *See* 5 U.S.C. §§ 402(a)(1), 401(1).

221.   Inspectors General were created to be independent watchdogs installed in federal agencies to keep those agencies accountable to the voters and prevent mismanagement, corruption, and government waste.  OIG's duties are "to conduct, supervise, and coordinate audits and investigations relating to the programs and operations of" USDA, inform the Secretary of Agriculture and Congress about problems in the agency, and other advisory functions, such as recommending policies for activities designed to promote efficiency and detect fraud and abuse

and "provid[ing] a means for keeping" the Secretary and Congress informed about problems with USDA activities.  5 U.S.C. § 402(b); 5 U.S.C. § 404(a).

222.  Although Inspectors General are constitutionally required to be confirmed by the U.S. Senate, 5 U.S.C. § 403(a), USDA currently has no Senate-confirmed Inspector General.  The Acting Inspector General at USDA was installed in February 2025 after the prior officeholder was fired in violation of applicable procedures[58]—along with 16 other inspectors general—on January 24, 2025 and escorted out of her office.[59]

223.  The previous USDA Inspector General (along with many other purportedly fired Inspectors General) has since sued, asserting that she was fired unlawfully.  *See Storch et al. v. Hegseth et al.*, No. 1:25-cv-415 (D.D.C.).

## B.    OIG Demands all SNAP participant data for 2024 from California, Illinois, and Michigan.

224.  On March 5, 2025, OIG announced an inspection of California's Department of Social Services ("CDSS") to "determine whether the State of California used FNS [Food and Nutrition Services] SNAP administrative funds to provide benefits to participants."  Over the course of the next couple of weeks, OIG conducted an in-person inspection and CDSS provided documents relevant to that inquiry.

225.  Shortly after the in-person inspection, OIG unexpectedly requested data for all SNAP applicants and their family members for the last fiscal year to "perform analytics on SNAP participant data to evaluate its quality and integrity."  Despite discussions with CDSS, OIG insisted on demanding personal information about applicants and household members, including names, languages spoken and read, and citizenship status.  But OIG did drop its request for data on income and employment status.

226.  CDSS raised concerns with the unprecedented nature of the request, including the volume of records requested and privacy concerns associated with sharing such data.  CDSS

---

[58] *See* 5 U.S.C. § 403(b).
[59] Rachael Levy, *Exclusive: USDA Inspector General Escorted Out of Her Office After Defying White House*, Reuters (Jan. 29, 2025), https://www.reuters.com/world/us/usda-inspector-general-escorted-out-her-office-after-defying-white-house-2025-01-29/.

1   offered to provide a limited data sample, such as the records already provided to USDA under the

2   mandatory quality control review process. OIG declined.

3       227.   OIG also provided additional information about its inspection goals in its discussions

4   with CDSS. OIG explained that it planned to review data used for eligibility determinations

5   because "[d]ata of poor or low quality can impact eligibility determinations. We are NOT

6   reviewing the data to determine full eligibility, but rather we are focused on the quality of the data

7   so that, ultimately, the USDA program agency (Food and Nutrition Service) can make appropriate

8   eligibility determinations on reliable information."

9       228.   CDSS was puzzled by OIG's explanations. Neither FNS nor any other component of

10  USDA makes SNAP eligibility determinations; rather, States and their counties do. *See* 7 U.S.C.

11  § 2020(a)(1) ("The State agency of each participating State shall have responsibility for certifying

12  applicant households[.]")

13      229.   Furthermore, OIG dropped its request for data on household income, which is a

14  primary factor in determining SNAP eligibility. And OIG declined CDSS's offer to aid OIG in

15  its data validation efforts by providing system documentation and explanation about how some of

16  OIG's stated concerns—such as entering letters into zip code fields—weren't possible in the

17  computer system used in California.

18      230.   Lastly, CDSS explained to OIG that any concerns with poor data quality would

19  appear in the large sample CDSS had already provided to USDA and that OIG had rejected.

20      231.   CDSS was also concerned by OIG's refusal to commit that it would not re-disclose

21  any data provided to OIG to other federal agencies. CDSS directly asked OIG about any plans to

22  share SNAP record data with DOGE or other entities in the federal government. OIG declined to

23  make any assurances about its plans in writing, and instead stated that it would comply with the

24  Privacy Act and its SORN.

25      232.   OIG also did not offer to negotiate a data and security protocol, even though one is

26  required before CDSS must produce SNAP records to USDA. 7 U.S.C. § 2020(a)(3)(B)(i).

27      233.   OIG represented that the requested data would be held in the system of records

28  described in a SORN published at 87 Fed. Reg. 62,066 as the one applicable to its collection,

maintenance, and disclosure of the SNAP records OIG requested from CDSS.  More specifically, OIG wrote that the requested data would be held in the "Office of Analytics and Innovation's (OAI) Holistic Information Analytics and Visualization Environment (HIAVE) System."  87 Fed. Reg. 62,076.  This SORN lists as the included record sources: "records obtained from systems of records maintained by USDA or other Federal agencies; individuals; non-Government, commercial, public, and private agencies and organizations; and publicly-available databases." *Id.* at 62077.

234.   This SORN also notes that disclosures of records under the "routine use exception" to the Privacy Act may be made when a record "indicates either by itself or in combination with other information, a violation or potential violation of a contract or law."  87 Fed. Reg. 62,069; *see id.* at 62,077 (identifying applicable routine uses).

235.   In response to a request by CDSS, OIG also identified a privacy impact assessment relating generally to its IT Infrastructure system.[60]  That assessment broadly notes that OIG's IT Infrastructure "includes many types of information, for example, information on individuals who are part of an audit or investigation, internal staff correspondence, copies of subpoenas issued during an investigation, affidavits, witness statements, transcripts of testimony, notes, reports, etc."  This data is used by OIG, again generally, "to perform OIG audits, investigations, and other activities, and to identify indicators of fraud and more generally, to promote the effectiveness and integrity of USDA programs."  Nothing in the assessment indicates that OIG has specifically assessed the need for, or privacy risks involved with, collecting the entire universe of SNAP participants' records.  Nor does the assessment analyze the risks associated with disclosing the universe of SNAP record data to another agency for non-SNAP purposes.

236.   Illinois was similarly notified in April 2025 that OIG would be conducting an inspection of its SNAP program seeking to "perform analytics on participant data to evaluate its quality and integrity."  OIG initially requested a sample set of 50-100 cases, seeking almost all data elements collected from each applicant in the sample set.

---

[60] Privacy Impact Assessment, OIG IT Infrastructure (OIG GSS) (Feb. 14, 2019), https://www.usda.gov/sites/default/files/documents/oig-gss-pia.pdf.

237.    In May 2025, as Illinois was preparing the sample, OIG revised their request and instead sought the "Entire Federal FY 24 Universe . . . of Snap Participant Data."  Given the unprecedented breadth of this request, both quantitatively and qualitatively, and the enormous amount of PII subject to potential disclosure, Illinois's SNAP agency has sought to negotiate privacy protections and other limitations on subsequent disclosure of the data beyond OIG.

238.    However, OIG refused requests by Illinois to provide de-identified data, enter into a confidentiality agreement, or agree to a data and security protocol as Illinois believes is otherwise required by statute.

239.    As of the date of the filing of this complaint, Illinois nevertheless remains engaged in a negotiated process with OIG with the goal of ensuring that cooperation with OIG's inspection does not threaten subsequent disclosure of Illinois's SNAP data for purposes unrelated to the SNAP program.

