BRETT A. SHUMATE
Assistant Attorney General
ELIZABETH J. SHAPIRO
Deputy Branch Director
BRADLEY P. HUMPHREYS
Senior Trial Counsel
BENJAMIN S. KURLAND
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
*Counsel for Defendants*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*, <br><br> *Defendants*. | Case No. 3:25-cv-06310-MMC <br><br> **DEFENDANTS' SUPPLEMENTAL OPPOSITION PURSUANT TO COURT ORDER, ECF NO. 83** |

# INTRODUCTION

On September 18, 2025, the Court issued a Temporary Restraining Order prohibiting the U.S. Department of Agriculture ("USDA") from suspending or disallowing administrative funding from State Agencies that fail to comply with USDA's request to provide SNAP participant data. Order, ECF No. 83 ("TRO"). The Court did not conclude that USDA's requests for data were unauthorized by statute, but rather found that two Routine Uses (8 and 11), as published in USDA's Systems of Record Notice ("SORN"), 90 Fed. Reg. 26,521 (June 23, 2025), likely exceeded the limitations imposed by SNAP's organic statute on the use and disclosure of the data, and, were therefore likely "contrary to law" under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. TRO at 11–12.

If the Court adheres to that conclusion, the only appropriate remedy going forward would be an injunction restraining the allegedly overbroad disclosures contemplated in Routine Uses 8 and 11. It would not be appropriate to enjoin USDA's data gathering requests more generally, or to prevent USDA from suspending or disallowing funding for the States that continue to fail to comply.

The Court, however, should not issue an injunction at all. USDA does not intend to disclose data other than as authorized by the Food and Nutrition Act of 2008, 7 U.S.C. § 2011, *et seq.* ("FNA"), and USDA is in the process of updating the SORN to avoid any potential ambiguity on that score. Moreover, consistent with the Court's reasoning regarding the States' computer matching claim, Plaintiffs lack standing to seek relief based on alleged Privacy Act violations in any event.

# ARGUMENT

**I. If the Court Issues a Preliminary Injunction Based on the SORN's Alleged Overbreadth, It Should Not Restrict Data Gathering or Permissible Disclosures.**

The sole ground on which the Court found the States were likely to succeed on the merits of their claims was the potential overbreadth of the Routine Uses, most particularly Routine Use 8. *See* TRO at 11–12. On those grounds, the Court enjoined USDA from "acting on [the] formal warning letters, including by disallowing SNAP funding." *Id.* at 17–18. The Court's TRO thus effectively prevented both the gathering of records from the States and the disclosure through Routine Uses for the permissible purpose of verifying eligibility. That remedy was overbroad; if the Court adheres to the view that the SORN authorizes uses and disclosures beyond those permitted by statute, any further injunction should be tailored to that particular wrong alone.

It is axiomatic that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Trump v. CASA, Inc.*, 606 U.S. 831, 851–52 (2025). Thus, "[a] court must find prospective relief that fits the remedy to the wrong or injury that has been established." *Salazar v. Buono*, 559 U.S. 700, 718 (2010). In other words, the remedy must match the alleged wrong.

Here, the alleged wrong is the overbreadth of the SORN, which the Court read to allow USDA to disclose data for purposes beyond those authorized by the FNA. But the Court did not conclude that the States are likely to succeed on their claims that USDA's gathering of data is arbitrary and capricious or contrary to law, nor can the States succeed on such claims, as the FNA provides USDA two distinct authorities under which to request SNAP-related data: Section 2020(a)(3) and Section 2020(e)(8)(A). As such, any perceived flaw in the SORN should not prevent USDA from requesting such data in the first instance, or from enforcing those lawful requests by suspending or disallowing administrative funding pursuant to Section 2020(g) from States that fail to comply.

Moreover, the Court found that only certain possible disclosures authorized by Routine Uses 8 and 11 were likely contrary to Section 2020(e)(8)(A), namely those that exceed the FNA's grant of authority for disclosures for the purpose of administering or enforcing provisions of the FNA or other Federal and Federal-State benefit programs. USDA respectfully disagrees with that reading of the Routine uses, but even under the Court's reasoning, there is no basis to prohibit *all* disclosures (let alone data-gathering). USDA's intent is to disclose records pursuant to the Routine Uses only for administrative and enforcement purposes, as permitted by the FNA. *See* Section II.A, *infra*. Such disclosures are compatible with the FNA, *see generally* 7 U.S.C. § 2020(e)(8), and, thus, any preliminary injunction should prevent only those disclosures for purposes *other than* those permitted by the FNA.

Accordingly, if the Court were to issue a preliminary injunction—and for the reasons outlined below and in Defendants' prior briefing, Plaintiffs have not met their burden of establishing entitlement to one—the injunction at most should reach only disclosures pursuant to SORN Routine Uses 8 and 11 for purposes other than those permitted by statute. *See* 7 U.S.C. § 2020(e)(8). It should not limit data gathering or prevent USDA from suspending or disallowing federal funds in response to the States' failure to comply.

