1  ROB BONTA
   Attorney General of California
2  PAUL STEIN
   Supervising Deputy Attorney General
3  ANDREW Z. EDELSTEIN
   ANNA RICH
4  EDWARD P. WOLFE
   SEBASTIAN BRADY
5  ROBIN GOLDFADEN
   WILLIAM BELLAMY
6  MARIA F. BUXTON
   Deputy Attorneys General
7  State Bar No. 318563
    455 Golden Gate Avenue, Suite 11000
8   San Francisco, CA 94102-7004
    Telephone: (415) 510-3873
9   Fax: (415) 703-5480
    E-mail: Maria.Buxton@doj.ca.gov
10 *Attorneys for Plaintiff State of California*

11 *Additional counsel listed on signature page*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA; STATE OF NEW YORK; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR** ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky; **STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; OFFICE OF THE GOVERNOR** ex rel. Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania; **STATE OF RHODE ISLAND; STATE OF WASHINGTON; STATE OF WISCONSIN,** | Case No. **3:25-cv-06310-MMC**<br><br>**SUPPLEMENTAL DECLARATION OF ALEXIS FERNÁNDEZ GARCIA IN SUPPORT OF PLAINTIFF STATES' MOTION FOR STAY OR PRELIMINARY INJUNCTION** |

1
2                                    Plaintiffs,
3
4          v.
5   **UNITED STATES DEPARTMENT OF**
    **AGRICULTURE; BROOKE ROLLINS,** in
6   her official capacity as U.S. Secretary of
    Agriculture; **U.S. DEPARTMENT OF**
7   **AGRICULTURE'S OFFICE OF**
    **INSPECTOR GENERAL,**
8
                                     Defendants.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# SUPPLEMENTAL DECLARATION OF ALEXIS FERNÁNDEZ GARCIA

I, Alexis Fernández Garcia, declare as follows:

1. I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

**Professional Background**

2. The California Department of Social Services (CDSS) is responsible for the administration of public social services, except health care services and medical assistance, throughout California.

3. I am currently employed by CDSS as Deputy Director of the Family Engagement and Empowerment Division (FEED) and have held this position since August 2023.

4. Prior to my most recent employment with CDSS, I was the Senior Director of Safety Net at Code for America Labs, Inc. I was previously employed by CDSS from June 2016 to August 2021; first as Chief of the CalFresh Policy Section from June 2016 to September 2017, then as the Chief of the CalFresh Policy Bureau from October 2017 to July 2019, then as Acting Chief of the CalFresh & Nutrition Branch from July 2019 to January 2020, and then as the Chief of the CalFresh and Nutrition Branch from February 2020 to August 2021. Before joining state service, I was the Policy Director at First 5 Association of California and Director of Legislation at California Food Policy Advocates.

5. I have a Master's degree in Social Welfare, with a specialization in Management and Planning, from University of California, Berkeley.

6. As Deputy Director of FEED, I am responsible for the administration of several

federal and state social service programs that provide critical financial, food, and employment and training support to individuals and families with low income. FEED oversees the development of program policy and procedures and provides operational oversight. Among the social services programs administered or overseen by FEED is the CalFresh program.

**USDA's Preliminary Findings on Fraud, Waste and Abuse**

7. On September 26, 2025, Shiela Corley, Chief of Staff to the Deputy Under Secretary for the Food, Nutrition, and Consumer Services (FNCS) mission area, a component of the United States Department of Agriculture (USDA), submitted a Supplemental Declaration in support of the USDA's Supplemental Opposition Pursuant to Court Order, ECF No. 83.

8. In her Supplemental Declaration, Ms. Corley asserts that FNS has uncovered instances of the same household being issued SNAP benefits twice in the same month. She concludes that this means that States are either paying benefits to an account no longer being used by a household or that households are fraudulently receiving more benefits than permitted.

9. Ms. Corley's declaration provides no context for the conclusions she draws from the limited statistics provided about duplicate payments. For example, in drawing conclusions regarding duplicate issuance within the same household in the same month, the definition of household that was used by FNS is not provided. Accordingly, it is unclear whether FNS is making its claims based on a household sharing the same address, or a household in which members "purchase and prepare" food together as utilized by the SNAP regulations, or some other definition entirely.

10. In any event, Ms. Corley's declaration ignores numerous SNAP regulations that offer legitimate explanations for SNAP households receiving multiple payments in the same month.

