United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| STATE OF CALIFORNIA, et al., | Case No.  25-cv-06310-MMC |
| Plaintiffs, |  |
| v. | **ORDER GRANTING PLAINTIFF STATES' MOTION FOR PRELIMINARY INJUNCTION** |
| UNITED STATES DEPARTMENT OF AGRICULTURE, et al., |  |
| Defendants. |  |

The Supplemental Nutrition Assistance Program ("SNAP") provides to eligible households monthly benefits that can be used to purchase food.  Under the provisions of the SNAP Act, see 7 U.S.C. §§ 2011-2036, the program is overseen by the Food and Nutrition Service ("FNS"), a division within the Department of Agriculture ("USDA").  Each participating State determines eligibility, however, and retains all SNAP applications as well as other information regarding persons who qualify.

As explained in greater detail below, USDA has demanded that all States provide to USDA information from their SNAP records, including personal information about applicants and recipients, and has given notice that it will withhold a significant amount of SNAP funding from any State failing to comply with such demand.

Plaintiffs, consisting of twenty-two States and the District of Columbia ("hereinafter, Plaintiff States"),[1] seek an order preliminarily enjoining USDA from making

---

[1] Plaintiff States, in the order set forth in the caption of the Amended Complaint, are the State of California, the State of New York, the State of Arizona, the State of Colorado, the State of Connecticut, the State of Delaware, the District of Columbia, the State of Hawai'i, the State of Illinois, the Office of the Governor ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky, the State of Maine, the State of Maryland, the Commonwealth of Massachusetts, the State of Michigan, the

United States District Court
Northern District of California

1  such demand and from instituting or continuing noncompliance proceedings against

2  them.

3        On August 18, 2025, Plaintiff States filed their "Motion for Stay or Preliminary

4  Injunction."  On September 16, 2025, the Court conducted a hearing on the motion, at

5  which time certain issues were raised for the first time.  In light of the new issues, the

6  Court, on September 18, 2025, granted a Temporary Restraining Order, afforded the

7  parties leave to address the new issues, and continued the matter for hearing on the

8  question of whether a preliminary injunction should be issued.[2]

9        On October 9, 2025, after the parties had filed supplemental briefing to address

10 the new issues, the Court conducted the hearing.  Maria F. Buxton, Paul Stein, and

11 Sebastian Brady of the Office of the Attorney General of California appeared on behalf of

12 Plaintiff States.  Benjamin S. Kurland and Elizabeth J. Shapiro of the United States

13 Department of Justice, accompanied by Sarah Merrill of USDA's Office of the General

14 Counsel, appeared on behalf of USDA.  Having read and considered the parties'

15 respective written submissions, and having considered the arguments of counsel made at

16 both the hearing conducted September 16, 2025, and the hearing conducted October 9,

17 2025, the Court rules as follows.

18                                   **BACKGROUND**

19       "Congress created SNAP—formerly known as the food stamp program—to

20 alleviate hunger and malnutrition by increasing the food purchasing power of low-income

21 households."  Hall v. U.S. Dep't of Agriculture, 984 F.3d 825, 831 (9th Cir. 2020) (internal

22 _____

23 State of Minnesota, the State of Nevada, the State of New Jersey, the State of New
   Mexico, the State of Oregon, plaintiff the Office of the Governor ex rel. Josh Shapiro, in
24 his official capacity as Governor of the Commonwealth of Pennsylvania, the State of
   Rhode Island, the State of Washington, and the State of Wisconsin.

25      [2] In the same order, the Court denied the motion to the extent brought on behalf of
26 the State of Nevada, undisputed evidence having been submitted that the State of
   Nevada "had fully complied with USDA's request for SNAP data" (see Corley Decl. ¶ 29),
27 with the result that no showing was made that USDA would withhold any SNAP funding
   from said State.  All further references to "Plaintiff States" in the instant Order refer to all
28 Plaintiffs States other than the State of Nevada.

1   quotation, citation, and alterations omitted).  As noted, each participating State

2   determines eligibility and retains all SNAP applications, see 7 U.S.C. § 2020(a)(1)

3   (providing "[t]he state agency of each participating State shall have responsibility for

4   certifying applicant households and issuing EBT [Electronic Benefit Transfer] cards"), and

5   the USDA, through FNS, oversees the States' compliance with SNAP requirements, see

6   7 C.F.R. § 276.4(a) (providing "FNS shall make determinations of the efficiency and

7   effectiveness of State agencies' administration of SNAP").[3]

8        On March 20, 2025, President Donald J. Trump issued Executive Order 14243,

9   titled "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos," wherein

10  "Agency Heads," e.g., the Secretary of Agriculture Brooke L. Rollins ("Secretary Rollins"),

11  are directed to "ensure the Federal Government has unfettered access to comprehensive

12  data from all State programs that receive Federal funding, including, as appropriate, data

13  generated by those programs but maintained in third-party databases."  See 90 FR

14  13681 § 3(c) (March 20, 2025).  The Executive Order states that "all necessary steps"

15  are to be taken "for the purposes of pursuing Administration priorities related to the

16  identification and elimination of waste, fraud, and abuse," and that such priorities

17  "include[ ] authorizing and facilitating both the intra- and inter- agency sharing and

18  consolidation of unclassified agency records."  See id. § 3(a).

19       In light thereof, USDA is requiring each State agency to provide certain of its

20  SNAP records to USDA.  In particular, on May 6, 2025, FNS wrote to the State agencies

21  to inform them USDA was "taking steps to require all States to work through their

22  processors to submit to the USDA the following data," for "the period beginning January

23  1, 2020, through present":

24          1.  Records sufficient to identify individuals as applicants for, or recipients
            of, SNAP benefits, including but not limited to personally identifiable [sic]
25          information in the form of names, dates of birth, personal addresses used,

26  _____

27       [3] The Court acknowledges that a number of the sections in the instant Order
     include essentially the same language as set forth in its Temporary Restraining Order,
28  but, for ease of reference, finds it preferable to repeat that material herein.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    and Social Security numbers.

2    2.  Records sufficient to calculate the total dollar value of SNAP benefits
     received by participants over time, with the ability to filter benefits received
3    by date ranges.

