1   ROB BONTA
    Attorney General of California
2   PAUL STEIN
    ROBIN GOLDFADEN
3   Supervising Deputy Attorneys General
    ANDREW Z. EDELSTEIN
4   ANNA RICH
    JANE REILLEY
5   SEBASTIAN BRADY
    WILLIAM BELLAMY
6   MARIA F. BUXTON
    LIAM E. O'CONNOR
7   Deputy Attorneys General
    State Bar No. 330050
8    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA 94102-7004
9   Telephone:  (415) 510-3915
    Fax:  (415) 703-5480
10   E-mail:  Liam.OConnor@doj.ca.gov
    *Attorneys for Plaintiff State of California*

11  *Additional counsel listed on signature page*

12                 IN THE UNITED STATES DISTRICT COURT

13              FOR THE NORTHERN DISTRICT OF CALIFORNIA

14                       SAN FRANCISCO DIVISION

15

16

17  **STATE OF CALIFORNIA, ET AL.**          Case No. **3:25-cv-06310-MMC**

18                            Plaintiffs,    **PLAINTIFF STATES' NOTICE OF
                                             MOTION AND MOTION TO
19                                           ENFORCE OR EXPAND THE
                                             PRELIMINARY INJUNCTION**
20        v.
                                             Date: February 13, 2026
21                                           Time: 9:00 a.m.
                                             Courtroom: 7
22  **UNITED STATES DEPARTMENT OF            Judge: Maxine M. Chesney
    AGRICULTURE, ET AL.**                    Trial Date: None set
23                            Defendants.    Action Filed: July 28, 2025

24

25

26

27

28

---

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

I.    Defendants Demand that States Produce Personal and Sensitive SNAP
      Data and Threaten to Withhold Funding for Noncompliance ................................ 2

II.   The Court Enjoins Defendants from Withholding Funding from Plaintiff
      States or Taking Other Steps to Enforce Their Data Demand ............................... 3

III.  Notwithstanding the Court's Injunction, Defendants Renew Their Data
      Demand and Threaten to Withhold Funding from Plaintiff States ........................ 4

LEGAL STANDARD ...................................................................................................... 6

ARGUMENT .................................................................................................................. 6

I.    The Court Should Enforce Its Injunction Against Defendants' Renewed
      Demand and Threats to Withhold Funding. ......................................................... 6

      A.    USDA's proposed protocol still does not ensure compliance with
            § 2020(e)(8)(A)(ii). ................................................................................... 7

      B.    USDA's renewed demand still lacks an agreed-upon protocol. ................. 9

II.   In the Alternative, the Court Should Expand Its Injunction to Bar
      Defendants' Renewed Demand and Threats to Withhold Funding. ..................... 11

      A.    Defendants' demand is contrary to the Computer Matching Act. ............ 12

      B.    Defendants failed to consider important issues raised by Plaintiffs. ........ 14

      C.    Defendants' demand for unfettered possession of State records is
            contrary to the SNAP Act. ....................................................................... 15

      D.    Defendants' demand arbitrarily circumvents existing privacy
            protections. .............................................................................................. 18

      E.    Plaintiffs will suffer irreparable harm absent injunctive relief and
            the balance of hardships and public interest weigh in their favor. ........... 25

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Acosta v. Loc. Union 26, UNITE HERE*
    895 F.3d 141 (1st Cir. 2018) ............................................................................. 16

*All. for the Wild Rockies v. Pena*
    865 F.3d 1211 (9th Cir. 2017) ............................................................................... 6

*Armstrong v. Brown*
    939 F. Supp. 2d 1012 (N.D. Cal. 2013) ................................................................. 6

*Arrington v. Daniels*
    516 F.3d 1106 (9th Cir. 2008) ............................................................................. 14

*City and County of S.F. v. Trump*
    897 F.3d 1225 (9th Cir. 2018) ............................................................................. 14

*County of Santa Clara v. Noem*
    No. 25-cv-08330-WHO, 2025 WL 3251660 (N.D. Cal. Nov. 21, 2025) .............. 14

*DHS v. Regents of the Univ. of Cal.*
    591 U.S. 1 (2020) ........................................................................................... 14, 21

*F.C.C. v. Fox Television Stations, Inc.*
    556 U.S. 502 (2009) ........................................................................................ 18, 19

*Friends of Back Bay v. U.S. Army Corps of Eng'rs*
    681 F.3d 581 (4th Cir. 2012) ............................................................................... 24

*Greater Birmingham Ministries v. Sec'y of State for Ala.*
    105 F.4th 1324 (11th Cir. 2024) .......................................................................... 16

*Inst. of Cetacean Research v. Sea Shepherd Conserv. Soc'y*
    774 F.3d 935 (9th Cir. 2014) ................................................................................. 6

*J.L. v. Cissna*
    341 F. Supp. 3d 1048 (N.D. Cal. 2018) .............................................................. 19

*Lackey v. Stinnie*
    604 U.S. 192 (2025) ............................................................................................. 25

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*
    463 U.S. 29 (1983) ........................................................................................ 20, 21

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*
    583 U.S. 109 (2018) ............................................................................................ 10

# TABLE OF AUTHORITIES
**(continued)**

**Page**

*Nat'l Fam. Farm Coal. v. Vilsack*
   758 F. Supp. 3d 1060 (N.D. Cal. 2024) ................................................................. 22

*Nw. Env't. Def. Ctr. v. Bonneville Power Admin.*
   477 F.3d 668 (9th Cir. 2007)................................................................................. 19

*Ohio v. EPA*
   603 U.S. 279 (2024).................................................................................... 14, 21

*Pallek v. Rollins*
   No. 1:25-cv-1650, ECF No. 11-1 (D.D.C. May 30, 2025) ....................................... 2

*Ramos v. Nielsen*
   321 F. Supp. 3d 1083 (N.D. Cal. 2018) ............................................................... 19

*Safe Air for Everyone v. EPA*
   488 F.3d 1088 (9th Cir. 2007).............................................................................. 24

*United States v. N.Y. Tel. Co.*
   434 U.S. 159 (1977)............................................................................................. 6

*Voter Reference Found., LLC v. Torrez*
   160 F.4th 1068(10th Cir. 2025).......................................................................... 16

*Winter v. Nat. Res. Def. Council, Inc.*
   555 U.S. 7 (2008) .......................................................................................... 6, 25

**STATUTES**

5 U.S.C.
   § 552a ............................................................................................................. 13
   § 552a(a)(8) ..................................................................................................... 13
   § 552a(a)(11) ................................................................................................... 13
   § 552a(o) ......................................................................................................... 14
   § 552a(o)(1)............................................................................. 1, 12, 13, 14
   § 552a(o)(1)(A)-(K) ......................................................................................... 12
   § 705............................................................................................................... 1

7 U.S.C.
   § 2015(b)(4) .................................................................................................... 17
   § 2020(x)(2)(A)............................................................................................... 23
   § 2020(x)(2)(C) ............................................................................................... 24
   § 2020(a)(3).............................................................................................. *passim*
   § 2020(e)(8) ....................................................................................... 3, 7, 8, 10
   § 2020(e)(8)(A) .................................................................................. 1, 4, 8

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

§ 2020(r)................................................................................................ 23
§ 2025(c) ......................................................................................... 18, 19
§ 2025(c)(4), (5) ................................................................................... 16
§ 2026 ................................................................................................... 22
§ 2026(n) ......................................................................................... 17, 23
§ 2026(n)(1)-(2) ................................................................................... 22
§ 2026(n)(1)-(4) ................................................................................... 17
§ 2026(n)(4)(B)(i) ................................................................................ 22

8

**REGULATIONS**

9

7 C.F.R.
§ 272.4(e) ............................................................................................. 24
§ 272.14 ................................................................................................ 23
§ 272.14(b)-(c) ..................................................................................... 23
§ 273.16(i) ............................................................................................ 24
§§ 275.10-275.14 ........................................................................... 18, 19
§§ 275.10-275.15 ................................................................................. 17
§ 276.4 ................................................................................................... 6
§ 276.4(d)(1) ..................................................................................... 5, 12

15

**COURT RULES**

16

Fed. R. Civ. P. 65 .................................................................................... 1

17

**OTHER AUTHORITIES**

18

77 Fed. Reg. 48045 (Aug. 13, 2012)...................................................... 23

19

87 Fed. Reg. 59633 (Oct. 3, 2022) ......................................................... 24

20

90 Fed. Reg. 26521 (June 23, 2025) ................................................. *passim*

21

Brooke Rollins (@SecRollins), X (Dec. 2, 2025 11:11 a.m. PST),
    https://x.com/SecRollins/status/1995933975211397454?s=20 ............ 11

22

23

*Computerize*, Merriam Webster, https://www.merriam-
    webster.com/dictionary/computerize ................................................. 13

24

25

Exec. Order No. 14243, 90 Fed. Reg. 13,681 (Mar. 20, 2025)................. 2, 8

26

ICE Policy Memorandum 11066.2 (Oct. 27, 2025),
    https://www.ice.gov/doclib/memos/11066.2.pdf ................................. 8

27

28

iv

# TABLE OF AUTHORITIES
### (continued)

**Page**

McGill, et al, *Feasibility of Revising the SNAP Quality Control Review Process*,
   i-ii, 49-54 (2019), https://fns-prod.azureedge.us/sites/default/files/resource-
   files/SNAPQC_Feasibility.pdf ............................................................................... 21

Ross Douthat, *What Palantir Sees*, NY TIMES (Oct. 30, 2025),
   https://www.nytimes.com/2025/10/30/opinion/palantir-shyam-sankar-
   military.html ............................................................................................................... 8

SNAP Data Transparency and Oversight Act of 2025,
   H.R. 6520, 119th Congress, § 2 (2025)................................................................... 17

*Subject to*, Merriam Webster, https://www.merriam-
   webster.com/dictionary/subject%20to ....................................................................... 9

The White House, *President Trump Hosts a Cabinet Meeting, Dec. 2, 2025*
   (YouTube Dec. 2, 2025), https://www.youtube.com/watch?v=pZSd7jn9CSc ..................... 10

USDA, *Ensuring Eligible SNAP Households Get the Right Benefits* (updated Dec.
   9, 2025), https://www.fns.usda.gov/snap/qc ........................................................... 18

USDA, *Feasibility of Revising the Supplemental Nutrition Assistance Program
   (SNAP) Quality Control Review Process (Summary)* (Dec. 2019),
   https://fns-prod.azureedge.us/sites/default/files/resource-
   files/SNAPQC_Feasibility-Summary.pdf ............................................................... 22

v

**NOTICE OF MOTION AND MOTION TO ENFORCE OR EXPAND THE
PRELIMINARY INJUNCTION**

**PLEASE TAKE NOTICE** that on February 13, 2026, at 9:00 a.m., in Courtroom 7 of the above-entitled court, located at 455 Golden Gate Avenue, San Francisco, California, Plaintiffs the States of California, New York, Arizona, Colorado, Connecticut, Delaware, Hawaiʻi, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, Oregon, Rhode Island, Washington, Wisconsin, the District of Columbia, the Commonwealth of Massachusetts, the Office of The Governor ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky, and the Office of The Governor ex rel. Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania (collectively, Plaintiffs or Plaintiff States) will and hereby do move this Court pursuant to 5 U.S.C. § 705, Federal Rule of Civil Procedure 65, and Local Rules 7-1 and 7-2 for an order enforcing or expanding the Preliminary Injunction (ECF No. 106) and prohibiting Defendants United States Department of Agriculture (USDA) and Secretary Brooke Rollins from enforcing Defendants' renewed demand for personal and sensitive data on Supplemental Nutrition Assistance Program (SNAP) applicants and recipients for USDA's "National SNAP Information Database" (SNAP Database) system of records, 90 Fed. Reg. 26521 (June 23, 2025), until Plaintiffs' challenges to the legality of the demand and the SNAP Database program can be adjudicated.

