1  ROB BONTA
   Attorney General of California
2  PAUL STEIN
   ROBIN GOLDFADEN
3  Supervising Deputy Attorneys General
   ANDREW Z. EDELSTEIN
4  ANNA RICH
   JANE REILLEY
5  SEBASTIAN BRADY
   WILLIAM BELLAMY
6  MARIA F. BUXTON
   LIAM E. O'CONNOR
7  Deputy Attorneys General
   State Bar No. 330050
8   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA 94102-7004
9   Telephone:  (415) 510-3915
    Fax:  (415) 703-5480
10   E-mail:  Liam.OConnor@doj.ca.gov
   *Attorneys for Plaintiff State of California*

11

12                  IN THE UNITED STATES DISTRICT COURT

13               FOR THE NORTHERN DISTRICT OF CALIFORNIA

14                       SAN FRANCISCO DIVISION

15

16

17  | **STATE OF CALIFORNIA, ET AL.** | Case No. **3:25-cv-06310-MMC** |
    | --- | --- |

18                     Plaintiffs,  **DECLARATION OF MARK LADOV
                                     IN SUPPORT OF PLAINTIFF**
19                                   **STATES' MOTION TO ENFORCE OR
                                     EXPAND PRELIMINARY**
20         v.                        **INJUNCTION**

21                                   Date: February 13, 2026
    **UNITED STATES DEPARTMENT OF**  Time: 9:00 a.m.
22  **AGRICULTURE, ET AL.**          Courtroom: 7
                                     Judge: Maxine M. Chesney
23                     Defendants.   Trial Date: None set
                                     Action Filed: July 28, 2025
24

25

26

27

28

---

Ladov Decl. ISO Pl. States' Mot. to Enforce or Expand the Prelim. Inj. (Case No. 3:25-cv-06310-MMC)

I, Mark Ladov, declare that the following is true and correct:

1.      I am an attorney licensed to practice law in the State of New York and admitted *pro hac vice* in this litigation. I am Special Counsel in the Office of the New York State Attorney General, and counsel to Plaintiff the State of New York. I make this declaration in support of Plaintiffs' motion to enforce or expand the preliminary injunction.

2.      I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

3.      Attached as Exhibit A is a copy of a letter dated November 24, 2025 from USDA Food and Nutrition Service Acting Administrator Patrick Penn to New York Governor Kathy Hochul. Included in this exhibit is a list of demanded data elements (which was sent as Attachment A to the letter) and a proposed data and security protocol (which was sent as Attachment B to the letter).

4.      Attached as Exhibit B is a copy of a letter sent on December 8, 2025, by counsel for Plaintiff States to counsel for Defendants in this litigation. This letter details Plaintiff States' objections to Defendants' November 24, 2025, data demand, and also attaches a list of questions and suggestions concerning USDA's proposed data and security protocol.

5.      Attached as Exhibit C is a copy of a letter dated December 23, 2025 from USDA Food and Nutrition Service Acting Administrator Patrick Penn to New York Governor Kathy Hochul. Included in this exhibit is an updated version of USDA's proposed data and security protocol, which was attached to this letter.

1

Ladov Decl. ISO Pl. States' Mot. to Enforce or Expand the Prelim. Inj. (Case No. 3:25-cv-06310-MMC)

6.      Attached as Exhibit D is a redline that I created using Microsoft Word to compare the November 24, 2025 and December 23, 2025 versions of USDA's proposed data and security protocol.

7.      Attached as Exhibit E is a copy of emails sent between counsel for Plaintiffs and Defendants on December 2 and 3, 2025.

8.      Attached as Exhibit F is a copy of a letter sent by New York State Office of Temporary and Disability Assistance (OTDA) Commissioner Barbara C. Guinn to USDA Food and Nutrition Service Acting Administrator Patrick Penn on January 9, 2026.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on January 9, 2026, at New York, NY.

**Mark Ladov**

Digitally signed by
Mark Ladov
Date: 2026.01.09
13:30:19 -05'00'

Mark Ladov
Special Counsel
New York State Office of the Attorney General

2

# Exhibit A



**Food and Nutrition Service**

U.S. DEPARTMENT OF AGRICULTURE

November 24, 2025

Governor Kathy Hochul
NYS State Capitol Building
Albany, New York 12224

Dear Governor Hochul,

Pursuant to 7 U.S.C. § 2020(a)(3), the United States Department of Agriculture (USDA), Food and Nutrition Service (FNS), directs that your State provide to FNS records including the Supplemental Nutrition Assistance Program (SNAP) Eligibility Data Elements for the period of January 1, 2020, to present, listed in Attachment A to this letter. The federal government provided funds to assist your State in collecting these records, and FNS needs the records to determine whether SNAP is being conducted in compliance with law.

Since last summer, 28 States have complied with FNS's request for this same type of data. FNS's preliminary review of this data indicates that billions of dollars in federal funds may have been lost due to fraud or other errors undetected by States in their administration of SNAP. Your State, however, has not yet provided FNS the data it seeks, citing the absence of agreed-upon "data and security protocols" specified in 7 U.S.C. § 2020(a)(3). Attachment B to this letter provides a set of data and security protocols that FNS observes with the 28 complying States. This set of protocols, which include FedRAMP High data security, provides a higher level of security than that which States, including your State, historically have accepted in releasing similar data to FNS—including social security numbers and addresses. FNS will inspect and audit the data provided pursuant to this request, and maintain it under the applicable System Of Records Notice, solely for the purposes of "determin[ing] whether the program is being conducted in compliance with [the Food and Nutrition Act of 2008 (FNA)] (including regulations issued under [the FNA]." *See* 7 U.S.C. § 2020(a)(3).

In view of the facts that 28 other States have produced their records to FNS, operating under FNS's data and security protocols, and that your State previously delivered the same type of data to FNS under *less stringent* protocols than those we set forth in Attachment B, there can be no good faith objection to the attached protocols. In *California, et al v. USDA, et al*, 3:25-cv-06310 (N.D. Calif., July 28, 2025), the Court acknowledged that the plain language of the FNA at 7 U.S.C. § 2020(a)(3) entitles USDA to obtain all the requested records, subject to data and security protocols agreed to by the States and USDA:

> "Congress, in the 'Records' section of § 2020, did use clear, ***mandatory*** language, specifically 'shall … be made available for inspection and audit,' thereby ***giving USDA the right to obtain***, subject to data and security protocols, all records necessary to determine whether the program is being conducted in accordance with the SNAP Act. See 7 U.S.C. § 2020(a)(3)(B)."

Order Granting Plaintiff States' Motion for Preliminary Injunction, Oct. 15, 2025, 15: 2-6 (emphasis added).[1]

Because FNS is operating under a higher level of data security than has proven acceptable to States, including yours, when producing to FNS the same type of information it requests here, we anticipate your State will now join the others in complying with Congress's mandate that USDA be able to obtain records to ensure that its federally-funded programs are being operated in compliance with law.

Our preliminary review of data provided to FNS by States complying with FNS's data requests indicates an estimated average of $24 million dollars per day of federal funds is lost to fraud and errors undetected by States in their administration of SNAP. That estimated loss will likely increase when data withheld by non-complying States factors into the analysis. Preventing such losses could save approximately $9 billion or more per year.

We respectfully request that your State respond in writing within seven days of the date of this letter with confirmation of your agreement to produce the requested data to FNS subject to the attached security and data protocols. Because the protection afforded by our data and security protocols exceeds that which your State historically has required before producing the same type of data to FNS, your State should have no difficulty nor reservations agreeing to these protocols. Based on our experience with States complying with FNS data requests, about which we provided notice last summer, your State should be able to produce its records no later than 30 days after the date of this letter. Your State's timely compliance with this letter is essential to safeguarding the public interest in securing federal SNAP funds from loss due to fraud, waste and abuse. If, for some reason, your State declines to produce the requested data subject to the attached protocols, we request that you inform us in writing within seven days of the date of this letter of: (1) the basis for your lack of agreement and (2) any proposed edits to the protocols that you deem necessary to produce the requested data.

In addition, please take all steps necessary to preserve all records covered by this request, whether possessed by your State or your vendors. We expect to be able to review historical data in its native, unaltered form, from January 1, 2020, to the present. It is imperative the Federal Government obtains unaltered data reflecting the actual performance of States in administering this federally-funded program for all time periods covered by this request.

---

[1] Specifically, 7 U.S.C. § 2020(a)(3)(B) requires that "**such records as may be necessary** to determine whether the program is being conducted in compliance with this [SNAP Act] (including regulations issued under this [SNAP Act])" "**shall be made available**" to USDA (emphasis added). The question presented and ruled upon by the Court in *California* was whether to preliminarily enjoin FNS from disallowing SNAP funding "based on Plaintiff States' failure to comply with the demands set forth in the above-discussed formal warning letters or otherwise acting thereon." *Id*. at 25:10–13. Those formal warning letters relied only on 7 U.S.C. § 2020(e)(8)(a), as to which the Court opined that "shall permit" in 7 U.S.C. § 2020(e)(8)(A) is permissive, as contrasted with the "clear, mandatory language" of 7 U.S.C. § 2020(a)(3)(B) "giving USDA the right to obtain" the requested data. *Id*. at 13:25–17:13. USDA respectfully disagrees with an interpretation that "shall permit" allows states to elect to withhold data requested under 7 U.S.C. § 2020(e)(8)(A), and maintains all rights to appeal and otherwise contest such an interpretation.

Thank you for your continued work to help address the needs of vulnerable Americans and safeguard taxpayer dollars.

Sincerely,

Patrick A. Penn
Acting Administrator, Food and Nutrition Service
Deputy Under Secretary, Food, Nutrition, and Consumer Services
U.S. Department of Agriculture

**U.S. DEPARTMENT OF AGRICULTURE**

**Supplemental Nutrition Assistance Program
Information SNAP Database**

***SNAP Eligibility Data Elements***
The following elements should be included in the data sharing file from each State agency on all household members that are listed in the SNAP case. Please provide a data dictionary if one is available to reduce the burden to both the State agency and USDA.

***Case Number***: The case number is a unique identifier, typically 7 to 10 digits long, assigned to a household when they apply and/or are approved for SNAP.

***First, Middle, Last Names***: The full name of all household members.

***Known Alias***: Assumed or alternative name(s) used by any of the household members.

***Authorized Representative(s)***: Provide any identified authorized representative for the household, and their corresponding information such as full name, means of verbal and written communication.

***Date of Birth***: The specific month, day and year the household member was born.

***Individual Recipient Identification Number***: The unique identifier assigned to that specific household member within the case by the State agency.

***Social Security Number***: The unique 9-digit identifier issued by the Social Security Administration and provided by the household member.

***Status on SNAP*** *(recipient/individual level)*: Identify if the household member in the case is actively receiving SNAP, disqualified, sanctioned, or excluded.

***Application and/or Recertification Date***: The date the household applied for SNAP (this can be the first application date, or most recent recertification date).

***Reporting Status***: Following initial certification, or recertification, households are determined to be a simplified or change reporting household. This data element should indicate the reporting status the household has been designated to be.

***Relationship:*** The relationship identifies who all household group members are to one another and assists with determining mandatory group members. The data should reflect who each household member is to one another.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

***Absent Parent*** (as applicable)**:** This identifies the parent of a minor child who resides in a separate household.

***Citizenship and/or Immigration Status*:** This identifies if the individual is a U.S. citizen or immigrant.

***Sponsorship:*** This identifies if an individual applying or receiving SNAP has been sponsored to enter the U.S. Data should identify the name or organization of the sponsor.

***Residential Address*:** The address the household has provided as to where they reside.

***Mailing Address*:** The address the household has provided as to where they would like all correspondence sent to (if different than residential).

