UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

_____

STATE OF CALIFORNIA; STATE OF
NEW YORK; STATE OF ARIZONA;
STATE OF COLORADO; STATE OF
CONNECTICUT; STATE OF
DELAWARE; DISTRICT OF
COLUMBIA; STATE OF HAWAIʻI;
STATE OF ILLINOIS; OFFICE OF THE
GOVERNOR ex rel. Andy Beshear, in his
official capacity as Governor of the
Commonwealth of Kentucky; STATE OF
MAINE; STATE OF MARYLAND;
COMMONWEALTH OF
MASSACHUSETTS; STATE OF
MICHIGAN; STATE OF MINNESOTA;
STATE OF NEVADA; STATE OF NEW
JERSEY; STATE OF NEW MEXICO;
STATE OF OREGON; OFFICE OF THE
GOVERNOR ex rel. Josh Shapiro, in his
official capacity as Governor of the
Commonwealth of Pennsylvania; STATE OF RHODE
ISLAND; STATE OF WASHINGTON;
STATE OF WISCONSIN,

                    Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
AGRICULTURE; BROOKE ROLLINS, in
her official capacity as U.S. Secretary of
Agriculture; U.S. DEPARTMENT OF
AGRICULTURE'S OFFICE OF
INSPECTOR GENERAL,

                    Defendants.

_____

Case No. 3:25-cv-06310

**DECLARATION OF
SHERRY TOMASKY**

1

SHERRY TOMASKY does hereby declare:

1.　　I am the Supplemental Nutrition Assistance Program ("SNAP") Policy Bureau Chief of the Food and Nutrition Policy Bureau in the Division of Employment and Income Support Programs ("EISP") within the New York State Office of Temporary and Disability Assistance ("OTDA"). OTDA's mission is to help vulnerable New Yorkers meet their essential needs and advance economically by providing opportunities for stable employment, housing, and nutrition.

2.　　OTDA is responsible for supervising the 58 social services districts ("districts") that are responsible for administering SNAP in New York State and providing SNAP benefits to eligible low-income households to address hunger by supplementing the food budget of such households.  The Food and Nutrition Bureau within OTDA is tasked with developing and overseeing policies and procedures related to providing monthly nutritional assistance benefits, including SNAP, for households as provided by section 95 of the New York Social Services Law.

3.　　As part of the SNAP application process, OTDA collects sensitive personally identifiable information ("PII") from applicants and recipients, including but not limited to, home addresses, dates of birth, Social Security Numbers, citizenship and immigration status, household income and living expense information.  OTDA maintains such data in its Welfare Management System ("WMS") database.

4.　　On July 9, 2025, USDA sent OTDA a demand for five years' worth of data on all SNAP applicants and recipients.  USDA did not, however, include in its demand any protocol that would govern the transmission, use, or retention of the data and protect against misuse or breach.  Facts concerning the necessity for a detailed data-sharing agreement and protocol, and the absence of one in USDA's request, were previously presented to the Court in a declaration

2

submitted by my agency colleague.  *See* ECF No. 59-21, Declaration of Wendy DeMarco (DeMarco Decl.) ¶¶ 14-26.

5.      On September 18, 2025, this Court issued a Temporary Restraining Order enjoining USDA from withholding administrative funds to which OTDA would normally be entitled, and on October 15, 2025, the Court issued a Preliminary Injunction, concluding that New York and its co-plaintiff states were likely to demonstrate that USDA had acted contrary to law.

6.      On Monday, November 24, 2025 USDA sent a letter to New York Governor Kathy Hochul renewing its demand for SNAP Eligibility Data Elements no later than 30 days after the date of such letter.  A copy of this correspondence is attached as Exhibit A.

7.      USDA attached to its letter a list of data elements that "should be included in the data sharing file from each State agency on all household members that are listed in the SNAP case."  Present on this list are several data elements that were not specified in USDA's prior demands, including (but not limited to) the following: an individual's mailing address; their homeless status; their email address; their phone number; their shelter expenses (including monthly rent); their assets or resources; SNAP change reporting status; their relationship to other household members; their middle names; any alternative names used; Authorized Representatives; and their individual recipient identification number assigned by OTDA.

8.      USDA also attached a "Fraud, Waste and Abuse Detection Protocol."  The Protocol is five pages long and purports to "establish[] a framework for State SNAP agencies to share data with the USDA/FNS for detection of fraud, waste, and abuse and program integrity purposes."

3

9.      On Monday, December 8, 2025, counsel for New York State and other Plaintiff States sent a 10-page letter to counsel for USDA detailing the concerns of plaintiff states.  In addition, OTDA submitted a copy of this letter directly to Acting Administrator of FNS Patrick Penn.  A copy of this letter is attached as Exhibit B.

10.      On December 23, 2025, USDA responded by providing a letter attaching a slightly revised protocol to the office of Governor Hochul.  A copy of the December 23, 2025 correspondence is attached as Exhibit C.

11.      OTDA has several concerns about the adequacy of the protocol, which I have elaborated on below.

12.      *First,* the protocol is lacking in specificity and therefore is insufficient to protect against data misuse by the federal government and security breaches by third parties.

13.      Based on OTDA's experience, a protocol typically would include specific information about the procedures for transferring information and how the data will be stored, accessed, and retained, usually detailed within a Computer Matching Agreement ("CMA") and an Interconnection Security Agreement ("ISA"), also commonly referred to as an Interface Control Document ("ICD").  The Computer Matching and Privacy Protection Act ("CMPPA"), which regulates the use of computer matching by federal agencies involving PII, requires federal agencies sharing data with non-federal agencies to have a written agreement in place specifying the terms under which the data matches are to be made. *See* 5 U.S.C. § 552a.

14.      Although the USDA claims in its December 23 letter that "[t]he states have no basis to invoke the Computer Matching Act" because the SNAP Information Database is not a matching program, but rather a database that stores the SNAP participant information submitted by state agencies, USDA also says that it intends to use the requested data elements to

4

electronically verify recipients' eligibility, such as to determine whether deceased individuals

remain on State SNAP benefit rolls.  In order to verify whether individuals on SNAP benefit rolls

are deceased, the USDA would need to match requested data elements, such as SSN, to other

databases, which triggers the CMPPA.  Per "Final Guidance Interpreting the Provisions of Public

Law 100-503, the Computer Matching and Privacy Protection Act of 1988", the federal Office of

Management and Budget ("OMB") revised the definition of a matching program to clarify that in

both Federal-to-Federal and Federal-to-nonFederal matching programs, there is the automated

comparison of two or more automated record sets, whether systems of records or non-Federal

records. "In taking this position, OMB is extremely concerned that agencies not adopt data

exchange practices that deliberately avoid the reach of the Act where compliance would

otherwise be required."  Further, in such Final Guidance, OMB specifically asserted that matches

between the Social Security Administration and state agencies for information with which to

update a benefits file should be considered a matching program because there are potentially

adverse consequences for the record subject in matching state records to federal records where

eligibility for a federal benefit program is involved.  Here, USDA's assertion that its request for

data is not subject to the CMPPA appears to be a deliberate attempt to avoid the reach of the

CMPPA despite USDA's alleged intent to use New York State's records to verify SNAP

eligibility.

15.    Additionally, pursuant to the Federal Information Security Modernization Act

("FISMA") at 44 U.S.C. Chapter 35, the Director of the federal Office of Management and

Budget issued Circular A-130, entitled "Managing Information as a Strategic Resource", which

requires federal agencies that share PII with other agencies to impose conditions that govern the

creation, collection, use, processing, storage, maintenance, dissemination, disclosure and

disposal of PII through written agreements, including contracts, data use agreements, information exchange agreements, and memoranda of understanding.

16.     For example, the Electronic Disqualified Recipient System ("eDRS"), which is used by states to prevent disqualified individuals from being approved for additional SNAP benefits, is the type of data sharing program that requires a detailed data sharing agreement pursuant to these statutes, regulations and long-standing agency policies.  A copy of the CMA and ISA executed between FNS and OTDA to implement eDRS is attached as Exhibit D; it represents a typical data sharing agreement between USDA and OTDA, and demonstrates the detailed policies and protocols that must be in place to protect against misuse or breach before OTDA can share PII with the federal government.  For example, the eDRS CMA explains that online access to eDRS is limited to those who have obtained eAuthentication Level 2 and approved personnel must enter a State issued unique identification number when accessing eDRS on their agency's systems.  Additionally, information generated through the match of a State record with eDRS will be destroyed by the States and FNS as soon as the record no longer serves a purpose with eDRS and is no longer needed to fulfill any legal retention requirement, using Disposition Authority N1-462-09-8, Records Retention Schedule File Code FNS-102.

17.     By contrast, the protocol proposed by USDA provides only an overview of the types of protections that should be used, without providing the details required for a proper data sharing agreement.  This is true of both USDA's original protocol and the slightly-modified protocol sent on December 23, 2025.  For example, section 9.5.1 of the protocol states that all data transfers shall utilize secure tools that meet or exceed FedRAMP High baseline standards without specifying the tools, which may result in USDA requesting data in a format for which OTDA cannot comply.  Additionally, section 10.1.1 of the protocol references a Chapter 10 of the

6

FNS Handbook, which is not contained within the FNS Handbook released in January 2025. OTDA is unable to locate a newer version of the FNS Handbook containing a Chapter 10 on USDA's website.

18.    *Second,* the protocol requests new data elements that do not seem to be useful or necessary for accomplishing USDA's stated purposes, and USDA has not provided any explanation to guide OTDA's review.  This disconnect makes it impossible for OTDA to propose amendments to the protocol that would protect OTDA's interests, including our obligation to protect the privacy interests of individuals, while also accomplishing USDA's stated goals.

19.    For example, USDA states that it is collecting data elements necessary to achieve duplicate enrollment prevention.  But it does not appear that any of the information provided here will further this interest beyond what is already accomplished through the Public Assistance Reporting Information System ("PARIS") match program, Front End Detection System ("FEDS"), and the National Accuracy Clearinghouse ("NAC"), the last of which New York State will participate in by Summer 2026.  SNAP applicant data must be run against a statewide database of all active SNAP cases for purposes of preventing duplicate intrastate participation before a case can be approved.  New York State fully complies with PARIS matching requirements to prevent and detect duplicate participation between states.  New York State also engages in a border state match with Massachusetts.  New York State also uses the National Directory of Contacts that is provided biannually by USDA to states to communicate with other states to check for duplicate SNAP participation.  Finally, New York State is actively complying with all pre-onboarding activities and is expected to fully participate in the federally established and managed NAC in the Summer of 2026, on schedule.  In short, New York is following the current practices and processes prescribed by USDA to prevent duplicate enrollment.

20.     It is important to note that residential address is *not* a data element used to prevent the issuance of duplicative SNAP benefits, either in-state or between states.  Rather, matches are made using a combination of name, date of birth ("DOB"), Social Security Number ("SSN"), and Client Identification Number, county of residence, and the state of residence (for the purpose of interstate matching).  Additionally, a large portion of the SNAP caseload falls under the simplified reporting system which does not require households to report a change in residential address during the certification period.  As a result, the address and shelter type information captured in the system of record is static from the last point of required contact and therefore may not reflect actual household circumstances for a given month.  Thus, residential address is not an effective data point for detecting duplicate benefits, and USDA has failed to offer any explanation for why it needs residential address to detect duplicate SNAP participation.

21.     OTDA is particularly concerned about disclosing certain PII such as residential address due to the potential to run afoul of privacy protections for domestic violence victims. For example, 18 NYCRR § 357.3(i) prohibits the release of information collected with respect to victims of domestic violence to any outside party or parties or other government agencies unless the information is required to be disclosed by law, or unless authorized in writing by the applicant or recipient.  USDA, in its own federal regulations at 7 C.F.R. § 272.18(c)(9), requires that State agencies establish a process to prevent the disclosure of any location information received from the NAC about any SNAP applicant or participant considered a vulnerable individual, which is defined to include a person who self-identifies as fleeing domestic violence. Per such federal regulation, "State agencies shall take steps to ensure that any information resulting from a NAC match, including identity and location, is protected during verification or resolution when a vulnerable individual is indicated in a positive match."  Thus, the USDA's

request for PII such as residential address conflicts with USDA's own mandate that State agencies must protect the location of domestic violence victims. OTDA remains amenable to discussing ways to provide SNAP data in deidentified form.

22.     In addition, the requested data will not provide sufficient information for USDA to evaluate a recipient's financial eligibility for the program. As USDA's December 23 letter points out, when OTDA sends a sample set of cases to USDA for auditing purposes, we include many data points that are not being requested for USDA's new SNAP Information Database. But that is because those additional data points are necessary to understand and review a SNAP eligibility determination. For example, household income information and shelter type and expense are several factors that are combined into a SNAP budget to determine financial eligibility for the program. However, looking at applicant-reported income and shelter cost alone will not sufficiently determine financial eligibility for SNAP. Furthermore, other income information that is reported to OTDA by third parties (such as social security income for SNAP recipients receiving benefits through the New York State Combined Application Project ("NYSCAP")) and that OTDA uses to verify applicant-reported income  will not be included in this data exchange as per the proposed privacy and security protocol, and will therefore further limit the utility of investigating client reported income information for eligibility purposes. In other words, USDA apparently intends to review applicants' eligibility using unverified applicant-reported information without the information that OTDA uses (as required by law) to verify applicant-reported information, leaving USDA with incomplete and potentially inaccurate information to purportedly review the accuracy of eligibility determinations. It therefore is not clear what purpose asking for income information serves.

23.     Curiously, although USDA indicates in the December 23 letter that the requested data elements "can help confirm the accuracy of eligibility and benefit level determinations," USDA did not request SNAP recipient benefit amounts in its November 24, 2025 demand for data.  It is unclear how USDA intends to verify SNAP household benefit levels without having data showing the amount of SNAP benefits issued to such households.

24.     *Third*, OTDA has concerns about USDA's stated intention to "verify[] SNAP recipient eligibility against federally maintained databases" without additional information about what databases will be used. For example, the Systematic Alien Verification for Entitlements ("SAVE") is a federal platform that allows user agencies to validate the immigration documentation for non-citizen applicants, which is used in conjunction with other factors to make an eligibility determination. SAVE also stores information about each query.

25.     When using SAVE, OTDA is not always able to verify an applicant's immigration document on the first query.  If an unclear result is given (for example, because of an error or inconsistency in the federal database, such as a mismatch between someone's maiden and married names or transposed document numbers), then OTDA will complete the required steps for second and third level additional verification, which occurs approximately 10% of the time. OTDA does this for every case, but it is time-consuming and only the final verified household detail is coded in the system of record.

26.     It is my understanding that the federal government is reportedly expanding its use of SAVE to audit public benefit programs.  Based on this, OTDA fears that USDA will run New York State's bulk SNAP data against SAVE, and then require OTDA to address potentially thousands of false positive or negative results, at great time and expense, even though OTDA has already run primary, secondary and tertiary SAVE verification checks to ensure the eligibility of

all SNAP applicants who are not U.S. citizens.  USDA's December 23 letter is silent about this issue, and offers nothing to alleviate this concern.  It is important to note that federal regulation 7 C.F.R. § 273.2(f)(1)(ii)(B) requires SNAP agencies to continue with an eligibility determination, and benefit issuance, if an individual is otherwise eligible, while awaiting a SAVE secondary or tertiary result.  It is permissible under such federal regulation that an individual may be in active receipt of SNAP in a given month without a verified SAVE response.

27.    I also understand that Secretary Rollins has claimed that data from other states show that thousands of deceased individuals are receiving SNAP benefits, but she has not presented data to explain these statistics. USDA's December 23 letter repeats these accusations but specifically refuses to offer any details about how USDA has come up with these claims, or that deceased individuals are actually redeeming benefits. The statements by USDA and Secretary Rollins raise questions about the data elements and methodology that USDA is using to assess whether SNAP benefits continue to be issued to deceased individuals and if these benefits are, in fact, being redeemed.

28.    For example, if an individual is in receipt of SNAP and dies in a given month, OTDA follows the regulatory requirements outlined in 7 CFR § 272.14 and is alerted through the federally prescribed Social Security Administration ("SSA") death match process (governed by the CMPPA).  Death data often lags by a month or more in the SSA files. However, OTDA does run this process as often as weekly, or monthly in some parts of the State, with the information received from SSA. Further, given that death matches from SSA are not considered verified upon receipt, there is an additional minimum required lag before OTDA is able to act upon a death match result because the match must be independently verified.  *See* OTDA, Administrative Directive Memorandum Re: Updated New York City Death Match Process (Feb 21, 2024),

https://otda.ny.gov/policy/directives/2024/ADM/24-ADM-03.pdf, and OTDA, Administrative

Directive Memorandum Re: Updated Upstate Death Match Process (July 28, 2021),

https://otda.ny.gov/policy/directives/2021/ADM/21-ADM-06.pdf.  Consequently, USDA *requires*

New York State to issue a Notice of Match Results to households, providing an opportunity

confirm or contest the death match findings.  Cases will automatically close if the death is

confirmed by the household or the household does not respond to the Notice of Match Results.

OTDA also cross-matches death match data with the New York State Vital Statistics records.

