1   ROB BONTA
    Attorney General of California
2   PAUL STEIN
    ROBIN GOLDFADEN
3   Supervising Deputy Attorneys General
    ANDREW Z. EDELSTEIN
4   ANNA RICH
    JANE REILLEY
5   SEBASTIAN BRADY
    WILLIAM BELLAMY
6   MARIA F. BUXTON
    LIAM E. O'CONNOR
7   Deputy Attorneys General
    State Bar No. 330050
8    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA 94102-7004
9    Telephone:  (415) 510-3915
     Fax:  (415) 703-5480
10   E-mail:  Liam.OConnor@doj.ca.gov
    *Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA, ET AL.**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL.**<br><br>Defendants. | Case No. **3:25-cv-06310-MMC**<br><br>**DECLARATION OF KASEY REAGAN IN SUPPORT OF PLAINTIFF STATES' MOTION TO ENFORCE OR EXPAND PRELIMINARY INJUNCTION**<br><br>Date: February 13, 2026<br>Time: 9:00 a.m.<br>Courtroom: 7<br>Judge: Maxine M. Chesney<br>Trial Date: None set<br>Action Filed: July 28, 2025 |

## DECLARATION OF KASEY REAGAN

**Kasey Reagan**, declares under penalty of perjury, under 28 U.S.C. § 1746, as follows:

1.      I am a resident of the State of Illinois. I am over the age of 18 and understand the obligations of an oath.

2.      Since January 1, 2026, I have held the position of Interim Director of the Division of Family and Community Services (FCS) for the Illinois Department of Human Services (IDHS or Agency), which includes oversight of  Illinois Supplemental Nutrition Assistance Program (SNAP). From May, 2019 through December, 2025, I served as Statewide Program Initiatives Administrator in FCS. I have otherwise worked at IDHS on related issues since 2001.

3.      I submit this declaration in support of Plaintiffs' Motion to Enforce or Expand this Court's October 15, 2025 Preliminary Injunction. This declaration supplements and incorporates by reference my prior declarations in this action (ECF Nos. 59-12, 99-2)

4.      IDHS received USDA's November 24, 2025 demand letter and attachments (ECF No. 109, Ex. A at 2), as well an additional letter and attachments sent on December 23, 2025.

5.      IDHS has serious concerns with USDA's most recent letters as well as its proposed "revised" data sharing protocols.

6.      The proposed data and security protocol is significantly weaker than, and conflicts with, the existing Data Sharing Agreement ("DSA") concerning Illinois' SNAP data that USDA executed on July 21, 2025. A copy of the current DSA and a Health Insurance Portability And Accountability Act (HIPAA) Business Associate Agreement ("BAA") simultaneously executed by USDA are attached to this declaration as Exhibit A.

7.      IDHS has historically always provided USDA with access to Illinois' SNAP records and the systems on which they are maintained in order to conduct statutorily-mandated quality control functions. This access is governed by a Data Sharing Agreement whose terms are agreed-

on by USDA Food and Nutrition Services ("FNS") and IDHS to "provide [FNS] with limited access to the Data maintained on the Integrated Eligibility System (IES) (referred to as "the Data") for the purposes of measuring the accuracy of State of Illinois Supplemental Nutrition Assistance Program (SNAP) eligibility and benefit determinations as reported to FNS." *See* Exhibit A.

8.      The new USDA proposed protocol does not contain many of the protections that the current DSA affords Illinois. Much of USDA's proposal remains unclear or vague, but it is concerning that USDA is unwilling to agree to the same level of protection and assurance that they have even recently agreed to, even after the announcement of the new SNAP Information Database.

9.      One of the most significant differences between the proposed protocol and the existing DSA is that the proposed SNAP Database protocol contemplates taking copies of IDHS' records and using them to create a federal database. USDA has previously been permitted to *access* and temporarily store Illinois' records and systems under mutually agreed terms specified in the agreement and compliant with the SNAP Act, but the records remained IDHS' proprietary information, subject only to USDA's permitted uses in the DSA.

10.      Even putting aside all other concerns with the proposed protocol, USDA's creation of a federal database populated from state records means that IDHS will no longer have control or oversight of its records once they are transferred to USDA. Any proposed protections or limitations on USDA's ability to use the data will no longer be within IDHS' capacity to directly enforce, and these new federal (as opposed to state) records could be used for purposes that violate our state laws and regulations around confidentiality and use of this information, as well as the SNAP Act and regulations.

11.     By comparison, the terms of Illinois' existing DSA emphasize and make clear that FNS is accessing Illinois' proprietary records and data; by the terms of the DSA, FNS "recognizes that the data is confidential" and prevents any release or re-disclosure of Illinois data without prior written approval by IDHS. *Id* at Art. VI. Violation of the confidentiality provisions entitles IDHS to immediately terminate the agreement. *Id.*

12.     USDA also has, by the terms of the current DSA, acknowledged IDHS' ownership of the data and is prohibited from independently storing it beyond the termination of the agreement:

> 8.16. <u>Ownership of System(s)/Data</u>. All Department client information provided through this Agreement is the sole property of the Department and will be used exclusively for the purposes described herein. Information received pursuant to this Agreement shall be disposed of after this Agreement's termination unless another agreement with the Department authorizes its continued use. Disposal means the return to IDHS of the information or the information's destruction, as directed by the Department. The System(s)/Data disclosed shall not be sent to a records center or archived and shall not be retained with personal identifiers for any period longer than the term of this Agreement unless another agreement with the Department authorizes its continued use.

*Id.* at 8.16 The DSA limits the individuals at FNS who may access the data, as well as their ability to utilize the data. Section 4.2 of the DSA defines Permissible Uses to limit the use of Illinois' data strictly to "Measuring the accuracy of State of Illinois SNAP eligibility and benefit determinations as reported to FNS." USDA's proposed protocols do not appear to have these same limitations on access and use of the information, as the revised protocol permits USDA to share data as "provided by law" without any clarification on what this means.

13.     The DSA also contains significant administrative, technical, and physical security requirements, including document retention and destruction policies, none of which are found in the proposed protocols. These security requirements ensure that data will not be subject to unnecessary exposure or breach and are not found in FNS' proposed protocols.

14.     For example, the DSA's Appendix A describes data elements and transmission, specifying that USDA FNS is only allowed Read and Receive permissions through Secure Web Access. The data elements are comprehensive, but are all listed as confidential. *Id* at A-1-A-5.

15.    IDHS has expressed numerous additional concerns to USDA through a letter sent jointly by Plaintiff states on December 8, 2025. USDA's most recent response, from December 23, 2025, rejects IDHS' concerns outright, and far from seeking a mutually agreeable data and security protocol is another attempt to strong-arm Illinois into turning over the confidential information on millions of state residents contrary to the SNAP Act and without any real assurances as to the security and confidentiality of Illinois' records.

16.    I declare under penalty of perjury that the foregoing is true and correct.


Executed this 7th day of January , 2026, in Springfield, Illinois

**Kasey Reagan**  Digitally signed by Kasey Reagan
Date: 2026.01.07 17:02:35 -06'00'
_____
Kasey Reagan
Interim Director of the Division of Family and Community Services
Illinois Department of Human Services

# Exhibit A

**DATA SHARING AGREEMENT**
**BETWEEN**
**THE ILLINOIS DEPARTMENT OF DEPARTMENT OF HUMAN SERVICES**
**AND**
**USDA FOOD & NUTRITION SERVICE**
**AGREEMENT #2026-177-DSA-FCS**

---

The Illinois Department of Human Services  (IDHS or the Department) and USDA Food & Nutrition Service (FNS or User), with its principal place of business at 77 W Jackson Blvd, 20th Floor, Chicago, IL 60604, hereby enter into this Data Sharing Agreement (Agreement) to provide the User with limited access to the Data maintained on the Integrated Eligibility System (IES) (referred to as "the Data") for the purposes of measuring the accuracy of State of Illinois Supplemental Nutrition Assistance Program (SNAP) eligibility and benefit determinations as reported to FNS. The Department and User are collectively referred to herein as "Parties" or individually as a "Party."

**ARTICLE I**
**INTRODUCTION**

1.1.  <u>Introduction</u>.  <u>The Supplemental Nutrition Assistance Program (SNAP) Quality Control System measures the accuracy of State eligibility and benefit determinations.  Data collected by quality control are also used for program improvement and analysis.  FNS and the States share responsibility to ensure the validity of the information reported for SNAP improper payments, and to take corrective action.  Under federal law, each state agency is responsible for monitoring its administration of SNAP, including payment accuracy.  As part of the quality control process, states collectively review about 50,000 cases each year.  FNS, which administers the program at the federal level, reviews a sampling of those cases to ensure payment accuracy and compliance with program eligibility requirements.</u>

**ARTICLE II**
**LEGAL AUTHORITY**

2.1.  <u>Disclosure Permitted</u>. Under the Illinois Public Aid Code at 305 ILCS 5/11-9, the Department is prohibited from disclosing Data except for purposes directly connected with the administration of public aid. Federal reviewers must be able to access State systems, certification files, or any other information maintained within the State SNAP quality control system per section 16{c)(4) and (S) of the Food and Nutrition Act of 2008, as amended (the Act), and 7 CFR 275.21 of the Federal Regulations. States may not restrict Federal reviewer access to State systems, certification files, or any information collected to determine the eligibility of a participant, or information maintained within the State SNAP quality control system.

