1  ROB BONTA
   Attorney General of California
2  PAUL STEIN
   ROBIN GOLDFADEN
3  Supervising Deputy Attorneys General
   ANDREW Z. EDELSTEIN
4  ANNA RICH
   JANE REILLEY
5  SEBASTIAN BRADY
   WILLIAM BELLAMY
6  MARIA F. BUXTON
   LIAM E. O'CONNOR
7  Deputy Attorneys General
   State Bar No. 330050
8   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA 94102-7004
9   Telephone: (415) 510-3915
    Fax: (415) 703-5480
10  E-mail: Liam.OConnor@doj.ca.gov
   *Attorneys for Plaintiff State of California*

11

12                IN THE UNITED STATES DISTRICT COURT

13            FOR THE NORTHERN DISTRICT OF CALIFORNIA

14                     SAN FRANCISCO DIVISION

15

16

17  **STATE OF CALIFORNIA, ET AL.**          Case No. **3:25-cv-06310-MMC**

18                           Plaintiffs,     **DECLARATION OF CARLA REYES**
                                             **IN SUPPORT OF PLAINTIFF**
19                                           **STATES' MOTION TO ENFORCE OR**
                                             **EXPAND PRELIMINARY**
20       v.                                  **INJUNCTION**

21                                           Date: February 13, 2026
    **UNITED STATES DEPARTMENT OF**          Time: 9:00 a.m.
22  **AGRICULTURE, ET AL.**                  Courtroom: 7
                                             Judge: Maxine M. Chesney
23                          Defendants.      Trial Date: None set
                                             Action Filed: July 28, 2025

24

25

26

27

28

## DECLARATION OF CARLA REYES

**Carla Reyes**, declares under penalty of perjury, pursuant to 28 U.S.C. Section 1746, as follows:

1.     I am a resident of the State of Washington. I am over the age of 18 and understand the obligations of an oath.

2.     I previously submitted a declaration in this matter (ECF No. 59-24). The information in that declaration remains true and correct to the best of my knowledge and I incorporate it here by reference. The further declaration I make here is based on my personal knowledge and on my review of information and records gathered by staff of the Washington State Department of Social and Health Services.

3.     On November 24, 2025, the state of Washington received a letter from Acting Administrator of the Food and Nutrition Service of the U.S. Department of Agriculture Patrick A. Penn. It directed Washington to produce information concerning every SNAP beneficiary in Washington since January 1, 2020, including their name, any known aliases, date of birth, social security number, residential address, mailing address, and other sensitive personally identifying information. It included a proposed data and security protocol and represented that the protocol "exceeds that which your State historically has required before producing the same type of data to FNS." On that basis, it argued that "your State should have no difficulty nor reservations agreeing to these protocols." While the letter was addressed to Governor Ferguson, the body of the letter never referenced Washington by name once, and appeared to be a form letter.

4.     On December 23, 2025, the state of Washington received an email from Acting Administrator of the Food and Nutrition Service of the U.S. Department of Agriculture Patrick A.

Penn. It said that Washington has "no basis for [its] continued withholding of [SNAP] data" and set a deadline of January 6 (later extended to January 9) "to indicate whether you agree to our November 24 request." Notably, Washington received the letter while in the midst of helping people impacted by effects from historic flooding that began December 9th and continued through the month impacting 14 counties. This was followed by extended power outages across 16 counties from a subsequent wind and rainstorm on December 17th. Washington was granted waivers to extend the period of reporting for food loss into mid-January. Our teams worked extended hours and travelled to impacted areas to assist with application for assistance, including replacement of food loss due to the flooding and power outages. During this time, we also had reduced staffing due to the winter holidays which limited the availability of staff who are critical to the evaluation of the request The letter further advised that Washington should "construe [the December 23] letter as your Advance Notification pursuant to 7 CFR 276.4(d)(1)" indicating that failure to agree would subject Washington to a disallowance of administrative funds. Included with the December 23 letter was an amended data and security protocol.

5.      I disagree with the characterization of the data and security protocol as exceeding data and security protocols that Washington has agreed to.

6.      First, I am not aware of an instance that Washington has agreed to the disclosure of information that meets or exceeds the breadth of the data demanded in the November 24, 2025, and December 23, 2025 letters. Generally, Washington provides SNAP recipient data to USDA on an as-needed basis to accomplish discrete administrative tasks. It is rare to provide historical information. Where historical information has been provided, it is usually in the form of a sample, and not a complete canvass of all recipient data. Further, the time frame requested here, in excess of five years' worth of data, is much larger than other comparable historical time frames of which

I am aware. The breadth of the request would demand a corresponding very strict data and security protocol, making any current agreement Washington has with FNS not comparable. The reason for this is that a data transfer of a greater volume warrants stricter protocols because the potential adverse outcomes of a data breach are much more severe. Even if all of the same data elements are transmitted as in prior transmittals, the number of people affected is so much greater that the data is simultaneously a much larger target for potential bad actors and much more disruptive if it is used unlawfully.

