ROB BONTA
Attorney General of California
PAUL STEIN
ROBIN GOLDFADEN
Supervising Deputy Attorneys General
ANDREW Z. EDELSTEIN
ANNA RICH
JANE REILLEY
SEBASTIAN BRADY
WILLIAM BELLAMY
MARIA F. BUXTON
LIAM E. O'CONNOR
Deputy Attorneys General
State Bar No. 330050
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 Telephone:  (415) 510-3915
 Fax:  (415) 703-5480
 E-mail:  Liam.OConnor@doj.ca.gov
*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA, ET AL.**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL.**<br><br>Defendants. | Case No. **3:25-cv-06310-MMC**<br><br>**DECLARATION OF LESA DENNIS IN SUPPORT OF PLAINTIFF STATES' MOTION TO ENFORCE OR EXPAND PRELIMINARY INJUNCTION**<br><br>Date: February 13, 2026<br>Time: 9:00 a.m.<br>Courtroom: 7<br>Judge: Maxine M. Chesney<br>Trial Date: None set<br>Action Filed: July 28, 2025 |

## DECLARATION OF LESA DENNIS

Lesa Dennis, declares under penalty of perjury, pursuant to 28 U.S.C. Section 1746, as follows:

1.    I am a resident of the Commonwealth of Kentucky. I am over the age of 18 and understand the obligations of an oath.

### Professional and Agency Background

2.    I am the Commissioner of the Kentucky Cabinet for Health and Family Services (CHFS), Department for Community Based Services (DCBS), as appointed by Governor Andy Beshear, a position that I have held since January 16, 2023. Prior to holding this position, I served as Deputy Commissioner of the Kentucky Department for Community Based Services. I make this declaration based on personal knowledge and on my review of information and records gathered by agency staff.

3.    Among the programs administered by DCBS is the Supplemental Nutrition Assistance Program (SNAP), which issues monthly electronic benefits that can be used to purchase food at authorized retail stores.

### USDA's Unprecedented Request for States' SNAP Data

4.    As part of the SNAP application process, DCBS collects sensitive personally identifiable information ("PII") from applicants and recipients, including but not limited to: home addresses; dates of birth; Social Security Numbers; citizenship and immigration status; and household income and resource information.

5. Kentucky strictly protects the confidentiality of its residents' SNAP data pursuant to KRS 205.175, only permitting release in certain circumstances expressly set forth in KRS 205.175(2).

6. On July 28, 2025, Kentucky, joined by several other states, filed the present action in the Northern District of California challenging the USDA's actions requesting states provide certain data of all SNAP recipients in Kentucky.

**Concerns with November 24, 2025, Letter**

7. On November 24, 2025, the USDA sent a letter again requesting DCBS provide certain data with specific security and data protocols proposed by USDA.

8. On December 23, 2025, the USDA sent another letter revising the protocol in the November letter.

9. Kentucky has concerns over these security and data protocols proposed by USDA and whether compliance with the proposed protocols is sufficient to protect the data.

10. The proposed data and security protocol is less secure than data sharing protocols Kentucky has agreed to in the past.

11. In comparison, CHFS has a Computer Matching Agreement with the Social Security Administration (SSA) for FFY 25, which contains strict data sharing security and safeguarding requirements. See attached as Exhibit A.

12. Unlike USDA's proposed security and data protocols that do not require all individuals accessing production data to be physically located in the United States, CHFS policy explicitly requires all individuals accessing production data to be physically located in the United States.

2

13.    CHFS policy requires procurement controls, encryption, chain-of-custody logs, markings, and destruction procedures. USDA's proposed security and data protocols provide no such documentation. Without mirroring CHFS' physical media protections, USDA's proposed security and data protocols introduce an unmanaged operational risk unacceptable under state and federal data governance rules.

14.    USDA's proposed security and data protocols do not explicitly forbid printing or define reproduction controls. Unrestricted printing is one of the highest breach vectors and violates CHFS' data/media policy without compensating controls.

15.    USDA's proposed security and data protocols list Role-Based Access Control (RBAC) and Mult-factor Authentication (MFA), but they lack CHFS' policy's detailed controls on provisioning, owner approval, privileged account labeling, and recordkeeping.

