1  BRETT A. SHUMATE
   Assistant Attorney General
2  TYLER BECKER
   Counsel to the Assistant Attorney General
3  ELIZABETH J. SHAPIRO
   Deputy Branch Director
4  BENJAMIN S. KURLAND
   Trial Attorney
5  U.S. Department of Justice
   Civil Division, Federal Programs Branch
6  1100 L Street, NW
   Washington, DC 20005
7  *Counsel for Defendants*

8

       **IN THE UNITED STATES DISTRICT COURT**
9      **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
            **SAN FRANCISCO DIVISION**
10

11  STATE OF CALIFORNIA, *et al.*,         Case No. 3:25-cv-06310-MMC

12                     *Plaintiffs*,

13          v.                              **DEFENDANTS' OPPOSITION TO**
                                            **PLAINTIFFS' MOTION TO ENFORCE**
14  UNITED STATES DEPARTMENT OF            **OR EXPAND THE PRELIMINARY**
    AGRICULTURE, *et al.*,                  **INJUNCTION**
15
                     *Defendants*.
16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

LEGAL STANDARD...................................................................................................... 7

ARGUMENT .................................................................................................................. 8

I.    USDA Has Not Violated the Existing Preliminary Injunction ................................. 8

    A.   USDA's Renewed Data Request is Distinct from the Original Request, and Seeks Data under a Different Authority ......................................................... 8

    B.   SNAP Act Section 2020(a) Provides USDA the Unequivocal Right to the Data Requested. ............................................................................................. 8

II.   The Court Should Not Expand its Existing Preliminary Injunction ........................ 12

    A.   The States are Unlikely to Succeed on the Merits of Their Claims.................. 12

        1.   Plaintiffs' Claim that USDA will Impermissibly Share Data is Speculative.............. 12

        2.   Plaintiffs Lack Standing for their Computer Matching Act Claim............................ 14

        3.   USDA's Renewed Data Request does not Implicate the Computer Matching Act ....................................................................................... 15

        4.   USDA Considered and Rejected the "Important Issues" Raised by Plaintiffs while Negotiating Data and Security Protocols ......................... 16

        5.   The Renewed Data Request is Not Contrary to the SNAP Act ................................. 18

        6.   USDA's Renewed Data Request is not Arbitrary and Capricious............................. 19

    B.   The States Fail to Show Irreparable Harm........................................................ 23

    C.   The Balance of the Equities Favors USDA ...................................................... 24

III.  Plaintiffs Should Be Ordered to Post Substantial Security in Connection with Any Preliminary Injunctive Relief and Any Preliminary Relief Should Be Stayed Pending Any Appeal ............................................................................................... 24

CONCLUSION............................................................................................................... 25

i

3:25-cv-06310-MMC         DEFS' OPP'N TO PLS' MOT. TO ENFORCE OR EXPAND THE PRELIM. INJ.

# TABLE OF AUTHORITIES

**Cases**

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump,*
148 F.4th 648 (9th Cir. 2025) ........................................................ 24

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.,*
771 F. Supp. 3d 717 (D. Md. 2025) ................................................ 15

*Arizona Dream Act Coal. v. Brewer,*
757 F.3d 1053 (9th Cir. 2014) ...................................................... 23

*Armstrong v. Brown,*
939 F. Supp. 2d 1012 (N.D. Cal. 2013) .......................................... 7

*Associated Gen. Contractors of California, Inc. v. Coal. for Econ. Equity,*
950 F.2d 1401 (9th Cir. 1991) ................................................ 23, 24

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
462 U.S. 87 (1983) ...................................................................... 19

*Caribbean Marine Servs. Co. v. Baldrige,*
844 F.2d 668 (9th Cir. 1988) ........................................................ 24

*Childs v. San Diego Fam. Hous., LLC,*
150 F.4th 1151 (9th Cir. 2025) .................................................... 10

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) .................................................................... 13

*FCC v. Fox Television Stations,*
556 U.S. 502 (2009) .................................................................... 19

*Hearst Radio, Inc. v. FCC,*
167 F.2d 225 (D.C. Cir. 1948) ...................................................... 20

*HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n,*
594 U.S. 382 (2021) .................................................................... 10

*Indep. Equip. Dealers Ass'n v. E.P.A.,*
372 F.3d 420 (D.C. Cir. 2004) ...................................................... 20

*Jimenez v. Quarterman,*
555 U.S. 113, (2009) .................................................................... 10

*Lopez v. Brewer,*
680 F.3d 1068 (9th Cir. 2012) ........................................................ 7

*Lujan v. Defs. of Wildlife,*
504 U.S. 555, (1992) .................................................................... 12

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) ............................................................................................ 20

*Maryland v. King,*
    567 U.S. 1301 (2012) .......................................................................................... 24

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ...................................................................................... 16, 19

*Nken v. Holder,*
    556 U.S. 418 (2009) ...................................................................................... 8, 24

*Or. Nat. Res. Council v. Thomas,*
    92 F.3d 792 (9th Cir. 1996) ............................................................................... 16

*R.J. Reynolds Tobacco Co. v. County of Los Angeles,*
    29 F.4th 542 (9th Cir. 2022) .............................................................................. 11

*Richards v. United States,*
    369 U.S. 1 (1962) ............................................................................................... 11

*Rouse v. U.S. Dep't of State,*
    567 F.3d 408 (9th Cir. 2009) ............................................................................. 14

*Sterling v. Feek,*
    No. 24-1296, ---F.4th---, 2025 WL 2536695 (9th Cir. Sept. 4, 2025) ................. 12

*Stillaguamish Tribe of Indians v. Washington,*
    102 F.4th 955 (9th Cir. 2024) .............................................................................. 7

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ........................................................................................... 12

*Tomczyk v. Garland,*
    25 F.4th 638 (9th Cir. 2022) (en banc) .............................................................. 11

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ........................................................................................... 12

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025) ........................................................................................... 24

*United States v. Cox,*
    963 F.3d 915 (9th Cir. 2020) ............................................................................. 11

*United States v. Paulson,*
    68 F.4th 528 (2023) ............................................................................................ 11

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................................. 8

**Statutes**

5 U.S.C. § 552a ................................................................................................ 14, 15, 16

5 U.S.C. § 706 .................................................................................................................. 2

7 U.S.C. § 2020 ...................................................................................................... *passim*

7 U.S.C. § 2025 ........................................................................................................ 19, 21

7 U.S.C. § 2026 .............................................................................................................. 21

7 U.S.C. §§ 2011–2036 .................................................................................................... 2

44 USC § 3607 ................................................................................................................. 5

Privacy Act of 1974,
    Pub. L. No. 93-579, 88 Stat. 1896 (1974) ................................................................ 14

**Rules**

Fed. R. Civ. P. 65 ........................................................................................................... 24

**Regulations**

7 C.F.R. § 276.4 ................................................................................................ 3, 7, 8, 17

7 C.F.R. § 276.7 .............................................................................................................. 23

90 Fed. Reg. 26,521 (June 23, 2025) ................................................................... *passim*

**Other Authorities**

"Subject to" Dictionary.com,
    https://www.dictionary.com/browse/be-subject-to ................................................. 11

"Subject to" Mirriam-Webster.com,
    https://www.merriam-webster.com/dictionary/subject%20to .......................... 10, 11

Available, Dictionary.com,
    https://perma.cc/4YQH-2QXY ............................................................................... 18

Audit, Merriam-Webster,
    https://perma.cc/J8RU-QURL ................................................................................ 18

Gen. Serv. Admin, FedRAMP,
    https://www.fedramp.gov/ ......................................................................................... 5

Gen. Serv. Admin, Understanding Baselines and Impact Levels in FedRAMP,
    https://www.fedramp.gov/archive/2017-11-16-understanding-baselines-and-impact-levels/
    (Nov. 15, 2017) ........................................................................................................ 5

Inspect, Merriam-Webster,
    https://perma.cc/RYZ6-7H9S ................................................................................ 18

iv

3:25-cv-06310-MMC          DEFS' OPP'N TO PLS' MOT. TO ENFORCE OR EXPAND THE PRELIM. INJ.

