1  Rob Bonta
   Attorney General of California
2  Paul Stein
   Robin Goldfaden
3  Supervising Deputy Attorneys General
   Andrew Z. Edelstein
4  Anna Rich
   Jane Reilley
5  Sebastian Brady
   William Bellamy
6  Maria F. Buxton
   Liam E. O'Connor
7  Deputy Attorneys General
   State Bar No. 330050
8   455 Golden Gate Avenue, Suite 11000
   San Francisco, CA 94102-7004
9  Telephone: (415) 510-3915
   Fax: (415) 703-5480
10  E-mail: Liam.OConnor@doj.ca.gov
   *Attorneys for Plaintiff State of California*

11
   *Additional counsel listed on signature page*

12
                    IN THE UNITED STATES DISTRICT COURT

13
                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

14
                          SAN FRANCISCO DIVISION

15

16

17  **STATE OF CALIFORNIA, ET AL.**            Case No. **3:25-cv-06310-MMC**

18                            Plaintiffs,       **PLAINTIFF STATES' REPLY IN
                                                SUPPORT OF MOTION TO
19                                              ENFORCE OR EXPAND THE
                                                PRELIMINARY INJUNCTION**
20           **v.**
                                                Date: February 13, 2026
21                                              Time: 9:00 a.m.
                                                Courtroom: 7
22  **UNITED STATES DEPARTMENT OF              Judge: Maxine M. Chesney
    AGRICULTURE, ET AL.**                       Trial Date: None set
23                            Defendants.       Action Filed: July 28, 2025

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................... 1

ARGUMENT ............................................................................................................... 2

I.    The Court Should Enforce Its Injunction Against the Renewed Demand. ............. 2

    A.    The Demand violates § 2020(e)(8). ............................................................. 2

    B.    The Demand lacks an agreed-upon protocol, in violation of § 2020(a)(3). ......................................................................................... 6

II.    In the Alternative, the Court Should Expand Its Injunction. ................................. 8

    A.    The Demand is contrary to the Computer Matching Act. ........................... 9

    B.    The Demand for unfettered possession of records violates § 2020(a)(3). ....................................................................................... 12

    C.    The Demand arbitrarily circumvents existing privacy protections. .......... 12

    D.    The remaining factors weigh in Plaintiffs' favor. ..................................... 13

    E.    The Court should deny Defendants' requests for a bond and a stay. ........ 15

CONCLUSION ......................................................................................................... 15

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Cal. State Grange v. Nat'l Marine Fisheries Serv.*
  620 F. Supp. 2d 1111 (E.D. Cal. 2008)................................................................. 10

*California v. Trump*
  963 F.3d 926 (9th Cir. 2020)................................................................................ 10

*City and County of S.F. v. Trump*
  897 F.3d 1225 (9th Cir. 2018)................................................................................ 9

*City of Seattle v. Trump*
  -- F. Supp. 3d --, 2025 WL 3041905 (W.D. Wash. Oct. 31, 2025) ........................ 14

*County of Santa Clara v. Noem*
  No. 25-cv-08330-WHO, 2025 WL 3251660 (N.D. Cal. Nov. 21, 2025) ................ 9

*Dep't of Com. v. New York*
  588 U.S. 752 (2019) ............................................................................................... 4

*DHS v. Regents of Univ. of Cal.*
  591 U.S. 1 (2020) ................................................................................................. 13

*Liquid Carbonic Indus. Corp. v. F.E.R.C.*
  29 F.3d 697 (D.C. Cir. 1994) .............................................................................. 10

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*
  463 U.S. 29 (1983) .............................................................................................. 13

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*
  583 U.S. 109 (2018) ............................................................................................... 8

*Ohio v. EPA*
  603 U.S. 279 (2024) ............................................................................................... 6

*Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nickels*
  150 F.4th 1260 (9th Cir. 2025)............................................................................... 7

*R.I. State Council of Churches v. Rollins*
  No. 25-cv-569-JJM-AEM, 2025 WL 3050100 (D. R.I. Nov. 6, 2025) ................... 4

*Rowland v. Bissell Homecare, Inc.*
  73 F.4th 177 (3d Cir. 2023)................................................................................... 7

*S.F. A.I.D.S. Found. v. Trump*
  786 F. Supp. 3d 1184 (N.D. Cal. 2025) ........................................................... 9, 11

ii

1

2

## TABLE OF AUTHORITIES
### (continued)

**Page**

3

4

*State of Minnesota v. U.S.D.A.*
   No. 25-cv-4767, 2026 WL 125180 (D. Minn. Jan. 16, 2026).......................................... 4, 14, 15

5

*United States v. Weber*
   No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ........................ 5

6

**STATUTES**

7

8

5 U.S.C.
   § 552a(a)(8) ....................................................................................................................... 11
   § 552a(a)(9) ......................................................................................................................... 9

9

   § 552a(a)(11) ....................................................................................................................... 9
   § 552a(o)(1) ............................................................................................................ 6, 9, 10

10

   § 552a(q) ........................................................................................................................... 10

11

7 U.S.C.

12

   § 2015(b)(4) ...................................................................................................................... 12
   § 2020(a)(3) ................................................................................................................ *passim*

13

   § 2020(e)(8) ................................................................................................................ *passim*
   § 2025(c)(5) ...................................................................................................................... 12

14

   § 2026(n)(3)(C) ............................................................................................................. 6, 13

15

26 I.R.C. § 7602(a) .................................................................................................................. 12

16

**REGULATIONS**

17

7 C.F.R.

18

   § 272.11 ............................................................................................................................... 3
   § 272.11(b) ........................................................................................................................ 11

19

   § 276.4(d) ............................................................................................................................ 7
   § 276.4(e)(1) ...................................................................................................................... 14

20

21

**COURT RULES**

22

Fed. R. Civ. P 16(a)(5) .............................................................................................................. 8

23

**OTHER AUTHORITIES**

24

87 Fed. Reg. 59,633 (Oct. 3, 2022) ......................................................................................... 13

25

90 Fed. Reg. 26521-01 (June 23, 2025) ..................................................................................... 2

26

13 Williston on Contracts § 38:16 (4th ed. May 2025) .............................................................. 7

27

Associated Press, *JD Vance delivers remarks in Minneapolis* (Jan. 22, 2026),
   https://www.youtube.com/live/xHOWRMk-MFU?t=439s ..................................................... 3

28

# TABLE OF AUTHORITIES
### (continued)

Page

Brooke Rollins (@SecRollins), X (Jan. 8, 2026, at 5:44 a.m. PT),
https://x.com/secrollins/status/2009259898349944855?s=12 .............................................. 15

*Computerize*, Merriam Webster, https://www.merriam-
webster.com/dictionary/computerize ................................................................................... 11

*Correcting the Record: Response to the EFF January 15, 2026 Report on Palantir*,
Palantir (Jan. 27, 2026), https://blog.palantir.com/correcting-the-record-
response-to-the-eff-january-15-2026-report-on-palantir-4b3a12536cd2 .............................. 4

Letter from A.G. Bondi to Gov. Walz (Jan. 24, 2026),
https://www.nytimes.com/interactive/2026/01/24/us/pam-bondi-walz-doc.html ................... 3

Rapid Response 47 (@RapidResponse47), X (Jan. 20, 2026, at 4:58 p.m. PT),
https://x.com/RapidResponse47/status/2013778212594069598 ........................................... 7

Sarah Maslin Nir, *Scammers Keep Stealing Food Stamps. New Cards Might Stop
Them*, N.Y. Times (Jan. 22, 2026),
https://www.nytimes.com/2026/01/22/nyregion/ebt-food-stamp-
skimming.html ..................................................................................................................... 5

*Subject*, Black's Law Dictionary (12th ed. 2024) ......................................................... 7

*Subject to*, Merriam Webster, https://www.merriam-
webster.com/dictionary/subject%20to ................................................................................. 7

1

**INTRODUCTION**

2          In issuing its preliminary injunction, this Court found that USDA has stated its intent to

3    share and use personal and sensitive applicant data in violation of the SNAP Act, 7 U.S.C.

