EXHIBIT A

FNS's November 24 Renewed Data Request and First Proposed Protocol

 **Food and Nutrition Service**

U.S. DEPARTMENT OF AGRICULTURE

November 24, 2025

Governor Gavin Newsom
1021 O Street, Suite 9000
Sacramento, California 95814

Dear Governor Newsom,

Pursuant to 7 U.S.C. § 2020(a)(3), the United States Department of Agriculture (USDA), Food and Nutrition Service (FNS), directs that your State provide to FNS records including the Supplemental Nutrition Assistance Program (SNAP) Eligibility Data Elements for the period of January 1, 2020, to present, listed in Attachment A to this letter. The federal government provided funds to assist your State in collecting these records, and FNS needs the records to determine whether SNAP is being conducted in compliance with law.

Since last summer, 28 States have complied with FNS's request for this same type of data. FNS's preliminary review of this data indicates that billions of dollars in federal funds may have been lost due to fraud or other errors undetected by States in their administration of SNAP. Your State, however, has not yet provided FNS the data it seeks, citing the absence of agreed-upon "data and security protocols" specified in 7 U.S.C. § 2020(a)(3). Attachment B to this letter provides a set of data and security protocols that FNS observes with the 28 complying States. This set of protocols, which include FedRAMP High data security, provides a higher level of security than that which States, including your State, historically have accepted in releasing similar data to FNS—including social security numbers and addresses. FNS will inspect and audit the data provided pursuant to this request, and maintain it under the applicable System Of Records Notice, solely for the purposes of "determin[ing] whether the program is being conducted in compliance with [the Food and Nutrition Act of 2008 (FNA)] (including regulations issued under [the FNA]." *See* 7 U.S.C. § 2020(a)(3).

In view of the facts that 28 other States have produced their records to FNS, operating under FNS's data and security protocols, and that your State previously delivered the same type of data to FNS under *less stringent* protocols than those we set forth in Attachment B, there can be no good faith objection to the attached protocols. In *California, et al v. USDA, et al*, 3:25-cv-06310 (N.D. Calif., July 28, 2025), the Court acknowledged that the plain language of the FNA at 7 U.S.C. § 2020(a)(3) entitles USDA to obtain all the requested records, subject to data and security protocols agreed to by the States and USDA:

> "Congress, in the 'Records' section of § 2020, did use clear, ***mandatory*** language, specifically 'shall … be made available for inspection and audit,' thereby ***giving USDA the right to obtain***, subject to data and security protocols, all records necessary to determine whether the program is being conducted in accordance with the SNAP Act. See 7 U.S.C. § 2020(a)(3)(B)."

Order Granting Plaintiff States' Motion for Preliminary Injunction, Oct. 15, 2025, 15: 2-6 (emphasis added).[1]

Because FNS is operating under a higher level of data security than has proven acceptable to States, including yours, when producing to FNS the same type of information it requests here, we anticipate your State will now join the others in complying with Congress's mandate that USDA be able to obtain records to ensure that its federally-funded programs are being operated in compliance with law.

Our preliminary review of data provided to FNS by States complying with FNS's data requests indicates an estimated average of $24 million dollars per day of federal funds is lost to fraud and errors undetected by States in their administration of SNAP. That estimated loss will likely increase when data withheld by non-complying States factors into the analysis. Preventing such losses could save approximately $9 billion or more per year.

We respectfully request that your State respond in writing within seven days of the date of this letter with confirmation of your agreement to produce the requested data to FNS subject to the attached security and data protocols. Because the protection afforded by our data and security protocols exceeds that which your State historically has required before producing the same type of data to FNS, your State should have no difficulty nor reservations agreeing to these protocols. Based on our experience with States complying with FNS data requests, about which we provided notice last summer, your State should be able to produce its records no later than 30 days after the date of this letter. Your State's timely compliance with this letter is essential to safeguarding the public interest in securing federal SNAP funds from loss due to fraud, waste and abuse. If, for some reason, your State declines to produce the requested data subject to the attached protocols, we request that you inform us in writing within seven days of the date of this letter of: (1) the basis for your lack of agreement and (2) any proposed edits to the protocols that you deem necessary to produce the requested data.

In addition, please take all steps necessary to preserve all records covered by this request, whether possessed by your State or your vendors. We expect to be able to review historical data in its native, unaltered form, from January 1, 2020, to the present. It is imperative the Federal Government obtains unaltered data reflecting the actual performance of States in administering this federally-funded program for all time periods covered by this request.

---

[1] Specifically, 7 U.S.C. § 2020(a)(3)(B) requires that "***such records as may be necessary*** to determine whether the program is being conducted in compliance with this [SNAP Act] (including regulations issued under this [SNAP Act)]" "**shall be made available**" to USDA (emphasis added). The question presented and ruled upon by the Court in *California* was whether to preliminarily enjoin FNS from disallowing SNAP funding "based on Plaintiff States' failure to comply with the demands set forth in the above-discussed formal warning letters or otherwise acting thereon." *Id*. at 25:10–13. Those formal warning letters relied only on 7 U.S.C. § 2020(e)(8)(a), as to which the Court opined that "shall permit" in 7 U.S.C. § 2020(e)(8)(A) is permissive, as contrasted with the "clear, mandatory language" of 7 U.S.C. § 2020(a)(3)(B) "giving USDA the right to obtain" the requested data. *Id*. at 13:25–17:13. USDA respectfully disagrees with an interpretation that "shall permit" allows states to elect to withhold data requested under 7 U.S.C. § 2020(e)(8)(A), and maintains all rights to appeal and otherwise contest such an interpretation.

Thank you for your continued work to help address the needs of vulnerable Americans and safeguard taxpayer dollars.

Sincerely,

Patrick A. Penn
Acting Administrator, Food and Nutrition Service
Deputy Under Secretary, Food, Nutrition, and Consumer Services
U.S. Department of Agriculture

**U.S. DEPARTMENT OF AGRICULTURE**

**Supplemental Nutrition Assistance Program
Information SNAP Database**

### SNAP Eligibility Data Elements

The following elements should be included in the data sharing file from each State agency on all household members that are listed in the SNAP case. Please provide a data dictionary if one is available to reduce the burden to both the State agency and USDA.

**Case Number:** The case number is a unique identifier, typically 7 to 10 digits long, assigned to a household when they apply and/or are approved for SNAP.

**First, Middle, Last Names:** The full name of all household members.

**Known Alias:** Assumed or alternative name(s) used by any of the household members.

**Authorized Representative(s):** Provide any identified authorized representative for the household, and their corresponding information such as full name, means of verbal and written communication.

**Date of Birth:** The specific month, day and year the household member was born.

**Individual Recipient Identification Number:** The unique identifier assigned to that specific household member within the case by the State agency.

**Social Security Number:** The unique 9-digit identifier issued by the Social Security Administration and provided by the household member.

**Status on SNAP** (recipient/individual level)**:** Identify if the household member in the case is actively receiving SNAP, disqualified, sanctioned, or excluded.

**Application and/or Recertification Date:** The date the household applied for SNAP (this can be the first application date, or most recent recertification date).

**Reporting Status:** Following initial certification, or recertification, households are determined to be a simplified or change reporting household. This data element should indicate the reporting status the household has been designated to be.

**Relationship:** The relationship identifies who all household group members are to one another and assists with determining mandatory group members. The data should reflect who each household member is to one another.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

*Absent Parent* (as applicable)**:** This identifies the parent of a minor child who resides in a separate household.

*Citizenship and/or Immigration Status***:** This identifies if the individual is a U.S. citizen or immigrant.

*Sponsorship:* This identifies if an individual applying or receiving SNAP has been sponsored to enter the U.S. Data should identify the name or organization of the sponsor.

*Residential Address***:** The address the household has provided as to where they reside.

*Mailing Address***:** The address the household has provided as to where they would like all correspondence sent to (if different than residential).

*Homeless Status***:** Please include if the household is identified as homeless.

*Phone Number(s)***:** The contact number(s) provided by the household as a means of contact.

*Email Address(es)***:** The email address(es) provided by the household as a means of contact.

*Unearned Income***:** The unearned income (RSDI, unemployment, child support, etc.) identifies the unearned income source, pay frequency, the household member receiving the pay, and the total amount of income budgeted to determine the SNAP allotment.

*Earned Income***:** The earned income identifies the earned income source, pay frequency, the household member receiving the pay, and the total amount of income budgeted to determine the SNAP allotment.

*Self-Employment Income***:** Self-employment should be identified as to what the self-employment is (type or business name), pay frequency, the household member who is self-employed, and the total amount of income budgeted as well as the amount of allowed expenses.

*Shelter Expenses***:** The shelter expenses should be identified as to shelter type (i.e. rent), and the budgeted dollar amount. Shelter expenses may be separated out as various expenses are taken into consideration for eligibility and those should be included if used in the SNAP allotment determination (i.e. telephone, heating, cooling). If the household is active with Section 8, which pays a portion of the rental expenses, please ensure that is included.

*Assets/Resources***:** Any known assets (i.e. bank accounts, boat, collector vehicle) or resources used to determine SNAP eligibility and must identify the asset type, amount and what household member the asset belongs to.

*Sanctions/Disqualifications***:** Identify any household members who are serving a sanction and/or disqualification that is impacting their eligibility to participate in SNAP. The sanction and/or disqualification type and any applicable time periods should be identified (i.e. IPV, 10/1/2024-9/30/2025). This field should correspond to the data provided in the status on SNAP if the household member is currently serving a disqualification, as well as any income field(s) that may pertain to the disqualified member due to income proration.

*SNAP EBT Card Number***:** The unique set of digits on the household's issued SNAP EBT card that connects the case to the associated transactions.



**U.S. DEPARTMENT OF AGRICULTURE**

### Supplemental Nutrition Assistance Program (SNAP) Information Database
### Fraud, Waste and Abuse Detection Protocol

## 1. OVERVIEW

1.1. U.S. Department of Agriculture (USDA) and the Food and Nutrition Service (FNS) will use the Supplemental Nutrition Assistance Program (SNAP) recipient data to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying duplicate enrollments for elimination, and performing additional eligibility and program integrity checks specified herein.

1.2. This protocol establishes a framework for State SNAP agencies to share data with the USDA/FNS for detection of fraud, waste, and abuse and program integrity purposes.

1.3. The protocol balances federal data access requirements under Executive Order 14243 and the Food and Nutrition Act of 2008 (FNA) with privacy protections, minimizes unnecessary data collection, and incorporates security standards while maintaining public trust and compliance with applicable law.

## 2. FRAMEWORK AND AUTHORITY

2.1. <u>Authority</u>

2.1.1. Executive Order 14243 (March 20, 2025): "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos" directs agency heads to "take all necessary steps, to the maximum extent consistent with law," to ensure federal government has "unfettered access to comprehensive data" from state programs receiving federal funding, including data maintained in third-party databases.

2.1.2. 7 U.S.C. § 2020(a)(3) that requires that each State agency shall keep records as may be necessary to determine whether the program is being conducted in compliance with this chapter, and all records shall be made available for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary.

2.1.3. 7 CFR 272 stipulates use or disclosure of information obtained from SNAP applicant or recipient households shall be restricted to persons directly connected with the administration or enforcement of the provisions of the FNA or regulations, other Federal assistance programs, federally-assisted State programs providing assistance on a means-tested basis to low-income individuals, or general assistance programs which are subject to joint processing requirements.

2.2. <u>Prohibited Purposes</u>

2.2.1. USDA shall NOT use the provided data for:

- Tax administration or tax compliance

- Law enforcement investigations beyond coordination regarding criminal and administrative SNAP violations

- Administration of non-SNAP federal assistance programs (*e.g.*, Medicaid, TANF, housing assistance)

- Sharing with foreign governments or international organizations

- Commercial use or transfer to private entities

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

2.2.2. USDA shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals (*i.e.*, the collection of data elements spelled out in the Privacy Impact Assessment).

3. **DATA CATEGORIES**

3.1. <u>Data Definition</u>

3.1.1. All data obtained by States or their vendors in administering SNAP or that otherwise may be necessary to determine whether the program is being conducted in accordance with the FNA or regulations issued under the FNA.

3.1.2. Data derived from third-party sources (employment verification databases, financial institution records, property records) that States use for verification but are not part of applicant-reported information are excluded.

3.2. <u>Permitted Data</u>

- Information that the applicant household reported on application/recertification forms including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers.

- Direct verifications that the State conducted to confirm applicant-reported information Records that the State maintains of SNAP applications, approvals, denials, certifications, and benefits issued.

- Household composition and income exactly as reported by the applicant (not third-party verified amounts).

- Transactional data necessary for fraud detection

4. **LIMITED ACCESS**

4.1. The SNAP Information Database is accessed and used ONLY by employees of the USDA who are:

4.1.1. Designated by the Chief of Staff at Food, Nutrition, Consumer Services (FNCS)

4.1.2. Trained in SNAP Act, Privacy Act, and this protocol

4.1.3. In compliance with all information security annual recertifications

4.2. No Access to the SNAP Information Database may be provided to:

4.2.1. Other USDA agencies (APHIS, ERS, NASS, etc.)

4.2.2. Divisions within FNS without an explicit need-to-know

4.2.3. OIG employees, unless in direct support of a law enforcement investigation related to SNAP fraud, waste, or abuse

4.2.4. Any other federal agency

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

**5. SYSTEM OF RECORDS NOTICE (SORN) AND PRIVACY IMPACT ASSESSMENT (PIA)**

5.1. SORN

The applicable SORN for this protocol is USDA/FNS-15 "National Supplemental Nutrition Assistance Program (SNAP) Information Database," 90 FR 26521.

The SORN location can be found here: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system-of-records

5.2. Privacy Impact Assessment (PIA)

The applicable Privacy Impact Assessment for the SNAP Information Database can be found here: https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

**6. FRAUD, WASTE, AND ABUSE DETECTION FRAMEWORK**

6.1. Core Fraud Detection Functions

6.1.1. USDA will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program that focuses on:

- identity verification
- income and eligibility verification
- immigration status
- verification against disqualified recipients

6.2. Enhanced Fraud, Waste, and Abuse Detection Techniques

6.2.1. In addition to the core fraud detection functions, USDA will employ additional techniques including, but not limited to:

- Intrastate and interstate duplicate detection
- Deceased individuals' detection
- Synthetic identity patterns (new SSNs with inconsistent biographical data)
- Geographic anomalies

6.2.2. New data mining techniques will be limited to identifying recipient and retailer fraud with a direct nexus to SNAP.

**7. DATA OUTPUT**

7.1. States

7.1.1. USDA will provide flagged data back to the State agency for review. States are encouraged to verify the accuracy of fraud detection flags and provide feedback to USDA to refine detection logic and reduce false positives. Collaborative processes will be established to ensure accurate identification of fraud and appropriate corrective actions.

7.2. Law Enforcement

7.2.1. The USDA may refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP.

7.3. USDA SNAP Retailer Operations Center (ROC)

7.3.1. The USDA may refer fraud detection leads to the ROC where, during fraud detection analysis, a compromised EBT card or terminal ID may have been identified.

 **U.S. DEPARTMENT OF AGRICULTURE**

**8. DATA MINIMIZATION AND RETENTION**

8.1. Retention Period

8.1.1. Until a record schedule is approved, data will be retained only as long as necessary for purposes set forth in the SORN and this protocol, and in no case longer than 3 years per the SORN.

8.2. Automatic Deletion

8.2.1. Data shall be retained for no longer than three years, consistent with the USDA/FNS-15 SORN. An automated process will be implemented to delete data upon expiration of the retention period, except for records related to ongoing audits, investigations, or litigation.

8.3. Ongoing Cases

8.3.1. Data pertaining to ongoing audit, investigation, or potential litigation retained only as long as necessary, then deleted.

**9. DATA SECURITY AND TECHNICAL REQUIREMENTS**

9.1. Infrastructure and Location

9.1.1. Primary storage location: AWS GovCloud (US) region

9.1.2. Backup/disaster recovery: Secondary AWS region

9.1.3. No storage, processing, or backup outside GovCloud or federal secure environments

9.1.4. All infrastructure must meet or exceed FedRAMP High baseline standards

9.1.5. AWS Personnel Access: Data is encrypted such that AWS personnel cannot access unencrypted data. Encryption keys are managed exclusively by federal USDA personnel and are not accessible to AWS or third-party vendors.

9.2. Access Controls

9.2.1. Multi-factor authentication required for all access

9.2.2. Role-based access control (RBAC) with principle of least privilege

9.2.3. Access is limited to specifically designated USDA employees engaged to assist in determining whether the program is being conducted in accordance with the FNA.

9.2.4. Access logging and audit trail maintenance (minimum period equal to data retention period, see Section V.E).

9.2.5. Quarterly access reviews by USDA

9.2.6. Immediate revocation of access upon employee termination or assignment change

9.3. Encryption Standards

9.3.1. Encrypted data at rest and in transit

9.3.2. Encryption keys managed solely by USDA federal personnel

9.3.3. No encryption keys held by commercial vendors

9.4. Data Segregation and Compartmentalization

9.4.1. SNAP data isolated in separate, dedicated AWS GovCloud environment

9.4.2. SNAP data not directly integrated with other USDA systems

9.4.3. Limiting access to individuals with specialized training and oversight

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

9.5.  Data Transfer

9.5.1. All  data transfers shall utilize secure tools that meet or exceed FedRAMP High baseline standards.

## 10.  INCIDENT RESPONSE AND BREACH NOTIFICATION

10.1. Incident Response

10.1.1.  Incident response procedures are aligned with FNS Handbook Chapter 10 security incident and breach notification requirements that USDA already follows internally. This protocol extends equivalent procedures to State notification.

10.2. Incident Definition

10.1.2.  Unauthorized access, use, or disclosure of data

10.1.3.  Security vulnerability or control failure affecting data

10.1.4.  Data loss, corruption, or destruction

10.1.5.  Encryption failure or key compromise

10.1.6.  Failed access control or authentication mechanism

10.1.7.  Any event that may reasonably be expected to compromise data security or confidentiality

10.3. Incident Notification Timeline

10.3.1.  Initial Notification within 12 hours

10.3.1.1.    Within 12 hours of discovery (by phone + email to State security/privacy contact and Director).

10.3.2.  Preliminary Report within 24 hours

10.3.2.1.    Description of incident and timeline

10.3.2.2.    Data elements affected (specific fields and estimated number of records)

10.3.2.3.    Estimated number of individuals affected

10.3.2.4.    Preliminary assessment of whether unencrypted sensitive data may have been exposed

10.3.2.5.    Preliminary remedial actions taken

10.3.2.6.    Root cause analysis plan and timeline

## APPENDIX A - SOURCES

- Privacy Impact Assessment: https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

- SORN: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system-of-records

- SNAP Act: https://www.law.cornell.edu/uscode/text/7/2020

- SNAP QC Handbook

- Executive Order 14243 (March 20, 2025) "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos:  https://www.govinfo.gov/content/pkg/DCPD-202500382/pdf/DCPD-202500382.pdf

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

EXHIBIT B

Plaintiff States' December 8 Letter

*Via E-mail*
Elizabeth J. Shapiro
Benjamin S. Kurland
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 598-7755
ben.kurland@usdoj.gov
*Counsel for U.S. Department of Agriculture and Secretary of Agriculture Brooke L. Rollins*

RE: Response to November 24, 2025 Letter to Plaintiff States from Patrick A. Penn

Dear Counsel:

On behalf of the Plaintiff States in *California v. USDA*, No. 3:25-cv-06310-MMC (N.D. Cal. Oct. 15, 2025), this letter responds to the November 24, 2025, letter of the U.S. Department of Agriculture's (USDA) Food and Nutrition Services (FNS). *See* ECF No. 109.

In that letter, USDA restated FNS's ongoing demand for Supplemental Nutrition Assistance Program (SNAP) Eligibility Data Elements for the period of January 1, 2020, to the present. As you are aware, this demand is the subject of ongoing litigation and was previously enjoined by the Court. *See* Order Granting Plaintiff States' Motion for Preliminary Injunction, *California v. USDA*, No. 3:25-cv-06310-MMC (N.D. Cal. Oct. 15, 2025). Thus, any attempt to seek a financial penalty or initiate an administrative noncompliance proceeding based on USDA's new letter, or any other iteration of FNS's ongoing data demand, would, at minimum, constitute a violation of that order, which preliminarily enjoins USDA from "disallowing SNAP funding based on Plaintiff States' failure to comply with the demands" for this SNAP data.

USDA's letter also provided proposed "data and security protocols," which by statute must be "agreed to by the State agency and Secretary" under 7 U.S.C. § 2020(a)(3)(B)(i). USDA's letter concluded by asking State agencies to produce the demanded SNAP data within 30 days, or to respond in writing to explain "(1) the basis for your lack of agreement and (2) any proposed edits to the protocols that you deem necessary to produce the requested data." This letter seeks clarification and to provide both (1) and (2), though we intend to provide further, more detailed edits to the proposed agreement after receiving the necessary clarifications sought herein, which will inform and facilitate those additional edits.

For the reasons described in our Complaint and Preliminary Injunction Motion, we object to USDA's unprecedented collection of millions of Americans' sensitive personally identifiable information (PII) without a clear need for such data and in violation of federal privacy laws. Nevertheless, we agree that USDA must negotiate with the States to develop a mutually agreeable data and security protocol prior to any data collection that may be authorized by 7 U.S.C. § 2020(a)(3). Therefore, without waiving any claims or defenses that may be raised in the

1

pending litigation, we are responding to provide comments on the proposed Data Elements and Data Sharing Protocol attached as Attachments A and B to the letter. Additional questions concerning both are also attached to this response.

We request written responses to the questions in this letter and the Attachment by Monday December 15, 2025.

### I.    The proposed data security protocol is insufficient compared to prior agreements between USDA and State agencies.

As an initial matter, FNS's letter claims that each of the States "previously delivered the same type of data to FNS under *less stringent* protocols." This assertion is inaccurate for several reasons. First, FNS has never sought anything comparable to the nearly six years of unredacted PII on all SNAP applicants and beneficiaries that it has now demanded; this unprecedented demand creates novel risks concerning the misuse of data and the protection of individuals' privacy.

Furthermore, without any reference to any specific protocol executed with any one of the States that received this letter, it is impossible to know whether prior protocols used to share a less sensitive data set were "less stringent" as you assert. Therefore, we ask that USDA specifically identify or provide copies of the protocols you refer to—for each State—so that we may evaluate this claim.

USDA's statement that this is a higher level of security and more stringent than previous protocols also appears to ignore the framework for the National Accuracy Clearinghouse (NAC) database that Congress mandated to identify duplicate SNAP enrollment. For example, the SORN for the NAC database mandates that any PII (including names, social security numbers (SSNs) and dates of birth (DOBs)) are converted to a secure cryptographic hash via the Privacy Protecting Record Linkage (PPRL) process before being shared. While some States are still working towards implementing the NAC, we would expect to see, at a minimum, the same protections (and the same careful testing and rollout process) applied to USDA's more recent request for SNAP Eligibility Data Elements.

The proposed protocol document also remains merely "a framework" that lacks many details required by federal law. *See* Proposed Protocol § 1.2. For example, when the federal government creates a "matching program," which the SNAP Information Database plainly is, agencies' data sharing agreements must articulate detailed procedures to protect the privacy, security and accuracy of individuals' data records. *See* 5 U.S.C. § 552a(o)(1). Attachment B falls far short of these specificity requirements. USDA has entered into necessarily detailed computer matching agreements and Interconnection Security Agreements (ISAs) with state agencies to implement the NAC and Electronic Disqualified Recipient System (eDRS) systems. Similarly detailed and comprehensive agreements are needed to implement any agreed-upon protocol before state agencies can lawfully share information.

Furthermore, although USDA's proposed protocol prohibits certain data uses, it does not define enforcement mechanisms. Without such mechanisms, the proposed protocol offers state agencies no assurance that violations will be detected, prevented, or corrected. Without enforcement mechanisms (such as monitoring, auditing, automated controls, or documented consequences), the restrictions function only as statements of intent. This creates compliance risk, allows improper data use to go unnoticed, and weakens the ability of State agencies to ensure legal, ethical, and policy-aligned handling of SNAP information.

The proposed protocol also presents, for the first time, a process by which USDA will return "flagged" results back to the State for State agency action. *See* Proposed Protocol § 7.1.1. In addition to the need for a secure data transfer mechanism and process to receive and process these files, the protocol fails to specify against which data the supposed fraud detection was identified, what specific actions the state must take to verify whether the fraudulent action is true, and what response the State must provide on its findings and subsequent actions. As discussed further below, applicable laws and policies require that all these iterative steps be spelled out in detail and agreed upon before any data sharing can take place.

### II.    The proposed data elements and protocol, along with USDA's public statements, raise concerns about the accuracy and validity of USDA's planned data analyses.

State agencies agree with USDA that it should "minimize[] unnecessary data collection." *See* Proposed Protocol § 1.3. Furthermore, USDA asserts that it "shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals." *Id.* § 2.2.2.

What makes data necessary, however, cannot be assessed in the abstract. We therefore request that USDA share its methodologies and proposed data analysis techniques with States so that we can provide feedback on the data needed, and the validity of the analytical methods being used, before providing FNS with confidential information on millions of SNAP beneficiaries.

As we have expressed in the litigation, the queries run through the SNAP Information Database by USDA so far do not account for the actual processes States use to review and verify applicant and household information. Our review of the "preliminary snapshot review" (*see* ECF No. 89-1) that USDA created from data some States have already submitted reveals that USDA's apparent methodologies result in overwhelming numbers of false positives and would not provide an accurate or meaningful picture of States' case files.[1]  This is not only misleading to the public, but risks placing a heavy burden on States to investigate these false positives.

This information is especially important because the proposed protocol does not exclude sensitive PII at all, and USDA is requesting numerous data elements that do not appear necessary

---

[1] We have discussed the apparent problems with this snapshot review in declarations submitted by California (ECF No. 99-1) and Illinois (ECF No. 99-2).

to investigate fraud, waste and abuse, especially at an aggregate level. It is necessary for the States to understand why USDA needs the specific PII elements requested so that the States can propose appropriate amendments to the draft protocol that would still accomplish any legitimate goals. Such amendments could include, for example, committing to using data solely for specific analyses described in the protocol and then purging it from USDA's system, as has been done in the past, and permitting States to provide information at a higher level of specificity depending on each agency's available data and technological capabilities (e.g., providing an age range rather than birthdate, or the county or ZIP code instead of a home address) to protect personal privacy.

Given the bulk review and processing USDA is engaging in (*see* ECF No. 72-1 at ¶ 34), it is unclear why deidentified data could not serve as a functionally identical and more secure means of identifying facts about program integrity to share with the States. Should USDA wish to review samples of cases identified through an initial deidentified process, States could participate under existing statutory procedures allowing for a full review of those individual eligibility cases. Another potential option could be through the use of a cryptographically secure PPRL approach, which, as noted, has already been developed for the NAC. Congress and the USDA explicitly created this privacy-protective system for this purpose, and States see no reason to circumvent it through the less-protective SNAP Information Database.

Additionally, the list of data elements attached to USDA's November 24, 2025 letter includes numerous elements (such as personal financial information) that were not considered in the agency's Privacy Impact Assessment.[2] This is a necessary step that the agency would need to correct before any data collection could proceed. Please confirm that USDA will be updating its Privacy Impact Assessment accordingly.

###### III.    USDA is ignoring the existing process for testing new programs to identify fraud, waste and abuse.

The statutes defining SNAP (hereafter the "SNAP Act") enshrine a cooperative model between the federal government and the States. Indeed, experimental and pilot projects "designed to test program changes that might increase the efficiency of [SNAP] and improve delivery of [SNAP] benefits to eligible households" are codified in the law (7 U.S.C. § 2026), and the SNAP Act provides a mechanism for USDA to work with state agencies to design, implement and evaluate new initiatives. This collaboration also includes State-led projects supported by the federal government under the SNAP Fraud Framework Implementation Grant Program, authorized and funded by Congress to support State initiatives. USDA's own fact sheet about that program recognizes that "States have long served as incubators for testing strategies to help prevent program fraud." *See https://www.fns.usda.gov/snap/fraud-framework*. USDA's departure from

---

[2] *See* USDA Privacy Impact Assessment for Fiscal Year 2025 at 8-10 (July 23, 2025), available at https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf.

this collaborative model ignores congressionally authorized programs and States' own expertise in program integrity.

USDA's proposed data protocol appears to acknowledge the collaborative framework and relationship that the SNAP Act establishes, stating that "collaborative processes will be established" to ensure the accuracy of new data analysis techniques. *See* Proposed Protocol § 7.1.1. But USDA's approach seems to be inconsistent with this acknowledgement, considering USDA's unilateral demands for data and threats of punitive action.

The agency should provide a clear explanation of its proposed data analysis objectives and methodologies, and engage in the required collaborative processes (including but not limited to testing and validation of findings for accuracy) needed to ensure such analysis is accurate and useful for detecting fraud, waste and abuse, *before* demanding production of almost 6 years of nearly unlimited PII on SNAP users to create an unprecedented database unsupported by law.

We are ready and willing to engage with USDA on a process that defines valid analytical goals and the data needed to meet those goals. For example, if USDA wants to test out new data tools, it could use sample sets of deidentified data and engage in an iterative process to check accuracy and results, as it has done in the past. It is unreasonable for USDA to abandon these time-tested techniques, and to run opaque, untested data analytic tools on millions of records in a manner likely to result in inaccurate results—particularly when USDA has signaled a desire to use those inaccurate results to unfairly impugn the integrity of state SNAP programs or the eligibility of residents to receive necessary food assistance.

### IV.    The proposed data analysis is duplicative of work that is already done by state agencies to prevent waste fraud and abuse.

USDA's proposed data protocol acknowledges that its proposed program is "similar to the SNAP Quality Control program" that has already been implemented as required by Congress in 7 U.S.C. § 2025 and through USDA's promulgated regulations. *See* Proposed Protocol § 6.1.1. The new framework appears to disregard congressional intent concerning the conduct of a quality control program, particularly given that the requested data would not permit USDA to conduct appropriate verification of applicant files.

States already engage in the statutorily mandated Quality Control Program and Performance Reporting System (*see* 7 U.S.C. § 2025; 7 C.F.R. §§ 275.1–275.24), which specifies procedures for federal monitoring "to determine whether a State agency is operating SNAP and the Performance Reporting System in accordance with program requirements" including annual reviews, management evaluation, quality control reviews and validation of state agency error rates. *See* 7 C.F.R. § 275.3. For deceased and disqualified individuals, among other verifications conducted by State Agencies, Congress has determined that verification of compliance with these requirements is satisfied by States' submission of annual reports to the Secretary "containing sufficient information" for USDA to make a determination on States' compliance. 7 U.S.C.

5

§ 2036c. Similarly, submission of state agency data for use in the NAC takes place under a specific statutory grant of authority. *See* 7 U.S.C. § 2020(x). States additionally conduct immigration verification through the Systematic Alien Verification for Entitlements Program (SAVE)[3] and verify income using federally approved income eligibility verification systems (*see* 7 U.S.C. § 2020(p)) which share data using privacy protective systems. States also already provide information on Intentional Program Violations (IPV) and program sanctions to USDA under existing reporting requirements and use the Electronic Disqualified Recipient system (eDRS) to check whether SNAP applicants have been disqualified from the program for fraud. For Electronic Benefit Transfers (EBT) fraud, FNS already receives daily transaction data for *all* EBT transactions under the Anti-Fraud Locator using EBT Retailer Transactions (ALERT) system. ALERT monitors that transaction activity and identifies suspicious retailers for analysis and investigation.

USDA's proposed protocol specifies that USDA-FNS will collect "only the data elements necessary to achieve specific, legally permissible goals." Given the already-existing, rigorous and comprehensive quality control regime under the SNAP Act and USDA's implementing regulations, we request that USDA specifically identify any unique goals of the SNAP Information Database proposal that are not covered by existing programs and federal oversight, and which data elements are actually necessary to achieve those additional goals.

## V.    Clarifying questions and suggestions

In addition to the concerns highlighted above, we are attaching a list of questions and suggestions about USDA's proposed protocol, and how FNS intends to use and share the data that our residents have entrusted to our agencies. We request this clarifying information to understand USDA's proposal better, and in an effort to make progress towards a mutually agreeable data and security protocol. We invite collaboration to generate a program that will respect existing legal frameworks and SNAP household privacy, while making a positive impact on program administration.

States have always been primary partners and leaders in SNAP program integrity. We appreciate the increased detail provided in this protocol, and hope that with further discussion and refinement States can continue to assist USDA in achieving legitimate program integrity

---

[3] The SAVE Program itself is deployed in the SNAP context with privacy in mind; States' agreements with USCIS to use the SAVE program include "safeguards limiting release or redisclosure as required by State or Federal law or regulation as discussed in [7 C.F.R.] § 272.1(c) and as may be required by other guidelines published by the Secretary." 7 C.F.R. § 272.11(b). States must include the steps taken to comply with this limit on disclosure as part of their state SNAP plans. *Id.* § 272.11(e). State agencies are further restricted to using the SAVE Program only for limited purposes related directly to establishing eligibility and program integrity. *Id.* § 272.11(c).

objectives while protecting the privacy of SNAP household data, reducing duplicative processes, and maintaining the security of confidential and sensitive information.

Dated: December 8, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General
ANDREW Z. EDELSTEIN
ANNA RICH
EDWARD P. WOLFE
ROBIN GOLDFADEN
SEBASTIAN BRADY
WILLIAM BELLAMY

/s/ *Maria Buxton*
MARIA F. BUXTON
DEPUTY ATTORNEYS GENERAL
*Attorneys for Plaintiff State of California*

LETITIA JAMES
Attorney General of New York

KWAME RAOUL
Attorney General of Illinois

/s/ *Mark Ladov*
MARK LADOV
Special Counsel
JULIE DONA
Special Counsel
28 Liberty St.
New York, NY 10005
(212) 416-8240
mark.ladov@ag.ny.gov
*Attorneys for Plaintiff State of New York*

/s/ *Sherief Gaber*
HARPREET K. KHERA
Bureau Chief, Special Litigation
SHERIEF GABER
Assistant Attorney General
115 S. LaSalle St., 35th Flr.
Chicago, Illinois 60603
(773) 590-7127
Harpreet.Khera@ilag.gov
*Attorneys for Plaintiff State of Illinois*

KRISTIN MAYES
Attorney General of Arizona

PHILIP J. WEISER
Attorney General of Colorado

/s/ *Hayleigh S. Crawford*
HAYLEIGH S. CRAWFORD (AZ No. 032326)
LUCI D. DAVIS (AZ No. 035347)
2005 N. Central Ave. Phoenix, AZ 85004
(602) 542-3333
Hayleigh.Crawford@azag.gov

/s/ *David Moskowitz*
DAVID MOSKOWITZ
Deputy Solicitor General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203

Luci.Davis@azag.gov
ACL@azag.gov
*Attorneys for Plaintiff State of Arizona*

WILLIAM TONG
Attorney General of Connecticut

*/s/ Janelle R. Medeiros*
JANELLE R. MEDEIROS
Special Counsel for Civil Rights
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Janelle.Medeiros@ct.gov
*Attorneys for Plaintiff State of Connecticut*

BRIAN L. SCHWALB
Attorney General for the District of
Columbia

*/s/ Nicole S. Hill*
NICOLE S. HILL
Assistant Attorney General
Office of the Attorney General for the
District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov
*Attorneys for Plaintiff District of Columbia*

OFFICE OF THE GOVERNOR *ex rel*. Andy
Beshear, in his official capacity as
Governor of the Commonwealth of
Kentucky

*/s/ S. Travis Mayo*
S. TRAVIS MAYO
General Counsel
TAYLOR PAYNE
Chief Deputy General Counsel

Phone: (720) 508-6000
david.moskowitz@coag.gov
*Attorneys for Plaintiff State of Colorado*

KATHLEEN JENNINGS
Attorney General of Delaware

*/s/ Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

ANNE E. LOPEZ
Attorney General of Hawaiʻi

*/s/ Kalikoʻonālani D. Fernandes*
DAVID D. DAY
Special Assistant to the Attorney General
KALIKOʻONĀLANI D. FERNANDES
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorneys for Plaintiff State of Hawaiʻi*

AARON M. FREY
Attorney General of Maine

*/s/ Brendan Kreckel*
BRENDAN KRECKEL
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 0433-0006
Tel.:  207-626-8800

8

LAURA C. TIPTON
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov
*Attorneys for Plaintiff Kentucky Governors'
Office*

Fax:  207-287-3145
brendan.kreckel@maine.gov
*Attorneys for Plaintiff State of Maine*


ANTHONY G. BROWN
Attorney General of Maryland

*/s/ James C. Luh*
JAMES C. LUH
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

*/s/ Katherine Dirks*
KATHERINE DIRKS
Chief State Trial Counsel
CASSANDRA THOMSON
Assistant Attorney General
Office of the Massachusetts Attorney
General
1 Ashburton Place Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
cassandra.thomson@mass.gov
*Attorneys for Plaintiff Commonwealth of
Massachusetts*


DANA NESSEL
Attorney General of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI
BRYAN BEACH
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov
beachb@michigan.gov
*Attorneys for Plaintiff State of Michigan*

KEITH ELLISON
Attorney General of Minnesota

*/s/ Joseph R. Richie*
JOSEPH R. RICHIE
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

9

MATTHEW J. PLATKIN
Attorney General of New Jersey

/s/ Kashif T. Chand
KASHIF T. CHAND (NJ BAR NO. 016752008)
Assistant Attorney General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
kashif.chand@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

RAÚL TORREZ
Attorney General of the State of New
Mexico

/s/ Steven Prefrement
STEVEN PERFREMENT
Senior Litigation Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
SPerfrement@nmdoj.gov
505-601-7727
*Attorneys for the State of New Mexico*

DAN RAYFIELD
Attorney General of Oregon

/s/ Scott P. Kennedy
SCOTT P. KENNEDY
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 453-9050
Fax (971) 673-5000
Scott.Kennedy@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*

JOSH SHAPIRO, in his official capacity as
Governor of the Commonwealth of
Pennsylvania

/s/ Jacob B. Boyer
JENNIFER SELBER
General Counsel
JACOB B. BOYER
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov
*Counsel for Governor Josh Shapiro*

PETER F. NERONHA
Attorney General of Rhode Island

/s/ Madeline R. Becker
MADELINE R. BECKER (RI BAR NO. 10034)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2151
mbecker@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

NICHOLAS W. BROWN
Attorney General of Washington

/s/ Jennifer K. Chung
JENNIFER K. CHUNG, WSBA #51583
WILLIAM MCGINTY, WSBA #41868
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
jennifer.chung@atg.wa.gov
william.mcginty@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

10

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Karla Z. Keckhaver*
KARLA Z. KECKHAVER
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-6365
karla.keckhaver@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*

11

**Attachment 1:**

**Questions and Suggestions Concerning USDA's Proposed Data and Security Protocol**

*Limiting unnecessary data elements and scope*

1.  Pursuant to USDA's acknowledgement that it must "minimize[] unnecessary data collection" (§ 1.3), and that it will collect "only the data elements necessary to achieve specific, legally permissible goals" (§ 2.2.2), please explain for each of the data elements in Attachment A:

    (a) how USDA intends to use this data element;

    (b) why it needs this data element for each SNAP beneficiary served by the State;

    (c) whether each data element is necessary to determine whether SNAP is being conducted in compliance with the SNAP Act, and why;

    (d) why such analysis is not duplicative of an analysis or match that already occurs;

    (e) whether each element is covered by the applicable System of Records Notice (SORN) and Privacy Impact Assessment (PIA); and

    (f) why it needs the data element for all files dating back to January 1, 2020.

*Clarifying and improving limitations on disclosure and use of data*

2.  The proposed data sharing agreement states that the requested data will be used "to ensure the integrity of Government programs[.]" However, 7 U.S.C. § 2020(e)(8) permits States to disclose information obtained from applicant households only to persons directly connected with the administration of federal assistance programs for the administration or enforcement of that program. To ensure compliance with 7 U.S.C. § 2020(e)(8), will USDA limit its use of the data to "ensure the integrity of the SNAP program" only?

3.  Section 2.2.1 of the proposed protocol says USDA shall not use the provided data for "law enforcement investigations beyond coordination regarding criminal and administrative SNAP violations." This phrasing does not appear in the SNAP Act and is unclear.

    (a) Please elaborate what USDA means by "coordination regarding criminal and administrative SNAP violations."

    (b) Can you confirm that USDA will not share any of this data with Immigration and Customs Enforcement (ICE) or any other Department of Homeland Security (DHS) subagencies for use in immigration enforcement activities?

    (c) In order to ensure that state SNAP data is not unlawfully used for immigration enforcement purposes, will USDA agree to include protocol language that alerts any State immediately if ICE or any other DHS subagency requests access to or use of

12

this data and provides at least 30 days for that State to respond (and if necessary take legal action) to prevent such data sharing?

(d) Please confirm that the prohibited purposes listed in Section 2.2, as clarified by USDA's response to this letter, will apply to all federal agencies.

4. Relatedly, the protocol reserves the right to "refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP." How does the USDA define a "criminal nexus"? Could the USDA provide examples of (a) what would constitute such a "criminal nexus" and (b) which agencies could potentially receive such a referral?

5. We also believe any protocol must also address how USDA would handle external requests (FOIA, administrative subpoena or otherwise) to obtain States' SNAP data. Will USDA provide clarification of these issues and agree to protocol language alerting any State to such a request and providing sufficient time for the State to respond prior to any USDA disclosure of data?

6. Currently, the proposed protocol only limits "access" to the database (*see* § 4), but does not similarly restrict USDA's ability to *disclose* the data.

(a) Pursuant to 7 U.S.C. § 2020(e)(8), will USDA include a clause that prohibits the agency from disclosing the requested data except to persons "directly connected with the administration" of the SNAP Act, for the purpose of administering or enforcing the SNAP Act only?

(b) Will USDA include a clause requiring the agency to identify the specific entities and individuals to whom the USDA intends to disclose data, and how they are "directly connected with the administration" of the SNAP Act, pursuant to 7 U.S.C. § 2020(e)(8)?

7. Relatedly, the proposed protocol contains contradictory statements that require clarification. It claims to limit "access" to data by anyone outside of the USDA, but then purports to require data matching that will entail sharing data outside of USDA.

(a) Can USDA provide clarification to reconcile these statements?

(b) Will USDA include a limitation in the proposed protocol to prevent data from being copied and/or sent outside of USDA's database?

(c) Prior data sharing agreements with USDA have specifically identified individuals who would be able to access States' data, and required those individuals to attest to compliance with the protocols. Will USDA agree to similar requirements here, and commit not to provide access to any individual without advance notice to States and providing sufficient time for States to respond prior to USDA providing that access?

13

(d) What measures will USDA take to prevent any redisclosure or improper intermingling of the data?

***Understanding the protocol's interaction with the SORN and Privacy Impact Assessment***

8. The proposed data protocol relies on USDA's existing SORN, but USDA has represented that it will publish an "updated SORN." *See* ECF No 90-1 at 2. Please let us know when that SORN will be published, and how it will address changes between the data request elements attached to the November 24, 2025 letter and USDA's prior data requests.

9. The proposed data protocol and the SORN are also at odds with each other on important issues. For example, the SORN states that records "will be kept indefinitely," which directly contradicts the protocol's proposal that data "shall be retained for no longer than three years." The protocol also restricts access to "[a]ny other federal agency" (§ 4.2.4), yet the SORN's routine uses permit disclosure to the Department of Justice and Department of the Treasury. Please clarify how USDA will reconcile these discrepancies, and whether USDA will commit to enforcing all restrictions on data access agreed upon in a final protocol, and not permitting the SORN's broader "routine use" language to control.

10. USDA's Privacy Impact Assessment associated with this data collection indicates that USDA expects this to be an ongoing data collection effort with "quarterly updates."

   (a) Is that the case, and if so, what is the source of USDA's authority to require States to provide virtually all SNAP data to USDA on a quarterly basis?

   (b) Does USDA intend to compensate States for the additional administrative burden that such an ongoing collection would present?

11. USDA's Privacy Impact Assessment associated with this data collection acknowledges the need to "[o]btain explicit consent for the collection and processing of sensitive personal information[.]" The proposed protocol does not mention obtaining consent from SNAP participants.

   (a) How does USDA intend to obtain this consent from SNAP participants? Will USDA provide a draft notice to States?

   (b) Does USDA expect States to assume the burden of obtaining this consent and, if so, does USDA intend to compensate States for the additional administrative burden that this would present?

***Clarifying USDA's proposed security measures***

12. Section 9, "Data Security and Technical Requirements," is comprised only of bulleted concepts, with no complete sentences and very limited detail. Will USDA revise this section to provide full sentences and a more thorough description of the security protections the agency intends to use, so that we may properly evaluate their sufficiency?

14

*Clarifying the methodologies and processes that USDA intends to implement*

13. States necessarily rely on numerous outside data sources to verify SNAP eligibility; this process is often time and labor intensive, particularly given our commitments to ensure that only eligible households receive benefits.

    (a) Given that outside, third-party data sources are essential to verification, how does USDA plan to review and verify eligibility of SNAP files without review of these data sources?

    (b) If USDA is requiring production of those third-party data sources (which is unclear), can USDA provide authority for that demand and authority authorizing States to disclose this third-party data?

    (c) In addition, please clarify how the "permitted" submission of verification records (per § 3.2) is consistent with the statement in § 3.1.2 that such verification records are "excluded" from this project.

14. Section 6.1.1 states that USDA "will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program." Please explain what a "foundational . . . verification" is, and how this data project differs from existing verification tests set forth in statute and promulgated regulations.

15. Section 6.2 lists several "enhanced" or "additional" data techniques. Please provide the methodologies for these techniques and explain why USDA believe they will produce valid statistical results. In particular:

    (a) Please explain how USDA's proposed detection of duplicate benefits will differ from the existing protections offered by the NAC and other established verification tests, and how USDA will resolve any conflicts between the NAC process and the one USDA proposes here.

    (b) Please explain how USDA's proposed detection of deceased individuals will differ from existing State systems for removing deceased beneficiaries from SNAP benefit rolls, and how this analysis will comport with USDA's requirements for such actions (including to ensure that households have an opportunity to address any inaccurate data before a reduction in benefits).

    (c) Please explain what USDA means by "synthetic identity patterns" and how this proposal will seek to detect such patterns.

    (d) Please explain what USDA means by "geographic anomalies" and how this proposal will seek to detect such anomalies.

    (e) To the extent EBT fraud is a concern, FNS already receives daily transaction data for all EBT transactions under the Anti-Fraud Locator using EBT Retailer Transactions (ALERT) system. ALERT monitors that transaction activity and identifies suspicious

15

retailers for analysis and investigation. Given the existence of this system and FNS's preexisting access to all EBT transaction data, what purpose does such duplicative analysis serve in the SNAP Information Database?

(f)  Will USDA be using artificial intelligence programs to analyze the data? If so, can USDA provide more information about those programs, including the security and privacy protections employed by the program?

16. USDA states in Section 7.1 of the proposed protocol that it will "provide flagged data back to the State agency for review," and will work collaboratively "to ensure accurate identification of fraud and appropriate corrective actions." Please clarify specifically what USDA intends this process to entail. Furthermore, please provide details on what this collaborative process has entailed to date for States that have already provided SNAP data.

EXHIBIT C

FNS's December 23 Letter and Second Proposed Protocol



## Food and Nutrition Service
U.S. DEPARTMENT OF AGRICULTURE

December 23, 2025

Governor Gavin Newsom
1021 O Street, Suite 9000
Sacramento, California 95814

Dear Governor Newsom,

This replies to your December 8, 2025 letter responding to the U.S. Department of Agriculture (USDA), Food and Nutrition Service (FNS)'s November 24, 2025 request to produce data related to the Supplemental Nutrition Assistance Program (SNAP). That request asked your State to share data to assist FNS in its statutorily-mandated administration and enforcement of the Food and Nutrition Act of 2008, as amended, (SNAP Act), including providing administrative funding to State Agencies to collect such information.

Your State, along with 20 others and the District of Columbia, responded through their lawyers by submitting a single, formulaic response objecting to our direction that you share with FNS SNAP data (December 8 Letter). The December 8 Letter seeks further delay, questioning FNS's need for, and right to obtain data necessary to audit the States' administration and enforcement of SNAP. USDA addresses each of your concerns in greater depth below. But, on the whole, your December 8 Letter provided no basis for your continued withholding of data because:

- FNS requires—and is statutorily entitled to—the SNAP eligibility and payment data that the States collect, with the aid of Federal funding, to administer SNAP benefits, which are funded entirely by FNS.

- FNS has offered to observe data and security protocols *more stringent* than any requested or observed by States historically in providing *the exact same type of data* to FNS. There is no material difference between the States uploading to FNS a sample set of names, DOBs, addresses, SSNs and other data elements for Quality Control (QC) and uploading the same data elements pursuant to FNS's request here for a complete set of the same data elements. None of your December 8 letter's objections and questions justified your State's refusal to accept FNS's offered protocols or to provide edits that you propose to accept those protocols.

**1. FNS requires the data it requested to verify compliance with the SNAP Act.** First, States may not undermine FNS's clear authority to determine what data FNS needs to complete its statutorily mandated role in overseeing SNAP. It is clear to all concerned that through undetected errors and fraud, Federal SNAP funds are being wasted and stolen. Indeed, on December 11, California's own State Auditor found its State's SNAP agency exposes taxpayers to "high-risk" after observing the financial consequences of widespread errors in the State's administration of SNAP. *See* https://www.auditor.ca.gov/reports/2025-601/. While California withholds SNAP data from the Federal Government, it gives that same data to State employees who can access and abuse the data apparently without appropriate safeguards against internal

abuse.  *See* https://www.justice.gov/usao-edca/pr/former-madera-county-welfare-benefits-employee-arrested-improperly-using-other-peoples.  Noncomplying States' failures to administer SNAP have become notorious nationwide.  *E.g.,* https://nypost.com/2025/12/16/us-news/calif-welfare-worker-stole-40k-in-benefits-using-identities-of-elderly-dead-people-feds/.

Data received from the 28 States that complied with USDA's request indicate that an estimated average of $24 million per day of SNAP funds are being erroneously spent or lost to fraud. Examples of fraud indicators included allowing hundreds of thousands of deceased and other ineligible people to remain on State SNAP benefit rolls.  Although the non-complying minority of States may dismiss the significance of their allowing dead or otherwise ineligible people to remain on SNAP rolls, failures to detect and correct errors and fraud make it important that they promptly join the cooperating states by complying with FNS's data request.  In the meantime, errors and fraud proliferate in the non-complying States.  *E.g.,* https://kstp.com/kstp-news/top-news/minnesota-repeatedly-reported-inaccurate-data-on-snap-to-the-federal-government/; https://www.justice.gov/usao-or/pr/romanian-nationals-unlawfully-residing-united-states-indicted-conspiring-steal-snap.

Each of the data elements FNS requested ensures that the various programmatic requirements, including eligibility requirements, are being met by households and are properly implemented and enforced by the States. The requested data elements can help confirm the accuracy of eligibility and benefit level determinations as well as aid in the investigation of SNAP benefit trafficking and theft, including EBT card skimming. Longitudinal data is required to detect patterns and trends that will inform SNAP administration, in addition to verifying the accuracy and reliability of the data submitted in response to this request.

**2. FNS's request is for records that Congress mandated "shall be made available" to USDA.**  As we outlined in our November 24 letter, FNS is statutorily entitled to the data we request.  *See* 7 U.S.C. § 2020(a)(3)(B) (requiring that "such records as may be necessary to determine whether the program is being conducted in compliance with this [SNAP Act] (including regulations issued under this [SNAP Act])" "shall be made available" for inspection and audit by USDA).  In their December 8 response, the non-complying States wrongly suggested that USDA agrees that States need not produce the requested data unless and before States agree to data and security protocols.  Although this statute permits the Secretary and State agency to agree that an inspection and audit be "subject to data and security protocols agreed to by the State agency and Secretary" it does not make such agreement a condition, let alone a condition precedent, to Congress' requirement that States' records "shall—. . . be made available" to USDA.  Textually, Section (a)(3) merely provides that FNS's access will be subject to any protocols that the Secretary agrees with the State agency to observe.  Congress did not, however, permit States to render the Federal audit statute meaningless by refusing to agree with the Secretary about a protocol, or otherwise attempting to dictate the terms upon which their expenditures of Federal funds shall be inspected or audited.

**3. FNS has offered to observe data and security protocols more stringent than any requested or observed by States historically in providing the exact same type of data to FNS.**  Although not required by law, in the interest of comity FNS offered to observe a set of data and security protocols that are far more stringent than any that have been requested or observed by States when they share SNAP data with FNS.  Indeed, the States, including yours,

routinely upload to FNS the same type of data we now request.  Your State's response rebuffed FNS's offer to provide specific edits or suggestions to the protocols; your State's response instead sent back questions (and often accusations) about FNS's purported intent.  FNS has addressed each question below and offered to make accommodations where appropriate.  But this does not change the fact that FNS has offered specific, concrete proposals, whereas the States have declined to do the same.

As illustrated by the following chart: (1) there is no material difference between the *type* of data your State routinely uploads to FNS for QC purposes, and the data elements FNS requested on November 24, and (2) FNS's data request only calls for a small portion of the categories that States normally submit to FNS for QC purposes:

### Data Element Comparisons

This chart identifies the required data elements submitted by State agencies to the U.S. Department of Agriculture (USDA) for Quality Control (QC) purposes.  States submit a sample set of this data to USDA monthly.  Fields identified with a * symbol have been requested by USDA for the Supplemental Nutrition Assistance Program (SNAP) Data Sharing integrity initiative.  As indicated by this chart, there is no difference between the data elements requested by USDA on November 24, 2025 and the corresponding data elements submitted by States to USDA for QC purposes, other than to request a complete set, rather than a sample set, of the same type of data.

| | | |
|---|---|---|
| Case Number* | Case Address* | Phone Number* |
| SNAP Household Names* | SNAP Household DOBs* | SNAP Household SSN* |
| SNAP Household Relationships* | Citizen/Non-Citizen Status * | Homeless Status* |
| All Household Earned Income* | All Household Unearned Income* | All Household Self-Employment Income* |
| Authorized Representative* | Indicator if SNAP Household Member is active* | Reporting Status* |
| Recipient Disqualification* | Certification Period* | Assets/Resources* |
| Categorial Eligibility | Directions to Home | Shelter Expenses* |
| Date of Interview | Household Composition | Expedited Service |
| Most Recent Action | Student Status | Amount of Allotment |
| Allotment Adjustments | Demonstration Projects | Residency |

| Earned Income Deductions | Dependent Care | Shelter Deductions |
|---|---|---|
| Other Government Benefits | Contributions | Deemed Income |
| Standard Utility Allowance | Child Support Deductions | Medical Deduction |
| Income from loans, scholarships, grants | Arithmetic Computation | SNAP Simplification Project |
| Significant Persons NOT living in home phone number | Significant Persons NOT living in the home relationship | Significant Persons NOT living in the home SSNs |
| Significant Persons Not living in the DOBs | Significant Persons NOT living in the home address | Significant Persons NOT living in the home financial support |
| All data related to work requirements – E&T programs, time limited participation, work registration, etc. | States must verify all elements with supporting documentation and upload those to SNAP-QCS | |

That FNS wishes now to examine a *complete* data set, instead of the self-selected samples States collect, is no good faith basis to object. Nor is there any valid basis to object to our request that States produce longitudinal data—as this will permit us to detect whether SNAP has been administered and enforced correctly during the past five years. And the preservation and production of that longitudinal data is important to FNS's need to determine whether anomalous changes we have observed signal a need for further investigation. These preliminary findings lead FNS to conclude that it must make a more complete use of its authority to review the States' administration and enforcement of SNAP.

**4. The States' cited reasons for continuing to withhold SNAP data are baseless.**

  a. **FNS requires a complete set, not just States' samples, of the same type of data States produce monthly.** The primary basis for the States' December 8 Letter's objection—that FNS seeks data of the same type but in greater *volume* than the self-selected sampling of households States provide to FNS for QC—makes no sense. It is simply baseless to object to providing a complete set, rather than just a sample, of the data FNS seeks.

  b. **The States' objections and suggestion of alternatives reflect a lack of understanding of SNAP program integrity.**

    i. **Although states are largely not using it, the National Accuracy Clearinghouse (NAC) is a tool for states to assist each other that does not meet FNS's need to obtain data that states are withholding from FNS.** The States' December 8 Letter attempts to use the National Accuracy Clearinghouse (NAC) to support their withholding reflects a lack of understanding of SNAP program integrity. As you may be aware, only four of the 22

noncomplying States have launched the NAC, an interstate data matching system designed *solely* to assist *States* to prevent duplicate participation.  The hashing of data for NAC is allowable only because each State with a legitimate need to access household PII *already has it*.  Both the "receiving" State agency and the "losing" State agency were provided the PII by the household at issue—the only information the States are lacking is whether that same household is participating or attempting to participate in another State simultaneously.  Because each State agency is already in possession of the information needed to take action on possible duplicate participation, there is no need for States to provide that information to each other un-hashed via the NAC.  As such, cryptographic hashing is appropriate.  The SNAP Information Database is clearly different. Unlike the NAC, which will eventually have 53 participating State agencies, USDA FNCS is the only entity receiving the SNAP data we have requested.

Crucially, the hashing of data is not a viable solution when only one of the entities (in this case, the State) possesses the data.  In the simplest of terms, a cryptographic hash function converts a piece of data into a specific hash value.  The hash value itself tells you nothing of the underlying piece of data, and you can only recreate the specific hash value with that function by inputting the same underlying piece of data into it.  If States were to submit the requested data in a cryptographic hash format, that would be akin to providing USDA hundreds of thousands of combination locks without any of the codes.

As such, it is not feasible for the SNAP Information Database to include "the same protections" as the NAC.

**ii. The states have no basis to invoke the Computer Matching Act.**  The SNAP Information Database is not a matching program.  It is a database that stores the SNAP participant information submitted by State agencies.  Nor will FNS's uses of data be automatic.  Although FNS hopes to help States improve their error rates in making eligibility determinations, the States retain their responsibility and liability for making those determinations.  The SNAP Information Database will not be matched with State agency databases, and as a result, the Computer Matching Act is not implicated and a CMA is not required or appropriate.

**iii. FNS's offer of FedRAMP High data security protocols exceed the protection accepted by States for the same type of data requested here**.  As stated in FNS's offered protocols, data is encrypted both in transit and at rest, and the requested data is protected with FedRAMP High data security, a higher level of security than that which States, including your State, historically have accepted in releasing similar data to FNS—including name, date of birth, social security number and address. FNS will inspect and audit the data provided pursuant to this request solely for the purposes of "determin[ing] whether the program is being conducted in compliance with [the Food and Nutrition Act of 2008 (FNA)] (including regulations issued under [the FNA]." See 7 U.S.C. § 2020(a)(3).

**iv. The States' remaining miscellany of questions provided no basis to withhold data on the States' use of SNAP funds.**  The non-complying States appear to suggest that USDA halt its present efforts in favor of constructing a pilot program under 7 U.S.C. § 2026.  This appears to be another unjustified effort by noncomplying States to resist a *complete* review of their use of SNAP funds.

As previously explained, our November 24 data request is founded upon 7 U.S.C. § 2020(a)(3). This provision, and its purposes, is independent from USDA's pilot authority. In any event, although USDA disagrees with the noncomplying States' implication that USDA's pilot authority requires collaboration with States, as our November 24 letter demonstrated, USDA offered to agree with States on a set of protocols, even though such agreement is not a condition limiting USDA's inspection and audit authority.

Further, the States' December 8 letter appears to ask FNS to disclose any sources or methods it will use to analyze whether the States are complying with SNAP requirements. To disclose beforehand additional details to States as to what, after receiving the data, specifically is or will be analyzed, how, and when, is not possible, given that the noncomplying States are withholding the data. Further, such disclosure would be ill-advised as it would provide a roadmap on how to avoid detection of noncompliance with SNAP requirements. FNS has already observed anomalous changes in reported data since it began providing notice last summer that it would seek to obtain this data. Hence, our previous request that States preserve their data.

Moreover, USDA is not prohibited from improving upon or developing new, efficient ways to detect fraud, waste, and abuse. Simply because other mechanisms exist to detect fraud does not preclude USDA from consistently striving for better, more efficient methods of detecting waste, fraud, and abuse in SNAP.

**5. Additional clarifying answers to States' December 8 questions.** FNS has carefully reviewed your December 8 Letter's attached questions and requests for clarification. The following information should sufficiently clarify our November 24 draft protocols, permitting you to now accept those protocols:

- USDA reiterates its November 24 letter's statement that it will only use the received data in compliance with the Food and Nutrition Act of 2008, as amended.
- In the event it receives external requests for data, USDA will follow all applicable laws. This would include, but is not limited to, the Food and Nutrition Act of 2008, as amended, FOIA, and the USDA Touhy regulations.
- The SNAP Information Database is FedRAMP certified (High).
- All data provided to the SNAP Information Database is encrypted in transit and at rest.
- USDA reiterates and clarifies that its SORN revisions will not impact the data elements requested but will simply bolster the introductory language of the Routine Uses section to clarify, as expressed previously, that the enumerated routine uses are only permitted to the extent they are permitted by the Food and Nutrition Act of 2008, as amended. The revisions will also remove the reference to "foreign" governments in Routine Use 8.

For the avoidance of doubt, we have edited our November 24 protocol to more clearly reflect the above answers to your questions and requests for clarification. We look forward to your State's reply to FNS's reiterated request. We hope to receive your agreement immediately to join the 28 States plus the Territory of Guam who are complying with FNS's November 24 request. Please construe this letter as your Advance Notification pursuant to 7 CFR 276.4(d)(1), providing you

two weeks from this letter's date above to indicate whether you agree to our November 24 request, and the protocols we have offered.

FNS appreciates your State's concluding assertion that it "has always been FNS's primary partners and leaders in SNAP program integrity." We hope that this signals a new approach of State cooperation that will provide FNS with access to the data it pays your state to collect so that FNS can properly administer and enforce the issuance of SNAP benefits paid for with Federal funding.

Sincerely,

Patrick A. Penn
Acting Administrator, Food and Nutrition Service
Deputy Under Secretary, Food, Nutrition, and Consumer Services
U.S. Department of Agriculture

Enclosure

cc:      Maria Buxton, Deputy Attorney General

EXHIBIT D

February 13 Preliminary Injunction Hearing Transcript

Pages 1 - 90

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, Judge

STATE OF CALIFORNIA, ET AL.,      )
                                  )
          Plaintiffs,             )
                                  )
   VS.                            )      NO. 25-CV-06310-MMC
                                  )
UNITED STATES DEPARTMENT OF       )
AGRICULTURE, et al.,              )
                                  )
          Defendants.             )
_____    )


                              San Francisco, California
                              Friday, February 13, 2026

                 TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:
                         CALIFORNIA DEPARTMENT OF JUSTICE
                         Government Law Section
                         455 Golden Gate Avenue, 11th Floor
                         San Francisco, CA 94102
                    BY:  LIAM E. O'CONNOR, ATTORNEY AT LAW
                         SEBASTIAN BRADY, ATTORNEY AT LAW
                         PAUL STEIN, ATTORNEY AT LAW

For Defendants:
                         DEPARTMENT OF JUSTICE - CIVIL DIVISION
                         1100 L Street, NW, Suite 12018
                         Washington, DC 20005
                    BY:  BENJAMIN KURLAND, ATTORNEY AT LAW

          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

REPORTED REMOTELY BY:  Kendra A. Steppler, RPR, CRR
                       Official United States Reporter

APPEARANCES: (Continued)

                      DEPARTMENT OF JUSTICE - CIVIL DIVISION
                      Office of the Assistant Attorney General
                      950 Pennsylvania Avenue, NW, Suite 3632
                      Washington, DC 20530
                 BY:  TYLER J. BECKER, ATTORNEY AT LAW

Also Present:         BRIAN A. MIZOGUCHI, ATTORNEY AT LAW

Friday - February 13, 2026                    10:06 a.m.

                    P R O C E E D I N G S

                         ---o0o---

THE COURTROOM DEPUTY:  Calling Civil Case Number 25-6310, State of California, et al. v. U.S. Department of Agriculture.

    Will counsel please step forward and state your appearances for the record.

THE COURT:  All right.  We'll start with plaintiffs' counsel.  Morning.

MR. O'CONNOR:  Morning, Your Honor.  Liam O'Connor on behalf of plaintiff, the State of California.

THE COURT:  Thank you.  There are other people over here on this side of the courtroom.  Are they going to make appearances?

MR. O'CONNOR:  Oh, yes, of course.

THE COURT:  I think he just didn't want to knock you over trying to get to the microphone.

    Okay.  Go ahead.

MR. BRADY:  Good morning, Your Honor.  Sebastian Brady for the plaintiff, State of California.

THE COURT:  Thank you, Mr. Brady.

MR. STEIN:  Good morning, Your Honor.  Paul Stein for the State of California.

THE COURT:  All right.  Thank you.

Then for the defendant.

MR. KURLAND:  Benjamin Kurland for the United States, Your Honor.  And at counsel's table is Brian Mizoguchi, who's the deputy general counsel for the U.S. Department of Agriculture.

THE COURT:  Mr. Mizoguchi.  All right.

So -- okay.  Now we have the motion.  I think that it is probably going to take a little more time than the others.  Hang on just a minute.  I think I have a paper from possibly -- I don't know why I have this.  I think those were for one of the other cases.  Hm.  I don't want to commingle the files here.

All right.  So we have a motion -- sorry.  I'm having a little trouble getting these together.  All right.  So the motion is to enforce or expand the Court's earlier issued preliminary injunction.  That motion we're all familiar with in the order.

I can tell you just as -- as kind of a starting point -- just to give you a little idea of, you know, where I'm coming from, a little bit like I did with the other cases.  But this is more complicated than those were.  But -- this has more issues.  Those each had really one issue.

I don't think my earlier order covers this event.  Because it was limited in the language that I used to the "above referenced letters," quote/unquote.  And those were the above

referenced letters in that order.  In other words, that I had referenced in that order.  And those were two earlier letters -- a demand letter and a -- I don't know -- threaten letter -- whatever you want to call the other one -- final letter.  What do you want to call the one that says we're not paying you?

MR. KURLAND:  I would call it a formal warning, because I think that's what it --

THE COURT:  Okay.  Formal warning letter.  Okay. Thank you.

Anyway, those were the two letters.  And I said that they couldn't act on those.  Interestingly, just to lay a little bit of a groundwork of then the issues that start coming up here -- well, then I think we're into the idea of either expanding it or just having a whole freestanding new order.  I don't know if it makes any difference.  The test would be the same.  We're really dealing with a new set of facts in the Court's view.

At the time that I issued that order, the same two statutory subsections under 7 USC 2020 were in front of the Court.  And those are the -- really the relevant sections here that we're going to talk about.  And that would be 2020 subsection (a)(3) and subsection (e)(8).  And, at the time, I had made a finding that (a)(3) required an agreed-upon protocol before the mandatory aspect of that section kicked in.

And the defendants' argument:  Oh, we don't ever worry

about that because we have this other section that doesn't require a protocol. And that's (e)(8). And it says you have to give it to us if we're trying to administer and enforce compliance with the program.

I then -- and we kept doing this in segments. All right? But, eventually, having once gotten everybody's arguments in front of the Court, the Court decided that the better argument -- and I'm, I mean, right or wrong -- I don't know -- but I decided the better argument is that (a)(3) was mandatory and (b)(8) [sic] was not mandatory.

It allowed the program -- the SNAP program -- the State -- to provide information, under certain limited circumstances, as an exception to the very broad prohibition about giving it to anybody. All right. And I read the language to be essentially discretionary on the part of the State.

Now, I think that where we are with this -- although, the -- I think the defendant may be arguing something to the contrary -- I think we are at the point -- because they're now relying on (a)(3) -- of whether or not there is a failure to obtain a protocol. And if that failure to obtain a protocol -- we arrive at an agreement -- is -- if you want to put it the fault of one party or the other -- or just look at it as, was it reasonable to reject the proposed protocol that the USDA submitted?

Because I agree with part of the defendants' argument that

a recipient of a -- not a recipient -- but a -- that the states can't simply unreasonably reject a protocol in order to get out from under the mandatory language of (a)(3).  So the real issue that I see today is whether or not that rejection was unreasonable.

If I'm missing some other issue in that regard, you can let me know.  But I think it really boils down to that.  The parties went away from here.  And I knew you were then going to start talking about a protocol.  And I envisioned there could be some future litigation.  And here we are.

All right.  So what I've got is the proposed language that -- a little bit of a play-by-play.  So the defendant says: Here's what we're proposing to do with the material if you give it to us.  The plaintiff goes:  I don't like it.  All right?  I don't like this about it.  I don't like that about it.  They go on at great length with a litany of complaints.

The defendant comes back and says:  Okay.  We've fixed up the two key parts here.  Section 2 point -- yeah -- 2 or 1 -- and 4.  Okay.  Fix those up.  And the plaintiff comes back and says it's worse.  All right.  At that point, the defendant says:  Okay.  I think you're being unreasonable.  And here's our advance letter to you putting you on notice that you could be subject to these penalties of losing your funding.

So that's where we are.  And I then am in a position of deciding whether there were terms that the USDA asked the

plaintiff states to agree to. That the plaintiff states either reasonably then or unreasonably felt were not appropriate, and they could not, as a matter of law, agree to them.

And their position is pretty much not we don't -- they're not just saying: We don't like it. All right? They're saying we cannot do it. And then the question is whether the law that they rely on for saying we can't do it -- here there's law that says we can't do it. Is that a reasonable position? Are they correct in reading the law? And so that's where we are.

Then there's the -- another aspect that -- I addressed it somewhat summarily in my prior order -- where the plaintiffs said: And besides that, no. Okay. Not only do we have (e)(8) that you're asking us to give this to you when we can't do it if we know that you could give it to somebody who you're not entitled to give it to, but you've got all these other problems. You didn't comply with this part of the Computer Matching Act. And you didn't comply with change of policy requirement and some other things.

I want to get clear, if I can, because it affects the arguments made as to those points -- one, in particular, kind of catching my attention -- that's the Computer Matching Act argument. The others I'm still not really super impressed with.

But is the position that the plaintiffs are taking that -- let's use computer matching -- we can't give it to -- this

information to you, because we'll be in violation of the part of the Computer Matching Act that covers us, or are you trying to bring some separate lawsuit under the Computer Matching Act, which I don't even know if there's a prior private right of action for?

MR. O'CONNOR:  The former, Your Honor.  And just to be clear, to respond to the Court's comments thus far, our position is not that we have a unilateral right to unreasonably reject a protocol.  I think the Court has touched upon our primary concerns, which is that agreeing to this protocol would actually violate federal law and our obligations under federal law.

THE COURT:  Okay.  And thank you for clarifying the other.  Because there's a big argument about standing that the defendant makes regarding the Computer Matching Act.  Standing goes to when somebody is bringing a claim.  Let's say somebody brings a claim under -- I don't know -- pick a law -- and the defense is there's no private right of action under it.  You can't bring it.  That's standing under that statute.  Then you have Article III standing.  And the defense says:  By the way, you weren't injured.  Nothing's happening to you.  This data that's going out there -- it's somebody else's.  Nobody's looking at your personal emails and your personal Social Security number and things of that nature.

But that isn't the question here, because, as I understood

it, the plaintiffs are not trying to sue under the Computer
Matching Act.  They are using that as one more reason why, if
they give the information, they will be violating something
that does tell them they can't do it.  All right.

MR. O'CONNOR:  Yes.

THE COURT:  That's my understanding.

MR. KURLAND:  May I --

THE COURT:  Okay.

MR. KURLAND:  May I respond to that, or do you want me
to wait?

THE COURT:  You really think they're bringing separate
claims?  Because they're disavowing that.

MR. O'CONNOR:  Well, sorry.  That was -- perhaps I
could clarify.

THE COURT:  Well, are you trying to bring a claim,
essentially, under the APA for violation of the Computer
Matching Act?

MR. O'CONNOR:  I think our position is perhaps twofold
here.  First, if the agreed-upon language in 2020(a)(3) is to
mean anything --

THE COURT:  Sorry?

MR. O'CONNOR:  If the agreed-upon language -- the
language in 2020(a)(3) -- that says plaintiffs shall make the
records available for inspection and audit subject to
agreed-upon data and security protocols...

THE COURT:  Keep going.

MR. O'CONNOR:  Yes.  That language agreed to by the State and the Secretary -- that language has to provide the plaintiffs a right not to disclose data when doing so would violate their federal statutory obligations.

THE COURT:  That's just a really complicated way of saying:  You're asking us to do something we can't do under the law.  Now, all I'm trying to find out is standing does not really come into play if you're not suing somebody under a particular statute.

MR. O'CONNOR:  Our claim is that --

THE COURT:  Let's see what Mr. -- he is -- so wants to be heard on this.  Go ahead, Mr. Kurland.

MR. KURLAND:  Sorry, Your Honor.  I think it's worth noting that the Computer Matching Act and what's happening here actually has two hops that we have to consider.  The first hop is the States' provision of data, the USDA, and the USDA's provision of data to another authority for the purpose of, you know, for example --

THE COURT:  Yes, okay.  And?

MR. KURLAND:  So we weren't -- we weren't particularly clear, from plaintiffs' original motion, which hop they were challenging.  And so our contention is basically if the hop is from the States to USDA, the Computer Matching Act doesn't even apply.  But if the question is the hop from USDA to, for

example, checking against the SAVE database for DHS, they don't have standing for a claim to bring that.  I just wanted to clarify that we kind of envision it as two hops here.

THE COURT:  A claim -- I still don't know what they're doing --

MR. O'CONNOR:  May I --

THE COURT:  -- given Mr. Brady's [sic] response here.

MR. KURLAND:  Sure.

THE COURT:  If they're not trying to directly accuse your client of violating the Computer Matching Act, which they may or may not have any right to do, then I don't care about standing.  All I care about is the argument that there is a section out there that says, if they get information, they can't give it to somebody who is not complying with the Computer Matching Act.

It's the same argument they're making about (e)(8).  It just happens to be another law.  You can't, for example -- never mind.  I'll get too extreme in my example and it won't be meaningful.

MR. O'CONNOR:  Yes, Your Honor.  To be clear, our claim is under the Administrative Procedure Act.  They're claiming, under the Administrative Procedure Act, the demands are contrary to law and that they're contrary to --

THE COURT:  But, again, that's kind of a separate argument.  And it's a sort of "so what" argument.  Because, in

effect, the -- what you're really just saying is you can't require us to give you this data, because it would be in violation of the Computer Matching Act if we give it to you and then you use it the way you are proposing to use it.  That's my understanding.

I don't really care because for your purpose -- I just don't want to see this come back.  All right?  The problem is that if I say today, "You have a strong point on argument X," and the rest of the stuff I don't address, if you go back and you are trying to negotiate an agreed-upon protocol, and they say, "Okay.  Here are the things we're going to do.  We're going to narrow this down.  Everything is going to read just like (e)(8)."  All right.  That's kind of what you wanted them to do.  Just narrow down what you're going to do to it to match (e)(8).

If they said that, and you still said, "Nope.  Sorry.  Sorry.  Not going to give it to you because, aside from (e)(8), you're still going to violate the Computer Matching Act," I need to say whether you've got a good point of winning on that or not.  I don't have to find you have one.  I just have to find, have you made out enough of a showing to support not giving the data until they fix it up as to the Computer Matching Act.

And then you have a big fight about words in the Computer Matching Act.  And I will ask you eventually what you

understand the word "automated" to mean versus "computerized" and what's the difference.  And then we can talk about where those words crop up, who's proposing to do what.

You know, we don't have Bartleby, the Scrivener here.  You know, somebody with a massive roll of paper going:  "John Doe.  Okay.  Now we go over to this paper.  John Doe."  I mean, every federal agency says they're understaffed.  And if that is what they were doing, they would be markedly understaffed.  So I'm assuming computers come in somewhere, and then we can talk about that later.

I want to get back to (e)(8).  The position by the defendant -- it starts to sound like, well, (e)(8) isn't relevant here.  And I really think -- I'm not accepting that.  But I'll hear an argument on it if you want to make it.  But it just seems to me it's very relevant, because it -- it wouldn't even have to be in the same section.

The plaintiff can say what you're asking me to do is asking me to violate the law.  And it doesn't have to be in the same statute.  It can be in another code.  That doesn't even have to be in the same code.  So the question is whether the language used in the proposed protocol would allow.  Not necessarily the defendant's going to do it.  But would allow USDA, if they felt like, to turn the information they get from the State over to someone or something that (e)(8) says the plaintiff can't give you the information if you're going to do

that.  All right?

And so that's -- that's what I -- I'm probably going to take (e)(8) here with you this morning, but I'm going to take the protocol proposed.  Plaintiff will point out where they think the language is not narrow enough to preclude distribution to a prohibited, I guess, distributee.  And then I'll look at it.  And Mr. Kurland will respond.  And I'll see whether it needs to be adjusted or not.

And then we can get the computer matching.  And then that would require some other agreement if, in fact, we're looking at that.  And what do people do in those instances?  Do you have some experience with that at all, Mr. Kurland -- what kind of agreements we're talking about and --

MR. KURLAND:  I haven't seen a Computer Matching Act agreement specifically.  I know they do exist in that, you know, they sometimes take specific forms.  They cover a whole bunch of agencies, for example.  So the relationships exist between agencies.  I don't know -- I haven't taken a wide view.

THE COURT:  Okay.

MR. KURLAND:  But, you know, there may be some standardized language.  There may be not.  But they are separate agreements.

THE COURT:  Yes.

MR. O'CONNOR:  Your Honor, we submitted two with our motion.

THE COURT:  Pardon me?

MR. O'CONNOR:  We submitted two examples of Computer Matching Act agreements between the plaintiff states and USDA. This is something that plaintiff states routinely negotiate and agree to with USDA.  The evidence was submitted in support of our motion with the New York declaration and with the Washington declaration.

THE COURT:  Do you recall -- and I'll pull it just to look at it for a minute -- I think I did look at it earlier. But I wasn't really focusing, at the time I saw it, on the Computer Matching Act.  And then I actually did not go back to them when I started focusing on that.  My prime focus was on the (e)(8) issue.

But if you can tell me -- I'll see if I have that handy -- well, somebody's looking.  Let's see -- if you find it, let me know.  I'll take a look.

MR. O'CONNOR:  Yeah.  It's --

THE COURT:  But -- so that -- if, in fact, I've found that this was applicable, there would be two different agreements.

MR. O'CONNOR:  I think we could incorporate the terms of the necessary requirements of the Computer Matching Act into a single data and security protocol.  Or it could be --

THE COURT:  I'm have a lot of trouble following you. And I think it's because of the way you're delivering the

sentences.  You start out in a reasonable pace, and you take the last three or four words and you rush them together.  Okay?  I don't know if you can avoid doing that, because it's apparently how you talk.  But it is hard for me to follow it.  So give it a try to say that last one again.

MR. O'CONNOR:  I apologize, Your Honor.

THE COURT:  That's all right.  Go ahead.

MR. O'CONNOR:  I think we could incorporate the necessary requirements for a computer matching agreement into the proposed data and security protocol.  I don't think it necessarily has to be a stand-alone agreement.

THE COURT:  Wouldn't that just complicate things?  No?

MR. O'CONNOR:  I don't think it matters whether it's one agreement that's a little longer or two agreements that refer to one another and incorporate one another.

THE COURT:  Okay.  Well, in any event, your view is it's not that hard.

MR. O'CONNOR:  It's something we have done with USDA before and I think we could do again.

THE COURT:  Okay.  Okay.  Now, apparently -- why don't we get off the Computer Matching Act for a minute, because that's not my prime focus, though I do have to make some kind of ruling on it or you'll be back here arguing about whether or not that's a relevant issue.

Okay.  Let me see where I want to go with this for just a

moment.  And then we'll see who looks like they're being disadvantaged by my tentative thoughts and then can then weigh in on them.

I think what I need to do -- first of all, let me just -- I guess I do want to make -- I do want to get to one point.  I believe, Mr. Kurland, that you are arguing that with respect to (a)(3), that one does not need to have the agreement before the data is required to be turned over.  Is that right?

MR. KURLAND:  Yes, Your Honor.

THE COURT:  All right.  I don't think I agree with that.  Okay?  It's a question of interpreting the words "subject to."  And "subject to" can mean what you said it means:  Kind of "governed by" or -- but it can also mean, essentially, "if you already have."  Okay?

And if you look at the other sections of 2020, there will be these subsections that use "subject to."  And all of them seem to be of the same ilk, if you will, but one, as what we have here.  In other words, subject to an agreement, subject to approval, subject to money being available.

You know, so if you have a section that says you need to spend this amount of money, subject to having an appropriation that covers it, you can't go spend the money before -- you know -- you have to have the appropriation.  If it says you can do something subject to the approval of the President, it's not like go do it and then the President is going to say, "Now,

what have you done?  I guess I'll ratify that."  No, it's before.

And there's another one.  Subject to the approval of the Secretary or whatever.  Same idea.  One section -- or subsection -- a little different -- said somebody could do something subject to review.  Well, you can't review something that hasn't happened.  So that one clearly was a -- if you want to call it a -- just governed by or a condition subsequent, but not precedent.

I don't think you can ask someone to turn over every piece of data that they have on the possibility that you may get an agreement later.  So I'm really likely to change that particular idea.  But I do acknowledge that the rejection of a proposal has to be reasonable.  And I'm first going to turn -- and then we can go back and rehash, if you want, this condition precedent idea.  But I don't think I'm probably going to change my mind on that one.

All right.  So here's (e)(8).  And it starts out -- you almost have to go way back to an earlier page under (e)(1) -- well, actually, as a -- sort of an introduction to (e), it says, quote, "The State plan of operation required under subsection (d) shall provide."  All right.  And then you get to all the things it shall provide.

One of them is (e)(8).  As a start, quote, "safeguards which prohibit the use or disclosure of information obtained

from applicant households, except..."

So, in other words, there has to be a plan that says this program cannot disclose this information that you get from the households, other than to the following.  And then it says it shall permit.  And then I went through a whole analysis of what permit versus, you know, have to do -- give means.  But, anyway, shall permit.  I read that as, if you want to, you can give it to other agencies that are federal assistance-type programs to help them out in running their program -- all right -- as long as they're just going to use it to run their program.

And then there is a listing of, if you want to call it, mandatory disclosures that seem to assume that somebody has some right to get something, and don't stand in their way.  All right.  And then these are very, very limited as to the nature of the recipient, the specific recipient, what they can do with it.  And it keeps winnowing down until you get to this run about law enforcement.  And then it's just an individual household member.  It's not the whole world's information.

If the member is free to avoid --

THE COURT REPORTER:  I'm sorry, Judge -- Judge --

THE COURT:  All right.  If the member is free to avoid prosecution or they have information that's necessary to a particular action, such as locating them, et cetera, et cetera, it's very, very specific.

So this is really a limited number of people who the states are allowed to give information to and for this limited purpose. Not so that once this other entity gets it, they can do whatever they feel like with it. Discuss it at a cocktail party. Now, have to be able to limit it.

So now I want to go to the protocol in its final form. There's no point in looking at the earlier form. So I'm going to go to that. You're going to get that out. Okay? And I am looking at Exhibit -- I'm trying to get the exhibit number -- C, I believe -- or letter C -- which is the December -- no, I'm sorry. That's the letter. Sorry. I take that back. D. Okay. Okay. D., I think, is the final submission from USDA.

Is that correct, Mr. Brady [sic]?

MR. O'CONNOR: Mr. O'Connor. And, yes, I believe --

THE COURT: I'm so sorry. I keep calling you Mr. Brady. I'm so sorry.

MR. O'CONNOR: No worries. It's an honor to be confused with Sebastian.

THE COURT: I'm sorry. I'm mixing up the two people from the --

MR. O'CONNOR: There's a height difference, which might help.

MR. KURLAND: I was going to say, they look so similar.

THE COURT: Okay. So, you know, we now have attorney

matching and -- you may have to get up our representative from the USDA to stand with other counsel.

MR. KURLAND:  I've been making the joke that I think that's the tallest height difference between two arguments you've probably ever had.

THE COURT:  People always see -- ask me, after they see me off the bench, boy, you're a lot shorter than we thought you were.

Okay.  So -- all right.  Now, we're going to look at the particular sections -- I'm sorry for giving you the wrong name -- the particular sections that the plaintiffs say would run afoul potentially of their obligations under (e)(8).  Okay?

Court reporter needs a break.  Okay.  It's just that we've been out here about an hour and a half -- a little over.  It's harder to take down this kind of proceeding than questions and answers, for example, at a trial when there are breaks and what have you.

So during -- well, we have to decide what we're going to do on our timing.  There are three case management conferences.  Every time I think case management conferences will take a half hour altogether, they take longer.  Maybe we should say come back at 11:15.  How would that sound?

And then, Ms. Geiger, do you think we can take those conferences?  They're by Zoom.

THE COURTROOM DEPUTY:  They're on Zoom.

THE COURT:  They're all there?  Okay.

All right.  We'll take a recess in this matter and resume at 11:15.

MR. KURLAND:  Thank you, Your Honor.

MR. O'CONNOR:  Thank you.

(Recess taken at 10:38 a.m.)

(Proceedings resumed at 11:53 a.m.)

THE COURTROOM DEPUTY:  Please come to order.

Please be seated.

THE COURT:  (Indiscernible.)

THE COURT REPORTER:  I'm sorry, Judge.  I didn't hear anything you said.

THE COURTROOM DEPUTY:  Sorry.

THE COURT:  It's not on, it turns out.

Returning to the record in the case of State of California v. United States Department of Agriculture, et al. -- "et al." on both sides.

I totally underestimated how long those matters would take, even adding time on to what I might ordinarily do.  So now we're at noon.  And the question is -- or almost noon -- how we should handle this matter.

Mr. Kurland is popping up.

Oh, okay.  Fine.  Well, then -- all right.  So we'll get your opposing counsel up here, as well.  All right.  So that's Mr. O'Connor, not to be confused with Mr. Brady.  And -- all

right.

I'm thinking maybe we should just break for lunch. But I can't, frankly, remember where we broke in our discussion. Oh, we do know. Because I was going to ask plaintiffs' counsel -- maybe we could just get a preview of where we're going and then figure out if it's worth talking now or waiting until after break.

I have both (e)(8) in front of me and then we have the proposed protocol in its revised form after the plaintiffs' initial critique. And my understanding was there were a couple of sections, in particular, that the plaintiff was concerned about:  2.2.1 and 4. Is that correct or am I off base there?

MR. O'CONNOR:  Yes, Your Honor, with respect to (e)(8).

THE COURT:  All right. Now, let's take them one at a time. And I may want to highlight something here. Okay. In 2.2.1 -- and that is titled Prohibited Purposes. And there are a number of different purposes. And it starts with:  USDA shall not use the provided data for -- and then there's a listing. And somewhere in there I gather you feel something could slip through. So tell me which ones we're looking at or how you would like to explain that problem.

MR. O'CONNOR:  Yes, thank you.

I think there are two issues. The first is an overarching issue that addresses both this section and 4.1 -- 4.2. And

that is that neither of these sections restricts USDA's ability to re-disclose data from the database.

THE COURT:  To what?

MR. O'CONNOR:  Re-disclose data from the database.

THE COURT:  Well, let's see.  2.2.1 says it shall not be used for -- now -- and I'll just look at them and then, as necessary, describe them.

Well, what I'd like you to do is match up.  All right?  So, for example, here we have tax administration or tax compliance.  Okay?  That's not something that sort of came up in (e)(8).  It's not related in any way to the kinds of things that are either restricted or allowed.

The next one, though, is.  The next one is, quote, "Law enforcement investigations beyond coordination regarding SNAP fraud or other violations relating to the FNA" -- FNA standing for?

MR. O'CONNOR:  We've been referring to it as the SNAP Act in this case, but I believe it's the Food Nutrition Act.

THE COURT:  In other words, for some reason, you decide to call the same thing two different things in one item.

MR. O'CONNOR:  To cause confusion, for sure.

THE COURT:  Okay.

MR. KURLAND:  We agree, SNAP Act is being used synonymously with the FNA.

THE COURT:  Okay.  Have you ever thought about sort of

some kind of consistency in that regard?

MR. O'CONNOR:  I think we can reach an agreement on that, Your Honor.

THE COURT:  Well, just at least in the same sentence. All right.  In any event, getting back to that.  So is it "or other," or what's your concern about -- if any -- about -- I'll just call it item B under 2.2.1?

MR. O'CONNOR:  Yes.  We do have concern with this.  We think that the language within this bullet -- "coordination regarding SNAP fraud or other violations relating to the FNA" -- is more broad than the permitted disclosure and use that is allowed by (e)(8)(A) and by (e)(8)(C).

THE COURT:  Okay.  Let's take a look at (A).  Do you want to describe why it goes beyond (A)?

MR. O'CONNOR:  Sure.  So in (A), there is a restriction both on disclosure and on use.

THE COURT:  Mm-hm.

MR. O'CONNOR:  Both the disclosure and the use restrictions are limited to the administration or enforcement of -- and then there is a list -- the provisions of this chapter -- that refers to the FNA -- regulations issued pursuant to this chapter, federal assistance programs --

THE COURT:  Okay.  All right.  And this is broader because?

MR. O'CONNOR:  Because the language used in the

protocol is quite vague.  And it would permit use -- permit USDA to use the data and to coordinate with others on investigations regarding SNAP fraud or other violations relating to the FNA.  "Relating to" is quite broad there, and it goes beyond (e)(8).

THE COURT:  All right.  If what -- let me just look at (A) for a minute.

One of the problems is it's combining two concepts:  Law enforcement and sort of use to administer SNAP or federally assisted benefit programs.  The fraud idea in (e)(8) is a whole separate -- I mean, not fraud, but law enforcement -- there are law enforcement entities that are referenced later in (e)(8).  So it's a little bit of combining two different ideas here that gets a little bit merged.

But if the particular words -- you just said people are -- we can use it to investigate SNAP fraud or other violations of the SNAP Act -- you know -- okay -- SNAP.  I think the broadness is what is -- all right.  Just a second.

Well, the problem is the law enforcement, I think, is what presents kind of a reference problem.  Because there could be someone else running a law enforcement-type investigation.  Because the -- I don't know if the Department of Agriculture does law enforcement in the way that people think it does.

So if it doesn't consider itself a law enforcement entity, for example, then you're talking about some other entity that

is doing an investigation of SNAP fraud, and that would not necessarily be a federally funded assistant program investigating SNAP fraud.  In other words, it doesn't fit into (A).  All right?

Are they law enforcement?

MR. KURLAND:  It's technically the Office of the Inspector General would be.  But the -- generally speaking, like, a violation of the SNAP Act could be prosecuted criminally.  And that would be by, you know --

THE COURT:  Somebody else.

MR. KURLAND:   -- U.S. Attorney's Offices.

THE COURT:  Right.  And that -- I don't know -- can they carry a gun?

No.  Okay.  They're not law enforcement.

Okay.  Now, let's go back to the idea -- oh, yeah.

THE COURT REPORTER:  I can't hear --

THE COURT:  And, Your Honor --

THE COURT REPORTER:  I can't hear anything being said back there, just FYI.

MR. KURLAND:  Pardon me, Your Honor.  This is Brian Mizoguchi, who is counsel --

THE COURTROOM DEPUTY:  Please talk into the mic.

MR. KURLAND:  This is Brian Mizoguchi, who is counsel with the USDA.

THE COURT:  All right.  Well, he -- he was introduced

earlier.  Is he going to say they are law enforcement?

THE COURT REPORTER:  If he could talk into the microphone; I don't know what he's saying.

MR. MIZOGUCHI:  Your Honor, I heard your question, and I'm not sure -- are you asking whether the Office of the Inspector General are law enforcement?

THE COURT:  No.

MR. MIZOGUCHI:  Oh.

THE COURT:  I'm asking whether the U.S. Department of Agriculture is considered law enforcement.

MR. MIZOGUCHI:  And my confusion, Your Honor, is that technically the Office of the Inspector General is part of the Department, and I do believe they are authorized to carry weapons.

THE COURT:  Oh, okay.

MR. MIZOGUCHI:  And they are law enforcement.

THE COURT:  All right.  I think -- thank you.  I think that at least it's broad enough, even if the defendant was considered law enforcement, that this could be any law enforcement entity who decides they're going to look into SNAP fraud.

And the problem here, is it can only go to people who are in the SNAP program or federally assisted benefit programs for them to run their programs.  And this is like, who can you give it to?  Do you want to help out other do-gooder programs?

Okay?  "Federally" as in the benefit programs.

All right.  And this is not -- this is looking at law enforcement.  It's not -- it's combining two different concepts.  I think it's a problem.  I just -- but we'll go back to it.  That's highlighted.  I understand I will hear from you, Mr. Kurland, after I get the full point being made.

All right.  Now -- so then the plaintiff thinks that it also was broader than -- you said something else.

MR. O'CONNOR:  Oh, yes, Your Honor.  (e)(8)(C) --

THE COURT:  (C).

MR. O'CONNOR:  -- is another provision that I imagine defendants might cite to.

THE COURT:  All right.  Now, that says all -- okay -- now I have to double-check where that's coming from.

Shall permit notwithstanding any other provision of law or information obtained from this -- under this chapter from an applicant household shall be made available.  Now, this is a mandate.  Okay?  This is not:  If you want to do it, you can.  But you don't have to.  This is if somebody asks for it.  All right?

And who was the requester here?  It says:  Upon request to local, state, or federal law enforcement officials for the purpose of investigating an alleged violation of this chapter or any regulation issued under this chapter.

So, essentially, the plan has to include something saying

that we will make available to any local, state, or law enforcement official, if they ask for it, to investigate an alleged violation.

Now, they do have law enforcement here that they're talking about in -- I'm calling it item B -- all right -- the second item. So the idea is we can give it to law enforcement to coordinate regarding SNAP fraud or other violations relating to the FNA.

So (C) is broad enough to cover a violation of the chapter. If that language is meant to be that, then it's mostly -- it's just not -- it doesn't read in the narrow way that there's, like, a request, somebody wants to look into it. This is like saying, well, you know, that there's some law enforcement investigation going on out there. We'll just -- we can give it to them. And it's not clear that it's quite as narrow.

And I'm not suggesting any bad faith here. It's just that if one is looking at (e)(8) -- and I know the defendant says it's irrelevant to what we're doing -- but if I find to the contrary, the easiest way is almost to incorporate (e)(8).

MR. O'CONNOR: Exactly.

THE COURT: You know? That we won't turn it over in any way that is not covered by (e)(8). And then if someone said, wait a minute, you may be interpreting it differently. Let's just spell it all out. It's in a word processor. We'll

bring it over from the statute, stick it in here.

Maybe that would be the safest way to do it if one isn't trying to do more.  If you do not want to be limited by (e)(8) and/or the Computer Matching Act -- but let's leave that out -- one, I think you run into the problem of someone saying it's beyond and we can't do it.

So now let me hear from Mr. Kurland.

MR. KURLAND:  Your Honor, first of all, I'd like to introduce Tyler Becker, who joined me as counsel between the break.  His last name a spelled B-E --

THE COURT:  C-K-E-R.

MR. KURLAND:  Yes.  He's on -- but he's joined us now, as well.

THE COURT:  I did notice you had expanded your team over there, apparently feeling outnumbered.  But okay.

MR. KURLAND:  I would like to just say we don't view this as -- as you've been saying -- as irrelevant.  What we view, actually, that provision is a direct application and importation of (e)(8)'s restrictions into the statute.  And I think it requires a lot of semantic splitting to say otherwise.

Because if you go back to (e)(8)(A)(i), it says the disclosure of such information to persons directly connected with administration and enforcement.  So that is not only to USDA people.  It is related to anybody who is charged with enforcing, and that includes law enforcement or prosecutorial

authorities, who --

THE COURT:  Sure.

MR. KURLAND:  -- have authority to investigate and bring actions for violation of the SNAP Act.

THE COURT:  I don't know.  I'll just say, I don't know.  If you really didn't want to do any more than that, then spell it out exactly as it is and nobody will be able to object.

MR. KURLAND:  That --

THE COURT:  If you want to just cut them off, all you have to do is import (e)(8) into the protocol, and they won't be essentially silenced.

MR. O'CONNOR:  I'm not sure I would agree with that, Your Honor.  But I do think if defendants' intent was to directly import (e)(8) into the protocol, they could have copied and pasted, like you said, with Microsoft Word.

THE COURT:  Yes, they could have.  That's why I'm wondering if -- as I say, if you -- every one of these you're going to get into an interpretation of both (e)(8) and what you said.  All right?  So when you read like (e)(8)(A)(i), it's persons directly connected with the administration or enforcement.

Okay.  That sounds to me like maybe OIG, the USDA, the F -- anyway -- but directly connected.  Or, it goes on -- all right -- with the enforcement of the provisions of this

chapter.  And then we get, I guess, that same lead-in phrase, directly connected with the administration or enforcement of federal assistance programs or federally assisted State programs.

And this is a -- it doesn't have anything to do with law enforcement.  All right?  You can say "law enforcement" means enforcement.  But I don't think the focus was on law enforcement per se.  But maybe.  You have law enforcement investigations.  And that could be anybody, including the San Francisco Police Department.  All right?  And I don't know that you can turn it over.

For example, we have a case right now in this court -- a criminal case -- brought against someone who is accused of making a fraudulent claim for PPP benefits during COVID.  All right.  I'm sure there's some kind of legislation that deals with checking out COVID programs and things.  But I believe that if you could just give this material to, like, the FBI -- all right -- who's looking in to prosecute a criminal case where they say somebody fraudulently made a claim for benefits against the SNAP program -- all right -- or people of the State of California v. SNAP recipient -- all right -- for fraud.

And I think that there are all kinds of people who may be out there that it overlaps with in law enforcement.  And that's why I think that combining law enforcement with the general idea just kind of muddied it a bit.  And I'm not, as I say,

ascribing any bad intent on -- as to the defense here.

All right.  Are you relying on the third one at all?

MR. O'CONNOR:  I don't think we have an issue with the third one.

THE COURT:  No?  How about -- this now -- they've -- they did take "foreign" out of the SORN.  And -- didn't they?  Is --

MR. O'CONNOR:  No, Your Honor.  They still have not amended the SORN.

THE COURT:  Oh, my goodness.  It's still in the SORN?  Okay.

MR. O'CONNOR:  Nope.

THE COURT:  Okay.  That's -- all right.  Well, they took it out here.  They're not going to share it with any foreign government or organizations.  And then we have -- what about the last here -- commercial use or transfer to private entities?

MR. O'CONNOR:  We're okay with that provision, as well.

THE COURT:  Okay.  All right.  Because it's a "not" -- you know -- and they all-capped and bolded "not."  So -- okay.

I do think there's a bit of a problem with this law enforcement investigation, et cetera.  Now, you took out "criminal" and "administrative."  But it's beyond -- in other words, if you left "criminal" in, it would be, we won't give it

to anyone accept criminal investigations.  If you took it out, we won't give it to anyone beyond SNAP fraud.

So taking out "criminal," but it's still -- it's -- I don't know.  Maybe if you read some of the restrictions that have been added, you can read it a little tighter.  But it just seems it's so much easier not to create a problem.  I guess that's the best way to put it.

All right.  Now where are we?  Do you want to go to 4.2?

MR. O'CONNOR:  Yes.

THE COURT:  All right.  We're on 4.2.  This is in a broader section titled "Limited Access."  4.2 reads:  "Except to the extent required by law, no access to the SNAP information database may be provided to."  Is it the "except to the extent required by law" or what?

MR. O'CONNOR:  I think there's even a prior issue, Your Honor.  And this is the overarching issue that I also mentioned with respect to 2.2.1, which is that neither of these provisions governs or in any way restricts USDA from taking data that is within the database and re-disclosing it.  This provision --

THE COURT:  Anybody -- are you saying it doesn't restrict the disclosure?

MR. O'CONNOR:  Yes.

THE COURT:  Ah, because it says "use," I guess.  Maybe that's --

MR. O'CONNOR:  2.2.1 refers to USDA's use, not USDA's re-disclosure --

THE COURT:  All right.

MR. O'CONNOR:  -- not any other agency's use.

THE COURT:  All right.  You didn't mention that before.  This one, however, says -- is using "provided to."  So 4.2, they are using that "no access to this information may be provided to."  Now, that's disclosure, unless you're reading it more narrowly.

MR. O'CONNOR:  I think, Your Honor, the language is more specific.  And it only prohibits USDA from granting access to the SNAP information database itself, the database.  It does not prohibit USDA from taking data that is within the database and sharing it externally.

THE COURT:  Okay.  I may have missed that point.  Let's do it one at a time.

First -- the first one said "use."  So it didn't talk about who you might give it to in one way or another.  And that could be modified to we're not going to disclose it to anybody beyond if we're going into it.  This one, however, says "may be provided to."  And are you reading that as some kind of physical distribution as opposed to disclosure of information or not?

MR. O'CONNOR:  I think the language that I'm focusing on is "access to the SNAP information database."

THE COURT:  Just the words "SNAP information database"?

MR. O'CONNOR:  It's the access to the database.  So, for example --

THE COURT:  No access -- you're reading "access" to be broader than disclosure?

MR. O'CONNOR:  What I'm reading --

THE COURT:  You're relying on a verb or something.

MR. O'CONNOR:  I think what's important here is there is a --

THE COURT:  Excuse me.  You're relying on a noun "access."  I just said, "Are you concerned about SNAP information database?"  You went, "No, access to the SNAP information database."  Is the word "access" important to you?

MR. O'CONNOR:  Yes.

THE COURT:  Why?

MR. O'CONNOR:  Providing access to the database, from my understanding, would be the equivalent of giving someone the login credentials to access the database.

THE COURT:  Okay.  You're, again, focusing on any distinction between these words and "you cannot disclose to."

MR. O'CONNOR:  Yes.

THE COURT:  Fine.  Now, your view is "disclosure" would be the broadest and clearest restriction that one could use as a verb in all of this; correct?

MR. O'CONNOR:  I think it would track (e)(8), and I think it would be more reasonable.  Yes.

THE COURT:  So, yes.  All right.  Fine.  Now -- so you're concerned about the word "access."  Maybe that can be read in a variety of ways.  And somebody could still disclose by -- I don't know -- somehow having access.  I'm not sure.

And then provided maybe people would argue about "provision" versus "access" versus "disclosure" versus -- we had had some argument at one time about the words in (a)(3) and the words "inspection" and "audit."  All right?  The plaintiff says, oh, yay, I read those really narrowly.  Okay?  And it doesn't mean you get this stuff.  You can sit here and look at it on our computer.  All right?  And then you can do an auditing right there, but you can't take it home with you.

Okay.  Now -- so plaintiff is concerned about certain words and how they're used.  And certainly then, when the defendant was faced with the plaintiffs', you know, interpretation of inspection and audit, and then they said, oh, no, means more than that.  So it would be nice not to have to fight over the word.  All right?

Now, is the actual scope of the data as being described -- SNAP information database -- is that in some way narrower than what you understand would be disclosed under (a)(3)?

MR. O'CONNOR:  I'm not sure I followed the question.

THE COURT:  (a)(3) allows you to -- well, allows the

defendant to get pretty much everything in your computer about the SNAP program -- the State -- all right -- the State's program.  (e)(8) is dealing with a smaller subset of that, which is -- well, that was redundant -- but, anyway, a subset of that, which would be information obtained from households.  Okay?  Because in being allowed to give it, they're only allowed to give or required to give this limited kind of data, not the entirety of the State SNAP program records.

All right.  But what is the relationship, in your mind, that you're concerned about a description, quote, "SNAP information database," closed quote?  Is that the database that's referred to in (a)(3)?

MR. O'CONNOR:  So the SNAP information database is the database that USDA is building with the records that they are collecting from the states.  Some states have --

THE COURT:  Oh, it's what USDA is doing with it?

MR. O'CONNOR:  Yes.

THE COURT:  Oh.  All right.  Now, this is then looking at some kind of distribution or possible distribution when you look at 4.2 that is saying:  We -- that anybody access the SNAP -- our database built from what you gave us -- well, you don't give it to these, and they say who they won't give it to; right?  But it says "access," and you're reading "access" as being something narrower than disclosure.

MR. O'CONNOR:  If I could just take a step back.  I

think we're concerned that this provision, by only governing access to the database, does not prohibit re-disclosure of data from the database.

THE COURT: Okay.

MR. O'CONNOR: They can pull the data out of the database and send it.

THE COURT: Okay. In other words, they can still have it. They just didn't plug it into their database.

MR. O'CONNOR: I think we're concerned that USDA will pull data out of the database and send it, and say, we're not violating 4.2, because we're not providing the recipient with access to the database itself.

THE COURT: I --

MR. O'CONNOR: We're just providing them with access to the data.

THE COURT: That's kind of strained, but okay. But it is possible that they do have information that they got that isn't in the database in some way. I don't know. But you're just saying, oh, they're just talking about the totality of their program. In other words, there's a program or a database, and we don't give that, but we can give bits and pieces of it. That's how you're reading it.

MR. O'CONNOR: My --

THE COURT: Maybe -- I don't want to hear what your concerned they're going to do. I want to know how it allows

them to do it.  All right?  Because that's what you are objecting to.

I have no idea what they're going to do with whatever they get.  Okay?  The question is whether somebody is allowed to do something.  And you say, well, if they're allowed to do it, then -- and we give it to them -- then we can't do that. Because they aren't limiting how they're going to use it. Now -- to what's in (e)(8).

So you believe that using the words "SNAP information database" -- let alone this "access" word -- but "SNAP information database" would allow them to do whatever they wanted, essentially, unrestricted by 4.2, as to parts of the database.  99 percent of the database, 5 percent of the database -- whatever -- but it's not the totality.  It doesn't constitute the database; it constitutes information in it.

MR. O'CONNOR:  Our concern -- and I won't use the word "concern."  My reading of this provision is that there will be a SNAP database.  That database will contain applicant data obtained from the states; however, this provision does not track the language of (e)(8), which would say --

THE COURT:  Which part?

MR. O'CONNOR:  -- (e)(8) only permits --

THE COURT:  Sorry, which part of it?

MR. O'CONNOR:  (e)(8)(A)(i).

THE COURT:  (e)(8)(A)(i).  Oh, we're back to that.

MR. O'CONNOR:  Yes.

THE COURT:  Okay.  Go ahead.

MR. O'CONNOR:  (e)(8) only permits the disclosure of applicant data to certain persons and for certain purposes. We're concerned that this language is written in a manner such that they could disclose data from the database not within the bounds of (e)(8)(A)(i).

THE COURT:  Do you mean that there's information that didn't come from applicant households?

MR. O'CONNOR:  We're concerned about the information that's coming from the applicant households.  That is much of what is being demanded from the states.

THE COURT:  Well, now I'm getting lost.  There's a SNAP database --

MR. O'CONNOR:  Yes.

THE COURT:  -- that USDA is going to create if they get this information.  And they are -- by this particular section -- and you can quibble about some of the wording they used -- but that it only refers to the SNAP -- oh, you think SNAP information database is broader than the household information?

MR. O'CONNOR:  The SNAP information database may also contain some information that does not come from SNAP applicants.

THE COURT:  Yes.  All right.  I'm -- okay.  I think I

get what you're saying.

By the way, you don't have to wait five seconds between each word.  Okay.

MR. O'CONNOR:  Sorry.

THE COURT:  Now, going back -- going back to where we were -- I don't want to create a monster out of this.  Okay.  The SNAP information database can contain anything they want to put in it that they got under (a)(3).  And (a)(3) has a broader scope than (e)(8).  (e)(8) is restricted to information obtained from households.  (a)(8) can have -- or (a) -- I'm sorry -- (a)(3) can have all manner of information, including, as an example, information they got for the stores as to who was buying what; right?  That was one of the concerns earlier.  You're looking at me with blank.  Mr. Kurland says "yeah."  Okay.

MR. O'CONNOR:  I'm not sure it's one of the current data elements that they're currently demanding.

THE COURT:  Pardon me?

MR. O'CONNOR:  I'm not sure whether that's within the scope of the current demand.

THE COURT:  I have no idea whether it is at this point.  But originally -- originally -- one of the arguments about --

MR. O'CONNOR:  Yes.  I understand, Your Honor.  I now understand you're referring to the prior order.  Yes.

(Indiscernible cross-talk.)

THE COURT:  I'm sorry.  I can only hear one at a time.

MR. O'CONNOR:  I apologize.

Yes.  That -- retailer data would be an example of something that would not fall within the scope of (e)(8).

THE COURT:  Right.  But it would be in the SNAP database if they got it under (a)(3), because (a)(3) is not limited to (e)(8) household information.

All right.  So then, by using the words "SNAP database," they aren't really necessarily -- well, it's broader.  It covers anything that comes out of (e)(8).  And so then the question -- I'm still -- I'm not sure I understand your point -- is that you think that it -- this is only representing a restriction as to the totality of the item called the SNAP database as opposed to information contained in it.

MR. O'CONNOR:  Yes.

THE COURT:  All right.

So now we're over to Mr. Kurland.  Okay.

MR. KURLAND:  Your Honor, very briefly, we don't read the statute the same -- or the proposal -- the same way.  And I can walk through all the semantic slicing is, I think, unnecessary, because USDA, when writing the protocol as it did, and as it announced in both the original letter for its purposes and the December 23rd letter, committed to complying with the SNAP Act and to only using this for the purposes of --

you know -- as it outlined for conducting an audit of it.
But --

THE COURT:  Okay.  Let me stop you for one second.

MR. KURLAND:  I --

THE COURT:  What if it read -- now, they're still going to complain about access, but at least to get rid of this point -- "no access to the SNAP information database or any part of it may be provided to"?

MR. O'CONNOR:  I think that would be better.

MR. KURLAND:  Your Honor, I -- the -- the letter that my USDA colleague just handed me is that we can agree to put in a reference to (e)(8)(A) and say we agree to comply with (e)(8)(A) as it is written, because that has always been the intent in this and putting it down in writing.  Our concern has always been that, no matter what, the states will find a reason not to agree or not to comply, because they have kind of thrown up roadblocks all over.

So if this is merely about the semantics of what is currently in there, we'll -- you know -- if the Court orders them to accept it or some other version of that -- I don't -- you know -- we'll put in, in compliance with the EAA.  We can kind of cut through some of this noise --

THE COURT:  All right.  Now --

MR. KURLAND:   -- because that's what we thought we were doing.

THE COURT: All right. Where did that description --

THE COURT REPORTER: Sorry, Judge. I think you're covering your mic.

THE COURT: Section 2020 is all we're talking about at the moment. Just if we can get a preview of how receptive they would be to that, would that satisfy plaintiffs or would you be concerned there's some room for something that you're worried about?

MR. O'CONNOR: If defendants were willing to copy and paste the provisions of (e)(8) and say that those provisions govern any re-disclosure and any subsequent use of applicant data, I think that would largely address our concern with (e)(8).

THE COURT: All right. So rather than them saying they'll comply with (e)(8) of section 2020, if they said, we will comply with the following -- you know, however they say -- and then spell it out.

MR. O'CONNOR: Yes. I think the words are quite important. In our view, this is not semantics. We're not trying to throw up roadblocks. We're trying to comply with the federal statute.

THE COURT: Yeah. Fine. Okay. All right.

Now, apparently they would be satisfied with your airlifting into the protocol the restrictions that are set out in (e)(8). And then you're going to need -- I mean, maybe it

just reads like (e)(8) reads so that you don't get into access, disclosure, whatever.  Because the verbs apparently get to be a stumbling block too.

Just looking at (e)(8) -- I guess it would -- you would have to have an intro to it.  Because, right now, it has to do with their plan and that they can't give it to anybody.  The plan has to provide it.  So it might have to be that --

THE COURT REPORTER:  Sorry, Judge.  "It might have to be..."

THE COURT:  Yeah.  I'm sorry.  I keep putting my hands up there because I'm getting tired.

All right.  We will not disclose information obtained from -- now, I think you'd prefer to have the database or at least information -- maybe you want to say "information obtained from the states pursuant to either (a)(3) or (e)(8)," except that we can provide it to -- I don't know -- they would then lay out how they can and how they shall or something.

But you will need to agree upon an introductory phrase.  It won't work unless you have something there that heads it up.  If you could do that, that would be, you know, very good.  Because these are the two sections they're concerned about.  And both of the sections are being compared to (e)(8).

Now, we still have the computer matching issue.  And I'm thinking maybe we could take a break and then come back on the whole computer matching issue and any of these ancillary

things, like you're willing to consider the importance of this, and you changed the plan, and you did whatever, and then we'll talk about those.  Because I don't want those to come up again, if they can be avoided.

I appreciate the suggestion that's being made on behalf of USDA.  And if you think that could work, you know, you can even talk for a couple of minutes.  Do you speak to each other outside of court?  I don't know.

MR. O'CONNOR:  We met today, but I'm sure we can speak.

THE COURT:  All right.

MR. O'CONNOR:  Of course, there are 22 plaintiffs.  So we can definitely start on this discussion, and the wording would be quite important.

THE COURT:  But we're going to come back -- now, we can come back -- it's 12:30, I think -- so we can come back at like 1:30, 2:00.  Go -- yes?

MR. KURLAND:  I -- my only concern, again, is we have a 5 o'clock flight, which I think means -- I'm, again, not from San Francisco -- but we would have to leave somewhere around 3:00, 3:30.

THE COURT:  Oh, well --

MR. KURLAND:  It's Friday traffic.

THE COURT:  Yes.  For example, like, Ms. Geiger's had no break since 9 o'clock.  And I'm just thinking -- are you

preferring we just keep going?

MR. KURLAND:  Or maybe a shorter break.

THE COURT:  Well, yeah.  Let me think for a minute. Yeah.  Let me just think.  Because I don't think that the computer matching would take that long.  Because I have views about it.  The real question, I think, is whether -- if I make certain -- you know -- I guess, if I gave you a tentative ruling, if you will, on everything, would this be something that, given what you've heard today, you might want to defer getting an order and seeing if you can agree upon a protocol before I start, you know, ordering to do things?

If not, then -- if -- in other words, if the defendant needs an order -- apparently they need an order.  So under those circumstances -- there's no way I'm going to get a long written order out today.  And, of course, then we have, like, this three-day weekend.

So my ruling today I think would have to be deemed tentative.  And is it -- there's currently no deadline, unlike the earlier time, where we had -- you know -- if you don't pony up the material, we're cutting you off as of -- all right --

MR. O'CONNOR:  Your Honor, the threat is still there. And we do believe that we're subject to imminent irreparable --

THE COURT:  You have no idea where I'm going with this, Counsel.

MR. O'CONNOR:  Sorry.

THE COURT: And if you'd wait a minute, we don't have a deadline. So I will endeavor to get an order out quickly, but I'm not under the gun. All right? And it isn't the only case in our chambers. Okay? That's all that I'm saying.

MR. KURLAND: If I may? We would have to still issue a formal warning. And they would still have 30 days to comply. So you would have even 30 days to rule.

THE COURT: Right. And there is an argument that there is no final agency action, in this case, at this time. There's an argument --

MR. O'CONNOR: I'm not aware that that argument's been raised by --

THE COURT: I think it had been. Had it not been?

MR. KURLAND: It's also jurisdictional in the Ninth Circuit.

MR. O'CONNOR: I'm not sure if defendant --

THE COURT: All right. I understood that -- maybe they didn't raise it this time. I'll have to look. Well, it has to be final agency action. And they don't have their formal -- formal letter yet. But they had indicated pretty much they've made up their mind in the sense that they said, okay, we gave you a chance to complain. You're unreasonable. And so now we're giving you notice that we have to give you. So I think it's far enough along.

So if that's not an issue, then we have the merits of this

matching question.  And anything else -- well, a few just little things.  But I think, though, still -- what if we came back at -- if you -- you have to leave here by 3:30?

MR. KURLAND:  I mean, I would defer to the San Franciscans here.

THE COURT:  Your flight's at 5:00.

MR. KURLAND:  Yes.  Boards at -- or lands -- or takes off at 5:00.  So --

THE COURT:  Right.  You aren't checking luggage or anything?  Do you have your boarding pass?

MR. KURLAND:  I have PreCheck.  He doesn't though, so --

THE COURT:  Oh.

MR. KURLAND:  -- he may get left behind.

THE COURT:  So it depends.  It could take -- at this hour on a Friday, it could take longer than usual to get down there.  So I'm really just wondering -- maybe we should just take maybe 10, 15 minutes now and then come back out and try to finish it up.

MR. KURLAND:  I wouldn't need more than a couple of minutes on the Computer Matching Act.  But I would also -- I'll defer --

THE COURT:  Well, I'm just thinking -- you know -- I guess we could do it.  Hang on.

MR. KURLAND:  I don't want to force court staff to do

anything on my account.

THE COURT: Ms. Geiger said she's, you know, game, so to speak, were her words, but that's what it boils down to. I'm looking for my notes.

MR. KURLAND: Your Honor, if I may just make one comment about what you were talking about, about how to proceed, and figuring things out.

THE COURT: Sure.

MR. KURLAND: Our main concern is that we would like to get to a resolution of this as quickly as possible so that the data can be provided. And I do think, in that case, it would be really helpful to have an order, not maybe by today, but outlining the other issues.

THE COURT: Outlining?

MR. KURLAND: You know, rulings on the Computer Matching Act. Because part of our concern is that if we're merely sent back to do renegotiations, that, you know, without some of the other formal guidance that the parties are currently at an impasse over, that we may not be able to still reach an agreement.

So I do think, you know, based on -- even on our commitment for (e)(8)(A), we might be able to table that specific problem for the moment.

THE COURT: Yep.

MR. KURLAND: But without certain other resolutions,

we would still be fine.

THE COURT:  All right.

MR. KURLAND:  That's all I would say.

THE COURT:  All right.  Let's look at how many other things there are.  There's a Computer Matching Act that the plaintiff may have a fairly decent argument on this time.  Last time I didn't think they had that.  This time, they've got a protocol phrase that they are connecting up with.  All right.

Then we have -- there were some other -- I think there were some arguments about failing to consider important issues.  I don't think the plaintiffs really made a sufficient -- I'll just give you, you know, a preview.  I don't think they've made a sufficient showing on that.

Changing practice -- okay.  They have -- this is so weird.  All right.  First, you have to change a practice, and then you have to not acknowledge that you know what you're doing.  And so -- and it's coming out of case law in some way on -- it's something arbitrary and capricious, because you just go off with their head.  And, previously, we used to let them treat people, and now we're going to cut their heads off.  Okay.  And nobody cares, and nobody says why, and doesn't even realize there may be a gory difference between it or anything.

Now, here, there was a statement in the plaintiffs', I think, December 8th letter, where they essentially say, you are really changing things.  And then the defendant acknowledges

that, okay, but that's no argument on your part to support anything about not going ahead with the protocol. So I don't really acknowledge that they're doing something different. Whether you want to call it a policy or a practice, they never had a stated policy: We will only ask for individuals or small groups of people.

However, if the case law suggests that if you have an ongoing practice to a certain extent -- that that could count as a policy -- the -- I think they've acknowledged the differential. Okay? And I will show you that sequence if you want to look at it.

Then you've got this, you go into one tier, and you used to have two tier, and I don't think they're going to one tier. They're not stopping anybody from doing whatever they want. They just want to get in the game. And so that's insufficient to preclude signing. And when I say "insufficient," insufficient showing that there would be a violation of something if -- or they're not entitled to have a protocol because of whatever.

And then there was an argument about failing to consider how private -- they're worried about privacy and, I guess, hacking or what have you. And I didn't think there was a showing that they were cavalier about that in some way. And so we're really pretty much left with the computer matching question.

All right.  Now, on computer matching -- let me see here -- okay.  I've got to get the language of it.  All right.  The plaintiff is concerned about section -- 5 USC Section 552a(o)(1), I believe, is the plaintiffs' focus.  Because it provides that no record which is contained in a system of records may be disclosed to a recipient agency or nonfederal agency for use in a Computer Matching program except pursuant to a written agreement between the source agency and the recipient agency or nonfederal agency.

The plaintiffs' position is they are the source, USDA is the recipient, and there's no agreement.  All right?  And that they understand that there's going to be some computer matching program.  Now, if we go back to the protocol -- it's not highlighted.  Where is the section where they say they're going to match?

MR. O'CONNOR:  In the protocol, Your Honor?

THE COURT:  Yes.  It's somewhere in here, I believe.

MR. O'CONNOR:  I think it's the very first section of the protocol.

THE COURT:  Hm, no.

MR. O'CONNOR:  US -- sorry, may I?  USDA will use recipient data --

THE COURT:  Which section are you reading?

MR. O'CONNOR:  Oh.

THE COURT:  Oh, wait a minute.  I see what I did.  I

was on page 2.  Sorry.

All right.  So you're doing 1.1; right?  1.1?

MR. O'CONNOR:  Yes.

THE COURT:  Okay.  Okay.  All right.  So USDA will use the information they get from the states to ensure the integrity of the program, including by verifying SNAP recipient eligibility against federally maintained databases.  And so that suggests they're going to do some kind of matching.  Then I think that they also -- are we relying on something beyond that?  It looks like you have a hovering pen.

MR. O'CONNOR:  Oh, I think they've made the admission multiple times.  The entire purpose of the SNAP database is to take the data and to match it against other databases to determine, for example, whether there are duplicate enrollments, whether there are deceased enrollments --

THE COURT:  You've got to slow down.  He has a plane to catch, and we don't have to go too far.

What I was going to ask you is -- I believe that you pointed out that they have conceded that they do matching -- that they got data from some of these complying states, and they are doing matching of some sort; correct?

MR. O'CONNOR:  Yes.

THE COURT:  Okay.  Now, the only question is, is that matching that's covered by the act?  All right.  So going back to it -- I'm sorry, but these notes are not helping me.  Just a

minute.

Where's the language -- I'm trying to find the language about the -- the definition of language, rather. Maybe if I get the Computer Act here, I can do it. Just a minute.

Okay. What's the particular -- just give me the particular section where they're using automated and computerized.

MR. O'CONNOR: Excuse me, the section of the statute that we're relying upon?

THE COURT: Yes. Yes.

MR. O'CONNOR: 5 USC 552a(o).

THE COURT: Okay. Let me go up to (o). I already said -- I guess that's -- well, I'm concerned about the definitions. Are the definitions in (o) or somewhere else? Okay. Let me go to (o) first, and then we'll see where we are.

All right. I've already read (o). Okay. I need the definition that gets us into what's computer matching.

MR. O'CONNOR: The matching -- the definition of "matching program" is --

THE COURT: Yes.

MR. O'CONNOR: -- 552a(a)(8).

THE COURT: (a) what?

MR. O'CONNOR: (8).

THE COURT: (8). Ah, the term "matching program" -- all right -- means any computerized comparison of two or more

automated systems of records; right?  That's what the argument starts with.  Okay.

The defendant says, well, we aren't doing automated comparisons.  And then the plaintiff says, automated just -- well, first, to the system of records and not to the comparisons being conducted.  So I had asked you, just earlier, what do you understand the difference to be between the two?

MR. O'CONNOR:  Me, Your Honor?

THE COURT:  Well, if the defendant says we're only doing (B) and not (A), then what do they understand (B) to be and what do they understand (A) to be?

MR. KURLAND:  Your Honor, I think it's important to remember -- when we're reviewing the Computer Matching Act -- is that it covers sending agencies and recipient agencies.  So we actually have to look at two separate hops here.  There is a hop where the states provide data to USDA, and then USDA may then run checks against other databases, for example, like we've mentioned, the SAVE database based at DAS -- DHS -- pardon me -- to confirm/deny.  And so it's easiest to take those two hops individually.

The first hop, from the states to USDA, is not a matching program.  We're not comparing data that we have --

THE COURT:  Okay, fine.

MR. KURLAND:   -- for the states --

THE COURT:  Okay.

MR. KURLAND:  -- really taking their data.

THE COURT:  All right.

MR. KURLAND:  So it's not a match.

THE COURT:  I got that.

MR. KURLAND:  Yeah.  And so, by definition, we don't need a CMA agreement.  And I think that's actually very -- it's Computer Matching Act agreement -- and I think that's actually shown very well by the two computer matching agreements that they provided in their declarations.

Because USDA, even when we're doing the quality control -- the QC review -- that we do -- provided with a different statute -- does not do that under -- with a computer matching agreement.  Because when we accept information from the states, we're not comparing them against each other.  We're merely accepting it and doing an internal review.

And so -- but there is, for example, something called -- and, apologies, I'm going to say this very slowly -- the Electronic Disqualification Recipient System.  And that is what the Computer Matching Act agreements, which they have provided, cover.  That's because the states have to give to a database -- and it's actually provided to various different states but run through USDA -- people who have been disqualified from receiving benefits.

So, you know, that database is then run against other state databases to determine whether a new applicant has been

disqualified somewhere else.

THE COURT:  Okay.

MR. KURLAND:  And in that --

THE COURT:  I'm just going to stop you.

MR. KURLAND:  Okay.  That's fair.

THE COURT:  Section (q) of this particular statute says, "No source agency may disclose any record which is contained in a system of records to a recipient agency or nonfederal agency for a matching program if such source agency has reason to believe that the requirements of subsection (p), or any matching agreement entered into pursuant to subsection (o), or both, are not being met by such recipient agency."

Now -- so to -- just go to that for a minute and see if it works here.  In other words, if somebody has reason to believe that somebody's going to do a matching program that doesn't have a -- that's not qualified.

Now, is that just between the source and USDA, or is that between USDA and a matching program, and the source agency can't give the material to the recipient if they're going to use it to match in a way that there's no agreement, I guess?

MR. O'CONNOR:  I think (q) reinforces (o) here.

THE COURT:  It's a sanctions section.  Hang on.  Let me just put this on here for a minute.  Okay.  Go back to (o).  All right.

All right.  If I'm not -- if I understand the defendants' argument -- and I may have to go back and look at this -- they understand the restriction about needing a program to be between the source and the recipient; is that the idea?

Mr. Kurland, what are you looking at?

MR. KURLAND:  I'm looking at the statute.  Pardon me, Your Honor.  I don't have --

THE COURT:  Okay.  Fine.

MR. KURLAND:  -- (q) in it, so I had to look it up on my phone.

THE COURT:  All right.  Well, then -- let me see if I got your argument correct -- all right -- if you'd stop -- well, okay --

MR. KURLAND:  Yeah, sorry.  Go ahead.

THE COURT:  Is your argument that the matching restrictions here in (o) or (q) are that it's -- envisions a matching program between the source and recipient?  In other words, that the source is going to give information to the recipient that's going to match it with the source in some way, or the source is going to match with the recipient, or the recipient's going to match with the source, but you're not looking at a third party down the line?

MR. KURLAND:  Yes.

THE COURT:  Ah, okay.  Now, I don't know if they're right or not; okay?  If they are, then the section is

inapplicable.  If they are not right, then we get to what's a computer matching program -- whether what the USDA is doing or plans to do with the information, given how they've been using it up to this point -- whether that sharing with a third party for purposes of matching -- I guess they wouldn't share.  They would get information -- they'd be a recipient; right?

In other words, this doesn't deal with disclosure here.  USDA has, let's say, information they've now received from the states.  And then they're going to ask somebody else to give them the information this other agency has.  In other words, the disclosures would keep them from giving it to the other agency, but the other agency could give them their records.

All right.  So if they -- if they were looking to see if somebody was a citizen and they could get from INS the INS records about whether somebody's a citizen or not, they could do that, as long as -- you know -- that the other agency wants to give it to them.  And it doesn't have to do with the disclosure.  I just wanted to get that part clear.

So let's say USDA plans to match this with some other federal agency, and they don't have an agreement with them.  Why would the source agency care?  So now I'm just trying to see whether Mr. Kurland may be right about who's covered.

MR. O'CONNOR:  Your Honor, I think Mr. Kurland's argument is completely divorced from the statutory language of (o)(1) --

THE COURT:  We're looking at (o)?

MR. O'CONNOR:  We're a source agency.  They're a recipient agency.

THE COURT:  Yes.

MR. O'CONNOR:  They're asking us to disclose records for use in a computer matching program.  We know that they're performing multiple types of matches.  For example --

THE COURT:  (Indiscernible.)

THE COURT REPORTER:  I'm sorry.  I didn't hear the beginning of that, Judge.

THE COURT:  All right.  You're getting off the statutory language.  All right?  Now, it says no record may be disclosed to a recipient agency for use in a computer -- well, it starts with no record that's contained in a system of records may be disclosed to a recipient agency for use in a computer matching program except pursuant to a written agreement between the source agency and the recipient agency.

All right.  In other words, the source and the recipient need an agreement.  But it doesn't say anything about how you're going to hand it out to other people.  It sounds like if you're -- if the source and recipient are going to match, you have to have some agreement about it.  Just like if the source and the recipient are going to be covered by (a)(3).  All right?

In other words, if the source is going to give the

information to USDA, the recipient, it has to be by an agreement between them. All right. And this sounds very much like that and then doesn't have anything to do with some third party having a matching agreement, which possibly then would be, at that point, USDA being the source and some other agency being -- well, no, they're not passing it on. They're just going to receive. All right. Hard to say.

But I'm not sure it applies. I will go back and see if it applies. If it applies, then I do think that the automation does not come into play for purposes of the type of comparison made. Only do you have automated records and you're now going to do a computerized comparison. And it looks like they're doing a computerized comparison.

So if this applies, then there may be a requirement that there will be an agreement. But it's not making a lot of sense to me about an agreement that works to the future of what they're going to do with it. So do you have any authority at all on that point?

In other words, I can understand why someone is concerned that if you give information to someone, they're going to hand it out to someone that you, yourself, are not allowed to give it to; okay? But I don't see, necessarily, the same reasoning for, oh, that they're going to -- you -- you're going to match in some way. I don't know who's matching who with what. But, anyway, you're going to match it. You need an agreement that's

between you and them.

And it doesn't say that -- pursuant to an agreement that requires that they now keep having matching agreements with other entities -- that they may give -- or match data -- not disclose -- but match data with.  So that would be my issue -- or my question.

MR. O'CONNOR:  Your Honor, so I think the triggering requirement here is that they're asking us to disclose records for use in a computer matching program.  And I think we know that the SNAP database is a computer matching program.  And we know that for multiple reasons.

First, they are taking the states' records --

THE COURT:  Skip that.  I just said it looks like they have a computer matching program.  I'm only on the first part.  So you're reading it as you can't disclose it to, we'll just say, a recipient agency for use in a computer matching program.  That sounds like something that if somebody wanted to say to Homeland Security -- if you're going to give this material to USDA so that they can match it, you have to have some agreement -- I don't know why.  Does anybody know the history of why they have this section?

MR. O'CONNOR:  The computer matching agreement?

THE COURT:  Why do they care?  Why does Congress care about whether you have an agreement or not between who you give this material to?

MR. O'CONNOR:  Yes.  So I think Congress, in the late '80s, wanted to ensure that recipients and applicants in federal benefits programs were protected, such that if their information was going to be used and matched with other systems of records by computers, they would be provided with certain things, including notice and including an opportunity to challenge the results of the matching, especially if it would have an adverse effect on their benefit determinations.

THE COURT:  Okay.  All right.  If the protection is, for some reason, going out to the people who give data -- or information -- we'll just say people give information to a federal agency.  And then the federal agency is going to start matching that with other things -- okay -- that the agency should say that this material could be matched elsewhere.  In other words, we're not going to just be looking at it in-house. Maybe they want to do that.  But I'm just not sure that this language really works.  And we have no cases on it; right?

MR. O'CONNOR:  I'm sorry, Your Honor.  I don't have any case authority on this point.  But I'm wondering if you could just help direct me where you think the language -- I'm just not following where it's --

(Indiscernible cross-talk.)

THE COURT REPORTER:  I'm sorry.  I missed the end of him and --

THE COURT:  I don't know what the problem is, because

I've got a lapel mic on.  I'll do the best I can.

THE COURT REPORTER:  I think it was -- you were both speaking at the same time.  So I missed the end of his and the beginning of yours.

THE COURT:  Oh, got you.  All right.

Let's look at it this way:  Ordinarily, you don't know necessarily what somebody is going to do with the data that they get from you.  All right.  You can't disclose it except for certain limited uses.  All right?  Otherwise you have to keep it private.

Somewhere down the line, if that person that you disclose it to, for a legitimate reason covered by (e)(8), decides they want to get their hands on somebody else's database and start comparing it -- all right -- that's so far down the line, I don't know that it is what this section is talking about.  If the idea is that if an agency who collects data is going to start comparing it with other programs, they should be warning somebody that applies, look, you can apply, but I just want you to know, we're just not going to just be looking at this here. We're going to be checking it against other agencies.  I don't know.  It still seems a little odd, but okay.

I just -- it's one thing to be looking at what someone is doing with the material immediately.  In other words, you can disclose it so they can immediately do whatever it is.  They're going to go find somebody who's on the run.  They're going to

capture them.  You can give them their data.  That's the last of (e)(8).  All right.

Or, here, there's just nothing to show there's anybody who's anticipated to be in the picture.  Because there's nothing in (e)(8) that says you can't give something to someone who's going to use it for a computer matching program.  There's nothing that says, in (e)(8), that they can't do matching as part of a legitimate plan.  So I don't see why they would be looking at this particular language to be covering something that nobody even knows is ever going to happen.

And the fact you say we do know doesn't mean that Congress knows when they're looking at this.  So it's -- it's something that I think is a question of statutory interpretation that may not have been discussed by anybody in any case.  I don't know.  Do you have any case on it that limits it?

MR. KURLAND:  We found very, very little case law on interpreting what --

THE COURT:  Okay.

MR. KURLAND:  -- the Matching Act program is.  I will add one point that kind of reinforces what you're thinking, is that even agencies that receive information are still bound by the Privacy Act.  And the Privacy Act, again, is only targeted at individuals' information and gives individuals and not states private causes of action.

So if the concern is that, like, somewhere umpteenth down

the line somebody may also -- you know -- some government agency gives it to some other government agency --

THE COURT:  Mm-hm.  Exactly.

MR. KURLAND:  -- who gives it to some other government agency who may some way disclose it, that end government agency -- the -- is still bound by the Privacy Act.  And if they violate the Privacy Act in some way, someone can bring a suit -- right -- a person, not a state.

MR. O'CONNOR:  Your Honor --

THE COURT:  In any of the cases that you say USDA has entered into some kind of matching program agreement, who are those agreements between?

MR. O'CONNOR:  They're between the state agencies and USDA.

THE COURT:  Right.  So in the past, they have done that.

And then, Mr. Kurland?

MR. KURLAND:  Sorry, Your Honor.  Those were for specific programs that were recognized as matching programs -- the Electronic Disqualification Recipient System.

THE COURT:  No.  I don't know what you're --

MR. KURLAND:  I know, it's really hard.

THE COURT:  I don't know what you're saying.  Just let me ask you, is it a program between the State SNAP program and USDA, or is it an agreement that is looking at a USDA matching

program with another entity?

MR. KURLAND:  My understanding is that it is signed between USDA and one state -- New York -- but also all the states.  They provided both of those, because that system, which I mentioned, is, itself, a matching program.  It automatically matches against all the systems.

THE COURT:  All right.

MR. KURLAND:  So --

THE COURT:  What you're saying is that agreement covers a matching program between the state and USDA.

MR. KURLAND:  Yes.

THE COURT:  Not USDA and some other federal agency.

MR. KURLAND:  Yes.

THE COURT:  Thank you.  And these are the exemplars the Court received?

MR. KURLAND:  Yes.

THE COURT:  I'll have to look at them.  And do you happen to know what the exhibit numbers are?

MR. KURLAND:  I don't off the top of my head.

THE COURT:  Do you?

MR. O'CONNOR:  Yes.  They're attached to the Tomasky declaration and to the Reyes declaration.  But, Your Honor, I think we've gotten completely divorced from the statutory language.

THE COURT:  Nope.  I don't think so at all.  You're

reading it very broadly, to cover any old agreement, any old time it happens, way down the line. And it says "for use in a computer matching program." Now --

MR. O'CONNOR: Yes.

THE COURT: -- they're reading it as between those two entities. You're reading it as it covers the world.

MR. O'CONNOR: No. I'm reading it as --

THE COURT: Excuse me. If, six years from now, they decide to do some matching program, they've got to come back to you and get an agreement between your client and them. It doesn't make sense, even if they say, six years from now, we've got a plan to do a matching program. So I want to see the exhibit. I do not want to hear an argument yet. You can make one afterwards.

So you said it's attached to -- at declaration -- I hope it's out here. And it may not be. I have -- nope, not there. Not here. Not here. Okay. Keep going.

MR. O'CONNOR: There's one that's attached as Exhibit D to the Tomasky declaration.

THE COURT: Okay. I do not, at the moment, but got more papers, so give me a second. I don't think I -- oh, okay, here's something with a D, so this probably is it. Yeah. Okay. Let me look at D. All right.

Do you happen to have that handy, Mr. Kurland?

MR. KURLAND: The agreements?

THE COURT:  Yes.

MR. KURLAND:  I didn't print them out, Your Honor.

THE COURT:  Okay.

MR. KURLAND:  I kind of tried to limit my carry-on.

THE COURT:  Now, according to Mr. Kurland, this agreement covers a matching program between the Department of Agriculture -- Department of Agriculture and a SNAP program.  I don't know which one it is.

Now, I don't know if he's right or not.  It's a very, very long agreement.  But if there's some -- and he doesn't have it.  So --

MR. KURLAND:  Your Honor, it's in the first couple of paragraphs.

THE COURT:  -- I'm not sure.

Don't talk while I'm talking.  We've already heard from the court reporter 100 times --

MR. KURLAND:  Sorry.

THE COURT:  -- and we're trying to get you on a plane.  You know?

MR. KURLAND:  Mm-hm.  Apologies, Your Honor.

THE COURT:  So -- okay.  Now, what were you trying to say?

MR. KURLAND:  The mention of the purpose -- for the purpose of the electronic system is in the first couple of paragraphs.

THE COURT:  Fine.

I don't know that it makes it clear there.  It's very general, and so I can't really tell.  I understand your argument.  It may not be a bad argument.  The plaintiff is reading the language very broadly.  And you are saying, as a practical matter and as a -- yeah -- logical matter, you're just talking about this recipient and the source.  And if they're going to match, they would have to have some agreement.  But why would they have to have an agreement?

MR. KURLAND:  Between the recipient and the source?

THE COURT:  Right.  What's the purpose of that, as you understand it?

MR. KURLAND:  My understanding is it has to do with installing protections and securing data.  I didn't go back through the whole purpose of it.  But, generally, the Privacy Act is about protecting individual data -- like, data of individuals.

THE COURT:  Is it with a similar thought in mind as (a)(3) of 2020 that requires a protocol?

MR. KURLAND:  I would be venturing a guess, Your Honor, because, again, I haven't --

THE COURT:  Okay.

MR. KURLAND:  -- gone back recently and looked at --

THE COURT:  All right.  Let me just see here.  Oh, brother.  Hard for me to tell what's going on here.

They're talking about -- here's one and then I have to go back and see. But this is section -- and I'm not saying necessarily just because this exhibit is limited the way you say, Mr. Kurland, that it necessarily limits the scope of the statute. But it certainly, at least, isn't an example of your client doing something contrary to what you're arguing here.

MR. KURLAND: Precisely, Your Honor.

THE COURT: Okay. Now, we have section -- and I just happened -- I'm flipping through this. It's called "Verification Procedure:" In order to protect any individual whose records are used in this matching program -- that sounds like a matching program between the two entities, the source and the recipient. Now, I'm not sure that's -- I just happened to see it. I don't know what came before it, because I'm on, you know, a later page here. But...

Well, all of it seems to be what those two agencies are going to do. For example, now (C) says FNS and the state agency will follow regulations specified, which maintain the following procedures: To permit an adversely affected party to contest findings that result from the computer matching activity under this agreement.

All right. Again, it sounds like it's between those two entities that are going to match.

MR. O'CONNOR: If I can provide an analogy to the current SNAP database?

THE COURT:  Are -- is anybody going to match between the state and USDA here?

MR. O'CONNOR:  Yes.  The -- I think what -- there are multiple ways in which USDA is matching the records that they're receiving from states.  One of those ways is they are taking State A's records, and they are taking State B's records, and they are matching them to determine whether they are duplicate enrollments.

THE COURT:  I think you're missing the point here, I'm sorry to say.  But the point being made is it doesn't matter what they're doing with them afterwards, as far as matching, as long as they're entitled to get them for a legitimate purpose under (e)(8).  And the only question is whether they're matching between themselves.

You have no case that says this section covers down-the-road matches; okay?  What's covered in the exemplar you gave me appears to be a matching plan.  In other words, USDA and the state are going to match -- do you know, Mr. Kurland, why they were matching records?

MR. KURLAND:  Why the --

THE COURT:  In this agreement.

MR. KURLAND:  So my understanding is that people who are disqualified for -- from receiving SNAP benefits -- this system is designed to make sure they don't go somewhere else and try to apply somewhere else.  Is that it's a matching

program that the state uploads this information and says, does anybody else got this applicant?

THE COURT:  If you have -- if you leave your argument, for a moment.  They can go down the line.  And every time they decide they're going to ask somebody for records and maybe match them, you're going to have to require -- you have to get involved in the agreement, which doesn't make sense to me.

All right.  Under these circumstances -- reading this in the way -- I'm at least leaning to it, but I may not ultimately -- are you able to argue that the agreement -- that the disclosure of the information being demanded is going to be used between your clients and USDA to do a matching program?

MR. O'CONNOR:  USDA would take our records and match them.

THE COURT:  To somebody else's.

MR. O'CONNOR:  The other states, to other federal agencies.

THE COURT:  But not with yours, because they don't have anything to match, is my understanding.  That's why they're trying to get information so ultimately they could match it.  But -- well, yes, they're going to.  They say they're going to.  But the point is that it doesn't look like this section is designed to deal with that.  All right?

It's not saying -- you happen to know that they may match this information down the line.  Ordinarily, you wouldn't.  All

right?  And then this section would still apply.  Because it sounds like it applies to what a recipient and the source are going to do, not what the recipient is going to give to the source.  It's not matching.  And the source and down the road at some point is going to match.

Now, I could be wrong.  I will look at it.  If you're right about how it reads, then I think it's been shown that they have a computerized program, in all likelihood, with whoever they're going to match it with.  But if you are wrong about that, then this is irrelevant.  And you are not able to say:  We aren't giving you the data, because you don't have a matching agreement.  Okay.  That's, I think, where we are.

MR. O'CONNOR:  And when the Court goes back to look, if I could just highlight --

THE COURT:  Sure.

MR. O'CONNOR:  The provision here deals with disclosure of records for use in a computer matching program. It does not say for use in a computer matching program between the source agency and the recipient agency.

THE COURT:  No, it doesn't.  But that's how it seems to be focused.

MR. O'CONNOR:  And --

THE COURT:  Because the agreement is between the -- it envisions an in-place computer matching program, not one that might happen down the line.  It envisions an in-place program

pursuant to an agreement between a source and a recipient.

Frankly, I don't know why the source and recipient would have to have an agreement about somebody else's matching program. It doesn't make any sense when nobody even knows under this statute. Not like you know. But when this is written and what it's envisioning, it's not envisioning that somebody's got a computer matching program out there. It doesn't say the source can't give this to somebody who's going to go match it. All right? It says for use in. It envisions at that point, not one of these prediction things. And that's why I think there could be a problem.

These papers are just coming apart they're so big. So I'll look at it. I recognize how it's written that you could argue it the way you're arguing it. But I don't think, in retrospect, that it may mean that. If you're right on the interpretation, then you can say, we're not giving this to you until we have an agreement under the Computer Matching Act; okay? If you're wrong, then it's irrelevant. Okay.

MR. KURLAND: Your Honor?

THE COURT: Do you want to say anything else?

MR. KURLAND: Yes.

THE COURT: You're kind of ahead of the game here.

MR. KURLAND: I know. I just -- to preserve, you know, the arguments we made in the brief, is that we don't believe the SNAP database itself is an internal matching

program.  Again, matching programs have to be --

THE COURT:  Wait a minute.  You don't believe the database that you created from --

MR. KURLAND:  I -- Mm-hm.

THE COURT:  -- from -- that you will create if you get it -- that you will create if you get the data is matching anything?  And my understanding is you're just taking it.

MR. KURLAND:  Mm-hm.

THE COURT:  Putting it into a database.  You're not comparing it.  It's what you got.  In other words, it's not what you have compared with --

MR. KURLAND:  Yes.

THE COURT:  Okay.

MR. KURLAND:  I -- sorry.  I had believed that that was an argument that plaintiffs were making, is that because we may, you know, take some records internally -- but that's not a computerized matching program.  And we also, again, rely on the arguments we made previously, that the program between USDA and DHS is not a matching program.  But I won't belabor that.

THE COURT:  I'm not actually buying that if you do have this program with USDA, that that's not a matching program covered by the statute.  What I am possibly accepting is it's none of their business what it is on the plaintiffs' side --

MR. O'CONNOR:  Your Honor, we --

THE COURT:  I'm sorry.  I'm not -- I'm just going to

have to ask you to stop talking; okay?  Because this is a very long day.  And I have given you time to argue this point.  And all you've done is repeated, multiple times, the language of the statute.

You have no authority to support you at the moment.  What you are using as an exemplar to show, see, they get these all the time, is not apparently this situation.  And if you had intended to say, even if you accept their argument, then there is a matching program between us and them, I don't see that argument.  All right?  And I gave you a chance to make it now, and I still don't hear it.

So back for a second.  I don't accept the defendants' argument that whatever's going on between them and if it's the Homeland Security or whoever is not covered by the Computer Matching Act.  And do you have agreements with them when you do this?

MR. KURLAND:  My only point in bringing it up again was to preserve it in the record to make the record clear.  So I recognize what you're saying, and I won't belabor it.

THE COURT:  Okay.  All right.  I'll come back once more.  You've already convinced me, if this section covers down-the-road matching programs, you've got one shown.  What you haven't yet convinced me is that has anything to do with your client, who is not matching with USDA.  Now, do you have any evidence that your client and USDA are matching?

MR. O'CONNOR:  I think what I'd like to point to is an example, which is that --

THE COURT:  I guess the answer is "no" to that.  Now what do you want to -- because otherwise the answer is "yes." And since you are not answering the question --

MR. O'CONNOR:  No.  I don't have an example of a computer matching agreement --

THE COURT:  All right.  That's it.  I've heard enough, because I'm talking and you're talking again.  All right?

MR. O'CONNOR:  I apologize.

THE COURT:  And this has been a very long hearing. And I have been very patient over the course of the day, which is now, at this point, 1:25, with no break for my staff.  I've been here since 8:00 in the morning, no break, and I'm hearing you interrupting me every five minutes.  All right?  So I'm giving you one last word on this, and I'm taking the matter under submission.  Make it your best word.

MR. O'CONNOR:  Your Honor, I think I just want to reiterate one thing -- or not reiterate -- but I just wanted to say one thing before we close the hearing today.  And that is that the states are quite concerned that a major reason for collecting all of the applicant and recipient data in the SNAP database is so they can, in turn, use it to share it with DHS for immigration enforcement purposes.

We haven't discussed that at all today.  But there was a

lot of evidence of that that was submitted with our motion and with our reply. And so I just want to impress upon the Court that we think that that raises the exact same problem that the Court identified in the preliminary injunction order, where there was evidence that the USDA intended to use the data and to disclose the data beyonds the bounds of (e)(8).

And so I would -- just wanted to impress upon the Court that this is an important issue for us in that even if we are able to get some better language on the revised protocol that defendant's preparing, we maintain our legal arguments that given the evidence that USDA intends to use and disclose the data beyond the purposes of (e)(8) here, that that's unlawful. And that we would have to have very strong provisions within any protocol between the states and USDA here to ensure that USDA would follow those provisions.

THE COURT: I said in the last order I hadn't found you had a good point under the Computer Matching Act. You hadn't even shown they were going to match.

MR. O'CONNOR: I just wanted to wrap up.

THE COURT: You hadn't even shown they were going to match with anybody. Now you've shown that they are going to match with Homeland Security. The argument being made at this point is a different argument than made before. And I may accept what the defendant is arguing.

My prior order was based on what the defendant in the

SORN, in particular, was proposing to do. And what we haven't talked about -- and maybe we should very briefly -- so I'll go back off on my submission for a moment. The plaintiffs' arguments at the last hearing were based primarily on the SORN as compared to the concepts under (e)(8) and saying that these announced uses under the SORN go beyond (e)(8). All right.

Now, let's say, for discussion purposes, that you end up being faced with a proposed protocol that says, very clearly, we are not going to disclose beyond (e)(8). All right?

Now, you could simply say, I don't believe you, but I don't know that you can make that much of a showing if they've actually committed to not doing it. It was one thing to say you haven't stopped yourself from doing it. So I expect you're going to do it. But if somebody says, as a contractual matter, we're not going to do it, then you would have to have some evidence that, in spite of that type of agreement, they'd do it. And I don't think we have that yet.

But what is the relationship -- I'm going to turn to you, Mr. Kurland -- the relationship between the SORN -- and I will go back, though I hesitate to do so, to plaintiffs' counsel -- the relationship between the SORN. So, for example, the SORN's still sitting here apparently saying we plan to give these things to foreign governments.

All right. Then you have, let's say, a perfectly well-written -- everybody agrees -- great language -- protocol.

Where does the SORN fit in?  And I may say -- regrettably go back to you, Mr. O'Connor.  Where does the SORN fit in?  If the SORN's still sitting there, and there's a protocol, what's the effect, if any?

MR. O'CONNOR:  The current proposed protocol did not have any provision to govern conflicts between the SORN and the protocol.

THE COURT:  I'm sorry.  Say that again.

MR. O'CONNOR:  The current proposed protocol does not have any provision that would govern a conflict between the SORN and the protocol.  So, for example --

THE COURT:  And therefore...

MR. O'CONNOR:  And therefore I think that's something that would need to be addressed in a revised protocol.

THE COURT:  Okay.  I'm not sure -- it just struck me that the focus in this hearing has been on the protocol, and the focus in the last hearing was on the SORN.  And I sort of lost track of the SORN for a minute -- more than a minute -- many minutes.

So, Mr. Kurland, what's your thought about that?  We don't want to run into another problem where you get a great protocol and the SORN is still sitting out there.

MR. KURLAND:  The protocol so governs.  The USDA could only provide the information as it has committed in (e)(8).  So it's not like the SORN is a separate authority under which we

could do something that would violate the protocol.  If we violate the protocol, it's a contractual agreement.  The states would have reason to complain.

SORNs -- I think it's easy -- it's interesting to go back and remember that SORNs are -- govern the system and not necessarily a specific instance of sharing.  It's for the lifetime of this system.  You know, we're creating a system that will be a pot in which we throw information that, for the lifetime of this system, it will govern how it -- how it will operate, and what we can and can't do, and how we may -- how we could possibly disclose for routine uses, keeping in mind that routine uses are often hypothetical -- trying to cover hypothetical future cases that we may not know.

I think it's also important to remember that the SORN itself says we will comply with (e)(8) and expresses that -- again, that we will not -- that USDA will not violate, you know, provisions of the SNAP Act and will comply with the Privacy Act.  And I think what Your Honor did last time was kind of read a broader intent into these routine uses than even, you know --

THE COURT:  So -- okay.  All right.  Okay.

MR. KURLAND:  -- the USDA thought that were doing.  Right.

THE COURT:  Enough of that for a minute.

Your position is that if somebody agrees in the

protocol -- if SORN doesn't control -- all right -- that the protocol controls, not the SORN.

MR. KURLAND:  I would -- I would hesitate to draw them as, like, competing authorities with each other.  They're kind of layers over top of each other.

THE COURT:  Well, I don't know if that's your best argument.  Anyway, I was trying to find -- because I did have the SORN flagged before.  And I thought that particular document was out here.  But I do not see it.  So I don't think I have that.

Anyway, it is a question of the relationship between the two.  And you may have to discuss that in connection with this protocol.  Whether it says irrespective of what's in the SORN, we can't do -- whatever it says, I don't know.  Because, unfortunately, I don't have the SORN out here.  Or at least I can't find it.

MR. KURLAND:  Do you want my copy that counsel just gave me?

THE COURT:  Wait a second.  Could this possibly be it?  Yep.  Okay.  Hang on.  I found it.  Okay.  It was buried behind a bunch of stuff.  Just a minute.  Okay.  Okay.

Yes.  You know, the SORN provides that if we get records -- all right -- that are personal -- okay -- they may be disclosed, it says, pursuant to the permitted routine uses outlined below.  And then those uses are broader than (e)(8) of

2020.  It may say something -- the court reporter needs a break.

MR. KURLAND:  Yes.

THE COURT REPORTER:  If we're about to wrap up, it's okay.  But my hands are just starting to go numb, so...

THE COURT:  Okay.

MR. KURLAND:  Oh my.

THE COURT:  All right.  I'm just going to read this quietly for a minute as opposed to talking.

I had thought sections 8 and 11 of the routine uses was broader than (e)(8) and remain broader than (e)(8).  And so if this is a statement about what they are going to do, but you preclude those broader actions and disclosures in the protocol -- I'm just not sure.  Some reference may have to be made to acknowledge that there is this other document.

You know, there are all kinds of statutes that say notwithstanding what some other law says, you can or you can't do whatever the current law is saying.  And maybe it would have to be something of that nature.  Because I don't think my view of the SORN exceeding (e)(8) has changed at all.  So I don't know that you are going to convince the plaintiffs' counsel that leaving it uncommented upon in some way is good enough.  So I'll just say that.

MR. KURLAND:  If I may?  So we believe that because the protocols are narrower, that we couldn't violate them.  And

violating them would give plaintiffs cause of action.  Again, routine uses are the Privacy Act and the province of only private action, like, by individuals.

But one of the reasons why we haven't amended the SORN yet is because we wanted to leave the opportunity to do this.  So if it's a matter of continuing concern for you, we will amend the SORN to say coextensive with (e)(8).

THE COURT:  I'm not telling the USDA what to do.  But if you leave the SORN as it is, you may have to make some reference to it in the protocol as to why the protocol controls over the SORN, very much like irrespective of a -- some other law might let you do, this law is not going to let you do it.  All right?

So just be thinking about that.  You know, I don't want you to get in trouble with whoever is in charge of your activity.  So I'm not telling you you have to amend anything, but you have to deal with it.

MR. KURLAND:  Yes, Your Honor.

THE COURT:  All right.  Now, I'm -- I think this is all we can do today.  And that's a lot of issues.  And if you want me to address all of these in an order, it's going to take a little while.

But my tentative ruling is that I will grant an injunction precluding the USDA from acting on the November -- I think it's November 24 and December 23 letters -- much in the same

language as used before.

I don't know if you've given me, from the plaintiffs' side, a real expansion order as opposed to an enforcement of the prior order -- order.  If you decide to submit a proposed order with language, at least as to how the last part of any order I issue reads as to the injunctive relief, show it as a courtesy first to Mr. Kurland, just to see.

But, ultimately, you can give it to me, and I'll look at it either way.  Because I think the proposed order you gave me before -- the language of it didn't cover the -- the enhancement idea.  I could be wrong, but I think so.

All right.  Then that's going to conclude the hearing.  And I guess that's all we can do.  Safe travels.

MR. KURLAND:  Thank you, Your Honor.

THE COURT:  And to everybody else wherever you're going.  That concludes this matter at this time.

Okay.  Thanks to the court reporter.

THE COURTROOM DEPUTY:  Court is in recess.

(Proceedings adjourned at 1:39 p.m.)

---oOo---

<u>CERTIFICATE OF REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Wednesday, February 18, 2026



_____

Kendra A. Steppler, RPR, CRR

Official Reporter, U.S. District Court

EXHIBIT E

FNS's February 17 Letter and Third Proposed Protocol

**U.S. DEPARTMENT OF AGRICULTURE**

February 17, 2026

Governor Gavin Newsom
1021 O Street, Suite 9000
Sacramento, California 95814

Dear Governor Newsom,

Following the February 13, 2026, Court hearing in *California et al. v. United States Department of Agriculture et al.*, no. 3:25-cv-06310-MMC (N.D. Calif.), the U.S. Department of Agriculture (USDA), Food and Nutrition Service (FNS) is further revising its November 24, 2025, data sharing request, as amended December 23, 2025. USDA is complying with the Court's guidance in revising its data sharing protocol pursuant to which it is directing that your State cooperate with FNS's audit of the State's administration and enforcement of the Supplemental Nutrition Assistance Program (SNAP). Although the majority of States last summer agreed with FNS's earlier request and produced SNAP data acquired from households to FNS, your State continues to withhold data that it is statutorily obligated to produce.

In the February 13th hearing, the Court affirmed that minor emendations to USDA's amended protocols to affirm FNS's commitment to follow 7 U.S.C. §§ 2020(a)(3) and (e)(8) are sufficient to avoid further challenge. Accordingly, USDA, guided by the Court's hearing, has revised its data protocols for plaintiff States. The attached protocols satisfy the two objectives suggested by the Court: it unequivocally confirms in its introduction that: (1) USDA's handling of data it receives from plaintiff States will be governed by and comply with the text of 7 U.S.C. §§ 2020(a)(3) and (e)(8), and (2) agrees the protocols control notwithstanding any provision of USDA's System of Records Notice (SORN) that could be read to the contrary.

USDA appreciates the Court's guidance. USDA has a statutory and moral obligation to taxpayers to ensure any distribution of federal funds accords with law and does not risk loss to errors, fraud, waste and abuse. We ask that we receive your State's agreement to this third amended protocol by February 23, 2026.

Sincerely,

Shiela Corley
Chief of Staff, Food, Nutrition, and Consumer Services
U.S. Department of Agriculture

Enclosure

cc:    Maria Buxton, Deputy Attorney General

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an equal opportunity provider, employer, and lender.



**U.S. DEPARTMENT OF AGRICULTURE**

### Supplemental Nutrition Assistance Program (SNAP) Information Database
### Fraud, Waste and Abuse Detection Protocol

**1.  OVERVIEW**

1.1.  U.S. Department of Agriculture (USDA) and the Food and Nutrition Service (FNS) will use the Supplemental Nutrition Assistance Program (SNAP) recipient data to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying duplicate enrollments for elimination, and performing additional eligibility and program integrity checks specified herein.

1.2.  This protocol establishes a framework for State SNAP agencies to share data with the USDA/FNS for detection of fraud, waste, and abuse and program integrity purposes.

1.3.  The protocol balances federal data access requirements under Executive Order 14243 and the Food and Nutrition Act of 2008 (FNA) with privacy protections, minimizes unnecessary data collection, and incorporates security standards while maintaining public trust and compliance with applicable law.

1.4.  Notwithstanding any other provision of this protocol, or any System of Record Notice, USDA and FNS: (a) shall not use or disclose data received under this protocol except as specified in 7 U.S.C. §§ 2020(a)(3) and (e)(8).  For the avoidance of doubt, that includes the specific requirements in 7 U.S.C § 2020(e)(8)(A), which provides that State Plans of Operation must include safeguards protecting information obtained from applicant households that shall permit

(i)   the disclosure of such information to persons directly connected with the administration or enforcement of the provisions of this chapter, regulations issued pursuant to this chapter, Federal assistance programs, or federally-assisted State programs; and

(ii)  the subsequent use of the information by persons described in clause (i) only for such administration or enforcement.

**2.  FRAMEWORK AND AUTHORITY**

2.1.  <u>Authority</u>

2.1.1.  Executive Order 14243 (March 20, 2025): "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos" directs agency heads to "take all necessary steps, to the maximum extent consistent with law," to ensure federal government has "unfettered access to comprehensive data" from state programs receiving federal funding, including data maintained in third-party databases.

2.1.2.  7 U.S.C. § 2020(a)(3) that requires that each State agency shall keep records as may be necessary to determine whether the program is being conducted in compliance with this chapter, and all records shall be made available for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary.

2.1.3.  7 CFR 272 stipulates use or disclosure of information obtained from SNAP applicant or recipient households shall be restricted to persons directly connected with the administration or enforcement of the provisions of the FNA or regulations, other Federal assistance programs, federally-assisted State programs providing assistance on a means-tested basis to low-income individuals, or general assistance programs which are subject to joint processing requirements.

2.2.  <u>Prohibited Purposes</u>

2.2.1.  USDA shall NOT use the provided data for:

- Tax administration or tax compliance

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

- Law enforcement investigations beyond coordination regarding SNAP fraud, or other violations relating to the FNA.

- Administration of non-SNAP federal assistance programs (*e.g.*, Medicaid, TANF, housing assistance)

- Sharing with foreign governments or international organizations

- Commercial use or transfer to private entities

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

2.2.2. USDA shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals (*i.e.*, the collection of data elements spelled out in the Privacy Impact Assessment).

## 3. DATA CATEGORIES

3.1. Data Definition

3.1.1. All data obtained by States or their vendors in administering SNAP or that otherwise may be necessary to determine whether the program is being conducted in accordance with the FNA or regulations issued under the FNA.

3.1.2. Data derived from third-party sources (employment verification databases, financial institution records, property records) that States use for verification but are not part of applicant-reported information are excluded.

3.2. Permitted Data

- Information that the applicant household reported on application/recertification forms including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers.

- Direct verifications that the State conducted to confirm applicant-reported information Records that the State maintains of SNAP applications, approvals, denials, certifications, and benefits issued.

- Household composition and income exactly as reported by the applicant (not third-party verified amounts).

- Transactional data necessary for fraud detection

## 4. LIMITED ACCESS

4.1. The SNAP Information Database is accessed and used ONLY by employees of the USDA who are:

4.1.1. Designated by the Chief of Staff at Food, Nutrition, Consumer Services (FNCS)

4.1.2. Trained in SNAP Act, Privacy Act, and this protocol

4.1.3. In compliance with all information security annual recertifications

4.2. Except to the extent required by law, no access to the SNAP Information Database may be provided to:

4.2.1. Other USDA agencies (APHIS, ERS, NASS, etc.)

4.2.2. Divisions within FNS without an explicit need-to-know

4.2.3. OIG employees, unless in direct support of a law enforcement investigation related to SNAP

fraud, waste, or abuse

4.2.4. Any other federal agency

4.2.5. Any FOIA, administrative subpoena or like external requester

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender


**U.S. DEPARTMENT OF AGRICULTURE**

**5. SYSTEM OF RECORDS NOTICE (SORN) AND PRIVACY IMPACT ASSESSMENT (PIA)**

5.1. SORN

The applicable SORN for this protocol is USDA/FNS-15 "National Supplemental Nutrition Assistance Program (SNAP) Information Database," 90 FR 26521.

The SORN location can be found here: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system-of-records

For the avoidance of doubt, this protocol controls notwithstanding any provision of the applicable SORN that conflicts with 7 U.S.C. §§ 2020(a)(3) and (e)(8).

5.2. Privacy Impact Assessment (PIA)

The applicable Privacy Impact Assessment for the SNAP Information Database can be found here: https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

**6. FRAUD, WASTE, AND ABUSE DETECTION FRAMEWORK**

6.1. Core Fraud Detection Functions

6.1.1. USDA will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program that focuses on:

- identity verification
- income and eligibility verification
- immigration status
- verification against disqualified recipients

6.2. Enhanced Fraud, Waste, and Abuse Detection Techniques

6.2.1. In addition to the core fraud detection functions, USDA will employ additional techniques including, but not limited to:

- Intrastate and interstate duplicate detection
- Deceased individuals' detection
- Synthetic identity patterns (new SSNs with inconsistent biographical data)
- Geographic anomalies

6.2.2. New data mining techniques will be limited to identifying recipient and retailer fraud with a direct nexus to SNAP.

**7. DATA OUTPUT**

7.1. States

7.1.1. USDA will provide flagged data back to the State agency for review. States are encouraged to verify the accuracy of fraud detection flags and provide feedback to USDA to refine detection logic and reduce false positives. Collaborative processes will be established to ensure accurate identification of fraud and appropriate corrective actions.

7.2. Law Enforcement

7.2.1. The USDA may refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP.

7.3. USDA SNAP Retailer Operations Center (ROC)

7.3.1. The USDA may refer fraud detection leads to the ROC where, during fraud detection analysis, a compromised EBT card or terminal ID may have been identified.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

## 8. DATA MINIMIZATION AND RETENTION

### 8.1. Retention Period

8.1.1. Until a record schedule is approved, data will be retained only as long as necessary for purposes set forth in the SORN and this protocol, and in no case longer than 3 years per the SORN.

### 8.2. Automatic Deletion

8.2.1. Data shall be retained for no longer than three years, consistent with the USDA/FNS-15 SORN. An automated process will be implemented to delete data upon expiration of the retention period, except for records related to ongoing audits, investigations, or litigation.

### 8.3. Ongoing Cases

8.3.1. Data pertaining to ongoing audit, investigation, or potential litigation retained only as long as necessary, then deleted.

## 9. DATA SECURITY AND TECHNICAL REQUIREMENTS

### 9.1. Infrastructure and Location

9.1.1. Primary storage location: AWS GovCloud (US) region

9.1.2. Backup/disaster recovery: Secondary AWS region

9.1.3. No storage, processing, or backup outside GovCloud or federal secure environments

9.1.4. All infrastructure must meet or exceed FedRAMP High baseline standards

9.1.5. AWS Personnel Access: Data is encrypted such that AWS personnel cannot access unencrypted data. Encryption keys are managed exclusively by federal USDA personnel and are not accessible to AWS or third-party vendors.

### 9.2. Access Controls

9.2.1. Multi-factor authentication required for all access

9.2.2. Role-based access control (RBAC) with principle of least privilege

9.2.3. Access is limited to specifically designated USDA employees engaged to assist in determining whether the program is being conducted in accordance with the FNA.

9.2.4. Access logging and audit trail maintenance (minimum period equal to data retention period, see Section V.E).

9.2.5. Quarterly access reviews by USDA

9.2.6. Immediate revocation of access upon employee termination or assignment change

### 9.3. Encryption Standards

9.3.1. Encrypted data at rest and in transit

9.3.2. Encryption keys managed solely by USDA federal personnel

9.3.3. No encryption keys held by commercial vendors

### 9.4. Data Segregation and Compartmentalization

9.4.1. SNAP data isolated in separate, dedicated AWS GovCloud environment

9.4.2. SNAP data not directly integrated with other USDA systems

9.4.3. Limiting access to individuals with specialized training and oversight

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

**USDA** U.S. DEPARTMENT OF AGRICULTURE

9.5.  Data Transfer

    9.5.1.  All data transfers shall utilize secure tools that meet or exceed FedRAMP High baseline standards.

## 10. INCIDENT RESPONSE AND BREACH NOTIFICATION

10.1.  Incident Response

    10.1.1. Incident response procedures are aligned with FNS Handbook Chapter 10 security incident and breach notification requirements that USDA already follows internally. This protocol extends equivalent procedures to State notification.

10.2.  Incident Definition

    10.1.2.  Unauthorized access, use, or disclosure of data

    10.1.3.  Security vulnerability or control failure affecting data

    10.1.4.  Data loss, corruption, or destruction

    10.1.5.  Encryption failure or key compromise

    10.1.6.  Failed access control or authentication mechanism

    10.1.7.  Any event that may reasonably be expected to compromise data security or confidentiality

10.3.  Incident Notification Timeline

    10.3.1.  Initial Notification within 12 hours

        10.3.1.1.    Within 12 hours of discovery (by phone + email to State security/privacy contact and Director).

    10.3.2.  Preliminary Report within 24 hours

        10.3.2.1.    Description of incident and timeline

        10.3.2.2.    Data elements affected (specific fields and estimated number of records)

        10.3.2.3.    Estimated number of individuals affected

        10.3.2.4.    Preliminary assessment of whether unencrypted sensitive data may have been exposed

        10.3.2.5.    Preliminary remedial actions taken

        10.3.2.6.    Root cause analysis plan and timeline

## APPENDIX A - SOURCES

- 7 U.S.C. §§ 2020(a)(3) and (e)(8).

- Privacy Impact Assessment: https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

- SORN: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system-of-records

- SNAP Act: https://www.law.cornell.edu/uscode/text/7/2020

- SNAP QC Handbook

- Executive Order 14243 (March 20, 2025) "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos: https://www.govinfo.gov/content/pkg/DCPD-202500382/pdf/DCPD-202500382.pdf

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

**Supplemental Nutrition Assistance Program (SNAP) Information Database
Fraud, Waste and Abuse Detection Protocol**

1. **OVERVIEW**

   1.1. U.S. Department of Agriculture (USDA) and the Food and Nutrition Service (FNS) will use the Supplemental Nutrition Assistance Program (SNAP) recipient data to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying duplicate enrollments for elimination, and performing additional eligibility and program integrity checks specified herein.

   1.2. This protocol establishes a framework for State SNAP agencies to share data with the USDA/FNS for detection of fraud, waste, and abuse and program integrity purposes.

   1.3. The protocol balances federal data access requirements under Executive Order 14243 and the Food and Nutrition Act of 2008 (FNA) with privacy protections, minimizes unnecessary data collection, and incorporates security standards while maintaining public trust and compliance with applicable law.

   1.4. Notwithstanding any other provision of this protocol, or any System of Record Notice, USDA and FNS: (a) shall not use or disclose data received under this protocol except as specified in 7 U.S.C. §§ 2020(a)(3) and (e)(8).  For the avoidance of doubt, that includes the specific requirements in 7 U.S.C § 2020(e)(8)(A), which provides that State Plans of Operation must include safeguards protecting information obtained from applicant households that shall permit

      (i)    the disclosure of such information to persons directly connected with the administration or enforcement of the provisions of this chapter, regulations issued pursuant to this chapter, Federal assistance programs, or federally-assisted State programs; and

      (i)(ii) the subsequent use of the information by persons described in clause (i) only for such administration or enforcement.

2. **FRAMEWORK AND AUTHORITY**

   2.1. <u>Authority</u>

      2.1.1. Executive Order 14243 (March 20, 2025): "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos" directs agency heads to "take all necessary steps, to the maximum extent consistent with law," to ensure federal government has "unfettered access to comprehensive data" from state programs receiving federal funding, including data maintained in third-party databases.

      2.1.2. 7 U.S.C. § 2020(a)(3) that requires that each State agency shall keep records as may be necessary to determine whether the program is being conducted in compliance with this chapter, and all records shall be made available for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary.

      2.1.3. 7 CFR 272 stipulates use or disclosure of information obtained from SNAP applicant or recipient households shall be restricted to persons directly connected with the administration or enforcement of the provisions of the FNA or regulations, other Federal assistance programs, federally-assisted State programs providing assistance on a means-tested basis to low-income individuals, or general assistance programs which are subject to joint processing requirements.

   2.2. <u>Prohibited Purposes</u>

      2.2.1. USDA shall NOT use the provided data for:

      - Tax administration or tax compliance

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 U.S. DEPARTMENT OF AGRICULTURE

- Law enforcement investigations beyond coordination regarding SNAP fraud, or other violations relating to the FNA.
- Administration of non-SNAP federal assistance programs (*e.g.*, Medicaid, TANF, housing assistance)
- Sharing with foreign governments or international organizations
- Commercial use or transfer to private entities

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

2.2.2. USDA shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals (*i.e.*, the collection of data elements spelled out in the Privacy Impact Assessment).

## 3. DATA CATEGORIES

3.1. Data Definition

3.1.1. All data obtained by States or their vendors in administering SNAP or that otherwise may be necessary to determine whether the program is being conducted in accordance with the FNA or regulations issued under the FNA.

3.1.2. Data derived from third-party sources (employment verification databases, financial institution records, property records) that States use for verification but are not part of applicant-reported information are excluded.

3.2. Permitted Data

- Information that the applicant household reported on application/recertification forms including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers.

- Direct verifications that the State conducted to confirm applicant-reported information Records that the State maintains of SNAP applications, approvals, denials, certifications, and benefits issued.

- Household composition and income exactly as reported by the applicant (not third-party verified amounts).

- Transactional data necessary for fraud detection

## 4. LIMITED ACCESS

4.1. The SNAP Information Database is accessed and used ONLY by employees of the USDA who are:

4.1.1. Designated by the Chief of Staff at Food, Nutrition, Consumer Services (FNCS)

4.1.2. Trained in SNAP Act, Privacy Act, and this protocol

4.1.3. In compliance with all information security annual recertifications

4.2. Except to the extent required by law, no access to the SNAP Information Database may be provided to:

4.2.1. Other USDA agencies (APHIS, ERS, NASS, etc.)

4.2.2. Divisions within FNS without an explicit need-to-know

4.2.3. OIG employees, unless in direct support of a law enforcement investigation related to SNAP

fraud, waste, or abuse

4.2.4. Any other federal agency

4.2.5. Any FOIA, administrative subpoena or like external requester

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender


**U.S. DEPARTMENT OF AGRICULTURE**

**5. SYSTEM OF RECORDS NOTICE (SORN) AND PRIVACY IMPACT ASSESSMENT (PIA)**

5.1. SORN

The applicable SORN for this protocol is USDA/FNS-15 "National Supplemental Nutrition Assistance Program (SNAP) Information Database," 90 FR 26521.

The SORN location can be found here: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system-of-records

For the avoidance of doubt, this protocol 1.1.4 controls notwithstanding any provision of the applicable SORN that conflicts with 7 U.S.C. §§ 2020(a)(3) and (e)(8).

5.2. Privacy Impact Assessment (PIA)

The applicable Privacy Impact Assessment for the SNAP Information Database can be found here: https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

**6. FRAUD, WASTE, AND ABUSE DETECTION FRAMEWORK**

6.1. Core Fraud Detection Functions

6.1.1. USDA will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program that focuses on:

- identity verification
- income and eligibility verification
- immigration status
- verification against disqualified recipients

6.2. Enhanced Fraud, Waste, and Abuse Detection Techniques

6.2.1. In addition to the core fraud detection functions, USDA will employ additional techniques including, but not limited to:

- Intrastate and interstate duplicate detection
- Deceased individuals' detection
- Synthetic identity patterns (new SSNs with inconsistent biographical data)
- Geographic anomalies

6.2.2. New data mining techniques will be limited to identifying recipient and retailer fraud with a direct nexus to SNAP.

**7. DATA OUTPUT**

7.1. States

7.1.1. USDA will provide flagged data back to the State agency for review. States are encouraged to verify the accuracy of fraud detection flags and provide feedback to USDA to refine detection logic and reduce false positives. Collaborative processes will be established to ensure accurate identification of fraud and appropriate corrective actions.

7.2. Law Enforcement

7.2.1. The USDA may refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP.

7.3. USDA SNAP Retailer Operations Center (ROC)

7.3.1. The USDA may refer fraud detection leads to the ROC where, during fraud detection analysis, a compromised EBT card or terminal ID may have been identified.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

**8. DATA MINIMIZATION AND RETENTION**

8.1. Retention Period

8.1.1. Until a record schedule is approved, data will be retained only as long as necessary for purposes set forth in the SORN and this protocol, and in no case longer than 3 years per the SORN.

8.2. Automatic Deletion

8.2.1. Data shall be retained for no longer than three years, consistent with the USDA/FNS-15 SORN. An automated process will be implemented to delete data upon expiration of the retention period, except for records related to ongoing audits, investigations, or litigation.

8.3. Ongoing Cases

8.3.1. Data pertaining to ongoing audit, investigation, or potential litigation retained only as long as necessary, then deleted.

**9. DATA SECURITY AND TECHNICAL REQUIREMENTS**

9.1. Infrastructure and Location

9.1.1. Primary storage location: AWS GovCloud (US) region

9.1.2. Backup/disaster recovery: Secondary AWS region

9.1.3. No storage, processing, or backup outside GovCloud or federal secure environments

9.1.4. All infrastructure must meet or exceed FedRAMP High baseline standards

9.1.5. AWS Personnel Access: Data is encrypted such that AWS personnel cannot access unencrypted data. Encryption keys are managed exclusively by federal USDA personnel and are not accessible to AWS or third-party vendors.

9.2. Access Controls

9.2.1. Multi-factor authentication required for all access

9.2.2. Role-based access control (RBAC) with principle of least privilege

9.2.3. Access is limited to specifically designated USDA employees engaged to assist in determining whether the program is being conducted in accordance with the FNA.

9.2.4. Access logging and audit trail maintenance (minimum period equal to data retention period, see Section V.E).

9.2.5. Quarterly access reviews by USDA

9.2.6. Immediate revocation of access upon employee termination or assignment change

9.3. Encryption Standards

9.3.1. Encrypted data at rest and in transit

9.3.2. Encryption keys managed solely by USDA federal personnel

9.3.3. No encryption keys held by commercial vendors

9.4. Data Segregation and Compartmentalization

9.4.1. SNAP data isolated in separate, dedicated AWS GovCloud environment

9.4.2. SNAP data not directly integrated with other USDA systems

9.4.3. Limiting access to individuals with specialized training and oversight

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

9.5.  Data Transfer

    9.5.1.  All data transfers shall utilize secure tools that meet or exceed FedRAMP High baseline standards.

## 10.  INCIDENT RESPONSE AND BREACH NOTIFICATION

10.1.  Incident Response

    10.1.1. Incident response procedures are aligned with FNS Handbook Chapter 10 security incident and breach notification requirements that USDA already follows internally. This protocol extends equivalent procedures to State notification.

10.2.  Incident Definition

    10.1.2.  Unauthorized access, use, or disclosure of data

    10.1.3.  Security vulnerability or control failure affecting data

    10.1.4.  Data loss, corruption, or destruction

    10.1.5.  Encryption failure or key compromise

    10.1.6.  Failed access control or authentication mechanism

    10.1.7.  Any event that may reasonably be expected to compromise data security or confidentiality

10.3.  Incident Notification Timeline

    10.3.1.  Initial Notification within 12 hours

        10.3.1.1.  Within 12 hours of discovery (by phone + email to State security/privacy contact and Director).

    10.3.2.  Preliminary Report within 24 hours

        10.3.2.1.  Description of incident and timeline

        10.3.2.2.  Data elements affected (specific fields and estimated number of records)

        10.3.2.3.  Estimated number of individuals affected

        10.3.2.4.  Preliminary assessment of whether unencrypted sensitive data may have been exposed

        10.3.2.5.  Preliminary remedial actions taken

        10.3.2.6.  Root cause analysis plan and timeline

## APPENDIX A - SOURCES

- 7 U.S.C. §§ 2020(a)(3) and (e)(8).
- Privacy Impact Assessment: https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf
- SORN: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system-of-records
- SNAP Act: https://www.law.cornell.edu/uscode/text/7/2020
- SNAP QC Handbook
- Executive Order 14243 (March 20, 2025) "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos: https://www.govinfo.gov/content/pkg/DCPD-202500382/pdf/DCPD-202500382.pdf

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

EXHIBIT F

Plaintiff States' February 25 Letter

*Via E-mail*
Elizabeth J. Shapiro
Tyler Becker
Benjamin S. Kurland
ben.kurland@usdoj.gov
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005

*Counsel for U.S. Department of Agriculture and Secretary of Agriculture Brooke L. Rollins*

   RE:  Response to February 17, 2026 Letter to Plaintiff States from Shiela Corley, Chief of
         Staff, Food, Nutrition, and Consumer Services, U.S. Department of Agriculture

Dear Counsel:

      We write on behalf of Plaintiffs in *State of California v. USDA*, No. 3:25-cv-06310 (N.D. Cal.). This letter, and its attached redlined protocol, respond to the further revised proposed protocol that USDA/FNS sent to Plaintiff States last week on February 17, 2026 (the "February 17 proposed protocol"). As set forth in the attached document, Plaintiff States request some revisions to USDA's February 17 proposed protocol, primarily to ensure compliance with 7 U.S.C. § 2020(e)(8). We have provided our rationale in comments to the redline. To the extent USDA disagrees with any of our proposals, we request the opportunity to meet and confer with USDA to try to resolve any remaining disagreements.

      With respect to 7 U.S.C. § 2020(e)(8), in particular, we hope our requested revisions will be noncontroversial, as each aligns the protocol with the applicable statutory and regulatory structure and the Court's rulings and tentative rulings in our litigation, as well as USDA's representations about how it intends to use and share the data and prior data sharing agreements.

      First, we have requested revisions to section 1.4 to make clear that USDA and FNS (and any person or entity to whom the data is disclosed) will abide by 7 U.S.C. § 2020(e)(8)'s data use and disclosure restrictions. As drafted, the reference in section 1.4 of USDA's February 17 proposed protocol to "State Plans of Operation" creates ambiguity as to whether USDA is taking the position that *its* data use and disclosure is not restricted by 7 U.S.C. § 2020(e)(8). The Food and Nutrition Act's data use and disclosure restrictions would be meaningless if once USDA or third parties collected the data that data could then be freely re-disclosed to persons and for purposes prohibited by the statute. Accordingly, the Court has already ruled that this provision does not merely restrict state plans; it also imposes "strict limitations" on "the *recipient*['s] . . . use of" information covered by this statute. ECF No. 106 at 18; *see* ECF No. 131 at 47-48 (Feb. 13, 2026 Hr'g Tr.).

Second, we have requested revisions to section 1.4 to make clear that 7 U.S.C. § 2020(e)(8) does not permit the use or disclosure of data for purposes of investigating potential violations of civil immigration laws or enforcing civil immigration laws. The Food and Nutrition Act (FNA) permits applicant data to be used and disclosed only for purposes of "administration or enforcement" of the FNA or Federal assistance programs. These restrictions would be meaningless if USDA could simply collect all States' data and redisclose it to DHS or its subagencies whenever they request it. USDA has now repeatedly stated that "it does not *intend* to share the data it collects with outside agencies for purposes other than administering and enforcing SNAP," *see* ECF No. 118 at 9 (emphasis added); *accord id.* at 13, 14, but it has yet to commit that it will not share the data with the Department of Homeland Security (DHS) or its subagencies for immigration enforcement purposes. Our requested revisions to section 1.4 (and requested conforming revisions to other sections throughout) would ensure that USDA can use and share the data for lawful purposes consistent with USDA's representations, while also ensuring that the data is not unlawfully used or disclosed in circumstances not permitted by the FNA.

We have also proposed amendments to the data elements proposed in Attachment A of the USDA's November 24, 2025 data demand, including to reduce the amount of personal identifiable information unnecessarily disclosed, in accordance with section 2.2.2 of the February 17 proposed protocol. Please note that certain other elements listed in Attachment A may not be available in and/or extractable from every state system in the form requested by USDA. We anticipate that USDA would discuss these limitations, and any other state-specific issues, with individual States prior to any future data production.

Finally, this counterproposal should not be viewed as a waiver of any rights asserted in the litigation *State of California v. USDA* or a concession as to the legality of the data demand, and we expect that any final protocol will likely need to incorporate issues addressed by the District Court in its forthcoming preliminary injunction decision. In addition, the legality of USDA's SNAP data collection efforts is the subject of *Pallek v Rollins*, No. 1:25-cv-1650 (D.D.C.), and the parties may need to address and incorporate any ruling from that court into a proposed or finalized resolution of USDA's data sharing request.

2

Thank you for your attention to this matter.

Dated: February 25, 2026

Rob Bonta
Attorney General of California

*/s/ Liam E. O'Connor*
Liam E. O'Connor

Paul Stein
Robin Goldfaden
Supervising Deputy Attorneys General
Andrew Z. Edelstein
Anna Rich
Jane Reilley
Sebastian Brady
William Bellamy
Maria F. Buxton
Liam E. O'Connor
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3915
Liam.OConnor@doj.ca.gov
*Attorneys for Plaintiff State of California*

Letitia James
Attorney General of New York

*/s/ Mark Ladov*
Mark Ladov
Special Counsel
Julie Dona
Special Counsel
28 Liberty St.
New York, NY 10005
(212) 416-8240
mark.ladov@ag.ny.gov
*Attorneys for Plaintiff State of New York*

Kwame Raoul
Attorney General of Illinois

*/s/ Sherief Gaber*
Harpreet K. Khera
Bureau Chief, Special Litigation
Sherief Gaber
Assistant Attorney General
115 S. LaSalle St., 35th Flr.
Chicago, Illinois 60603
(773) 590-7127
sherief.gaber@ilag.gov
*Attorneys for Plaintiff State of Illinois*

Kristin Mayes
Attorney General of Arizona

*/s/ Hayleigh S. Crawford*
Hayleigh S. Crawford (AZ No. 032326)
Luci D. Davis (AZ No. 035347)
2005 N. Central Ave. Phoenix, AZ 85004
(602) 542-3333
Hayleigh.Crawford@azag.gov
Luci.Davis@azag.gov
ACL@azag.gov
*Attorneys for Plaintiff State of Arizona*

Philip J. Weiser
Attorney General of Colorado

*/s/ David Moskowitz*
David Moskowitz
Deputy Solicitor General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6000
david.moskowitz@coag.gov
*Attorneys for Plaintiff State of Colorado*

3

William Tong
Attorney General of Connecticut

*/s/ Janelle R. Medeiros*
Janelle R. Medeiros
Special Counsel for Civil Rights
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Janelle.Medeiros@ct.gov
*Attorneys for Plaintiff State of Connecticut*

Brian L. Schwalb
Attorney General for the District of Columbia

*/s/ Nicole S. Hill*
Nicole S. Hill
Assistant Attorney General
Office of the Attorney General for the District
of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov
*Attorneys for Plaintiff District of Columbia*

Office of The Governor *ex rel*. Andy Beshear,
in his official capacity as Governor of the
Commonwealth of Kentucky

*/s/ S. Travis Mayo*
S. Travis Mayo
General Counsel
Taylor Payne
Chief Deputy General Counsel
Laura C. Tipton
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov
*Attorneys for Plaintiff Kentucky Governors'
Office*

Kathleen Jennings
Attorney General of Delaware

*/s/ Vanessa L. Kassab*
Ian R. Liston
Director of Impact Litigation
Vanessa L. Kassab
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

Anne E. Lopez
Attorney General of Hawaiʻi

*/s/ Kalikoʻonālani D. Fernandes*
David D. Day
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorneys for Plaintiff State of Hawaiʻi*

Aaron M. Frey
Attorney General of Maine

*/s/ Brendan Kreckel*
Brendan Kreckel
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 0433-0006
Tel.: 207-626-8800
Fax: 207-287-3145
brendan.kreckel@maine.gov
*Attorneys for Plaintiff State of Maine*

4

Anthony G. Brown
Attorney General of Maryland

*/s/ James C. Luh*
James C. Luh
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

Andrea Joy Campbell
Attorney General of Massachusetts

*/s/ Katherine Dirks*
Katherine Dirks
Chief State Trial Counsel
Cassandra Thomson
Assistant Attorney General
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
cassandra.thomson@mass.gov
*Attorneys for Plaintiff Commonwealth of Massachusetts*

Dana Nessel
Attorney General of Michigan

*/s/ Neil Giovanatti*
Neil Giovanatti
Bryan Beach
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov
beachb@michigan.gov
*Attorneys for Plaintiff State of Michigan*

Keith Ellison
Attorney General of Minnesota

*/s/ Joseph R. Richie*
Joseph R. Richie
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

Jennifer Davenport
Attorney General of New Jersey

*/s/ Kashif T. Chand*
Kashif T. Chand (NJ Bar No. 016752008)
Assistant Attorney General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
kashif.chand@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

Raúl Torrez
Attorney General of the State of New Mexico

*/s/ Steven Prefrement*
Steven Perfrement
Senior Litigation Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
SPerfrement@nmdoj.gov
505-601-7727
*Attorneys for the State of New Mexico*

5

Dan Rayfield
Attorney General of Oregon

*/s/ Scott P. Kennedy*
Scott P. Kennedy
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 453-9050
Fax (971) 673-5000
Scott.Kennedy@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*

Josh Shapiro, in his official capacity as
Governor of the Commonwealth of
Pennsylvania

*/s/ Jacob B. Boyer*
Jennifer Selber
General Counsel
Jacob B. Boyer
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov
*Counsel for Governor Josh Shapiro*

Peter F. Neronha
Attorney General of Rhode Island

/s/ *Madeline R. Becker*
Madeline R. Becker (RI Bar No. 10034)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2151
mbecker@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

Nicholas W. Brown
Attorney General of Washington

*/s/ Jennifer K. Chung*
Jennifer K. Chung, WSBA #51583
William Mcginty, WSBA #41868
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
jennifer.chung@atg.wa.gov
william.mcginty@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

Joshua l. Kaul
Attorney General of Wisconsin

*/s/ Karla Z. Keckhaver*
Karla Z. Keckhaver
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-6365
karla.keckhaver@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*

# Attachment 1

# Plaintiffs' proposed revised protocol



## U.S. DEPARTMENT OF AGRICULTURE

**Supplemental Nutrition Assistance Program (SNAP) Information Database
Fraud, Waste and Abuse Detection Protocol**

### 1. OVERVIEW

1.1. U.S. Department of Agriculture (USDA) and the Food and Nutrition Service (FNS) will use the Supplemental Nutrition Assistance Program (SNAP) recipient data to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying duplicate enrollments for elimination, and performing additional eligibility and program integrity checks specified herein.

1.2. This protocol establishes a framework for State SNAP agencies to share data with the USDA/FNS for detection of fraud, waste, and abuse and program integrity purposes.

1.3. USDA represents that the protocol balances federal data access requirements under Executive Order 14243 and the Food and Nutrition Act of 2008 (FNA, also referred to here as the "SNAP Act") with privacy protections, minimizes unnecessary data collection, and incorporates security standards while maintaining public trust and compliance with applicable law.

1.4. Notwithstanding any other provision of this protocol, or any System of Record Notice, USDA and FNS: (a) shall not use or disclose data received under this protocol except as specified in 7 U.S.C. §§ 2020(a)(3) and (e)(8) and 7 C.F.R. § 272.1(c)(1) and (2). For the avoidance of doubt, this means that USDA and FNS (and any person or entity to whom the data is disclosed) shall not:

   (i)   use the data, except for administration or enforcement of the provisions of Chapter 51 of Title 7 of the U.S. Code and regulations issued pursuant to that chapter, Federal assistance programs, or federally-assisted State programs;

   (ii)  disclose the data, except to persons directly connected with the administration or enforcement of the provisions of this chapter, regulations issued pursuant to this chapter, Federal assistance programs, or federally-assisted State programs; and only so that such persons can subsequently use the data for such administration or enforcement;

   (iii) use or disclose data for purposes of investigating potential violations of civil immigration laws or enforcing civil immigration laws, including but not limited to in response to a request by the Department of Homeland Security or a subagency thereof.

1.5 USDA acknowledges that the data shared under this Protocol is subject to federal and state confidentiality, privacy, and information security laws and regulations. Unauthorized access to, use of, or disclosure of such data, or failure to protect such data in accordance with applicable law, may subject the responsible party and, where applicable, individual users to civil or criminal penalties under federal or state law.

### 2. FRAMEWORK AND AUTHORITY

2.1. <u>Authority</u>

   2.1.1. Executive Order 14243 (March 20, 2025): "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos" directs agency heads to "take all necessary steps, to the maximum extent consistent with law," to ensure federal government has "unfettered access to comprehensive data" from state programs receiving federal funding, including data maintained in third-party databases.

   2.1.2. 7 U.S.C. § 2020(a)(3) requires that each State agency shall keep records as may be necessary to determine whether the program is being conducted in compliance with this chapter, and all records

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

shall be made available for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary.

2.1.3. 7 CFR 272 stipulates use or disclosure of information obtained from SNAP applicant or recipient households shall be restricted to persons directly connected with the administration or enforcement of the provisions of the FNA or regulations, other Federal assistance programs, federally-assisted State programs providing assistance on a means-tested basis to low-income individuals, or general assistance programs which are subject to joint processing requirements.

2.2. <u>Prohibited Purposes</u>

2.2.1. USDA shall NOT use the provided data for:

- Tax administration or tax compliance

- Law enforcement investigations beyond coordination regarding SNAP fraud, or other violations of the FNA and regulations implementing the FNA.

- Administration of non-SNAP federal assistance programs (*e.g.*, Medicaid, TANF, housing assistance)

- Sharing with foreign governments or international organizations

- Commercial use or transfer to private entities

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

**U.S. DEPARTMENT OF AGRICULTURE**

2.2.2. USDA shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals (*i.e.*, the collection of data elements spelled out in the Privacy Impact Assessment).

## 3. DATA CATEGORIES

3.1. Data Definition

3.1.1. All data obtained by States in administering SNAP or that otherwise may be necessary to determine whether the program is being conducted in accordance with the FNA or regulations issued under the FNA, in accordance with Attachment A to this protocol and any other state-specific terms negotiated and mutually agreed to by each state and USDA based on each state's data collection and storage realities.

3.1.2. Data derived from third-party sources (employment verification databases, financial institution records, property records) that States use for verification but are not part of applicant-reported information are excluded.

## 4. LIMITED ACCESS

4.1. The SNAP Information Database and all data collected therein is accessed and used ONLY by employees of the USDA who are:

4.1.1. Designated by the Chief of Staff at Food, Nutrition, Consumer Services (FNCS)

4.1.2. Trained in SNAP Act, Privacy Act, and this protocol

4.1.3. In compliance with all information security annual recertifications

4.2. Except to the extent required by law, no access to, or disclosures of data from, the SNAP Information Database may be provided to:

4.2.1. Other USDA agencies (APHIS, ERS, NASS, etc.)

4.2.2. Divisions within FNS without an explicit need-to-know

4.2.3. OIG employees, unless in direct support of a law enforcement investigation related to SNAP fraud, waste, or abuse

4.2.4. Any other federal agency

4.2.5. Any FOIA, administrative subpoena or like external requester

4.3  For the reasons explained in Section 1.4, above, no access to, or disclosures of data from, the SNAP Information Database may be provided to the Department of Homeland Security or any subagency thereof for purposes of investigating potential violations of civil immigration laws or enforcing civil immigration laws.

4.4.  USDA shall provide each state agency, on an ongoing basis and upon request, with a list of all parties who have requested access to this data, and a list of all users who have been granted access to the provided data.

## 5. SYSTEM OF RECORDS NOTICE (SORN) AND PRIVACY IMPACT ASSESSMENT (PIA)

5.1. SORN

The applicable SORN for this protocol is USDA/FNS-15 "National Supplemental Nutrition Assistance Program (SNAP) Information Database," 90 FR 26521.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender


## U.S. DEPARTMENT OF AGRICULTURE

The SORN location can be found here:
https://www.federalregister.gov/documents/2025/06/23/202511463/privacy-act-of-1974-system-of-records

For the avoidance of doubt, this protocol controls notwithstanding any provision of the applicable SORN.

### 5.2. Privacy Impact Assessment (PIA)

The applicable Privacy Impact Assessment for the SNAP Information Database is Version 1.1 created 02/12/2025, which can be found here:
https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

For the avoidance of doubt, this protocol controls notwithstanding any provision of the PIA.

## 6. FRAUD, WASTE, AND ABUSE DETECTION FRAMEWORK

### 6.1. Core Fraud Detection Functions

6.1.1. USDA will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program that focuses on:

- identity verification
- income and eligibility verification
- immigration status
- verification against disqualified recipients

### 6.2. Enhanced Fraud, Waste, and Abuse Detection Techniques

6.2.1. In addition to the core fraud detection functions, USDA will employ additional techniques including, but not limited to:

- Intrastate and interstate duplicate detection
- Deceased individuals' detection
- Synthetic identity patterns (new SSNs with inconsistent biographical data)
- Geographic anomalies

6.2.2. New data mining techniques will be limited to identifying recipient and retailer data anomalies with a direct nexus to SNAP.

## 7. DATA OUTPUT

### 7.1. States

7.1.1. USDA will provide flagged data back to the State agency for review, including the specific data elements flagged and source of the data that generated the flag. States are encouraged to verify the accuracy of fraud detection flags and provide feedback to USDA to refine detection logic and reduce false positives. Collaborative processes will be established to ensure accurate identification of fraud and appropriate corrective actions, including processes to allow individuals to contest inaccurate information and require updates to the originating system of record where false positives are identified. No presumptive results shall be made public prior to verification by State agency of the accuracy of the detection flags.

### 7.2. Law Enforcement

7.2.1. The USDA may refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP in accordance with 7 U.S.C § 2020(e)(8)(A) and USDA's regulation implementing that provision, 7 C.F.R. § 272.1(c)(1).

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

7.3. USDA SNAP Retailer Operations Center (ROC)

   7.3.1. The USDA may refer fraud detection leads to the ROC where, during fraud detection analysis, a compromised EBT card or terminal ID may have been identified in accordance with 7 U.S.C § 2020(e)(8)(A) and USDA's regulation implementing that provision, 7 C.F.R. § 272.1(c)(1).

## 8. DATA MINIMIZATION AND RETENTION

8.1. Retention Period

   8.1.1. Until a record schedule is approved, data will be retained only as long as necessary for purposes set forth in the SORN and this protocol, and in no case longer than 3 years per the SORN.

8.2. Automatic Deletion

   8.2.1. Data shall be retained for no longer than three years, consistent with the USDA/FNS-15 SORN. An automated process will be implemented to delete data upon expiration of the retention period, except for records related to ongoing audits, investigations, or litigation.

8.3. Ongoing Cases

   8.3.1. Data pertaining to ongoing audit, investigation, or potential litigation retained only as long as necessary, then deleted.

## 9. DATA SECURITY AND TECHNICAL REQUIREMENTS

9.1. Infrastructure and Location

   9.1.1. Primary storage location: AWS GovCloud (US) region

   9.1.2. Backup/disaster recovery: Secondary AWS region

   9.1.3. No storage, processing, or backup outside GovCloud or federal secure environments

   9.1.4. All infrastructure must meet or exceed FedRAMP High baseline standards

   9.1.5. AWS Personnel Access: Data is encrypted such that AWS personnel cannot access unencrypted data. Encryption keys are managed exclusively by federal USDA personnel and are not accessible to AWS or third-party vendors.

9.2. Access Controls

   9.2.1. Multi-factor authentication required for all access

   9.2.2. Role-based access control (RBAC) with principle of least privilege

   9.2.3. Access is limited to specifically designated USDA employees engaged to assist in determining whether the program is being conducted in accordance with the FNA.

   9.2.4. Access logging and audit trail maintenance (minimum period equal to data retention period, see Section V.E).

   9.2.5. Quarterly access reviews by USDA

   9.2.6. Immediate revocation of access upon employee termination or assignment change

9.3. Encryption Standards

   9.3.1. Encrypted data at rest and in transit

   9.3.2. Encryption keys managed solely by USDA federal personnel

   9.3.3. No encryption keys held by commercial vendors

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

9.4. Data Segregation and Compartmentalization

9.4.1. SNAP data isolated in separate, dedicated AWS GovCloud environment

9.4.2. SNAP data not directly integrated with other USDA systems

9.4.3. Limiting access to individuals with specialized training and oversight

9.5. Data Transfer

9.5.1. All data transfers shall utilize secure tools that meet or exceed FedRAMP High baseline standards.

## 10. INCIDENT RESPONSE AND BREACH NOTIFICATION

10.1. Incident Response

10.1.1. Incident response procedures are aligned with FNS Handbook Chapter 10 security incident and breach notification requirements that USDA already follows internally. This protocol extends equivalent procedures to State notification.

10.2. Incident Definition

10.2.2. Unauthorized access, use, or disclosure of data

10.2.3. Security vulnerability or control failure affecting data

10.2.4. Data loss, corruption, or destruction

10.2.5. Encryption failure or key compromise

10.2.6. Failed access control or authentication mechanism

10.2.7. Any event that may reasonably be expected to compromise data security or confidentiality, including any request for use of, access to, or disclosure of data outside the permitted circumstances set forth in Section 1.4

10.3. Incident Notification Timeline

10.3.1. Initial Notification within 12 hours

10.3.1.1.    Within 12 hours of discovery (by phone + email to State security/privacy contact and Director).

10.3.2. Preliminary Report within 24 hours

10.3.2.1.    Description of incident and timeline

10.3.2.2.    Data elements affected (specific fields and estimated number of records)

10.3.2.3.    Estimated number of individuals affected

10.3.2.4.    Preliminary assessment of whether unencrypted sensitive data may have been exposed

10.3.2.5.    Preliminary remedial actions taken

10.3.2.6.    Root cause analysis plan and timeline

10.3.3 Progress Reports and Incident Close-out

10.3.3.1    USDA shall provide supplemental progress updates to state agencies as material information becomes available, but in no event less frequently than every 14 days, including refinements to scope, impact, and remediation measures, until the Incident is resolved. Upon resolution, USDA shall provide a close-out report of the Incident.

10.3.3.2    USDA shall provide notice to affected individuals in compliance with all applicable federal breach response and notification requirements, including but not limited to FISMA and

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



## U.S. DEPARTMENT OF AGRICULTURE

OMB Memorandum M-17-12. Nothing in this protocol shall be construed to shift responsibility for individual breach notification to the state agency.

**APPENDIX A - SOURCES**

- 7 U.S.C. §§ 2020(a)(3) and (e)(8).

- Privacy Impact Assessment: https://www.usda.gov/sites/default/files/documents/fns-snap-informationdatabase-pia.pdf

- SORN: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-systemof-records

- SNAP Act: https://www.law.cornell.edu/uscode/text/7/2020

- SNAP QC Handbook

- Executive Order 14243 (March 20, 2025) "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos: https://www.govinfo.gov/content/pkg/DCPD-202500382/pdf/DCPD-202500382.pdf

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

# Attachment 2

# Plaintiffs' proposed revised protocol (redline)



**U.S. DEPARTMENT OF AGRICULTURE**

**Supplemental Nutrition Assistance Program (SNAP) Information Database**
**Fraud, Waste and Abuse Detection Protocol**

**1. OVERVIEW**

1.1. U.S. Department of Agriculture (USDA) and the Food and Nutrition Service (FNS) will use the Supplemental Nutrition Assistance Program (SNAP) recipient data to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying duplicate enrollments for elimination, and performing additional eligibility and program integrity checks specified herein.

1.2. This protocol establishes a framework for State SNAP agencies to share data with the USDA/FNS for detection of fraud, waste, and abuse and program integrity purposes.

1.3. USDA represents that tThe protocol balances federal data access requirements under Executive Order 14243 and the Food and Nutrition Act of 2008 (FNA, also referred to here as the "SNAP Act") with privacy protections, minimizes unnecessary data collection, and incorporates security standards while maintaining public trust and compliance with applicable law.

1.4. Notwithstanding any other provision of this protocol, or any System of Record Notice, USDA and FNS: (a) shall not use or disclose data received under this protocol except as specified in 7 U.S.C. §§ 2020(a)(3) and (e)(8) and 7 C.F.R. § 272.1(c)(1) and (2). For the avoidance of doubt, this means that USDA and FNS (and any person or entity to whom the data is disclosed) shall not:that includes the specific requirements in 7 U.S.C § 2020(e)(8)(A), which provides that State Plans of Operation must include safeguards protecting information obtained from applicant households that shall permit

(i)    use the data, except for administration or enforcement of the provisions of Chapter 51 of Title 7 of the U.S. Code and regulations issued pursuant to that chapter, Federal assistance programs, or federally-assisted State programs; and

(i)    disclose the data, except to the disclosure of such information to persons directly connected with the administration or enforcement of the provisions of this chapter, regulations issued pursuant to this chapter, Federal assistance programs, or federally-assisted State programs; and only so that such persons can subsequently use the data ; and

(ii)    the subsequent use of the information by persons described in clause (i) only for such administration or enforcement;

(iii)    use or disclose data for purposes of investigating potential violations of civil immigration laws or enforcing civil immigration laws, including but not limited to in response to a request by the Department of Homeland Security or a subagency thereof.

1.5    USDA acknowledges that the data shared under this Protocol is subject to federal and state confidentiality, privacy, and information security laws and regulations. Unauthorized access to, use of, or disclosure of such data, or failure to protect such data in accordance with applicable law, may subject the responsible party and, where applicable, individual users to civil or criminal penalties under federal or state law.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

**2. FRAMEWORK AND AUTHORITY**

2.1. <u>Authority</u>

2.1.1. Executive Order 14243 (March 20, 2025): "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos" directs agency heads to "take all necessary steps, to the maximum extent consistent with law," to ensure federal government has "unfettered access to comprehensive data" from state programs receiving federal funding, including data maintained in third-party databases.

2.1.2. 7 U.S.C. § 2020(a)(3) ~~that~~ requires that each State agency shall keep records as may be necessary to determine whether the program is being conducted in compliance with this chapter, and all records shall be made available for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary.

2.1.3. 7 CFR 272 stipulates use or disclosure of information obtained from SNAP applicant or recipient households shall be restricted to persons directly connected with the administration or enforcement of the provisions of the FNA or regulations, other Federal assistance programs, federally-assisted State programs providing assistance on a means-tested basis to low-income individuals, or general assistance programs which are subject to joint processing requirements.

2.2. <u>Prohibited Purposes</u>

2.2.1. USDA shall NOT use the provided data for:

• Tax administration or tax compliance

• Law enforcement investigations beyond coordination regarding SNAP fraud, or other violations ~~relating to~~of the FNA <u>and regulations implementing the FNA</u>.

• Administration of non-SNAP federal assistance programs (*e.g.*, Medicaid, TANF, housing assistance)

• Sharing with foreign governments or international organizations

• Commercial use or transfer to private entities

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

2.2.2. USDA shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals (*i.e.*, the collection of data elements spelled out in the Privacy Impact Assessment).

## 3. DATA CATEGORIES

3.1. Data Definition

3.1.1. All data obtained by States ~~or their vendors~~ in administering SNAP or that otherwise may be necessary to determine whether the program is being conducted in accordance with the FNA or regulations issued under the FNA, in accordance with Attachment A to this protocol and any other state-specific terms negotiated and mutually agreed to by each state and USDA based on each state's data collection and storage realities.

3.1.2. Data derived from third-party sources (employment verification databases, financial institution records, property records) that States use for verification but are not part of applicant-reported information are excluded.

~~3.2. Permitted Data~~

~~• Information that the applicant household reported on application/recertification forms including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers.~~

~~• Direct verifications that the State conducted to confirm applicant reported information Records that the State maintains of SNAP applications, approvals, denials, certifications, and benefits issued.~~

~~• Household composition and income exactly as reported by the applicant (not third party verified amounts).~~

~~• Transactional data necessary for fraud detection~~

> **Commented [A1]:** Plaintiffs anticipate that each State will have different proposed edits to Attachment A, based on State-specific approaches to sharing PII, as well as State-specific data collection and access requirements. Therefore, States will need to address these issues separately once an agreed-upon protocol is in place.

> **Commented [A2]:** Plaintiffs do not understand what this section of the protocol intends to convey if the data elements are set forth in Attachment A and therefore request that this section be deleted.

## 4. LIMITED ACCESS

4.1. The SNAP Information Database and all data collected therein is accessed and used ONLY by employees of the USDA who are:

4.1.1. Designated by the Chief of Staff at Food, Nutrition, Consumer Services (FNCS)

4.1.2. Trained in SNAP Act, Privacy Act, and this protocol

4.1.3. In compliance with all information security annual recertifications

4.2. Except to the extent required by law, no access to, or disclosures of data from, the SNAP Information Database may be provided to:

4.2.1. Other USDA agencies (APHIS, ERS, NASS, etc.)

4.2.2. Divisions within FNS without an explicit need-to-know

4.2.3. OIG employees, unless in direct support of a law enforcement investigation related to SNAP fraud, waste, or abuse

4.2.4. Any other federal agency

4.2.5. Any FOIA, administrative subpoena or like external requester

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender


**U.S. DEPARTMENT OF AGRICULTURE**

4.3  For the reasons explained in Section 1.4, above, no access to, or disclosures of data from, the SNAP Information Database may be provided to the Department of Homeland Security or any subagency thereof for purposes of investigating potential violations of civil immigration laws or enforcing civil immigration laws.

4.4.  USDA shall provide each state agency, on an ongoing basis and upon request, with a list of all parties who have requested access to this data, and a list of all users who have been granted access to the provided data.

> **Commented [A3]:** This provision is modeled after similar provisions in the Memoranda of Understanding for data sharing between state agencies and USDA/FNS.  For example, provision (7) of a standard 2018 eDRS agreement states: "In the event that USDA/FNS or the State Agency discloses [Sensitive but Unclassified Information] or PII to any authorized person not originally identified by either party, USDA/FNS and/or the State Agency will notify the appropriate Federal or State entity as to the identity of each person to whom disclosure is made, that such disclosure is made in accordance with all applicable laws and regulations and obligations outlined in this MOU, and that the contents of the disclosure shall be protected as outlined in the MOU." *See California v. USDA*, 25-cv-6310 (N.D. Cal.), ECF No. 116-3 at 74.

## 5. SYSTEM OF RECORDS NOTICE (SORN) AND PRIVACY IMPACT ASSESSMENT (PIA)

5.1.  SORN

The applicable SORN for this protocol is USDA/FNS-15 "National Supplemental Nutrition Assistance Program (SNAP) Information Database," 90 FR 26521.

The SORN location can be found here:
https://www.federalregister.gov/documents/2025/06/23/202511463/privacy-act-of-1974-system-of-records

For the avoidance of doubt, this protocol controls notwithstanding any provision of the applicable SORN that conflicts with 7 U.S.C. §§ 2020(a)(3) and (e)(8).

5.2.  Privacy Impact Assessment (PIA)

The applicable Privacy Impact Assessment for the SNAP Information Database is Version 1.1 created 02/12/2025, which can be found here:
https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

For the avoidance of doubt, this protocol controls notwithstanding any provision of the PIA.

## 6. FRAUD, WASTE, AND ABUSE DETECTION FRAMEWORK

6.1.  Core Fraud Detection Functions

6.1.1. USDA will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program that focuses on:

- identity verification
- income and eligibility verification
- immigration status
- verification against disqualified recipients

6.2.  Enhanced Fraud, Waste, and Abuse Detection Techniques

6.2.1. In addition to the core fraud detection functions, USDA will employ additional techniques including, but not limited to:

- Intrastate and interstate duplicate detection
- Deceased individuals' detection
- Synthetic identity patterns (new SSNs with inconsistent biographical data)
- Geographic anomalies

6.2.2. New data mining techniques will be limited to identifying recipient and retailer data anomalies fraud with a direct nexus to SNAP.

## 7. DATA OUTPUT

7.1.  States

7.1.1. USDA will provide flagged data back to the State agency for review, including the specific data elements flagged and source of the data that generated the flag. States are encouraged to verify the accuracy of

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

fraud detection flags and provide feedback to USDA to refine detection logic and reduce false positives. Collaborative processes will be established to ensure accurate identification of fraud and appropriate corrective actions, including processes to allow individuals to contest inaccurate information and require updates to the originating system of record where false positives are identified. No presumptive results shall be made public prior to verification by State agency of the accuracy of the detection flags.

7.2. Law Enforcement

7.2.1. The USDA may refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP in accordance with 7 U.S.C § 2020(e)(8)(A) and USDA's regulation implementing that provision, 7 C.F.R. § 272.1(c)(1).

7.3. USDA SNAP Retailer Operations Center (ROC)

7.3.1. The USDA may refer fraud detection leads to the ROC where, during fraud detection analysis, a compromised EBT card or terminal ID may have been identified in accordance with 7 U.S.C § 2020(e)(8)(A) and USDA's regulation implementing that provision, 7 C.F.R. § 272.1(c)(1).

## 8. DATA MINIMIZATION AND RETENTION

8.1. Retention Period

8.1.1. Until a record schedule is approved, data will be retained only as long as necessary for purposes set forth in the SORN and this protocol, and in no case longer than 3 years per the SORN.

8.2. Automatic Deletion

8.2.1. Data shall be retained for no longer than three years, consistent with the USDA/FNS-15 SORN. An automated process will be implemented to delete data upon expiration of the retention period, except for records related to ongoing audits, investigations, or litigation.

8.3. Ongoing Cases

8.3.1. Data pertaining to ongoing audit, investigation, or potential litigation retained only as long as necessary, then deleted.

## 9. DATA SECURITY AND TECHNICAL REQUIREMENTS

9.1. Infrastructure and Location

9.1.1. Primary storage location: AWS GovCloud (US) region

9.1.2. Backup/disaster recovery: Secondary AWS region

9.1.3. No storage, processing, or backup outside GovCloud or federal secure environments

9.1.4. All infrastructure must meet or exceed FedRAMP High baseline standards

9.1.5. AWS Personnel Access: Data is encrypted such that AWS personnel cannot access unencrypted data. Encryption keys are managed exclusively by federal USDA personnel and are not accessible to AWS or third-party vendors.

9.2. Access Controls

9.2.1. Multi-factor authentication required for all access

9.2.2. Role-based access control (RBAC) with principle of least privilege

9.2.3. Access is limited to specifically designated USDA employees engaged to assist in determining whether the program is being conducted in accordance with the FNA.

9.2.4. Access logging and audit trail maintenance (minimum period equal to data retention period, see Section V.E).

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

**USDA**
**U.S. DEPARTMENT OF AGRICULTURE**

9.2.5. Quarterly access reviews by USDA

9.2.6. Immediate revocation of access upon employee termination or assignment change

9.3. Encryption Standards

9.3.1. Encrypted data at rest and in transit

9.3.2. Encryption keys managed solely by USDA federal personnel

9.3.3. No encryption keys held by commercial vendors

9.4. Data Segregation and Compartmentalization

9.4.1. SNAP data isolated in separate, dedicated AWS GovCloud environment

9.4.2. SNAP data not directly integrated with other USDA systems

9.4.3. Limiting access to individuals with specialized training and oversight

9.5. Data Transfer

9.5.1. All data transfers shall utilize secure tools that meet or exceed FedRAMP High baseline standards

> **Commented [A4]:** As discussed in prior letters, State agencies have concern that this protocol is a "framework" that lacks sufficient detail for implementation, and that it will need to be accompanied by additional documents (such as an Interconnection Security Agreement and Memorandum of Understanding) that are standard when agencies share data with each other. Our expectation is that if USDA/FNS and a State agency agree on the protocol framework, they will promptly enter into any additional agreements, such as an ISA or MOU, necessary to facilitate the data sharing required by this protocol.

## 10. INCIDENT RESPONSE AND BREACH NOTIFICATION

10.1. Incident Response

10.1.1. Incident response procedures are aligned with FNS Handbook Chapter 10 security incident and breach notification requirements that USDA already follows internally. This protocol extends equivalent procedures to State notification.

10.2. Incident Definition

10.2.2. Unauthorized access, use, or disclosure of data

10.2.3. Security vulnerability or control failure affecting data

10.2.4. Data loss, corruption, or destruction

10.2.5. Encryption failure or key compromise

10.2.6. Failed access control or authentication mechanism

10.2.7. Any event that may reasonably be expected to compromise data security or confidentiality, including any request for use of, access to, or disclosure of data outside the permitted circumstances set forth in Section 1.4

10.3. Incident Notification Timeline

10.3.1. Initial Notification within 12 hours

10.3.1.1.    Within 12 hours of discovery (by phone + email to State security/privacy contact and Director).

10.3.2. Preliminary Report within 24 hours

10.3.2.1.    Description of incident and timeline

10.3.2.2.    Data elements affected (specific fields and estimated number of records)

10.3.2.3.    Estimated number of individuals affected

10.3.2.4.    Preliminary assessment of whether unencrypted sensitive data may have been exposed

10.3.2.5.    Preliminary remedial actions taken

10.3.2.6.    Root cause analysis plan and timeline

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



## U.S. DEPARTMENT OF AGRICULTURE

10.3.3 Progress Reports and Incident Close-out

10.3.3.1   USDA shall provide supplemental progress updates to state agencies as material information becomes available, but in no event less frequently than every 14 days, including refinements to scope, impact, and remediation measures, until the Incident is resolved. Upon resolution, USDA shall provide a close-out report of the Incident.

10.3.3.2   USDA shall provide notice to affected individuals in compliance with all applicable federal breach response and notification requirements, including but not limited to FISMA and OMB Memorandum M-17-12. Nothing in this protocol shall be construed to shift responsibility for individual breach notification to the state agency.

**Commented [A5]:** Plaintiffs' understanding is that these additional notification provisions are routine after a security breach, and since we don't have access to the FNS Handbook Chapter 10 cited above we wanted to spell them out here.

(Per the prior comment, other details like this may need to be spelled out more clearly in the course of state-specific implementation.)

## APPENDIX A - SOURCES

- 7 U.S.C. §§ 2020(a)(3) and (e)(8).
- Privacy Impact Assessment: https://www.usda.gov/sites/default/files/documents/fns-snap-informationdatabase-pia.pdf
- SORN: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-systemof-records
- SNAP Act: https://www.law.cornell.edu/uscode/text/7/2020
- SNAP QC Handbook
- Executive Order 14243 (March 20, 2025) "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos: https://www.govinfo.gov/content/pkg/DCPD-202500382/pdf/DCPD-202500382.pdf

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

# Attachment 3

# Plaintiffs' proposed revised data elements

![USDA]
**U.S. DEPARTMENT OF AGRICULTURE**

**Supplemental Nutrition Assistance Program
Information SNAP Database**

***SNAP Eligibility Data Elements***
The following elements should be included in the data sharing file from each State agency on all benefit recipients that are listed in the SNAP case, to the extent such data is available and extractable from each state system.  For purposes of this document, the term "recipient" refers to individuals currently receiving benefits and individuals who formerly received benefits within the defined retention period, but not to disqualified or excluded individuals.  Please provide a data dictionary if one is available to reduce the burden to both the State agency and USDA.

***Case Number*:** The case number is a unique identifier, typically 7 to 10 digits long, assigned to a household or recipient (depending on each state) when they are approved for SNAP.

***First, Middle, Last Names*:** The full name of all recipients in the household.

***Known Alias*:** Assumed or alternative name(s) used by any of the recipients.

***Date of Birth*:** The specific month, day and year the recipient was born.

***Individual Recipient Identification Number*:** The unique identifier assigned to that specific benefit recipient within the case by the State agency.

***Social Security Number*:** The unique 9-digit identifier issued by the Social Security Administration and provided by the recipient.

***Status on SNAP*** *(recipient/individual level)***:** Identify if the recipient in the case is actively receiving SNAP, disqualified, sanctioned, or excluded.

***Application and/or Recertification Date*:** The date the recipient applied for SNAP (this can be the first application date, or most recent recertification date).

***Reporting Status*:** Following initial certification, or recertification, households are determined to be a simplified or change reporting household. This data element should indicate the reporting status the household is designated to be.

***Relationship:*** The relationship identifies who all recipients in a household are to one another and assists with determining mandatory group members. The data should reflect who each recipient is to one another.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

***Citizenship and/or Immigration Status***: This identifies if the recipient is a U.S. citizen or immigrant.

***Sponsorship:*** This identifies if an individual receiving SNAP is known to have been sponsored to enter the U.S.

***Zip code:*** Zip code associated with the recipient's residential address.

***County:*** County associated with the recipient's residential address.

***Homeless Status***: Please include if recipients are identified as homeless.

***Phone Number(s)***: The contact number(s) provided by the recipient as a means of contact.

***Email Address(es)***: The email address(es) provided by the recipient as a means of contact.

***Unearned Income***: The total unearned income (RSDI, unemployment, child support, etc.) amount budgeted to determine the SNAP allotment.

***Earned Income***: The total earned income amount budgeted to determine the SNAP allotment.

***Self-Employment Income***: The total self-employment income budgeted as well as the amount of allowed expenses.

***Shelter Expenses***: The total shelter expenses budgeted dollar amount. Shelter expenses may be separated out as various expenses are taken into consideration for eligibility and those should be included if used in the SNAP allotment determination (i.e. telephone, heating, cooling). If the household is active with Section 8, which pays a portion of the rental expenses, please ensure that is included.

***Assets/Resources***: The total assets reported (e.g.. bank accounts, boat, collector vehicle, etc.) or any resources used to determine SNAP eligibility.

***Sanctions/Disqualifications***: Identify any recipients who are serving a sanction and/or disqualification that is impacting their eligibility to participate in SNAP. The sanction and/or disqualification type and any applicable time periods should be identified (i.e. IPV, 10/1/2024-9/30/2025). This field should correspond to the data provided in the status on SNAP if the recipient is currently serving a disqualification, as well as any income field(s) that may pertain to the disqualified member due to income proration.

***SNAP EBT Card Number***: The unique set of digits on the household's issued SNAP EBT card that connects the case to the associated transactions.  For states that issue more than one card to a household, or for households where more than one recipient lives, the state need only provide the digits for the primary card issued to the household.

# Attachment 4

# Plaintiffs' proposed revised data elements (redline)

 **U.S. DEPARTMENT OF AGRICULTURE**

**Supplemental Nutrition Assistance Program**
**Information SNAP Database**

*SNAP Eligibility Data Elements*

The following elements should be included in the data sharing file from each State agency on all ~~household~~ benefit recipients~~members~~ s that are listed in the SNAP case,– to the extent such data is available and extractable from each state system.  For purposes of this document, the term "recipient" refers to individuals currently receiving benefits and individuals who formerly received benefits within the defined retention period, but not to disqualified or excluded individuals.  Please provide a data dictionary if one is available to reduce the burden to both the State agency and USDA.

*Case Number:* The case number is a unique identifier, typically 7 to 10 digits long, assigned to a household or recipient (depending on each state) when they ~~apply and/or~~ are approved for SNAP.

*First, Middle, Last Names:* The full name of all recipients in the household ~~members~~.

*Known Alias:* Assumed or alternative name(s) used by any of the recipients ~~household members~~.

~~Authorized Representative(s): Provide any identified authorized representative for the household, and their corresponding information such as full name, means of verbal and written communication.~~

*Date of Birth:* The specific month, day and year the ~~household member~~recipient was born.

*Individual Recipient Identification Number:* The unique identifier assigned to that specific ~~household member~~benefit recipient within the case by the State agency.

*Social Security Number:* The unique 9-digit identifier issued by the Social Security Administration and provided by the ~~household member~~recipient.

*Status on SNAP (recipient/individual level):* Identify if the ~~household member~~recipient in the case is actively receiving SNAP, disqualified, sanctioned, or excluded.

*Application and/or Recertification Date:* The date the ~~household~~recipient applied for SNAP (this can be the first application date, or most recent recertification date).

*Reporting Status:* Following initial certification, or recertification, households are determined to be a simplified or change reporting household. This data element should indicate the reporting status the household ~~has been~~is designated to be.

> **Commented [A1]:** We have amended this document primarily to propose three changes.
>
> First, we propose limiting data production to SNAP recipients (excluding non-recipient data). Second, we propose submitting zip code and county data in lieu of personal addresses. Both of these amendments are proposed in order to reduce the amount of personal identifiable information (PII) unnecessarily disclosed, in accordance with term 2.2.2 of the February 17 proposed protocol.
>
> Third, as specified below, we propose omitting certain details on income, expenses and assets which, for many states, could not be easily produced in bulk, and which would require production of third-party verification materials excluded by USDA's proposed protocol.

*Relationship:* The relationship identifies who all ~~household group~~recipient ~~s~~members in a household are to one another and assists with determining mandatory group members. The data should reflect who each ~~household~~ recipient ~~member~~ is to one another.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

Page **2** of **3**

*~~Absent Parent~~* (as applicable)~~:~~ ~~This identifies the parent of a minor child who resides in a separate household.~~

*Citizenship and/or Immigration Status*: This identifies if the ~~individual~~ recipient is a U.S. citizen or immigrant.

*Sponsorship:* This identifies if an individual ~~applying or~~ receiving SNAP is known to have ~~has~~ been sponsored to enter the U.S. ~~Data should identify the name or organization of the sponsor.~~

*Zip code:* Zip code associated with the recipient's residential address.

*County:* County associated with the recipient's residential address.

*~~Residential Address:~~* ~~The address the household has provided as to where they reside.~~

*~~Mailing Address:~~* ~~The address the household has provided as to where they would like all correspondence sent to (if different than residential).~~

*Homeless Status*: Please include if ~~the household~~recipients are ~~is~~ identified as homeless.

*Phone Number(s)*: The contact number(s) provided by the ~~household~~ recipient as a means of contact.

*Email Address(es)*: The email address(es) provided by the ~~household~~ recipient as a means of contact.

*Unearned Income*: The total unearned income (RSDI, unemployment, child support, etc.) ~~identifies the unearned income source, pay frequency, the household member receiving the pay, and the total~~ amount ~~of income~~ budgeted to determine the SNAP allotment.

*Earned Income*: The total earned income ~~identifies the earned income source, pay frequency, the household member receiving the pay, and the total~~ amount ~~of income~~ budgeted to determine the SNAP allotment.

*Self-Employment Income*: The total ~~S~~self-employment ~~should be identified as to what the selfemployment is (type or business name), pay frequency, the household member who is~~

selfemployed, and the total amount of income budgeted as well as the amount of allowed expenses.

**Shelter Expenses**: The total shelter expenses should be identified as to shelter type (i.e. rent), and the budgeted dollar amount. Shelter expenses may be separated out as various expenses are taken into consideration for eligibility and those should be included if used in the SNAP allotment determination (i.e. telephone, heating, cooling). If the household is active with Section 8, which pays a portion of the rental expenses, please ensure that is included.

**Assets/Resources**: Any The total known assets reported (i.ee.g.. bank accounts, boat, collector vehicle, etc.) or any resources used to determine SNAP eligibility. and must identify the asset type, amount and what household member the asset belongs to.

***Sanctions/Disqualifications*:** Identify any ~~household members~~recipients who are serving a sanction and/or disqualification that is impacting their eligibility to participate in SNAP. The sanction and/or disqualification type and any applicable time periods should be identified (i.e. IPV, 10/1/2024-9/30/2025). This field should correspond to the data provided in the status on SNAP if the recipient~~household member~~ is currently serving a disqualification, as well as any income field(s) that may pertain to the disqualified member due to income proration.

***SNAP EBT Card Number*:** The unique set of digits on the household's issued SNAP EBT card that connects the case to the associated transactions.  For states that issue more than one card to a household, or for households where more than one recipient lives, the state need only provide the digits for the primary card issued to the household.

EXHIBIT G

FNS's March 10 Letter, Fourth Proposed Protocol, and Attachments



**Food and Nutrition Service**

U.S. DEPARTMENT OF AGRICULTURE

March 10, 2026

Governor Gavin Newsom
1021 O Street, Suite 9000
Sacramento, California 95814

Dear Governor Newsom,

This replies to your February 25, 2025, letter responding to the U.S. Department of Agriculture (USDA), Food and Nutrition Service (FNS)'s Third Proposed Protocol issued on February 17, 2025. FNS requires your State to share data to assist FNS in its statutorily-mandated administration and enforcement of the Food and Nutrition Act of 2008, as amended, (FNA), including its provision for USDA's inspection and audit of state records. This is Defendants' fourth and final attempt to settle this matter by agreement. Should Plaintiffs continue unreasonably to withhold their consent to these protocols, Defendants will seek further guidance from the Court.

In light of clear direction from the Court, the protocol looks directly to the FNA's text. The State of Kansas recently accepted this straightforward approach, whereby the text of the FNA cabins demands. Plaintiff States and the District of Columbia should now join Kansas and the majority of States and comply with their statutory obligation to share the data FNS has requested to verify the States' SNAP eligibility determinations and payments of Federally-funded SNAP benefits.

**The February 13, 2026, Agreement to a Protocol Using the Text of 7 U.S.C. § 2020(e)(8).**
At the Court's February 13, 2026, hearing initiated by the Plaintiff States by motion to the Court, Defendants proposed, the Court endorsed, and Plaintiffs accepted, resolving Plaintiffs' holdout by "put[ting] in a reference to [7 U.S.C. § 2020] (e)(8)(A) and say we agree to comply with (e)(8)(A) as it is written."[1] On the next business day, February 17, 2026, Defendants submitted to Plaintiff States a Third Proposed Protocol, revised in accordance with the Court's February 13 guidance and parties' apparent agreement thereto. This should have secured the holdout States' agreement and production of the data previously withheld since the summer of 2025.

---

[1] Tr. of Proceedings, *California, et al., v. United States Dept. of Agriculture, et al.*, no. 25-CV-06310 (N.D. Calif.), Feb. 13, 2026, ECF No. 131, at 32:16 to 33:12 (The Court: "If you want to just cut them off all you have to do is import (e)(8) into the protocol"); 46:10 ([USDA] can agree to say we agree to comply with (e)(A) as it is written"); 47:4-8 ("The Court: would that satisfy plaintiffs . . . ?"); 47:9-13 ([Plaintiffs' Counsel]: "If defendants were willing to copy and paste the provisions of (e)(8) and say that those provisions govern any re-disclosure and any subsequent use of applicant data, I think that would largely address our concern with (e)(8)"); 47:14-48:1 ("The Court: . . . Now, apparently they would be satisfied with your airlifting into the protocol the restrictions that are set out in (e)(8). . . .maybe it just reads like (e)(8) reads so that you don't get into [']access['],[']disclosure['], whatever.")

**Kansas's Stipulation to Settle its Appeal and Produce Data Based on FNS's Commitment to Comply With the Text of 7 U.S.C. § 2020(e)(8).**  As with the Plaintiff States, Kansas originally declined to provide FNS with the data FNS requested and chose instead to challenge its disallowance through administrative appeal.  On February 26, 2026, after a State SNAP Appeals Board hearing in which Kansas contested FNS's data sharing demand and disallowance of costs, Kansas signed a joint filing reporting, in pertinent part, that:

> the parties have entered into a settlement whereby [Kansas] will produce the data requested by USDA-FNS to the SNAP Information Database . . . and withdraw its appeal. As consideration for the foregoing, USDA-FNS agrees to revoke the disallowance and to follow applicable law with respect to the data Kansas provides, including, by way of example, the [FNA], 7 U.S.C. 2011 *et. seq.*, FOIA, and/or the Privacy Act, to the extent applicable.  Further, USDA-FNS agrees to not share the data with foreign entities.[2]

Kansas has indicated that it can produce the requested data in as little as one to three weeks.

**Plaintiff States' Continued Refusal To Produce SNAP Data.**  Notwithstanding the Court and parties' February 13 agreement to rely on statutory text to resolve their dispute, and Defendant's Third Proposed Protocol adhering to that agreement,[3]  Plaintiff States' February 25, 2026 reply refused to accept the Third Proposed Protocol.[4]  Plaintiffs' February 25 reply deviated from the agreed-upon approach, asserting new demands that appear calculated to circumvent the Court's instruction that "a State is not entitled to unreasonably decline to agree to a protocol."[5]

As with their prior assertion of various objections that have since been rejected by the Court,[6] Plaintiff States' February 25 reply seeks to exceed the express statutory text governing this matter.  USDA cannot accept the Plaintiffs' proposed edits to the Third Proposed Protocol that restrict or place additional burdens on USDA beyond what is required by law or would hamper USDA's ability to comply with its legal obligations.  In a fourth and final attempt to reach agreement, however, USDA has amended the Third Proposed Protocol, accepting where it can

---

[2] A copy of this joint filing with the State Supplemental Nutrition Assistance Program Appeals Board in *In Re: State of Kansas SNAP Appeal,* Case No. 01-2025 (Feb. 26. 2026), is attached as Exhibit 1.

[3] See ECF No. 128.

[4] See ECF No. 130.

[5] Order Granting in Part Pl. States' Mot. to Enforce or Expand Prelim. Inj. at 12, ECF No. 134 ("Second PI"); *See also* Tr. of Proceedings at 7:2-3, Note 1, *supra* ("states can't simply unreasonably reject a protocol in order to get out from under the mandatory language of (a)(3).").

[6] *See* Note 1, *supra*, and Second PI at 19 ("In all other respects, Plaintiff States have failed to make the requisite showing" of likelihood of success on the merits.)

certain of the Plaintiff States' February 25 edits in the attached Fourth Proposed Protocol.[7] Because it aligns with the Court's February 13 guidance, and the parties' then-acceptance of that guidance, USDA believes the Plaintiff States should, like Kansas, promptly agree to this reasonable proposal.

Our Fourth Proposed Protocol includes the Plaintiff States' February 25 proposed edits that USDA found unacceptable. They are noted in dark red text with a double strikethrough. The following list summarizes why those State-proposed edits are unacceptable.

- In **Section 1.4**, USDA has rejected proposed changes that are redundant and do not mirror the language of 7 U.S.C. § 2020(e)(8)(A). This is in keeping with the above-noted Court's guidance and the parties' agreement to include the language of 7 U.S.C. § 2020(e)(8)(A). Additionally, affirmatively precluding any information sharing regarding immigration status may run afoul of 8 U.S.C. § 1373.

- USDA has deleted the last sentence of proposed **Section 1.5**. USDA cannot stipulate that Federal officials are subject to *State criminal liability*.

- In **Section 3.1.1**, USDA deleted proposed addition that sought to limit the data elements obtained by USDA to those agreed to on a state-by-state basis. All of the data elements that USDA is requesting are needed to ensure proper administration of SNAP. USDA cannot agree to permit States to dictate or otherwise limit which areas of program administration USDA may audit. Further, USDA cannot agree to limit its audit authority depending on which data elements are held by the State versus the State's contracted vendor. This would frustrate the purpose of USDA's audit authority. This new demand by Plaintiffs is contrary to their longstanding monolithic approach to FNS's data requests, with all States responding with a form letter. Plaintiffs' suggestion that Defendants will now have to negotiate separately with each of the plaintiff States, is yet another tactic to delay and ultimately avoid compliance with the FNA's data production requirements, to the extent they are subject to an (a)(3) protocol.

- USDA has deleted proposed **Section 4.3**. USDA is already agreeing to follow all applicable Federal law, including 7 U.S.C. § 2020(e)(8)(A) (which is incorporated into the protocols at Section 1.4). As such, Section 4.3 is unnecessary and creates unintended ambiguities.

- USDA is deleting proposed **Section 4.4**. USDA may receive requests for data that must remain confidential, such as an ongoing investigation of fraud or crimes. As such, it cannot agree to provide each State agency with a list of all parties who have requested or been granted access to the data.

- In **Section 7.1.1**, USDA has deleted two proposed edits:

---

[7] The Fourth Protocol is attached as Exhibit 2.

- o Although USDA is committed to sharing as much information as it can to assist with improving administration of SNAP, it cannot commit to sharing the source of data that was used to generate a flag for further review. Such information could originate from confidential sources (*e.g.*, a whistleblower).
- o USDA is already complying with, and is required to comply with, the Privacy Act, including 5 U.S.C. § 552a(d)(2), making the language pertaining to individuals contesting their records unnecessary. To the extent the proposed edit sought to require more, such as requiring USDA to permit individuals to correct a system of record USDA does not maintain, USDA cannot agree.

- In **Section 7.2.1**, USDA has deleted language that sought to limit the USDA Office of the Inspector General's and other law enforcement's authority to 7 U.S.C. § 2020(e)(8)(A) and its implementing regulations. USDA cannot agree to limit the statutory authorities of other entities and must respond to all lawful requests. Further, the Federal government pursues criminal investigations and prosecutions for crimes involving SNAP, such as identity theft and wire fraud, that are not found within the SNAP Act. Because 7 U.S.C. § 2020(e)(8)(A) limits use and disclosure to "the administration and enforcement of the provisions of [the SNAP Act]," the proposed edit could be read to prohibit USDA in assisting with such investigations and prosecutions.

- In **Section 10.2**, USDA has deleted the proposed insertion of data requests that fall outside the scope of Section 1.4. USDA must comply with all applicable laws. A lawful request for disclosure does not constitute a reasonable expectation of a security incident and is therefore inappropriate to include.

- USDA has deleted the proposed **Section 10.3.3.1**. USDA will not agree to reporting procedures outside of what is required by law.

- In proposed **Section 10.3.3.2**, USDA has deleted references to specific laws and OMB Memoranda. USDA is agreeing to follow all federal requirements. Specific examples are unnecessary and could lead to confusion should requirements change.

All Plaintiff States' proposed edits to the Third Protocol that USDA has accepted can be found in the Fourth Protocol document, highlighted in green, and attached as Exhibit 2. For the avoidance of doubt, the terms of the Fourth Proposed Protocol will govern all data stored in the SNAP Information Database regardless of the source of the data.

**USDA Rejects Plaintiff States' Proposal to Restrict Data Elements that are Within the Scope of 7 U.S.C. § 2020(a)(3) or (e)(8)**

Plaintiffs' February 25 response to the Third Proposed Protocol proposed to curtail their obligation to produce data that is within the scope of the FNA data sharing requirements in 7 U.S.C. § 2020(a)(3) or (e)(8). All proposed edits to the requested data elements, which are reattached to this letter as Exhibit 3, have been rejected. Indeed, these are the very same data elements which States have produced for years as part of the quality control process without complaint. The following shows the type of data that States already release to FNS, without the

protections of the Fourth Proposed Protocol, and the subset of those types of data that have been requested by FNS pursuant to 7 U.S.C. § 2020(a)(3) or (e)(8).

### Data Element Comparisons

This chart identifies the required data elements submitted by State agencies to the U.S. Department of Agriculture (USDA) for Quality Control (QC) purposes.  States submit a sample set of this data to USDA monthly.  Fields identified with a * symbol have been requested by USDA for the Supplemental Nutrition Assistance Program (SNAP) Data Sharing integrity initiative.  As indicated by this chart, there is no difference between the data elements requested by USDA on November 24, 2025 and the corresponding data elements submitted by States to USDA for QC purposes, other than to request a complete set, rather than a sample set, of the same type of data.

| | | |
|---|---|---|
| Case Number* | Case Address* | Phone Number* |
| SNAP Household Names* | SNAP Household DOBs* | SNAP Household SSN* |
| SNAP Household Relationships* | Citizen/Non-Citizen Status * | Homeless Status* |
| All Household Earned Income* | All Household Unearned Income* | All Household Self-Employment Income* |
| Authorized Representative* | Indicator if SNAP Household Member is active* | Reporting Status* |
| Recipient Disqualification* | Certification Period* | Assets/Resources* |
| Categorial Eligibility | Directions to Home | Shelter Expenses* |
| Date of Interview | Household Composition | Expedited Service |
| Most Recent Action | Student Status | Amount of Allotment |
| Allotment Adjustments | Demonstration Projects | Residency |
| Earned Income Deductions | Dependent Care | Shelter Deductions |
| Other Government Benefits | Contributions | Deemed Income |
| Standard Utility Allowance | Child Support Deductions | Medical Deduction |
| Income from loans, scholarships, grants | Arithmetic Computation | SNAP Simplification Project |

| Significant Persons NOT living in home phone number | Significant Persons NOT living in the home relationship | Significant Persons NOT living in the home SSNs |
|---|---|---|
| Significant Persons Not living in the DOBs | Significant Persons NOT living in the home address | Significant Persons NOT living in the home financial support |
| All data related to work requirements – E&T programs, time limited participation, work registration, etc. | States must verify all elements with supporting documentation and upload those to SNAP-QCS | |

For the foregoing reasons, this is Defendants' fourth and final attempt to settle this matter by agreement. Plaintiff States should join Kansas and the majority of States in complying with the FNA. Plaintiff States should accept this final offer because it adheres to the Court's February 13 guidance and the parties' agreement[8] to accept the text of the FNA as a reasonable protocol. Indeed, USDA will accept agreement to these protocols by individual Plaintiff States who wish to honor the commitment made in Court and their legal obligations under the FNA.

We respectfully request that the plaintiff States inform us by March 20, 2026, whether they will now comply with FNS's data request. Notwithstanding this offer, the Federal Government preserves all claims and contentions that it has made, or could have made, in relation to its data requests, and its right to pursue further action that it may take to seek review or enforcement of any data request that is not complied with by a Plaintiff State.

Sincerely,

Shiela Corley
Chief of Staff
Food, Nutrition, and Consumer Services
U.S. Department of Agriculture

Enclosure

cc:   Maria Buxton, Deputy Attorney General

---

[8] *See* Note 1, *supra*.

**STATE SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM APPEALS BOARD**

In Re:

State of Kansas SNAP Appeal

Case No. 01-2025

<u>**JOINT REQUEST TO EXTEND DEADLINE**</u>
<u>**FOR POST-HEARING SUBMISSIONS AND DEFERRAL OF FINAL DECISION**</u>

Now come the Appellant, the Kansas Department for Children and Families (KDCF), and the Respondent, the United States Department of Agriculture – Food Nutrition Services (USDA-FNS), and for their Joint Request to Extend Deadline for Post-Hearing Submissions and Deferral of Final Decision, hereby state as follows:

1.     The hearing on KDCF's appeal of USDA-FNS's disallowance took place on February 17, 2026.

2.     Any post-hearing submissions are due by February 27, 2026.

3.     Since the hearing, the parties have entered into a settlement whereby KDCF will produce the data requested by USDA-FNS to the SNAP Information Database created by in the June 23, 2025, SORN, and withdraw its appeal.  As consideration for the foregoing, USDA-FNS agrees to revoke the disallowance and to follow applicable law with respect to the data Kansas provides, including, by way of example, the Food and Nutrition Act, 7 U.S.C. 2011 et seq., FOIA, and/or the Privacy Act, to the extent applicable. Further, USDA-FNS agrees to not share the data with foreign entities.

4.     In light of the foregoing, the parties request that the date for post-hearing submissions be extended 30 days to allow for the parties to prepare settlement documents and act in accordance with those documents.  The parties further request that the Hearing Officer's decision be delayed accordingly.

██████████████

Deputy Assistant General Counsel
International Affairs, Food Assistance, and
Farm and Rural Programs Division
USDA, Office of the General Counsel
1400 Independence Avenue, SW, ████████
Washington, D.C. 20250-1400
██████████

*Counsel for USDA FNS*

████████████████████████

*Chief Counsel for Governor Kelly*
Kansas Office of the Governor
Statehouse, 300 SW 10th Ave ████████
Topeka, KS 66612
Phone: ████████
████████@ks.gov

*Counsel for Governor Kelly*



**U.S. DEPARTMENT OF AGRICULTURE**

**Supplemental Nutrition Assistance Program (SNAP) Information Database**
**Fraud, Waste and Abuse Detection Protocol**

## 1. OVERVIEW

1.1. U.S. Department of Agriculture (USDA) and the Food and Nutrition Service (FNS) will use the Supplemental Nutrition Assistance Program (SNAP) recipient data to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying duplicate enrollments for elimination, and performing additional eligibility and program integrity checks specified herein.

1.2. This protocol establishes a framework for State SNAP agencies to share data with the USDA/FNS for detection of fraud, waste, and abuse and program integrity purposes.

1.3. USDA represents that tThe protocol balances federal data access requirements under Executive Order 14243 and the Food and Nutrition Act of 2008 (FNA, also referred to here as the "SNAP Act") with privacy protections, minimizes unnecessary data collection, and incorporates security standards while maintaining public trust and compliance with applicable law.

1.4. Notwithstanding any other provision of this protocol, or any System of Record Notice, USDA and FNS: (a) shall not use or disclose data received under this protocol except as specified in 7 U.S.C. §§ 2020(a)(3) and (e)(8) and 7 C.F.R. § 272.1(c)(1) and (2), or any other applicable law. For the avoidance of doubt, this means that USDA and FNS (and any person or entity to whom the data is disclosed) shall not: ~~that includes the specific requirements in 7 U.S.C § 2020(e)(8)(A), which provides that State Plans of Operation must include safeguards protecting information obtained from applicant households that shall permit~~

(i) use the data, except for administration or enforcement of the provisions of Chapter 51 of Title 7 of the U.S. Code, regulations issued pursuant to that chapter, Federal assistance programs, or federally-assisted State programs; and

(ii) disclose the data, except to ~~the disclosure of such information to~~ persons directly connected with the administration or enforcement of the provisions of this chapter, regulations issued pursuant to this chapter, Federal assistance programs, or federally-assisted State programs. ~~and only so that such persons can subsequently use the data for such administration and enforcement; and~~

(iii) ~~use or disclose data for purposes of investigating potential violations of civil immigration laws or enforcing civil immigration laws, including but not limited to in response to a request by the Department of Homeland Security or subagency thereof.~~

1.5 USDA acknowledges that the data shared under this Protocol is subject to ~~federal and state~~ existing confidentiality, privacy, and information security laws and regulations. ~~Unauthorized access to, use of, or disclosure of such data, or failure to protect such data in accordance with applicable law, may subject the responsible party and, where applicable, individual users to civil or criminal penalties under federal or state law.~~ Notwithstanding the foregoing, this provision does not create any new rights or liabilities or waive any applicable immunities.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



## U.S. DEPARTMENT OF AGRICULTURE

**2. FRAMEWORK AND AUTHORITY**

2.1. <u>Authority</u>

2.1.1. Executive Order 14243 (March 20, 2025): "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos" directs agency heads to "take all necessary steps, to the maximum extent consistent with law," to ensure federal government has "unfettered access to comprehensive data" from state programs receiving federal funding, including data maintained in third-party databases.

2.1.2. 7 U.S.C. § 2020(a)(3) ~~that~~ requires that each State agency shall keep records as may be necessary to determine whether the program is being conducted in compliance with this chapter, and all records shall be made available for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary.

2.1.3. 7 CFR 272 stipulates use or disclosure of information obtained from SNAP applicant or recipient households shall be restricted to persons directly connected with the administration or enforcement of the provisions of the FNA or regulations, other Federal assistance programs, federally-assisted State programs providing assistance on a means-tested basis to low-income individuals, or general assistance programs which are subject to joint processing requirements.

2.2. <u>Prohibited Purposes</u>

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

2.2.1. USDA shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals (*i.e.*, the collection of data elements spelled out in the Privacy Impact Assessment).

## 3. DATA CATEGORIES

3.1. <u>Data Definition</u>

3.1.1. All data obtained by States or their vendors ~~or their vendors~~ in administering SNAP or that otherwise may be necessary to determine whether the program is being conducted in accordance with the FNA or regulations issued under the FNA, in accordance with Attachment A of this protocol. ~~and any other state-specific terms negotiated and mutually agreed to by each state and USDA based on each state's data collection and storage realities.~~

3.1.2. Data derived from third-party sources (employment verification databases, financial institution records, property records) that States use for verification but are not part of applicant-reported information are excluded.

~~3.2 Permitted Data:~~

- ~~Information that the applicant household reported on application/certification forms including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers;~~
- ~~Direct verifications that the State conducted to confirm applicant-reported information~~
- ~~Records that the State maintains of SNAP applications, approvals, denials, certifications, and benefits issued~~
- ~~Household composition and income exactly as reported by the applicant (not third-party verified amounts)~~
- ~~retailer and transactional data necessary for fraud detection~~

## 4. LIMITED ACCESS

4.1. The SNAP Information Database and all data collected therein is accessed and used ONLY by employees of the USDA who are:

4.1.1. Designated by the Chief of Staff at Food, Nutrition, Consumer Services (FNCS)

4.1.2. Trained in SNAP Act, Privacy Act, and this protocol

4.1.3. In compliance with all information security annual recertifications

4.2. Except to the extent permitted by law, no access to, or disclosures of data from, the SNAP Information Database may be provided to:

4.2.1. Other USDA agencies (APHIS, ERS, NASS, etc.)

4.2.2. Divisions within FNS without an explicit need-to-know

4.2.3. Any other federal agency

4.2.4. Any FOIA, administrative subpoena or like external requester

4.3. Notwithstanding section 4.1, this protocol does not limit access to the SNAP Information Database and all data contained therein by USDA's Office of the Inspector General as authorized by the Inspector General's Act, 5 USC 401-424.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender


**U.S. DEPARTMENT OF AGRICULTURE**

~~4.3. For the reasons explained in Section 1.4, above, no access to, or disclosures of data from, the SNAP Information Database may be provided to the Department of Homeland Security or any subagency thereof for purposes of investigating potential violations of civil immigration laws or enforcing civil immigration laws.~~

~~4.4. USDA shall provide each state agency, on an ongoing basis and upon request, with a list of all parties who have requested access to this data, and a list of all users who have been granted access to the provided data~~.

## 5. SYSTEM OF RECORDS NOTICE (SORN) AND PRIVACY IMPACT ASSESSMENT (PIA)

5.1. <u>SORN</u>

The applicable SORN for this protocol is USDA/FNS-15 "National Supplemental Nutrition Assistance Program (SNAP) Information Database," 90 FR 26521.

The SORN location can be found here:
https://www.federalregister.gov/documents/2025/06/23/202511463/privacy-act-of-1974-system-of-records

For the avoidance of doubt, this protocol controls notwithstanding any provision of the applicable SORN <mark>that conflicts with 7 U.S.C. §§ 2020(a)(3) and (e)(8)</mark>.

5.2. <u>Privacy Impact Assessment (PIA)</u>

The applicable Privacy Impact Assessment for the SNAP Information Database <mark>is Version 1.1 created 02/12/2025, which</mark> can be found here:
https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

<mark>For the avoidance of doubt, this protocol controls notwithstanding any provision of the PIA.</mark>

## 6. FRAUD, WASTE, AND ABUSE DETECTION FRAMEWORK

6.1. <u>Core Fraud Detection Functions</u>

6.1.1. USDA will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program that focuses on:

- identity verification
- income and eligibility verification
- immigration status
- verification against disqualified recipients

6.2. <u>Enhanced Fraud, Waste, and Abuse Detection Techniques</u>

6.2.1. In addition to the core fraud detection functions, USDA will employ additional techniques including, but not limited to:

- Intrastate and interstate duplicate detection
- Deceased individuals' detection
- Synthetic identity patterns (new SSNs with inconsistent biographical data)
- Geographic anomalies

6.2.2. New data mining techniques will be limited to identifying <mark>data anomalies ~~fraud~~</mark> with a direct nexus to SNAP.

## 7. DATA OUTPUT

7.1. <u>States</u>

7.1.1. USDA will provide flagged data back to the State agency for review, <mark>including the specific data elements flagged</mark> ~~and source of the data that generated the flag~~. States are encouraged to provide feedback to

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

USDA to refine detection logic and reduce false positives. Collaborative processes will be established to ensure accurate identification of fraud and appropriate corrective actions. ~~including processes to allow individuals to contest inaccurate information and require updates to the originating system of record where false positives are identified.~~ No presumptive results will ~~shall~~ be made public ~~prior to verification by~~ ~~State agency~~ by FNS until 30 days from the initial date that USDA provided flagged data; during that 30 days States can provide additional information related to ~~of~~ the accuracy of the detection flags.

7.2. Law Enforcement

7.2.1. The USDA may refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP. ~~in accordance with 7 U.S.C § 2020(e)(8)(A) and USDA's regulation implementing that provision, 7 C.F.R. § 272.1(c)(1).~~

7.3. USDA SNAP Retailer Operations Center (ROC)

7.3.1. The USDA may refer fraud detection leads to the ROC where, during fraud detection analysis, a compromised EBT card or terminal ID may have been identified in accordance with 7 U.S.C § 2020(e)(8)(A) and USDA's regulation implementing that provision, 7 C.F.R. § 272.1(c)(1).

# 8. DATA MINIMIZATION AND RETENTION

8.1. Retention Period

8.1.1. Until a record schedule is approved, data will be retained only as long as necessary for purposes set forth in the SORN and this protocol, and in no case longer than 3 years per the SORN.

8.2. Automatic Deletion

8.2.1. Data shall be retained for no longer than three years, consistent with the USDA/FNS-15 SORN. An automated process will be implemented to delete data upon expiration of the retention period, except for records related to ongoing audits, investigations, or litigation.

8.3. Ongoing Cases

8.3.1. Data pertaining to ongoing audit, investigation, or potential litigation retained only as long as necessary, then deleted.

# 9. DATA SECURITY AND TECHNICAL REQUIREMENTS

9.1. Infrastructure and Location

9.1.1. Primary storage location: AWS GovCloud (US) region

9.1.2. Backup/disaster recovery: Secondary AWS region

9.1.3. No storage, processing, or backup outside GovCloud or federal secure environments

9.1.4. All infrastructure must meet or exceed FedRAMP High baseline standards

9.1.5. AWS Personnel Access: Data is encrypted such that AWS personnel cannot access unencrypted data. Encryption keys are managed exclusively by federal USDA personnel and are not accessible to AWS or third-party vendors.

9.2. Access Controls

9.2.1. Multi-factor authentication required for all access

9.2.2. Role-based access control (RBAC) with principle of least privilege

9.2.3. Access is limited to specifically designated USDA employees engaged to assist in determining whether the program is being conducted in accordance with the FNA.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender


**U.S. DEPARTMENT OF AGRICULTURE**

9.2.4. Access logging and audit trail maintenance (minimum period equal to data retention period, see Section V.E).

9.2.5. Quarterly access reviews by USDA

9.2.6. Immediate revocation of access upon employee termination or assignment change

9.3. Encryption Standards

9.3.1. Encrypted data at rest and in transit

9.3.2. Encryption keys managed solely by USDA federal personnel

9.3.3. No encryption keys held by commercial vendors

9.4. Data Segregation and Compartmentalization

9.4.1. SNAP data isolated in separate, dedicated AWS GovCloud environment

9.4.2. SNAP data not directly integrated with other USDA systems

9.4.3. Limiting access to individuals with specialized training and oversight

9.5. Data Transfer

9.5.1. All data transfers shall utilize secure tools that meet or exceed FedRAMP High baseline standards.

## 10. INCIDENT RESPONSE AND BREACH NOTIFICATION

10.1. Incident Response

10.1.1.Incident response procedures are aligned with FNS Handbook Chapter 10 security incident and breach notification requirements that USDA already follows internally. This protocol extends equivalent procedures to State notification.

10.2. Incident Definition

10.2.2. Unauthorized access, use, or disclosure of data

10.2.3. Security vulnerability or control failure affecting data

10.2.4. Data loss, corruption, or destruction

10.2.5. Encryption failure or key compromise

10.2.6. Failed access control or authentication mechanism

10.2.7. Any event that may reasonably be expected to compromise data security or confidentiality. ~~including any request for use of, access to, or disclosure of data outside the permitted circumstances set forth in Section 1.4~~

10.3. Incident Notification Timeline

10.3.1. Initial Notification within 12 hours

10.3.1.1.    Within 12 hours of discovery (by phone + email to State security/privacy contact and Director).

10.3.2. Preliminary Report within 24 hours

10.3.2.1.    Description of incident and timeline

10.3.2.2.    Data elements affected (specific fields and estimated number of records)

10.3.2.3.    Estimated number of individuals affected

10.3.2.4.    Preliminary assessment of whether unencrypted sensitive data may have been exposed

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



## U.S. DEPARTMENT OF AGRICULTURE

10.3.2.5.     Preliminary remedial actions taken

10.3.2.6.     Root cause analysis plan and timeline

10.3.3 Progress Reports and Incident Close-out

10.3.3.1     USDA shall provide supplemental progress updates to state agencies as material information becomes available, but in no event less frequently than every 14 days, including refinements to scope, impact, and remediation measures, until the Incident is resolved. Upon resolution, USDA shall provide a close-out report of the Incident.

10.3.3.1     USDA shall provide notice to affected individuals in compliance with all applicable federal breach response and notification requirements, including, but not limited to FISMA and OMB Memorandum M-17-12. Nothing in this protocol shall be construed to shift responsibility for individual breach notification to the state agency.

## APPENDIX A - SOURCES

- 7 U.S.C. §§ 2020(a)(3) and (e)(8).

- Privacy Impact Assessment: https://www.usda.gov/sites/default/files/documents/fns-snap-informationdatabase-pia.pdf

- SORN: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-systemof-records

- SNAP Act: https://www.law.cornell.edu/uscode/text/7/2020

- SNAP QC Handbook

- Executive Order 14243 (March 20, 2025) "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos: https://www.govinfo.gov/content/pkg/DCPD-202500382/pdf/DCPD-202500382.pdf

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

**U.S. DEPARTMENT OF AGRICULTURE**

**Supplemental Nutrition Assistance Program
Information SNAP Database**

### SNAP Eligibility Data Elements

The following elements should be included in the data sharing file from each State agency on all household members that are listed in the SNAP case. Please provide a data dictionary if one is available to reduce the burden to both the State agency and USDA.

**Case Number:** The case number is a unique identifier, typically 7 to 10 digits long, assigned to a household when they apply and/or are approved for SNAP.

**First, Middle, Last Names:** The full name of all household members.

**Known Alias:** Assumed or alternative name(s) used by any of the household members.

**Authorized Representative(s):** Provide any identified authorized representative for the household, and their corresponding information such as full name, means of verbal and written communication.

**Date of Birth:** The specific month, day and year the household member was born.

**Individual Recipient Identification Number:** The unique identifier assigned to that specific household member within the case by the State agency.

**Social Security Number:** The unique 9-digit identifier issued by the Social Security Administration and provided by the household member.

**Status on SNAP** *(recipient/individual level)***:** Identify if the household member in the case is actively receiving SNAP, disqualified, sanctioned, or excluded.

**Application and/or Recertification Date:** The date the household applied for SNAP (this can be the first application date, or most recent recertification date).

**Reporting Status:** Following initial certification, or recertification, households are determined to be a simplified or change reporting household. This data element should indicate the reporting status the household has been designated to be.

**Relationship:** The relationship identifies who all household group members are to one another and assists with determining mandatory group members. The data should reflect who each household member is to one another.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

***Absent Parent*** (as applicable)**:** This identifies the parent of a minor child who resides in a separate household.

***Citizenship and/or Immigration Status*:** This identifies if the individual is a U.S. citizen or immigrant.

***Residential Address*:** The address the household has provided as to where they reside.

***Mailing Address*:** The address the household has provided as to where they would like all correspondence sent to (if different than residential).

***Homeless Status*:** Please include if the household is identified as homeless.

***Phone Number(s)*:** The contact number(s) provided by the household as a means of contact.

***Email Address(es)*:** The email address(es) provided by the household as a means of contact.

***Unearned Income*:** The unearned income (RSDI, unemployment, child support, etc.) identifies the unearned income source, pay frequency, the household member receiving the pay, and the total amount of income budgeted to determine the SNAP allotment.

***Earned Income*:** The earned income identifies the earned income source, pay frequency, the household member receiving the pay, and the total amount of income budgeted to determine the SNAP allotment.

***Self-Employment Income*:** Self-employment should be identified as to what the self-employment is (type or business name), pay frequency, the household member who is self-employed, and the total amount of income budgeted as well as the amount of allowed expenses.

***Shelter Expenses*:** The shelter expenses should be identified as to shelter type (i.e. rent), and the budgeted dollar amount. Shelter expenses may be separated out as various expenses are taken into consideration for eligibility and those should be included if used in the SNAP allotment determination (i.e. telephone, heating, cooling). If the household is active with Section 8 which pays a portion of the rental expenses, please ensure that is included.

***Assets/Resources*:** Any known assets (i.e. bank accounts, boat, collector vehicle) or resources used to determine SNAP eligibility and must identify the asset type, amount and what household member the asset belongs to.

***Sanctions/Disqualifications*:** Identify any household members who are serving a sanction and/or disqualification that is impacting their eligibility to participate in SNAP. The sanction and/or disqualification type and any applicable time periods should be identified (i.e. IPV,

10/1/2024-9/30/2025). This field should correspond to the data provided in the status on SNAP if the household member is currently serving a disqualification, as well as any income field(s) that may pertain to the disqualified member due to income proration.

***SNAP EBT Card Number***: The unique set of digits on the household's issued SNAP EBT card that connects the case to the associated transactions.

EXHIBIT H

March 11 to 25 Correspondence Between Counsel

| | |
|---|---|
| **From:** | Liam O"Connor |
| **To:** | Kurland, Benjamin S (CIV); Becker, Tyler (CIV); Shapiro, Elizabeth (CIV) |
| **Cc:** | Sebastian Brady; Paul Stein; Ladov, Mark; Gaber, Sherief |
| **Subject:** | [EXTERNAL] RE: California v. USDA - Fourth Protocol |
| **Date:** | Wednesday, March 25, 2026 3:33:41 PM |
| **Attachments:** | 2026-03-25 Plaintiffs" Response to USDA"s March 10 Letter.pdf |

Dear Counsel,

Plaintiffs' response to USDA's March 10 correspondence is attached.

Thanks,
Liam

_____

**Liam E. O'Connor** | Deputy Attorney General

California Department of Justice | Government Law Section

455 Golden Gate Ave, 11th Fl., San Francisco, CA 94102

(415) 510-3915 | liam.oconnor@doj.ca.gov

---

**From:** Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>
**Sent:** Tuesday, March 24, 2026 1:17 PM
**To:** Liam O'Connor <Liam.OConnor@doj.ca.gov>; Sebastian Brady <Sebastian.Brady@doj.ca.gov>;
Paul Stein <Paul.Stein@doj.ca.gov>; Ladov, Mark <mark.ladov@ag.ny.gov>; Gaber, Sherief
<sherief.gaber@ilag.gov>
**Cc:** Becker, Tyler (CIV) <Tyler.Becker@usdoj.gov>; Shapiro, Elizabeth (CIV)
<Elizabeth.Shapiro@usdoj.gov>
**Subject:** RE: California v. USDA - Fourth Protocol

> **EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Hi Liam,

USDA responds:

The question asks a hypothetical.  USDA has answered this question time and again, and the Department's position has not changed.  Section 2020(e)(8)(A) does not provide USDA with authority to respond to a request from DHS for data for purpose(s) of civil immigration enforcement. At the same time, Section 2020(e)(15) requires the States to report directly to DHS whenever a State determines that any member of a SNAP household is present in the United States illegally; this requirement is not subject to Section 2020(e)(8)'s restrictions.  USDA will assist with enforcement of that obligation if

the States fail to comply.

Thanks,
Ben

Ben Kurland
Trial Attorney | Federal Programs Branch
202.598.7755

---

**From:** Liam O'Connor <Liam.OConnor@doj.ca.gov>
**Sent:** Tuesday, March 24, 2026 12:12 PM
**To:** Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>; Sebastian Brady <Sebastian.Brady@doj.ca.gov>; Paul Stein <Paul.Stein@doj.ca.gov>; Ladov, Mark <mark.ladov@ag.ny.gov>; Gaber, Sherief <sherief.gaber@ilag.gov>
**Cc:** Becker, Tyler (CIV) <Tyler.Becker@usdoj.gov>; Shapiro, Elizabeth (CIV) <Elizabeth.Shapiro@usdoj.gov>
**Subject:** [EXTERNAL] RE: California v. USDA - Fourth Protocol

Thanks, Ben.  Again, could USDA please answer the question we've repeatedly asked:

> How would USDA respond to an interagency request for the data from DHS or any DHS subagency, such as the request for Medicaid data that DHS/ICE have made of CMS, citing 8 U.S.C. § 1360 and 6 U.S.C. § 122?   Would USDA deny the request and inform DHS that USDA may not disclose the data pursuant to 7 U.S.C. § 2020(e)(8)?

If USDA is unable to answer this question by 5:00 pm ET today, Plaintiffs request an extension of the March 25 deadline for Plaintiffs to respond to USDA's March 10 letter to two business days after USDA provides an answer.

Thanks,
Liam

---

**From:** Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>
**Sent:** Monday, March 23, 2026 5:55 PM
**To:** Liam O'Connor <Liam.OConnor@doj.ca.gov>; Sebastian Brady <Sebastian.Brady@doj.ca.gov>; Paul Stein <Paul.Stein@doj.ca.gov>; Ladov, Mark <mark.ladov@ag.ny.gov>; Gaber, Sherief <sherief.gaber@ilag.gov>
**Cc:** Becker, Tyler (CIV) <Tyler.Becker@usdoj.gov>; Shapiro, Elizabeth (CIV) <Elizabeth.Shapiro@usdoj.gov>
**Subject:** RE: California v. USDA - Fourth Protocol

---

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Hi Liam,

In response to your additional clarifying questions, USDA confirms the follow:

1. While Section 2020(e)(8) does not permit wholesale data sharing for purposes of civil immigration enforcement, States have an obligation pursuant to Section 2020(e)(15) to provide information to DHS regarding household members present in the United States in violation of immigration laws, without regard to Section (e)(8)'s limitations.  As has been stated time and again, FNS confirms that it cannot use or disseminate the requested data to other agencies for purposes beyond what Section (e)(8) allows.  At the same time, FNS notes that the Court has treated Section 2020(e)(15) as a mandatory provision.  *See* ECF 106 at 16–17.  As such, FNS will ensure that States comply with their Section 2020(e)(15) obligations and will pursue appropriate relief with respect to States who are not compliant.

2. FNS will notify the States if prohibited access to the data occurs; prohibited requests will not be reported.  There is no obligation to do the latter, which is not a "breach" under any of the common standards governing such incident responses.  USDA has separately replied to Illinois regarding the DSA.

3. FNS will not reduce or eliminate any of the requested data elements.  The agency has explained why these data elements are necessary to fulfill its audit and inspection functions under Section 2020(a)(3) and respectfully notes that the Court has already rejected Plaintiffs' argument that USDA failed to properly minimize the data elements it seeks.  *See* ECF No. 116 at 19–20 (motion to expand PI arguing USDA failed to offer good reasons for data elements requested); ECF No. 134 at 18 (Court finding that USDA has adequately considered and explained its data request).

I hope the reiterated assurances on the scope of Section 2020(e)(8)(A) is sufficient to clear up the States' remaining concerns.

Thank you,
Ben

Ben Kurland
Trial Attorney | Federal Programs Branch
202.598.7755

3

**From:** Liam O'Connor <Liam.OConnor@doj.ca.gov>
**Sent:** Friday, March 20, 2026 10:19 AM
**To:** Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>; Sebastian Brady <Sebastian.Brady@doj.ca.gov>; Paul Stein <Paul.Stein@doj.ca.gov>; Ladov, Mark <mark.ladov@ag.ny.gov>; Gaber, Sherief <sherief.gaber@ilag.gov>
**Cc:** Becker, Tyler (CIV) <Tyler.Becker@usdoj.gov>; Shapiro, Elizabeth (CIV) <Elizabeth.Shapiro@usdoj.gov>
**Subject:** [EXTERNAL] RE: California v. USDA - Fourth Protocol

Hi Ben,

Thanks to USDA for the quick response and for agreeing to extend the response deadline to March 25.  We respond regarding each of the three points below, including because we still do not have clarity on USDA's position regarding Section 1.4.

On the first point, during our call, you agreed (1) that 7 U.S.C. § 2020(e)(8) prohibits SNAP data from being disclosed or used for purposes of investigating potential violations of immigration laws or enforcing immigration laws and (2) that 8 U.S.C. § 1373 itself does not grant USDA any authority to disclose any data.  Accordingly, on our call, we had requested that USDA clarify its position how it would respond to an interagency request for the data from DHS or any DHS subagency, such as the request for Medicaid data that DHS/ICE have made of CMS, citing 8 U.S.C. § 1360 and 6 U.S.C. § 122.  USDA's response does not answer that question.  Would USDA deny the request and inform DHS that USDA may not disclose the data pursuant to 7 U.S.C. § 2020(e)(8)?  If not, then USDA is not "commit[ting] to comply with Section 2020(e)(8)(A)," as you state in the conclusion of your email.  USDA should agree to a provision clarifying that, pursuant to 7 U.S.C. § 2020(e)(8), the data will not be disclosed or used for purposes of investigating potential violations of immigration laws or enforcing immigration laws.

On the second point, we were referring to our proposed section 10.2.7. which would provide the States with notice of "any request for use of, access to, or disclosure of data outside the permitted circumstances set forth in Section 1.4," which had incorporated 7 U.S.C. § 2020(e)(8).  This would include any request to access the data for purposes of investigating potential violations of immigration laws or enforcing immigration laws, because, as the parties agree, 7 U.S.C. § 2020(e)(8) does not permit SNAP data to be disclosed or used for such purposes.  For reference, we have filed a copy of Illinois' current data sharing agreement with USDA, within which USDA has agreed (1) that USDA may "use" Illinois SNAP data "only for . . . purposes" of "[m]easuring the accuracy of State of Illinois SNAP eligibility and benefit determinations as reported to FNS," and

(2) that "[i]nquiries" of Illinois' SNAP data "shall not be made by, or for, another agency, organization or individual without the prior knowledge and written consent of [Illinois' State agency]."  ECF No. 116-4 at 37.

We have been asking for clarity on USDA's position on these issues for months.  *See, e.g.*, Pls.' Dec. 8 Ltr. at 12-13; Pls.' Feb. 25 Ltr. at 2.  We would appreciate straightforward answers so the parties can attempt to identify and narrow the scope of issues in dispute.

The third point is related to the prior two.  With respect to immigration enforcement, in particular, USDA has not yet provided assurances that the data will be safeguarded from being redisclosed and used for unrelated purposes and without notice.  At the same time, the bulk checks that USDA claims to be performing with the SNAP Database—to identify recipients who are ineligible because they are potentially receiving benefits more than once, because they are potentially deceased, or because they do not have the requisite immigration status, *see* ECF Nos. 72-1, 89-1—do not require non-recipient data or street addresses.  Further, as described by the SORN, the SNAP Database also cannot be used to accurately determine and verify any individual household's income because that would require review of all the backup and verification documentation that state agencies must consider when making eligibility and benefit allotment determinations.  *See* 7 C.F.R. § 273.2(f).

We respectfully request a response by Monday, March 23, so the States may take that response into account when answering USDA's March 10 letter by USDA's March 25 deadline.

Thank you,
Liam

---

**From:** Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>
**Sent:** Wednesday, March 18, 2026 6:17 PM
**To:** Liam O'Connor <Liam.OConnor@doj.ca.gov>; Sebastian Brady <Sebastian.Brady@doj.ca.gov>; Paul Stein <Paul.Stein@doj.ca.gov>; Ladov, Mark <mark.ladov@ag.ny.gov>; Gaber, Sherief <sherief.gaber@ilag.gov>
**Cc:** Becker, Tyler (CIV) <Tyler.Becker@usdoj.gov>; Shapiro, Elizabeth (CIV) <Elizabeth.Shapiro@usdoj.gov>
**Subject:** RE: California v. USDA - Fourth Protocol

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Dear Liam

Thank you for the call today. I appreciate you crystalizing Plaintiffs' remaining concerns so that we can reach a swift resolution of this matter. I discussed your central concerns with USDA and can report the following regarding your three main issues:

- Regarding your concerns related to the sharing of immigration data with DHS, we believe the Fourth Proposed Protocol Section 1.4 speaks directly to that issue and incorporated exactly the language both the Court and Plaintiffs found sufficient to ameliorate Plaintiffs' concerns. In essence, USDA does not know what more it can do in terms of Section 1.4. Additionally, USDA explained in its March 10 Letter why it could not agree to Plaintiffs' specific suggestion in Section 1.4(iii). We would consider any specific suggestion you have to the existing Section 1.4 to clarify the commitment therein, but it is hard to see in the abstract what more we can provide.

- Regarding notice, we take your comment to address Section 10, Incident Breaches, in which USDA already commits to providing breach notifications. Again, USDA believes its current provision complies with its incident response obligations. If there are specific pieces of incident response you believe USDA has omitted, can you provide the written agreements that you are claiming USDA has agreed to in the past? But generally, a data breach does not occur, and therefore no notice is due, until data leaves USDA system in an unlawful manner.

- Finally, regarding the data elements, USDA believes that the data elements it has requested are narrowly tailored to address its auditing and investigation powers under the statute. To the extent Plaintiffs' concern regarding "non-recipient data" and "street address" is intertwined with the immigration concern mentioned above, USDA believes Section 1.4 directly speaks to the issue and hopes that the ability to resolve the first point will resolve this point. Additionally, USDA notes that this is information which the States currently provide to Snap Quality Control process. Finally, those specific data points are necessary to determine and verify household income and prevent benefits erroneously being issued.

Additionally, you raised the point that some States may have technical issues regarding their systems. We understand that such issues will be worked out promptly and directly

6

between the individual State and USDA.

Finally, we note that you have requested additional time to consider these clarifications. In the interest of reaching a good faith agreement, USDA will extend the deadline to respond to USDA to Wednesday, March 25. As noted above, we believe that USDA's commitment to comply with Section 2020(e)(8)(A), as it must, should ameliorate the Plaintiffs' concerns. Given this extension, we would propose extending the JSR deadline by a week to Monday, March 30.

Thank you,
Ben

Ben Kurland
Trial Attorney | Federal Programs Branch
202.598.7755

---

**From:** Liam O'Connor <Liam.OConnor@doj.ca.gov>
**Sent:** Wednesday, March 18, 2026 4:07 PM
**To:** Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>; Sebastian Brady <Sebastian.Brady@doj.ca.gov>; Paul Stein <Paul.Stein@doj.ca.gov>; Ladov, Mark <mark.ladov@ag.ny.gov>; Gaber, Sherief <sherief.gaber@ilag.gov>
**Cc:** Becker, Tyler (CIV) <Tyler.Becker@usdoj.gov>; Shapiro, Elizabeth (CIV) <Elizabeth.Shapiro@usdoj.gov>
**Subject:** [EXTERNAL] RE: California v. USDA - Fourth Protocol

Hi Ben,

Thanks for the productive conversation today and for agreeing to seek further clarity from USDA on the items we discussed. Given that any update from USDA will affect States' response to USDA's March 10 letter, would USDA be amenable to a short extension of the States' March 20 deadline to respond—to perhaps 7 days after we hear back from you/USDA? And because any proposed case schedule would be affected by our ongoing discussions, would USDA be amenable to another stipulation to continue the JSR deadline—perhaps by 14 days? To be clear, we have no interest in delay for delay's sake; we just want to make sure there is some time for the States to consider USDA's response (also, some of our team is traveling tomorrow and Friday, as previously mentioned).

Thanks,
Liam

---

**From:** Liam O'Connor
**Sent:** Tuesday, March 17, 2026 2:32 PM

7

**To:** Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>; Sebastian Brady <Sebastian.Brady@doj.ca.gov>; Paul Stein <Paul.Stein@doj.ca.gov>; Ladov, Mark <mark.ladov@ag.ny.gov>; Gaber, Sherief <sherief.gaber@ilag.gov>
**Cc:** Becker, Tyler (CIV) <Tyler.Becker@usdoj.gov>; Shapiro, Elizabeth (CIV) <Elizabeth.Shapiro@usdoj.gov>
**Subject:** RE: California v. USDA - Fourth Protocol

Thanks, Ben.  Could we shoot for 1:30 ET?  We promise to be efficient.  I'll send a calendar invite.

Best,
Liam

---

**From:** Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>
**Sent:** Tuesday, March 17, 2026 1:44 PM
**To:** Liam O'Connor <Liam.OConnor@doj.ca.gov>; Sebastian Brady <Sebastian.Brady@doj.ca.gov>; Paul Stein <Paul.Stein@doj.ca.gov>; Ladov, Mark <mark.ladov@ag.ny.gov>; Gaber, Sherief <sherief.gaber@ilag.gov>
**Cc:** Becker, Tyler (CIV) <Tyler.Becker@usdoj.gov>; Shapiro, Elizabeth (CIV) <Elizabeth.Shapiro@usdoj.gov>
**Subject:** Re: California v. USDA - Fourth Protocol

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Hi Liam,

Happy to discuss tomorrow, but it will just be me. I can make either window work. Slight preference for 1ET, because I'm usually commenting around 5:30, but I have a hard stop at 2.

Thanks,
Ben

Ben Kurland
Trial Attorney | Federal Programs Branch
202.598.7755

---

**From:** Liam O'Connor <Liam.OConnor@doj.ca.gov>
**Sent:** Tuesday, March 17, 2026 3:37 PM
**To:** Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>; Sebastian Brady <Sebastian.Brady@doj.ca.gov>; Paul Stein <Paul.Stein@doj.ca.gov>; Ladov, Mark <mark.ladov@ag.ny.gov>; Gaber, Sherief <sherief.gaber@ilag.gov>

**Cc:** Becker, Tyler (CIV) <Tyler.Becker@usdoj.gov>; Shapiro, Elizabeth (CIV) <Elizabeth.Shapiro@usdoj.gov>
**Subject:** [EXTERNAL] RE: California v. USDA - Fourth Protocol

Hi Ben,

Thanks for providing copies of USDA's response.  Plaintiffs are still reviewing USDA's proposal and discussing with their respective state agencies.  But given Monday's deadline to submit a JSR regarding the case schedule and that some of our team is traveling on Thursday and Friday of this week, we were hoping you might be available to touch base tomorrow to discuss USDA's response and how it affects our forthcoming JSR regarding the case schedule.  Would you be available to meet during either of the following windows: 1-2 ET or 4-5:30 ET?

Thanks,
Liam

---

**From:** Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>
**Sent:** Wednesday, March 11, 2026 11:14 AM
**To:** Sebastian Brady <Sebastian.Brady@doj.ca.gov>; Liam O'Connor <Liam.OConnor@doj.ca.gov>; Paul Stein <Paul.Stein@doj.ca.gov>; Ladov, Mark <mark.ladov@ag.ny.gov>; Gaber, Sherief <sherief.gaber@ilag.gov>
**Cc:** Becker, Tyler (CIV) <Tyler.Becker@usdoj.gov>; Shapiro, Elizabeth (CIV) <Elizabeth.Shapiro@usdoj.gov>
**Subject:** California v. USDA - Fourth Protocol

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Dear Counsel,

As you are likely already aware, FNS issued its Fourth Proposed Protocol yesterday and sent the attached directly to the relevant State Agencies. I am attaching the version that went to California as a courtesy, but all the letters are substantively the same.

Please let us know if you have any questions.

Thank you,
Ben

**Benjamin S. Kurland**
Trial Attorney
U.S. Department of Justice

Civil Division, Federal Programs Branch
O 202.353.0533 | M 202.598.7755
ben.kurland@usdoj.gov

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

EXHIBIT I

Plaintiff States' March 25 Letter

*Via E-mail*
Elizabeth J. Shapiro
Tyler Becker
Benjamin S. Kurland
ben.kurland@usdoj.gov
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005

*Counsel for U.S. Department of Agriculture and Secretary of Agriculture Brooke L. Rollins*

RE:  Response to March 10, 2026 Letter to Plaintiff States from Shiela Corley, Chief of Staff, Food, Nutrition, and Consumer Services, U.S. Department of Agriculture

Dear Counsel:

We write on behalf of Plaintiffs in *State of California v. USDA*, No. 3:25-cv-06310 (N.D. Cal.).  This letter responds to the letter and further revised proposed protocol that USDA/FNS sent to Plaintiff States on March 10, 2026.

In our February 25 letter and proposed protocol, we included provisions to ensure compliance with 7 U.S.C. § 2020(e)(8), and we requested the opportunity to meet and confer to try to resolve any remaining disagreements.  *See* Pls.' Feb. 25 Ltr. at 1.  Unfortunately, USDA rejected each of those provisions and stated that its latest letter is its "final attempt to settle this matter by agreement," *see* USDA's Mar. 10 Ltr. at 1, ending the parties' efforts to reach a protocol "agreed to by [each] State agency and [USDA]," 7 U.S.C. § 2020(a)(3)(B)(i), for a second time.

Despite two preliminary injunctions on this issue, USDA's revisions to the protocol reflect a continued refusal to commit to the data use and disclosure restrictions of 7 U.S.C. § 2020(e)(8).  In particular, USDA has struck Plaintiffs' proposed revision to Section 1.4 to clarify that USDA and FNS (and any person or entity who receives Plaintiffs' data from USDA and FNS) may not use or disclose Plaintiffs' data for purposes of enforcing immigration laws.  USDA's Mar. 10 Protocol Redline § 1.4.  Additionally, USDA's proposed protocol now asserts the unilateral right to use and disclose Plaintiffs' data "as specified in . . . any . . . applicable law," *id.*, while simultaneously refusing to provide Plaintiffs with notice when it does so, *see id.* §§ 4.4, 10.2.7.  Indeed, when Plaintiffs' counsel, seeking clarification on USDA's position, asked USDA's counsel to agree that USDA "would not disclose the data in response to an interagency request for the data from [the Department of Homeland Security (DHS)] or any DHS subagency, such as the request for Medicaid data that DHS/ICE have made of [the Centers for Medicare & Medicaid Services], citing 8 U.S.C. § 1360 and 6 U.S.C. § 122," *see* Pls.' Mar.

1

20 Email, USDA sidestepped the question and appeared to claim a newfound right to pursue data sharing with DHS and its subagencies under the SNAP Act, *see* USDA's Mar. 24 Email.

As explained in Plaintiffs' February 25 letter, the parties must have a meeting of the minds that 7 U.S.C. § 2020(e)(8) prohibits USDA and FNS (and any person or entity to whom the data is disclosed) from sharing Plaintiffs' data with DHS and its subagencies for the purpose of enforcing immigration laws.  USDA has yet to provide any coherent rationale why it cannot agree to such a provision in the protocol.

USDA initially claimed in its March 10 letter that a provision "affirmatively precluding any information sharing regarding immigration status may run afoul of 8 U.S.C. § 1373." USDA's Mar. 10 Ltr. at 3.  But, as USDA's counsel subsequently conceded during a meet and confer with Plaintiffs' counsel, 8 U.S.C. § 1373 itself does not *grant* DHS any authority to request, nor USDA any authority to share, Plaintiffs' data.  *See* Pls.' Mar. 20 Email. Section 1373 is entirely inapplicable.[1]

This is especially true where, as here, another federal statute *prohibits* the relevant data disclosure.  *See* Relationship Between Illegal Immigration Reform and Immigrant Responsibility Act of 1996 and Statutory Requirement for Confidentiality of Census Information, 23 Op. O.L.C. Supp. 5 (1999).[2]  In 7 U.S.C. § 2020(e)(8)(A), Congress prohibited the use and disclosure of SNAP applicant data for any purpose other than the administration of federal benefits programs. When Congress wanted to create exceptions to that rule, it did so expressly in the subparagraphs that followed.  *See, e.g.*, 7 U.S.C. § 2020(e)(8)(C), (E) & 7 C.F.R. § 272.1(c)(1)(vi), (vii) (narrow exceptions to disclose data to law enforcement officials for purposes of enforcing the SNAP Act or to apprehend specified criminal suspects); 7 U.S.C. § 2020(e)(8)(F), (e)(15) & 7 C.F.R. § 273.4(b) (narrow exception for a state agency to make a report to U.S. Citizenship and Immigration Services upon a determination by the state agency that a household member is ineligible for benefits because they are present in the United States in violation of the Immigration and Nationality Act).  There is no exception for recipients of Plaintiffs' SNAP data to share it with DHS for immigration enforcement purposes.

---

[1] Moreover, even if 8 U.S.C. § 1373 were somehow applicable, it could apply only to a narrow category of an individual's data: "information strictly pertaining to immigration status (i.e. what one's immigration status is)" and not "information like . . . addresses.'" *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019) (citation omitted).  Therefore, 8 U.S.C. § 1373 could never justify USDA's wholesale rejection of Plaintiffs' proposed provision to prevent sensitive data—including street addresses—from being used or disclosed for immigration enforcement purposes.

[2] Available at http://www.justice.gov/sites/default/files/olc/opinions/attachments/2014/11/10/1999-05-18-census-confidentiality.pdf.

8 U.S.C. § 1360 and 6 U.S.C. § 122 also provide USDA with no authority to share Plaintiffs' data with DHS and its subagencies.  The SNAP Act's carefully crafted scheme that specifically governs the use and disclosure of SNAP applicant data controls over these statutory provisions that generally permit data sharing between federal agencies; otherwise, the SNAP Act's restrictions on data use and disclosure would be rendered meaningless.  *See* ECF No. 134 at 15 (USDA may not "serv[e] as a conduit between Plaintiff States and prohibited entities").  Congress mandated that state agencies, not the federal government, would collect and safeguard sensitive data about SNAP applicants; USDA cannot bypass these statutory protections by asserting a vague right to share data with other federal agencies pursuant to "applicable laws" absent any effort to explain what those laws are or how they govern data sharing.

USDA's counsel also suggested that USDA cannot agree to a provision clarifying that USDA will not use or disclose the data "for purposes of investigating potential violations of immigration laws or enforcing immigration laws," *see* Pls.' Mar. 20 Email, because "*States* have an obligation pursuant to [7 U.S.C. § 2020(e)(15)] to provide information to DHS regarding household members present in the United States in violation of immigration laws, without regard to Section (e)(8)'s limitations," *see* USDA's Mar. 23 Email (emphasis added).  But a protocol clarifying the restrictions on *USDA's* use and disclosure of States' data in no way interferes with *States'* ability to disclose the data to pursuant to 7 U.S.C. § 2020(e)(15).  Thus, just like 8 U.S.C. § 1373, 7 U.S.C. § 2020(e)(15) is entirely inapplicable to a protocol governing use and disclosure of the data by USDA and FNS (and any other third party to whom they disclose the data).

Relatedly, USDA rejected Plaintiffs' proposed revision to exclude residential address information from the list of required data elements.  But street addresses have little to no value for program integrity purposes, including because a large portion of SNAP recipients (who have net incomes below the poverty line) often have unstable housing situations and most recipients are not even required to report changes in their address on a regular basis under simplified reporting procedures.  *See, e.g.*, ECF No. 116-3 ¶ 20.  Moreover, USDA continues to demand sensitive data, like street addresses, on *non-recipients*, including applicants who withdrew their applications or whose applications were *denied* and household members who *never even applied* for benefits for themselves.  Given that these individuals never received benefits, this sensitive data is not necessary to USDA's purported goal of identifying ineligible *recipients* who are receiving benefits and therefore contributing to purportedly widespread "fraud, waste, and abuse."  The fact that state agencies provide similar PII for a small sample set of households during formal quality control audits offers no precedent for USDA's current efforts to amass data on millions of Americans, particularly given the agency's refusal to safeguard this sensitive information from misuse.[3]  Section 2020(a)(3) requires that the protocol be "agreed to by the State agency," and USDA cannot unilaterally reject State agencies' efforts to ensure the protocol

---

[3] Further, QC audits require review of income verification documents and other materials that are necessary for effective auditing but excluded from the SNAP Information Database.

3

satisfies reasonable and legally required data protection requirements—including when the data requested by USDA is not aligned with the stated purpose for the request.

Of course, the Vice President has already confirmed why the Administration wants street addresses, including for non-recipients who never received a dollar of benefits: to fuel the Administration's mass deportations. Associated Press, *JD Vance delivers remarks in Minneapolis*, 7:20-8:10 (Jan. 22, 2026), https://www.youtube.com/live/xHOWRMk-MFU?t=439s (calling on State officials to share the "last address" of an undocumented individual "according to a SNAP application" to give immigration authorities "insight to where this person is today"). And apparently for this reason, USDA has rejected Plaintiffs' modest revisions, which would have permitted USDA to perform any legitimate program integrity functions while also safeguarding applicant data as required by 7 U.S.C. § 2020(e)(8).

To be clear, Plaintiffs would welcome the opportunity to resume the parties' discussions to reach an agreed-upon protocol as required by 7 U.S.C. § 2020(a)(3)(B)(i). But Plaintiffs cannot agree to any proposed protocol that would permit USDA to amass troves of Plaintiffs' data and allow it to be used for immigration enforcement and other unauthorized purposes unrelated to the administration of SNAP or other federal benefits programs.[4]

Dated: March 25, 2026

Rob Bonta
Attorney General of California

*/s/ Liam E. O'Connor*
Liam E. O'Connor

Paul Stein
Robin Goldfaden
Supervising Deputy Attorneys General
Andrew Z. Edelstein
Anna Rich
Jane Reilley
Sebastian Brady
William Bellamy
Maria F. Buxton
Liam E. O'Connor
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3915
Liam.OConnor@doj.ca.gov
*Attorneys for Plaintiff State of California*

---

[4] As USDA's counsel confirmed during the March 18 meet and confer with Plaintiffs' counsel, the Court's February 26, 2026 preliminary injunction order prohibits USDA from enforcing its renewed data demands. *See* ECF No. 134. If USDA nevertheless seeks to disallow Plaintiffs' funding based on purported noncompliance with its renewed data demands, Plaintiffs will immediately seek an order enforcing the injunction.

Letitia James
Attorney General of New York

*/s/ Mark Ladov*
Mark Ladov
Special Counsel
Julie Dona
Special Counsel
28 Liberty St.
New York, NY 10005
(212) 416-8240
mark.ladov@ag.ny.gov
*Attorneys for Plaintiff State of New York*

Kristin Mayes
Attorney General of Arizona

*/s/ Luci D. Davis*
Luci D. Davis (AZ No. 035347)
Hayleigh S. Crawford (AZ No. 032326)
2005 N. Central Ave. Phoenix, AZ 85004
(602) 542-3333
Luci.Davis@azag.gov
Hayleigh.Crawford@azag.gov
ACL@azag.gov
*Attorneys for Plaintiff State of Arizona*

Kwame Raoul
Attorney General of Illinois

*/s/ Sherief Gaber*
Harpreet K. Khera
Bureau Chief, Special Litigation
Sherief Gaber
Assistant Attorney General
115 S. LaSalle St., 35th Flr.
Chicago, Illinois 60603
(773) 590-7127
sherief.gaber@ilag.gov
*Attorneys for Plaintiff State of Illinois*

Philip J. Weiser
Attorney General of Colorado

*/s/ David Moskowitz*
David Moskowitz
Deputy Solicitor General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6000
david.moskowitz@coag.gov
*Attorneys for Plaintiff State of Colorado*

5

William Tong
Attorney General of Connecticut

*/s/ Janelle R. Medeiros*
Janelle R. Medeiros
Special Counsel for Civil Rights
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Janelle.Medeiros@ct.gov
*Attorneys for Plaintiff State of Connecticut*


Brian L. Schwalb
Attorney General for the District of Columbia

*/s/ Nicole S. Hill*
Nicole S. Hill
Assistant Attorney General
Office of the Attorney General for the District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov
*Attorneys for Plaintiff District of Columbia*


Office of The Governor *ex rel*. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky

*/s/ S. Travis Mayo*
S. Travis Mayo
General Counsel
Taylor Payne
Chief Deputy General Counsel
Laura C. Tipton
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov
*Attorneys for Plaintiff Kentucky Governors' Office*

Kathleen Jennings
Attorney General of Delaware

*/s/ Vanessa L. Kassab*
Ian R. Liston
Director of Impact Litigation
Vanessa L. Kassab
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*


Anne E. Lopez
Attorney General of Hawai'i

*/s/ Kaliko'onālani D. Fernandes*
David D. Day
Special Assistant to the Attorney General
Kaliko'onālani D. Fernandes
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorneys for Plaintiff State of Hawai'i*


Aaron M. Frey
Attorney General of Maine

*/s/ Brendan Kreckel*
Brendan Kreckel
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 0433-0006
Tel.:  207-626-8800
Fax:  207-287-3145
brendan.kreckel@maine.gov
*Attorneys for Plaintiff State of Maine*

6

Anthony G. Brown
Attorney General of Maryland

/s/ James C. Luh
James C. Luh
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

Andrea Joy Campbell
Attorney General of Massachusetts

/s/ Katherine Dirks
Katherine Dirks
Chief State Trial Counsel
Cassandra Thomson
Assistant Attorney General
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
cassandra.thomson@mass.gov
*Attorneys for Plaintiff Commonwealth of Massachusetts*

Dana Nessel
Attorney General of Michigan

/s/ Neil Giovanatti
Neil Giovanatti
Bryan Beach
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov
beachb@michigan.gov
*Attorneys for Plaintiff State of Michigan*

Keith Ellison
Attorney General of Minnesota

/s/ Joseph R. Richie
Joseph R. Richie
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

Jennifer Davenport
Attorney General of New Jersey

/s/ Kashif T. Chand
Kashif T. Chand (NJ Bar No. 016752008)
Assistant Attorney General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
kashif.chand@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

Raúl Torrez
Attorney General of the State of New Mexico

/s/ Steven Prefrement
Steven Perfrement
Senior Litigation Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
SPerfrement@nmdoj.gov
505-601-7727
*Attorneys for the State of New Mexico*

7

Dan Rayfield
Attorney General of Oregon

*/s/ Scott P. Kennedy*
Scott P. Kennedy
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 453-9050
Fax (971) 673-5000
Scott.Kennedy@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*

Josh Shapiro, in his official capacity as
Governor of the Commonwealth of
Pennsylvania

*/s/ Jacob B. Boyer*
Jennifer Selber
General Counsel
Jacob B. Boyer
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov
*Counsel for Governor Josh Shapiro*

Peter F. Neronha
Attorney General of Rhode Island

/s/ *Madeline R. Becker*
Madeline R. Becker (RI Bar No. 10034)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2151
mbecker@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

Nicholas W. Brown
Attorney General of Washington

*/s/ Jennifer K. Chung*
Jennifer K. Chung, WSBA #51583
William Mcginty, WSBA #41868
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
jennifer.chung@atg.wa.gov
william.mcginty@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

Joshua L. Kaul
Attorney General of Wisconsin

*/s/ Karla Z. Keckhaver*
Karla Z. Keckhaver
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-6365
karla.keckhaver@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*

EXHIBIT J

FNS's March 27 Letter and Amended Fourth Proposed Protocol

**U.S. DEPARTMENT OF AGRICULTURE**

March 27, 2026

Governor Gavin Newsom
1021 O Street, Suite 9000
Sacramento, California 95814

Dear Governor Newsom,

Enclosed please find a revised copy of the Fourth Protocol originally transmitted to your State on March 10, 2026. Counsel for the 21 States and the District of Columbia requested that we clarify a section of the protocol. This protocol adheres to the text of the Food and Nutrition Act, including 7 U.S.C. § 2020(e)(8)(A), and we have clarified what that section does not authorize in new section 1.4.(iii).

Sincerely,

Chief of Staff
Food, Nutrition, and Consumer Services
U.S. Department of Agriculture

Enclosure

cc:    Maria Buxton, Deputy Attorney General

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an equal opportunity provider, employer, and lender.

**USDA**

**U.S. DEPARTMENT OF AGRICULTURE**

**Supplemental Nutrition Assistance Program (SNAP) Information Database
Fraud, Waste and Abuse Detection Protocol**

**1.  OVERVIEW**

1.1. U.S. Department of Agriculture (USDA) and the Food and Nutrition Service (FNS) will use the Supplemental Nutrition Assistance Program (SNAP) recipient data to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying duplicate enrollments for elimination, and performing additional eligibility and program integrity checks specified herein.

1.2. This protocol establishes a framework for State SNAP agencies to share data with the USDA/FNS for detection of fraud, waste, and abuse and program integrity purposes.

1.3. USDA represents that the protocol balances federal data access requirements under Executive Order 14243 and the Food and Nutrition Act of 2008 (FNA, also referred to here as the "SNAP Act") with privacy protections, minimizes unnecessary data collection, and incorporates security standards while maintaining public trust and compliance with applicable law.

1.4. Notwithstanding any other provision of this protocol, or any System of Record Notice, USDA and FNS:

a)  Shall not use or disclose data received under this protocol except as specified in U.S.C. §§ 2020(a)(3) and (e)(8) and 7 C.F.R. § 272.1(c)(1) and (2), or any other applicable law.  For the avoidance of doubt, this means that USDA and FNS (and any person or entity to whom the data is disclosed) shall not:

   (i)      use the data, except for administration or enforcement of the provisions of Chapter 51 of Title 7 of the U.S. Code, regulations issued pursuant to that chapter, Federal assistance programs, or federally-assisted State programs; and

   (ii)     disclose the data, except to the disclosure of such information to persons directly connected with the administration or enforcement of the provisions of this chapter, regulations issued pursuant to this chapter, Federal assistance programs, or federally-assisted State programs.

   (iii)    Section 2020(e)(8)(A) does not provide USDA with authority to respond to a request from DHS for data for purpose(s) of civil immigration enforcement.

1.5. USDA acknowledges that the data shared under this Protocol is subject to existing confidentiality, privacy, and information security laws and regulations. Notwithstanding the foregoing, this provision does not create any new rights or liabilities or waive any applicable immunities.

**2.  FRAMEWORK AND AUTHORITY**

2.1. Authority

   2.1.1. Executive Order 14243 (March 20, 2025): "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos" directs agency heads to "take all necessary steps, to the maximum extent consistent with law," to ensure federal government has "unfettered access to comprehensive data" from state programs receiving federal funding, including data maintained in third-party databases.

   2.1.2. 7 U.S.C. § 2020(a)(3) that requires each State agency shall keep records as may be necessary to determine whether the program is being conducted in compliance with this chapter, and all records shall be made available for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



## U.S. DEPARTMENT OF AGRICULTURE

2.1.3. 7 CFR 272 stipulates use or disclosure of information obtained from SNAP applicant or recipient households shall be restricted to persons directly connected with the administration or enforcement of the provisions of the FNA or regulations, other Federal assistance programs, federally-assisted State programs providing assistance on a means-tested basis to low-income individuals, or general assistance programs which are subject to joint processing requirements.

2.2. Prohibited Purposes

2.2.1. USDA shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals (*i.e.*, the collection of data elements spelled out in the Privacy Impact Assessment).

## 3. DATA CATEGORIES

3.1. Data Definition

3.1.1. All data obtained by States or their vendors in administering SNAP or that otherwise may be necessary to determine whether the program is being conducted in accordance with the FNA or regulations issued under the FNA, in accordance with Attachment A of this protocol.

3.1.2. Data derived from third-party sources (employment verification databases, financial institution records, property records) that States use for verification but are not part of applicant-reported information are excluded.

## 4. LIMITED ACCESS

4.1. The SNAP Information Database and all data collected therein is accessed and

used ONLY by the employees of the USDA who are:

4.1.1. Designated by the Chief of Staff at Food, Nutrition, Consumer Services (FNCS)

4.1.2. Trained in SNAP Act, Privacy Act, and this protocol

4.1.3. In compliance with all information security annual recertifications

4.2. Except to the extent permitted by law, no access to, or disclosures of data from, the SNAP Information Database may be provided to:

4.2.1. Other USDA agencies (APHIS, ERS, NASS, etc.)

4.2.2. Divisions within FNS without an explicit need-to-know

4.2.3. Any other federal agency

4.2.4. Any FOIA, administrative subpoena or like external requester

4.3. Notwithstanding section 4.1, this protocol does not limit access to the SNAP Information Database and all data contained therein by USDA's Office of the Inspector General as authorized by the Inspector General's Act, 5 U.S.C. 401-424.

## 5. SYSTEM OF RECORDS NOTICE (SORN) AND PRIVACY IMPACT ASSESSMENT (PIA)

5.1. SORN

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



## U.S. DEPARTMENT OF AGRICULTURE

The applicable SORN for this protocol is USDA/FNS-15 "National Supplemental Nutrition Assistance Program (SNAP) Information Database," 90 FR 26521.

The SORN location can be found here: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system-of-records

For the avoidance of doubt, this protocol controls notwithstanding any provisions of the applicable SORN.

5.2. Privacy Impact Assessment (PIA)

The applicable Privacy Impact Assessment for the SNAP Information Database is version 1.1 created February 12, 2025, can be found here: https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

For the avoidance of doubt, this protocol controls notwithstanding any provision of the PIA.


## 6. FRAUD, WASTE, AND ABUSE DETECTION FRAMEWORK

6.1. Core Fraud Detection Functions

6.1.1. USDA will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program that focuses on:

- Identity verification
- Income and eligibility verification
- Immigration status
- Verification against disqualified recipients

6.2. Enhanced Fraud, Waste, and Abuse Detection Techniques

6.2.1. In addition to the core fraud detection functions, USDA will employ additional techniques including, but not limited to:

- Intrastate and interstate duplicate detection
- Deceased individuals' detection
- Synthetic identity patterns (new SSNs with inconsistent biographical data)
- Geographic anomalies

6.2.2. New data mining techniques will be limited to data anomalies with a direct nexus to SNAP.


## 7. DATA OUTPUT

7.1. States

7.1.1. USDA will provide flagged data to State agencies for review, including the specific data elements flagged. States are encouraged to verify the accuracy of fraud detection flags and provide feedback to USDA to refine detection logic and reduce false positives. Collaborative processes will be established to ensure accurate identification of fraud and appropriate corrective actions. No presumptive results will be made public by FNS until 30 days from the initial date the USDA provided flagged data; during that 30 days States can provide additional information related to the accuracy of the detection flags.

 **U.S. DEPARTMENT OF AGRICULTURE**

7.2. <u>Law Enforcement</u>

    7.2.1. The USDA may refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP.

7.3. USDA SNAP Retailer Operations Center (ROC)

    7.3.1. The USDA may refer fraud detection leads to the ROC where, during fraud detection analysis, a compromised EBT card or terminal ID may have been identified in accordance 7 U.S.C § 2020(e)(8)(A) and USDA's regulation implementing that provision, 7 C.F.R. § 272.1(c)(1).

## 8. DATA MINIMIZATION AND RETENTION

8.1. <u>Retention Period</u>

    8.1.1. Until a record schedule is approved, data will be retained only as long as necessary for purposes set forth in the SORN and this protocol, and in no case longer than 3 years per the SORN.

8.2. <u>Automatic Deletion</u>

    8.2.1. Data shall be retained for no longer than three years, consistent with the USDA/FNS-15 SORN. An automated process will be implemented to delete data upon expiration of the retention period, except for records related to ongoing audits, investigations, or litigation.

8.3. <u>Ongoing Cases</u>

    8.3.1. Data pertaining to ongoing audit, investigation, or potential litigation retained only as long as necessary, then deleted.

## 9. DATA SECURITY AND TECHNICAL REQUIREMENTS

9.1. <u>Infrastructure and Location</u>

    9.1.1. Primary storage location: AWS GovCloud (US) region

    9.1.2. Backup/disaster recovery: Secondary AWS region

    9.1.3. No storage, processing, or backup outside GovCloud or federal secure environments

    9.1.4. All infrastructure must meet or exceed FedRAMP Moderate baseline standards

    9.1.5. AWS Personnel Access: Data is encrypted such that AWS personnel cannot access unencrypted data. Encryption keys are managed exclusively by federal USDA personnel and not accessible to AWS or third-party vendors.

    9.1.6. Servers that host the database are stored in a USDA FedRAMP authorized data center with strict physical access control procedures in place to prevent unauthorized access.

9.2. <u>Access Controls</u>

    9.2.1. Multi-factor authentication required for all access

    9.2.2. Role-based access control (RBAC) with principle of least privilege

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

9.2.3. Access limited to specifically designated FNS Program Integrity Division employees

9.2.4. Access logging and audit trail maintenance (minimum period equal to data retention period, see Section V.E).

9.2.5. Quarterly access reviews by USDA

9.2.6. Immediate revocation of access upon employee termination or assignment change

9.3. Encryption Standards

9.3.1. Encrypted data at rest and in transit

9.3.2. Encryption keys managed solely by USDA federal personnel

9.3.3. No encryption keys held by commercial vendors

9.4. Data Segregation and Compartmentalization

9.4.1. SNAP data isolated in separate, dedicated AWS GovCloud environment

9.4.2. SNAP data not directly integrated with other USDA systems

9.4.3. Limiting access to individuals with specialized training and oversight

9.5. Data Transfer

9.5.1. All data transfers shall utilize secure tools that meet or exceed FedRAMP Moderate baseline standards.

## 10. INCIDENT RESPONSE AND BREACH NOTIFICATION

10.1. Incident Response

10.1.1. Incident response procedures are aligned with FNS Handbook Chapter 10 security incident and breach notification requirements that USDA already follows internally. This protocol extends equivalent procedures to State notification.

10.2. Incident Definition

10.1.2. Unauthorized access, use, or disclosure of data

10.1.3. Security vulnerability or control failure affecting data

10.1.4. Data loss, corruption, or destruction

10.1.5. Encryption failure or key compromise

10.1.6. Failed access control or authentication mechanism

10.1.7. Any event that may reasonably be expected to compromise data security or confidentiality

10.3. Incident Notification Timeline

10.3.1. Initial Notification within 12 hours

10.3.1.1. Within 12 hours of discovery (by phone + email to State security/privacy contact and Director).

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

10.3.2.   Preliminary Report within 24 hours

   10.3.2.1.      Description of incident and timeline

   10.3.2.2.      Data elements affected (specific fields and estimated number of records)

   10.3.2.3.      Estimated number of individuals affected

   10.3.2.4.      Preliminary assessment of whether unencrypted sensitive data may have been exposed.

   10.3.2.5.      Preliminary remedial actions taken

   10.3.2.6.      Root cause analysis plan and timeline

10.3.3   Progress Reports and Incident Close-out

   10.3.3.1      USDA shall provide notice to affected individuals in compliance with all applicable federal breach response and notification requirements. Nothing in this protocol shall be construed to shift responsibility for individual breach notification to the state agency.


## APPENDIX A – SOURCES

- 7 U.S.C. §§ 2020(a)(3) and (e)(8)
- Privacy Impact Assessment: https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf
- SORN: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system- of-records
- SNAP Act: https://www.law.cornell.edu/uscode/text/7/2020
- SNAP QC Handbook
- Executive Order 14243 (March 20, 2025) "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos: https://www.govinfo.gov/content/pkg/DCPD-202500382/pdf/DCPD-202500382.pdf

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender


**U.S. DEPARTMENT OF AGRICULTURE**

**Supplemental Nutrition Assistance Program (SNAP) Information Database**
**Fraud, Waste and Abuse Detection Protocol**

## 1. OVERVIEW

1.1. U.S. Department of Agriculture (USDA) and the Food and Nutrition Service (FNS) will use the Supplemental Nutrition Assistance Program (SNAP) recipient data to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying duplicate enrollments for elimination, and performing additional eligibility and program integrity checks specified herein.

1.2. This protocol establishes a framework for State SNAP agencies to share data with the USDA/FNS for detection of fraud, waste, and abuse and program integrity purposes.

1.3. USDA represents that tThe protocol balances federal data access requirements under Executive Order 14243 and the Food and Nutrition Act of 2008 (FNA, also referred to here as the "SNAP Act") with privacy protections, minimizes unnecessary data collection, and incorporates security standards while maintaining public trust and compliance with applicable law.

1.4. Notwithstanding any other provision of this protocol, or any System of Record Notice, USDA and FNS: (a) shall not use or disclose data received under this protocol except as specified in 7 U.S.C. §§ 2020(a)(3) and (e)(8) and 7 C.F.R. § 272.1(c)(1) and (2), or any other applicable law.  For the avoidance of doubt, this means that USDA and FNS (and any person or entity to whom the data is disclosed) shall not: that includes the specific requirements in 7 U.S.C § 2020(e)(8)(A), which provides that State Plans of Operation must include safeguards protecting information obtained from applicant households that shall permit

(i) use the data, except for administration or enforcement of the provisions of Chapter 51 of Title 7 of the U.S. Code, regulations issued pursuant to that chapter, Federal assistance programs, or federally-assisted State programs; and

(ii) disclose the data, except to the disclosure of such information to persons directly connected with the administration or enforcement of the provisions of this chapter, regulations issued pursuant to this chapter, Federal assistance programs, or federally-assisted State programs. and only so that such persons can subsequently use the data for such administration and enforcement; and

(iii) use or disclose data for purposes of investigating potential violations of civil immigration laws or enforcing civil immigration laws, including but not limited to in response to a request by the Department of Homeland Security or subagency thereof.  Section 2020(e)(8)(A) does not provide USDA with authority to respond to a request from DHS for data for purpose(s) of civil immigration enforcement.

1.5   USDA  acknowledges that the data shared under this Protocol is subject to federal and state existing confidentiality, privacy, and information security laws and regulations. Unauthorized access to, use of, or disclosure of such data, or failure to protect such data in accordance with applicable law, may subject the responsible party and, where applicable, individual users to civil or criminal penalties under federal or state law.  Notwithstanding the foregoing, this provision does not create any new rights or liabilities or waive any applicable immunities.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

**2. FRAMEWORK AND AUTHORITY**

2.1. Authority

2.1.1. Executive Order 14243 (March 20, 2025): "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos" directs agency heads to "take all necessary steps, to the maximum extent consistent with law," to ensure federal government has "unfettered access to comprehensive data" from state programs receiving federal funding, including data maintained in third-party databases.

2.1.2. 7 U.S.C. § 2020(a)(3) ~~that~~ requires that each State agency shall keep records as may be necessary to determine whether the program is being conducted in compliance with this chapter, and all records shall be made available for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary.

2.1.3. 7 CFR 272 stipulates use or disclosure of information obtained from SNAP applicant or recipient households shall be restricted to persons directly connected with the administration or enforcement of the provisions of the FNA or regulations, other Federal assistance programs, federally-assisted State programs providing assistance on a means-tested basis to low-income individuals, or general assistance programs which are subject to joint processing requirements.

2.2. Prohibited Purposes

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

2.2.1. USDA shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals (*i.e.*, the collection of data elements spelled out in the Privacy Impact Assessment).

## 3. DATA CATEGORIES

3.1. <u>Data Definition</u>

3.1.1. All data obtained by States or their vendors ~~or their vendors~~ in administering SNAP or that otherwise may be necessary to determine whether the program is being conducted in accordance with the FNA or regulations issued under the FNA, in accordance with Attachment A of this protocol, ~~and any other state-specific terms negotiated and mutually agreed to by each state and USDA based on each state's data collection and storage realities.~~

3.1.2. Data derived from third-party sources (employment verification databases, financial institution records, property records) that States use for verification but are not part of applicant-reported information are excluded.

~~3.2 Permitted Data:~~

~~• Information that the applicant household reported on application/certification forms including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers;~~

~~• Direct verifications that the State conducted to confirm applicant-reported information~~

~~• Records that the State maintains of SNAP applications, approvals, denials, certifications, and benefits issued~~

~~• Household composition and income exactly as reported by the applicant (not third-party verified amounts)~~

~~• retailer and transactional data necessary for fraud detection~~

## 4. LIMITED ACCESS

4.1. The SNAP Information Database and all data collected therein is accessed and used ONLY by employees of the USDA who are:

4.1.1. Designated by the Chief of Staff at Food, Nutrition, Consumer Services (FNCS)

4.1.2. Trained in SNAP Act, Privacy Act, and this protocol

4.1.3. In compliance with all information security annual recertifications

4.2. Except to the extent permitted by law, no access to, or disclosures of data from, the SNAP Information Database may be provided to:

4.2.1. Other USDA agencies (APHIS, ERS, NASS, etc.)

4.2.2. Divisions within FNS without an explicit need-to-know

4.2.3. Any other federal agency

4.2.4. Any FOIA, administrative subpoena or like external requester

4.3. Notwithstanding section 4.1, this protocol does not limit access to the SNAP Information Database and all data contained therein by USDA's Office of the Inspector General as authorized by the Inspector General's Act, 5 USC 401-424.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

~~4.3. For the reasons explained in Section 1.4, above, no access to, or disclosures of data from, the SNAP Information Database may be provided to the Department of Homeland Security or any subagency thereof for purposes of investigating potential violations of civil immigration laws or enforcing civil immigration laws.~~

~~4.4. USDA shall provide each state agency, on an ongoing basis and upon request, with a list of all parties who have requested access to this data, and a list of all users who have been granted access to the provided data~~.

## 5. SYSTEM OF RECORDS NOTICE (SORN) AND PRIVACY IMPACT ASSESSMENT (PIA)

5.1. <u>SORN</u>

The applicable SORN for this protocol is USDA/FNS-15 "National Supplemental Nutrition Assistance Program (SNAP) Information Database," 90 FR 26521.

The SORN location can be found here:
https://www.federalregister.gov/documents/2025/06/23/202511463/privacy-act-of-1974-system-of-records

For the avoidance of doubt, this protocol controls notwithstanding any provision of the applicable SORN ==that conflicts with 7 U.S.C. §§ 2020(a)(3) and (e)(8)==.

5.2. <u>Privacy Impact Assessment (PIA)</u>

The applicable Privacy Impact Assessment for the SNAP Information Database ==is Version 1.1 created 02/12/2025, which== can be found here:
https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

==For the avoidance of doubt, this protocol controls notwithstanding any provision of the PIA.==

## 6. FRAUD, WASTE, AND ABUSE DETECTION FRAMEWORK

6.1. <u>Core Fraud Detection Functions</u>

6.1.1. USDA will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program that focuses on:

- identity verification
- income and eligibility verification
- immigration status
- verification against disqualified recipients

6.2. <u>Enhanced Fraud, Waste, and Abuse Detection Techniques</u>

6.2.1. In addition to the core fraud detection functions, USDA will employ additional techniques including, but not limited to:

- Intrastate and interstate duplicate detection
- Deceased individuals' detection
- Synthetic identity patterns (new SSNs with inconsistent biographical data)
- Geographic anomalies

6.2.2. New data mining techniques will be limited to identifying ==data anomalies fraud== with a direct nexus to SNAP.

## 7. DATA OUTPUT

7.1. <u>States</u>

7.1.1. USDA will provide flagged data back to the State agency for review, ==including the specific data elements flagged== ~~and source of the data that generated the flag~~. States are encouraged to provide feedback to

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

USDA to refine detection logic and reduce false positives. Collaborative processes will be established to ensure accurate identification of fraud and appropriate corrective actions. ~~including processes to allow individuals to contest inaccurate information and require updates to the originating system of record where false positives are identified.~~ No presumptive results will ~~shall~~ be made public ~~prior to verification by~~ ~~State agency~~ by FNS until 30 days from the initial date that USDA provided flagged data; during that 30 days States can provide additional information related to ~~of~~ the accuracy of the detection flags.

7.2. Law Enforcement

    7.2.1. The USDA may refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP. ~~in accordance with 7 U.S.C § 2020(e)(8)(A) and USDA's regulation implementing that provision, 7 C.F.R. § 272.1(c)(1).~~

7.3. USDA SNAP Retailer Operations Center (ROC)

    7.3.1. The USDA may refer fraud detection leads to the ROC where, during fraud detection analysis, a compromised EBT card or terminal ID may have been identified in accordance with 7 U.S.C § 2020(e)(8)(A) and USDA's regulation implementing that provision, 7 C.F.R. § 272.1(c)(1).

## 8. DATA MINIMIZATION AND RETENTION

8.1. Retention Period

    8.1.1. Until a record schedule is approved, data will be retained only as long as necessary for purposes set forth in the SORN and this protocol, and in no case longer than 3 years per the SORN.

8.2. Automatic Deletion

    8.2.1. Data shall be retained for no longer than three years, consistent with the USDA/FNS-15 SORN. An automated process will be implemented to delete data upon expiration of the retention period, except for records related to ongoing audits, investigations, or litigation.

8.3. Ongoing Cases

    8.3.1. Data pertaining to ongoing audit, investigation, or potential litigation retained only as long as necessary, then deleted.

## 9. DATA SECURITY AND TECHNICAL REQUIREMENTS

9.1. Infrastructure and Location

    9.1.1. Primary storage location: AWS GovCloud (US) region

    9.1.2. Backup/disaster recovery: Secondary AWS region

    9.1.3. No storage, processing, or backup outside GovCloud or federal secure environments

    9.1.4. All infrastructure must meet or exceed FedRAMP High baseline standards

    9.1.5. AWS Personnel Access: Data is encrypted such that AWS personnel cannot access unencrypted data. Encryption keys are managed exclusively by federal USDA personnel and are not accessible to AWS or third-party vendors.

9.2. Access Controls

    9.2.1. Multi-factor authentication required for all access

    9.2.2. Role-based access control (RBAC) with principle of least privilege

    9.2.3. Access is limited to specifically designated USDA employees engaged to assist in determining whether the program is being conducted in accordance with the FNA.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

9.2.4. Access logging and audit trail maintenance (minimum period equal to data retention period, see Section V.E).

9.2.5. Quarterly access reviews by USDA

9.2.6. Immediate revocation of access upon employee termination or assignment change

9.3. <u>Encryption Standards</u>

9.3.1. Encrypted data at rest and in transit

9.3.2. Encryption keys managed solely by USDA federal personnel

9.3.3. No encryption keys held by commercial vendors

9.4. <u>Data Segregation and Compartmentalization</u>

9.4.1. SNAP data isolated in separate, dedicated AWS GovCloud environment

9.4.2. SNAP data not directly integrated with other USDA systems

9.4.3. Limiting access to individuals with specialized training and oversight

9.5. <u>Data Transfer</u>

9.5.1. All data transfers shall utilize secure tools that meet or exceed FedRAMP High baseline standards.

## 10. INCIDENT RESPONSE AND BREACH NOTIFICATION

10.1. <u>Incident Response</u>

10.1.1. Incident response procedures are aligned with FNS Handbook Chapter 10 security incident and breach notification requirements that USDA already follows internally. This protocol extends equivalent procedures to State notification.

10.2. <u>Incident Definition</u>

10.2.2. Unauthorized access, use, or disclosure of data

10.2.3. Security vulnerability or control failure affecting data

10.2.4. Data loss, corruption, or destruction

10.2.5. Encryption failure or key compromise

10.2.6. Failed access control or authentication mechanism

10.2.7. Any event that may reasonably be expected to compromise data security or confidentiality. ~~including any request for use of, access to, or disclosure of data outside the permitted circumstances set forth in Section 1.4~~

10.3. <u>Incident Notification Timeline</u>

10.3.1. Initial Notification within 12 hours

10.3.1.1.    Within 12 hours of discovery (by phone + email to State security/privacy contact and Director).

10.3.2. Preliminary Report within 24 hours

10.3.2.1.    Description of incident and timeline

10.3.2.2.    Data elements affected (specific fields and estimated number of records)

10.3.2.3.    Estimated number of individuals affected

10.3.2.4.    Preliminary assessment of whether unencrypted sensitive data may have been exposed

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



# U.S. DEPARTMENT OF AGRICULTURE

10.3.2.5.    Preliminary remedial actions taken

10.3.2.6.    Root cause analysis plan and timeline

10.3.3 Progress Reports and Incident Close-out

~~10.3.3.1    USDA shall provide supplemental progress updates to state agencies as material information becomes available, but in no event less frequently than every 14 days, including refinements to scope, impact, and remediation measures, until the Incident is resolved. Upon resolution, USDA shall provide a close-out report of the Incident.~~

10.3.3.1    USDA shall provide notice to affected individuals in compliance with all applicable federal breach response and notification requirements, ~~including, but not limited to FISMA and OMB Memorandum M-17-12.~~ Nothing in this protocol shall be construed to shift responsibility for individual breach notification to the state agency.

## APPENDIX A - SOURCES

- 7 U.S.C. §§ 2020(a)(3) and (e)(8).

- Privacy Impact Assessment: https://www.usda.gov/sites/default/files/documents/fns-snap-informationdatabase-pia.pdf

- SORN: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-systemof-records

- SNAP Act: https://www.law.cornell.edu/uscode/text/7/2020

- SNAP QC Handbook

- Executive Order 14243 (March 20, 2025) "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos: https://www.govinfo.gov/content/pkg/DCPD-202500382/pdf/DCPD-202500382.pdf

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

EXHIBIT K

Plaintiff States' March 30 Letter

*Via E-mail*
Elizabeth J. Shapiro
Tyler Becker
Benjamin S. Kurland
ben.kurland@usdoj.gov
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005

*Counsel for U.S. Department of Agriculture and Secretary of Agriculture Brooke L. Rollins*

RE:  Response to USDA's March 27, 2026 Amendment to USDA's March 10 Proposed
Protocol

Dear Counsel:

We write on behalf of Plaintiffs in *State of California v. USDA*, No. 3:25-cv-06310 (N.D.
Cal.), in response to USDA's March 27 Amendment to USDA's March 10 Proposed Protocol.
USDA's amendment does not address the concerns raised in Plaintiffs' March 25 letter.

The amendment adds language to Section 1.4 stating that "Section 2020(e)(8)(A) does
not provide USDA with authority to respond to a request from DHS for data for purpose(s) of
civil immigration enforcement."  While Plaintiffs agree that Section 2020(e)(8)(A) does not
provide USDA with "authority" to respond to such a request, USDA's amended Section 1.4 still
provides that USDA may use or disclose the data "as specified in . . . any other applicable law."
Thus, when it comes to using and sharing the data for immigration enforcement purposes, USDA
is still not committing to abide by Section 2020(e)(8)(A); instead, USDA is maintaining the
purported right to share the data with DHS and its subagencies for immigration enforcement
purposes pursuant to some "other . . . law."  In short, USDA still refuses to provide a
straightforward response to the yes-or-no question Plaintiffs have repeatedly asked: will USDA
commit to deny an interagency request for the data from DHS or any DHS subagency (such as
the request for Medicaid data that DHS/ICE have made of CMS, citing 8 U.S.C. § 1360 and 6
U.S.C. § 122)?

For the reasons explained in Plaintiffs' March 25 letter, USDA must commit that USDA
(and FNS and any third party to whom USDA/FNS discloses Plaintiffs' SNAP data) will not use
or disclose the data for purposes of investigating violations of immigration laws or enforcing
immigration laws.  The amended proposed protocol does not do so, and USDA still has not
provided any coherent rationale why it cannot agree to such a provision in the protocol.

USDA's amendment also does not address the related concerns detailed in Plaintiffs'
March 25 letter, including the collection of data elements that appear useful for immigration

1

enforcement but not for the purported program integrity functions of the SNAP Information Database. Collecting the minimum PII necessary to perform an intended task is a basic data privacy principle; if USDA does not need specific data elements to conduct the program integrity functions of the SNAP Information Database, it should not be collecting them.

As stated in our March 25 letter, Plaintiffs cannot agree to any proposed protocol that would permit USDA to amass troves of Plaintiffs' data and allow it to be used for immigration enforcement and other unauthorized purposes unrelated to the administration of SNAP or other federal benefits programs. Therefore, while Plaintiffs welcome continued discussions of a proposed protocol, including a response that addresses the concerns raised in our March 25 letter, Plaintiffs do not agree to this revised protocol.

Dated: March 30, 2026

Rob Bonta
Attorney General of California

*/s/ Liam E. O'Connor*
Liam E. O'Connor

Paul Stein
Robin Goldfaden
Supervising Deputy Attorneys General
Andrew Z. Edelstein
Anna Rich
Jane Reilley
Sebastian Brady
William Bellamy
Maria F. Buxton
Liam E. O'Connor
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3915
Liam.OConnor@doj.ca.gov
*Attorneys for Plaintiff State of California*

Letitia James
Attorney General of New York

Kwame Raoul
Attorney General of Illinois

*/s/ Mark Ladov*
Mark Ladov
Special Counsel
Julie Dona
Special Counsel
28 Liberty St.
New York, NY 10005
(212) 416-8240
mark.ladov@ag.ny.gov
*Attorneys for Plaintiff State of New York*

*/s/ Sherief Gaber*
Harpreet K. Khera
Bureau Chief, Special Litigation
Sherief Gaber
Assistant Attorney General
115 S. LaSalle St., 35th Flr.
Chicago, Illinois 60603
(773) 590-7127
sherief.gaber@ilag.gov
*Attorneys for Plaintiff State of Illinois*

2

Kristin Mayes
Attorney General of Arizona

/s/ Luci D. Davis
Luci D. Davis (AZ No. 035347)
Hayleigh S. Crawford (AZ No. 032326)
2005 N. Central Ave. Phoenix, AZ 85004
(602) 542-3333
Luci.Davis@azag.gov
Hayleigh.Crawford@azag.gov
ACL@azag.gov
Attorneys for Plaintiff State of Arizona

Philip J. Weiser
Attorney General of Colorado

/s/ David Moskowitz
David Moskowitz
Deputy Solicitor General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6000
david.moskowitz@coag.gov
Attorneys for Plaintiff State of Colorado

William Tong
Attorney General of Connecticut

/s/ Janelle R. Medeiros
Janelle R. Medeiros
Special Counsel for Civil Rights
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Janelle.Medeiros@ct.gov
Attorneys for Plaintiff State of Connecticut

Kathleen Jennings
Attorney General of Delaware

/s/ Vanessa L. Kassab
Ian R. Liston
Director of Impact Litigation
Vanessa L. Kassab
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
Attorneys for Plaintiff State of Delaware

Brian L. Schwalb
Attorney General for the District of Columbia

/s/ Nicole S. Hill
Nicole S. Hill
Assistant Attorney General
Office of the Attorney General for the District
of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov
Attorneys for Plaintiff District of Columbia

Anne E. Lopez
Attorney General of Hawaiʻi

/s/ Kalikoʻonālani D. Fernandes
David D. Day
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
Attorneys for Plaintiff State of Hawaiʻi

3

Office of The Governor *ex rel*. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky

*/s/ S. Travis Mayo*
S. Travis Mayo
General Counsel
Taylor Payne
Chief Deputy General Counsel
Laura C. Tipton
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov
*Attorneys for Plaintiff Kentucky Governors' Office*

Aaron M. Frey
Attorney General of Maine

*/s/ Brendan Kreckel*
Brendan Kreckel
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 0433-0006
Tel.: 207-626-8800
Fax: 207-287-3145
brendan.kreckel@maine.gov
*Attorneys for Plaintiff State of Maine*

Anthony G. Brown
Attorney General of Maryland

*/s/ James C. Luh*
James C. Luh
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

Andrea Joy Campbell
Attorney General of Massachusetts

*/s/ Katherine Dirks*
Katherine Dirks
Chief State Trial Counsel
Cassandra Thomson
Assistant Attorney General
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
cassandra.thomson@mass.gov
*Attorneys for Plaintiff Commonwealth of Massachusetts*

Dana Nessel
Attorney General of Michigan

*/s/ Neil Giovanatti*
Neil Giovanatti
Bryan Beach
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov
beachb@michigan.gov
*Attorneys for Plaintiff State of Michigan*

Keith Ellison
Attorney General of Minnesota

*/s/ Joseph R. Richie*
Joseph R. Richie
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

Jennifer Davenport
Attorney General of New Jersey

/s/ *Kashif T. Chand*
Kashif T. Chand (NJ Bar No. 016752008)
Assistant Attorney General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
kashif.chand@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

Raúl Torrez
Attorney General of the State of New Mexico

/s/ *Steven Prefrement*
Steven Perfrement
Senior Litigation Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
SPerfrement@nmdoj.gov
505-601-7727
*Attorneys for the State of New Mexico*

Dan Rayfield
Attorney General of Oregon

/s/ *Scott P. Kennedy*
Scott P. Kennedy
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 453-9050
Fax (971) 673-5000
Scott.Kennedy@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*

Josh Shapiro, in his official capacity as
Governor of the Commonwealth of
Pennsylvania

/s/ *Jacob B. Boyer*
Jennifer Selber
General Counsel
Jacob B. Boyer
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov
*Counsel for Governor Josh Shapiro*

Peter F. Neronha
Attorney General of Rhode Island

/s/ *Madeline R. Becker*
Madeline R. Becker (RI Bar No. 10034)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2151
mbecker@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

Nicholas W. Brown
Attorney General of Washington

/s/ *Jennifer K. Chung*
Jennifer K. Chung, WSBA #51583
William Mcginty, WSBA #41868
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
jennifer.chung@atg.wa.gov
william.mcginty@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

5

Joshua L. Kaul
Attorney General of Wisconsin

*/s/ Karla Z. Keckhaver*
Karla Z. Keckhaver
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-6365
karla.keckhaver@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*

EXHIBIT L

March 26 to 27 Correspondence Between Counsel

██████████████

**From:**      Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>
**Sent:**      Friday, March 27, 2026 12:07 PM
**To:**        Liam O'Connor
**Cc:**        Becker, Tyler (CIV); Shapiro, Elizabeth (CIV); Sebastian Brady; Paul Stein; Ladov, Mark; Gaber, Sherief
**Subject:**   Re: California v. USDA - SAC and JSR

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Hi Liam,

We also do not oppose your filing the amended complaint pursuant to whatever timeline the Cort establishes.

Thanks,
Ben

Ben Kurland
Trial Attorney | Federal Programs Branch
202.598.7755

---

**From:** Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>
**Sent:** Friday, March 27, 2026 12:50 PM
**To:** Liam O'Connor <Liam.OConnor@doj.ca.gov>
**Cc:** Becker, Tyler (CIV) <Tyler.Becker@usdoj.gov>; Shapiro, Elizabeth (CIV) <Elizabeth.Shapiro@usdoj.gov>; Sebastian Brady <Sebastian.Brady@doj.ca.gov>; Paul Stein <Paul.Stein@doj.ca.gov>; Ladov, Mark <mark.ladov@ag.ny.gov>; Gaber, Sherief <sherief.gaber@ilag.gov>
**Subject:** RE: California v. USDA - SAC and JSR

Hi Liam,

USDA is issuing the following amendment to its Fourth Proposed Protocol. You will see it includes a specific commitment on requests regarding civil immigration enforcement. The new section is 1.4(iii), where Plaintiffs requested the addition. Please let us know by the end of today whether this addresses Plaintiff's remaining concerns.

Thanks,
Ben

Ben Kurland
Trial Attorney | Federal Programs Branch
202.598.7755

---

**From:** Liam O'Connor <Liam.OConnor@doj.ca.gov>
**Sent:** Thursday, March 26, 2026 2:53 PM

1

**To:** Kurland, Benjamin S (CIV) <Ben.Kurland@usdoj.gov>
**Cc:** Becker, Tyler (CIV) <Tyler.Becker@usdoj.gov>; Shapiro, Elizabeth (CIV) <Elizabeth.Shapiro@usdoj.gov>; Sebastian Brady <Sebastian.Brady@doj.ca.gov>; Paul Stein <Paul.Stein@doj.ca.gov>; Ladov, Mark <mark.ladov@ag.ny.gov>; Gaber, Sherief <sherief.gaber@ilag.gov>
**Subject:** [EXTERNAL] California v. USDA - SAC and JSR

Hi Ben,

I write regarding a couple issues.

First, as we've discussed, Plaintiffs intend to amend the complaint to address events subsequent to the FAC and to expressly challenge USDA's renewed data demands.  Our proposed SAC is attached, along with a redline comparing it to our FAC.  Could you please let us know by close of business ET tomorrow whether Defendants consent to our amendment per FRCP 15(a)(2)?

Second and relatedly, in light of Monday's deadline to file a JSR and propose summary judgment deadlines, we have prepared the attached JSR and proposed case schedule, which is consistent with the local rule governing summary judgment briefing in APA cases.

The parties have already twice burdened the court with preliminary motions practice, resulting in two preliminary injunctions that prohibit enforcement of both the original and renewed data demands.  At this point, the most efficient path to resolution of this case is to expeditiously proceed to a final judgment on the merits.  We believe our proposed schedule achieves that goal.

If Defendants intend to propose any alternative deadlines, could you please let us know by close of business ET tomorrow so we have an opportunity to consider them before Monday's filing?

We are of course happy to discuss by Teams.

Thanks,
Liam
_____

**Liam E. O'Connor** | Deputy Attorney General
California Department of Justice | Government Law Section
455 Golden Gate Ave, 11th Fl., San Francisco, CA 94102
(415) 510-3915 | liam.oconnor@doj.ca.gov


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.