240.    OIG also recently sought beneficiary information from Michigan, and USDA was directly involved in that demand, despite OIG being ostensibly independent from USDA. On May 8, 2025, OIG submitted a request for information to Michigan's Department of Health and Human Services ("MDHHS") via email.  The email request sought "System Information" including a "List of system(s) MI uses to store eligibility data"; "List of data sources MI uses to verify eligibility"; "Eligibility system data dictionary"; and "Sample SNAP cases (anywhere between 50-100 cases would be enough for us to understand the data elements contained in MI's eligibility system)," and provided a list of 24 "data elements" for SNAP beneficiaries' information, all of which would include PII (e.g., name, SSN, address, alien status, etc.).  The email acknowledged that OIG "underst[oo]d it might take a while" to respond to the request "based on the size of the dataset, and having to go through internal processes such as checking with your legal team."

241.    On May 14, 2025, OIG followed up via email stating: "As part of this request we are asking for all participant information that is provided at the time of the application and any data collected to validate the data provided by the applicant/s is accurate, as it relates to SNAP. That would be any information that an applicant would enter into [Michigan's benefits system], not

limited to the [24 data elements in the original request]. This could include income/employment, household information, etc."

242.   On June 2, 2025, the FNS Midwest Regional Office (an office of USDA, not OIG) contacted Michigan regarding OIG's request.  FNS advised that OIG was "able to modify its requests from the entire universe of SNAP participant data to a sample of that data.  That is anywhere between 50-100 cases."  FNS's email acknowledged the "burden" of the original OIG request and indicated that "hopefully" the "modification" of the request reduced the burden.

243.   On July 22, 2025, MDHHS provided the requested sample data with the beneficiary data deidentified to the FNS Regional Office.

244.   On July, 24, 2025, the FNS Regional Office responded, indicating the Regional Office had shared the sample with OIG and that OIG sought additional information, specifically "the full FY24 (10/1/23-9/30/24) SNAP participant data set," including beneficiaries' PII.

245.   On information and belief, OIG's demands for data from Plaintiffs California and Michigan is the culmination of the agency's decision-making process, purports to place on those States an obligation of producing data, and constitutes a final agency action.

**VII.  PLAINTIFF STATES WILL BE IRREPARABLY HARMED IF FORCED TO DISCLOSE THE DEMANDED SNAP DATA.**

246.   If they are forced to disclose the requested data, Plaintiff States will suffer irreparable harm that monetary damages cannot adequately remedy.

247.   Once sensitive personal information is disclosed to Defendants, it is nearly impossible to effectively and totally claw it back, prevent it from being re-disclosed outside Defendant agencies, or ensure it is not misused.  If Plaintiff States are forced to comply with Defendants' demands, they will be harmed in at least three ways.  First, they face proprietary harm from Defendant USDA threatening to withhold SNAP administrative funding in retaliation for refusing to provide data.  Second, turning over SNAP data to the federal government will thwart Plaintiff States' goals of curtailing hunger by chilling individuals' participation in SNAP and destroying trust between the Plaintiff States and their residents built over many years and through the dedication of significant resources.  Third, Defendants' actions undermine Plaintiff States'

55

1    sovereign interest in enforcing their state privacy laws and administering their SNAP programs as

2    they have for decades.

3        **A.    Proprietary Harms—Withholding of Administrative Funds, Burden on
           State Agencies, and Litigation Risk**

4

5        248.    Plaintiff States face proprietary harm due to the potential loss of federal funds for the

6    administration of SNAP threatened by USDA.

7        249.    If USDA penalizes Plaintiff States—either on its own or, in the case of California and

8    Michigan, because OIG reports the State to USDA for failing to comply with its data request and

9    USDA penalizes Plaintiff States—Plaintiff States will lose some of the federal administrative

10   funds they have currently budgeted for next year.  In order to continue operating SNAP, the

11   Plaintiff States and their counties would have to divert resources in order to shoulder an increased

12   proportion of the cost of administering the program.

13       250.    Plaintiff States rely on and plan for significant federal funds for the administration of

14   SNAP.  For 2025-2026, California has budgeted $1.228 billion in federal funding for CalFresh

15   administration.[61]  The State is budgeted to pay $902 million and counties to pay $348 million for

16   the same time period.  In fiscal year 2024, Connecticut incurred $157.7 million in SNAP

17   administrative expenses, of which 50% was reimbursed by the federal government.  In fiscal year

18   2025, Illinois has received $177,042,875 in federal funding for SNAP administration.  The State

19   is budgeted to pay at least $177,042,875 in match.  For 2025-26, Maine has budgeted $13.3

20   million in federal funding for its SNAP administration, along with a further $13.3 million in state

21   funds for the same purpose.  For 2025-2026, Maryland has budgeted $1.7 billion in federal

22   funding for SNAP consisting of $115 million for administration and $1.6 billion for benefits.  For

23   FFY 2025, Massachusetts has budgeted approximately $213 million to pay for SNAP

24   administration, anticipating approximately $106 million generated in federal financial

25   participation reimbursements.  In Michigan, the State budgeted approximately $164 million to

26   administer the SNAP program, with the State providing approximate $84 million and the federal

27

28        [61] *The 2025-26 Budget: Food Assistance Programs*, Legislative Analyst's Office (Feb. 19,
     2025), https://lao.ca.gov/Publications/Report/4971.

government contributing approximately $80 million.  For New Jersey's 2024-2025 fiscal calendar year, the State has budgeted $190 million in federal funds for SNAP administration and allocated approximately $34 million from state funds and $156 million from county funds for administration.  For FY 2025, Rhode Island has budgeted over $27 million in federal funds to help pay SNAP administrative costs.  Wisconsin would expect over $100 million in federal funding for program administration and budgeted an equal amount from state and local funds.  In FFY 2024, Washington budgeted $129.5 million in such federal funding and $129.5 million in state funds.

251.   Plaintiff States also face a significant burden on their agencies if they are forced to collect and produce the massive amount of data demanded by Defendants, as noted above in paragraph 196.  This burden is difficult to quantify, given the ambiguities in Defendants' demands.  On information and belief, this burden far exceeds the 20,000 hours estimated by Defendant USDA.

252.   Plaintiff States also face risk of litigation arising from any noncompliance with USDA and OIG's data demands.

**B.    Chilling Effect Harm—Disclosure and misuse of data will cause a chilling effect on SNAP participation.**

253.   Defendants' actions will have a predictable and imminent chilling effect on individuals' willingness to avail themselves of critically needed public benefits.

254.   The mere prospect that SNAP PII may get shared with other federal agencies, such as DOGE or DHS, for surveillance or broad-based immigration enforcement purposes will discourage individuals from participating in nutrition programs for which they are eligible and authorized to participate.  This chilling effect will affect citizens, individuals who are not (or should not be) at risk of deportation, such as green card holders, and mixed-immigration status families with U.S. citizen children.

255.   The predictable chilling effects of Defendants' actions will harm Plaintiff States by causing loss of federal funding associated with any eligible individuals who avoid participating in SNAP.

256.   For example, for each eligible individual who is discouraged from participating in SNAP by Defendants' overreach, Plaintiff States, will lose from about $150 to almost $200 per month, per recipient, in federal funding.

257.   To the extent that members of the public decide to stop using statewide application and enrollment systems, then those systems will not operate as effectively as they do now.