In addition to being necessary to avoid overbroad injunctive relief, the Court should narrow any preliminary injunction for important practical reasons that go to the balance of the equities and public interest, which merge in this context. In its preliminary findings of the data it has already received from States that are complying with FNS's data request, USDA has identified instances of inter- and intra-State duplicate enrollment that implicate up to an estimated $1.1 billion, annualized, as well as over 300,000 potential instances of deceased individuals actively receiving SNAP benefits that implicate over half a billion dollars *See* Supplemental Declaration of Shiela Corley ¶¶ 5–6 ("Suppl. Corley Decl.") (attached as Exhibit 1). Additionally, USDA has identified 3,994 instances of disqualified households that are still participating in SNAP and 500,000 instances of unexplained placeholder, or "dummy," SSNs. *Id.* ¶ 7. There is surely more waste, fraud, and abuse to be found in the data that the Plaintiff States refuse to disclose. Accordingly, Defendants respectfully ask that, if the Court enters a preliminary injunction, it be narrowly tailored to allow suspension or disallowance of federal funds if the Plaintiff States continue to refuse to comply with USDA's lawful data requests, even if certain other types of disclosures under Routine Uses 8 and 11 are enjoined.

## II. No Injunction on This Basis Is Necessary or Appropriate.

Notwithstanding the above, the Court should not enter any injunction in this matter. Although the Court read Routine Uses 8 and 11 as overbroad and thus contrary to the FNA and APA, USDA did not intend the Routine Uses to sweep that broadly and does not intend to use them in that way. Indeed, USDA instead plans to amend the SORN to avoid this ambiguity. As such, Plaintiffs cannot show that they have Article III standing to challenge such a hypothetical disclosure, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, (1992)—let alone that such harm is "likely, not just possible," as required for a preliminary injunction. *See All. For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Moreover, the harm alleged here—a violation of the Privacy Act—is a harm to *individuals* whose privacy is at stake, not a harm to *States*. Plaintiffs therefore lack standing to seek any injunction on this theory.

### A. Plaintiffs' Claims Regarding Routine Uses 8 And 11 Are Impermissibly Speculative.

In issuing the TRO, the Court construed the SORN's Routine Uses as suggesting that USDA intends to broadly disclose records in a manner inconsistent with the FNA. *See* TRO at 11–12 (citing 7 U.S.C. § 2020(e)(8)(A)(ii)). Specifically, the Court appears to have understood the publication of

1  Routine Uses 8 and 11 as a statement of intent to "disclose the data to a large number of entities, including numerous entities that are not assistance programs, and for purposes other than the administration or enforcement of an assistance program." *Id.* (citing SORN at 26,522–23 (Routine Uses 8 and 11)).

That is not USDA's position on the scope of the Routine Uses. USDA has affirmatively stated, to the contrary, that it intends to utilize Routine Uses 8 and 11 for the purpose of "ensur[ing] the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases." SORN at 26,522. This intent is perfectly in line with the FNA's authorization of disclosure of records through routine use to "persons directly connected with the administration or enforcement of [the FNA], regulations issued pursuant [to the FNA], Federal assistance programs, or federally-assisted State programs[,]" where those persons use such information "for such administration or enforcement." 7 U.S.C. § 2020(e)(8)(A).

This limited purpose is confirmed by the Declaration of Shiela Corley, who describes USDA's intent as "assist[ing] states by conducting additional administrative checks against other available federal databases." Decl. of Shiela Corley ¶ 31, ECF No. 72-1. As an example, she explained that "USDA will conduct manual checks against the Department of Homeland Security's SAVE database, which provides immigration status and naturalized/acquired U.S. citizenship information." *Id.*[1] After such manual checks, "[t]he result files are then manually processed by USDA employees to determine whether there are facts about program integrity to share with the states." *Id.* ¶ 34. In sum, USDA intends to use the Routine Uses to double check that only eligible individuals are receiving benefits, *i.e.* actions which are directly related to administering and enforcing the FNA.

For the reasons stated above, USDA believes that the SORN is clear that any information contained in the system of records will be disclosed only to the extent authorized by the FNA. To avoid any ambiguity, however, USDA will publish an updated SORN to further clarify that data will not be disclosed except as authorized by the FNA. *See* Suppl. Corley Decl. ¶ 10. Absent extenuating circumstances, USDA estimates publishing a revised SORN within thirty days. *Id.* ¶ 11. USDA also commits in the meantime to continue its practice of disclosing data received from the States only for purposes authorized by the FNA. *Id.* ¶ 12.

---

[1] U.S. citizenship or other lawful status in the country is a statutory condition of receiving SNAP benefits. *See* 7 U.S.C. § 2015(f).

There is thus no basis for a preliminary injunction, because the States have presented no evidence that the current Routine Uses are being or will imminently be used for other purposes that are inconsistent with the administration and enforcement process outlined above.  That the Plaintiffs States suggest USDA may allegedly someday disclose records in a manner otherwise inconsistent with its stated goal is speculative beyond establishing Article III standing, much less entitlement to a preliminary injunction.  *See Clapper*, 598 U.S. at 409 ("Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending.  Thus, we have repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient.").  Courts have an "'independent obligation' to ensure that a case falls within [their] Article III jurisdiction by confirming that standing exists[.]" *Sterling v. Feek*, No. 24-1296, --- F.4th ---, 2025 WL 2536695, at *5 (9th Cir. Sept. 4, 2025) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)).  Here, despite the Court's initial reading of the SORN as potentially overbroad, the States have no standing to pursue relief on that basis, much less to secure the extraordinary relief of a preliminary injunction.