11. I am informed and believe that Federal SNAP law recognizes numerous

circumstances when a benefit or supplement may be issued in the same month. For example, the state agency may appropriately issue a supplement to address an issuance error. (7 C.F.R. § 273.12(c)(1)(ii).) A recipient may lawfully receive benefits twice in the same month if they are abused and have fled the home of the abuser or fled to a shelter for battered women and children. (7 C.F.R. § 273.3(a).) State agencies may provide replacement issuances to a household when food purchased with SNAP benefits was destroyed in a household misfortune when reported within 10 days. (7 C.F.R. § 274.6(a).) When a household applies for initial benefits after the 15th of the month and is eligible for expedited service, they must receive benefits for the application month and the following month at the same time. (7 C.F.R. § 273.2(i)(4)(iii)(C).) Further, SNAP regulations support that EBT benefits be able to be used in any state. (7 C.F.R. § 274.8(b)(10).)

12. Although Ms. Corley attempts to connect alleged duplicate payments in a single month with "putting the accumulating benefits at risk for theft," it is my understanding that SNAP regulations contemplate that households may accumulate benefits on their EBT cards beyond the month in which they are initially received, and state agencies must only expunge them after 9 months (or 274 days) of inactivity. (7 C.F.R. § 274.2(i).)

13. Ms. Corley's assertion that FNS's discovery of 300,000 "potential" instances of deceased individuals enrolled in SNAP is either an indication of wasteful allocation of funds or fraud and abuse fails to recognize the federal regulatory system which governs SNAP and the unfortunate death of recipients.

14. As Ms. Corley noted, the federal government has only identified "potentially" deceased individuals. If the federal government cannot confirm whether a SNAP recipient is deceased, the individual States may not be able to either. I am informed and believe that, as required by SNAP regulations, state agencies utilize the Social Security Administration's

(SSA's) Death Master File to verify whether individuals are deceased. (7 C.F.R. § 272.14.) I am informed and believe that the SSA death match is not updated in real time which results in a lag in the SSA death data. Additionally, my understanding is that States are required to independently verify death matches to determine their accuracy and provide notice to the household and an opportunity to respond prior to any determination to deny, reduce, or terminate benefits on such basis. (7 C.F.R. § 272.14(c)(3) and (4).)

15. The conclusions drawn by Ms. Corley do not demonstrate that any benefits were fraudulently issued and used while any person was deceased. Benefits could have been issued while a person was alive and remain available on their account after they later became deceased. Further, to the extent that benefits may have been issued to a person who may ultimately be verified as deceased, the State may have done so while following all related regulatory requirements. As noted above, it is my understanding that federal expungement rules and timelines prevent States from expunging benefits earlier than the timeline mandated by law, even after a death is reported (but not yet verified). (See 7 C.F.R. § 274.2(i).) In fact, only if a death match is verified for all certified members of the household and the SNAP case is closed in accordance with noticed regulatory requirements and collection of any overpayments, as appropriate, may a state agency expunge a household's outstanding SNAP balance after a death match. (7 C.F.R. § 274.2(i)(4).)

16. Although Ms. Corley's declaration does not identify how many States have provided data, assuming that all 28 states that are not party to this lawsuit have provided the USDA with their data, the data sample Ms. Corley draws from likely includes at least 18,373,693 people participating in SNAP in those states as of May 2025, based on publicly

available USDA statistics.[1] Even if 300,000 of those participants were deceased, that would only represent 1.6% of the total participant population. However, as identified above, without additional information, these statistics are virtually meaningless.

17. Ms. Corley's declaration states that FNS's preliminary review uncovered over 500,000 instances of unexplained placeholder SSNs being used in SNAP but rightfully did not conclude that this was an indication of fraud, waste or abuse.

18. I am informed and believe that while social security numbers are generally a requirement for participation in SNAP (7 C.F.R. § 273.6), an applicant for SNAP may demonstrate that they have submitted an application for an SSN to the Social Security Administration to temporarily receive benefits. (7 C.F.R. § 273.6(b)(2).) I am further informed and believe that application and approval is allowed when a newborn does not yet have an SSN until the next certification or 6 months, whichever is later. (7 C.F.R. § 273.6(b)(4).) It is my understanding that State agencies may also determine that good cause exists for the failure to provide or apply for a SSN and allow participation in SNAP for a period of one month without such SSN. (7 C.F.R. § 273.6(d).) Such good cause determinations may be extended on a monthly basis.

19. As noted above, assuming that all 28 states which are not party to this lawsuit have provided the USDA with their data, this data sample Ms. Corley's assumptions draw from likely includes approximately 18,373,693 people participating in SNAP in those states as of May 2025. Even if there are 500,000 participants with placeholder SSNs, that is only 2.7% of the participants. Without acknowledging the regulatory exemptions from utilizing an SSN, and

---

1. *Supplemental Nutrition Assistance Program: Number of Persons Participating*, USDA (last updated Aug. 8, 2025), available at: https://fns-prod.azureedge.us/sites/default/files/resource-files/snap-persons-8.pdf.

whether and how that was addressed in FNS's statistical analysis, along with additional contextual information, one cannot draw any meaningful conclusions from these statistics.

Executed on October 3, 2025, at Sacramento, California.

_____
Alexis Fernández Garcia