4    (See Gillette Decl. Ex. B ("May 6 letter").)  As support for such request, FNS cited to two

5    provisions in the SNAP Act, namely, 7 U.S.C. § 2020(a)(3) and § 2020(e)(8)(A).  (See

6    id.)[4]  Although the letter did not include a deadline, it stated "[f]ailure to grant processor

7    authorizations or to take the steps necessary to provide SNAP data to FNS may trigger

8    noncompliance procedures codified at 7 U.S.C. § 2020(g)."  (See id.)

9    Next, on June 23, 2025, USDA published in the Federal Register a "System of

10   Records Notice" ("SORN"), in which USDA gave notice it would "create a new system of

11   records," which system would be used "to validate the accuracy of eligibility

12   determinations and strengthen SNAP and government program integrity," see 90 FR

13   26521-01, at 26521 (June 23, 2025), and that the "[i]nformation in this system" would be

14   "provided by the 53 State agencies that administer SNAP and their designated vendors

15   and/or contractors," see id. at 26522.[5]  As in the May 6 letter, the SORN asserts that the

16   legal authority for requiring the State agencies to provide such information is 7 U.S.C.

17   § 2020(a)(3) and § 2020(e)(8)(A).  See id. at 26521.

18   On July 9, 2025, Secretary Rollins wrote to all State agencies, citing Executive

19   Order 14243 and the SORN, to inform them USDA was "requiring" them to submit to

20   USDA, no later than the close of business on July 30, 2025, the "SNAP data" identified in

21

22   _____

     [4] Sections 2020(a)(3) and 2020(e)(8)(A) are discussed below.  The letter also cited
23   7 C.F.R. § 272.1(c)(1), which regulation, in essence, restates provisions set forth in
     § 2020(e)(8)(A) in more specific detail.

24
     [5] The SORN describes the information to be provided as "records containing
25   personally identifying information, including but not limited to SNAP participant name,
     Social Security Number (SSN), date of birth (DOB), residential address, [EBT] card
26   number, and case record identifier number or other identifiers or data elements
     maintained by States, vendors, or contractors to identify SNAP recipients," as well as
27   "information derived from and associated with EBT transactions, including but not limited
     to records sufficient to calculate the total dollar value of SNAP benefits received by
28   participants over time, such as applied amounts and benefit available dates."  See id.

1  the SORN.  (See Gillette Decl. Ex. C.)  Thereafter, on July 23, 2025, FNS sent a letter to

2  all State agencies, citing the May 6 letter and again requiring the agencies to transmit the

3  SNAP data no later than July 30, 2025 (see id. Ex. D), after which, on July 25, 2025, FNS

4  sent an additional letter reminding State agencies of the July 30 deadline and reiterating

5  that a failure to comply "may trigger noncompliance procedures codified in 7 U.S.C.

6  § 2020(g)" (see id. Ex. E).

7      On July 28, 2025, Plaintiff States filed the instant action, alleging "the federal

8  government's unprecedented demands are unlawful" (see Compl. ¶ 21), and asserting

9  claims under the Administrative Procedure Act ("APA"), as well as under a claim titled

10  "Ultra Vires" and a claim brought under the Spending Clause of the United States

11  Constitution.

12      On August 18, 2025, as noted, Plaintiff States filed the instant motion, seeking an

13  order "preliminarily enjoining both: (1) USDA's demand for SNAP applicant and recipient

14  data from Plaintiffs; and (2) the institution of noncompliance procedures against Plaintiffs,

15  which USDA has threatened could lead to significant funding cuts for States that refuse to

16  comply with the data demand."  (See Pls.' Mot. at 1:17-20.)

17      Shortly thereafter, on August 20, 2025, FNS sent a "formal warning" to the

18  Governor of each Plaintiff State, in which FNS asserted it "will initiate a disallowance of

19  Federal funding" if such Plaintiff State did not "transmit SNAP enrollment data" to USDA

20  within 30 days, i.e., by September 19, 2025.  (See Brady Decl. Exs. A-P.)[6][7]  The formal

21  warning cites to 7 U.S.C. § 2020(e)(8)(A) as support for the demand.  The formal warning

22  also sets forth the amount FNS will disallow, which amount varies from Plaintiff State to

23  Plaintiff State, e.g., "up to $338,326,748.10" in funding to California for each quarter of

24  noncompliance and "up to $133,800,507.01" in funding to Illinois for each said quarter.

25  _____

26  [6] The letter states that,"[i]n response to State requests," the July 30 deadline had
   been extended to August 19, 2025 (See id.)

27  [7] On August 26, 2025, the same formal warning was sent to the Mayor of the
28  District of Columbia.  (See Corley Decl. ¶ 51; Campbell Decl. ¶¶ 23-24.)

United States District Court
Northern District of California

1  (See Brady Decl. Exs. A-P.)

2                                    **DISCUSSION**

3          By the instant motion, Plaintiff States seek a preliminary injunction prohibiting

4  USDA from continuing to demand the SNAP data and from instituting noncompliance

5  proceedings, i.e., disallowing SNAP funding as a consequence of noncompliance.

6  **A.  Legal Standard**

7          Under the APA, "[a] person suffering legal wrong because of agency action, or

8  adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof,"

9  see 5 U.S.C. § 702,[8] and, "[o]n such conditions as may be required and to the extent

10  necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary

11  and appropriate process to postpone the effective date of an agency action or to preserve

12  status or rights pending conclusion of the review proceedings," see 5 U.S.C. § 705.

13          "[T]he factors used to determine whether to issue a § 705 stay under the APA are

14  the same equitable factors used to consider whether to issue a preliminary injunction."

15  Immigrant Defenders Law Center v. Noem, 145 F.4th 972, 995 (2025).

16          "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to

17  succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of

18  preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an

19  injunction is in the public interest," Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20

20  (2008), or, alternatively, that there are "[1] serious questions going to the merits, and

21  [2] a balance of hardships that tips sharply toward the plaintiff," provided there also is a

22  "[3] likelihood of irreparable injury and [4] that the injunction is in the public interest," see

23  Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).

24  //

25  ―――――――――――――

26          [8] The APA defines "person" to include a "public or private organization," see 5
    U.S.C. § 511(2), and courts have found States are public organizations, see, e.g.,
27  Maryland Dep't of Human Resources v. Department of Health & Human Services, 763
    F.2d 1441, 1445 n.1 (D.C. Cir. 1985) (holding "a state is a person within the meaning of
28  the APA").