This Motion is based on this Notice; the accompanying Memorandum of Points and Authorities; the supporting declarations filed herewith; the Amended Complaint for Declaratory and Injunctive Relief (ECF No. 84); the Court's Preliminary Injunction and all supporting briefing and evidence; this Court's file; and any other matters properly before the Court.

**INTRODUCTION**

In disregard of this Court's preliminary injunction, USDA has renewed its demand for six years' worth of SNAP applicant and recipient records, and again threatened to penalize States by withholding potentially hundreds of millions of dollars of necessary funding. Although USDA has now "proposed" a data and security protocol, its latest demand violates the Court's injunction because its protocol would *still* permit data sharing and use that is unlawful under this Court's order. ECF No. 106 ("PI Order") at 18-19 (citing 7 U.S.C. § 2020(e)(8)(A)). Furthermore, when Plaintiffs provided a detailed response to the proposed protocol, including suggested edits, questions, and clarifications, USDA rejected Plaintiffs' concerns out of hand, claiming that States have "no discretion" in the matter—contrary to the SNAP Act's explicit requirement that any protocol must be agreed to by the States. *See* PI Order at 13 (citing 7 U.S.C. § 2020(a)(3)). In fact, the only significant revision USDA made to the proposed protocol *exacerbates* the risk of unlawful disclosure and use by adding a broad loophole for sharing the demanded data with other agencies, including the Department of Homeland Security, for purposes unrelated to SNAP.

USDA has now unilaterally terminated negotiations, once again initiating noncompliance proceedings and threatening draconian penalties if Plaintiff States do not comply with USDA's unlawful demands. This "my way or the highway" approach has left States with no choice but to seek enforcement of the Court's order on an emergency basis.

Even if USDA's renewed demand is beyond the scope of the existing injunction, the Court should expand that injunction, because the renewed demand is contrary to law for the same reasons as USDA's original demand: it violates § 2020(e)(8)'s restrictions on data sharing and use and it is unsupported by an agreed-upon protocol, as required by § 2020(a)(3).

In addition, the expanded record supporting this motion underscores additional ways that Defendants' actions violate the Administrative Procedure Act (APA). USDA's renewed demand is contrary to law because the Computer Matching Act prohibits Plaintiffs from disclosing records "for use in a computer matching program" absent an agreement that meets minimum statutory requirements. 5 U.S.C. § 552a(o)(1). And in unilaterally terminating negotiations with Plaintiffs, USDA has arbitrarily dismissed their concerns that the proposed protocol would create significant

1

1    data security risks, including the risks of unlawful disclosure and use.

2    　　Also, as Plaintiffs have previously argued, USDA's renewed demand is contrary to law

3    because § 2020(a)(3) only provides USDA with authority to obtain *access to*—not unfettered

4    *possession of*—States' SNAP records. This is a foundational flaw that the Court should revisit in

5    light of new developments and evidence. Finally, USDA's renewed demand makes clear that in

6    establishing the SNAP Database, USDA has arbitrarily ignored its prior findings that it lacks the

7    authority to create such a system, and it has arbitrarily circumvented privacy protections built into

8    the existing systems that were carefully designed to accomplish the claimed goals of the new

9    database.

10    　　The Court should enforce its injunction order against the renewed demand or (if

11    necessary) expand the injunction to prevent an endless cat-and-mouse game of relitigating

12    variations of the same fundamentally unlawful demand for States' data.

13    **BACKGROUND**

14    **I.    DEFENDANTS DEMAND THAT STATES PRODUCE PERSONAL AND SENSITIVE SNAP
15    DATA AND THREATEN TO WITHHOLD FUNDING FOR NONCOMPLIANCE**

16    　　In May 2025, USDA and its "assigned Department of Government Efficiency ('DOGE')

17    team" sought to obtain SNAP data directly from the States' third-party electronic benefit transfer

18    (EBT) processors. ECF No. 59-12 (IL Decl.), Ex. 1. USDA claimed it was implementing a March

19    20 executive order directing federal agencies to eliminate so-called "information silos," to gain

20    "unfettered access to comprehensive data from all State programs," and to then share that data

21    across the federal government in furtherance of the Administration's goals. ECF No. 59-7 (CA

22    Decl.), Ex. B (citing Exec. Order No. 14243, 90 Fed. Reg. 13,681 (Mar. 20, 2025)).

23    　　In June, after USDA was sued by private plaintiffs for failing to follow the Privacy Act,

24    among other laws, it published a System of Records Notice (SORN), which describes a new

25    "National Supplemental Nutrition Assistance Program (SNAP) Information Database" (SNAP

26    Database) containing SNAP applicants' and recipients' PII, including their names, Social Security

27    Numbers (SSNs), dates of birth, and addresses. 90 Fed. Reg. 26521; *see Pallek v. Rollins*, No.

28    1:25-cv-1650, ECF No. 11-1, ¶¶ 13-14 (D.D.C. May 30, 2025). USDA sought comment only on

2

its planned "routine uses" of the data, which contemplated broad rediscosure of States' SNAP

records to myriad agencies and individuals that have nothing to do with administering SNAP.

*E.g.*, 90 Fed. Reg. at 26522 ("When a record on its face, or in conjunction with other records,

indicates a violation or potential violation of law . . . USDA/FNS may disclose the record to the

appropriate agency, whether Federal, foreign, State, local, or tribal[.]").

On July 9, USDA demanded that the States produce virtually all SNAP applicant and

recipient data dating back to 2020—including applicants' and recipients' names, SSNs, dates of

birth, and addresses—no later than July 30. ECF No. 59-7 (CA Decl.), Exs. C, D; *see also* 90 Fed.

Reg. at 26522 (SORN listing categories of demanded data). In the following weeks, USDA

doubled down on its demand, threatening to impose crippling monetary penalties on

noncomplying States. ECF No. 59-7 (CA Decl.), Ex. E; *see* ECF No. 59 at 7 n.4. In many cases,

USDA threatened to disallow funding in amounts that greatly *exceed* a State's total administrative

funding—a plainly coercive move that is untethered to the regulations. ECF No. 75-1, Ex. C.

## II.    THE COURT ENJOINS DEFENDANTS FROM WITHHOLDING FUNDING FROM PLAINTIFF STATES OR TAKING OTHER STEPS TO ENFORCE THEIR DATA DEMAND

Plaintiffs filed the present action on July 28, and soon after moved for a preliminary

injunction to bar Defendants from enforcing their data demand. ECF Nos. 1, 59. After issuing a

temporary restraining order to preserve the status quo while the parties briefed Defendants' last-

minute arguments, ECF Nos. 83, 94, the Court granted a preliminary injunction on October 15,

concluding that Plaintiffs are likely to prevail on their claim that Defendants' demand is contrary

to law for at least three independent reasons. PI Order at 13-19.[1]

***First***, the Court rejected Defendants' contentions that 7 U.S.C. § 2020(e)(8) provides

USDA with authority to collect States' records. That subsection merely permits States to disclose

otherwise-confidential data to specified recipients—it does not by itself require them to turn over

data to USDA. PI Order at 14-18. Therefore, Defendants' demand was likely unlawful. *Id.*

Although a different provision of the SNAP Act, 7 U.S.C. § 2020(a)(3), may provide some

authority for USDA to access States' records, as the Court explained, the plain text "requires

---

[1] The preliminary injunction covers all Plaintiffs except Nevada. PI Order at 2 n.2.

3

1   USDA and a State agency to agree to data and security protocols before the State agency is

2   required to provide the SNAP records demanded by USDA." *Id.* at 13. There was no such

3   protocol in place, however; indeed, USDA had never even proposed one. *See id.*

4       ***Second***, the Court held that Defendants' demand likely violated § 2020(e)(8)(A) because

5   it swept in data that is not "obtained from applicant households," such as transactional records

6   and SNAP usage and retailer data. PI Order at 18 (citing ECF No. 59-7 (CA Decl.), Ex. D).

7       ***Third***, the Court held that Defendants' demand was likely unlawful because USDA had

8   "announced its intent" to disclose and use the data in "ways well beyond those permitted under

9   § 2020(e)(8)(A)(ii)." PI Order at 18. The Court stressed that, because Plaintiff States "are

10  required by the SNAP Act to safeguard information they obtain from applicant households and

11  are permitted to disclose such information under § 2020(e)(8)(A) only for the limited purposes set

12  forth therein," the Plaintiff States "are *prohibited* from disclosing information" under such

13  circumstances—where USDA has "announce[d] in advance an intent to use the information for

14  purposes beyond those set forth in § 2020(e)(8)(A)(ii)." *Id.* at 18-19 (emphasis added).

15      After finding that Plaintiffs established irreparable harm and that the balance of the

16  equities and the public interest supported an injunction, PI Order at 21-24, the Court preliminarily

17  enjoined USDA "from disallowing SNAP funding based on Plaintiff States' failure to comply

18  with the demands set forth in the [USDA's] formal warning letters or otherwise acting thereon,"

19  *id.* at 25. Defendants did not appeal the Court's order, and the deadline to do so has now passed.