***Homeless Status*:** Please include if the household is identified as homeless.

***Phone Number(s)*:** The contact number(s) provided by the household as a means of contact.

***Email Address(es)*:** The email address(es) provided by the household as a means of contact.

***Unearned Income*:** The unearned income (RSDI, unemployment, child support, etc.) identifies the unearned income source, pay frequency, the household member receiving the pay, and the total amount of income budgeted to determine the SNAP allotment.

***Earned Income*:** The earned income identifies the earned income source, pay frequency, the household member receiving the pay, and the total amount of income budgeted to determine the SNAP allotment.

***Self-Employment Income*:** Self-employment should be identified as to what the self-employment is (type or business name), pay frequency, the household member who is self-employed, and the total amount of income budgeted as well as the amount of allowed expenses.

***Shelter Expenses*:** The shelter expenses should be identified as to shelter type (i.e. rent), and the budgeted dollar amount. Shelter expenses may be separated out as various expenses are taken into consideration for eligibility and those should be included if used in the SNAP allotment determination (i.e. telephone, heating, cooling). If the household is active with Section 8, which pays a portion of the rental expenses, please ensure that is included.

***Assets/Resources*:** Any known assets (i.e. bank accounts, boat, collector vehicle) or resources used to determine SNAP eligibility and must identify the asset type, amount and what household member the asset belongs to.

***Sanctions/Disqualifications***: Identify any household members who are serving a sanction and/or disqualification that is impacting their eligibility to participate in SNAP. The sanction and/or disqualification type and any applicable time periods should be identified (i.e. IPV, 10/1/2024-9/30/2025). This field should correspond to the data provided in the status on SNAP if the household member is currently serving a disqualification, as well as any income field(s) that may pertain to the disqualified member due to income proration.

***SNAP EBT Card Number***: The unique set of digits on the household's issued SNAP EBT card that connects the case to the associated transactions.



**U.S. DEPARTMENT OF AGRICULTURE**

**Supplemental Nutrition Assistance Program (SNAP) Information Database
Fraud, Waste and Abuse Detection Protocol**

**1. OVERVIEW**

1.1. U.S. Department of Agriculture (USDA) and the Food and Nutrition Service (FNS) will use the Supplemental Nutrition Assistance Program (SNAP) recipient data to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying duplicate enrollments for elimination, and performing additional eligibility and program integrity checks specified herein.

1.2. This protocol establishes a framework for State SNAP agencies to share data with the USDA/FNS for detection of fraud, waste, and abuse and program integrity purposes.

1.3. The protocol balances federal data access requirements under Executive Order 14243 and the Food and Nutrition Act of 2008 (FNA) with privacy protections, minimizes unnecessary data collection, and incorporates security standards while maintaining public trust and compliance with applicable law.

**2. FRAMEWORK AND AUTHORITY**

2.1. <u>Authority</u>

2.1.1. Executive Order 14243 (March 20, 2025): "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos" directs agency heads to "take all necessary steps, to the maximum extent consistent with law," to ensure federal government has "unfettered access to comprehensive data" from state programs receiving federal funding, including data maintained in third-party databases.

2.1.2. 7 U.S.C. § 2020(a)(3) that requires that each State agency shall keep records as may be necessary to determine whether the program is being conducted in compliance with this chapter, and all records shall be made available for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary.

2.1.3. 7 CFR 272 stipulates use or disclosure of information obtained from SNAP applicant or recipient households shall be restricted to persons directly connected with the administration or enforcement of the provisions of the FNA or regulations, other Federal assistance programs, federally-assisted State programs providing assistance on a means-tested basis to low-income individuals, or general assistance programs which are subject to joint processing requirements.

2.2. <u>Prohibited Purposes</u>

2.2.1. USDA shall NOT use the provided data for:

- Tax administration or tax compliance

- Law enforcement investigations beyond coordination regarding criminal and administrative SNAP violations

- Administration of non-SNAP federal assistance programs (*e.g.*, Medicaid, TANF, housing assistance)

- Sharing with foreign governments or international organizations

- Commercial use or transfer to private entities

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

2.2.2. USDA shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals (*i.e.*, the collection of data elements spelled out in the Privacy Impact Assessment).

## 3. DATA CATEGORIES

3.1. <u>Data Definition</u>

3.1.1. All data obtained by States or their vendors in administering SNAP or that otherwise may be necessary to determine whether the program is being conducted in accordance with the FNA or regulations issued under the FNA.

3.1.2. Data derived from third-party sources (employment verification databases, financial institution records, property records) that States use for verification but are not part of applicant-reported information are excluded.

3.2. <u>Permitted Data</u>

- Information that the applicant household reported on application/recertification forms including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers.

- Direct verifications that the State conducted to confirm applicant-reported information Records that the State maintains of SNAP applications, approvals, denials, certifications, and benefits issued.

- Household composition and income exactly as reported by the applicant (not third-party verified amounts).

- Transactional data necessary for fraud detection

## 4. LIMITED ACCESS

4.1. The SNAP Information Database is accessed and used ONLY by employees of the USDA who are:

4.1.1. Designated by the Chief of Staff at Food, Nutrition, Consumer Services (FNCS)

4.1.2. Trained in SNAP Act, Privacy Act, and this protocol

4.1.3. In compliance with all information security annual recertifications

4.2. No Access to the SNAP Information Database may be provided to:

4.2.1. Other USDA agencies (APHIS, ERS, NASS, etc.)

4.2.2. Divisions within FNS without an explicit need-to-know

4.2.3. OIG employees, unless in direct support of a law enforcement investigation related to SNAP fraud, waste, or abuse

4.2.4. Any other federal agency

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

5. **SYSTEM OF RECORDS NOTICE (SORN) AND PRIVACY IMPACT ASSESSMENT (PIA)**

5.1. <u>SORN</u>

The applicable SORN for this protocol is USDA/FNS-15 "National Supplemental Nutrition Assistance Program (SNAP) Information Database," 90 FR 26521.

The SORN location can be found here: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system-of-records

5.2. <u>Privacy Impact Assessment (PIA)</u>

The applicable Privacy Impact Assessment for the SNAP Information Database can be found here: https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

6. **FRAUD, WASTE, AND ABUSE DETECTION FRAMEWORK**

6.1. <u>Core Fraud Detection Functions</u>

6.1.1. USDA will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program that focuses on:

- identity verification
- income and eligibility verification
- immigration status
- verification against disqualified recipients

6.2. <u>Enhanced Fraud, Waste, and Abuse Detection Techniques</u>

6.2.1. In addition to the core fraud detection functions, USDA will employ additional techniques including, but not limited to:

- Intrastate and interstate duplicate detection
- Deceased individuals' detection
- Synthetic identity patterns (new SSNs with inconsistent biographical data)
- Geographic anomalies

6.2.2. New data mining techniques will be limited to identifying recipient and retailer fraud with a direct nexus to SNAP.

7. **DATA OUTPUT**

7.1. <u>States</u>

7.1.1. USDA will provide flagged data back to the State agency for review. States are encouraged to verify the accuracy of fraud detection flags and provide feedback to USDA to refine detection logic and reduce false positives. Collaborative processes will be established to ensure accurate identification of fraud and appropriate corrective actions.

7.2. <u>Law Enforcement</u>

7.2.1. The USDA may refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP.

7.3. <u>USDA SNAP Retailer Operations Center (ROC)</u>

7.3.1. The USDA may refer fraud detection leads to the ROC where, during fraud detection analysis, a compromised EBT card or terminal ID may have been identified.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

8. **DATA MINIMIZATION AND RETENTION**

8.1. <u>Retention Period</u>

8.1.1. Until a record schedule is approved, data will be retained only as long as necessary for purposes set forth in the SORN and this protocol, and in no case longer than 3 years per the SORN.

8.2. <u>Automatic Deletion</u>

8.2.1. Data shall be retained for no longer than three years, consistent with the USDA/FNS-15 SORN. An automated process will be implemented to delete data upon expiration of the retention period, except for records related to ongoing audits, investigations, or litigation.

8.3. <u>Ongoing Cases</u>

8.3.1. Data pertaining to ongoing audit, investigation, or potential litigation retained only as long as necessary, then deleted.

9. **DATA SECURITY AND TECHNICAL REQUIREMENTS**

9.1. <u>Infrastructure and Location</u>

9.1.1. Primary storage location: AWS GovCloud (US) region

9.1.2. Backup/disaster recovery: Secondary AWS region

9.1.3. No storage, processing, or backup outside GovCloud or federal secure environments

9.1.4. All infrastructure must meet or exceed FedRAMP High baseline standards

9.1.5. AWS Personnel Access: Data is encrypted such that AWS personnel cannot access unencrypted data. Encryption keys are managed exclusively by federal USDA personnel and are not accessible to AWS or third-party vendors.

9.2. <u>Access Controls</u>

9.2.1. Multi-factor authentication required for all access

9.2.2. Role-based access control (RBAC) with principle of least privilege

9.2.3. Access is limited to specifically designated USDA employees engaged to assist in determining whether the program is being conducted in accordance with the FNA.

9.2.4. Access logging and audit trail maintenance (minimum period equal to data retention period, see Section V.E).

9.2.5. Quarterly access reviews by USDA

9.2.6. Immediate revocation of access upon employee termination or assignment change

9.3. <u>Encryption Standards</u>

9.3.1. Encrypted data at rest and in transit

9.3.2. Encryption keys managed solely by USDA federal personnel

9.3.3. No encryption keys held by commercial vendors

9.4. <u>Data Segregation and Compartmentalization</u>

9.4.1. SNAP data isolated in separate, dedicated AWS GovCloud environment

9.4.2. SNAP data not directly integrated with other USDA systems

9.4.3. Limiting access to individuals with specialized training and oversight

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender


**U.S. DEPARTMENT OF AGRICULTURE**

9.5.  Data Transfer

    9.5.1. All  data transfers shall utilize secure tools that meet or exceed FedRAMP High baseline standards.

## 10. INCIDENT RESPONSE AND BREACH NOTIFICATION

10.1. Incident Response

    10.1.1.  Incident response procedures are aligned with FNS Handbook Chapter 10 security incident and breach notification requirements that USDA already follows internally. This protocol extends equivalent procedures to State notification.

10.2. Incident Definition

    10.1.2.  Unauthorized access, use, or disclosure of data

    10.1.3.  Security vulnerability or control failure affecting data

    10.1.4.  Data loss, corruption, or destruction

    10.1.5.  Encryption failure or key compromise

    10.1.6.  Failed access control or authentication mechanism

    10.1.7.  Any event that may reasonably be expected to compromise data security or confidentiality

10.3. Incident Notification Timeline

    10.3.1.  Initial Notification within 12 hours

        10.3.1.1.  Within 12 hours of discovery (by phone + email to State security/privacy contact and Director).

    10.3.2.  Preliminary Report within 24 hours

        10.3.2.1.  Description of incident and timeline

        10.3.2.2.  Data elements affected (specific fields and estimated number of records)

        10.3.2.3.  Estimated number of individuals affected

        10.3.2.4.  Preliminary assessment of whether unencrypted sensitive data may have been exposed

        10.3.2.5.  Preliminary remedial actions taken

        10.3.2.6.  Root cause analysis plan and timeline

## APPENDIX A - SOURCES

- Privacy Impact Assessment: https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf
- SORN: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system-of-records
- SNAP Act: https://www.law.cornell.edu/uscode/text/7/2020
- SNAP QC Handbook
- Executive Order 14243 (March 20, 2025) "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos:  https://www.govinfo.gov/content/pkg/DCPD-202500382/pdf/DCPD-202500382.pdf

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

# Exhibit 4

*Via E-mail*
Elizabeth J. Shapiro
Benjamin S. Kurland
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 598-7755
ben.kurland@usdoj.gov
*Counsel for U.S. Department of Agriculture and Secretary of Agriculture Brooke L. Rollins*

RE: Response to November 24, 2025 Letter to Plaintiff States from Patrick A. Penn

Dear Counsel:

On behalf of the Plaintiff States in *California v. USDA*, No. 3:25-cv-06310-MMC (N.D. Cal. Oct. 15, 2025), this letter responds to the November 24, 2025, letter of the U.S. Department of Agriculture's (USDA) Food and Nutrition Services (FNS). *See* ECF No. 109.