These matches are reinforced by a quarterly SSA death match process.  Thus, the process to close

a SNAP case or remove a deceased individual from an active SNAP case is rigorous, and may

take a month or, often, more.  It is almost impossible to verify a death match and remove a

deceased individual from a case in the same month as the death, given the federally prescribed

SSA death match process, noticing requirement, and cross match with verified vital statistics

data.  Therefore, an individual who was subsequently determined to be deceased is almost

always listed as an active SNAP recipient in the month of death and possibly in the subsequent

month. Claims that deceased individuals are in active receipt of SNAP is grossly misleading and

disregards the federally prescribed process to verify a death and appropriately close or remove an

individual from a SNAP case.

29.     Also, deceased individuals are not able to spend SNAP benefits.  If there are

unused SNAP benefits on a deceased individual's EBT card, the federal government ultimately

does not bear the cost of those unused benefits because benefits issued to a case where the sole

household member dies are immediately expunged upon verification of death and case closure. If

benefits issued to a deceased person are being spent by household members in the 30-60 day

period during which the information is being verified as required by law, that is an entirely

different issue, and one that USDA has failed to explain properly.

30.    In the Supplemental Corley Declaration (ECF No. 90-1), USDA claims to have

found over 500,000 cases with dummy SSNs in their records, without providing the proper

context or explanation for why this may legitimately exist in a SNAP case record.  When a

SNAP case worker conducts an SSN validation against the federally prescribed SSA database,

validations can sometimes fail or be delayed due to a mismatch in name/DOB/SSN, a keystroke

error on SSN, or for other reasons.  If SSN validation is pending and the client is otherwise

eligible for SNAP, the case can be processed as eligible using a placeholder in the SSN field until

which time the SSN is validated (or fails to validate).  It is entirely normal for a case record to

contain a placeholder SSN in an active month.  USDA did not ask states for any information

about subsequent resolution of pending SSN validation.  Given the nature of the data request, it

is impossible for USDA to derive any meaningful conclusions about the presence of placeholder

SSNs in monthly active SNAP case records.

31.    Although the USDA's December 23 letter indicates that data received from 28

states indicates that an estimated average of $24 million per day of SNAP funds are being

erroneously spent or lost to fraud, New York State conducts robust data matching for fraud

prevention and detection and actively addresses incidents of fraud within the SNAP program and

utilizes numerous available databases for ensuring accuracy in eligibility determinations,

including but not limited to, the Income and Eligibility Verification System ("IEVS"), which is a

federally-mandated matching system, PARIS, FEDS, SAVE, eDRS and will soon be participating

in the NAC. To minimize any false errors, such as a placeholder SSN, it would be constructive

for USDA and OTDA to discuss the programs and methodologies that USDA anticipates using,

and how to interpret results from USDA's data mining, as well as what data elements are needed specifically for each data system—so that OTDA can provide the specific information that is necessary for USDA to accomplish its stated goals without unnecessarily disclosing extraneous private information or mischaracterizing findings.

32.     Finally, OTDA notes that the 30 days given by USDA to produce the requested data is inadequate. OTDA estimates that a **minimum** of 120 days is needed to:

1. Agree to privacy and security terms.

2. Finalize data extraction rules and definitions (keeping in mind that USDA's definition of data elements does not align with state-specific data systems and data element definitions). Depending on the final agreed-upon data elements, scope of information generated on each element, and where and how they exist in various NYS systems, the proposed timeline may increase.

3. Determine the IT processing schedule that does not jeopardize other required programming projects such as mass rebudgeting, reporting schedules, scheduled updates, etc. (IT schedules can fill up 18 months in advance).

4. Program and execute the data extraction for the **most recent active month** of SNAP data.

5. Test results for accuracy and validity.

6. Complete the data transmission process.

Once steps 1-6 are complete, this process must repeat for every month back to January 2020 (72 months).  Given USDA's request for "longitudinal data" for the entire caseload, it is unclear to us how we are to assemble data to meet this need. OTDA has never had to produce this type and volume of data en masse before, and it is unknown how long it will take to retrieve the required

data for retrospective months.  OTDA is also concerned about the sheer volume of data that will be generated and how that may impact other required system functions.  Lastly, the files returned to OTDA with flagged cases require a set of business rules to guide the receipt, processing and follow up actions needed on these cases.  Without any understanding of what type of information USDA may return to the state, we cannot complete the business requirement process for this step.

I declare under penalty of perjury pursuant to 28 U.S.C. 1746 that the foregoing is true and accurate.

Date: January 9, 2026
        Albany, New York

_____
SHERRY TOMASKY

Sherry
Tomasky

Digitally signed by
Sherry Tomasky
Date: 2026.01.09
09:55:41 -05'00'

# Exhibit A



**Food and Nutrition Service**

U.S. DEPARTMENT OF AGRICULTURE

November 24, 2025

Governor Kathy Hochul
NYS State Capitol Building
Albany, New York 12224

Dear Governor Hochul,

Pursuant to 7 U.S.C. § 2020(a)(3), the United States Department of Agriculture (USDA), Food and Nutrition Service (FNS), directs that your State provide to FNS records including the Supplemental Nutrition Assistance Program (SNAP) Eligibility Data Elements for the period of January 1, 2020, to present, listed in Attachment A to this letter. The federal government provided funds to assist your State in collecting these records, and FNS needs the records to determine whether SNAP is being conducted in compliance with law.

Since last summer, 28 States have complied with FNS's request for this same type of data. FNS's preliminary review of this data indicates that billions of dollars in federal funds may have been lost due to fraud or other errors undetected by States in their administration of SNAP. Your State, however, has not yet provided FNS the data it seeks, citing the absence of agreed-upon "data and security protocols" specified in 7 U.S.C. § 2020(a)(3). Attachment B to this letter provides a set of data and security protocols that FNS observes with the 28 complying States. This set of protocols, which include FedRAMP High data security, provides a higher level of security than that which States, including your State, historically have accepted in releasing similar data to FNS—including social security numbers and addresses. FNS will inspect and audit the data provided pursuant to this request, and maintain it under the applicable System Of Records Notice, solely for the purposes of "determin[ing] whether the program is being conducted in compliance with [the Food and Nutrition Act of 2008 (FNA)] (including regulations issued under [the FNA]." *See* 7 U.S.C. § 2020(a)(3).

In view of the facts that 28 other States have produced their records to FNS, operating under FNS's data and security protocols, and that your State previously delivered the same type of data to FNS under *less stringent* protocols than those we set forth in Attachment B, there can be no good faith objection to the attached protocols. In *California, et al v. USDA, et al*, 3:25-cv-06310 (N.D. Calif., July 28, 2025), the Court acknowledged that the plain language of the FNA at 7 U.S.C. § 2020(a)(3) entitles USDA to obtain all the requested records, subject to data and security protocols agreed to by the States and USDA:

> "Congress, in the 'Records' section of § 2020, did use clear, **mandatory** language, specifically 'shall … be made available for inspection and audit,' thereby **giving USDA the right to obtain**, subject to data and security protocols, all records necessary to determine whether the program is being conducted in accordance with the SNAP Act. See 7 U.S.C. § 2020(a)(3)(B)."

Order Granting Plaintiff States' Motion for Preliminary Injunction, Oct. 15, 2025, 15: 2-6 (emphasis added).[1]

Because FNS is operating under a higher level of data security than has proven acceptable to States, including yours, when producing to FNS the same type of information it requests here, we anticipate your State will now join the others in complying with Congress's mandate that USDA be able to obtain records to ensure that its federally-funded programs are being operated in compliance with law.

Our preliminary review of data provided to FNS by States complying with FNS's data requests indicates an estimated average of $24 million dollars per day of federal funds is lost to fraud and errors undetected by States in their administration of SNAP. That estimated loss will likely increase when data withheld by non-complying States factors into the analysis. Preventing such losses could save approximately $9 billion or more per year.

We respectfully request that your State respond in writing within seven days of the date of this letter with confirmation of your agreement to produce the requested data to FNS subject to the attached security and data protocols. Because the protection afforded by our data and security protocols exceeds that which your State historically has required before producing the same type of data to FNS, your State should have no difficulty nor reservations agreeing to these protocols. Based on our experience with States complying with FNS data requests, about which we provided notice last summer, your State should be able to produce its records no later than 30 days after the date of this letter. Your State's timely compliance with this letter is essential to safeguarding the public interest in securing federal SNAP funds from loss due to fraud, waste and abuse. If, for some reason, your State declines to produce the requested data subject to the attached protocols, we request that you inform us in writing within seven days of the date of this letter of: (1) the basis for your lack of agreement and (2) any proposed edits to the protocols that you deem necessary to produce the requested data.

In addition, please take all steps necessary to preserve all records covered by this request, whether possessed by your State or your vendors. We expect to be able to review historical data in its native, unaltered form, from January 1, 2020, to the present. It is imperative the Federal Government obtains unaltered data reflecting the actual performance of States in administering this federally-funded program for all time periods covered by this request.

---

[1] Specifically, 7 U.S.C. § 2020(a)(3)(B) requires that "***such records as may be necessary*** to determine whether the program is being conducted in compliance with this [SNAP Act] (including regulations issued under this [SNAP Act)]" "**shall be made available**" to USDA (emphasis added). The question presented and ruled upon by the Court in *California* was whether to preliminarily enjoin FNS from disallowing SNAP funding "based on Plaintiff States' failure to comply with the demands set forth in the above-discussed formal warning letters or otherwise acting thereon." *Id*. at 25:10–13. Those formal warning letters relied only on 7 U.S.C. § 2020(e)(8)(a), as to which the Court opined that "shall permit" in 7 U.S.C. § 2020(e)(8)(A) is permissive, as contrasted with the "clear, mandatory language" of 7 U.S.C. § 2020(a)(3)(B) "giving USDA the right to obtain" the requested data. *Id*. at 13:25–17:13. USDA respectfully disagrees with an interpretation that "shall permit" allows states to elect to withhold data requested under 7 U.S.C. § 2020(e)(8)(A), and maintains all rights to appeal and otherwise contest such an interpretation.

Thank you for your continued work to help address the needs of vulnerable Americans and safeguard taxpayer dollars.

Sincerely,

Patrick A. Penn
Acting Administrator, Food and Nutrition Service
Deputy Under Secretary, Food, Nutrition, and Consumer Services
U.S. Department of Agriculture

**U.S. DEPARTMENT OF AGRICULTURE**

**Supplemental Nutrition Assistance Program
Information SNAP Database**

*SNAP Eligibility Data Elements*
The following elements should be included in the data sharing file from each State agency on all household members that are listed in the SNAP case. Please provide a data dictionary if one is available to reduce the burden to both the State agency and USDA.

*Case Number***:** The case number is a unique identifier, typically 7 to 10 digits long, assigned to a household when they apply and/or are approved for SNAP.

*First, Middle, Last Names***:** The full name of all household members.

*Known Alias***:** Assumed or alternative name(s) used by any of the household members.

*Authorized Representative(s)***:** Provide any identified authorized representative for the household, and their corresponding information such as full name, means of verbal and written communication.

*Date of Birth***:** The specific month, day and year the household member was born.

*Individual Recipient Identification Number***:** The unique identifier assigned to that specific household member within the case by the State agency.

*Social Security Number***:** The unique 9-digit identifier issued by the Social Security Administration and provided by the household member.

*Status on SNAP* (recipient/individual level)**:** Identify if the household member in the case is actively receiving SNAP, disqualified, sanctioned, or excluded.

*Application and/or Recertification Date***:** The date the household applied for SNAP (this can be the first application date, or most recent recertification date).

*Reporting Status***:** Following initial certification, or recertification, households are determined to be a simplified or change reporting household. This data element should indicate the reporting status the household has been designated to be.

*Relationship:* The relationship identifies who all household group members are to one another and assists with determining mandatory group members. The data should reflect who each household member is to one another.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

***Absent Parent*** (as applicable)**:** This identifies the parent of a minor child who resides in a separate household.

***Citizenship and/or Immigration Status***: This identifies if the individual is a U.S. citizen or immigrant.

***Sponsorship:*** This identifies if an individual applying or receiving SNAP has been sponsored to enter the U.S. Data should identify the name or organization of the sponsor.

***Residential Address***: The address the household has provided as to where they reside.

***Mailing Address***: The address the household has provided as to where they would like all correspondence sent to (if different than residential).

***Homeless Status***: Please include if the household is identified as homeless.

***Phone Number(s)***: The contact number(s) provided by the household as a means of contact.

***Email Address(es)***: The email address(es) provided by the household as a means of contact.

***Unearned Income***: The unearned income (RSDI, unemployment, child support, etc.) identifies the unearned income source, pay frequency, the household member receiving the pay, and the total amount of income budgeted to determine the SNAP allotment.

***Earned Income***: The earned income identifies the earned income source, pay frequency, the household member receiving the pay, and the total amount of income budgeted to determine the SNAP allotment.

***Self-Employment Income***: Self-employment should be identified as to what the self-employment is (type or business name), pay frequency, the household member who is self-employed, and the total amount of income budgeted as well as the amount of allowed expenses.

***Shelter Expenses***: The shelter expenses should be identified as to shelter type (i.e. rent), and the budgeted dollar amount. Shelter expenses may be separated out as various expenses are taken into consideration for eligibility and those should be included if used in the SNAP allotment determination (i.e. telephone, heating, cooling). If the household is active with Section 8, which pays a portion of the rental expenses, please ensure that is included.

***Assets/Resources***: Any known assets (i.e. bank accounts, boat, collector vehicle) or resources used to determine SNAP eligibility and must identify the asset type, amount and what household member the asset belongs to.

***Sanctions/Disqualifications:*** Identify any household members who are serving a sanction and/or disqualification that is impacting their eligibility to participate in SNAP. The sanction and/or disqualification type and any applicable time periods should be identified (i.e. IPV, 10/1/2024-9/30/2025). This field should correspond to the data provided in the status on SNAP if the household member is currently serving a disqualification, as well as any income field(s) that may pertain to the disqualified member due to income proration.

***SNAP EBT Card Number:*** The unique set of digits on the household's issued SNAP EBT card that connects the case to the associated transactions.

**USDA**
**U.S. DEPARTMENT OF AGRICULTURE**

**Supplemental Nutrition Assistance Program (SNAP) Information Database**
**Fraud, Waste and Abuse Detection Protocol**

**1. OVERVIEW**

1.1. U.S. Department of Agriculture (USDA) and the Food and Nutrition Service (FNS) will use the Supplemental Nutrition Assistance Program (SNAP) recipient data to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying duplicate enrollments for elimination, and performing additional eligibility and program integrity checks specified herein.

1.2. This protocol establishes a framework for State SNAP agencies to share data with the USDA/FNS for detection of fraud, waste, and abuse and program integrity purposes.

1.3. The protocol balances federal data access requirements under Executive Order 14243 and the Food and Nutrition Act of 2008 (FNA) with privacy protections, minimizes unnecessary data collection, and incorporates security standards while maintaining public trust and compliance with applicable law.

**2. FRAMEWORK AND AUTHORITY**

2.1. Authority

2.1.1. Executive Order 14243 (March 20, 2025): "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos" directs agency heads to "take all necessary steps, to the maximum extent consistent with law," to ensure federal government has "unfettered access to comprehensive data" from state programs receiving federal funding, including data maintained in third-party databases.

2.1.2. 7 U.S.C. § 2020(a)(3) that requires that each State agency shall keep records as may be necessary to determine whether the program is being conducted in compliance with this chapter, and all records shall be made available for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary.

2.1.3. 7 CFR 272 stipulates use or disclosure of information obtained from SNAP applicant or recipient households shall be restricted to persons directly connected with the administration or enforcement of the provisions of the FNA or regulations, other Federal assistance programs, federally-assisted State programs providing assistance on a means-tested basis to low-income individuals, or general assistance programs which are subject to joint processing requirements.

2.2. Prohibited Purposes

2.2.1. USDA shall NOT use the provided data for:

- Tax administration or tax compliance
- Law enforcement investigations beyond coordination regarding criminal and administrative SNAP violations
- Administration of non-SNAP federal assistance programs (*e.g.*, Medicaid, TANF, housing assistance)
- Sharing with foreign governments or international organizations
- Commercial use or transfer to private entities

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

2.2.2. USDA shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals (*i.e.*, the collection of data elements spelled out in the Privacy Impact Assessment).

## 3.  DATA CATEGORIES

3.1.  Data Definition

3.1.1. All data obtained by States or their vendors in administering SNAP or that otherwise may be necessary to determine whether the program is being conducted in accordance with the FNA or regulations issued under the FNA.

3.1.2. Data derived from third-party sources (employment verification databases, financial institution records, property records) that States use for verification but are not part of applicant-reported information are excluded.

3.2.  Permitted Data

- Information that the applicant household reported on application/recertification forms including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers.

- Direct verifications that the State conducted to confirm applicant-reported information Records that the State maintains of SNAP applications, approvals, denials, certifications, and benefits issued.

- Household composition and income exactly as reported by the applicant (not third-party verified amounts).

- Transactional data necessary for fraud detection

## 4.  LIMITED ACCESS

4.1.  The SNAP Information Database is accessed and used ONLY by employees of the USDA who are:

4.1.1. Designated by the Chief of Staff at Food, Nutrition, Consumer Services (FNCS)

4.1.2. Trained in SNAP Act, Privacy Act, and this protocol

4.1.3. In compliance with all information security annual recertifications

4.2.  No Access to the SNAP Information Database may be provided to:

4.2.1. Other USDA agencies (APHIS, ERS, NASS, etc.)

4.2.2. Divisions within FNS without an explicit need-to-know

4.2.3. OIG employees, unless in direct support of a law enforcement investigation related to SNAP fraud, waste, or abuse

4.2.4. Any other federal agency

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender


**U.S. DEPARTMENT OF AGRICULTURE**

**5. SYSTEM OF RECORDS NOTICE (SORN) AND PRIVACY IMPACT ASSESSMENT (PIA)**

5.1. <u>SORN</u>

The applicable SORN for this protocol is USDA/FNS-15 "National Supplemental Nutrition Assistance Program (SNAP) Information Database," 90 FR 26521.