**ARTICLE III**
**ACCESS METHOD**

3.1.  <u>Access Method</u>.    The Department will provide Data as applicable to the User.  The Data format shall be Program/Application Access**.**

(a)    Electronic Media Transfer Method. The User and the Department are not exchanging the Data electronically.

(b)    Non-Electronic Transfer Method. The User and the Department are not exchanging the Data in hard copy, paper-based method.

**ARTICLE IV**
**DATA AND USE**

4.1.  Accessible Systems/Data and User Roles.

(a)    IES:  The Department authorizes the User access to the IES.  User's access shall be limited to the IES security role designated as: Clerical - Inquiry Only.

(b)    The above System(s)/Data elements of information are collectively referred to herein as Data.

(c)    The User may not access any Data or Department system not specifically identified in this Section 4.1 without the prior written approval of the Department.  User must also complete the Data Elements and Transmission form, Appendix A of this Agreement.


4.2.  Permissible Uses. The User may use the Department's Data only for the following purposes and on the following conditions:

(a)    Measuring the accuracy of State of Illinois SNAP eligibility and benefit determinations as reported to FNS.

(b)    All Data inquires made by the User shall be limited to purposes directly connected with the administration of the legal authority listed in Article II.

(c)    To help safeguard and maintain confidentiality of the Department's Data, as specified in this Agreement, the User shall maintain an updated list of the User's authorized personnel who have written approval to access Department Data. referred to herein as Authorized User.  The User is responsible for contacting the Department in a timely manner to add, delete or edit Authorized User access.  Only those persons designated by the User as being responsible for the project, as described above, shall have access to make inquiries, and they have the following job titles:

(1)    Team Lead

(2)    Senior Program Specialist

(d)    Inquiries shall not be made by, or for, another agency, organization or individual without the prior knowledge and written consent of the Department.

(e)    The User certifies compliance with the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Public Law No. 104-191; 45 C.F.R. Parts 160 and 164; the Social Security Act (42 U.S.C. §§1320d-2 through 1320d-7), and Privacy Act of 1974 (5 U.S.C § 5524a) in that it may not use or disclose Protected Health Information (PHI), Individually Identifying Health Information (IIHI) or Personally Identifying Information (PII) other than as permitted or required by law and agrees to use appropriate safeguards to prevent use or disclosure of any PHI, IIHI, or PII.

4.3.  Business Associates.  User is a business associate of the Department for purposes of HIPAA.  If User is a business associate of the Department, a duly executed business associate agreement shall be executed separately from this Agreement.

4.4.  Client Release Authorization. No consent is required for the disclosure of Data for this User as access is related to the administration and/or enforcement of the Supplemental Food and Nutrition Program (SNAP).


**ARTICLE V**
**INFORMATION SECURITY AND AUDIT COMPLIANCE**

5.1.  Security Requirements.  The User agrees to comply with the security and privacy requirements, policies and guidelines established by the Department and the Illinois Department of Innovation and Technology/Bureau of Computer and Computer Services (DoIT/BCCS). These requirements, policies, and guidelines include the following documents, which are available upon request:

(a)   The Privacy Act of 1974 (5 U.S.C. § 552a)

(b)   Health Insurance Portability and Accountability Act of 1996

(c)   Illinois Personal Information Protection Act (815 ILCS 530)

(d)   Applicable DoIT and IDHS policies regarding Information Security

The security requirements may be updated at any time by the Department. In such instances, the Department shall provide the User with written notification of such changes and the timeframe for compliance and require written assurance by the User that it shall comply with new or revised security requirements.

5.2.  General Information

(a)   The Data will only be stored in an appropriate manner as defined below.

(b)   Only one (1) complete copy of the Data permitted to be maintained by Recipient; however, time-delimited temporary data analysis files may be created. Any temporary data file(s) and subsets of the original Data set will be considered Data and subject to the terms and conditions of this Agreement.

(c)   Protected Health Information (PHI), Personally Identifiable Information (PII) and Social Security Numbers require additional security and privacy safeguards due to federal or state statutory requirements. The User must be familiar with their responsibilities to protect the confidentiality, integrity and availability of this Data per the requirements listed in Section 5.1.

(d)   The security requirements with which the User shall comply as a condition of receiving information from the Department are presented in three categories: administrative, technical and physical, and three additional sections: Incident Handling and Notification Responsibility, Security Certification and Audit Requirements.

5.3.  <u>Administrative Security Requirements</u>

(a)    The User shall restrict access to, and disclosure of, the Data to only authorized personnel who need the Data to perform their official duties in connection with the Permissible Uses specified in the Agreement.

(b)    The User shall establish and/or maintain ongoing management oversight and quality assurance capabilities to ensure that only authorized personnel have access to the Data.

(c)    The User shall advise all Authorized Personnel who access the Data of the confidentiality of the Data, the safeguards required to protect the Data, and the civil and criminal sanctions for noncompliance contained in the applicable federal and state laws.

(d)    The User shall deliver security awareness training for Authorized Users and maintain a copy of the training received.  The training shall include information about the responsibility Authorized Users for proper use and protection of the Data, and the possible sanctions for misuse.  All Authorized Users shall receive security awareness training prior to accessing the Data, and at least annually thereafter. Such training shall address the Privacy Act of 1974, other federal and state laws governing computer security and the use and misuse of HIPAA/PII/PHI/IIHI/SSN as applicable.

(e)    The User's Authorized Personnel shall sign the External Certificate of Understanding and Confidentiality Agreement (see Appendix B) which outline the authorized purposes for which the Data may be used by the User and the civil and criminal penalties for unauthorized use.

(f)    The User shall maintain records of Authorized Personnel with access to the Data.  The records shall contain a copy of each individual's signed Certificate of Understanding and Confidentiality Agreement and proof of the individual's participation in security awareness training and HIPAA training. The User shall make such records available to the Department within two working days of a request for such records. Such records are to be maintained for three (3) years.

(g)    The User shall have appropriate procedures in place to report security or privacy incidents (unauthorized disclosure or use involving PHI/IIHI/PII/SSN as applicable, or suspected incidents involving the Data. The User shall report confirmed and suspected incidents in either electronic or physical form to the IDHS Privacy Officer and the IDHS Chief Information Security Officer (CISO) as listed in Article 8.9 immediately upon discovery, but in no case later than one (1) of discovery of the incident. The requirement for the User to report confirmed or suspected incidents involving the Data to IDHS exists in addition to, not in lieu of, any User requirements to report to any other reporting agencies.

5.4.  <u>Technical Security Requirements</u>

(a)    <u>Access via remote terminal/workstation over the Public Internet.</u> Remote data access is prohibited unless Recipient requests, and the Department authorizes, remote access as part of this Agreement. If requesting remote access, the User will include the safeguards specified in the User's Security and Privacy Controls Questionnaire (SPCQ) in place to secure the receipt and transmission of Data.

(b)    Wireless Local Area Network (WLAN) or wireless access points, if utilized by the User, WLANs must be secured in accordance with NIST 800-53r4; NIST 800-153 provides guidelines for Securing Wireless Local Area Networks.

(c)    The User shall utilize and maintain technological (logical) access controls that limit access to Data to only those personnel identified in the records maintained by the User pursuant to Sections 4.2 (c) and 5.1. who are authorized for such access based on their official duties.

(d)    The User shall implement a Network Access Control, a Network Admission Control (NAC) solution or commensurate security controls to enforce security policy compliance on all devices that attempt to gain access to, or use, the Data. The NAC/NAC-like solution shall be employed to authenticate and authorize users and devices.

(1)    The solution chosen or employed should be capable of evaluating whether remote machines are compliant with security policies through host(s) integrity tests against redefied templates such as patch level, service packs, antivirus and personal firewall status, and custom-created checks tailored for the state enterprise environment.

(2)    The solution should enforce security policies by blocking, isolating or quarantining non-compliant devices from accessing the state network and resources while maintaining an audit or report on User' access and presence on the state network.

(e)    If unable to implement a full NAC-like solution, the User must employ security controls that provide assurance that remotely connected devices pose no risk to the system or Data being accessed.

(f)    The User shall implement role-based access control procedures and account management that provides an adequate level of security and privacy commiserate to the confidentiality and sensitivity of the Data being shared.

(g)    The User transmits all Data provided pursuant to this agreement in a manner that safeguards the Data and prohibits unauthorized access. The User and the Department exchange the Data via a mutually-approved and secured data transfer method which utilizes a FIPS 140-2 compliant, NIST-certified encryption solution (i.e. VPN).