7.     But, comparing current and past data and security protocols and federal regulation with the proposed SNAP Information Database Fraud, Waste, and Abuse Detection protocol included in the November 24 letter, as amended on December 23, shows that the proposed protocol does not exceed those to which Washington has agreed. For example, the proposed protocol at paragraph 2.2.1 states that USDA will not use the data for "Law enforcement investigations beyond coordination regarding SNAP fraud, or other violations relating to the FNA." This is not as strong as past protocol/Federal regulation 7 C.F.R. § 272.1(c)(1)(vi) that allows the release of this data specifically for the purpose of investigating alleged violation of the "Food and Nutrition Act of 2002 or regulation," on written request. Further, 7 C.F.R. § 272.1(c)(1)(vi) requires the written request to include the "identity of the individual requesting the information and his authority to do so, violation being investigated, and the identity of the person on which the information is requested." But paragraph 2.2.1 does not require a specific request, or a specific allegation of a violation, and allows "coordination regarding SNAP fraud, or other violations relating to the FNA," which is a much broader permitted disclosure.

8.     Paragraph 4 of the proposed data and security protocol does not limit who can access the data in ways that Washington has previously agreed to. For example, paragraph 4.1 does

not limit what FNS employees may access the data in relation to the purpose for which the data is being accessed. That is, it permits any FNS employee with proper designations, training, and/or certification, to access the data. Washington is used to agreeing to data and security protocols that limit access privileges to those with job duties consistent with the purposes for which the data is collected. Paragraph 4.1 also does not specify whether the access requirements in 4.1.1, 4.1.2, and 4.1.3 are conjunctive or disjunctive. Washington would expect that the requirements are conjunctive, but that is not specifically stated.

9.      Paragraph 4.2.3 also permits OIG employees to access the data for any investigation "related" to an investigation about "SNAP fraud, waste, or abuse." Washington is used to agreeing to data and security protocols that requires investigation be of a violation of the Food and Nutrition Act or one the regulations promulgated thereunder, not merely an investigation "related" to such a violation.

10.      Paragraph 6 is a new set of purposes and uses for this detection framework data and security protocol. Notably, it permits "data mining," which is not defined, and appears to be unlimited in scope because the data mining "techniques" include but are "not limited to" four bullet points in paragraph 6.2.1. Prior to agreeing to such a data and security protocol, Washington would seek to further understand what data mining uses USDA intends to pursue. Further, it specifies that the "data mining" must have a "direct nexus to SNAP." But this is more permissive than previous data and security protocols which, as discussed above, have required allegations of violations of the Food and Nutrition Act or regulations promulgated thereunder, not a "nexus," direct or otherwise.

11.      Paragraph 7.2.1 similarly allows disclosure to law enforcement where a "criminal nexus has been drawn specifically to SNAP." This is more permissive than previous protocols

4

which required alleged violations of the Food and Nutrition Act or the regulations promulgated thereunder.

12.    A true and correct copy of a recent data and security protocol executed in October of 2024 is attached to this declaration as **Exhibit A**.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 7th day of January 2026, in Olympia, WA.

CARLA REYES
Assistant Secretary
Washington State Department of
Social and Health Services

Exhibit A

## COMPUTER MATCHING AGREEMENT

### BETWEEN

### THE U.S. DEPARTMENT OF AGRICULTURE'S FOOD AND NUTRITION SERVICE, SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM

### AND

### STATE AGENCY ADMINISTERING THE SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM

### Match#: USDA-FNS-2024-EDRS-03

## I.   PURPOSE AND LEGAL AUTHORITY FOR CONDUCTING THE MATCHING PROGRAM

This computer matching agreement (CMA) governs a matching program between the U.S. Department of Agriculture's Food and Nutrition Service (FNS) and each State agency administering the Supplemental Nutrition Assistance Program (SNAP) to include all 50 States, the District of Columbia and the territories of Guam and the U.S. Virgin Islands (State agencies). This CMA reestablishes the existing matching program in which FNS and State agencies have participated, through agreements and renewals since 2017.

The Privacy Act of 1974 (Privacy Act), as amended by the Computer Matching and Privacy Protection Act of 1988 and the Computer Matching and Privacy Protection Amendments of 1990, set the requirements for matching programs at 5 U.S.C. §552a(o).