16.    CHFS policy requires sensitivity markings, labeling of outputs, and classification rules. Failure to enforce labeling undermines downstream controls (retention, printing, destruction, access).

17.    USDA's proposed security and data protocols use a 12-hour initial notice/24-hour preliminary report, but do not commit to the SSA's 1-hour rule, IRS's 24-hour (IRS Publication 1075, Tax Information Security Guidelines, 1.8.4)  , or Kentucky's statutory requirements detailed in KRS 61.931 through KRS 61.934 to provide notification as soon as possible, but within seventy-two (72) hours of determination or notification of the security breach  CHFS cannot legally delegate or weaken statutory breach-reporting obligations.

18.    USDA's proposed security and data protocols contain retention, deletion, and data lifecycle ambiguities. USDA's proposed security and data protocols retain data up to three years, but do not discuss secure deletion validation, destruction logs, cross-system retention alignment,

or state verification rights.If SNAP data is not properly classified, labeled, and marked, CHFS faces higher operational risk, regulatory risk, and security risk because the protections required by CHFS policy cannot be consistently or automatically enforced. Even strong technical safeguards won't activate correctly if the data isn't clearly identified as sensitive.

19.     USDA's proposed security and data protocols state keys are controlled by federal personnel, but the protocols do not describe auditability of AWS key access events, controls against insider misuse, and cross-account access limitations. If USDA controls all encryption keys but does not describe how AWS key-access events are audited, how insider misuse is prevented, or how cross-account access is restricted, CHFS cannot verify that only authorized personnel can decrypt or handle sensitive data. Without documented audit trails, insider-threat controls, and boundaries between AWS accounts, there is no assurance that key usage is monitored, that unauthorized access would be detected, or that data is protected from escalation or misuse by privileged federal or cloud administrators. This creates gaps in accountability, oversight, and enforceable security controls, especially critical when encryption is the last line of defense for protecting sensitive SNAP and CHFS data.

20.     USDA's proposed security and data protocols prohibit certain data uses, but do not define enforcement mechanisms. If USDA protocol lists prohibited data uses but does not define how those prohibitions are enforced, CHFS has no assurance that violations will be detected, prevented, or corrected. Without enforcement mechanisms, such as monitoring, auditing, automated controls, or documented consequences, the restrictions function only as statements of intent. This creates compliance risk, allows improper data use to go unnoticed, and weakens CHFS's ability to ensure legal, ethical, and policy-aligned handling of SNAP and CHFS information.

21.    Additionally, certain data elements USDA requests are verified by the Social Security Administration (SSA) or the Internal Revenue Service (IRS). Due to verification, these data elements are SSA or IRS Federal Tax Information (FTI) data and are governed by the IRS Publication 1075 Tax Information Security Guidelines and the IRS Technical System Security Requirements. State agencies are held accountable to adhere to the requirements detailed in these documents, subject to civil or criminal penalties. IRC § 7213 prescribes criminal penalties, making it a felony offense for federal and state employees and others who illegally disclose federal tax returns and return information (FTI). Additionally, IRC § 7213A makes the unauthorized inspection of FTI a misdemeanor, punishable by fines, imprisonment, or both. Further, IRC § 7431 prescribes civil damages available to the taxpayer upon notification that a criminal indictment or the existence of information that an unauthorized inspection or disclosure has occurred under IRC §§ 7213 or 7213(A). Unauthorized access, use, misuse, or modification of this computer system or of the data contained herein or in transit to/from this system constitutes a violation of Title 18, United States Code, Section 1030, and may subject the individual to criminal and civil penalties pursuant to Title 26, United States Code, Sections 7213, 7213A (the Taxpayer Browsing Protection Act), and 7431.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this 9th day of January, 2026,


Lesa Dennis
Commissioner
Kentucky Department for Community Based Services


5

# Exhibit A



EXHIBIT A

COMPUTER MATCHING AND PRIVACY PROTECTION ACT AGREEMENT
BETWEEN
THE SOCIAL SECURITY ADMINISTRATION
AND
THE STATE OF KENTUCKY