McGill, et al, *Feasibility of Revising the SNAP Quality Control Review Process* (2019),
    https://perma.cc/8S9N-WK7K ................................................................................. 21

The White House, President Trump Hosts a Cabinet Meeting, Dec. 2, 2025, at 59:45–1:00:33
(YouTube Dec. 2, 2025),
    https://perma.cc/RYZ6-7H9S ................................................................................. 11

U.S. Dep't of Agric., Data Sharing Guidance,
    https://perma.cc/3GDH-THAK ................................................................. 2, 3, 4, 5

v

3:25-cv-06310-MMC          DEFS' OPP'N TO PLS' MOT. TO ENFORCE OR EXPAND THE PRELIM. INJ.

# INTRODUCTION

Every day, millions of dollars of federally provided funds are squandered on waste, fraud, and abuse in one of the nation's most important federal benefits programs, the Supplemental Nutrition Assistance Program or "SNAP."  Since last May, the U.S. Department of Agriculture ("USDA")—which oversees the program at the federal level—has attempted to exercise its statutory authority to gather the records it needs to carry out its Congressional mandated role in administering the program and enforcing its requirements.  USDA has requested that the State agencies who conduct the daily operations of the program provide critical data to root out waste and malfeasance.  Over half of the States have complied, providing invaluable information to USDA in its efforts.  Initial evaluation of the data it has received from States that have complied has uncovered evidence of fraud, waste, and abuse that had previously gone undetected.  The States that are Plaintiffs in this lawsuit, however, have chosen instead to frustrate USDA's efforts, despite operating some of the largest and fastest growing SNAP programs in the country.

After this Court issued a preliminary injunction enjoining USDA from utilizing 7 U.S.C. § 2020(e)(8)(A) to obtain the information related to the State's administrative of SNAP benefits, USDA turned to 7 U.S.C. § 2020(a)(3), which provides that "[a]ll records, and the entire information systems in which records are contained" that States utilize to operate their State programs "shall be made available for inspection and audit by [USDA]."  As this Court has already concluded, this statutory language imposes a "clear" and "mandatory" obligation on states to provide their data to USDA and gives USDA a "right to obtain" the data.  Order Granting Pl. States' Mot. for Prelim. Inj. at 15, ECF No. 106 ("PI").

But the noncompliant Plaintiff States have found a new way to erect roadblocks.  The Plaintiff States have continued to object to USDA's authority to obtain the data at all, despite the "clear" and "mandatory" statutory language requiring them to produce the data.  *Id.*  The States have also relied on the fact that section 2020(a)(3) provides that provision of data to USDA shall be "subject to data and security protocols," and the States have weaponized negotiations over reasonable protocols.  7 U.S.C. § 2020(a)(3).  USDA issued a clear new data request in November, explaining its authority, purposes, and thinking.  It also proposed an exceedingly reasonable and protective data security

protocol.  But, instead of negotiating in good faith, and reaching a practical agreement, the noncompliant States have continued to stonewall.  For example, in December, USDA sent the States a thorough analysis of their objections, and why USDA could agree to some, but not other suggestions.  Instead of accepting these explanations and despite USDA providing the States repeated extensions to provide their input and consider USDA's objections, the States terminated negotiations and ran back to this Court hoping it would save them from complying with their statutory duty to provide information to USDA.

Specifically, Plaintiffs have filed a motion to enforce or expand the Courts' previous preliminary injunction.  Pl. States' Not. of Mot. and Mot. to Enforce or Expand the Prelim. Inj., ECF No. 116 ("Mot.").  There is no basis on which to conclude USDA violated the Court's previous preliminary injunction order, which was expressly limited only to USDA's authority under 7 U.S.C. § 2020(e)(8)(A), and did not affect the separate authority in 7 U.S.C. § 2020(a)(3).  Further, the Court should not expand its previous injunction because Plaintiffs have failed to establish they are entitled to such relief, as Plaintiffs lack standing to bring their new claims, USDA has an unequivocal statutory right to request such records, and Plaintiffs' newly fashioned claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, fail to establish that USDA acted contrary to any specific law or in an arbitrary or capricious manner.

All-in-all, USDA has jumped through every hoop, and granted every lenience and extension, but must be allowed to carry out the task Congress assigned it in the SNAP Act.  It is time Plaintiffs to comply with their legal obligation to provide the requested records to USDA.

## BACKGROUND

The Court carefully outlined the legal and factual background of this matter in its TRO and PI Orders.  *See* TRO, ECF No. 83 at 2–5 ("TRO"); PI at 2–6.  To summarize, on May 6, 2025, USDA launched an initiative to gather data related to the SNAP program from the State agencies that oversee the day-to-day operations of the Program in line with a Presidential initiative to locate and eliminate waste, fraud, and abuse in benefits programs funded with federal dollars.  *See* PI at 3; U.S. Dep't of Agric., Data Sharing Guidance, https://perma.cc/3GDH-THAK ("Original Data Request").  The SNAP Program is established by the SNAP Act, 7 U.S.C. §§ 2011–2036 ("SNAP Act" or "FNA"),

which splits responsibility for administering the program between State SNAP agencies and the Food and Nutrition Service ("FNS"), a subcomponent of USDA.

The Original Data Request cited two authorities in the SNAP Act that authorized USDA to collect the information it requested: 7 U.S.C. § 2020(a)(3) and 7 U.S.C. § 2020(e)(8)(A). Original Data Request at 1. First, in Section 2020(a), the SNAP Act requires State agencies to "keep such records as may be necessary to determine whether the program is being conducted in compliance with [the SNAP Act]." 7 U.S.C. § 2020(a)(3)(A). The provision then states that "[a]ll records, and the entire information systems in which records are contained … shall be made available for inspection and audit by [USDA], subject to data and security protocols agreed to by the State agency and [USDA]." *Id.* § 2020(a)(3)(B).

Second, in Section 2020(e), the SNAP Act requires State agencies to submit plans of operation to administer their programs. *Id.* § 2020(e). That section then provides that such plans must include safeguards to protect participant data, but those safeguards "shall permit the disclosure of [information obtained from applicant households] to persons directly connected with the administration or enforcement of the provisions of" the SNAP Act or other federally funded assistance programs so long as "the subsequent use of the information" is limited to "administration or enforcement" of SNAP or the other programs. *Id.* § 2020(e)(8)(A).

Twenty-eight States complied with USDA's Original Data Request. Several States, however, refused to comply, and USDA was forced to initiate noncompliance proceedings under SNAP Act Section 2020(g). Section 2020(g) and SNAP regulations authorize USDA to disallow or suspend administrative funding to State agencies that fail to comply with the SNAP Act. *See* 7 C.F.R. § 276.4. USDA followed all required procedure regarding these noncompliant States in accordance with the SNAP disallowance and suspension regulations citing the States' failure to provide data pursuant to Section 2020(e)(8)(A) as grounds for the disallowance. *See* PI at 5.

Meanwhile, the noncompliant Plaintiff filed the present suit on July 28, 2025, and filed a motion for a preliminary injunction on August 18, 2025. *Id.*; *see also* Compl. ECF No. 1; Mot. to Stay or for Prelim. Inj., ECF No. 59. After a hearing, the Court issued a TRO enjoining USDA from disallowing or suspending State agency administrative funds on the grounds that Routine Uses 8 and

11 in the System of Records Notification, which USDA published after establishing a new system to house the records it intended to collect, evidenced an intent on USDA's part to share information with outside agencies beyond the bounds of "administration and enforcement" authorized by Section 2020(e)(8)(A).  TRO at 9–12; *see also* USDA/FNS–15, "National Supplemental Nutrition Assistance Program (SNAP) Information Database."  90 Fed. Reg. 26,521 (June 23, 2025) ("SORN").  The Court, however, reserved granting Plaintiffs a preliminary injunction pending additional briefing.  *Id.* 17–18.