4    § 2020(e)(8). The Court further explained that, under 7 U.S.C. § 2020(a)(3), Defendants must

5    obtain the States' agreement to a "data and security protocol" in order to obtain the demanded

6    data. Defendants did not appeal that order. They instead issued a renewed demand for the same

7    data, attached a "proposed" data and security protocol to it, and demanded that Plaintiffs sign it,

8    even though the protocol fails to address the fundamental legal defect previously identified by the

9    Court. When Plaintiffs asked Defendants to include provisions to address that defect, Defendants

10   instituted proceedings to cut off Plaintiffs' administrative funding—belying the narrative in

11   Defendants' Opposition that they "attempted to work with" Plaintiffs. ECF No. 118 (Opp.) at 5.

12         Defendants' Opposition also effectively suggests that the Court should reconsider its PI

13   Order, claiming it is speculative that Defendants would unlawfully disclose and use the demanded

14   data. The Court should not be fooled. Despite ample opportunity, Defendants *still* have not

15   amended the relevant System of Records Notice (SORN), which the Court rightly found

16   announces the Administration's "intent to use [applicant data] in ways well beyond those

17   permitted under § 2020(e)(8)(A)(ii)." ECF No. 106 (PI Order) at 18. Moreover, Defendants *still*

18   refuse to agree to abide by § 2020(e)(8)—and instead assert their purported right to share

19   applicant data with other agencies upon request. And, if there was ever any doubt, a recent memo

20   by U.S. Immigration and Customs Enforcement (ICE) and recent remarks by Administration

21   officials make it unmistakably clear: the Administration wants to use Plaintiffs' SNAP records to

22   fuel its mass surveillance and deportation machines—purposes far beyond the limited scope of

23   disclosures permitted by § 2020(e)(8).

24         The Court should enforce its preliminary injunction—not reconsider it. Alternatively, if

25   the Court finds Defendants' renewed demand to be beyond the scope of the preliminary

26   injunction, then the Court should expand that order. Either way, Defendants should be barred

27   from carrying out their retaliatory threats to cut off Plaintiffs' funding before Plaintiffs have the

28   opportunity to obtain a final judgment on the merits.

1

**ARGUMENT**

**I.    THE COURT SHOULD ENFORCE ITS INJUNCTION AGAINST THE RENEWED DEMAND.**

The Court should enforce its preliminary injunction against Defendants' renewed demand because it fails to cure the basic defects the Court identified in Defendants' original demand.

**A.    The Demand violates § 2020(e)(8).**

The Court has already held that Plaintiffs are "likely to show the SNAP Act prohibits them from disclosing to USDA the information demanded," PI Order at 19, because "USDA has announced its intent to use [SNAP applicants' information] in ways well beyond those permitted under § 2020(e)(8)(A)(ii)," including by asserting in the relevant SORN "the right to disclose the data to a number of entities, including numerous entities that are not assistance programs, and for purposes other than the administration or enforcement of the programs referenced in § 2020(e)(8)(A)(i)," PI Order at 18 (citing 90 Fed. Reg. 26521-01, 26522-23 (June 23, 2025)). In their Opposition, Defendants offer no new evidence or legal authority for the Court to reconsider its holding. But they nevertheless take the position that their renewed demand need not comply with § 2020(e)(8) for two reasons, both of which are baseless.

*First*, Defendants assert that the renewed demand is somehow beyond the scope of the PI Order because it cites § 2020(a)(3) as its source of authority, whereas Defendants' original demand cited both § 2020(a)(3) and § 2020(e)(8). *See* Opp. at 8. But the Court's holding regarding § 2020(e)(8) applies with equal force to Defendants' renewed demand, because § 2020(e)(8) governs *any* disclosure of "information obtained from applicant households," 7 U.S.C. § 2020(e)(8)(A)(i)—what Defendants demand here. *See* ECF No. 116 (Mot.) at 7 n.3; ECF No. 116-2, Ex. A (Renewed Demand), Attachment at 1-3 (demanding, among other things, Social Security numbers and addresses "provided" by applicants). Indeed, in past agreed-upon data and security protocols, USDA has acknowledged that its authority to collect and use applicant data is "subject to confidentiality and limitations on disclosure at [7 U.S.C. § 2020(e)(8)]." ECF No. 116-5 (WA Decl.), Ex. A at 2; *see also* ECF No. 116-4 (IL Decl.), Ex. A at 9. Defendants' Opposition ignores this fact—and, indeed, all the evidence that Plaintiffs submitted.

*Second*, Defendants claim that Plaintiffs' and the Court's concerns that USDA will

2

"impermissibly share data [are] speculative." Opp. at 12 (capitalization altered). Specifically, Defendants claim that the "sole evidence" that USDA will not comply with § 2020(e)(8) is the SORN, Opp. at 10, and they ask this Court to reconsider its finding that in the SORN USDA "announced its intent to use [SNAP applicants' information] in ways well beyond those permitted under § 2020(e)(8)(A)(ii)," PI Order at 18. But Defendants' Opposition offers no serious defense of their continued failure to amend the SORN, *see* Opp. at 9 n.2, and simply fails to confront the mounting evidence that bolsters this Court's finding.

Indeed, the day before Defendants filed their Opposition, Vice President Vance delivered prepared remarks in Minneapolis, blaming "state and local officials" for their "lack of cooperation," and calling upon them to share SNAP applicant data so the Administration can use it to support its mass deportation campaign:

> Let's say . . . we have a criminal migrant who is a sex offender. . . . [W]e've got to go and arrest that person. . . . But because they're an illegal alien, we don't know their last address. . . . What we'd like to do is talk to local officials and say, "You know what, according to the Medicaid rules . . . where was the last address this person was domiciled?" **Or according to a SNAP application, a food stamps application, maybe that could give us insight to where this person is today.**"[1]

The Administration doubled down two days later in a letter from U.S. Attorney General Pamela Bondi to Minnesota Governor Tim Walz addressing the ongoing upheaval in that State— including the killing of two American citizens by U.S. Department of Homeland Security (DHS) officers. In that letter, Attorney General Bondi emphasized her "commit[ment] to enforcing federal immigration laws" and urged Minnesota to "partner with this administration" in these efforts. *See* Letter from A.G. Bondi to Gov. Walz (Jan. 24, 2026) at 3.[2] The very first demand for cooperation on this front was for Minnesota to "share all of [its] records on Medicaid and Food and Nutrition Service programs, including [SNAP] data, with the federal government." *Id.* at 2.