258.   If Defendants move forward with their unprecedented data demands, they will cause additional administrative and fiscal burdens for Plaintiff States.

259.   Plaintiff States' agencies already engage in extensive outreach efforts to inform and educate the public about availability of nutrition programs.  For example, California's FFY 2019-2021 CalFresh outreach plan has an annual budget of over $44 million for each of those three years, and funds 145 contractors and subcontractors and works with local government agencies, local schools, community-based organizations, the California State University system, and many others to encourage CalFresh enrollment.

260.   Other States devote substantial resources to outreach efforts through a variety of contractor, faith-based groups, or governmental partners, for example, Arizona spends roughly $6 million; Illinois roughly $4.8 million; New Jersey roughly $5 million; Rhode Island roughly $1 million; Washington roughly $10 million; and New York roughly $23 million.

261.   Defendant USDA itself has acknowledged that just *asking* for sensitive information chills participation in the SNAP program, at one point discouraging States from asking for citizenship, immigration status, and SSNs for household members in SNAP applications because these inquiries "may have a chilling effect on the pursuit of the application" and "deter[] households from filing applications," and warning that "[f]ear and misinformation may deter many non-citizens from seeking benefits for which they are eligible—particularly if there are other members in the household who may be ineligible because of their immigration status."[62]

---

[62] FNS Memo to SNAP Regional Directors re Conforming to the Tri-Agency Guidance Through Online Applications (Feb. 18, 2011), https://fns-prod.azureedge.us/sites/default/files/Tri-Agency_Guidance_Memo-021811.pdf.

On information and belief, Defendant USDA is aware that requiring States to *disclose* that information to the federal government is even more likely to chill participation in SNAP.

262.   To avoid a significant decrease in SNAP enrollment, Plaintiff States' agencies will need to divert some of these outreach and education resources in order to encourage SNAP participation despite Defendants' actions, including by explaining Defendants' actions to fearful community members, if possible.  Portions of these resources will have to be redirected toward training employees and volunteers and developing new outreach materials and applications.

**C.     Chilling Effect Harm—Disaster Response (California, New Jersey, Oregon, and Washington)**

263.   Disaster SNAP provides short-term food benefits and supplements to certain natural disaster victims.

264.   If Plaintiff States cannot assure disaster victims of the safety and confidentiality of their private information, they will not be able to maximize victims' timely, adequate, and safe access to all applicable benefits during a disaster, as required by state law.  *See, e.g.*, Cal. Welf. & Inst. Code § 18917(e); N.J. Admin. Code § 10:87-9.8; Or. Admin. R. §§ 461-135-0491– 461-135-0497; Wash. Rev. Code § 74.04.660.

**D.     Chilling Effect Harm—School Lunch Program**

265.   The predictable chilling effects of Defendants' actions will have a broader negative impact on several Plaintiff States' ability to access federal support for the National School Lunch Program and School Breakfast Program (collectively "school meals" programs), including California, Connecticut, Illinois, Maryland, Massachusetts, Michigan, New Jersey, New York, Oregon, and Washington.

266.   School meals programs help to fight hunger and obesity by assisting schools in providing healthy meals to children.

267.   Defendants' actions will lead to undermining of school meals programs and their goal of ensuring adequate nutrition for America's schoolchildren because the school meals programs' automatic enrollment process is linked to rates of participation in SNAP.

268.   Through a federal option called "direct certification" for its school lunch program, California currently certifies almost 1.6 million children for federally funded free or reduced price meals due to their households' participation in SNAP.  Any reduction in SNAP enrollment for families with schoolchildren therefore has a negative impact on federal eligibility for free or reduced-price meals.  Plaintiff States Connecticut, Illinois, Maryland, Massachusetts, Michigan, New Jersey, New York, and Washington certify over 2 million additional children combined. This fall, New York will provide free breakfast and lunch to over 2.7 million students, with the cost of this undertaking offset by federal reimbursement for those students eligible for SNAP benefits.

269.   Lower SNAP participation rates will also have a concrete fiscal impact on States that have adopted a universal free lunch program.  Where a minimum percentage of students in a particular school are directly certified for free meals through programs like SNAP, all students in the school receive federally funded free school lunch without collecting a household application. If the percentage of eligible students dips below that mark, however, the school no longer receives federal funding for free school meals for all students and must instead require students to submit an application to be determined eligible.

**E.     Chilling Effect Harm—Safety Net Programs**

270.   Discouraging individuals and families from accessing public benefits for which they are eligible will ultimately transfer costs to state and local governments and community organizations, as families increasingly rely on emergency services and public safety net programs, such as local food pantries.

271.   Food banks, for example, are already struggling to fill a growing nutrition gap in the face of other cutbacks in nutrition assistance from the federal government.

272.   Plaintiff States' inability to assure eligible participants that their personal data will not be misused will worsen the burden on food banks.  In California alone, those food banks already provide for 4.6 million Californians (including 1.7 million children) facing food insecurity.

**F.    Chilling Effect Harm—Deterioration of Public Health and Welfare**

273.    Plaintiff States' quasi-sovereign interests will be harmed because chilling effects on SNAP participation will cause deterioration of public health and well-being.  Ultimately, the States will bear costs associated with many of these harms.

274.    Historically, some of the most vulnerable immigrants are likely to be discouraged from availing themselves of benefits like SNAP if they perceive that their status as legally present in the United States could be placed at risk.  Defendants' acts will discourage eligible immigrants from seeking both federally and State-funded nutrition assistance, thus thwarting Plaintiffs' programs addressing hunger and food insecurity.

275.    Reduced access to SNAP benefits leads to food insecurity, which is associated with numerous negative health outcomes in children, such as depression, fatigue, poor self-efficacy, and behavioral problems.  Low-income children who go without nutritious food will struggle to learn in classrooms, impacting their educational advancement and that of their peers.

276.    Conversely, food security translates to better health outcomes and lower public healthcare expenditures.  Low-income adults participating in SNAP incur about $1,400 less in medical care costs in a year than low-income non-participants.  When state residents forego SNAP, these benefits will be lost.

277.    The Census Bureau also uses receipt of SNAP benefits to calculate the Supplemental Poverty Measure, which "serve[s] as an additional indicator of economic well-being and will provide a deeper understanding of economic conditions and policy effects."[63]  Disenrollment from SNAP will undermine the accuracy of this measure and therefore misrepresent national and statewide economic conditions.

278.    Decreased participation in SNAP and state nutrition programs has economic consequences beyond hunger and public health.

279.    For example, fewer people using SNAP will harm the merchants that accept SNAP benefits for food purchases—26,600 grocers, farmers' markets, and other merchants in

---

[63] *About the Supplemental Poverty Measure*, U.S. Census Bureau (last revised June 13, 2025), https://www.census.gov/topics/income-poverty/supplemental-poverty-measure/about.html.

61

California; 18,000 merchants in New York; 9,600 in Illinois; 6,000 in New Jersey; 5,500 in Massachusetts; 5,000 in Washington; 4,600 in Kentucky; 4,500 in Wisconsin; 4,000 in Maryland; 3,500 in Oregon; over 1400 in Maine; and over 900 in Rhode Island.

280.    SNAP benefits generate secondary economic effects that increase overall spending and production.  Defendant USDA has estimated that in a slowing economy, every $1 in SNAP benefits generates $1.54 in economic activity.[64]  Thus, decisions by families to forgo critical nutritional benefits will also result in loss of economic activity.