**B. The States Cannot Rely on Injury to Individuals to Obtain a Preliminary Injunction.**

The States also lack standing to pursue this theory for another reason.  Their claim that Routine Uses 8 and 11 are contrary to the APA rests on the Privacy Act, 5 U.S.C § 552a.  The Privacy Act generally prevents an agency from disclosing records about individuals, *id.* § 552a(b), but allows disclosure, among other reasons, pursuant to published routine uses, *id.* § 552a(b)(3), provided the disclosure in the routine use is "compatible with the purpose for which [the record] was collected," *id.* § 552a(a)(7).  The Privacy Act, however, is meant to protect only the information of individuals, not States.  *See, e.g.*, Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(4), 88 Stat. 1896 ("The right to privacy is a personal and fundamental right protected by the Constitution of the United States[.]").  As such, the Privacy Act provides *individuals* with a cause of action, not States.  *See* 5 U.S.C. § 552a(g)(1) (providing civil remedies to "individual[s]"); *id.* at § 552a(a)(2) (defining "individual" as "a citizen of the United States or an alien lawfully admitted for permanent residence"); *see also Rouse v. U.S. Dep't of State*, 567 F.3d 408, 413 (9th Cir. 2009) ("[t]he Privacy Act was designed to

'protect the privacy of individuals' through regulation of the 'collection, maintenance, use, and dissemination of information' by federal agencies." (quoting 5 U.S.C. § 552a note)).

Here, the substance of the States' claim is that individual SNAP participants' data may be shared through the Routine Uses with outside agencies in a manner inconsistent with the restrictions of 7 U.S.C § 2020(e)(8)(A). *See* Compl. ¶¶ 305–19, ECF No. 1. But the States cannot demonstrate Article III injury, because it is not their information being shared. Rather, that the data belongs to individuals. As argued in USDA's PI Opposition, the States "lack standing to assert [Privacy Act-related claims] . . . [as] Plaintiffs' alleged harm is based on potential loss of funds, not a theory of *parens patriae* standing." PI Opp'n at 21; *see also* Compl. ¶¶ 245–94. While Defendants made that argument in the context of Plaintiffs' Computer Matching Act claims, it applies equally here as the Computer Matching Act is a component of the Privacy Act. *See* 5 U.S.C. § 552a(o); Computer Matching and Privacy Protection Act, Pub. L. No. 100–503, 102 Stat 2507 (Amending Section 522a of Title 5, United States Code); *see also* Natalie R. Ortiz, Cong. Rsch. Serv., R47325, Computer Matching and Privacy Protection Act: Data Integration and Individual Rights (2022) ("The [Computer Matching and Privacy Protection Act] amended provisions enacted by the Privacy Act of 1974 and operates within the Privacy Act's statutory framework."). Indeed, this is the same theory under which the Court already properly found the States were *unlikely* to succeed on their Computer Matching Act claim. *See* TRO at 14 (citing USDA's argument that States failed to establish standing for Computer Matching claim, and Plaintiffs' failure to establish such standing).

For similar reasons, the States cannot bring their Privacy Act claim through the APA, because the Privacy Act forecloses a cause of action for the States, and the APA does not provide a cause of action where the underlying statute bars suit. *See* 5 U.S.C. § 552a(g)(1)(D) ("Whenever any agency . . . fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an *individual* . . . the *individual* may bring a civil action[.]" (emphasis added)); 5 U.S.C. § 702; *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 216 (2012) (explaining that "a plaintiff cannot use the APA to end-run [a statute]'s limitations"). Thus, "[w]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded." *Block v. Cmty.*

*Nutrition Inst.*, 467 U.S. 340, 349 (1984).[2]  That further forecloses the States from pursuing this theory.

Dated:  September 26, 2025                              Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Branch Director
Civil Division, Federal Programs Branch

 /s/ Bradley P. Humphreys
BRADLEY P. HUMPHREYS
Senior Trial Counsel
BENJAMIN S. KURLAND
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-0878
bradley.humphreys@usdoj.gov

*Counsel for Defendants*

---

[2] While "the requirements for obtaining relief under the APA go to the merits, not to subject matter jurisdiction[,]" *Vaz v. Neal*, 33 F.4th 1131, 1135 (9th Cir. 2022), the Court should still conclude that APA review is foreclosed.  The States are not within the zone-of-interest intended by the Privacy Act.  *See Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 771 F. Supp. 3d 717, 794–95 (D. Md. 2025) (discussing zone-of-interest of Privacy Act and concluding "the Privacy Act only protects information regarding individuals[.]"), *appeal dismissed*, No. 25-1291, 2025 WL 1111245 (4th Cir. Apr. 1, 2025).