United States District Court
Northern District of California

United States District Court
Northern District of California

**B. Need for Preliminary Relief**

The Court next considers the requisite factors

**1. Likelihood of Success on the Merits**

Plaintiff States argue they are likely to succeed on the merits of their APA claims and their ultra vires claim.[9]

### a. Ultra Vires Claim

Plaintiff States allege USDA has "acted ultra vires in demanding Plaintiff States' SNAP recipient data," because "[n]o statute authorizes such a demand" in the absence of "a data and security protocol agreed to by the Plaintiff States." (See Amended Complaint ("AC") ¶ 355.)[10]

As the Supreme Court explained earlier this year, an "ultra vires" claim, i.e., a "nonstatutory" claim, was recognized "[b]efore enactment of the APA," and could be brought "where an agency's action was ultra vires – that is, unauthorized by any law and in violation of the rights of the individual." See Nuclear Regulatory Comm'n v. Texas, 605 U.S. 665, 680 (2025) (internal quotation and citation omitted). Today, however, such a claim cannot be brought where, "as is usually the case," a "statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review." See id. at 681.

Here, Plaintiff States have brought claims under the APA, and, consequently, they fail to show their ultra vires claim is likely to succeed, or, alternatively, that they have raised serious questions going to the merits of such claim.

### b. APA Claims

Under the APA, "[t]he reviewing court shall . . . hold unlawful and set aside agency

---

[9] Plaintiff States do not base the instant motion on their claim under the Spending Clause.

[10] Plaintiff States filed the AC on September 22, 2025. The sole difference between the AC and the initial Complaint is the addition of another plaintiff, namely, Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania.

1   action, findings, and conclusions found to be— (A) arbitrary, capricious, an abuse of

2   discretion, or otherwise not in accordance with law; (B) contrary to constitutional right,

3   power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or

4   limitations, or short of statutory right; [or] (D) without observance of procedure required by

5   law." See 5 U.S.C. § 706.

6          Here, Plaintiff States allege USDA's demand is "contrary to law [and] without

7   observance of procedure required by law" (see AC at 65:1-2), as well as "arbitrary and

8   capricious" (see AC at 71:1-2).

9                              **(1) Finality**

10         To be reviewable, the agency action challenged here must be "final agency

11  action." See 5 U.S.C. § 704.

12         "As a general matter, two conditions must be satisfied for agency action to be

13  'final.'" Bennett v. Spear, 520 U.S. 154, 177 (1997).  "First, the action must mark the

14  consummation of the agency's decisionmaking process—it must not be of a merely

15  tentative or interlocutory nature." Id. at 177-78 (internal quotation and citation omitted).

16  "[S]econd, the action must be one by which rights or obligations have been determined,

17  or from which legal consequences will flow." Id. at 178 (internal quotation and citation

18  omitted).

19         Here, Plaintiff States assert, and USDA has not argued to the contrary, that the

20  demand for SNAP data constitutes final agency action.  The Court agrees.  As noted,

21  Secretary Rollins wrote to the State agencies on July 9, 2025, to inform them that, in light

22  of Executive Order 14243 and the SORN, State agencies are "require[d]" to submit the

23  SNAP date to the USDA no later than July 30, 2025, i.e., a determination that is neither

24  tentative nor interlocutory.  (See Gillette Decl. Ex. C; Corley Decl. ¶ 24.)[11]  Additionally,

25  although FNS's letter dated July 25, 2025, states a failure to comply "may trigger

26

27         _____

           [11] As set forth above, see n.6, the deadline to comply was extended by the USDA

28  to August 19, 2025.

United States District Court
Northern District of California

1    noncompliance procedures" (see Gillette Decl. Ex. E (emphasis added)), the statute

2    authorizing such procedures states the Secretary of Agriculture, upon finding a failure,

3    "without good cause," to comply, "shall proceed to withhold from the State . . . funds

4    authorized under [the SNAP Act]."  See 7 U.S.C. § 2020(g) (emphasis added).

5           In sum, the challenged action not only is final but also determines Plaintiff States'

6    obligations and the consequences flowing from a failure to comply therewith.

7                                    **(2) Ripeness**

8           USDA argues that the APA claims are not ripe.

9           "Evaluating ripeness in the agency context requires considering (1) whether

10   delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention

11   would inappropriately interfere with further administrative action; and (3) whether the

12   courts would benefit from further factual development of the issues presented."

13   Environmental Defense Center v. Bureau of Ocean Energy Management, 36 F.4th 850,

14   870 (9th Cir. 2022); see also id. at 867-71 (finding determination of whether agency

15   action is "final" and whether such action is "ripe" are separate questions).

16          Here, the sole reason advanced by USDA as to why the APA claims are not ripe is

17   that Plaintiff States have not availed themselves of administrative review procedures set

18   forth in the SNAP Act and a regulation implemented thereunder.  See 7 U.S.C.

19   § 2023(a)(3)-(5); 7 C.F.R. §§ 276.7.  The cited administrative review procedures,

20   however, do not use mandatory language, see 7 U.S.C. §§  2023(a)(1), (a)(3) (providing

21   a "retail food store," a "wholesale food concern," or a "State agency" aggrieved by USDA

22   action "may" seek administrative review); 7 C.F.R. § 276.7(a) (providing State agency

23   "may" appeal claim asserted by FNS), and the Supreme Court has held that the failure to

24   avail oneself of an administrative review procedure does not bar an APA claim where the

25   review is "optional," see Darby v. Cisneros, 509 U.S. 137, 146-47 (1993) (holding, under

26   APA, exhaustion of administrative remedies required only where "statute or rule clearly

27   mandates").

28   //

United States District Court
Northern District of California

USDA argues the procedures set forth in § 2023(a) and § 276.7 nevertheless are mandatory in light of language in a different statute, namely, 7 U.S.C. § 6912(e), which is contained in the Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994.  Section 6912(e) provides:  "Notwithstanding any other provision of law, a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against – (1) the Secretary; (2) the Department [of Agriculture]; or (3) an agency, office, officer, or employee of the Department."  7 U.S.C. § 6912(e).