20  **III.   NOTWITHSTANDING THE COURT'S INJUNCTION, DEFENDANTS RENEW THEIR DATA**
21  **DEMAND AND THREATEN TO WITHHOLD FUNDING FROM PLAINTIFF STATES**

22      Despite the Court's injunction, USDA renewed its data demand in letters to Plaintiff

23  States on November 24. Ladov Decl., Ex. A (Renewed Demand) & Attachments. As discussed in

24  more detail below, the renewed demand included a proposed protocol, but USDA claimed that

25  "there can be no good faith objection" to it, and required Plaintiff States to respond within a week

26  stating whether they would comply. *Id.* at 1. Among other problems, the proposed protocol makes

27  clear that the renewed demand is governed by the same SORN, which includes the "routine uses"

28  that the Court found violate the SNAP Act, *see* PI Order at 18-19 & n.24. Indeed, although USDA

4

1  told the Court in September that it would amend the SORN to "clarify that data will not be

2  disclosed except as authorized by the [SNAP Act]," ECF No. 90-1 (USDA Decl.) ¶¶ 10-12, it has

3  not done so.

4      On December 8, Plaintiffs sent a letter detailing problems with the proposed protocol and

5  seeking clarification about USDA's plans in order to offer additional substantive suggestions.

6  Ladov Decl., Ex. B (Pls.' Dec. 8 Ltr.). Plaintiffs requested a response by December 15.

7      Ignoring that request, USDA responded after the close of business Eastern Time on

8  December 23. Rather than trying to reach agreement with Plaintiffs, USDA rejected their

9  concerns out of hand and accused them of seeking "delay" just by raising those concerns. *See*

10  Ladov Decl., Ex. C (USDA Dec. 23 Ltr.) at 1. Worse still, USDA's letter states that it serves as

11  an advance notification under 7 C.F.R. § 276.4(d)(1), thereby initiating noncompliance

12  proceedings to withhold Plaintiffs' funding. *Id.* at 6-7. This notice required Plaintiffs to commit

13  by January 6 to turn over the data, *id.*—a deadline that was later extended to January 9.

14  Defendants also revised their proposed protocol, not to address any of the concerns raised by

15  Plaintiffs, but instead to reserve their purported right to share access to their new SNAP Database

16  with other parties "to the extent required by law." Ladov Decl., Ex. C, Attachment (USDA

17  Revised Protocol) § 4.2; *see id.*, Ex. D § 4.2 (redline showing changes in the revised proposed

18  protocol).[2] This seemingly innocuous proviso appears to be a Trojan Horse intended to leave

19  room for USDA to share States' applicant data with immigration enforcement authorities, and

20  perhaps other federal agencies, in violation of the SNAP Act.

21      On January 9, Plaintiff States responded to USDA by its prescribed deadline, explaining

22  that they are unable to agree to USDA's renewed demand, including because it fails to cure the

23  defects identified in this Court's order, but also that they remain ready to work with USDA in

24  good faith towards an agreed-upon protocol that complies with the SNAP Act and other

25  applicable laws. Ladov Decl. Ex. F (Pls.' Jan. 9 Ltr.).

26

27

28      ---

[2] For ease of reference, Plaintiffs refer to USDA's Revised Protocol throughout, including
when referring to provisions that remain unchanged from the original version.

5

1

**LEGAL STANDARD**

2       Courts have broad authority to issue orders to "secure compliance with [their] earlier

3   orders and governing law." *Armstrong v. Brown*, 939 F. Supp. 2d 1012, 1018 (N.D. Cal. 2013);

4   *see also United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977) (federal courts can issue orders

5   as "necessary or appropriate to effectuate and prevent the frustration of orders"). "In deciding

6   whether an injunction has been violated it is proper to observe the objects for which the relief was

7   granted and to find a breach of the decree in a violation of the spirit of the injunction, even though

8   its strict letter may not have been disregarded." *Inst. of Cetacean Research v. Sea Shepherd*

9   *Conserv. Soc'y*, 774 F.3d 935, 949 (9th Cir. 2014) (citation omitted).

10      Plaintiffs' alternative request for an order expanding the Court's existing injunction is

11  governed by *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008): To prevail, Plaintiffs

12  must show that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable

13  harm, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest.

14  Under the "sliding scale" test, Plaintiffs also may prevail by showing "serious questions" going to

15  the merits—a lesser showing than a likelihood of success on the merits—and that "the balance of

16  hardships tips *sharply* in [their] favor, and the other two *Winter* factors are satisfied." *All. for the*

17  *Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (citation omitted).

18

**ARGUMENT**

19

20  I.   **THE COURT SHOULD ENFORCE ITS INJUNCTION AGAINST DEFENDANTS' RENEWED
         DEMAND AND THREATS TO WITHHOLD FUNDING.**

21      As noted above, this Court's preliminary injunction bars USDA "from disallowing SNAP

22  funding based on Plaintiff States' failure to comply with the demands set forth in [USDA's]

23  formal warning letters or otherwise acting thereon." PI Order at 25. Yet USDA has renewed its

24  prior demand, requesting the *same* SNAP data for the same SNAP Database, including all the

25  same PII (names, dates of birth, addresses, and SSNs) and more (e.g., immigration sponsor

26  identity, absent parent status, and SNAP EBT Card Number). *Compare* Renewed Demand, *with*

27  PI Order at 3-4 (describing prior demand). USDA is also invoking the same authority—7 C.F.R.

28

1  § 276.4—to impose draconian financial penalties on non-complying States. *Compare* USDA Dec.

2  23 Ltr. at 6-7, *with* ECF No. 59-7 (CA Decl.), Ex. G (prior advance notification letter).

3      USDA apparently believes it can circumvent the preliminary injunction, simply because

4  its renewed demand includes a proposed data and security protocol. Not so. As explained below,

5  USDA's renewed demand fails to cure either of the major legal defects the Court identified in its

6  preliminary injunction order: it still would permit applicant data to be disclosed and used in

7  violation of § 2020(e)(8)(A)(ii), *see* PI Order at 18-19, and it still lacks an agreed-upon data and

8  security protocol, as required by § 2020(a)(3), *see* PI Order at 13.

9  **A.  USDA's proposed protocol still does not ensure compliance with**
10      **§ 2020(e)(8)(A)(ii).**

11      The Court previously found that "USDA has announced its intent to use [SNAP

12  applicants' information] in ways well beyond those permitted under § 2020(e)(8)(A)(ii),"

13  including by asserting in the SORN "the right to disclose the data to a number of entities,

14  including numerous entities that are not assistance programs, and for purposes other than the

15  administration or enforcement of the programs referenced in § 2020(e)(8)(A)(i)." PI Order at 18

16  (citing 90 Fed. Reg. at 26522-23). Thus, the Court held that Plaintiffs are "likely to show the

17  SNAP Act prohibits them from disclosing to USDA the information demanded[.]" *Id.* at 19.

18      The facts that led the Court to this conclusion have not changed with USDA's renewed

19  demand and proposed protocol.[3] First, the renewed demand relies on the same SORN as the

20  relevant authority for the collection. USDA Revised Protocol § 5 (citing 90 Fed. Reg 26521).

21  That SORN has not been amended, despite Defendants' representations months ago that they

22  would do so. ECF No. 90-1 (USDA Decl.) ¶¶ 10-12. When Plaintiff States asked USDA how it

23  would reconcile differences between the SORN and the protocol, *see* Pls. Dec. 8 Ltr. at 14,

24

25  ─────────────────
      [3] While USDA now focuses on § 2020(a)(3) as the source of authority for its demand
    instead of § 2020(e)(8), the latter subsection still governs disclosure and use of States' applicant
26  data; USDA cannot simply ignore its restrictions. By its terms, this provision applies to *any*
    disclosure of "information obtained from applicant households," § 2020(e)(8)(A)(i), which
27  encompasses the vast majority of the information USDA seeks here. Indeed, USDA has
    previously acknowledged that its authority to collect and utilize SNAP applicant data is "subject
28  to confidentiality and limitations on disclosure at [7 U.S.C. § 2020(e)(8)]"). Reyes Decl. (WA),
    Ex. A at 2; *see also* Reagan Decl. (IL), Ex. A at 9.

1    USDA again promised it would, someday, amend the SORN, but it also made clear that, while

2    USDA plans to drop the SORN's reference to foreign governments, it will not amend the

3    language that this Court found transgresses § 2020(e)(8)(A), *see* USDA Dec. 23 Ltr. at 6.

4         Second, in addition to failing to cure the defects in the SORN, USDA flatly refused to

5    close related loopholes in its proposed protocol that seem intended to permit the disclosure and

6    use of applicant data in violation of § 2020(e)(8)(A)(i). Most notably, while the protocol limits

7    "access" to the SNAP Database itself by other federal agencies, it contains no restriction on

8    USDA's ability to *disclose* information from the database to other federal agencies—something

9    that the Information Silos Executive Order, cited by USDA in its demand and its SORN,

10   expressly dictates. *See* USDA Revised Protocol § 2.1.1 (citing Exec. Order No. 14243, 90 Fed.

11   Reg. 13,681 (Mar. 20, 2025); *see also* 90 Fed. Reg. 26521 (same). Plaintiffs asked USDA to

12   amend the proposed protocol to prohibit USDA from *disclosing* the demanded data "except to

13   persons 'directly connected with the administration' of the SNAP Act, for the purpose of

14   administering or enforcing the SNAP Act only"; to confirm that it would comply with

15   § 2020(e)(8) by "limit[ing] its use of the data to 'ensure the integrity of the SNAP program'

16   only"; and to confirm that it would not share participant data with the Department of Homeland

17   Security or its subagencies "for use in immigration enforcement activities." Pls. Dec. 8 Ltr. at 12-

18   13. In response, USDA stated only that "[i]n the event it receives external requests for data,

19   USDA will follow all applicable laws," USDA Dec. 23 Ltr. at 6, and added language to its

20   proposed protocol reflecting this position, USDA Revised Protocol § 4.2 (stating that "access to

21   the SNAP Information Database may [only] be provided to . . . [a]ny other federal agency" "to

22   the extent required by law"). This provides no assurance at all, because U.S. Immigration and

23   Customs Enforcement (ICE) has publicly announced its position that it may demand other federal

24   agencies to turn over any "lawfully collected information" for use in immigration enforcement.