In that letter, USDA restated FNS's ongoing demand for Supplemental Nutrition Assistance Program (SNAP) Eligibility Data Elements for the period of January 1, 2020, to the present. As you are aware, this demand is the subject of ongoing litigation and was previously enjoined by the Court. *See* Order Granting Plaintiff States' Motion for Preliminary Injunction, *California v. USDA*, No. 3:25-cv-06310-MMC (N.D. Cal. Oct. 15, 2025). Thus, any attempt to seek a financial penalty or initiate an administrative noncompliance proceeding based on USDA's new letter, or any other iteration of FNS's ongoing data demand, would, at minimum, constitute a violation of that order, which preliminarily enjoins USDA from "disallowing SNAP funding based on Plaintiff States' failure to comply with the demands" for this SNAP data.

USDA's letter also provided proposed "data and security protocols," which by statute must be "agreed to by the State agency and Secretary" under 7 U.S.C. § 2020(a)(3)(B)(i). USDA's letter concluded by asking State agencies to produce the demanded SNAP data within 30 days, or to respond in writing to explain "(1) the basis for your lack of agreement and (2) any proposed edits to the protocols that you deem necessary to produce the requested data." This letter seeks clarification and to provide both (1) and (2), though we intend to provide further, more detailed edits to the proposed agreement after receiving the necessary clarifications sought herein, which will inform and facilitate those additional edits.

For the reasons described in our Complaint and Preliminary Injunction Motion, we object to USDA's unprecedented collection of millions of Americans' sensitive personally identifiable information (PII) without a clear need for such data and in violation of federal privacy laws. Nevertheless, we agree that USDA must negotiate with the States to develop a mutually agreeable data and security protocol prior to any data collection that may be authorized by 7 U.S.C. § 2020(a)(3). Therefore, without waiving any claims or defenses that may be raised in the

1

pending litigation, we are responding to provide comments on the proposed Data Elements and Data Sharing Protocol attached as Attachments A and B to the letter. Additional questions concerning both are also attached to this response.

We request written responses to the questions in this letter and the Attachment by Monday December 15, 2025.

## I. The proposed data security protocol is insufficient compared to prior agreements between USDA and State agencies.

As an initial matter, FNS's letter claims that each of the States "previously delivered the same type of data to FNS under *less stringent* protocols." This assertion is inaccurate for several reasons. First, FNS has never sought anything comparable to the nearly six years of unredacted PII on all SNAP applicants and beneficiaries that it has now demanded; this unprecedented demand creates novel risks concerning the misuse of data and the protection of individuals' privacy.

Furthermore, without any reference to any specific protocol executed with any one of the States that received this letter, it is impossible to know whether prior protocols used to share a less sensitive data set were "less stringent" as you assert. Therefore, we ask that USDA specifically identify or provide copies of the protocols you refer to—for each State—so that we may evaluate this claim.

USDA's statement that this is a higher level of security and more stringent than previous protocols also appears to ignore the framework for the National Accuracy Clearinghouse (NAC) database that Congress mandated to identify duplicate SNAP enrollment. For example, the SORN for the NAC database mandates that any PII (including names, social security numbers (SSNs) and dates of birth (DOBs)) are converted to a secure cryptographic hash via the Privacy Protecting Record Linkage (PPRL) process before being shared. While some States are still working towards implementing the NAC, we would expect to see, at a minimum, the same protections (and the same careful testing and rollout process) applied to USDA's more recent request for SNAP Eligibility Data Elements.

The proposed protocol document also remains merely "a framework" that lacks many details required by federal law. *See* Proposed Protocol § 1.2. For example, when the federal government creates a "matching program," which the SNAP Information Database plainly is, agencies' data sharing agreements must articulate detailed procedures to protect the privacy, security and accuracy of individuals' data records. *See* 5 U.S.C. § 552a(o)(1). Attachment B falls far short of these specificity requirements. USDA has entered into necessarily detailed computer matching agreements and Interconnection Security Agreements (ISAs) with state agencies to implement the NAC and Electronic Disqualified Recipient System (eDRS) systems. Similarly detailed and comprehensive agreements are needed to implement any agreed-upon protocol before state agencies can lawfully share information.

2

Furthermore, although USDA's proposed protocol prohibits certain data uses, it does not define enforcement mechanisms. Without such mechanisms, the proposed protocol offers state agencies no assurance that violations will be detected, prevented, or corrected. Without enforcement mechanisms (such as monitoring, auditing, automated controls, or documented consequences), the restrictions function only as statements of intent. This creates compliance risk, allows improper data use to go unnoticed, and weakens the ability of State agencies to ensure legal, ethical, and policy-aligned handling of SNAP information.

The proposed protocol also presents, for the first time, a process by which USDA will return "flagged" results back to the State for State agency action. *See* Proposed Protocol § 7.1.1. In addition to the need for a secure data transfer mechanism and process to receive and process these files, the protocol fails to specify against which data the supposed fraud detection was identified, what specific actions the state must take to verify whether the fraudulent action is true, and what response the State must provide on its findings and subsequent actions. As discussed further below, applicable laws and policies require that all these iterative steps be spelled out in detail and agreed upon before any data sharing can take place.

## II.     The proposed data elements and protocol, along with USDA's public statements, raise concerns about the accuracy and validity of USDA's planned data analyses.

State agencies agree with USDA that it should "minimize[] unnecessary data collection." *See* Proposed Protocol § 1.3. Furthermore, USDA asserts that it "shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals." *Id.* § 2.2.2.

What makes data necessary, however, cannot be assessed in the abstract. We therefore request that USDA share its methodologies and proposed data analysis techniques with States so that we can provide feedback on the data needed, and the validity of the analytical methods being used, before providing FNS with confidential information on millions of SNAP beneficiaries.

As we have expressed in the litigation, the queries run through the SNAP Information Database by USDA so far do not account for the actual processes States use to review and verify applicant and household information. Our review of the "preliminary snapshot review" (*see* ECF No. 89-1) that USDA created from data some States have already submitted reveals that USDA's apparent methodologies result in overwhelming numbers of false positives and would not provide an accurate or meaningful picture of States' case files.[1]  This is not only misleading to the public, but risks placing a heavy burden on States to investigate these false positives.

This information is especially important because the proposed protocol does not exclude sensitive PII at all, and USDA is requesting numerous data elements that do not appear necessary

---

[1] We have discussed the apparent problems with this snapshot review in declarations submitted by California (ECF No. 99-1) and Illinois (ECF No. 99-2).

3

to investigate fraud, waste and abuse, especially at an aggregate level. It is necessary for the States to understand why USDA needs the specific PII elements requested so that the States can propose appropriate amendments to the draft protocol that would still accomplish any legitimate goals. Such amendments could include, for example, committing to using data solely for specific analyses described in the protocol and then purging it from USDA's system, as has been done in the past, and permitting States to provide information at a higher level of specificity depending on each agency's available data and technological capabilities (e.g., providing an age range rather than birthdate, or the county or ZIP code instead of a home address) to protect personal privacy.

Given the bulk review and processing USDA is engaging in (*see* ECF No. 72-1 at ¶ 34), it is unclear why deidentified data could not serve as a functionally identical and more secure means of identifying facts about program integrity to share with the States. Should USDA wish to review samples of cases identified through an initial deidentified process, States could participate under existing statutory procedures allowing for a full review of those individual eligibility cases. Another potential option could be through the use of a cryptographically secure PPRL approach, which, as noted, has already been developed for the NAC. Congress and the USDA explicitly created this privacy-protective system for this purpose, and States see no reason to circumvent it through the less-protective SNAP Information Database.

Additionally, the list of data elements attached to USDA's November 24, 2025 letter includes numerous elements (such as personal financial information) that were not considered in the agency's Privacy Impact Assessment.[2] This is a necessary step that the agency would need to correct before any data collection could proceed. Please confirm that USDA will be updating its Privacy Impact Assessment accordingly.

### III.    USDA is ignoring the existing process for testing new programs to identify fraud, waste and abuse.

The statutes defining SNAP (hereafter the "SNAP Act") enshrine a cooperative model between the federal government and the States. Indeed, experimental and pilot projects "designed to test program changes that might increase the efficiency of [SNAP] and improve delivery of [SNAP] benefits to eligible households" are codified in the law (7 U.S.C. § 2026), and the SNAP Act provides a mechanism for USDA to work with state agencies to design, implement and evaluate new initiatives. This collaboration also includes State-led projects supported by the federal government under the SNAP Fraud Framework Implementation Grant Program, authorized and funded by Congress to support State initiatives. USDA's own fact sheet about that program recognizes that "States have long served as incubators for testing strategies to help prevent program fraud." *See* *https://www.fns.usda.gov/snap/fraud-framework*. USDA's departure from

---

[2] *See* USDA Privacy Impact Assessment for Fiscal Year 2025 at 8-10 (July 23, 2025), available at https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf.

this collaborative model ignores congressionally authorized programs and States' own expertise in program integrity.

USDA's proposed data protocol appears to acknowledge the collaborative framework and relationship that the SNAP Act establishes, stating that "collaborative processes will be established" to ensure the accuracy of new data analysis techniques. *See* Proposed Protocol § 7.1.1. But USDA's approach seems to be inconsistent with this acknowledgement, considering USDA's unilateral demands for data and threats of punitive action.

The agency should provide a clear explanation of its proposed data analysis objectives and methodologies, and engage in the required collaborative processes (including but not limited to testing and validation of findings for accuracy) needed to ensure such analysis is accurate and useful for detecting fraud, waste and abuse, *before* demanding production of almost 6 years of nearly unlimited PII on SNAP users to create an unprecedented database unsupported by law.

We are ready and willing to engage with USDA on a process that defines valid analytical goals and the data needed to meet those goals. For example, if USDA wants to test out new data tools, it could use sample sets of deidentified data and engage in an iterative process to check accuracy and results, as it has done in the past. It is unreasonable for USDA to abandon these time-tested techniques, and to run opaque, untested data analytic tools on millions of records in a manner likely to result in inaccurate results—particularly when USDA has signaled a desire to use those inaccurate results to unfairly impugn the integrity of state SNAP programs or the eligibility of residents to receive necessary food assistance.

### IV.    The proposed data analysis is duplicative of work that is already done by state agencies to prevent waste fraud and abuse.

USDA's proposed data protocol acknowledges that its proposed program is "similar to the SNAP Quality Control program" that has already been implemented as required by Congress in 7 U.S.C. § 2025 and through USDA's promulgated regulations. *See* Proposed Protocol § 6.1.1. The new framework appears to disregard congressional intent concerning the conduct of a quality control program, particularly given that the requested data would not permit USDA to conduct appropriate verification of applicant files.

States already engage in the statutorily mandated Quality Control Program and Performance Reporting System (*see* 7 U.S.C. § 2025; 7 C.F.R. §§ 275.1–275.24), which specifies procedures for federal monitoring "to determine whether a State agency is operating SNAP and the Performance Reporting System in accordance with program requirements" including annual reviews, management evaluation, quality control reviews and validation of state agency error rates. *See* 7 C.F.R. § 275.3. For deceased and disqualified individuals, among other verifications conducted by State Agencies, Congress has determined that verification of compliance with these requirements is satisfied by States' submission of annual reports to the Secretary "containing sufficient information" for USDA to make a determination on States' compliance. 7 U.S.C.