The SORN location can be found here: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system-of-records

5.2. <u>Privacy Impact Assessment (PIA)</u>

The applicable Privacy Impact Assessment for the SNAP Information Database can be found here: https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

**6. FRAUD, WASTE, AND ABUSE DETECTION FRAMEWORK**

6.1. <u>Core Fraud Detection Functions</u>

6.1.1. USDA will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program that focuses on:

- identity verification
- income and eligibility verification
- immigration status
- verification against disqualified recipients

6.2. <u>Enhanced Fraud, Waste, and Abuse Detection Techniques</u>

6.2.1. In addition to the core fraud detection functions, USDA will employ additional techniques including, but not limited to:

- Intrastate and interstate duplicate detection
- Deceased individuals' detection
- Synthetic identity patterns (new SSNs with inconsistent biographical data)
- Geographic anomalies

6.2.2. New data mining techniques will be limited to identifying recipient and retailer fraud with a direct nexus to SNAP.

**7. DATA OUTPUT**

7.1. <u>States</u>

7.1.1. USDA will provide flagged data back to the State agency for review. States are encouraged to verify the accuracy of fraud detection flags and provide feedback to USDA to refine detection logic and reduce false positives. Collaborative processes will be established to ensure accurate identification of fraud and appropriate corrective actions.

7.2. <u>Law Enforcement</u>

7.2.1. The USDA may refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP.

7.3. <u>USDA SNAP Retailer Operations Center (ROC)</u>

7.3.1. The USDA may refer fraud detection leads to the ROC where, during fraud detection analysis, a compromised EBT card or terminal ID may have been identified.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

USDA
**U.S. DEPARTMENT OF AGRICULTURE**

8. **DATA MINIMIZATION AND RETENTION**

8.1. Retention Period

8.1.1. Until a record schedule is approved, data will be retained only as long as necessary for purposes set forth in the SORN and this protocol, and in no case longer than 3 years per the SORN.

8.2. Automatic Deletion

8.2.1. Data shall be retained for no longer than three years, consistent with the USDA/FNS-15 SORN. An automated process will be implemented to delete data upon expiration of the retention period, except for records related to ongoing audits, investigations, or litigation.

8.3. Ongoing Cases

8.3.1. Data pertaining to ongoing audit, investigation, or potential litigation retained only as long as necessary, then deleted.

9. **DATA SECURITY AND TECHNICAL REQUIREMENTS**

9.1. Infrastructure and Location

9.1.1. Primary storage location: AWS GovCloud (US) region

9.1.2. Backup/disaster recovery: Secondary AWS region

9.1.3. No storage, processing, or backup outside GovCloud or federal secure environments

9.1.4. All infrastructure must meet or exceed FedRAMP High baseline standards

9.1.5. AWS Personnel Access: Data is encrypted such that AWS personnel cannot access unencrypted data. Encryption keys are managed exclusively by federal USDA personnel and are not accessible to AWS or third-party vendors.

9.2. Access Controls

9.2.1. Multi-factor authentication required for all access

9.2.2. Role-based access control (RBAC) with principle of least privilege

9.2.3. Access is limited to specifically designated USDA employees engaged to assist in determining whether the program is being conducted in accordance with the FNA.

9.2.4. Access logging and audit trail maintenance (minimum period equal to data retention period, see Section V.E).

9.2.5. Quarterly access reviews by USDA

9.2.6. Immediate revocation of access upon employee termination or assignment change

9.3. Encryption Standards

9.3.1. Encrypted data at rest and in transit

9.3.2. Encryption keys managed solely by USDA federal personnel

9.3.3. No encryption keys held by commercial vendors

9.4. Data Segregation and Compartmentalization

9.4.1. SNAP data isolated in separate, dedicated AWS GovCloud environment

9.4.2. SNAP data not directly integrated with other USDA systems

9.4.3. Limiting access to individuals with specialized training and oversight

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

**USDA** **U.S. DEPARTMENT OF AGRICULTURE**

9.5.  Data Transfer

    9.5.1. All  data transfers shall utilize secure tools that meet or exceed FedRAMP High baseline standards.

## 10.  INCIDENT RESPONSE AND BREACH NOTIFICATION

10.1. Incident Response

    10.1.1.  Incident response procedures are aligned with FNS Handbook Chapter 10 security incident and breach notification requirements that USDA already follows internally. This protocol extends equivalent procedures to State notification.

10.2. Incident Definition

    10.1.2.  Unauthorized access, use, or disclosure of data

    10.1.3.  Security vulnerability or control failure affecting data

    10.1.4.  Data loss, corruption, or destruction

    10.1.5.  Encryption failure or key compromise

    10.1.6.  Failed access control or authentication mechanism

    10.1.7.  Any event that may reasonably be expected to compromise data security or confidentiality

10.3. Incident Notification Timeline

    10.3.1.  Initial Notification within 12 hours

        10.3.1.1.  Within 12 hours of discovery (by phone + email to State security/privacy contact and Director).

    10.3.2.  Preliminary Report within 24 hours

        10.3.2.1.  Description of incident and timeline

        10.3.2.2.  Data elements affected (specific fields and estimated number of records)

        10.3.2.3.  Estimated number of individuals affected

        10.3.2.4.  Preliminary assessment of whether unencrypted sensitive data may have been exposed

        10.3.2.5.  Preliminary remedial actions taken

        10.3.2.6.  Root cause analysis plan and timeline

## APPENDIX A - SOURCES

- Privacy Impact Assessment: https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf
- SORN: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system-of-records
- SNAP Act: https://www.law.cornell.edu/uscode/text/7/2020
- SNAP QC Handbook
- Executive Order 14243 (March 20, 2025) "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos:  https://www.govinfo.gov/content/pkg/DCPD-202500382/pdf/DCPD-202500382.pdf

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

# Exhibit B

| | |
|---|---|
| **From:** | Forino, Donna (OTDA) on behalf of Guinn, Barbara C (OTDA) |
| **To:** | patrick.penn@usda.gov |
| **Cc:** | Guinn, Barbara C (OTDA); Chawla, Rajni (OTDA); Gutierrez, Malinka (OTDA); Forino, Donna (OTDA); Henschel, Matthew - FNS; "christine.ruggieri@usda.gov"; Maguire, Dawn (OTDA) |
| **Subject:** | California v. USDA SORN Data Case |
| **Date:** | Monday, December 8, 2025 11:47:20 AM |
| **Attachments:** | 2025.12.08_Ltr to USDA.pdf |
| **Importance:** | High |

Good morning,

In response to USDA's correspondence to the State of New York on November 24, 2025, we submit the attached correspondence, which we understand was also sent earlier this morning, on our behalf, to USDA's counsel by counsel for Plaintiff States in *California v. USDA* (Case No. 3:25-cv-06310-MMC).

**Barbara C. Guinn** *(she/her)*
Commissioner

**Office of Temporary and Disability Assistance**
40 North Pearl Street, Albany, NY  12243
(518) 474-9425 | BarbaraC.Guinn@otda.ny.gov

---

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential, personal, private, sensitive and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including, but not limited to, the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender immediately to notify him/her of the misdirection and destroy all copies of the communication.

*Via E-mail*
Elizabeth J. Shapiro
Benjamin S. Kurland
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 598-7755
ben.kurland@usdoj.gov
*Counsel for U.S. Department of Agriculture and Secretary of Agriculture Brooke L. Rollins*

RE: Response to November 24, 2025 Letter to Plaintiff States from Patrick A. Penn

Dear Counsel:

On behalf of the Plaintiff States in *California v. USDA*, No. 3:25-cv-06310-MMC (N.D. Cal. Oct. 15, 2025), this letter responds to the November 24, 2025, letter of the U.S. Department of Agriculture's (USDA) Food and Nutrition Services (FNS). *See* ECF No. 109.

In that letter, USDA restated FNS's ongoing demand for Supplemental Nutrition Assistance Program (SNAP) Eligibility Data Elements for the period of January 1, 2020, to the present. As you are aware, this demand is the subject of ongoing litigation and was previously enjoined by the Court. *See* Order Granting Plaintiff States' Motion for Preliminary Injunction, *California v. USDA*, No. 3:25-cv-06310-MMC (N.D. Cal. Oct. 15, 2025). Thus, any attempt to seek a financial penalty or initiate an administrative noncompliance proceeding based on USDA's new letter, or any other iteration of FNS's ongoing data demand, would, at minimum, constitute a violation of that order, which preliminarily enjoins USDA from "disallowing SNAP funding based on Plaintiff States' failure to comply with the demands" for this SNAP data.

USDA's letter also provided proposed "data and security protocols," which by statute must be "agreed to by the State agency and Secretary" under 7 U.S.C. § 2020(a)(3)(B)(i). USDA's letter concluded by asking State agencies to produce the demanded SNAP data within 30 days, or to respond in writing to explain "(1) the basis for your lack of agreement and (2) any proposed edits to the protocols that you deem necessary to produce the requested data." This letter seeks clarification and to provide both (1) and (2), though we intend to provide further, more detailed edits to the proposed agreement after receiving the necessary clarifications sought herein, which will inform and facilitate those additional edits.

For the reasons described in our Complaint and Preliminary Injunction Motion, we object to USDA's unprecedented collection of millions of Americans' sensitive personally identifiable information (PII) without a clear need for such data and in violation of federal privacy laws. Nevertheless, we agree that USDA must negotiate with the States to develop a mutually agreeable data and security protocol prior to any data collection that may be authorized by 7 U.S.C. § 2020(a)(3). Therefore, without waiving any claims or defenses that may be raised in the

1

pending litigation, we are responding to provide comments on the proposed Data Elements and Data Sharing Protocol attached as Attachments A and B to the letter. Additional questions concerning both are also attached to this response.

We request written responses to the questions in this letter and the Attachment by Monday December 15, 2025.

### I.    The proposed data security protocol is insufficient compared to prior agreements between USDA and State agencies.

As an initial matter, FNS's letter claims that each of the States "previously delivered the same type of data to FNS under *less stringent* protocols." This assertion is inaccurate for several reasons. First, FNS has never sought anything comparable to the nearly six years of unredacted PII on all SNAP applicants and beneficiaries that it has now demanded; this unprecedented demand creates novel risks concerning the misuse of data and the protection of individuals' privacy.

Furthermore, without any reference to any specific protocol executed with any one of the States that received this letter, it is impossible to know whether prior protocols used to share a less sensitive data set were "less stringent" as you assert. Therefore, we ask that USDA specifically identify or provide copies of the protocols you refer to—for each State—so that we may evaluate this claim.

USDA's statement that this is a higher level of security and more stringent than previous protocols also appears to ignore the framework for the National Accuracy Clearinghouse (NAC) database that Congress mandated to identify duplicate SNAP enrollment. For example, the SORN for the NAC database mandates that any PII (including names, social security numbers (SSNs) and dates of birth (DOBs)) are converted to a secure cryptographic hash via the Privacy Protecting Record Linkage (PPRL) process before being shared. While some States are still working towards implementing the NAC, we would expect to see, at a minimum, the same protections (and the same careful testing and rollout process) applied to USDA's more recent request for SNAP Eligibility Data Elements.

The proposed protocol document also remains merely "a framework" that lacks many details required by federal law. *See* Proposed Protocol § 1.2. For example, when the federal government creates a "matching program," which the SNAP Information Database plainly is, agencies' data sharing agreements must articulate detailed procedures to protect the privacy, security and accuracy of individuals' data records. *See* 5 U.S.C. § 552a(o)(1). Attachment B falls far short of these specificity requirements. USDA has entered into necessarily detailed computer matching agreements and Interconnection Security Agreements (ISAs) with state agencies to implement the NAC and Electronic Disqualified Recipient System (eDRS) systems. Similarly detailed and comprehensive agreements are needed to implement any agreed-upon protocol before state agencies can lawfully share information.

Furthermore, although USDA's proposed protocol prohibits certain data uses, it does not define enforcement mechanisms. Without such mechanisms, the proposed protocol offers state agencies no assurance that violations will be detected, prevented, or corrected. Without enforcement mechanisms (such as monitoring, auditing, automated controls, or documented consequences), the restrictions function only as statements of intent. This creates compliance risk, allows improper data use to go unnoticed, and weakens the ability of State agencies to ensure legal, ethical, and policy-aligned handling of SNAP information.

The proposed protocol also presents, for the first time, a process by which USDA will return "flagged" results back to the State for State agency action. *See* Proposed Protocol § 7.1.1. In addition to the need for a secure data transfer mechanism and process to receive and process these files, the protocol fails to specify against which data the supposed fraud detection was identified, what specific actions the state must take to verify whether the fraudulent action is true, and what response the State must provide on its findings and subsequent actions. As discussed further below, applicable laws and policies require that all these iterative steps be spelled out in detail and agreed upon before any data sharing can take place.

## II.     The proposed data elements and protocol, along with USDA's public statements, raise concerns about the accuracy and validity of USDA's planned data analyses.

State agencies agree with USDA that it should "minimize[] unnecessary data collection." *See* Proposed Protocol § 1.3. Furthermore, USDA asserts that it "shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals." *Id.* § 2.2.2.

What makes data necessary, however, cannot be assessed in the abstract. We therefore request that USDA share its methodologies and proposed data analysis techniques with States so that we can provide feedback on the data needed, and the validity of the analytical methods being used, before providing FNS with confidential information on millions of SNAP beneficiaries.

As we have expressed in the litigation, the queries run through the SNAP Information Database by USDA so far do not account for the actual processes States use to review and verify applicant and household information. Our review of the "preliminary snapshot review" (*see* ECF No. 89-1) that USDA created from data some States have already submitted reveals that USDA's apparent methodologies result in overwhelming numbers of false positives and would not provide an accurate or meaningful picture of States' case files.[1] This is not only misleading to the public, but risks placing a heavy burden on States to investigate these false positives.

This information is especially important because the proposed protocol does not exclude sensitive PII at all, and USDA is requesting numerous data elements that do not appear necessary

---

[1] We have discussed the apparent problems with this snapshot review in declarations submitted by California (ECF No. 99-1) and Illinois (ECF No. 99-2).

3

to investigate fraud, waste and abuse, especially at an aggregate level. It is necessary for the States to understand why USDA needs the specific PII elements requested so that the States can propose appropriate amendments to the draft protocol that would still accomplish any legitimate goals. Such amendments could include, for example, committing to using data solely for specific analyses described in the protocol and then purging it from USDA's system, as has been done in the past, and permitting States to provide information at a higher level of specificity depending on each agency's available data and technological capabilities (e.g., providing an age range rather than birthdate, or the county or ZIP code instead of a home address) to protect personal privacy.

Given the bulk review and processing USDA is engaging in (*see* ECF No. 72-1 at ¶ 34), it is unclear why deidentified data could not serve as a functionally identical and more secure means of identifying facts about program integrity to share with the States. Should USDA wish to review samples of cases identified through an initial deidentified process, States could participate under existing statutory procedures allowing for a full review of those individual eligibility cases. Another potential option could be through the use of a cryptographically secure PPRL approach, which, as noted, has already been developed for the NAC. Congress and the USDA explicitly created this privacy-protective system for this purpose, and States see no reason to circumvent it through the less-protective SNAP Information Database.

Additionally, the list of data elements attached to USDA's November 24, 2025 letter includes numerous elements (such as personal financial information) that were not considered in the agency's Privacy Impact Assessment.[2] This is a necessary step that the agency would need to correct before any data collection could proceed. Please confirm that USDA will be updating its Privacy Impact Assessment accordingly.

### III.    USDA is ignoring the existing process for testing new programs to identify fraud, waste and abuse.

The statutes defining SNAP (hereafter the "SNAP Act") enshrine a cooperative model between the federal government and the States. Indeed, experimental and pilot projects "designed to test program changes that might increase the efficiency of [SNAP] and improve delivery of [SNAP] benefits to eligible households" are codified in the law (7 U.S.C. § 2026), and the SNAP Act provides a mechanism for USDA to work with state agencies to design, implement and evaluate new initiatives. This collaboration also includes State-led projects supported by the federal government under the SNAP Fraud Framework Implementation Grant Program, authorized and funded by Congress to support State initiatives. USDA's own fact sheet about that program recognizes that "States have long served as incubators for testing strategies to help prevent program fraud." *See* https://www.fns.usda.gov/snap/fraud-framework. USDA's departure from

---

[2] *See* USDA Privacy Impact Assessment for Fiscal Year 2025 at 8-10 (July 23, 2025), available at https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf.

this collaborative model ignores congressionally authorized programs and States' own expertise in program integrity.

USDA's proposed data protocol appears to acknowledge the collaborative framework and relationship that the SNAP Act establishes, stating that "collaborative processes will be established" to ensure the accuracy of new data analysis techniques. *See* Proposed Protocol § 7.1.1. But USDA's approach seems to be inconsistent with this acknowledgement, considering USDA's unilateral demands for data and threats of punitive action.

The agency should provide a clear explanation of its proposed data analysis objectives and methodologies, and engage in the required collaborative processes (including but not limited to testing and validation of findings for accuracy) needed to ensure such analysis is accurate and useful for detecting fraud, waste and abuse, *before* demanding production of almost 6 years of nearly unlimited PII on SNAP users to create an unprecedented database unsupported by law.