(h)    The User shall prohibit the use of personally owned/non-agency provided computing devices (e.g., personal computers, mobile devices such as Blackberries, iPhones, iPods, MP3 players, USB/Flash drives, external hard drives, CD/DVDs) used to connect, access or transmit the Data locally or remotely in resident, commercial or public facilities (e.g., hotels, convention centers, airports) unless specifically requested by the User and authorized within this Agreement.

(i)    <u>Data Storage</u>

(1)    The User shall prohibit the Data from being copied to and stored at User site(s) on mobile media (e.g., laptops, CD-ROMs, USB drives) unless specifically requested by the User and authorized within this Agreement.

(2)    Data shall not be stored by User on portable devices or media which include but are not limited to laptops, tablets, handhelds/PDAs, Ultramobile PCs, optical discs, CDs, DVDs, Blu-Rays, removable storage and flash memory devices unless specifically requested by the User and authorized within this Agreement. The request must include methods for encrypting the Data, controlling access to the Data and physically protecting the device(s) containing the Data.

(3)    If storing the Data, User agrees to store Data on one or more of the following media and protect the Data as described:

i.    Data stored on local workstation hard disks.  Access to the Data will be restricted to Authorized Users by requiring logon to the local workstation using a unique user ID and complex password or other authentication mechanisms which provide equal or greater security, such as biometrics or smart cards.

ii.    If the workstation is located in an unsecured physical location the hard drive must have encryption to protect the Data in the event the device is stolen.

iii.   Data stored on hard disks mounted on network servers and made available through shared folders.

iv.   Access to the Data will be restricted to Authorized Users through the use of role-based access control lists which will grant access only after the Authorized User has authenticated to the network using a unique user ID and complex password or other authentication mechanisms which provide equal or greater security, such as biometrics or smart cards.

v.    Data on disks mounted to such servers must be located in an area which is accessible only to authorized personnel, with access controlled through use of a key, card key, combination lock, or comparable mechanism.

vi.   Backup copies for Disaster Recovery purposes must be encrypted if recorded to removable media.

(j)    <u>Data Segregation</u>

(1)    Non-sensitive Data is data that does not include PII or PHI information. Sensitive data must be segregated or otherwise distinguishable from non-sensitive Data or information. This is to ensure that when no longer needed by the User, all Data can be identified for return or destruction. It also aids in determining whether Data has or may have been compromised in the event of a security breach.

(2)    <u>Data shall be stored in one of the following methods:</u>

i.    Data will be kept on media (e.g. hard disk, optical disc, tape, etc.) which will contain no non- sensitive Data; or

ii.    Data will be stored in a logical container on electronic media, such as a partition or folder dedicated to such Data;  or,

iii.   Data will be stored in a database which will contain no non-sensitive Data;  or,

iv.   Data will be stored within a database and will be distinguishable from non-sensitive Data by the value of a specific field or fields within database records.

(3)    When it is not feasible or practical to segregate sensitive Data from non-sensitive Data, then both the Data and the non-sensitive Data with which it is commingled must be protected as described in this Agreement.

5.5.  <u>Physical Security Requirements</u>

(a)    All Data shall be stored in a secure environment physically located in the continental United States with access limited to the least number of staff needed to complete the purpose of this Agreement.

(b)    User equipment containing Data (servers, routers, hubs, etc.) are to be maintained in secure spaces or those off limits to the general public where access is restricted to authorized employees or contractors, vendors and delivery personnel who have a business purpose for being there.

(c)    Individuals who are not employees or contractors of the User may not be present in these spaces unless escorted by authorized personnel.

(d)    Users shall not leave workstations unattended while accessing the Data. Technical or logical controls should be utilized, such as locking the computer or automatic screensavers, so as not to expose the Department Data to unauthorized personnel/passersby.

(e)    Paper documents containing the Data must be stored securely in locked offices, rooms, cabinets and/or desks.

(f)    <u>Disposal of Paper Documents and Electronic Media Containing the Data:</u>

(1)    Upon termination of the Agreement, User shall dispose of IDHS PHI/IIHI/PII/SSN Data received along with backup copies and any temporary or permanent work files that contain such Data and provide written notification of disposal.  Disposal must be in accordance with NIST 800-53 r4. Failure to do so may prevent Data sharing agreements with the User in the future.

(2)    Upon the destruction of the Data, the User shall complete Appendix C of this Agreement, Certification of Data Disposition, and submit to IDHS program personnel listed in Article 8.9 of this Agreement within fifteen (15) days of the date of disposal.

(3)    Failure to properly destroy of the Data and to provide written verification of data destruction may prevent data sharing agreements with the User in the future.

(4)    Requirements to dispose of PHI/IIHI/PII/SSN survive termination of this Agreement.

(g)    Acceptable Destruction Methods for various types of media include:

(1)    For paper documents containing sensitive or confidential information (PHI/IIHI/PII/SSN), must be shredded for disposal and is prohibited from being disposed in the office trash. A contract with a recycling firm to recycle sensitive or confidential documents is acceptable, provided the contract ensures that the confidentiality of the Data will be protected. Such documents may also be destroyed by on-site shredding, pulping, or incineration.

(2)    If Data has been stored on server or workstation data hard drives, similar media (e.g. floppies, USB flash drives, portable hard disks, or similar disks), optical discs (e.g. CDs, DVDs, Blu-ray) or magnetic tape , the User shall destroy the Data by using a "wipe" utility which will overwrite the Data at least three (3) times using either random or single character data, degaussing sufficiently to ensure that the Data cannot be reconstructed, or physically destroying disk(s) (e.g., by incineration the disc(s), shredding the discs, or completely deface the readable surface with a coarse abrasive).

5.6.    Incident Handling and Notification Responsibility

(a)    The User shall report confirmed and suspected incidents in either electronic or physical form to the Department Privacy Officer and the Department Chief Information Security Officer (CISO) designated in the DSA immediately upon discovery, but in no case later than one hour of discovery of the incident. The requirement for the User to report confirmed or suspected incidents involving the Data to the Department exists in addition to, not in lieu of, any User requirements to report to any other reporting agencies. Within one hour of discovery of the incident or suspected breach, the User is responsible for reporting the incident or suspected breach to the Department security officials listed in Section 8.9, Persons to Contact.

(b)    The User is responsible for all reporting and notification activities, including but not limited to:

- investigating the incident;
- communicating with required state government breach response officials;
- notifying individuals whose information is breached;
- communicating with any third parties including the media, as necessary;
- notifying any other, public and private sector agencies involved;
- responding to inquiries about the breach;
- resolving all issues surrounding the breach of the Data;
- performing any necessary follow-up activities to correct the vulnerability that allowed the breach;
- any other activities as required by the Department.

(c)    Additional information on Department policy and procedures regarding Security/Integrity Breaches are available upon request.

5.7.    Security Certification

(a)    Security Posture

(1)    The User shall submit to the Department Chief Information Security Officer an IDHS SPCQ, Appendix D, and any required documentation for approval prior to accessing the Data to ensure security and privacy control requirements are met.

(b)    Security and Privacy Self-Assessment and Certification of Compliance

(1)  The User shall submit annually to the Department a SPCQ that details the measures the User has in place to comply with the requirements specified in this security addendum.  The SPCQ contains a certification of compliance that is signed by an authorized official of the User to certify that information provided in the Security and Privacy Questionnaire is accurate.

(2)  If there are changes to the User's IT environment that may affect the security and privacy controls reported on the SPCQ, they must report such changes to the Department CISO so that they may ensure continued compliancy with the standards and requirements outlined in the DSA.

5.8.  <u>Audit Requirements</u>

(a)  If there are changes to the User IT environment that may affect the security and privacy controls as reported on the SPCQ, they must report such changes to the IDHS CISO so that IDHS may ensure continued compliancy with the standards and requirements outlined in the DSA.

**ARTICLE VI**
**CONFIDENTIALITY**

6.1.  <u>Confidentiality of Information</u>. All Data, records, Data elements, and any other information collected, gathered, obtained, or otherwise received by the User under this Agreement, shall be protected from unauthorized disclosure.  Any release or re-disclosure of information must be pre-approved, in writing, by the Department.

6.2.  <u>Statutory Basis</u>.   The User recognizes that the Data is confidential, as provided in one or more of the following statutes and regulations:

(a)  Illinois Public Aid Code, 305 ILCS 5/11-9;

(b)  Medicaid, 42 U.S.C. §1396a(a)(7), 42 C.F.R. 431.300-307;

(c)  Temporary Assistance for Needy Families (TANF), 42 U.S.C. §602(a)(1)(A)(iv);

(d)  Supplemental Nutrition Assistance Program (SNAP), 7 U.S.C. §2020(e)(8), 7 C.F.R. 272.1(c);

(e)  Public Assistance Programs, 45 C.F.R. 205.50;

(f)  89 Ill. Adm. Code 10.230;

(g)  Health Insurance Portability and Accountability (HIPAA), 45 CFR Part 160, Part 162, and Part 164;

(h)  The Privacy Act of 1974, 5 U.S.C. 552a;

(i)  Illinois Personal Identification Protection Act (PIPA), 815 ILCS 530/1;

(j)  Federal Information Security Management Act of 2002 (FISMA), 44 U.S.C.  § 3514; and

(k)  Family Educational Rights and Privacy Act (FERPA) (20 U.S.C. § 1232g; 34 CFR Part 99).