A computerized comparison of records from systems of records for the purpose of establishing or verifying eligibility for SNAP benefits constitutes a "matching program" as defined by the Privacy Act. Records contained in a system of records may not be disclosed to a recipient agency or a non-federal agency for use in a "matching program," as defined by the Privacy Act, except pursuant to a written agreement containing certain provisions as specified in the Privacy Act, section (o). This CMA contains the specified provisions.

### A.  Purpose

The purpose of the matching program is to maintain program integrity and reduce payment errors by providing information to assist State agencies with establishing or verifying the eligibility of individuals for SNAP benefits and determining the appropriate disqualification period to be imposed for a new intentional program violation. Each State agency must submit information about individuals who have been disqualified from SNAP within their State to the Electronic Disqualified Recipient System (eDRS), which is maintained by FNS. As a participant in this matching program, each State agency has

1

access to this national system to both submit the required information for their State and perform the required matches against information provided by all State agencies.

Consistent with Federal mandates, this CMA, combined with the Interconnection Security Agreement (ISA), sets forth the conditions, terms, and safeguards under which State agencies will provide data to and receive data from FNS through eDRS to meet these requirements in their administration of SNAP.

## B. Legal Authority

This CMA is executed pursuant to the Privacy Act, Office of Management and Budget (OMB) Circular A-130, Management of Federal Information Resources at 61 Federal Register (FR) 6428-6435 (February 20, 1996), and OMB guidelines pertaining to computer matching at 54 FR 25818 (June 19, 1989).

The Food and Nutrition Act of 2008 (the Act), as amended, 7 U.S.C. §2015, provides the legal authority for conducting the matching program. Section 6(b) of the Act, prescribes mandatory periods of ineligibility for persons found to have committed an intentional program violation (IPV) such as fraud, misrepresentation, or other violation of statute or regulation in connection with SNAP.  Section 6(b)(4) prescribes regulations to ensure that appropriate State and Federal entities forward information concerning determinations arising out of such proscribed activity by a specific individual.

FNS possesses the legal authority to collect and utilize SNAP beneficiary data for program administration and enforcement as provided in the Act, subject to confidentiality and limitations on disclosure at section 11(e)(8) (SNAP recipients), section 7(h)(2)(SNAP recipient electronic benefit transfer transaction data), and section 9(c) (SNAP retailers).

State agencies meet the requirement to forward information about the disqualifications they impose by submitting the information to eDRS. This information is then accessible to all State agencies that participate in this matching program to help determine program eligibility and appropriate disqualification periods for new disqualifications.

## C. Background

State agencies that participate in this matching program use eDRS to both submit information about disqualifications imposed in their State and to access information about disqualifications nationally. As the agency that owns and maintains eDRS, FNS is the "source agency" and the State agency is the "non-federal agency," as defined by the Privacy Act, sections (a)(9) and (11). This CMA contains the specified provisions for this portion of the matching agreement. The ISA covers additional provisions that must be addressed due to the specific nature of this matching program.

Because State agency access to eDRS to receive information cannot be separated from access to submit information, this agreement also includes provisions that apply to FNS

as the receiver of information from State agencies about the disqualifications imposed in their State and State agencies as the providers of such information.

The ISA is a separate document that provides additional terms and conditions that apply if the State agency chooses to access eDRS through a web services connection. For web services States, the CMA in combination with the ISA constitute the full matching agreement between FNS and that State agency. The CMA alone constitutes the full agreement between FNS and State agencies that choose to access eDRS only through the online system.

This is a standard agreement for FNS and participating State agencies. The parties have participated in eDRS matching agreements, including renewals since 2022, the latest of which expired on August 03, 2023.

1. Match# USDA-FNS-2020-EDRS-02: Effective February 4, 2021, through August 03, 2022.
2. Renewal of Match# USDA-FNS-2020-EDRS-02: Effective August 4, 2022, through August 3, 2023.

## II.  JUSTIFICATION AND ANTICIPATED RESULTS

### A.  Justification

Section 6(b) of the Act prescribes mandatory periods of ineligibility for persons found to have committed an IPV such as fraud, misrepresentation, or other violation of statute or regulation in connection with SNAP and requires State agencies that impose these disqualifications to forward this information to FNS (Section 6(b)(4) of the Act). The purpose of these laws is to maintain program integrity and reduce improper payments by allowing State agencies access to information about disqualifications in other jurisdictions that affect their State.

State agencies use eDRS to meet these mandates. To assist in determining applicant eligibility for SNAP benefits, State agencies match against eDRS to ensure applicants and new household members are not currently disqualified from receiving SNAP benefits due to an IPV (7 Code of Federal Regulations (CFR) 273.2(f)(11)(i)(B)). State agencies also use eDRS to ensure the proper disqualification period is imposed for new IPVs received in their State (7 CFR 273.2(f)(11)(i)(A)). Before imposing a new disqualification, State agencies must check eDRS to determine if the individual to be disqualified has received any prior disqualifications because the existence of any prior disqualifications is one of the determining factors in setting an appropriate disqualification period for a new IPV (7 CFR 273.16(b)).