## I.    Purpose and Legal Authority

### A.  Purpose

This Computer Matching and Privacy Protection Act (CMPPA) Agreement (Agreement) between the Social Security Administration (SSA) and the State of Kentucky (State) sets forth the terms and conditions governing disclosures of records, information, or data (collectively referred to herein as "data") made by SSA to various State agencies and departments (State Agencies)that administer federally funded benefit programs, including those under various provisions of the Social Security Act (Act), such as section 1137 of the Act (42 U.S.C. § 1320b-7), as well as the state-funded state supplementary payment programs under Title XVI of the Act. The terms and conditions of this Agreement ensure that SSA makes such disclosures of data, and the State uses such disclosed data, in accordance with the requirements of the Privacy Act of 1974, as amended by the CMPPA of 1988, 5 U.S.C. § 552a.

Under section 1137 of the Act, the State is required to use an income and eligibility verification system to administer specified federally funded benefit programs, including the state-funded state supplementary payment programs under Title XVI of the Act. To assist the State in determining entitlement to and eligibility for benefits under those programs, as well as other federally funded benefit programs, SSA verifies the Social Security number (SSN) and discloses certain data about applicants (and in limited circumstances, members of an applicant's household), for state-administered benefits from SSA Privacy Act Systems of Records (SOR).

### B.  Legal Authority

SSA's authority to disclose data and the State's authority to collect, maintain, and use data protected under SSA SORs for specified purposes is:

- Sections 453, 1106(b), and 1137 of the Act (42 U.S.C. §§ 653, 1306(b), and 1320b-7) (income and eligibility verification data);
- 26 U.S.C. § 6103(l)(7) and (8) (Federal tax information);
- Sections 202(x)(3)(B)(iv) and 1611(e)(1)(I)(iii) of the Act (42 U.S.C. §§ 402(x)(3)(B)(iv) and 1382(e)(1)(I)(iii)) (prisoner data);

- Section 205(r)(3) of the Act (42 U.S.C. § 405(r)(3)) and the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. 108-458, § 7213(a)(2) (death data);
- Sections 402, 412, 421, and 435 of Pub. L. 104-193 (8 U.S.C. §§ 1612, 1622, 1631, and 1645) (quarters of coverage data);
- Section 1902(ee) of the Act (42 U.S.C. § 1396a(ee)); Children's Health Insurance Program Reauthorization Act of 2009 (CHIPRA), Pub. L. 111-3 (citizenship data); and
- Routine use exception to the Privacy Act, 5 U.S.C. § 552a(b)(3) and SSA's compatibility regulation, 20 C.F.R. § 401.150 (data necessary to administer other programs compatible with SSA programs).

This Agreement further carries out section 1106(a) of the Act (42 U.S.C. § 1306), the regulations promulgated pursuant to that section (20 C.F.R. Part 401), the Privacy Act of 1974 (5 U.S.C. § 552a), as amended by the CMPPA, related Office of Management and Budget (OMB) guidelines, the Federal Information Security Management Act of 2002 (FISMA) (44 U.S.C. § 3551, et seq.), as amended by the Federal Information Security Modernization Act of 2014 (Pub. L. 113-283); and related National Institute of Standards and Technology (NIST) guidelines, which provide the requirements that the State must follow with regard to use, treatment, and safeguarding of data.

## II.    Scope

A. The State will ensure that State Agencies using SSA data to administer federally funded benefit programs will comply with the terms and conditions of this Agreement and the Privacy Act, as amended by the CMPPA. For the purpose of this Agreement, "State Agencies" do not include any tribal entities recognized by the U.S. Bureau of Indian Affairs.

B. Each State Agency that participates in data exchanges with SSA covered by this Agreement will execute an Information Exchange Agreement (IEA) with SSA, documenting additional terms and conditions applicable to those specific data exchanges, including the particular benefit programs administered by that State Agency, the data elements that will be disclosed, and the data protection requirements implemented to assist the State Agency in the administration of those programs.