After the additional briefing, and an additional preliminary injunction hearing, the Court issued a preliminary injunction on October 15.  PI, ECF No. 106.  In its PI Order, the Court determined that Plaintiffs made the necessary showing of likelihood of success on the merits of their claim that USDA's Original Data Request was contrary to the FNA, under the APA, because 7 U.S.C. § 2020(e)(8)(A) is completely permissive so that, while USDA may request data under that provision, the States were not compelled to provide it, no matter how reasonable the request.  *Id.* at 13–19.  In the alternative, the Court found that USDA's request was contrary to the FNA because (1) FNS requested data beyond the information "obtained from applicant households," which the FNA authorizes to be collected in 7 U.S.C. § 2020(e)(8)(A), and (2) FNS demonstrated an intent to disclose the data to agencies beyond which the FNA authorizes in 7 U.S.C. § 2020(e)(8)(A)(ii).  *Id.* at 18–19.  Based on these findings, the Court enjoined USDA from suspending or disallowing administrative funding from Plaintiffs while they continued not to comply with the Original Data Request.  *Id.* at 25.

In doing so, however, the Court limited its findings to SNAP Act Section 2020(e)(8)(A).  The Court explicitly noted that, "as USDA no longer relies on § 2020(a)(3), the question presented is whether the State must comply with a demand made by USDA under § 2020(e)."  PI at 13–14 (citing USDA's formal warning letters).  At the same time, the Court recognized that, "Congress, in the 'Records' section of § 2020, did use clear, mandatory language, specifically, 'shall … be made available for inspection and audit,' *thereby giving USDA the right to obtain*, subject to data and security protocols, all records necessary to determine whether the program is being conducted in compliance with the SNAP Act."  PI at 15 (quoting 7 U.S.C. § 2020(a)(3)(B)) (emphasis added).

4

3:25-cv-06310-MMC          DEFS' OPP'N TO PLS' MOT. TO ENFORCE OR EXPAND THE PRELIM. INJ.

After issuance of the preliminary injunction, USDA attempted to work with the noncompliant Plaintiff States to come to a mutually acceptable agreement under which USDA could collect the vital data it sought to fulfill its statutory duty to administer and enforce the SNAP Program.  Specifically, on November 24, 2025, USDA issued a renewed data request, this time under the authority of Section 2020(a)(3), and providing the States with a proposed data and security protocol.  *See* Decl. of Mark Ladov ("Ladov Decl."), Ex. A at 5–7, ECF No. 116-2 ("Renewed Data Request"); Ladov Decl., Ex. A at 11–15 ("Proposed Protocol").  Specifically, the Renewed Data Request sought much the same information as the Original Data Request for a period of January 1, 2020, to present.  Renewed Data Request at 1; *see also* Ladov Decl., Ex. A at 8–10 (SNAP Eligibility Data Elements requested).  It affirmed that the data USDA gathered would be stored in the system of record for which the previous SORN was published.  Renewed Data Request at 1.  The request also noted that USDA's proposed protocol is the same as observed between FNS and the 28 States which complied with the Original Data Request and included FedRAMP[1] High data security.  *Id.* at 1.

USDA also made its purpose clear in the Renewed Data Request, stating that "FNS will inspect and audit the data provided … solely for the purposes of 'determin[ing] whether the program in being conducted in compliance with the [FNA.]"  *Id.* at 1 (citing 7 U.S.C. § 2020(a)(3)).  Such inspection and audit are necessary as USDA noted that preliminary review of data from compliant States indicated an "estimated average of $24 million dollars per day of federal funds [] lost to fraud and errors undetected by States in their administration of SNAP."  *Id.* at 2.

The proposed protocol that USDA sent to the States along with the request included higher levels of security than what States historically accepted in releasing similar data to FNS.  For example, the protocol prohibits USDA from sharing data with "law enforcement investigations beyond coordination regarding criminal and administrative SNAP violations," Proposed Protocol ¶ 2.2.1, and

---

[1] "FedRAMP" is the Federal Risk and Authorization Management Program, which is a federal government-wide compliance program that provides a standardized approach to security assessment, authorization, and continuous monitoring for cloud computing products and services that process unclassified information used by agencies.  *See* 44 USC § 3607, *et seq.*; *see also* Gen. Serv. Admin, FedRAMP, https://www.fedramp.gov/.  FedRAMP maintains three levels, with "High" being the most secure.  *See* Gen. Serv. Admin, Understanding Baselines and Impact Levels in FedRAMP, https://www.fedramp.gov/archive/2017-11-16-understanding-baselines-and-impact-levels/ (Nov. 15, 2017).

5

3:25-cv-06310-MMC          DEFS' OPP'N TO PLS' MOT. TO ENFORCE OR EXPAND THE PRELIM. INJ.

strictly limited access to the system of record, including prohibiting access by "[a]ny other federal agency," *id.* ¶ 4.2.4.  The proposed protocol also included extensive sections on data minimization and retention, data security and technical requirements, access control, encryption standards, data segregation and compartmentalization, and incident response.  *See id.* ¶¶ 8, 9, and 10.  In short, the protocol USDA proposed was comprehensive and would effectively protect the data that USDA sought to gather.

Rather than accept this practical approach, the noncompliant States responded on December 8 by questioning USDA's motives and demanding protocol provisions beyond the sensible, reasonable, or legally required.  *See* Ladov Decl., Ex. B ("Dec. 8 Letter").  The States' response also included sixteen questions to which they demanded a response even though many of the topics raised appeared more as attempts to impede a practical approach to data security than an attempt to reach a fair agreement.

Nevertheless, USDA provided a detailed response on December 23.  *See* Ladov Decl., Ex. C at 34–40 ("Dec. 23 Letter").  In its response, USDA further explained its need for the data in question and its legal entitlement to the data.  *Id.* at 1–2.  It also explained that USDA's proposed protocol is more stringent than protocols under which States historically have provided data to FNS.  USDA also included a data elements comparison chart detailing how there is no material difference between the type of data States routinely upload to FNS for quality control purposes and the data elements requested by USDA.  *Id.* at 2–4.  Further, USDA addressed numerous concerns raised by the States' December 8 Letter, including why the National Accuracy Clearinghouse is not a substitute for the Renewed Data Request, *id.* at 4–5, why the request comports with the Computer Matching Act, *id.* at 5, and confirmation that USDA would utilize FedRAMP High data security protocols to protect data both in transit and while being stored by USDA, *id.*  USDA also explained that it could not elaborate more on the sources and methods it will utilize to analyze data because doing so "would provide a roadmap on how to avoid detection of noncompliance with SNAP requirements."  *Id.* at 6.  Finally, USDA provided numerous assurances including that "it will only use the received data in compliance with the [SNAP Act]."  *Id.*

6

3:25-cv-06310-MMC        DEFS' OPP'N TO PLS' MOT. TO ENFORCE OR EXPAND THE PRELIM. INJ.

Along with the December 23 Letter, USDA provided an amended protocol, which incorporated some of Plaintiffs' suggestions and provided some additional clarifications. Ladov Decl, Ex. C at 41–45 ("Am. Protocol"). To ensure that the parties were moving towards an agreement, however, USDA informed the States that the December 23 Letter constituted an Advance Notification of disallowance or suspension proceeds if the States failed to comply with the Renewed Data Request. *Id.* (citing 7 C.F.R. § 276.4(d)(1)). To date, USDA has not issued a Formal Warning pursuant to 7 C.F.R. § 276.4(d)(2) and after issuing the December 23 Letter, USDA still stood ready to work with the States to address any remaining good faith objections. In fact, although USDA had proposed a deadline of January 6, 2026 for Plaintiffs to reply to the December 23 Letter, Plaintiffs requested additional time to allow their state agencies subject-matter experts to review. USDA agreed to an extension until January 9, 2026, expecting further responses from the States that day. Instead, on January 9, Plaintiffs filed the pending motion, claiming that USDA's Renewed Data Request violated the Court's preliminary injunction, even though the Renewed Request is clearly outside the scope of the preliminary injunction. Mot., ECF No. 116. Alternatively, Plaintiffs requested that the Court expand its preliminary injunction to cover USDA's present efforts, demonstrating that absent intervention from the Court, Plaintiffs have no intention of providing the data to USDA.