___

[1] Associated Press, *JD Vance delivers remarks in Minneapolis*, 7:20-8:10 (Jan. 22, 2026), https://www.youtube.com/live/xHOWRMk-MFU?t=439s (emphasis added). To be clear, undocumented immigrants are ineligible for SNAP benefits and States enforce this requirement by verifying immigration status through the U.S. Citizenship and Immigration Services' Systematic Alien Verification for Entitlements (SAVE) database. *See* 7 C.F.R. § 272.11; *see also* ECF No. 72-1 ¶¶ 31-35 (explaining that Defendants are duplicating these checks by matching collected data against the same database).

[2] https://www.nytimes.com/interactive/2026/01/24/us/pam-bondi-walz-doc.html.

These remarks come on the heels of technology company Palantir acknowledging it has already used data from "applications for benefits" to develop the "ImmigrationOS" platform that supports ICE's operations, and ICE claiming that it has the power to demand other agencies to turn over any "lawfully collected information" for use in immigration enforcement. Mot. at 8 & n.4.[3]

Despite this evidence, Defendants insist that their protocol "*prohibits* USDA from *sharing* data with 'law enforcement investigations beyond coordination regarding criminal and administrative SNAP violations.'" Opp. at 5 (quoting ECF No. 116-2, Ex. C, Attachment (USDA Initial Protocol) § 2.2.1) (emphasis added). But the cited provision only addresses *USDA's own* "*use*" of data, USDA Revised Protocol § 2.2.1 (emphasis added); contrary to Defendants' representations to the Court, it does *not* "prohibit" USDA from "sharing" data with other law enforcement agencies, *see* Opp. at 5. In fact, when Plaintiffs pointed out this problem in their December 8 letter, Defendants responded by adding a provision to grant *access to the database itself* to "[a]ny other federal agency" whenever USDA deems such access to be "required by law." Mot. at 8-9 (quoting USDA Revised Protocol § 4.2).[4] Moreover, Defendants also expanded the provision regarding USDA's own use of the data to include "coordination regarding . . . other violations *relating to* the" SNAP Act, a vague limitation that USDA makes no attempt to define, *see* ECF No. 116-2, Ex. D § 2.2.1 (protocol redline) (emphasis added).

This Court need not "'exhibit a naiveté from which ordinary citizens are free.'" *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).[5] Instead, it should follow the lead of the Central

---

[3] Palantir recently confirmed it has developed a tool that ICE is using to aggregate data about individuals that DHS receives from other agencies, including the U.S. Department of Health and Human Services, to locate targets for deportation. *See Correcting the Record: Response to the EFF January 15, 2026 Report on Palantir*, Palantir (Jan. 27, 2026), https://blog.palantir.com/correcting-the-record-response-to-the-eff-january-15-2026-report-on-palantir-4b3a12536cd2.

[4] Notably, although Defendants have collected 28 States' data, they do not explain how they have handled any "external requests for data" to date. *See* Opp. at 13 n.5.

[5] By now, it is clear that this Administration is willing to disregard the SNAP Act's requirements when it suits its interests. *See State of Minnesota v. U.S.D.A.*, No. 25-cv-4767 (LMP/JFD), 2026 WL 125180, at *13 (D. Minn. Jan. 16, 2026) (as explained *infra* § II(D), enjoining USDA's attempt to summarily strip SNAP funding from Minnesota and rejecting USDA's "breathtaking" position that it has "'unfettered' authority in its administration of SNAP" and can "disregard" Congressional mandates); *R.I. State Council of Churches v. Rollins*, No. 25-cv-569-JJM-AEM, 2025 WL 3050100, *1-2 (D. R.I. Nov. 6, 2025) (restraining USDA's actions to suspend SNAP benefits during the government shutdown on the false premise that there were

(continued…)

4

1  District of California, which recently dismissed the Administration's lawsuit attempting to force

2  California to produce unredacted voter roll data on tens of millions of people in violation of

3  federal privacy laws. *United States v. Weber*, No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807,

4  at *20 (C.D. Cal. Jan. 15, 2026). Citing the Administration's wide-ranging efforts to amass PII—

5  *including the demands at issue in this case*—the court explained that it was not "obliged to

6  accept" the Administration's "contrived statement and purpose" when it "appears that the DOJ is

7  on a nationwide quest to gather the sensitive, private information of millions of Americans for use

8  in a centralized federal database." *Id.* at *10-11. As relevant here, the court emphasized that if an

9  agency wants to use statutory authorities "for more than their stated purpose, circumventing the

10 authority granted to them by Congress, it cannot do so under the guise of a pretextual

11 investigative purpose." *Id.* at *12.

12      In this case, as in *Weber*, notwithstanding Defendants' claim that their demand is aimed at

13 combating "waste, fraud, and abuse" in the SNAP program, there is ample evidence that

14 Defendants intend to amass SNAP households' PII at least in part so that the federal government

15 can share it beyond § 2020(e)(8)'s restrictions. Indeed, in addition to the evidence discussed

16 above, Defendants have now produced the administrative record, and the *only* document that pre-

17 dates their efforts to obtain this data (other than background materials) is President Trump's

18 Information Silos Executive Order, which directs agency heads to "ensure the Federal

19 Government has unfettered access to comprehensive data from all State programs" and to then

20 share it across the federal government. Mot. at 2; *see* ECF No. 115-1, at 2. As the Court has

21 already found, the SNAP Act prohibits Defendants from enforcing their demands for SNAP

22 applicant data in these circumstances, given the Administration's stated intent "to use the

23 information for purposes beyond those set forth in § 2020(e)(8)(A)(ii)." PI Order at 18-19.

24      Accordingly, while Plaintiffs remain committed to ensuring that only eligible applicants

25 receive SNAP benefits, and to partnering with the Administration to improve program integrity,[6]

26 no available appropriations when in fact there were $6 billion in contingency funds the President
had previously recognized "are available if SNAP funds lapse due to a government shutdown"

27 and $23 billion in additional funds), *appeal dismissed*, No. 25-2089 (1st Cir. Dec. 4, 2025).

          [6] *See, e.g.,* Sarah Maslin Nir, *Scammers Keep Stealing Food Stamps. New Cards Might*

28                                                                                (continued…)

5

Plaintiff States' Reply ISO Mot. to Enforce or Expand the Prelim. Inj. (Case No. 3:25-cv-06310-MMC)

1  they cannot agree to Defendants' renewed demand, which violates the preliminary injunction.