### G.    State Sovereignty Harms—Undermining Plaintiff States' Laws and Policies

281.    Defendants' overbroad demands for personal SNAP data threaten harm to Plaintiff States' sovereign interests in maintaining and enforcing laws that preserve confidentiality of that data.

282.    State laws strictly protect the confidentiality of SNAP data, with many of those laws specifically prohibiting either opening records for examination or publication or disclosure of a list of SNAP recipients for purposes not directly connected with the administration of the program.  *See, e.g.*, Cal. Welf. & Inst. Code § 10850(a)-(b); *see also* Cal. Welf. & Inst. Code § 18909 (applying Section 10850 to CalFresh); 305 Ill. Comp. Stat. § 5/11-9; N.J. Admin. Code § 10:87-1.14; *see also supra*, note 9 (collecting similar state privacy law provisions).

283.    While Plaintiff States' confidentiality laws do allow some reasonable exceptions, they clearly do not authorize the sharing of the entire SNAP roster for purposes of federal surveillance or broad-based immigration enforcement.

284.    Plaintiff States' ability to enforce their state laws will be harmed if Defendants are allowed to use their novel and expansive data demands to trump state privacy protections.  *Cf. Hawaii v. Trump*, 859 F.3d 741, 765 (9th Cir. 2017) (holding that State had sovereign interest in its ability to carry out its own refugee policies), *vacated on other grounds*, 138 S. Ct. 377 (2017) (mem.).

---

[64] Patrick Canning & Brian Stacy, *The Supplemental Nutrition Assistance Program (SNAP) and the Economy: New Estimates of the SNAP Multiplier*, USDA, at iii (Jul. 19, 2019), https://ers.usda.gov/sites/default/files/_laserfiche/publications/93529/ERR-265.pdf?v=43851.

285.   Defendants' actions also interfere with Plaintiff States' sovereign interests in protecting the health, safety, and well-being of all residents.  *See, e.g.*, Cal. Welf. & Inst. Code § 18700(a)(1) (declaring state policy that "every human being has the right to access sufficient affordable and healthy food"); *id.* § 18919.1 (stating "intent of the Legislature to maximize food access for all CalFresh recipients"); N.J. Admin. Code § 10:87-13.1 (establishing a minimum benefit amount "to reduce hunger and improve nutrition among NJ SNAP recipients by increasing their ability to purchase food and meet their nutritional needs").

286.   Further, Plaintiff States' legislatures have designed numerous aspects of their SNAP and other nutrition programs in reliance on the assumption that the federal government would operate within normal legal limits when administering SNAP.  Defendants' unlawful actions therefore threaten substantial interference with the operation of Plaintiff States' nutrition programs.

287.   For example, a reduced willingness to participate in SNAP would have a negative impact on access and funding for their respective school-based nutrition programs, including the new Summer EBT or SUN Bucks program.

288.   Some Plaintiff States, including California and New Jersey, have elected a federal option called "direct certification" for their school lunch programs, in which children in CalFresh or NJ SNAP households are automatically determined eligible for Free or Reduced Price Meals (FRPM) without having to apply.[65]  Any reduction in CalFresh or NJ SNAP enrollment among families with schoolchildren therefore has a negative impact on federal eligibility for FRPM.

289.   California law also requires that data collected for the purposes of CalFresh (and other state benefit programs) to be used as part of a "statewide process for using data collected for purposes of those four programs . . . to increase enrollment in the CalFresh program."  Cal. Welf. & Inst. Code § 18901.56(a).  A single, statewide accessible application is used by all California entities authorized to make eligibility determinations for CalFresh.

290.   In authorizing these programmatic designs, which facilitate limited, privacy-protective data-sharing both within the State and between the State and the federal government,

[65] *See SUN Bucks*, CDSS (last updated May 16, 2025), https://cdss.ca.gov/sun-bucks.

63

the California legislature relied on the assumption that the federal government would adhere to federal confidentiality and security laws, such as the Privacy Act.

291.   Many Plaintiff States, including New York, use a single application for multiple public benefits programs as authorized by 7 C.F.R. § 273.2(b)(3).

292.   Defendants' actions would similarly interfere with Wisconsin's "Public assistance recipients' bill of rights," Wis. Stat. § 49.81(2), which guarantees recipients of public assistance the "right to confidentiality of agency records and files on the recipient," and undermine the assurances Wisconsin makes to its state SNAP applicants, recipients, and household members that their data, including immigration status, will not be disclosed.

293.   Illinois also has a combined benefits application, the Application for Benefits Eligibility that allows applicants to apply for SNAP alongside Medicaid, TANF, and other benefits programs.  Additionally, Illinois facilitates a school-to-SNAP linkage in one direction such that households already on SNAP are automatically enrolled in school meal programs. However, the reverse—using a school lunch application to jumpstart a SNAP application—is not allowed or implemented in Illinois.  This means that discouraging or chilling SNAP applications and participation would lead to a decrease in school lunch program enrollment.

294.   Now Plaintiff States are faced with an untenable choice: allow their integrated systems to be used by Defendants for purposes unrelated (or even antithetical) to the reasons the programs were created, or undo programmatic decisions and abandon significant investments made into the infrastructure for administering the States' public nutrition programs.

295.   Either way, if Defendants are allowed unfettered access to SNAP data without regard for the purpose for which that data was collected, it will cause irrevocable harm to trust and relationships that have taken years to build.

**FIRST CLAIM**
**VIOLATION OF APA, 5 U.S.C. § 706(2) (C), (D) – CONTRARY TO LAW & WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW**
**Against Defendants USDA and Rollins (by all Plaintiff States) and Defendant OIG (by Plaintiffs California and Michigan)**

296.   Plaintiffs reallege and incorporate herein by reference each and every allegation and paragraph set forth previously.

297.   The Administrative Procedure Act directs courts to hold unlawful and set aside agency actions that are found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

298.   Defendants' demands that Plaintiffs transfer SNAP data containing sensitive personal information to Defendants—with no data and security protocol, and with profound risk of sharing, if not clear intent to share, that data with DOGE, DHS, or other federal agencies for purposes unrelated to SNAP administration—are "final agency action[s] for which there is no other adequate remedy in a court," within the meaning of the APA.  5 U.S.C. § 704.

299.   **Defendants USDA and Secretary Rollins's demand is contrary to the limited authority granted to USDA in the SNAP Act and implementing regulations.**

300.   The SNAP Act provides: "All records, and the entire information systems in which records are contained," necessary to determine whether the [SNAP] program is being conducted in compliance with" the SNAP Act and regulations "shall . . . be made available *for inspection and audit* by the Secretary, *subject to data and security protocols agreed to by the State agency and Secretary*."  7 U.S.C. § 2020(a)(3) (emphasis added).  Therefore, Defendants USDA and Secretary Rollins lack authority to "access" Plaintiffs' SNAP records unless this access is "subject to data and security protocols agreed to by the State agency."

301.   Defendants USDA and Rollins demanded that Plaintiffs not only permit "access" to records, but to give Defendants complete *possession* of five years' worth of the most sensitive SNAP data that Plaintiff States collect in administering SNAP, including social security numbers, home addresses, bank account numbers, citizenship or immigration statuses, and grocery purchase information.

302.    Defendants USDA and Rollins have not provided any written assurances that this data will be adequately protected from re-disclosure or misuse, let alone offered statutorily mandated "data and security protocols," and have instead insisted that Plaintiffs turn over the demanded data without appropriate protections.  Defendants lack the authority to make these demands and act contrary to law in making them.