As Plaintiff States point out, however, § 6912(e) applies to "a person," see id., a term that is presumed not to apply to a sovereign, and which "longstanding interpretative presumption" may be "disregarded only upon some affirmative showing of statutory intent to the contrary."  See Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 780 (2000) (citing cases applying presumption; holding False Claims Act, which imposes liability upon "person" who knowingly submits false claim to United States, does not apply to States or State agencies, as nothing in said Act indicates States are "persons" liable thereunder); United States v. Cooper Corp., 312 U.S. 600, 604-614 (1941) (holding § 7 of Sherman Act, providing "person" injured by violation may bring claim seeking treble damages, does not allow United States to bring such claim; explaining statutes employing "person" are "ordinarily construed to exclude [sovereigns]" and finding nothing in Sherman Act to indicate "Congress intended to confer upon the United States the right to maintain an action for treble damages").[12]

Although the chapter containing § 6912, titled "Department of Agriculture Reorganization," includes a "Definitions" section, the word "person" is not defined therein. See 7 U.S.C. § 6902.  Additionally, although said chapter includes a section titled "Purpose," stating "[t]he purpose of this chapter is to provide the Secretary of Agriculture

---

[12] As noted, only a "person" may bring a claim under the APA.  See 5 U.S.C. § 702.  The APA, however, defines "person" to include public organizations, such as States.  See 5 U.S.C. § 511(2).

with the necessary authority to streamline and reorganize the Department of Agriculture to achieve greater efficiency, effectiveness, and economies in the organization and management of the programs and activities carried out by the Department," see 7 U.S.C. § 6901, nothing therein clearly expresses an intent to require States to exhaust what otherwise are optional administrative remedies, see Vermont Agency of Natural Resources, 529 U.S. at 780; see also id. at 787 (explaining courts, in determining whether "person" is meant to apply to sovereigns, are to consider "the ordinary rule of statutory construction that if Congress intends to alter the usual constitutional balance between States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute").

Given such authority, Plaintiff States are likely to establish that a State is not a "person" for purposes of § 6912(e).

Additionally, Plaintiff States argue, even if § 6912(e) were to be interpreted to apply to sovereigns, an order requiring them to exhaust would be futile.

Where, as here, a statute mandating exhaustion is not jurisdictional, see McBride Cotton & Cattle Corp., 290 F.3d 973, 976 (9th Cir. 2002) (holding "the exhaustion requirement of 7 U.S.C. § 7612(e) is not jurisdictional"), exhaustion is excused where it "would be futile," see id. at 982.

"The purpose of exhaustion is to allow the agency, in the first instance, to develop a detailed factual record and utilize its expertise in applying its own regulations to those facts." Id. Such purpose is advanced by the manner in which the Appeals Board charged with conducting administrative appeals under § 276.7 conducts its hearings, see 7 C.F.R. § 276.7(a)(2), namely, to take "evidence and testimony," see 7 C.F.R. § 276.7(h)(3).[13]

---

[13] The members of the Appeals Board appear to be USDA employees, and the only qualification set forth in § 276.7 is that they be "people who were not involved in the decision to file the claim" against the entity seeking administrative review. See 7 C.F.R. § 276.7(a)(2).

United States District Court
Northern District of California

United States District Court
Northern District of California

In the instant case, however, there is no factual dispute and, consequently, no need to offer evidence and testimony at an administrative hearing. Rather, it is undisputed that USDA has demanded certain SNAP data be produced and that Plaintiff States have not provided the data, leaving for resolution the question of whether the demand is lawful under the SNAP Act. As discussed below, it also is undisputed that protocols are lacking, a requirement that must be met for USDA to demand data under § 2020(a)(3)(B),[14] leaving only the question of whether the demand can be made under § 2020(e)(8)(A), the statute on which USDA now exclusively relies, or whether said statute simply permits disclosure at the State agency's option. Resolving that issue of statutory interpretation does not involve an agency's "applying its own regulations to . . . facts," but, rather, its application of a statutory interpretation, as well as its interpretation of such agency's regulations promulgated thereunder. Consequently, it appears that "requiring exhaustion would be an idle act." See McBride Cotton & Cattle Corp., 290 F.3d at 976, 982 (finding exhaustion of claim challenging USDA's "interpret[ation]" of its regulation would be "futile").[15]

Under such circumstances, Plaintiff States are likely to establish that, even assuming they are "persons" subject to the requirements set forth in § 6912(e), exhaustion would be futile.

//

---

[14] At the hearing conducted October 9, 2025, USDA asserted that disagreements about data and security protocols could be addressed at an administrative hearing. (See Def.'s Opp. at 15:20-21.) Here, however, there is no evidence that any Plaintiff State has refused to negotiate protocols, and, consequently, there is no factual dispute as the good faith of a negotiating party. Indeed, undisputed evidence has been submitted that some of the Plaintiff States have advised USDA of their willingness to negotiate protocols that would apply to the data USDA seeks, but have received no response. (See McClelland Decl. ¶¶ 19, 27, 30; Hall Decl. ¶ 28; Pham Decl. ¶¶ 31-33, Exs. 1-2.)

[15] As noted, the administrative appeals are not heard by a third party, but, rather, by USDA employees. Given such circumstances, it is unclear how any meaningful hearing would be conducted, as each Plaintiff State would argue "we are not required under § 2020(e)(8)(A) to provide SNAP data to USDA," to which USDA would respond "yes you are," at which point administrative proceedings would end.

1    Accordingly, the Court finds Plaintiff States are likely to establish the APA claims

2 are ripe, and next turns to the merits of those claims.

3                    **(3) Whether USDA's Demand is Contrary to SNAP Act**

4    The Court begins with Plaintiff States' claim that USDA's demand for data is

5 contrary to the SNAP Act.  In support of such argument, Plaintiff States cite the two

6 provisions of the Act on which USDA initially relied, namely, 7 U.S.C. § 2020(a)(3) and

7 § 2020(e)(8)(A).

8    The former provides:

9    (3) Records

10        (A) In general

11        Each State agency shall keep such records as may be necessary to

12        determine whether the program is being conducted in compliance
         with [the SNAP Act] (including regulations issued under [the SNAP

13        Act).

14    **(**B) Inspection and audit

15        All records, and the entire information systems in which records are
         contained, that are covered in subparagraph (A) shall—

16

17            (i) be made available for inspection and audit by the
             Secretary, subject to data and security protocols agreed to by
             the State agency and Secretary . . . .