25   ICE Policy Memorandum 11066.2 (Oct. 27, 2025).[4]

---

26   [4] Available at https://www.ice.gov/doclib/memos/ 11066.2.pdf. Additionally, Palantir
     executive Shyam Sankar has publicly recognized that the data used by the Palantir platform
27   ("ImmigrationOS") supporting ICE enforcement and removal operations is being pulled from
     "applications for benefits." *See* Ross Douthat, *What Palantir Sees*, NY TIMES (Oct. 30, 2025),
28   https://www.nytimes.com/2025/10/30/opinion/palantir-shyam-sankar-military.html.

1  USDA also refused to agree to any transparency or enforcement mechanism in the

2  protocol—the lack of which would make it impossible for Plaintiff States to know how their

3  SNAP records and applicant data are being shared and used. *Compare* Pls.' Dec. 8 Ltr. at 12-13,

4  *with* USDA Dec. 23 Ltr. Most importantly, Plaintiffs requested that USDA "include protocol

5  language that alerts any State immediately if ICE or any other DHS subagency requests access to

6  or use of this data and provides at least 30 days for that State to respond (and if necessary take

7  legal action) to prevent such data sharing[.]" Pls.' Dec. 8 Ltr. at 12-13. USDA ignored the issue

8  altogether, heightening concerns that USDA will use the data in ways that violate the SNAP Act.

9  In these circumstances—where President Trump has directed federal agencies to share

10 State data across the federal government, USDA has already "announced its intent" to disclose

11 and use applicant data outside of § 2020(e)(8)(A)(ii)'s restrictions, PI Order at 18, and USDA has

12 failed to amend its SORN and its data and security protocol to comply with § 2020(e)(8)(A)(ii)—

13 USDA's renewed demand violates the preliminary injunction, and Plaintiff States continue to be

14 statutorily "prohibit[ed]" from complying with the demand, PI Order at 18.

15 **B.    USDA's renewed demand still lacks an agreed-upon protocol.**

16 The Court previously recognized that § 2020(a)(3) "requires USDA and a State agency to

17 *agree to* data and security protocols *before* the State agency is required to provide the SNAP

18 records demanded by USDA." PI Order at 13 (emphasis added). USDA has failed to cure this

19 defect: regardless of whether the terms that USDA seeks to unilaterally impose actually constitute

20 a "data and security protocol," as that term is normally understood, it is still not a "data and

21 security protocol[] *agreed to by the State agency*." § 2020(a)(3)(B)(i) (emphasis added).

22 With its latest letter, USDA has taken the remarkable position that § 2020(a)(3) does not

23 make an agreed-upon protocol a "condition" at all, and that it only needs to abide by a data and

24 security protocol agreed to by the States if it chooses to enter into one. USDA Dec. 23 Ltr. at 2.

25 Yet again, USDA disregards both the Court's order (*see* PI Order at 12-13) and the plain meaning

26 of Congress's words. *See Subject to*, Merriam Webster, https://www.merriam-

27 webster.com/dictionary/subject%20to (defining "subject to" as "dependent on something else to

28 happen or be true"). Congress expressly provided that the relevant "records . . . shall . . . be made

9

available, *subject to* data and security protocols agreed to by the State agency and Secretary," § 2020(a)(3)(B)(i)—not (as USDA would have it) that the records shall be made available, *regardless of whether* there are data and security protocols agreed to by the State agency. USDA's interpretation would rewrite the statute altogether, which neither the agency nor the Court can do. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 123 (2018) ("[T]his Court is not free to 'rewrite the statute' to the Government's liking."); PI Order at 17 (declining to adopt USDA's interpretation that would have rewritten § 2020(e)(8)).

As the plain meaning of the "subject to" phrase indicates, it allows States to secure an effective data and security protocol—one that would safeguard their personal and sensitive data from being leaked, breached, illegally disclosed, or illegally used—"before" States are "required" to grant access to their records. PI Order at 13. Accordingly, in response to USDA's renewed demand, Plaintiff States explained, in painstaking detail, the significant problems with USDA's proposed protocol—including that it would put millions of Americans' sensitive data at risk and that it did not even ensure that USDA would follow the "strict limitations" that Congress has "placed on the use of" applicant data. PI Order at 18; *see* Pls.' Dec. 8 Ltr. Plaintiff States offered this response in good faith, just as they had responded to USDA's original demand. *See* PI Order at 12 n.14 (observing that "there is no evidence that any Plaintiff State has refused to negotiate protocols," and that "some of the Plaintiff States ha[d] advised USDA of their willingness to negotiate protocols that would apply to the data USDA seeks, but ha[d] received no response").

Meanwhile, USDA never made any real attempt to reach agreement. Even before Plaintiffs had an opportunity to respond to the renewed demand, Secretary Rollins announced during a televised cabinet meeting that she had already decided to penalize "blue states" (referring to Plaintiffs), stating that "as of next week we have begun and will begin to stop moving federal funds into those states until they comply" with USDA's renewed demand.[5] She then announced on X: "NO DATA, NO MONEY – it's that simple," and accused Plaintiffs of

---

[5] The White House, *President Trump Hosts a Cabinet Meeting, Dec. 2, 2025*, at 59:45-1:00:33 (YouTube Dec. 2, 2025), https://www.youtube.com/watch?v=pZSd7jn9CSc.

10

"protecting their bribery schemes."[6] USDA's renewed demand itself mirrors the Secretary's sentiments, stating unequivocally that "there can be *no good faith objection* to the attached protocols." Renewed Demand at 1 (emphasis added). And Defendants' counsel has similarly asserted that States have no "discretion" in the matter. Ladov Decl., Ex. E.

Then, after Plaintiffs' response, USDA unilaterally terminated negotiations without addressing the problems Plaintiffs raised. *See infra* § II(B). Accordingly, Plaintiffs States have declined to acquiesce to USDA's renewed demand—as they are statutorily *required* to do. *See* PI Order at 18-19 (holding that Plaintiffs are "prohibited from disclosing" applicant data to USDA, given the agency's stated intent to disclose and use that data "for purposes beyond those set forth in § 2020(e)(8)(A)(ii)").

In short, the Court recognized in its PI Order that USDA lacks authority to enforce its original demand under § 2020(a)(3) without an agreed-upon data and security protocol. *See* PI Order at 13. USDA has not cured this fundamental defect. Therefore, the Court should enforce its order against USDA's renewed demand and threats to disallow funding.

## II.    IN THE ALTERNATIVE, THE COURT SHOULD EXPAND ITS INJUNCTION TO BAR DEFENDANTS' RENEWED DEMAND AND THREATS TO WITHHOLD FUNDING.

If the Court finds that Defendants' renewed data demand and financial threats violate the existing injunction, then that should be the end of the analysis; the Court may defer consideration of Plaintiffs' remaining arguments until summary judgment, when the Court may fully consider the issues on a complete administrative record. However, if the Court finds that the Defendants' renewed demand is beyond the scope of its preliminary injunction, then it should expand its preliminary injunction to bar the renewed demand, because Plaintiffs are likely to prevail on their arguments that it violates the APA in multiple ways, in addition to the defects discussed above.[7]

As explained below, USDA's renewed demand is contrary to the Computer Matching Act,

---

[6] Brooke Rollins (@SecRollins), X (Dec. 2, 2025 11:11 a.m. PST), https://x.com/SecRollins/status/1995933975211397454?s=20.

[7] Whether characterized as a new demand or a continuation of the enjoined demand, USDA's December 23 letter constitutes a final agency action. It is "not only is final but also determines Plaintiff States' obligations and the consequences flowing from a failure to comply therewith." PI Order at 9. Specifically, USDA's December 23 letter instructs the Plaintiff States (continued…)

because Plaintiffs may not disclose the demanded records absent a written agreement that meets minimum statutory requirements. *See infra* § II(A). USDA has also arbitrarily failed to consider important issues raised by Plaintiffs, including that USDA's proposed protocol fails to protect States' records against data security risks. *See infra* § II(B). Finally, as the expanded preliminary record shows, Plaintiffs are likely to prevail on their claims that USDA lacks statutory authority to demand unfettered possession and control of State SNAP records, *see infra* § II(C), and that USDA's proposed SNAP Database arbitrarily abandons long-standing agency practice and circumvents existing data privacy protections, *see infra* § II(D).

### A.    Defendants' demand is contrary to the Computer Matching Act.

In their response to USDA's proposed protocol, Plaintiff States objected that USDA's proposed protocol fails to comply with the Computer Matching and Privacy Protection Act ("Computer Matching Act"), which ***prohibits*** States from disclosing records "for use in a computer matching program" except pursuant to a written agreement that meets minimum statutory requirements. 5 U.S.C. § 552a(o)(1); *see* Pls.' Dec. 8 Ltr. at 2. Among other things, the agreement must specify: the purpose of the program; each data element that will be used; procedures for verifying information produced by the program; procedures for protecting data security and privacy; and prohibitions on the duplication and redisclosure of records. 5 U.S.C. § 552a(o)(1)(A)-(K). As Plaintiff States noted in their letter, they have previously entered into necessarily detailed computer matching agreements with USDA, including to implement the National Accuracy Clearinghouse (NAC) and Electronic Disqualified Recipient System (eDRS) systems. *Id.*; *see* Reyes Decl. (WA), Ex. A; Reagan Decl. (IL), Ex. A at 3; Tomasky Decl. (NY) ¶¶ 12-17.

In response to Plaintiffs' letter, USDA did not dispute that its proposed protocol fails to comply with 5 U.S.C. § 552a(o)(1). Instead, it suggested that it need not comply with the Computer Matching Act because the agency may not use States' records in a computer matching

---

to "construe this letter as your Advance Notification pursuant to 7 CFR 276.4(d)(1)" that USDA intends to disallow funding. USDA Dec. 23 Ltr. at 6. The Court has held that such formal steps toward disallowance are evidence of a final agency action. PI Order at 8-9.

1   program, first stating that "FNS's uses of data" will not "be automatic," USDA Dec. 23 Ltr. at 5,

2   and later refusing to describe which data "will be analyzed, how, and when," *id.* at 6.

3   But USDA has already made clear that it intends to use the demanded records for a

4   "computer matching program," which is defined to include "any computerized comparison of . . .