§ 2036c. Similarly, submission of state agency data for use in the NAC takes place under a specific statutory grant of authority. *See* 7 U.S.C. § 2020(x). States additionally conduct immigration verification through the Systematic Alien Verification for Entitlements Program (SAVE)[3] and verify income using federally approved income eligibility verification systems (*see* 7 U.S.C. § 2020(p)) which share data using privacy protective systems. States also already provide information on Intentional Program Violations (IPV) and program sanctions to USDA under existing reporting requirements and use the Electronic Disqualified Recipient system (eDRS) to check whether SNAP applicants have been disqualified from the program for fraud. For Electronic Benefit Transfers (EBT) fraud, FNS already receives daily transaction data for *all* EBT transactions under the Anti-Fraud Locator using EBT Retailer Transactions (ALERT) system. ALERT monitors that transaction activity and identifies suspicious retailers for analysis and investigation.

USDA's proposed protocol specifies that USDA-FNS will collect "only the data elements necessary to achieve specific, legally permissible goals." Given the already-existing, rigorous and comprehensive quality control regime under the SNAP Act and USDA's implementing regulations, we request that USDA specifically identify any unique goals of the SNAP Information Database proposal that are not covered by existing programs and federal oversight, and which data elements are actually necessary to achieve those additional goals.

## V.    Clarifying questions and suggestions

In addition to the concerns highlighted above, we are attaching a list of questions and suggestions about USDA's proposed protocol, and how FNS intends to use and share the data that our residents have entrusted to our agencies. We request this clarifying information to understand USDA's proposal better, and in an effort to make progress towards a mutually agreeable data and security protocol. We invite collaboration to generate a program that will respect existing legal frameworks and SNAP household privacy, while making a positive impact on program administration.

States have always been primary partners and leaders in SNAP program integrity. We appreciate the increased detail provided in this protocol, and hope that with further discussion and refinement States can continue to assist USDA in achieving legitimate program integrity

---

[3] The SAVE Program itself is deployed in the SNAP context with privacy in mind; States' agreements with USCIS to use the SAVE program include "safeguards limiting release or redisclosure as required by State or Federal law or regulation as discussed in [7 C.F.R.] § 272.1(c) and as may be required by other guidelines published by the Secretary." 7 C.F.R. § 272.11(b). States must include the steps taken to comply with this limit on disclosure as part of their state SNAP plans. *Id.* § 272.11(e). State agencies are further restricted to using the SAVE Program only for limited purposes related directly to establishing eligibility and program integrity. *Id.* § 272.11(c).

objectives while protecting the privacy of SNAP household data, reducing duplicative processes, and maintaining the security of confidential and sensitive information.

Dated: December 8, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General
ANDREW Z. EDELSTEIN
ANNA RICH
EDWARD P. WOLFE
ROBIN GOLDFADEN
SEBASTIAN BRADY
WILLIAM BELLAMY

*/s/ Maria Buxton*
MARIA F. BUXTON
DEPUTY ATTORNEYS GENERAL
*Attorneys for Plaintiff State of California*

| | |
|---|---|
| LETITIA JAMES<br>Attorney General of New York | KWAME RAOUL<br>Attorney General of Illinois |
| */s/ Mark Ladov*<br>MARK LADOV<br>Special Counsel<br>JULIE DONA<br>Special Counsel<br>28 Liberty St.<br>New York, NY 10005<br>(212) 416-8240<br>mark.ladov@ag.ny.gov<br>*Attorneys for Plaintiff State of New York* | */s/ Sherief Gaber*<br>HARPREET K. KHERA<br>Bureau Chief, Special Litigation<br>SHERIEF GABER<br>Assistant Attorney General<br>115 S. LaSalle St., 35th Flr.<br>Chicago, Illinois 60603<br>(773) 590-7127<br>Harpreet.Khera@ilag.gov<br>*Attorneys for Plaintiff State of Illinois* |
| KRISTIN MAYES<br>Attorney General of Arizona | PHILIP J. WEISER<br>Attorney General of Colorado |
| */s/ Hayleigh S. Crawford*<br>HAYLEIGH S. CRAWFORD (AZ NO. 032326)<br>LUCI D. DAVIS (AZ NO. 035347)<br>2005 N. Central Ave. Phoenix, AZ 85004<br>(602) 542-3333<br>Hayleigh.Crawford@azag.gov | */s/ David Moskowitz*<br>DAVID MOSKOWITZ<br>Deputy Solicitor General<br>Colorado Department of Law<br>1300 Broadway, 10th Floor<br>Denver, CO 80203 |

7

Luci.Davis@azag.gov
ACL@azag.gov
*Attorneys for Plaintiff State of Arizona*

WILLIAM TONG
Attorney General of Connecticut

*/s/ Janelle R. Medeiros*
JANELLE R. MEDEIROS
Special Counsel for Civil Rights
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Janelle.Medeiros@ct.gov
*Attorneys for Plaintiff State of Connecticut*

BRIAN L. SCHWALB
Attorney General for the District of
Columbia

*/s/ Nicole S. Hill*
NICOLE S. HILL
Assistant Attorney General
Office of the Attorney General for the
District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov
*Attorneys for Plaintiff District of Columbia*

OFFICE OF THE GOVERNOR *ex rel*. Andy
Beshear, in his official capacity as
Governor of the Commonwealth of
Kentucky

*/s/ S. Travis Mayo*
S. TRAVIS MAYO
General Counsel
TAYLOR PAYNE
Chief Deputy General Counsel

Phone: (720) 508-6000
david.moskowitz@coag.gov
*Attorneys for Plaintiff State of Colorado*

KATHLEEN JENNINGS
Attorney General of Delaware

*/s/ Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

ANNE E. LOPEZ
Attorney General of Hawai'i

*/s/ Kalikoʻonālani D. Fernandes*
DAVID D. DAY
Special Assistant to the Attorney General
KALIKOʻONĀLANI D. FERNANDES
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorneys for Plaintiff State of Hawai'i*

AARON M. FREY
Attorney General of Maine

*/s/ Brendan Kreckel*
BRENDAN KRECKEL
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 0433-0006
Tel.:  207-626-8800

LAURA C. TIPTON
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov
*Attorneys for Plaintiff Kentucky Governors' Office*

Fax:  207-287-3145
brendan.kreckel@maine.gov
*Attorneys for Plaintiff State of Maine*


ANTHONY G. BROWN
Attorney General of Maryland

*/s/ James C. Luh*
JAMES C. LUH
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

*/s/ Katherine Dirks*
KATHERINE DIRKS
Chief State Trial Counsel
CASSANDRA THOMSON
Assistant Attorney General
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
cassandra.thomson@mass.gov
*Attorneys for Plaintiff Commonwealth of Massachusetts*


DANA NESSEL
Attorney General of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI
BRYAN BEACH
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov
beachb@michigan.gov
*Attorneys for Plaintiff State of Michigan*

KEITH ELLISON
Attorney General of Minnesota

*/s/ Joseph R. Richie*
JOSEPH R. RICHIE
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

MATTHEW J. PLATKIN
Attorney General of New Jersey

/s/ *Kashif T. Chand*
KASHIF T. CHAND (NJ BAR NO. 016752008)
Assistant Attorney General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
kashif.chand@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

DAN RAYFIELD
Attorney General of Oregon

/s/ *Scott P. Kennedy*
SCOTT P. KENNEDY
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 453-9050
Fax (971) 673-5000
Scott.Kennedy@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*

PETER F. NERONHA
Attorney General of Rhode Island

/s/ *Madeline R. Becker*
MADELINE R. BECKER (RI BAR NO. 10034)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2151
mbecker@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

RAÚL TORREZ
Attorney General of the State of New
Mexico

/s/ *Steven Prefrement*
STEVEN PERFREMENT
Senior Litigation Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
SPerfrement@nmdoj.gov
505-601-7727
*Attorneys for the State of New Mexico*

JOSH SHAPIRO, in his official capacity as
Governor of the Commonwealth of
Pennsylvania

/s/ *Jacob B. Boyer*
JENNIFER SELBER
General Counsel
JACOB B. BOYER
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov
*Counsel for Governor Josh Shapiro*

NICHOLAS W. BROWN
Attorney General of Washington

/s/ *Jennifer K. Chung*
JENNIFER K. CHUNG, WSBA #51583
WILLIAM MCGINTY, WSBA #41868
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
jennifer.chung@atg.wa.gov
william.mcginty@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

10

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Karla Z. Keckhaver*
KARLA Z. KECKHAVER
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-6365
karla.keckhaver@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*

**Attachment 1:**

**Questions and Suggestions Concerning USDA's Proposed Data and Security Protocol**

*Limiting unnecessary data elements and scope*

1. Pursuant to USDA's acknowledgement that it must "minimize[] unnecessary data collection" (§ 1.3), and that it will collect "only the data elements necessary to achieve specific, legally permissible goals" (§ 2.2.2), please explain for each of the data elements in Attachment A:

    (a) how USDA intends to use this data element;

    (b) why it needs this data element for each SNAP beneficiary served by the State;

    (c) whether each data element is necessary to determine whether SNAP is being conducted in compliance with the SNAP Act, and why;

    (d) why such analysis is not duplicative of an analysis or match that already occurs;

    (e) whether each element is covered by the applicable System of Records Notice (SORN) and Privacy Impact Assessment (PIA); and

    (f) why it needs the data element for all files dating back to January 1, 2020.

*Clarifying and improving limitations on disclosure and use of data*

2. The proposed data sharing agreement states that the requested data will be used "to ensure the integrity of Government programs[.]" However, 7 U.S.C. § 2020(e)(8) permits States to disclose information obtained from applicant households only to persons directly connected with the administration of federal assistance programs for the administration or enforcement of that program. To ensure compliance with 7 U.S.C. § 2020(e)(8), will USDA limit its use of the data to "ensure the integrity of the SNAP program" only?

3. Section 2.2.1 of the proposed protocol says USDA shall not use the provided data for "law enforcement investigations beyond coordination regarding criminal and administrative SNAP violations." This phrasing does not appear in the SNAP Act and is unclear.

    (a) Please elaborate what USDA means by "coordination regarding criminal and administrative SNAP violations."

    (b) Can you confirm that USDA will not share any of this data with Immigration and Customs Enforcement (ICE) or any other Department of Homeland Security (DHS) subagencies for use in immigration enforcement activities?

    (c) In order to ensure that state SNAP data is not unlawfully used for immigration enforcement purposes, will USDA agree to include protocol language that alerts any State immediately if ICE or any other DHS subagency requests access to or use of

this data and provides at least 30 days for that State to respond (and if necessary take legal action) to prevent such data sharing?

(d) Please confirm that the prohibited purposes listed in Section 2.2, as clarified by USDA's response to this letter, will apply to all federal agencies.

4. Relatedly, the protocol reserves the right to "refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP." How does the USDA define a "criminal nexus"? Could the USDA provide examples of (a) what would constitute such a "criminal nexus" and (b) which agencies could potentially receive such a referral?

5. We also believe any protocol must also address how USDA would handle external requests (FOIA, administrative subpoena or otherwise) to obtain States' SNAP data. Will USDA provide clarification of these issues and agree to protocol language alerting any State to such a request and providing sufficient time for the State to respond prior to any USDA disclosure of data?

6. Currently, the proposed protocol only limits "access" to the database (*see* § 4), but does not similarly restrict USDA's ability to *disclose* the data.

(a) Pursuant to 7 U.S.C. § 2020(e)(8), will USDA include a clause that prohibits the agency from disclosing the requested data except to persons "directly connected with the administration" of the SNAP Act, for the purpose of administering or enforcing the SNAP Act only?

(b) Will USDA include a clause requiring the agency to identify the specific entities and individuals to whom the USDA intends to disclose data, and how they are "directly connected with the administration" of the SNAP Act, pursuant to 7 U.S.C. § 2020(e)(8)?