We are ready and willing to engage with USDA on a process that defines valid analytical goals and the data needed to meet those goals. For example, if USDA wants to test out new data tools, it could use sample sets of deidentified data and engage in an iterative process to check accuracy and results, as it has done in the past. It is unreasonable for USDA to abandon these time-tested techniques, and to run opaque, untested data analytic tools on millions of records in a manner likely to result in inaccurate results—particularly when USDA has signaled a desire to use those inaccurate results to unfairly impugn the integrity of state SNAP programs or the eligibility of residents to receive necessary food assistance.

### IV.    The proposed data analysis is duplicative of work that is already done by state agencies to prevent waste fraud and abuse.

USDA's proposed data protocol acknowledges that its proposed program is "similar to the SNAP Quality Control program" that has already been implemented as required by Congress in 7 U.S.C. § 2025 and through USDA's promulgated regulations. *See* Proposed Protocol § 6.1.1. The new framework appears to disregard congressional intent concerning the conduct of a quality control program, particularly given that the requested data would not permit USDA to conduct appropriate verification of applicant files.

States already engage in the statutorily mandated Quality Control Program and Performance Reporting System (*see* 7 U.S.C. § 2025; 7 C.F.R. §§ 275.1–275.24), which specifies procedures for federal monitoring "to determine whether a State agency is operating SNAP and the Performance Reporting System in accordance with program requirements" including annual reviews, management evaluation, quality control reviews and validation of state agency error rates. *See* 7 C.F.R. § 275.3. For deceased and disqualified individuals, among other verifications conducted by State Agencies, Congress has determined that verification of compliance with these requirements is satisfied by States' submission of annual reports to the Secretary "containing sufficient information" for USDA to make a determination on States' compliance. 7 U.S.C.

§ 2036c. Similarly, submission of state agency data for use in the NAC takes place under a specific statutory grant of authority. *See* 7 U.S.C. § 2020(x). States additionally conduct immigration verification through the Systematic Alien Verification for Entitlements Program (SAVE)[3] and verify income using federally approved income eligibility verification systems (*see* 7 U.S.C. § 2020(p)) which share data using privacy protective systems. States also already provide information on Intentional Program Violations (IPV) and program sanctions to USDA under existing reporting requirements and use the Electronic Disqualified Recipient system (eDRS) to check whether SNAP applicants have been disqualified from the program for fraud. For Electronic Benefit Transfers (EBT) fraud, FNS already receives daily transaction data for *all* EBT transactions under the Anti-Fraud Locator using EBT Retailer Transactions (ALERT) system. ALERT monitors that transaction activity and identifies suspicious retailers for analysis and investigation.

USDA's proposed protocol specifies that USDA-FNS will collect "only the data elements necessary to achieve specific, legally permissible goals." Given the already-existing, rigorous and comprehensive quality control regime under the SNAP Act and USDA's implementing regulations, we request that USDA specifically identify any unique goals of the SNAP Information Database proposal that are not covered by existing programs and federal oversight, and which data elements are actually necessary to achieve those additional goals.

## V.    Clarifying questions and suggestions

In addition to the concerns highlighted above, we are attaching a list of questions and suggestions about USDA's proposed protocol, and how FNS intends to use and share the data that our residents have entrusted to our agencies. We request this clarifying information to understand USDA's proposal better, and in an effort to make progress towards a mutually agreeable data and security protocol. We invite collaboration to generate a program that will respect existing legal frameworks and SNAP household privacy, while making a positive impact on program administration.

States have always been primary partners and leaders in SNAP program integrity. We appreciate the increased detail provided in this protocol, and hope that with further discussion and refinement States can continue to assist USDA in achieving legitimate program integrity

---

[3] The SAVE Program itself is deployed in the SNAP context with privacy in mind; States' agreements with USCIS to use the SAVE program include "safeguards limiting release or redisclosure as required by State or Federal law or regulation as discussed in [7 C.F.R.] § 272.1(c) and as may be required by other guidelines published by the Secretary." 7 C.F.R. § 272.11(b). States must include the steps taken to comply with this limit on disclosure as part of their state SNAP plans. *Id.* § 272.11(e). State agencies are further restricted to using the SAVE Program only for limited purposes related directly to establishing eligibility and program integrity. *Id.* § 272.11(c).

objectives while protecting the privacy of SNAP household data, reducing duplicative processes, and maintaining the security of confidential and sensitive information.

Dated: December 8, 2025                    Respectfully submitted,

ROB BONTA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General
ANDREW Z. EDELSTEIN
ANNA RICH
EDWARD P. WOLFE
ROBIN GOLDFADEN
SEBASTIAN BRADY
WILLIAM BELLAMY

/s/ Maria Buxton
MARIA F. BUXTON
DEPUTY ATTORNEYS GENERAL
Attorneys for Plaintiff State of California

| | |
|---|---|
| LETITIA JAMES<br>Attorney General of New York | KWAME RAOUL<br>Attorney General of Illinois |
| /s/ Mark Ladov<br>MARK LADOV<br>Special Counsel<br>JULIE DONA<br>Special Counsel<br>28 Liberty St.<br>New York, NY 10005<br>(212) 416-8240<br>mark.ladov@ag.ny.gov<br>Attorneys for Plaintiff State of New York | /s/ Sherief Gaber<br>HARPREET K. KHERA<br>Bureau Chief, Special Litigation<br>SHERIEF GABER<br>Assistant Attorney General<br>115 S. LaSalle St., 35th Flr.<br>Chicago, Illinois 60603<br>(773) 590-7127<br>Harpreet.Khera@ilag.gov<br>Attorneys for Plaintiff State of Illinois |
| KRISTIN MAYES<br>Attorney General of Arizona | PHILIP J. WEISER<br>Attorney General of Colorado |
| /s/ Hayleigh S. Crawford<br>HAYLEIGH S. CRAWFORD (AZ NO. 032326)<br>LUCI D. DAVIS (AZ NO. 035347)<br>2005 N. Central Ave. Phoenix, AZ 85004<br>(602) 542-3333<br>Hayleigh.Crawford@azag.gov | /s/ David Moskowitz<br>DAVID MOSKOWITZ<br>Deputy Solicitor General<br>Colorado Department of Law<br>1300 Broadway, 10th Floor<br>Denver, CO 80203 |

Luci.Davis@azag.gov
ACL@azag.gov
*Attorneys for Plaintiff State of Arizona*

WILLIAM TONG
Attorney General of Connecticut

*/s/ Janelle R. Medeiros*
JANELLE R. MEDEIROS
Special Counsel for Civil Rights
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Janelle.Medeiros@ct.gov
*Attorneys for Plaintiff State of Connecticut*

BRIAN L. SCHWALB
Attorney General for the District of
Columbia

*/s/ Nicole S. Hill*
NICOLE S. HILL
Assistant Attorney General
Office of the Attorney General for the
District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov
*Attorneys for Plaintiff District of Columbia*

OFFICE OF THE GOVERNOR *ex rel*. Andy
Beshear, in his official capacity as
Governor of the Commonwealth of
Kentucky

*/s/ S. Travis Mayo*
S. TRAVIS MAYO
General Counsel
TAYLOR PAYNE
Chief Deputy General Counsel

Phone: (720) 508-6000
david.moskowitz@coag.gov
*Attorneys for Plaintiff State of Colorado*

KATHLEEN JENNINGS
Attorney General of Delaware

*/s/ Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

ANNE E. LOPEZ
Attorney General of Hawai'i

*/s/ Kaliko'onālani D. Fernandes*
DAVID D. DAY
Special Assistant to the Attorney General
KALIKO'ONĀLANI D. FERNANDES
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorneys for Plaintiff State of Hawai'i*

AARON M. FREY
Attorney General of Maine

*/s/ Brendan Kreckel*
BRENDAN KRECKEL
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 0433-0006
Tel.:  207-626-8800

LAURA C. TIPTON
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov
*Attorneys for Plaintiff Kentucky Governors' Office*

Fax: 207-287-3145
brendan.kreckel@maine.gov
*Attorneys for Plaintiff State of Maine*


ANTHONY G. BROWN
Attorney General of Maryland

*/s/ James C. Luh*
JAMES C. LUH
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

*/s/ Katherine Dirks*
KATHERINE DIRKS
Chief State Trial Counsel
CASSANDRA THOMSON
Assistant Attorney General
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
cassandra.thomson@mass.gov
*Attorneys for Plaintiff Commonwealth of Massachusetts*


DANA NESSEL
Attorney General of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI
BRYAN BEACH
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov
beachb@michigan.gov
*Attorneys for Plaintiff State of Michigan*

KEITH ELLISON
Attorney General of Minnesota

*/s/ Joseph R. Richie*
JOSEPH R. RICHIE
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

MATTHEW J. PLATKIN
Attorney General of New Jersey

/s/ *Kashif T. Chand*
KASHIF T. CHAND (NJ BAR NO. 016752008)
Assistant Attorney General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
kashif.chand@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

RAÚL TORREZ
Attorney General of the State of New
Mexico

/s/ *Steven Prefrement*
STEVEN PERFREMENT
Senior Litigation Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
SPerfrement@nmdoj.gov
505-601-7727
*Attorneys for the State of New Mexico*

DAN RAYFIELD
Attorney General of Oregon

/s/ *Scott P. Kennedy*
SCOTT P. KENNEDY
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 453-9050
Fax (971) 673-5000
Scott.Kennedy@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*

JOSH SHAPIRO, in his official capacity as
Governor of the Commonwealth of
Pennsylvania

/s/ *Jacob B. Boyer*
JENNIFER SELBER
General Counsel
JACOB B. BOYER
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov
*Counsel for Governor Josh Shapiro*

PETER F. NERONHA
Attorney General of Rhode Island

/s/ *Madeline R. Becker*
MADELINE R. BECKER (RI BAR NO. 10034)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2151
mbecker@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

NICHOLAS W. BROWN
Attorney General of Washington

/s/ *Jennifer K. Chung*
JENNIFER K. CHUNG, WSBA #51583
WILLIAM MCGINTY, WSBA #41868
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
jennifer.chung@atg.wa.gov
william.mcginty@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Karla Z. Keckhaver*
KARLA Z. KECKHAVER
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-6365
karla.keckhaver@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*

**Attachment 1:**

**Questions and Suggestions Concerning USDA's Proposed Data and Security Protocol**

### *Limiting unnecessary data elements and scope*

1. Pursuant to USDA's acknowledgement that it must "minimize[] unnecessary data collection" (§ 1.3), and that it will collect "only the data elements necessary to achieve specific, legally permissible goals" (§ 2.2.2), please explain for each of the data elements in Attachment A:

    (a) how USDA intends to use this data element;

    (b) why it needs this data element for each SNAP beneficiary served by the State;

    (c) whether each data element is necessary to determine whether SNAP is being conducted in compliance with the SNAP Act, and why;

    (d) why such analysis is not duplicative of an analysis or match that already occurs;

    (e) whether each element is covered by the applicable System of Records Notice (SORN) and Privacy Impact Assessment (PIA); and

    (f) why it needs the data element for all files dating back to January 1, 2020.

### *Clarifying and improving limitations on disclosure and use of data*

2. The proposed data sharing agreement states that the requested data will be used "to ensure the integrity of Government programs[.]" However, 7 U.S.C. § 2020(e)(8) permits States to disclose information obtained from applicant households only to persons directly connected with the administration of federal assistance programs for the administration or enforcement of that program. To ensure compliance with 7 U.S.C. § 2020(e)(8), will USDA limit its use of the data to "ensure the integrity of the SNAP program" only?

3. Section 2.2.1 of the proposed protocol says USDA shall not use the provided data for "law enforcement investigations beyond coordination regarding criminal and administrative SNAP violations." This phrasing does not appear in the SNAP Act and is unclear.

    (a) Please elaborate what USDA means by "coordination regarding criminal and administrative SNAP violations."

    (b) Can you confirm that USDA will not share any of this data with Immigration and Customs Enforcement (ICE) or any other Department of Homeland Security (DHS) subagencies for use in immigration enforcement activities?

    (c) In order to ensure that state SNAP data is not unlawfully used for immigration enforcement purposes, will USDA agree to include protocol language that alerts any State immediately if ICE or any other DHS subagency requests access to or use of

this data and provides at least 30 days for that State to respond (and if necessary take legal action) to prevent such data sharing?

(d) Please confirm that the prohibited purposes listed in Section 2.2, as clarified by USDA's response to this letter, will apply to all federal agencies.

4. Relatedly, the protocol reserves the right to "refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP." How does the USDA define a "criminal nexus"? Could the USDA provide examples of (a) what would constitute such a "criminal nexus" and (b) which agencies could potentially receive such a referral?

5. We also believe any protocol must also address how USDA would handle external requests (FOIA, administrative subpoena or otherwise) to obtain States' SNAP data. Will USDA provide clarification of these issues and agree to protocol language alerting any State to such a request and providing sufficient time for the State to respond prior to any USDA disclosure of data?

6. Currently, the proposed protocol only limits "access" to the database (*see* § 4), but does not similarly restrict USDA's ability to *disclose* the data.

(a) Pursuant to 7 U.S.C. § 2020(e)(8), will USDA include a clause that prohibits the agency from disclosing the requested data except to persons "directly connected with the administration" of the SNAP Act, for the purpose of administering or enforcing the SNAP Act only?

(b) Will USDA include a clause requiring the agency to identify the specific entities and individuals to whom the USDA intends to disclose data, and how they are "directly connected with the administration" of the SNAP Act, pursuant to 7 U.S.C. § 2020(e)(8)?

7. Relatedly, the proposed protocol contains contradictory statements that require clarification. It claims to limit "access" to data by anyone outside of the USDA, but then purports to require data matching that will entail sharing data outside of USDA.

(a) Can USDA provide clarification to reconcile these statements?

(b) Will USDA include a limitation in the proposed protocol to prevent data from being copied and/or sent outside of USDA's database?

(c) Prior data sharing agreements with USDA have specifically identified individuals who would be able to access States' data, and required those individuals to attest to compliance with the protocols. Will USDA agree to similar requirements here, and commit not to provide access to any individual without advance notice to States and providing sufficient time for States to respond prior to USDA providing that access?

13

    (d) What measures will USDA take to prevent any redisclosure or improper intermingling of the data?

***Understanding the protocol's interaction with the SORN and Privacy Impact Assessment***

8. The proposed data protocol relies on USDA's existing SORN, but USDA has represented that it will publish an "updated SORN." *See* ECF No 90-1 at 2. Please let us know when that SORN will be published, and how it will address changes between the data request elements attached to the November 24, 2025 letter and USDA's prior data requests.

9. The proposed data protocol and the SORN are also at odds with each other on important issues. For example, the SORN states that records "will be kept indefinitely," which directly contradicts the protocol's proposal that data "shall be retained for no longer than three years." The protocol also restricts access to "[a]ny other federal agency" (§ 4.2.4), yet the SORN's routine uses permit disclosure to the Department of Justice and Department of the Treasury. Please clarify how USDA will reconcile these discrepancies, and whether USDA will commit to enforcing all restrictions on data access agreed upon in a final protocol, and not permitting the SORN's broader "routine use" language to control.

10. USDA's Privacy Impact Assessment associated with this data collection indicates that USDA expects this to be an ongoing data collection effort with "quarterly updates."

    (a) Is that the case, and if so, what is the source of USDA's authority to require States to provide virtually all SNAP data to USDA on a quarterly basis?

    (b) Does USDA intend to compensate States for the additional administrative burden that such an ongoing collection would present?

11. USDA's Privacy Impact Assessment associated with this data collection acknowledges the need to "[o]btain explicit consent for the collection and processing of sensitive personal information[.]" The proposed protocol does not mention obtaining consent from SNAP participants.

    (a) How does USDA intend to obtain this consent from SNAP participants? Will USDA provide a draft notice to States?

    (b) Does USDA expect States to assume the burden of obtaining this consent and, if so, does USDA intend to compensate States for the additional administrative burden that this would present?

***Clarifying USDA's proposed security measures***

12. Section 9, "Data Security and Technical Requirements," is comprised only of bulleted concepts, with no complete sentences and very limited detail. Will USDA revise this section to provide full sentences and a more thorough description of the security protections the agency intends to use, so that we may properly evaluate their sufficiency?

*Clarifying the methodologies and processes that USDA intends to implement*

13. States necessarily rely on numerous outside data sources to verify SNAP eligibility; this process is often time and labor intensive, particularly given our commitments to ensure that only eligible households receive benefits.

  (a) Given that outside, third-party data sources are essential to verification, how does USDA plan to review and verify eligibility of SNAP files without review of these data sources?

  (b) If USDA is requiring production of those third-party data sources (which is unclear), can USDA provide authority for that demand and authority authorizing States to disclose this third-party data?

  (c) In addition, please clarify how the "permitted" submission of verification records (per § 3.2) is consistent with the statement in § 3.1.2 that such verification records are "excluded" from this project.

14. Section 6.1.1 states that USDA "will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program." Please explain what a "foundational . . . verification" is, and how this data project differs from existing verification tests set forth in statute and promulgated regulations.

15. Section 6.2 lists several "enhanced" or "additional" data techniques. Please provide the methodologies for these techniques and explain why USDA believe they will produce valid statistical results. In particular:

  (a) Please explain how USDA's proposed detection of duplicate benefits will differ from the existing protections offered by the NAC and other established verification tests, and how USDA will resolve any conflicts between the NAC process and the one USDA proposes here.