(l)  Mental Health and Developmental Disabilities Confidentiality Act, 740 ILCS 110

(m)  Mental Health and Developmental Disabilities Code, 405 ILCS 5

(n)  Alcoholism and Substance Abuse, 42 C.F.R. Part 2

(o)  Substance Use Disorder Act, 20 ILCS 301

(p)  Illinois Controlled Substance Act, 720 ILCS 570/318

6.3.  <u>Confidentiality Violations</u>.  Any violation of this Article shall be cause for immediate termination of this Agreement at the discretion of the Department.

**ARTICLE VII**
**TERM AND TERMINATION**

7.1.  <u>Term</u>. This Agreement shall commence upon full execution by the Parties and, unless otherwise terminated by the Parties, shall continue until June 30, 2027.

7.2.  <u>Termination for Convenience</u>.  This Agreement may be terminated by either Party for any or no reason upon thirty (30) days' prior written notice to the other Party.

7.3.  <u>Termination for Cause</u>.  In the event either Party breaches this Agreement and fails to cure such breach within ten (10) days' written notice thereof from the non-breaching Party, the non-breaching Party may immediately terminate this Agreement upon written notice to the breaching Party.

**ARTICLE VIII**
**MISCELLANEOUS**

8.1.  <u>Renewal</u>. This Agreement may be renewed for additional periods by mutual consent of the Parties, expressed in writing and signed by the Parties.

8.2.  <u>Amendments</u>. This Agreement may be modified or amended at any time during its term by mutual consent of the Parties, expressed in writing and signed by the Parties.

8.3.  <u>Applicable Law and Severability</u>. This Agreement shall be governed in all respects by the laws of the State of Illinois. If any provision of this Agreement shall be held or deemed to be invalid, inoperative or unenforceable because it conflicts with any other provision or provisions hereof or any constitution, statute, ordinance, rule of law or public policy, or for any reason, such circumstance shall not have the effect of rendering any other provision contained herein invalid, inoperative or unenforceable to any extent whatsoever. The invalidity of any one or more phrases, sentences, clauses, or sections contained in this Agreement shall not affect the remaining portions of this Agreement or any part thereof. In the event that this Agreement is determined to be invalid by a court of competent jurisdiction, it shall be terminated immediately.

8.4.  <u>Records Retention</u>. The Parties shall maintain for a minimum of five (5) from the termination of this Agreement, adequate books, records and supporting documents to verify the uses of the System(s)/Data as described herein.  This Agreement shall be available for review and audit by each Party and the Auditor General of the State of Illinois, the Illinois Office of the Attorney General (OAG), and the Office of the Executive Inspector General for the Agencies of the Illinois Governor (OEIG).  Each Party shall cooperate fully with any audit conducted by the Auditor General, the OAG or the OEIG and shall provide full access to all relevant materials.  If an audit, litigation or other action involving the records is begun before the end of the five-year period, the records shall be retained until all issues arising out of the action are resolved.

8.5.  <u>No Personal Liability</u>. No member, official, director, employee or agent of the Department shall be individually or personally liable in connection with this Agreement.

8.6.  Assignment; Binding Effect. This Agreement, or any portion thereof, shall not be assigned by any Party without the prior written consent of the other Party. This Agreement shall inure to the benefit of and shall be binding upon the Department and User and their respective successors and permitted assigns.

8.7.  Precedence. In the event there is a conflict between this Agreement and any of the exhibits hereto, this Agreement shall control. In the event there is a conflict between this Agreement and relevant statute(s) or Administrative Rule(s), the relevant statute(s) or rule(s) shall control.

8.8.  Entire Agreement. This Agreement constitutes the entire agreement between the Parties; no promises, terms, or conditions not recited, incorporated or referenced herein, including prior agreements or oral discussions, shall be binding upon either Party.

8.9.  Notices. All written notices, requests and communications must be made in the most expedient manner, through which a mailing date can be determined, including electronic mail, to the address or e-mail address set forth below.

> To the Department for legal-related notices:
>
>> Office of General Counsel
>> Illinois Department of Human Services
>> 69 W. Washington, 9th Floor
>> Chicago, IL 60602
>
> To the Department for program-related notices:
>
>> Kyle Thomas
>> Illinois Department of Human Services
>> Harris II, 2nd Floor, 100 S Grand Avenue East
>> Springfield, IL  62762
>> (217) 720-8361
>> kyle.thomas2@illinois.gov
>
> To User for legal-related notices:
>
>> Stephanie Uchima
>> SNAP QC Team Lead
>> USDA Food & Nutrition ServiceMidwest Regional Office
>> 77 W Jackson Blvd, 20th Floor
>> Chicago, IL  60604
>> (312) 886-5633
>> stephanie.uchima@usda.gov
>
> To User for program-related notices:
>
>> Stephanie Uchima
>> SNAP QC Team Lead
>> USDA Food & Nutrition ServiceMidwest Regional Office
>> 77 W Jackson Blvd, 20th Floor

Chicago, IL  60604
(312) 886-5633
stephanie.uchima@usda.gov

To IDHS for Security and Privacy incidents, notices, and information:

IDHS HIPAA Chief Privacy Officer
69 W. Washington, 9th Floor
Chicago, IL  60602
DHS.HIPAA@Illinois.gov

IDHS Chief Information Security Officer:
100 South Grand Avenue East
Springfield, Illinois 62762
DoIT.DHS.CISO@Illinois.gov

8.10. <u>Professional Integrity</u>. The User certifies that it has not been convicted of bribery or attempting to bribe an officer or employee of the State of Illinois, nor has the User made an admission of guilt of such conduct which is a matter of record, nor has an official, officer, agent, employee or other person associated with the User been so convicted nor made such an admission.

8.11. <u>Nondiscrimination</u>. The User shall abide by the Federal Civil Rights Act of 1964, the Federal Rehabilitation Act of 1973, the Federal Americans with Disabilities Act of 1990, the Illinois Human Rights Act, and all other Federal and State laws, regulations or orders (including Executive Orders 11246 and 11375, "Equal Employment Opportunity") which prohibit discrimination because of race, color, religion, sex, national origin, ancestry, age, physical or mental handicap, and the User further agrees to take affirmative action to ensure that no unlawful discrimination is committed.

8.12. <u>Release and Indemnity</u>. To the extent permitted by law, the User agrees to assume all risk of loss and to indemnify and hold HFS and IDHS, its officers, agents and employees, harmless from and against any and all liabilities, demands, claims, suits, losses, damages, causes or actions, fines or judgments, including costs, attorneys' and witnesses' fees, and expenses incident thereto for injuries (including death) to persons and for loss of, damage to, or destruction of property (including property of the State of Illinois) arising out of the intentional torts, negligence or breach of contract of User, with the exception of acts performed in conformance with an explicit, written directive of HFS or IDHS, in connection with this Agreement.  Neither Party assumes liability for actions of the other Party under this Agreement including, but not limited to, the negligent acts and omissions of either Party's agents, employees or subcontractors in the performance of their duties as described under this Agreement.

8.13. <u>Notice of Claim or Suit</u>. In the event that any demand or claim is made or suit is commenced against the Department that is related to this Agreement, the Department shall give prompt written notice thereof to the User.  Likewise, User shall notify the Department of any related demand or claim made to it or suit commenced against it.

8.14. <u>Payment</u>. Payment for access to Department's System(s)/Data is waived.

8.15. <u>Availability of Appropriations</u>. The Parties' respective obligations hereunder shall cease immediately, without penalty, if: (a) the Illinois General Assembly fails to make an appropriation sufficient to pay such obligations; (b) adequate funds are not appropriated or granted to the Department by the Illinois General Assembly to allow it to fulfill its obligations under this Agreement; or (c) funds appropriated are de-appropriated or not allocated.

8.16. <u>Ownership of System(s)/Data</u>.  All Department client information provided through this Agreement is the sole property of the Department and will be used exclusively for the purposes described herein.  Information received pursuant to this Agreement shall be disposed of after this Agreement's termination unless another agreement with the Department authorizes its continued use. Disposal means the return to IDHS of the information or the information's destruction, as directed by the Department. The System(s)/Data disclosed shall not be sent to a records center or archived and shall not be retained with personal identifiers for any period longer than the term of this Agreement unless another agreement with the Department authorizes its continued use.