This data exchange through the use of eDRS is necessary because each State agency maintains its own records about disqualifications imposed within the State, but a disqualification in one political jurisdiction is valid nationally. The reporting requirements for State agencies are codified in 7 CFR 273.16(i). Once a State agency

3

submits information to eDRS, the information is available nationally to all State agencies that participate in the agreement to meet their computer matching requirements.

FNS and State agencies use eDRS for this legally required data exchange because it is more economical, more efficient, and faster than using manual processes. The system is a live, real-time, centralized database of current and past disqualifications.

## B. Anticipated Results

FNS and State agencies will continue to use eDRS to ensure program efficiency while maintaining program integrity.

The cost benefit analysis indicates an anticipated net benefit of over $24 million dollars annually. FNS anticipates that similar savings and operational benefits will continue throughout the matching program.

The cost benefit analysis demonstrates that the cost for the eDRS matching program is outweighed by the benefit of avoiding improper payments. FNS anticipates that participants will continue to experience savings and operational benefits through continued use of eDRS.

## III.    DESCRIPTION OF THE RECORDS

### A. System of Records

FNS' system of records (SOR) for eDRS is USDA/FNS-5, Information on Persons Disqualified from the Supplemental Nutrition Assistance Program, 75 FR 81205 (Dec. 27, 2010). The FNS records involved in this data exchange are the master files of recipients and their associated IPV records.

Each State agency updates and verifies its data within eDRS according to the technology it uses to connect to eDRS (web services or online).

State agencies exchanging data with eDRS do so with their respective authoritative and substantiated listing of that State's disqualified SNAP recipients. Each State's substantiation is performed at the State level and must include specific documents from an appropriate court of jurisdiction or administrative hearing that meet the legal requirements to disqualify a recipient or change a disqualification period for a recipient.

### B. Data Elements

State agencies are required by regulations at 7 CFR 273.16(i)(3) to report specific data elements to FNS about disqualifications they impose in their State. The required elements include identifying information about the individual being disqualified, information about the disqualification itself, and information about the agency imposing

the disqualification. Information contained within eDRS is Sensitive but Unclassified (SBU) and includes Personally Identifiable Information (PII).

Required data:

1. PII: Name, social security number, date of birth, gender
2. Disqualification details: Disqualification number, disqualification decision date, disqualification start date, length of disqualification period
3. Agency imposing the disqualification: Locality code and the title, location, and phone number of the locality contact

The following data elements are also available in eDRS: Alias, alternative ID, and offense code.

These same data elements are available to system users who perform queries in eDRS for assistance in determining eligibility or proper disqualification periods or performing other related tasks necessary in the administration of SNAP.

## C. Number of Records Involved

The number of matches performed and records exchanged between eDRS and each State agency varies according to the size of the population served by the State agency and the associated activities the State agency undertakes in administering SNAP.

### 1. Query Activity

State agencies are required to match against eDRS in two scenarios. For the purpose of eligibility determination, State agencies match SNAP applicants and new household members against eDRS to determine if the individual is currently disqualified due to an IPV. Before imposing a new disqualification, State agencies are required to match against eDRS to determine the appropriate disqualification period. In addition to these required matches, State agencies may choose to perform queries at other times as part of their program administration and program integrity efforts. Below are examples of queries run by State agencies from February 4, 2021, to August 4, 2022, for eligibility and penalty determination.

- 5,403,441 queries were performed with the purpose of *Eligibility Determination.*

- 224,052,237 queries were performed with the purpose of *Penalty Determination.*

### 2. Record Maintenance Activity

State agencies are required to submit information about the disqualifications they impose and to maintain their records to ensure the accuracy and relevancy of the disqualification records for their State. Below are examples of records added, modified and deleted by State agencies from February 4, 2021 to August 4, 2022.

- 45,310 new records were added
- 2,752 records were modified
- 1,167 records were deleted

## IV.    NOTICE OF MATCHING PROGRAM

The Privacy Act requires the matching agreement to specify procedures for providing individual notice to applicants for and recipients of financial assistance or payments under federal benefit programs that any information provided by applicants and recipients may be subject to verification through matching programs. Such notice is required at the time of application and periodically thereafter, as directed by the Data Integrity Board (DIB) of the USDA, subject to guidance provided by the Director of OMB (the Privacy Act, section (o)(1)(D)(i) and 7 CFR 273.2(b)(4)).