C. The State, through its State Agencies, will use the SSA data governed by this Agreement to determine entitlement and eligibility of individuals for the following programs, which are specifically identified in the IEA:

1. Temporary Assistance to Needy Families (TANF) program under Part A of Title IV of the Act;
2. Medicaid provided under an approved State plan or an approved waiver under Title XIX of the Act;

3. State Children's Health Insurance Program (CHIP) under Title XXI of the Act;
4. Supplemental Nutritional Assistance Program (SNAP) under the Food Stamp Act of 1977 (7 U.S.C. § 2011, et seq.);
5. Women, Infants and Children Program (WIC) under the Child Nutrition Act of 1966 (42 U.S.C. § 1771, et seq.);
6. Medicare Savings Programs (MSP) under 42 U.S.C. § 1396a(10)(E);
7. Unemployment Compensation programs provided under a state law described in section 3304 of the Internal Revenue Code of 1954;
8. Low Income Heating and Energy Assistance Program (LIHEAP or home energy grants) under  42 U.S.C. § 8621;
9. State-administered supplementary payments of the type described in section 1616(a) of the Act;
10. Programs under a plan approved under Titles I, X, XIV, or XVI of the Act;
11. Foster Care and Adoption Assistance under Title IV of the Act;
12. Child Support Enforcement programs under section 453 of the Act (42 U.S.C. § 653);
13. Other applicable federally funded programs administered by State Agencies under Titles I, IV, X, XIV, XVI, XVIII, XIX, XX, and XXI of the Act; and
14. Any other federally funded programs administered by State Agencies that are compatible with SSA's programs.

D. The State will ensure that SSA data disclosed for the specific purpose of administering a particular federally funded benefit program is used only to administer that program.

## III.    Justification and Expected Results

A. Justification

This Agreement and related data exchanges with State Agencies are necessary for SSA to assist the State in its administration of federally funded benefit programs by providing the data required to accurately determine entitlement and eligibility of individuals for benefits provided under these programs. SSA uses computer technology to transfer the data because it is more economical, efficient, and faster than using manual processes.

B. Expected Results

State Agencies will use the data provided by SSA to improve public service and program efficiency and integrity. The use of SSA data expedites the application process and ensures that benefits are awarded only to applicants that satisfy the State's program criteria. A cost-benefit analysis for the exchange made under this Agreement is not required in accordance with the determination by the SSA Data Integrity Board (DIB) to waive such analysis pursuant to 5 U.S.C. § 552a(u)(4)(B).

## IV.    Record Description

### A.  Systems of Records (SOR)

SSA SORs used for purposes of the subject data exchanges include:

- 60-0058 -- Master Files of SSN Holders and SSN Applications;
- 60-0059 -- Earnings Recording and Self-Employment Income System;
- 60-0090 -- Master Beneficiary Record;
- 60-0103 -- Supplemental Security Income Record (SSR) and Special Veterans Benefits (SVB);
- 60-0269 -- Prisoner Update Processing System (PUPS); and
- 60-0321 -- Medicare Database (MDB) File.

The State will ensure that the Federal tax information (FTI) contained in **SOR 60-0059** (Earnings Recording and Self-Employment Income System) will only be used in accordance with 26 U.S.C. § 6103.

### B.  Data Elements

Data elements disclosed in computer matching governed by this Agreement are Personally Identifiable Information (PII) from specified SSA SORs, including names, SSNs, addresses, amounts, and other information related to SSA benefits and earnings information.  Specific listings of data elements are available at:

http://www.ssa.gov/dataexchange/

### C.  Number of Records Involved

The maximum number of records involved in this matching activity is the number of records maintained in SSA's SORs listed above in Section IV.A.

## V.    Notice and Opportunity to Contest Procedures

### A.  Notice to Applicants

State Agencies will notify all individuals who apply for federally funded, state-administered benefits that any data they provide are subject to verification through computer matching with SSA.  State Agencies and SSA will provide such notice through appropriate language printed on application forms or separate handouts.

### B.    Notice to Beneficiaries/Recipients/Annuitants

State Agencies will provide notice to beneficiaries, recipients, and annuitants under the programs covered by this Agreement informing them of ongoing

computer matching with SSA.  SSA will provide such notice through publication in the Federal Register and periodic mailings to all beneficiaries, recipients, and annuitants describing SSA's matching activities.