## LEGAL STANDARD

In considering whether USDA's Renewed Data Request is contrary to the Court's previous PI Order, when "a district court retains jurisdiction over future proceedings following its issuance of an injunction, its continuing jurisdiction derives from its equitable power." *Stillaguamish Tribe of Indians v. Washington*, 102 F.4th 955, 965 (9th Cir. 2024) (Bress, J concurring). Thus, district courts retain "the authority to make an enforcement order to secure compliance with its earlier orders and governing law." *Armstrong v. Brown*, 939 F. Supp. 2d 1012, 1018 (N.D. Cal. 2013).

To the extent Plaintiffs seek an expanded preliminary injunction because USDA's Renewed Data Request is outside the scope of the original PI, to obtain the "extraordinary and drastic remedy" of a preliminary injunction, *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (citation omitted), Plaintiffs must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their]

7

3:25-cv-06310-MMC        DEFS' OPP'N TO PLS' MOT. TO ENFORCE OR EXPAND THE PRELIM. INJ.

favor," and (4) "an injunction is in the public interest," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.     USDA Has Not Violated the Existing Preliminary Injunction

#### A.     USDA's Renewed Data Request is Distinct from the Original Request, and Seeks Data under a Different Authority

Plaintiffs first argue that the Renewed Data Request violates the Court's preliminary injunction. *See* Mot. at 6–11. But there can be little doubt that the Renewed Data Request falls outside the scope of the Court's PI. The Court previously enjoined USDA from enforcing its Original Data Request against the noncompliant States but, in doing so, it clearly recognized USDA had limited its noncompliance procedures to its authority to receive the data pursuant to SNAP Act Section 2020(e)(8)(A). *See* PI at 13 ("as USDA no longer relies on § 2020(a)(3), the question presented is whether a State must comply with a demand made by USDA under § 2020(e).").

The Renewed Data Request, by contrast, explicitly cites Section 2020(a)(3) as its authority to gather the records requested. *See* Renewed Records Request at 1. Additionally, the December 23 Letter specifically states that the recipients should construe the letter as an Advance Notification pursuant to 7 C.F.R. § 276.4(d)(1), which initiated new and separate disallowance proceedings based on a distinct deficiency, rather than continuation of the former (enjoined) process. Thus, the request and its underlying authority are outside the scope of what the Court previously addressed and served as the basis for its injunction.

#### B.     SNAP Act Section 2020(a) Provides USDA the Unequivocal Right to the Data Requested.

Even if the Renewed Data Request was within the scope of the previous injunction, the request fully complies with the injunction and the SNAP Act. The SNAP Act gives USDA the unequivocal authority to request the data in question under Section 2020(a)(3), which provides that "[a]ll records, and the entire information systems in which records are contained … *shall be made available* for inspection and audit by [USDA.]" 7 U.S.C. § 2020(a)(3) (emphasis added). The Court has already noted the mandatory nature of this obligation in its preliminary injunction order. *See* PI at 15 ("Here,

as set forth above, Congress, in the "Records" section of § 2020, did use clear, mandatory language"). Thus, the State must provide data to USDA pursuant to its inspection and audit authority under Section 2020(a)(3) when requested.  Further, as the Court also noted, the information which the SNAP Act provides USDA the right to inspect and audit is broad, including not only "[a]ll records" but the "entire information systems in which records are contained."  7 U.S.C. § 2020(a)(3); *see also* PI at 15 n.18 ("§ 2020(a)(3) covers a broader set of data than § 2020(e)(8)[.]").

Plaintiffs attempt to stymie this straightforward conclusion with two arguments.  First, they claim that the Renewed Data Request still violates Section 2020(e)(8)(A)(ii) because the SORN[2] evidences an intent to share the data USDA will collect with outside agencies for purposes other than administration and enforcement of the SNAP Act.  *See* Mot. at 7–9 (citing 7 U.S.C. § 2020(e)(8)(A)(ii)).  But the requirement that State Plans of Operations should permit the disclosure of information obtained from applicant households for the purpose of administering and enforcement of federal assistance programs appears only in Section 2020(e)(8)(A)—which applies to a different set of information—not Section 2020(a)(3).  That difference is nevertheless largely academic because USDA has again affirmed that it does not intend to share the data it collects with outside agencies for purposes other than administering and enforcing SNAP, or in a manner that would otherwise violate the SNAP Act.  *See* Renewed Data Request at 1; Dec. 23 Letter at 6 ("USDA reiterates its November 24 letter's statement that it will only use the data received in compliance with the [SNAP Act].").  USDA's proposed protocol makes this commitment concrete.  *See* Am. Protocol ¶ 2.2.1 ("USDA shall NOT use the provided data for … Law enforcement investigations beyond coordination

---

[2] Plaintiffs note that USDA has not yet amended the SORN as it intends to do.  Mot. at 4–5. It is unclear what relevance this has to the States' failure to agree to USDA's proposed protocols, which already include the substance of likely amendments has been included in USDA's proposed protocol.  *See* Am. Protocol ¶ 2.2 (committing that USDA "shall NOT use the provided data for" sharing with foreign governments, law enforcement outside of SNAP enforcement, and more).  This makes good sense.  SORNS are meant to govern operation of a specific system of record, not an instance of sharing of data.  They are often written broadly to cover many as-yet unforeseen circumstances that might arise throughout the lifetime of the system.  The proposed protocol, however, will address this specific data request initiative.  In any event, USDA is working on amending the SORN, but the ongoing process of this litigation makes it difficult to determine what amendments the SORN requires in addition to removing the reference to "foreign" agencies in Routine Use 8.  *See* Supp. Decl. of Shiela Corley ¶¶ 10–12, ECF No. 90-1.

regarding SNAP fraud, or other violations relating to the FNA" and other non-SNAP-related purposes); *see also id.* ¶ 4. These provisions cover Plaintiffs' concerns that it may disclose information in a manner inconsistent with the SNAP Act. *See* Mot. at 8.

Plaintiffs' sole evidence that USDA does not intend to follow its word and the law is the breadth of the Routine Uses 8 and 11 in the SORN. But Routine Uses 8 and 11 are not evidence that USDA intends to share information outside the agency in the manner Plaintiffs construe. The SORN itself confirms that USDA's only plan to send data outside of the agency is to manually verify the data against other federally maintained databases to confirm recipient eligibility. SORN at 26,522. As this purpose is for administration and enforcement of the SNAP Act, Plaintiffs can show no potential violation of 7 U.S.C. § 2020(e)(8)(A)(ii).[3]

Second, Plaintiffs argue that Section 2020(a)(3)'s language that data should be made available to USDA "subject to data and security protocols agreed to by the State agency" makes such protocols a prerequisite to data sharing, permitting them to unreasonably withhold consent to the proposed protocol to stymie USDA's efforts. Mot. at 9–11. That is incorrect. "As with any question of statutory interpretation, [the Court's] analysis begins with the plain language of the statute." *Jimenez v. Quarterman*, 555 U.S. 113, 118, (2009). In interpreting statutes, "courts 'generally seek to afford a statutory term its ordinary or natural meaning.'" *Childs v. San Diego Fam. Hous., LLC*, 150 F.4th 1151, 1159 (9th Cir. 2025) (quoting *HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 388 (2021)).

Section 2020(a)(3)'s language that data must be provided "subject to data and security protocols" is most naturally read to mean that the terms of sharing will be *governed by* or *controlled by* the terms of any protocols on which the State and USDA agree. *See* "Subject to" Mirriam-Webster.com, https://www.merriam-webster.com/dictionary/subject%20to ("affected by or possibly

---

[3] Additionally, to the extent Plaintiffs argue that USDA's declining to add a disclosure or monitoring provision per their request serves as evidence of malintent by USDA, Plaintiffs are incorrect. Mot. at 8–9. As to a disclosure provision, as USDA affirmed in the December 23 Letter, it must comport with lawful external requests. *See* Dec. 23 Letter at 6. USDA cannot agree to ignore lawful authority if presented with it. Further, Plaintiffs can point to no authority mandating a monitoring provision. As such, USDA need not agree to such a provision where it does not intend to break the law, and monitoring would establish a burdensome route for States to potentially obstruct USDA's efforts as they have done in this litigation.