2  **B.    The Demand lacks an agreed-upon protocol, in violation of § 2020(a)(3).**

3  This Court has already recognized that Defendants could not enforce their initial demands

4  under § 2020(a)(3) because that provision "requires USDA and a State agency to *agree to* data

5  and security protocols *before* the State agency is required to provide the SNAP records demanded

6  by USDA." PI Order at 13 (emphasis added). Nevertheless, Defendants renewed their demands

7  and initiated proceedings to cut off Plaintiffs' funding, *without* an agreed-upon protocol.

8  In order to avoid this problem, Defendants accuse Plaintiffs of not "negotiating in good

9  faith," Opp. at 2, and claim that "after issuing the December 23 Letter, USDA still stood ready to

10  work with the States to address any remaining good faith objections," *id.* at 7. Yet Defendants

11  have made clear that it was never their intent to negotiate in good faith with Plaintiffs. Instead,

12  they insisted from the outset that "there [could] be no good faith" objections to their demands,

13  Renewed Demand at 1, and that Plaintiffs have no "discretion" in the matter, ECF No. 116-2, Ex.

14  E at 1. Despite Defendants' "my-way-or-the-highway" approach, Plaintiffs suggested—

15  reasonably and in good faith—that the protocol be amended:

16  - to ensure compliance with § 2020(e)(8), which this Court held "prohibits [Plaintiffs]
17  from disclosing to USDA the information demanded" given USDA's intent to share
   and use the information more broadly, PI Order at 19—a holding that Defendants
   refused to acknowledge in the Parties' "negotiations" or in their Opposition;

18  - to ensure compliance with 5 U.S.C. § 552a(o)(1), as supported by Defendants' past
19  practice of entering into computer matching agreements, *see, e.g.*, ECF No. 116-5
   (WA Decl.), Ex. A; ECF No. 116-3 (NY Decl.), Ex. D, and Defendants' Privacy
20  Impact Assessment, which identifies "Computer Matching Agreements" as an action
   to "manage the risk associated with external sharing and disclosure of personal
21  information while complying with Privacy Act requirements," *see* ECF No. 59-7, Ex.
   A (Privacy Impact Assessment) at 22-23—a practice and a document that Defendants
22  refused to acknowledge in the Parties' "negotiations" or in their Opposition; and

23  - to minimize the unnecessary collection of PII, as supported by Defendants' claimed
   goals, *see* USDA Revised Protocol § 1.3, by Congressional restrictions on
24  longitudinal pooling of participant data, § 2026(n)(3)(C), and by the protections built
   into USDA's existing program integrity processes, *see* Mot. at 23-24.[7]

25  *Stop Them*, N.Y. Times (Jan. 22, 2026), https://www.nytimes.com/2026/01/22/nyregion/ebt-food-
26  stamp-skimming.html (describing new state initiatives to combat "skimming" practices that steal
   SNAP benefits by copying data from EBT cards).
   [7] Defendants argue that they adequately considered the important issues raised by
27  Plaintiffs. Opp. at 16-17. But at most Defendants cite conclusory assertions in their December 23
   Letter that "did not address [Plaintiffs'] concern[s] so much as sidestep [them]," *Ohio v. EPA*,
28  603 U.S. 279, 296 (2024), in violation of the APA. *See* Mot. at 14-15.

6

Rather than responding meaningfully to Plaintiffs' proposals, USDA terminated negotiations and initiated proceedings to cut off Plaintiffs' funding, as Secretary Rollins had promised from the start. *See* Mot. at 10-11.[8] This left Plaintiffs with no choice but to comply by Defendants' stated deadline "to [USDA's] satisfaction," 7 C.F.R. § 276.4(d), or to seek judicial relief. Contrary to Defendants' suggestion, Plaintiffs do not claim that § 2020(a)(3) "empowers the States to refuse to agree to *reasonable* data and security protocols." Opp. at 11 (emphasis added). But, at a minimum, Defendants cannot use § 2020(a)(3) to force Plaintiffs to disclose data when doing so is prohibited by law. *See* PI Order at 18-19; *supra* § I(A); *infra* § II(A).

As a fallback to their baseless claim that Plaintiffs are stonewalling, Defendants make a startling new argument that an agreed-upon protocol is not required at all. *See* Opp. at 10-12. This flies in the face of the text of the statute and the Court's prior order. In everyday use and in the law, the term "subject to" signals a condition precedent. *See Subject to*, Merriam Webster, https://www.merriam-webster.com/dictionary/subject%20to (defining "subject to" as "dependent on something else to happen or be true," e.g., "The sale of the property is subject to approval by the city council.").[9] This is particularly true when, as here, an object is "subject to" *an agreement*. Were it otherwise, the phrase would be meaningless, because one party could unilaterally claim an "unequivocal right" to the object, *see* Opp. at 8 (capitalization altered), regardless of the other's input, as Defendants now claim. *See Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nickels*, 150 F.4th 1260, 1273 (9th Cir. 2025) ("We cannot adopt a statutory reading which we know will sap the interpreted provision of all practical significance."). In short, Congress provided that Defendants' access is "subject to data and security protocols *agreed to by the State*

---

[8] Plaintiffs have hardly needed to "cherry pick," *see* Opp. at 11 n.4, from Secretary Rollins's comments. *See, e.g.,* Rapid Response 47 (@RapidResponse47), X, 0:23-0:42 (Jan. 20, 2026, at 4:58 p.m. PT), https://x.com/RapidResponse47/status/2013778212594069598 (claiming that "Biden increased [SNAP] 40 percent in his four years—of course, trying to buy reelection for the Democrats," that the "fraud is insane," and that therefore USDA is "going to stop funding a lot of [SNAP]" and is "suing a lot of the blue states to give [USDA] the data").

[9] *See also Rowland v. Bissell Homecare, Inc.*, 73 F.4th 177, 181 (3d Cir. 2023) ("'subject to' means 'only if'" (citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 126 (2012)); *Subject*, Black's Law Dictionary (12th ed. 2024) ("Dependent on or exposed to (some contingency); esp., being under discretionary authority <funding is subject to the board's approval>"); 13 Williston on Contracts § 38:16 (4th ed. May 2025) ("[T]he words 'subject to' in a contract usually indicate a condition to one party's duty of performance and not a promise by the other.").

7

*agency and* Secretary," § 2020(a)(3)(B) (emphasis added), not just "agreed to by the Secretary," as Defendants would have it. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 123 (2018) ("[T]his Court is not free to 'rewrite the statute' to the Government's liking." (citation omitted)).