303.    **Defendant OIG's demand is contrary to the Inspector General Act.**

304.    As set forth in paragraphs II.E, *supra*, the Inspector General Act authorizes each Inspector General "to have timely access to all records, reports, audits, reviews, documents, papers, recommendations, or other materials *available to the applicable establishment* which relate to the programs and operations with respect to which that Inspector General has responsibilities under this chapter[.]"  5 U.S.C. § 406(a)(1)(A).  The "applicable establishment" for USDA-OIG is USDA.  *See id.* § 402(b) (giving IGs responsibility for auditing their respective "establishments"); *id.* § 401(1) (defining "establishment" to include USDA).  As described above, 7 U.S.C. § 2020 defines the scope of SNAP-related records from participating States that are "available" to USDA.  For the same reasons stated above, Defendant OIG's demand for SNAP data without any data and security protocols does not comport with the authority granted in 7 U.S.C. § 2020 and, by extension 5 U.S.C. § 406(a)(1)(A).

305.    **Defendants' demands require Plaintiff States to violate the restrictions on disclosure of applicant information in the SNAP Act and implementing regulations.**

306.    The SNAP Act and USDA's implementing regulations strictly curtail States' ability to disclose the type of data demanded by Defendants, *i.e.*, "information from SNAP applicant or recipient households."  7 C.F.R. § 272.1(c)(1); *see* 7 U.S.C. § 2020(e)(8).  Such information may only be disclosed to eight discrete categories of recipients, 7 C.F.R. § 272.1(c)(1), including "[p]ersons directly connected with the administration or enforcement of the provisions of the Food and Nutrition Act of 2008 or regulations," *id.* § 272.1(c)(1)(i).

307.    The relevant SORNs issued by Defendants both contain "routine uses" purporting to allow Defendants to disclose information from SNAP applicant or recipient households obtained from States to any relevant law enforcement agency, whether a "Federal, foreign, [or] State"

66

authority, so long as a "record, on its face or in conjunction with other records, indicates a violation or potential violation of a law, whether civil, criminal, or regulatory in nature." 90 Fed. Reg. 26,521, 26,522 (June 23, 2025) (USDA SORN); *see also* 87 Fed. Reg. 62,066, 62,069 (Oct. 13, 2022) (OIG SORN) (similar).

308.    However, under the SNAP Act, the only circumstance under which States may allow this information to be disclosed to law enforcement is "upon written request by such law enforcement officers that includes the name of the household member being sought, for the purpose of obtaining the address, social security number, and, if available, photograph of the household member, if the member is fleeing to avoid prosecution for custody for a crime, or an attempt to commit a crime, that would be classified as a felony . . . or is violating a condition of probation or parole." 7 CFR § 272.1(c)(1)(vii).  Even in those circumstances, the State may "disclose only such information as is necessary to comply with a specific written request of a law enforcement agency authorized by this paragraph." *Id.*

309.    Because Defendants have notified Plaintiffs, through their SORNs, that they will disclose SNAP data to law enforcement under circumstances much broader than those allowable in the SNAP Act, complying with their demand would violate the spirit and the letter of the SNAP Act's limitation on disclosure, and the demands are therefore contrary to law.

310.    Further, Plaintiffs reasonably believe that USDA intends to share the data it receives with DOGE and DHS, among other federal agencies, for immigration enforcement and other non-SNAP-purposes, in light of the facts described in Sections III, IV, and V.E, *supra*, DOGE's demand for EBT vendor data in conjunction with USDA, Defendants' lack of written assurances to the contrary, and the routine uses described in USDA's SORN described above in Section V.B.

311.    For these same reasons, and in light of OIG's demand for citizenship status but not household income, its refusal to provide written assurances that it will not share the requested data outside of the agency, and the routine uses in its SORN, described in paragraphs 230-231, Plaintiffs California and Michigan have reason to believe that OIG either intends to, or will be forced to, disclose the demanded data to DOGE, DHS, or other federal agencies for non-SNAP-administration purposes.

312.   Therefore, complying with Defendants' demands would violate the spirit and the letter of the SNAP Act's limitation on disclosure, and the demands are contrary to law.

313.   **Defendants' demands and intended use of the information are also contrary to the Privacy Act.**

314.   As set forth in Section II.B, *supra*, the Privacy Act sets strict procedural requirements before an agency can create or revise a system of records and collect individuals' data.  *See* 5 U.S.C. § 552a(e).

315.   Section 552a(b) of the Privacy Act further prohibits disclosure of records from systems of records absent certain conditions.  To the extent that Defendants intend to disclose the demanded SNAP data to DOGE, DHS, or some other federal agencies for immigration enforcement or any other non-SNAP-administration purpose, Defendants violate the Privacy Act. Disclosure from Defendants' systems of records to DOGE or DHS would not meet any of the conditions enumerated in 5 U.S.C. § 552a(b), and is therefore inconsistent with the Privacy Act.

316.   Specifically, disclosure of personal SNAP data to agencies outside Defendants' agencies for the purpose of immigration enforcement is not "a purpose which is compatible with the purpose for which [the data] was collected."  *Id.* § 552a(a)(7).  As discussed above, SNAP records were collected by States for administration of the SNAP program after telling applicants that their personal information would not be used for immigration purposes.  Therefore, even if Defendants' SORNS included immigration enforcement as a "routine use," the agency would nevertheless be in violation of the Privacy Act.  *Id.* § 552a(a)(7), (b)(3).

317.   As described above in paragraph 66, Defendants' SORNs purport to allow Defendants to disclose individuals' personal information to any relevant law enforcement agency, whether a "Federal, foreign, [or] State" authority, so long as a "record, on its face or in conjunction with other records, indicates a violation or potential violation of a law, whether civil, criminal, or regulatory in nature."  90 Fed. Reg. 26,521, 26,522 (June 23, 2025) (USDA SORN); *see also* 87 Fed. Reg. 62,066, 62,069 (Oct. 13, 2022) (OIG SORN) (similar).  This includes disclosures that would be incompatible with the original purpose of collecting that data for SNAP

1  purposes.  It therefore violates the Privacy Act's requirement that "the use of such record for a

2  purpose which is compatible with the purpose for which it was collected."  *Id.* § 552a(b)(3).

3      318.    Further, as described in Section II.B, *supra*, the Privacy Act requires an agency to

4  "provide an opportunity for interested persons to submit written data, views, or arguments to the

5  agency."  5 U.S.C. § 552a(e)(11).  This provision means that the agency must review the

6  comments and consider changes in response. By issuing a demand for data beginning the day

7  after the comment period closed, with a six-day deadline to comply, USDA has already decided

8  to demand and collect millions of records without considering the data, views, or arguments that

9  Plaintiff States or any other interested parties provided in response to the SORN, in violation of

10  the Privacy Act's notice and comment period.  Defendant USDA's actions render meaningless

11  Plaintiff States' information and participation rights.

12      319.    Additionally, by demanding SNAP data from Plaintiffs, Defendant OIG is attempting

13  to collect SNAP data from States without first publishing a notice required by 5 U.S.C.

14  § 552a(e)(4), and therefore fails to comply with the Privacy Act's informational and procedural

15  requirements.  The SORN that Defendant OIG claims covers the maintenance of SNAP records

16  from States is 87 Fed. Reg. 62,066.  That SORN does not discuss collecting or maintaining an

17  entire set of SNAP records from state agencies.