18

19 See 7 U.S.C. § 2020(a)(3).

20    Plaintiff States, correctly observing that § 2020(a)(3) requires USDA and a State

21 agency to agree to data and security protocols before the State agency is required to

22 provide the SNAP records demanded by USDA, argue that, because the Secretary has

23 not entered into protocol agreements with any of the Plaintiff States' agencies, they

24 cannot be required to submit the data or be sanctioned for failing to do so, and, for those

25 reasons, the demand and subsequent issuance of the formal warnings are contrary to the

26 SNAP Act.  USDA counters that it is entitled to demand SNAP data under

27 § 2020(e)(8)(A), which makes no reference to protocols.  Consequently, as USDA no

28 longer relies on § 2020(a)(3), the question presented is whether a State must comply with

a demand made by USDA under § 2020(e).[16]

Section 2020(e) provides that each State agency shall have a "plan of operation" that "shall provide," inter alia,

(8) safeguards which prohibit the use or disclosure of information obtained from applicant households, except that—

(A) the safeguards shall permit—

(i) the disclosure of such information to persons directly connected with the administration or enforcement of the provisions of this chapter,[17] regulations issued pursuant to this chapter, Federal assistance programs, or federally-assisted State programs; and

(ii) the subsequent use of the information by persons described in clause (i) only for such administration or enforcement[.]

See 7 U.S.C. § 2020(e)(8).

Plaintiff States interpret the words "shall permit" as meaning State agencies are allowed to provide information obtained from applicant households to the persons listed in § 2020(e)(8)(A)(i), in other words, that such disclosures would not be in violation of the general prohibition that State agencies cannot disclose any information to anyone. USDA, by contrast, interprets "shall permit" to mean State agencies are required to provide the information obtained from applicant households.

To resolve the partes' dispute, the Court must interpret § 2020(e)(8)(A) in light of the SNAP Act as a whole.  See Richards v. United States, 369 U.S. 1, 11 (1962 (holding "it [is] fundamental that a section of a statute should not be read in isolation from the context of the whole Act, and that in fulfilling [a court's] responsibility in interpreting legislation, [courts] must not be guided by a single sentence or member of a sentence, but should look to the provisions of the whole law, and to its object and policy") (internal

---

[16] As set forth above, the May 6 letter and the SORN cite to both § 2020(a)(3) and §2020(e)(8)(A) as authority for the demand.  In the formal warnings, however, sent two days after the instant motion was filed, USDA cited as authority only § 2020(e)(8)(A).

[17] The referenced "chapter" is the SNAP Act.

1    quotation, footnotes, and citation omitted).

2         Here, as set forth above, Congress, in the "Records" section of § 2020, did use

3    clear, mandatory language, specifically, "shall . . . be made available for inspection and

4    audit," thereby giving USDA the right to obtain, subject to data and security protocols, all

5    records necessary to determine whether the program is being conducted in compliance

6    with the SNAP Act.  See 7 U.S.C. § 2020(a)(3)(B).[18]

7         Moreover, the above-quoted exception in § 2020(e)(8) is the first of six exceptions,

8    and, in describing those exceptions, Congress chose to use several phrases, including

9    "shall be made available," which words it did not use in the exception on which USDA

10   relies.

11        In particular, in two of the statutory exceptions, each of which identifies the

12   recipient as Federal, state, and local "law enforcement," Congress states that the

13   requested information "shall be made available," i.e., State agencies are required to

14   provide information to law enforcement under the circumstances set forth in those

15   subsections.  See 7 U.S.C. § 2020(e)(8)(C) (providing "all information" obtained from

16   applicant households "shall be made available" to law enforcement officials

17   "investigating" violations of SNAP Act);[19] 7 U.S.C. § 2020(e)(8)(E) (providing "address,

18   social security number, and, if available, photograph" of "member" of applicant household

19   "shall be made available" to law enforcement officer seeking to locate specified member,

20   e.g., a member who is a fleeing felon or key witness to any crime).[20]

21

22        [18] Although § 2020(a)(3) covers a broader set of data than § 2020(e)(8), the latter
23   covers a larger group of potential recipients.

24        [19] Section (e)(8)(C) provides: "notwithstanding any other provision of law, all
     information obtained under this chapter from an applicant household shall be made
25   available, upon request, to local, State or Federal law enforcement officials for the
     purpose of investigating an alleged violation of this chapter or any regulation issued
26   under this chapter[.]"  See id.

27        [20] Section (e)(8)(E) provides: "notwithstanding any other provision of law, the
     address, social security number, and, if available, photograph of any member of a
28   household shall be made available, on request, to any Federal, State, or local law
     enforcement officer if the officer furnishes the State agency with the name of the member

United States District Court
Northern District of California

In three of the exceptions, each of which references one or more statutes by which another agency is entitled to obtain information, Congress uses the phrase "the safeguards shall not prevent," i.e., State agencies are directed to comply with those other statutes instead of complying with the general prohibition against disclosure.  See 7 U.S.C. § 2020(e)(8)(B) (providing "safeguards shall not prevent" State agencies from disclosing to Comptroller General information, if authorized by "any other provision of law");[21] 7 U.S.C. § (e)(8)(D) (providing "safeguards shall not prevent" disclosure to federal agencies seeking to "collect[ ] the amount of an overissuance of [SNAP] benefits" as authorized by two specified statutes);[22] 7 U.S.C. § (e)(8)(F) (providing "safeguards shall not prevent" State agencies from complying with subsections of § 2020 requiring disclosures to Immigration and Naturalization Service ("INS"), entities with knowledge of

_____

and notifies the agency that--

> (i) the member--
>
> > (I) is fleeing to avoid prosecution, or custody or confinement after conviction, for a crime (or attempt to commit a crime) that, under the law of the place the member is fleeing, is a felony (or, in the case of New Jersey, a high misdemeanor), or is violating a condition of probation or parole imposed under Federal or State law; or
> >
> > (II) has information that is necessary for the officer to conduct an official duty related to subclause (I);
>
> (ii) locating or apprehending the member is an official duty; and
>
> (iii) the request is being made in the proper exercise of an official duty[.]

See id.