5   two or more automated systems of records or a system of records with non-Federal records" in

6   order to "establish[] or verify[]" applicants' "eligibility" for "cash or in-kind assistance or

7   payments under Federal benefit programs." 5 U.S.C. § 552a(a)(8). Indeed, in its Privacy Impact

8   Assessment, USDA explained that it is using the SNAP Database to "verify[] SNAP recipient

9   eligibility" by "leverag[ing] data-sharing across Federal and State systems to identify and rectify

10   any ineligible, duplicate, or fraudulent SNAP enrollments or transactions," ECF No. 59-7, (CA

11   Decl.) Ex. A at 13, by conducting "[i]nter-Agency data matches" "using automated scripts and

12   queries on the compiled database" as well as "matching algorithms," *id.* at 5.[8]

13   In these circumstances, where USDA has already expressed its intent to use the demanded

14   records in a computer matching program, 5 U.S.C. § 552a(o)(1) *prohibits* Plaintiff States from

15   disclosing the demanded records without a necessarily detailed computer matching agreement.

16   *See* 5 U.S.C. § 552a(o)(1) ("No record which is contained in a system of records may be

17   disclosed to a recipient agency . . . for use in a computer matching program except pursuant to a

18   [computer-matching agreement] between the source agency and the recipient agency . . . ."); *see*

19   *also* PI Order at 18-19 (holding that because USDA has stated its intent to violate

20   § 2020(e)(8)(A)(ii), that subsection prohibits Plaintiff States from disclosing applicant data).[9]

21

22   [8] Available at https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf. USDA previously tried to argue that it is not engaging in an "automated"

23   comparison of data, ECF No. 72 at 30 (citation omitted), but the statute expressly applies to "any *computerized*" comparison of data, 5 U.S.C. § 552a(a)(8) (emphasis added), which USDA

24   indisputably intends to do with the demanded records. *See Computerize*, Merriam Webster, https://www.merriam-webster.com/dictionary/computerize (defining "computerize" as "to carry out, control, or produce by means of a computer").

25   [9] When ruling on Plaintiffs' preliminary injunction motion, the Court preliminarily found that there was insufficient evidence that USDA "intend[ed] to act in violation of the strictures set

26   forth in the Computer Matching Act." *See* PI Order at 21 n.26. However, Plaintiffs previously did not press the argument they raise here: that 5 U.S.C. § 552a requires USDA to enter into

27   computer matching agreements *with Plaintiff States*. *See* PI Mot. at 20-21; *see also* 5 U.S.C. § 552a(a)(11) (defining "source agency" to include "any State . . . which discloses records to be

28   used in a matching program").

1    Therefore, USDA's renewed demand that Plaintiff States violate 5 U.S.C. § 552a(o)(1) is contrary

2    to law and should be enjoined.[10]

3        **B.    Defendants failed to consider important issues raised by Plaintiffs.**

4        Under the APA, agency action is arbitrary and capricious when the agency has "failed to

5    consider important aspects of the problem" before it. *DHS v. Regents of the Univ. of Cal.*, 591

6    U.S. 1, 4 (2020) (citation modified). Here, USDA did precisely that. In particular, after USDA

7    issued its renewed demand, Plaintiff States raised concerns that USDA's proposed protocol would

8    still expose Plaintiffs' records to unlawful disclosure and use. In response, USDA ignored these

9    concerns and instituting noncompliance proceedings. *See* USDA Dec. 23 Ltr. This plug-your-ears

10   approach violates the APA. *See Ohio v. EPA*, 603 U.S. 279, 293 (2024) (agency acted arbitrarily

11   and capriciously by "offer[ring] no reasoned response"); *Arrington v. Daniels*, 516 F.3d 1106,

12   1112 (9th Cir. 2008) (courts "may not 'infer an agency's reasoning from mere silence'").

13       *First*, USDA disregarded Plaintiffs States' objections that the renewed demand and

14   proposed protocol fail to comply with statutory restrictions on data disclosure and use contained

15   within the SNAP Act, *see supra* § I(A), and the Computer Matching Act, *see supra* § II(A).

16       *Second*, as noted above, Plaintiff States expressed concern that USDA's proposed

17   protocol lacks enforcement mechanisms, such as monitoring, auditing, automated controls, or

18   documented consequences. Pls.' Dec. 8 Ltr. at 3. Without methods to ensure compliance, the

19   protocol's purported restrictions on access to the SNAP Database merely serve as statements of

20   intent, and improper data disclosure and usage may go unprevented, unnoticed, and uncorrected.

21   *Id.*; Dennis Decl. (KY) ¶ 19; Tomasky Decl. (NY) ¶¶ 15-17. This leaves Plaintiffs States without

22   assurance that their records and their applicant data will be handled consistent with their

---

23       [10] In their opposition to Plaintiffs' preliminary injunction motion, USDA argued that
24   Plaintiffs lack standing to challenge USDA's violations of the Computer Matching Act on the
     ground that those failures are distinct from USDA's data demand and cause Plaintiffs "no injury."
     *See* ECF No. 72 at 21-22. Defendants are wrong. Just as Defendants' demand that Plaintiffs either
25   violate the SNAP Act's data disclosure restrictions or lose federal funding injures Plaintiffs, so
     too does their demand that Plaintiffs either violate 5 U.S.C. § 552a(o)'s data disclosure
26   restrictions or lose federal funding. *See City and County of S.F. v. Trump*, 897 F.3d 1225, 1236
     (9th Cir. 2018) (threatened loss of federal funding "satisfies Article III's standing requirement.");
27   *County of Santa Clara v. Noem*, No. 25-cv-00330-WHO, 2025 WL 3251660, at *43 (N.D. Cal.
     Nov. 21, 2025) ("Hobson's choice" between accepting unlawful terms for federal funding and
28   losing federal funding constitutes irreparable harm).

1    representations to participants and consistent with the statutory restrictions on the disclosure and

2    use of the demanded data. Pls.' Dec. 8 Ltr. at 3. USDA's response failed to consider this issue

3    whatsoever, which is another reason why its renewed demand is arbitrary and capricious.

4        *Third*, because USDA's data demand is unprecedented in scope, it creates significant risks

5    of illegal use, disclosure, and hacking. Pls.' Dec. 8 Ltr. at 2. USDA dismissed these risks,

6    asserting that Plaintiff States have previously uploaded far more limited datasets to USDA for

7    quality control purposes, and, in USDA's view, "[i]t is simply baseless to object to providing a

8    complete [dataset], rather than just a sample," because transferring "data of the same type but in

9    greater *volume*" presents no greater risk. USDA Dec. 23 Ltr. at 4 (emphasis in original). But

10   transferring data in vastly greater quantities and centralizing it in one place *does* present greater

11   risks: more data housed in a single database, as USDA proposes, can more easily be wrongfully

12   used or disclosed or hacked. *See, e.g.,* ECF No. 59-3 (Piazza Decl.) ¶¶ 5-12; Reyes (WA) Decl.

13   ¶ 6. And those risks are exacerbated here, because, as noted above, USDA's proposed protocol

14   includes weak restrictions on the disclosure and use of applicant data and lacks enforcement

15   mechanisms. *See, e.g.,* Reyes Decl. (WA) ¶¶ 5, 7-11.

16       *Finally*, as with USDA's original demand, USDA's renewed demand insists that Plaintiffs

17   produce the demanded records "no later than 30 days" after receipt of the demand. Renewed

18   Demand at 2. As Plaintiffs noted in their preliminary injunction motion, this is a near-impossible

19   timeline for many Plaintiffs, particularly those with large caseloads. *See* ECF No. 59 (PI Mot.) at

20   13. Collecting and securely producing almost six-years' worth of numerous data elements is a

21   time-consuming process that would require thousands of personnel hours for many Plaintiffs. For

22   example, New York's agency estimates that it would take *at least* 120 days to collect the

23   demanded data. Tomasky Decl. (NY) ¶ 32. USDA's refusal to grapple with this basic logistical

24   challenge and decision to demand production in just 30 days is also arbitrary and capricious.

25

26   **C.    Defendants' demand for unfettered possession of State records is contrary
        to the SNAP Act.**

27       USDA's renewed demand that Plaintiff States turn over *possession* of their SNAP records

28   to USDA is also contrary to law, because it falls well outside of the carefully cabined right of

15

1    access to "inspect" and "audit" granted in 7 U.S.C. § 2020(a)(3).

2        Section 2020(a)(3) was enacted to ensure that USDA could "inspect" and "audit" state

3    SNAP records to monitor State agencies' administration of SNAP, either through remote access

4    or in person. The plain language of the statute provides that ("subject to" agreed-upon data and

5    security protocols) States must "ma[ke] available for inspection and audit" "[a]ll records, and the

6    entire information systems in which records are contained, that are covered in subparagraph (A),"

7    § 2020(a)(3)(B)(i)—not that States must "provide," "transmit," or "furnish" any records. That

8    distinction is important: *access* to State records allows for the "inspection" and "audit" of those

9    records as contemplated by § 2020(a)(3), while still allowing the State agency to maintain

10   possession and control of the records and, accordingly, to protect the privacy and security of

11   SNAP participants' data as required by law. *See Greater Birmingham Ministries v. Sec'y of State*

12   *for Ala.*, 105 F.4th 1324, 1333 (11th Cir. 2024) (noting that a right to "inspection" does not

13   encompass a right to copy, take possession of, or receive via electronic disclosure); *Acosta v. Loc.*

14   *Union 26, UNITE HERE*, 895 F.3d 141, 144 (1st Cir. 2018) (holding right to "inspection" does

15   not include copying or taking handwritten notes, but only "[t]o look upon; to view closely and

16   critically, esp. so as to ascertain quality of state, to detect errors, etc.; to scrutinize[.]"); *Voter*

17   *Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1081(10th Cir. 2025) ("To 'inspect' is to 'look

18   carefully into' or to 'view closely and critically.'"). By contrast, when a state agency turns over

19   *possession* of SNAP records, it loses control of them, and risks allowing USDA to retain, copy,

20   redisclose, or manipulate the data, thereby creating the myriad data security and privacy problems

21   which Plaintiff States have raised throughout this litigation.

22       Elsewhere in the SNAP Act, Congress has differentiated between giving USDA

23   *access* to data versus turning over *possession* of data. For example, in contrast to the right of

24   access for inspection and auditing granted in § 2020(a)(3), § 2025 requires a state agency to

25   "***submit*** . . . data concerning the operations of the State agency . . . sufficient for the Secretary to

26   establish the State agency's payment error rate." 7 U.S.C. § 2025(c)(4), (5) (emphasis added).