7. Relatedly, the proposed protocol contains contradictory statements that require clarification. It claims to limit "access" to data by anyone outside of the USDA, but then purports to require data matching that will entail sharing data outside of USDA.

(a) Can USDA provide clarification to reconcile these statements?

(b) Will USDA include a limitation in the proposed protocol to prevent data from being copied and/or sent outside of USDA's database?

(c) Prior data sharing agreements with USDA have specifically identified individuals who would be able to access States' data, and required those individuals to attest to compliance with the protocols. Will USDA agree to similar requirements here, and commit not to provide access to any individual without advance notice to States and providing sufficient time for States to respond prior to USDA providing that access?

13

(d) What measures will USDA take to prevent any redisclosure or improper intermingling of the data?

***Understanding the protocol's interaction with the SORN and Privacy Impact Assessment***

8. The proposed data protocol relies on USDA's existing SORN, but USDA has represented that it will publish an "updated SORN." *See* ECF No 90-1 at 2. Please let us know when that SORN will be published, and how it will address changes between the data request elements attached to the November 24, 2025 letter and USDA's prior data requests.

9. The proposed data protocol and the SORN are also at odds with each other on important issues. For example, the SORN states that records "will be kept indefinitely," which directly contradicts the protocol's proposal that data "shall be retained for no longer than three years." The protocol also restricts access to "[a]ny other federal agency" (§ 4.2.4), yet the SORN's routine uses permit disclosure to the Department of Justice and Department of the Treasury. Please clarify how USDA will reconcile these discrepancies, and whether USDA will commit to enforcing all restrictions on data access agreed upon in a final protocol, and not permitting the SORN's broader "routine use" language to control.

10. USDA's Privacy Impact Assessment associated with this data collection indicates that USDA expects this to be an ongoing data collection effort with "quarterly updates."

    (a) Is that the case, and if so, what is the source of USDA's authority to require States to provide virtually all SNAP data to USDA on a quarterly basis?

    (b) Does USDA intend to compensate States for the additional administrative burden that such an ongoing collection would present?

11. USDA's Privacy Impact Assessment associated with this data collection acknowledges the need to "[o]btain explicit consent for the collection and processing of sensitive personal information[.]" The proposed protocol does not mention obtaining consent from SNAP participants.

    (a) How does USDA intend to obtain this consent from SNAP participants? Will USDA provide a draft notice to States?

    (b) Does USDA expect States to assume the burden of obtaining this consent and, if so, does USDA intend to compensate States for the additional administrative burden that this would present?

***Clarifying USDA's proposed security measures***

12. Section 9, "Data Security and Technical Requirements," is comprised only of bulleted concepts, with no complete sentences and very limited detail. Will USDA revise this section to provide full sentences and a more thorough description of the security protections the agency intends to use, so that we may properly evaluate their sufficiency?

14

***Clarifying the methodologies and processes that USDA intends to implement***

13. States necessarily rely on numerous outside data sources to verify SNAP eligibility; this process is often time and labor intensive, particularly given our commitments to ensure that only eligible households receive benefits.

    (a) Given that outside, third-party data sources are essential to verification, how does USDA plan to review and verify eligibility of SNAP files without review of these data sources?

    (b) If USDA is requiring production of those third-party data sources (which is unclear), can USDA provide authority for that demand and authority authorizing States to disclose this third-party data?

    (c) In addition, please clarify how the "permitted" submission of verification records (per § 3.2) is consistent with the statement in § 3.1.2 that such verification records are "excluded" from this project.

14. Section 6.1.1 states that USDA "will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program." Please explain what a "foundational . . . verification" is, and how this data project differs from existing verification tests set forth in statute and promulgated regulations.

15. Section 6.2 lists several "enhanced" or "additional" data techniques. Please provide the methodologies for these techniques and explain why USDA believe they will produce valid statistical results. In particular:

    (a) Please explain how USDA's proposed detection of duplicate benefits will differ from the existing protections offered by the NAC and other established verification tests, and how USDA will resolve any conflicts between the NAC process and the one USDA proposes here.

    (b) Please explain how USDA's proposed detection of deceased individuals will differ from existing State systems for removing deceased beneficiaries from SNAP benefit rolls, and how this analysis will comport with USDA's requirements for such actions (including to ensure that households have an opportunity to address any inaccurate data before a reduction in benefits).

    (c) Please explain what USDA means by "synthetic identity patterns" and how this proposal will seek to detect such patterns.

    (d) Please explain what USDA means by "geographic anomalies" and how this proposal will seek to detect such anomalies.

    (e) To the extent EBT fraud is a concern, FNS already receives daily transaction data for all EBT transactions under the Anti-Fraud Locator using EBT Retailer Transactions (ALERT) system. ALERT monitors that transaction activity and identifies suspicious

retailers for analysis and investigation. Given the existence of this system and FNS's preexisting access to all EBT transaction data, what purpose does such duplicative analysis serve in the SNAP Information Database?

(f) Will USDA be using artificial intelligence programs to analyze the data? If so, can USDA provide more information about those programs, including the security and privacy protections employed by the program?

16. USDA states in Section 7.1 of the proposed protocol that it will "provide flagged data back to the State agency for review," and will work collaboratively "to ensure accurate identification of fraud and appropriate corrective actions." Please clarify specifically what USDA intends this process to entail. Furthermore, please provide details on what this collaborative process has entailed to date for States that have already provided SNAP data.

# Exhibit 5



# Food and Nutrition Service

**U.S. DEPARTMENT OF AGRICULTURE**

December 23, 2025

Governor Kathy Hochul
NYS State Capitol Building
Albany, New York 12224

Dear Governor Hochul,

This replies to your December 8, 2025 letter responding to the U.S. Department of Agriculture (USDA), Food and Nutrition Service (FNS)'s November 24, 2025 request to produce data related to the Supplemental Nutrition Assistance Program (SNAP). That request asked your State to share data to assist FNS in its statutorily-mandated administration and enforcement of the Food and Nutrition Act of 2008, as amended, (SNAP Act), including providing administrative funding to State Agencies to collect such information.

Your State, along with 20 others and the District of Columbia, responded through their lawyers by submitting a single, formulaic response objecting to our direction that you share with FNS SNAP data (December 8 Letter). The December 8 Letter seeks further delay, questioning FNS's need for, and right to obtain data necessary to audit the States' administration and enforcement of SNAP. USDA addresses each of your concerns in greater depth below. But, on the whole, your December 8 Letter provided no basis for your continued withholding of data because:

- FNS requires—and is statutorily entitled to—the SNAP eligibility and payment data that the States collect, with the aid of Federal funding, to administer SNAP benefits, which are funded entirely by FNS.

- FNS has offered to observe data and security protocols *more stringent* than any requested or observed by States historically in providing *the exact same type of data* to FNS. There is no material difference between the States uploading to FNS a sample set of names, DOBs, addresses, SSNs and other data elements for Quality Control (QC) and uploading the same data elements pursuant to FNS's request here for a complete set of the same data elements. None of your December 8 letter's objections and questions justified your State's refusal to accept FNS's offered protocols or to provide edits that you propose to accept those protocols.

**1. FNS requires the data it requested to verify compliance with the SNAP Act.** First, States may not undermine FNS's clear authority to determine what data FNS needs to complete its statutorily mandated role in overseeing SNAP. It is clear to all concerned that through undetected errors and fraud, Federal SNAP funds are being wasted and stolen. Indeed, on December 11, California's own State Auditor found its State's SNAP agency exposes taxpayers to "high-risk" after observing the financial consequences of widespread errors in the State's administration of SNAP. *See* https://www.auditor.ca.gov/reports/2025-601/. While California withholds SNAP data from the Federal Government, it gives that same data to State employees who can access and abuse the data apparently without appropriate safeguards against internal

abuse. *See* https://www.justice.gov/usao-edca/pr/former-madera-county-welfare-benefits-employee-arrested-improperly-using-other-peoples. Noncomplying States' failures to administer SNAP have become notorious nationwide. *E.g.,* https://nypost.com/2025/12/16/us-news/calif-welfare-worker-stole-40k-in-benefits-using-identities-of-elderly-dead-people-feds/.

Data received from the 28 States that complied with USDA's request indicate that an estimated average of $24 million per day of SNAP funds are being erroneously spent or lost to fraud. Examples of fraud indicators included allowing hundreds of thousands of deceased and other ineligible people to remain on State SNAP benefit rolls. Although the non-complying minority of States may dismiss the significance of their allowing dead or otherwise ineligible people to remain on SNAP rolls, failures to detect and correct errors and fraud make it important that they promptly join the cooperating states by complying with FNS's data request. In the meantime, errors and fraud proliferate in the non-complying States. *E.g.,* https://kstp.com/kstp-news/top-news/minnesota-repeatedly-reported-inaccurate-data-on-snap-to-the-federal-government/; https://www.justice.gov/usao-or/pr/romanian-nationals-unlawfully-residing-united-states-indicted-conspiring-steal-snap.

Each of the data elements FNS requested ensures that the various programmatic requirements, including eligibility requirements, are being met by households and are properly implemented and enforced by the States. The requested data elements can help confirm the accuracy of eligibility and benefit level determinations as well as aid in the investigation of SNAP benefit trafficking and theft, including EBT card skimming. Longitudinal data is required to detect patterns and trends that will inform SNAP administration, in addition to verifying the accuracy and reliability of the data submitted in response to this request.

**2. FNS's request is for records that Congress mandated "shall be made available" to USDA.** As we outlined in our November 24 letter, FNS is statutorily entitled to the data we request. *See* 7 U.S.C. § 2020(a)(3)(B) (requiring that "such records as may be necessary to determine whether the program is being conducted in compliance with this [SNAP Act] (including regulations issued under this [SNAP Act])" "shall be made available" for inspection and audit by USDA). In their December 8 response, the non-complying States wrongly suggested that USDA agrees that States need not produce the requested data unless and before States agree to data and security protocols. Although this statute permits the Secretary and State agency to agree that an inspection and audit be "subject to data and security protocols agreed to by the State agency and Secretary" it does not make such agreement a condition, let alone a condition precedent, to Congress' requirement that States' records "shall—. . . be made available" to USDA. Textually, Section (a)(3) merely provides that FNS's access will be subject to any protocols that the Secretary agrees with the State agency to observe. Congress did not, however, permit States to render the Federal audit statute meaningless by refusing to agree with the Secretary about a protocol, or otherwise attempting to dictate the terms upon which their expenditures of Federal funds shall be inspected or audited.

**3. FNS has offered to observe data and security protocols more stringent than any requested or observed by States historically in providing the exact same type of data to FNS.** Although not required by law, in the interest of comity FNS offered to observe a set of data and security protocols that are far more stringent than any that have been requested or observed by States when they share SNAP data with FNS. Indeed, the States, including yours,

routinely upload to FNS the same type of data we now request.  Your State's response rebuffed FNS's offer to provide specific edits or suggestions to the protocols; your State's response instead sent back questions (and often accusations) about FNS's purported intent.  FNS has addressed each question below and offered to make accommodations where appropriate.  But this does not change the fact that FNS has offered specific, concrete proposals, whereas the States have declined to do the same.