  (b) Please explain how USDA's proposed detection of deceased individuals will differ from existing State systems for removing deceased beneficiaries from SNAP benefit rolls, and how this analysis will comport with USDA's requirements for such actions (including to ensure that households have an opportunity to address any inaccurate data before a reduction in benefits).

  (c) Please explain what USDA means by "synthetic identity patterns" and how this proposal will seek to detect such patterns.

  (d) Please explain what USDA means by "geographic anomalies" and how this proposal will seek to detect such anomalies.

  (e) To the extent EBT fraud is a concern, FNS already receives daily transaction data for all EBT transactions under the Anti-Fraud Locator using EBT Retailer Transactions (ALERT) system. ALERT monitors that transaction activity and identifies suspicious

15

retailers for analysis and investigation. Given the existence of this system and FNS's preexisting access to all EBT transaction data, what purpose does such duplicative analysis serve in the SNAP Information Database?

(f) Will USDA be using artificial intelligence programs to analyze the data? If so, can USDA provide more information about those programs, including the security and privacy protections employed by the program?

16. USDA states in Section 7.1 of the proposed protocol that it will "provide flagged data back to the State agency for review," and will work collaboratively "to ensure accurate identification of fraud and appropriate corrective actions." Please clarify specifically what USDA intends this process to entail. Furthermore, please provide details on what this collaborative process has entailed to date for States that have already provided SNAP data.

# Exhibit C



**Food and Nutrition Service**
U.S. DEPARTMENT OF AGRICULTURE

December 23, 2025

Governor Kathy Hochul
NYS State Capitol Building
Albany, New York 12224

Dear Governor Hochul,

This replies to your December 8, 2025 letter responding to the U.S. Department of Agriculture (USDA), Food and Nutrition Service (FNS)'s November 24, 2025 request to produce data related to the Supplemental Nutrition Assistance Program (SNAP). That request asked your State to share data to assist FNS in its statutorily-mandated administration and enforcement of the Food and Nutrition Act of 2008, as amended, (SNAP Act), including providing administrative funding to State Agencies to collect such information.

Your State, along with 20 others and the District of Columbia, responded through their lawyers by submitting a single, formulaic response objecting to our direction that you share with FNS SNAP data (December 8 Letter). The December 8 Letter seeks further delay, questioning FNS's need for, and right to obtain data necessary to audit the States' administration and enforcement of SNAP. USDA addresses each of your concerns in greater depth below. But, on the whole, your December 8 Letter provided no basis for your continued withholding of data because:

- FNS requires—and is statutorily entitled to—the SNAP eligibility and payment data that the States collect, with the aid of Federal funding, to administer SNAP benefits, which are funded entirely by FNS.

- FNS has offered to observe data and security protocols *more stringent* than any requested or observed by States historically in providing *the exact same type of data* to FNS. There is no material difference between the States uploading to FNS a sample set of names, DOBs, addresses, SSNs and other data elements for Quality Control (QC) and uploading the same data elements pursuant to FNS's request here for a complete set of the same data elements. None of your December 8 letter's objections and questions justified your State's refusal to accept FNS's offered protocols or to provide edits that you propose to accept those protocols.

**1. FNS requires the data it requested to verify compliance with the SNAP Act.** First, States may not undermine FNS's clear authority to determine what data FNS needs to complete its statutorily mandated role in overseeing SNAP. It is clear to all concerned that through undetected errors and fraud, Federal SNAP funds are being wasted and stolen. Indeed, on December 11, California's own State Auditor found its State's SNAP agency exposes taxpayers to "high-risk" after observing the financial consequences of widespread errors in the State's administration of SNAP. *See* https://www.auditor.ca.gov/reports/2025-601/. While California withholds SNAP data from the Federal Government, it gives that same data to State employees who can access and abuse the data apparently without appropriate safeguards against internal

abuse.  *See* https://www.justice.gov/usao-edca/pr/former-madera-county-welfare-benefits-employee-arrested-improperly-using-other-peoples.  Noncomplying States' failures to administer SNAP have become notorious nationwide.  *E.g.,* https://nypost.com/2025/12/16/us-news/calif-welfare-worker-stole-40k-in-benefits-using-identities-of-elderly-dead-people-feds/.

Data received from the 28 States that complied with USDA's request indicate that an estimated average of $24 million per day of SNAP funds are being erroneously spent or lost to fraud.  Examples of fraud indicators included allowing hundreds of thousands of deceased and other ineligible people to remain on State SNAP benefit rolls.  Although the non-complying minority of States may dismiss the significance of their allowing dead or otherwise ineligible people to remain on SNAP rolls, failures to detect and correct errors and fraud make it important that they promptly join the cooperating states by complying with FNS's data request.  In the meantime, errors and fraud proliferate in the non-complying States.  *E.g.,* https://kstp.com/kstp-news/top-news/minnesota-repeatedly-reported-inaccurate-data-on-snap-to-the-federal-government/; https://www.justice.gov/usao-or/pr/romanian-nationals-unlawfully-residing-united-states-indicted-conspiring-steal-snap.

Each of the data elements FNS requested ensures that the various programmatic requirements, including eligibility requirements, are being met by households and are properly implemented and enforced by the States. The requested data elements can help confirm the accuracy of eligibility and benefit level determinations as well as aid in the investigation of SNAP benefit trafficking and theft, including EBT card skimming. Longitudinal data is required to detect patterns and trends that will inform SNAP administration, in addition to verifying the accuracy and reliability of the data submitted in response to this request.

**2. FNS's request is for records that Congress mandated "shall be made available" to USDA.**  As we outlined in our November 24 letter, FNS is statutorily entitled to the data we request.  *See* 7 U.S.C. § 2020(a)(3)(B) (requiring that "such records as may be necessary to determine whether the program is being conducted in compliance with this [SNAP Act] (including regulations issued under this [SNAP Act])" "shall be made available" for inspection and audit by USDA).  In their December 8 response, the non-complying States wrongly suggested that USDA agrees that States need not produce the requested data unless and before States agree to data and security protocols.  Although this statute permits the Secretary and State agency to agree that an inspection and audit be "subject to data and security protocols agreed to by the State agency and Secretary" it does not make such agreement a condition, let alone a condition precedent, to Congress' requirement that States' records "shall—. . . be made available" to USDA.  Textually, Section (a)(3) merely provides that FNS's access will be subject to any protocols that the Secretary agrees with the State agency to observe.  Congress did not, however, permit States to render the Federal audit statute meaningless by refusing to agree with the Secretary about a protocol, or otherwise attempting to dictate the terms upon which their expenditures of Federal funds shall be inspected or audited.

**3. FNS has offered to observe data and security protocols more stringent than any requested or observed by States historically in providing the exact same type of data to FNS.**  Although not required by law, in the interest of comity FNS offered to observe a set of data and security protocols that are far more stringent than any that have been requested or observed by States when they share SNAP data with FNS.  Indeed, the States, including yours,

routinely upload to FNS the same type of data we now request.  Your State's response rebuffed FNS's offer to provide specific edits or suggestions to the protocols; your State's response instead sent back questions (and often accusations) about FNS's purported intent.  FNS has addressed each question below and offered to make accommodations where appropriate.  But this does not change the fact that FNS has offered specific, concrete proposals, whereas the States have declined to do the same.

As illustrated by the following chart: (1) there is no material difference between the *type* of data your State routinely uploads to FNS for QC purposes, and the data elements FNS requested on November 24, and (2) FNS's data request only calls for a small portion of the categories that States normally submit to FNS for QC purposes:

## Data Element Comparisons

This chart identifies the required data elements submitted by State agencies to the U.S. Department of Agriculture (USDA) for Quality Control (QC) purposes.  States submit a sample set of this data to USDA monthly.  Fields identified with a * symbol have been requested by USDA for the Supplemental Nutrition Assistance Program (SNAP) Data Sharing integrity initiative.  As indicated by this chart, there is no difference between the data elements requested by USDA on November 24, 2025 and the corresponding data elements submitted by States to USDA for QC purposes, other than to request a complete set, rather than a sample set, of the same type of data.

| | | |
|---|---|---|
| Case Number* | Case Address* | Phone Number* |
| SNAP Household Names* | SNAP Household DOBs* | SNAP Household SSN* |
| SNAP Household Relationships* | Citizen/Non-Citizen Status * | Homeless Status* |
| All Household Earned Income* | All Household Unearned Income* | All Household Self-Employment Income* |
| Authorized Representative* | Indicator if SNAP Household Member is active* | Reporting Status* |
| Recipient Disqualification* | Certification Period* | Assets/Resources* |
| Categorial Eligibility | Directions to Home | Shelter Expenses* |
| Date of Interview | Household Composition | Expedited Service |
| Most Recent Action | Student Status | Amount of Allotment |
| Allotment Adjustments | Demonstration Projects | Residency |

| | | |
|---|---|---|
| Earned Income Deductions | Dependent Care | Shelter Deductions |
| Other Government Benefits | Contributions | Deemed Income |
| Standard Utility Allowance | Child Support Deductions | Medical Deduction |
| Income from loans, scholarships, grants | Arithmetic Computation | SNAP Simplification Project |
| Significant Persons NOT living in home phone number | Significant Persons NOT living in the home relationship | Significant Persons NOT living in the home SSNs |
| Significant Persons Not living in the DOBs | Significant Persons NOT living in the home address | Significant Persons NOT living in the home financial support |
| All data related to work requirements – E&T programs, time limited participation, work registration, etc. | States must verify all elements with supporting documentation and upload those to SNAP-QCS | |

That FNS wishes now to examine a *complete* data set, instead of the self-selected samples States collect, is no good faith basis to object. Nor is there any valid basis to object to our request that States produce longitudinal data—as this will permit us to detect whether SNAP has been administered and enforced correctly during the past five years. And the preservation and production of that longitudinal data is important to FNS's need to determine whether anomalous changes we have observed signal a need for further investigation. These preliminary findings lead FNS to conclude that it must make a more complete use of its authority to review the States' administration and enforcement of SNAP.

**4. The States' cited reasons for continuing to withhold SNAP data are baseless.**

  **a. FNS requires a complete set, not just States' samples, of the same type of data States produce monthly.** The primary basis for the States' December 8 Letter's objection—that FNS seeks data of the same type but in greater *volume* than the self-selected sampling of households States provide to FNS for QC—makes no sense. It is simply baseless to object to providing a complete set, rather than just a sample, of the data FNS seeks.

  **b. The States' objections and suggestion of alternatives reflect a lack of understanding of SNAP program integrity.**

    **i. Although states are largely not using it, the National Accuracy Clearinghouse (NAC) is a tool for states to assist each other that does not meet FNS's need to obtain data that states are withholding from FNS.** The States' December 8 Letter attempts to use the National Accuracy Clearinghouse (NAC) to support their withholding reflects a lack of understanding of SNAP program integrity. As you may be aware, only four of the 22

noncomplying States have launched the NAC, an interstate data matching system designed *solely* to assist *States* to prevent duplicate participation. The hashing of data for NAC is allowable only because each State with a legitimate need to access household PII *already has it*. Both the "receiving" State agency and the "losing" State agency were provided the PII by the household at issue—the only information the States are lacking is whether that same household is participating or attempting to participate in another State simultaneously. Because each State agency is already in possession of the information needed to take action on possible duplicate participation, there is no need for States to provide that information to each other un-hashed via the NAC. As such, cryptographic hashing is appropriate. The SNAP Information Database is clearly different. Unlike the NAC, which will eventually have 53 participating State agencies, USDA FNCS is the only entity receiving the SNAP data we have requested.

Crucially, the hashing of data is not a viable solution when only one of the entities (in this case, the State) possesses the data. In the simplest of terms, a cryptographic hash function converts a piece of data into a specific hash value. The hash value itself tells you nothing of the underlying piece of data, and you can only recreate the specific hash value with that function by inputting the same underlying piece of data into it. If Plaintiff States were to submit the requested data in a cryptographic hash format, that would be akin to providing USDA hundreds of thousands of combination locks without any of the codes.

As such, it is not feasible for the SNAP Information Database to include "the same protections" as the NAC.

**ii. The states have no basis to invoke the Computer Matching Act.** The SNAP Information Database is not a matching program. It is a database that stores the SNAP participant information submitted by State agencies. Nor will FNS's uses of data be automatic. Although FNS hopes to help States improve their error rates in making eligibility determinations, the States retain their responsibility and liability for making those determinations. The SNAP Information Database will not be matched with State agency databases, and as a result, the Computer Matching Act is not implicated and a CMA is not required or appropriate.

**iii. FNS's offer of FedRAMP High data security protocols exceed the protection accepted by States for the same type of data requested here**. As stated in FNS's offered protocols, data is encrypted both in transit and at rest, and the requested data is protected with FedRAMP High data security, a higher level of security than that which States, including your State, historically have accepted in releasing similar data to FNS—including name, date of birth, social security number and address. FNS will inspect and audit the data provided pursuant to this request solely for the purposes of "determin[ing] whether the program is being conducted in compliance with [the Food and Nutrition Act of 2008 (FNA)] (including regulations issued under [the FNA]." See 7 U.S.C. § 2020(a)(3).

**iv. The States' remaining miscellany of questions provided no basis to withhold data on the States' use of SNAP funds.** The non-complying States appear to suggest that USDA halt its present efforts in favor of constructing a pilot program under 7 U.S.C. § 2026. This appears to be another unjustified effort by noncomplying States to resist a *complete* review of their use of SNAP funds.

As previously explained, our November 24 data request is founded upon 7 U.S.C. § 2020(a)(3). This provision, and its purposes, is independent from USDA's pilot authority. In any event, although USDA disagrees with the noncomplying States' implication that USDA's pilot authority requires collaboration with States, as our November 24 letter demonstrated, USDA offered to agree with States on a set of protocols, even though such agreement is not a condition limiting USDA's inspection and audit authority.

Further, the States' December 8 letter appears to ask FNS to disclose any sources or methods it will use to analyze whether the States are complying with SNAP requirements.  To disclose beforehand additional details to States as to what, after receiving the data, specifically is or will be analyzed, how, and when, is not possible, given that the noncomplying States are withholding the data.  Further, such disclosure would be ill-advised as it would provide a roadmap on how to avoid detection of noncompliance with SNAP requirements.   FNS has already observed anomalous changes in reported data since it began providing notice last summer that it would seek to obtain this data.  Hence, our previous request that States preserve their data.

Moreover, USDA is not prohibited from improving upon or developing new, efficient ways to detect fraud, waste, and abuse.  Simply because other mechanisms exist to detect fraud does not preclude USDA from consistently striving for better, more efficient methods of detecting waste, fraud, and abuse in SNAP.

**5. Additional clarifying answers to States' December 8 questions.**  FNS has carefully reviewed your December 8 Letter's attached questions and requests for clarification. The following information should sufficiently clarify our November 24 draft protocols, permitting you to now accept those protocols:

- USDA reiterates its November 24 letter's statement that it will only use the received data in compliance with the Food and Nutrition Act of 2008, as amended.
- In the event it receives external requests for data, USDA will follow all applicable laws. This would include, but is not limited to, the Food and Nutrition Act of 2008, as amended, FOIA, and the USDA Touhy regulations.
- The SNAP Information Database is FedRAMP certified (High).
- All data provided to the SNAP Information Database is encrypted in transit and at rest.
- USDA reiterates and clarifies that its SORN revisions will not impact the data elements requested but will simply bolster the introductory language of the Routine Uses section to clarify, as expressed previously, that the enumerated routine uses are only permitted to the extent they are permitted by the Food and Nutrition Act of 2008, as amended. The revisions will also remove the reference to "foreign" governments in Routine Use 8.

For the avoidance of doubt, we have edited our November 24 protocol to more clearly reflect the above answers to your questions and requests for clarification.  We look forward to your State's reply to FNS's reiterated request.  We hope to receive your agreement immediately to join the 28 States plus the Territory of Guam who are complying with FNS's November 24 request.  Please construe this letter as your Advance Notification pursuant to 7 CFR 276.4(d)(1), providing you

two weeks from this letter's date above to indicate whether you agree to our November 24 request, and the protocols we have offered.

FNS appreciates your State's concluding assertion that it "has always been FNS's primary partners and leaders in SNAP program integrity." We hope that this signals a new approach of State cooperation that will provide FNS with access to the data it pays your state to collect so that FNS can properly administer and enforce the issuance of SNAP benefits paid for with Federal funding.

Sincerely,

Patrick A. Penn
Acting Administrator, Food and Nutrition Service
Deputy Under Secretary, Food, Nutrition, and Consumer Services
U.S. Department of Agriculture

Enclosure

cc:    Mark Ladov, Special Counsel

**U.S. DEPARTMENT OF AGRICULTURE**

## Supplemental Nutrition Assistance Program (SNAP) Information Database
## Fraud, Waste and Abuse Detection Protocol

**1. OVERVIEW**

1.1. U.S. Department of Agriculture (USDA) and the Food and Nutrition Service (FNS) will use the Supplemental Nutrition Assistance Program (SNAP) recipient data to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying duplicate enrollments for elimination, and performing additional eligibility and program integrity checks specified herein.

1.2. This protocol establishes a framework for State SNAP agencies to share data with the USDA/FNS for detection of fraud, waste, and abuse and program integrity purposes.