8.17. <u>Work Product</u>.  Except as otherwise required by law, any work product, such as written reports, memoranda, documents, recordings, drawings, software or other deliverables developed in the course of this Agreement shall become the property of the User.  The Department reserves the right to review and comment on any document or Data set completed as a result of the sharing of information described herein before release to any entity. Any publication resulting from the use of these Data must indicate that the Data were provided by the Department and must include a disclaimer to the effect that published material does not necessarily reflect the views of the Department.

8.18. <u>Headings</u>. Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

8.19. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be considered to be one and the same agreement, binding on all Parties hereto, notwithstanding that all Parties are not signatories to the same counterpart.  Duplicated signatures, signatures transmitted via facsimile, or signatures contained in a Portable Document Format (PDF) document shall be deemed original for all purposes.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives.

**ILLINOIS DEPARTMENT OF HUMAN SERVICES**     **USDA FOOD & NUTRITION SERVICE**

Dulce Quintero by Crystal VanDiver
Digitally signed by Dulce Quintero by Crystal VanDiver Date: 2025.07.25 15:11:43 -05'00'

STEPHANIE UCHIMA
Digitally signed by STEPHANIE UCHIMA Date: 2025.07.21 11:02:05 -05'00'

_____     _____

Dulce Quintero, Secretary     Stephanie Uchima, SNAP QC Team Lead
                              FEIN: 72-0564834

Date:___7/25/25_____     Date:___7/21/25_____

**APPENDIX A:**
**DATA ELEMENTS AND TRANSMISSION**

**SEND ORG ONLY:** Organization's data is uploaded/sent to IDHS system/resource only. Once uploaded, the Organization can no longer access the data in the IDHS system/resource. No IDHS or uploaded Organization data is accessed, viewed, downloaded, printed or stored.

Organization Data is sent using one or more of the following methods:

☐ Secure Web Access (SWA)

☐ Electronic Transmission (i.e. SFTP/FTP, CyberFusion, etc.)

☐ Postal Mail: Paper

☐ Postal Mail: Electronic Media (i.e.CD/Flash/etc.)

**SEND and RECEIVE ORG ONLY:** Organization's data is sent to IDHS system/data source and only Organization data is received by or accessible to the Organization. No IDHS Data is viewed, accessed, or stored.

Organization Data is sent and received using one or more of the following methods:

☐ Secure Web Access (SWA)

☐ Electronic Transmission (i.e. SFTP/FTP, CyberFusion, etc.)

☐ Postal Mail: Paper

☐ Postal Mail: Electronic Media (i.e.CD/Flash/etc.)

**READ IDHS ONLY:** Accessing/reading IDHS system/data only; No download, printing or storage of IDHS Data or input of Organization's data.

IDHS Data is accessed/read using one or more of the following methods:

☐ Secure Web Access (SWA)

☐ Electronic Transmission (i.e. SFTP/FTP, CyberFusion, etc.)

☐ Postal Mail: Paper

☐ Postal Mail: Electronic Media (i.e.CD/Flash/etc.)

**READ and RECIEVE IDHS ONLY:** Accessing/Reading IDHS system/data and download, print, or store IDHS Data (electronic and/or paper), however no input of Organization's data into the IDHS System.

IDHS Data is accessed/read and received using one or more of the following methods:

☒ Secure Web Access (SWA)

☐ Electronic Transmission (i.e. SFTP/FTP, CyberFusion, etc.)

☐ Postal Mail: Paper

☐ Postal Mail: Electronic Media (i.e.CD/Flash/etc.)

**SEND and RECEIVE BOTH ONLY:** Organization can access IDHS System/Data and download, store IDHS Data for use in Organization. Organization can input Organization data into IDHS system/data source.

IDHS Data is accessed/read and received and Organization data is input using one or more of the following methods:

Secure Web Access (SWA)

☐ Electronic Transmission (i.e. SFTP/FTP, CyberFusion, etc.)

☐ Postal Mail: Paper

☐ Postal Mail: Electronic Media (i.e.CD/Flash/etc.)

**IDHS DATA ELEMENTS ACCESSED, VIEWED, DOWNLOADED, or STORED by User(s)**

| DATA ELEMENT | DATA CLASSIFICATION | ENCRYPTION | DATA SOURCE |
|---|---|---|---|
| **EXAMPLES:** | **See next page for classification category definitions.** | A Yes/No question. Classification determined by either Data Classification or by the Data Owner. | This is the system, application, or resource which is providing that data element. |
| *FEIN_Num* | *Public* | *No* | *IES* |
| *Invo_Date* | *Official Use Only* | *(up to Data Owner)* | *CARS* |
| *SSN_Num* | *Confidential* | *Yes* | *CCMS* |
| Name | Confidential | Yes | IES |
| Birthdate | Confidential | Yes | IES |
| Age | Confidential | Yes | IES |
| SSN | Confidential | Yes | IES |
| Race | Confidential | Yes | IES |
| Ethnicity | Confidential | Yes | IES |
| Hispanic/Non-Hispanic | Confidential | Yes | IES |
| Citizenship Status | Confidential | Yes | IES |
| Lawful Presence | Confidential | Yes | IES |
| Alien Residence Date | Confidential | Yes | IES |
| IL Residency Status | Confidential | Yes | IES |
| Address | Confidential | Yes | IES |
| Phone Number | Confidential | Yes | IES |
| Email | Confidential | Yes | IES |
| Education | Confidential | Yes | IES |
| Type of Benefit | Confidential | Yes | IES |
| Benefit Amount | Confidential | Yes | IES |
| Benefit Period | Confidential | Yes | IES |
| Benefit History | Confidential | Yes | IES |
| Benefit Denial Reason | Confidential | Yes | IES |
| Eligibility Determination Group (EDG) | Confidential | Yes | IES |
| Case Number | Confidential | Yes | IES |
| Individual Number | Confidential | Yes | IES |
| EDG Number | Confidential | Yes | IES |

| RIN | Confidential | Yes | IES |
|---|---|---|---|
| IV-D Case ID | Confidential | Yes | IES |
| TANF Counter | Confidential | Yes | IES |
| Case Comments | Confidential | Yes | IES |
| Application Comments | Confidential | Yes | IES |
| Spenddown Amount | Confidential | Yes | IES |
| Benefit Review Date | Confidential | Yes | IES |
| Head of Household | Confidential | Yes | IES |
| Members of Household | Confidential | Yes | IES |
| Relationships | Confidential | Yes | IES |
| Military Information | Confidential | Yes | IES |
| Disability Information | Confidential | Yes | IES |
| Aged/Disability Benefits | Confidential | Yes | IES |
| Out of State Benefits | Confidential | Yes | IES |
| Pregnancy | Confidential | Yes | IES |
| Medicare Claims | Confidential | No | IES |
| Medicare Information | Confidential | No | IES |
| Minor Parent Information | Confidential | Yes | IES |
| Third Party Liability (Insurance) | Confidential | No | IES |
| Work and Training Information | Confidential | Yes | IES |
| Work and Training Exemption | Confidential | Yes | IES |
| Crisis Assistance Details | Confidential | Yes | IES |
| Absent Parent Information | Confidential | Yes | IES |
| Resource-Vehicle | Confidential | Yes | IES |
| Resource-Liquid | Confidential | Yes | IES |
| Resource-Real Property | Confidential | Yes | IES |
| Resource-Lump Sum/Accumulated Benefits | Confidential | Yes | IES |
| Resource-Trust | Confidential | Yes | IES |
| Resource-Burial | Confidential | Yes | IES |
| Resource-Life Insurance | Confidential | Yes | IES |
| Resource-House | Confidential | Yes | IES |
| Resource-Other | Confidential | Yes | IES |
| Expense-Dependent Care | Confidential | Yes | IES |
| Expense-Medical | Confidential | Yes | IES |
| Expense-Support | Confidential | Yes | IES |
| Expense-Misc. | Confidential | Yes | IES |
| Expense-Shelter | Confidential | Yes | IES |
| Expense-AABD Allowance | Confidential | Yes | IES |
| Expense-Utility Standard | Confidential | Yes | IES |
| Child Support Income | Confidential | Yes | IES |
| Child Support Expenses | Confidential | Yes | IES |
| Child Support Non-Cooperation | Confidential | Yes | IES |
| Good Cause Non-Cooperation | Confidential | Yes | IES |
| Marital Status | Confidential | Yes | IES |
| Sanctions | Confidential | Yes | IES |
| Notices and Correspondence | Confidential | Yes | IES |
| Electronic Case Records | Confidential | Yes | IES |
| IDHS Program Appeals Information | Confidential | No | IES |
| HFS Program Appeals Information | Confidential | No | IES |
| Appeals Case Number | Confidential | No | IES |