Pursuant to this requirement, State agencies have implemented procedures and developed forms for providing individualized notice as required. Methods for notification include, but are not limited to: a statement on the initial application for SNAP benefits (hard copy and electronic); an explanation in the benefit program handbook provided at the time of application; a banner on the State agency website for SNAP applicants and SNAP renewal; and a statement in letters to applicants and recipients of SNAP assistance. Such procedures are in accordance with directions by the DIB, subject to guidance by OMB.

## V.    VERIFICATION, NOTICE, AND OPPORTUNITY TO CONTEST

Section (p) of the Privacy Act requires that each matching agreement specify procedures for verifying information produced in the matching program and an opportunity for matched individuals to contest findings.

### A. Verification Procedures

To protect any individual whose records are used in this matching program, neither FNS nor the State agency will take any adverse action against such individual as a result of information produced by such matching program until the State agency has independently verified the information.

The secondary verification process State agencies must follow is specified at 7 CFR 273.2(f)(11)(iii).

(iii) Independent verification shall take place separate from and prior to issuing a notice of adverse action—a two-step process. Independent verification for disqualification purposes means contacting the applicant or recipient household and/or the State agency that originated the disqualification record immediately to obtain corroborating information or documentation to support the reported disqualification information in the intentional Program violation database.

(A) Documentation may be in any form deemed appropriate and legally sufficient by the State agency considering the adverse action. Such documentation may include, but shall not be limited to, electronic or hard copies of court decisions, administrative disqualification hearing determinations, signed disqualification consent agreements or administrative disqualification hearing waivers.

(B) A State may accept a verbal or written statement from another State agency attesting to the existence of the documentation listed in paragraph (f)(11)(iii)(A) of this section.

(C) A State may accept a verbal or written statement from the household affirming the accuracy of the disqualification information if such a statement is properly documented and included in the case record.

(D) If a State agency is not able to provide independent verification because of a lack of supporting documentation, the State agency shall so advise the requesting State agency or FNS, as appropriate, and shall take immediate action to remove the unsupported record from the disqualified recipient database in accordance with 7 CFR 273.16(i)(6).

**B. Notice of Match and Opportunity to Contest**

To comply with the requirements of the Privacy Act, section (p), FNS and State agencies will follow regulations specified at 7 CFR 272.12(c) and 273.2(f)(11)(ii). These regulations specify the following procedures to permit an adversely affected party to contest findings that result from the computer matching activity under this CMA and give the individual an opportunity to submit a brief statement representing his or her position for the record.

1. FNS has policies and procedures in place that provide for and facilitate an affected individual's dispute of eDRS information.
2. SNAP applicants have the opportunity to contest an eligibility decision. When information obtained from a matching program indicates that an applicant is not eligible for SNAP benefits and such information has been independently verified, the State agency will provide the applicant with a written notice. Such notices will:
   a. Inform the applicant of the match findings and the opportunity to contest these findings to the State agency;

7

b. Give the applicant until the expiration of a specified time period to respond to the notice. The time period begins on the date on which notice is mailed or otherwise provided to the individual to respond;

c. Clearly state that, unless the applicant responds to the State agency in accordance with the notice in the required time period, the State agency will conclude that the secondary verification of eDRS data is correct and the State agency will effectuate the proposed action or otherwise make the necessary adjustment to the individual's benefit or entitlement; and

d. Comply with the requirements of the Privacy Act, section (p)(1).

## VI. DISPOSITION AND RECORDS RETENTION OF MATCHED ITEMS

Information generated through the match of a State record with eDRS will be destroyed by the States and FNS as soon as the record no longer serves a purpose with eDRS and is no longer needed to fulfill any legal retention requirement. Disposition Authority - N1-462-09-8, Records Retention Schedule File Code FNS-102.

FNS and State agencies will destroy by deletion the electronic files created through matching activities, such as log files recording record query and/or access, that retain information about individual records after three years' retention time. Disposition and records retention requirements for the disqualification records in eDRS are covered in the Additional Responsibilities of the Participants section of this CMA.

## VII. SECURITY PROCEDURES

FNS and State agencies will comply with the requirements of the Federal Information Security Modernization Act of 2014 (FISMA), 44 U.S.C. §3551 et seq., related OMB circulars and memoranda, such as Circular A-130, Managing Information as a Strategic Resource, National Institute of Science and Technology (NIST) directives, Federal Information Processing Standards Publication (FIPS PUB) 200, and the Federal Acquisition Regulations. These laws, directives, and regulations include requirements for safeguarding Federal information systems and PII used in Federal agency business processes, as well as related reporting requirements.