C.  Opportunity to Contest

State Agencies will not terminate, suspend, reduce, deny, or take other adverse action against an applicant for or recipient of federally funded, state-administered benefits based on data disclosed by SSA from its SORs until the individual is notified in writing of the potential adverse action and provided an opportunity to contest the planned action. "Adverse action" means any action that results in a termination, suspension, reduction, or final denial of eligibility, payment, or benefit.  Such notices will:

1.  Inform the individual of the match findings and the opportunity to contest these findings;

2.  Give the individual until the expiration of any time period established for the relevant program by a statute or regulation for the individual to respond to the notice. If no such time period is established by a statute or regulation for the program, a 30-day period will be provided.  The time period begins on the date on which notice is mailed or otherwise provided to the individual to respond; and

3.  Clearly state that, unless the individual responds to the notice in the required time period, the State will conclude that the SSA data are correct and will effectuate the planned action or otherwise make the necessary adjustment to the individual's benefit or entitlement.

**VI.   Records Accuracy Assessment and Verification Procedures**

Pursuant to 5 U.S.C. § 552a(p)(1)(A)(ii), SSA's DIB has determined that State Agencies may use SSA's benefit data without independent verification. SSA has independently assessed the accuracy of its benefits data to be more than 99 percent accurate when the benefit record is created.

The SSA Enumeration System used for SSN matching is 100 percent accurate based on SSA's Office of Analytics, Review, and Oversight (FY 2018 Enumeration Accuracy Review Report, April, 2019).

SSA does not have an accuracy assessment specific to SOR 60-0059 (Earnings Recording and Self-Employment Income System). The correctness of the FTI provided to SSA, as an agent for the Internal Revenue Service (IRS), is generally contingent upon the correctness of the information provided by the payer of the income.

Prisoner and death data, some of which is not independently verified by SSA, does not have the same degree of accuracy as SSA's benefit data. Therefore, State Agencies must independently verify these data through applicable State verification procedures and follow the notice and opportunity to contest procedures specified in Section V of this Agreement before taking any adverse action against any individual.

Individuals applying for SSNs report their citizenship status at the time they apply for their SSNs.  There is no obligation for an individual to report to SSA a change in his or her immigration status until he or she files for a Social Security benefit. State Agencies must independently verify citizenship data through applicable State verification procedures and follow the notice and opportunity to contest procedures specified in Section V of this Agreement before taking any adverse action against any individual.

**VII.    Disposition and Records Retention of Matched Items**

A.  State Agencies receiving data from SSA to administer programs governed by this Agreement will retain all such data only for the required processing times for the applicable federally funded benefit programs and will then destroy all such data.

B.  State Agencies may retain SSA data in hardcopy to meet evidentiary requirements, provided that they retire such data in accordance with applicable state laws governing State Agencies' retention of records.

C.  State Agencies may use any accretions, deletions, or changes to the SSA data governed by this Agreement to update their master files of federally funded, state-administered benefit program applicants and recipients and retain such master files in accordance with applicable state laws governing State Agencies' retention of records.

D.  State Agencies may not create separate files or records comprised solely of the data provided by SSA to administer programs governed by this Agreement. State Agencies will delete the outgoing files from SSA as soon as the State Agency has incorporated the responsive information into the State Agency system.

E.  SSA will delete electronic data input files received from State Agencies after it processes the applicable match. SSA will retire its data in accordance with the Federal Records Retention Schedule (44 U.S.C. § 3303a).

**VIII.  Security Procedures**

SSA and the State will ensure that their use of the data exchanged under this Agreement complies with the security and safeguarding requirements of the Privacy Act, as amended by the CMPPA, related OMB guidelines, FISMA, related NIST guidelines, and the current revision of IRS Publication 1075, *Tax Information Security Guidelines for Federal, State and Local Agencies*, available at

7

http://www.irs.gov. In addition, SSA and State Agencies will have in place administrative, technical, and physical safeguards for the matched data and results of such matches. Additional administrative, technical, and physical security requirements governing all data SSA provides electronically to State Agencies, including SSA's *Electronic Information Exchange Security Requirements and Procedures for State and Local Agencies Exchanging Electronic Information with SSA*, as well as specific guidance on safeguarding and reporting responsibilities for PII, are set forth in the IEAs.