10

affected by (something)"); "Subject to" Dictionary.com, https://www.dictionary.com/browse/be-subject-to ("Be under the control or authority of"); *see also Tomczyk v. Garland*, 25 F.4th 638, 644 (9th Cir. 2022) (en banc) ("To determine ordinary meaning, we consider dictionary definitions." (quoting *United States v. Cox*, 963 F.3d 915, 920 (9th Cir. 2020))).  Nothing in the statute conditions provision of the data to which USDA is legally entitled on agreement to protocols as a condition precedent and certainly nothing in the statute empowers the States to refuse to agree to reasonable data and security protocols as a means to avoid providing the data.  Indeed, reading an implied veto into the statute, by permitting the States to continually decline to enter a data and security protocol, would impermissibly frustrate Congress's clear intent to give USDA mandatory access to the data in question.  *See* PI at 14–15 ("it is fundamental that a section of a statute should not be read in isolation from the context of the whole Act, and that in fulfilling a court's responsibility in interpreting legislation, courts must not be guided by a single sentence or member of a sentence, but should look to the provisions of the whole law, and to its object and policy") (quoting *Richards v. United States*, 369 U.S. 1, 11 (1962))); *see also United States v. Paulson*, 68 F.4th 528, 539 (2023) (Courts are "bound … to 'strive to give effect to each word and make every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.'" (quoting *R.J. Reynolds Tobacco Co. v. County of Los Angeles*, 29 F.4th 542, 553 (9th Cir. 2022) (cleaned up)).[4]

As such, USDA is statutorily entitled to the information it has requested in the Renewed Data Request.  And in making that request, USDA has fully complied with the Court's preliminary injunction.  USDA must therefore be permitted to collect the data it requires to fulfill its statutory

---

[4] Plaintiffs cherry pick comments from Secretary Rollins during the December 2 cabinet meeting as a basis to assert that USDA did not negotiate protocols in good faith leading to USDA "unilaterally terminat[ing]" negotiations.  *See* Mot. at 10–11 (quoting The White House, President Trump Hosts a Cabinet Meeting, Dec. 2, 2025, at 59:45–1:00:33 (YouTube Dec. 2, 2025), https://perma.cc/E4B9-FYPZ.  This is factually incorrect.  First, a viewing of the clip in question confirms that Secretary Rollins was discussing a possibility of how to proceed if the noncompliant States continued to refuse to agree to reasonable protocols and provide the data they are required to provide.  Second, USDA continued to negotiate with Plaintiffs after December 2 (with no suspension of SNAP funding), for example thoroughly answering Plaintiffs' December 8 Letter with the December 23 Letter and issuing the Amended Protocols.  It is Plaintiffs who terminated negotiations by filing the present motion, not USDA.

duty to oversee the SNAP Program and protect the public fisc from squandering through waste and fraud.

## II.    The Court Should Not Expand its Existing Preliminary Injunction

Having failed to establish that USDA violated the Court's preliminary injunction, Plaintiffs fall back to asking the Court to issue a new injunction based on the Renewed Data Request.  Mot. at 11–25.  But they are not entitled to one because they cannot show they will likely succeed on the merits of their claims, both for jurisdictional reasons and on the merits of their claims.  They also cannot show irreparable harm, and the balance of the equities tips in USDA's favor.

### A.  The States are Unlikely to Succeed on the Merits of Their Claims

#### 1.  Plaintiffs' Claim that USDA will Impermissibly Share Data is Speculative

Plaintiffs again claim that USDA intends to share data outside the agency in a manner which violates the SNAP Act.  *See supra* at 9–10; *see also* Mot. at 7–9, 14.  But Plaintiffs lack Article III standing to bring this claim.  At its "irreducible constitutional minimum," the doctrine of standing requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent, (2) a causal connection between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, (1992).  Courts have an "'independent obligation' to ensure that a case falls within [their] Article III jurisdiction by confirming that standing exists[.]"  *Sterling v. Feek*, No. 24-1296, ---F.4th---, 2025 WL 2536695, at *5 (9th Cir. Sept. 4, 2025) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)).  Further, "standing is not dispensed in gross," so "plaintiffs must demonstrate standing for each claim that they press[.]"  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

Plaintiffs, however, have failed to establish that the possibility of impermissible sharing is sufficiently concrete or imminent to establish standing.  Specifically, Plaintiffs point to Routine Uses 8 and 11 as evidence that USDA intends to share the data it collects for purposes other than "administration and enforcement" of the SNAP Act or other Federal assistance programs, in violation of 7 U.S.C. § 2020(e)(8)(A).  In a previous context, the Court largely agreed with Plaintiffs in

12

3:25-cv-06310-MMC        DEFS' OPP'N TO PLS' MOT. TO ENFORCE OR EXPAND THE PRELIM. INJ.

ascribing an intent to share data in violation of the SNAP Act when it issued its TRO and PI.  *See* TRO at 11–12; PI at 18 n.24.

It is axiomatic, though, that to establish Article III standing, Plaintiffs must allege an injury-in-fact which is "concrete, particularized, and actual or imminent," and, "[a]lthough imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citations omitted).

Contrary to Plaintiffs' claims, USDA does not intend to use or share information outside the agency for purposes other than administration and enforcement of the SNAP Act.  For example, FNS has affirmatively stated that it intends to utilize Routine Uses 8 and 11 for the purpose of "ensur[ing] the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases."  SORN at 26,522.  Indeed, USDA has affirmed, and reaffirmed, that it intends to use the data it collects solely for administering the SNAP Act.  *See* Renewed Data Request ("FNS will inspect and audit the data provided pursuant to this request, and maintain it under the applicable System Of Records Notice, solely for the purposes of 'determin[ing] whether the program is being conducted in compliance with [the Food and Nutrition Act of 2008 (FNA)] (including regulations issued under [the FNA].' (quoting 7 U.S.C. § 2020(a)(3)); Dec. 23 Letter ("USDA reiterates its November 24 letter's statement that it will only use the received data in compliance with the Food and Nutrition Act of 2008, as amended."); Am. Protocol ¶ 6.1.1. ("USDA will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program that focuses on: identity verification[,] income and eligibility verification[,] immigration status[, and] verification against disqualified recipients."); *see also id.* ¶ 2.2.1 (under Prohibited Purposes, "Law enforcement investigations beyond coordination regarding SNAP fraud, or other violations relating to the FNA."); *id.* ¶ 4.2.4 ("Except to the extent required by law, no access to the SNAP Information Database may be provided to: … [a]ny other federal agency").[5]

_____

[5] Plaintiffs point to the fact that USDA's amended protocol commits to providing access to the data "to the extent required by law" as evidence that USDA will share data in a manner inconsistent with the SNAP Act.  Mot. at 8; *see also* Am. Protocol ¶ 4.2; *see also* Dec 23 Letter ("[i]n the event it receives external requests for data, USDA will follow all applicable laws" including the

This intent is perfectly in line with the SNAP Act's authorization to disclose records through routine uses to "persons directly connected with the administration or enforcement of [the SNAP Act], regulations issued pursuant [to the SNAP Act], Federal Assistance Programs, or federally-assisted State programs[,]" where those persons use such information "for such administration or enforcement." 7 U.S.C. § 2020(e)(8)(A). But what is clear from USDA's continued pronouncements is that USDA does not intend to use the information or share it with an outside agency, for reasons unconnected with USDA's duty to administer and enforce the SNAP Act. Thus, Plaintiffs fail to show a concrete and imminent nonauthorized disclosure which would violate the SNAP Act and could serve as a basis for Article III standing.