\* \* \*

To reiterate, at every turn, USDA has made clear it will not negotiate over the terms of its demand: Secretary Rollins said as much two months ago, no matter how much Defendants try to spin it, *see* Opp. at 11 n.4; USDA's November 24 letter made clear the protocol was offered on a take-it-or-leave-it basis; and its December 23 letter confirmed the point, rejecting out of hand all Plaintiffs' suggestions while also initiating proceedings to cut off Plaintiffs' funding. Thus, Defendants' position in their Opposition—that they have "stood ready to work with the States," *e.g.*, Opp. at 7—is surprising, to say the least. If this is anything other than a litigation tactic, Plaintiffs welcome the opportunity to engage in good faith discussions. It remains the case, however, that the Administration continues to express an intent to use the demanded data outside what § 2020(e)(8) permits. *See, e.g., supra* p. 3 (Vice President Vance's remarks confirming Administration's intent to use SNAP data for immigration enforcement). And Defendants continue to insist that they will allow direct access to the SNAP Database by other agencies in response to requests that *they*, unilaterally, deem "lawful," while refusing to agree to even notify Plaintiffs before acceding to such requests. *See* Opp. at 10 n.3. So, while Plaintiffs remain willing to engage in good-faith negotiations (without the threat of immediate disallowance hanging over them), they also submit that this Court's involvement would be helpful in creating space for agreement, if Defendants are willing to accept the Court's help. *See* Fed. R. Civ. P 16(a)(5).[10]

## II.    IN THE ALTERNATIVE, THE COURT SHOULD EXPAND ITS INJUNCTION.

If the Court finds that Defendants' renewed demand is beyond the scope of its preliminary injunction, then it should expand the injunction to bar the renewed demand. The renewed demand

---

[10] Plaintiffs have already dedicated a significant amount of time and energy working towards a draft data and security protocol that would comply with the law, ensure the privacy and security of confidential applicant data, and minimize, to the extent possible, the need for USDA to engage in state-by-state negotiations.

8

is likely contrary to § 2020(e)(8) and § 2020(a)(3), for the reasons explained above.[11] The renewed demand also violates the APA for additional reasons, as explained below.

### A.    The Demand is contrary to the Computer Matching Act.

In their Motion, Plaintiffs argued that Defendants' renewed demand is contrary to 5 U.S.C. § 552a(o)(1), which prohibits a "source agency" from "disclos[ing]" records to a "recipient agency" "for use in a computer program except pursuant to" a computer matching agreement that meets the minimum requirements of that section. *See* Mot. at 12-14. Defendants do not dispute that Plaintiffs' SNAP agencies are "source agenc[ies]," *see* 5 U.S.C. § 552a(a)(11), that USDA is a "recipient agency," *see id.* § 552a(a)(9), and that the proposed protocol is not an "agreement" that satisfies 5 U.S.C. § 552a(o)(1). *See* Opp. at 14-15. Instead, Defendants raise three other arguments in an attempt to dodge the Computer Matching Act, but all are meritless.

First, Defendants assert that their unlawful computer matching will not cause Plaintiffs "Article III injury" and therefore Plaintiffs lack standing. Opp. at 14-15. But Defendants do not even address the injury identified by Plaintiffs in their Motion: that Defendants' demand requires them to either disclose records in violation of 5 U.S.C. § 552a(o)(1) or to lose up to hundreds of millions of dollars in federal funding. Mot. at 14 n.9; *see* ECF No. 75-1, Ex. C. By failing to "respond to this specific argument, [Defendants] have waived [any counterargument] and conceded the point." *S.F. A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184, 1230 (N.D. Cal. 2025), *appeal docketed*, No. 25-4988 (9th Cir. Aug. 7, 2025).

Second, Defendants claim Plaintiffs do "not fall within the zone of interests of the Computer Matching Act" insofar as the statute "protects the information of only individuals, not States." Opp. at 15. But "in the APA context, the zone of interests test does 'not require any

---

[11] Defendants claim Plaintiffs lack Article III standing to challenge the renewed demand as contrary to § 2020(e)(8) on the theory that the "possibility of impermissible sharing" is "speculative." Opp. at 12-14. As discussed above, there is nothing speculative about it. *See supra* § I(A). Moreover, Defendants simply ignore that if Plaintiffs do not produce the demanded data, they will lose their federal funding. *See City and County of S.F. v. Trump*, 897 F.3d 1225, 1236 (9th Cir. 2018) (threatened loss of federal funding "satisfies Article III's standing requirement" (citation omitted)). Indeed, this Court has already found that Defendants' threatened funding cuts constitute irreparable harm. *See* PI Order at 21-22; *County of Santa Clara v. Noem*, No. 25-cv-08330-WHO, 2025 WL 3251660, at *43 (N.D. Cal. Nov. 21, 2025) ("Hobson's choice" between accepting unlawful terms for federal funding and losing federal funding constitutes irreparable harm), *appeal docketed*, No. 26-402 (9th Cir. Jan. 20, 2026).

indication of congressional purpose to benefit the would-be plaintiff.'" *California v. Trump*, 963 F.3d 926, 941 (9th Cir. 2020). Instead, it "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* Further, "parties regulated by a statute . . . fall within its 'zone of interest.'" *Liquid Carbonic Indus. Corp. v. F.E.R.C.*, 29 F.3d 697, 704 (D.C. Cir. 1994); *accord Cal. State Grange v. Nat'l Marine Fisheries Serv.*, 620 F. Supp. 2d 1111, 1147 (E.D. Cal. 2008).

Here, Plaintiffs' interests in complying with 5 U.S.C. § 552a(o)(1)'s prohibition on disclosing records for use in a computer matching program without a computer matching agreement in place are, of course, *perfectly consistent* with the purpose of that section: to prohibit such disclosures.[12] And because Congress regulated States' conduct by obligating them to comply with 5 U.S.C. § 552a(o)(1), *see id.* § 552a(q), it can "reasonably be assumed" that Congress intended Plaintiffs to comply with the section and to obtain relief when necessary to do so, *see California*, 963 F.3d at 941 (citation omitted). Defendants' contrary suggestion—that Congress intended for Plaintiffs to have no recourse but to violate the section whenever USDA says so— flies in the face of common sense, as well as the APA's presumption of judicial review, which affords Plaintiffs "the benefit of any doubt," *see California*, 963 F.3d at 942 (citation omitted).

Third, Defendants claim that they do not intend to use the demanded records in a "computer-matching program," incorporating two arguments they raised in prior briefing. *See* Opp. at 15-16 (citing ECF No. 72 at 21-22). But both blatantly ignore the statutory definition of a "computer matching program," which includes "any computerized comparison of . . . two or more automated systems of records or a system of records with non-Federal records" in order to

---

[12] Moreover, Plaintiffs' interests align with those of SNAP participants, because—as Defendants themselves have acknowledged—data sharing can chill SNAP participation, leaving residents without federal nutrition assistance and increasing the strain on State resources. *See* Privacy Impact Assessment at 22-23 (acknowledging that "sharing of PII, especially if not communicated transparently, can lead to public distrust" and identifying "Computer Matching Agreements" as an action to mitigate these risks); ECF No. 59-2, Ex. B at 23 (acknowledging that disclosure of participants' data without consent "would negatively affect SNAP participation rates"). Accordingly, Plaintiffs are "more likely" to "further" rather than "frustrate" the statutory objectives. *California*, 963 F.3d at 942 (citation omitted).

"establish[] or verify[]" applicants' "eligibility" for "cash or in-kind assistance or payments under Federal benefit programs." 5 U.S.C. § 552a(a)(8).