18      320.    Defendants' actions contravene the Privacy Act and are therefore not in accordance

19  with law in violation of the APA.

20      321.    **Defendants' demands are contrary to the Computer Matching and Privacy**

21  **Protection Act.**

22      322.    As set forth in paragraphs 108, 206-208, *supra*, Plaintiff States have reason to believe

23  that Defendants intend to engage in a computer matching program using Plaintiffs' SNAP data.

24      323.    Defendant USDA has admitted, in its Privacy Impact Assessment, that it intends to

25  use the demanded SNAP data in at least one computer matching program.

26      324.    On information and belief, DOGE intends to combine the requested SNAP data with

27  other federal benefit data, taxpayer data, and other information in the mass database it is building.

28

Amended Complaint for Declaratory and Injunctive Relief  (Case No. 3:25-cv-06310)

325.   On information and belief, neither Defendants, nor DOGE, have complied with the required procedures for a computer matching program laid out in 5 U.S.C. § 522a(o) and (p).

326.   For these reasons, Defendants' demand that Plaintiff States turn over years' worth of SNAP data, with no assurance that 5 U.S.C. 522a(o) and (p) have been satisfied, is contrary to law.

327.   **Defendants' demands are contrary to the E-Government Act.**

328.   As set forth in paragraphs 203-211, *supra*, Defendants have not conducted and published an appropriate privacy impact assessment before collecting information on individuals, as required by the E-Government Act of 2002, Pub. L. No. 107-347, § 208, 44 U.S.C. § 3501 note.  This includes a failure to assess the privacy risks of disclosures for non-SNAP purposes, particularly given the requirements in the Privacy Act and the notice provided by and consent obtained by the Plaintiff States regarding how SNAP data will be limited in its use and disclosure.

329.   Therefore, Defendant USDA's and Defendant OIG's demands and attempted collection of SNAP data are contrary to the E-Government Act.

330.   **Defendant USDA's demand is also contrary to the Paperwork Reduction Act.**

331.   As set forth in Section II.B, *supra*, Defendants USDA and Rollins have also failed to comply with the requirements of the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq*., because they have not published an appropriate notice and solicited and considered public comments before attempting to collect and maintain state SNAP records, they have they obtained appropriate approval from OMB and the agency's Chief Information Security Officer to do so, and they have not meaningfully considered whether their collection is duplicative of existing collections.  *Id.* §§ 3506(c), 3507(a).

332.   Plaintiff States are harmed by Defendant USDA's failure to comply with the procedures required by the Paperwork Reduction Act, including because they were not notified in advance of the federal government's intention to collect the demanded SNAP data, and therefore were not afforded time to prepare for such collection.  Plaintiff States also were not afforded the opportunity to explain to Defendant USDA the significant burden this collection would place on their state agencies and the significant resources required to comply with it.

**SECOND CLAIM**
**Violation of APA, 5 U.S.C. § 706(2)(a) – Arbitrary and Capricious**
**Against Defendants USDA and Rollins (by all Plaintiff States) and Defendant OIG (by Plaintiffs California and Michigan)**

333.   Plaintiffs reallege and incorporate herein by reference each and every allegation and paragraph set forth previously.

334.   The Administrative Procedure Act directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

335.   Defendants' demands that Plaintiffs transfer SNAP data containing sensitive personal information to Defendants with no data and security protocols are "final agency action[s] for which there is no other adequate remedy in a court," within the meaning of the APA.  5 U.S.C. § 704.

336.   An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

337.   Defendants failed to engage in reasoned decision-making as required by the APA. Among other deficiencies, Defendants failed to consider the important privacy and public health consequences of their unprecedented transfer and use of state SNAP data.  Defendants have failed to consider the impact their actions will have on USDA's and States' ability to fulfill the SNAP program's purpose of providing food benefits to low-income families.  Defendants' stated purpose for requesting this data is belied by Plaintiffs' repeated demonstrations that this data is not necessary to fulfill Defendants' stated purpose.  Moreover, Defendants' stated purpose for collecting the demanded data is to facilitate USDA conducting eligibility verification for SNAP participants, which is statutorily delegated to States, not to USDA.

338.   Neither Defendant USDA nor Defendant OIG have offered to execute data and security protocols that might address concerns that the data would be redisclosed or misused in violation of the law.  Defendant USDA has declined to substantively respond to at least one Plaintiff State's request for such an agreement.

339.   Defendant USDA promulgated a SORN, as required under the Privacy Act, announcing its intent to collect and maintain sensitive SNAP data for the purpose of eligibility verification, and allowed affected parties to submit comments on that SORN by July 23, 2025. On July 9, 2025, USDA demanded that Plaintiffs turn over the requested data beginning the day after comments on the SORN were due, on July 24, 2025.  In doing so, USDA impliedly admitted that it did not intend to consider any comments submitted, and therefore did not engage in reasoned decision-making.

340.   Defendants additionally ignored substantial reliance interests in the federal government's well-established rules, policies, and norms regarding the privacy, security, and confidentiality of personally identifying information collected as part of SNAP.

341.   Defendants ignored the reliance interests of Plaintiff States, who have fostered trust with their residents by representing to them that their SNAP applications are confidential and will not be used to facilitate immigration enforcement actions against them

342.   Defendant USDA further ignored the substantial burden that its data demand would place on the States, by asking for massive amounts of data in less than a month, when collection and production of the data, even if the demand was clear enough to comply with, would likely take at least three times that amount of time, if not more.  Defendant USDA only provided more detailed instructions just days before the July 30 deadline, showing a complete disregard for the amount of time required to produce the data being demanded.

343.   Although Defendants may change their policies within statutory limits, the agency must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).  Defendant have not even provided notice of their change in policy, much less the necessary "satisfactory explanation" for their about-face on the type and amount of data required from participating States and protections afforded to that data. *State Farm*, 463 U.S. at

43.  Not only did Defendants offer no reasonable explanation, there is no reasonable justification for seeking this data for any lawful purpose.

344.  Finally, agency action is arbitrary and capricious when the justifications offered for it are pretextual.  *See Department of Commerce v. New York*, 588 U.S. 752, 781-83 (2019).  Because the APA requires an agency decision-maker to "disclose the basis of its" decision, a pretextual decision must be set aside without further inquiry.

345.  Plaintiffs reasonably believe that Defendant USDA's justification for its demand is pretextual, in light of the facts described in Sections III, IV, and V.E, *supra*, DOGE's demand for EBT vendor data in conjunction with USDA, Defendants' lack of written assurances to the contrary, and the routine uses described in USDA's SORN described above in Section V.B.

346.  For these same reasons, and in light of OIG's demand for citizenship status but not household income, its refusal to provide written assurances that it will not share the requested data outside of the agency, and the routine uses in its SORN, described in paragraphs 230-231, Plaintiffs California and Michigan have reason to believe that OIG justification for its demands are also pretextual.

347.  Defendants' actions are therefore arbitrary and capricious in violation of § 706(2)(A) of the APA.

### THIRD CLAIM
**Violation of APA, 5 U.S.C. § 706(2)(D) – Public Notice and Comment Requirement
Against Defendants USDA and Rollins**

348.  Plaintiffs reallege and incorporate herein by reference each and every allegation and paragraph set forth previously.

349.  The Administrative Procedure Act directs courts to hold unlawful and set aside agency actions that are found to be without observance of procedure required by law.  5 U.S.C. § 706(2)(D).