[21] Section 2020(e)(8)(B) provides: "the safeguards shall not prevent the use or disclosure of such information to the Comptroller General of the United States for audit and examination authorized by any other provision of law[.]"  See 7 U.S.C. § 2020(e)(8)(B).

[22] Section 2020(e)(8)(D) provides: "the safeguards shall not prevent the use by, or disclosure of such information, to agencies of the Federal Government (including the United States Postal Service) for purposes of collecting the amount of an overissuance of benefits, as determined under section 2022(b) of this title, from Federal pay (including salaries and pensions) as authorized pursuant to section 5514 of Title 5 or a Federal income tax refund as authorized by section 3720A of Title 31[.]"  See id.

United States District Court
Northern District of California

detained individuals, and State agencies administrating school lunch programs).[23]

The remaining exception, namely, the exception on which USDA relies, § 2020(e)(8)(A), does not contain the phrase "shall be made available" nor the phrase "the safeguards shall not prevent," but, rather, uses the phrase "the safeguards shall permit" the disclosures covered therein.

Where, as here, "Congress includes particular language in one section of a statute but omits it in another section of the same act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." See Russello v. United States, 464 U.S. 16, 23 (1983) (internal quotation, citation, and alteration omitted). Had Congress intended to make the disclosures described in § 2020(e)(8)(A) mandatory, it presumably would have done so expressly as it did in § 2020(a)(3)(B), in § 2020(e)(8)(C), and in § 2020(e)(8)(E), and, as USDA points out, although mandating cooperation between State agencies and other agencies that administer or enforce the SNAP Act or other benefit programs is not unreasonable, the Court cannot interpret § 2020(e)(8)(A) as setting forth such a mandate in the absence of language to that effect. See id. (declining to conclude "that the differing language in . . . subsections [of the same statute] has the same meaning in each"; explaining, "[t]he short answer is that Congress did not write the statute that way") (internal quotation and citation omitted).

In light of the above, the Court finds Plaintiff States are likely to establish that, although they are permitted to do so, they are not required by § 2020(e)(8)(A) to provide data to the persons listed therein, and, consequently, have shown a likelihood of success

---

[23] Section 2020(e)(8)(F) provides:  "the safeguards shall not prevent compliance with paragraph (15) or (18)(B) or subsection (u)[.]"  See id.  Those subsections, in turn, require "immediate reporting to the [INS]" of any determination State agencies make that an individual in a household "is present in the United States in violation of the Immigration and Nationality Act," see 7 U.S.C. § 2020(e)(15), require State agencies to "take action on a periodic basis" to "verify" that individuals who have been "placed under detention" for "more than 30 days" are ineligible for SNAP benefits, see 7 U.S.C. § 2020(e)(18), and require each State agency to "enter into an agreement with the State agency administering the school lunch program established under . . . 42 U.S.C. § 1751," see 7 U.S.C. § 2020(u).

1    on their claim that USDA, in demanding such data, acted in a manner contrary to law.

2         Further, even assuming, arguendo, § 2020(e)(8)(A) can be interpreted as

3    mandating such disclosure, the Court finds Plaintiff States, for two reasons, nonetheless

4    are likely to establish the specific demand made by USDA is contrary to the SNAP Act.

5         First, USDA has demanded information that is not "obtained from applicant

6    households," see 7 U.S.C. § 2020(e)(8)(A), such as "transactional records," "SNAP

7    usage and retailer data," and "records sufficient to calculate the total dollar value of

8    SNAP benefits received by participants over time," and, to extent such data was obtained

9    from a source other than an applicant, "data records used to determine eligibility or

10   ineligibility" (see Gillette Decl. Ex. D).  Consequently, the demand as presently made to

11   Plaintiff States seeks information beyond that within the scope of § 2020(e)(8)(A).

12        Second, when a State agency provides information under § 2020(e)(8)(A), the

13   recipient is subject to strict limitations placed on the use of the information so obtained,

14   see 7 U.S.C. § 2020(e)(8)(A)(ii), and, as Plaintiff States point out, USDA has announced

15   its intent to use such information in ways well beyond those permitted under

16   § 2020(e)(8)(A)(ii).  In particular, USDA, in the SORN, asserts the right to disclose the

17   data to a number of entities, including numerous entities that are not assistance

18   programs, and for purposes other than the administration or enforcement of the programs

19   referenced in § 2020(e)(8)(A)(i).  See 9 FR at 26522-23.[24]  Under such circumstances,

20   Plaintiff States, which are required by the SNAP Act to safeguard information they obtain

21   from applicant households and are permitted to disclose such information under

22   § 2020(e)(8)(A) only for the limited purposes set forth therein, see 7 U.S.C.

23   § 2020(e)(8)(A)(ii), are prohibited from disclosing information to persons who announce in

24   advance an intent to use the information for purposes beyond those set forth in

25   _____

26        [24] Specifically, the SORN asserts the records USDA obtains from States "may be
     disclosed pursuant to the permitted routine uses outlined [in the SORN]," which include,
27   for example, "[w]hen a record on its face, or in conjunction with other records, indicates a
     violation or potential violation of law . . ., the USDA/FNS may disclose the record to the
28   appropriate agency, whether Federal, foreign, State, local, or tribal."  See id.

§ 2020(e)(8)(A)(ii).[25]

Accordingly, the Court finds Plaintiff States are likely to show the SNAP Act prohibits them from disclosing to USDA the information demanded in the formal warnings and, consequently, for such additional reason, have shown a likelihood of success on their claim that USDA, in making such demand, acted in a manner contrary to law.

### (4) Other Claims Under the APA

The Court next addresses the other APA claims argued in Plaintiff States' motion, and, as set forth on the record at the hearing conducted September 16, 2025, the Court, for the reasons stated at the hearing, found Plaintiff States were unlikely to succeed on the merits of such claims, nor were serious questions going to the merits raised, which reasons the Court next summarizes.

As to Plaintiff States' claim that USDA has failed to provide an "explanation for the change" in its "policy" pertaining to the scope of its demand for SNAP data, see Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221-222 (2016) (setting forth agency's obligation to explain change of policy), Plaintiff States have made an insufficient showing that a policy pertaining to USDA's obtaining SNAP data existed prior to the subject demand, let alone that a change in policy has occurred.