27   Congress created this obligation to "submit" data in the context of a statutorily prescribed quality

28   control system, which expressly requires USDA to determine a state agency's payment error rate

16

1    based on a "probability sample of participating households." *Id.* § 2025(c)(2)(A).[11] Similarly, in

2    the portion of the SNAP Act governing "eligibility disqualifications," Congress directed USDA to

3    promulgate regulations to "ensure that [certain] information . . . with respect to a specific

4    individual" found ineligible due to fraud or program violations "is *forwarded to* the Office of the

5    Secretary by any appropriate State or Federal entity for the use of the Secretary in administering

6    the provisions of this section." 7 U.S.C. § 2015(b)(4) (emphasis added). Thus, Congress knows

7    how to require that States hand over information to USDA when necessary, as for purposes of

8    calculating payment error rates and adjudicating specific claims. But no authorization exists for

9    USDA to demand production of data on millions of individuals, as USDA has done here.[12]

10        Finally, as discussed below, *see infra* § II(D), in a different section of the SNAP Act

11    dealing with the creation of longitudinal databases tracking SNAP usage patterns over time,

12    Congress directed States to "share" applicant data from such databases with "researchers and the

13    Secretary," but due to "Federal and State privacy standards and requirements" that data must first

14    be *de-identified*. *See* 7 U.S.C. § 2026(n)(1)-(4). The SNAP Database that Secretary Rollins wants

15    to create here is exactly that: a longitudinal database containing information on every applicant

16    and participant for the past five years. Yet, by statute, USDA is only entitled to *de-identified* data

17    for such purposes. *Id*. USDA's attempt to pool PII from State SNAP records without regard to the

18    restrictions in 7 U.S.C. § 2026(n) and these "Federal and State privacy standards and

19    requirements" further demonstrates that the SNAP Database project far exceeds the authority to

20    inspect and audit State program administration authorized by § 2020(a)(3).

21        Because § 2020(a)(3) only requires State agencies to make records available for

22    inspection and audit so that USDA can monitor State performance, and does not require States to

23

24    ───────────────

         [11] The statute also requires USDA to analyze this sample of state data using regulated
25    methods that produce "valid statistical results." *Id.* § 2025(c)(1)(B)(i)(I); *see also* 7 C.F.R.
      §§ 275.10-275.15 (setting forth requirements for quality control sampling plan and analysis). As
      explained below (*see infra* § II(D)), this careful approach to data production and analysis is a far
      cry from USDA's new SNAP Database.

26        [12] Members of Congress recently introduced legislation that would amend § 2020 to
27    require the "*provision* of recipient data" to USDA as a condition of participation in SNAP. SNAP
      Data Transparency and Oversight Act of 2025, H.R. 6520, 119th Congress, § 2 (2025) (emphasis
28    added). This proposal, apparently introduced in reaction to this lawsuit, further suggests that the
      SNAP Act *as currently written* does not authorize the Secretary's current data demands.

turn over possession of their most sensitive SNAP data for USDA to retain, copy, and disclose, USDA's renewed data demand exceeds the authority granted in § 2020(a)(3) and is contrary to law.

**D.    Defendants' demand arbitrarily circumvents existing privacy protections.**

USDA's renewed demand and proposed protocol also provide fresh evidence that USDA seeks to circumvent the privacy protections that are engrained in long-standing agency practice, required by Congress for longitudinal data-pooling, and built into existing quality control systems. USDA's failure to explain its actions renders them arbitrary and capricious.

**1.    USDA has failed to acknowledge and explain its departure from long-standing agency practice.**

When an agency changes its position, it must "display awareness that it *is* changing position" and "show that there are good reasons" for its new position. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Here, USDA has failed to acknowledge and explain its departure from its long-standing practice of collecting only limited sample datasets to review State agencies' administration of SNAP. *See* 7 U.S.C. § 2025(c); 7 C.F.R. §§ 275.10-275.14.

Plaintiff States and USDA have long operated a two-tiered system for monitoring accurate administration of SNAP under the SNAP Act and USDA's implementing regulations. At the first tier, State agencies periodically review a large sample of cases for errors and conduct processes to root out issues like duplicate enrollment and deceased enrollees. At the second tier, USDA reviews a smaller, but statistically significant, sample of cases based on agreed-upon testing policies, and provides feedback to State agencies. As USDA describes the system:

> The SNAP quality control process is a rigorous, two-tier system, that involves both state and federal reviews to assess the accuracy of household eligibility and benefit determinations nationwide. Every year, states review a total of 50,000 SNAP cases nationwide, and USDA conducts a re-review of about half of those cases to ensure accurate reporting by states. Quality control reviewers follow established processes for assessing the accuracy of eligibility and benefit decisions, which include verifying data on household circumstances through a variety of sources and directly interviewing households to confirm case information.

USDA, *Ensuring Eligible SNAP Households Get the Right Benefits* (updated Dec. 9, 2025), https://www.fns.usda.gov/snap/qc.

Plaintiff States have already submitted unrebutted evidence that, within this two-tier

1    system, USDA had a long-standing practice of not collecting all applicants' and participants' data

2    and instead reviewing only limited datasets, thereby avoiding the data security and privacy risks

3    that come with pooling so much sensitive data in one place. *See, e.g.*, 7 U.S.C. § 2025(c); 7 C.F.R.

4    §§ 275.10-275.14; ECF No. 59-3 (Piazza Decl.) ¶¶ 5-12, 20 (declaration by former Chief of FNS

5    explaining this long-standing agency practice); ECF No. 59-7 (CA Decl.) ¶¶ 18–26, 70; Reyes

6    Decl. (WA) ¶ 6. With its recent data demands, USDA has abandoned this practice without even

7    "display[ing] awareness" that it is doing so. *Fox Television Stations*, 556 U.S. at 515; *see* ECF

8    No. 59-3 (Piazza Decl.) ¶ 20 ("[i]n SNAP's 60-year history, USDA has never needed nor sought

9    anywhere near the same scope of PII").

10        Defendants have not disputed that they are departing from this long-standing agency

11    practice; instead, they have merely asserted that there is no "definitive previous regulation or

12    policy statement establishing a policy to only sample." ECF No. 72 at 11. But as a matter of law,

13    Plaintiff States need not point to "a formal rule or policy"; an agency must equally explain any

14    "shift in agency practice." *Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1109 (N.D. Cal. 2018); *see,*

15    *e.g.*, *Nw. Env't. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687 (9th Cir. 2007) (agency

16    departure from "long-standing practice" was arbitrary and capricious); *J.L. v. Cissna*, 341 F.

17    Supp. 3d 1048, 1063 (N.D. Cal. 2018) (agency's "sharp departure from prior practice" was

18    arbitrary and capricious). Therefore, given the additional evidence and legal support offered with

19    this motion, Plaintiffs' respectfully urge the Court to reconsider its preliminary conclusion that

20    Plaintiffs States previously "made an insufficient showing" of a "change in policy," *see* PI Order

21    at 19, and to instead hold that USDA has arbitrarily abandoned its long-standing practice without

22    even "display[ing] awareness" that it is doing so. *Fox Television Stations*, 556 U.S. at 515.

23        In addition, USDA has failed to offer "good reasons" for collecting the trove of

24    applicants' PII that it now demands. *Fox Television Stations*, 556 U.S. at 515. Notably, USDA's

25    proposed protocol claims that the agency is "minimiz[ing] unnecessary data collection," USDA

26    Revised Protocol § 1.3; that it "shall collect only the data elements necessary to achieve specific,

27    legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program

28    integrity checks," *id*. § 2.2.2; and that it will limit its collection to exclude "sensitive PII unless

19

1    directly relevant to these goals," *id.* But as Plaintiffs noted in their response to USDA, the

2    proposed protocol does not exclude sensitive PII at all, and USDA requests "numerous data

3    elements that do not appear necessary to investigate fraud, waste, and abuse, especially at an

4    aggregate level." Pls.' Dec. 8 Ltr. at 3-4; Tomasky Decl. (NY) ¶¶ 18-23 (explaining why several

5    demanded data elements "do not seem to be useful or necessary for accomplishing USDA's stated

6    purposes").

7         Accordingly, Plaintiff States asked USDA to explain why the agency needs certain PII

8    elements, so Plaintiffs could propose appropriate amendments to the draft protocol to help USDA

9    achieve its stated goal of minimizing unnecessary collection of applicants' PII. Pls.' Dec. 8 Ltr. at

10   3-4, 6, 12. Plaintiffs also offered to work with USDA to provide information at a higher level of

11   specificity depending on each agency's available data and technological capabilities (e.g.,

12   providing an age range rather than birthdate, or the county or ZIP code instead of a home address)

13   to protect personal privacy. *Id.* at 4. Additionally, Plaintiffs suggested that USDA could minimize

14   unnecessary retention of applicants' PII by committing to using data solely for analyses described

15   in the protocol and then deleting the data, as the agency has done with PII in the past. *Id.*

16        USDA's December 23 response letter dismissed these questions and suggestions, in

17   violation of the agency's basic obligations under the APA. Rather than "articulate a satisfactory

18   explanation" for the scope of its demands, *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm*

19   *Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), USDA refused to "disclose" how it intends to use

20   participants' PII, based on the completely baseless suggestion that Plaintiff States would use that

21   information to manipulate data "to avoid detection of noncompliance with SNAP requirements."

22   USDA Dec. 23 Ltr. at 6. USDA's refusal to explain its insistence on pooling SNAP applicants'

23   and participants' PII is particularly concerning given this Administration's well-publicized efforts

24   to use public benefits data for immigration enforcement and other purposes. *See supra* n.4. And

25   the agency's refusal to explain how it will use and analyze this data is unreasonable given

26   Defendants' misleading statements regarding their "snapshot findings" in the SNAP data

27

28

collected from other states.[13] By careening ahead while "entirely fail[ing] to consider" the issues

Plaintiffs have raised about the scope of USDA's collection and retention of applicants' and

recipients' PII—contrary to USDA's own stated goals to minimize such collection and

retention—USDA has acted arbitrarily and capriciously. *State Farm*, 463 U.S. at 43.[14]

### 2. USDA has failed to consider important aspects of the problem of collecting all applicant data into a single federal database.