As illustrated by the following chart: (1) there is no material difference between the *type* of data your State routinely uploads to FNS for QC purposes, and the data elements FNS requested on November 24, and (2) FNS's data request only calls for a small portion of the categories that States normally submit to FNS for QC purposes:

**Data Element Comparisons**

This chart identifies the required data elements submitted by State agencies to the U.S. Department of Agriculture (USDA) for Quality Control (QC) purposes.  States submit a sample set of this data to USDA monthly.  Fields identified with a * symbol have been requested by USDA for the Supplemental Nutrition Assistance Program (SNAP) Data Sharing integrity initiative.  As indicated by this chart, there is no difference between the data elements requested by USDA on November 24, 2025 and the corresponding data elements submitted by States to USDA for QC purposes, other than to request a complete set, rather than a sample set, of the same type of data.

| | | |
|---|---|---|
| Case Number* | Case Address* | Phone Number* |
| SNAP Household Names* | SNAP Household DOBs* | SNAP Household SSN* |
| SNAP Household Relationships* | Citizen/Non-Citizen Status * | Homeless Status* |
| All Household Earned Income* | All Household Unearned Income* | All Household Self-Employment Income* |
| Authorized Representative* | Indicator if SNAP Household Member is active* | Reporting Status* |
| Recipient Disqualification* | Certification Period* | Assets/Resources* |
| Categorial Eligibility | Directions to Home | Shelter Expenses* |
| Date of Interview | Household Composition | Expedited Service |
| Most Recent Action | Student Status | Amount of Allotment |
| Allotment Adjustments | Demonstration Projects | Residency |

| | | |
|---|---|---|
| Earned Income Deductions | Dependent Care | Shelter Deductions |
| Other Government Benefits | Contributions | Deemed Income |
| Standard Utility Allowance | Child Support Deductions | Medical Deduction |
| Income from loans, scholarships, grants | Arithmetic Computation | SNAP Simplification Project |
| Significant Persons NOT living in home phone number | Significant Persons NOT living in the home relationship | Significant Persons NOT living in the home SSNs |
| Significant Persons Not living in the DOBs | Significant Persons NOT living in the home address | Significant Persons NOT living in the home financial support |
| All data related to work requirements – E&T programs, time limited participation, work registration, etc. | States must verify all elements with supporting documentation and upload those to SNAP-QCS | |

That FNS wishes now to examine a *complete* data set, instead of the self-selected samples States collect, is no good faith basis to object. Nor is there any valid basis to object to our request that States produce longitudinal data—as this will permit us to detect whether SNAP has been administered and enforced correctly during the past five years. And the preservation and production of that longitudinal data is important to FNS's need to determine whether anomalous changes we have observed signal a need for further investigation. These preliminary findings lead FNS to conclude that it must make a more complete use of its authority to review the States' administration and enforcement of SNAP.

**4. The States' cited reasons for continuing to withhold SNAP data are baseless.**

   **a. FNS requires a complete set, not just States' samples, of the same type of data States produce monthly.** The primary basis for the States' December 8 Letter's objection—that FNS seeks data of the same type but in greater *volume* than the self-selected sampling of households States provide to FNS for QC—makes no sense. It is simply baseless to object to providing a complete set, rather than just a sample, of the data FNS seeks.

   **b. The States' objections and suggestion of alternatives reflect a lack of understanding of SNAP program integrity.**

      **i. Although states are largely not using it, the National Accuracy Clearinghouse (NAC) is a tool for states to assist each other that does not meet FNS's need to obtain data that states are withholding from FNS.** The States' December 8 Letter attempts to use the National Accuracy Clearinghouse (NAC) to support their withholding reflects a lack of understanding of SNAP program integrity. As you may be aware, only four of the 22

noncomplying States have launched the NAC, an interstate data matching system designed *solely* to assist *States* to prevent duplicate participation. The hashing of data for NAC is allowable only because each State with a legitimate need to access household PII *already has it*. Both the "receiving" State agency and the "losing" State agency were provided the PII by the household at issue—the only information the States are lacking is whether that same household is participating or attempting to participate in another State simultaneously. Because each State agency is already in possession of the information needed to take action on possible duplicate participation, there is no need for States to provide that information to each other un-hashed via the NAC. As such, cryptographic hashing is appropriate. The SNAP Information Database is clearly different. Unlike the NAC, which will eventually have 53 participating State agencies, USDA FNCS is the only entity receiving the SNAP data we have requested.

Crucially, the hashing of data is not a viable solution when only one of the entities (in this case, the State) possesses the data. In the simplest of terms, a cryptographic hash function converts a piece of data into a specific hash value. The hash value itself tells you nothing of the underlying piece of data, and you can only recreate the specific hash value with that function by inputting the same underlying piece of data into it. If Plaintiff States were to submit the requested data in a cryptographic hash format, that would be akin to providing USDA hundreds of thousands of combination locks without any of the codes.

As such, it is not feasible for the SNAP Information Database to include "the same protections" as the NAC.

**ii. The states have no basis to invoke the Computer Matching Act.** The SNAP Information Database is not a matching program. It is a database that stores the SNAP participant information submitted by State agencies. Nor will FNS's uses of data be automatic. Although FNS hopes to help States improve their error rates in making eligibility determinations, the States retain their responsibility and liability for making those determinations. The SNAP Information Database will not be matched with State agency databases, and as a result, the Computer Matching Act is not implicated and a CMA is not required or appropriate.

**iii. FNS's offer of FedRAMP High data security protocols exceed the protection accepted by States for the same type of data requested here**. As stated in FNS's offered protocols, data is encrypted both in transit and at rest, and the requested data is protected with FedRAMP High data security, a higher level of security than that which States, including your State, historically have accepted in releasing similar data to FNS—including name, date of birth, social security number and address. FNS will inspect and audit the data provided pursuant to this request solely for the purposes of "determin[ing] whether the program is being conducted in compliance with [the Food and Nutrition Act of 2008 (FNA)] (including regulations issued under [the FNA]." See 7 U.S.C. § 2020(a)(3).

**iv. The States' remaining miscellany of questions provided no basis to withhold data on the States' use of SNAP funds.** The non-complying States appear to suggest that USDA halt its present efforts in favor of constructing a pilot program under 7 U.S.C. § 2026. This appears to be another unjustified effort by noncomplying States to resist a *complete* review of their use of SNAP funds.

As previously explained, our November 24 data request is founded upon 7 U.S.C. § 2020(a)(3). This provision, and its purposes, is independent from USDA's pilot authority. In any event, although USDA disagrees with the noncomplying States' implication that USDA's pilot authority requires collaboration with States, as our November 24 letter demonstrated, USDA offered to agree with States on a set of protocols, even though such agreement is not a condition limiting USDA's inspection and audit authority.

Further, the States' December 8 letter appears to ask FNS to disclose any sources or methods it will use to analyze whether the States are complying with SNAP requirements.  To disclose beforehand additional details to States as to what, after receiving the data, specifically is or will be analyzed, how, and when, is not possible, given that the noncomplying States are withholding the data.  Further, such disclosure would be ill-advised as it would provide a roadmap on how to avoid detection of noncompliance with SNAP requirements.  FNS has already observed anomalous changes in reported data since it began providing notice last summer that it would seek to obtain this data.  Hence, our previous request that States preserve their data.

Moreover, USDA is not prohibited from improving upon or developing new, efficient ways to detect fraud, waste, and abuse.  Simply because other mechanisms exist to detect fraud does not preclude USDA from consistently striving for better, more efficient methods of detecting waste, fraud, and abuse in SNAP.

**5. Additional clarifying answers to States' December 8 questions.**  FNS has carefully reviewed your December 8 Letter's attached questions and requests for clarification. The following information should sufficiently clarify our November 24 draft protocols, permitting you to now accept those protocols:

- USDA reiterates its November 24 letter's statement that it will only use the received data in compliance with the Food and Nutrition Act of 2008, as amended.
- In the event it receives external requests for data, USDA will follow all applicable laws. This would include, but is not limited to, the Food and Nutrition Act of 2008, as amended, FOIA, and the USDA Touhy regulations.
- The SNAP Information Database is FedRAMP certified (High).
- All data provided to the SNAP Information Database is encrypted in transit and at rest.
- USDA reiterates and clarifies that its SORN revisions will not impact the data elements requested but will simply bolster the introductory language of the Routine Uses section to clarify, as expressed previously, that the enumerated routine uses are only permitted to the extent they are permitted by the Food and Nutrition Act of 2008, as amended. The revisions will also remove the reference to "foreign" governments in Routine Use 8.

For the avoidance of doubt, we have edited our November 24 protocol to more clearly reflect the above answers to your questions and requests for clarification.  We look forward to your State's reply to FNS's reiterated request.  We hope to receive your agreement immediately to join the 28 States plus the Territory of Guam who are complying with FNS's November 24 request.  Please construe this letter as your Advance Notification pursuant to 7 CFR 276.4(d)(1), providing you

two weeks from this letter's date above to indicate whether you agree to our November 24 request, and the protocols we have offered.

FNS appreciates your State's concluding assertion that it "has always been FNS's primary partners and leaders in SNAP program integrity." We hope that this signals a new approach of State cooperation that will provide FNS with access to the data it pays your state to collect so that FNS can properly administer and enforce the issuance of SNAP benefits paid for with Federal funding.

Sincerely,

Patrick A. Penn
Acting Administrator, Food and Nutrition Service
Deputy Under Secretary, Food, Nutrition, and Consumer Services
U.S. Department of Agriculture

Enclosure

cc:    Mark Ladov, Special Counsel


**U.S. DEPARTMENT OF AGRICULTURE**

**Supplemental Nutrition Assistance Program (SNAP) Information Database
Fraud, Waste and Abuse Detection Protocol**

## 1. OVERVIEW

1.1. U.S. Department of Agriculture (USDA) and the Food and Nutrition Service (FNS) will use the Supplemental Nutrition Assistance Program (SNAP) recipient data to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying duplicate enrollments for elimination, and performing additional eligibility and program integrity checks specified herein.

1.2. This protocol establishes a framework for State SNAP agencies to share data with the USDA/FNS for detection of fraud, waste, and abuse and program integrity purposes.

1.3. The protocol balances federal data access requirements under Executive Order 14243 and the Food and Nutrition Act of 2008 (FNA) with privacy protections, minimizes unnecessary data collection, and incorporates security standards while maintaining public trust and compliance with applicable law.

## 2. FRAMEWORK AND AUTHORITY

2.1. <u>Authority</u>

2.1.1. Executive Order 14243 (March 20, 2025): "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos" directs agency heads to "take all necessary steps, to the maximum extent consistent with law," to ensure federal government has "unfettered access to comprehensive data" from state programs receiving federal funding, including data maintained in third-party databases.

2.1.2. 7 U.S.C. § 2020(a)(3) that requires that each State agency shall keep records as may be necessary to determine whether the program is being conducted in compliance with this chapter, and all records shall be made available for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary.

2.1.3. 7 CFR 272 stipulates use or disclosure of information obtained from SNAP applicant or recipient households shall be restricted to persons directly connected with the administration or enforcement of the provisions of the FNA or regulations, other Federal assistance programs, federally-assisted State programs providing assistance on a means-tested basis to low-income individuals, or general assistance programs which are subject to joint processing requirements.

2.2. <u>Prohibited Purposes</u>

2.2.1. USDA shall NOT use the provided data for:

- Tax administration or tax compliance
- Law enforcement investigations beyond coordination regarding SNAP fraud, or other violations relating to the FNA.
- Administration of non-SNAP federal assistance programs (*e.g.*, Medicaid, TANF, housing assistance)
- Sharing with foreign governments or international organizations
- Commercial use or transfer to private entities

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender


**U.S. DEPARTMENT OF AGRICULTURE**

2.2.2. USDA shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals (*i.e.*, the collection of data elements spelled out in the Privacy Impact Assessment).

## 3. DATA CATEGORIES

3.1. <u>Data Definition</u>

3.1.1. All data obtained by States or their vendors in administering SNAP or that otherwise may be necessary to determine whether the program is being conducted in accordance with the FNA or regulations issued under the FNA.

3.1.2. Data derived from third-party sources (employment verification databases, financial institution records, property records) that States use for verification but are not part of applicant-reported information are excluded.

3.2. <u>Permitted Data</u>

- Information that the applicant household reported on application/recertification forms including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers.

- Direct verifications that the State conducted to confirm applicant-reported information Records that the State maintains of SNAP applications, approvals, denials, certifications, and benefits issued.