1.3. The protocol balances federal data access requirements under Executive Order 14243 and the Food and Nutrition Act of 2008 (FNA) with privacy protections, minimizes unnecessary data collection, and incorporates security standards while maintaining public trust and compliance with applicable law.

**2. FRAMEWORK AND AUTHORITY**

2.1. Authority

2.1.1. Executive Order 14243 (March 20, 2025): "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos" directs agency heads to "take all necessary steps, to the maximum extent consistent with law," to ensure federal government has "unfettered access to comprehensive data" from state programs receiving federal funding, including data maintained in third-party databases.

2.1.2. 7 U.S.C. § 2020(a)(3) that requires that each State agency shall keep records as may be necessary to determine whether the program is being conducted in compliance with this chapter, and all records shall be made available for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary.

2.1.3. 7 CFR 272 stipulates use or disclosure of information obtained from SNAP applicant or recipient households shall be restricted to persons directly connected with the administration or enforcement of the provisions of the FNA or regulations, other Federal assistance programs, federally-assisted State programs providing assistance on a means-tested basis to low-income individuals, or general assistance programs which are subject to joint processing requirements.

2.2. Prohibited Purposes

2.2.1. USDA shall NOT use the provided data for:

- Tax administration or tax compliance
- Law enforcement investigations beyond coordination regarding SNAP fraud, or other violations relating to the FNA.
- Administration of non-SNAP federal assistance programs (*e.g.*, Medicaid, TANF, housing assistance)
- Sharing with foreign governments or international organizations
- Commercial use or transfer to private entities

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

    2.2.2. USDA shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals (*i.e.*, the collection of data elements spelled out in the Privacy Impact Assessment).

## 3. DATA CATEGORIES

3.1. <u>Data Definition</u>

    3.1.1. All data obtained by States or their vendors in administering SNAP or that otherwise may be necessary to determine whether the program is being conducted in accordance with the FNA or regulations issued under the FNA.

    3.1.2. Data derived from third-party sources (employment verification databases, financial institution records, property records) that States use for verification but are not part of applicant-reported information are excluded.

3.2. <u>Permitted Data</u>

- Information that the applicant household reported on application/recertification forms including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers.

- Direct verifications that the State conducted to confirm applicant-reported information Records that the State maintains of SNAP applications, approvals, denials, certifications, and benefits issued.

- Household composition and income exactly as reported by the applicant (not third-party verified amounts).

- Transactional data necessary for fraud detection

## 4. LIMITED ACCESS

4.1. The SNAP Information Database is accessed and used ONLY by employees of the USDA who are:

    4.1.1. Designated by the Chief of Staff at Food, Nutrition, Consumer Services (FNCS)

    4.1.2. Trained in SNAP Act, Privacy Act, and this protocol

    4.1.3. In compliance with all information security annual recertifications

4.2. Except to the extent required by law, no access to the SNAP Information Database may be provided to:

    4.2.1. Other USDA agencies (APHIS, ERS, NASS, etc.)

    4.2.2. Divisions within FNS without an explicit need-to-know

    4.2.3. OIG employees, unless in direct support of a law enforcement investigation related to SNAP fraud, waste, or abuse

    4.2.4. Any other federal agency
    4.2.5. Any FOIA, administrative subpoena or like external requester

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

5. **SYSTEM OF RECORDS NOTICE (SORN) AND PRIVACY IMPACT ASSESSMENT (PIA)**

5.1. <u>SORN</u>

The applicable SORN for this protocol is USDA/FNS-15 "National Supplemental Nutrition Assistance Program (SNAP) Information Database," 90 FR 26521.

The SORN location can be found here: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system-of-records

5.2. <u>Privacy Impact Assessment (PIA)</u>

The applicable Privacy Impact Assessment for the SNAP Information Database can be found here: https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

6. **FRAUD, WASTE, AND ABUSE DETECTION FRAMEWORK**

6.1. <u>Core Fraud Detection Functions</u>

6.1.1. USDA will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program that focuses on:

- identity verification
- income and eligibility verification
- immigration status
- verification against disqualified recipients

6.2. <u>Enhanced Fraud, Waste, and Abuse Detection Techniques</u>

6.2.1. In addition to the core fraud detection functions, USDA will employ additional techniques including, but not limited to:

- Intrastate and interstate duplicate detection
- Deceased individuals' detection
- Synthetic identity patterns (new SSNs with inconsistent biographical data)
- Geographic anomalies

6.2.2. New data mining techniques will be limited to identifying recipient and retailer fraud with a direct nexus to SNAP.

7. **DATA OUTPUT**

7.1. <u>States</u>

7.1.1. USDA will provide flagged data back to the State agency for review. States are encouraged to verify the accuracy of fraud detection flags and provide feedback to USDA to refine detection logic and reduce false positives. Collaborative processes will be established to ensure accurate identification of fraud and appropriate corrective actions.

7.2. <u>Law Enforcement</u>

7.2.1. The USDA may refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP.

7.3. <u>USDA SNAP Retailer Operations Center (ROC)</u>

7.3.1. The USDA may refer fraud detection leads to the ROC where, during fraud detection analysis, a compromised EBT card or terminal ID may have been identified.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

**USDA**
**U.S. DEPARTMENT OF AGRICULTURE**

8. **DATA MINIMIZATION AND RETENTION**

   8.1. <u>Retention Period</u>

   8.1.1. Until a record schedule is approved, data will be retained only as long as necessary for purposes set forth in the SORN and this protocol, and in no case longer than 3 years per the SORN.

   8.2. <u>Automatic Deletion</u>

   8.2.1. Data shall be retained for no longer than three years, consistent with the USDA/FNS-15 SORN. An automated process will be implemented to delete data upon expiration of the retention period, except for records related to ongoing audits, investigations, or litigation.

   8.3. <u>Ongoing Cases</u>

   8.3.1. Data pertaining to ongoing audit, investigation, or potential litigation retained only as long as necessary, then deleted.

9. **DATA SECURITY AND TECHNICAL REQUIREMENTS**

   9.1. <u>Infrastructure and Location</u>

   9.1.1. Primary storage location: AWS GovCloud (US) region

   9.1.2. Backup/disaster recovery: Secondary AWS region

   9.1.3. No storage, processing, or backup outside GovCloud or federal secure environments

   9.1.4. All infrastructure must meet or exceed FedRAMP High baseline standards

   9.1.5. AWS Personnel Access: Data is encrypted such that AWS personnel cannot access unencrypted data. Encryption keys are managed exclusively by federal USDA personnel and are not accessible to AWS or third-party vendors.

   9.2. <u>Access Controls</u>

   9.2.1. Multi-factor authentication required for all access

   9.2.2. Role-based access control (RBAC) with principle of least privilege

   9.2.3. Access is limited to specifically designated USDA employees engaged to assist in determining whether the program is being conducted in accordance with the FNA.

   9.2.4. Access logging and audit trail maintenance (minimum period equal to data retention period, see Section V.E).

   9.2.5. Quarterly access reviews by USDA

   9.2.6. Immediate revocation of access upon employee termination or assignment change

   9.3. <u>Encryption Standards</u>

   9.3.1. Encrypted data at rest and in transit

   9.3.2. Encryption keys managed solely by USDA federal personnel

   9.3.3. No encryption keys held by commercial vendors

   9.4. <u>Data Segregation and Compartmentalization</u>

   9.4.1. SNAP data isolated in separate, dedicated AWS GovCloud environment

   9.4.2. SNAP data not directly integrated with other USDA systems

   9.4.3. Limiting access to individuals with specialized training and oversight

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

**U.S. DEPARTMENT OF AGRICULTURE**

9.5.  Data Transfer

　9.5.1.  All data transfers shall utilize secure tools that meet or exceed FedRAMP High baseline standards.

## 10. INCIDENT RESPONSE AND BREACH NOTIFICATION

10.1. Incident Response

　10.1.1.  Incident response procedures are aligned with FNS Handbook Chapter 10 security incident and breach notification requirements that USDA already follows internally. This protocol extends equivalent procedures to State notification.

10.2. Incident Definition

　10.1.2.  Unauthorized access, use, or disclosure of data

　10.1.3.  Security vulnerability or control failure affecting data

　10.1.4.  Data loss, corruption, or destruction

　10.1.5.  Encryption failure or key compromise

　10.1.6.  Failed access control or authentication mechanism

　10.1.7.  Any event that may reasonably be expected to compromise data security or confidentiality

10.3. Incident Notification Timeline

　10.3.1.  Initial Notification within 12 hours

　　10.3.1.1.  Within 12 hours of discovery (by phone + email to State security/privacy contact and Director).

　10.3.2.  Preliminary Report within 24 hours

　　10.3.2.1.  Description of incident and timeline

　　10.3.2.2.  Data elements affected (specific fields and estimated number of records)

　　10.3.2.3.  Estimated number of individuals affected

　　10.3.2.4.  Preliminary assessment of whether unencrypted sensitive data may have been exposed

　　10.3.2.5.  Preliminary remedial actions taken

　　10.3.2.6.  Root cause analysis plan and timeline

## APPENDIX A - SOURCES

- Privacy Impact Assessment: https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

- SORN: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system-of-records

- SNAP Act: https://www.law.cornell.edu/uscode/text/7/2020

- SNAP QC Handbook

- Executive Order 14243 (March 20, 2025) "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos: https://www.govinfo.gov/content/pkg/DCPD-202500382/pdf/DCPD-202500382.pdf

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

# Exhibit D

**COMPUTER MATCHING AGREEMENT**

**Between**

**THE U.S. DEPARTMENT OF AGRICULTURE'S FOOD AND NUTRITION SERVICE,**
**SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM**
**And**
**STATE AGENCY ADMINISTERING**
**THE SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM**
**Match# CMA-USDA/FNS eDRS 1**

## I.  PURPOSE AND LEGAL AUTHORITY

### A. Purpose

This Computer Matching Agreement ("Agreement") between the U.S. Department of Agriculture's Food and Nutrition Service (FNS), Supplemental Nutrition Assistance Program (SNAP), and State agencies of each of the 50 States and State agencies of the District of Columbia and the territories of Guam and the Virgin Islands administering SNAP is executed under the Privacy Act of 1974, 5 U.S.C. § 552a, as amended by the Computer Matching and Privacy Protection Act of 1988 (CMPPA) and the Office of Management and Budget (OMB) guidance interpreting those statutes.

This Agreement sets forth the conditions, terms, and safeguards under which a State Agency will provide and receive data to/from FNS through the Electronic Disqualified Recipient System (eDRS) for the purpose of determining SNAP recipient (applicants and individuals being certified or recertified for eligibility) eligibility at certification and to assist the State Agency in assigning proper periods of disqualification to individuals found to have committed program fraud.

### B. Legal Authority

This Agreement is executed pursuant to the Privacy Act of 1974, 5 U.S.C. § 552a, as amended by the CMPPA; OMB Circular A-130, titled "Management of Federal Information Resources" at 61 Federal Register (FR) 6428-6435 (February 20, 1996); and OMB guidelines pertaining to computer matching at 54 FR 25818 (June 19, 1989).

The legal authority for conducting the matching program is the Food and Nutrition Act of 2008, as amended. Section 6(b) of the Act, 7 U.S.C. 2015(b), prescribes mandatory periods of ineligibility for persons found on one or more occasions, to have committed fraud, misrepresentation, or other violation of statute or regulation in connection with SNAP.  Section 6(b)(4), prescribes regulations to ensure that appropriate State and Federal entities forward information concerning determinations rising out of such proscribed activity by a specific individual.  The State Agency shall also use eDRS to

1

conduct matches as specified in 7 CFR § 273.16 on initial program application prior to certification. Computer matching is listed under the routine uses in the System of Record Notice for eDRS.

## II.   RESPONSIBILITIES OF THE PARTIES

**FNS's Responsibilities**
**FNS shall:**

1.   Maintain the eDRS environment, including system security;

2.   Maintain the authoritative database of participants that have been disqualified from participation (as a recipient or vendor) of federal benefits under SNAP;

3.   Provide each State Agency with a HelpDesk for technical and system support to enable State Agency connection to eDRS and the ability to input/extract record data;

4.   Provide each State Agency with the necessary trainings following technical upgrades to enable the State Agency technology compatibility;

5.   Report to each State Agency when records are not accepted by the eDRS system; and

6.   Authorize access to eDRS by each State Agency system or by State Agency personnel who have been appropriately accredited and endorsed by the State Agency, and approved by FNS.

**State Agency Responsibilities**
**The State Agency shall:**

1.   Restrict record access to only those authorized employees and officials who need it to perform their official duties in connection with the uses of the information authorized in this agreement.

2.   Store the records matched, and any records created by the match, in an area that is physically safe from access by unauthorized persons during duty hours as well as non-duty hours, or when not in use;

3.   Transport the records matched, or any records created by the match, under appropriate safeguards;

4.   Process the records matched, and any records created by the match, under the immediate supervision and control of authorized personnel in a manner which will protect the confidentiality of the records, and in such a way that unauthorized persons cannot retrieve any such records by computer, remote terminal, or other means;

2

5. Advise all personnel who will have access to the records matched, and to any records created by the match, of the confidential nature of the information, the safeguards required to protect the information, and the civil and criminal sanctions for noncompliance contained in applicable Federal statutes.

## III.  JUSTIFICATION AND ANTICIPATED RESULTS

### A.  Justification

This data exchange through the use of eDRS is necessary to ensure SNAP recipient eligibility at application, certification, and recertification, and to assist each State Agency to assign proper periods of disqualification to persons found to have committed program fraud. FNS and the State Agency will use eDRS to transfer the data because it is more economical, more efficient, and faster than using manual processes. The cost benefit analysis for the first year of eDRS service is estimated at $55,259,398.25.

### B.  Anticipated Results

FNS and the State Agency will use the eDRS data provided by the State Agency to ensure program efficiency and integrity. The use of eDRS data expedites the application process and ensures that benefits are awarded only to applicants that satisfy the eligibility criteria as specified in 7 CFR § 273.16 .

## IV.  RECORDS DESCRIPTION

### A.  Systems of Records

FNS' system of records (SOR) for this data exchange comprising eDRS is USDA/FNS-5, Information on Persons Disqualified from the Supplemental Nutrition Assistance Program, 75 Fed. Reg. 81205 (Dec. 27, 2010). The FNS SORs used for the purposes of this data exchange are the master files of recipients and their associated IPV records.

Each state updates and verifies its data within eDRS according to the technology it uses to connect to eDRS (Web Services or Online).

State Agencies exchanging data with eDRS do so with their respective authoritative and substantiated listing of that State's disqualified SNAP recipients. Each state's substantiation is performed at the State level and must include specific court documents and/or records of formal court action that disqualify a recipient or change a disqualification period for a recipient.

### B. Data Elements

1. For each applicant identified, the State Agency will submit an electronic update to eDRS that contains the mandatory specified data elements per regulations at 7 CFR 273.16(i)(3). To the extent that a conflict exists between the data elements described in 7 CFR 273.16(i)(3) and the Interconnection Security Agreement, 273.16(i)(3) and this provision of the Agreement control.

2. For each applicant identified, eDRS will provide a response. The response will be in a standard fixed record format.

### C. Number of Records Involved

The number of records that FNS and the State Agency will exchange will vary according to the size of the population served by the State Agency. This includes record additions, updates, and deletes as well as queries for potential recipient eligibility purposes through the various eDRS interfaces.

## V.   NOTICE PROCEDURES

Per OMB Final Guidance Interpreting the Provision of Public Law 100-503, the Computer Matching and Privacy Protection Act of 1988, 54 Fed. Reg. 25818, 25825 (June 19, 1989), states will provide individualized notice on an initial application form and on application renewal forms or, at the least, during the period the record is maintained (see Section VIII, Disposition and Records Retention of Matched Items), in a notice accompanying the application response.

## VI.   VERIFICATION PROCEDURE AND OPPORTUNITY TO CONTEST

### A. ACCURACY ASSESSMENTS

EDRS data is not considered verified upon receipt. Therefore, the State Agency must complete the secondary verification process as established at 7 CFR 273.2 (f)(11)(iii) which states that independent verification shall take place separate from and prior to issuing a notice of adverse action—a two-step process. Independent verification for disqualification purposes means contacting the applicant or recipient household and/or the State Agency that originated the disqualification record immediately to obtain corroborating information or documentation to support the reported disqualification information in the intentional program violation database.

1. Documentation may be in any form deemed appropriate and legally sufficient by the State Agency considering the adverse action. Such documentation may include, but shall not be limited to, electronic or hard copies of court decisions, administrative disqualification hearing determinations, signed disqualification consent agreements or administrative disqualification hearing waivers.

4

2. A State Agency may accept a verbal or written statement from another State Agency attesting to the existence of the documentation listed in paragraph (f)(11)(iii)(A) of this section.

3. A State Agency may accept a verbal or written statement from the household affirming the accuracy of the disqualification information if such a statement is properly documented and included in the case record.

4. If a State Agency is not able to provide independent verification because of a lack of supporting documentation, the State Agency shall so advise the requesting State Agency or FNS, as appropriate, and shall take immediate action to remove the unsupported record from the disqualified recipient database in accordance with §273.16(i)(6).

## B. Verification Procedure

In order to protect any individual whose records are used in this matching program, neither FNS nor the State Agency will take any adverse action against such individual as a result of information produced by such matching program until the State Agency has independently verified the information in accordance with the procedures above.