| | | | |
|---|---|---|---|
| Appeals Decision | Confidential | No | IES |
| Current Employment Data-Name of Employer | Confidential | Yes | IES |
| Current Employment Data-Dates of Employment | Confidential | Yes | IES |
| Current Employment Data-Most Recent Hire Date | Confidential | Yes | IES |
| Current Employment Data-Most Recent Pay Date | Confidential | Yes | IES |
| Current Employment Data-Employer FEIN | Confidential | Yes | IES |
| Current Employment Data-Employer Address | Confidential | Yes | IES |
| Current Employment Data-Income from Employer | Confidential | Yes | IES |
| Current Employment Data-Wage Amount by Quarter | Confidential | Yes | IES |
| Current Employment Data-Wage Amount by Year | Confidential | Yes | IES |
| Past Employment Details-Dates of Employment | Confidential | Yes | IES |
| Past Employment Details-Name of Employer | Confidential | Yes | IES |
| Past Employment Details-Address of Employer | Confidential | Yes | IES |
| Past Employment Details-Income from Employer | Confidential | Yes | IES |
| ARS Account Status | Confidential | Yes | IES |
| ARS Current Balance | Confidential | Yes | IES |
| ARS Monthly Amount Due | Confidential | Yes | IES |
| Disqualification Present | Confidential | Yes | IES |
| Title II – Current Net Monthly Payment | Confidential | Yes | IES |
| Title XVI – SSI Current | Confidential | Yes | IES |
| Monthly Payment | Confidential | Yes | IES |
| Cross-Reference Entitlement Numbers | Confidential | Yes | IES |
| SSI Current Payment | Confidential | Yes | IES |
| SSI Payment History | Confidential | Yes | IES |
| SSA Current Payment | Confidential | Yes | IES |
| Third Party Liability Insurance Company Name | Confidential | No | IES |
| Third Party Liability Policy Holder Name | Confidential | No | IES |
| Third Party Liability Policy Number | Confidential | No | IES |
| Third Party Liability Group Number | Confidential | No | IES |
| Third Party Liability Relationship to Policy Holder | Confidential | No | IES |

**If additional rows are needed, please recreate above table on another sheet and attach to DSA.**

**IDHS Data Classification Categories**: Used for the classification of data and systems thereby enabling the determination of appropriate/required security and privacy controls.

**Public:** Data should be classified as Public when the unauthorized disclosure, alteration or destruction of that Data would result in little or no risk to our clients, IDHS, the State of Illinois, our providers and partners.  Examples of Public data include press releases, course information and research publications.  While little or no controls are required to protect the confidentiality of Public data, some level of control is required to prevent unauthorized modification or destruction of Public data. Public Data is available to all residents of Illinois and to all individuals and entities external to Illinois.

**Official Use Only (OUO):** Data should be classified as For Official Use Only when the unauthorized disclosure, alteration or destruction of that data could result in a moderate level of risk to our clients, IDHS, the State of Illinois, our providers and partners.  By default, all IDHS Data that is not explicitly classified as Confidential or Public data should be treated as OUO Data.  A reasonable level of security controls should be applied to OUO Data. Data Owners may designate data as Official Use Only.

**Confidential:** Data should be classified as Confidential when the unauthorized disclosure, alteration or destruction of that Data could cause a significant level of risk to our clients, IDHS, the State of Illinois, our providers and partners. Examples of Confidential Data include Data protected by state or federal privacy regulations and Data protected by confidentiality agreements.  The highest level of security controls should be applied to Confidential Data. This includes Personally Identifiable Information (PII), Personal Health Information (PHI), Individually Identifying Health Information (IIHI) and Federal Tax Information (FTI). Disclosure of Confidential Data to parties outside of the State of Illinois should be authorized by Executive Management and/or the Data Owner and General Counsel.

**Appendix B**

**Certificate of Understanding and Confidentiality Agreement**

DSA#     __2026-177-DSA-FCS__


I understand that all information and Data received from the Illinois Department of Human Services (IDHS or the Department) under the DSA listed above is confidential and must be protected from unauthorized use and disclosure.

I understand and agree that all such information or Data (oral, visual or written, including both paper and electronic) which I see or to which I have access may not be released, copied or disclosed, in whole or in part, unless authorized by the Department.

When I no longer require access to confidential information, whether because of termination of employment, reassignment of duties or otherwise, I agree that I will not access or attempt to access any the Department confidential information, or any confidential information in the Department systems or other sources to which I have been given access. I will return any and all reports, notes, memoranda, notebooks, drawings, and other confidential information or Data developed, received, compiled by or delivered to me in order to carry out functions under the contract or subcontract, regardless of the source of the confidential information or Data.

I understand that the law forbids releasing or disclosing such confidential information, in whole or part. I further understand that if I am unsure as to what information is confidential, I will immediately and prior to any such disclosure consult with the Department or my supervisor.

I will safeguard, and will not disclose to unauthorized parties, any user name and/or password that may be issued to me in furtherance of my access to the confidential information. I understand that my access to the confidential Data may be revoked at any time for any other reason at the discretion and direction of the Department or my supervisor.

I will comply with all applicable Federal and State laws and regulations and with all applicable policies and procedures as set by the State of Illinois, including, but not limited to, the Illinois Public Aid Code (305 ILCS 5/1 *et seq.*), the Health Insurance Portability and Accountability Act (45 CFR Parts 160, 162, and 164), and other applicable state and federal laws.

I will promptly report to my supervisor or the Department any activities by any individual or entity that I suspect may compromise the availability, integrity, security or privacy of the confidential information. I will immediately notify my supervisor of any request for confidential information or Data received from an individual or entity not authorized to receive the Data under the DSA listed above.

I agree not to attach or load any additional hardware or software to or into the Department equipment/applications unless authorized to do so. I will use only my access rights to, and will access only those systems, directories, confidential information or Data authorized for my use by the Department.

I agree to store confidential information received in secure, locked containers or, where Data is stored on a computer or other electronic media, in accordance with the Department computer security policy that protects confidential information from unauthorized disclosure.

I understand and agree that the terms of this Confidentiality Agreement shall continue even when I am no longer employed by the agency which is covered by the DSA indicated above, and that I will abide by the terms of this Confidentiality Agreement in perpetuity.

I understand that failure to comply with these requirements may result in disciplinary action, termination, monetary penalties and criminal prosecution, as well as any other penalties provided by law.

This Agreement shall be governed by the laws of the State of Illinois, unless otherwise required by the Federal Supremacy Clause.

STEPHANIE UCHIMA
Digitally signed by STEPHANIE UCHIMA
Date: 2025.07.21 11:02:35 -05'00'

7/21/25

_____          _____
Signature                                            Date

Stephanie Uchima
_____
Name (Printed)

**APPENDIX C**
**Certification of Data Disposition**

Date of Disposition _____

I hereby attest that with regards to the Data Sharing Agreement between IDHS, and **[INSERT AGENCY]** that was execued on _____ **[INSERT DATE OF EXECUTION]**.

____    All copies of any Data have been wiped from Data storage systems.

____    All materials and non-wiped computer media containing any Data sets have been destroyed.

____    All copies of any Data that have not been disposed of in a manner described above, have been returned to Agencies' authorized representative as listed in this Agreement.

The User hereby certifies, by signature below, that the Data disposition requirements as provided in the above-captioned Data Sharing Agreement have been fulfilled as indicated above.

Signature of Recipient's Authorized Representative_____

Print Name of Recipient's Authorized Representative_____

Date: _____

**APPENDIX D**

**Please contact the IDHS Program POC or DoIT.DHS.MISSecurity@Illinois.gov for the Security and Privacy Control Questionnaire.**

---

Reset Form                                             PRINT

## ILLINOIS DEPARTMENT OF HUMAN SERVICES

# SECURITY AND PRIVACY QUESTIONNAIRE

### VERSION 4.1 (06/2018)

Prepared By (Disclosure Officer):

Organization/Agency/Entity Name:

Date:

All red questions/responses are **Required** for the SPCQ to be Approved.

The Security and Privacy Questionnaire (SPCQ serves to outline your Organization/Agency's baseline security and privacy controls as they relate to the Data Sharing Agreement (DSA contractual requirements to access the Illinois Department of Human Services (IDHS data, documents and electronic media.

The baseline control questions are in accordance with the Federal and State laws, policies and audit compliance regarding how IDHS provides security and privacy of our client's data and personal information.

The questions are not all inclusive as each IDHS Application or System is different, however, these questions do provide a place from which to develop further discussion and ensure your Organization/Agency meets these security and privacy requirements in regards to IDHS data.

This Questionnaire is an **Annual Requirement of the DSA**. You will be given a copy of the final, approved SPCQ to maintain for your records. Each year, you will complete the form and re-submit for approval.

---

IDHS SPCQ v4.1 03/2018

Revised 8/31/2020

**HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT (HIPAA)
DEPARTMENT OF HUMAN SERVICES BUSINESS ASSOCIATE AGREEMENT
USDA FOOD AND NUTRITION SERVICE
AGREEMENT #2026-178-BAA-FCS**

This Business Associate Agreement is made and entered into by and between the Illinois Department of Human Services (DHS or Covered Entity (CE)), and USDA Food and Nutrition Service (FNS or Business Associate (BA)). The BA and the CE are referred to herein collectively as "Parties," or individually, as a "Party." This Agreement supplements and is made a part of the existing Data Sharing Agreement #2026-177-DSA-FCS or other contractual agreement (hereinafter referred to as the "Contract") between the Parties.