FNS and State agencies recognize and will implement the laws, regulations, NIST standards, and OMB directives including those published subsequent to the effective date of this CMA. FISMA requirements apply to all Federal contractors, organizations, or entities that possess or use Federal information, or that operate, use, or have access to Federal information systems on behalf of an agency. FNS and State agencies are responsible for oversight and compliance of their contractors and agents.

### A. Administrative Safeguards

FNS and State agencies will restrict access to eDRS, the data matched, and any data created by the match to only those authorized employees and officials who need it to perform their official duties in connection with the uses of the data authorized in this

CMA. Furthermore, all personnel who will have access to the data matched and to any data created by the match will be advised of the confidential nature of the data, the safeguards required to protect the data, and the civil and criminal sanctions for noncompliance contained in the applicable Federal laws. Employees will also complete mandatory information security awareness training.

## B.  Physical Safeguards

The data matched and any data created by the match will be stored in an area that is physically secure from access by unauthorized persons during duty hours as well as non-duty hours or when not in use (e.g., door locks, card keys, biometric identifiers, etc.). Only authorized personnel will transport the data matched and any data created by the match.

## C.  Technical Safeguards

Online access to eDRS is limited to those who have obtained eAuthentication Level 2 and have been approved for access by their supervisor and FNS. State agencies that use web services allow access to appropriate users through their State system access approval process. Approved personnel must enter a State issued unique identification number when accessing eDRS on their agency's systems.

Access is limited by user roles to those electronic data areas necessary for the authorized employee to perform his or her official duties. The data matched and any data created by the match will be processed under the immediate supervision and control of authorized personnel in a manner that will protect the confidentiality of the data, so that unauthorized persons cannot retrieve any data by computer, remote terminal, or other means.

## D.  Application of Policy and Procedures

FNS and State agencies will adopt policies and procedures to ensure that information obtained through the matching program is used solely as provided in this agreement. FNS and State agencies will comply with these guidelines and any subsequent revisions.

## E.  Breach Procedures

If FNS or a State agency experiences a breach or loss of PII provided under the terms of this CMA, the agency experiencing the loss will follow the OMB guidelines in OMB M-17-12, Preparing for and Responding to a Breach of Personally Identifiable Information and USDA Departmental Regulation 3505-005, Cyber Incident Management Procedures. The agency experiencing the loss of PII will notify the eDRS Help Desk within one hour at SM.FN.eDRS@USDA.gov or 866-557-8330. The eDRS Help Desk will notify any state identified in the potential loss of PII with instructions regarding mitigation of the potential impact of the loss.

**F. Security Design Plan**

FNS will provide a copy of the eDRS Security Design Plan (SDP) to the Systems Security contact or other authorized representative named herein upon request. The SDP will comprehensively document the technical and non-technical security controls in place to protect eDRS information provided under the terms of this CMA.

**G. Review and Inspection**

FNS reserves the right to monitor State agency compliance with FISMA and OMB M-18-02: Guidance on Federal Information Security and Privacy Management Requirements and to conduct, at its discretion, announced periodic security reviews, which may entail onsite inspections for purposes of auditing compliance with this agreement and ensuring the security of eDRS-provided information during the lifetime of this CMA and any extension of this CMA.

**VIII.   RESTRICTIONS ON DUPLICATION AND REDISCLOSURE**

State agencies will comply with the prohibition on duplication and re-disclosure of records provided by FNS through access to eDRS within and outside the State agency, except where required by law or where authorized by law and essential to the conduct of the matching program. An example of a possible allowable disclosure would be to the Department of Justice, or another law enforcement entity, if applicable to the program. FNS and State agencies will comply with the following limitations on use, duplication, and re-disclosure:

1. State agencies will duplicate or re-disclose eDRS data only for those purposes specified in this CMA or as otherwise allowed or required by Federal law.
2. FNS and State agencies will enter into a written agreement with each of its contractors and agents that needs eDRS data to perform their official duties whereby such contractor or agent agrees to abide by all relevant Federal laws, restrictions on access, use, and disclosure, and security requirements in this CMA.
3. FNS and State agency employees, contractors, and agents who access, use, or disclose eDRS data in a manner or purpose not authorized by this CMA may be subject to civil and criminal sanctions pursuant to applicable federal statutes.

**IX.   RECORDS USAGE**

State agencies will use records provided by FNS through access to eDRS only for such purposes as described in this agreement. State agencies will use eDRS records to meet their requirements to verify the eligibility of individuals for SNAP benefits and determine the appropriate disqualification period to be imposed for new intentional program violations.