SSA has the right to monitor the State Agencies' compliance with FISMA, the terms of this Agreement, and the IEA and to make onsite inspections of the State Agencies for purposes of auditing compliance, if necessary, during the lifetime of this Agreement or of any extension of this Agreement. This right includes onsite inspection of any entity that receives SSA data from the State Agencies under the terms of this Agreement, if SSA determines it is necessary.

## IX.    Controlled Unclassified Information (CUI) Requirements

Pursuant to 32 C.F.R. § 2002.16(a)(6), the State must ensure that its State Agencies receiving or accessing data from SSA under this Agreement will handle any CUI in accordance with Executive Order 13556, 32 C.F.R. Part 2002, and the CUI Registry. The State acknowledges that misuse of CUI is subject to penalties established in applicable law, regulations, or Government-wide policies. The State will report any non-compliance with handling requirements to SSA using methods approved by SSA.

## X.    Records Usage, Duplication, and Redisclosure Restrictions

A. State Agencies will use and access SSA data and the records created using that data only for the purpose of verifying eligibility for the specific federally funded benefit programs identified in the IEA.

B. State Agencies will comply with the following limitations on use, duplication, and redisclosure of SSA data:

1. State Agencies will not use or redisclose the data disclosed by SSA for any purpose other than to determine eligibility for, or the amount of, benefits under the state-administered income/health maintenance programs identified in the IEA.

2. State Agencies will not extract information concerning individuals who are neither applicants for, nor recipients of, benefits under the state-administered income/health maintenance programs identified in this Agreement. In limited circumstances that are approved by SSA, State Agencies may extract information about an individual other than the applicant/recipient when the applicant/recipient has provided identifying information about the individual

and the individual's income or resources affect the applicant's/recipient's eligibility for such program.

3. State Agencies will not disclose to an applicant/recipient information about another individual (i.e., an applicant's household member) without the written consent from the individual to whom the information pertains.

4. State Agencies will use the FTI disclosed by SSA only to determine individual eligibility for, or the amount of, assistance under a state plan pursuant to section 1137 programs and child support enforcement programs in accordance with 26 U.S.C. § 6103(l)(7) and (8). State Agencies receiving FTI will maintain all FTI from IRS in accordance with 26 U.S.C. § 6103(p)(4) and the IRS Publication 1075. Contractors and agents acting on behalf of the State Agencies will only have access to FTI where specifically authorized by 26 U.S.C. § 6103 and the current revision of IRS Publication 1075.

5. When a data incident results in the State Agency taking adverse or disciplinary action against an employee based on an unauthorized inspection or disclosure of FTI in violation of the Stage Agency's procedures, the State Agency must notify each impacted taxpayer in writing. The notification letter must include the date of the unauthorized inspection or disclosure, and notify the taxpayer of his or her rights to file a civil action under Internal Revenue Code § 7431. The State Agency must report to IRS Safeguards when taxpayer notification letters are issued, in accordance with Publication 1075.

6. State Agencies will use the citizenship status data disclosed by SSA only to determine entitlement of new applicants to: (a) the Medicaid program and CHIP program pursuant to CHIPRA, Pub. L. 111-3; or (b) federally funded, state-administered health or income maintenance programs approved by SSA. State Agencies will further comply with additional terms and conditions regarding use of citizenship data, as set forth in the State Agencies' IEAs.

7. State Agencies will use the State Data Exchange (SDX) file disclosed by SSA only for purposes of administering: (a) the state supplementary payment programs under Title XVI of the Act; (b) the Medicaid program; or (c) other state-administered health or income maintenance programs that justify the need for information concerning all Supplemental Security Income recipients in that State, if sufficiently documented by the State Agency and approved by SSA.