## 2.  Plaintiffs Lack Standing for their Computer Matching Act Claim

Plaintiffs allege that USDA has violated the Computer Matching Act because USDA intends to use the data it collects in a computer matching program but has not entered into a required computer matching agreement. *See* Mot. at 12–14; *see also* 5 U.S.C. § 552a(o); *id.* § 552a(a)(8) (defining "matching program"). But the Computer Matching Act is part of the Privacy Act, *see* 5 U.S.C. § 552a(o), and the Privacy Act protects the information of only individuals, not States. *See, e.g.*, Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(4), 88 Stat. 1896 (1974) ("The right to privacy is a personal and fundamental right protected by the Constitution of the United States[.]"). As such, the Privacy Act provides individuals with a cause of action, not States. *See* 5 U.S.C. § 552a(g); *id.* at § 552a(a)(2); *see also Rouse v. U.S. Dep't of State*, 567 F.3d 408, 413 (9th Cir. 2009) ("[t]he Privacy Act was designed to 'protect the privacy of individuals' through regulation of the 'collection, maintenance, use, and dissemination of information' by federal agencies." (quoting 5 U.S.C. § 552a note)).

Here, the substance of the States' claim is that individual SNAP participants' data may be subject to a matching program without USDA observing the proper procedures. But the States cannot

---

SNAP Act). But this is no evidence of intent not to follow the SNAP Act. USDA must commit to following all applicable laws and cannot agree to ignore lawful authority. Furthermore, Plaintiffs have not presented a concrete or imminent instance where such a request may occur. In other words, it is entirely speculative what alternative lawful authority USDA may be presented with and how USDA would respond.

14

3:25-cv-06310-MMC    DEFS' OPP'N TO PLS' MOT. TO ENFORCE OR EXPAND THE PRELIM. INJ.

demonstrate Article III injury, because it is not their information allegedly being matched.  Rather, that data belongs to individuals, who are not plaintiffs here.

USDA's compliance with the Computer Matching Act is separate from its authority to gather data under the FNA.  Plaintiffs suffer no injury caused by the alleged computer matching, as it is undisputably not information regarding the States being allegedly matched.  Moreover, as USDA has previously argued, even if Plaintiffs had standing to assert this claim, the Court should not address it as a prudential matter, because Plaintiffs' alleged harm does not fall within the zone of interests of the Computer Matching Act.  *See Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 771 F. Supp. 3d 717, 794–95 (D. Md. 2025) ("the Privacy Act only protects information regarding individuals[.]"), *appeal dismissed*, No. 25-1291, 2025 WL 1111245 (4th Cir. Apr. 1, 2025).  Indeed, the Court determined in its preliminary injunction order that Plaintiffs were unlikely to succeed on their Computer Matching Act claims for this very reason.  *See* PI at 21.

### 3.  USDA's Renewed Data Request does not Implicate the Computer Matching Act

Moving to the merits of Plaintiffs' claims, Plaintiffs' first claim is that USDA has violated the Computer Matching Act, as summarized above.  *See supra* at 14–15; *see also* Mot. at 12–14.  In addition to lacking standing to bring this claim, it also fails on its merits.  USDA has already explained why its intent to verify data against databases at other agencies does not constitute a computer matching program and USDA adopts those arguments here.  *See* Defs.' Opp'n to Mot. from Prelim. Inj. at 21–22, ECF No. 72 ("PI Opp'n"); *see also* PI at 21 ("Moreover . . . there is no evidence to support a finding that USDA intends to act in violation of the strictures set forth in the Computer Matching Act, and, consequently, any contention USDA intends to do so is, at best, speculative.").  In fact, USDA explained to the noncompliant States why the Renewed Data Request does not implicate the Computer Matching Act in its December 23 Letter.  *See* Dec. 23 Letter at 5.  As USDA explained, the database which is storing the information is not a matching program because it is not "automated" "computerized comparison" of "two or more" systems of records.  5 U.S.C. § 552a(a)(8).

So, Plaintiffs' claim fails at both steps of the process.  First, the States' provision of data to USDA (and USDA's housing of that information in its system of record) is not a matching program, because there is no comparison being run between State and USDA databases.  Second, USDA's verification against other federal databases is not a matching program because it is not "automated" and the verification is not being done for the "purpose of establishing or verifying the eligibility" because that is the duty of the State Agencies in the SNAP Program.  5 U.S.C. § 552a(a)(8): *see also* PI Opp'n at 22.

### 4. USDA Considered and Rejected the "Important Issues" Raised by Plaintiffs while Negotiating Data and Security Protocols

Under the APA's standard of review, an agency action may be arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem."  *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996) ("[w]hether an agency has overlooked 'an important aspect of the problem' . . . turns on what a relevant substantive statute makes 'important.'").  Plaintiffs have alleged that USDA transgressed this requirement when it failed to consider "important issues raised by Plaintiffs" while negotiating the proposed protocol.  Mot. at 14–15.  But USDA considered and rejected the points raised by Plaintiffs.  Just because Plaintiffs disagree with the answers they received does not mean USDA failed to consider an important aspect of the problem.

For example, Plaintiffs allege that USDA disregarded their concerns regarding the Renewed Data Request's compliance with the SNAP Act and the Computer Matching Act.  Mot. at 14.  As explained above, both concerns are unfounded.  *See supra* at 9–10; 15–16.  In any event, USDA did consider the concerns and explained to the States why they were not issues.  *See* Dec. 23 Letter at 5 (addressing Computer Matching Act); *id.* at 6 ("USDA reiterates its November 24 letter's statement that it will only use the received data in compliance with the [SNAP Act.]").

Next, Plaintiffs allege that USDA ignored its request for a provision allowing the States to monitor USDA's compliance with the SNAP Act.  Mot. at 14.  But as USDA stated expressly in its letters to Plaintiffs and the protocol itself, USDA has no intention of violating the SNAP Act and has designed its proposed protocol to address those concerns, including limiting access to certain SNAP

Act and Privacy Act-trained employees.  Am. Protocol ¶ 4.  In fact, in response to Plaintiffs' concerns, USDA added a specific provision committing to not release the data to other entities unless "required by law."  *Id*. at ¶ 4.2.  Moreover, Plaintiffs can point to nothing obligating USDA to include such a provision.  Indeed, entering into such an agreement would undermine efficiency of USDA's audit and allow the audited to interfere with their own audit.  As such, USDA's declining to include such a provision provides no evidence that it ignored an important problem under the APA's standard of review.

Third, Plaintiffs again claim that USDA failed to consider "significant risks of illegal use, disclosure, and hacking."  Mot. at 15.  The Court already rejected this claim on the existing record in its preliminary injunction.  *See* PI at 20.  The expanded record confirms that USDA has instituted numerous protections to guard the information it intends to collect.  *See* Am. Protocol ¶¶ 8–10. Indeed, USDA has emphasized that it is utilizing "FedRAMP High data security, [which] provides a higher level of security than that which States . . . historically have accepted in releasing similar data to FNS."  Renewed Data Request at 1.

Finally, Plaintiffs complain that they were given only 30 days to comply with the Renewed Data Request, which fails to "grapple with the basic logistical challenge[s]" of providing the data. Mot. at 15.  But as the Renewed Data Request notes, 28 other States have managed to comply with USDA's requests in similar timeframes.  Indeed, the noncompliant States have known exactly the information USDA has been requesting since May 2025.  They have had plenty of time to work out the logistics of the transfer.  Instead, they have spent their time resisting USDA's efforts.  This argument is no more than a red herring, as the States' failure to comply is not based on logistical concerns, but because they object to provision of data in the first instance despite Section 2020(a)(3)'s clear mandate.  If there are logistical concerns, USDA is happy to work with the States to resolve them.  Further, the States may forestall further noncompliance proceedings based on logistical difficulties by submitting an acceptable corrective action plan.  *See* 7 C.F.R. § 276.4(d)(2)(ii).

In short, Plaintiffs have failed to establish that they will likely succeed on any claim that USDA entirely failed to consider an important aspect of the problem.