The first argument is that Defendants' SNAP Database does not constitute a computer matching program because Defendants' "comparison of data is not '*automated*.'" ECF No. 72 at 22. But the statutory definition covers "any *computerized* comparison of" records, 5 U.S.C. § 552a(a)(8) (emphasis added), not any *automated* comparison. And Defendants are indisputably engaging in *computerized* comparisons here, because they are using computers to run programs—in Defendants' words, "automated scripts and queries" and "matching algorithms," Privacy Impact Assessment at 5—to compare each State's system of SNAP records (which contain records for hundreds of thousands if not millions of individuals) against federal systems of records.[13] While Defendants seem to think that it is significant that *humans* must click a few buttons to run the computer programs that compare the records, *see* ECF No. 72-1 ¶¶ 31-35, they cannot escape the fact that the comparisons are "computerized," 5 U.S.C. § 552a(a)(8).[14] Plaintiffs explained all this, *see* Mot. at 13 n.8, but Defendants could not muster any response, *see* Opp. at 15-16, thereby conceding the issue, *see S.F. A.I.D.S. Found.*, 786 F. Supp. 3d at 1230.

Second, Defendants argue that the SNAP Database is not a computer matching program because "it is the States' responsibility, not USDA's, to 'establish[] or verify[] eligibility' for SNAP benefits." ECF No. 72 at 22 (citations omitted). State agencies do process applications in the first instance. But that does not change the fact that Defendants are engaging in computer matching to "*verify[]* SNAP recipient *eligibility*," as they have repeatedly admitted. Privacy Impact Assessment at 13 (emphasis added); USDA Revised Protocol § 1.1 (Defendants "will . . . *verify[]* SNAP recipient *eligibility*" (emphasis added)). After all, the purported purpose of the

___

[13] *See, e.g.*, ECF No. 72-1 ¶¶ 31-35 (admitting that USDA is matching States' records against DHS's records through UCSIS's SAVE program); USDA Revised Protocol, § 1.1 (Defendants will match "the [SNAP] recipient data . . . against federally maintained databases, identify[] duplicate enrollments for elimination, and perform[] additional eligibility and program integrity checks specified herein").

[14] *See Computerize*, Merriam Webster, https://www.merriam-webster.com/dictionary/computerize (defining "computerize" as "to carry out, control, or produce by means of a computer"); ECF No. 72-1 ¶ 34 (admitting that the "SAVE [program] completes the analysis" and then a "human . . . downloads the result files"); *see also* 7 C.F.R. § 272.11(b) (requiring computer matching agreements before States may engage in computer matching through the same SAVE Program).

11

Plaintiff States' Reply ISO Mot. to Enforce or Expand the Prelim. Inj. (Case No. 3:25-cv-06310-MMC)

1    SNAP Database is to verify that benefits are only going to those who are eligible. *See, e.g.*, ECF

2    No. 90 at 4 (Defendants' "preliminary findings" of ineligible individuals receiving benefits).

3    **B.    The Demand for unfettered possession of records violates § 2020(a)(3).**

4    Defendants claim that the "clear text" of § 2020(a)(3) authorizes their demand for

5    unfettered possession of six years' worth of States' records concerning millions of applicants and

6    recipients. *See* Opp. at 18. But § 2020(a)(3) must be read in the context of the SNAP Act as a

7    whole, not in isolation. *See* PI Order at 14-15 ("[I]t is fundamental that a section of a statute

8    should not be read in isolation from the context of the whole Act." (citation omitted)). As

9    Plaintiffs set forth in their Motion, Congress knew how to grant USDA a right to *possess* certain

10    records in the SNAP Act, as it did in §§ 2015(b)(4) and 2025(c)(5); it did not include such

11    language in § 2020(a)(3), and this decision must be given effect. *See* Mot. at 15-18.

12    In particular, the SNAP Act includes multiple provisions that prevent the unrestricted

13    pooling of PII from SNAP households, for example by requiring the use of de-identified data to

14    protect individuals' privacy. *See* Mot. at 17, 22-24. And § 2020(a)(3) only requires State agencies

15    to make records available for inspection and audit so that USDA can monitor their performance.

16    As a former USDA official has explained, Defendants' "unprecedented and risky expansion of

17    federal data collection and retention practices" here cannot be justified by the agency's inspection

18    and audit authority, because the "vast quantities of PII that USDA is seeking far exceed what

19    USDA has shown to need to fulfill its oversight role." ECF 59-3 (Piazza Decl.) ¶¶ 12, 20.[15]

20    **C.    The Demand arbitrarily circumvents existing privacy protections.**

21    As Plaintiffs' undisputed evidence shows, and as Defendants concede, prior to the current

22    data demands, USDA had a long-standing practice of not collecting all applicants' and

23    participants' data into a single federal database and instead reviewing only limited datasets,

24    thereby avoiding the data security and privacy risks that come with pooling so much sensitive

25    data in one place. *See* Mot. at 19 (collecting citations); Opp. at 19 (offering no counterargument).

26

27    ───────────

[15] While Defendants may be correct that "[n]o one would contend that the IRS could not ask taxpayers to submit audit records electronically," Opp. at 18, that is because Congress expressly gave the IRS, in addition to its authority to "examine" certain documents, the authority to require "produc[tion]" of such documents. 26 I.R.C. § 7602(a).

28

12

Plaintiff States' Reply ISO Mot. to Enforce or Expand the Prelim. Inj. (Case No. 3:25-cv-06310-MMC)

1    In their Opposition, Defendants fail to cite any evidence that they were even aware of this long-

2    standing practice or its benefits when they abandoned it, as the APA requires. *See* Opp. at 19-20.

3           Nor have Defendants adequately explained how they considered and rejected policy

4    "alternatives" that would better protect applicant and recipient data. *DHS v. Regents of Univ. of*

5    *Cal.*, 591 U.S. 1, 30 (2020). First, Defendants flatly rejected Plaintiffs' offer to work with them to

6    minimize the collection of PII. *See* Mot. at 20. Like Defendants' December 23 Letter,

7    Defendants' Opposition simply makes the conclusory assertion that USDA "has curtailed the

8    elements to what it needs," without even attempting to explain how it made that determination.

9    Opp. at 20; *see Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

10   29, 52 (1983) (an agency may not "merely recite [] terms"; it "must explain the evidence which is

11   available, and must offer a 'rational connection between the facts found and the choice made'").

12   Second, Defendants dismissed Plaintiffs' concerns with "produc[ing] longitudinal data" with PII,

13   USDA Dec. 23 Ltr. at 4, even though Congress has required deidentified data for State agencies

14   to create longitudinal databases, 7 U.S.C. § 2026(n)(3)(C), and USDA required deidentified data

15   when creating the National Accuracy Clearinghouse, 87 Fed. Reg. 59,633, 59,638 (Oct. 3, 2022).