350.  The USDA's May 6 Letter, July 9 Letter, and July 25 Letter constitute rules under the APA.  The APA requires that agencies provide the public with notice and an opportunity to comment, and consider the relevant matter presented in those comments before implementing a

1   rule.  *See* 5 U.S.C. § 553(b), (c).  USDA issued the May 6 Letter, July 9 Letter, and July 25 Letter

2   without any notice and comment or consideration of interested parties' input, in violation of the

3   APA.

4       351.   5 U.S.C. § 553(a)(2) does not provide an exception to the APA's notice and comment

5   procedures for Defendant USDA's "guidance" in the May 6, July 9, or July 25 Letters.

6   "[D]espite the exemption from APA procedures for grant and benefit programs, 5 U.S.C.

7   § 553(a)(2) (1982), food stamp regulations must be promulgated 'in accordance with the

8   procedures set forth in section 553 of title 5.'"  *Levesque v. Block*, 723 F.2d 175, 177 (1st Cir.

9   1983) (quoting 7 U.S.C. § 2013(c)).  Section 2013(c) further imposes an additional requirement

10  on the Secretary: "In addition, prior to issuing any regulation, the Secretary shall provide the

11  Committee on Agriculture of the House of Representatives and the Committee on Agriculture,

12  Nutrition, and Forestry of the Senate a copy of the regulation with a detailed statement justifying

13  it."

14      352.   On information and belief, USDA did not follow these procedures before issuing the

15  May 6, July 9, or July 25 Letters.

**FOURTH CLAIM**
**Ultra Vires**
**Against Defendants USDA and Rollins (by all Plaintiff States) and Defendant OIG (by Plaintiffs California and Michigan)**

19      353.   Plaintiffs reallege and incorporate by reference each and every allegation and

20  paragraph set forth previously.

21      354.   No administrative agency can take any action that exceeds its statutory authority.

22  *See, e.g.*, *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 301 (2022).

23      355.   Defendants have acted ultra vires in demanding Plaintiff States' SNAP recipient data,

24  including records containing millions of individuals' personally identifying information and

25  citizenship status without a data and security protocol agreed to by the Plaintiff States.  No statute

26  authorizes such a demand.

27

28

356.   Defendants have acted in excess of their legal authority contrary to specific prohibitions present in law and regulations governing the treatment and protection of the Plaintiff States' SNAP data.

357.   For these reasons, Plaintiff States are also entitled to a declaration that Defendants' actions are ultra vires.

**FIFTH CLAIM**
**Spending Clause, U.S. Const. art. I, § 8, cl. 1 – Lack of Clear Notice**
**Against Defendants USDA and Rollins (by all Plaintiff States) and Defendant OIG (by Plaintiffs California and Michigan)**

358.   Plaintiffs reallege and incorporate herein by reference each and every allegation and paragraph set forth previously.

359.   As explained in the prior claims above, to the extent that Defendants demand Plaintiff States' SNAP data under a pretext of auditing Plaintiff States' program or data integrity, with the intent of sharing that data with other federal agencies for some purpose other than the administration of SNAP, their conduct is unlawful.  Their conduct is also unconstitutional because Plaintiff States did not have clear notice that this was a condition of federal SNAP funding.

360.   Article I of the U.S. Constitution specifically grants Congress the power "to pay the Debts and provide for the common Defense and general Welfare of the United States."  U.S. Const., art. I, § 8, cl. 1.

361.   Incident to the spending power, "Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987).  However, any conditions must be imposed "unambiguously" to enable "States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* at 207 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

362.   There is no statute that clearly states that SNAP funds provided by Defendants are conditioned on consent to the unfettered transfer of SNAP data to agencies outside USDA, for purposes of immigration enforcement, or any other purposes unrelated to the SNAP program,

1  other than certain narrow exceptions.  On the contrary, the statutes and regulations governing

2  SNAP have long imposed stringent limitations on the disclosure of SNAP data outside of USDA.

3      363.    Therefore, conditioning federal SNAP funding on unfettered access to SNAP

4  applicant and recipients' PII would violate this limitation on the spending power, because, *inter

5  alia*, Plaintiffs did not have "clear notice" of such a condition.  *See Arlington Cent. Sch. Dist. Bd.

6  of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

7      364.    Moreover, conditions on federal grants must be related to the national program for

8  which the grant monies are provided.  *See Dole*, 483 U.S. at 207-08 (citing *Massachusetts v.

9  United States*, 435 U.S. 444, 461 (1978)).  Defendants' efforts to mine sensitive and protected

10  SNAP beneficiary data for purposes like immigration enforcement is not related to SNAP's

11  programmatic goals of "provid[ing] food benefits to low-income families to supplement their

12  grocery budget so they can afford the nutritious food essential to health and well-being."[66]  *See* 7

13  U.S.C. § 2011 (authorizing SNAP, "which will permit low-income households to obtain a more

14  nutritious diet," "[t]o alleviate . . . hunger and malnutrition").  Nor is there any connection

15  between this type of sharing of beneficiary data and the sound administration of the SNAP

16  program.  Conditioning SNAP funds on States' sharing of sensitive beneficiary data is therefore

17  inconsistent with the Spending Clause.

18      365.    Additionally, to the extent that Defendants are attempting to create a new SNAP data

19  sharing condition on federal SNAP funding, such a condition is unlawful because it was issued

20  after Plaintiff States accepted federal funds, and Defendants cannot "surpris[e] participating

21  States with post acceptance or 'retroactive' conditions."  *Pennhurst*, 451 U.S. at 25.

22      366.    Pursuant to 28 U.S.C. § 2201(a), Plaintiff States are entitled to a declaration that their

23  receipt of federal SNAP funds is not conditioned on consent to unfettered waiver of SNAP

24  beneficiaries' privacy and confidentiality rights.

25

26

27

28

---

[66] *Supplemental Nutrition Assistance Program (SNAP)*, USDA (last updated May 27, 2025), https://www.fns.usda.gov/snap/supplemental-nutrition-assistance-program.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff States respectfully request that this Court enter judgment in their favor and grant the following relief:

1.    A declaration that Defendant USDA and Defendant Rollins's demand for SNAP data from Plaintiff States and their EBT vendors is unlawful, violates the APA, and is ultra vires.

2.    A declaration that Defendant OIG's demand for SNAP data from Plaintiff States California and Michigan are unlawful, violate the APA, and are ultra vires.

3.    A declaration that Defendants cannot lawfully disclose the requested SNAP data to DOGE or DHS for any purposes, including immigration enforcement, other than SNAP administration.

4.    A declaration that Defendant USDA and Defendant Rollins's demand for SNAP data from Plaintiff States violates the Spending Clause.

5.    A declaration that Defendant OIG's demand for SNAP data from California and Michigan violates the Spending Clause.

6.    An injunction preventing Defendant USDA from making its demand for SNAP data from Plaintiff States as described herein, and an order setting aside Defendant USDA's pending demand.

7.    An injunction preventing Defendant OIG from making its demands for SNAP data from Plaintiff States California and Michigan and an order setting aside Defendant OIG's pending demands.

8.    An injunction preventing USDA from initiating noncompliance procedures against any Plaintiff State based on refusing to provide SNAP data in response to USDA's or OIG's demands.

9.    An injunction preventing Defendants from disclosing the requested SNAP data to DOGE or DHS for any purposes, including immigration enforcement, other than SNAP administration.