As to Plaintiff States' claim that USDA's decision to demand SNAP data "lacks any rational connection between the facts found and the choice made" (see Pls.' Mot. at 14:9-10 (internal quotation and citation omitted)); see also Encino Motorcars, 579 U.S. at 221 (setting forth "procedural requirement[ ]" that federal agency "must give adequate reasons for its decisions"), Plaintiff States have made an insufficient showing that USDA's decision lacked the requisite rational connection, the stated reason for the action taken being, inter alia, the need to "verify[ ] SNAP recipient eligibility against federally

---

[25] USDA has stated it intends to amend the SORN in a manner that, according to USDA, will limit the uses to those that fall within § 2020(e)(8)(A)(ii).  (See Supp. Corley Decl. ¶¶ 10-11.)  USDA has not, however, submitted its proposed amendment, and, consequently, the Court is unable to consider it at this time.

1  maintained data bases" and "identify[ ] and eliminat[e] duplicate enrollments," see 9 FR at

2  26521.

3          As to Plaintiff States' claim that USDA "ignored several important aspects of the

4  problem" (see Pls.' Mot. at 12:19-21) (internal quotation and citation omitted), in

5  particular, the possibility of computer hackers accessing USDA's database, the potential

6  chilling effect as to individuals seeking benefits, and the burden on State agencies to

7  submit the volume of SNAP data, see Motor Vehicle Manufacturers Ass'n v. State Farm

8  Mutual Automobile Ins. Co., 463 U.S. 29, 43 (1983) (holding agency's action is deemed

9  "arbitrary and capricious" when it "entirely fail[s] to consider an important aspect of the

10  problem"), there is an insufficient showing that those concerns were not considered.

11          As to Plaintiff States' claim that USDA did not consider the public comments

12  submitted in response to the SORN, see 5 U.S.C. § 552a(e)(11) (providing agency

13  publishing SORN must "provide an opportunity for interested persons to submit written

14  data, views, or arguments to the agency"), although the Secretary's letter of July 9, 2025,

15  requiring State agencies to comply with the demand preceded the July 23, 2025,

16  deadline for public comment, the deadline to comply was extended by more than three

17  weeks to August 19, 2025, thereby leaving adequate time for consideration of all

18  comments submitted.  Additionally, USDA has offered evidence that the comments were

19  considered (see Corley Decl. ¶ 21 (summarizing comments received and USDA's

20  consideration thereof)), and that, in light of those comments, USDA "is working to

21  implement [a] change" to the SORN, namely, to eliminate a statement that USDA had the

22  right to disclose SNAP data to "foreign" governments (see id. ¶ 22).

23          As to Plaintiff States' claim that USDA failed to comply with the Paperwork

24  Reduction Act when it submitted to the Director of the Office of Management and Budget

25  ("OMB") a request for what USDA described as a nonsubstantive change, see 44 U.S.C.

26  § 3507 (setting forth process federal agency must follow before "conduct[ing] or

27  sponsor[ing] the collection of information), the decision of the OMB to approve such

28  request is not subject to judicial review, see 44 U.S.C. § 3507(d)(6).

1    Lastly, as to Plaintiff States' claim that the USDA failed to comply with the

2    Computer Matching Act, USDA, in its opposition to the instant motion, made the

3    argument that Plaintiff States lack standing to assert such claim, in that the Computer

4    Matching Act protects the privacy of individuals who have provided information, see 5

5    U.S.C. § 552a(o), and Plaintiff States, in their reply, have not addressed the issue.[26]

6                    **(5) Summary: Likelihood of Success on the Merits**

7    The Court finds Plaintiff States have shown a likelihood of success on the merits of

8    their claim that USDA's demand and threatened disallowance of funding are contrary to

9    the SNAP Act and, in all other respects, have failed to make the requisite showing.

10        **2. Likelihood of Irreparable Harm**

11    The amount of SNAP funds the USDA has formally warned it will disallow if

12    Plaintiff States do not comply equals, for at least 18 of the 22 Plaintiff States, the entirety,

13    or close to it, of the amounts to which those States otherwise would be entitled (see

14    Second Brady Decl. Ex. C; Pham Decl. ¶¶ 30, 34), and the amounts proposed to be

15    disallowed as to the other Plaintiff States are substantial as well.[27]

16    Further, Plaintiff States have offered declarations from their respective agency

17    officials, who explain that having SNAP funds withheld is likely to require them to cut

18    staffing and otherwise greatly reduce their ability to comply with their obligations under

19    the SNAP Act to administer benefits, including, for example, the speed with which

20    applications can be reviewed and required reports can be prepared.

21    USDA argues the claimed injuries identified in the above-referenced declarations

22    can be remedied by a monetary award, namely, recovery of the withheld funds, and,

23    consequently, do not constitute the irreparable harm required for preliminary injunctive

24 _____

25    [26] Moreover, although not discussed at the hearing, there is no evidence to support
26    a finding that USDA intends to act in violation of the strictures set forth in the Computer
      Matching Act, and, consequently, any contention USDA intends to do so is, at best,
      speculative.

27    [27] UDSA pays fifty percent of the "administrative costs involved in each State
28    agency's operation of [SNAP]." See 7 U.S.C. § 2025(a).

United States District Court
Northern District of California

relief.  The Ninth Circuit has held, however, that the "denial of reimbursements" by the federal government can constitute "irreparable" injury, as such denial can cause "economic injuries for which monetary damages are not available."  See Washington v. Trump, 145 F.4th 1013, 1036-37 (9th Cir. 2025); see also East Bay Sanctuary Covenant v. Biden, 993 F.3d 640, 677 (9th Cir. 2021) (holding "significant change[s] in [organization's] programs" constitutes irreparable "intangible injury").

USDA next argues Plaintiff States have no need for preliminary relief because they have the option of seeking administrative relief whereby they would be entitled to a stay of the imposition of disallowances until such time as their administrative remedies are exhausted.  See 7 C.F.R. § 276.7(e).  As discussed above, however, Plaintiff States need not exhaust such optional administrative process before bringing their APA claims, see Darby, 509 U.S. at 154, and the Court finds a ruling requiring a party to pursue administrative remedies in lieu of preliminary relief would seriously undermine such party's right to proceed in court.[28]

Accordingly, the Court finds Plaintiff States have shown they are likely to incur irreparable harm if not provided injunctive relief.