USDA's renewed data demand is also arbitrary and capricious because USDA has

"simply ignored important aspects of the problem" of collecting all applicant data into a single

federal database. *Ohio*, 603 U.S. at 295 (citation modified).

***First***, with its renewed demand, USDA has now made clear that the agency intends to

pool all SNAP applicant and participant data into a single database to "employ a foundational

fraud, waste, and abuse verification [program] similar to the SNAP Quality Control program."

USDA Revised Protocol § 6.1. In other words, USDA intends to initiate a one-tier quality control

process. But USDA previously found that it *lacks authority* to do just that, and its failure to

acknowledge this finding—let alone explain why it no longer holds—is arbitrary and capricious.

In 2019, USDA commissioned a study to examine the feasibility of direct federal review

of SNAP administration—in other words, a "one-tier" quality control system—and concluded

that direct review would require substantial statutory, regulatory, and programmatic changes. *See*

McGill, et al, *Feasibility of Revising the SNAP Quality Control Review Process*, i-ii, 49-54

(2019).[15] As is pertinent here, USDA stated that "Congress would need to make statutory changes

to enable certain aspects of a one-tier QC system, including a requirement for FNS to conduct all

QC reviews instead of States and to effectively support a data-sharing infrastructure between FNS

and other Federal agencies," and USDA "would need to develop regulations to provide guidance

---

[13] *See, e.g.,* ECF Nos. 99-1 (CA Decl.) & 99-2 (IL Decl.) (refuting Defendants' "snapshot review" of data collected from other states)

[14] To the extent that USDA's data collection efforts are motivated by other concerns, such as gathering information on SNAP applicants and recipients to use in immigration enforcement activities unrelated to SNAP, then the agency is also acting arbitrarily and capriciously by relying on "factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. And an agency's action cannot be upheld based on justifications the agency did not present when it acted. *E.g.*, *Regents of the Univ. of Cal.*, 591 U.S. at 23-24.

[15] Available at https://fns-prod.azureedge.us/sites/default/files/resource-files/SNAPQC_Feasibility.pdf.

on how to implement the legislation." USDA, *Feasibility of Revising the Supplemental Nutrition Assistance Program (SNAP) Quality Control Review Process (Summary)* (Dec. 2019).[16] Congress and USDA have done none of these things.

Yet, as USDA acknowledges, it is now effectively trying to create a one-tier verification program "similar to the SNAP Quality Control program." USDA Revised Protocol § 6.1.1. By failing to address its past finding that it lacks the authority to do so, USDA has "'failed to consider an important aspect of the problem' that the agency itself had identified." *Nat'l Fam. Farm Coal. v. Vilsack*, 758 F. Supp. 3d 1060, 1076 (N.D. Cal. 2024) (citation omitted).

**Second**, USDA has failed to consider how its data demands for the SNAP Database circumvent privacy protections that Congress has established for pooling of participant data.

As part of the SNAP Act's provisions governing "research, demonstration, and evaluations" of SNAP programs (*see* 7 U.S.C. § 2026), Congress has authorized State agencies (who collect and directly review applicant and participant data) to create "longitudinal database[s]" containing "information about households and members of households" receiving SNAP benefits—i.e., exactly what USDA seeks to do with its proposed SNAP Database. 7 U.S.C. § 2026(n)(1)-(2). But in order to "protect the privacy" of participant data, Congress imposed strict requirements on the creation of such databases. *Id.* § 2026(n)(4)(B)(i). In particular, "unique identifier[s]" must be used for each participant, to allow the participant data to be analyzed and compared "in multiple participating States over time *while protecting participant privacy*." *Id.* § 2026(n)(3)(C) (emphasis added). Moreover, Congress expressly prohibited the pooling of PII that USDA is attempting now, by specifying that longitudinal databases shall not include any "personally identifiable information (including social security number, home address, or contact information)." 7 U.S.C. § 2026(n)(4)(B)(i) (emphasis added).

Consistent with these statutory restrictions, Plaintiff States suggested that Defendants use deidentified participant data for its SNAP Database project. *See* Pls.' Dec. 8 Ltr. at 4 ("Given the bulk review and processing USDA is engaging in, it is unclear why deidentified data could not

---

[16] Available at https://fns-prod.azureedge.us/sites/default/files/resource-files/SNAPQC_Feasibility-Summary.pdf.

1    serve as a functionally identical and more secure means of identifying facts about program

2    integrity to share with the States." (citation omitted)). USDA dismissed Plaintiffs' suggestion

3    outright, claiming (contrary to 7 U.S.C. § 2026(n)) that there is no "valid basis to object to

4    [USDA's] request that States produce longitudinal data" that includes the SNAP participants' PII.

5    *See* USDA Dec. 23 Ltr. at 4. In doing so, USDA has arbitrarily and capriciously failed to consider

6    an important protection for participant data—one that Congress itself deemed necessary for the

7    creation of a longitudinal database.

8        **Third**, USDA has failed to consider how its data demands for the SNAP Database

9    circumvent privacy protections built into existing systems that address its purported goals.

10    According to USDA, the SNAP Database is needed to identify duplicate enrollments and

11    deceased enrollees. *See* USDA Revised Protocol § 6.2.1. But USDA has failed to consider that

12    Congress and USDA have already established effective systems to address these issues, *without*

13    the need to aggregate massive amounts of PII in a national database, and *with* robust privacy

14    protections.

15        To address the common occurrence of the death of a SNAP recipient, USDA has

16    promulgated a regulation directing states to "establish a system to verify and ensure that benefits

17    are not issued to individuals who are deceased," including by entering into a computer matching

18    agreement with the Social Security Administration (SSA) in order to check their rolls against

19    SSA's Death Master File. 7 C.F.R. § 272.14; *see* 7 U.S.C. § 2020(r); Tomasky Decl. (NY) ¶ 28

20    (discussing prescribed system of identifying deceased recipients). USDA has found that requiring

21    States to conduct this check more frequently than upon application and once a year thereafter

22    would "not effectively promote Program integrity." 77 Fed. Reg. 48045, 48046 (Aug. 13, 2012).[17]

23        To address duplicate benefits, USDA and States—at Congress's direction—are already

24    implementing the National Accuracy Clearinghouse (NAC), a program "to prevent multiple

25    issuances of [SNAP] benefits to an individual by more than 1 [one] State agency simultaneously."

26    ───────────────
        [17] As the Court previously observed, USDA regulations also ensure that SNAP recipients
27    have an opportunity to challenge inaccurate data before benefits are cut off. PI Order at 23-24
       (citing 7 C.F.R. § 272.14(b)-(c)). And USDA has offered no evidence that the inevitable presence
28    of recently deceased individuals in SNAP files is proof of fraud, waste, or abuse. *See* Tomasky
       Decl. (NY) ¶ 27-29.

1  7 U.S.C. § 2020(x)(2)(A). USDA itself has found that "[o]nce the NAC is successfully

2  implemented nationwide, the Department expects that active cases of duplicate participation

3  across State lines will largely be eliminated." 87 Fed. Reg. 59633, 59657 (Oct. 3, 2022). In

4  establishing the program, Congress required USDA and State agencies to protect the privacy of

5  data used for the NAC. *See, e.g.*, 7 U.S.C. § 2020(x)(2)(C) (instructing USDA that it may *only*

6  use data submitted to the NAC for that purpose; that data should be retained for no longer than

7  needed; and that data should be used in a manner "that protects the identity and location of a

8  vulnerable individual (including a victim of domestic violence) that is an applicant for, or

9  recipient of, [SNAP] benefits"); *see also* ECF No. 59-3 (Piazza Decl.) ¶¶ 7-9 (explaining how

10  Congress and USDA worked together when creating the NAC to address data privacy and

11  security concerns). And USDA concluded that only a limited set of PII—not including, for

12  example, home addresses—is necessary to check for duplicate participation.[18] 87 Fed. Reg. at

13  59654-55; *see also* Tomasky Decl. (NY) ¶ 20-21 (explaining that home address is a static field

14  that may not be current and has not been used to prevent duplicative SNAP benefits).[19]

15      For the foregoing reasons, Defendants' renewed data demand illustrates USDA's

16  disregard for the privacy protections previously afforded by the agency's own long-standing

17  practices, by Congress for longitudinal data-pooling, and by existing systems that already perform

18  the intended functions of the SNAP Database. This "material misapprehension of the baseline

19  conditions" renders USDA's demands arbitrary and capricious. *Friends of Back Bay v. U.S. Army*

20  *Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012); *see also Safe Air for Everyone v. EPA*, 488

21  F.3d 1088, 1101-02 (9th Cir. 2007) (holding that agency action was "arbitrary, capricious, or

22      [18] With its renewed demand, USDA has considered none of the privacy protections
mentioned in this paragraph. At most, USDA has claimed that it cannot use a separate privacy

23  protection: the NAC's cryptographic hashing. *See* USDA Dec. 23 Ltr. at 4-5. But USDA also has
not demonstrated any legitimate basis for circumventing that privacy protection.

24      [19] To the extent USDA is concerned with *intra*-state duplicate participation, there is also a
system for that. *See* 7 C.F.R. § 272.4(e). And there are even more examples of how USDA's

25  SNAP Database duplicates existing programs used by Plaintiff States to combat fraud, waste, and
abuse. *See* Tomasky Decl. (NY) ¶ 31. For example, States are required to provide information on

26  Intentional Program Violations (IPV) and program sanctions to USDA, and to use the Electronic
Disqualified Recipient system (eDRS) created by FNS to check whether SNAP applicants have

27  been disqualified from the program for fraud. *See* 7 C.F.R. § 273.16(i). Notably, the regulation
governing IPVs specifies the data elements that a State agency must report to FNS, which are

28  narrower than the elements currently being demanded. *Id.* § 273.16(i)(3).

otherwise not in accordance with law" because it rested on a "legally erroneous" and "flawed premise").

### E.    Plaintiffs will suffer irreparable harm absent injunctive relief and the balance of hardships and public interest weigh in their favor.