- Household composition and income exactly as reported by the applicant (not third-party verified amounts).

- Transactional data necessary for fraud detection

## 4. LIMITED ACCESS

4.1. The SNAP Information Database is accessed and used ONLY by employees of the USDA who are:

4.1.1. Designated by the Chief of Staff at Food, Nutrition, Consumer Services (FNCS)

4.1.2. Trained in SNAP Act, Privacy Act, and this protocol

4.1.3. In compliance with all information security annual recertifications

4.2. Except to the extent required by law, no access to the SNAP Information Database may be provided to:

4.2.1. Other USDA agencies (APHIS, ERS, NASS, etc.)

4.2.2. Divisions within FNS without an explicit need-to-know

4.2.3. OIG employees, unless in direct support of a law enforcement investigation related to SNAP

fraud, waste, or abuse

4.2.4. Any other federal agency

4.2.5. Any FOIA, administrative subpoena or like external requester

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender


**U.S. DEPARTMENT OF AGRICULTURE**

5. **SYSTEM OF RECORDS NOTICE (SORN) AND PRIVACY IMPACT ASSESSMENT (PIA)**

5.1. <u>SORN</u>

The applicable SORN for this protocol is USDA/FNS-15 "National Supplemental Nutrition Assistance Program (SNAP) Information Database," 90 FR 26521.

The SORN location can be found here: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system-of-records

5.2. <u>Privacy Impact Assessment (PIA)</u>

The applicable Privacy Impact Assessment for the SNAP Information Database can be found here: https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

6. **FRAUD, WASTE, AND ABUSE DETECTION FRAMEWORK**

6.1. <u>Core Fraud Detection Functions</u>

6.1.1. USDA will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program that focuses on:

- identity verification

- income and eligibility verification

- immigration status

- verification against disqualified recipients

6.2. <u>Enhanced Fraud, Waste, and Abuse Detection Techniques</u>

6.2.1. In addition to the core fraud detection functions, USDA will employ additional techniques including, but not limited to:

- Intrastate and interstate duplicate detection

- Deceased individuals' detection

- Synthetic identity patterns (new SSNs with inconsistent biographical data)

- Geographic anomalies

6.2.2. New data mining techniques will be limited to identifying recipient and retailer fraud with a direct nexus to SNAP.

7. **DATA OUTPUT**

7.1. <u>States</u>

7.1.1. USDA will provide flagged data back to the State agency for review. States are encouraged to verify the accuracy of fraud detection flags and provide feedback to USDA to refine detection logic and reduce false positives. Collaborative processes will be established to ensure accurate identification of fraud and appropriate corrective actions.

7.2. <u>Law Enforcement</u>

7.2.1. The USDA may refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP.

7.3. <u>USDA SNAP Retailer Operations Center (ROC)</u>

7.3.1. The USDA may refer fraud detection leads to the ROC where, during fraud detection analysis, a compromised EBT card or terminal ID may have been identified.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender


**U.S. DEPARTMENT OF AGRICULTURE**

**8. DATA MINIMIZATION AND RETENTION**

   8.1. <u>Retention Period</u>

      8.1.1. Until a record schedule is approved, data will be retained only as long as necessary for purposes set forth in the SORN and this protocol, and in no case longer than 3 years per the SORN.

   8.2. <u>Automatic Deletion</u>

      8.2.1. Data shall be retained for no longer than three years, consistent with the USDA/FNS-15 SORN. An automated process will be implemented to delete data upon expiration of the retention period, except for records related to ongoing audits, investigations, or litigation.

   8.3. <u>Ongoing Cases</u>

      8.3.1. Data pertaining to ongoing audit, investigation, or potential litigation retained only as long as necessary, then deleted.

**9. DATA SECURITY AND TECHNICAL REQUIREMENTS**

   9.1. <u>Infrastructure and Location</u>

      9.1.1. Primary storage location: AWS GovCloud (US) region

      9.1.2. Backup/disaster recovery: Secondary AWS region

      9.1.3. No storage, processing, or backup outside GovCloud or federal secure environments

      9.1.4. All infrastructure must meet or exceed FedRAMP High baseline standards

      9.1.5. AWS Personnel Access: Data is encrypted such that AWS personnel cannot access unencrypted data. Encryption keys are managed exclusively by federal USDA personnel and are not accessible to AWS or third-party vendors.

   9.2. <u>Access Controls</u>

      9.2.1. Multi-factor authentication required for all access

      9.2.2. Role-based access control (RBAC) with principle of least privilege

      9.2.3. Access is limited to specifically designated USDA employees engaged to assist in determining whether the program is being conducted in accordance with the FNA.

      9.2.4. Access logging and audit trail maintenance (minimum period equal to data retention period, see Section V.E).

      9.2.5. Quarterly access reviews by USDA

      9.2.6. Immediate revocation of access upon employee termination or assignment change

   9.3. <u>Encryption Standards</u>

      9.3.1. Encrypted data at rest and in transit

      9.3.2. Encryption keys managed solely by USDA federal personnel

      9.3.3. No encryption keys held by commercial vendors

   9.4. <u>Data Segregation and Compartmentalization</u>

      9.4.1. SNAP data isolated in separate, dedicated AWS GovCloud environment

      9.4.2. SNAP data not directly integrated with other USDA systems

      9.4.3. Limiting access to individuals with specialized training and oversight

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender


**U.S. DEPARTMENT OF AGRICULTURE**

9.5.  Data Transfer

    9.5.1.  All  data transfers shall utilize secure tools that meet or exceed FedRAMP High baseline standards.

## 10.  INCIDENT RESPONSE AND BREACH NOTIFICATION

10.1. Incident Response

    10.1.1.   Incident response procedures are aligned with FNS Handbook Chapter 10 security incident and breach notification requirements that USDA already follows internally. This protocol extends equivalent procedures to State notification.

10.2. Incident Definition

    10.1.2.  Unauthorized access, use, or disclosure of data

    10.1.3.  Security vulnerability or control failure affecting data

    10.1.4.  Data loss, corruption, or destruction

    10.1.5.  Encryption failure or key compromise

    10.1.6.  Failed access control or authentication mechanism

    10.1.7.  Any event that may reasonably be expected to compromise data security or confidentiality

10.3. Incident Notification Timeline

    10.3.1.  Initial Notification within 12 hours

        10.3.1.1.   Within 12 hours of discovery (by phone + email to State security/privacy contact and Director).

    10.3.2.  Preliminary Report within 24 hours

        10.3.2.1.   Description of incident and timeline

        10.3.2.2.   Data elements affected (specific fields and estimated number of records)

        10.3.2.3.   Estimated number of individuals affected

        10.3.2.4.   Preliminary assessment of whether unencrypted sensitive data may have been exposed

        10.3.2.5.   Preliminary remedial actions taken

        10.3.2.6.   Root cause analysis plan and timeline

## APPENDIX A - SOURCES

- Privacy Impact Assessment: https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf
- SORN: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system-of-records
- SNAP Act: https://www.law.cornell.edu/uscode/text/7/2020
- SNAP QC Handbook
- Executive Order 14243 (March 20, 2025) "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos: https://www.govinfo.gov/content/pkg/DCPD-202500382/pdf/DCPD-202500382.pdf

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

# Exhibit 6


**U.S. DEPARTMENT OF AGRICULTURE**

**Supplemental Nutrition Assistance Program (SNAP) Information Database
Fraud, Waste and Abuse Detection Protocol**

## 1. OVERVIEW

1.1. U.S. Department of Agriculture (USDA) and the Food and Nutrition Service (FNS) will use the Supplemental Nutrition Assistance Program (SNAP) recipient data to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying duplicate enrollments for elimination, and performing additional eligibility and program integrity checks specified herein.

1.2. This protocol establishes a framework for State SNAP agencies to share data with the USDA/FNS for detection of fraud, waste, and abuse and program integrity purposes.

1.3. The protocol balances federal data access requirements under Executive Order 14243 and the Food and Nutrition Act of 2008 (FNA) with privacy protections, minimizes unnecessary data collection, and incorporates security standards while maintaining public trust and compliance with applicable law.

## 2. FRAMEWORK AND AUTHORITY

2.1. <u>Authority</u>

2.1.1. Executive Order 14243 (March 20, 2025): "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos" directs agency heads to "take all necessary steps, to the maximum extent consistent with law," to ensure federal government has "unfettered access to comprehensive data" from state programs receiving federal funding, including data maintained in third-party databases.

2.1.2. 7 U.S.C. § 2020(a)(3) that requires that each State agency shall keep records as may be necessary to determine whether the program is being conducted in compliance with this chapter, and all records shall be made available for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary.

2.1.3. 7 CFR 272 stipulates use or disclosure of information obtained from SNAP applicant or recipient households shall be restricted to persons directly connected with the administration or enforcement of the provisions of the FNA or regulations, other Federal assistance programs, federally-assisted State programs providing assistance on a means-tested basis to low-income individuals, or general assistance programs which are subject to joint processing requirements.

2.2. <u>Prohibited Purposes</u>

2.2.1. USDA shall NOT use the provided data for:

- Tax administration or tax compliance
- Law enforcement investigations beyond coordination regarding ~~criminal and administrative~~ SNAP <u>fraud, or other</u> violations <u>relating to the FNA.</u>
- Administration of non-SNAP federal assistance programs (*e.g.*, Medicaid, TANF, housing assistance)
- Sharing with foreign governments or international organizations
- Commercial use or transfer to private entities

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

2.2.2. USDA shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals (*i.e.*, the collection of data elements spelled out in the Privacy Impact Assessment).

## 3. DATA CATEGORIES

3.1. <u>Data Definition</u>

3.1.1. All data obtained by States or their vendors in administering SNAP or that otherwise may be necessary to determine whether the program is being conducted in accordance with the FNA or regulations issued under the FNA.

3.1.2. Data derived from third-party sources (employment verification databases, financial institution records, property records) that States use for verification but are not part of applicant-reported information are excluded.

3.2. <u>Permitted Data</u>

- Information that the applicant household reported on application/recertification forms including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers.

- Direct verifications that the State conducted to confirm applicant-reported information Records that the State maintains of SNAP applications, approvals, denials, certifications, and benefits issued.

- Household composition and income exactly as reported by the applicant (not third-party verified amounts).

- Transactional data necessary for fraud detection

## 4. LIMITED ACCESS

4.1. The SNAP Information Database is accessed and used ONLY by employees of the USDA who are:

4.1.1. Designated by the Chief of Staff at Food, Nutrition, Consumer Services (FNCS)

4.1.2. Trained in SNAP Act, Privacy Act, and this protocol

4.1.3. In compliance with all information security annual recertifications

4.2. ~~No Access~~<u>Except to the extent required by law, no access</u> to the SNAP Information Database may be provided to:

4.2.1. Other USDA agencies (APHIS, ERS, NASS, etc.)

4.2.2. Divisions within FNS without an explicit need-to-know

4.2.3. OIG employees, unless in direct support of a law enforcement investigation related to SNAP fraud, waste, or abuse

4.2.4. Any other federal agency

4.2.5. <u>Any FOIA, administrative subpoena or like external requester</u>

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender


**U.S. DEPARTMENT OF AGRICULTURE**

**5. SYSTEM OF RECORDS NOTICE (SORN) AND PRIVACY IMPACT ASSESSMENT (PIA)**

5.1. <u>SORN</u>

The applicable SORN for this protocol is USDA/FNS-15 "National Supplemental Nutrition Assistance Program (SNAP) Information Database," 90 FR 26521.