## C. Notice and Opportunity to Contest

To comply with the requirements of 5 U.S.C. § 552a(p), FNS and the State Agency will follow regulations specified at 7 CFR 272.12 (c) and 273.2(f)(11)(ii), which maintain the following procedures to permit an adversely affected party to contest findings that result from the computer matching activity under this Agreement and give the individual an opportunity to submit a brief statement representing his or her position for the record.

1. FNS has policies and procedures in place that provide for and facilitate an applicant's dispute of eDRS information.

2. SNAP applicants have the opportunity to contest an initial eligibility decision. When information obtained from a matching program indicates that an applicant is not eligible for SNAP benefits, the State Agency will provide the applicant with a written notice of adverse action.

   Such notices will:

   a. Inform the applicant of the match findings and the opportunity to contest these findings to the State Agency;

   b. Give the applicant until the expiration of a specified time period to respond to the notice. The time period begins on the date on which notice is mailed or otherwise provided to the individual to respond;

5

   c. Clearly state that, unless the applicant responds to the State Agency in accordance with the notice in the required time period, the State Agency will conclude that the secondary verification of eDRS data is correct and the State Agency will effectuate the proposed action or otherwise make the necessary adjustment to the individual's benefit or entitlement; and

   d. Comply with the requirements of 5 U.S.C. § 552a(p)(1).

## VII. DISPOSITION AND RECORDS RETENTION OF MATCHED ITEMS

Information about recipients generated through the match of a State record with eDRS will be destroyed by the States and FNS as soon as the record no longer serves a purpose with eDRS and is no longer needed to fulfill any legal retention requirement. Disposition Authority - N1-462-09-8

FNS and the State Agency will destroy by deletion the electronic files in eDRS that retain information about individual records (log files recording record query and/or access) after three years' retention time.

The State Agency will also destroy by deletion a recipient's electronic record in eDRS:

1. When the recipient is deceased;

2. When the recipient reaches their 80th birthday, if the State has chosen to implement this option;

3. In cases where the determination of intentional program violation is reversed by a court of appropriate jurisdiction;

4. If a State determines that supporting documentation for a disqualification record that it has entered is inadequate or nonexistent;

5. If a State Agency is unable to demonstrate to the satisfaction of FNS that the information in question is correct; and

6. In accordance with the Federal Records Retention Schedule (44 U.S.C. § 3303a).

State Agency deletion of a recipient's record in eDRS removes that record from the FNS system.

## VIII. SECURITY PROCEDURES

FNS and State Agency will comply with the requirements of the Federal Information Security Management Act (FISMA), 44 U.S.C. § 3541 et seq.; related OMB circulars and memoranda, such as Circular No. A-130, Management of Federal Information Resources (Nov. 28, 2000), and Memorandum M-06-16, Protection of Sensitive Agency Information

6

(June 23, 2006); National Institute of Science and Technology (NIST) directives; and the Federal Acquisition Regulations. These laws, directives, and regulations include requirements for safeguarding Federal information systems and personally identifiable information (PII) used in Federal Agency business processes, as well as related reporting requirements. FNS and the State Agency recognize and will implement the laws, regulations, NIST standards, and OMB directives including those published subsequent to the effective date of this Agreement. FISMA requirements apply to all Federal contractors, organizations, or entities that possess or use Federal information, or that operate, use, or have access to Federal information systems on behalf of an agency. FNS, as the recipient agency, is responsible for oversight and compliance of their contractors and agents. FNS reserves the right to conduct onsite inspections to monitor compliance with FISMA regulations during the lifetime of this Agreement, or any extensions thereof.

## A. Loss Reporting

If FNS or the State Agency experiences a loss of PII provided under the terms of this Agreement, the agency experiencing the loss will follow the OMB loss reporting guidelines (OMB M-06-19, "Reporting Incidents Involving Personally Identifiable Information and Incorporating the Cost for Security into IT Investments") and notify the United States Computer Emergency Readiness Team within one hour of discovering the incident. In addition, the agency experiencing the loss of PII will notify the eDRS HelpDesk within one hour at eDRS@fns.usda.gov or at 866-557-8330. Conversely, the eDRS Help Desk will notify any state identified in the potential loss of PII with instructions regarding mitigation of the potential impact of the loss.

## B. Breach Notification

FNS and the State Agency will follow PII breach notification policies and related procedures as required by OMB M-07-16 (May 22, 2007) and USDA Breach Notification and Incident Response Plan (August 1, 2011). If an agency determines that the risk of harm requires notification to affected individuals and/or other remedies, that agency will carry out these remedies without cost to the other agency.

## C. Administrative Safeguards

Access to the data matched and to any data created by the match will be restricted to only those authorized employees and officials who need it to perform their official duties in connection with the uses of the data authorized in this Agreement. Furthermore, all personnel who will have access to the data matched and to any data created by the match will be advised of the confidential nature of the data, the safeguards required to protect the data, and the civil and criminal sanctions for noncompliance contained in the applicable Federal laws. Employees will also complete mandatory security awareness training.

### D. Physical Safeguards

The data matched and any data created by the match will be stored in an area that is physically and technologically secure from access by unauthorized persons during duty hours as well as non-duty hours or when not in use (e.g., door locks, card keys, biometric identifiers, etc.). Only authorized personnel will transport the data matched and any data created by the match.

### E. Technical Safeguards

The data matched and any data created by the match will be processed under the immediate supervision and control of authorized personnel in a manner that will protect the confidentiality of the data, so that unauthorized persons cannot retrieve any data by computer, remote terminal, or other means. Systems personnel must enter a State issued unique identification number when accessing data on the agency's systems. Authorization is strictly limited to those electronic data areas necessary for the authorized analyst to perform his/her official duties.

### F. Application of Policy and Procedures

FNS and the State Agency will adopt policies and procedures to ensure that information contained in their respective records or obtained from each other is used solely as provided in this agreement. FNS and the State Agencies will comply with these guidelines and any subsequent revisions.

### G. Onsite Inspection

FNS reserves the right to monitor compliance with FISMA and OMB M-06-16 requirements and to make onsite inspections for purposes of auditing compliance, if necessary, during the lifetime of this Agreement or of any extension of this Agreement.

### H. Security Design Plan

An FNS authorized official will provide a written and properly formatted Security Design Plan (SDP) to the Systems Security contact named herein upon this Agreement's execution. The SDP will comprehensively document the aforementioned agency's technical and non-technical security controls to protect eDRS information provided under the terms of this Agreement. Under the terms of this Agreement, FNS retains the right to conduct, at its discretion, announced periodic security reviews, which may entail onsite visits, of the State agencies to ensure the security of eDRS provided information.

## IX.   RECORDS USAGE, DUPLICATION AND, REDISCLOSURE RESTRICTIONS

FNS and the State Agency will comply with the requirements of 5 U.S.C. § 552a(o)(1)(H) and (I). This section prohibits duplication and re-disclosure of records provided by the

8

source agency within and outside the recipient agency, except where required by law or where authorized by law and essential to the conduct of the matching program, and includes procedures for the use and return/destruction of records used by a recipient or non-Federal Agency. An example of a possible disclosure would be to the Department of Justice, or another law enforcement entity, if applicable to the program. FNS and the State Agency will comply with the following limitations on use, duplication, and re-disclosure:

1. FNS and the State Agency will use or re-disclose eDRS data *only* for those purposes specified in this Agreement.

2. FNS and the State Agency will restrict access to the eDRS data to only those authorized employees, contractors, and agents who need such data to perform their official duties in connection with the purposes identified in this Agreement.

3. FNS and the State Agency will enter into a written agreement with each of its contractors and agents that needs eDRS data to perform their official duties whereby such contractor or agent agrees to abide by all relevant federal laws, restrictions on access, use, and disclosure, and security requirements in this Agreement.

4. FNS and the State Agency employees, contractors, and agents who access, use, or disclose eDRS data in a manner or purpose not authorized by this Agreement may be subject to civil and criminal sanctions pursuant to applicable federal statutes.

5. FNS and the State Agency will electronically destroy by deletion all information about recipients generated through the match of a State record with eDRS as soon as the record no longer serves a purpose with eDRS and is no longer needed to fulfill any legal retention requirement. State Agency deletion of a recipient's record in eDRS removes (electronically destroys) that record from the FNS system. Specific criteria for use within the eDRS program are specified in Section VIII, Disposition and Records Retention of Matched Items.

## X.    COMPTROLLER GENERAL ACCESS

Pursuant to 5 U.S.C. § 552(o)(1)(K), the Government Accountability Office (Comptroller General) may have access to all FNS and the State Agency records, as necessary, in order to monitor or verify compliance with this Agreement.

## XI.    DURATION, MODIFICATION, AND TERMINATION OF THE AGREEMENT

### A. Duration

1. The Effective Date of this agreement will be 30 days after the publication of the Federal Register Notice and will be in effect for 18 months from that date.

9

2. In accordance with 5 U.S.C. § 552a(e)(11) and (12) and applicable regulations, FNS will: (a) publish a Computer Matching Notice in the Federal Register at least 30 days prior to the Effective Date; (b) send required notices to the Congressional committees of jurisdiction under 5 U.S.C. § 552a(o)(2)(A)(i) at least 40 days prior to the Effective Date; and (c) send the required report to the OMB at least 40 days prior to the Effective Date.

3. Ninety (90) days prior to the Expiration Date, the parties to this Agreement may request a 12-month extension in accordance with the Privacy Act (5 U.S.C. § 552a(o)(2)(D)). If any of the parties does not want to extend this Agreement, it should notify the other at least 90 days prior to the Expiration Date.

### B. Modification

Any modification to this Agreement must be in writing, signed by all parties and approved by the USDA Data Integrity Board (DIB).

### C. Termination

The parties may terminate this Agreement at any time upon mutual written consent of all parties. Any of the parties may unilaterally terminate this Agreement upon 90 days advance written notice to the other parties; such unilateral termination will be effective 90 days after the date of the notice, or at a later date specified in the notice. To the extent that a conflict exists between the termination provisions described in this Agreement, the MOU, and the Interconnectivity Security Agreement, this provision of the Agreement controls.

## XII.  REIMBURSEMENT

EDRS is a Federal requirement of the States; the base percentage for Federal payment to the State shall be 50 percent of State Agency's administrative costs per regulations at 7 CFR 277.4(b).

## XIII.  INTEGRATION CLAUSE

This Agreement, including attachments, constitutes the entire agreement of the parties with respect to its subject matter. There have been no representations, warranties, or promises made outside of this Agreement. This Agreement will take precedence over any other documents that may be in conflict with it.

## XIV.  POINTS OF CONTACT

### A.  FNS contacts

Matching Issues
Susan M Cole
Program Analyst
State Administration Branch
USDA, Food and Nutrition Service
Telephone: 703-605-3218
Email: susan.m.cole@fns.usda.gov

Computer/Technology Issues
eDRS HelpDesk
edrs@fns.usda.gov
Telephone: (866)-557-8330

Systems Security Issues
Stephanie R. Means
Information Security Officer
USDA – Food and Nutrition Service
77 W. Jackson, 20th Floor
Chicago, IL 60604
Telephone: 312-353-7270 (Office)
Email: stephanie.means@fns.usda.gov

### B.  State Contacts – See Appendix A

11

## XV.  SIGNATURES  OF AUTHORIZED OFFICIALS

The signatories below warrant and represent that they have the competent authority on behalf of
their respective agency to enter into the obligations set forth in this  Agreement.

**U.S. Department of Agriculture**

By . _____          Date _____

Jessica Shahin.
A;;ciat-Administrator
Supplemental Nutrition Assistance Program

The Data Integrity Board for the United State Department of Agriculture has reviewed this
matching Agreement and finds it in compliance with relevant statutes, regulations, and
guidelines.  We, therefore, approve the conduct of the aforementioned  matching program.

By _____          Date   12./12.IZ.6•6

tf-**Dr.** Gregory Parham,
Assistant Secretary for Administration and
Senior Agency Official for Privacy
Chair, Data Integrity Board

**Recipient Agency**

See Appendix  A – Recipient Agency  Approvals

12

## APPENDIX A – RECIPIENT AGENCY APPROVALS

The signatories below warrant and represent that they have the competent authority on behalf of their respective agency to enter into the obligations set forth in this Agreement.

**Recipient Agency**

Barbara C Gwinn
Signature

August 15, 2018
Date

Name: Barbara C. Gwinn

Title: Executive Deputy Commissioner

State: New York

Agency: Office of Temporary and Disability Assistance

13

Memorandum of Understanding between the State of New York
and the United States Department of Agriculture
Food and Nutrition Service

The State of New York, its employees, officers, agents, contractors, subcontractors, and/or other representatives and the United States Department of Agriculture (USDA) Food and Nutrition Service (FNS) are entering into this Memorandum of Understanding (MOU) dated June 22, 2017, relative to the Recipient Computer Matching Agreement that USDA/FNS and the State Agency are conducting to further strengthen fraud detection efforts in the Supplemental Nutrition Assistance Program (SNAP). In connection with the Recipient Computer Matching Agreement, USDA/FNS and the participating State Agency will receive, have access to, or be exposed to certain documents, records, and other information (including electronically stored information), that are Sensitive but Unclassified (SBU) Information and protected from disclosure, including, but not limited to: records sufficient to identify an applicant for, or recipient of, SNAP benefits; personally identifiable information (PII) such as social security number, name and date of birth, as well as State case record information and any other records, reports, information, and statements required to be protected by federal or State laws, regulations, or by court order.

In consideration of the mutual promises and covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  USDA/FNS possesses the legal authority to collect and utilize SNAP beneficiary data for program administration and enforcement as provided in the Food and Nutrition Act of 2008 (Act) regarding confidentiality and limitations on disclosure at section 11(e)(8) (SNAP recipients), section 7(h)(2) (SNAP recipient EBT transaction data, and section 9(c) (SNAP retailers) of the FNA. USDA/FNS possesses the legal authority to conduct computer matching at section 6(b) of the Act.

2.  USDA/FNS will only use the documents, records, and other information (including electronically stored information) pursuant to this agreement through the Electronic Disqualified System Recipient System (eDRS) to determine SNAP applicant eligibility at certification and to assist the State Agency in assigning proper periods of disqualification to persons found to have committed program fraud.

3.  USDA/FNS acknowledges that, just as other Executive Department state government entities, the State Agency is required to comply with all current statewide technology standards and policies issued within its lawful authority by the NYS Office of Information Technology Services (ITS), which are currently posted in their entirety by ITS at the public website https://its.ny.gov/tables/technologypolicyindex, and, specifically under the category of "Security," at https://its.ny.gov/eiso/policies/security. ITS's role is to transmit data between the Parties and to store the data on technology that meets, or exceeds, all laws, rules, regulations, or requirements in order to secure the data when in ITS's possession. Once the data is transferred from ITS's possession, ITS's responsibilities for the security of the data cease and transfer to the USDA/FNS and/or the State Agency.

1

4.  USDA/FNS and the State Agency will protect the confidentiality of any SBU or PII Information, as described above, that USDA/FNS and the State Agency views, receives or is exposed to during the course of fulfilling the regulatory matching requirements as specified at 7 CFR 272.1 and  273.16.

5.  USDA/FNS and the State Agency will not disclose any such Federal or State SBU, PII, or other legally protected Information to any third parties,  or  make any unauthorized use of it. Only Federal and State employees with a need to know the information in connection with their duties will have authorized access to any SBU or PII Information, as described above.

6.  USDA/FNS shall protect SBU and PII information received and shared pursuant to Section 1137(a)(5)(A) and (B) of the Social Security Act, which provides for the protection of IRS and SSA data, pursuant to Section 6103(1) of the Internal Revenue Code of 1954, and regulations established by the Secretary of  Agriculture.

7.  In the event that USDA/FNS or the State Agency discloses SBU or PII to an authorized person not originally identified by either party, USDA/FNS and/or the State Agency will notify the appropriate Federal or State entity as to the identity of each person to whom disclosure is made, that such disclosure is made in accordance with all applicable laws and regulations and obligations outlined in this MOU, and that the contents of the disclosure shall be protected as outlined in the MOU.

8.  USDA/FNS and the State Agency agree to ensure appropriate controls are in place in accordance with FIPS 200 and NIST 800-53, rev. 4 to protect the confidentiality, integrity, and availability of all Systems and the Information contained within the System, and to prevent unauthorized access, disclosure, use, breach or attempted breach of the data covered by Federal and State laws, regulations, and this MOU.  In the event of a breach of the SBU or PII, USDA/FNS and/or the State Agency will notify the partnering agency within one hour of the discovery thereof, in accordance with US-CERT and USDA    policy.

9.  USDA/FNS will not remove any SBU or PII Information from the location in which it is provided without  prior written  authorization.

10. USDA/FNS and the State Agency will not use the SBU or PII Information for its personal purposes or benefit, and will not release or reveal any State or Federal protected information outside of the agreed upon terms and conditions of this MOU.

11. At the conclusion of this project, USDA/FNS will purge all State provided Information in its custody or control, in the manner  required by the State and outlined in this  MOU.

12. This MOU can be terminated at any time by either party with or without cause. Upon termination of the agreement, any restrictions contained herein as to the State Information and/or the USDA/FNS shall survive indefinitely.

Each of the undersigned acknowledges that they have read, understand, and agree to abide by all of the terms and conditions of this MOU, and that each of them is authorized to enter into this MOU on behalf of their respective entities, with the intent to be bound thereby.