A.    **Definitions**

General Definitions:

Unless otherwise defined herein, the following terms used in this Agreement has the same meaning as those terms in the HIPAA Rules:  Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practice, Protected Health Information, Required by Law, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use.

Specific Definitions:

"Agreement" shall mean this Agreement.

"ARRA" shall mean the American Recovery and Reinvestment Act, Pub.L. 111–5, Feb. 17, 2009, 123 Stat. 115.

"Business Associate" generally shall have the same meaning as the term "business associate" in the Privacy Rule, 45 C.F.R. § 160.103, and, in reference to this Agreement, shall mean the entity noted above in the first paragraph.

"Covered Entity" generally shall have the same meaning as the term "covered entity" in the Privacy Rule, 45 C.F.R. § 160.103, and, in reference to this Agreement shall mean DHS.

"HHS" shall mean the Department of Health and Human Services, which is the Department of the federal government that has overall responsibility for implementing HIPAA.

"HIPAA" shall mean the Health Insurance Portability and Accountability Act of 1996, Pub.L. 104–191, Aug. 21, 1996, 110 Stat. 1936.

"HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 C.F.R. Part 160 and 164.

Revised 8/31/2020

"HITECH" shall mean the Health Information Technology for Economic and Clinical Health Act, Pub.L. 111–5, Div. A, Title XIII, Div. B, Title IV, Feb. 17, 2009, 123 Stat. 226, 467.

"Privacy Rule" shall mean 45 C.F.R. §§ 160, 162, and Subpart E, 164.500 through 164.532.

"Security Rule" shall mean 45 C.F.R. §§ 160, 162 and Subpart C, 164.302 through 164.318.

"Secretary" shall mean the Secretary of the federal Department of Health and Human Services, or any other officer or employee of HHS to whom the Secretary delegates authority to investigate HIPAA complaints.

B.     **Purpose**

ARRA, through HITECH, made significant changes to the HIPAA law and to the relationship between Covered Entities and Business Associates.  BAs are now responsible for compliance with Sections 45 C.F.R. §§164.308, 164.310, 164.312, and 164.316 of the HIPAA Security Rule and the breach notification and enforcement provisions of HITECH now apply to BAs in the same way they apply to CEs.

The BA also must follow the Illinois Personal Information Protection Act of 2007, 815 ILCS 530/1 *et seq*.  This statute applies to all entities, public and private, that handle, collect, disseminate, or otherwise deal with non-public information.

The BA may receive from, or create on behalf of DHS, information that constitutes PHI under HIPAA and its implementing regulations to perform the following activity for DHS:  measuring the accuracy of State of Illinois SNAP eligibility and benefit determinations as reported to FNS.

C.     **Permitted Uses and Disclosures by Business Associate**

1.   Business Associate may use or disclose PHI as permitted or required by this Agreement, or as required by law.

2.   Business Associate agrees to make uses and disclosures and requests for protected health information consistent with the Minimum Necessary requirements (and limitations) set forth in 45 C.F.R. §§ 164.502(b) and 164.514(d).

3.   Business Associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 C.F.R. Part 164 if done by DHS except for the specific sues and disclosures, if any, set for in this Agreement.

2

Revised 8/31/2020

4.  Business Associate may use protected health information for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate.

5.  Business Associate may provide data aggregation services relating to the health care operations of DHS.

6.  Business Associate may disclose protected health information to report violations of law to appropriate federal or state authorities, consistent with 45 C.F.R. § 164.502(j)(1).

D.    **Obligations and Activities of the BA**

1.  <u>Appropriate Safeguards</u>:  The BA shall use appropriate safeguards, and comply with Subpart C of 45 C.F.R. Part 164, to prevent use or disclosure of DHS's protected health information other than as provided for by this Agreement.

2.  <u>Risk Assessments</u>:  The BA shall conduct, pursuant to 45 C.F.R. § 164.308, an accurate and thorough risk assessment of potential risks and vulnerabilities to the confidentiality, integrity, and availability of electronic health information held by the BA, which shall be made available to DHS upon request.

3.  <u>Agents and Subcontractors</u>:  The BA shall ensure, in accordance with 45 C.F.R. §§ 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, that any agents or subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information.

    To the extent that the BA uses an Electronic Health Information Exchange, a Regional Health Information Organization Personal Health Record vendor, or E-Prescribing gateway, in relation to DHS, the BA must enter into a contract or business associate agreement with that organization.

4.  <u>Client Access to Protected Health Information</u>:  The BA shall make protected health information in designated record sets available to DHS clients within five business days of a request by a DHS client or by DHS on behalf of a client.  The BA also shall make PHI in designated record sets available to DHS as necessary to satisfy DHS' obligations under 45 C.F.R. § 164.524.

5.  <u>Amendment of Protected Health Information</u>:  The BA shall make any amendment to protected health information in a designated record set as directed or agreed to by DHS pursuant to 45 C.F.R. § 164.526 or take other measures as necessary to satisfy

Revised 8/31/2020

DHS's obligations under 45 C.F.R. § 164.526.  The BA shall respond to a request for amendment that the BA receives directly from a client or from DHS on behalf of a client within five business days.  The BA shall incorporate any amendment to information in a designated record set within five business days of responding to a request for amendment.  The BA shall notify DHS of a client's request for an amendment and the BA response to the request (*e.g*, grant or deny the request) within five business days of responding to the request for amendment.

6.  <u>Accounting Rights</u>:  The BA shall maintain and make available the information required to provide an accounting of disclosures to DHS's clients as necessary to satisfy DHS's obligations under 45 C.F.R. § 164.528.  The Business Associate shall respond to such a request within five business days of receipt of the request.  At a minimum, such information shall include:

   a)  the date of disclosure;
   b)  the name and address (if known) of the entity or person that received the protected health information;
   c)  a brief description of the protected health information disclosed; and
   d)  a brief statement of the purpose for the disclosure that reasonably informs the client of the basis for the disclosure, a copy of the client's authorization, or a copy of the written request for disclosure.

7.  <u>Accounting for Electronic Medical Records</u>:  If the BA maintains an electronic medical record of a client's protected health information, the BA shall make available to the client all electronic disclosures, including those for treatment, payment, or healthcare operations, for a period not to exceed three years prior to the date on which an accounting is requested.  If the BA's electronic records do not comprise three years of data, the BA shall provide the disclosures for the time period in which such electronic data exists.

8.  <u>Federal Government Access to Medical Records</u>:  The BA shall make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.  The BA shall provide DHS with any information and materials provided to the Secretary at the time it is provided to the Secretary.

9.  <u>Performance of DHS's Obligations</u>:  To the extent the business associate is to carry out one or more of DHS's obligations under Subpart E of 45 C.F.R. Part 164, comply with the requirements of Subpart E that apply to DHS in the performance of such obligations.

10.  <u>Retention of Protected Health Information</u>:  The BA shall retain DHS's PHI, including documentation of all unauthorized disclosures, while this Agreement is in effect, and securely maintain the PHI for a period of six years from the date of the

record's creation or the date the Agreement was last in effect, whichever is later, or as required by law.  This obligation shall survive the termination of this Agreement.

11. <u>Training</u>:  The BA shall train all its employees who access, use, modify, or disclose DHS's PHI regarding HIPAA and HITECH privacy, security, and breach notification procedures.  The BA shall maintain training records, including attendance records and training materials, to be made available to DHS upon request.

12. <u>Destruction of Protected Health Information</u>:  The BA shall implement policies and procedures for the final disposition of DHS's PHI maintained in electronic media, or any other form or medium, to make the data unusable, unreadable, or indecipherable to unauthorized individuals.

13. <u>Breach Notification</u>:  The BA shall notify DHS by email and by Registered Mail within 24 hours of becoming aware of any use or disclosure of protected health information, that is not provided for by this Agreement, including breaches of unsecured protected health information as required at 45 C.F.R. § 164.410, and any other security incident. The BA will pay all expenses related to breaches chargeable to it and hold DHS harmless for any such expenses. The BA will work with DHS to ensure that all breach notifications to DHS clients and others meet legal requirements.

    a) The BA's notice to DHS shall identify each individual whose protected health information has been, or is reasonably believed by the BA to have been, accessed, acquired, or disclosed without authorization.

    b) For purposes of this section, a data breach shall be treated as discovered by the BA as of the first day on which such breach is known or should reasonably have been known to it.

    c) For each data breach chargeable to the BA, the BA shall notify each individual whose protected health information has been accessed, acquired, or disclosed as a result of such breach.

    d) All notifications of a data breach involving PHI or PHI combined with personal identifiers shall be made in the most expedient way possible and without unreasonable delay, but in no case later than 60 calendar days after the discovery of such breach by the BA.

    e) The BA shall have the burden of demonstrating that all notifications were made as required under this section, including evidence demonstrating the necessity of any delay.

    f) Breach notification shall be provided as required by law.