10

X.    **ASSESSMENT OF ACCURACY OF RECORDS**

Disqualification records in eDRS must be supported by appropriate documentation retained by the originating State agency that shows an individual was found to have committed an IPV. Secondary verification to ensure such documentation exists must be performed before a disqualification record may be used for an adverse action. Additional information about this process is in the Verification Procedures section of this CMA. If appropriate documentation cannot be found, the disqualification record must be deleted from eDRS and may not be used as a factor for any adverse action.

XI.    **COMPTROLLER GENERAL ACCESS**

Pursuant to the Privacy Act, section (o)(1)(K), the Government Accountability Office (Comptroller General) may have access to all FNS and State agency records, as necessary, in order to monitor or verify compliance with this CMA.

XII.    **ADDITIONAL RESPONSIBILITIES OF THE PARTICIPANTS**

As the agency that owns and maintains eDRS, FNS is the "source agency" and the State agency is the "non-federal agency," as defined by the Privacy Act. This CMA contains the provisions required by the Privacy Act for the parties to such a matching agreement. As participants in the eDRS matching program, State agencies also serve as the providers of information about disqualifications imposed in their State because they have been found to have committed an IPV. FNS, as the eDRS system owner, is also the receiver of disqualification information from each participating State agency. This section contains provisions that apply to both parties in addition to all provisions otherwise covered in this agreement.

A.    **State Agency Responsibilities as Provider of Information to FNS**

State agencies meet their requirements to provide information to FNS about disqualifications imposed on individuals in their State by submitting the information to eDRS. While this information is then accessible by all State agencies that participate in this agreement, the originating State agency maintains responsibility for the information it submits. This includes the need to maintain data integrity and to follow the applicable retention requirements on the records submitted by the State agency.

State agency will:

1.  Submit information to eDRS about new disqualifications imposed by their State no more than 30 days after the date the disqualification takes effect (7 CFR 273.16(i)(1-3)).
2.  Respond to secondary verification requests from other State agencies within 20 working days of receipt of such request by providing necessary verification or, if such documentation cannot be found, by so notifying the requesting State agency and deleting the disqualification record from eDRS (7 CFR 272.12(c)(2)).

3. Maintain eDRS data integrity by modifying or deleting their disqualification records as appropriate to ensure accuracy of the information.

Case records relating to IPVs must be retained indefinitely by the State agency and in eDRS except in specific circumstances described below. The State agency shall destroy by deletion a recipient's electronic record in eDRS under the following circumstances ((7 CFR 272.1(f)(2-3) and 273.16(i)(6-8)):

1. When the recipient is deceased;
2. When the recipient reaches his or her 80th birthday, if the State has chosen to implement this option;
3. In cases where the determination of intentional program violation is reversed by a court of appropriate jurisdiction;
4. If the State agency determines that supporting documentation for a disqualification record that it has entered is inadequate or nonexistent;
5. If the State agency is unable to demonstrate to the satisfaction of FNS that the information in question is correct; and
6. In accordance with the Federal Records Retention Schedule (44 U.S.C. §3303a).

## B. FNS Responsibilities as Receiver of State Agency Information

FNS operates eDRS as the authoritative national database each State agency uses to submit information about the disqualifications imposed by the State agency due to a finding of an IPV. FNS maintains responsibility for ensuring system operation and security while providing assistance and access to all system users.

FNS will:

1. Operate and maintain eDRS for use by participating State agencies to meet their requirements around disqualified recipients;
2. Comply with all provisions of the Security Procedures section of this CMA;
3. Authorize access to eDRS by each State agency system or by State agency personnel who have been appropriately accredited and endorsed by the State agency, and approved by FNS;
4. Provide a Help Desk to assist eDRS users and State agency technical staff with general system and process questions and technical assistance to enable State agency connection to eDRS for submitting and receiving information;
5. Provide necessary training following system changes and upgrades to enable State agency technology compatibility and continued connectivity;
6. Refrain from modifying or deleting data submitted by a State agency without written permission from the originating State agency.
7. Protect information received and shared pursuant to Section 1137(a)(5)(A) and (B) of the Social Security Act, which provide for the protection of Internal Revenue Service and Social Security Administration data, pursuant to Section 6103(l) of the Internal Revenue Code of 1954.

## XIII.    REIMBURSEMENT

The use of eDRS is a Federal requirement of the States; the base percentage for Federal payment to the State shall be 50 percent of the State agency's administrative costs per regulations at 7 CFR 277.4(b) Federal reimbursement rate.

## XIV.    EFFECTIVE DATE, DURATION, MODIFICATION, AND TERMINATION OF AGREEMENT

### A.  Effective Date

The Privacy Act provides that no agreement shall be effective until 30 days after publication of a notice of matching program in the Federal Register (the Privacy Act, sections (o)(2)(A)(i) and (ii). Notice of the matching program must be transmitted to the Senate Committee on Homeland Security and Governmental Affairs, to the House Committee on Oversight and Government Reform, and to OMB at least 30 days prior to the submission of the notice to the *Federal Register* for publication. See 5 U.S.C. §552a(e)(12) and (r), and OMB Circular No. A-108, Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act.