8. State Agencies will restrict access to the data disclosed by SSA to only those authorized State employees, contractors, and agents who need such data to perform their official duties in connection with the purposes identified in this Agreement.

9. State Agencies will enter into a written agreement with each of their contractors and agents who need SSA data to perform their official duties whereby such contractor or agent agrees to abide by all relevant Federal laws, restrictions on access, use, and disclosure, and security requirements in this Agreement. State Agencies will provide their contractors and agents with copies of this Agreement, related IEAs, and all related attachments before initial disclosure of SSA data to such contractors and agents. Prior to signing this Agreement, and thereafter at SSA's request, each State Agency will obtain from its contractors and agents a current list of the employees of such contractors and agents with access to SSA data and provide such lists to SSA.

10. If State Agencies are authorized or required – pursuant to an applicable law, regulation, or intra-governmental documentation – to provide SSA data to another State or local government entity for the administration of the federally funded, state-administered programs covered by this Agreement, the State Agencies must ensure that the State or local government entity, including its employees, abides by all relevant Federal laws, restrictions on access, use, and disclosure, and security requirements in this Agreement and the IEA. At SSA's request, the State Agencies will provide copies of any applicable law, regulation, or intra-governmental documentation that authorizes the intra-governmental relationship with the State or local government entity. Upon request from SSA, the State Agencies will also establish how they ensure that the State or local government entity complies with the terms of this Agreement and the IEA.

11. State Agencies' employees, contractors, and agents who access, use, or disclose SSA data in a manner or purpose not authorized by this Agreement may be subject to civil and criminal sanctions pursuant to applicable Federal statutes.

12. State Agencies will conduct triennial compliance reviews of their contractor(s) and agent(s) no later than three years after the initial approval of the security certification to SSA. State Agencies will share documentation of their recurring compliance reviews of their contractor(s) and agent(s) with SSA. State Agencies will provide documentation to SSA during their scheduled compliance and certification reviews or upon request.

C. State Agencies will not duplicate in a separate file or disseminate, without prior written permission from SSA, the data governed by this Agreement for any purpose other than to determine entitlement to, or eligibility for, federally funded benefits. State Agencies proposing the redisclosure must specify in writing to SSA what data are being disclosed, to whom, and the reasons that justify the redisclosure. SSA will not give permission for such redisclosure unless the redisclosure is required by law or essential to the conduct of the matching program and authorized under a routine use. To the extent SSA approves the requested redisclosure, the State Agencies will ensure that any entity receiving the

==highlight== redisclosed data will comply with the procedures and limitations on use, duplication, and redisclosure of SSA data, as well as all administrative, technical, and physical security requirements governing all data SSA provides electronically to the State Agencies including specific guidance on safeguarding and reporting responsibilities for PII, as set forth in this Agreement and the accompanying IEAs. ==highlight==

## XI.    Comptroller General Access

The Government Accountability Office (Comptroller General) may have access to all records of the State and its State Agencies that the Comptroller General deems necessary to monitor or verify compliance with this Agreement in accordance with 5 U.S.C. § 552a(o)(l)(K).

## XII.    Duration, Modification, and Termination of the Agreement

A.  Duration

1.  This Agreement is effective from July 1, 2022 (Effective Date) through December 31, 2023 (Expiration Date). [*If the State signs the CMA after the effective date already provided, please provide an updated effective date. The expiration date will not change*.]

2.  In accordance with the CMPPA, SSA will: report the proposal to re-establish this matching program to the Congressional committees of jurisdiction and OMB in accordance with 5 U.S.C. § 552a(o)(2)(A) and OMB Circular A-108 (December 23, 2016), and publish notice of the matching program in the Federal Register in accordance with 5 U.S.C. § 552a(e)(12).

3.  Within 3 months before the Expiration Date, the SSA DIB may, without additional review, renew this Agreement for a period not to exceed 12 months, pursuant to 5 U.S.C. § 552a(o)(2)(D), if:

    •   the applicable data exchange will continue without any change; and
    •   SSA and the State certify to the DIB in writing that the applicable data exchange has been conducted in compliance with this Agreement.