17

3:25-cv-06310-MMC         DEFS' OPP'N TO PLS' MOT. TO ENFORCE OR EXPAND THE PRELIM. INJ.

**5.   The Renewed Data Request is Not Contrary to the SNAP Act**

Next, Plaintiffs renew their claim that SNAP Act Section 2020(a)(3) merely grants USDA remote or physical access to records, not "possession," so that requiring the States to send data to USDA violates this provision of the Act.  Mot. at 15–18.  This understanding is inconsistent with both the text of the Act and the modern world.

SNAP Act Section 2020(a)(3) provides that "[a]ll records, and the entire information systems in which records are contained . . . shall be *made available for inspection and audit*" to USDA.  7 U.S.C. § 2020(a)(3) (emphasis added).  "[M]ade available for inspection and audit" must mean that USDA has the ability to collect the records it needs to accomplish the tasks outlined in the provision. *See* Available, Dictionary.com, https://perma.cc/4YQH-2QXY (defining "available" as "suitable or ready for use; of use or service; at hand" or "readily obtainable; accessible."); Inspect, Merriam-Webster, https://perma.cc/RYZ6-7H9S ("to view closely in critical appraisal : look over"); Audit, Merriam-Webster, https://perma.cc/J8RU-QURL ("a formal examination of an organization's or individual's accounts or financial situation").  In the digital age, the contention that USDA needs to travel to each State, or only view systems of records through remote access (which, incidentally, the States have not offered), without the ability to receive and analyze the records to inspect them is nonsensical.[6]  No one would contend that the IRS could not ask taxpayers to submit audit records electronically, and that instead the IRS needs to travel to the taxpayer and conduct its audits without the benefit of retaining relevant documents.

Simply put, Plaintiffs cannot read a distinction between "access" and "possession" into the statute's clear text, which obligates the States to make all records available to USDA.  Thus, USDA's Renewed Data Request is not contrary to the SNAP Act on these grounds.

---

[6] Indeed, the Court recognized the impracticality of this argument during the September 16 preliminary injunction hearing.  *See* PI Hrg. Tr. at 15:8–15 (Sep. 16, 2025) ("my general view is that if you've got a right to audit, you're going to have to, as a practical matter, have the material.  You can't just sit there in somebody's office and go through thousands and thousands of records and other matters.  So I think the inspect here and audit would give them – the USDA – a right if they check all the other boxes that they have to check – but a right to get, not just look at, the material.").

18

### 6.  USDA's Renewed Data Request is not Arbitrary and Capricious

Finally, Plaintiffs launch a tangle of claims alleging that USDA's Renewed Data request is "arbitrary and capricious" because USDA has failed to (1) adequately explain its reasons for initiating the Renewed Request, Mot. at 18–21, and (2) put in place adequate protections for the data it will gather, *id.* at 21–25.  This is simply not the case, and Plaintiffs' claims merely confuse their own unreasonable demands for what the agency itself has determined is necessary, to which the Court owes deference.

Arbitrary and capricious review is highly deferential to the agency, and "a court is not to substitute its judgment for that of the agency." *State Farm Mut. Auto. Ins.*, 463 U.S. at 43.  Courts uphold agency action where the agency "has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983).   The ultimate question is whether the agency's action was reasonable.  *FCC v. Fox Television Stations*, 556 U.S. 502, 514–15 (2009).

First, USDA has satisfactorily described the reasons for initiating the Renewed Data Request. In the request, USDA explained that it "needs the records to determine whether SNAP is being conducted in compliance with law." Renewed Data Request at 1.  As an example, the request affirms that preliminary review of data provided by compliant States "indicates an estimated average of $24 million dollars per day of federal funds is lost to fraud and errors undetected by States in their administration of SNAP."  *Id.* at 2.  The December 23 Letter provides more, including specific examples from Plaintiff States California and Minnesota regarding high error rates and recently discovered fraud.  Dec. 23 Letter at 1–2.

Seeking to avoid the exceedingly rational decision to request and audit raw data to uncover waste, fraud, and abuse, Plaintiffs revive their claim that USDA has departed from a long-standing policy to limit itself only to the quality control system outlined in 7 U.S.C. § 2025(c).  But the Court has already rejected this claim, finding that Plaintiffs failed to establish such a practice.  PI at 19.  And even were Plaintiffs able to establish an alleged long-standing policy to only conduct quality control reviews, their claim would still fail.  The APA requires only that agencies provide a "reasoned explanation" for a change in policy or an "awareness that it is changing position." *Fox Television*

*Stations*, 556 U.S. at 515.  There is no "heightened standard" for such a decision, and the agency is not required to justify its policy change by reasons more substantial than those required to adopt a policy in the first instance.  *Id.* at 514.  As outlined above, USDA has good reasons for conducting this audit.  *See supra* at 19.  Indeed, as USDA also explained in the December 23 Letter, "[s]imply because other mechanisms exist to detect fraud does not preclude USDA from consistently striving for better, more efficient methods to detect waste, fraud, and abuse."  Dec. 23 Letter at 6.

Finally, Plaintiffs claim USDA failed to explain why it sought every single data element it requested.  *See* Mot. at 19–21.  Specifically, Plaintiffs' December 8 Letter demanded that USDA answer an extensive list of questions for each data element it sought to gather.  *See* Dec. 8 Letter at 12.  USDA responded with a chart comparing the data elements requested pursuant to the Renewed Data Request and the elements regularly uploaded by the States for quality control purposes, demonstrating that USDA has curtailed the elements to what it needs.  *See* Dec. 23 Letter at 3–4.  But, as USDA later explained, it could not provide more details of its auditing methodology lest "it would provide a roadmap on how to avoid detection of noncompliance with SNAP requirements."  *Id.*  They are iterative processes in which the agency cannot decisively determine the course of its actions until it has gathered the evidence it deems relevant and examined the results.  *See, e.g.*, *Indep. Equip. Dealers Ass'n v. E.P.A.*, 372 F.3d 420, 427 (D.C. Cir. 2004) ("the term [agency action] is not so all-encompassing as to authorize us to exercise 'judicial review [over] everything done by an administrative agency.'" (quoting *Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948))); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990) (APA does not authorize "a general judicial review of [an agency's] day-to-day operations.").  Thus, Plaintiffs fail to establish that they are likely to succeed on a claim that USDA has failed to consider data minimalization, *see, e.g.*, Am. Protocol ¶ 8, or that USDA acted irrationally in requesting the data elements it did.

Second, Plaintiffs allege that USDA has failed to consider "important aspects of the problem of colleting all applicant data into a single federal database."  Mot. at 21; *see id.* at 21–25.  But the Court has already rejected Plaintiffs' claims that USDA failed to adequately consider data security concerns.  PI at 20.  And, while Plaintiffs again throw everything into the kitchen sink into this claim—which Defendants will address in greater depth below—none of Plaintiffs' arguments negate

20

3:25-cv-06310-MMC          DEFS' OPP'N TO PLS' MOT. TO ENFORCE OR EXPAND THE PRELIM. INJ.

the fact the USDA has thoughtfully considered data protection and put in place top-of-the-line protection to safeguard its system of records. *See* SORN at 26,523; Decl. of Ryan Gillette, Ex. A at 5–6, 14–15, 18–20, 22–23, 27–28, ECF No. 59-7 (FY2025 Privacy Impact Assessment); Am. Protocol ¶¶ 2.2, 4, 8–10. There is simply no basis to contend that USDA has entirely failed to consider this aspect of the problem and addressed it. Plaintiffs' arguments otherwise are unavailing.

For example, Plaintiffs argue that USDA is attempting to establish a "one-tier quality control process," which the agency previously determined it was unable to do in a 2019 study. *See* Mot. at 21–22 (citing McGill, et al, *Feasibility of Revising the SNAP Quality Control Review Process* at i-ii, 49–54 (2019) ("2019 Study")).[7] But that study reviewed the feasibility of scrapping the current two-tiered process by which States review SNAP cases to make error determinations followed by Federal re-reviews of a subset of the cases under the system established in 7 U.S.C. § 2025(c). Nowhere in USDA's actions has it suggested disestablishing this system in favor of a one-tiered system by which only USDA would review SNAP cases to make error determinations for all SNAP agencies. Instead, USDA has initiated a complementary audit, pursuant to its authority in 7 U.S.C. § 2020(a)(3), to conduct a review of SNAP Act compliance. In short, the 2019 Study bears no evidence on the feasibility or reasonableness of USDA conducting its audit under the APA's arbitrary and capricious standard of review.