16   *See* Mot. at 22-23. Finally, Defendants have never clarified why the SNAP Database duplicates

17   existing processes to identify individuals with duplicate enrollments or who are deceased but

18   without incorporating the existing processes' legally mandated privacy protections. Defendants

19   simply claim that they are "striving for better, more efficient methods," but they have yet to

20   explain how they made that determination. Opp. at 22.[16]

21          **D.    The remaining factors weigh in Plaintiffs' favor.**

22          Plaintiffs also satisfy the remaining *Winter* factors. *See* Mot. at 25. As to irreparable harm,

23   Defendants primarily recycle arguments, *see* Opp. at 23-24, that this Court already rejected in

24   finding that Defendants' threatened funding cuts would cause Plaintiffs irreparable harm absent

25

26   _____

27   [16] Defendants' attempt to sidestep their 2019 feasibility study, Opp. at 21, fails to address that study's conclusions about the necessary statutory and regulatory changes for USDA to obtain and review all recipients' records for QC purposes and to access the databases required to conduct

28   an appropriate review of SNAP eligibility. *See* Mot. at 21-22.

13

injunctive relief, *see* PI Order at 21-22 (holding that threatened disallowances constitute irreparable injury, notwithstanding the "option of seeking administrative relief").

The fact that Defendants have not "[t]o date" "issued . . . Formal Warning[s]," Opp. at 7, does not obviate the need for immediate injunctive relief to prevent irreparable harm. Defendants reiterate in their Opposition that negotiations have ended, *id.* at 11 n.4, which means that formal warnings are the inevitable next step in their campaign to obtain Plaintiffs' data. Once Defendants issue those warnings, they could disallow Plaintiffs' funding as soon as 30 days later, 7 C.F.R. § 276.4(e)(1), meaning that, absent injunctive relief, Plaintiffs would be forced to brief—and the Court would be forced to decide—yet another motion on an expedited schedule.[17]

Also, as their recent actions make clear, Defendants cannot be trusted to follow the governing regulations before disallowing Plaintiffs' funding. After issuing their renewed data demand to all Plaintiff States, Defendants also issued a separate demand to Minnesota that it "recertify all SNAP beneficiaries" in some of the State's most populous counties (more than 100,000 households and nearly 200,000 recipients) within 30 days; Defendants threatened to "trigger noncompliance procedures" to cut off Minnesota's funding if it did not complete this impossible task. *State of Minnesota v. U.S.D.A.*, No. 25-cv-4767 (LMP/JFD), 2026 WL 125180, at *1 (D. Minn. Jan. 16, 2026); *see* Richie Decl. ¶ 3, Ex. A. After Minnesota moved for a preliminary injunction, Defendants' counsel suggested that Defendants might be willing to negotiate the terms of the recertification demand if Minnesota agreed to comply with Defendants' renewed data demand, which is the subject of the present motion. Richie Decl. ¶ 9. Then, even before the court could hold a hearing on Minnesota's motion (and even before Defendants' stated deadline), Defendants issued a disallowance letter "immediately withholding administrative funding," referencing Minnesota's purported failure to "provide[] [USDA] with" the data demanded in the present case (alongside Minnesota's failure to comply with the recertification demand) as a basis for the summary disallowance of Minnesota's administrative funding. Richie

---

[17] *See also City of Seattle v. Trump*, -- F. Supp. 3d --, 2025 WL 3041905, *10 & n.15 (W.D. Wash. Oct. 31, 2025) (plaintiffs "need not await formal implementation" to demonstrate "imminent harm" from threatened funding cuts, including because "the 'looming risk' of acute budgetary uncertainty due to Defendants' unlawful actions is an injury in of itself").

14

Plaintiff States' Reply ISO Mot. to Enforce or Expand the Prelim. Inj. (Case No. 3:25-cv-06310-MMC)

Decl. ¶ 11, Ex. B. The court rightfully enjoined both the recertification demand and the disallowance as contrary to law and arbitrary and capricious, including because Defendants' only purported justification for their actions—the "Feeding Our Future fraud scheme"—did not even involve SNAP. *Minnesota*, 2026 WL 125180, at *14. And in its order, the court held it was "deeply troubling" that Defendants "preemptively took the very action that Minnesota's motion sought to enjoin" before the hearing, *id.* at *7 n.5—not to mention the fact that Defendants "disregard[ed] the congressionally mandated" process to disallow funding altogether. *Id.* at *13.

In short, Defendants have already cut off funding once without the warnings required by law; Plaintiffs need protection from them doing the same here. *See* Brooke Rollins (@SecRollins), X, 0:17-0:23 (Jan. 8, 2026, at 5:44 a.m. PT) (Secretary Rollins claiming that after Minnesota, Defendants are coming for "California next" and "looking at New York" and "some other states"), https://x.com/secrollins/status/2009259898349944855?s=12.

With respect to the balance of hardships and public interest, *see* Opp. at 24, Defendants rehash rejected arguments and submit no new evidence for the Court to reconsider its finding that Defendants' "preliminary snapshot review" does not show any widespread fraud, waste, or abuse in Plaintiffs' SNAP programs. *See* PI Order at 23; *see also Minnesota*, 2026 WL 125180, at *14 n.11 (similarly rejecting Defendants' "sweeping, nonspecific, and unsupported accusations of 'fraud, waste, and abuse'" based on its review of the new SNAP Database).

**E.    The Court should deny Defendants' requests for a bond and a stay.**

Defendants' cursory requests for a bond and a stay pending appeal, *see* Opp. at 24-25, fail to provide any basis for the Court to revisit its prior ruling on these issues. In short, Defendants face no "realistic likelihood of harm," and they have not made a strong showing of a likelihood of success on the merits of any appeal. *See* PI Order at 24-25; *see also Minnesota*, 2026 WL 125180, at *19 (similarly rejecting requests by Defendants for a bond and a stay).

**CONCLUSION**

The Court should grant Plaintiffs' Motion and bar Defendants from enforcing their renewed demand and threats of funding cuts so Plaintiffs can fully litigate their claims on the merits.

15

1    Dated: January 30, 2026                          Respectfully submitted,

2                                                      ROB BONTA
                                                       Attorney General of California
3                                                      PAUL STEIN
                                                       ROBIN GOLDFADEN
4                                                      Supervising Deputy Attorneys General
                                                       ANDREW Z. EDELSTEIN
5                                                      ANNA RICH
                                                       JANE REILLEY
6                                                      EDWARD P. WOLFE
                                                       SEBASTIAN BRADY
7                                                      WILLIAM BELLAMY
                                                       MARIA F. BUXTON
8                                                      LIAM E. O'CONNOR

9                                                      */s/ Liam E. O'Connor*
                                                       LIAM E. O'CONNOR
10                                                     DEPUTY ATTORNEY GENERAL
                                                       *Attorneys for Plaintiff State of California*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff States' Reply ISO Mot. to Enforce or Expand the Prelim. Inj. (Case No. 3:25-cv-06310-MMC)

Letitia James
Attorney General of New York

*/s/ Mark Ladov*
Mark Ladov
Special Counsel
Julie Dona
Special Counsel
28 Liberty St.
New York, NY 10005
(212) 416-8240
mark.ladov@ag.ny.gov
*Attorneys for Plaintiff State of New York*

Kristin Mayes
Attorney General of Arizona

*/s/ Hayleigh S. Crawford*
Hayleigh S. Crawford (AZ No. 032326)
Luci D. Davis (AZ No. 035347)
2005 N. Central Ave. Phoenix, AZ 85004
(602) 542-3333
Hayleigh.Crawford@azag.gov
Luci.Davis@azag.gov
ACL@azag.gov
*Attorneys for Plaintiff State of Arizona*