10.    Plaintiff States' costs, expenses, and reasonable attorneys' fees; and

11.    Such other relief as the Court deems just and proper.

1    Dated:  September 22, 2025                    Respectfully submitted,

2                                                 ROB BONTA
                                                  Attorney General of California
3                                                 PAUL STEIN
                                                  Supervising Deputy Attorney General
4                                                 ANDREW Z. EDELSTEIN
                                                  ANNA RICH
5                                                 EDWARD P. WOLFE
                                                  ROBIN GOLDFADEN
6                                                 SEBASTIAN BRADY
                                                  WILLIAM BELLAMY
7
                                                  */s/ Maria F. Buxton*
8                                                 MARIA F. BUXTON
                                                  DEPUTY ATTORNEYS GENERAL
9                                                 *Attorneys for Plaintiff State of California*

10
     LETITIA JAMES                                KRISTIN MAYES
11   Attorney General of New York                 Attorney General of Arizona

12   */s/ Mark Ladov*                             */s/ Hayleigh S. Crawford*
     MARK LADOV                                   HAYLEIGH S. CRAWFORD (AZ No. 032326)
13   Special Counsel                              LUCI D. DAVIS (AZ No. 035347)
     JULIE DONA                                   2005 N. Central Ave. Phoenix, AZ 85004
14   Special Counsel                              (602) 542-3333
     28 Liberty St.                               Hayleigh.Crawford@azag.gov
15   New York, NY 10005                           Luci.Davis@azag.gov
     (212) 416-8240                               ACL@azag.gov
16   mark.ladov@ag.ny.gov                         *Attorneys for Plaintiff State of Arizona*
     *Attorneys for Plaintiff State of New York*
17

18   PHILIP J. WEISER                             WILLIAM TONG
     Attorney General of Colorado                 Attorney General of Connecticut
19
     */s/ David Moskowitz*                        */s/ Janelle R. Medeiros*
20   DAVID MOSKOWITZ                              JANELLE R. MEDEIROS
     Deputy Solicitor General                     Special Counsel for Civil Rights
21   Colorado Department of Law                    165 Capitol Ave
     1300 Broadway, 10th Floor                     Hartford, CT 06106
22   Denver, CO 80203                              (860) 808-5020
     Phone: (720) 508-6000                         Janelle.Medeiros@ct.gov
23   david.moskowitz@coag.gov                      *Attorneys for Plaintiff State of Connecticut*
     *Attorneys for Plaintiff State of Colorado*
24

25

26

27

28

Amended Complaint for Declaratory and Injunctive Relief  (Case No. 3:25-cv-06310)

KATHLEEN JENNINGS
Attorney General of Delaware

*/s/ Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
VANESSA L. KASSAB*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

BRIAN L. SCHWALB
Attorney General for the District of
Columbia

*/s/ Nicole S. Hill*
NICOLE S. HILL
Assistant Attorney General
Office of the Attorney General for the
District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov
*Attorneys for Plaintiff District of Columbia*

ANNE E. LOPEZ
Attorney General of Hawai'i

*/s/ Kaliko'onālani D. Fernandes*
DAVID D. DAY
Special Assistant to the Attorney General
KALIKO'ONĀLANI D. FERNANDES
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorneys for Plaintiff State of Hawai'i*

KWAME RAOUL
Attorney General of Illinois

*/s/ Sherief Gaber*
HARPREET K. KHERA
Bureau Chief, Special Litigation
SHERIEF GABER
Assistant Attorney General
115 S. LaSalle St., 35th Flr.
Chicago, Illinois 60603
(773) 590-7127
Harpreet.Khera@ilag.gov
*Attorneys for Plaintiff State of Illinois*

OFFICE OF THE GOVERNOR *ex rel*. Andy
Beshear, in his official capacity as
Governor of the Commonwealth of
Kentucky

*/s/ S. Travis Mayo*
S. TRAVIS MAYO
General Counsel
TAYLOR PAYNE
Chief Deputy General Counsel
LAURA C. TIPTON
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov
*Attorneys for Plaintiff Kentucky Governors'
Office*

AARON M. FREY
Attorney General of Maine

*/s/ Brendan Kreckel*
BRENDAN KRECKEL
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 0433-0006
Tel.:  207-626-8800
Fax:  207-287-3145
brendan.kreckel@maine.gov
*Attorneys for Plaintiff State of Maine*

79

ANTHONY G. BROWN
Attorney General of Maryland

*/s/ James C. Luh*
JAMES C. LUH
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

*/s/ Katherine Dirks*
KATHERINE DIRKS
Chief State Trial Counsel
CASSANDRA THOMSON
Assistant Attorney General
Office of the Massachusetts Attorney
General
1 Ashburton Place Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
cassandra.thomson@mass.gov
*Attorneys for Plaintiff Commonwealth of
Massachusetts*

DANA NESSEL
Attorney General of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI
BRYAN BEACH
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov
beachb@michigan.gov
*Attorneys for Plaintiff State of Michigan*

KEITH ELLISON
Attorney General of Minnesota

*/s/ Joseph R. Richie*
JOSEPH R. RICHIE
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

AARON D. FORD
Attorney General of Nevada

*/s/ Heidi Parry Stern*
HEIDI PARRY STERN (Bar. No. 8873)
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov
*Attorneys for Plaintiff State of Nevada*

MATTHEW J. PLATKIN
Attorney General of New Jersey

*/s/ Kashif T. Chand*
KASHIF T. CHAND (NJ BAR NO. 016752008)
Assistant Attorney General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
kashif.chand@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

RAÚL TORREZ
Attorney General of the State of New
Mexico

/s/ Steven Perfrement
STEVEN PERFREMENT*
Senior Litigation Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
SPerfrement@nmdoj.gov
505-601-7727
Attorneys for the State of New Mexico

JOSH SHAPIRO, in his official capacity as
Governor of the Commonwealth of
Pennsylvania

JENNIFER SELBER
General Counsel

/s/ Jacob B. Boyer
Jacob B. Boyer*
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov
Counsel for Governor Josh Shapiro

NICHOLAS W. BROWN
Attorney General of Washington

/s/ Jennifer K. Chung
JENNIFER K. CHUNG, WSBA #51583
WILLIAM MCGINTY, WSBA #41868
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
jennifer.chung@atg.wa.gov
william.mcginty@atg.wa.gov
Attorneys for Plaintiff State of Washington

DAN RAYFIELD
Attorney General of Oregon

/s/ Scott P. Kennedy
SCOTT P. KENNEDY
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 453-9050
Fax (971) 673-5000
Scott.Kennedy@doj.oregon.gov
Attorneys for Plaintiff State of Oregon

PETER F. NERONHA
Attorney General of Rhode Island

/s/ Madeline R. Becker
MADELINE R. BECKER (RI BAR NO. 10034)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2151
mbecker@riag.ri.gov
Attorneys for Plaintiff State of Rhode Island

JOSHUA L. KAUL
Attorney General of Wisconsin

/s/ Karla Z. Keckhaver
KARLA Z. KECKHAVER
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-6365
karla.keckhaver@wisdoj.gov
Attorneys for Plaintiff State of Wisconsin

* pro hac vice forthcoming

# CERTIFICATE OF SERVICE

Case Name: ***California, et al. v. U.S.***            Case No.    **3:25-cv-06310-MMC**
                    ***Department of Agriculture***

I hereby certify that on <u>September 22, 2025</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

- **AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>September 22, 2025</u>, at San Francisco, California.

_____            _____
M. Mendiola                                     Signature
Declarant

SA2025302238
44806769.docx