### 3.  Balance of Hardships/Public Interest

The two remaining factors are that the balance of hardships tips in the plaintiff's favor and that the injunction is in the public interest.  See Winter, 555 U.S. at 20.  Where, as here, the federal government is the defendant, "balancing the hardships and the public interest merge."  See Immigrant Defenders Law Center, 145 F.4th at 994.  Thus, a district court balances the public's interest asserted by the federal government in the particular

---

[28] The Court also finds unpersuasive USDA's argument that the filing of the instant motion three weeks after the filing of the Complaint signifies a lack of irreparable injury. The asserted three-week "delay" here is in no manner comparable to the lengthy periods of delay described in the authority cited by the USDA.  See Y.Y.G.M. SA v. Redbubble, Inc., 75 F.4th 995, 1066 (9th Cir. 2022) (providing example of trademark holder that learned of infringement, yet waited three years to file suit and seek preliminary injunction; noting "any injury [the trademark holder] would suffer before trial on the merits would be a relatively short extension of the injury that [the trademark holder] knowingly suffered for three years before it filed suit").

1    case and the hardships to the plaintiff.  See id.

2         The hardships to Plaintiff States are set forth above.  The public interest asserted

3    by the USDA is that "[the] proposed injunction would limit the President's ability to

4    effectuate the policies the American people elected him to pursue, including the

5    President's ability to identify fraud, waste, and abuse in this critical program."  (See Def.'s

6    Opp. at 24:16-18.)  "[T]he mere existence of the Executive Branch's desire to enact a

7    policy," however, "is not sufficient to satisfy the irreparable harm prong."  See Immigrant

8    Defenders Law Center, 145 F.4th at 985.  "If that were the case," the Ninth Circuit has

9    explained, "no act of the [E]xecutive [B]ranch asserted to be inconsistent with a legislative

10   enactment could be the subject of a preliminary injunction [and] [t]hat cannot be so."  See

11   id.

12        Further, while eliminating fraud, waste, and abuse in a government assistance

13   program is in the public interest, the showing made by USDA, namely "a preliminary

14   snapshot review" of SNAP data submitted by States that have complied with USDA's

15   demand for data (see Supp. Corley Decl. ¶ 4), is insufficient to warrant altering the status

16   quo at this time, the status quo being USDA's retention of the right to inspect and audit

17   Plaintiff States' SNAP records, albeit under agreed protocols.  It is unclear whether the

18   observations USDA has preliminarily made, such as "over 300,000 potential instances of

19   deceased individuals" being enrolled in SNAP (see id. ¶ 6), pertain to the records

20   submitted by all, or at least a significant number of, compliant States, or whether they

21   represent an aberrant situation involving one or a few compliant States, thus limiting their

22   potential relevance as being indicative of Plaintiff States.

23        Moreover, Plaintiff States have explained that the referenced 300,000 individuals

24   represent only 1.6% of the total number of SNAP recipients (see Supp. Fernández Garcia

25   Decl. ¶ 16), and that, in any event, SNAP regulations prohibit State agencies from

26   removing a deceased person immediately upon learning or otherwise being notified of a

27   death, see 7 C.F.R. §§ 272.14(b)-(c) (providing, when State agency learns of apparent

28   "match," either from checking applicants/recipients against "SSA's Death Master File" or

1   otherwise, it must, before disenrolling apparently deceased recipient, conduct

2   "independent verification," and then provide "[n]otice to the household of match results"

3   and give household "opportunity . . . to  respond").

4        Further, Plaintiff States have submitted evidence to explain why other preliminary

5   observations by USDA pertaining to records of complying States may not, in fact, be

6   instances of fraud or waste.  (See Supp. Fernández Garcia Decl. ¶¶ 10-15, 17-18; Supp.

7   Reagan Decl. ¶¶ 7-16, 20.)

8        Accordingly, the third and fourth factors weigh in favor of Plaintiff States.

9   **4.  Conclusion:  Need for Preliminary Relief**

10        As discussed above, the Court finds all relevant factors support a grant of

11  preliminary relief, and, accordingly, finds it appropriate to grant a preliminary injunction at

12  this time.

13  **C.  Remaining Issues**

14        USDA requests, in the event the Court enters a preliminary injunction, it issue an

15  order imposing a bond, as well as an order staying the injunction during the pendency of

16  any appeal or, alternatively, administratively staying the injunction for seven days to

17  afford USDA an opportunity to request a stay from a higher court.

18        At the outset, the Court declines to impose a bond, as there is no showing that a

19  "realistic likelihood of harm" to USDA will occur if, during the pendency of the preliminary

20  injunction, it cannot disallow SNAP funding to Plaintiff States.  See Johnson v. Couturier,

21  572 F.3d 1067, 1086 (9th Cir. 2009) (holding "district court may dispense with the filing of

22  a bond when it concludes there is no realistic likelihood of harm to the defendant from

23  enjoining [its] conduct") (internal citation and quotation omitted).  In particular, if Plaintiff

24  States ultimately are unable to show judgment should be entered in their favor, USDA

25  could, at that time, impose any amount of disallowance it finds appropriate, see 7 U.S.C.

26  § 2020(g), and can withhold those funds from future disbursements once such funding is

27  reinstated.

28        Next, a stay pending appeal is appropriate only where, inter alia, the appellant

United States District Court
Northern District of California

"has made a strong showing that he is likely to succeed on the merits."  See Nken v. Holder, 556 U.S. 418, 434 (2009).  Here, as set forth above, USDA has not made such showing.  Additionally, although the Court, in some instances, might be amenable to an administrative stay, in this instance, given such a stay, USDA's planned disallowance of SNAP funds could occur immediately, and USDA at both hearings declined to extend, by even one day, let alone during the pendency of an administrative stay, the date by which USDA would begin to disallow such funding.  Under these circumstances, the Court declines to enter an administrative stay.

## CONCLUSION

For the reasons stated above, Plaintiff States' motion is hereby GRANTED, and USDA is PRELIMINARY ENJOINED from disallowing SNAP funding based on Plaintiff States' failure to comply with the demands set forth in the above-discussed formal warning letters or otherwise acting thereon.

**IT IS SO ORDERED.**

Dated: October 15, 2025

MAXINE M. CHESNEY
United States District Judge