The remaining *Winter* factors are easily met here for the reasons articulated in Plaintiffs' first preliminary injunction motion (*see* ECF No. 59 at 21-25, ECF No. 75 at 1-5, 14-15) and adopted in the Court's PI Order, *see* PI Order at 21-24. In short, Plaintiffs would suffer irreparable harm absent injunctive relief, because Defendants' threatened funding cuts would "likely . . . require [Plaintiff States] to cut staffing and otherwise greatly reduce their ability to comply with their obligations under the SNAP Act to administer benefits, including, for example, the speed with which applications can be reviewed and required reports can be prepared." PI Order at 21. Additionally, the balance of hardships and public interest weigh in Plaintiffs' favor in light of these harms. *Id.* at 22-24. Meanwhile, USDA has failed to make any evidentiary showing of ongoing widespread fraud, waste, or abuse in Plaintiff States' SNAP programs[20]—let alone that any showing that USDA needs the demanded data to address any ongoing issues, especially considering the existing quality control processes and the fact that the data USDA seeks is largely years old. *See Lackey v. Stinnie*, 604 U.S. 192, 200 (2025) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until" issues can be fully adjudicated, and "to balance the equities as the litigation moves forward.").

### CONCLUSION

The Court should grant Plaintiffs' Motion and bar Defendants from enforcing their renewed demand for SNAP applicant and recipient data and from taking any adverse action against Plaintiff States on the basis that they have failed to comply with the renewed demand.

---

[20] Notably, this Court has found that Defendants' "snapshot review" of the supposed waste, fraud, and abuse that USDA has identified in SNAP data submitted by other States fails to show that any such issues affect Plaintiff States, and it was further undermined by Plaintiff States' evidence and Defendants' own regulations (for example, while Defendants claimed that they found "'over 300,000 potential instances of deceased individuals' being enrolled in SNAP," their own regulations "prohibit State agencies from removing a deceased person immediately upon learning or otherwise being notified of a death"). PI Order at 23-24 (citations omitted).

25

1    Dated: January 9, 2026                          Respectfully submitted,

2                                                    ROB BONTA
                                                     Attorney General of California
3                                                    PAUL STEIN
                                                     Supervising Deputy Attorney General
4                                                    ANDREW Z. EDELSTEIN
                                                     ANNA RICH
5                                                    JANE REILLEY
                                                     EDWARD P. WOLFE
6                                                    ROBIN GOLDFADEN
                                                     SEBASTIAN BRADY
7                                                    WILLIAM BELLAMY
                                                     MARIA F. BUXTON
8                                                    LIAM E. O'CONNOR

9                                                    */s/ Liam E. O'Connor*
                                                     LIAM E. O'CONNOR
10                                                   DEPUTY ATTORNEY GENERAL
                                                     *Attorneys for Plaintiff State of California*

11
      Letitia James                                 Kwame Raoul
12    Attorney General of New York                  Attorney General of Illinois

13    */s/ Mark Ladov*                              */s/ Sherief Gaber*
      Mark Ladov                                    Harpreet K. Khera
14    Special Counsel                               Bureau Chief, Special Litigation
      Julie Dona                                    Sherief Gaber
15    Special Counsel                               Assistant Attorney General
      28 Liberty St.                                115 S. LaSalle St., 35th Flr.
16    New York, NY 10005                            Chicago, Illinois 60603
      (212) 416-8240                                (773) 590-7127
17    mark.ladov@ag.ny.gov                          Harpreet.Khera@ilag.gov
      *Attorneys for Plaintiff State of New York*   *Attorneys for Plaintiff State of Illinois*

18

19    Kristin Mayes                                 Philip J. Weiser
      Attorney General of Arizona                   Attorney General of Colorado
20
      */s/ Hayleigh S. Crawford*                    */s/ David Moskowitz*
21    Hayleigh S. Crawford (AZ No. 032326)          David Moskowitz
      Luci D. Davis (AZ No. 035347)                 Deputy Solicitor General
22    2005 N. Central Ave. Phoenix, AZ 85004        Colorado Department of Law
      (602) 542-3333                                1300 Broadway, 10th Floor
23    Hayleigh.Crawford@azag.gov                    Denver, CO 80203
      Luci.Davis@azag.gov                           Phone: (720) 508-6000
24    ACL@azag.gov                                  david.moskowitz@coag.gov
      *Attorneys for Plaintiff State of Arizona*    *Attorneys for Plaintiff State of Colorado*

25

26

27

28

                                        26

William Tong
Attorney General of Connecticut

*/s/ Janelle R. Medeiros*
Janelle R. Medeiros
Special Counsel for Civil Rights
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Janelle.Medeiros@ct.gov
*Attorneys for Plaintiff State of Connecticut*

Kathleen Jennings
Attorney General of Delaware

*/s/ Vanessa L. Kassab*
Ian R. Liston
Director of Impact Litigation
Vanessa L. Kassab
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

Brian L. Schwalb
Attorney General for the District of Columbia

*/s/ Nicole S. Hill*
Nicole S. Hill
Assistant Attorney General
Office of the Attorney General for the District
of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov
*Attorneys for Plaintiff District of Columbia*

Anne E. Lopez
Attorney General of Hawai'i

*/s/ Kaliko'onālani D. Fernandes*
David D. Day
Special Assistant to the Attorney General
Kaliko'onālani D. Fernandes
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorneys for Plaintiff State of Hawai'i*

Office of The Governor *ex rel*. Andy Beshear,
in his official capacity as Governor of the
Commonwealth of Kentucky

*/s/ S. Travis Mayo*
S. Travis Mayo
General Counsel
Taylor Payne
Chief Deputy General Counsel
Laura C. Tipton
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov
*Attorneys for Plaintiff Kentucky Governors'
Office*

Aaron M. Frey
Attorney General of Maine

*/s/ Brendan Kreckel*
Brendan Kreckel
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 0433-0006
Tel.: 207-626-8800
Fax: 207-287-3145
brendan.kreckel@maine.gov
*Attorneys for Plaintiff State of Maine*

27

1

2    Anthony G. Brown                          Andrea Joy Campbell
     Attorney General of Maryland              Attorney General of Massachusetts

3
     */s/ James C. Luh*                        */s/ Katherine Dirks*
4    James C. Luh                              Katherine Dirks
     Senior Assistant Attorney General        Chief State Trial Counsel
5    Office of the Attorney General            Cassandra Thomson
     200 Saint Paul Place, 20th Floor          Assistant Attorney General
6    Baltimore, Maryland 21202                 Office of the Massachusetts Attorney General
     410-576-6411                              1 Ashburton Place Boston, MA 02108
7    jluh@oag.state.md.us                      (617) 963-2277
     *Attorneys for Plaintiff State of Maryland*  katherine.dirks@mass.gov
8                                              cassandra.thomson@mass.gov
                                               *Attorneys for Plaintiff Commonwealth of*
9                                              *Massachusetts*

10
     Dana Nessel                               Keith Ellison
11   Attorney General of Michigan             Attorney General of Minnesota

12   */s/ Neil Giovanatti*                     */s/ Joseph R. Richie*
     Neil Giovanatti                           Joseph R. Richie
13   Bryan Beach                               Special Counsel
     Assistant Attorneys General              445 Minnesota Street, Suite 1400
14   Michigan Department of Attorney General   St. Paul, Minnesota, 55101
     525 W. Ottawa                             (651) 300-0921
15   Lansing, MI 48909                         joseph.richie@ag.state.mn.us
     (517) 335-7603                            *Attorneys for Plaintiff State of Minnesota*
16   giovanattin@michigan.gov
     beachb@michigan.gov
17   *Attorneys for Plaintiff State of Michigan*

18

19   Matthew J. Platkin                        Raúl Torrez
     Attorney General of New Jersey            Attorney General of the State of New Mexico

20
     */s/ Kashif T. Chand*                     */s/ Steven Prefrement*
21   Kashif T. Chand (NJ Bar No. 016752008)    Steven Perfrement
     Assistant Attorney General               Senior Litigation Counsel
22   New Jersey Office of the Attorney General,  New Mexico Department of Justice
     Division of Law                           408 Galisteo Street
23   124 Halsey Street, 5th Floor              Santa Fe, New Mexico 87501
     Newark, NJ 07101                          SPerfrement@nmdoj.gov
24   Tel: (973) 648-2052                       505-601-7727
     kashif.chand@law.njoag.gov                *Attorneys for the State of New Mexico*
25   *Attorneys for Plaintiff State of New Jersey*

26

27

28

1

2

3   Dan Rayfield                          Josh Shapiro, in his official capacity as
    Attorney General of Oregon            Governor of the Commonwealth of
                                          Pennsylvania
4   */s/ Scott P. Kennedy*
    Scott P. Kennedy                      */s/ Jacob B. Boyer*
5   Senior Assistant Attorney General     Jennifer Selber
    Oregon Department of Justice          General Counsel
6   100 SW Market Street                  Jacob B. Boyer
    Portland, OR 97201                    Deputy General Counsel
7   Tel (971) 453-9050                    Pennsylvania Office of the Governor
    Fax (971) 673-5000                    30 N. 3rd St., Suite 200
8   Scott.Kennedy@doj.oregon.gov          Harrisburg, PA 17101
    *Attorneys for Plaintiff State of Oregon*  (717) 460-6786
9                                         jacobboyer@pa.gov
                                          *Counsel for Governor Josh Shapiro*
10

11  Peter F. Neronha                      Nicholas W. Brown
    Attorney General of Rhode Island      Attorney General of Washington
12
    */s/ Madeline R. Becker*              */s/ Jennifer K. Chung*
13  Madeline R. Becker (RI Bar No. 10034) Jennifer K. Chung, WSBA #51583
    Special Assistant Attorney General    William Mcginty, WSBA #41868
14  150 South Main Street                 Assistant Attorneys General
    Providence, RI 02903                  800 Fifth Avenue, Suite 2000
15  (401) 274-4400, Ext. 2151             Seattle, WA 98104
    mbecker@riag.ri.gov                   206-464-7744
16  *Attorneys for Plaintiff State of Rhode Island*  jennifer.chung@atg.wa.gov
                                          william.mcginty@atg.wa.gov
17                                        *Attorneys for Plaintiff State of Washington*

18

19  Joshua l. Kaul
    Attorney General of Wisconsin
20
    */s/ Karla Z. Keckhaver*
21  Karla Z. Keckhaver
    Assistant Attorney General
22  Wisconsin Department of Justice
    Post Office Box 7857
23  Madison, Wisconsin 53707-7857
    608-264-6365
24  karla.keckhaver@wisdoj.gov
    *Attorneys for Plaintiff State of Wisconsin*

25

26

27

28

Plaintiff States' Motion to Enforce or Expand the Preliminary Injunction (Case No. 3:25-cv-06310-MMC)