The SORN location can be found here: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system-of-records

5.2. <u>Privacy Impact Assessment (PIA)</u>

The applicable Privacy Impact Assessment for the SNAP Information Database can be found here: https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

**6. FRAUD, WASTE, AND ABUSE DETECTION FRAMEWORK**

6.1. <u>Core Fraud Detection Functions</u>

6.1.1. USDA will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program that focuses on:

- identity verification
- income and eligibility verification
- immigration status
- verification against disqualified recipients

6.2. <u>Enhanced Fraud, Waste, and Abuse Detection Techniques</u>

6.2.1. In addition to the core fraud detection functions, USDA will employ additional techniques including, but not limited to:

- Intrastate and interstate duplicate detection
- Deceased individuals' detection
- Synthetic identity patterns (new SSNs with inconsistent biographical data)
- Geographic anomalies

6.2.2. New data mining techniques will be limited to identifying recipient and retailer fraud with a direct nexus to SNAP.

**7. DATA OUTPUT**

7.1. <u>States</u>

7.1.1. USDA will provide flagged data back to the State agency for review. States are encouraged to verify the accuracy of fraud detection flags and provide feedback to USDA to refine detection logic and reduce false positives. Collaborative processes will be established to ensure accurate identification of fraud and appropriate corrective actions.

7.2. <u>Law Enforcement</u>

7.2.1. The USDA may refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP.

7.3. <u>USDA SNAP Retailer Operations Center (ROC)</u>

7.3.1. The USDA may refer fraud detection leads to the ROC where, during fraud detection analysis, a compromised EBT card or terminal ID may have been identified.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

8. **DATA MINIMIZATION AND RETENTION**

8.1. <u>Retention Period</u>

8.1.1. Until a record schedule is approved, data will be retained only as long as necessary for purposes set forth in the SORN and this protocol, and in no case longer than 3 years per the SORN.

8.2. <u>Automatic Deletion</u>

8.2.1. Data shall be retained for no longer than three years, consistent with the USDA/FNS-15 SORN. An automated process will be implemented to delete data upon expiration of the retention period, except for records related to ongoing audits, investigations, or litigation.

8.3. <u>Ongoing Cases</u>

8.3.1. Data pertaining to ongoing audit, investigation, or potential litigation retained only as long as necessary, then deleted.

9. **DATA SECURITY AND TECHNICAL REQUIREMENTS**

9.1. <u>Infrastructure and Location</u>

9.1.1. Primary storage location: AWS GovCloud (US) region

9.1.2. Backup/disaster recovery: Secondary AWS region

9.1.3. No storage, processing, or backup outside GovCloud or federal secure environments

9.1.4. All infrastructure must meet or exceed FedRAMP High baseline standards

9.1.5. AWS Personnel Access: Data is encrypted such that AWS personnel cannot access unencrypted data. Encryption keys are managed exclusively by federal USDA personnel and are not accessible to AWS or third-party vendors.

9.2. <u>Access Controls</u>

9.2.1. Multi-factor authentication required for all access

9.2.2. Role-based access control (RBAC) with principle of least privilege

9.2.3. Access is limited to specifically designated USDA employees engaged to assist in determining whether the program is being conducted in accordance with the FNA.

9.2.4. Access logging and audit trail maintenance (minimum period equal to data retention period, see Section V.E).

9.2.5. Quarterly access reviews by USDA

9.2.6. Immediate revocation of access upon employee termination or assignment change

9.3. <u>Encryption Standards</u>

9.3.1. Encrypted data at rest and in transit

9.3.2. Encryption keys managed solely by USDA federal personnel

9.3.3. No encryption keys held by commercial vendors

9.4. <u>Data Segregation and Compartmentalization</u>

9.4.1. SNAP data isolated in separate, dedicated AWS GovCloud environment

9.4.2. SNAP data not directly integrated with other USDA systems

9.4.3. Limiting access to individuals with specialized training and oversight

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

9.5.  Data Transfer

>    9.5.1.  All data transfers shall utilize secure tools that meet or exceed FedRAMP High baseline standards.

**10.  INCIDENT RESPONSE AND BREACH NOTIFICATION**

10.1.  Incident Response

>    10.1.1.Incident response procedures are aligned with FNS Handbook Chapter 10 security incident and breach notification requirements that USDA already follows internally. This protocol extends equivalent procedures to State notification.

10.2.  Incident Definition

>    10.1.2.  Unauthorized access, use, or disclosure of data

>    10.1.3.  Security vulnerability or control failure affecting data

>    10.1.4.  Data loss, corruption, or destruction

>    10.1.5.  Encryption failure or key compromise

>    10.1.6.  Failed access control or authentication mechanism

>    10.1.7.  Any event that may reasonably be expected to compromise data security or confidentiality

10.3.  Incident Notification Timeline

>    10.3.1.  Initial Notification within 12 hours

>>        10.3.1.1.    Within 12 hours of discovery (by phone + email to State security/privacy contact and Director).

>    10.3.2.  Preliminary Report within 24 hours

>>        10.3.2.1.    Description of incident and timeline

>>        10.3.2.2.    Data elements affected (specific fields and estimated number of records)

>>        10.3.2.3.    Estimated number of individuals affected

>>        10.3.2.4.    Preliminary assessment of whether unencrypted sensitive data may have been exposed

>>        10.3.2.5.    Preliminary remedial actions taken

>>        10.3.2.6.    Root cause analysis plan and timeline

**APPENDIX A - SOURCES**

- Privacy Impact Assessment: https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf
- SORN: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system-of-records
- SNAP Act: https://www.law.cornell.edu/uscode/text/7/2020
- SNAP QC Handbook
- Executive Order 14243 (March 20, 2025) "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos: https://www.govinfo.gov/content/pkg/DCPD-202500382/pdf/DCPD-202500382.pdf

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

# Exhibit 7

**Ladov, Mark**

---

| | |
|---|---|
| **From:** | Shapiro, Elizabeth (CIV) <Elizabeth.Shapiro@usdoj.gov> |
| **Sent:** | Wednesday, December 3, 2025 12:59 PM |
| **To:** | Maria Buxton; Kurland, Benjamin S (CIV) |
| **Cc:** | Sebastian Brady; Paul Stein; Gaber, Sherief; Ladov, Mark; Jane Reilley |
| **Subject:** | RE: California v. USDA |

Maria,

It should be obvious that the agency has no intention of violating the court's October 15, 2025 order. The government takes court orders seriously and abides by them. The court's order here was very specifically cabined to the prior demand letters under 7 U.S.C § 2020(e)(8). See Mem. Op. at pp.13-14, 25; see also Letter from Patrick Penn, Nov. 24, 2025, n.1. The Secretary's remarks related to the recent correspondence seeking your agreement to or comments on the security protocols, which the Court suggested was a prerequisite to legal collection of the requested data under Section (a)(3). As you know, and as the court acknowledged, the Department's authority pursuant to (a)(3) does not confer discretion on the States; States are obligated to produce data to the Department in the context of an (a)(3) request. Mem. Op. p. 15:2-6. Thus, far from intending to violate a court order, the Secretary's intent was to follow the court's instruction to the agency to adopt mutually agreeable security protocols. You asked for an extra week to consider the protocols, to which we agreed. We are not willing to further extend that time. The protocols match or exceed in protection those requested or accepted by the states in providing the same type of information to FNS. They should, therefore, be both uncontroversial and welcome. There is also no need for all states to coordinate; they each received the agency's communication and can respond individually. Coordination is no reason to inject further delay. With respect to next steps in the case, Ben should be back Friday and can confer with you about a plan moving forward.

Best,

Betsy

---

**From:** Maria Buxton <Maria.Buxton@doj.ca.gov>
**Sent:** Tuesday, December 2, 2025 6:43 PM
**To:** Shapiro, Elizabeth (CIV) <Elizabeth.Shapiro@usdoj.gov>; Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>
**Cc:** Sebastian Brady <Sebastian.Brady@doj.ca.gov>; Paul Stein <Paul.Stein@doj.ca.gov>; Gaber, Sherief <sherief.gaber@ilag.gov>; Ladov, Mark <Mark.Ladov@ag.ny.gov>; Jane Reilley <Jane.Reilley@doj.ca.gov>
**Subject:** [EXTERNAL] California v. USDA

Betsy and Ben,

I hope you both had a restful holiday. We write to discuss a few issues in *California et al. v. USDA et al.*

First, we've just been made aware of statements that your client, Secretary Rollins, made today at a cabinet meeting with the President, stating that "as of next week" USDA has "begun and will begin to stop moving federal funds" into Plaintiff States, "until they comply" with the demand for SNAP data that USDA made "[i]n February of this year." A recording of those comments is available here ("In February of this year we asked for all the states for the first time to turn over their data to the federal government . . . . But 21 states, including California, New York, and Minnesota—blue states—continue to say no. So, as of next week we have begun and will begin to stop moving federal funds into those states until they comply[.]"). This raises a few questions, to which we would appreciate answers:

a. Does Secretary Rollins intend to violate the preliminary injunction in this case, and if not, can you please explain how these statements do not constitute a violation of that order?

b. If this threat was intended to refer to the letter USDA sent on Nov. 24—which Secretary Rollins clearly views as the same demand made in February that is the subject of the Court's order—can you further clarify why such a threat is not in violation of the preliminary injunction order?

c. In our last correspondence, you noted that USDA is seeking comments from Plaintiff States to the security protocols – is that still the case, or is it USDA's position that states would be in noncompliance (and subject to penalties) if they do not unequivocally agree to produce the data identified in the Nov. 24 letter subject to USDA's  proposed data sharing agreement, without any edits or suggestions?

Second, we remain open to discussing a schedule for this case going forward. Please let us know what you propose. As part of that discussion, we'd like to also discuss our deadline to respond to USDA's Nov. 24 letter.  We intend to provide a response on behalf of all Plaintiff States, and, as I'm sure you can understand, providing a meaningful response on behalf of 23 states requires some time, especially given the holiday last week.

Thanks,
Maria

**Maria F. Buxton**
Deputy Attorney General
California Attorney General's Office | Government Law Section
455 Golden Gate Avenue, Suite 11000 | San Francisco, CA 94102 | Tel: 415-510-3873
maria.buxton@doj.ca.gov

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

# Exhibit 8



**KATHY HOCHUL**
Governor

**BARBARA C. GUINN**
Commissioner

**RAJNI CHAWLA**
Executive Deputy Commissione

January 9, 2026

Patrick A. Penn
Acting Administrator
Food and Nutrition Service
U.S. Department of Agriculture
1320 Braddock Place
Alexandria, VA 22314

Dear Acting Administrator Penn:

I write in response to your letter of December 23, 2025, concerning USDA's renewed data demand dated November 24, 2025. As explained in the prior letter sent to USDA and its counsel on December 8, 2025, the New York State Office of Temporary and Disability Assistance (OTDA) has significant concerns with USDA's renewed data demand and proposed security protocol. USDA's December 23 response dismissed or disregarded those concerns and its revised security protocol remains deficient.

Accordingly, as of this date, OTDA is unable to agree to USDA's renewed data demand. Under the security protocol proposed by USDA on December 23, 2025, compliance with the renewed data demand would violate laws that protect the privacy, security and integrity of data submitted to our agency by SNAP applicants and recipients. USDA's renewed demand and accompanying threat to disallow funding also violates the preliminary injunction order issued by the Court in *California v. USDA*, No. 3:25-cv-06310-MMC (N.D. Cal. Oct. 15, 2025), which holds that state agencies "are prohibited" from disclosing the demanded data given that "USDA has announced its intent to use such information in ways well beyond those permitted under § 2020(e)(8)(A)(ii)." Because USDA has terminated negotiations and initiated the disallowance process, OTDA is again forced to return to the Court to seek emergency relief to prevent USDA from cutting off the funding that we need to administer the program, on which our residents and communities rely for food security.

OTDA stands ready to work with USDA towards an agreed protocol that complies with the SNAP Act and other applicable laws.

Sincerely,

Barbara C. Guinn
Commissioner

cc:    Rajni Chawla
       Valerie Figueroa
       Malinka Gutierrez