**USDA/FNS Representative**

Ronald K. Ward
Director
Program Accountability and Administration Division

_____     _____
Signature                                                    Date

**State Representative**

_Barbara C. Guinn_                          _Ayost 15, 2018_
Signature                                                    Date

Name: _Barbara C. Guinn_

Title: _Executive Deputy Commissioner_

Agency: _Office of Temporary and Disability Assistance_

State: _New York_

1



# Interconnection Security Agreement

# & Memorandum of Understanding

## Between

## Electronic Disqualified Recipient System (eDRS) Application &

## State Systems

*Revision: 1.1*

*November 2015*

United States Department of Agriculture
1400 Independence Ave., SW
Washington, DC 20250
Template Release April 2011



# Document Information

| eDRS Point of Contact | |
|---|---|
| Name | Joel Mallard |
| Contact Number | 703-305-2811 |
| E-mail Address | Joel.Mallard@fns.usda.gov |
| **State Systems Representative Point of Contact** | |
| Name | See Part 2 of the ISA |
| Contact Number | See Part 2 of the ISA |
| E-mail Address | See Part 2 of the ISA |

| Document Review | | | |
|---|---|---|---|
| System ISSPM Name | System ISSPM Signature | Date | Comments (if any) |
| Kimberly Jackson | | | |
| | | | |
| | | | |
| | | | |

| Distribution List | | | |
|---|---|---|---|
| Name | Title | Agency/Office | Contact Information |
| Jane Duffield | System Owner | FNS/SNAP/PAAD | 703-605-4385 |
| John Coulter | Information System Security Officer | FNS/OIT/PMD | 651-488-1249 |
| Stephanie Means | Information System Security Manager | FNS/OIT/ISO | 312-353-7270 |
| Ronald Ward | Authorizing Official | FNS/SNAP/PAAD | 703-305-2523 |

**USDA**
**z2:Z'Ei**

# Interconnection Security Agreement Authorization

We have carefully reviewed the Interconnection Security Agreement (ISA) between the Electronic Disqualified Recipient Subsystem Application (eDRS) and State Systems. This document has been completed in accordance with the requirements set forth in the National Institute of Standards and Technology (NIST) Special Publication (SP) 800-47, *Security Guide for Interconnecting Information Technology Systems*. This agreement will be reviewed annually on the previous page and will be re-signed by all parties every third year.

Electronic Disqualified Recipient Subsystem Application (eDRS)

2/4/16
Date

Information System Owner

Kimberly Jackson
FNS Information Security Manager

2/4/16
Date

Ronald K. Ward
eDRS Authorizing Official

2/4/16
Date

----------------------------------------------------

State Agency Representative
See Part 2 of the ISA

November 2015

Template Release April 2011



# Table of Contents

1       INTRODUCTION ................................................................................................1

2       CONNECTION PURPOSE ...............................................................................1
2.1     System Identification.......................................................................................1
2.2     Connection Purpose and Information Shared/Passed .....................................2
2.3     Information Sensitivity .....................................................................................2

3       CONNECTION SPECIFICS................................................................................2
3.1     Connection Method ..........................................................................................2
3.2     Connection Segregation ..................................................................................3

4       SYSTEM VULNERABILITIES ...........................................................................3

5       COMMON/HYBRID CONTROLS .......................................................................3

6       INCIDENT REPORTING .....................................................................................3

7       BACKUPS/UPDATES/CHANGES .....................................................................3

8       USER COMMUNITY ...........................................................................................4

9       RULES OF BEHAVIOR.......................................................................................4

10      CONTROLS.........................................................................................................4

11      COST CONSIDERATIONS .................................................................................4

12      AUDIT TRAIL RESPONSIBILITIES ...................................................................5

13      TOPOLOGICAL/INFORMATIONAL FLOW DRAWING ......................................5

14      TIMELINE ............................................................................................................5

APPENDIX A. EDRS PLAN OF ACTION AND MILESTONES.......................... A-1

APPENDIX B. STATE SYSTEMS' PLAN OF ACTION AND MILESTONES...... B-1

APPENDIX C.   INHERITED CONTROLS.......................................................... C-1

# 1 Introduction

A system interconnection is defined as the direct connection of two or more information technology (IT) systems for the purpose of sharing data and other information resources. The NIST SP 800-53 (Revision 3) Certification and Accreditation - Control 3 (CA-3) primarily refers to connections but uses the terms connections and interconnections interchangeably. An interconnection security agreement (ISA) is used to document connections between systems. The ISA is much more than a contract or service agreement between two agencies/departments/divisions. The ISA is a security agreement that protects both interconnected systems from each other. The intent behind an ISA is to detail some basic system information and then to document and agree on how the security of the two systems will be maintained. Significant benefits that can be realized through a system connection include reduced operating costs, greater functionality, improved efficiency, and centralized access to data. Interconnecting IT systems may also strengthen ties among participating organizations by promoting communication and cooperation.

# 2 Connection Purpose

FNS has provided an alternative method that allows States to connect with eDRS from the State systems instead of requiring State users to directly access eDRS online with a unique eAuthentication account and login. The use of the web service connection allows States to use their own system(s) to enter and update disqualification records and to confirm whether a potential recipient has an active disqualification from benefits at the time of application for Supplemental Nutrition Assistance Program (SNAP) benefits.

## 2.1 System Identification

**System A:**

United States Department of Agriculture, Food and Nutrition Service, Information Security Office, eDRS

FIPS 199 Categorization: Moderate

Authority to Operate (ATO) Date:     05/02/15

System Owner     Name:            Jane Duffield

                 Contact Number:  703-305-2795

                 Email Address:   Jane.Duffield@fns.usda.gov

**System B:**

**State Agency:** See Part 2 of the ISA



## 2.2 Connection Purpose and Information Shared/Passed

The purpose of the interconnection between the State systems and eDRS is to share information regarding recipient disqualifications. The States use the system in two ways. First, when a State obtains a disqualification from benefits for an individual, the State must enter that information into eDRS in a timely fashion. Second, the State must check eDRS for any active disqualifications at the time a potential recipient applies for SNAP benefits. The benefit of connecting the State systems to eDRS directly is to reduce the cost and management burden of Federal issued eAuthentication credentials on the States. Furthermore, by connecting the systems through a web services interface, States can use the single sign-on functionality.

EDRS and the State systems pass information between them. The State shares basic biographical information regarding a recipient who has been disqualified. This information will include full name, address, social security number or other federally issued identification (e.g. passport), and date of birth, in addition to the specific details about the disqualification, including the reason for the disqualification, penalty length, decision date, and start date. States will make a web service call using the recipient's social security number and/or name along with their date of birth to search the eDRS database for any disqualifications that may exist within the system. EDRS will return all the records, from any State (up to 100 records at a time), which match the entered search criteria. Personally Identifiable Information (PII), is passed both to eDRS for storage and for data retrieval from the States.

EDRS does not make any calls to any State systems, nor does eDRS proactively retrieve data from any State system. The connection is solely for the State system to deliver data and for the State system to query and retrieve data from eDRS.

## 2.3 Information Sensitivity

The data within eDRS is considered Sensitive But Unclassified (SBU) and therefore the system should only be accessed by users with the State equivalent of a Federally issued eAuthentication level 2 credential. It is the State's responsibility to ensure that any user with access to perform eDRS queries has sufficient authorization to do so. When leveraging the web service connection to eDRS, the State must agree to safeguard their access to that connection and agree that only State agency users with the appropriate level of authorization required to review said data will perform any calls made through that connection.

# 3  Connection Specifics

## 3.1 Connection Method

The systems are connected over the internet. FIPS-140-2 compliant encryption is used. The connection is achieved through a specific structured web services call to a specific port. On an FNS-674 form, each State must identify their external IP address as part of the configuration and setup of their connection, as only that IP address can make the pre-defined web service calls. The connection method from the State system to eDRS is classified as two-factor authentication for each web service call: user name/password plus IP address.

 

## 3.2 Connection Segregation

State systems are not subject to FIPS 199 categorizations and are therefore assumed to be lower than eDRS, which is a Federal system categorized as Moderate.

The systems are segregated in that they do not exist in the same data center and do not share the network. There is no risk that a State system could compromise the application layer of eDRS because any web service call not in compliance with the standard is rejected. Queries which would return an exorbitant number of records (>100) are rejected and the user is required to refine their search. The connection method uses two-factor authentication, in addition to the added segregation of traffic as specific web service calls are restricted to specific ports.

# 4   System Vulnerabilities

One system's vulnerabilities can have an adverse impact on the security of another system, especially when the two systems are connected and sharing information. Because of this, the system owners and the security officers must be aware of the identified vulnerabilities of all the systems that are connected to their system.

As stated in Appendix A, the CSAM system contains the complete and current list of Plans of Action and Milestones (POA&M) for eDRS. However, there are currently no outstanding POA&Ms for eDRS. Per Appendix B, State systems do not track POA&Ms. Therefore, this section is not applicable to State systems. EDRS will pay special attention to any moderate or high vulnerabilities and report them immediately to the system owner / security officer.

# 5   Common/Hybrid Controls

EDRS and the State systems do not inherit controls that are common to both systems. State agencies provide their own security controls and eDRS inherits controls from NITC. This section is not applicable for this interconnection.

# 6   Incident Reporting

Each organization will report incidents in accordance with USDA policies and procedures.

Each organization will keep the other organization informed in writing through their respective Information System Security Program Manager (ISSPM) and the State Agency Representative when incidents occur which might have any impact on the other organization's systems. These information exchanges will take place as soon as is practical to ensure that appropriate steps will be taken as soon as possible to mitigate any potential loss/compromise of data or denial of service.

# 7   Backups/Updates/Changes

FNS maintains the documentation and performs the backups of the data that resides within eDRS. Notification of changes to the web services structure must be made to the States and

sufficient time should be provided for States to adapt to any changes in the web services.



Unless mission critical, an effort will be made to keep an existing eDRS web service operational for up to one year, to allow States to transition to the replacement web service. Communication of any pending web service changes will be sent from FNS to the contact person identified in Part 2 of the ISA document and the region. There are no notification requirements for any data structure changes, backups, maintenance or other systemic changes to systems by either party.

# 8 User Community

All persons with access to the FNS eDRS production system and content must have a Level 2 security clearance issued through eAuthentication. The FNS eDRS system is used by State agencies as part of the qualification process for SNAP benefits. SNAP benefit applicants found to have an active disqualification in the eDRS system are subject to denial of benefits; per program regulations. Disqualifications are generated by the courts and SNAP agencies for persons found guilty of Intentional Program Violations (IPVs) of SNAP regulations and statutes.

# 9 Rules of Behavior

All FNS users of eDRS are required to complete annual Security Awareness Training which is a policy enforced through USDA AgLearn. All State users of eDRS must complete Security Awareness training as assigned by the State. By signing this agreement, the State is attesting it will meet this requirement.

There are no additional security awareness training requirements needed because of the interconnections between the systems identified in this agreement.

All users and administrators are expected to protect the information transmitted in accordance with all required laws, regulations, and NIST guidance.

Both parties agree to work together to ensure the joint security of the connected systems and the data they store, process, and transmit. Each party certifies that its respective system is designed, managed, and operated in compliance with all relevant agency regulations, official guidance, and policies. As part of assuring this compliance for the security and benefit of each partner organization, a thorough review of essential security documents, such as the SSP, has been performed.

# 10 Controls

All controls that are identified in CSAM for each system need to be implemented to ensure that the connection is secure.

# 11 Cost Considerations

Both parties agree to equally share the costs of the interconnecting mechanism and/or media, but no such expenditures or financial commitments shall be made without the written concurrence of both parties. Modifications to either system that are necessary to support the interconnection are the responsibility of the respective system owners' organization.



# 12 Audit Trail Responsibilities

The organizations agree to implement audit and accountability policies and procedures as required by USDA and Federal guidance (i.e., FIPS 200) for proactive and post-incident response efforts.

Where agreed upon in writing, each organization will provide relevant audit and accountability data to support incident response efforts.

# 13 Topological/Informational Flow Drawing



# 14 Timeline

This agreement will remain in effect for one (1) year after the last date on either Authorizing Official's signature. After one (1) year, this agreement can be continued for an additional two years with concurrence from the ISSPM for eDRS and the State Agency Representative. If the parties wish to extend this agreement beyond the three years, they may do so by reviewing, updating, and reauthorizing this agreement. The newly signed agreement should explicitly supersede this agreement, which should be referenced by title and date. If one or both of the parties wish to terminate this agreement prematurely, they may do so with 30 days advanced notice or in the event of a security incident that necessitates an immediate response.



# Appendix A. eDRS Plan of Action and Milestones

Complete and current listing of eDRS POA&Ms can be found in the CSAM system.
However, there are currently no outstanding POA&Ms for eDRS.



## Appendix B.    State Systems' Plan of Action and Milestones

State systems do not have any POA&Ms.

Template Release April 2011



# Appendix C. Inherited controls

There are no inherited controls that are common to both eDRS and the State systems at this time.

Template Release April 2011

Interconnection Security Agreement between eDRS and State of New York- Part 2
(Partner Agency)

| I. Name and Address of the State Agency |
|---|

**State Agency Name:** New York

| State Agency Address: |
|---|
| Address: 40 North Pearl Street |
| City: Albany |
| State: NY |
| Zip: 12243 |

| II. State System Information | | | | |
|---|---|---|---|---|
| | Name of Data Center | IP Address | Port # | Web Service_ID |
| 1 | | 161.11.222.152 | 71 18 | SANYWServices |
| 2 | | 161.11.228.23 | 71 18 | SANYWServices |
| 3 | | 161.11.222.188 | 7 1'18 | SANYWServices |
| 4 | | 161.11.228.71 | 7118 | SANYWServices |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |

| III. State Agency Representative who will receive the e-Authentication Account | |
|---|---|
| 1. Name: | **Stephen Bach** |
| 2. Title: | Director of Program Integrity |
| 3. Contact Number: | **(518) 402-0117** |
| 4. Email Address: | stephen.bach@otda.ny.gov |

| IV. State Agency Secondary Points of Contact | |
|---|---|
| 1. Name: | |
| 2. Title | |
| 3. Contact Number: | |
| 4. E-mail Address: | |

Interconnection Security Agreement between eDRS and State of New York- Part 2
(Partner Agency)

| V. State Agency IT Support – Points of Contact | |
|---|---|
| I. Name: | |
| 2. Title: | |
| 3. Contact Number: | |
| 4. E-mail Address: | |
| *Secondary Contact* | |
| 5. Name : | Rebecca Lynch |
| 6. Title: | Management Specialist 3 |
| 7. Contact Number: | 518-402-0013 |
| 8. E-mail Address: | Rebecca.Lynch@otda.ny.gov |

Interconnection Security Agreement between eDRS and State of New York- Part 2
(Partner Agency)

## Brief Description of Users:

For a State Agency to communicate with Web Services, the following steps must be completed before the connection is established.

The State's technical point of contact must do the following to gain access:

1. **Create a Level 2 eAuthentication Account:**
   https://www.eauth.usda.gov/MainPages/ eauth WhatIsAccount.aspx

   FNS recommends that the eAuthentication Account be obtained by the State representative who would answer questions regarding user access and activity to eDRS on behalf their State. The State employee would then be responsible for providing the State's credentials to any State system that wishes to interface with the eDRS application Web Services.

2. **Fill out an FNS-674 to obtain an eDRS application login:**
   https://www.edrsng.fns.usda.gov

   The above State employee must submit a completed FNS-674 to their regional representative to obtain an eDRS account. FNS provides the State user with the State's user ID and password. A separate form is required for each environment. Only one account is issued for each State per environment. The State user can then pass that information to the State's system development team.

3. **Provide Specific IP Address(es):**

   States must provide the external IP address to FNS so that the IP can be whitelisted in the firewall ruleset. Access to eDRS Web Services will be secured by restricting access from the Firewall to Web Servers. Each State must provide the specific IP address(es) from which their State will be making the Web Services calls in order to add the correct exception to the firewall for the specific port. This should be a very small number of IP addresses.

4. **Follow Standard Call Parameters:**

   All calls are very specific and any call not following the required format will be rejected. Every eDRS application Web Services call requires three standard parameters as the first three parameters to the Web Services, regardless of the service. Below are these three standard parameters, along with their descriptions, common to all service calls.

Interconnection Security Agreement between eDRS and State of New York- Part 2
(Partner Agency)

| | |
|---|---|
| **req_StateAuthorization_ID** | A unique ID assigned to each State using Web Services. This ID will be provided by the eDRS Help Desk for any State using Web Services. |
| **req_StateAuthorization_PW:** | The password assigned to the User ID for the State. This will be provided by the eDRS Help Desk for any State using Web Services. |
| **req_StateSystemID** | A value the State must provide in each req uest which **uniquely identifies the user** on whose behalf the State system is making the Web Service call. The value must be 50 characters or less. *This value may not be the user login to the State system.* |

5. **Include a Purpose/Reason for the Call:**

   Every eDRS application Web Service call used for retrieving data regarding a recipient or a disqualification must include the purpose/reason for the query.

Interconnection Security Agreement between eDRS and State of New York- Part 2
(Partner Agency)

# Interconnection Security Agreement Authorization

The undersigned agree to the terms and conditions specified within the Interconnection Security Agreement (ISA) between eDRS and the State of New York as outlined in Part 1, *Section 14 -Timelines* of this agreement.


_Barbara C. Guinn_                         _August 15, 2018_
Signature of Agency Representative          Date


Name: _Barbara C. Guinn_

Title: _Executive Deputy Commissioner_

Agency: _Office of Temporary and Disability Assistance_

State: _New York_