14. <u>Audits, Inspection and Enforcement</u>:  The BA shall allow DHS or its designated agent(s) to inspect the BA's facilities, systems, books, records, agreements, policies and procedures to the extent DHS determines an examination of the BA's privacy or security practices is necessary to comply with DHS's legal obligations.  An inspection by DHS or its agent(s) also will be allowed by the BA to determine

Revised 8/31/2020

whether the BA's privacy and security practices comply with the HIPAA Rules, this Agreement or any applicable law.  Nothing in this paragraph shall be construed as requiring DHS to conduct any such examination.

Within five business days of a written request by DHS, the BA shall allow DHS to conduct a reasonable inspection of the facilities, systems, books, records, agreements, policies and procedures relating to the use or disclosure of DHS's PHI.

The fact that DHS inspects, fails to inspect, or has the right to inspect the BA's facilities, systems, books, records, agreements, policies and procedures does not relieve the BA of its responsibility to comply with this Agreement, HIPAA, or HITECH.  DHS's detection of, or failure to detect, issues of non-compliance shall not constitute acceptance of such practice or a waiver of DHS's enforcement rights under this Agreement.

15. <u>Safeguards during Transmission</u>:  The BA shall use security measures as required by the Security Rule to reasonably and appropriately maintain and ensure the confidentiality, integrity, and availability of DHS's PHI transmitted to DHS, the BA's subcontractors or any third party, pursuant to this Agreement and in accordance with the standards and requirements of HIPAA and HITECH.

16. <u>Contractual Breach by the BA's Subcontractor</u>:  If the BA knows of a pattern of activity or practice of its subcontractors that constitutes a material breach or violation of the BA's agreement with the subcontractor, the subcontractor must take reasonable steps to cure the material breach. If attempts are unsuccessful, the BA must terminate the contract, business associate agreement or other arrangement with the subcontractor.  If the BA believes termination is not feasible, the BA must inform DHS of the problem in writing.  DHS may require the BA's agreement with its subcontractor be terminated or inform the Secretary of the breach or violation.

E. **Obligations of DHS**

1. DHS shall comply with HIPAA and HITECH security standards when transmitting PHI to the BA.

2. DHS shall provide a copy of its Notice of Privacy Practices to the BA and notify the BA of any limitation(s) in the notice of privacy practices under 45 C.F.R. § 164.520, to the extent such limitation may affect the BA's use or disclosure of protected health information.

3. DHS shall notify the BA of any changes in, or revocations of, the permission by an individual to use or disclose his or her protected health information, to the extent such changes may affect the BA's use or disclosure of protected health information.

4. DHS shall notify the BA of any restriction on the use or disclosure of protected health information that DHS has agreed to or is required to abide by under 45 C.F.R. § 164.522, to the extent such restriction may affect the BA's use or disclosure of protected health information.

5. DHS shall notify the Secretary as required by law of data breaches chargeable to DHS or the BA.

**F.    Term and Termination**

1. Term:  This Agreement shall be effective upon its full execution, and shall terminate upon termination with or without cause of the Contract; the execution of a new Agreement; or on the date the Agreement terminates with "notice" or "for cause" as authorized in paragraph s (2) and (3) in this Section, whichever is sooner.

2. Termination for Cause:  The Business Associate authorizes termination of this Agreement by DHS, if DHS determines the BA has violated a material term of the Agreement.  If DHS elects not to terminate the Agreement, the BA shall cure the breach or end the violation within 30 calendar days of DHS's election.  If the BA fails to cure the breach or end the violation within the 30 calendar days, DHS may either terminate the Agreement or report BA's breach or violation to the Secretary.

   Notwithstanding termination of the Agreement, and subject to direction from DHS, the BA shall take all reasonable and necessary actions to protect and preserve protected health information and property containing protected health information in the possession of the BA.

3. Termination on Notice:  This Agreement may be terminated by either Party for any or no reason upon thirty (30) days' prior written notice to the other Party.

4. Obligations of Business Associate Upon Termination:  Upon termination of this Agreement for any reason, the BA shall return or, if agreed to by DHS in writing, destroy all protected health information received from DHS, or created, maintained, or received by the BA on behalf of DHS, that the BA maintains in any form.  The BA shall retain no copies of the protected health information.  The BA shall provide DHS with an opportunity to review the protected health information prior to its destruction.

Revised 8/31/2020

The BA shall certify in writing to DHS that the protected health information has been destroyed.

To the extend DHS and the BA determine that returning or destroying DHS's protected health information is not feasible, there shall be written notice to DHS of the conditions making return or destruction infeasible. The BA shall continue to use appropriate safeguards, and comply with Subpart C of 45 C.F.R. Part 164 to prevent use or disclosure of the protected health information for as long as the BA retains the protected health information.

The BA also shall obtain or ensure the destruction of DHS protected health information created, received, or maintained by its subcontractor(s) pursuant to the terms of this section.

**G.    Miscellaneous**

1. <u>No Waiver of Immunity</u>:  No term or condition of this Agreement shall be construed or interpreted as a waiver, express or implied, of any of the immunities, rights, benefits, protection, or other provisions of the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, or the common law, as applicable, as now in effect or hereafter amended.

2. <u>Disclaimer</u>:  DHS makes no warranty or representation that compliance by the BA with this Agreement, HIPAA or HITECH will be adequate or satisfactory for the BA's own purposes, regarding the security or privacy of its systems.

3. <u>Regulatory Reference</u>:  A reference in this Agreement to a section in the HIPAA Rules means the section as in effect or as amended.

4. <u>Amendments</u>:  The Parties agree to take such action as is necessary to amend this Agreement from time to time as is necessary for compliance with the requirements of HIPAA Rules and any other applicable law.  The Parties further agree to promptly enter into negotiations concerning amendment(s) to this Agreement upon request.  All amendments must be in writing and signed by the Parties.

5. <u>No Third Party Beneficiaries</u>: Nothing express or implied in this Agreement is intended to confer any rights, remedies, obligations or liabilities whatsoever upon any person other than DHS, the BA, and their respective successors or assigns.

6. <u>Effect on Contract</u>:  This Agreement is incorporated into the Contract as if set forth in full therein.  The Parties expressly waive any claim or defense that this Agreement is not a part of the Contract between the Parties.

Revised 8/31/2020

7.  <u>Interpretation and Order of Precedence</u>:

    a.  This Agreement supersedes and replaces any previous, separately executed Business Associate Agreement between the Parties.

    b.  This Agreement is the complete agreement of the Parties with respect to their BA relationship under the HIPAA and HITECH regulations.

    c.  This Agreement shall be interpreted as broadly as necessary to implement and comply with HIPAA and HITECH.

    d.  Any ambiguity in this Agreement shall be resolved in favor of a meaning that complies and is consistent with HIPAA and HITECH.

    e.  In the event of any conflict between the mandatory provisions of HIPAA and HITECH and the provisions of this Agreement, HIPAA and HITECH shall control.  Where the provisions of this Agreement differ from those in HIPAA and HITECH, but are nonetheless permitted by HIPAA and HITECH, the provisions of this Agreement shall control.

8.  <u>Notice</u>:  Unless otherwise specified in this agreement, all required notices between the Parties shall be in writing and shall be hand delivered or sent by U.S. Registered Mail to the representatives at the addresses below. Any notice given to a Party under this Agreement shall be deemed effective upon: (i) delivery, if hand delivered; or (ii) the fifth business day after being sent by Registered Mail.

Department of Human Services:

Name: Kyle Thomas

Illinois Department of Human Services

Organizational Unit: Bureau of Performance Management

Address: Harris II, 2nd Floor, 100 S Grand Avenue East

Springfield, IL 62762

Phone:  217/720-8361

<u>kyle.thomas2@illinois.gov</u>

Revised 8/31/2020

Business Associate Representative:

Name:  Stephanie Uchima

Title:  SNAP QC Team Lead

Organization:  USDA Food & Nutrition Service

Midwest Regional Office

77 W Jackson Blvd, 20th Floor

Chicago, IL 60604

Phone:  312/886-5633

stephanie.uchima@usda.gov

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the Agreement effective date.

Department of Human Services                    USDA Food & Nutrition Service

Dulce Quintero by     Digitally signed by Dulce           STEPHANIE     Digitally signed by
Crystal VanDiver      Quintero by Crystal VanDiver         UCHIMA        STEPHANIE UCHIMA
                      Date: 2025.07.25 15:13:36                          Date: 2025.07.21
                      -05'00'                                            11:04:58 -05'00'
_____              _____
Dulce Quintero, Secretary                    Stephanie Uchima
                                             SNAP QC Team Lead


7/25/25                                       7/21/25
_____              _____
Date:                                        Date:

10