The intended effective date of this CMA will be September 23, 2024, 30 days after the anticipated date of publication of the notice in the Federal Register.

### B.  Duration

The Privacy Act requires that each matching agreement shall remain in effect only for such period, not to exceed 18 months, as the DIB of the agency determines is appropriate in light of the purposes, and length of time necessary for the conduct, of the matching program (the Privacy Act, section (o)(2)(C)).

This CMA shall remain in effect for 18 months from the effective date. Within 90 days prior to the Expiration Date, the parties to this CMA may request an extension. The DIB of the USDA may renew the CMA for a period of up to one year if the matching program will be conducted without any change and FNS and State agencies certify to the DIB in writing that the program has been conducted in compliance with the CMA (the Privacy Act ((o)(2)(D)).

The Privacy Act provides that no source agency may renew a matching agreement unless the recipient agency or non-Federal agency has certified that it has complied with the provisions of that agreement; and the source agency has no reason to believe that the certification is inaccurate. 5 U.S.C. §552a(q)(2)(A) and (B).

### C.  Modification

Any modification to this CMA must be in writing, signed by all parties, and approved by the USDA DIB.

### D. Termination

This agreement may be terminated at any time with the consent of both agencies.

Either agency may unilaterally terminate this CMA upon written notice to the other agency, in which case the termination date shall be effective 90 days after the date of the notice or at a later date specified in the notice provided this date does not exceed the approved duration of the CMA.

If FNS has reason to believe that the verification and opportunity to contest requirements of subsection (p) of the Privacy Act or any other requirement of this CMA are not being met, FNS shall terminate disclosures of records contained in eDRS under the agreement, in accordance with the Privacy act, section (q)(1).

If FNS determines that any authorized entity to which eDRS information is re-disclosed is not complying with any of the terms and provisions in this CMA, FNS may terminate this agreement.

If FNS determines the privacy or security of eDRS information is at risk, FNS may terminate the agreement and any further disclosures without prior notice to the State agency.

Upon termination of this agreement with a State agency, State agency access to eDRS will be terminated. Records in eDRS received from that State agency will remain in eDRS and FNS will maintain adherence to all provisions in this agreement regarding such data, including retention, security, and confidentiality requirements.

## XV.  INTEGRATION CLAUSE

This CMA in combination with the ISA constitutes the entire agreement of the parties with respect to its subject matter. The CMA alone constitutes the entire agreement for State agencies that access eDRS only through the online system. There have been no representations, warranties, or promises made outside of this agreement. This CMA will take precedence over any other documents that may be in conflict with it.

14

XVI.    **POINTS OF CONTACT**

A.  **FNS contacts**
    <u>Matching Issues</u>
    Jennifer Ragan
    Program Analyst
    State Administration Branch
    USDA, Food and Nutrition Service
    jennifer.ragan@usda.gov
    703-457-6786

    <u>Computer/Technology Issues</u>
    eDRS Help Desk
    SM.FN.eDRS@usda.gov
    866-557-8330

    <u>Systems Security Issues</u>
    John Rosselot
    Information System Security Manager
    USDA, Food and Nutrition Service
    john.rosselotjr@usda.gov
    571-563-5260

B.  **State Contacts -** See State Agency Official(s) Signature Page

XVII.   **SIGNATURES OF AUTHORIZED OFFICIALS**

By their signatures below, the authorized officials approve this agreement.

A.  **U.S. Department of Agriculture, Food and Nutrition Service, Supplemental Nutrition Assistance Program**

| RONALD WARD Digitally signed by RONALD WARD<br>Date: 2024.09.26 10:06:50 -04'00' | |
| --- | --- |
| **Catherine Buhrig**<br>**Associate Administrator**<br>**Supplemental Nutrition Assistance Program** | **Date**<br>9/26/24 |

15

**B. State Agency Official(s)**

**NAME OF STATE AGENCY**

WA Department of Social and Health Services

| | Date |
|---|---|
| **[Name of State Agency Authorized Official]**<br>[Title of State Agency Authorized Official]<br>Brice Montgomery, Interim Director, WA DSHS, ESA,CSD | 10/17/2024 |

| | Date |
|---|---|
| **[Name of State Agency Authorized Official, if approval by two officials is required]**<br>[Title of State Agency Authorized Official]<br>Michelle Malmoe, Contracts Officer, WA DSHS, ESA, CSD | 10/22/2024 |

16