4.  If either SSA or the State does not wish to renew this Agreement, it must notify the other party of its intent not to renew at least 3 months prior to the Expiration Date.

B.        Modification

Any modification to this Agreement must be in writing, signed by both parties, and approved by the SSA DIB.

C.        Termination

The parties may terminate this Agreement at any time upon mutual written consent of both parties. Either party may unilaterally terminate this Agreement upon 90 days advance written notice to the other party; such unilateral termination will be effective 90 days after the date of the notice, or at a later date specified in the notice.

SSA may immediately and unilaterally suspend the data flow or terminate this Agreement if SSA determines, in its sole discretion, that the State or a State Agency has violated or failed to comply with this Agreement.

## XIII.  Reimbursement

In accordance with section 1106(b) of the Act, the Commissioner of SSA has determined not to charge the State and State Agencies the costs of furnishing the electronic data from the SSA SORs under this Agreement.

## XIV.  Disclaimer

SSA is not liable for any damages or loss resulting from errors in the data provided to State Agencies under any IEAs governed by this Agreement. Furthermore, SSA is not liable for any damages or loss resulting from the destruction of any materials or data provided by State Agencies.

The performance or delivery by SSA of the goods and/or services described herein and the timeliness of said delivery are authorized only to the extent that they are consistent with proper performance of the official duties and obligations of SSA and the relative importance of this request to others.  If for any reason SSA delays or fails to provide services, or discontinues the services or any part thereof, SSA is not liable for any damages or loss resulting from such delay or for any such failure or discontinuance.

**XV.    Points of Contact**

### A.  SSA Point of Contact

**Regional Office**
Brooks Hansen and Connie Bradley
Data Exchange Coordinator
Center for Automation, Security & Integrity
1200 Rev. Abraham Woods Jr. Blvd.
Phone:  (205) 801-1819
Fax:  (205) 801-1804
Email:  brooks.hansen@ssa.gov
AT.RO.DXL.Contacts@ssa.gov

### B. State Point of Contact

S. Travis Mayo
General Counsel
Office of the Governor
700 Capital Avenue,
Suite 106
Frankfort, KY 40601
Phone: (502) 564-2611
Fax: (502) 564-6858 Email:
travis.mayo@ky.gov

## XVI.  SSA and Data Integrity Board Approval of Model CMPPA Agreement

The signatories below warrant and represent that they have the competent authority on behalf of SSA to approve the model of this CMPPA Agreement.

The signatories may sign this document electronically by using an approved electronic signature process. Each signatory electronically signing this document agrees that his/her electronic signature has the same legal validity and effect as his/her handwritten signature on the document, and that it has the same meaning as his/her handwritten signature.

**SOCIAL SECURITY ADMINISTRATION**

MARY
ZIMMERMAN

Digitally signed by
MARY ZIMMERMAN
Date: 2021.11.03
14:23:46 -04'00'

_____

Mary Ann Zimmerman
Deputy Executive Director
Office of Privacy and Disclosure
Office of the General Counsel

_____

Date

I certify that the SSA Data Integrity Board approved the model of this CMPPA Agreement.

Matthew Ramsey

Digitally signed by Matthew
Ramsey
Date: 2021.12.07 13:10:07 -05'00'

_____

Matthew D. Ramsey
Chair
SSA Data Integrity Board

_____

Date

## XVII. Authorized Signatures

The signatories below warrant and represent that they have the competent authority on behalf of their respective parties to enter into the obligations set forth in this Agreement. The State signatory below further acknowledges and agrees that, by his or her signature below, he or she represents State Agencies and is duly authorized to enter into the obligations set forth in this Agreement on behalf of those State Agencies.

The signatories may sign this document electronically by using an approved electronic signature process. Each signatory electronically signing this document agrees that his/her electronic signature has the same legal validity and effect as his/her handwritten signature on the document, and that it has the same meaning as his/her handwritten signature.

**SOCIAL SECURITY ADMINISTRATION**

_____
Rose Mary Buehler
Regional Commissioner
Atlanta Region

_____
Date

**COMMONWEALTH OF KENTUCKY**

_____
Andy Beshear
Governor

_____
Date