Next, Plaintiffs allege that elsewhere, under a different provision of the SNAP Act, Congress required certain longitudinal studies to utilize deidentified participant data (or hashing of data),[8] so USDA should do so here too. *See* Mot. at 22–23 (citing 7 U.S.C. § 2026(n)). First, that provision governs longitudinal studies conducted by State agencies, not USDA. 7 U.S.C. § 2026(n)(1) ("a State agency may, on approval by the Secretary, establish a longitudinal database . . ..."). Second, that Congress included deidentification procedures in this provision, but not 7 U.S.C. § 2020(a)(3), is evidence that Congress could have instituted such restrictions in the latter provision but chose not to. Thus, it would be inappropriate to import restrictions from one provision into the other. Finally, USDA explained to the States why deidentified participant data would not be feasible because USDA

---

[7] Available at https://perma.cc/8S9N-WK7K.

[8] Data hashing involves converting a piece of data into a specific computerized value apart from the underlying information.

would have no means of unlocking the underlying information to conduct its audits. *See* Dec. 23 Letter at 4–5. In its most simple terms, masking certain personal identifiable information would prevent USDA from conducting the audit it wishes to carry out, as it would be unable to unlock that data without the States' participation. "[T]hat would be akin to providing USDA hundreds of thousands of combination locks without any of the codes." *Id.* at 5. Thus, USDA both considered this suggestion and rejected it on non-arbitrary and capricious grounds.

Finally, Plaintiffs allege that USDA failed to consider existing means to achieve some of its stated goals, including that the SNAP Act and regulations already require States to verify participants against the Social Security Administration's Death Master File and that Congress has established the National Accuracy Clearinghouse ("NAC") program, 7 U.S.C. § 2020(x), which allows States to verify enrollment against each other. Mot. at 23–24. But, as USDA explained in the December 23 Letter, "[s]imply because other mechanisms exist . . . does not preclude USDA from consistently striving for better, more efficient methods of detecting waste, fraud, and abuse in SNAP." Dec. 23 Letter at 6. In other words, USDA may use all the tools at its disposal to protect the public fisc and federal SNAP dollars.

Even more, USDA also explained why the NAC is not an adequate substitute. As USDA explained, "only four of the 22 noncomplying States have launched the NAC, an interstate data matching system designed *solely* to assist *States* to prevent duplication participation." Dec. 23 Letter at 4–5. Thus, it is neither fully operational nor does it provide USDA access to data needed to conduct its statutory oversight duties.

* * *

As Defendants previously stated, Plaintiffs have attempted to throw everything into the kitchen sink to stymie USDA's efforts to carry out its statutory duties. USDA has time and again sought practical solutions, only to be met with unreasonable demands. While USDA has attempted to reach reasonable data and security protocols—and thoroughly explained its reasoning and objectives—the States have consistently sought to obfuscate, rather than agree. With no other available option USDA was forced to issue an Advance Warning of noncompliance proceedings,

22

3:25-cv-06310-MMC          DEFS' OPP'N TO PLS' MOT. TO ENFORCE OR EXPAND THE PRELIM. INJ.

while continuing to negotiate.  This Court should reject the Plaintiffs' efforts to avoid satisfaction of the statute through emergency motion practice.

### B.  The States Fail to Show Irreparable Harm

Plaintiffs fail to show irreparable harm.  As the Court has already noted, and as demonstrated above, Section 2020(a)(3) provides USDA an unequivocal right to inspect and audit "[a]ll records, and the entire information systems in which records are contained" related to SNAP.  7 U.S.C. § 2020(a)(3); PI at 15.  Thus, Plaintiffs are obligated to provide the requested data to USDA, and they can only argue that their own failure to follow this obligation will subject them to the consequences of potential disallowance and suspension of their administrative funding.  *See* Mot. at 25.

As discussed throughout this brief, Plaintiffs claim they are unable to provide the data for various reasons, which USDA has failed to address.  While this is incorrect, the noncompliant States still have an avenue to address their concerns, and avoid their allegedly imminent irreparable harms, through continued negotiation or administrative appeal under 7 C.F.R. § 276.7, if USDA issues a formal warning.  While the Court previously determined that such administrative appeal was optional,[9] that does not mean the noncompliant States do not have an avenue to address their grievances and avoid any imminent irreparable harm while litigation proceeds on the merits. Administrative appeals are considered state-by-state and include a lengthy process of additional information submission, review by the Appeal Board, and, most importantly, an immediate stay of USDA's suspension or disallowance action. 7 C.F.R. § 276.7(e).  Thus, each State has an opportunity to press their individual claims as to why they cannot agree to USDA's proposed protocol before a neutral arbiter.  And the Appeal Board is authorized to set aside disallowance or suspension orders issued by USDA or even adjust the suspension or disallowance at the Board's discretion.  *Id.* § 276.7(i)(2).  Thus, Plaintiffs' alleged injury is not certain or impending if they are correct about the need for protocols as a prerequisite for providing data to USDA.  *See Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) ("Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy[.]"); *Associated Gen. Contractors of California, Inc. v. Coal.*

---

[9] Defendants continue to assert that this holding was erroneous and here adopt the arguments previous espoused to preserve for any appeal.  *See* PI Opp'n at 9–10; Defs.' Opp'n to Ex Parte Mot. to Expand the Court's Sept. 18, 2025 TRO at 3–4, ECF No. 89.

*for Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991) ("A plaintiff must do more than merely allege imminent harm sufficient to establish standing, he or she must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief."); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("[A] plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief.").

### C.  The Balance of the Equities Favors USDA

While Plaintiffs have failed to demonstrate they are irreparably harmed because they have an avenue to address their alleged grievances, USDA would be harmed by an injunction.  For months, USDA has been stonewalled in collecting evidence of waste, fraud, and abuse to which it is entitled by law.  Preliminary review of data provided by States complying with USDA's request has uncovered potentially millions in waste, fraud, and abuse in the SNAP program.  *See* Renewed Data Request at 2.  Without the data to which it is legally entitled, USDA cannot adequately carry out its statutory responsibilities to oversee the SNAP program.  This constitutes direct harm tipping the balance of equities to the government.  *See Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury" (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers))); *see also Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 148 F.4th 648, 655 (9th Cir. 2025).

### III.    Plaintiffs Should Be Ordered to Post Substantial Security in Connection with Any Preliminary Injunctive Relief and Any Preliminary Relief Should Be Stayed Pending Any Appeal

To the extent the Court issues any injunctive relief, such relief be stayed pending the disposition of any appeal that is authorized, or at a minimum, administratively stayed for a period of seven days to allow the United States to seek an expedited stay from the Court of Appeals or Supreme Court if an appeal is authorized.  For the reasons explained above, Defendants have, at a minimum, satisfied the requirements for a stay of any injunction pending appeal.  *See Nken*, 556 U.S. at 434 (describing the standard for obtaining such a stay and noting the "substantial overlap" between that standard and "the factors governing preliminary injunctions").

24

3:25-cv-06310-MMC          DEFS' OPP'N TO PLS' MOT. TO ENFORCE OR EXPAND THE PRELIM. INJ.

The Defendants also respectfully request that any injunctive relief be accompanied by a bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

## CONCLUSION

For the reasons outlined above, the Court should deny Plaintiffs' motion to enforce or expand the Court's previous preliminary injunction.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

TYLER BECKER
Counsel to the Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Branch Director
Civil Division, Federal Programs Branch

BENJAMIN S. KURLAND
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 598-7755
ben.kurland@usdoj.gov

*Counsel for Defendants*