Kwame Raoul
Attorney General of Illinois

*/s/ Sherief Gaber*
Harpreet K. Khera
Bureau Chief, Special Litigation
Sherief Gaber
Assistant Attorney General
115 S. LaSalle St., 35th Flr.
Chicago, Illinois 60603
(773) 590-7127
sherief.gaber@ilag.gov
*Attorneys for Plaintiff State of Illinois*

Philip J. Weiser
Attorney General of Colorado

*/s/ David Moskowitz*
David Moskowitz
Deputy Solicitor General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6000
david.moskowitz@coag.gov
*Attorneys for Plaintiff State of Colorado*

17

William Tong
Attorney General of Connecticut

*/s/ Janelle R. Medeiros*
Janelle R. Medeiros
Special Counsel for Civil Rights
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Janelle.Medeiros@ct.gov
*Attorneys for Plaintiff State of Connecticut*

Brian L. Schwalb
Attorney General for the District of Columbia

*/s/ Nicole S. Hill*
Nicole S. Hill
Assistant Attorney General
Office of the Attorney General for the District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov
*Attorneys for Plaintiff District of Columbia*

Office of The Governor *ex rel.* Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky

*/s/ S. Travis Mayo*
S. Travis Mayo
General Counsel
Taylor Payne
Chief Deputy General Counsel
Laura C. Tipton
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov
*Attorneys for Plaintiff Kentucky Governors' Office*

Kathleen Jennings
Attorney General of Delaware

*/s/ Vanessa L. Kassab*
Ian R. Liston
Director of Impact Litigation
Vanessa L. Kassab
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

Anne E. Lopez
Attorney General of Hawai'i

*/s/ Kaliko'onālani D. Fernandes*
David D. Day
Special Assistant to the Attorney General
Kaliko'onālani D. Fernandes
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorneys for Plaintiff State of Hawai'i*

Aaron M. Frey
Attorney General of Maine

*/s/ Brendan Kreckel*
Brendan Kreckel
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 0433-0006
Tel.: 207-626-8800
Fax: 207-287-3145
brendan.kreckel@maine.gov
*Attorneys for Plaintiff State of Maine*

18

1

2     Anthony G. Brown                          Andrea Joy Campbell
      Attorney General of Maryland              Attorney General of Massachusetts

3
      */s/ James C. Luh*                        */s/ Katherine Dirks*
4     James C. Luh                              Katherine Dirks
      Senior Assistant Attorney General         Chief State Trial Counsel
5     Office of the Attorney General            Cassandra Thomson
      200 Saint Paul Place, 20th Floor          Assistant Attorney General
6     Baltimore, Maryland 21202                 Office of the Massachusetts Attorney General
      410-576-6411                              1 Ashburton Place Boston, MA 02108
7     jluh@oag.state.md.us                      (617) 963-2277
      *Attorneys for Plaintiff State of Maryland*  katherine.dirks@mass.gov
8                                               cassandra.thomson@mass.gov
                                                *Attorneys for Plaintiff Commonwealth of*
9                                               *Massachusetts*

10
      Dana Nessel                               Keith Ellison
11    Attorney General of Michigan              Attorney General of Minnesota

12    */s/ Neil Giovanatti*                     */s/ Joseph R. Richie*
      Neil Giovanatti                           Joseph R. Richie
13    Bryan Beach                               Special Counsel
      Assistant Attorneys General              445 Minnesota Street, Suite 1400
14    Michigan Department of Attorney General   St. Paul, Minnesota, 55101
      525 W. Ottawa                             (651) 300-0921
15    Lansing, MI 48909                         joseph.richie@ag.state.mn.us
      (517) 335-7603                            *Attorneys for Plaintiff State of Minnesota*
16    giovanattin@michigan.gov
      beachb@michigan.gov
17    *Attorneys for Plaintiff State of Michigan*

18

19                                             Raúl Torrez
      Jennifer Davenport                        Attorney General of the State of New Mexico
20    Attorney General of New Jersey
                                                */s/ Steven Prefrement*
21    */s/ Kashif T. Chand*                     Steven Perfrement
      Kashif T. Chand (NJ Bar No. 016752008)    Senior Litigation Counsel
22    Assistant Attorney General               New Mexico Department of Justice
      New Jersey Office of the Attorney General, 408 Galisteo Street
23    Division of Law                           Santa Fe, New Mexico 87501
      124 Halsey Street, 5th Floor              SPerfrement@nmdoj.gov
24    Newark, NJ 07101                          505-601-7727
      Tel: (973) 648-2052                       *Attorneys for the State of New Mexico*
25    kashif.chand@law.njoag.gov
      *Attorneys for Plaintiff State of New Jersey*
26

27

28

19

1

2

3  Dan Rayfield                           Josh Shapiro, in his official capacity as
   Attorney General of Oregon             Governor of the Commonwealth of
                                          Pennsylvania
4  */s/ Scott P. Kennedy*
   Scott P. Kennedy                       */s/ Jacob B. Boyer*
5  Senior Assistant Attorney General      Jennifer Selber
   Oregon Department of Justice           General Counsel
6  100 SW Market Street                   Jacob B. Boyer
   Portland, OR 97201                     Deputy General Counsel
7  Tel (971) 453-9050                     Pennsylvania Office of the Governor
   Fax (971) 673-5000                     30 N. 3rd St., Suite 200
8  Scott.Kennedy@doj.oregon.gov           Harrisburg, PA 17101
   *Attorneys for Plaintiff State of Oregon*   (717) 460-6786
9                                         jacobboyer@pa.gov
                                          *Counsel for Governor Josh Shapiro*
10

11 Peter F. Neronha                       Nicholas W. Brown
   Attorney General of Rhode Island       Attorney General of Washington
12
   */s/ Madeline R. Becker*              */s/ Jennifer K. Chung*
13 Madeline R. Becker (RI Bar No. 10034)  Jennifer K. Chung, WSBA #51583
   Special Assistant Attorney General     William Mcginty, WSBA #41868
14 150 South Main Street                  Assistant Attorneys General
   Providence, RI 02903                   800 Fifth Avenue, Suite 2000
15 (401) 274-4400, Ext. 2151             Seattle, WA 98104
   mbecker@riag.ri.gov                    206-464-7744
16 *Attorneys for Plaintiff State of Rhode Island*   jennifer.chung@atg.wa.gov
                                          william.mcginty@atg.wa.gov
17                                        *Attorneys for Plaintiff State of Washington*

18

19 Joshua l. Kaul
   Attorney General of Wisconsin
20
   */s/ Karla Z. Keckhaver*
21 Karla Z. Keckhaver
   Assistant Attorney General
22 Wisconsin Department of Justice
   Post Office Box 7857
23 Madison, Wisconsin 53707-7857
   608-264-6365
24 karla.keckhaver@wisdoj.gov
   *Attorneys for Plaintiff State of Wisconsin*

25

26

27

28

20