ROB BONTA
Attorney General of California
PAUL STEIN
ROBIN GOLDFADEN
Supervising Deputy Attorneys General
ANDREW Z. EDELSTEIN
ANNA RICH
LIAM E. O'CONNOR
JULIA HEMING SEGAL
WILLIAM BELLAMY
MARIA F. BUXTON
SEBASTIAN BRADY
Deputy Attorneys General
State Bar No. 330904
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 Telephone:  (415) 510-3592
 Fax:  (415) 703-5480
 E-mail:  Sebastian.Brady@doj.ca.gov
*Attorneys for Plaintiff State of California*

*Additional Counsel Listed on Signature Page*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA; STATE OF NEW YORK; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAIʻI; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR** ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky; **STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; JOSH SHAPIRO**, in his official capacity as Governor of the Commonwealth of Pennsylvania**; STATE OF RHODE ISLAND; STATE OF WASHINGTON; STATE OF WISCONSIN,** | Case No. 3:25-cv-06310-MMC<br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Courtroom:  Courtroom 7 – 19th Floor<br>Judge:        Hon. Maxine M. Chesney<br>Action Filed: July 28, 2025 |

1

Plaintiffs,

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS,** in her official capacity as U.S. Secretary of Agriculture; **U.S. DEPARTMENT OF AGRICULTURE'S OFFICE OF INSPECTOR GENERAL,**

Defendants.

2

**TABLE OF CONTENTS**

TABLE OF CONTENTS ....................................................................................................... 3

INTRODUCTION ............................................................................................................... 6

JURISDICTION AND VENUE ......................................................................................... 11

PARTIES ........................................................................................................................... 11

    I.     Plaintiffs ......................................................................................................... 11

    II.    Defendants ...................................................................................................... 15

BACKGROUND ............................................................................................................... 16

    I.     Plaintiff States serve millions of food-insecure residents through SNAP. ........... 16

        A.    To administer SNAP, state agencies collect applicants' highly sensitive personal information. ................................................................. 18

        B.    Plaintiff States use third-party vendors to administer EBT cards, and those vendors collect sensitive data on SNAP recipients, subject to strict confidentiality requirements. ........................................... 20

        C.    States periodically share some SNAP data with USDA, but never large swaths of PII or other sensitive data. ................................................ 21

        D.    As required by statute, States verify the eligibility and immigration status of SNAP applicants. .......................................................... 22

    II.    Federal law strictly limits the use and disclosure of personal information collected by state agencies about SNAP applicants and recipients ....................... 24

        A.    The SNAP Act and USDA's implementing regulations ........................... 24

        B.    The Privacy Act of 1974 ........................................................................ 25

        C.    The Computer Matching and Privacy Protection Act of 1988 .................. 26

        D.    The Paperwork Reduction Act & the E-Government Act ........................ 27

        E.    The Authority of OIG to Request Documents ......................................... 29

    III.    Defendants' demands are only one part of a campaign by the Trump administration to amass Americans' sensitive, personal data and misuse that data for unauthorized purposes. ......................................................... 30

        A.    President Trump has issued Executive Orders paving the way for DOGE and other federal agencies to gain access to sensitive federal benefit data. ........................................................................................ 30

        B.    Public reports reveal that DOGE is compiling sensitive personal information collected by federal agencies into a mass database. .............. 32

        C.    CMS recently demanded Medicaid data from States, then shared it with DHS and, after States sued, gave ICE unfettered access to state data. ................................................................................................... 35

        D.    On the insistence of DOGE, the IRS and DHS have already begun creating a system for sharing home addresses of deportation targets with DHS. .................................................................................. 36

Second Amended Complaint for Declaratory and Injunctive Relief  (Case No. 3:25-cv-06310)

IV.    USDA has already taken steps to advance the administration's campaign to collect and misuse Americans' data. ................................................................... 38

    A.    DOGE has already begun accessing sensitive data systems at USDA. .......................................................................................................... 38

    B.    USDA has recently erased guidance on its website promising that information provided by SNAP applicants would not be used for immigration enforcement. ........................................................................... 39

V.    In an unprecedented move, USDA demanded five years' worth of personal information on SNAP applicants and recipients from Plaintiff States. ................. 41

    A.    USDA first attempted to obtain all SNAP participant data directly from Plaintiffs' EBT vendors, then changed course after being sued. ....... 41

    B.    USDA then issued a SORN notifying stakeholders of its intent to collect SNAP data, and hundreds of stakeholders submitted comments criticizing the proposal. ........................................................... 43

    C.    USDA disregarded all comments and demanded SNAP data from Plaintiff States by July 30, 2025. ............................................................. 45

    D.    USDA threatened States with noncompliance procedures if they do not comply by the agency's arbitrary deadline. ........................................ 50

    E.    USDA has refused to commit that it will not immediately disclose SNAP data it collects outside the agency. ................................................. 51

    F.    USDA persists in its unlawful data demands despite the Court's preliminary injunction order. ........................................................................ 52

    G.    Secretary Rollins has confirmed that the decision to create the SNAP Information Database was based on falsehoods about SNAP program integrity. ..................................................................................... 55

VI.    USDA-OIG Makes Unprecedented Demands for All SNAP Participant Data from Plaintiff States. ................................................................................... 57

    A.    USDA's Office of Inspector General ..................................................... 57

    B.    OIG Demands all SNAP participant data for 2024 from California, Illinois, and Michigan. ............................................................................. 58

VII.    Plaintiff States will be irreparably harmed if forced to disclose the demanded SNAP data. .................................................................................... 62

    A.    Proprietary Harms—Withholding of Administrative Funds, Burden on State Agencies, and Litigation Risk ...................................................... 62

    B.    Chilling Effect Harm—Disclosure and misuse of data will cause a chilling effect on SNAP participation. ....................................................... 64

    C.    Chilling Effect Harm—Disaster Response (California, New Jersey, Oregon, and Washington) ......................................................................... 66

    D.    Chilling Effect Harm—School Lunch Program ...................................... 66

    E.    Chilling Effect Harm—Safety Net Programs ......................................... 67

    F.    Chilling Effect Harm—Deterioration of Public Health and Welfare ........ 67

    G.    State Sovereignty Harms—Undermining Plaintiff States' Laws and Policies ................................................................................................... 69

FIRST CLAIM ............................................................................................................ 71

4

SECOND CLAIM ................................................................................................................ 77
THIRD CLAIM .................................................................................................................. 80
FOURTH CLAIM .............................................................................................................. 81
FIFTH CLAIM ................................................................................................................... 82
PRAYER FOR RELIEF ...................................................................................................... 84

Second Amended Complaint for Declaratory and Injunctive Relief  (Case No. 3:25-cv-06310)

**INTRODUCTION**

1.    The United States Department of Agriculture ("USDA") has made an unprecedented demand that Plaintiff States turn over sensitive and personal information about tens of millions of Americans who have applied for food assistance through the State-administered Supplemental Nutrition Assistance Program ("SNAP").  USDA's attempt to collect this information from Plaintiff States flies in the face of privacy and security protections in federal and state law.

2.    USDA makes this demand for the stated purpose of detecting "overpayments and fraud."  Instead, the move appears to be part of the federal government's well-publicized campaign to amass enormous troves of personal and private data, including information on taxpayers and Medicaid recipients, to advance goals that have nothing to do with combating waste, fraud, or abuse in federal benefit programs.  Plaintiff States therefore seek a judicial declaration that the demand is contrary to law, arbitrary and capricious, and exceeds the agency's authority, as well as injunctive relief preventing enforcement of the demand.

3.    For sixty years, States have been administering the federal hunger-prevention program known as SNAP.  The program serves as an essential safety net for millions of low-income Americans by providing benefits that can be used to purchase groceries for themselves and their children.

4.    In those sixty years, the federal government and state agencies have worked together to build a robust process whereby States ensure that only eligible individuals receive benefits.  In fact, USDA has described SNAP as having "one of the most rigorous quality control systems in the federal government."[1]

5.    Federal law delegates to States the role of administering SNAP day-to-day.  States are tasked with creating and processing applications for benefits, determining eligibility, granting benefits, terminating benefits where appropriate, and ensuring program accountability.  The federal government has a more limited role; it sets requirements for state plans, performs some

---

[1] *SNAP Quality Control*, USDA (updated Dec. 9, 2025), https://www.fns.usda.gov/snap/qc.

quality control functions, and provides technical assistance to States to help them better implement their plans.

6. That quality control process requires some exchange of SNAP applicant and recipient data between States and the federal government. The data States collect in administering SNAP is highly sensitive; it includes the home addresses, Social Security numbers, recent locations, citizenship and immigration status, and household income of millions of Americans. And, because non-citizen parents may legally apply for benefits for their citizen children, States' SNAP data includes personal identifying information ("PII") and home addresses of non-citizen parents who have lawfully sought government assistance to feed their U.S. citizen children.

7. Because of the sensitive nature of this data and federal privacy laws protecting it, the federal government has always asked States to share only what is necessary to conduct quality control checks, such as, for example, a statistically significant sample of data. Likewise, Congress has created specific systems for States to use to vet eligibility and investigate fraud, and those systems have significant privacy protections and limitations on the use of State-submitted information. Even the federal government's own ability to access state SNAP records for inspection or audit is limited by statute.

8. Never before, to Plaintiffs' knowledge, has the federal government demanded that States turn over PII on their entire SNAP caseloads, much less home address, social security number, immigration status, and day-to-day grocery purchase information for each and every SNAP applicant and recipient. That longstanding policy and practice, which reflects statutory limits, abruptly changed recently when USDA demanded that States turn over virtually all of their SNAP applicant and recipient data for the past five years, including detailed "transactional records from each household," citing vague "program integrity" concerns. In doing so, USDA has exceeded its statutory authority and threatened the privacy of tens of millions of Americans.

9. On May 6, 2025, USDA's Food and Nutrition Service ("FNS") issued a letter to all States, citing to a recent executive order titled "Stopping Waste, Fraud, and Abuse by Eliminating

Information Silos,"[2] and announcing that, "each State, district, territory, and payment processor is a SNAP information silo" and that "USDA and FNS are working to eliminate these information silos."

10.    USDA announced that it had already contacted States' third-party vendors which administer SNAP payment systems, and that it planned to circumvent the States themselves and collect States' SNAP data directly from those vendors.  USDA claimed the agency would use this data to "ensure program integrity," including by verifying the eligibility of recipients, even though Congress has delegated that task to the States.

11.    USDA also announced that it was "taking steps to require all states to work through their processors" to submit to FNS personally identifiable information, including "names, dates of birth, personal addresses used, and Social Security numbers" and total amount of benefits received for *all* SNAP applicants and recipients *since January 2020*.  USDA cited to statutes and regulations related to state recordkeeping and audit requirements, but none of them authorize such a sweeping demand for personal information on SNAP applicants and recipients, especially without any protections or restrictions on the use or disclosure of that data.

12.    The letter threatened States with noncompliance procedures—including potential SNAP funding cuts—if they refused to comply.

13.    Privacy advocates promptly sued USDA for making this demand for sensitive PII about tens of millions of Americans without completing the procedural steps required under federal privacy laws like the Privacy Act.  *See Namod Pallek et al. v. Rollins et al.*, Case No. 1:25-cv-01650 (D.D.C. filed May 22, 2025).  In response to plaintiffs' motion for a temporary restraining order, USDA stated that it had not yet collected any data pursuant to the demand, and that it intended to publish a new System of Records Notice ("SORN"), as required by the Privacy Act before proceeding further with the proposed data collection.

14.    On July 9, 2025, after publishing a SORN purporting to give notice of its new data collection campaign, Defendant Secretary Rollins sent States another letter, reviving the USDA's

---

[2] Exec. Order No. 14,243, 90 Fed. Reg. 13,681 (Mar. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/stopping-waste-fraud-and-abuse-by-eliminating-information-silos/.

demand for five years' worth of data on all SNAP applicants and recipients, and again indicated that the agency was demanding the same data from States' third-party payment processors. Secretary Rollins again invoked the Information Silos Executive Order, which directs federal agencies to gain "unfettered access" to state data and share that data across the federal government.[3]  The July 9 Letter directed States to produce the data starting July 24 and no later than July 30, 2025.  Public comments on the proposed SORN were not due until July 23, making clear that USDA had no intention of modifying the proposed data collection based on any public comments it received.

15.    At the same time as USDA was making its demands, some of the Plaintiff States were subjected to a separate demand from USDA's Office of Inspector General ("OIG") for similar data, including PII, that they maintained on SNAP recipients for the year 2024.  This request, ostensibly part of a routine inspection of SNAP data "quality and integrity," was likewise beyond any request from OIG that the affected States had ever received.  Moreover, OIG refused, without sufficient explanation, to accept deidentified data or samples, or to enter into a confidentiality agreement or data and security protocols contemplated by statute.  While Plaintiff States have no objection to complying with a lawful OIG inspection, OIG must nevertheless follow appropriate laws when seeking States' sensitive data about their residents.

16.    The actions of Defendants USDA and OIG have put Plaintiff States in an impossible position.  On the one hand, Plaintiff States are required to keep personal information about SNAP applicants and recipients strictly confidential; both federal and state law prohibit them from disclosing personally identifying SNAP data unless strictly necessary for the administration of the program, or other limited circumstances exist.  Even the federal government's oversight of this confidential data is limited to USDA's inspection or audit of state records that are "necessary to determine whether the program is being conducted in compliance" with the SNAP statute, and even then "subject to data and security protocols agreed to by the State agency and [USDA]."  7 U.S.C. § 2020(a)(3)(B)(i).  Defendant OIG, in turn, has the authority to "access" records that are "available to" USDA.  5 U.S.C. § 406(a)(1)(A).  OIG can also formally request or subpoena

---

[3] *Id.*

additional information, but only as "necessary" to perform the functions of the Inspector General. 5 U.S.C. § 406(a)(3)-(4). No statute authorizes Defendant USDA or OIG to demand, and take possession of, *all* SNAP data collected by States, without any restrictions on the use or re-disclosure of that data.

17. On the other hand, the federal government has threatened that it will institute noncompliance procedures if the Plaintiff States do not comply, which could include withholding administrative funding on which the Plaintiff States depend to run the program and help keep food on the table for millions of struggling Americans. California, for example, receives roughly $1.3 billion a year to administer the program; other Plaintiff States receive tens of millions of dollars in administrative funding. Any delay in that funding could be catastrophic for the State and the residents who rely on SNAP to meet their basic nutritional needs. On July 26, USDA reiterated the threat from May, warning States that "[f]ailure to take the steps necessary to provide the relevant data to FNS may trigger noncompliance procedures specified in 7 U.S.C. § 2020(g)."

18. Meanwhile, the federal government's stated justifications for its unprecedented data demands make no sense on their own terms and are belied by the available facts. Defendant USDA has never needed, and does not need now, a wholesale transfer of sensitive and confidential PII about every SNAP applicant and recipient to prevent overpayments. Further, recent events strongly indicate that the government's explanations are pretextual, and that its overriding purpose is not to ensure SNAP program "integrity," but to use the sensitive information it collects from States to advance the President's agenda on fronts that are wholly unrelated to SNAP program administration.

19. As just one example, public reporting has recently revealed that the Department of Government Efficiency ("DOGE") has been quietly amassing data from a wide array of state and federal sources, including the Social Security Administration ("SSA"), the Internal Revenue Service ("IRS"), and the Department of Health and Human Services ("HHS"), to build a searchable database on citizens and non-citizens alike for a variety of purposes, including to locate and deport people the administration wishes to remove from the United States.

10

20.    To that same end, HHS has already disclosed to the Department of Homeland Security a massive tranche of Medicaid data shared by several States with HHS as part of a routine audit.  And, just days after being sued by several States over the disclosure, HHS executed an agreement to allow ICE *unfettered* access to its entire database of state Medicaid data, containing some of the most sensitive data collected by States.

21.    Against this backdrop, Plaintiff States are deeply and justifiably concerned about USDA's intent and what will happen to this data once it is in the hands of the federal government.  And, more fundamentally, Plaintiff States dispute that the federal government's demands are lawful to begin with.  However, Plaintiff States' refusal to give up their data exposes them to potential punitive action by the federal government, up to and including significant SNAP funding cuts.  Therefore, Plaintiff States have no choice but to file the instant complaint seeking a judicial declaration that the federal government's unprecedented demands are unlawful, and that any state SNAP data that is appropriately disclosed to the federal government may not be used or disclosed outside of USDA or OIG for non-SNAP-related purposes.

## JURISDICTION AND VENUE

22.    The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 2201(a).

23.    Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because the California Attorney General and the State of California have offices at 455 Golden Gate Avenue, San Francisco, California and at 1515 Clay Street, Oakland, California, and therefore reside in this district, and no real property is involved in this action.  This is a civil action in which Defendants are agencies of the United States or officers of such an agency.

24.    Assignment to the San Francisco Division of this District is proper pursuant to Civil Local Rule 3-2(c)-(d) and 3-5(b) because Plaintiff the State of California maintains offices in San Francisco County.

## PARTIES

I.    PLAINTIFFS

25.    Plaintiff the State of California, by and through its Attorney General Rob Bonta, is a sovereign State of the United States.  Attorney General Bonta is the chief law officer of the State

11

of California and head of the California Department of Justice. He has the authority to file civil actions to protect California's rights and interests and the resources of this State. Cal. Const., art. V, § 13; Cal. Gov't Code §§ 12510-11; *see Pierce v. Superior Court*, 1 Cal. 2d 759, 761-62 (1934) (the Attorney General "has the power to file any civil action or proceeding directly involving the rights and interests of the state").

26.   Plaintiff the State of New York, represented by and through its Attorney General Letitia James, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on its behalf of the State in this matter.

27.   Plaintiff the State of Arizona joins this action by and through Attorney General Kristin Mayes, who is the chief law enforcement officer of the State and authorized to "[r]epresent this state in any action in a federal court." Ariz. Rev. Stat. § 41-193(A)(3); *see* Ariz. Const. art. V, § 1(A).

28.   Plaintiff the State of Colorado is a sovereign State of the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the state and is authorized by Colo Rev. Stat. § 24-31-101 to pursue this action.

29.   Plaintiff the State of Connecticut is a sovereign State of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

30.   Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

31.    Plaintiff the State of Delaware is a sovereign State of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941).  Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority.  Del. Code Ann. tit. 29, § 2504.

32.    Plaintiff the State of Hawaiʻi, represented by and through its Attorney General Anne E. Lopez, is a sovereign State of the United States of America.  The Attorney General is Hawaii's chief legal officer and chief law enforcement officer and is authorized by Hawaii Revised Statues § 28-1 to pursue this action.

33.    Plaintiff the Office of the Governor, *ex rel.* Andy Beshear, brings this suit his official capacity as Governor of the Commonwealth of Kentucky.  The Kentucky Constitution makes the Governor the Chief Magistrate with the "supreme executive power of the Commonwealth," Ky. Const. § 69, and gives the Governor, and only the Governor, the duty to "take care that the laws be faithfully executed," Ky Const. § 81.  In taking office, Governor Beshear swears an oath that he will support the Constitution of the United States and the Kentucky Constitution.  Ky. Const. § 228.

34.    Plaintiff the State of Illinois is a sovereign State of the United States of America. The State of Illinois is represented in this action by the Attorney General of Illinois, who is the chief legal officer of the State and is authorized to pursue this action on behalf of the State under Article V, Section 15 of the Illinois Constitution and 15 Ill. Comp. Stat. § 205/4.

35.    Plaintiff the State of Maine is a sovereign State of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine.  The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

36.    Plaintiff the State of Maryland is a sovereign State of the United States of America. Maryland is represented by Attorney General Anthony G. Brown, who is the chief legal officer of Maryland.

37.    Plaintiff the Commonwealth of Massachusetts is a sovereign State of the United States of America.  Massachusetts is represented by Attorney General Andrea Joy Campbell, the Commonwealth's chief legal officer.

38.    Plaintiff the State of Michigan is a sovereign State of the United States of America.  Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

39.    Plaintiff the State of Minnesota is a sovereign State of the United States of America.  Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota.  The Attorney General's powers and duties include acting in federal court in matters of State concern.  Minn. Stat. § 8.01.  The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Minnesota residents and to vindicate the State's sovereign and quasi-sovereign interests.

40.    Plaintiff the State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. 228.110 and Nev. Rev. Stat. 228.170.

41.    Plaintiff the State of New Jersey is a sovereign State of the United States of America, and by and through Attorney General Matthew Platkin, brings this action.  The Attorney General of New Jersey is the New Jersey's chief legal adviser and is authorized to act in federal court on behalf of the State on matters of public concern.  N.J. Stat. Ann. § 52:17A-4.

42.    Plaintiff the State of New Mexico is a sovereign State of the United States of America.  New Mexico is represented by Attorney General Raúl Torrez.  The Attorney General is New Mexico's chief law enforcement officer and is authorized to pursue this action pursuant to N.M. Stat. Ann. § 8-5-2(B).

43.    Plaintiff the State of Oregon is a sovereign State of the United States of America.  Oregon is represented by Attorney General Dan Rayfield.  The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

44. Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania and is authorized to bring suit on their behalf. 71 P.S. §§ 732-204(c), 732-301(6), 732-303.

45. Plaintiff the State of Rhode Island is a sovereign State in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island and authorized to pursue this action on behalf of the State of Rhode Island. R.I. Gen. Laws § 42-9-6.

46. Plaintiff the State of Washington, represented by and through its Attorney General Nicholas Brown, is a sovereign State of the United States of America.  The Attorney General is Washington's chief law enforcement officer and is authorized under Wash. Rev. Code § 43.10.030 to pursue this action.

47. Plaintiff the State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin.  Attorney General Kaul is authorized to sue on behalf of the State.

## II. DEFENDANTS

48. Defendant United States Department of Agriculture ("USDA") is a department of the executive branch of the United States government, which, through its sub-agency the Food and Nutrition Service ("FNS"), is responsible for overseeing the States' administration of SNAP.

49. Defendant Brooke Rollins is the Secretary of Agriculture and the head of USDA.  She is sued in her official capacity only.

50. Defendant United States Department of Agriculture's Office of Inspector General ("OIG") is a department of the executive branch of the United States government, responsible for investigating allegations of crime against USDA's programs, and promoting the economy and efficiency of USDA's operations.

Second Amended Complaint for Declaratory and Injunctive Relief  (Case No. 3:25-cv-06310)

# BACKGROUND

I.    **PLAINTIFF STATES SERVE MILLIONS OF FOOD-INSECURE RESIDENTS THROUGH SNAP.**

51.    First authorized in 1964 as the "Food Stamp Program," the Supplemental Nutrition Assistance Program ("SNAP") has long been the country's primary weapon against hunger and an important safety net for low-income Americans.  The goal of SNAP is "to 'alleviate . . . hunger and malnutrition' by 'increasing [the] food purchasing power' of low-income households." *Hall v. U.S. Dep't of Agric.*, 984 F.3d 825, 831 (9th Cir. 2020) (quoting 7 U.S.C. § 2011).  To achieve this end, SNAP provides monthly benefits to eligible households that can be used to buy food. *Id.*

52.    In 2024, SNAP helped more than 41 million people avoid food insecurity.[4]  More than 62 percent of SNAP participants are in families with children, and more than 37 percent are in families with members who are elderly or have disabilities.[5]  Collectively, in a month, Plaintiff States provide more than 21 million individuals, in more than 12 million households, with food assistance through SNAP.[6]

53.    At the federal level, SNAP is overseen by FNS, a component of USDA.  7 C.F.R. § 271.3(a).

54.    The federal government funds SNAP benefits, and pays roughly half of administrative costs, but it is state agencies that are "responsible for the administration of the [SNAP] program," including "[c]ertification of applicant households" and "[i]ssuance, control, and accountability of SNAP benefits and [Electronic Benefit Transfer ('EBT')] cards."  7 C.F.R. § 271.4(a)(1), (2); *see also* 7 U.S.C. §§ 2020(a)(1), 2025(a); 7 C.F.R. § 277.4.

55.    States alone are responsible for creating and processing applications for benefits, making determinations on eligibility, issuing benefits, and ensuring program integrity.  7 U.S.C. § 2020(a)(1); *see also* 7 C.F.R. § 271.4.

---

[4] Center on Budget and Policy Priorities, *Policy Basics: The Supplemental Nutrition Assistance Program (SNAP)* (updated Nov. 25, 2024), https://www.cbpp.org/research/food-assistance/the-supplemental-nutrition-assistance-program-snap.
[5] *Id.*
[6] *SNAP Data Tables*, USDA (last updated July 14, 2025), https://www.fns.usda.gov/pd/supplemental-nutrition-assistance-program-snap.

56.     By law, it is likewise state agencies that are responsible for conducting quality-control reviews and management evaluations of their SNAP operations.  7 C.F.R. §§ 275.1-275.24 (Performance Reporting System).

57.     And it is States that contract directly with third-party electronic benefit transfer providers, which process benefit payments directly to benefit recipients.

58.     To be eligible for SNAP, households generally must earn less than 100 percent of the federal poverty level based on net income.  *See* 7 C.F.R. § 273.9(a)(2).  SNAP benefits can be used to buy most groceries and some prepared food at participating vendors, which include most grocery and convenience stores.

59.     Some lawfully present non-citizens are permitted to receive SNAP benefits.  *See* 7 U.S.C. § 2015(f); 7 C.F.R. § 273.4.  In providing SNAP benefits for some of the nation's most vulnerable immigrants, Congress recognized the critical nature of nutrition for healthy families and communities.[7]

60.     Separately, individuals whose immigration status makes them ineligible to receive SNAP benefits, but who have children who are eligible to receive SNAP benefits may apply for and receive SNAP benefits on behalf of their eligible children.[8]

61.     The SNAP statute and implementing regulations restrict the ways in which SNAP applicant data can be used or disclosed.  *See, e.g.*, 7 U.S.C. § 2020(e)(8); 7 C.F.R. § 272.1(c)(1)(i), (iii).

62.     Plaintiff States each administer their own SNAP program.  For example, California's SNAP program is called CalFresh.  Cal. Welf. & Inst. Code § 18900.2(a).  CalFresh is overseen by the California Department of Social Services ("CDSS"), but the certification of applicant households and the issuance of EBT cards is managed by California's 58 counties, as authorized by federal law.  *See* 7 U.S.C. §§ 2012(s)(1), 2020(a)(2); *see also* Cal. Welf. & Inst. Code § 18902.

[7] In fact, after the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 stripped most lawfully present noncitizens of benefits eligibility, Congress recanted and passed two successive laws in 1998 and 2002 restoring SNAP eligibility to the majority of these lawfully present noncitizens.  *See City of Chicago v. Shalala*, 189 F.3d 598, 601 n.1 (7th Cir. 1999).

[8] *See SNAP Eligibility for Non-Citizens*, USDA Food & Nutrition Service (updated June 2, 2025), https://www.fns.usda.gov/snap/recipient/eligibility/non-citizen.

17

63.    CalFresh is the second largest social services program in California after Medi-Cal, California's Medicaid program, and it provides an essential hunger safety net to an average of 5.5 million Californians per month.  Since the beginning of Federal Fiscal Year 2025, approximately $1.07 billion in CalFresh benefits have been issued each month.  Annually, the federal reimbursement of California's CalFresh administrative costs totaled approximately $1.3 billion.  Each month, approximately 1.9 million SNAP recipients in California are children.

64.    Similarly, in May 2025, approximately 1.7 million New York households, representing over 2.9 million individuals, participated in SNAP.  Nearly one million of those individuals were children.  In New Jersey, 441,199 households, representing 824,020 individuals, participated in SNAP.

**A.    To administer SNAP, state agencies collect applicants' highly sensitive personal information.**

65.    In order to administer the SNAP program as required by federal law, the States create and maintain millions of records containing sensitive, personal information about SNAP applicants and recipients.

66.    As part of the SNAP benefits application process, individuals must provide extensive personal information, including but not limited to name, home address, and social security number ("SSN").  *See* 7 C.F.R. § 273.2(b), (f)(1)(v).  Such information is frequently referred to as personally identifiable information, or "PII."  Applicants must also disclose their citizenship and/or immigration status.  *See id.* § 273.2.  The application collects the same information from ineligible individuals who are applying for benefits on behalf of their eligible children.

67.    State and federal laws require that States strictly protect the confidentiality of the data they collect and maintain as part of administering SNAP.  For example, the SNAP statute requires that States create "safeguards which prohibit the use or disclosure of information obtained from applicant households" subject to several narrow exceptions, which permit, for example, disclosure to "persons directly connected with the administration or enforcement" of SNAP.  7 U.S.C. § 2020(e)(8).  The law also permits disclosure to "law enforcement officials," but only

"upon request" and "for the purpose of investigating an alleged violation of" the SNAP statute or its implementing regulations. *Id.* § 2020(e)(8)(C).

68.    In California, state law protects the confidentiality of "all applications and records concerning any individual" who has applied for public social services and prohibits the disclosure of such information "for any purpose not directly connected with the administration of the program." Cal. Welf. & Inst. Code § 10850(a); *see also id.* § 18909 (applying Section 10850 to CalFresh); Civ. Code §1798.24 ("An agency shall not disclose any personal information in a manner that would link the information disclosed to the individual to whom it pertains [listing narrow exceptions].").

69.    Other Plaintiff States have similar laws that restrict the use and disclosure of SNAP records to administering public benefits programs or for limited uses consistent with the SNAP Act or regulations, such as limited disclosures to law enforcement to prosecute SNAP fraud or capture wanted felons.[9]

70.    Given these federal and state laws requiring confidentiality, States represent to applicants that their data will only be used for the administration of SNAP benefits, with only narrow exceptions. For example, one California county tells applicants that "personal information is protected and only used to determine your eligibility for benefits . . . with limited exceptions."[10] California's application for SNAP is explicit that immigration status will not be used for non-SNAP purposes[11]:

---

[9] Ariz. Rev. Stat. 41-1959(A); Colo. Rev. Stat. Ann. § 26-1-114; 10 Colo. Code Regs. § 2506-1:4.140; Conn. Gen. Stat. § 17b-90; D.C. Code § 4-209.04(c); 305 Ill. Comp. Stat. § 5/11-9; Md. Code Ann., Hum. Servs. § 1-201; COMAR 07.01.07.01-.12; Md. Code Ann., Gen. Prov. §§ 4-301(a) & 4-307; R.I. Gen. Laws § 40-6-12 and 218 R.I.C.R. 20-00-1.1.7; 22 Me. Rev. Stat. Ann. § 42(2); Mass. Gen. Laws ch. 18, § 11; Mass. Gen. Laws ch. 66A; 801 Mass. Code Regs. § 3.00 (2017); 106 Mass. Code Regs. § 360.400 (2022); Mass. Gen. Laws ch. 66, § 17A; Mass. Gen. Laws ch. 93H; Mich. Comp. Laws § 400.35; Nev. Rev. Stat. Ann. § 422A.342; N.J. Admin. Code § 10:87-1.14; N.J. Stat. Ann. § 44:10-47; N.J. Stat. Ann. § 47:4-4; N.M. Admin. Code 8.100.100.14; N.Y. Soc. Serv. Law § 21(3); Or. Rev. Stat. Ann. § 411.320; R.I. Gen. Laws § 40-6-12; Wash. Rev. Code § 74.04.060; Wis. Stat. Ann. § 49.81(2); Wis. Admin. Code DHS § 252.20.

[10] *CalFresh for Immigrants: Frequently Asked Questions*, San Francisco Human Services Agency (last visited March 24, 2026), https://www.sfhsa.org/services/food/calfresh/calfresh-immigrants-frequently-asked-questions.

[11] *Application for CalFresh, Cash Aid, and/or Medi-Cal/Health Care Programs*, CDSS (last visited July 28, 2025), https://www.cdss.ca.gov/cdssweb/entres/forms/English/SAWS2_PLUS.pdf.

**Important Information for Noncitizens**
You can apply for and get CalFresh benefits . . . for people who are eligible . . . .
For example, immigrant parents may apply for CalFresh benefits . . . for their
U.S. citizen or qualified immigrant children, even though the parents may not be
eligible. . . .  Immigration information is private and confidential. The
immigration status of noncitizens who are eligible and apply for benefits will be
checked with the U.S. Citizenship and Immigration Services (USCIS). Federal
law says the USCIS cannot use the information for anything else except cases of
fraud.

USDA has not previously expressed any concerns with this language during any management review.

71.    Many other Plaintiff States include similar privacy notices on their public benefits applications or in informational materials provided to applicants, all with the goal of ensuring applicants understand the purposes for which their personal information will be used.  And many counties and non-profits that assist applicants provide similar assurances to applicants that their data will not be used or re-disclosed for non-SNAP-related purposes.  Without those assurances, many people may decide to forego applying for benefits and go hungry, a risk that is particularly acute for citizen or qualified-immigrant children of ineligible parents.

**B.    Plaintiff States use third-party vendors to administer EBT cards, and those vendors collect sensitive data on SNAP recipients, subject to strict confidentiality requirements.**

72.    As part of administering the SNAP program, state agencies are responsible for issuing EBT cards.  *See* 7 C.F.R. § 271.4(a)(2).  An EBT card is a plastic, reusable card similar to a prepaid debit or gift card.  EBT cards are the exclusive means by which program participants may redeem their benefits in exchange for food at qualifying retail stores.  *See* 7 U.S.C. § 2016(f)(3)(B).  For example, a SNAP recipient may use their EBT card to buy approved food items at a grocery store that can process EBT payments.

73.    Plaintiff States' EBT Systems are databases in which benefits are stored and electronically accessed by cardholders at a point-of-sale terminal, ATM, or other device.

74.    Plaintiff States have contracted with one of two vendors, Fidelity Information Services ("Fidelity") or Conduent Inc., to provide EBT processing services, including managing the EBT System for their SNAP programs.  Plaintiff States' agreements with their EBT vendors

all restrict the authority of vendors to disclose SNAP participant data absent consent from the State, except in very narrow circumstances.

75. These EBT systems contain highly confidential data about individual SNAP beneficiaries. Raw EBT data includes names, addresses, dates of birth, Social Security numbers, contact information, and individual bank account numbers. EBT data also contains benefit codes that can be used to discern characteristics of clients that go beyond just personal identifying information, and EBT systems include transaction data that shows where and when a payee used an EBT card. These EBT systems also include information about individuals who receive state-funded public benefits.

### C. States periodically share some SNAP data with USDA, but never large swaths of PII or other sensitive data.

76. Plaintiff States treat SNAP applicant and recipient data—especially PII—with the utmost care. Among other things, many Plaintiff States implement a minimum-necessary practice whereby only data that is absolutely necessary to support a particular function may be accessed or disclosed.

77. When Plaintiff States receive requests for SNAP data from the federal government, Plaintiff States often only provide representative subsets of SNAP data that are responsive to the request and/or anonymize the data.

78. At times, in its role overseeing States' administration of the SNAP program, FNS has requested SNAP data from States in order to ensure that the program is administered correctly, and benefits are properly granted or denied.

79. Plaintiff States have provided SNAP data to FNS in the past, as part of routine monitoring and oversight. These requests have historically been narrowly limited to samples of data and/or anonymized data that does not contain PII. The requests have also historically been clearly consistent with the purposes for which the information was originally collected, *i.e.*, to ensure proper administration of SNAP.

80. One example is the federal SNAP Quality Control System ("SNAP-QCS"), which is one of several ways States and USDA ensure that recipients receive the correct benefits and that

decisions to deny, terminate, or suspend households are correct.  *See* 7 C.F.R. § 275.10.  As laid out in these regulations, States provide a random sample of SNAP cases every month to be reviewed through the federal SNAP-QCS.  *See* 7 C.F.R. §§ 275.11–.14.  This process is subject to a detailed "Privacy Impact Assessment," which lays out who can conduct this quality control data analysis and how the data will be used.[12]

81.    USDA itself describes SNAP as having "one of the most rigorous quality control systems in the federal government."[13]

**D.    As required by statute, States verify the eligibility and immigration status of SNAP applicants.**

82.    States rely on the Systematic Alien Verification for Entitlement program, known as the SAVE program, to verify eligible noncitizen status in a safeguarded fashion.

83.    SAVE is a federal database administered by U.S. Citizenship and Immigration Services within the Department of Homeland Security ("DHS").  It allows registered entities, including state governments and relevant state agencies, to verify the immigration status of applicants seeking federally funded benefits, including SNAP benefits.[14]

84.    The SAVE program is deployed in the SNAP context with privacy in mind.  States enter into agreements with USCIS that contain "safeguards limiting release or redisclosure as required by State or Federal law or regulation as discussed in § 272.1(c) and as may be required by other guidelines published by the Secretary."  7 C.F.R. § 272.11(b)(v).  States must include the steps taken to comply with this limit on disclosure as part of their state SNAP plans.  *Id.* § 272.11(e).  State agencies are further restricted to using the SAVE Program only for limited purposes related directly to establishing eligibility and program integrity.  *Id.* § 272.11(c).

---

[12] Privacy Impact Assessment for the Supplemental Nutrition Assistance Program - Quality Control System (July 1, 2019), https://www.reginfo.gov/public/do/DownloadDocument?objectID=133879401.

[13] SNAP Quality Control (last updated Dec. 9, 2025), https://www.fns.usda.gov/snap/qc.

[14] *See* SAVE, U.S. Citizenship and Immigration Services (last visited March 24, 2026), https://www.uscis.gov/save#:~:text=SAVE%20is%20an%20online%20service,of%20 20Homeland%20Security%20(DHS).

Second Amended Complaint for Declaratory and Injunctive Relief  (Case No. 3:25-cv-06310)

85.   Additionally, States take steps to prevent improper payments by using the National Accuracy Clearinghouse ("NAC"), a federal clearinghouse designed to ensure that individuals do not improperly receive SNAP benefits from multiple States at the same time.  7 C.F.R. § 272.18.

86.   USDA issued an interim final rule implementing the NAC on October 3, 2022, describing the results of a NAC pilot program and setting forth rules and an October 4, 2027 compliance deadline.  *See* 87 Fed. Reg. 59,633-01, 59,633 (Oct. 3, 2022).  Since then, Plaintiff States have been actively engaged with USDA to ensure that the NAC is used for the limited statutory purpose of preventing interstate duplicate participation, while protecting vulnerable individuals (such as domestic violence victims) from unauthorized disclosures of their personal information and complying with relevant privacy laws.  For example, NAC administrators have agreed to develop a system that hashes certain PII to reduce the risk of unauthorized disclosure of such information.  Federal regulations also require that each State and FNS enter into an agreement that ensures compliance with the Computer Matching and Privacy Protection Act of 1988, among other laws, before participating in the NAC.  7 C.F.R. § 272.18(a)(3).

87.   At least one Plaintiff State, Illinois, has already implemented the NAC system effective January 2025, building NAC matching into its benefits application to perform a NAC match with the other States participating in the process.

88.   States also already provide point-in-time EBT transaction data to USDA using the Anti-Fraud Locator Using EBT Retailer Transactions ("ALERT") System.  ALERT provides pseudonymized daily transaction records from States' EBT processors to USDA to conduct analysis of patterns in the data which may indicate fraudulent activity by stores that accept SNAP benefits.

89.   The ALERT system has significant data and privacy protections to ensure sensitive data is only used for the specific purpose of the system and prohibits sharing ALERT data outside of USDA.[15]

---

[15] *See* Privacy Impact Assessment: Anti-Fraud Locator Using EBT Transaction, USDA (April 14, 2020), https://www.usda.gov/sites/default/files/documents/fncs-alert-pia.pdf.

**II.    FEDERAL LAW STRICTLY LIMITS THE USE AND DISCLOSURE OF PERSONAL INFORMATION COLLECTED BY STATE AGENCIES ABOUT SNAP APPLICANTS AND RECIPIENTS.**

    **A.    The SNAP Act and USDA's implementing regulations**

90.    Congress created SNAP "to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. § 2011. In doing so, Congress also expressly limited the transmission of personal data collected in the operation of SNAP.

91.    SNAP requires state agencies to certify applicant households and issue EBT cards and requires such agencies to keep records necessary to determine whether the conduct of the program complies with federal law. 7 U.S.C. § 2020(a)(1)-(3). And while the Secretary of Agriculture may inspect and audit state records, such access is "subject to data and security protocols agreed to by the State agency and Secretary." 7 U.S.C. § 2020(a)(3)(B)(i).

92.    Federal regulations further limit the "[u]se or disclosure of information obtained from SNAP applicant or recipient households." 7 C.F.R. § 272.1(c)(1).

93.    Use or disclosure of such information is limited to, *inter alia*, persons directly connected with the SNAP program or "the verification of immigration status of aliens applying for SNAP benefits, through the Systematic Alien Verification for Entitlements (SAVE) Program, to the extent the information is necessary to identify the individual for verification purposes." 7 C.F.R. § 272.1(c)(1)(i), (iii).

94.    Congress also created the NAC to help detect improper duplicate benefits, as discussed above. To do this, once the NAC is fully implemented, States will report certain information to the NAC to see if individuals are simultaneously claiming benefits from multiple States. In creating the NAC, Congress mandated strong privacy protections for this reporting of data to USDA. First, "[t]he Secretary shall require that State agencies make available to [the NAC] only such information as is necessary for the [specified] purpose" of preventing duplicate benefits. 7 U.S.C. § 2020(x)(2)(B). Second, the "information made available by State agencies … shall be used only for the purpose" of preventing multiple benefits. *Id.* § 2020(x)(2)(C)(i).

Lastly, the data States provide "shall not be retained [by the NAC] for longer than is necessary to accomplish the purpose" of detecting and preventing duplicate benefits. *Id.* § 2020(x)(2)(C)(iii).

**B.    The Privacy Act of 1974**

95.    Congress enacted the Privacy Act of 1974 to "provide certain safeguards for an individual against an invasion of personal privacy," by requiring government agencies to maintain accurate records and providing individuals with more control over the gathering, dissemination, and accuracy of information about themselves.  Pub. L. No. 93-579, § 2(b), 88 Stat. 1896 (1974). This includes allowing individuals "to prevent records pertaining to [them] obtained by [federal] agencies for a particular purpose from being used or made available for another purpose without [their] consent." *Id.*

96.    To accomplish these purposes, the Privacy Act states, "[n]o agency shall disclose any record which is contained in a system of records . . .  except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains," unless a statutory exception applies.  5 U.S.C. § 552a(b).

97.    The Privacy Act lists thirteen exceptions to the bar on disclosure, only two of which are even arguably relevant here.

98.    An agency may disclose the records it maintains "to another agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought."  5 U.S.C. § 552a(b)(7).  As the Office of Management and Budget ("OMB") explained in its original July 1, 1975 Privacy Act Guidelines, this exception requires that the "misconduct is related to the purposes for which the records are maintained" and "blanket requests for all records pertaining to an individual are not permitted" under this exception.  40 Fed. Reg. 28,949, 28,955 (Jul. 9, 1975).

99.    Additionally, an agency may disclose a record "for a routine use," defined as "the use of such record for a purpose which is compatible with the purpose for which it was collected."  5

U.S.C. § 552a(b)(3). Any "routine use" must be detailed in the relevant System of Records Notice, published in the Federal Register, and must be compatible with the purpose for which the data was collected. *Id*. § 552a(a)(7), (e)(4)(D).

100. No exception to the Privacy Act's bar on nonconsensual disclosure permits Defendants to disclose SNAP applicant and recipient data to DOGE for the purpose of compiling a mass database, or to DHS for immigration enforcement, or to any other federal agency for non-SNAP-related purposes except in very narrow circumstances.

101. Additionally, the Privacy Act requires federal agencies to follow specific procedures before they "maintain, collect, use, or disseminate," any covered information. 5 U.S.C. § 552a(a)(3), (e)–(f).

102. When an agency "establish[es] or revis[es]" a "system of records" containing retrievable information about individuals, it must "publish in the Federal Register . . . a notice of the existence and character of the system of records." 5 U.S.C. § 552a(e)(4), (a)(5) (defining "system of records").

103. This notice, commonly referred to as a System of Records Notice ("SORN"), must identify the agency's intended uses and disclosures of those records. *Id*. § 552a(e)(4).

104. At least 30 days before publishing a SORN, the agency must also publish notice in the Federal Register "of any new use or intended use of the information in the system" and provide an opportunity for interested parties to submit "written data, views, or arguments to the agency." *Id*. § 552a(e)(11). Thus, before an agency can establish or revise a system of records, it must provide notice and an opportunity for public comment at least 30 days in advance.

**C.    The Computer Matching and Privacy Protection Act of 1988**

105. The Computer Matching and Privacy Protection Act of 1988 created additional protections for individuals' personal information against federal agency use of computer matching programs. Pub. Law No. 100-503, § 2, 102 Stat. 2507.

106. The Act prohibits the disclosure of any "record which is contained in a system of records . . . to a recipient agency . . . for use in a computer matching program except pursuant to a written agreement between the source agency and the recipient agency" explaining, among other

26

things, "the purpose and legal authority for conducting the program," "the justification for the program and the anticipated results, including a specific estimate of any savings," and "procedures for providing individualized notice at the time of application, and notice periodically thereafter as directed by the Data Integrity Board of such agency . . . to . . . applicants for and recipients of financial assistance or payments under Federal benefit programs."  *See* 5 U.S.C. § 552a(o).  Such agreements shall not be effective until 30 days after the agreement is submitted to Congress and cannot remain effective for more than 18 months.

107.   The Act defines a "matching program" as "any computerized comparison of . . . two or more automated systems of records or a system of records with non-Federal records for the purpose of . . . verifying the eligibility of applicants for, recipients or beneficiaries of, participants in, or providers of services with respect to, cash or in-kind assistance or payments under Federal benefit programs[.]"  5 U.S.C. § 552a(a)(8).  SNAP is a "Federal benefit program" as defined by the same section.  *See id.* § 552a(a)(12).

108.   The Act further forbids any agency from terminating, reducing, or making any final denial of any federal benefit payment to any individual as a result of such a matching program, until the agency has undergone certain procedures, including providing notice to the individual and an opportunity to contest the decision.  *Id.* § 552a(p).

109.   Finally, the Act prohibits a source agency from disclosing any records contained in a system of records to another agency for a matching program if the source agency has reason to believe that these requirements have not been met.  *Id.* § 552a(q).

110.   On information and belief, Defendants intend to conduct a computer matching program similar to the program that the IRS and DHS are engaged in building, according to public reporting.  *See infra*, Section III.D.

111.   On information and belief, Defendants have failed to comply with the requirements of 5 U.S.C. § 552a(o) and (p).

**D.     The Paperwork Reduction Act & the E-Government Act**

112.   The Paperwork Reduction Act ("PRA"), 44 U.S.C. § 3501 *et seq.*, governs federal agencies' collection of information from or about members of the public.  Under the PRA, an

27

agency shall not conduct or sponsor a collection of information unless the agency has complied with certain statutorily mandated steps.  44 U.S.C. § 3507.  These steps include conducting a review of the proposed collection to assess its necessity, how to efficiently use the information, and the burden imposed on the persons providing the information.  *Id.* §§ 3506(c)(1); 3507(a)(1).

113.   A collecting agency must also publish a notice in the Federal Register soliciting comments regarding necessity, minimizing burdens, and other topics.  *Id.* §§ 3506(c)(2); 3507(a)(1)(D).  One of those topics is "an estimate of the burden that shall result from the collection of information."  *Id*. § 3507(a)(1)(D)(ii)(V).  Burden is defined to include, among other things, "searching data systems," "adjusting the existing ways to comply with any previously applicable instructions and requirements," and "completing and reviewing the collection of information."  *Id*. § 3502(2).

114.   Following a 60-day public comment period, the agency must certify to OMB, using supporting records or public comments, that the proposed collection of information meets 10 criteria, including that it is "necessary for the proper performance of the functions of the agency," is "not unnecessarily duplicative of information otherwise reasonably accessible," the agency plans to use "effective and efficient statistical survey methodology appropriate to the purpose" of the collection, and the proposed collection "reduces to the extent practicable and appropriate the burden on persons who shall provide information to or for the agency."  *Id.* § 3506(c)(3).

115.   Finally, OMB must approve the proposed collection of information and provide the agency with a control number to be displayed on the documents soliciting the information.  *Id.* § 3507(a)(2) & (3).  Before making its decision, OMB must provide at least 30 days for public comment.  *Id.* § 3507(b).

116.   On information and belief, Defendant USDA has failed to comply with these requirements.

117.   Defendant USDA has not published a notice regarding its proposed collection in the Federal Register, nor has it solicited comments.  Instead, USDA submitted a "Nonsubstantive Change Request" memorandum directly to OMB on June 11, 2025.  In its memorandum, USDA "request[ed] approval of nonsubstantive changes to a currently approved collection" of SNAP

28

data performed by the States.  USDA explained that the "purpose" was "to add requirements to report to USDA a number of currently collected data elements related to SNAP certification and benefit issuance."[16]  USDA estimated it would take 20,000 additional hours for States to respond to these reporting requirements.

118.   On information and belief, Defendant USDA has not adequately considered the duplicative nature of this collection, the stated purposes for which are already served by existing systems, described in Section I.D.

119.   While USDA published a related SORN in the Federal Register, described above, the SORN did not address the 10 criteria required by the Paperwork Reduction Act.

120.   Pursuant to the E-Government Act of 2002, Pub. L. No. 107-347, § 208 *et seq.*, federal agencies are also required to conduct and publicly post a privacy impact assessment for the agency's information collections and each of its electronic information systems.

**E.    The Authority of OIG to Request Documents**

121.   The laws concerning the maintenance, use, and disclosure of personal data by federal agencies also apply to Inspectors General.

122.   The duties and responsibilities of Inspectors General include coordinating audits and investigations related to the programs and operations of their agency, taking steps to promote economy and efficiency in the administration of programs and operations, and preventing fraud and abuse.  5 U.S.C. § 404(a).

123.   Under 5 U.S.C. § 406, an Inspector General is authorized "to have timely access" to documents "available to the applicable establishment which relate to the programs and operations with respect to which that Inspector General has responsibilities."  5 U.S.C. § 406(a)(1)(A).  5 U.S.C. § 401(1) defines "establishment" to include USDA. Thus, under this provision, the Inspector General is limited to the documents and materials to which USDA itself has access under the SNAP Act, the Privacy Act, or other laws, and under the same conditions.

---

[16] FNS Memorandum to OMB, *Nonsubstantive Change Request – Supplemental Nutrition Assistance Program* OMB #0584-0064 (June 11, 2025), https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202506-0584-001.

124.   Additionally, the Inspector General may "request such information or assistance as may be necessary for carrying out [their] duties and responsibilities . . . from any Federal, State, or local governmental agency or unit thereof."  5 U.S.C. § 406(a)(3).  Accordingly, Inspectors General can only request information necessary for carrying out their duties and responsibilities, which, as explained above, concern promoting efficiency and preventing fraud and abuse in the programs and operations of their agencies.

125.   Similarly, Inspectors General may issue subpoenas, but only to obtain documents and materials "necessary in the performance of the functions assigned" by statute.  5 U.S.C. § 406(a)(4).

III.   **DEFENDANTS' DEMANDS ARE ONLY ONE PART OF A CAMPAIGN BY THE TRUMP ADMINISTRATION TO AMASS AMERICANS' SENSITIVE, PERSONAL DATA AND MISUSE THAT DATA FOR UNAUTHORIZED PURPOSES.**

126.   Defendants' demands for SNAP data from States do not occur in a vacuum, but rather in the context of a number of similar moves by federal agencies to obtain and disclose highly sensitive PII, not for program purposes, but for the creation of a surveillance system to advance the President's agenda, including by facilitating the President's mass deportation efforts.  The President initiated this campaign by issuing several Executive Orders urging unprecedented data sharing between federal agencies and directing federal agencies to gain "unfettered access" to States' data for federally funded programs that States administer. Then, according to public reporting, DOGE began amassing Americans' data from agencies such as the IRS and the Social Security Administration.  It has since been revealed that at least the IRS and HHS have given ICE access to troves of sensitive personal information to use for immigration enforcement.  Defendants' sweeping and unprecedented demands for five years' worth of PII on SNAP applicants and recipients appear to be another step in this Orwellian surveillance campaign.

A.   **President Trump has issued Executive Orders paving the way for DOGE and other federal agencies to gain access to sensitive federal benefit data.**

127.   On January 20, 2025, President Trump issued an executive order to create DOGE, directing all federal agency heads to "establish within their respective Agencies a DOGE Team of at least four employees."  Exec. Order No. 14,158, 90 Fed. Reg. 8,441, § 2(c).  Agency heads

were directed to consult with the head of DOGE when selecting this DOGE Team. *Id*. Additionally, the agency heads "shall ensure that DOGE Team Leads coordinate their work with [DOGE] and advise their respective Agency Heads on implementing the President's DOGE Agenda." *Id.*  The executive order also mandated that DOGE itself, not just the agency's DOGE Team, "ha[ve] full and prompt access to all unclassified agency records, software systems, and IT systems." *Id.* § 4(a).

128.   On February 19, 2025, President Trump signed an Executive Order titled "Ending Taxpayer Subsidization of Open Borders."  Exec. Order No. 14,218, 90 Fed. Reg. 10,581 (hereinafter the "Open Borders EO").  The Open Borders EO directs executive agencies to "enhance eligibility verification systems, to the maximum extent possible, to ensure that taxpayer-funded benefits exclude any ineligible alien[.]"  *Id.* § 2(a)(ii).  Further, it commands agencies to "refer any improper receipt or use of Federal benefits to the Department of Justice and the Department of Homeland Security for appropriate action."  *Id.* § 2(c).  It also purports to give DOGE new authority to "recommend . . . enhance[d] eligibility verification systems" for public benefits.  *Id.* § 2(b)(ii).

129.   On March 20, 2025, the President issued Executive Order 14,243, titled "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos" (hereinafter "Information Silos EO"). 90 Fed. Reg. 13,681.  The Information Silos EO directed agency heads to "take all necessary steps" to "ensure Federal officials designated by the President or Agency Heads (or their designees) have full and prompt access to all unclassified agency records [and data] . . . for purposes of pursuing Administration priorities related to the identification and elimination of waste, fraud, and abuse."  *Id.* § 3(a).  Such steps include "authorizing and facilitating both the intra- and inter-agency sharing and consolidation of unclassified agency records."  *Id.*

130.   Further, the Information Silos EO directed agency heads to "take all necessary steps" to ensure the federal government has "unfettered access to comprehensive data from all State programs that receive Federal funding, including, as appropriate, data generated by those programs but maintained in third-party databases."  *Id.* § 3(c).

Second Amended Complaint for Declaratory and Injunctive Relief  (Case No. 3:25-cv-06310)

**B.    Public reports reveal that DOGE is compiling sensitive personal information collected by federal agencies into a mass database.**

131.    In April 2025, multiple media outlets reported that DOGE had enlisted the technology company Palantir to build a massive repository of data pulled from multiple federal agencies, including the IRS, SSA, and HHS, among others, for the purpose of immigration enforcement.[17] It has also been reported that at least DHS and HHS have already adopted a key Palantir product called Foundry, which would streamline the implementation of such a project.[18]

132.    "Multiple sources" told one media outlet that DOGE seeks to "create a massive repository of data pulled from various agencies."[19]  News reports stated that "officials see the project as a way to overcome a major hurdle: quickly building 'targeting lists' that Immigration and Customs Enforcement can use to find, detain and deport migrants in the US."[20]

133.    In written responses to discovery in litigation over DOGE's access to sensitive personal information, three federal agencies identified employees of DOGE, or employees of other agencies who were then detailed to work for DOGE, who had access to information systems maintained by those agencies.[21]  One of the systems DOGE employees gained access to was the Center for Medicare & Medicaid's Integrated Data Repository, which contains Medicare and Medicaid data including "Social security number, gender, race/ethnicity, date of birth, geographic location, Medicare enrollment and entitlement information," "historic and current listing of

---

[17] *See* Priscilla Alvarez, *et al.*, *DOGE is Building a Master Database for Immigration Enforcement, Sources Say*, CNN (April 25, 2025), https://www.cnn.com/2025/04/25/politics/doge-building-master-database-immigration; Makena Kelly & Vittoria Elliott, *DOGE Is Building a Master Database to Surveil and Track Immigrants* (April 18, 2025), https://www.wired.com/story/doge-collecting-immigrant-data-surveil-track/.

[18] *See* Sheera Frenkel & Aaron Krolic, *Trump Taps Palantir to Compile Data on Americans*, New York Times (May 30, 2025), https://www.nytimes.com/2025/05/30/technology/trump-palantir-data-americans.html

[19] *See* Priscilla Alvarez, *et al.*, *DOGE is Building a Master Database for Immigration Enforcement, Sources Say*, CNN (Apr. 25, 2025), https://www.cnn.com/2025/04/25/politics/doge-building-master-database-immigration.

[20] *See id.*

[21] Defs.' Resp. to Plfs' Disc., Ex. B, *AFL-CIO v. Dept. of Labor*, No. 1:25-cv-00339-JDB (D.D.C. Mar. 29, 2025), ECF No. 73-2.

32

Second Amended Complaint for Declaratory and Injunctive Relief  (Case No. 3:25-cv-06310)

residences," and sensitive medical treatment information.[22]  Some of these DOGE employees were simultaneously detailed to multiple agencies at the same time.

134.  According to other media reports and a whistleblower's complaint, DOGE staffers have also violated cybersecurity laws, protocols, and best practices that protect the integrity of PII.[23]  These violations include DOGE staffers gaining access permissions that were not logged and not monitored for compliance with security protocols.

135.  According to news reports relying on anonymous tips by three persons familiar with the matter, DOGE staffers have been using a third-party AI chat bot to analyze data.[24]  One of the sources told Reuters that DOGE staffers feed large amount of data into the AI then "ask [the AI chatbot questions], get it to prepare reports, [and] give data analysis."  Use of third-party generative AI by employees at USDA is prohibited by the agency.[25]  This prohibition applies to all USDA employees and contractors, including OIG.

136.  DOGE has been accused publicly of mishandling sensitive data and ignoring data security protocols.  For example, a letter sent by the ranking member of the House Oversight and Government Reform Committee to the Social Security Administration alleged, based on information provided by a former federal employee and whistleblower, that "individuals associated with DOGE have assembled backpacks full of laptops, each with access to different agency systems, that DOGE staff is using to combine databases that are currently maintained

---

[22] System of Records Notice 09-70-0571, Medicare Integrated Data Repository, https://www.hhs.gov/foia/privacy/sorns/09700571/index.html (last visited March 24, 2026).

[23] Jenna McLaughlin, *A Whistleblower's Disclosure Details How DOGE May Have Taken Sensitive Labor Data*, NPR (Apr. 15, 2025), https://www.npr.org/2025/04/15/nx-s1-5355896/doge-nlrb-elon-musk-spacex-security; Letter from Whistleblower Aid to Congress, Apr. 14, 2025, attaching Decl. of Daniel J. Berulis, Apr. 14, 2025, https://whistlebloweraid.org/wp-content/uploads/2025/06/2025_0414_Berulis-Disclosure-HELP-and-Oversight-with-Exhibits.pdf.

[24] Marisa Taylor & Alexandra Ulmer, *Musk's DOGE Expanding his Grok AI in U.S. Government*, Reuters (May 23, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/musks-doge-expanding-his-grok-ai-us-government-raising-conflict-concerns-2025-05-23/.

[25] In USDA's "Interim Guidance on the Use of Generative Artificial Intelligence at USDA," the department noted the risks of using AI and prohibited USDA employees and contractors from accessing publicly available, third-party Generative AI tools while in their official capacity or on government furnished equipment."  USDA later noted in a memo to OMB regarding USDA's "Compliance Plan for OMB Memoranda M-24-10" regarding generative AI, that the department presently "lack[s] the resources to review terms of service, assess the adequacy of guardrails, test the limitations of software, or even gather technical info such as the foundation model used."

separately by multiple federal agencies."[26] The letter went on to assert that "[s]uch a system would pose unprecedented operational security risks and undermine the zero-trust cybersecurity architecture that prevents a breach at one agency from spreading across the government."[27]

137. Although Administration officials have said publicly that DOGE has been disbanded as a formal "centralized entity," many of its employees have remained at federal agencies and are reportedly continuing to pursue DOGE's agenda—including the centralization and unfettered use of sensitive data. *See* Makena Kelly and Vittoria Elliott, *DOGE Isn't Dead. Here's What Its Operatives Are Doing Now*, WIRED (Dec. 2, 2025), available at https://www.wired.com/story/what-is-doge-doing-now/.

138. Upon information and belief, DHS, with the assistance of DOGE and external entities, such as ICE contractor Palantir, are combining federal, state, and local databases of information into a single interoperable database for the purpose of "mass deportations" and other large-scale immigration enforcement and mass surveillance purposes.[28] This effort reportedly includes databases of personal information that have never been used for immigration enforcement or other purposes unrelated to the primary missions of the agencies that initially collected the data. Impacted federal agencies and programs reportedly include HHS, the IRS, the Supplemental Nutrition Assistance Program, the SSA, the U.S. Department of Housing and Urban Development, the U.S. Department of Veterans Affairs, the U.S. Education Department, and the U.S. Postal Service.[29]

139. Upon information and belief, Defendants' demands for state SNAP data are in service of this same effort, involving DOGE, to amass Americans' information in order to advance the President's agenda. Administration officials have acknowledged this connection. For example,

[26] See Letter from Committee on Oversight and Government Reform to Assistant Inspector General for Audit, SSA, Michelle L. Anderson (April 17, 2025), https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/evo-media-document/2025-04-17.gec-to-ssa-oig-master-data.pdf.
[27] *Id.*
[28] *See* Muzaffar Chishti & Colleen Putzel-Kavanaugh, *Seeking to Ramp Up Deportations, the Trump Administration Quietly Expands a Vast Web of Data*, Migration Policy Institute (May 29, 2025), https://www.migrationpolicy.org/article/trump-ice-data-surveillance.
[29] *Id.*

during public remarks in Minneapolis on January 22, 2026, Vice President JD Vance called on "state and local officials" to share SNAP and Medicaid data (specifically including home addresses) so that the Administration can use that data to support its mass deportation campaign. Associated Press, *JD Vance delivers remarks in Minneapolis* (Jan. 22, 2026), at 7:20-8:10, available at https://www.youtube.com/live/xHOWRMk-MFU?t=439s.  Two days later, Attorney General Pam Bondi sent a letter to Minnesota Governor Tim Walz urging Minnesota to "partner with this administration" on "enforcing federal immigration laws," including by sharing all of the State's "records on Medicaid and Food and Nutrition Service programs, including [SNAP] data, with the federal government."  Letter from A.G. Bondi to Gov. Walz (Jan. 24, 2026) at 2-3.[30]

### C.    CMS recently demanded Medicaid data from States, then shared it with DHS and, after States sued, gave ICE unfettered access to state data.

140.   On June 13, 2025, it was reported for the first time that the HHS had transferred, *en masse*, sensitive Medicaid data files from California, Illinois, Washington, and the District of Columbia, to DHS, without the States' consent.[31]

141.   According to reports, the shared data contains personal health records representing millions of individuals, was personally identifiable, not anonymized, and included Medicaid beneficiaries' immigration status, addresses, and social security numbers, among other details. Senior HHS political appointees ordered that the data be shared immediately, over the objections of career staff who advised that such a transfer of information would violate federal law, and the HHS officials were given just 54 minutes to comply with the directive.

142.   A DHS spokesperson confirmed receipt of the mass personal Medicaid data transfer from HHS.  In its statement to the Associated Press, DHS claimed that "Joe Biden flooded our country with tens of millions of illegal aliens," and that therefore the Centers for Medicare & Medicaid Services ("CMS")—a component of HHS—and DHS "are exploring an initiative to

---

[30] Available at https://www.nytimes.com/interactive/2026/01/24/us/pam-bondi-walz-doc.html.
[31] *See* Kimberly Kindy & Amanda Seitz, *Trump administration gives personal data of immigrant Medicaid enrollees to deportation officials*, Associated Press (Jul. 14, 2025), https://apnews.com/article/medicaid-deportation-immigrants-trump-4e0f979e4290a4d10a067da0acca8e22.

ensure that illegal aliens are not receiving Medicaid benefits that are meant for law-abiding Americans."

143.  HHS's disclosure of Medicaid personal data to DHS was far broader than would be needed for the identification and prevention of waste, fraud, and abuse.  HHS has never before enlisted DHS's participation in "oversight" of the Medicaid program in such a manner.

144.  News of the disclosure to DHS caused a public outcry, followed by a lawsuit by twenty states—including California, New York, New Jersey, and several other Plaintiff States— that is currently pending in the Northern District of California.  *California et al. v. U.S. Dep't of Health and Human Servs. et al.*, Case No. 3:25-cv-05536-VC (N.D. Cal. filed July 1, 2025).

145.  Days after the States' filed their lawsuit, ICE and CMS executed an agreement to give ICE *direct* access to the database of Americans' Medicaid data submitted by States to CMS, so that ICE can "receive information concerning the identity and location of aliens in the United States, such as address, telephone number, banking information…email address…or other information . . . ."

146.  In other words, ICE is brazenly attempting to use the information individuals submit to States in their Medicaid application and claims—to get basic medical care—in order to deport those individuals or their family members.  In doing so, ICE is using the federally maintained database as a vehicle to obtain state data that it could not otherwise demand from the States themselves.  The move is unprecedented.

147.  On information and belief, Defendants' demands for SNAP data from Plaintiff States is a similar attempt to improperly collect and share this data with other federal agencies, that do not intend to use the data for any SNAP administration-related purpose.

**D.     On the insistence of DOGE, the IRS and DHS have already begun creating a system for sharing home addresses of deportation targets with DHS.**

148.  On July 15, 2025, ProPublica published a detailed account of documents it had obtained from the IRS revealing the agency's plan to build a computer program that would give

Second Amended Complaint for Declaratory and Injunctive Relief  (Case No. 3:25-cv-06310)

ICE officers on-demand access to confidential tax data.[32]  Specifically, the system would allow ICE to obtain the home addresses of those it seeks to deport, using information provided by taxpayers for tax purposes.

149.  According to ProPublica's reporting, DOGE began pressuring the IRS to provide taxpayer data to ICE earlier this year, but the acting general counsel refused.  He was soon replaced by Andrew De Mello.  Soon after, the IRS and DHS entered into a memorandum of understanding ("MOU") that allowed for inter-agency information sharing but provided for specific legal guardrails to safeguard taxpayers' information.[33]  On or around June 25, ICE demanded that the IRS turn over the addresses of 7.3 million taxpayers, according to public reporting.[34]  De Mello refused, finding that this demand did not comply with the requirements of the agencies' MOU, including ICE's obligation to provide written assurance that each individual whose data was requested was under active criminal investigation.  Two days later he, too, was forced out of his job as general counsel of IRS.[35]

150.  ProPublica also learned that a top ICE official proposed to IRS that DHS provide the agency with all of its deportation targets, and IRS simply respond with the home addresses associated with those individuals.  ProPublica reports that IRS lawyers were alarmed by this suggestion, and its brazen illegality under taxpayer confidentiality statutes, and it caused a wave of departures in the agency's legal and privacy departments.  Nonetheless, ProPublica obtained a technical blueprint that appears to show that the IRS and DHS took steps to carry out precisely that plan before the end of July 2025.[36]

151.  In response to a request for comment, the White House confirmed that ICE plans to use this data to fulfill the President's campaign pledge to carry out mass deportations.[37]

---

[32] William Turton, Christopher Bing & Avi Asher-Schapiro, *The IRS Is Building a Vast System to Share Millions of Taxpayers' Data with ICE*, ProPublica (July 15, 2025), https://www.propublica.org/article/trump-irs-share-tax-records-ice-dhs-deportations.
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*

Second Amended Complaint for Declaratory and Injunctive Relief  (Case No. 3:25-cv-06310)

**IV.   USDA HAS ALREADY TAKEN STEPS TO ADVANCE THE ADMINISTRATION'S CAMPAIGN TO COLLECT AND MISUSE AMERICANS' DATA.**

152.   Under ordinary circumstances, USDA's data demand would be unreasonable and beyond the scope of its statutory oversight role.  However, USDA's demand comes in conjunction with other acts and public statements making it clear that the agency is not focused on efficient program administration and integrity but rather intent on sharing this information across the federal government, including for the purpose of assisting immigration enforcement.

**A.   DOGE has already begun accessing sensitive data systems at USDA.**

153.   USDA is no exception to this administration's pervasive campaign against individual privacy.  On February 14, 2025, U.S. Secretary of Agriculture Brooke Rollins announced that the agency was welcoming DOGE into USDA and giving them "full access and transparency" to the agency.[38]

154.   According to public reporting from July 15, 2025, a whistleblower from USDA recently provided evidence revealing that DOGE has gained high-level access to view and change the contents of USDA's National Payment Service, which controls billions of dollars in USDA payments to American farmers.[39]

155.   The National Payment Service contains highly sensitive information shared by farmers who apply for federal loans and other payments.  As one former senior USDA official explained, "When we talk about farm loan application records, there is no more personal information anywhere than in that database . . . . The farmer's entire financial life and the life of their kids and their family, every time they've missed a payment, every time they've had a hard time, every time they've gotten in financial trouble . . . it's there."[40]

---

[38] *Secretary Rollins Takes Bold Action to Stop Wasteful Spending and Optimize USDA to Better Serve American Agriculture*, USDA (Feb. 14, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/02/14/secretary-rollins-takes-bold-action-stop-wasteful-spending-and-optimize-usda-better-serve-american.

[39] Jenna McLaughlin, *DOGE keeps gaining access to sensitive data. Now it can cut off billions to farmers*, NPR (updated July 11, 2025), https://www.npr.org/2025/07/10/nx-s1-5455779/doge-usda-farmers-data.

[40] *Id.*

156.  Allowing DOGE access to this information is a sharp break from USDA's longstanding policy.  One former deputy FSA administrator commented, "I cannot understate the emphasis and the seriousness with which USDA had historically taken the handling of private information."[41]

157.  On July 15, 2025, U.S. Senator Tammy Baldwin from Wisconsin issued a letter to Secretary Rollins, on behalf of Wisconsin farmers, demanding that DOGE's access be revoked. She warned that DOGE's access to sensitive agricultural information is "an intrusion that not only breaches [farmers'] privacy, but also raises serious concerns about the future of USDA payments, our nation's food security, and the consolidation of farmland and processing operations."[42]

**B.     USDA has recently erased guidance on its website promising that information provided by SNAP applicants would not be used for immigration enforcement.**

158.  Historically, and until very recently, USDA guidance materials have emphasized that immigration status information provided by SNAP applicants would not be used for immigration purposes, consistent with federal law and relevant policies.

159.  As recently as February 2, 2025, the USDA FNS website contained a section titled "SNAP Eligibility for Non-Citizens" that had a banner at the top of the page stating "Important" in bold large type and said "You can apply for or receive SNAP without immigration consequences."[43]  The website's FAQ stated, "you will not be deported, denied entry into the U.S., denied permanent resident status (Green Card holder), or the ability to become a U.S. citizen solely because you *or a family member* applied for or received SNAP."[44]  (emphasis added).

---

[41] *Id.*
[42] Letter from Senator Tammy Baldwin to Brooke Rollins, Sec'y, USDA (July 15, 2025), https://www.documentcloud.org/documents/25998912-2025-07-15-final-letter-to-usda-regarding-doge-access/.
[43] *See SNAP Eligibility for Non-Citizens*, USDA (updated Jan. 27, 2025), https://web.archive.org/web/20250202100047/https://www.fns.usda.gov/snap/recipient/eligibility/non-citizen.
[44] *Id.*

160.  As of February 22, 2025, that "Important" banner and the FAQ quoted above had been removed from the webpage.[45]  The changes also removed some other language, including an answer in a FAQ explaining to ineligible noncitizens that "you may apply for your eligible non-citizen or citizen children. Your income and resources still count to determine eligibility and benefit levels for the rest of your household members. Since you are not applying for SNAP, you do not need to provide your Social Security number or immigration status."

161.  On information and belief, no law, rule or regulation changed during this period in February to warrant removal of the text previously on the FNS website.

162.  The FNS website section on Program Guidance on Non-Citizen Eligibility previously contained a PDF document titled Supplemental Nutrition Assistance Program Guidance on Non-Citizen Eligibility, which contains the same assurances about immigration consequences associated with SNAP benefits.[46]  That PDF has now been removed.

163.  USDA's website also previously contained a factsheet for "immigrant serving institutions" stating that applying for or receiving Summer EBT, a program to subsidize groceries for parents of school-aged children while school is out of session, would not result in being "deported, denied entry to the country, or denied permanent status."[47]  That fact sheet has been removed.

164.  On information and belief, USDA removed these references on its website because it knows that SNAP applicant and recipient information will now be used for immigration-enforcement related purposes, contrary to law and long-standing policy and practice.

---

[45] *See SNAP Eligibility for Non-Citizens*, USDA (updated Feb. 21, 2025), https://web.archive.org/web/20250222190554/https://www.fns.usda.gov/snap/recipient/eligibility/non-citizen.

[46] *Supplemental Nutrition Assistance Program Guidance on Non-Citizen Eligibility*, USDA (June 2011), https://web.archive.org/web/20250208231044/https://fnsprod.azureedge.us/sites/default/files/resource-files/Non-Citizen%20Guidance_6-30-2011.pdf.

[47] *Summer EBT Factsheet for Immigrant Serving Institutions*, USDA (Jan. 2024), https://web.archive.org/web/20250202082329/https://www.fns.usda.gov/sebt/outreach-toolkit/factsheet-immigrant-serving-institutions.

40

## V.    IN AN UNPRECEDENTED MOVE, USDA DEMANDED FIVE YEARS' WORTH OF PERSONAL INFORMATION ON SNAP APPLICANTS AND RECIPIENTS FROM PLAINTIFF STATES.

### A.    USDA first attempted to obtain all SNAP participant data directly from Plaintiffs' EBT vendors, then changed course after being sued.

165.  As noted above, Plaintiff States have contracted with one of two vendors, Fidelity Information Services ("Fidelity") or Conduent, to provide EBT processing services, including managing the EBT System for their SNAP programs.

166.  On or around May 5, 2025, Plaintiff States that contract with Fidelity received a letter from the firm stating that it had been contacted by USDA and USDA's DOGE team related to the recent Information Silos Executive Order, but had not provided any confidential data pursuant its contract with the relevant Plaintiff States.

167.  In late April or early May, Plaintiff States were informed by Conduent or Fidelity, depending on which firm the State contracts with, that USDA and/or DOGE had contacted them to request SNAP data. Pursuant to its agreement with those States, Conduent and Fidelity stated that it did not share any confidential or personally identifiable information with USDA or DOGE.

168.  On April 24, 2025, USDA made a verbal request for SNAP participant data from Conduent.  USDA sought "audit"-level data for Conduent's entire customer base nationwide including account setup and maintenance files, which includes PII files, and six months of historical data.  Conduent did not share the requested data and responded to USDA noting that the federal agency might want to reach out to the States directly.

169.  On May 6, 2025, USDA's FNS sent a letter to all state SNAP agency directors, titled "FNS Data Sharing Guidance," informing them that USDA intended to effectuate the Information Silos EO recently issued by President Trump (the "May 6 Letter").  To that end, USDA claimed that federal law authorizes USDA to "obtain SNAP data from state agencies and, by extension, their contractors."  Therefore, USDA "is working with several SNAP payment processors to consolidate SNAP data[.]"  A true and correct copy of that letter is attached as Exhibit A.

170.  The May 6 Letter also notified the state agencies that USDA would be "taking steps to require all states to work through their processors to submit at least the following data to

41

[USDA]": (1) "Records sufficient to identity individuals as applicants for, or recipients of, SNAP benefits, including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers"; and (2) "Records sufficient to calculate the total dollar value of SNAP benefits received by participants over time, with the ability to filter benefits received by date ranges."  It continued, "[r]equested data will cover the period beginning Jan. 1, 2020, through the present[.]"  The letter ends with a threat, stating that "[f]ailure to grant processor authorizations or to take the steps necessary to provide SNAP data to [USDA] may trigger noncompliance procedures codified at 7 USC 2020(g)."

171.    In the May 6 Letter, USDA acknowledged that it was engaged in rulemaking by promulgating the "data sharing guidance" therein.  The Letter cites to 5 U.S.C. § 553(a)(2), apparently claiming an exception to the notice and comment requirement for such rulemaking for "a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts."  5 U.S.C. § 553(a)(2).

172.    On May 9, 2025, Fidelity informed several Plaintiff States, including California, New York, and Illinois, that USDA had requested records regarding SNAP cardholder and transaction data and that Fidelity intended to cooperate with the request.  The vendor stated that it was nevertheless seeking the state agencies' consent for Fidelity to disclose information to USDA.

173.    Plaintiff States that received this communication from Fidelity individually engaged with Fidelity, explaining that they did not consent to the disclosure of their data to USDA.  On or around May 14-15, 2025, Fidelity assured these same Plaintiff States that it would not release data without the States' consent.

174.    Similarly, Plaintiff States that contract with Conduent, such as Connecticut and New Jersey, informed Conduent that it was not authorized to release information to USDA without the States' authorization and approval.  Conduent relayed that it did not share SNAP data when requested by USDA.

175.    To Plaintiff States' knowledge, their EBT vendors have not, to date, released any SNAP participant data in connection with USDA's requests.

176. After the May 6 Letter, privacy advocacy groups swiftly filed suit to enjoin USDA from collecting SNAP data containing PII from state agencies.  *See* Compl., *Pallek v. Rolllins*, No. 1:25-cv-1650 (ECF No. 1) (D.D.C. May 22, 2025).  The complaint alleges that USDA's actions violated the Privacy Act, the Paperwork Reduction Act, and the Administrative Procedure Act.

177. When the plaintiffs moved for a temporary restraining order, a USDA official stated that USDA "has instructed EBT Processors to refrain from sending any data until USDA completed procedural steps to ensure that data received would be appropriately safeguarded and to satisfy all necessary legal requirements."  Corley Decl. ¶ 13, *Pallek v. Rolllins*, No. 1:25-cv-1650 (ECF No. 11-1) (D.D.C. May 30, 2025).  The official further represented that USDA planned to complete and publish a new System of Records Notice ("SORN"),[48] as required by the Privacy Act, before collecting any data under the May 6 Letter.  *Id.* ¶ 14.

**B.   USDA then issued a SORN notifying stakeholders of its intent to collect SNAP data, and hundreds of stakeholders submitted comments criticizing the proposal.**

178. On June 23, 2025, USDA published a SORN in the Federal Register titled USDA/FNS–15, ''National Supplemental Nutrition Assistance Program (SNAP) Information Database.''  90 Fed. Reg. 26,521 (June 23, 2025).

179. The SORN states: "Pursuant to, among other authorities, 7 U.S.C. 2020(a)(3) and (e)(8)(A) and 7 CFR 272.1(c)(1) and (e), FNS will work with all State agencies and their designated vendors and/or contractors to transmit data on SNAP participants and transactions for the purposes listed below.  This system is consistent with and effectuates multiple executive orders, including but not limited to Executive Order 14243 of March 20, 2025, Stopping Waste, Fraud, and Abuse by Eliminating Information Silos and Executive Order 14218 of February 19, 2025, Ending Taxpayer Subsidization of Open Borders." *Id.*

---

[48] "[E]ach time an agency 'establish[es] or revis[es]' a system of records, it must publish a System of Records Notice ('SORN') in the Federal Register detailing, among other things, 'each routine use of the records contained in the system, including the categories of users and the purpose of such use.'" *AFSCME v. Soc. Sec. Admin.*, No. ELH-25-0596, 2025 WL 1206246, at *57 (D. Md. Apr. 17, 2025) (quoting 5 U.S.C. § 552a(e)(4)(D)).

180.  The SORN announces that USDA intends to demand the following records from "53 State agencies and their designated vendors and/or contractors": "records containing personally identifying information, including but not limited to SNAP participant name, Social Security Number (SSN), date of birth (DOB), residential address, Electronic Benefit Transaction (EBT) card number, and case record identifier number or other identifiers or data elements maintained by States, vendors, or contractors to identify SNAP recipients." *Id.*

181.  The SORN also portends to collect "information derived from and associated with EBT transactions, including but not limited to records sufficient to calculate the total dollar value of SNAP benefits received by participants over time, such as applied amounts and benefit available dates." *Id.*

182.  These categories of information will be collected for all "individuals who have received, are currently receiving, or have applied to receive SNAP benefits." *Id.*

183.  The SORN lists the following sources from which USDA will collect this "data on SNAP participants and transactions": "53 State agencies that administer SNAP and their designated vendors and/or contractors. Information in this system is also provided by other Federal agencies with which USDA partners on program integrity efforts." *Id.*

184.  In vague terms, the SORN explains that the data will be used "to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying and eliminating duplicate enrollments, and performing additional eligibility and program integrity checks specified herein."  It is unclear what is meant by "ensure the integrity of Government programs" and "performing . . . program integrity checks," and USDA has not provided additional detail to Plaintiff States. *Id.*

185.  As authority for the collection of SNAP data, the SORN cites 7 U.S.C. § 2020(a)(3) and (e)(8)(A); 7 CFR § 272.1(c)(1) and (e), in addition to the Information Silos EO and the Open Borders EO. *Id.*

186.  The SORN sets out eleven "routine uses" for which USDA intends to disclose the SNAP data it collects.  The eighth "routine use" announces that USDA intends to disclose the data "[w]hen a record on its face, or in conjunction with other records, indicates a violation or

44

potential violation of law, whether civil, criminal or regulatory in nature . . . USDA/FNS may disclose the record to the appropriate agency, whether Federal, foreign, State, local, or tribal, or other public authority responsible for enforcing, investigating, or prosecuting such violation or charged with enforcing or implementing the statute, or rule . . if the information disclosed is relevant to any enforcement, regulatory, investigative or prosecutive responsibility of the receiving entity." *Id.*

187.   The SORN states that it became effective upon publication, except for the "routine uses," which would become effective after a 30-day comment period, ending on July 23, 2025. *Id.*

188.   Alarmed by several aspects of this SORN, California, Arizona, Colorado, Connecticut, Illinois, Maryland, Michigan, Minnesota, New Mexico, New Jersey, New York, Oregon, Rhode Island, and Washington submitted a comment letter to outlining their objections to USDA's proposal.  A true and correct copy of that letter is attached as Exhibit B.

189.   The States' letter explained that USDA's new database would unlawfully require States to turn over sensitive, personal information that was collected for SNAP-use only. Furthermore, USDA's proposal would duplicate Congressionally mandated eligibility determinations already performed by the States.  Lastly, the SORN purported to allow USDA to disclose individuals' personal information for any legal or regulatory enforcement purpose, which would be incompatible with the original purpose of collecting that data for SNAP purposes. *See, e.g., Britt v. Naval Investigative Serv.*, 886 F.2d 544, 548-49 (3rd Cir. 1989).

**C.    USDA disregarded all comments and demanded SNAP data from Plaintiff States by July 30, 2025.**

190.   Hundreds of individuals, organizations, and state actors submitted negative comments on USDA's SORN.  A total of 458 comments on the SORN are available publicly.

191.   On information and belief, USDA did not, and never intended to, consider any comments to the SORN, including the comment letter submitted by Plaintiff States (Exhibit B), as evidenced by the fact that the agency began attempting to collect data the day after the SORN went into effect.

192.   In recent court filings, USDA has claimed that it is tracking and reviewing comments and has acknowledged that the comments are overwhelmingly opposed to the SORN.  ECF No. 29-1, *Pallek et al. v. Rollins et al.,* No. 1:25-cv-01650-JMC (D.D.C. July 21, 2025).  Yet, publicly, Defendant USDA has made no changes to its demand for data nor to its intended treatment of the data.  Defendant USDA's actions belie any claim that it has engaged in a meaningful notice and comment procedure.

193.   In fact, USDA did not wait to consider any comments from interested parties before acting on its SORN.  Just over two weeks after issuing its SORN, on July 9, 2025, Secretary Rollins sent the States a new demand letter (the "July 9 Letter").  The July 9 Letter is attached here as Exhibit C.

194.   The July 9 Letter again cites the President's Information Silos Executive Order and states that USDA "is committed to effectuating this Executive Order," in particular the provision requiring agency heads to "take all necessary steps . . . to ensure the Federal Government has unfettered access to comprehensive data from all state programs that receive federal funding, including . . . data generated by those programs but maintained in third-party databases."

195.   It goes on to explain that USDA's goal is to "eliminate[] bureaucratic duplication and inefficiency and enhance[] the Government's ability not only to have point-in-time information but also to detect overpayments and fraud."

196.   The Letter cites to the SORN described above and acknowledges that the SORN would become fully effective on July 23, 2025, the last day for comments.

197.   Finally, it states "[t]o ensure efficient implementation of this system, and to ensure USDA has a complete and accurate database, we are requiring collection of SNAP data from EBT processors or State agencies beginning on July 24, 2025, with submissions to USDA no later than the close of business on July 30, 2025."

198.   The July 9 Letter states that the "required data" are listed in the SORN under the heading "Categories of Records in the System."  They are: "records containing personally identifying information, including but not limited to SNAP participant name, Social Security Number (SSN), date of birth (DOB), residential address, Electronic Benefit Transaction (EBT)

46

card number, and case record identifier number or other identifiers or data elements maintained by States, vendors, or contractors to identify SNAP recipients" and "information derived from and associated with EBT transactions, including but not limited to records sufficient to calculate the total dollar value of SNAP benefits received by participants over time, such as applied amounts and benefit available dates."  The Letter does not provide a time period for this data.

199.    On information and belief, the May 6 Letter is the culmination of Defendant USDA's decision-making process, purports to place an obligation on the States to produce data, and constitutes a final agency action.

200.    In issuing this letter, USDA ignored the substantial burden that this unlawful data demand would place on Plaintiff States, which are being asked to produce massive quantities of sensitive data on an impossibly short deadline.  USDA estimated that compliance would take States a total of 20,000 additional hours to comply.[49]  That is a vast underestimate.  In California, for example, state agency officials have estimated that collecting and producing the requested data would take a minimum of 3 months and possibly over 6 months due to the breadth and ambiguity of the request, the need to collect data from multiple legacy automated systems, and other technical challenges.  New Jersey's SNAP administrator also faces technical challenges as the requested data would need to be culled and compiled from across multiple sources, requiring months of work.  Texas's comment on USDA's SORN similarly observed that it would take "approximately 8-10 weeks (from the time additional FNS guidance is provided) to provide initial requested data and at least 8-12 weeks to develop and implement system requirements that will regularly interface with the new USDA/FNS-15",[50] in stark contradiction to USDA's estimate.

201.    On July 23, 2025, one week before the deadline it set to produce data, Defendant USDA sent state agencies another letter ("the July 23 Letter") with further details about its demand, attached hereto as Exhibit D.

---

[49]  USDA Memo. to O.M.B., Nonsubstantive Change Request - Supplemental Nutrition Assistance Program (OMB # 0584-0064) (June 11, 2025), https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202506-0584-001.

[50] Texas Health and Hum. Serv. Comm'n, Comment Letter On FNS-2025-0024 (July 21, 2025), https://www.regulations.gov/comment/FNS-2025-0024-0037.

47

202.   The agency clarified, for the first time, that it is demanding data on "individuals who have received, are currently receiving, or have applied to receive SNAP benefits from January 1, 2020, through present date.  Requested data elements shall include records sufficient to identify individuals as applicants for, or recipients of, SNAP benefits, including but not limited to all household group members' names, dates of birth, social security numbers, residential and mailing addresses used or provided, as well as all data records used to determine eligibility or ineligibility."

203.   Additionally, the letter noted that USDA is requesting "transactional records from each household . . . sufficient to calculate the total dollar value of SNAP received by recipients over time . . . as well as SNAP usage and retailer data."  *See* Exhibit D.  In other words, it appears that USDA is not only demanding PII of all applicants, but also PII of household members, as well as records showing how recipients used their benefits and at which grocery stores.

204.   The letter further directs States to transmit their data via the commercial platform, Box.

205.   USDA's demand departs from past practice not only with respect to the breadth of information requested and lack of substantive protections, but also with respect to basic protocols undertaken.  For example, when New York's SNAP administration agency has transmitted data sets to USDA in the past—all of which have been much smaller than the set demanded here, and were shared for federally approved purposes—USDA and the state agency have executed data-sharing agreements and/or memoranda of understanding prior to transmission.  USDA and the state agency have also resolved technical questions, including determining the appropriate data elements and proper data formatting, prior to transmission.  The rushed process undertaken here has not afforded USDA and state agencies time to follow these important steps.  Indeed, USDA initially completely ignored the express statutory requirement that it may only inspect state SNAP records pursuant to "data and security protocols *agreed to by the State agency and Secretary*." 7 U.S.C. § 2020(a)(3)(B)(i) (emphasis added).

206.   At least one Plaintiff State, Colorado, requested that USDA-FNS agree to data and security protocols in connection with this data collection, and received no substantive response from the agency.

207.   On July 23, USDA also published a Privacy Impact Assessment, in what appears to be a rushed attempt at surface-level compliance with one of the requirements of the Paperwork Reduction Act. [51]

208.   In it, USDA claims to have the authority to "collect and utilize SNAP beneficiary data for program administration and enforcement as provided, for example, in the Food and Nutrition Act of 2008 (7 U.S.C. 2011 et seq.) at 7 U.S.C. 2020(a)(3)(B), (e)(8)(A); 7 C.F.R. 272.1(c)(1), (e)."[52]  USDA misstates the authority granted by the cited provisions.

209.   USDA discloses that the uses of the data in the database would be "to detect duplicate enrollments across states, verify immigration status eligibility, and perform other fraud prevention checks against other Federal agencies' datasets, thereby ensuring program integrity, including by verifying the eligibility of benefit recipients."[53]

210.   In its privacy impact assessment, USDA also reveals that it intends to "cross check data against other Federal databases using matching algorithms to determine accuracy," clearly describing a computer matching program.[54]  However, on information and belief, USDA has not executed a computer matching agreement nor complied with the requirements of the Computer Matching and Privacy Protection Act of 1988.

211.   USDA also states that it intends to share the data collected with Federal agencies "when necessary to investigate and rectify fraudulent or otherwise improper or illegal SNAP enrollments or transactions."[55]

212.   USDA further reveals that it intends to use the data to "perform other fraud prevention checks against other Federal agencies' datasets," without providing further detail on

---

[51] USDA, Cybersecurity and Priv. Operations Ctr., Priv. Div., USDA Privacy Impact Assessment Fiscal Year 2025 (July 23, 2025), https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *Id.*

how those datasets would be obtained or whether USDA would share SNAP data with other agencies in order to do so.[56] Again, to Plaintiffs' knowledge, USDA has not complied with the prerequisites to conducting a computer matching program, as this statement describes.

213. The purposes for which USDA states it will use the collected data are all duplicative of existing systems. The Privacy Impact Assessment states the data will be used to "detect duplicate enrollments across states, verify immigration status eligibility, and perform other fraud prevention checks against other Federal agencies' datasets, thereby ensuring program integrity."[57] States already conduct these checks, using systems such as NAC and SAVE, described in Section I.D.

214. USDA states that notice of this data collection will be provided to applicants by States "at the point the individual applies for SNAP enrollment."[58] Plaintiff States do not, nor have they been instructed to, notify SNAP applicants that their data may be turned over, wholesale, to the federal government in this manner.

215. Finally, USDA reveals in its Privacy Impact Assessment that, unlike in a routine audit, USDA intends to keep the data it collects from States indefinitely.

**D.    USDA threatened States with noncompliance procedures if they do not comply by the agency's arbitrary deadline.**

216. On July 25, 2025, USDA sent state agency directors another letter (the "July 25 Letter"), reminding them of the July 9 demand and the July 30, 2025 deadline to comply. A true and correct copy of that letter is attached as Exhibit E.

217. The letter contained a thinly veiled threat to retaliate against States who do not (or cannot) comply with USDA's unlawful demand. It stated: "Failure to take the steps necessary to provide the relevant data to FNS may trigger noncompliance procedures codified in 7 U.S.C. 2020(g)." *See* Exhibit E.

218. Then, on August 12, after Plaintiff States initiated this lawsuit, USDA sent many state governors an "advance notice" about noncompliance procedures and threatened to issue a "formal

---

[56] *Id.*
[57] *Id.*
[58] *Id.*

warning" if States did not provide the data by August 15—just three days later. *See, e.g.*, ECF No. 59-7, Ex. G (citing 7 C.F.R. § 276.4). This deadline was later extended to August 19.

219. Plaintiff States moved for a stay or preliminary injunction on August 18.

220. USDA then sent Plaintiff States "formal warnings" threatening to disallow federal administrative funding—in amounts reaching to hundreds of millions of dollars per quarter for some States, and in amounts exceeding the total annual federal share of administrative funding for some States—if Plaintiff States did not hand over the demanded data within thirty days. *See* ECF No. 67-1, Exs. A-P; ECF No. 75-1, Exs. B-C; ECF No. 75-4, Ex. A.

221. After issuing a temporary restraining order to preserve the status quo while the parties briefed Defendants' last-minute arguments, the Court granted a preliminary injunction on October 15, 2025, concluding that Plaintiffs are likely to prevail on their claim that Defendants' demand is contrary to law. *See* ECF No. 106 at 13-19.

**E.    USDA has refused to commit that it will not immediately disclose SNAP data it collects outside the agency.**

222. On July 23, 2025, representatives for USDA appeared in court for a hearing in the *Pallek* case about its demands for SNAP data. *See Pallek et al. v. Rollins et al.*, No. 1:25-cv-01650-JMC (D.D.C.).

223. When asked by the court, "Do you know what the next step is? . . . after the last day of the month, what's next?" USDA's representative stated, "I don't, Your Honor. I know the agency is working on setting up a process very soon to allow for data transfers. But I do assume there would be some work that goes into collating that data . . . ."

224. When asked by the court whether Defendant USDA was willing to represent that "data won't be disclosed to any third parties or outside USDA in the next two weeks," USDA's representative responded, "I can't say that definitively."

**F.      USDA persists in its unlawful data demands despite the Court's preliminary injunction order.**

225.   Despite the Court's preliminary injunction, USDA renewed its data demand in letters to Plaintiff States dated November 24, 2025 (the "November 24 Letter").  A true and correct copy of that letter (including attachments) is attached to the Complaint as Exhibit F.[59]

226.   According to the November 24 Letter, its renewed demand followed the agency's consideration of a "preliminary review" of data already collected from other States, which USDA claimed "indicates that billions of dollars in federal funds may have been lost due to fraud or other errors undetected by States in their administration of SNAP."

227.   USDA's renewed demand included a proposed data and security protocol.  USDA claimed that "there can be no good faith objection" to its proposed protocol.

228.   USDA's November 24 proposed protocol nonetheless remained contrary to law for numerous reasons.  Among other problems, the proposed protocol made clear that the renewed demand remained governed by the SNAP Information Database SORN, which includes the "routine uses" that the Court found likely rendered Defendants' original demand unlawful; despite having represented on September 2, 2025 that it was working to amend the SORN, *see* ECF No. 72-1, ¶ 22, USDA *still* has not done so as of the date of this filing.  For this and other reasons, the November 24 proposed protocol would permit the unlawful use and disclosure of States' SNAP records.

229.   On December 8, 2025, Plaintiffs sent a letter detailing these and other problems with the proposed protocol and seeking clarification about USDA's plans in order to offer additional substantive suggestions.  A true and correct copy of this letter is attached to the Complaint as Exhibit G.

230.   Among other requests, Plaintiffs' December 8, 2025 letter asked USDA to explain how its data demand aligned with its assertions that the agency "shall collect only the data

[59] Many of USDA's letters to Plaintiff States have been separately addressed but substantively identical, and Plaintiff States have at times responded with a letter from each Plaintiff State including substantively identical text.  Where appropriate, Plaintiff States attach as exhibits to this Complaint just single exemplars of these letters.

elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks" and that "[t]he scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals." Specifically, Plaintiffs asked USDA to "share its methodologies and proposed data analysis techniques with States so that [the States could] provide feedback on the data needed, and the validity of the analytical methods being used, before providing FNS with confidential information on millions of SNAP beneficiaries."

231.   USDA responded to Plaintiffs after the close of business on December 23, 2025.  A true and correct copy of USDA's response is attached to the Complaint as Exhibit H.  Rather than trying to reach agreement with Plaintiffs, USDA rejected their concerns out of hand and accused them of seeking "delay" for raising those concerns.  USDA advised Plaintiffs to treat its December 23 letter as an advance notification under 7 C.F.R. § 276.4(d)(1), thereby initiating noncompliance proceedings to withhold Plaintiffs' funding.  USDA's notice required Plaintiffs to commit by January 6, 2026 to turn over the demanded data—a deadline that was later extended to January 9.  Defendants also revised their proposed protocol, not to address any of the concerns raised by Plaintiffs, but instead to reserve their purported right to share access to their new SNAP Database with other parties "to the extent required by law"—apparently leaving USDA room to share States' applicant data with immigration enforcement authorities, and perhaps other federal agencies, in violation of the SNAP Act.

232.   On January 9, 2026, Plaintiff States responded to USDA by its prescribed deadline, explaining that they were unable to agree to USDA's renewed demand, including because it fails to cure the defects identified in this Court's order, but also that they remain ready to work with USDA in good faith towards an agreed-upon protocol that complies with the SNAP Act and other applicable laws.  A true and correct copy of that letter is attached to the Complaint as Exhibit I.

233.   On January 9, 2026, Plaintiff States also filed a motion to enforce or expand the preliminary injunction.  *See* ECF No. 116.

234.   Following briefing and oral argument on Plaintiffs' motion, USDA sent letters to Plaintiff States stating that the agency was "further revising its pending November 24, 2025 data

53

sharing request, as amended December 23, 2025" to address issues raised during the court hearing held on February 13, 2026. A true and correct copy of USDA's February 17, 2026 letter (and the agency's February 17 proposed protocol) is attached to the Complaint as Exhibit J.

235. USDA's February 17 letter once again referred to the agency's receipt of SNAP data from other States to justify its renewed data demand, and claimed that it was obligated to seek this data "to ensure any distribution of federal funds accords with law and does not risk loss to errors, fraud, waste and abuse."

236. Plaintiff States provided USDA with detailed responses to the agency's February 17 proposed protocol on February 25, 2026, and filed a copy of that response with the Court. *See* ECF No. 133. A true and correct copy of this letter (including attachments**)** is attached to the Complaint as Exhibit K. As explained therein, Plaintiffs' proposed revisions were primarily intended to ensure that States' SNAP data could only be used or disclosed consistent with the statutory restrictions set forth by 7 U.S.C. § 2020(e)(8)—including to ensure that the States' data would not be impermissibly used or disclosed for purposes of investigating potential violations of or enforcing immigration laws—and to avoid unnecessary disclosures of PII.

237. The Court subsequently granted in part Plaintiffs' motion to enforce or expand the preliminary injunction, in an order dated February 26, 2026, which preliminary enjoined USDA "from disallowing SNAP funding based on Plaintiff States' failure to comply with the demands set forth in the November 24 and December 23 letters or otherwise acting thereon." ECF No. 134 at 22.

238. On March 10, 2026, USDA rejected Plaintiffs' February 25 proposed protocol and sent an updated proposed protocol. A true and correct copy of USDA's correspondence to Plaintiff States (including attachments) is attached as Exhibit L. In its cover letter, USDA requested that "the plaintiff States inform [USDA] by March 20, 2026, whether they will now comply with FNS's data request."

239. On March 25, 2026, Plaintiff States provided a responsive letter to USDA explaining ongoing concerns with the legality of USDA's data requests and proposed protocols, including that USDA is apparently attempting to amass States' data to in turn share it with DHS and its

54

subagencies for purposes of enforcing immigration laws, contrary to the SNAP Act.  A true and correct copy of that correspondence is attached as Exhibit M.

240.  On March 27, 2026, USDA sent Plaintiff States a three-sentence letter and updated protocol without addressing the points raised in Plaintiff States' March 25 letter.  A true and correct copy of USDA's correspondence is attached as Exhibit N.

241.  On March 30, 2026, Plaintiff States responded to USDA explaining that the latest protocol failed to address the concerns Plaintiff States had repeatedly raised.  A true and correct copy of this correspondence is attached as Exhibit O.

242.  On March 31, 2026, in a joint status report to this Court, Defendants proposed further amendments to the protocol.  *See* ECF No. 143.

**G.     Secretary Rollins has confirmed that the decision to create the SNAP Information Database was based on falsehoods about SNAP program integrity.**

243.  Secretary Rollins's public statements about the SNAP Information Database show that the initial impetus for USDA's data demands was based on falsehoods about SNAP program integrity.

244.  For example, Secretary Rollins has repeatedly claimed that her motivation for demanding SNAP data has been to "figure out why under Biden the food stamp program increased 40 percent."[60]  In her telling, USDA "asked every state . . . to send us their data and let us, with DOGE . . . actually start going through this data to better understand how this explosion of SNAP benefits happened under Joe Biden.  We increased almost 40% on this program in just a couple of years under the Biden administration.  Of course, we know that they were trying to buy the election, but that's a conversation for another time."[61]

---

[60] Brooke Rollins (@SecRollins), X (Jan 16, 2026 10:21 a.m. PST), https://x.com/SecRollins/status/2012228822096056324?s=20.

[61] Fox News, "CORRUPT SYSTEM": Illegal immigrants' use of SNAP benefits revealed, at 3:09-3:34 (YouTube Nov. 2, 2025), https://youtu.be/piXXRqJQdKs?si=I7JBRPghWdhARKty&t=188; *accord* Rapid Response 47 (@RapidResponse47), X (Jan. 20, 2026 4:58 p.m. PST), https://x.com/RapidResponse47/status/2013778212594069598 (claiming that "Biden increased [SNAP] 40 percent in his four years—of course, trying to buy reelection for the Democrats," that the "fraud is insane," and that therefore USDA is "going to stop funding a lot of [SNAP]" and is

(continued…)

245.   Upon information and belief, Defendants know that this "40 percent" is neither attributable to Plaintiff States nor evidence of potential fraud, waste, or abuse, but was the consequence of legislation signed during President Trump's first term to authorize "emergency allotments to households participating in [SNAP]" during the COVID-19 pandemic.[62]  Pursuant to that COVID relief legislation, then-USDA Secretary Sonny Perdue announced "a 40% increase in SNAP benefits to ensure that low-income individuals have enough food to feed themselves and their families during this national emergency."[63]  These Pandemic-era emergency allotments expired in February 2023.[64]  Accordingly, after an initial increase in program spending during FY2021, program spending decreased each fiscal year back to pre-emergency-allotment levels.[65]

246.   Upon information and belief, despite Defendants' awareness of the false nature of their claims, they have refused to correct the record, and Secretary Rollins continues to spread these falsehoods.[66]

---

"suing a lot of the blue states to give [USDA] the data"); Fox Business, Crackdown on SNAP fraud tied to broader push for government accountability, at 2:45-3:05 (March 25, 2026), https://www.foxbusiness.com/video/6391640248112 ("speculat[ing]" that "blue states" are "working to put people into government programs where they can buy their vote for the election")

[62] *See* Families First Coronavirus Response Act, Pub. L. No. 116-127, § 2302(a)(1), 134 Stat. 178, 188 (2020).

[63] *USDA Increases Monthly SNAP Benefits by 40%: Emergency Benefits Prompted by COVID-19*, USDA (Apr. 22, 2020), https://www.usda.gov/about-usda/news/press-releases/2020/04/22/usda-increases-monthly-snap-benefits-40.

[64] *SNAP Emergency Allotments are Ending*, USDA (Feb. 8, 2023), https://www.usda.gov/about-usda/news/blog/snap-emergency-allotments-are-ending; Consolidated Appropriations Act, Pub. L. No. 117-328, § 501, 136 Stat 4459, 5994 (2022).

[65] *See* Jordan W. Jones, *Supplemental Nutrition Assistance Program (SNAP) - Key Statistics and Research*, USDA Economic Research Service (July 24, 2025), https://www.ers.usda.gov/topics/food-nutrition-assistance/supplemental-nutrition-assistance-program-snap/key-statistics-and-research; *see also SNAP Data Tables: National and/or State Level Monthly and/or Annual Data*, USDA (Jan. 9, 2026), https://www.fns.usda.gov/pd/supplemental-nutrition-assistance-program-snap (in January 2025, program participation was 42,819,061 persons at an average monthly benefit of $185.95 per person; in January 2021, program participation was 42,125,157 persons at an average monthly benefit of $206.20 per person).

[66] *See* Rae Deng, *Did SNAP Benefits Increase Almost 40% Under Biden Administration?  What We know*, Snopes (Nov. 7, 2025), https://www.snopes.com/news/2025/11/07/snap-biden-administration/ ("Rather than answer clarifying questions about Rollins's remarks, USDA sent via email a link to its SNAP datasets,

(continued…)

## VI. USDA-OIG MAKES UNPRECEDENTED DEMANDS FOR ALL SNAP PARTICIPANT DATA FROM PLAINTIFF STATES.

### A. USDA's Office of Inspector General

247. Congress has established an Office of Inspector General in USDA ("OIG"), as it has in various other federal agencies. *See* 5 U.S.C. §§ 402(a)(1), 401(1).

248. Inspectors General were created to be independent watchdogs installed in federal agencies to keep those agencies accountable to the voters and prevent mismanagement, corruption, and government waste. OIG's duties are "to conduct, supervise, and coordinate audits and investigations relating to the programs and operations of" USDA, inform the Secretary of Agriculture and Congress about problems in the agency, and other advisory functions, such as recommending policies for activities designed to promote efficiency and detect fraud and abuse and "provid[ing] a means for keeping" the Secretary and Congress informed about problems with USDA activities. 5 U.S.C. § 402(b); 5 U.S.C. § 404(a).

249. On January 24, 2025, USDA's Inspector General was fired in violation of applicable procedures[67]—along with 16 other inspectors general—and escorted out of her office.[68] USDA's new Inspector General was confirmed in December 2025 and took office in January 2026.[69]

250. The previous USDA Inspector General (along with many other purportedly fired Inspectors General) sued, asserting that she was fired unlawfully. *See Storch et al. v. Hegseth et al.*, No. 1:25-cv-415 (D.D.C.). The district court agreed, though it declined to order her reinstatement. *See Storch v. Hegseth*, 804 F. Supp. 3d 216, 220 (D.D.C. 2025).

which Snopes used to disprove Rollins's possible claims."); Jude Joffe-Block, *The Agriculture Secretary Says SNAP Changes Are Coming. Here's What We know*, NPR (Dec. 1, 2025), https://www.npr.org/2025/12/01/nx-s1-5608225/snap-rule-changes-usda-rollins (explaining why Secretary Rollins remarks are baseless and that "USDA did not respond to a question seeking clarification.").

[67] *See* 5 U.S.C. § 403(b).

[68] Rachael Levy, *Exclusive: USDA Inspector General Escorted Out of Her Office After Defying White House*, Reuters (Jan. 29, 2025), https://www.reuters.com/world/us/usda-inspector-general-escorted-out-her-office-after-defying-white-house-2025-01-29/.

[69] *John Walk, Inspector General, U.S. Department of Agriculture*, USDA OIG, https://usdaoig.oversight.gov/about/inspector-general-biography.

**B.      OIG Demands all SNAP participant data for 2024 from California, Illinois, and Michigan.**

251.    On March 5, 2025, OIG announced an inspection of California's Department of Social Services ("CDSS") to "determine whether the State of California used FNS [Food and Nutrition Services] SNAP administrative funds to provide benefits to participants." Over the course of the next couple of weeks, OIG conducted an in-person inspection and CDSS provided documents relevant to that inquiry.

252.    Shortly after the in-person inspection, OIG unexpectedly requested data for all SNAP applicants and their family members for the last fiscal year to "perform analytics on SNAP participant data to evaluate its quality and integrity." Despite discussions with CDSS, OIG insisted on demanding personal information about applicants and household members, including names, languages spoken and read, and citizenship status. But OIG did drop its request for data on income and employment status.

253.    CDSS raised concerns with the unprecedented nature of the request, including the volume of records requested and privacy concerns associated with sharing such data. CDSS offered to provide a limited data sample, such as the records already provided to USDA under the mandatory quality control review process. OIG declined.

254.    OIG also provided additional information about its inspection goals in its discussions with CDSS. OIG explained that it planned to review data used for eligibility determinations because "[d]ata of poor or low quality can impact eligibility determinations. We are NOT reviewing the data to determine full eligibility, but rather we are focused on the quality of the data so that, ultimately, the USDA program agency (Food and Nutrition Service) can make appropriate eligibility determinations on reliable information."

255.    CDSS was puzzled by OIG's explanations. Neither FNS nor any other component of USDA makes SNAP eligibility determinations; rather, States and their counties do. *See* 7 U.S.C. § 2020(a)(1) ("The State agency of each participating State shall have responsibility for certifying applicant households[.]")

256.   Furthermore, OIG dropped its request for data on household income, which is a primary factor in determining SNAP eligibility.  And OIG declined CDSS's offer to aid OIG in its data validation efforts by providing system documentation and explanation about how some of OIG's stated concerns—such as entering letters into zip code fields—weren't possible in the computer system used in California.

257.   Lastly, CDSS explained to OIG that any concerns with poor data quality would appear in the large sample CDSS had already provided to USDA and that OIG had rejected.

258.   CDSS was also concerned by OIG's refusal to commit that it would not re-disclose any data provided to OIG to other federal agencies.  CDSS directly asked OIG about any plans to share SNAP record data with DOGE or other entities in the federal government.  OIG declined to make any assurances about its plans in writing, and instead stated that it would comply with the Privacy Act and its SORN.

259.   OIG also did not offer to negotiate a data and security protocol, even though one is required before CDSS must produce SNAP records to USDA.  7 U.S.C. § 2020(a)(3)(B)(i).

260.   OIG represented that the requested data would be held in the system of records described in a SORN published at 87 Fed. Reg. 62,066 as the one applicable to its collection, maintenance, and disclosure of the SNAP records OIG requested from CDSS.  More specifically, OIG wrote that the requested data would be held in the "Office of Analytics and Innovation's (OAI) Holistic Information Analytics and Visualization Environment (HIAVE) System."  87 Fed. Reg. 62,076.  This SORN lists as the included record sources: "records obtained from systems of records maintained by USDA or other Federal agencies; individuals; non-Government, commercial, public, and private agencies and organizations; and publicly-available databases."  *Id.* at 62077.

261.   This SORN also notes that disclosures of records under the "routine use exception" to the Privacy Act may be made when a record "indicates either by itself or in combination with other information, a violation or potential violation of a contract or law."  87 Fed. Reg. 62,069; *see id.* at 62,077 (identifying applicable routine uses).

262.   In response to a request by CDSS, OIG also identified a privacy impact assessment relating generally to its IT Infrastructure system.[70]  That assessment broadly notes that OIG's IT Infrastructure "includes many types of information, for example, information on individuals who are part of an audit or investigation, internal staff correspondence, copies of subpoenas issued during an investigation, affidavits, witness statements, transcripts of testimony, notes, reports, etc."  This data is used by OIG, again generally, "to perform OIG audits, investigations, and other activities, and to identify indicators of fraud and more generally, to promote the effectiveness and integrity of USDA programs."  Nothing in the assessment indicates that OIG has specifically assessed the need for, or privacy risks involved with, collecting the entire universe of SNAP participants' records.  Nor does the assessment analyze the risks associated with disclosing the universe of SNAP record data to another agency for non-SNAP purposes.

263.   Illinois was similarly notified in April 2025 that OIG would be conducting an inspection of its SNAP program seeking to "perform analytics on participant data to evaluate its quality and integrity."  OIG initially requested a sample set of 50-100 cases, seeking almost all data elements collected from each applicant in the sample set.

264.    In May 2025, as Illinois was preparing the sample, OIG revised their request and instead sought the "Entire Federal FY 24 Universe . . . of Snap Participant Data."  Given the unprecedented breadth of this request, both quantitatively and qualitatively, and the enormous amount of PII subject to potential disclosure, Illinois's SNAP agency has sought to negotiate privacy protections and other limitations on subsequent disclosure of the data beyond OIG.

265.   However, OIG refused requests by Illinois to provide de-identified data, enter into a confidentiality agreement, or agree to a data and security protocol as Illinois believes is otherwise required by statute.

266.   As of the initiation of this lawsuit, Illinois nevertheless remained engaged in a negotiated process with OIG with the goal of ensuring that cooperation with OIG's inspection

---

[70] Privacy Impact Assessment, OIG IT Infrastructure (OIG GSS) (Feb. 14, 2019), https://www.usda.gov/sites/default/files/documents/oig-gss-pia.pdf.

does not threaten subsequent disclosure of Illinois's SNAP data for purposes unrelated to the SNAP program.

267.    OIG also recently sought beneficiary information from Michigan, and USDA was directly involved in that demand, despite OIG being ostensibly independent from USDA. On May 8, 2025, OIG submitted a request for information to Michigan's Department of Health and Human Services ("MDHHS") via email.  The email request sought "System Information" including a "List of system(s) MI uses to store eligibility data"; "List of data sources MI uses to verify eligibility"; "Eligibility system data dictionary"; and "Sample SNAP cases (anywhere between 50-100 cases would be enough for us to understand the data elements contained in MI's eligibility system)," and provided a list of 24 "data elements" for SNAP beneficiaries' information, all of which would include PII (e.g., name, SSN, address, alien status, etc.).  The email acknowledged that OIG "underst[oo]d it might take a while" to respond to the request "based on the size of the dataset, and having to go through internal processes such as checking with your legal team."

268.    On May 14, 2025, OIG followed up via email stating: "As part of this request we are asking for all participant information that is provided at the time of the application and any data collected to validate the data provided by the applicant/s is accurate, as it relates to SNAP. That would be any information that an applicant would enter into [Michigan's benefits system], not limited to the [24 data elements in the original request]. This could include income/employment, household information, etc."

269.    On June 2, 2025, the FNS Midwest Regional Office (an office of USDA, not OIG) contacted Michigan regarding OIG's request.  FNS advised that OIG was "able to modify its requests from the entire universe of SNAP participant data to a sample of that data.  That is anywhere between 50-100 cases."  FNS's email acknowledged the "burden" of the original OIG request and indicated that "hopefully" the "modification" of the request reduced the burden.

270.    On July 22, 2025, MDHHS provided the requested sample data with the beneficiary data deidentified to the FNS Regional Office.

271.   On July, 24, 2025, the FNS Regional Office responded, indicating the Regional Office had shared the sample with OIG and that OIG sought additional information, specifically "the full FY24 (10/1/23-9/30/24) SNAP participant data set," including beneficiaries' PII.

272.   On information and belief, OIG's demands for data from Plaintiffs California and Michigan is the culmination of the agency's decision-making process, purports to place on those States an obligation of producing data, and constitutes a final agency action.

## VII.   PLAINTIFF STATES WILL BE IRREPARABLY HARMED IF FORCED TO DISCLOSE THE DEMANDED SNAP DATA.

273.   If they are forced to disclose the requested data, Plaintiff States will suffer irreparable harm that monetary damages cannot adequately remedy.

274.   Once sensitive personal information is disclosed to Defendants, it is nearly impossible to effectively and totally claw it back, prevent it from being re-disclosed outside Defendant agencies, or ensure it is not misused.  If Plaintiff States are forced to comply with Defendants' demands, they will be harmed in at least three ways.  First, they face proprietary harm from Defendant USDA threatening to withhold SNAP administrative funding in retaliation for refusing to provide data.  Second, turning over SNAP data to the federal government will thwart Plaintiff States' goals of curtailing hunger by chilling individuals' participation in SNAP and destroying trust between the Plaintiff States and their residents built over many years and through the dedication of significant resources.  Third, Defendants' actions undermine Plaintiff States' sovereign interest in enforcing their state privacy laws and administering their SNAP programs as they have for decades.

### A.   Proprietary Harms—Withholding of Administrative Funds, Burden on State Agencies, and Litigation Risk

275.   Plaintiff States face proprietary harm due to the potential loss of federal funds for the administration of SNAP threatened by USDA.

276.   If USDA penalizes Plaintiff States—either on its own or, in the case of California and Michigan, because OIG reports the State to USDA for failing to comply with its data request and USDA penalizes Plaintiff States—Plaintiff States will lose some or all of the federal

62

administrative funds they have currently budgeted for next year.  In order to continue operating SNAP, Plaintiff States and their counties would have to divert resources in order to shoulder an increased proportion of the cost of administering the program.

277.    Plaintiff States rely on and plan for significant federal funds for the administration of SNAP.  For 2025-2026, California has budgeted $1.228 billion in federal funding for CalFresh administration.[71]  The State is budgeted to pay $902 million and counties to pay $348 million for the same time period.  In fiscal year 2024, Connecticut incurred $157.7 million in SNAP administrative expenses, of which 50% was reimbursed by the federal government.  In fiscal year 2025, Illinois has received $177,042,875 in federal funding for SNAP administration.  The State is budgeted to pay at least $177,042,875 in match.  For 2025-26, Maine has budgeted $13.3 million in federal funding for its SNAP administration, along with a further $13.3 million in state funds for the same purpose.  For 2025-2026, Maryland has budgeted $1.7 billion in federal funding for SNAP consisting of $115 million for administration and $1.6 billion for benefits.  For FFY 2025, Massachusetts has budgeted approximately $213 million to pay for SNAP administration, anticipating approximately $106 million generated in federal financial participation reimbursements.  In Michigan, the State budgeted approximately $164 million to administer the SNAP program, with the State providing approximate $84 million and the federal government contributing approximately $80 million.  For New Jersey's 2024-2025 fiscal calendar year, the State has budgeted $190 million in federal funds for SNAP administration and allocated approximately $34 million from state funds and $156 million from county funds for administration.  For FY 2025, Rhode Island has budgeted over $27 million in federal funds to help pay SNAP administrative costs.  Wisconsin would expect over $100 million in federal funding for program administration and budgeted an equal amount from state and local funds.  In FFY 2024, Washington budgeted $129.5 million in such federal funding and $129.5 million in state funds.

---

[71] *The 2025-26 Budget: Food Assistance Programs*, Legislative Analyst's Office (Feb. 19, 2025), https://lao.ca.gov/Publications/Report/4971.

278.  Plaintiff States also face a significant burden on their agencies if they are forced to collect and produce the massive amount of data demanded by Defendants.  This burden is difficult to quantify, given the ambiguities in Defendants' demands.  On information and belief, this burden far exceeds the 20,000 hours estimated by Defendant USDA.

279.  Plaintiff States also face risk of litigation arising from any noncompliance with USDA's and OIG's data demands.

**B.  Chilling Effect Harm—Disclosure and misuse of data will cause a chilling effect on SNAP participation.**

280.  Defendants' actions will have a predictable and imminent chilling effect on individuals' willingness to avail themselves of critically needed public benefits.

281.  The mere prospect that SNAP PII may get shared with other federal agencies, such as DOGE or DHS, for surveillance or broad-based immigration enforcement purposes will discourage individuals from participating in nutrition programs for which they are eligible and authorized to participate.  This chilling effect will affect citizens, individuals who are not (or should not be) at risk of deportation, such as green card holders, and mixed-immigration status families with U.S. citizen children.

282.  The predictable chilling effects of Defendants' actions will harm Plaintiff States by causing loss of federal funding associated with any eligible individuals who avoid participating in SNAP.

283.  For example, for each eligible individual who is discouraged from participating in SNAP by Defendants' overreach, Plaintiff States will lose from about $150 to almost $200 per month, per recipient, in federal funding.

284.  To the extent that members of the public decide to stop using statewide application and enrollment systems, then those systems will not operate as effectively as they do now.

285.  If Defendants move forward with their unprecedented data demands, they will cause additional administrative and fiscal burdens for Plaintiff States.

286.  Plaintiff States' agencies already engage in extensive outreach efforts to inform and educate the public about availability of nutrition programs.  For example, California's FFY 2019-

64

2021 CalFresh outreach plan has an annual budget of over $44 million for each of those three years, and funds 145 contractors and subcontractors and works with local government agencies, local schools, community-based organizations, the California State University system, and many others to encourage CalFresh enrollment.

287. Other States devote substantial resources to outreach efforts through a variety of contractor, faith-based groups, or governmental partners. For example, Arizona spends roughly $6 million; Illinois roughly $4.8 million; New Jersey roughly $5 million; Rhode Island roughly $1 million; Washington roughly $10 million; and New York roughly $23 million.

288. Defendant USDA itself has acknowledged that just *asking* for sensitive information chills participation in the SNAP program, at one point discouraging States from asking for citizenship, immigration status, and SSNs for household members in SNAP applications because these inquiries "may have a chilling effect on the pursuit of the application" and "deter[] households from filing applications," and warning that "[f]ear and misinformation may deter many non-citizens from seeking benefits for which they are eligible—particularly if there are other members in the household who may be ineligible because of their immigration status."[72] On information and belief, Defendant USDA is aware that requiring States to *disclose* that information to the federal government is even more likely to chill participation in SNAP.

289. To avoid a significant decrease in SNAP enrollment, Plaintiff States' agencies will need to divert some of these outreach and education resources in order to encourage SNAP participation despite Defendants' actions, including by explaining Defendants' actions to fearful community members, if possible. Portions of these resources will have to be redirected toward training employees and volunteers and developing new outreach materials and applications.

---

[72] FNS Memo to SNAP Regional Directors re Conforming to the Tri-Agency Guidance Through Online Applications (Feb. 18, 2011), https://fns-prod.azureedge.us/sites/default/files/Tri-Agency_Guidance_Memo-021811.pdf.

**C.    Chilling Effect Harm—Disaster Response (California, New Jersey, Oregon, and Washington)**

290.    Disaster SNAP provides short-term food benefits and supplements to certain natural disaster victims.

291.    If Plaintiff States cannot assure disaster victims of the safety and confidentiality of their private information, they will not be able to maximize victims' timely, adequate, and safe access to all applicable benefits during a disaster, as required by state law. *See, e.g.*, Cal. Welf. & Inst. Code § 18917(e); N.J. Admin. Code § 10:87-9.8; Or. Admin. R. §§ 461-135-0491– 461-135-0497; Wash. Rev. Code § 74.04.660.

**D.    Chilling Effect Harm—School Lunch Program**

292.    The predictable chilling effects of Defendants' actions will have a broader negative impact on several Plaintiff States' ability to access federal support for the National School Lunch Program and School Breakfast Program (collectively "school meals" programs), including California, Connecticut, Illinois, Maryland, Massachusetts, Michigan, New Jersey, New York, Oregon, and Washington.

293.    School meals programs help to fight hunger and obesity by assisting schools in providing healthy meals to children.

294.    Defendants' actions will lead to undermining of school meals programs and their goal of ensuring adequate nutrition for America's schoolchildren because the school meals programs' automatic enrollment process is linked to rates of participation in SNAP.

295.    Through a federal option called "direct certification" for its school lunch program, California currently certifies almost 1.6 million children for federally funded free or reduced price meals due to their households' participation in SNAP. Any reduction in SNAP enrollment for families with schoolchildren therefore has a negative impact on federal eligibility for free or reduced-price meals. Plaintiff States Connecticut, Illinois, Maryland, Massachusetts, Michigan, New Jersey, New York, and Washington certify over 2 million additional children combined. This fall, New York will provide free breakfast and lunch to over 2.7 million students, with the

Second Amended Complaint for Declaratory and Injunctive Relief  (Case No. 3:25-cv-06310)

cost of this undertaking offset by federal reimbursement for those students eligible for SNAP benefits.

296.    Lower SNAP participation rates will also have a concrete fiscal impact on States that have adopted a universal free lunch program.  Where a minimum percentage of students in a particular school are directly certified for free meals through programs like SNAP, all students in the school receive federally funded free school lunch without collecting a household application.  If the percentage of eligible students dips below that mark, however, the school no longer receives federal funding for free school meals for all students and must instead require students to submit an application to be determined eligible.

### E.    Chilling Effect Harm—Safety Net Programs

297.    Discouraging individuals and families from accessing public benefits for which they are eligible will ultimately transfer costs to state and local governments and community organizations, as families increasingly rely on emergency services and public safety net programs, such as local food pantries.

298.    Food banks, for example, are already struggling to fill a growing nutrition gap in the face of other cutbacks in nutrition assistance from the federal government.

299.    Plaintiff States' inability to assure eligible participants that their personal data will not be misused will worsen the burden on food banks.  In California alone, those food banks already provide for 4.6 million Californians (including 1.7 million children) facing food insecurity.

### F.    Chilling Effect Harm—Deterioration of Public Health and Welfare

300.    Plaintiff States' quasi-sovereign interests will be harmed because chilling effects on SNAP participation will cause deterioration of public health and well-being.  Ultimately, the States will bear costs associated with many of these harms.

301.    Historically, some of the most vulnerable immigrants are likely to be discouraged from availing themselves of benefits like SNAP if they perceive that their status as legally present in the United States could be placed at risk.  Defendants' acts will discourage eligible immigrants from seeking both federally and state-funded nutrition assistance, thus thwarting Plaintiffs' programs addressing hunger and food insecurity.

67

302.   Reduced access to SNAP benefits leads to food insecurity, which is associated with numerous negative health outcomes in children, such as depression, fatigue, poor self-efficacy, and behavioral problems.  Low-income children who go without nutritious food will struggle to learn in classrooms, impacting their educational advancement and that of their peers.

303.   Conversely, food security translates to better health outcomes and lower public healthcare expenditures.  Low-income adults participating in SNAP incur about $1,400 less in medical care costs in a year than low-income non-participants.  When state residents forego SNAP, these benefits will be lost.

304.   The Census Bureau also uses receipt of SNAP benefits to calculate the Supplemental Poverty Measure, which "serve[s] as an additional indicator of economic well-being and will provide a deeper understanding of economic conditions and policy effects."[73]  Disenrollment from SNAP will undermine the accuracy of this measure and therefore misrepresent national and statewide economic conditions.

305.   Decreased participation in SNAP and state nutrition programs has economic consequences beyond hunger and public health.

306.   For example, fewer people using SNAP will harm the merchants that accept SNAP benefits for food purchases—26,600 grocers, farmers' markets, and other merchants in California; 18,000 merchants in New York; 9,600 in Illinois; 6,000 in New Jersey; 5,500 in Massachusetts; 5,000 in Washington; 4,600 in Kentucky; 4,500 in Wisconsin; 4,000 in Maryland; 3,500 in Oregon; over 1400 in Maine; and over 900 in Rhode Island.

307.   SNAP benefits generate secondary economic effects that increase overall spending and production.  Defendant USDA has estimated that in a slowing economy, every $1 in SNAP benefits generates $1.54 in economic activity.[74]  Thus, decisions by families to forgo critical nutritional benefits will also result in loss of economic activity.

[73] *About the Supplemental Poverty Measure*, U.S. Census Bureau (last revised June 13, 2025), https://www.census.gov/topics/income-poverty/supplemental-poverty-measure/about.html.
[74] Patrick Canning & Brian Stacy, *The Supplemental Nutrition Assistance Program (SNAP) and the Economy: New Estimates of the SNAP Multiplier*, USDA, at iii (Jul. 19, 2019), https://ers.usda.gov/sites/default/files/_laserfiche/publications/93529/ERR-265.pdf?v=43851.

68

### G.    State Sovereignty Harms—Undermining Plaintiff States' Laws and Policies

308.    Defendants' overbroad demands for personal SNAP data threaten harm to Plaintiff States' sovereign interests in maintaining and enforcing laws that preserve confidentiality of that data.

309.    State laws strictly protect the confidentiality of SNAP data, with many of those laws specifically prohibiting either opening records for examination or publication or disclosure of a list of SNAP recipients for purposes not directly connected with the administration of the program.  *See, e.g.*, Cal. Welf. & Inst. Code § 10850(a)-(b); *see also* Cal. Welf. & Inst. Code § 18909 (applying Section 10850 to CalFresh); 305 Ill. Comp. Stat. § 5/11-9; N.J. Admin. Code § 10:87-1.14; *see also supra*, note 9 (collecting similar state privacy law provisions).

310.    While Plaintiff States' confidentiality laws do allow some reasonable exceptions, they clearly do not authorize the sharing of the entire SNAP roster for purposes of federal surveillance or broad-based immigration enforcement.

311.    Plaintiff States' ability to enforce their state laws will be harmed if Defendants are allowed to use their novel and expansive data demands to trump state privacy protections.  *Cf. Hawaii v. Trump*, 859 F.3d 741, 765 (9th Cir. 2017) (holding that State had sovereign interest in its ability to carry out its own refugee policies), *vacated on other grounds*, 138 S. Ct. 377 (2017) (mem.).

312.    Defendants' actions also interfere with Plaintiff States' sovereign interests in protecting the health, safety, and well-being of all residents.  *See, e.g.*, Cal. Welf. & Inst. Code § 18700(a)(1) (declaring state policy that "every human being has the right to access sufficient affordable and healthy food"); *id.* § 18919.1 (stating "intent of the Legislature to maximize food access for all CalFresh recipients"); N.J. Admin. Code § 10:87-13.1 (establishing a minimum benefit amount "to reduce hunger and improve nutrition among NJ SNAP recipients by increasing their ability to purchase food and meet their nutritional needs").

313.    Further, Plaintiff States' legislatures have designed numerous aspects of their SNAP and other nutrition programs in reliance on the assumption that the federal government would

69

operate within normal legal limits when administering SNAP.  Defendants' unlawful actions therefore threaten substantial interference with the operation of Plaintiff States' nutrition programs.

314.   For example, a reduced willingness to participate in SNAP would have a negative impact on access and funding for their respective school-based nutrition programs, including the new Summer EBT or SUN Bucks program.

315.   Some Plaintiff States, including California and New Jersey, have elected a federal option called "direct certification" for their school lunch programs, in which children in CalFresh or NJ SNAP households are automatically determined eligible for Free or Reduced Price Meals (FRPM) without having to apply.[75]  Any reduction in CalFresh or NJ SNAP enrollment among families with schoolchildren therefore has a negative impact on federal eligibility for FRPM.

316.   California law also requires that data collected for the purposes of CalFresh (and other state benefit programs) to be used as part of a "statewide process for using data collected for purposes of those four programs . . . to increase enrollment in the CalFresh program."  Cal. Welf. & Inst. Code § 18901.56(a).  A single, statewide accessible application is used by all California entities authorized to make eligibility determinations for CalFresh.

317.   In authorizing these programmatic designs, which facilitate limited, privacy-protective data-sharing both within the State and between the State and the federal government, the California legislature relied on the assumption that the federal government would adhere to federal confidentiality and security laws, such as the Privacy Act.

318.   Many Plaintiff States, including New York, use a single application for multiple public benefits programs as authorized by 7 C.F.R. § 273.2(b)(3).

319.   Defendants' actions would similarly interfere with Wisconsin's "Public assistance recipients' bill of rights," Wis. Stat. § 49.81(2), which guarantees recipients of public assistance the "right to confidentiality of agency records and files on the recipient," and undermine the assurances Wisconsin makes to its state SNAP applicants, recipients, and household members that their data, including immigration status, will not be disclosed.

---

[75] *See SUN Bucks*, CDSS (last updated Feb. 20, 2026), https://cdss.ca.gov/sun-bucks.

320.    Illinois also has a combined benefits application, the Application for Benefits Eligibility, that allows applicants to apply for SNAP alongside Medicaid, TANF, and other benefits programs.  Additionally, Illinois facilitates a school-to-SNAP linkage in one direction such that households already on SNAP are automatically enrolled in school meal programs.  However, the reverse—using a school lunch application to jumpstart a SNAP application—is not allowed or implemented in Illinois.  This means that discouraging or chilling SNAP applications and participation would lead to a decrease in school lunch program enrollment.

321.    Now Plaintiff States are faced with an untenable choice: allow their integrated systems to be used by Defendants for purposes unrelated (or even antithetical) to the reasons the programs were created, or undo programmatic decisions and abandon significant investments made into the infrastructure for administering the States' public nutrition programs.

322.    Either way, if Defendants are allowed unfettered access to SNAP data without regard for the purpose for which that data was collected, it will cause irrevocable harm to trust and relationships that have taken years to build.

**FIRST CLAIM**
**VIOLATION OF APA, 5 U.S.C. § 706(2) (C), (D) – CONTRARY TO LAW & WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW**
**Against Defendants USDA and Rollins (by all Plaintiff States) and Defendant OIG (by Plaintiffs California and Michigan)**

323.    Plaintiffs reallege and incorporate herein by reference each and every allegation and paragraph set forth previously.

324.    The Administrative Procedure Act directs courts to hold unlawful and set aside agency actions that are found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

325.    Defendants' demands that Plaintiffs transfer SNAP data containing sensitive personal information to Defendants—with no agreed-upon data and security protocol, and with profound

71

risk of sharing, if not clear intent to share, that data with DOGE, DHS, or other federal agencies for purposes unrelated to SNAP administration—are "final agency action[s] for which there is no other adequate remedy in a court," within the meaning of the APA.  5 U.S.C. § 704.

326.   **Defendants USDA and Secretary Rollins's demands are contrary to the limited authority granted to USDA in the SNAP Act and implementing regulations.**

327.   The SNAP Act provides: "All records, and the entire information systems in which records are contained," necessary to determine whether the [SNAP] program is being conducted in compliance with" the SNAP Act and regulations "shall . . . be made available *for inspection and audit* by the Secretary, *subject to data and security protocols agreed to by the State agency and Secretary*."  7 U.S.C. § 2020(a)(3) (emphasis added).  Therefore, Defendants USDA and Secretary Rollins lack authority to "access" Plaintiffs' SNAP records unless this access is "subject to data and security protocols agreed to by the State agency."

328.   Defendants USDA and Rollins demanded that Plaintiffs not only permit "access" to records, but to give Defendants complete *possession* of five years' worth of the most sensitive SNAP data that Plaintiff States collect in administering SNAP, including social security numbers, home addresses, bank account numbers, citizenship or immigration statuses, and grocery purchase information.

329.   Defendants USDA and Rollins have not provided any written assurances that this data will be adequately protected from re-disclosure or misuse, or offered statutorily mandated "data and security protocols" that would protect PII and other data from such re-disclosure and misuse, and have instead insisted that Plaintiffs turn over the demanded data without appropriate protections.  Defendants lack the authority to make and enforce these demands and act contrary to law in doing so.

330.   **Defendant OIG's demand is contrary to the Inspector General Act.**

331.   As set forth in paragraphs II.E, *supra*, the Inspector General Act authorizes each Inspector General "to have timely access to all records, reports, audits, reviews, documents, papers, recommendations, or other materials *available to the applicable establishment* which relate to the programs and operations with respect to which that Inspector General has

responsibilities under this chapter[.]"  5 U.S.C. § 406(a)(1)(A) (emphasis added).  The "applicable establishment" for USDA-OIG is USDA.  *See id.* § 402(b) (giving IGs responsibility for auditing their respective "establishments"); *id.* § 401(1) (defining "establishment" to include USDA).  As described above, 7 U.S.C. § 2020 defines the scope of SNAP-related records from participating States that are "available" to USDA.  For the same reasons stated above, Defendant OIG's demand for SNAP data without any data and security protocols does not comport with the authority granted in 7 U.S.C. § 2020 and, by extension 5 U.S.C. § 406(a)(1)(A).

332.  **Defendants' demands require Plaintiff States to violate the restrictions on disclosure of applicant information in the SNAP Act and implementing regulations.**

333.  The SNAP Act and USDA's implementing regulations strictly curtail States' ability to disclose the type of data demanded by Defendants, *i.e.*, "information from SNAP applicant or recipient households."  7 C.F.R. § 272.1(c)(1); *see* 7 U.S.C. § 2020(e)(8).  Such information may only be disclosed to eight discrete categories of recipients, 7 C.F.R. § 272.1(c)(1), including "[p]ersons directly connected with the administration or enforcement of the provisions of the Food and Nutrition Act of 2008 or regulations," *id.* § 272.1(c)(1)(i).

334.  The relevant SORNs issued by Defendants both contain "routine uses" purporting to allow Defendants to disclose information from SNAP applicant or recipient households obtained from States to any relevant law enforcement agency, whether a "Federal, foreign, [or] State" authority, so long as a "record, on its face or in conjunction with other records, indicates a violation or potential violation of a law, whether civil, criminal, or regulatory in nature."  90 Fed. Reg. 26,521, 26,522 (June 23, 2025) (USDA SORN); *see also* 87 Fed. Reg. 62,066, 62,069 (Oct. 13, 2022) (OIG SORN) (similar).

335.  However, under the SNAP Act, the only circumstance under which States may allow this information to be disclosed to law enforcement is "upon written request by such law enforcement officers that includes the name of the household member being sought, for the purpose of obtaining the address, social security number, and, if available, photograph of the household member, if the member is fleeing to avoid prosecution for custody for a crime, or an attempt to commit a crime, that would be classified as a felony . . . or is violating a condition of

probation or parole." 7 CFR § 272.1(c)(1)(vii). Even in those circumstances, the State may "disclose only such information as is necessary to comply with a specific written request of a law enforcement agency authorized by this paragraph." *Id.*

336. Because Defendants have notified Plaintiffs, through their SORNs, that they will disclose SNAP data to law enforcement under circumstances much broader than those allowable in the SNAP Act, complying with their demand would violate the spirit and the letter of the SNAP Act's limitation on disclosure, and the demands are therefore contrary to law.

337. Further, Plaintiffs reasonably believe that USDA intends to share the data it receives with DOGE and DHS, among other federal agencies, for immigration enforcement and other non-SNAP-purposes, in light of the facts described in Sections III, IV, and V.E, *supra*, DOGE's demand for EBT vendor data in conjunction with USDA, Defendants' lack of written assurances to the contrary, and the routine uses described in USDA's SORN described above in Section V.B.

338. For these same reasons, and in light of OIG's demand for citizenship status but not household income, its refusal to provide written assurances that it will not share the requested data outside of the agency, and the routine uses in its SORN, Plaintiffs California and Michigan have reason to believe that OIG either intends to, or will be forced to, disclose the demanded data to DOGE, DHS, or other federal agencies for non-SNAP-administration purposes.

339. Therefore, complying with Defendants' demands would violate the spirit and the letter of the SNAP Act's limitation on disclosure, and the demands are contrary to law.

340. **Defendants' demands and intended use of the information are also contrary to the Privacy Act.**

341. As set forth in Section II.B, *supra*, the Privacy Act sets strict procedural requirements before an agency can create or revise a system of records and collect individuals' data. *See* 5 U.S.C. § 552a(e).

342. Section 552a(b) of the Privacy Act further prohibits disclosure of records from systems of records absent certain conditions. To the extent that Defendants intend to disclose the demanded SNAP data to DOGE, DHS, or some other federal agencies for immigration enforcement or any other non-SNAP-administration purpose, Defendants violate the Privacy Act.

74

Disclosure from Defendants' systems of records to DOGE or DHS would not meet any of the conditions enumerated in 5 U.S.C. § 552a(b), and is therefore inconsistent with the Privacy Act.

343. Specifically, disclosure of personal SNAP data to agencies outside Defendants' agencies for the purpose of immigration enforcement is not "a purpose which is compatible with the purpose for which [the data] was collected." *Id.* § 552a(a)(7). As discussed above, SNAP records were collected by States for administration of the SNAP program after telling applicants that their personal information would not be used for immigration purposes. Therefore, even if Defendants' SORNs included immigration enforcement as a "routine use," the agency would nevertheless be in violation of the Privacy Act. *Id.* § 552a(a)(7), (b)(3).

344. As described above, Defendants' SORNs purport to allow Defendants to disclose individuals' personal information to any relevant law enforcement agency, whether a "Federal, foreign, [or] State" authority, so long as a "record, on its face or in conjunction with other records, indicates a violation or potential violation of a law, whether civil, criminal, or regulatory in nature." 90 Fed. Reg. 26,521, 26,522 (June 23, 2025) (USDA SORN); *see also* 87 Fed. Reg. 62,066, 62,069 (Oct. 13, 2022) (OIG SORN) (similar). This includes disclosures that would be incompatible with the original purpose of collecting that data for SNAP purposes. It therefore violates the Privacy Act's requirement that "the use of such record for a purpose which is compatible with the purpose for which it was collected." 5 U.S.C. § 552a(b)(3).

345. Further, as described in Section II.B, *supra*, the Privacy Act requires an agency to "provide an opportunity for interested persons to submit written data, views, or arguments to the agency." 5 U.S.C. § 552a(e)(11). This provision means that the agency must review the comments and consider changes in response. By issuing a demand for data beginning the day after the comment period closed, with a six-day deadline to comply, USDA has already decided to demand and collect millions of records without considering the data, views, or arguments that Plaintiff States or any other interested parties provided in response to the SORN, in violation of the Privacy Act's notice and comment period. Defendant USDA's actions render meaningless Plaintiff States' information and participation rights.

346. Additionally, by demanding SNAP data from Plaintiffs, Defendant OIG is attempting to collect SNAP data from States without first publishing a notice required by 5 U.S.C. § 552a(e)(4), and therefore fails to comply with the Privacy Act's informational and procedural requirements. The SORN that Defendant OIG claims covers the maintenance of SNAP records from States is 87 Fed. Reg. 62,066. That SORN does not discuss collecting or maintaining an entire set of SNAP records from state agencies.

347. Defendants' actions contravene the Privacy Act and are therefore not in accordance with law in violation of the APA.

348. **Defendants' demands are contrary to the Computer Matching and Privacy Protection Act.**

349. As set forth above, Plaintiff States have reason to believe that Defendants intend to engage in a computer matching program using Plaintiffs' SNAP data.

350. Defendant USDA has admitted, in its Privacy Impact Assessment, that it intends to use the demanded SNAP data in at least one computer matching program.

351. On information and belief, the Administration intends to combine and/or match the requested SNAP data (along with SNAP applicant and recipient data USDA has already received from other States) with other federal benefit data, taxpayer data, and other information in the mass database it is building.

352. On information and belief, neither Defendants, nor any other federal agency, have complied with the required procedures for a computer matching program laid out in 5 U.S.C. § 522a(o) and (p).

353. For these reasons, Defendants' demand that Plaintiff States turn over years' worth of SNAP data, with no assurance that 5 U.S.C. 522a(o) and (p) have been satisfied, is contrary to law.

354. **Defendants' demands are contrary to the E-Government Act.**

355. As set forth above, Defendants have not conducted and published an appropriate privacy impact assessment before collecting information on individuals, as required by the E-Government Act of 2002, Pub. L. No. 107-347, § 208, 44 U.S.C. § 3501 note. This includes a

failure to assess the privacy risks of disclosures for non-SNAP purposes, particularly given the requirements in the Privacy Act and the notice provided by and consent obtained by Plaintiff States regarding how SNAP data will be limited in its use and disclosure.

356.  Therefore, Defendants' demands and attempted collection of SNAP data are contrary to the E-Government Act.

357.  **Defendant USDA's demand is also contrary to the Paperwork Reduction Act.**

358.  As set forth in Section II.B, *supra*, Defendants USDA and Rollins have also failed to comply with the requirements of the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq*., because they have not published an appropriate notice and solicited and considered public comments before attempting to collect and maintain state SNAP records, they have not obtained appropriate approval from OMB and the agency's Chief Information Security Officer to do so, and they have not meaningfully considered whether their collection is duplicative of existing collections.  *Id.* §§ 3506(c), 3507(a).

359.  Plaintiff States are harmed by Defendant USDA's failure to comply with the procedures required by the Paperwork Reduction Act, including because they were not notified in advance of the federal government's intention to collect the demanded SNAP data, and therefore were not afforded time to prepare for such collection.  Plaintiff States also were not afforded the opportunity to explain to Defendant USDA the significant burden this collection would place on their state agencies and the significant resources required to comply with it.

**SECOND CLAIM**
**Violation of APA, 5 U.S.C. § 706(2)(a) – Arbitrary and Capricious**
**Against Defendants USDA and Rollins (by all Plaintiff States) and Defendant OIG (by Plaintiffs California and Michigan)**

360.  Plaintiffs reallege and incorporate herein by reference each and every allegation and paragraph set forth previously.

361.  The Administrative Procedure Act directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

Second Amended Complaint for Declaratory and Injunctive Relief  (Case No. 3:25-cv-06310)

362.   Defendants' demands that Plaintiffs transfer SNAP data containing sensitive personal information to Defendants with no agreed-upon data and security protocols are "final agency action[s] for which there is no other adequate remedy in a court," within the meaning of the APA. 5 U.S.C. § 704.

363.   An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

364.   Defendants failed to engage in reasoned decision-making as required by the APA. Among other deficiencies, Defendants failed to consider the important privacy and public health consequences of their unprecedented transfer and use of state SNAP data.  Defendants have failed to consider the impact their actions will have on USDA's and States' ability to fulfill the SNAP program's purpose of providing food benefits to low-income families.  Defendants' stated purpose for requesting this data is belied by Plaintiffs' repeated demonstrations that this data is not necessary to fulfill Defendants' stated purpose.  Moreover, Defendants' stated purpose for collecting the demanded data is to facilitate USDA conducting eligibility verification for SNAP participants, which is statutorily delegated to States, not to USDA.

365.   Neither Defendant USDA nor Defendant OIG have offered to execute data and security protocols that resolve Plaintiffs' concerns that the data would be redisclosed or misused in violation of the law.  Defendant USDA has declined to substantively respond to at least one Plaintiff State's request for such an agreement after its initial data demand.  And when Defendant USDA has subsequently proposed data and security protocols, the agency has refused to meaningfully address Plaintiffs' objections that these proposed protocols would permit unlawful data use and disclosure.

366.   Defendant USDA promulgated a SORN, as required under the Privacy Act, announcing its intent to collect and maintain sensitive SNAP data for the purpose of eligibility

verification, and allowed affected parties to submit comments on that SORN by July 23, 2025. On July 9, 2025, USDA demanded that Plaintiffs turn over the requested data beginning the day after comments on the SORN were due, on July 24, 2025.  In doing so, USDA impliedly admitted that it did not intend to consider any comments submitted, and therefore did not engage in reasoned decision-making.

367.   Defendants additionally ignored substantial reliance interests in the federal government's well-established rules, policies, and norms regarding the privacy, security, and confidentiality of personally identifying information collected as part of SNAP.

368.   Defendants ignored the reliance interests of Plaintiff States, who have fostered trust with their residents by representing to them that their SNAP applications are confidential and will not be used to facilitate immigration enforcement actions against them.

369.   Defendant USDA further ignored the substantial burden that its data demand would place on the States, by asking for massive amounts of data in less than a month, when collection and production of the data, even if the demand was clear enough to comply with, would likely take at least three times that amount of time, if not more.  Defendant USDA only provided more detailed instructions just days before the July 30 deadline, showing a complete disregard for the amount of time required to produce the data being demanded.

370.   Although Defendants may change their policies within statutory limits, the agency must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).  Defendants have not even provided notice of their change in policy, much less the necessary "satisfactory explanation" for their about-face on the type and amount of data required from participating States and protections afforded to that data. *State Farm*, 463 U.S. at 43.  Not only did Defendants offer no reasonable explanation, there is no reasonable justification for seeking this data for any lawful purpose.

371.   Finally, agency action is arbitrary and capricious when the justifications offered for it are pretextual. *See Department of Commerce v. New York*, 588 U.S. 752, 781-83 (2019). Because the APA requires an agency decision-maker to "disclose the basis of its" decision, a pretextual decision must be set aside without further inquiry.

79

372.   Plaintiffs reasonably believe that Defendant USDA's justification for its demand is pretextual, in light of the facts described above, DOGE's demand for EBT vendor data in conjunction with USDA, Defendants' lack of written assurances to the contrary, and the routine uses described in USDA's SORN described above.

373.   For these same reasons, and in light of OIG's demand for citizenship status but not household income, its refusal to provide written assurances that it will not share the requested data outside of the agency, and the routine uses in its SORN, described above, Plaintiffs California and Michigan have reason to believe that OIG justification for its demands are also pretextual.

374.   Defendants' actions are therefore arbitrary and capricious in violation of § 706(2)(A) of the APA.

### THIRD CLAIM
**Violation of APA, 5 U.S.C. § 706(2)(D) – Public Notice and Comment Requirement Against Defendants USDA and Rollins**

375.   Plaintiffs reallege and incorporate herein by reference each and every allegation and paragraph set forth previously.

376.   The Administrative Procedure Act directs courts to hold unlawful and set aside agency actions that are found to be without observance of procedure required by law.  5 U.S.C. § 706(2)(D).

377.   USDA's May 6 Letter, July 9 Letter, July 23 Letter, July 25 Letter, November 24 Letter and December 23 Letter constitute rules under the APA.  The APA requires that agencies provide the public with notice and an opportunity to comment, and consider the relevant matter presented in those comments before implementing a rule.  *See* 5 U.S.C. § 553(b), (c).  USDA issued the May 6 Letter, July 9 Letter, July 23 Letter, July 25 Letter, November 24 Letter, and December 23 Letter without any notice and comment or consideration of interested parties' input, in violation of the APA.

378.   5 U.S.C. § 553(a)(2) does not provide an exception to the APA's notice and comment procedures for Defendant USDA's "guidance" in the May 6, July 9, July 23, July 25, November

24 or December 23 Letters. "[D]espite the exemption from APA procedures for grant and benefit programs, 5 U.S.C. § 553(a)(2) (1982), food stamp regulations must be promulgated 'in accordance with the procedures set forth in section 553 of title 5.'" *Levesque v. Block*, 723 F.2d 175, 177 (1st Cir. 1983) (quoting 7 U.S.C. § 2013(c)). 7 U.S.C. § 2013(c) further imposes an additional requirement on the Secretary: "In addition, prior to issuing any regulation, the Secretary shall provide the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate a copy of the regulation with a detailed statement justifying it."

379.   On information and belief, USDA did not follow these procedures before issuing the May 6, July 9, July 25, November 24 or December 23 Letters.

**FOURTH CLAIM**
**Ultra Vires**
**Against Defendants USDA and Rollins (by all Plaintiff States) and Defendant OIG (by Plaintiffs California and Michigan)**

380.   Plaintiffs reallege and incorporate by reference each and every allegation and paragraph set forth previously.

381.   No administrative agency can take any action that exceeds its statutory authority. *See, e.g.*, *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 301 (2022).

382.   Defendants have acted ultra vires in demanding Plaintiff States' SNAP recipient data, including records containing millions of individuals' personally identifying information and citizenship status, without a data and security protocol agreed to by Plaintiff States. No statute authorizes such a demand.

383.   Defendants have acted in excess of their legal authority contrary to specific prohibitions present in law and regulations governing the treatment and protection of Plaintiff States' SNAP data.

384.   For these reasons, Plaintiff States are also entitled to a declaration that Defendants' actions are ultra vires.

**FIFTH CLAIM**
**Spending Clause, U.S. Const. art. I, § 8, cl. 1 – Lack of Clear Notice**
**Against Defendants USDA and Rollins (by all Plaintiff States) and Defendant OIG (by Plaintiffs California and Michigan)**

385.   Plaintiffs reallege and incorporate herein by reference each and every allegation and paragraph set forth previously.

386.   As explained in the prior claims above, to the extent that Defendants demand Plaintiff States' SNAP data under a pretext of auditing Plaintiff States' program or data integrity, with the intent of sharing that data with other federal agencies for some purpose other than the administration of SNAP, their conduct is unlawful.  Their conduct is also unconstitutional because Plaintiff States did not have clear notice that this was a condition of federal SNAP funding.

387.   Article I of the U.S. Constitution specifically grants Congress the power "to pay the Debts and provide for the common Defense and general Welfare of the United States."  U.S. Const., art. I, § 8, cl. 1.

388.   Incident to the spending power, "Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987).  However, any conditions must be imposed "unambiguously" to enable "States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* at 207 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

389.   There is no statute that clearly states that SNAP funds provided by Defendants are conditioned on consent to the unfettered transfer of SNAP data to agencies outside USDA, for purposes of immigration enforcement, or any other purposes unrelated to the SNAP program, other than certain narrow exceptions.  On the contrary, the statutes and regulations governing SNAP have long imposed stringent limitations on the disclosure of SNAP data outside of USDA.

390.   Therefore, conditioning federal SNAP funding on unfettered access to SNAP applicant and recipients' PII would violate this limitation on the spending power, because, *inter alia*, Plaintiffs did not have "clear notice" of such a condition. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

82

391.   Moreover, conditions on federal grants must be related to the national program for which the grant monies are provided.  *See Dole*, 483 U.S. at 207-08 (citing *Massachusetts v. United States*, 435 U.S. 444, 461 (1978)).  Defendants' efforts to mine sensitive and protected SNAP beneficiary data for purposes like immigration enforcement is not related to SNAP's programmatic goals of "provid[ing] food benefits to low-income families to supplement their grocery budget so they can afford the nutritious food essential to health and well-being."[76]  *See* 7 U.S.C. § 2011 (authorizing SNAP, "which will permit low-income households to obtain a more nutritious diet," "[t]o alleviate . . . hunger and malnutrition").  Nor is there any connection between this type of sharing of beneficiary data and the sound administration of the SNAP program.  Conditioning SNAP funds on States' sharing of sensitive beneficiary data is therefore inconsistent with the Spending Clause.

392.   Additionally, to the extent that Defendants are attempting to create a new SNAP data sharing condition on federal SNAP funding, such a condition is unlawful because it was issued after Plaintiff States accepted federal funds, and Defendants cannot "surpris[e] participating States with post acceptance or 'retroactive' conditions."  *Pennhurst*, 451 U.S. at 25.

393.   Finally, the federal government cannot "attach conditions to the receipt of federal funds if 'the financial inducement offered by Congress might be so coercive as to pass the point at which pressure turns into compulsion.'"  *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 (9th Cir. 2019) (quoting *Dole*, 483 U.S. at 211). Where Defendants have threatened to withhold billions of dollars in SNAP administrative funding from Plaintiff States—in many cases threatening a greater amount than Plaintiff States even receive in SNAP administrative funding each year—they have crossed that threshold.

394.   Pursuant to 28 U.S.C. § 2201(a), Plaintiff States are entitled to a declaration that their receipt of federal SNAP funds is not conditioned on consent to unfettered waiver of SNAP beneficiaries' privacy and confidentiality rights.

---

[76] *Supplemental Nutrition Assistance Program (SNAP)*, USDA (last updated March 12, 2026), https://www.fns.usda.gov/snap/supplemental-nutrition-assistance-program.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff States respectfully request that this Court enter judgment in their favor and grant the following relief:

1. A declaration that Defendant USDA and Defendant Rollins's demands for SNAP data from Plaintiff States and their EBT vendors are unlawful, violate the APA, and are ultra vires.

2. A declaration that Defendant OIG's demands for SNAP data from Plaintiff States California and Michigan are unlawful, violate the APA, and are ultra vires.

3. A declaration that Defendants cannot lawfully disclose the requested SNAP data to DOGE or DHS for any purposes, including immigration enforcement, other than SNAP administration.

4. A declaration that Defendant USDA and Defendant Rollins's demands for SNAP data from Plaintiff States violate the Spending Clause.

5. A declaration that Defendant OIG's demands for SNAP data from California and Michigan violate the Spending Clause.

6. An injunction preventing Defendant USDA and Defendant Rollins from making their demands for SNAP data from Plaintiff States as described herein, and an order setting aside their pending demands.

7. An injunction preventing Defendant OIG from making its demands for SNAP data from Plaintiff States California and Michigan and an order setting aside Defendant OIG's pending demands.

8. An injunction preventing Defendant USDA and Defendant Rollins from initiating noncompliance procedures against any Plaintiff State based on refusing to provide SNAP data in response to USDA and Secretary Rollins' or OIG's demands.

9. An injunction preventing Defendants from disclosing the requested SNAP data to DOGE or DHS for any purposes, including immigration enforcement, other than SNAP administration.

10. Plaintiff States' costs, expenses, and reasonable attorneys' fees; and

11. Such other relief as the Court deems just and proper.

84

Dated:  April 3, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
PAUL STEIN
ROBIN GOLDFADEN
Supervising Deputy Attorneys General
ANDREW Z. EDELSTEIN
ANNA RICH
LIAM E. O'CONNOR
JULIA HEMING SEGAL
WILLIAM BELLAMY
MARIA F. BUXTON

*/s/ Sebastian Brady*
SEBASTIAN BRADY
Deputy Attorneys General
*Attorneys for Plaintiff State of California*

Second Amended Complaint for Declaratory and Injunctive Relief  (Case No. 3:25-cv-06310)

Letitia James
Attorney General of New York

/s/ Mark Ladov
Mark Ladov
Special Counsel
Julie Dona
Special Counsel
28 Liberty St.
New York, NY 10005
(212) 416-8240
mark.ladov@ag.ny.gov
*Attorneys for Plaintiff State of New York*

Kwame Raoul
Attorney General of Illinois

/s/ Sherief Gaber
Sherief Gaber
Assistant Attorney General
Harpreet K. Khera
Bureau Chief, Special Litigation
115 S. LaSalle St., 35th Flr.
Chicago, Illinois 60603
(773) 590-7127
sherief.gaber@ilag.gov
*Attorneys for Plaintiff State of Illinois*

Kristin Mayes
Attorney General of Arizona

/s/ Luci D. Davis

Luci D. Davis (AZ No. 035347)
Hayleigh S. Crawford (AZ No. 032326)
2005 N. Central Ave. Phoenix, AZ 85004
(602) 542-3333
Luci.Davis@azag.gov
Hayleigh.Crawford@azag.gov
ACL@azag.gov
*Attorneys for Plaintiff State of Arizona*

Philip J. Weiser
Attorney General of Colorado

/s/ David Moskowitz
David Moskowitz
Deputy Solicitor General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6000
david.moskowitz@coag.gov
*Attorneys for Plaintiff State of Colorado*

William Tong
Attorney General of Connecticut

/s/ Janelle R. Medeiros
Janelle R. Medeiros
Special Counsel for Civil Rights
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Janelle.Medeiros@ct.gov
*Attorneys for Plaintiff State of Connecticut*

Kathleen Jennings
Attorney General of Delaware

/s/ Vanessa L. Kassab
Ian R. Liston
Director of Impact Litigation
Vanessa L. Kassab
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

86

Brian L. Schwalb
Attorney General for the District of Columbia

/s/ Nicole S. Hill
Nicole S. Hill
Assistant Attorney General
Office of the Attorney General for the District
of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov
Attorneys for Plaintiff District of Columbia

Anne E. Lopez
Attorney General of Hawai'i

/s/ Kaliko'onālani D. Fernandes
David D. Day
Special Assistant to the Attorney General
Kaliko'onālani D. Fernandes
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
Attorneys for Plaintiff State of Hawai'i

Office of The Governor ex rel. Andy Beshear,
in his official capacity as Governor of the
Commonwealth of Kentucky

/s/ S. Travis Mayo
S. Travis Mayo
General Counsel
Taylor Payne
Chief Deputy General Counsel
Laura C. Tipton
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov
Attorneys for Plaintiff Kentucky Governors'
Office

Aaron M. Frey
Attorney General of Maine

/s/ Brendan Kreckel
Brendan Kreckel
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 0433-0006
Tel.:  207-626-8800
Fax:  207-287-3145
brendan.kreckel@maine.gov
Attorneys for Plaintiff State of Maine

Anthony G. Brown
Attorney General of Maryland

/s/ James C. Luh
James C. Luh
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us
Attorneys for Plaintiff State of Maryland

Andrea Joy Campbell
Attorney General of Massachusetts

/s/ Katherine Dirks
Katherine Dirks
Chief State Trial Counsel
Cassandra Thomson
Assistant Attorney General
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
cassandra.thomson@mass.gov
Attorneys for Plaintiff Commonwealth of
Massachusetts

Dana Nessel
Attorney General of Michigan

/s/ Neil Giovanatti
Neil Giovanatti
Bryan Beach
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov
beachb@michigan.gov
Attorneys for Plaintiff State of Michigan

Keith Ellison
Attorney General of Minnesota

/s/ Joseph R. Richie
Joseph R. Richie
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us
Attorneys for Plaintiff State of Minnesota

Jennifer Davenport
Attorney General of New Jersey

/s/ Kashif T. Chand
Kashif T. Chand (NJ Bar No. 016752008)
Assistant Attorney General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
kashif.chand@law.njoag.gov
Attorneys for Plaintiff State of New Jersey

Raúl Torrez
Attorney General of the State of New Mexico

/s/ Steven Prefrement
Steven Perfrement
Senior Litigation Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
SPerfrement@nmdoj.gov
505-601-7727
Attorneys for the State of New Mexico

Dan Rayfield
Attorney General of Oregon

/s/ Scott P. Kennedy
Scott P. Kennedy
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 453-9050
Fax (971) 673-5000
Scott.Kennedy@doj.oregon.gov
Attorneys for Plaintiff State of Oregon

Josh Shapiro, in his official capacity as
Governor of the Commonwealth of
Pennsylvania

/s/ Jacob B. Boyer
Jennifer Selber
General Counsel
Jacob B. Boyer
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov
Counsel for Governor Josh Shapiro

Second Amended Complaint for Declaratory and Injunctive Relief  (Case No. 3:25-cv-06310)

Peter F. Neronha
Attorney General of Rhode Island

/s/ *Madeline R. Becker*
Madeline R. Becker (RI Bar No. 10034)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2151
mbecker@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

Nicholas W. Brown
Attorney General of Washington

/s/ *Jennifer K. Chung*
Jennifer K. Chung

Julie Moroney*
Assistant Attorneys General
William McGinty
Deputy Solicitor General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
jennifer.chung@atg.wa.gov
julie.moroney@atg.wa.gov
william.mcginty@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

Joshua L. Kaul
Attorney General of Wisconsin

/s/ *Karla Z. Keckhaver*
Karla Z. Keckhaver
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-6365
karla.keckhaver@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*

Aaron D. Ford
Attorney General of Nevada

/s/ *Heidi Parry Stern*
Heidi Parry Stern (Bar. No. 8873)
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov
*Attorneys for Plaintiff State of Nevada*

* *pro hac vice forthcoming*

Second Amended Complaint for Declaratory and Injunctive Relief  (Case No. 3:25-cv-06310)

# EXHIBIT A



United States Department of Agriculture
Washington, D.C. 20250
May 6, 2025

Dear State Agency Directors,

On March 20, 2025, President Trump issued Executive Order 14243, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos*. Among myriad important directives, this Executive Order required agency heads to "take all necessary steps, to the maximum extent consistent with law, to ensure the Federal Government has unfettered access to comprehensive data from all State programs that receive Federal funding, including, as appropriate, data generated by those programs but maintained in third-party databases." The Department of Agriculture (USDA) is committed to effectuating this Executive Order with respect to all programs in its purview.

The Food and Nutrition Service (FNS) at USDA plays a key role in providing nutrition services to Americans in need through the Supplemental Nutrition Assistance Program (SNAP or the Program). SNAP, which is Federally funded, is administered by the States, districts, and territories through partnerships with FNS and several payment processors.

This distributed administration takes advantage of our federal system to enable States to meet the needs of their residents. However, as explained in the President's Executive Order, USDA must retain "unfettered access to comprehensive data" from federally funded programs like SNAP even if such data is "maintained in third-party databases." This is the only way to eliminate "bureaucratic duplication and inefficiency" and enhance "the Government's ability to detect overpayments and fraud."

At present, each State, district, territory, and payment processor is a SNAP information silo. These various entities maintain discrete collections of SNAP application, enrollment, recipient, and transaction data, each of which is necessary in ensuring the integrity of the Program. Thus, pursuant to the President's Executive Order and to confirm that SNAP is being administered appropriately and lawfully, USDA and FNS are working to eliminate these information silos.

7 U.S.C. 2020(a)(3) and (e)(8)(A) and 7 C.F.R. 272.1(c)(1) and (e) authorize USDA and FNS to obtain SNAP data from State agencies and, by extension, their contractors. FNS is therefore working with several SNAP payment processors to consolidate SNAP data. If they have not yet done so, your processors may reach out to you to provide notice of this partnership and data sharing.

FNS will use the data it receives from processors to ensure Program integrity, including by verifying the eligibility of benefit recipients. This is consistent with FNS's statutory authority and the President's Executive Order and will ensure Americans in need receive assistance, while at the same time safeguarding taxpayer dollars from abuse. Upon completion of its analysis, and to the extent necessary, FNS will follow up with State agencies regarding next steps.

Additionally, pursuant to, among other authorities, the President's Executive Order, 5 U.S.C. 553(a)(2), 7 U.S.C. 2020(a)(3), and 7 C.F.R. 272.1(e), USDA is taking steps to require all States to work through their processors to submit at least the following data to FNS, as applicable:

1. Records sufficient to identify individuals as applicants for, or recipients of, SNAP benefits, including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers.
2. Records sufficient to calculate the total dollar value of SNAP benefits received by participants over time, with the ability to filter benefits received by date ranges.

Requested data will cover the period beginning January 1, 2020, through present. Please contact me at gina.brand@usda.gov with any questions related to this data sharing request.

Failure to grant processor authorizations or to take the steps necessary to provide SNAP data to FNS may trigger noncompliance procedures codified at 7 U.S.C. 2020(g).

Thank you for your continued work to help address the needs of vulnerable Americans and safeguard taxpayer dollars.

Sincerely,

Digitally signed by GINA BRAND
Date: 2025.05.06
18:28:56 -04'00'

Gina Brand
Senior Policy Advisor for Integrity
United States Department of Agriculture
Food, Nutrition, and Consumer Services

# EXHIBIT B



State of California
Office of the Attorney General

ROB BONTA
ATTORNEY GENERAL

***Via Federal eRulemaking Portal***
James C. Miller
Administrator
Food and Nutrition Service
U.S. Department of Agriculture
1320 Braddock Place
Alexandria, VA 22314

RE: Comments on USDA/FNS System of Record Notice Update: Docket No. FNS-2025-11463, USDA/FNS–15, Nat'l SNAP Info. Database, 90 Fed. Reg. 26521 (Jun. 23, 2025)

Dear Mr. Miller:

We, the Attorneys General for the States of California, Arizona, Colorado, Connecticut, Illinois, Maryland, Michigan, Minnesota, New Mexico, New Jersey, New York, Oregon, Rhode Island, and Washington (collectively "States") write to urge the U.S. Department of Agriculture and its Food and Nutrition Service (collectively "USDA") to withdraw or modify its proposal to create a National SNAP Information Database, as described in the System of Record Notice published at 90 Fed. Reg. 26,521 (SORN) (June 23, 2025). USDA's proposal to create a new Supplemental Nutrition Assistance Program (SNAP) participant database, populated by SNAP records, would necessarily require that States unlawfully turn over Americans' sensitive, personal information. Relevant to this comment, USDA's proposal would duplicate Congressionally mandated eligibility determinations already performed by the States, which is not only a profound threat to individuals' privacy, but also a waste of funds that could be used to fight hunger. Not only that, the SORN then purports to allow USDA to disclose individuals' personal information for any legal or regulatory enforcement purpose, in violation of the Privacy Act of 1974. Currently, such data can generally only be used for SNAP purposes, such as administering the program or enforcing SNAP-related laws and regulations. Simply put, USDA's unprecedented proposal improperly seeks to acquire SNAP participant data long held by the States, to do a job already done by the States, and then disclose that data in ways federal law prohibits the States from doing. USDA should rethink this flawed and unlawful proposal and instead work with the States to improve program efficiency and integrity through the robust processes already in place.

July 18, 2025
Page 2

## Legal and Factual Background

SNAP is a federally-funded, state-administered program providing billions of dollars in food assistance to tens of millions of needy families across the country. Under The Food and Nutrition Act of 2008, 7 U.S.C. § 2011 *et seq*. (the "SNAP Act"), States determine the eligibility of SNAP recipients under criteria determined by USDA. 7 U.S.C. §§ 2014(b), 2020(a)(1); 7 C.F.R. §§ 273, 276.1(a)(4). Because States administer SNAP, many aspects of program regulation are governed by the statutorily-required State Plan of Operations, which USDA approves as a condition of providing funding. 7 U.S.C. § 2020(d). The SNAP Act specifies many elements to be included in the State Plan. *Id.* § 2020(e).

State Plans thus "establish procedures governing [program] operation" and pursuant to the plan, States must "promptly determine the eligibility of each applicant household." 7 U.S.C. § 2020(e)(2)(A), (3). States determine recipients' eligibility through a mandatory "income and eligibility verification system" and verify immigration status through another system maintained by the federal government. *See* 7 CFR §§ 272.8 & 272.11. States must also maintain "a system for monitoring and improving [their] administration of SNAP." 7 C.F.R. § 275.1. The State Plan must also contain a Quality Control Sampling Plan and plans on how to use the systems to verify income and immigration status. 7 C.F.R. § 272.2(d)(1)(i), (iv) & (vii). As USDA itself describes it, "[S]tates are responsible for ensuring recipient eligibility and monitoring their benefit use."[1]

While the States administer SNAP, USDA, in contrast, annually reviews "certain functions performed at the State agency level," performs "a management evaluation of at least two State Quality Control Systems," and validates States' "payment error rate[s]." 7 C.F.R. § 275.3(a), (c), & (d). USDA's current Quality Control process already assesses whether States' denials are accurate and whether the state's eligibility and benefits determinations are accurate; those processes are known as the Case and Procedural Error Rate (CAPER) and the Payment Error Rate (PER).[2] USDA also reviews, at least biennially, the State's own "Management Evaluation System." 7 C.F.R. § 275.3 (b).

USDA also maintains two systems to detect and prevent fraud. The first, the National Accuracy Clearinghouse, prevents people from fraudulently claiming benefits from multiple states, which States check when they determine eligibility. 7 C.F.R. § 272.18. USDA also maintains a point-in-time system for detecting EBT fraud, the Anti-Fraud Locator Using Electronic Benefits Transfer Retailer Transactions (ALERT). The ALERT system provides daily EBT transaction information to USDA to identify and stop fraud waste and abuse under a robust set of privacy protections.[3] Under this system, "Records will be available only to identified State agency personnel charged with SNAP enforcement."

Lastly, the SNAP Act contemplates that USDA can perform targeted inspections and audits of State programs, subject to privacy protections. 7 U.S.C. § 2020(a)(3)(A) provides that

---

[1]  https://www.fns.usda.gov/snap/fraud (visited July 9, 2025).

[2]  https://www.fns.usda.gov/snap/qc/caper (last visited July 11, 2025); https://www.fns.usda.gov/snap/qc/per (last visited July 12, 2025).

[3]  https://www.federalregister.gov/documents/2010/12/27/2010-32457/privacy-act-revision-of-privacy-act-systems-of-records.

July 18, 2025
Page 3

States must maintain "such records as may be necessary to determine whether the program is being conducted in compliance" with the SNAP Act and regulations. Those records and related systems shall "be made available for inspection and audit by the [USDA], subject to data and security protocols agreed to by the State agency and [USDA]." *Id.* § 2020(a)(3)(B).

Despite the existence of these oversight processes and anti-fraud systems, USDA states in its recently issued SORN that the "primary purposes" of the new SNAP database are "to validate the accuracy of eligibility determinations and strengthen SNAP and government program integrity." USDA cites two recent Executive Orders[4] and states that it will "will leverage data-sharing across Federal and State systems to identify and rectify" improper SNAP payments. "This includes verifying eligibility based on immigration status, identifying and eliminating duplicate enrollments, … and performing other eligibility and program integrity checks using lawfully shared internal and interagency data." Importantly, USDA cannot directly "rectify" benefits that it believes should not be paid. The SNAP Act and regulations provide that only States Agencies can terminate benefits and must afford a "fair hearing" to SNAP recipients whose benefits are terminated. 7 U.S.C. § 2020(e)(10); 7 C.F.R. § 273.15(a).

State Agencies' records of SNAP applicant and recipient data are subject to significant safeguards under the statutory administration scheme, and disclosure of States' SNAP data is only permitted under strictly limited circumstances. Federal law specifies that States are responsible for making their SNAP records "available for inspection and audit" by USDA, as noted above, but that access must be "subject to data and security protocols." 7 U.S.C. § 2020(a)(3)(B)(i). To permit this inspection and audit, the statute provides for certain delineated exceptions to the general prohibition on "the use or disclosure of information obtained from applicant households." *See e.g. 7* U.S.C. § 2020(e)(8)(A). For example, one permitted disclosure is to "persons directly connected with the administration and enforcement" of SNAP and other assistance programs. Those persons, in turn, can use SNAP records "only for such administration or enforcement." *Id.* The SNAP Act includes other exceptions for disclosure to capture fleeing felons, recoup overpayments, or investigate or prosecute violations of the SNAP Act or regulations. *See id.* Consistent with the Act, USDA's regulations similarly limit the use or disclosure of SNAP-participant data. *See* 7 C.F.R. § 272.1(c)(1). For example, the regulations limit disclosure to "Local, State, or Federal law enforcement officials, upon their written request," but expressly limit such disclosure to "investigating an alleged violation of the [SNAP Act] or regulation." *Id.*, § 272(c)(1)(vi). Disclosures for other purposes are not allowed.

As part of the State Plan, and as mandated by the SNAP act, States must maintain similar limitations on disclosure of SNAP applicant and recipient data. California's State Plan, for example, incorporates its Food Stamp Manual, which provides that "[u]se or disclosure of information obtained from food stamp applicant or recipient households" is limited to "[p]ersons directly connected with the administration or enforcement of the provisions of the Food Stamp Act or regulations." § 63-201.311. Like the SNAP regulations, California's State Plan permits

---

[4]    Executive Order 14243 of March 20, 2025, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos* and Executive Order 14218 of February 19, 2025, *Ending Taxpayer Subsidization of Open Borders.*

July 18, 2025
Page 4

disclosures of SNAP data to law enforcement to "investigat[e] an alleged violation of the Food Stamp Act or regulations." § 63.313(a). Other States' plans have similar restrictions.[5] USDA approved California's State Plan and agreed "to act in accordance with the provisions of the Food and Nutrition Act of 2008, as amended, implementing regulations and the FNS approved State Plan of Operation" on September 27, 2024. USDA has approved other States' plans on the same or similar terms.

Consistent with the SNAP Act and regulations' limitations on disclosures of SNAP data, many States also have laws that similarly limit disclosure of data regarding applicants and recipients of SNAP and other benefits programs.[6]

Putting aside the conditions by which USDA can rightfully access State SNAP data, this SORN creates a system that ignores statutory limitations on sharing SNAP-applicant and recipient data. This includes multiple broadly worded "routine use" provisions purporting to authorize USDA to share data with various entities that do not appear to have any connection to benefits administration or enforcement. Of particular concern, one proposed routine use would allow disclosure of SNAP records to a government agency when "a record on its face, or in conjunction with other records," indicates a violation or potential violation of law, "whether civil, criminal, or regulatory in nature." Another routine use purports to allow disclosures to "investigate fraud, waste, or abuse" in other federal benefits programs. Unlike the limitations on disclosure described above, these broad provisions do not include any connection to the enforcement or administration of the SNAP Act or regulations, which violates the Privacy Act as discussed below.

### Discussion

USDA's proposed collection of State-held, SNAP-participant data is both novel and unnecessary, and its proposed disclosure of data to other agencies for non-SNAP related purposes exceeds what federal law allows.

### A. USDA's proposed collection of SNAP applicant data is unnecessary, impracticable, and risks violating federal law.

USDA's proposed SNAP database is not needed to accomplish its professed purposes and will generate government waste and increase States' burdens, rather than reducing them. As discussed above, USDA's stated rationale for the database is "to validate the accuracy of eligibility determinations and strengthen SNAP and government program integrity." But as set out above, USDA and the States already have extensive processes and systems to determine and

---

[5]   For example, New York's SNAP Source Book contains nearly identical restrictions on disclosure of SNAP records as the SNAP regulations, including limiting disclosure to "persons directly connection with administration and enforcement" of federal benefits programs and law enforcement for "the purpose of investigating an alleged violation of the Food Stamp Act or regulations," following a "written request." Section 3(E), pp. 3-9-3-11.

[6]   *See*, *e.g*., Cal. Welf. & Inst. Code, § 10850; 503 Ill. Con. Stat. 5/11-9; Ore. Rev. Stat. 411.320; Col. Rev. Stat. § 26-1-114 & 10 Co. Code Reg. 2506-1 § 4.140.B.3; N.J. Admin. Code 10:87-1.14

July 18, 2025
Page 5

review eligibility and prevent fraud. USDA also has processes to determine payment error rates, including over- and under-payments, and it publishes the CAPER and PER annually.[7]  The USDA itself describes SNAP as having "one of the most rigorous quality control systems in the federal government . . . leveraging both state agency reviews and federal reviews . . . ."[8]

The States' interest in avoiding duplicate eligibility determinations is not solely rooted in good policy. Federal law counsels for both an efficient and privacy-protective approach to collecting, maintaining and using peoples' data. The Paperwork Reduction Act was passed by Congress for the purpose of "ensur[ing] the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government." 44 U.S.C. § 3501(2). When collecting information, Congress wanted federal agencies to "minimize the paperwork burden" on States and "minimize costs to the Federal Government." OMB, which implements the act, has therefore directed agencies to "perform[] information resources management activities in an efficient, effective, economical, secure, and privacy-enhancing manner." OMB Circular A-130, *Managing Information as a Strategic Resource* (July 28, 2016). Thus, federal agencies "shall…reduce [their] [personally identifiable information] to the minimum necessary for the proper performance of authorized agency functions." *Id.* at ¶ 5(a)(1)(a)(ii). The Privacy Act of 1974 also directs federal agencies to minimize records concerning individuals. 5 U.S.C. § 552a(e)(1).

While the SORN does not provide specific details related to how the data collection will be facilitated or at what frequency, it would appear to cause significant administrative burden and cost to the States. This may include preparing data for transfer to USDA on an ongoing basis or establishing automated data transfer protocols integrated with the States' eligibility system. There is also a strong risk to recipients and efficient program administration posed by potential inconsistent determinations on eligibility between the federal and state or local levels, particularly when the household and income data maintained by the states can change more quickly than it could be updated in this proposed new system. As a related example, there have been public statements by the federal administration about comparing SNAP data to IRS data. Doing so would result in a faulty comparison due to misaligned data sets. SNAP qualification is calculated, and can change, on a monthly basis; it is based on anyone in a home who purchases or eats food together. By contrast, IRS data is based on annual income of legal households, such as spouses and dependents. Importantly, any increase in error rates caused by comparing misaligned data has potentially severe consequences under recently passed legislation and could cost States and families hundreds of millions in benefits.

And, as noted above, only States Agencies can determine eligibility or terminate benefits, and in the latter case, they must provide a "fair hearing" to aggrieved individuals. 7 U.S.C. § 2020(e)(10); 7 C.F.R. § 273.15(a).

As USDA is aware, it already has a more efficient and data-minimizing means of validating States' eligibility determinations and payments. Most obviously, USDA can and

---

[7]    https://www.fns.usda.gov/snap/qc/per (visited July 9, 2025);
       https://www.fns.usda.gov/snap/qc/CAPER (visited July 12, 2025).
[8]    https://www.fns.usda.gov/snap/qc (visited July 11, 2025).

July 18, 2025
Page 6

already does perform regular quality control **sampling** of SNAP data, which it also requires the States to do. 7 C.F.R. § 275.11 ("Each State agency shall develop a quality control sampling plan which demonstrates the integrity of its sampling procedures."). As described in a USDA-commissioned study, "[t]he current two-tier SNAP QC process relies on State reviews of SNAP cases to make error determinations followed by Federal re-reviews **of a subset of the cases**; the final error rates combine the results of the State and Federal reviews."[9]

The federal government has repeatedly defended the use of statistical sampling given the cost of case-by-case review. As a result, "courts have routinely permitted the use of statistical sampling to determine whether there has been a pattern of overpayments spanning a large number of claims where case-by-case review would be too costly." *Chaves County Home Health Service, Inc. v. Sullivan*, 931 F.2d 914, 919 (D.C. Cir. 1991).[10] Indeed, "[a]udit on an individual claim-by-claim basis of the many thousands of claims submitted each month by each state **would be a practical impossibility** as well as unnecessary." *State of Ga., Dept. of Human Resources v. Califano*, 446 F.Supp. 404, 410 (N.D. Ga. 1977) (emphasis added). In contrast to the "thousands of claims" that proved impracticable in *Califano*, California alone has over 5.5 million beneficiaries who receive SNAP benefits on a monthly basis. Nationwide, these numbers balloon well beyond what USDA could meaningfully review.

Even if USDA wished to perform a far more extensive quality control review of all SNAP participants, pursuant to an agreed data and security protocol, 7 U.S.C. § 2020(a))(3), the agency could do so while still complying with the Paperwork Reduction Act and OMB's privacy guidance. USDA could request deidentified data in samples to perform its reviews or exclude other unnecessary information, like addresses. As currently used with some systems – including the National Accuracy Clearinghouse, which collects much of the same information – States could use hashing algorithms to render certain data unreadable to the recipient, but capable of reidentification by the sender. Using hashing would comport with existing regulations: if the government has adequate reason to believe an individual is wrongfully collecting SNAP benefits, federal law enforcement could submit a "written request" for the specific individual's data as it is permitted to do "for the purpose of investigating an alleged violation of the [SNAP Act] or regulation." 7 C.F.R. § 272.1(c)(1)(vi). In other words, protecting privacy does not mean the government must let wrongdoers off the hook.

Conducting a quality control review as proposed in this SORN is also impracticable. USDA has studied the feasibility of performing all quality control reviews at USDA and identified numerous challenges. *See* Feasibility Study, *supra*, note 5. That study determined that consolidating review at the federal level "would involve a significant undertaking" that faced both legal and operational impediments. For example, "FNS would need to significantly expand its workforce to conduct QC reviews without the State tier of review." FNS would also need

---

[9]   Feasibility of Revising the SNAP Quality Control Review Process, USDA, FNS Office of Policy Support (Dec. 2019) (emphasis added).

[10]   *See also Illinois Physicians Union v. Miller,* 675 F.2d 151, 155 (7th Cir.1982) (Medicaid); *Michigan Dep't of Edu. v. United States Dep't of Edu.*, 875 F.2d 1196, 1204–06 (6th Cir.1989) (vocational rehabilitation programs).

July 18, 2025
Page 7

access to various federal, state, and local systems, which likely would require legislative changes, data use agreements, and implicate "privacy requirements related to integrated eligibility systems [that] are stringent and do not currently allow this type of access in most instances." *Id.* As the study makes abundantly clear, performing quality control review is not as simple as creating a new database for all SNAP participant data and asking States for a current copy of their SNAP records.

> ### B. USDA's proposed broad disclosure to law enforcement is not a valid "routine use" under the Privacy Act.

USDA's broad proposed "routine use" to disclose SNAP records to government agencies, if the records, alone or in conjunction with others, indicate even a potential violation of any law, runs afoul of the Privacy Act of 1974. The Act generally prohibits federal agencies from disclosing personal records without the individual's consent or some other statutory exception. 5 U.S.C. § 552a(b). USDA invokes the "routine use" exception in the act to assert in the SORN that it may share with any government agency any records potentially indicating a violation or potential violation of any law. This swings too broadly to fit within the Privacy Act's limits.

The Privacy Act limits routine uses to disclosures for "a purpose which is compatible with the purpose for which it was collected." *Id.* § 552a(a)(7). Thus, to be a valid routine use, the reason for disclosing records must match the reason for collecting them. "There must be a more concrete relationship or similarity, some meaningful degree of convergence, between the disclosing agency's purpose in gathering the information and in its disclosure." *Britt v. Naval Investigative Service*, 886 F.2d 544, 549–550 (3d Cir. 1989). In *Britt*, an NCIS investigator met with a reserve Marine Corps major's federal civilian supervisor for background on an investigation into military ordnance found in a private home. The investigator gave the supervisor his investigatory files, thinking the supervisor might find it "relevant" to employing the major at his federal civilian job. The major then sued under the Privacy Act. The Third Circuit held that the government failed to establish that the investigator's disclosure was a valid routine use because it was not related to the original purpose of collection—a criminal investigation into improperly requisitioned and stored ordnance.

Here, States collected SNAP participant's data for the purposes of administering SNAP benefits[11] and ultimately ameliorating hunger. SNAP data can therefore be used for any routine SNAP purpose, assuming it is properly disclosed in a SORN. But USDA appears to propose to disclose SNAP records for any law enforcement purpose, regardless of its connection to SNAP. To allow such a disclosure would, "by the mere publication of broad routine use purposes, evade the statutory requirement that disclosure must be compatible with the purpose for which the material was collected." *Britt,* 886 F.2d at 550; *see also Swenson v. U.S. Postal Serv.*, 890 F.2d 1075, 1078 (9th Cir. 1989) (EEOC complaint data not compatible with disclosure to congress about number of rural mail routes); *Covert v. Harrington,* 876 F.2d 751, 755 (9th Cir. 1989) (information collected for security clearance purposes is incompatible with disclosure for criminal investigation of subsequent actions); *Mazaleski v. Treusdell,* 562 F.2d 701, 713 n. 31

---

[11]    Thus, SNAP data can be used to prosecute SNAP fraudsters, including retailers or EBT skimmers, as a valid part of overseeing or administering the program.

July 18, 2025
Page 8

(D.C. Cir.1977) (derogatory information concerning a federal employee's dismissal not compatible with disclosure to prospective employer); *see also* S. Rep. No. 1183, 93d Cong., 2d Sess., *reprinted in* 1974 *U.S. Code Cong. & Admin. News* 6916, 6983 (Privacy Act intended to prevent "an agency from merely citing a notice of intended 'use' as a routine and easy means of justifying transfer or release of information.").

As OMB itself stated, in its original 1975 Guidelines and Responsibilities for Privacy Act Implementation:

> A record may also be disclosed to a law enforcement agency at the initiative of the agency which maintains the record when a violation of law is suspected; *provided*, that such disclosure has been established in advance as a 'routine use' and that misconduct is related to the purposes for which the records are maintained…."[12]

40 Fed. Reg. 28955 (July 9, 1975). More recently, OMB reiterated that "Routine uses shall be narrowly tailored to address a specific and appropriate use of the records…[and] may be appropriate…when the use is both related to and compatible with the original purpose for which the information was collected." OMB Circular No. A-108, *Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act*.

Indeed, both the States' original collection of SNAP records, and USDA's contemplated collection of those records from the States, did not occur in a vacuum. Instead, both these collections have or will occur pursuant to a regulatory regime that by-and-large limits disclosures of SNAP records to SNAP-related purposes only, with some very specific exceptions not relevant here. *See* 7 U.S.C. § 2020(e)(8); 7 C.F.R. § 272.1(c)(1). Unlike the broad purposes contemplated by USDA's new SORN, the existing SNAP law-enforcement exception permits disclosures only when "investigating an alleged violation of the [SNAP Act] or regulation[s]." 7 C.F.R. § 272(c)(1) (vi). Thus, the proposed "routine use" is not compatible with USDA's own regulatory framework regarding how SNAP records may be disclosed.

Lastly, the fact that applicants were told their personal data would only be used for SNAP purposes forecloses USDA's proposed broad "routine use" disclosures for general law enforcement. Like the Privacy Act, other privacy laws prohibit uses or disclosures of data that are incompatible with the original collection's purpose. *E.g.* Cal. Civ. Code § 17908.100(c); Tex. Bus. & Comm. Code § 541.101(b)(1). In determining compatible uses, these regimes often inquire into "the reasonable expectations of the consumer." Cal. Code Regs. § 7002(b); *see also* Tex. Bus. & Comm. Code § 541.201(a)(2) (allowing internal uses of data "reasonably aligned with the expectations of the consumer"). In other words, when collecting data from a person, it's not the collecting entities' subjective purpose that controls, but what the individual who provided their personal information reasonably thought those purposes could be. Otherwise, an entity's ulterior motives for collection would eviscerate protections in privacy laws, like the Privacy Act.

---

[12]  Discussing requests initiated by an agency under the related law enforcement exception to the Privacy Act, OMB noted that "blanket requests for all records pertaining to an individual are not permitted" either. 40 Fed. Reg. 28955.

July 18, 2025
Page 9

SNAP applicants are told their data will not be used for non-SNAP investigations, whether expressly or implicitly. New York's SNAP application, for example, requires applicants to specifically consent to "any investigation by" the state or local agencies administering SNAP, but only "in connection with my request for SNAP benefits."[13] California's application for SNAP is particularly explicit that immigration status will not be used for non-SNAP purposes:

> **Important Information for Noncitizens**
> You can apply for and get [benefits] for people who are eligible . . . [such as] immigrant parents may apply for . . . their U.S. citizen or qualified immigrant children, even though the parents may not be eligible.… Immigration information is private and confidential . . . [but may be] checked with the U.S. Citizenship and Immigration Services (USCIS). Federal law says the USCIS cannot use the information for anything else except cases of fraud.[14]

USDA has not previously expressed any concerns with the applications' language during any management review. California counties also reinforce the message that applicants' "personal information is protected and only used to determine your eligibility for benefits . . . with limited exceptions."[15] These assurances to applicants are not just required by law; they help ensure the success of the program by reassuring applicants that their data will not be used or re-disclosed for improper purposes. Without those assurances, many people may decide to forego applying for benefits and go hungry—a risk that is particularly acute for citizen or qualified-immigrant children of ineligible parents.

Indeed, even USDA has told applicants that their personal information won't be used for non-SNAP purposes. As recently as February 2, 2025, the USDA FNS website contained a section titled "SNAP Eligibility for Non-Citizens" that had a banner at the top of the page that said "**Important**" and then "You can apply for or receive SNAP without immigration consequences."[16] The website's FAQ stated, "you will not be deported, denied entry into the U.S., denied permanent resident status (Green Card holder), or the ability to become a U.S. citizen solely because you or a family member applied for or received SNAP."

To be clear, the States are not proposing that SNAP records cannot be disclosed for longstanding anti-fraud purposes. But to the extent that USDA's new SORN purports to allow new uses of SNAP records for enforcing other laws, that is not a "routine"—or lawful—use.

## Conclusion

The States remain committed to working with our federal partners to eliminate fraud and waste in benefits program using the mechanisms that already exist today, and to finding ways of improving those mechanisms that respect both the program's governing statutes and regulations

---

[13]   https://otda.ny.gov/programs/applications/4826.pdf (visited July 10, 2025).
[14]   https://www.cdss.ca.gov/cdssweb/entres/forms/English/SAWS2_PLUS.pdf (emphasis added)
[15]   https://www.sfhsa.org/services/food/calfresh/calfresh-immigrants-frequently-asked-questions (visited July 10, 2025).
[16]   See https://web.archive.org/web/20250202100047/https://www.fns.usda.gov/snap/recipient/eligibility/non-citizen (last visited July 17, 2025, but archived Feb. 2, 2025).

July 18, 2025
Page 10

and SNAP applicants' reasonable expectations of privacy. But, ultimately, the undersigned States urge the USDA not to lose sight of the fact that SNAP exists to fight hunger. The Privacy Act and other limitations on disclosure in the SNAP Act and its implementing regulations exist to protect people's privacy. Lawful recipients of these vital food benefits should not have to choose between protecting their privacy and getting enough to eat. Congress mandated that federal and state agencies accomplish both, and it gave them the tools to do so.

For the foregoing reasons, we urge USDA to withdraw the SORN set forth at USDA/FNS–15, Nat'l SNAP Info. Database, 90 Fed. Reg. 26521 (Jun. 23, 2025), and instead continue to work with the States to improve the efficiency and integrity of SNAP through the well-developed oversight processes already in place.

Sincerely,

ROB BONTA
*California Attorney General*

LETITIA JAMES
*New York Attorney General*

DAN RAYFIELD
*Oregon Attorney General*

KWAME RAOUL
*Illinois Attorney General*

RAÚL TORREZ
*New Mexico Attorney General*

PETER NERONHA
*Rhode Island Attorney General*

KEITH ELLISON
*Minnesota Attorney General*

NICK BROWN
*Washington Attorney General*

DANA NESSEL
*Michigan Attorney General*

ANTHONY G. BROWN
*Maryland Attorney General*

July 18, 2025
Page 11

WILLIAM TONG
*Connecticut Attorney General*

KRISTIN K. MAYES
*Arizona Attorney General*

PHILIP J. WEISER
*Colorado Attorney General*

MATTHEW J. PLATKIN
*New Jersey Attorney General*

# EXHIBIT C



*Secretary Brooke L. Rollins*

July 9, 2025

Dear SNAP State Agencies,

On March 20, 2025, President Trump issued Executive Order 14243, Stopping Waste, Fraud, and Abuse by Eliminating Information Silos. This Executive Order required agency heads to "take all necessary steps, to the maximum extent consistent with law, to ensure the Federal Government has unfettered access to comprehensive data from all state programs that receive federal funding, including, as appropriate, data generated by those programs but maintained in third-party databases." The Department of Agriculture (USDA) is committed to effectuating this Executive Order with respect to all programs in its purview.

The Food and Nutrition Service (FNS) at USDA works in partnership with State agencies to provide nutrition assistance to Americans in need through the Supplemental Nutrition Assistance Program (SNAP). It is imperative that USDA eliminates bureaucratic duplication and inefficiency and enhances the Government's ability not only to have point-in-time information but also to detect overpayments and fraud. As noted in the May 6, 2025, announcement of the Department's plan to request these data from EBT processors, USDA is committed to ensuring appropriate and lawful participation in SNAP.

On June 23, 2025, pursuant to the provisions of the Privacy Act of 1974 and Office of Management and Budget (OMB) Circular No. A-108, USDA published a notice in the Federal Register that the department proposes to create a new system of records (SOR) entitled USDA/FNS-15, "National Supplemental Nutrition Assistance Program (SNAP) Information Database." This system is owned, administered, and secured by FNS, and the system's primary purpose is to strengthen SNAP and government program integrity.

In accordance with 5 USC 552a(e)(4) and (11), this system of records notice becomes effective upon publication in the Federal Register, except for the routine uses, which will become effective on July 23, 2025. To ensure efficient implementation of this system, and to ensure USDA has a complete and accurate database, we are requiring collection of SNAP data from EBT processors or State agencies beginning on July 24, 2025, with submissions to USDA no later than the close of business on July 30, 2025. The required data are listed in the notice section, "Categories of Records in the System."

Thank you for your continued work to help address the needs of vulnerable Americans and safeguard taxpayer dollars. If you or your staff have any questions, please have your staff contact the FNS Governmental Affairs Team at fnsgovaffairs@usda.gov.

Sincerely,

Brooke L. Rollins
Secretary
U.S. Department of Agriculture

# EXHIBIT D



United States Department of Agriculture
Washington, D.C. 20250
July 23, 2025

Dear State agency Directors,

On May 6, 2025, State agencies were advised of the United States Department of Agriculture's (USDA) intent to implement President Trump's March 20, 2025, Executive Order 14243, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos* through State data sharing to the Food and Nutrition Service (FNS).  In the May 6, 2025, memo, States were advised that the USDA/FNS was working with Supplemental Nutrition Assistance Program (SNAP) payment processors to assist with data collection. As requested by State agencies, States are welcome to determine the most appropriate and feasible method to share the requested data with FNS. State agencies can work through their payment processor, a vendor of their own choosing, or with their State Information Technology team.

### *Data Elements*

The requested data elements are for individuals who have received, are currently receiving, or have applied to receive SNAP benefits from January 1, 2020, through present date. Requested data elements shall include records sufficient to identify individuals as applicants for, or recipients of, SNAP benefits, including but not limited to all household group members names, dates of birth, social security numbers, residential and mailing addresses used or provided, as well as all data records used to determine eligibility or ineligibility. It is understood that these data records will vary household to household, and may include earned and unearned income, absent parent(s), and other data used in the determination process. Please do not include supporting documents or case comments.

Additionally, transactional records from each household are also requested, and must be sufficient to calculate the total dollar value of SNAP received by recipients over time, with the ability to filter benefits received by date ranges, as well as SNAP usage and retailer data.

### *Data Transmission*

Each State agency shall transmit data to FNS via the platform called Box. Once you identify the individual who will be responsible for transmitting the data for your State agency, please send their name, title, and email address to SNAPDatabase@usda.gov. The State agency identified contact will then receive an email for account creation and access for data transmission.

Box is a secure platform which employs various security measures, including encryption, access controls, and compliance features to handle the sensitive data that States will be transmitting.

Data shall be transmitted to FNS no later than Wednesday, July 30, 2025.

***Follow-Up Steps***
Upon completion of data analysis, FNS will follow up with State agencies in respect to any applicable next steps of reconciliation.

For questions related to the required data elements and/or assistance with the transmission of data, please send inquiries to SNAPDatabase@usda.gov.

We look forward to expanding this partnership with our State partners to ensure and enhance Program integrity.

Sincerely,

Digitally signed
by GINA BRAND
Date: 2025.07.23
22:20:31 -04'00'

Gina Brand
Senior Policy Advisor for Integrity
United States Department of Agriculture
Food, Nutrition, and Consumer Services

# EXHIBIT E

**USDA**

**U.S. DEPARTMENT OF AGRICULTURE**

July 25, 2025

Dear State Agency Directors,

The Food and Nutrition Service (FNS) of the U.S. Department of Agriculture (USDA, Department) plays a key role, in conjunction with our State agency partners, providing Federally funded nutrition services to Americans in need through the Supplemental Nutrition Assistance Program (SNAP). The Department is dedicated to upholding the commitments of both President Trump and Secretary Rollins to strengthening government program integrity, as directed by Executive Order 14243, Stopping Waste, Fraud, and Abuse by Eliminating Information Silos.

To that end, USDA has established the SNAP Information Database. In accordance with Secretary Rollins' July 9, 2025, letter, and in order to ensure a complete and accurate database, State agencies must be compliant with the requirement of transmitting SNAP participant data to FNS no later than July 30, 2025. As a reminder, 7 U.S.C. 2020(e)(8)(A) provides that State data protections must allow for this disclosure.

State agencies should refer to the SNAP Data Sharing Guidance letter, published on July 23, 2025, to confirm the steps each State agency shall follow to transmit the data. Departmental staff stand ready to assist State partners with any technology challenges and/or provide clarifications as necessary to ensure State agency partners are compliant, and meet the July 30, 2025, deadline.

Failure to take the steps necessary to provide the relevant data to FNS may trigger noncompliance procedures codified in 7 U.S.C. 2020(g).

The Food and Nutrition Service thanks you for your dedication to improved program integrity and transparency in not only addressing the needs of vulnerable Americans, but safeguarding taxpayer dollars.

Sincerely,

Patrick A. Penn
Deputy Under Secretary
Food, Nutrition, and Consumer Services

# EXHIBIT F



**Food and Nutrition Service**

U.S. DEPARTMENT OF AGRICULTURE

November 24, 2025

Governor Kathy Hochul
NYS State Capitol Building
Albany, New York 12224

Dear Governor Hochul,

Pursuant to 7 U.S.C. § 2020(a)(3), the United States Department of Agriculture (USDA), Food and Nutrition Service (FNS), directs that your State provide to FNS records including the Supplemental Nutrition Assistance Program (SNAP) Eligibility Data Elements for the period of January 1, 2020, to present, listed in Attachment A to this letter. The federal government provided funds to assist your State in collecting these records, and FNS needs the records to determine whether SNAP is being conducted in compliance with law.

Since last summer, 28 States have complied with FNS's request for this same type of data. FNS's preliminary review of this data indicates that billions of dollars in federal funds may have been lost due to fraud or other errors undetected by States in their administration of SNAP. Your State, however, has not yet provided FNS the data it seeks, citing the absence of agreed-upon "data and security protocols" specified in 7 U.S.C. § 2020(a)(3). Attachment B to this letter provides a set of data and security protocols that FNS observes with the 28 complying States. This set of protocols, which include FedRAMP High data security, provides a higher level of security than that which States, including your State, historically have accepted in releasing similar data to FNS—including social security numbers and addresses. FNS will inspect and audit the data provided pursuant to this request, and maintain it under the applicable System Of Records Notice, solely for the purposes of "determin[ing] whether the program is being conducted in compliance with [the Food and Nutrition Act of 2008 (FNA)] (including regulations issued under [the FNA]." *See* 7 U.S.C. § 2020(a)(3).

In view of the facts that 28 other States have produced their records to FNS, operating under FNS's data and security protocols, and that your State previously delivered the same type of data to FNS under *less stringent* protocols than those we set forth in Attachment B, there can be no good faith objection to the attached protocols. In *California, et al v. USDA, et al*, 3:25-cv-06310 (N.D. Calif., July 28, 2025), the Court acknowledged that the plain language of the FNA at 7 U.S.C. § 2020(a)(3) entitles USDA to obtain all the requested records, subject to data and security protocols agreed to by the States and USDA:

> "Congress, in the 'Records' section of § 2020, did use clear, ***mandatory*** language, specifically 'shall … be made available for inspection and audit,' thereby ***giving USDA the right to obtain***, subject to data and security protocols, all records necessary to determine whether the program is being conducted in accordance with the SNAP Act. <u>See</u> 7 U.S.C. § 2020(a)(3)(B)."

Order Granting Plaintiff States' Motion for Preliminary Injunction, Oct. 15, 2025, 15: 2-6 (emphasis added).[1]

Because FNS is operating under a higher level of data security than has proven acceptable to States, including yours, when producing to FNS the same type of information it requests here, we anticipate your State will now join the others in complying with Congress's mandate that USDA be able to obtain records to ensure that its federally-funded programs are being operated in compliance with law.

Our preliminary review of data provided to FNS by States complying with FNS's data requests indicates an estimated average of $24 million dollars per day of federal funds is lost to fraud and errors undetected by States in their administration of SNAP. That estimated loss will likely increase when data withheld by non-complying States factors into the analysis. Preventing such losses could save approximately $9 billion or more per year.

We respectfully request that your State respond in writing within seven days of the date of this letter with confirmation of your agreement to produce the requested data to FNS subject to the attached security and data protocols. Because the protection afforded by our data and security protocols exceeds that which your State historically has required before producing the same type of data to FNS, your State should have no difficulty nor reservations agreeing to these protocols. Based on our experience with States complying with FNS data requests, about which we provided notice last summer, your State should be able to produce its records no later than 30 days after the date of this letter. Your State's timely compliance with this letter is essential to safeguarding the public interest in securing federal SNAP funds from loss due to fraud, waste and abuse. If, for some reason, your State declines to produce the requested data subject to the attached protocols, we request that you inform us in writing within seven days of the date of this letter of: (1) the basis for your lack of agreement and (2) any proposed edits to the protocols that you deem necessary to produce the requested data.

In addition, please take all steps necessary to preserve all records covered by this request, whether possessed by your State or your vendors. We expect to be able to review historical data in its native, unaltered form, from January 1, 2020, to the present. It is imperative the Federal Government obtains unaltered data reflecting the actual performance of States in administering this federally-funded program for all time periods covered by this request.

---

[1] Specifically, 7 U.S.C. § 2020(a)(3)(B) requires that "***such records as may be necessary*** to determine whether the program is being conducted in compliance with this [SNAP Act] (including regulations issued under this [SNAP Act)]" "**shall be made available**" to USDA (emphasis added). The question presented and ruled upon by the Court in *California* was whether to preliminarily enjoin FNS from disallowing SNAP funding "based on Plaintiff States' failure to comply with the demands set forth in the above-discussed formal warning letters or otherwise acting thereon." *Id*. at 25:10–13. Those formal warning letters relied only on 7 U.S.C. § 2020(e)(8)(a), as to which the Court opined that "shall permit" in 7 U.S.C. § 2020(e)(8)(A) is permissive, as contrasted with the "clear, mandatory language" of 7 U.S.C. § 2020(a)(3)(B) "giving USDA the right to obtain" the requested data. *Id*. at 13:25–17:13. USDA respectfully disagrees with an interpretation that "shall permit" allows states to elect to withhold data requested under 7 U.S.C. § 2020(e)(8)(A), and maintains all rights to appeal and otherwise contest such an interpretation.

Thank you for your continued work to help address the needs of vulnerable Americans and safeguard taxpayer dollars.

Sincerely,

Patrick A. Penn
Acting Administrator, Food and Nutrition Service
Deputy Under Secretary, Food, Nutrition, and Consumer Services
U.S. Department of Agriculture

**U.S. DEPARTMENT OF AGRICULTURE**

**Supplemental Nutrition Assistance Program
Information SNAP Database**

### SNAP Eligibility Data Elements

The following elements should be included in the data sharing file from each State agency on all household members that are listed in the SNAP case. Please provide a data dictionary if one is available to reduce the burden to both the State agency and USDA.

**Case Number:** The case number is a unique identifier, typically 7 to 10 digits long, assigned to a household when they apply and/or are approved for SNAP.

**First, Middle, Last Names:** The full name of all household members.

**Known Alias:** Assumed or alternative name(s) used by any of the household members.

**Authorized Representative(s):** Provide any identified authorized representative for the household, and their corresponding information such as full name, means of verbal and written communication.

**Date of Birth:** The specific month, day and year the household member was born.

**Individual Recipient Identification Number:** The unique identifier assigned to that specific household member within the case by the State agency.

**Social Security Number:** The unique 9-digit identifier issued by the Social Security Administration and provided by the household member.

**Status on SNAP** *(recipient/individual level)***:** Identify if the household member in the case is actively receiving SNAP, disqualified, sanctioned, or excluded.

**Application and/or Recertification Date:** The date the household applied for SNAP (this can be the first application date, or most recent recertification date).

**Reporting Status:** Following initial certification, or recertification, households are determined to be a simplified or change reporting household. This data element should indicate the reporting status the household has been designated to be.

**Relationship:** The relationship identifies who all household group members are to one another and assists with determining mandatory group members. The data should reflect who each household member is to one another.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

*Absent Parent* (as applicable)**:** This identifies the parent of a minor child who resides in a separate household.

*Citizenship and/or Immigration Status***:** This identifies if the individual is a U.S. citizen or immigrant.

*Sponsorship:* This identifies if an individual applying or receiving SNAP has been sponsored to enter the U.S. Data should identify the name or organization of the sponsor.

*Residential Address***:** The address the household has provided as to where they reside.

*Mailing Address***:** The address the household has provided as to where they would like all correspondence sent to (if different than residential).

*Homeless Status***:** Please include if the household is identified as homeless.

*Phone Number(s)***:** The contact number(s) provided by the household as a means of contact.

*Email Address(es)***:** The email address(es) provided by the household as a means of contact.

*Unearned Income***:** The unearned income (RSDI, unemployment, child support, etc.) identifies the unearned income source, pay frequency, the household member receiving the pay, and the total amount of income budgeted to determine the SNAP allotment.

*Earned Income***:** The earned income identifies the earned income source, pay frequency, the household member receiving the pay, and the total amount of income budgeted to determine the SNAP allotment.

*Self-Employment Income***:** Self-employment should be identified as to what the self-employment is (type or business name), pay frequency, the household member who is self-employed, and the total amount of income budgeted as well as the amount of allowed expenses.

*Shelter Expenses***:** The shelter expenses should be identified as to shelter type (i.e. rent), and the budgeted dollar amount. Shelter expenses may be separated out as various expenses are taken into consideration for eligibility and those should be included if used in the SNAP allotment determination (i.e. telephone, heating, cooling). If the household is active with Section 8, which pays a portion of the rental expenses, please ensure that is included.

*Assets/Resources***:** Any known assets (i.e. bank accounts, boat, collector vehicle) or resources used to determine SNAP eligibility and must identify the asset type, amount and what household member the asset belongs to.

***Sanctions/Disqualifications*:** Identify any household members who are serving a sanction and/or disqualification that is impacting their eligibility to participate in SNAP. The sanction and/or disqualification type and any applicable time periods should be identified (i.e. IPV, 10/1/2024-9/30/2025). This field should correspond to the data provided in the status on SNAP if the household member is currently serving a disqualification, as well as any income field(s) that may pertain to the disqualified member due to income proration.

***SNAP EBT Card Number*:** The unique set of digits on the household's issued SNAP EBT card that connects the case to the associated transactions.



**U.S. DEPARTMENT OF AGRICULTURE**

**Supplemental Nutrition Assistance Program (SNAP) Information Database
Fraud, Waste and Abuse Detection Protocol**

## 1. OVERVIEW

1.1. U.S. Department of Agriculture (USDA) and the Food and Nutrition Service (FNS) will use the Supplemental Nutrition Assistance Program (SNAP) recipient data to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying duplicate enrollments for elimination, and performing additional eligibility and program integrity checks specified herein.

1.2. This protocol establishes a framework for State SNAP agencies to share data with the USDA/FNS for detection of fraud, waste, and abuse and program integrity purposes.

1.3. The protocol balances federal data access requirements under Executive Order 14243 and the Food and Nutrition Act of 2008 (FNA) with privacy protections, minimizes unnecessary data collection, and incorporates security standards while maintaining public trust and compliance with applicable law.

## 2. FRAMEWORK AND AUTHORITY

2.1. Authority

2.1.1. Executive Order 14243 (March 20, 2025): "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos" directs agency heads to "take all necessary steps, to the maximum extent consistent with law," to ensure federal government has "unfettered access to comprehensive data" from state programs receiving federal funding, including data maintained in third-party databases.

2.1.2. 7 U.S.C. § 2020(a)(3) that requires that each State agency shall keep records as may be necessary to determine whether the program is being conducted in compliance with this chapter, and all records shall be made available for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary.

2.1.3. 7 CFR 272 stipulates use or disclosure of information obtained from SNAP applicant or recipient households shall be restricted to persons directly connected with the administration or enforcement of the provisions of the FNA or regulations, other Federal assistance programs, federally-assisted State programs providing assistance on a means-tested basis to low-income individuals, or general assistance programs which are subject to joint processing requirements.

2.2. Prohibited Purposes

2.2.1. USDA shall NOT use the provided data for:

- Tax administration or tax compliance
- Law enforcement investigations beyond coordination regarding criminal and administrative SNAP violations
- Administration of non-SNAP federal assistance programs (*e.g.*, Medicaid, TANF, housing assistance)
- Sharing with foreign governments or international organizations
- Commercial use or transfer to private entities

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

2.2.2. USDA shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals (*i.e.*, the collection of data elements spelled out in the Privacy Impact Assessment).

## 3. DATA CATEGORIES

3.1. <u>Data Definition</u>

3.1.1. All data obtained by States or their vendors in administering SNAP or that otherwise may be necessary to determine whether the program is being conducted in accordance with the FNA or regulations issued under the FNA.

3.1.2. Data derived from third-party sources (employment verification databases, financial institution records, property records) that States use for verification but are not part of applicant-reported information are excluded.

3.2. <u>Permitted Data</u>

- Information that the applicant household reported on application/recertification forms including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers.

- Direct verifications that the State conducted to confirm applicant-reported information Records that the State maintains of SNAP applications, approvals, denials, certifications, and benefits issued.

- Household composition and income exactly as reported by the applicant (not third-party verified amounts).

- Transactional data necessary for fraud detection

## 4. LIMITED ACCESS

4.1. The SNAP Information Database is accessed and used ONLY by employees of the USDA who are:

4.1.1. Designated by the Chief of Staff at Food, Nutrition, Consumer Services (FNCS)

4.1.2. Trained in SNAP Act, Privacy Act, and this protocol

4.1.3. In compliance with all information security annual recertifications

4.2. No Access to the SNAP Information Database may be provided to:

4.2.1. Other USDA agencies (APHIS, ERS, NASS, etc.)

4.2.2. Divisions within FNS without an explicit need-to-know

4.2.3. OIG employees, unless in direct support of a law enforcement investigation related to SNAP fraud, waste, or abuse

4.2.4. Any other federal agency

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

**5.  SYSTEM OF RECORDS NOTICE (SORN) AND PRIVACY IMPACT ASSESSMENT (PIA)**

5.1.  <u>SORN</u>

The applicable SORN for this protocol is USDA/FNS-15 "National Supplemental Nutrition Assistance Program (SNAP) Information Database," 90 FR 26521.

The SORN location can be found here: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system-of-records

5.2.  <u>Privacy Impact Assessment (PIA)</u>

The applicable Privacy Impact Assessment for the SNAP Information Database can be found here: https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

**6.  FRAUD, WASTE, AND ABUSE DETECTION FRAMEWORK**

6.1.  <u>Core Fraud Detection Functions</u>

6.1.1. USDA will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program that focuses on:

- identity verification

- income and eligibility verification

- immigration status

- verification against disqualified recipients

6.2.  <u>Enhanced Fraud, Waste, and Abuse Detection Techniques</u>

6.2.1. In addition to the core fraud detection functions, USDA will employ additional techniques including, but not limited to:

- Intrastate and interstate duplicate detection

- Deceased individuals' detection

- Synthetic identity patterns (new SSNs with inconsistent biographical data)

- Geographic anomalies

6.2.2. New data mining techniques will be limited to identifying recipient and retailer fraud with a direct nexus to SNAP.

**7.  DATA OUTPUT**

7.1.  <u>States</u>

7.1.1. USDA will provide flagged data back to the State agency for review. States are encouraged to verify the accuracy of fraud detection flags and provide feedback to USDA to refine detection logic and reduce false positives. Collaborative processes will be established to ensure accurate identification of fraud and appropriate corrective actions.

7.2.  <u>Law Enforcement</u>

7.2.1. The USDA may refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP.

7.3.  <u>USDA SNAP Retailer Operations Center (ROC)</u>

7.3.1. The USDA may refer fraud detection leads to the ROC where, during fraud detection analysis, a compromised EBT card or terminal ID may have been identified.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

## 8. DATA MINIMIZATION AND RETENTION

8.1. Retention Period

8.1.1. Until a record schedule is approved, data will be retained only as long as necessary for purposes set forth in the SORN and this protocol, and in no case longer than 3 years per the SORN.

8.2. Automatic Deletion

8.2.1. Data shall be retained for no longer than three years, consistent with the USDA/FNS-15 SORN. An automated process will be implemented to delete data upon expiration of the retention period, except for records related to ongoing audits, investigations, or litigation.

8.3. Ongoing Cases

8.3.1. Data pertaining to ongoing audit, investigation, or potential litigation retained only as long as necessary, then deleted.

## 9. DATA SECURITY AND TECHNICAL REQUIREMENTS

9.1. Infrastructure and Location

9.1.1. Primary storage location: AWS GovCloud (US) region

9.1.2. Backup/disaster recovery: Secondary AWS region

9.1.3. No storage, processing, or backup outside GovCloud or federal secure environments

9.1.4. All infrastructure must meet or exceed FedRAMP High baseline standards

9.1.5. AWS Personnel Access: Data is encrypted such that AWS personnel cannot access unencrypted data. Encryption keys are managed exclusively by federal USDA personnel and are not accessible to AWS or third-party vendors.

9.2. Access Controls

9.2.1. Multi-factor authentication required for all access

9.2.2. Role-based access control (RBAC) with principle of least privilege

9.2.3. Access is limited to specifically designated USDA employees engaged to assist in determining whether the program is being conducted in accordance with the FNA.

9.2.4. Access logging and audit trail maintenance (minimum period equal to data retention period, see Section V.E).

9.2.5. Quarterly access reviews by USDA

9.2.6. Immediate revocation of access upon employee termination or assignment change

9.3. Encryption Standards

9.3.1. Encrypted data at rest and in transit

9.3.2. Encryption keys managed solely by USDA federal personnel

9.3.3. No encryption keys held by commercial vendors

9.4. Data Segregation and Compartmentalization

9.4.1. SNAP data isolated in separate, dedicated AWS GovCloud environment

9.4.2. SNAP data not directly integrated with other USDA systems

9.4.3. Limiting access to individuals with specialized training and oversight

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

9.5.  Data Transfer

    9.5.1. All  data transfers shall utilize secure tools that meet or exceed FedRAMP High baseline standards.

## 10. INCIDENT RESPONSE AND BREACH NOTIFICATION

10.1. Incident Response

    10.1.1.  Incident response procedures are aligned with FNS Handbook Chapter 10 security incident and breach notification requirements that USDA already follows internally. This protocol extends equivalent procedures to State notification.

10.2. Incident Definition

    10.1.2.  Unauthorized access, use, or disclosure of data

    10.1.3.  Security vulnerability or control failure affecting data

    10.1.4.  Data loss, corruption, or destruction

    10.1.5.  Encryption failure or key compromise

    10.1.6.  Failed access control or authentication mechanism

    10.1.7.  Any event that may reasonably be expected to compromise data security or confidentiality

10.3. Incident Notification Timeline

    10.3.1.  Initial Notification within 12 hours

        10.3.1.1.    Within 12 hours of discovery (by phone + email to State security/privacy contact and Director).

    10.3.2.  Preliminary Report within 24 hours

        10.3.2.1.    Description of incident and timeline

        10.3.2.2.    Data elements affected (specific fields and estimated number of records)

        10.3.2.3.    Estimated number of individuals affected

        10.3.2.4.    Preliminary assessment of whether unencrypted sensitive data may have been exposed

        10.3.2.5.    Preliminary remedial actions taken

        10.3.2.6.    Root cause analysis plan and timeline

## APPENDIX A - SOURCES

- Privacy Impact Assessment: https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

- SORN: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system-of-records

- SNAP Act: https://www.law.cornell.edu/uscode/text/7/2020

- SNAP QC Handbook

- Executive Order 14243 (March 20, 2025) "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos:  https://www.govinfo.gov/content/pkg/DCPD-202500382/pdf/DCPD-202500382.pdf

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

# EXHIBIT G

*Via E-mail*
Elizabeth J. Shapiro
Benjamin S. Kurland
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 598-7755
ben.kurland@usdoj.gov
*Counsel for U.S. Department of Agriculture and Secretary of Agriculture Brooke L. Rollins*

RE: Response to November 24, 2025 Letter to Plaintiff States from Patrick A. Penn

Dear Counsel:

On behalf of the Plaintiff States in *California v. USDA*, No. 3:25-cv-06310-MMC (N.D. Cal. Oct. 15, 2025), this letter responds to the November 24, 2025, letter of the U.S. Department of Agriculture's (USDA) Food and Nutrition Services (FNS). *See* ECF No. 109.

In that letter, USDA restated FNS's ongoing demand for Supplemental Nutrition Assistance Program (SNAP) Eligibility Data Elements for the period of January 1, 2020, to the present. As you are aware, this demand is the subject of ongoing litigation and was previously enjoined by the Court. *See* Order Granting Plaintiff States' Motion for Preliminary Injunction, *California v. USDA*, No. 3:25-cv-06310-MMC (N.D. Cal. Oct. 15, 2025). Thus, any attempt to seek a financial penalty or initiate an administrative noncompliance proceeding based on USDA's new letter, or any other iteration of FNS's ongoing data demand, would, at minimum, constitute a violation of that order, which preliminarily enjoins USDA from "disallowing SNAP funding based on Plaintiff States' failure to comply with the demands" for this SNAP data.

USDA's letter also provided proposed "data and security protocols," which by statute must be "agreed to by the State agency and Secretary" under 7 U.S.C. § 2020(a)(3)(B)(i). USDA's letter concluded by asking State agencies to produce the demanded SNAP data within 30 days, or to respond in writing to explain "(1) the basis for your lack of agreement and (2) any proposed edits to the protocols that you deem necessary to produce the requested data." This letter seeks clarification and to provide both (1) and (2), though we intend to provide further, more detailed edits to the proposed agreement after receiving the necessary clarifications sought herein, which will inform and facilitate those additional edits.

For the reasons described in our Complaint and Preliminary Injunction Motion, we object to USDA's unprecedented collection of millions of Americans' sensitive personally identifiable information (PII) without a clear need for such data and in violation of federal privacy laws. Nevertheless, we agree that USDA must negotiate with the States to develop a mutually agreeable data and security protocol prior to any data collection that may be authorized by 7 U.S.C. § 2020(a)(3). Therefore, without waiving any claims or defenses that may be raised in the

1

pending litigation, we are responding to provide comments on the proposed Data Elements and Data Sharing Protocol attached as Attachments A and B to the letter. Additional questions concerning both are also attached to this response.

We request written responses to the questions in this letter and the Attachment by Monday December 15, 2025.

**I.      The proposed data security protocol is insufficient compared to prior agreements between USDA and State agencies.**

As an initial matter, FNS's letter claims that each of the States "previously delivered the same type of data to FNS under *less stringent* protocols." This assertion is inaccurate for several reasons. First, FNS has never sought anything comparable to the nearly six years of unredacted PII on all SNAP applicants and beneficiaries that it has now demanded; this unprecedented demand creates novel risks concerning the misuse of data and the protection of individuals' privacy.

Furthermore, without any reference to any specific protocol executed with any one of the States that received this letter, it is impossible to know whether prior protocols used to share a less sensitive data set were "less stringent" as you assert. Therefore, we ask that USDA specifically identify or provide copies of the protocols you refer to—for each State—so that we may evaluate this claim.

USDA's statement that this is a higher level of security and more stringent than previous protocols also appears to ignore the framework for the National Accuracy Clearinghouse (NAC) database that Congress mandated to identify duplicate SNAP enrollment. For example, the SORN for the NAC database mandates that any PII (including names, social security numbers (SSNs) and dates of birth (DOBs)) are converted to a secure cryptographic hash via the Privacy Protecting Record Linkage (PPRL) process before being shared. While some States are still working towards implementing the NAC, we would expect to see, at a minimum, the same protections (and the same careful testing and rollout process) applied to USDA's more recent request for SNAP Eligibility Data Elements.

The proposed protocol document also remains merely "a framework" that lacks many details required by federal law. *See* Proposed Protocol § 1.2. For example, when the federal government creates a "matching program," which the SNAP Information Database plainly is, agencies' data sharing agreements must articulate detailed procedures to protect the privacy, security and accuracy of individuals' data records. *See* 5 U.S.C. § 552a(o)(1). Attachment B falls far short of these specificity requirements. USDA has entered into necessarily detailed computer matching agreements and Interconnection Security Agreements (ISAs) with state agencies to implement the NAC and Electronic Disqualified Recipient System (eDRS) systems. Similarly detailed and comprehensive agreements are needed to implement any agreed-upon protocol before state agencies can lawfully share information.

Furthermore, although USDA's proposed protocol prohibits certain data uses, it does not define enforcement mechanisms. Without such mechanisms, the proposed protocol offers state agencies no assurance that violations will be detected, prevented, or corrected. Without enforcement mechanisms (such as monitoring, auditing, automated controls, or documented consequences), the restrictions function only as statements of intent. This creates compliance risk, allows improper data use to go unnoticed, and weakens the ability of State agencies to ensure legal, ethical, and policy-aligned handling of SNAP information.

The proposed protocol also presents, for the first time, a process by which USDA will return "flagged" results back to the State for State agency action. *See* Proposed Protocol § 7.1.1. In addition to the need for a secure data transfer mechanism and process to receive and process these files, the protocol fails to specify against which data the supposed fraud detection was identified, what specific actions the state must take to verify whether the fraudulent action is true, and what response the State must provide on its findings and subsequent actions. As discussed further below, applicable laws and policies require that all these iterative steps be spelled out in detail and agreed upon before any data sharing can take place.

II.  **The proposed data elements and protocol, along with USDA's public statements, raise concerns about the accuracy and validity of USDA's planned data analyses.**

State agencies agree with USDA that it should "minimize[] unnecessary data collection." *See* Proposed Protocol § 1.3. Furthermore, USDA asserts that it "shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals." *Id.* § 2.2.2.

What makes data necessary, however, cannot be assessed in the abstract. We therefore request that USDA share its methodologies and proposed data analysis techniques with States so that we can provide feedback on the data needed, and the validity of the analytical methods being used, before providing FNS with confidential information on millions of SNAP beneficiaries.

As we have expressed in the litigation, the queries run through the SNAP Information Database by USDA so far do not account for the actual processes States use to review and verify applicant and household information. Our review of the "preliminary snapshot review" (*see* ECF No. 89-1) that USDA created from data some States have already submitted reveals that USDA's apparent methodologies result in overwhelming numbers of false positives and would not provide an accurate or meaningful picture of States' case files.[1]  This is not only misleading to the public, but risks placing a heavy burden on States to investigate these false positives.

This information is especially important because the proposed protocol does not exclude sensitive PII at all, and USDA is requesting numerous data elements that do not appear necessary

---

[1] We have discussed the apparent problems with this snapshot review in declarations submitted by California (ECF No. 99-1) and Illinois (ECF No. 99-2).

to investigate fraud, waste and abuse, especially at an aggregate level. It is necessary for the States to understand why USDA needs the specific PII elements requested so that the States can propose appropriate amendments to the draft protocol that would still accomplish any legitimate goals. Such amendments could include, for example, committing to using data solely for specific analyses described in the protocol and then purging it from USDA's system, as has been done in the past, and permitting States to provide information at a higher level of specificity depending on each agency's available data and technological capabilities (e.g., providing an age range rather than birthdate, or the county or ZIP code instead of a home address) to protect personal privacy.

Given the bulk review and processing USDA is engaging in (*see* ECF No. 72-1 at ¶ 34), it is unclear why deidentified data could not serve as a functionally identical and more secure means of identifying facts about program integrity to share with the States. Should USDA wish to review samples of cases identified through an initial deidentified process, States could participate under existing statutory procedures allowing for a full review of those individual eligibility cases. Another potential option could be through the use of a cryptographically secure PPRL approach, which, as noted, has already been developed for the NAC. Congress and the USDA explicitly created this privacy-protective system for this purpose, and States see no reason to circumvent it through the less-protective SNAP Information Database.

Additionally, the list of data elements attached to USDA's November 24, 2025 letter includes numerous elements (such as personal financial information) that were not considered in the agency's Privacy Impact Assessment.[2] This is a necessary step that the agency would need to correct before any data collection could proceed. Please confirm that USDA will be updating its Privacy Impact Assessment accordingly.

III.    **USDA is ignoring the existing process for testing new programs to identify fraud, waste and abuse.**

The statutes defining SNAP (hereafter the "SNAP Act") enshrine a cooperative model between the federal government and the States. Indeed, experimental and pilot projects "designed to test program changes that might increase the efficiency of [SNAP] and improve delivery of [SNAP] benefits to eligible households" are codified in the law (7 U.S.C. § 2026), and the SNAP Act provides a mechanism for USDA to work with state agencies to design, implement and evaluate new initiatives. This collaboration also includes State-led projects supported by the federal government under the SNAP Fraud Framework Implementation Grant Program, authorized and funded by Congress to support State initiatives. USDA's own fact sheet about that program recognizes that "States have long served as incubators for testing strategies to help prevent program fraud." *See https://www.fns.usda.gov/snap/fraud-framework*. USDA's departure from

---

[2] *See* USDA Privacy Impact Assessment for Fiscal Year 2025 at 8-10 (July 23, 2025), available at https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf.

this collaborative model ignores congressionally authorized programs and States' own expertise in program integrity.

USDA's proposed data protocol appears to acknowledge the collaborative framework and relationship that the SNAP Act establishes, stating that "collaborative processes will be established" to ensure the accuracy of new data analysis techniques. *See* Proposed Protocol § 7.1.1. But USDA's approach seems to be inconsistent with this acknowledgement, considering USDA's unilateral demands for data and threats of punitive action.

The agency should provide a clear explanation of its proposed data analysis objectives and methodologies, and engage in the required collaborative processes (including but not limited to testing and validation of findings for accuracy) needed to ensure such analysis is accurate and useful for detecting fraud, waste and abuse, *before* demanding production of almost 6 years of nearly unlimited PII on SNAP users to create an unprecedented database unsupported by law.

We are ready and willing to engage with USDA on a process that defines valid analytical goals and the data needed to meet those goals. For example, if USDA wants to test out new data tools, it could use sample sets of deidentified data and engage in an iterative process to check accuracy and results, as it has done in the past. It is unreasonable for USDA to abandon these time-tested techniques, and to run opaque, untested data analytic tools on millions of records in a manner likely to result in inaccurate results—particularly when USDA has signaled a desire to use those inaccurate results to unfairly impugn the integrity of state SNAP programs or the eligibility of residents to receive necessary food assistance.

### IV. The proposed data analysis is duplicative of work that is already done by state agencies to prevent waste fraud and abuse.

USDA's proposed data protocol acknowledges that its proposed program is "similar to the SNAP Quality Control program" that has already been implemented as required by Congress in 7 U.S.C. § 2025 and through USDA's promulgated regulations. *See* Proposed Protocol § 6.1.1. The new framework appears to disregard congressional intent concerning the conduct of a quality control program, particularly given that the requested data would not permit USDA to conduct appropriate verification of applicant files.

States already engage in the statutorily mandated Quality Control Program and Performance Reporting System (*see* 7 U.S.C. § 2025; 7 C.F.R. §§ 275.1–275.24), which specifies procedures for federal monitoring "to determine whether a State agency is operating SNAP and the Performance Reporting System in accordance with program requirements" including annual reviews, management evaluation, quality control reviews and validation of state agency error rates. *See* 7 C.F.R. § 275.3. For deceased and disqualified individuals, among other verifications conducted by State Agencies, Congress has determined that verification of compliance with these requirements is satisfied by States' submission of annual reports to the Secretary "containing sufficient information" for USDA to make a determination on States' compliance. 7 U.S.C.

5

§ 2036c. Similarly, submission of state agency data for use in the NAC takes place under a specific statutory grant of authority. *See* 7 U.S.C. § 2020(x). States additionally conduct immigration verification through the Systematic Alien Verification for Entitlements Program (SAVE)[3] and verify income using federally approved income eligibility verification systems (*see* 7 U.S.C. § 2020(p)) which share data using privacy protective systems. States also already provide information on Intentional Program Violations (IPV) and program sanctions to USDA under existing reporting requirements and use the Electronic Disqualified Recipient system (eDRS) to check whether SNAP applicants have been disqualified from the program for fraud. For Electronic Benefit Transfers (EBT) fraud, FNS already receives daily transaction data for *all* EBT transactions under the Anti-Fraud Locator using EBT Retailer Transactions (ALERT) system. ALERT monitors that transaction activity and identifies suspicious retailers for analysis and investigation.

USDA's proposed protocol specifies that USDA-FNS will collect "only the data elements necessary to achieve specific, legally permissible goals." Given the already-existing, rigorous and comprehensive quality control regime under the SNAP Act and USDA's implementing regulations, we request that USDA specifically identify any unique goals of the SNAP Information Database proposal that are not covered by existing programs and federal oversight, and which data elements are actually necessary to achieve those additional goals.

## V.      Clarifying questions and suggestions

In addition to the concerns highlighted above, we are attaching a list of questions and suggestions about USDA's proposed protocol, and how FNS intends to use and share the data that our residents have entrusted to our agencies. We request this clarifying information to understand USDA's proposal better, and in an effort to make progress towards a mutually agreeable data and security protocol. We invite collaboration to generate a program that will respect existing legal frameworks and SNAP household privacy, while making a positive impact on program administration.

States have always been primary partners and leaders in SNAP program integrity. We appreciate the increased detail provided in this protocol, and hope that with further discussion and refinement States can continue to assist USDA in achieving legitimate program integrity

---

[3] The SAVE Program itself is deployed in the SNAP context with privacy in mind; States' agreements with USCIS to use the SAVE program include "safeguards limiting release or redisclosure as required by State or Federal law or regulation as discussed in [7 C.F.R.] § 272.1(c) and as may be required by other guidelines published by the Secretary." 7 C.F.R. § 272.11(b). States must include the steps taken to comply with this limit on disclosure as part of their state SNAP plans. *Id.* § 272.11(e). State agencies are further restricted to using the SAVE Program only for limited purposes related directly to establishing eligibility and program integrity. *Id.* § 272.11(c).

objectives while protecting the privacy of SNAP household data, reducing duplicative processes, and maintaining the security of confidential and sensitive information.


Dated: December 8, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General
ANDREW Z. EDELSTEIN
ANNA RICH
EDWARD P. WOLFE
ROBIN GOLDFADEN
SEBASTIAN BRADY
WILLIAM BELLAMY


/s/ *Maria Buxton*
MARIA F. BUXTON
DEPUTY ATTORNEYS GENERAL
*Attorneys for Plaintiff State of California*

LETITIA JAMES
Attorney General of New York

KWAME RAOUL
Attorney General of Illinois

*/s/ Mark Ladov*
MARK LADOV
Special Counsel
JULIE DONA
Special Counsel
28 Liberty St.
New York, NY 10005
(212) 416-8240
mark.ladov@ag.ny.gov
*Attorneys for Plaintiff State of New York*

*/s/ Sherief Gaber*
HARPREET K. KHERA
Bureau Chief, Special Litigation
SHERIEF GABER
Assistant Attorney General
115 S. LaSalle St., 35th Flr.
Chicago, Illinois 60603
(773) 590-7127
Harpreet.Khera@ilag.gov
*Attorneys for Plaintiff State of Illinois*

KRISTIN MAYES
Attorney General of Arizona

PHILIP J. WEISER
Attorney General of Colorado

*/s/ Hayleigh S. Crawford*
HAYLEIGH S. CRAWFORD (AZ NO. 032326)
LUCI D. DAVIS (AZ NO. 035347)
2005 N. Central Ave. Phoenix, AZ 85004
(602) 542-3333
Hayleigh.Crawford@azag.gov

*/s/ David Moskowitz*
DAVID MOSKOWITZ
Deputy Solicitor General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203

7

Luci.Davis@azag.gov
ACL@azag.gov
*Attorneys for Plaintiff State of Arizona*

Phone: (720) 508-6000
david.moskowitz@coag.gov
*Attorneys for Plaintiff State of Colorado*

WILLIAM TONG
Attorney General of Connecticut

*/s/ Janelle R. Medeiros*
JANELLE R. MEDEIROS
Special Counsel for Civil Rights
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Janelle.Medeiros@ct.gov
*Attorneys for Plaintiff State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware

*/s/ Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

BRIAN L. SCHWALB
Attorney General for the District of
Columbia

*/s/ Nicole S. Hill*
NICOLE S. HILL
Assistant Attorney General
Office of the Attorney General for the
District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov
*Attorneys for Plaintiff District of Columbia*

ANNE E. LOPEZ
Attorney General of Hawaiʻi

*/s/ Kalikoʻonālani D. Fernandes*
DAVID D. DAY
Special Assistant to the Attorney General
KALIKOʻONĀLANI D. FERNANDES
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorneys for Plaintiff State of Hawaiʻi*

OFFICE OF THE GOVERNOR *ex rel*. Andy
Beshear, in his official capacity as
Governor of the Commonwealth of
Kentucky

*/s/ S. Travis Mayo*
S. TRAVIS MAYO
General Counsel
TAYLOR PAYNE
Chief Deputy General Counsel

AARON M. FREY
Attorney General of Maine

*/s/ Brendan Kreckel*
BRENDAN KRECKEL
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 0433-0006
Tel.:  207-626-8800

8

LAURA C. TIPTON
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov
*Attorneys for Plaintiff Kentucky Governors'
Office*

Fax:  207-287-3145
brendan.kreckel@maine.gov
*Attorneys for Plaintiff State of Maine*


ANTHONY G. BROWN
Attorney General of Maryland

*/s/ James C. Luh*
JAMES C. LUH
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

*/s/ Katherine Dirks*
KATHERINE DIRKS
Chief State Trial Counsel
CASSANDRA THOMSON
Assistant Attorney General
Office of the Massachusetts Attorney
General
1 Ashburton Place Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
cassandra.thomson@mass.gov
*Attorneys for Plaintiff Commonwealth of
Massachusetts*


DANA NESSEL
Attorney General of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI
BRYAN BEACH
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov
beachb@michigan.gov
*Attorneys for Plaintiff State of Michigan*

KEITH ELLISON
Attorney General of Minnesota

*/s/ Joseph R. Richie*
JOSEPH R. RICHIE
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

9

MATTHEW J. PLATKIN
Attorney General of New Jersey

/s/ *Kashif T. Chand*
KASHIF T. CHAND (NJ BAR NO. 016752008)
Assistant Attorney General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
kashif.chand@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

RAÚL TORREZ
Attorney General of the State of New
Mexico

/s/ *Steven Prefrement*
STEVEN PERFREMENT
Senior Litigation Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
SPerfrement@nmdoj.gov
505-601-7727
*Attorneys for the State of New Mexico*

DAN RAYFIELD
Attorney General of Oregon

/s/ *Scott P. Kennedy*
SCOTT P. KENNEDY
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 453-9050
Fax (971) 673-5000
Scott.Kennedy@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*

JOSH SHAPIRO, in his official capacity as
Governor of the Commonwealth of
Pennsylvania

/s/ *Jacob B. Boyer*
JENNIFER SELBER
General Counsel
JACOB B. BOYER
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov
*Counsel for Governor Josh Shapiro*

PETER F. NERONHA
Attorney General of Rhode Island

/s/ *Madeline R. Becker*
MADELINE R. BECKER (RI BAR NO. 10034)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2151
mbecker@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

NICHOLAS W. BROWN
Attorney General of Washington

/s/ *Jennifer K. Chung*
JENNIFER K. CHUNG, WSBA #51583
WILLIAM MCGINTY, WSBA #41868
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
jennifer.chung@atg.wa.gov
william.mcginty@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

10

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Karla Z. Keckhaver*
KARLA Z. KECKHAVER
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-6365
karla.keckhaver@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*

11

**Attachment 1:**

**Questions and Suggestions Concerning USDA's Proposed Data and Security Protocol**

*Limiting unnecessary data elements and scope*

1. Pursuant to USDA's acknowledgement that it must "minimize[] unnecessary data collection" (§ 1.3), and that it will collect "only the data elements necessary to achieve specific, legally permissible goals" (§ 2.2.2), please explain for each of the data elements in Attachment A:

    (a) how USDA intends to use this data element;

    (b) why it needs this data element for each SNAP beneficiary served by the State;

    (c) whether each data element is necessary to determine whether SNAP is being conducted in compliance with the SNAP Act, and why;

    (d) why such analysis is not duplicative of an analysis or match that already occurs;

    (e) whether each element is covered by the applicable System of Records Notice (SORN) and Privacy Impact Assessment (PIA); and

    (f) why it needs the data element for all files dating back to January 1, 2020.

*Clarifying and improving limitations on disclosure and use of data*

2. The proposed data sharing agreement states that the requested data will be used "to ensure the integrity of Government programs[.]" However, 7 U.S.C. § 2020(e)(8) permits States to disclose information obtained from applicant households only to persons directly connected with the administration of federal assistance programs for the administration or enforcement of that program. To ensure compliance with 7 U.S.C. § 2020(e)(8), will USDA limit its use of the data to "ensure the integrity of the SNAP program" only?

3. Section 2.2.1 of the proposed protocol says USDA shall not use the provided data for "law enforcement investigations beyond coordination regarding criminal and administrative SNAP violations." This phrasing does not appear in the SNAP Act and is unclear.

    (a) Please elaborate what USDA means by "coordination regarding criminal and administrative SNAP violations."

    (b) Can you confirm that USDA will not share any of this data with Immigration and Customs Enforcement (ICE) or any other Department of Homeland Security (DHS) subagencies for use in immigration enforcement activities?

    (c) In order to ensure that state SNAP data is not unlawfully used for immigration enforcement purposes, will USDA agree to include protocol language that alerts any State immediately if ICE or any other DHS subagency requests access to or use of

12

this data and provides at least 30 days for that State to respond (and if necessary take legal action) to prevent such data sharing?

(d) Please confirm that the prohibited purposes listed in Section 2.2, as clarified by USDA's response to this letter, will apply to all federal agencies.

4. Relatedly, the protocol reserves the right to "refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP." How does the USDA define a "criminal nexus"? Could the USDA provide examples of (a) what would constitute such a "criminal nexus" and (b) which agencies could potentially receive such a referral?

5. We also believe any protocol must also address how USDA would handle external requests (FOIA, administrative subpoena or otherwise) to obtain States' SNAP data. Will USDA provide clarification of these issues and agree to protocol language alerting any State to such a request and providing sufficient time for the State to respond prior to any USDA disclosure of data?

6. Currently, the proposed protocol only limits "access" to the database (*see* § 4), but does not similarly restrict USDA's ability to *disclose* the data.

(a) Pursuant to 7 U.S.C. § 2020(e)(8), will USDA include a clause that prohibits the agency from disclosing the requested data except to persons "directly connected with the administration" of the SNAP Act, for the purpose of administering or enforcing the SNAP Act only?

(b) Will USDA include a clause requiring the agency to identify the specific entities and individuals to whom the USDA intends to disclose data, and how they are "directly connected with the administration" of the SNAP Act, pursuant to 7 U.S.C. § 2020(e)(8)?

7. Relatedly, the proposed protocol contains contradictory statements that require clarification. It claims to limit "access" to data by anyone outside of the USDA, but then purports to require data matching that will entail sharing data outside of USDA.

(a) Can USDA provide clarification to reconcile these statements?

(b) Will USDA include a limitation in the proposed protocol to prevent data from being copied and/or sent outside of USDA's database?

(c) Prior data sharing agreements with USDA have specifically identified individuals who would be able to access States' data, and required those individuals to attest to compliance with the protocols. Will USDA agree to similar requirements here, and commit not to provide access to any individual without advance notice to States and providing sufficient time for States to respond prior to USDA providing that access?

13

(d) What measures will USDA take to prevent any redisclosure or improper intermingling of the data?

### *Understanding the protocol's interaction with the SORN and Privacy Impact Assessment*

8. The proposed data protocol relies on USDA's existing SORN, but USDA has represented that it will publish an "updated SORN." *See* ECF No 90-1 at 2. Please let us know when that SORN will be published, and how it will address changes between the data request elements attached to the November 24, 2025 letter and USDA's prior data requests.

9. The proposed data protocol and the SORN are also at odds with each other on important issues. For example, the SORN states that records "will be kept indefinitely," which directly contradicts the protocol's proposal that data "shall be retained for no longer than three years." The protocol also restricts access to "[a]ny other federal agency" (§ 4.2.4), yet the SORN's routine uses permit disclosure to the Department of Justice and Department of the Treasury. Please clarify how USDA will reconcile these discrepancies, and whether USDA will commit to enforcing all restrictions on data access agreed upon in a final protocol, and not permitting the SORN's broader "routine use" language to control.

10. USDA's Privacy Impact Assessment associated with this data collection indicates that USDA expects this to be an ongoing data collection effort with "quarterly updates."

    (a) Is that the case, and if so, what is the source of USDA's authority to require States to provide virtually all SNAP data to USDA on a quarterly basis?

    (b) Does USDA intend to compensate States for the additional administrative burden that such an ongoing collection would present?

11. USDA's Privacy Impact Assessment associated with this data collection acknowledges the need to "[o]btain explicit consent for the collection and processing of sensitive personal information[.]" The proposed protocol does not mention obtaining consent from SNAP participants.

    (a) How does USDA intend to obtain this consent from SNAP participants? Will USDA provide a draft notice to States?

    (b) Does USDA expect States to assume the burden of obtaining this consent and, if so, does USDA intend to compensate States for the additional administrative burden that this would present?

### *Clarifying USDA's proposed security measures*

12. Section 9, "Data Security and Technical Requirements," is comprised only of bulleted concepts, with no complete sentences and very limited detail. Will USDA revise this section to provide full sentences and a more thorough description of the security protections the agency intends to use, so that we may properly evaluate their sufficiency?

14

*Clarifying the methodologies and processes that USDA intends to implement*

13. States necessarily rely on numerous outside data sources to verify SNAP eligibility; this process is often time and labor intensive, particularly given our commitments to ensure that only eligible households receive benefits.

   (a) Given that outside, third-party data sources are essential to verification, how does USDA plan to review and verify eligibility of SNAP files without review of these data sources?

   (b) If USDA is requiring production of those third-party data sources (which is unclear), can USDA provide authority for that demand and authority authorizing States to disclose this third-party data?

   (c) In addition, please clarify how the "permitted" submission of verification records (per § 3.2) is consistent with the statement in § 3.1.2 that such verification records are "excluded" from this project.

14. Section 6.1.1 states that USDA "will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program." Please explain what a "foundational . . . verification" is, and how this data project differs from existing verification tests set forth in statute and promulgated regulations.

15. Section 6.2 lists several "enhanced" or "additional" data techniques. Please provide the methodologies for these techniques and explain why USDA believe they will produce valid statistical results. In particular:

   (a) Please explain how USDA's proposed detection of duplicate benefits will differ from the existing protections offered by the NAC and other established verification tests, and how USDA will resolve any conflicts between the NAC process and the one USDA proposes here.

   (b) Please explain how USDA's proposed detection of deceased individuals will differ from existing State systems for removing deceased beneficiaries from SNAP benefit rolls, and how this analysis will comport with USDA's requirements for such actions (including to ensure that households have an opportunity to address any inaccurate data before a reduction in benefits).

   (c) Please explain what USDA means by "synthetic identity patterns" and how this proposal will seek to detect such patterns.

   (d) Please explain what USDA means by "geographic anomalies" and how this proposal will seek to detect such anomalies.

   (e) To the extent EBT fraud is a concern, FNS already receives daily transaction data for all EBT transactions under the Anti-Fraud Locator using EBT Retailer Transactions (ALERT) system. ALERT monitors that transaction activity and identifies suspicious

15

retailers for analysis and investigation. Given the existence of this system and FNS's preexisting access to all EBT transaction data, what purpose does such duplicative analysis serve in the SNAP Information Database?

(f)   Will USDA be using artificial intelligence programs to analyze the data? If so, can USDA provide more information about those programs, including the security and privacy protections employed by the program?

16. USDA states in Section 7.1 of the proposed protocol that it will "provide flagged data back to the State agency for review," and will work collaboratively "to ensure accurate identification of fraud and appropriate corrective actions." Please clarify specifically what USDA intends this process to entail. Furthermore, please provide details on what this collaborative process has entailed to date for States that have already provided SNAP data.

# EXHIBIT H

**USDA** **Food and Nutrition Service**
U.S. DEPARTMENT OF AGRICULTURE

December 23, 2025

Governor Kathy Hochul
NYS State Capitol Building
Albany, New York 12224

Dear Governor Hochul,

This replies to your December 8, 2025 letter responding to the U.S. Department of Agriculture (USDA), Food and Nutrition Service (FNS)'s November 24, 2025 request to produce data related to the Supplemental Nutrition Assistance Program (SNAP).  That request asked your State to share data to assist FNS in its statutorily-mandated administration and enforcement of the Food and Nutrition Act of 2008, as amended, (SNAP Act), including providing administrative funding to State Agencies to collect such information.

Your State, along with 20 others and the District of Columbia, responded through their lawyers by submitting a single, formulaic response objecting to our direction that you share with FNS SNAP data (December 8 Letter).  The December 8 Letter seeks further delay, questioning FNS's need for, and right to obtain data necessary to audit the States' administration and enforcement of SNAP.  USDA addresses each of your concerns in greater depth below.  But, on the whole, your December 8 Letter provided no basis for your continued withholding of data because:

- FNS requires—and is statutorily entitled to—the SNAP eligibility and payment data that the States collect, with the aid of Federal funding, to administer SNAP benefits, which are funded entirely by FNS.

- FNS has offered to observe data and security protocols *more stringent* than any requested or observed by States historically in providing *the exact same type of data* to FNS.  There is no material difference between the States uploading to FNS a sample set of names, DOBs, addresses, SSNs and other data elements for Quality Control (QC) and uploading the same data elements pursuant to FNS's request here for a complete set of the same data elements.  None of your December 8 letter's objections and questions justified your State's refusal to accept FNS's offered protocols or to provide edits that you propose to accept those protocols.

**1. FNS requires the data it requested to verify compliance with the SNAP Act.**  First, States may not undermine FNS's clear authority to determine what data FNS needs to complete its statutorily mandated role in overseeing SNAP.  It is clear to all concerned that through undetected errors and fraud, Federal SNAP funds are being wasted and stolen.  Indeed, on December 11, California's own State Auditor found its State's SNAP agency exposes taxpayers to "high-risk" after observing the financial consequences of widespread errors in the State's administration of SNAP.  *See* https://www.auditor.ca.gov/reports/2025-601/.  While California withholds SNAP data from the Federal Government, it gives that same data to State employees who can access and abuse the data apparently without appropriate safeguards against internal

abuse.  *See* https://www.justice.gov/usao-edca/pr/former-madera-county-welfare-benefits-employee-arrested-improperly-using-other-peoples.  Noncomplying States' failures to administer SNAP have become notorious nationwide.  *E.g.,* https://nypost.com/2025/12/16/us-news/calif-welfare-worker-stole-40k-in-benefits-using-identities-of-elderly-dead-people-feds/.

Data received from the 28 States that complied with USDA's request indicate that an estimated average of $24 million per day of SNAP funds are being erroneously spent or lost to fraud.  Examples of fraud indicators included allowing hundreds of thousands of deceased and other ineligible people to remain on State SNAP benefit rolls.  Although the non-complying minority of States may dismiss the significance of their allowing dead or otherwise ineligible people to remain on SNAP rolls, failures to detect and correct errors and fraud make it important that they promptly join the cooperating states by complying with FNS's data request.  In the meantime, errors and fraud proliferate in the non-complying States.  *E.g.,* https://kstp.com/kstp-news/top-news/minnesota-repeatedly-reported-inaccurate-data-on-snap-to-the-federal-government/; https://www.justice.gov/usao-or/pr/romanian-nationals-unlawfully-residing-united-states-indicted-conspiring-steal-snap.

Each of the data elements FNS requested ensures that the various programmatic requirements, including eligibility requirements, are being met by households and are properly implemented and enforced by the States. The requested data elements can help confirm the accuracy of eligibility and benefit level determinations as well as aid in the investigation of SNAP benefit trafficking and theft, including EBT card skimming. Longitudinal data is required to detect patterns and trends that will inform SNAP administration, in addition to verifying the accuracy and reliability of the data submitted in response to this request.

**2. FNS's request is for records that Congress mandated "shall be made available" to USDA.**  As we outlined in our November 24 letter, FNS is statutorily entitled to the data we request.  *See* 7 U.S.C. § 2020(a)(3)(B) (requiring that "such records as may be necessary to determine whether the program is being conducted in compliance with this [SNAP Act] (including regulations issued under this [SNAP Act])" "shall be made available" for inspection and audit by USDA).  In their December 8 response, the non-complying States wrongly suggested that USDA agrees that States need not produce the requested data unless and before States agree to data and security protocols.  Although this statute permits the Secretary and State agency to agree that an inspection and audit be "subject to data and security protocols agreed to by the State agency and Secretary" it does not make such agreement a condition, let alone a condition precedent, to Congress' requirement that States' records "shall—. . . be made available" to USDA.  Textually, Section (a)(3) merely provides that FNS's access will be subject to any protocols that the Secretary agrees with the State agency to observe.  Congress did not, however, permit States to render the Federal audit statute meaningless by refusing to agree with the Secretary about a protocol, or otherwise attempting to dictate the terms upon which their expenditures of Federal funds shall be inspected or audited.

**3. FNS has offered to observe data and security protocols more stringent than any requested or observed by States historically in providing the exact same type of data to FNS.**  Although not required by law, in the interest of comity FNS offered to observe a set of data and security protocols that are far more stringent than any that have been requested or observed by States when they share SNAP data with FNS.  Indeed, the States, including yours,

routinely upload to FNS the same type of data we now request.  Your State's response rebuffed FNS's offer to provide specific edits or suggestions to the protocols; your State's response instead sent back questions (and often accusations) about FNS's purported intent.  FNS has addressed each question below and offered to make accommodations where appropriate.  But this does not change the fact that FNS has offered specific, concrete proposals, whereas the States have declined to do the same.

As illustrated by the following chart: (1) there is no material difference between the *type* of data your State routinely uploads to FNS for QC purposes, and the data elements FNS requested on November 24, and (2) FNS's data request only calls for a small portion of the categories that States normally submit to FNS for QC purposes:

### Data Element Comparisons

This chart identifies the required data elements submitted by State agencies to the U.S. Department of Agriculture (USDA) for Quality Control (QC) purposes.  States submit a sample set of this data to USDA monthly.  Fields identified with a * symbol have been requested by USDA for the Supplemental Nutrition Assistance Program (SNAP) Data Sharing integrity initiative.  As indicated by this chart, there is no difference between the data elements requested by USDA on November 24, 2025 and the corresponding data elements submitted by States to USDA for QC purposes, other than to request a complete set, rather than a sample set, of the same type of data.

| | | |
|---|---|---|
| Case Number* | Case Address* | Phone Number* |
| SNAP Household Names* | SNAP Household DOBs* | SNAP Household SSN* |
| SNAP Household Relationships* | Citizen/Non-Citizen Status * | Homeless Status* |
| All Household Earned Income* | All Household Unearned Income* | All Household Self-Employment Income* |
| Authorized Representative* | Indicator if SNAP Household Member is active* | Reporting Status* |
| Recipient Disqualification* | Certification Period* | Assets/Resources* |
| Categorial Eligibility | Directions to Home | Shelter Expenses* |
| Date of Interview | Household Composition | Expedited Service |
| Most Recent Action | Student Status | Amount of Allotment |
| Allotment Adjustments | Demonstration Projects | Residency |

| Earned Income Deductions | Dependent Care | Shelter Deductions |
|---|---|---|
| Other Government Benefits | Contributions | Deemed Income |
| Standard Utility Allowance | Child Support Deductions | Medical Deduction |
| Income from loans, scholarships, grants | Arithmetic Computation | SNAP Simplification Project |
| Significant Persons NOT living in home phone number | Significant Persons NOT living in the home relationship | Significant Persons NOT living in the home SSNs |
| Significant Persons Not living in the DOBs | Significant Persons NOT living in the home address | Significant Persons NOT living in the home financial support |
| All data related to work requirements – E&T programs, time limited participation, work registration, etc. | States must verify all elements with supporting documentation and upload those to SNAP-QCS | |

That FNS wishes now to examine a *complete* data set, instead of the self-selected samples States collect, is no good faith basis to object. Nor is there any valid basis to object to our request that States produce longitudinal data—as this will permit us to detect whether SNAP has been administered and enforced correctly during the past five years. And the preservation and production of that longitudinal data is important to FNS's need to determine whether anomalous changes we have observed signal a need for further investigation. These preliminary findings lead FNS to conclude that it must make a more complete use of its authority to review the States' administration and enforcement of SNAP.

**4. The States' cited reasons for continuing to withhold SNAP data are baseless.**

  **a. FNS requires a complete set, not just States' samples, of the same type of data States produce monthly.** The primary basis for the States' December 8 Letter's objection—that FNS seeks data of the same type but in greater *volume* than the self-selected sampling of households States provide to FNS for QC—makes no sense. It is simply baseless to object to providing a complete set, rather than just a sample, of the data FNS seeks.

  **b. The States' objections and suggestion of alternatives reflect a lack of understanding of SNAP program integrity.**

    **i. Although states are largely not using it, the National Accuracy Clearinghouse (NAC) is a tool for states to assist each other that does not meet FNS's need to obtain data that states are withholding from FNS.** The States' December 8 Letter attempts to use the National Accuracy Clearinghouse (NAC) to support their withholding reflects a lack of understanding of SNAP program integrity. As you may be aware, only four of the 22

noncomplying States have launched the NAC, an interstate data matching system designed *solely* to assist *States* to prevent duplicate participation. The hashing of data for NAC is allowable only because each State with a legitimate need to access household PII *already has it*. Both the "receiving" State agency and the "losing" State agency were provided the PII by the household at issue—the only information the States are lacking is whether that same household is participating or attempting to participate in another State simultaneously. Because each State agency is already in possession of the information needed to take action on possible duplicate participation, there is no need for States to provide that information to each other un-hashed via the NAC. As such, cryptographic hashing is appropriate. The SNAP Information Database is clearly different. Unlike the NAC, which will eventually have 53 participating State agencies, USDA FNCS is the only entity receiving the SNAP data we have requested.

Crucially, the hashing of data is not a viable solution when only one of the entities (in this case, the State) possesses the data. In the simplest of terms, a cryptographic hash function converts a piece of data into a specific hash value. The hash value itself tells you nothing of the underlying piece of data, and you can only recreate the specific hash value with that function by inputting the same underlying piece of data into it. If Plaintiff States were to submit the requested data in a cryptographic hash format, that would be akin to providing USDA hundreds of thousands of combination locks without any of the codes.

As such, it is not feasible for the SNAP Information Database to include "the same protections" as the NAC.

**ii. The states have no basis to invoke the Computer Matching Act.** The SNAP Information Database is not a matching program. It is a database that stores the SNAP participant information submitted by State agencies. Nor will FNS's uses of data be automatic. Although FNS hopes to help States improve their error rates in making eligibility determinations, the States retain their responsibility and liability for making those determinations. The SNAP Information Database will not be matched with State agency databases, and as a result, the Computer Matching Act is not implicated and a CMA is not required or appropriate.

**iii. FNS's offer of FedRAMP High data security protocols exceed the protection accepted by States for the same type of data requested here**. As stated in FNS's offered protocols, data is encrypted both in transit and at rest, and the requested data is protected with FedRAMP High data security, a higher level of security than that which States, including your State, historically have accepted in releasing similar data to FNS—including name, date of birth, social security number and address. FNS will inspect and audit the data provided pursuant to this request solely for the purposes of "determin[ing] whether the program is being conducted in compliance with [the Food and Nutrition Act of 2008 (FNA)] (including regulations issued under [the FNA]." See 7 U.S.C. § 2020(a)(3).

**iv. The States' remaining miscellany of questions provided no basis to withhold data on the States' use of SNAP funds.** The non-complying States appear to suggest that USDA halt its present efforts in favor of constructing a pilot program under 7 U.S.C. § 2026. This appears to be another unjustified effort by noncomplying States to resist a *complete* review of their use of SNAP funds.

As previously explained, our November 24 data request is founded upon 7 U.S.C. § 2020(a)(3). This provision, and its purposes, is independent from USDA's pilot authority. In any event, although USDA disagrees with the noncomplying States' implication that USDA's pilot authority requires collaboration with States, as our November 24 letter demonstrated, USDA offered to agree with States on a set of protocols, even though such agreement is not a condition limiting USDA's inspection and audit authority.

Further, the States' December 8 letter appears to ask FNS to disclose any sources or methods it will use to analyze whether the States are complying with SNAP requirements.  To disclose beforehand additional details to States as to what, after receiving the data, specifically is or will be analyzed, how, and when, is not possible, given that the noncomplying States are withholding the data.  Further, such disclosure would be ill-advised as it would provide a roadmap on how to avoid detection of noncompliance with SNAP requirements.   FNS has already observed anomalous changes in reported data since it began providing notice last summer that it would seek to obtain this data.  Hence, our previous request that States preserve their data.

Moreover, USDA is not prohibited from improving upon or developing new, efficient ways to detect fraud, waste, and abuse.  Simply because other mechanisms exist to detect fraud does not preclude USDA from consistently striving for better, more efficient methods of detecting waste, fraud, and abuse in SNAP.

**5. Additional clarifying answers to States' December 8 questions.**  FNS has carefully reviewed your December 8 Letter's attached questions and requests for clarification. The following information should sufficiently clarify our November 24 draft protocols, permitting you to now accept those protocols:

- USDA reiterates its November 24 letter's statement that it will only use the received data in compliance with the Food and Nutrition Act of 2008, as amended.
- In the event it receives external requests for data, USDA will follow all applicable laws. This would include, but is not limited to, the Food and Nutrition Act of 2008, as amended, FOIA, and the USDA Touhy regulations.
- The SNAP Information Database is FedRAMP certified (High).
- All data provided to the SNAP Information Database is encrypted in transit and at rest.
- USDA reiterates and clarifies that its SORN revisions will not impact the data elements requested but will simply bolster the introductory language of the Routine Uses section to clarify, as expressed previously, that the enumerated routine uses are only permitted to the extent they are permitted by the Food and Nutrition Act of 2008, as amended. The revisions will also remove the reference to "foreign" governments in Routine Use 8.

For the avoidance of doubt, we have edited our November 24 protocol to more clearly reflect the above answers to your questions and requests for clarification.  We look forward to your State's reply to FNS's reiterated request.  We hope to receive your agreement immediately to join the 28 States plus the Territory of Guam who are complying with FNS's November 24 request.  Please construe this letter as your Advance Notification pursuant to 7 CFR 276.4(d)(1), providing you

two weeks from this letter's date above to indicate whether you agree to our November 24 request, and the protocols we have offered.

FNS appreciates your State's concluding assertion that it "has always been FNS's primary partners and leaders in SNAP program integrity." We hope that this signals a new approach of State cooperation that will provide FNS with access to the data it pays your state to collect so that FNS can properly administer and enforce the issuance of SNAP benefits paid for with Federal funding.

Sincerely,

Patrick A. Penn
Acting Administrator, Food and Nutrition Service
Deputy Under Secretary, Food, Nutrition, and Consumer Services
U.S. Department of Agriculture

Enclosure

cc:      Mark Ladov, Special Counsel



## U.S. DEPARTMENT OF AGRICULTURE

### Supplemental Nutrition Assistance Program (SNAP) Information Database
### Fraud, Waste and Abuse Detection Protocol

**1. OVERVIEW**

1.1. U.S. Department of Agriculture (USDA) and the Food and Nutrition Service (FNS) will use the Supplemental Nutrition Assistance Program (SNAP) recipient data to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying duplicate enrollments for elimination, and performing additional eligibility and program integrity checks specified herein.

1.2. This protocol establishes a framework for State SNAP agencies to share data with the USDA/FNS for detection of fraud, waste, and abuse and program integrity purposes.

1.3. The protocol balances federal data access requirements under Executive Order 14243 and the Food and Nutrition Act of 2008 (FNA) with privacy protections, minimizes unnecessary data collection, and incorporates security standards while maintaining public trust and compliance with applicable law.

**2. FRAMEWORK AND AUTHORITY**

2.1. Authority

2.1.1. Executive Order 14243 (March 20, 2025): "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos" directs agency heads to "take all necessary steps, to the maximum extent consistent with law," to ensure federal government has "unfettered access to comprehensive data" from state programs receiving federal funding, including data maintained in third-party databases.

2.1.2. 7 U.S.C. § 2020(a)(3) that requires that each State agency shall keep records as may be necessary to determine whether the program is being conducted in compliance with this chapter, and all records shall be made available for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary.

2.1.3. 7 CFR 272 stipulates use or disclosure of information obtained from SNAP applicant or recipient households shall be restricted to persons directly connected with the administration or enforcement of the provisions of the FNA or regulations, other Federal assistance programs, federally-assisted State programs providing assistance on a means-tested basis to low-income individuals, or general assistance programs which are subject to joint processing requirements.

2.2. Prohibited Purposes

2.2.1. USDA shall NOT use the provided data for:

- Tax administration or tax compliance
- Law enforcement investigations beyond coordination regarding SNAP fraud, or other violations relating to the FNA.
- Administration of non-SNAP federal assistance programs (*e.g.*, Medicaid, TANF, housing assistance)
- Sharing with foreign governments or international organizations
- Commercial use or transfer to private entities

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

2.2.2. USDA shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals (*i.e.*, the collection of data elements spelled out in the Privacy Impact Assessment).

## 3. DATA CATEGORIES

3.1. <u>Data Definition</u>

3.1.1. All data obtained by States or their vendors in administering SNAP or that otherwise may be necessary to determine whether the program is being conducted in accordance with the FNA or regulations issued under the FNA.

3.1.2. Data derived from third-party sources (employment verification databases, financial institution records, property records) that States use for verification but are not part of applicant-reported information are excluded.

3.2. <u>Permitted Data</u>

- Information that the applicant household reported on application/recertification forms including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers.

- Direct verifications that the State conducted to confirm applicant-reported information Records that the State maintains of SNAP applications, approvals, denials, certifications, and benefits issued.

- Household composition and income exactly as reported by the applicant (not third-party verified amounts).

- Transactional data necessary for fraud detection

## 4. LIMITED ACCESS

4.1. The SNAP Information Database is accessed and used ONLY by employees of the USDA who are:

4.1.1. Designated by the Chief of Staff at Food, Nutrition, Consumer Services (FNCS)

4.1.2. Trained in SNAP Act, Privacy Act, and this protocol

4.1.3. In compliance with all information security annual recertifications

4.2. Except to the extent required by law, no access to the SNAP Information Database may be provided to:

4.2.1. Other USDA agencies (APHIS, ERS, NASS, etc.)

4.2.2. Divisions within FNS without an explicit need-to-know

4.2.3. OIG employees, unless in direct support of a law enforcement investigation related to SNAP fraud, waste, or abuse

4.2.4. Any other federal agency
4.2.5. Any FOIA, administrative subpoena or like external requester

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

**5. SYSTEM OF RECORDS NOTICE (SORN) AND PRIVACY IMPACT ASSESSMENT (PIA)**

5.1. SORN

The applicable SORN for this protocol is USDA/FNS-15 "National Supplemental Nutrition Assistance Program (SNAP) Information Database," 90 FR 26521.

The SORN location can be found here: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system-of-records

5.2. Privacy Impact Assessment (PIA)

The applicable Privacy Impact Assessment for the SNAP Information Database can be found here: https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

**6. FRAUD, WASTE, AND ABUSE DETECTION FRAMEWORK**

6.1. Core Fraud Detection Functions

6.1.1. USDA will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program that focuses on:

- identity verification

- income and eligibility verification

- immigration status

- verification against disqualified recipients

6.2. Enhanced Fraud, Waste, and Abuse Detection Techniques

6.2.1. In addition to the core fraud detection functions, USDA will employ additional techniques including, but not limited to:

- Intrastate and interstate duplicate detection

- Deceased individuals' detection

- Synthetic identity patterns (new SSNs with inconsistent biographical data)

- Geographic anomalies

6.2.2. New data mining techniques will be limited to identifying recipient and retailer fraud with a direct nexus to SNAP.

**7. DATA OUTPUT**

7.1. States

7.1.1. USDA will provide flagged data back to the State agency for review. States are encouraged to verify the accuracy of fraud detection flags and provide feedback to USDA to refine detection logic and reduce false positives. Collaborative processes will be established to ensure accurate identification of fraud and appropriate corrective actions.

7.2. Law Enforcement

7.2.1. The USDA may refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP.

7.3. USDA SNAP Retailer Operations Center (ROC)

7.3.1. The USDA may refer fraud detection leads to the ROC where, during fraud detection analysis, a compromised EBT card or terminal ID may have been identified.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

8. **DATA MINIMIZATION AND RETENTION**

   8.1. Retention Period

   8.1.1. Until a record schedule is approved, data will be retained only as long as necessary for purposes set forth in the SORN and this protocol, and in no case longer than 3 years per the SORN.

   8.2. Automatic Deletion

   8.2.1. Data shall be retained for no longer than three years, consistent with the USDA/FNS-15 SORN. An automated process will be implemented to delete data upon expiration of the retention period, except for records related to ongoing audits, investigations, or litigation.

   8.3. Ongoing Cases

   8.3.1. Data pertaining to ongoing audit, investigation, or potential litigation retained only as long as necessary, then deleted.

9. **DATA SECURITY AND TECHNICAL REQUIREMENTS**

   9.1. Infrastructure and Location

   9.1.1. Primary storage location: AWS GovCloud (US) region

   9.1.2. Backup/disaster recovery: Secondary AWS region

   9.1.3. No storage, processing, or backup outside GovCloud or federal secure environments

   9.1.4. All infrastructure must meet or exceed FedRAMP High baseline standards

   9.1.5. AWS Personnel Access: Data is encrypted such that AWS personnel cannot access unencrypted data. Encryption keys are managed exclusively by federal USDA personnel and are not accessible to AWS or third-party vendors.

   9.2. Access Controls

   9.2.1. Multi-factor authentication required for all access

   9.2.2. Role-based access control (RBAC) with principle of least privilege

   9.2.3. Access is limited to specifically designated USDA employees engaged to assist in determining whether the program is being conducted in accordance with the FNA.

   9.2.4. Access logging and audit trail maintenance (minimum period equal to data retention period, see Section V.E).

   9.2.5. Quarterly access reviews by USDA

   9.2.6. Immediate revocation of access upon employee termination or assignment change

   9.3. Encryption Standards

   9.3.1. Encrypted data at rest and in transit

   9.3.2. Encryption keys managed solely by USDA federal personnel

   9.3.3. No encryption keys held by commercial vendors

   9.4. Data Segregation and Compartmentalization

   9.4.1. SNAP data isolated in separate, dedicated AWS GovCloud environment

   9.4.2. SNAP data not directly integrated with other USDA systems

   9.4.3. Limiting access to individuals with specialized training and oversight

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

9.5. Data Transfer

    9.5.1. All data transfers shall utilize secure tools that meet or exceed FedRAMP High baseline standards.

## 10. INCIDENT RESPONSE AND BREACH NOTIFICATION

10.1. Incident Response

    10.1.1. Incident response procedures are aligned with FNS Handbook Chapter 10 security incident and breach notification requirements that USDA already follows internally. This protocol extends equivalent procedures to State notification.

10.2. Incident Definition

    10.1.2. Unauthorized access, use, or disclosure of data

    10.1.3. Security vulnerability or control failure affecting data

    10.1.4. Data loss, corruption, or destruction

    10.1.5. Encryption failure or key compromise

    10.1.6. Failed access control or authentication mechanism

    10.1.7. Any event that may reasonably be expected to compromise data security or confidentiality

10.3. Incident Notification Timeline

    10.3.1. Initial Notification within 12 hours

        10.3.1.1. Within 12 hours of discovery (by phone + email to State security/privacy contact and Director).

    10.3.2. Preliminary Report within 24 hours

        10.3.2.1. Description of incident and timeline

        10.3.2.2. Data elements affected (specific fields and estimated number of records)

        10.3.2.3. Estimated number of individuals affected

        10.3.2.4. Preliminary assessment of whether unencrypted sensitive data may have been exposed

        10.3.2.5. Preliminary remedial actions taken

        10.3.2.6. Root cause analysis plan and timeline

## APPENDIX A - SOURCES

- Privacy Impact Assessment: https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

- SORN: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system-of-records

- SNAP Act: https://www.law.cornell.edu/uscode/text/7/2020

- SNAP QC Handbook

- Executive Order 14243 (March 20, 2025) "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos: https://www.govinfo.gov/content/pkg/DCPD-202500382/pdf/DCPD-202500382.pdf

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

# EXHIBIT I



**KATHY HOCHUL**
Governor

**BARBARA C. GUINN**
Commissioner

**RAJNI CHAWLA**
Executive Deputy Commissione

January 9, 2026

Patrick A. Penn
Acting Administrator
Food and Nutrition Service
U.S. Department of Agriculture
1320 Braddock Place
Alexandria, VA 22314

Dear Acting Administrator Penn:

I write in response to your letter of December 23, 2025, concerning USDA's renewed data demand dated November 24, 2025. As explained in the prior letter sent to USDA and its counsel on December 8, 2025, the New York State Office of Temporary and Disability Assistance (OTDA) has significant concerns with USDA's renewed data demand and proposed security protocol. USDA's December 23 response dismissed or disregarded those concerns and its revised security protocol remains deficient.

Accordingly, as of this date, OTDA is unable to agree to USDA's renewed data demand. Under the security protocol proposed by USDA on December 23, 2025, compliance with the renewed data demand would violate laws that protect the privacy, security and integrity of data submitted to our agency by SNAP applicants and recipients. USDA's renewed demand and accompanying threat to disallow funding also violates the preliminary injunction order issued by the Court in *California v. USDA*, No. 3:25-cv-06310-MMC (N.D. Cal. Oct. 15, 2025), which holds that state agencies "are prohibited" from disclosing the demanded data given that "USDA has announced its intent to use such information in ways well beyond those permitted under § 2020(e)(8)(A)(ii)." Because USDA has terminated negotiations and initiated the disallowance process, OTDA is again forced to return to the Court to seek emergency relief to prevent USDA from cutting off the funding that we need to administer the program, on which our residents and communities rely for food security.

OTDA stands ready to work with USDA towards an agreed protocol that complies with the SNAP Act and other applicable laws.

Sincerely,

*Barbara C. Guinn*

Barbara C. Guinn
Commissioner

cc:    Rajni Chawla
       Valerie Figueroa
       Malinka Gutierrez

# EXHIBIT J

# U.S. DEPARTMENT OF AGRICULTURE

February 17, 2026

Governor Gavin Newsom
1021 O Street, Suite 9000
Sacramento, California 95814

Dear Governor Newsom,

Following the February 13, 2026, Court hearing in *California et al. v. United States Department of Agriculture et al.*, no. 3:25-cv-06310-MMC (N.D. Calif.), the U.S. Department of Agriculture (USDA), Food and Nutrition Service (FNS) is further revising its November 24, 2025, data sharing request, as amended December 23, 2025. USDA is complying with the Court's guidance in revising its data sharing protocol pursuant to which it is directing that your State cooperate with FNS's audit of the State's administration and enforcement of the Supplemental Nutrition Assistance Program (SNAP). Although the majority of States last summer agreed with FNS's earlier request and produced SNAP data acquired from households to FNS, your State continues to withhold data that it is statutorily obligated to produce.

In the February 13th hearing, the Court affirmed that minor emendations to USDA's amended protocols to affirm FNS's commitment to follow 7 U.S.C. §§ 2020(a)(3) and (e)(8) are sufficient to avoid further challenge. Accordingly, USDA, guided by the Court's hearing, has revised its data protocols for plaintiff States. The attached protocols satisfy the two objectives suggested by the Court: it unequivocally confirms in its introduction that: (1) USDA's handling of data it receives from plaintiff States will be governed by and comply with the text of 7 U.S.C. §§ 2020(a)(3) and (e)(8), and (2) agrees the protocols control notwithstanding any provision of USDA's System of Records Notice (SORN) that could be read to the contrary.

USDA appreciates the Court's guidance. USDA has a statutory and moral obligation to taxpayers to ensure any distribution of federal funds accords with law and does not risk loss to errors, fraud, waste and abuse. We ask that we receive your State's agreement to this third amended protocol by February 23, 2026.

Sincerely,

Shiela Corley
Chief of Staff, Food, Nutrition, and Consumer Services
U.S. Department of Agriculture

Enclosure

cc:     Maria Buxton, Deputy Attorney General

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an equal opportunity provider, employer, and lender.

 **U.S. DEPARTMENT OF AGRICULTURE**

**Supplemental Nutrition Assistance Program (SNAP) Information Database
Fraud, Waste and Abuse Detection Protocol**

## 1. OVERVIEW

1.1. U.S. Department of Agriculture (USDA) and the Food and Nutrition Service (FNS) will use the Supplemental Nutrition Assistance Program (SNAP) recipient data to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying duplicate enrollments for elimination, and performing additional eligibility and program integrity checks specified herein.

1.2. This protocol establishes a framework for State SNAP agencies to share data with the USDA/FNS for detection of fraud, waste, and abuse and program integrity purposes.

1.3. The protocol balances federal data access requirements under Executive Order 14243 and the Food and Nutrition Act of 2008 (FNA) with privacy protections, minimizes unnecessary data collection, and incorporates security standards while maintaining public trust and compliance with applicable law.

1.4. Notwithstanding any other provision of this protocol, or any System of Record Notice, USDA and FNS: (a) shall not use or disclose data received under this protocol except as specified in 7 U.S.C. §§ 2020(a)(3) and (e)(8). For the avoidance of doubt, that includes the specific requirements in 7 U.S.C § 2020(e)(8)(A), which provides that State Plans of Operation must include safeguards protecting information obtained from applicant households that shall permit

(i) the disclosure of such information to persons directly connected with the administration or enforcement of the provisions of this chapter, regulations issued pursuant to this chapter, Federal assistance programs, or federally-assisted State programs; and

~~(i)~~(ii) the subsequent use of the information by persons described in clause (i) only for such administration or enforcement.

## 2. FRAMEWORK AND AUTHORITY

2.1. Authority

2.1.1. Executive Order 14243 (March 20, 2025): "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos" directs agency heads to "take all necessary steps, to the maximum extent consistent with law," to ensure federal government has "unfettered access to comprehensive data" from state programs receiving federal funding, including data maintained in third-party databases.

2.1.2. 7 U.S.C. § 2020(a)(3) that requires that each State agency shall keep records as may be necessary to determine whether the program is being conducted in compliance with this chapter, and all records shall be made available for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary.

2.1.3. 7 CFR 272 stipulates use or disclosure of information obtained from SNAP applicant or recipient households shall be restricted to persons directly connected with the administration or enforcement of the provisions of the FNA or regulations, other Federal assistance programs, federally-assisted State programs providing assistance on a means-tested basis to low-income individuals, or general assistance programs which are subject to joint processing requirements.

2.2. Prohibited Purposes

2.2.1. USDA shall NOT use the provided data for:

- Tax administration or tax compliance

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

- Law enforcement investigations beyond coordination regarding SNAP fraud, or other violations relating to the FNA.
- Administration of non-SNAP federal assistance programs (*e.g.*, Medicaid, TANF, housing assistance)
- Sharing with foreign governments or international organizations
- Commercial use or transfer to private entities

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

2.2.2. USDA shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals (*i.e.*, the collection of data elements spelled out in the Privacy Impact Assessment).

## 3.  DATA CATEGORIES

3.1.  Data Definition

3.1.1.  All data obtained by States or their vendors in administering SNAP or that otherwise may be necessary to determine whether the program is being conducted in accordance with the FNA or regulations issued under the FNA.

3.1.2.  Data derived from third-party sources (employment verification databases, financial institution records, property records) that States use for verification but are not part of applicant-reported information are excluded.

3.2.  Permitted Data

- Information that the applicant household reported on application/recertification forms including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers.

- Direct verifications that the State conducted to confirm applicant-reported information Records that the State maintains of SNAP applications, approvals, denials, certifications, and benefits issued.

- Household composition and income exactly as reported by the applicant (not third-party verified amounts).

- Transactional data necessary for fraud detection

## 4.  LIMITED ACCESS

4.1. The SNAP Information Database is accessed and used ONLY by employees of the USDA who are:

4.1.1.  Designated by the Chief of Staff at Food, Nutrition, Consumer Services (FNCS)

4.1.2.  Trained in SNAP Act, Privacy Act, and this protocol

4.1.3.  In compliance with all information security annual recertifications

4.2.  Except to the extent required by law, no access to the SNAP Information Database may be provided to:

4.2.1.  Other USDA agencies (APHIS, ERS, NASS, etc.)

4.2.2.  Divisions within FNS without an explicit need-to-know

4.2.3.  OIG employees, unless in direct support of a law enforcement investigation related to SNAP

fraud, waste, or abuse

4.2.4. Any other federal agency
4.2.5. Any FOIA, administrative subpoena or like external requester

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

**5. SYSTEM OF RECORDS NOTICE (SORN) AND PRIVACY IMPACT ASSESSMENT (PIA)**

5.1. SORN

The applicable SORN for this protocol is USDA/FNS-15 "National Supplemental Nutrition Assistance Program (SNAP) Information Database," 90 FR 26521.

The SORN location can be found here: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system-of-records

For the avoidance of doubt, this protocol ~~1.1.4~~ controls notwithstanding any provision of the applicable SORN that conflicts with 7 U.S.C. §§ 2020(a)(3) and (e)(8).

5.2. Privacy Impact Assessment (PIA)

The applicable Privacy Impact Assessment for the SNAP Information Database can be found here: https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

**6. FRAUD, WASTE, AND ABUSE DETECTION FRAMEWORK**

6.1. Core Fraud Detection Functions

6.1.1. USDA will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program that focuses on:

- identity verification
- income and eligibility verification
- immigration status
- verification against disqualified recipients

6.2. Enhanced Fraud, Waste, and Abuse Detection Techniques

6.2.1. In addition to the core fraud detection functions, USDA will employ additional techniques including, but not limited to:

- Intrastate and interstate duplicate detection
- Deceased individuals' detection
- Synthetic identity patterns (new SSNs with inconsistent biographical data)
- Geographic anomalies

6.2.2. New data mining techniques will be limited to identifying recipient and retailer fraud with a direct nexus to SNAP.

**7. DATA OUTPUT**

7.1. States

7.1.1. USDA will provide flagged data back to the State agency for review. States are encouraged to verify the accuracy of fraud detection flags and provide feedback to USDA to refine detection logic and reduce false positives. Collaborative processes will be established to ensure accurate identification of fraud and appropriate corrective actions.

7.2. Law Enforcement

7.2.1. The USDA may refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP.

7.3. USDA SNAP Retailer Operations Center (ROC)

7.3.1. The USDA may refer fraud detection leads to the ROC where, during fraud detection analysis, a compromised EBT card or terminal ID may have been identified.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

## 8. DATA MINIMIZATION AND RETENTION

8.1. Retention Period

8.1.1. Until a record schedule is approved, data will be retained only as long as necessary for purposes set forth in the SORN and this protocol, and in no case longer than 3 years per the SORN.

8.2. Automatic Deletion

8.2.1. Data shall be retained for no longer than three years, consistent with the USDA/FNS-15 SORN. An automated process will be implemented to delete data upon expiration of the retention period, except for records related to ongoing audits, investigations, or litigation.

8.3. Ongoing Cases

8.3.1. Data pertaining to ongoing audit, investigation, or potential litigation retained only as long as necessary, then deleted.

## 9. DATA SECURITY AND TECHNICAL REQUIREMENTS

9.1. Infrastructure and Location

9.1.1. Primary storage location: AWS GovCloud (US) region

9.1.2. Backup/disaster recovery: Secondary AWS region

9.1.3. No storage, processing, or backup outside GovCloud or federal secure environments

9.1.4. All infrastructure must meet or exceed FedRAMP High baseline standards

9.1.5. AWS Personnel Access: Data is encrypted such that AWS personnel cannot access unencrypted data. Encryption keys are managed exclusively by federal USDA personnel and are not accessible to AWS or third-party vendors.

9.2. Access Controls

9.2.1. Multi-factor authentication required for all access

9.2.2. Role-based access control (RBAC) with principle of least privilege

9.2.3. Access is limited to specifically designated USDA employees engaged to assist in determining whether the program is being conducted in accordance with the FNA.

9.2.4. Access logging and audit trail maintenance (minimum period equal to data retention period, see Section V.E).

9.2.5. Quarterly access reviews by USDA

9.2.6. Immediate revocation of access upon employee termination or assignment change

9.3. Encryption Standards

9.3.1. Encrypted data at rest and in transit

9.3.2. Encryption keys managed solely by USDA federal personnel

9.3.3. No encryption keys held by commercial vendors

9.4. Data Segregation and Compartmentalization

9.4.1. SNAP data isolated in separate, dedicated AWS GovCloud environment

9.4.2. SNAP data not directly integrated with other USDA systems

9.4.3. Limiting access to individuals with specialized training and oversight

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender


**U.S. DEPARTMENT OF AGRICULTURE**

9.5.  Data Transfer

9.5.1. All data transfers shall utilize secure tools that meet or exceed FedRAMP High baseline standards.

## 10.  INCIDENT RESPONSE AND BREACH NOTIFICATION

10.1.  Incident Response

10.1.1. Incident response procedures are aligned with FNS Handbook Chapter 10 security incident and breach notification requirements that USDA already follows internally. This protocol extends equivalent procedures to State notification.

10.2.  Incident Definition

10.1.2.  Unauthorized access, use, or disclosure of data

10.1.3.  Security vulnerability or control failure affecting data

10.1.4.  Data loss, corruption, or destruction

10.1.5.  Encryption failure or key compromise

10.1.6.  Failed access control or authentication mechanism

10.1.7.  Any event that may reasonably be expected to compromise data security or confidentiality

10.3.  Incident Notification Timeline

10.3.1.  Initial Notification within 12 hours

10.3.1.1.    Within 12 hours of discovery (by phone + email to State security/privacy contact and Director).

10.3.2.  Preliminary Report within 24 hours

10.3.2.1.    Description of incident and timeline

10.3.2.2.    Data elements affected (specific fields and estimated number of records)

10.3.2.3.    Estimated number of individuals affected

10.3.2.4.    Preliminary assessment of whether unencrypted sensitive data may have been exposed

10.3.2.5.    Preliminary remedial actions taken

10.3.2.6.    Root cause analysis plan and timeline

## APPENDIX A - SOURCES

- 7 U.S.C. §§ 2020(a)(3) and (e)(8).

- Privacy Impact Assessment: https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

- SORN: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-system-of-records

- SNAP Act: https://www.law.cornell.edu/uscode/text/7/2020

- SNAP QC Handbook

- Executive Order 14243 (March 20, 2025) "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos: https://www.govinfo.gov/content/pkg/DCPD-202500382/pdf/DCPD-202500382.pdf

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

# EXHIBIT K

*Via E-mail*
Elizabeth J. Shapiro
Tyler Becker
Benjamin S. Kurland
ben.kurland@usdoj.gov
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005

*Counsel for U.S. Department of Agriculture and Secretary of Agriculture Brooke L. Rollins*

  RE:  Response to February 17, 2026 Letter to Plaintiff States from Shiela Corley, Chief of
       Staff, Food, Nutrition, and Consumer Services, U.S. Department of Agriculture

Dear Counsel:

     We write on behalf of Plaintiffs in *State of California v. USDA*, No. 3:25-cv-06310 (N.D.
Cal.). This letter, and its attached redlined protocol, respond to the further revised proposed
protocol that USDA/FNS sent to Plaintiff States last week on February 17, 2026 (the "February
17 proposed protocol"). As set forth in the attached document, Plaintiff States request some
revisions to USDA's February 17 proposed protocol, primarily to ensure compliance with 7
U.S.C. § 2020(e)(8). We have provided our rationale in comments to the redline. To the extent
USDA disagrees with any of our proposals, we request the opportunity to meet and confer with
USDA to try to resolve any remaining disagreements.

     With respect to 7 U.S.C. § 2020(e)(8), in particular, we hope our requested revisions will
be noncontroversial, as each aligns the protocol with the applicable statutory and regulatory
structure and the Court's rulings and tentative rulings in our litigation, as well as USDA's
representations about how it intends to use and share the data and prior data sharing agreements.

     First, we have requested revisions to section 1.4 to make clear that USDA and FNS (and
any person or entity to whom the data is disclosed) will abide by 7 U.S.C. § 2020(e)(8)'s data use
and disclosure restrictions. As drafted, the reference in section 1.4 of USDA's February 17
proposed protocol to "State Plans of Operation" creates ambiguity as to whether USDA is taking
the position that *its* data use and disclosure is not restricted by 7 U.S.C. § 2020(e)(8). The Food
and Nutrition Act's data use and disclosure restrictions would be meaningless if once USDA or
third parties collected the data that data could then be freely re-disclosed to persons and for
purposes prohibited by the statute. Accordingly, the Court has already ruled that this provision
does not merely restrict state plans; it also imposes "strict limitations" on "the *recipient*['s] . . .
use of" information covered by this statute. ECF No. 106 at 18; *see* ECF No. 131 at 47-48 (Feb.
13, 2026 Hr'g Tr.).

Second, we have requested revisions to section 1.4 to make clear that 7 U.S.C. § 2020(e)(8) does not permit the use or disclosure of data for purposes of investigating potential violations of civil immigration laws or enforcing civil immigration laws. The Food and Nutrition Act (FNA) permits applicant data to be used and disclosed only for purposes of "administration or enforcement" of the FNA or Federal assistance programs. These restrictions would be meaningless if USDA could simply collect all States' data and redisclose it to DHS or its subagencies whenever they request it. USDA has now repeatedly stated that "it does not *intend* to share the data it collects with outside agencies for purposes other than administering and enforcing SNAP," *see* ECF No. 118 at 9 (emphasis added); *accord id.* at 13, 14, but it has yet to commit that it will not share the data with the Department of Homeland Security (DHS) or its subagencies for immigration enforcement purposes. Our requested revisions to section 1.4 (and requested conforming revisions to other sections throughout) would ensure that USDA can use and share the data for lawful purposes consistent with USDA's representations, while also ensuring that the data is not unlawfully used or disclosed in circumstances not permitted by the FNA.

We have also proposed amendments to the data elements proposed in Attachment A of the USDA's November 24, 2025 data demand, including to reduce the amount of personal identifiable information unnecessarily disclosed, in accordance with section 2.2.2 of the February 17 proposed protocol. Please note that certain other elements listed in Attachment A may not be available in and/or extractable from every state system in the form requested by USDA. We anticipate that USDA would discuss these limitations, and any other state-specific issues, with individual States prior to any future data production.

Finally, this counterproposal should not be viewed as a waiver of any rights asserted in the litigation *State of California v. USDA* or a concession as to the legality of the data demand, and we expect that any final protocol will likely need to incorporate issues addressed by the District Court in its forthcoming preliminary injunction decision. In addition, the legality of USDA's SNAP data collection efforts is the subject of *Pallek v Rollins*, No. 1:25-cv-1650 (D.D.C.), and the parties may need to address and incorporate any ruling from that court into a proposed or finalized resolution of USDA's data sharing request.

Thank you for your attention to this matter.

Dated: February 25, 2026

Rob Bonta
Attorney General of California

*/s/ Liam E. O'Connor*
Liam E. O'Connor

Paul Stein
Robin Goldfaden
Supervising Deputy Attorneys General
Andrew Z. Edelstein
Anna Rich
Jane Reilley
Sebastian Brady
William Bellamy
Maria F. Buxton
Liam E. O'Connor
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3915
Liam.OConnor@doj.ca.gov
*Attorneys for Plaintiff State of California*

Letitia James
Attorney General of New York

*/s/ Mark Ladov*
Mark Ladov
Special Counsel
Julie Dona
Special Counsel
28 Liberty St.
New York, NY 10005
(212) 416-8240
mark.ladov@ag.ny.gov
*Attorneys for Plaintiff State of New York*

Kwame Raoul
Attorney General of Illinois

*/s/ Sherief Gaber*
Harpreet K. Khera
Bureau Chief, Special Litigation
Sherief Gaber
Assistant Attorney General
115 S. LaSalle St., 35th Flr.
Chicago, Illinois 60603
(773) 590-7127
sherief.gaber@ilag.gov
*Attorneys for Plaintiff State of Illinois*

Kristin Mayes
Attorney General of Arizona

*/s/ Hayleigh S. Crawford*
Hayleigh S. Crawford (AZ No. 032326)
Luci D. Davis (AZ No. 035347)
2005 N. Central Ave. Phoenix, AZ 85004
(602) 542-3333
Hayleigh.Crawford@azag.gov
Luci.Davis@azag.gov
ACL@azag.gov
*Attorneys for Plaintiff State of Arizona*

Philip J. Weiser
Attorney General of Colorado

*/s/ David Moskowitz*
David Moskowitz
Deputy Solicitor General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6000
david.moskowitz@coag.gov
*Attorneys for Plaintiff State of Colorado*

3

William Tong
Attorney General of Connecticut

/s/ Janelle R. Medeiros
Janelle R. Medeiros
Special Counsel for Civil Rights
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Janelle.Medeiros@ct.gov
Attorneys for Plaintiff State of Connecticut

Kathleen Jennings
Attorney General of Delaware

/s/ Vanessa L. Kassab
Ian R. Liston
Director of Impact Litigation
Vanessa L. Kassab
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
Attorneys for Plaintiff State of Delaware

Brian L. Schwalb
Attorney General for the District of Columbia

/s/ Nicole S. Hill
Nicole S. Hill
Assistant Attorney General
Office of the Attorney General for the District
of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov
Attorneys for Plaintiff District of Columbia

Anne E. Lopez
Attorney General of Hawaiʻi

/s/ Kalikoʻonālani D. Fernandes
David D. Day
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
Attorneys for Plaintiff State of Hawaiʻi

Office of The Governor ex rel. Andy Beshear,
in his official capacity as Governor of the
Commonwealth of Kentucky

/s/ S. Travis Mayo
S. Travis Mayo
General Counsel
Taylor Payne
Chief Deputy General Counsel
Laura C. Tipton
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov
Attorneys for Plaintiff Kentucky Governors'
Office

Aaron M. Frey
Attorney General of Maine

/s/ Brendan Kreckel
Brendan Kreckel
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 0433-0006
Tel.:  207-626-8800
Fax:  207-287-3145
brendan.kreckel@maine.gov
Attorneys for Plaintiff State of Maine

4

Anthony G. Brown
Attorney General of Maryland

*/s/ James C. Luh*
James C. Luh
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

Andrea Joy Campbell
Attorney General of Massachusetts

*/s/ Katherine Dirks*
Katherine Dirks
Chief State Trial Counsel
Cassandra Thomson
Assistant Attorney General
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
cassandra.thomson@mass.gov
*Attorneys for Plaintiff Commonwealth of Massachusetts*

Dana Nessel
Attorney General of Michigan

*/s/ Neil Giovanatti*
Neil Giovanatti
Bryan Beach
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov
beachb@michigan.gov
*Attorneys for Plaintiff State of Michigan*

Keith Ellison
Attorney General of Minnesota

*/s/ Joseph R. Richie*
Joseph R. Richie
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

Jennifer Davenport
Attorney General of New Jersey

*/s/ Kashif T. Chand*
Kashif T. Chand (NJ Bar No. 016752008)
Assistant Attorney General
New Jersey Office of the Attorney General, Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
kashif.chand@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

Raúl Torrez
Attorney General of the State of New Mexico

*/s/ Steven Prefrement*
Steven Perfrement
Senior Litigation Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
SPerfrement@nmdoj.gov
505-601-7727
*Attorneys for the State of New Mexico*

5

Dan Rayfield
Attorney General of Oregon

/s/ Scott P. Kennedy
Scott P. Kennedy
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 453-9050
Fax (971) 673-5000
Scott.Kennedy@doj.oregon.gov
Attorneys for Plaintiff State of Oregon

Josh Shapiro, in his official capacity as
Governor of the Commonwealth of
Pennsylvania

/s/ Jacob B. Boyer
Jennifer Selber
General Counsel
Jacob B. Boyer
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov
Counsel for Governor Josh Shapiro

Peter F. Neronha
Attorney General of Rhode Island

/s/ Madeline R. Becker
Madeline R. Becker (RI Bar No. 10034)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2151
mbecker@riag.ri.gov
Attorneys for Plaintiff State of Rhode Island

Nicholas W. Brown
Attorney General of Washington

/s/ Jennifer K. Chung
Jennifer K. Chung, WSBA #51583
William Mcginty, WSBA #41868
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
jennifer.chung@atg.wa.gov
william.mcginty@atg.wa.gov
Attorneys for Plaintiff State of Washington

Joshua l. Kaul
Attorney General of Wisconsin

/s/ Karla Z. Keckhaver
Karla Z. Keckhaver
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-6365
karla.keckhaver@wisdoj.gov
Attorneys for Plaintiff State of Wisconsin

# Attachment 1

# Plaintiffs' proposed revised protocol



## U.S. DEPARTMENT OF AGRICULTURE

**Supplemental Nutrition Assistance Program (SNAP) Information Database
Fraud, Waste and Abuse Detection Protocol**

### 1. OVERVIEW

1.1. U.S. Department of Agriculture (USDA) and the Food and Nutrition Service (FNS) will use the Supplemental Nutrition Assistance Program (SNAP) recipient data to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying duplicate enrollments for elimination, and performing additional eligibility and program integrity checks specified herein.

1.2. This protocol establishes a framework for State SNAP agencies to share data with the USDA/FNS for detection of fraud, waste, and abuse and program integrity purposes.

1.3. USDA represents that the protocol balances federal data access requirements under Executive Order 14243 and the Food and Nutrition Act of 2008 (FNA, also referred to here as the "SNAP Act") with privacy protections, minimizes unnecessary data collection, and incorporates security standards while maintaining public trust and compliance with applicable law.

1.4. Notwithstanding any other provision of this protocol, or any System of Record Notice, USDA and FNS: (a) shall not use or disclose data received under this protocol except as specified in 7 U.S.C. §§ 2020(a)(3) and (e)(8) and 7 C.F.R. § 272.1(c)(1) and (2). For the avoidance of doubt, this means that USDA and FNS (and any person or entity to whom the data is disclosed) shall not:

   (i)   use the data, except for administration or enforcement of the provisions of Chapter 51 of Title 7 of the U.S. Code and regulations issued pursuant to that chapter, Federal assistance programs, or federally-assisted State programs;

   (ii)  disclose the data, except to persons directly connected with the administration or enforcement of the provisions of this chapter, regulations issued pursuant to this chapter, Federal assistance programs, or federally-assisted State programs; and only so that such persons can subsequently use the data for such administration or enforcement;

   (iii) use or disclose data for purposes of investigating potential violations of civil immigration laws or enforcing civil immigration laws, including but not limited to in response to a request by the Department of Homeland Security or a subagency thereof.

1.5 USDA acknowledges that the data shared under this Protocol is subject to federal and state confidentiality, privacy, and information security laws and regulations. Unauthorized access to, use of, or disclosure of such data, or failure to protect such data in accordance with applicable law, may subject the responsible party and, where applicable, individual users to civil or criminal penalties under federal or state law.

### 2. FRAMEWORK AND AUTHORITY

2.1. <u>Authority</u>

   2.1.1. Executive Order 14243 (March 20, 2025): "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos" directs agency heads to "take all necessary steps, to the maximum extent consistent with law," to ensure federal government has "unfettered access to comprehensive data" from state programs receiving federal funding, including data maintained in third-party databases.

   2.1.2. 7 U.S.C. § 2020(a)(3) requires that each State agency shall keep records as may be necessary to determine whether the program is being conducted in compliance with this chapter, and all records

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

shall be made available for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary.

2.1.3. 7 CFR 272 stipulates use or disclosure of information obtained from SNAP applicant or recipient households shall be restricted to persons directly connected with the administration or enforcement of the provisions of the FNA or regulations, other Federal assistance programs, federally-assisted State programs providing assistance on a means-tested basis to low-income individuals, or general assistance programs which are subject to joint processing requirements.

2.2. <u>Prohibited Purposes</u>

2.2.1. USDA shall NOT use the provided data for:

- Tax administration or tax compliance

- Law enforcement investigations beyond coordination regarding SNAP fraud, or other violations of the FNA and regulations implementing the FNA.

- Administration of non-SNAP federal assistance programs (*e.g.*, Medicaid, TANF, housing assistance)

- Sharing with foreign governments or international organizations

- Commercial use or transfer to private entities

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

2.2.2. USDA shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals (*i.e.*, the collection of data elements spelled out in the Privacy Impact Assessment).

## 3. DATA CATEGORIES

3.1. <u>Data Definition</u>

3.1.1. All data obtained by States in administering SNAP or that otherwise may be necessary to determine whether the program is being conducted in accordance with the FNA or regulations issued under the FNA, in accordance with Attachment A to this protocol and any other state-specific terms negotiated and mutually agreed to by each state and USDA based on each state's data collection and storage realities.

3.1.2. Data derived from third-party sources (employment verification databases, financial institution records, property records) that States use for verification but are not part of applicant-reported information are excluded.

## 4. LIMITED ACCESS

4.1. The SNAP Information Database and all data collected therein is accessed and used ONLY by employees of the USDA who are:

4.1.1. Designated by the Chief of Staff at Food, Nutrition, Consumer Services (FNCS)

4.1.2. Trained in SNAP Act, Privacy Act, and this protocol

4.1.3. In compliance with all information security annual recertifications

4.2. Except to the extent required by law, no access to, or disclosures of data from, the SNAP Information Database may be provided to:

4.2.1. Other USDA agencies (APHIS, ERS, NASS, etc.)

4.2.2. Divisions within FNS without an explicit need-to-know

4.2.3. OIG employees, unless in direct support of a law enforcement investigation related to SNAP fraud, waste, or abuse

4.2.4. Any other federal agency

4.2.5. Any FOIA, administrative subpoena or like external requester

4.3 For the reasons explained in Section 1.4, above, no access to, or disclosures of data from, the SNAP Information Database may be provided to the Department of Homeland Security or any subagency thereof for purposes of investigating potential violations of civil immigration laws or enforcing civil immigration laws.

4.4. USDA shall provide each state agency, on an ongoing basis and upon request, with a list of all parties who have requested access to this data, and a list of all users who have been granted access to the provided data.

## 5. SYSTEM OF RECORDS NOTICE (SORN) AND PRIVACY IMPACT ASSESSMENT (PIA)

5.1. <u>SORN</u>

The applicable SORN for this protocol is USDA/FNS-15 "National Supplemental Nutrition Assistance Program (SNAP) Information Database," 90 FR 26521.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

The SORN location can be found here:
https://www.federalregister.gov/documents/2025/06/23/202511463/privacy-act-of-1974-system-of-records

For the avoidance of doubt, this protocol controls notwithstanding any provision of the applicable SORN.

5.2. Privacy Impact Assessment (PIA)

The applicable Privacy Impact Assessment for the SNAP Information Database is Version 1.1 created 02/12/2025, which can be found here:
https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

For the avoidance of doubt, this protocol controls notwithstanding any provision of the PIA.

## 6. FRAUD, WASTE, AND ABUSE DETECTION FRAMEWORK

6.1. Core Fraud Detection Functions

6.1.1. USDA will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program that focuses on:

- identity verification

- income and eligibility verification

- immigration status

- verification against disqualified recipients

6.2. Enhanced Fraud, Waste, and Abuse Detection Techniques

6.2.1. In addition to the core fraud detection functions, USDA will employ additional techniques including, but not limited to:

- Intrastate and interstate duplicate detection

- Deceased individuals' detection

- Synthetic identity patterns (new SSNs with inconsistent biographical data)

- Geographic anomalies

6.2.2. New data mining techniques will be limited to identifying recipient and retailer data anomalies with a direct nexus to SNAP.

## 7. DATA OUTPUT

7.1. States

7.1.1. USDA will provide flagged data back to the State agency for review, including the specific data elements flagged and source of the data that generated the flag. States are encouraged to verify the accuracy of fraud detection flags and provide feedback to USDA to refine detection logic and reduce false positives. Collaborative processes will be established to ensure accurate identification of fraud and appropriate corrective actions, including processes to allow individuals to contest inaccurate information and require updates to the originating system of record where false positives are identified. No presumptive results shall be made public prior to verification by State agency of the accuracy of the detection flags.

7.2. Law Enforcement

7.2.1. The USDA may refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP in accordance with 7 U.S.C § 2020(e)(8)(A) and USDA's regulation implementing that provision, 7 C.F.R. § 272.1(c)(1).

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

7.3. USDA SNAP Retailer Operations Center (ROC)

    7.3.1. The USDA may refer fraud detection leads to the ROC where, during fraud detection analysis, a compromised EBT card or terminal ID may have been identified in accordance with 7 U.S.C § 2020(e)(8)(A) and USDA's regulation implementing that provision, 7 C.F.R. § 272.1(c)(1).

## 8. DATA MINIMIZATION AND RETENTION

8.1. Retention Period

    8.1.1. Until a record schedule is approved, data will be retained only as long as necessary for purposes set forth in the SORN and this protocol, and in no case longer than 3 years per the SORN.

8.2. Automatic Deletion

    8.2.1. Data shall be retained for no longer than three years, consistent with the USDA/FNS-15 SORN. An automated process will be implemented to delete data upon expiration of the retention period, except for records related to ongoing audits, investigations, or litigation.

8.3. Ongoing Cases

    8.3.1. Data pertaining to ongoing audit, investigation, or potential litigation retained only as long as necessary, then deleted.

## 9. DATA SECURITY AND TECHNICAL REQUIREMENTS

9.1. Infrastructure and Location

    9.1.1. Primary storage location: AWS GovCloud (US) region

    9.1.2. Backup/disaster recovery: Secondary AWS region

    9.1.3. No storage, processing, or backup outside GovCloud or federal secure environments

    9.1.4. All infrastructure must meet or exceed FedRAMP High baseline standards

    9.1.5. AWS Personnel Access: Data is encrypted such that AWS personnel cannot access unencrypted data. Encryption keys are managed exclusively by federal USDA personnel and are not accessible to AWS or third-party vendors.

9.2. Access Controls

    9.2.1. Multi-factor authentication required for all access

    9.2.2. Role-based access control (RBAC) with principle of least privilege

    9.2.3. Access is limited to specifically designated USDA employees engaged to assist in determining whether the program is being conducted in accordance with the FNA.

    9.2.4. Access logging and audit trail maintenance (minimum period equal to data retention period, see Section V.E).

    9.2.5. Quarterly access reviews by USDA

    9.2.6. Immediate revocation of access upon employee termination or assignment change

9.3. Encryption Standards

    9.3.1. Encrypted data at rest and in transit

    9.3.2. Encryption keys managed solely by USDA federal personnel

    9.3.3. No encryption keys held by commercial vendors


**U.S. DEPARTMENT OF AGRICULTURE**

9.4. <u>Data Segregation and Compartmentalization</u>

9.4.1. SNAP data isolated in separate, dedicated AWS GovCloud environment

9.4.2. SNAP data not directly integrated with other USDA systems

9.4.3. Limiting access to individuals with specialized training and oversight

9.5. <u>Data Transfer</u>

9.5.1. All data transfers shall utilize secure tools that meet or exceed FedRAMP High baseline standards.

## 10. INCIDENT RESPONSE AND BREACH NOTIFICATION

10.1. <u>Incident Response</u>

10.1.1. Incident response procedures are aligned with FNS Handbook Chapter 10 security incident and breach notification requirements that USDA already follows internally. This protocol extends equivalent procedures to State notification.

10.2. <u>Incident Definition</u>

10.2.2. Unauthorized access, use, or disclosure of data

10.2.3. Security vulnerability or control failure affecting data

10.2.4. Data loss, corruption, or destruction

10.2.5. Encryption failure or key compromise

10.2.6. Failed access control or authentication mechanism

10.2.7. Any event that may reasonably be expected to compromise data security or confidentiality, including any request for use of, access to, or disclosure of data outside the permitted circumstances set forth in Section 1.4

10.3. <u>Incident Notification Timeline</u>

10.3.1. Initial Notification within 12 hours

10.3.1.1.    Within 12 hours of discovery (by phone + email to State security/privacy contact and Director).

10.3.2. Preliminary Report within 24 hours

10.3.2.1.    Description of incident and timeline

10.3.2.2.    Data elements affected (specific fields and estimated number of records)

10.3.2.3.    Estimated number of individuals affected

10.3.2.4.    Preliminary assessment of whether unencrypted sensitive data may have been exposed

10.3.2.5.    Preliminary remedial actions taken

10.3.2.6.    Root cause analysis plan and timeline

10.3.3 Progress Reports and Incident Close-out

10.3.3.1    USDA shall provide supplemental progress updates to state agencies as material information becomes available, but in no event less frequently than every 14 days, including refinements to scope, impact, and remediation measures, until the Incident is resolved. Upon resolution, USDA shall provide a close-out report of the Incident.

10.3.3.2    USDA shall provide notice to affected individuals in compliance with all applicable federal breach response and notification requirements, including but not limited to FISMA and

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



## U.S. DEPARTMENT OF AGRICULTURE

OMB Memorandum M-17-12. Nothing in this protocol shall be construed to shift responsibility for individual breach notification to the state agency.

**APPENDIX A - SOURCES**

- 7 U.S.C. §§ 2020(a)(3) and (e)(8).

- Privacy Impact Assessment: https://www.usda.gov/sites/default/files/documents/fns-snap-informationdatabase-pia.pdf

- SORN: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-systemof-records

- SNAP Act: https://www.law.cornell.edu/uscode/text/7/2020

- SNAP QC Handbook

- Executive Order 14243 (March 20, 2025) "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos: https://www.govinfo.gov/content/pkg/DCPD-202500382/pdf/DCPD-202500382.pdf

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

# Attachment 2

# Plaintiffs' proposed revised protocol (redline)



**U.S. DEPARTMENT OF AGRICULTURE**

**Supplemental Nutrition Assistance Program (SNAP) Information Database**
**Fraud, Waste and Abuse Detection Protocol**

## 1. OVERVIEW

1.1. U.S. Department of Agriculture (USDA) and the Food and Nutrition Service (FNS) will use the Supplemental Nutrition Assistance Program (SNAP) recipient data to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying duplicate enrollments for elimination, and performing additional eligibility and program integrity checks specified herein.

1.2. This protocol establishes a framework for State SNAP agencies to share data with the USDA/FNS for detection of fraud, waste, and abuse and program integrity purposes.

1.3. ~~USDA represents that t~~The protocol balances federal data access requirements under Executive Order 14243 and the Food and Nutrition Act of 2008 (FNA, also referred to here as the "SNAP Act") with privacy protections, minimizes unnecessary data collection, and incorporates security standards while maintaining public trust and compliance with applicable law.

1.4. Notwithstanding any other provision of this protocol, or any System of Record Notice, USDA and FNS: (a) shall not use or disclose data received under this protocol except as specified in 7 U.S.C. §§ 2020(a)(3) and (e)(8) and 7 C.F.R. § 272.1(c)(1) and (2).  For the avoidance of doubt, this means that USDA and FNS (and any person or entity to whom the data is disclosed) shall not:~~that includes the specific requirements in 7 U.S.C § 2020(e)(8)(A), which provides that State Plans of Operation must include safeguards protecting information obtained from applicant households that shall permit~~

   (i)   use the data, except for administration or enforcement of the provisions of Chapter 51 of Title 7 of the U.S. Code and regulations issued pursuant to that chapter, Federal assistance programs, or federally-assisted State programs; ~~and~~

   (i)   ~~disclose the data, except to~~ ~~the disclosure of such information to~~ persons directly connected with the administration or enforcement of the provisions of this chapter, regulations issued pursuant to this chapter, Federal assistance programs, or federally-assisted State programs; and only so that such persons can subsequently use the data ~~; and~~

   (ii)   ~~the subsequent use of the information by persons described in clause (i) only~~ for such administration or enforcement;

   (iii)   use or disclose data for purposes of investigating potential violations of civil immigration laws or enforcing civil immigration laws, including but not limited to in response to a request by the Department of Homeland Security or a subagency thereof.

1.5   USDA acknowledges that the data shared under this Protocol is subject to federal and state confidentiality, privacy, and information security laws and regulations. Unauthorized access to, use of, or disclosure of such data, or failure to protect such data in accordance with applicable law, may subject the responsible party and, where applicable, individual users to civil or criminal penalties under federal or state law.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

**USDA**
**U.S. DEPARTMENT OF AGRICULTURE**

**2. FRAMEWORK AND AUTHORITY**

2.1. Authority

2.1.1. Executive Order 14243 (March 20, 2025): "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos" directs agency heads to "take all necessary steps, to the maximum extent consistent with law," to ensure federal government has "unfettered access to comprehensive data" from state programs receiving federal funding, including data maintained in third-party databases.

2.1.2. 7 U.S.C. § 2020(a)(3) ~~that~~ requires that each State agency shall keep records as may be necessary to determine whether the program is being conducted in compliance with this chapter, and all records shall be made available for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary.

2.1.3. 7 CFR 272 stipulates use or disclosure of information obtained from SNAP applicant or recipient households shall be restricted to persons directly connected with the administration or enforcement of the provisions of the FNA or regulations, other Federal assistance programs, federally-assisted State programs providing assistance on a means-tested basis to low-income individuals, or general assistance programs which are subject to joint processing requirements.

2.2. Prohibited Purposes

2.2.1. USDA shall NOT use the provided data for:

- Tax administration or tax compliance

- Law enforcement investigations beyond coordination regarding SNAP fraud, or other violations ~~relating to~~of the FNA and regulations implementing the FNA.

- Administration of non-SNAP federal assistance programs (*e.g.*, Medicaid, TANF, housing assistance)

- Sharing with foreign governments or international organizations

- Commercial use or transfer to private entities

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

2.2.2. USDA shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals (*i.e.*, the collection of data elements spelled out in the Privacy Impact Assessment).

## 3. DATA CATEGORIES

3.1. <u>Data Definition</u>

3.1.1. All data obtained by States ~~or their vendors~~ in administering SNAP or that otherwise may be necessary to determine whether the program is being conducted in accordance with the FNA or regulations issued under the FNA, <u>in accordance with Attachment A to this protocol and any other state-specific terms</u> <u>negotiated and mutually agreed to by each state and USDA based on each state's data collection and storage realities</u>.

3.1.2. Data derived from third-party sources (employment verification databases, financial institution records, property records) that States use for verification but are not part of applicant-reported information are excluded.

~~3.2. Permitted Data~~

~~• Information that the applicant household reported on application/recertification forms including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers.~~

~~• Direct verifications that the State conducted to confirm applicant-reported information Records that the State maintains of SNAP applications, approvals, denials, certifications, and benefits issued.~~

~~• Household composition and income exactly as reported by the applicant (not third-party verified amounts).~~

~~• Transactional data necessary for fraud detection~~

## 4. LIMITED ACCESS

4.1. The SNAP Information Database <u>and all data collected therein</u> is accessed and used ONLY by employees of the USDA who are:

4.1.1. Designated by the Chief of Staff at Food, Nutrition, Consumer Services (FNCS)

4.1.2. Trained in SNAP Act, Privacy Act, and this protocol

4.1.3. In compliance with all information security annual recertifications

4.2. Except to the extent required by law, no access to<u>, or disclosures of data from,</u> the SNAP Information Database may be provided to:

4.2.1. Other USDA agencies (APHIS, ERS, NASS, etc.)

4.2.2. Divisions within FNS without an explicit need-to-know

4.2.3. OIG employees, unless in direct support of a law enforcement investigation related to SNAP fraud, waste, or abuse

4.2.4. Any other federal agency

4.2.5. Any FOIA, administrative subpoena or like external requester

> **Commented [A1]:** Plaintiffs anticipate that each State will have different proposed edits to Attachment A, based on State-specific approaches to sharing PII, as well as State-specific data collection and access requirements. Therefore, States will need to address these issues separately once an agreed-upon protocol is in place.

> **Commented [A2]:** Plaintiffs do not understand what this section of the protocol intends to convey if the data elements are set forth in Attachment A and therefore request that this section be deleted.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender


**U.S. DEPARTMENT OF AGRICULTURE**

4.3  For the reasons explained in Section 1.4, above, no access to, or disclosures of data from, the SNAP Information Database may be provided to the Department of Homeland Security or any subagency thereof for purposes of investigating potential violations of civil immigration laws or enforcing civil immigration laws.

4.4.  USDA shall provide each state agency, on an ongoing basis and upon request, with a list of all parties who have requested access to this data, and a list of all users who have been granted access to the provided data.

> **Commented [A3]:** This provision is modeled after similar provisions in the Memoranda of Understanding for data sharing between state agencies and USDA/FNS.  For example, provision (7) of a standard 2018 eDRS agreement states: "In the event that USDA/FNS or the State Agency discloses [Sensitive but Unclassified Information] or PII to any authorized person not originally identified by either party, USDA/FNS and/or the State Agency will notify the appropriate Federal or State entity as to the identity of each person to whom disclosure is made, that such disclosure is made in accordance with all applicable laws and regulations and obligations outlined in this MOU, and that the contents of the disclosure shall be protected as outlined in the MOU."  *See California v. USDA*, 25-cv-6310 (N.D. Cal.), ECF No. 116-3 at 74.

## 5. SYSTEM OF RECORDS NOTICE (SORN) AND PRIVACY IMPACT ASSESSMENT (PIA)

5.1. SORN

The applicable SORN for this protocol is USDA/FNS-15 "National Supplemental Nutrition Assistance Program (SNAP) Information Database," 90 FR 26521.

The SORN location can be found here:
https://www.federalregister.gov/documents/2025/06/23/202511463/privacy-act-of-1974-system-of-records

For the avoidance of doubt, this protocol controls notwithstanding any provision of the applicable SORN ~~that conflicts with 7 U.S.C. §§ 2020(a)(3) and (e)(8)~~.

5.2. Privacy Impact Assessment (PIA)

The applicable Privacy Impact Assessment for the SNAP Information Database is Version 1.1 created 02/12/2025, which can be found here:
https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

For the avoidance of doubt, this protocol controls notwithstanding any provision of the PIA.

## 6. FRAUD, WASTE, AND ABUSE DETECTION FRAMEWORK

6.1. Core Fraud Detection Functions

6.1.1. USDA will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program that focuses on:

- identity verification
- income and eligibility verification
- immigration status
- verification against disqualified recipients

6.2. Enhanced Fraud, Waste, and Abuse Detection Techniques

6.2.1. In addition to the core fraud detection functions, USDA will employ additional techniques including, but not limited to:

- Intrastate and interstate duplicate detection
- Deceased individuals' detection
- Synthetic identity patterns (new SSNs with inconsistent biographical data)
- Geographic anomalies

6.2.2. New data mining techniques will be limited to identifying recipient and retailer data anomalies ~~fraud~~ with a direct nexus to SNAP.

## 7. DATA OUTPUT

7.1. States

7.1.1. USDA will provide flagged data back to the State agency for review, including the specific data elements flagged and source of the data that generated the flag. States are encouraged to verify the accuracy of

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

fraud detection flags and provide feedback to USDA to refine detection logic and reduce false positives. Collaborative processes will be established to ensure accurate identification of fraud and appropriate corrective actions, including processes to allow individuals to contest inaccurate information and require updates to the originating system of record where false positives are identified. No presumptive results shall be made public prior to verification by State agency of the accuracy of the detection flags.

7.2. Law Enforcement

7.2.1. The USDA may refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP in accordance with 7 U.S.C § 2020(e)(8)(A) and USDA's regulation implementing that provision, 7 C.F.R. § 272.1(c)(1).

7.3. USDA SNAP Retailer Operations Center (ROC)

7.3.1. The USDA may refer fraud detection leads to the ROC where, during fraud detection analysis, a compromised EBT card or terminal ID may have been identified in accordance with 7 U.S.C § 2020(e)(8)(A) and USDA's regulation implementing that provision, 7 C.F.R. § 272.1(c)(1).

## 8. DATA MINIMIZATION AND RETENTION

8.1. Retention Period

8.1.1. Until a record schedule is approved, data will be retained only as long as necessary for purposes set forth in the SORN and this protocol, and in no case longer than 3 years per the SORN.

8.2. Automatic Deletion

8.2.1. Data shall be retained for no longer than three years, consistent with the USDA/FNS-15 SORN. An automated process will be implemented to delete data upon expiration of the retention period, except for records related to ongoing audits, investigations, or litigation.

8.3. Ongoing Cases

8.3.1. Data pertaining to ongoing audit, investigation, or potential litigation retained only as long as necessary, then deleted.

## 9. DATA SECURITY AND TECHNICAL REQUIREMENTS

9.1. Infrastructure and Location

9.1.1. Primary storage location: AWS GovCloud (US) region

9.1.2. Backup/disaster recovery: Secondary AWS region

9.1.3. No storage, processing, or backup outside GovCloud or federal secure environments

9.1.4. All infrastructure must meet or exceed FedRAMP High baseline standards

9.1.5. AWS Personnel Access: Data is encrypted such that AWS personnel cannot access unencrypted data. Encryption keys are managed exclusively by federal USDA personnel and are not accessible to AWS or third-party vendors.

9.2. Access Controls

9.2.1. Multi-factor authentication required for all access

9.2.2. Role-based access control (RBAC) with principle of least privilege

9.2.3. Access is limited to specifically designated USDA employees engaged to assist in determining whether the program is being conducted in accordance with the FNA.

9.2.4. Access logging and audit trail maintenance (minimum period equal to data retention period, see Section V.E).

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

9.2.5. Quarterly access reviews by USDA

9.2.6. Immediate revocation of access upon employee termination or assignment change

9.3. <u>Encryption Standards</u>

9.3.1. Encrypted data at rest and in transit

9.3.2. Encryption keys managed solely by USDA federal personnel

9.3.3. No encryption keys held by commercial vendors

9.4. <u>Data Segregation and Compartmentalization</u>

9.4.1. SNAP data isolated in separate, dedicated AWS GovCloud environment

9.4.2. SNAP data not directly integrated with other USDA systems

9.4.3. Limiting access to individuals with specialized training and oversight

9.5. <u>Data Transfer</u>

9.5.1. All data transfers shall utilize secure tools that meet or exceed FedRAMP High baseline standards.

> **Commented [A4]:** As discussed in prior letters, State agencies have concern that this protocol is a "framework" that lacks sufficient detail for implementation, and that it will need to be accompanied by additional documents (such as an Interconnection Security Agreement and Memorandum of Understanding) that are standard when agencies share data with each other. Our expectation is that if USDA/FNS and a State agency agree on the protocol framework, they will promptly enter into any additional agreements, such as an ISA or MOU, necessary to facilitate the data sharing required by this protocol.

## 10. INCIDENT RESPONSE AND BREACH NOTIFICATION

10.1. <u>Incident Response</u>

10.1.1. Incident response procedures are aligned with FNS Handbook Chapter 10 security incident and breach notification requirements that USDA already follows internally. This protocol extends equivalent procedures to State notification.

10.2. <u>Incident Definition</u>

10.2.2. Unauthorized access, use, or disclosure of data

10.2.3. Security vulnerability or control failure affecting data

10.2.4. Data loss, corruption, or destruction

10.2.5. Encryption failure or key compromise

10.2.6. Failed access control or authentication mechanism

10.2.7. Any event that may reasonably be expected to compromise data security or confidentiality, including any request for use of, access to, or disclosure of data outside the permitted circumstances set forth in Section 1.4

10.3. <u>Incident Notification Timeline</u>

10.3.1. Initial Notification within 12 hours

10.3.1.1.  Within 12 hours of discovery (by phone + email to State security/privacy contact and Director).

10.3.2. Preliminary Report within 24 hours

10.3.2.1.  Description of incident and timeline

10.3.2.2.  Data elements affected (specific fields and estimated number of records)

10.3.2.3.  Estimated number of individuals affected

10.3.2.4.  Preliminary assessment of whether unencrypted sensitive data may have been exposed

10.3.2.5.  Preliminary remedial actions taken

10.3.2.6.  Root cause analysis plan and timeline

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender


**U.S. DEPARTMENT OF AGRICULTURE**

10.3.3 Progress Reports and Incident Close-out

    10.3.3.1    USDA shall provide supplemental progress updates to state agencies as material information becomes available, but in no event less frequently than every 14 days, including refinements to scope, impact, and remediation measures, until the Incident is resolved. Upon resolution, USDA shall provide a close-out report of the Incident.

    10.3.3.2    USDA shall provide notice to affected individuals in compliance with all applicable federal breach response and notification requirements, including but not limited to FISMA and OMB Memorandum M-17-12. Nothing in this protocol shall be construed to shift responsibility for individual breach notification to the state agency.

> **Commented [A5]:** Plaintiffs' understanding is that these additional notification provisions are routine after a security breach, and since we don't have access to the FNS Handbook Chapter 10 cited above we wanted to spell them out here.
>
> (Per the prior comment, other details like this may need to be spelled out more clearly in the course of state-specific implementation.)

**APPENDIX A - SOURCES**

- 7 U.S.C. §§ 2020(a)(3) and (e)(8).
- Privacy Impact Assessment: https://www.usda.gov/sites/default/files/documents/fns-snap-informationdatabase-pia.pdf
- SORN: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-systemof-records
- SNAP Act: https://www.law.cornell.edu/uscode/text/7/2020
- SNAP QC Handbook
- Executive Order 14243 (March 20, 2025) "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos: https://www.govinfo.gov/content/pkg/DCPD-202500382/pdf/DCPD-202500382.pdf

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

# Attachment 3

# Plaintiffs' proposed revised data elements

![USDA logo]

## U.S. DEPARTMENT OF AGRICULTURE

**Supplemental Nutrition Assistance Program**
**Information SNAP Database**

***SNAP Eligibility Data Elements***

The following elements should be included in the data sharing file from each State agency on all benefit recipients that are listed in the SNAP case, to the extent such data is available and extractable from each state system.  For purposes of this document, the term "recipient" refers to individuals currently receiving benefits and individuals who formerly received benefits within the defined retention period, but not to disqualified or excluded individuals.  Please provide a data dictionary if one is available to reduce the burden to both the State agency and USDA.

***Case Number***: The case number is a unique identifier, typically 7 to 10 digits long, assigned to a household or recipient (depending on each state) when they are approved for SNAP.

***First, Middle, Last Names***: The full name of all recipients in the household.

***Known Alias***: Assumed or alternative name(s) used by any of the recipients.

***Date of Birth***: The specific month, day and year the recipient was born.

***Individual Recipient Identification Number***: The unique identifier assigned to that specific benefit recipient within the case by the State agency.

***Social Security Number***: The unique 9-digit identifier issued by the Social Security Administration and provided by the recipient.

***Status on SNAP*** (*recipient/individual level*): Identify if the recipient in the case is actively receiving SNAP, disqualified, sanctioned, or excluded.

***Application and/or Recertification Date***: The date the recipient applied for SNAP (this can be the first application date, or most recent recertification date).

***Reporting Status***: Following initial certification, or recertification, households are determined to be a simplified or change reporting household. This data element should indicate the reporting status the household is designated to be.

***Relationship:*** The relationship identifies who all recipients in a household are to one another and assists with determining mandatory group members. The data should reflect who each recipient is to one another.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

***Citizenship and/or Immigration Status***: This identifies if the recipient is a U.S. citizen or immigrant.

***Sponsorship:*** This identifies if an individual receiving SNAP is known to have been sponsored to enter the U.S.

***Zip code:*** Zip code associated with the recipient's residential address.

***County:*** County associated with the recipient's residential address.

***Homeless Status***: Please include if recipients are identified as homeless.

***Phone Number(s)***: The contact number(s) provided by the recipient as a means of contact.

***Email Address(es)***: The email address(es) provided by the recipient as a means of contact.

***Unearned Income***: The total unearned income (RSDI, unemployment, child support, etc.) amount budgeted to determine the SNAP allotment.

***Earned Income***: The total earned income amount budgeted to determine the SNAP allotment.

***Self-Employment Income***: The total self-employment income budgeted as well as the amount of allowed expenses.

***Shelter Expenses***: The total shelter expenses budgeted dollar amount. Shelter expenses may be separated out as various expenses are taken into consideration for eligibility and those should be included if used in the SNAP allotment determination (i.e. telephone, heating, cooling). If the household is active with Section 8, which pays a portion of the rental expenses, please ensure that is included.

***Assets/Resources***: The total assets reported (e.g.. bank accounts, boat, collector vehicle, etc.) or any resources used to determine SNAP eligibility.

*Sanctions/Disqualifications*: Identify any recipients who are serving a sanction and/or disqualification that is impacting their eligibility to participate in SNAP. The sanction and/or disqualification type and any applicable time periods should be identified (i.e. IPV, 10/1/2024-9/30/2025). This field should correspond to the data provided in the status on SNAP if the recipient is currently serving a disqualification, as well as any income field(s) that may pertain to the disqualified member due to income proration.

*SNAP EBT Card Number*: The unique set of digits on the household's issued SNAP EBT card that connects the case to the associated transactions.  For states that issue more than one card to a household, or for households where more than one recipient lives, the state need only provide the digits for the primary card issued to the household.

# Attachment 4

# Plaintiffs' proposed revised data elements (redline)

**USDA** U.S. DEPARTMENT OF AGRICULTURE

**Supplemental Nutrition Assistance Program
Information SNAP Database**

*SNAP Eligibility Data Elements*

The following elements should be included in the data sharing file from each State agency on all ~~household~~ benefit recipients~~members~~ s that are listed in the SNAP case~~,~~ - to the extent such data is available and extractable from each state system.  For purposes of this document, the term "recipient" refers to individuals currently receiving benefits and individuals who formerly received benefits within the defined retention period, but not to disqualified or excluded individuals.  Please provide a data dictionary if one is available to reduce the burden to both the State agency and USDA.

*Case Number*: The case number is a unique identifier, typically 7 to 10 digits long, assigned to a household or recipient (depending on each state) when they ~~apply and/or~~ are approved for SNAP.

*First, Middle, Last Names*: The full name of all recipients in the household ~~members~~.

*Known Alias*: Assumed or alternative name(s) used by any of the recipients ~~household members~~.

~~Authorized Representative(s): Provide any identified authorized representative for the household, and their corresponding information such as full name, means of verbal and written communication.~~

*Date of Birth*: The specific month, day and year the ~~household member~~recipient was born.

*Individual Recipient Identification Number*: The unique identifier assigned to that specific ~~household member~~benefit recipient within the case by the State agency.

*Social Security Number*: The unique 9-digit identifier issued by the Social Security Administration and provided by the ~~household member~~recipient.

*Status on SNAP (recipient/individual level)*: Identify if the ~~household member~~recipient in the case is actively receiving SNAP, disqualified, sanctioned, or excluded.

*Application and/or Recertification Date*: The date the ~~household~~ recipient applied for SNAP (this can be the first application date, or most recent recertification date).

*Reporting Status*: Following initial certification, or recertification, households are determined to be a simplified or change reporting household. This data element should indicate the reporting status the household ~~has been~~is designated to be.

**Commented [A1]:** We have amended this document primarily to propose three changes.

First, we propose limiting data production to SNAP recipients (excluding non-recipient data). Second, we propose submitting zip code and county data in lieu of personal addresses. Both of these amendments are proposed in order to reduce the amount of personal identifiable information (PII) unnecessarily disclosed, in accordance with term 2.2.2 of the February 17 proposed protocol.

Third, as specified below, we propose omitting certain details on income, expenses and assets which, for many states, could not be easily produced in bulk, and which would require production of third-party verification materials excluded by USDA's proposed protocol.

*Relationship:* The relationship identifies who all ~~household group~~recipient ~~s~~members in a household are to one another and assists with determining mandatory group members. The data should reflect who each ~~household~~ recipient ~~member~~ is to one another.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

Page **2** of **3**

~~*Absent Parent* (as applicable)**:** This identifies the parent of a minor child who resides in a separate household.~~

*Citizenship and/or Immigration Status*: This identifies if the ~~individual~~ recipient is a U.S. citizen or immigrant.

*Sponsorship:* This identifies if an individual ~~applying or~~ receiving SNAP is known to have ~~has~~ been sponsored to enter the U.S. ~~Data should identify the name or organization of the sponsor.~~

*Zip code:* Zip code associated with the recipient's residential address.

*County:* County associated with the recipient's residential address.

~~*Residential Address***:** The address the household has provided as to where they reside.~~

~~*Mailing Address***:** The address the household has provided as to where they would like all correspondence sent to (if different than residential).~~

*Homeless Status*: Please include if ~~the household~~recipients are ~~is~~ identified as homeless.

*Phone Number(s)*: The contact number(s) provided by the ~~household~~ recipient as a means of contact.

*Email Address(es)*: The email address(es) provided by the ~~household~~ recipient as a means of contact.

*Unearned Income*: The total unearned income (RSDI, unemployment, child support, etc.) ~~identifies the unearned income source, pay frequency, the household member receiving the pay, and the total~~ amount ~~of income~~ budgeted to determine the SNAP allotment.

*Earned Income*: The total earned income ~~identifies the earned income source, pay frequency, the household member receiving the pay, and the total~~ amount ~~of income~~ budgeted to determine the SNAP allotment.

*Self-Employment Income*: The total ~~S~~self-employment ~~should be identified as to what the selfemployment is (type or business name), pay frequency, the household member who is~~

selfemployed, and the total amount of income budgeted as well as the amount of allowed expenses.

**Shelter Expenses**: The total shelter expenses should be identified as to shelter type (i.e. rent), and the budgeted dollar amount. Shelter expenses may be separated out as various expenses are taken into consideration for eligibility and those should be included if used in the SNAP allotment determination (i.e. telephone, heating, cooling). If the household is active with Section 8, which pays a portion of the rental expenses, please ensure that is included.

**Assets/Resources**: Any The total known assets reported (i.ee.g.. bank accounts, boat, collector vehicle, etc.) or any resources used to determine SNAP eligibility. and must identify the asset type, amount and what household member the asset belongs to.

***Sanctions/Disqualifications***: Identify any ~~household members~~recipients who are serving a sanction and/or disqualification that is impacting their eligibility to participate in SNAP. The sanction and/or disqualification type and any applicable time periods should be identified (i.e. IPV, 10/1/2024-9/30/2025). This field should correspond to the data provided in the status on SNAP if the recipient~~household member~~ is currently serving a disqualification, as well as any income field(s) that may pertain to the disqualified member due to income proration.

***SNAP EBT Card Number***: The unique set of digits on the household's issued SNAP EBT card that connects the case to the associated transactions.  For states that issue more than one card to a household, or for households where more than one recipient lives, the state need only provide the digits for the primary card issued to the household.

# EXHIBIT L



**Food and Nutrition Service**

U.S. DEPARTMENT OF AGRICULTURE

March 10, 2026

Governor Kathy Hochul
NYS State Capitol Building
Albany, New York 12224

Dear Governor Hochul,

This replies to your February 25, 2025, letter responding to the U.S. Department of Agriculture (USDA), Food and Nutrition Service (FNS)'s Third Proposed Protocol issued on February 17, 2025.  FNS requires your State to share data to assist FNS in its statutorily-mandated administration and enforcement of the Food and Nutrition Act of 2008, as amended, (FNA), including its provision for USDA's inspection and audit of state records.  This is Defendants' fourth and final attempt to settle this matter by agreement.  Should Plaintiffs continue unreasonably to withhold their consent to these protocols, Defendants will seek further guidance from the Court.

In light of clear direction from the Court, the protocol looks directly to the FNA's text.  The State of Kansas recently accepted this straightforward approach, whereby the text of the FNA cabins demands.  Plaintiff States and the District of Columbia should now join Kansas and the majority of States and comply with their statutory obligation to share the data FNS has requested to verify the States' SNAP eligibility determinations and payments of Federally-funded SNAP benefits.

**The February 13, 2026, Agreement to a Protocol Using the Text of 7 U.S.C. § 2020(e)(8).**
At the Court's February 13, 2026, hearing initiated by the Plaintiff States by motion to the Court, Defendants proposed, the Court endorsed, and Plaintiffs accepted, resolving Plaintiffs' holdout by "put[ting] in a reference to [7 U.S.C. § 2020] (e)(8)(A) and say we agree to comply with (e)(8)(A) as it is written."[1]  On the next business day, February 17, 2026, Defendants submitted to Plaintiff States a Third Proposed Protocol, revised in accordance with the Court's February 13 guidance and parties' apparent agreement thereto.  This should have secured the holdout States' agreement and production of the data previously withheld since the summer of 2025.

---

[1] Tr. of Proceedings, *California, et al., v. United States Dept. of Agriculture, et al.*, no. 25-CV-06310 (N.D. Calif.), Feb. 13, 2026, ECF No. 131, at 32:16 to 33:12 (The Court: "If you want to just cut them off all you have to do is import (e)(8) into the protocol"); 46:10 ([USDA] can agree to say we agree to comply with (e)(A) as it is written"); 47:4-8 ("The Court:  would that satisfy plaintiffs . . . ?"); 47:9-13 ([Plaintiffs' Counsel]: "If defendants were willing to copy and paste the provisions of (e)(8) and say that those provisions govern any re-disclosure and any subsequent use of applicant data, I think that would largely address our concern with (e)(8)"); 47:14-48:1 ("The Court: . . . Now, apparently they would be satisfied with your airlifting into the protocol the restrictions that are set out in (e)(8). . . .maybe it just reads like (e)(8) reads so that you don't get into  [']access['],[']disclosure['], whatever.")

Food and Nutrition Service, Braddock Metro Center, 1320 Braddock Place, Alexandria, VA 22314

USDA is an equal opportunity provider, employer, and lender.

**Kansas's Stipulation to Settle its Appeal and Produce Data Based on FNS's Commitment to Comply With the Text of 7 U.S.C. § 2020(e)(8).**  As with the Plaintiff States, Kansas originally declined to provide FNS with the data FNS requested and chose instead to challenge its disallowance through administrative appeal.  On February 26, 2026, after a State SNAP Appeals Board hearing in which Kansas contested FNS's data sharing demand and disallowance of costs, Kansas signed a joint filing reporting, in pertinent part, that:

> the parties have entered into a settlement whereby [Kansas] will produce the data requested by USDA-FNS to the SNAP Information Database . . . and withdraw its appeal. As consideration for the foregoing, USDA-FNS agrees to revoke the disallowance and to follow applicable law with respect to the data Kansas provides, including, by way of example, the [FNA], 7 U.S.C. 2011 *et. seq.*, FOIA, and/or the Privacy Act, to the extent applicable.  Further, USDA-FNS agrees to not share the data with foreign entities.[2]

Kansas has indicated that it can produce the requested data in as little as one to three weeks.

**Plaintiff States' Continued Refusal To Produce SNAP Data.**  Notwithstanding the Court and parties' February 13 agreement to rely on statutory text to resolve their dispute, and Defendant's Third Proposed Protocol adhering to that agreement,[3]  Plaintiff States' February 25, 2026 reply refused to accept the Third Proposed Protocol.[4]  Plaintiffs' February 25 reply deviated from the agreed-upon approach, asserting new demands that appear calculated to circumvent the Court's instruction that "a State is not entitled to unreasonably decline to agree to a protocol."[5]

As with their prior assertion of various objections that have since been rejected by the Court,[6] Plaintiff States' February 25 reply seeks to exceed the express statutory text governing this matter.  USDA cannot accept the Plaintiffs' proposed edits to the Third Proposed Protocol that restrict or place additional burdens on USDA beyond what is required by law or would hamper USDA's ability to comply with its legal obligations.  In a fourth and final attempt to reach agreement, however, USDA has amended the Third Proposed Protocol, accepting where it can

---

[2] A copy of this joint filing with the State Supplemental Nutrition Assistance Program Appeals Board in *In Re: State of Kansas SNAP Appeal,* Case No. 01-2025 (Feb. 26. 2026), is attached as Exhibit 1.

[3] See ECF No. 128.

[4] See ECF No. 130.

[5] Order Granting in Part Pl. States' Mot. to Enforce or Expand Prelim. Inj. at 12, ECF No. 134 ("Second PI"); *See also* Tr. of Proceedings at 7:2-3, Note 1, *supra* ("states can't simply unreasonably reject a protocol in order to get out from under the mandatory language of (a)(3).").

[6]  *See* Note 1, *supra*, and Second PI at 19 ("In all other respects, Plaintiff States have failed to make the requisite showing" of likelihood of success on the merits.)

certain of the Plaintiff States' February 25 edits in the attached Fourth Proposed Protocol.[7] Because it aligns with the Court's February 13 guidance, and the parties' then-acceptance of that guidance, USDA believes the Plaintiff States should, like Kansas, promptly agree to this reasonable proposal.

Our Fourth Proposed Protocol includes the Plaintiff States' February 25 proposed edits that USDA found unacceptable. They are noted in dark red text with a double strikethrough. The following list summarizes why those State-proposed edits are unacceptable.

- In **Section 1.4**, USDA has rejected proposed changes that are redundant and do not mirror the language of 7 U.S.C. § 2020(e)(8)(A). This is in keeping with the above-noted Court's guidance and the parties' agreement to include the language of 7 U.S.C. § 2020(e)(8)(A). Additionally, affirmatively precluding any information sharing regarding immigration status may run afoul of 8 U.S.C. § 1373.

- USDA has deleted the last sentence of proposed **Section 1.5**. USDA cannot stipulate that Federal officials are subject to *State criminal liability*.

- In **Section 3.1.1**, USDA deleted proposed addition that sought to limit the data elements obtained by USDA to those agreed to on a state-by-state basis. All of the data elements that USDA is requesting are needed to ensure proper administration of SNAP. USDA cannot agree to permit States to dictate or otherwise limit which areas of program administration USDA may audit. Further, USDA cannot agree to limit its audit authority depending on which data elements are held by the State versus the State's contracted vendor. This would frustrate the purpose of USDA's audit authority. This new demand by Plaintiffs is contrary to their longstanding monolithic approach to FNS's data requests, with all States responding with a form letter. Plaintiffs' suggestion that Defendants will now have to negotiate separately with each of the plaintiff States, is yet another tactic to delay and ultimately avoid compliance with the FNA's data production requirements, to the extent they are subject to an (a)(3) protocol.

- USDA has deleted proposed **Section 4.3**. USDA is already agreeing to follow all applicable Federal law, including 7 U.S.C. § 2020(e)(8)(A) (which is incorporated into the protocols at Section 1.4). As such, Section 4.3 is unnecessary and creates unintended ambiguities.

- USDA is deleting proposed **Section 4.4**. USDA may receive requests for data that must remain confidential, such as an ongoing investigation of fraud or crimes. As such, it cannot agree to provide each State agency with a list of all parties who have requested or been granted access to the data.

- In **Section 7.1.1**, USDA has deleted two proposed edits:

---

[7] The Fourth Protocol is attached as Exhibit 2.

- o Although USDA is committed to sharing as much information as it can to assist with improving administration of SNAP, it cannot commit to sharing the source of data that was used to generate a flag for further review. Such information could originate from confidential sources (*e.g.*, a whistleblower).
  - o USDA is already complying with, and is required to comply with, the Privacy Act, including 5 U.S.C. § 552a(d)(2), making the language pertaining to individuals contesting their records unnecessary. To the extent the proposed edit sought to require more, such as requiring USDA to permit individuals to correct a system of record USDA does not maintain, USDA cannot agree.

- In **Section 7.2.1**, USDA has deleted language that sought to limit the USDA Office of the Inspector General's and other law enforcement's authority to 7 U.S.C. § 2020(e)(8)(A) and its implementing regulations. USDA cannot agree to limit the statutory authorities of other entities and must respond to all lawful requests. Further, the Federal government pursues criminal investigations and prosecutions for crimes involving SNAP, such as identity theft and wire fraud, that are not found within the SNAP Act. Because 7 U.S.C. § 2020(e)(8)(A) limits use and disclosure to "the administration and enforcement of the provisions of [the SNAP Act]," the proposed edit could be read to prohibit USDA in assisting with such investigations and prosecutions.

- In **Section 10.2**, USDA has deleted the proposed insertion of data requests that fall outside the scope of Section 1.4. USDA must comply with all applicable laws. A lawful request for disclosure does not constitute a reasonable expectation of a security incident and is therefore inappropriate to include.

- USDA has deleted the proposed **Section 10.3.3.1**. USDA will not agree to reporting procedures outside of what is required by law.

- In proposed **Section 10.3.3.2**, USDA has deleted references to specific laws and OMB Memoranda. USDA is agreeing to follow all federal requirements. Specific examples are unnecessary and could lead to confusion should requirements change.

All Plaintiff States' proposed edits to the Third Protocol that USDA has accepted can be found in the Fourth Protocol document, highlighted in green, and attached as Exhibit 2. For the avoidance of doubt, the terms of the Fourth Proposed Protocol will govern all data stored in the SNAP Information Database regardless of the source of the data.

**USDA Rejects Plaintiff States' Proposal to Restrict Data Elements that are Within the Scope of 7 U.S.C. § 2020(a)(3) or (e)(8)**

Plaintiffs' February 25 response to the Third Proposed Protocol proposed to curtail their obligation to produce data that is within the scope of the FNA data sharing requirements in 7 U.S.C. § 2020(a)(3) or (e)(8). All proposed edits to the requested data elements, which are reattached to this letter as Exhibit 3, have been rejected. Indeed, these are the very same data elements which States have produced for years as part of the quality control process without complaint. The following shows the type of data that States already release to FNS, without the

protections of the Fourth Proposed Protocol, and the subset of those types of data that have been requested by FNS pursuant to 7 U.S.C. § 2020(a)(3) or (e)(8).

## Data Element Comparisons

This chart identifies the required data elements submitted by State agencies to the U.S. Department of Agriculture (USDA) for Quality Control (QC) purposes.  States submit a sample set of this data to USDA monthly.  Fields identified with a * symbol have been requested by USDA for the Supplemental Nutrition Assistance Program (SNAP) Data Sharing integrity initiative.  As indicated by this chart, there is no difference between the data elements requested by USDA on November 24, 2025 and the corresponding data elements submitted by States to USDA for QC purposes, other than to request a complete set, rather than a sample set, of the same type of data.

| | | |
|---|---|---|
| Case Number* | Case Address* | Phone Number* |
| SNAP Household Names* | SNAP Household DOBs* | SNAP Household SSN* |
| SNAP Household Relationships* | Citizen/Non-Citizen Status * | Homeless Status* |
| All Household Earned Income* | All Household Unearned Income* | All Household Self-Employment Income* |
| Authorized Representative* | Indicator if SNAP Household Member is active* | Reporting Status* |
| Recipient Disqualification* | Certification Period* | Assets/Resources* |
| Categorial Eligibility | Directions to Home | Shelter Expenses* |
| Date of Interview | Household Composition | Expedited Service |
| Most Recent Action | Student Status | Amount of Allotment |
| Allotment Adjustments | Demonstration Projects | Residency |
| Earned Income Deductions | Dependent Care | Shelter Deductions |
| Other Government Benefits | Contributions | Deemed Income |
| Standard Utility Allowance | Child Support Deductions | Medical Deduction |
| Income from loans, scholarships, grants | Arithmetic Computation | SNAP Simplification Project |

| Significant Persons NOT living in home phone number | Significant Persons NOT living in the home relationship | Significant Persons NOT living in the home SSNs |
|---|---|---|
| Significant Persons Not living in the DOBs | Significant Persons NOT living in the home address | Significant Persons NOT living in the home financial support |
| All data related to work requirements – E&T programs, time limited participation, work registration, etc. | States must verify all elements with supporting documentation and upload those to SNAP-QCS | |

For the foregoing reasons, this is Defendants' fourth and final attempt to settle this matter by agreement. Plaintiff States should join Kansas and the majority of States in complying with the FNA. Plaintiff States should accept this final offer because it adheres to the Court's February 13 guidance and the parties' agreement[8] to accept the text of the FNA as a reasonable protocol. Indeed, USDA will accept agreement to these protocols by individual Plaintiff States who wish to honor the commitment made in Court and their legal obligations under the FNA.

We respectfully request that the plaintiff States inform us by March 20, 2026, whether they will now comply with FNS's data request. Notwithstanding this offer, the Federal Government preserves all claims and contentions that it has made, or could have made, in relation to its data requests, and its right to pursue further action that it may take to seek review or enforcement of any data request that is not complied with by a Plaintiff State.

Sincerely,

Shiela Corley
Chief of Staff
Food, Nutrition, and Consumer Services
U.S. Department of Agriculture

Enclosure

cc:    Mark Ladov, Special Counsel

---

[8] *See* Note 1, *supra.*

**STATE SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM APPEALS BOARD**

In Re:

State of Kansas SNAP Appeal

Case No. 01-2025

## JOINT REQUEST TO EXTEND DEADLINE
## FOR POST-HEARING SUBMISSIONS AND DEFERRAL OF FINAL DECISION

Now come the Appellant, the Kansas Department for Children and Families (KDCF), and the Respondent, the United States Department of Agriculture – Food Nutrition Services (USDA-FNS), and for their Joint Request to Extend Deadline for Post-Hearing Submissions and Deferral of Final Decision, hereby state as follows:

1.    The hearing on KDCF's appeal of USDA-FNS's disallowance took place on February 17, 2026.

2.    Any post-hearing submissions are due by February 27, 2026.

3.    Since the hearing, the parties have entered into a settlement whereby KDCF will produce the data requested by USDA-FNS to the SNAP Information Database created by in the June 23, 2025, SORN, and withdraw its appeal. As consideration for the foregoing, USDA-FNS agrees to revoke the disallowance and to follow applicable law with respect to the data Kansas provides, including, by way of example, the Food and Nutrition Act, 7 U.S.C. 2011 et seq., FOIA, and/or the Privacy Act, to the extent applicable. Further, USDA-FNS agrees to not share the data with foreign entities.

4.    In light of the foregoing, the parties request that the date for post-hearing submissions be extended 30 days to allow for the parties to prepare settlement documents and act in accordance with those documents. The parties further request that the Hearing Officer's decision be delayed accordingly.

███████████████

Deputy Assistant General Counsel
International Affairs, Food Assistance, and
Farm and Rural Programs Division
USDA, Office of the General Counsel
1400 Independence Avenue, SW, ███████
Washington, D.C. 20250-1400
████████████

*Counsel for USDA FNS*

███████████████████████████

*Chief Counsel for Governor Kelly*
Kansas Office of the Governor
Statehouse, 300 SW 10th Ave ██████████
Topeka, KS 66612
Phone: ████████████
███████████@ks.gov

*Counsel for Governor Kelly*



**U.S. DEPARTMENT OF AGRICULTURE**

### Supplemental Nutrition Assistance Program (SNAP) Information Database
### Fraud, Waste and Abuse Detection Protocol

**1. OVERVIEW**

1.1. U.S. Department of Agriculture (USDA) and the Food and Nutrition Service (FNS) will use the Supplemental Nutrition Assistance Program (SNAP) recipient data to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying duplicate enrollments for elimination, and performing additional eligibility and program integrity checks specified herein.

1.2. This protocol establishes a framework for State SNAP agencies to share data with the USDA/FNS for detection of fraud, waste, and abuse and program integrity purposes.

1.3. USDA represents that tThe protocol balances federal data access requirements under Executive Order 14243 and the Food and Nutrition Act of 2008 (FNA, also referred to here as the "SNAP Act") with privacy protections, minimizes unnecessary data collection, and incorporates security standards while maintaining public trust and compliance with applicable law.

1.4. Notwithstanding any other provision of this protocol, or any System of Record Notice, USDA and FNS: (a) shall not use or disclose data received under this protocol except as specified in 7 U.S.C. §§ 2020(a)(3) and (e)(8) and 7 C.F.R. § 272.1(c)(1) and (2), or any other applicable law. For the avoidance of doubt, this means that USDA and FNS (and any person or entity to whom the data is disclosed) shall not: that includes the specific requirements in 7 U.S.C § 2020(e)(8)(A), which provides that State Plans of Operation must include safeguards protecting information obtained from applicant households that shall permit

(i) use the data, except for administration or enforcement of the provisions of Chapter 51 of Title 7 of the U.S. Code, regulations issued pursuant to that chapter, Federal assistance programs, or federally-assisted State programs; and

(ii) disclose the data, except to the disclosure of such information to persons directly connected with the administration or enforcement of the provisions of this chapter, regulations issued pursuant to this chapter, Federal assistance programs, or federally-assisted State programs. and only so that such persons can subsequently use the data for such administration and enforcement; and

(iii) use or disclose data for purposes of investigating potential violations of civil immigration laws or enforcing civil immigration laws, including but not limited to in response to a request by the Department of Homeland Security or subagency thereof.

1.5 USDA acknowledges that the data shared under this Protocol is subject to federal and state existing confidentiality, privacy, and information security laws and regulations. Unauthorized access to, use of, or disclosure of such data, or failure to protect such data in accordance with applicable law, may subject the responsible party and, where applicable, individual users to civil or criminal penalties under federal or state law. Notwithstanding the foregoing, this provision does not create any new rights or liabilities or waive any applicable immunities.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

**2. FRAMEWORK AND AUTHORITY**

2.1. <u>Authority</u>

2.1.1. Executive Order 14243 (March 20, 2025): "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos" directs agency heads to "take all necessary steps, to the maximum extent consistent with law," to ensure federal government has "unfettered access to comprehensive data" from state programs receiving federal funding, including data maintained in third-party databases.

2.1.2. 7 U.S.C. § 2020(a)(3) ~~that~~ requires that each State agency shall keep records as may be necessary to determine whether the program is being conducted in compliance with this chapter, and all records shall be made available for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary.

2.1.3. 7 CFR 272 stipulates use or disclosure of information obtained from SNAP applicant or recipient households shall be restricted to persons directly connected with the administration or enforcement of the provisions of the FNA or regulations, other Federal assistance programs, federally-assisted State programs providing assistance on a means-tested basis to low-income individuals, or general assistance programs which are subject to joint processing requirements.

2.2. <u>Prohibited Purposes</u>



Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

 **U.S. DEPARTMENT OF AGRICULTURE**

2.2.1. USDA shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals (*i.e.*, the collection of data elements spelled out in the Privacy Impact Assessment).

## 3. DATA CATEGORIES

3.1. <u>Data Definition</u>

3.1.1. All data obtained by States or their vendors ~~or their vendors~~ in administering SNAP or that otherwise may be necessary to determine whether the program is being conducted in accordance with the FNA or regulations issued under the FNA, in accordance with Attachment A of this protocol. ~~and any other state-specific terms negotiated and mutually agreed to by each state and USDA based on each state's data collection and storage realities.~~

3.1.2. Data derived from third-party sources (employment verification databases, financial institution records, property records) that States use for verification but are not part of applicant-reported information are excluded.

~~3.2 Permitted Data:~~

- ~~Information that the applicant household reported on application/certification forms including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers;~~
- ~~Direct verifications that the State conducted to confirm applicant-reported information~~
- ~~Records that the State maintains of SNAP applications, approvals, denials, certifications, and benefits issued~~
- ~~Household composition and income exactly as reported by the applicant (not third-party verified amounts)~~
- ~~retailer and transactional data necessary for fraud detection~~

## 4. LIMITED ACCESS

4.1. The SNAP Information Database and all data collected therein is accessed and used ONLY by employees of the USDA who are:

4.1.1. Designated by the Chief of Staff at Food, Nutrition, Consumer Services (FNCS)

4.1.2. Trained in SNAP Act, Privacy Act, and this protocol

4.1.3. In compliance with all information security annual recertifications

4.2. Except to the extent permitted by law, no access to, or disclosures of data from, the SNAP Information Database may be provided to:

4.2.1. Other USDA agencies (APHIS, ERS, NASS, etc.)

4.2.2. Divisions within FNS without an explicit need-to-know

4.2.3. Any other federal agency

4.2.4. Any FOIA, administrative subpoena or like external requester

4.3. Notwithstanding section 4.1, this protocol does not limit access to the SNAP Information Database and all data contained therein by USDA's Office of the Inspector General as authorized by the Inspector General's Act, 5 USC 401-424.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

~~4.3.  For the reasons  explained in Section 1.4, above, no access to, or disclosures of data from, the SNAP Information Database may be provided to the Department of Homeland Security or any subagency thereof for purposes of investigating potential violations of civil immigration laws or enforcing civil immigration laws.~~

~~4.4.  USDA shall  provide each state agency, on an ongoing basis and upon request, with a list of all parties who have requested access to this data, and a list of all users who have been granted access to the provided data~~.

## 5. SYSTEM OF RECORDS NOTICE (SORN) AND PRIVACY IMPACT ASSESSMENT (PIA)

5.1. <u>SORN</u>

The applicable SORN for this protocol is USDA/FNS-15 "National Supplemental Nutrition Assistance Program (SNAP) Information Database," 90 FR 26521.

The SORN location can be found here:
https://www.federalregister.gov/documents/2025/06/23/202511463/privacy-act-of-1974-system-of-records

For the avoidance of doubt, this protocol controls notwithstanding any provision of the applicable SORN <mark>that</mark> ~~conflicts with 7 U.S.C. §§ 2020(a)(3) and (e)(8)~~.

5.2. <u>Privacy Impact Assessment (PIA)</u>

The applicable Privacy Impact Assessment for the SNAP Information Database <mark>is Version 1.1 created 02/12/2025, which</mark> can be found here:
https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

<mark>For the avoidance of doubt, this protocol controls notwithstanding any provision of the PIA.</mark>

## 6. FRAUD, WASTE, AND ABUSE DETECTION FRAMEWORK

6.1. <u>Core Fraud Detection Functions</u>

6.1.1. USDA will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program that focuses on:

- identity verification
- income and eligibility verification
- immigration status
- verification against disqualified recipients

6.2. <u>Enhanced Fraud, Waste, and Abuse Detection Techniques</u>

6.2.1. In addition to the core fraud detection functions, USDA will employ additional techniques including, but not limited to:

- Intrastate and interstate duplicate detection
- Deceased individuals' detection
- Synthetic identity patterns (new SSNs with inconsistent biographical data)
- Geographic anomalies

6.2.2. New data mining techniques will be limited to identifying <mark>data anomalies</mark> ~~fraud~~ with a direct nexus to SNAP.

## 7. DATA OUTPUT

7.1. <u>States</u>

7.1.1. USDA will provide flagged data back to the State agency for review, <mark>including the specific data elements flagged</mark> ~~and source of the data that generated the flag~~. States are encouraged to provide feedback to

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

USDA to refine detection logic and reduce false positives. Collaborative processes will be established to ensure accurate identification of fraud and appropriate corrective actions. ~~including processes to allow individuals to contest inaccurate information and require updates to the originating system of record where false positives are identified.~~ No presumptive results will ~~shall~~ be made public ~~prior to verification by~~ ~~State agency~~ by FNS until 30 days from the initial date that USDA provided flagged data; during that 30 days States can provide additional information related to ~~of~~ the accuracy of the detection flags.

7.2. Law Enforcement

7.2.1. The USDA may refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP. ~~in accordance with 7 U.S.C § 2020(e)(8)(A) and USDA's regulation implementing that provision, 7 C.F.R. § 272.1(c)(1).~~

7.3. USDA SNAP Retailer Operations Center (ROC)

7.3.1. The USDA may refer fraud detection leads to the ROC where, during fraud detection analysis, a compromised EBT card or terminal ID may have been identified in accordance with 7 U.S.C § 2020(e)(8)(A) and USDA's regulation implementing that provision, 7 C.F.R. § 272.1(c)(1).

## 8. DATA MINIMIZATION AND RETENTION

8.1. Retention Period

8.1.1. Until a record schedule is approved, data will be retained only as long as necessary for purposes set forth in the SORN and this protocol, and in no case longer than 3 years per the SORN.

8.2. Automatic Deletion

8.2.1. Data shall be retained for no longer than three years, consistent with the USDA/FNS-15 SORN. An automated process will be implemented to delete data upon expiration of the retention period, except for records related to ongoing audits, investigations, or litigation.

8.3. Ongoing Cases

8.3.1. Data pertaining to ongoing audit, investigation, or potential litigation retained only as long as necessary, then deleted.

## 9. DATA SECURITY AND TECHNICAL REQUIREMENTS

9.1. Infrastructure and Location

9.1.1. Primary storage location: AWS GovCloud (US) region

9.1.2. Backup/disaster recovery: Secondary AWS region

9.1.3. No storage, processing, or backup outside GovCloud or federal secure environments

9.1.4. All infrastructure must meet or exceed FedRAMP High baseline standards

9.1.5. AWS Personnel Access: Data is encrypted such that AWS personnel cannot access unencrypted data. Encryption keys are managed exclusively by federal USDA personnel and are not accessible to AWS or third-party vendors.

9.2. Access Controls

9.2.1. Multi-factor authentication required for all access

9.2.2. Role-based access control (RBAC) with principle of least privilege

9.2.3. Access is limited to specifically designated USDA employees engaged to assist in determining whether the program is being conducted in accordance with the FNA.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

9.2.4. Access logging and audit trail maintenance (minimum period equal to data retention period, see Section V.E).

9.2.5. Quarterly access reviews by USDA

9.2.6. Immediate revocation of access upon employee termination or assignment change

9.3. <u>Encryption Standards</u>

9.3.1. Encrypted data at rest and in transit

9.3.2. Encryption keys managed solely by USDA federal personnel

9.3.3. No encryption keys held by commercial vendors

9.4. <u>Data Segregation and Compartmentalization</u>

9.4.1. SNAP data isolated in separate, dedicated AWS GovCloud environment

9.4.2. SNAP data not directly integrated with other USDA systems

9.4.3. Limiting access to individuals with specialized training and oversight

9.5. <u>Data Transfer</u>

9.5.1. All data transfers shall utilize secure tools that meet or exceed FedRAMP High baseline standards.

## 10. INCIDENT RESPONSE AND BREACH NOTIFICATION

10.1. <u>Incident Response</u>

10.1.1. Incident response procedures are aligned with FNS Handbook Chapter 10 security incident and breach notification requirements that USDA already follows internally. This protocol extends equivalent procedures to State notification.

10.2. <u>Incident Definition</u>

10.2.2. Unauthorized access, use, or disclosure of data

10.2.3. Security vulnerability or control failure affecting data

10.2.4. Data loss, corruption, or destruction

10.2.5. Encryption failure or key compromise

10.2.6. Failed access control or authentication mechanism

10.2.7. Any event that may reasonably be expected to compromise data security or confidentiality. ~~including any request for use of, access to, or disclosure of data outside the permitted circumstances set forth in Section 1.4~~

10.3. <u>Incident Notification Timeline</u>

10.3.1. Initial Notification within 12 hours

10.3.1.1.    Within 12 hours of discovery (by phone + email to State security/privacy contact and Director).

10.3.2. Preliminary Report within 24 hours

10.3.2.1.    Description of incident and timeline

10.3.2.2.    Data elements affected (specific fields and estimated number of records)

10.3.2.3.    Estimated number of individuals affected

10.3.2.4.    Preliminary assessment of whether unencrypted sensitive data may have been exposed

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



## U.S. DEPARTMENT OF AGRICULTURE

10.3.2.5.    Preliminary remedial actions taken

10.3.2.6.    Root cause analysis plan and timeline

10.3.3 Progress Reports and Incident Close-out

10.3.3.1    ~~USDA shall provide supplemental progress updates to state agencies as material information becomes available, but in no event less frequently than every 14 days, including refinements to scope, impact, and remediation measures, until the Incident is resolved. Upon resolution, USDA shall provide a close-out report of the Incident.~~

10.3.3.1    USDA shall provide notice to affected individuals in compliance with all applicable federal breach response and notification requirements, ~~including, but not limited to FISMA and OMB Memorandum M-17-12.~~ Nothing in this protocol shall be construed to shift responsibility for individual breach notification to the state agency.

## APPENDIX A - SOURCES

- 7 U.S.C. §§ 2020(a)(3) and (e)(8).

- Privacy Impact Assessment: https://www.usda.gov/sites/default/files/documents/fns-snap-informationdatabase-pia.pdf

- SORN: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-systemof-records

- SNAP Act: https://www.law.cornell.edu/uscode/text/7/2020

- SNAP QC Handbook

- Executive Order 14243 (March 20, 2025) "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos: https://www.govinfo.gov/content/pkg/DCPD-202500382/pdf/DCPD-202500382.pdf

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

**USDA**
U.S. DEPARTMENT OF AGRICULTURE

**Supplemental Nutrition Assistance Program**
**Information SNAP Database**

**SNAP Eligibility Data Elements**
The following elements should be included in the data sharing file from each State agency on all household members that are listed in the SNAP case. Please provide a data dictionary if one is available to reduce the burden to both the State agency and USDA.

**Case Number:** The case number is a unique identifier, typically 7 to 10 digits long, assigned to a household when they apply and/or are approved for SNAP.

**First, Middle, Last Names:** The full name of all household members.

**Known Alias:** Assumed or alternative name(s) used by any of the household members.

**Authorized Representative(s):** Provide any identified authorized representative for the household, and their corresponding information such as full name, means of verbal and written communication.

**Date of Birth:** The specific month, day and year the household member was born.

**Individual Recipient Identification Number:** The unique identifier assigned to that specific household member within the case by the State agency.

**Social Security Number:** The unique 9-digit identifier issued by the Social Security Administration and provided by the household member.

**Status on SNAP** *(recipient/individual level)***:** Identify if the household member in the case is actively receiving SNAP, disqualified, sanctioned, or excluded.

**Application and/or Recertification Date:** The date the household applied for SNAP (this can be the first application date, or most recent recertification date).

**Reporting Status:** Following initial certification, or recertification, households are determined to be a simplified or change reporting household. This data element should indicate the reporting status the household has been designated to be.

**Relationship:** The relationship identifies who all household group members are to one another and assists with determining mandatory group members. The data should reflect who each household member is to one another.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

*Absent Parent* (as applicable)**:** This identifies the parent of a minor child who resides in a separate household.

*Citizenship and/or Immigration Status***:** This identifies if the individual is a U.S. citizen or immigrant.

*Residential Address***:** The address the household has provided as to where they reside.

*Mailing Address***:** The address the household has provided as to where they would like all correspondence sent to (if different than residential).

*Homeless Status***:** Please include if the household is identified as homeless.

*Phone Number(s)***:** The contact number(s) provided by the household as a means of contact.

*Email Address(es)***:** The email address(es) provided by the household as a means of contact.

*Unearned Income***:** The unearned income (RSDI, unemployment, child support, etc.) identifies the unearned income source, pay frequency, the household member receiving the pay, and the total amount of income budgeted to determine the SNAP allotment.

*Earned Income***:** The earned income identifies the earned income source, pay frequency, the household member receiving the pay, and the total amount of income budgeted to determine the SNAP allotment.

*Self-Employment Income***:** Self-employment should be identified as to what the self-employment is (type or business name), pay frequency, the household member who is self-employed, and the total amount of income budgeted as well as the amount of allowed expenses.

*Shelter Expenses***:** The shelter expenses should be identified as to shelter type (i.e. rent), and the budgeted dollar amount. Shelter expenses may be separated out as various expenses are taken into consideration for eligibility and those should be included if used in the SNAP allotment determination (i.e. telephone, heating, cooling). If the household is active with Section 8 which pays a portion of the rental expenses, please ensure that is included.

*Assets/Resources***:** Any known assets (i.e. bank accounts, boat, collector vehicle) or resources used to determine SNAP eligibility and must identify the asset type, amount and what household member the asset belongs to.

*Sanctions/Disqualifications***:** Identify any household members who are serving a sanction and/or disqualification that is impacting their eligibility to participate in SNAP. The sanction and/or disqualification type and any applicable time periods should be identified (i.e. IPV,

10/1/2024-9/30/2025). This field should correspond to the data provided in the status on SNAP if the household member is currently serving a disqualification, as well as any income field(s) that may pertain to the disqualified member due to income proration.

***SNAP EBT Card Number:*** The unique set of digits on the household's issued SNAP EBT card that connects the case to the associated transactions.

# EXHIBIT M

*Via E-mail*
Elizabeth J. Shapiro
Tyler Becker
Benjamin S. Kurland
ben.kurland@usdoj.gov
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005

*Counsel for U.S. Department of Agriculture and Secretary of Agriculture Brooke L. Rollins*

    RE:  Response to March 10, 2026 Letter to Plaintiff States from Shiela Corley, Chief of Staff,
           Food, Nutrition, and Consumer Services, U.S. Department of Agriculture

Dear Counsel:

      We write on behalf of Plaintiffs in *State of California v. USDA*, No. 3:25-cv-06310 (N.D. Cal.).  This letter responds to the letter and further revised proposed protocol that USDA/FNS sent to Plaintiff States on March 10, 2026.

      In our February 25 letter and proposed protocol, we included provisions to ensure compliance with 7 U.S.C. § 2020(e)(8), and we requested the opportunity to meet and confer to try to resolve any remaining disagreements.  *See* Pls.' Feb. 25 Ltr. at 1.  Unfortunately, USDA rejected each of those provisions and stated that its latest letter is its "final attempt to settle this matter by agreement," *see* USDA's Mar. 10 Ltr. at 1, ending the parties' efforts to reach a protocol "agreed to by [each] State agency and [USDA]," 7 U.S.C. § 2020(a)(3)(B)(i), for a second time.

      Despite two preliminary injunctions on this issue, USDA's revisions to the protocol reflect a continued refusal to commit to the data use and disclosure restrictions of 7 U.S.C. § 2020(e)(8).  In particular, USDA has struck Plaintiffs' proposed revision to Section 1.4 to clarify that USDA and FNS (and any person or entity who receives Plaintiffs' data from USDA and FNS) may not use or disclose Plaintiffs' data for purposes of enforcing immigration laws.  USDA's Mar. 10 Protocol Redline § 1.4.  Additionally, USDA's proposed protocol now asserts the unilateral right to use and disclose Plaintiffs' data "as specified in . . . any . . . applicable law," *id.*, while simultaneously refusing to provide Plaintiffs with notice when it does so, *see id.* §§ 4.4, 10.2.7.  Indeed, when Plaintiffs' counsel, seeking clarification on USDA's position, asked USDA's counsel to agree that USDA "would not disclose the data in response to an interagency request for the data from [the Department of Homeland Security (DHS)] or any DHS subagency, such as the request for Medicaid data that DHS/ICE have made of [the Centers for Medicare & Medicaid Services], citing 8 U.S.C. § 1360 and 6 U.S.C. § 122," *see* Pls.' Mar.

20 Email, USDA sidestepped the question and appeared to claim a newfound right to pursue data sharing with DHS and its subagencies under the SNAP Act, *see* USDA's Mar. 24 Email.

As explained in Plaintiffs' February 25 letter, the parties must have a meeting of the minds that 7 U.S.C. § 2020(e)(8) prohibits USDA and FNS (and any person or entity to whom the data is disclosed) from sharing Plaintiffs' data with DHS and its subagencies for the purpose of enforcing immigration laws.  USDA has yet to provide any coherent rationale why it cannot agree to such a provision in the protocol.

USDA initially claimed in its March 10 letter that a provision "affirmatively precluding any information sharing regarding immigration status may run afoul of 8 U.S.C. § 1373." USDA's Mar. 10 Ltr. at 3.  But, as USDA's counsel subsequently conceded during a meet and confer with Plaintiffs' counsel, 8 U.S.C. § 1373 itself does not *grant* DHS any authority to request, nor USDA any authority to share, Plaintiffs' data.  *See* Pls.' Mar. 20 Email. Section 1373 is entirely inapplicable.[1]

This is especially true where, as here, another federal statute *prohibits* the relevant data disclosure.  *See* Relationship Between Illegal Immigration Reform and Immigrant Responsibility Act of 1996 and Statutory Requirement for Confidentiality of Census Information, 23 Op. O.L.C. Supp. 5 (1999).[2]  In 7 U.S.C. § 2020(e)(8)(A), Congress prohibited the use and disclosure of SNAP applicant data for any purpose other than the administration of federal benefits programs. When Congress wanted to create exceptions to that rule, it did so expressly in the subparagraphs that followed.  *See, e.g.*, 7 U.S.C. § 2020(e)(8)(C), (E) & 7 C.F.R. § 272.1(c)(1)(vi), (vii) (narrow exceptions to disclose data to law enforcement officials for purposes of enforcing the SNAP Act or to apprehend specified criminal suspects); 7 U.S.C. § 2020(e)(8)(F), (e)(15) & 7 C.F.R. § 273.4(b) (narrow exception for a state agency to make a report to U.S. Citizenship and Immigration Services upon a determination by the state agency that a household member is ineligible for benefits because they are present in the United States in violation of the Immigration and Nationality Act).  There is no exception for recipients of Plaintiffs' SNAP data to share it with DHS for immigration enforcement purposes.

---

[1] Moreover, even if 8 U.S.C. § 1373 were somehow applicable, it could apply only to a narrow category of an individual's data: "information strictly pertaining to immigration status (i.e. what one's immigration status is)" and not "information like . . . addresses.'" *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019) (citation omitted).  Therefore, 8 U.S.C. § 1373 could never justify USDA's wholesale rejection of Plaintiffs' proposed provision to prevent sensitive data—including street addresses—from being used or disclosed for immigration enforcement purposes.

[2] Available at http://www.justice.gov/sites/default/files/olc/opinions/attachments/2014/11/10/1999-05-18-census-confidentiality.pdf.

8 U.S.C. § 1360 and 6 U.S.C. § 122 also provide USDA with no authority to share Plaintiffs' data with DHS and its subagencies. The SNAP Act's carefully crafted scheme that specifically governs the use and disclosure of SNAP applicant data controls over these statutory provisions that generally permit data sharing between federal agencies; otherwise, the SNAP Act's restrictions on data use and disclosure would be rendered meaningless. *See* ECF No. 134 at 15 (USDA may not "serv[e] as a conduit between Plaintiff States and prohibited entities"). Congress mandated that state agencies, not the federal government, would collect and safeguard sensitive data about SNAP applicants; USDA cannot bypass these statutory protections by asserting a vague right to share data with other federal agencies pursuant to "applicable laws" absent any effort to explain what those laws are or how they govern data sharing.

USDA's counsel also suggested that USDA cannot agree to a provision clarifying that USDA will not use or disclose the data "for purposes of investigating potential violations of immigration laws or enforcing immigration laws," *see* Pls.' Mar. 20 Email, because "*States* have an obligation pursuant to [7 U.S.C. § 2020(e)(15)] to provide information to DHS regarding household members present in the United States in violation of immigration laws, without regard to Section (e)(8)'s limitations," *see* USDA's Mar. 23 Email (emphasis added). But a protocol clarifying the restrictions on *USDA's* use and disclosure of States' data in no way interferes with *States'* ability to disclose the data to pursuant to 7 U.S.C. § 2020(e)(15). Thus, just like 8 U.S.C. § 1373, 7 U.S.C. § 2020(e)(15) is entirely inapplicable to a protocol governing use and disclosure of the data by USDA and FNS (and any other third party to whom they disclose the data).

Relatedly, USDA rejected Plaintiffs' proposed revision to exclude residential address information from the list of required data elements. But street addresses have little to no value for program integrity purposes, including because a large portion of SNAP recipients (who have net incomes below the poverty line) often have unstable housing situations and most recipients are not even required to report changes in their address on a regular basis under simplified reporting procedures. *See, e.g.*, ECF No. 116-3 ¶ 20. Moreover, USDA continues to demand sensitive data, like street addresses, on *non-recipients*, including applicants who withdrew their applications or whose applications were *denied* and household members who *never even applied* for benefits for themselves. Given that these individuals never received benefits, this sensitive data is not necessary to USDA's purported goal of identifying ineligible *recipients* who are receiving benefits and therefore contributing to purportedly widespread "fraud, waste, and abuse." The fact that state agencies provide similar PII for a small sample set of households during formal quality control audits offers no precedent for USDA's current efforts to amass data on millions of Americans, particularly given the agency's refusal to safeguard this sensitive information from misuse.[3] Section 2020(a)(3) requires that the protocol be "agreed to by the State agency," and USDA cannot unilaterally reject State agencies' efforts to ensure the protocol

---

[3] Further, QC audits require review of income verification documents and other materials that are necessary for effective auditing but excluded from the SNAP Information Database.

3

satisfies reasonable and legally required data protection requirements—including when the data requested by USDA is not aligned with the stated purpose for the request.

Of course, the Vice President has already confirmed why the Administration wants street addresses, including for non-recipients who never received a dollar of benefits: to fuel the Administration's mass deportations. Associated Press, *JD Vance delivers remarks in Minneapolis*, 7:20-8:10 (Jan. 22, 2026), https://www.youtube.com/live/xHOWRMk-MFU?t=439s (calling on State officials to share the "last address" of an undocumented individual "according to a SNAP application" to give immigration authorities "insight to where this person is today"). And apparently for this reason, USDA has rejected Plaintiffs' modest revisions, which would have permitted USDA to perform any legitimate program integrity functions while also safeguarding applicant data as required by 7 U.S.C. § 2020(e)(8).

To be clear, Plaintiffs would welcome the opportunity to resume the parties' discussions to reach an agreed-upon protocol as required by 7 U.S.C. § 2020(a)(3)(B)(i). But Plaintiffs cannot agree to any proposed protocol that would permit USDA to amass troves of Plaintiffs' data and allow it to be used for immigration enforcement and other unauthorized purposes unrelated to the administration of SNAP or other federal benefits programs.[4]

Dated: March 25, 2026

Rob Bonta
Attorney General of California

*/s/ Liam E. O'Connor*
Liam E. O'Connor

Paul Stein
Robin Goldfaden
Supervising Deputy Attorneys General
Andrew Z. Edelstein
Anna Rich
Jane Reilley
Sebastian Brady
William Bellamy
Maria F. Buxton
Liam E. O'Connor
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3915
Liam.OConnor@doj.ca.gov
*Attorneys for Plaintiff State of California*

---

[4] As USDA's counsel confirmed during the March 18 meet and confer with Plaintiffs' counsel, the Court's February 26, 2026 preliminary injunction order prohibits USDA from enforcing its renewed data demands. *See* ECF No. 134. If USDA nevertheless seeks to disallow Plaintiffs' funding based on purported noncompliance with its renewed data demands, Plaintiffs will immediately seek an order enforcing the injunction.

4

Letitia James
Attorney General of New York

*/s/ Mark Ladov*
Mark Ladov
Special Counsel
Julie Dona
Special Counsel
28 Liberty St.
New York, NY 10005
(212) 416-8240
mark.ladov@ag.ny.gov
*Attorneys for Plaintiff State of New York*

Kwame Raoul
Attorney General of Illinois

*/s/ Sherief Gaber*
Harpreet K. Khera
Bureau Chief, Special Litigation
Sherief Gaber
Assistant Attorney General
115 S. LaSalle St., 35th Flr.
Chicago, Illinois 60603
(773) 590-7127
sherief.gaber@ilag.gov
*Attorneys for Plaintiff State of Illinois*

Kristin Mayes
Attorney General of Arizona

*/s/ Luci D. Davis*
Luci D. Davis (AZ No. 035347)
Hayleigh S. Crawford (AZ No. 032326)
2005 N. Central Ave. Phoenix, AZ 85004
(602) 542-3333
Luci.Davis@azag.gov
Hayleigh.Crawford@azag.gov
ACL@azag.gov
*Attorneys for Plaintiff State of Arizona*

Philip J. Weiser
Attorney General of Colorado

*/s/ David Moskowitz*
David Moskowitz
Deputy Solicitor General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6000
david.moskowitz@coag.gov
*Attorneys for Plaintiff State of Colorado*

William Tong
Attorney General of Connecticut

*/s/ Janelle R. Medeiros*
Janelle R. Medeiros
Special Counsel for Civil Rights
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Janelle.Medeiros@ct.gov
*Attorneys for Plaintiff State of Connecticut*

Brian L. Schwalb
Attorney General for the District of Columbia

*/s/ Nicole S. Hill*
Nicole S. Hill
Assistant Attorney General
Office of the Attorney General for the District
of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov
*Attorneys for Plaintiff District of Columbia*

Office of The Governor *ex rel*. Andy Beshear,
in his official capacity as Governor of the
Commonwealth of Kentucky

*/s/ S. Travis Mayo*
S. Travis Mayo
General Counsel
Taylor Payne
Chief Deputy General Counsel
Laura C. Tipton
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov
*Attorneys for Plaintiff Kentucky Governors'
Office*

Kathleen Jennings
Attorney General of Delaware

*/s/ Vanessa L. Kassab*
Ian R. Liston
Director of Impact Litigation
Vanessa L. Kassab
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

Anne E. Lopez
Attorney General of Hawaiʻi

*/s/ Kalikoʻonālani D. Fernandes*
David D. Day
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorneys for Plaintiff State of Hawaiʻi*

Aaron M. Frey
Attorney General of Maine

*/s/ Brendan Kreckel*
Brendan Kreckel
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 0433-0006
Tel.:  207-626-8800
Fax:  207-287-3145
brendan.kreckel@maine.gov
*Attorneys for Plaintiff State of Maine*

6

Anthony G. Brown
Attorney General of Maryland

/s/ James C. Luh
James C. Luh
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us
Attorneys for Plaintiff State of Maryland

Andrea Joy Campbell
Attorney General of Massachusetts

/s/ Katherine Dirks
Katherine Dirks
Chief State Trial Counsel
Cassandra Thomson
Assistant Attorney General
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
cassandra.thomson@mass.gov
Attorneys for Plaintiff Commonwealth of Massachusetts

Dana Nessel
Attorney General of Michigan

/s/ Neil Giovanatti
Neil Giovanatti
Bryan Beach
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov
beachb@michigan.gov
Attorneys for Plaintiff State of Michigan

Keith Ellison
Attorney General of Minnesota

/s/ Joseph R. Richie
Joseph R. Richie
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us
Attorneys for Plaintiff State of Minnesota

Jennifer Davenport
Attorney General of New Jersey

/s/ Kashif T. Chand
Kashif T. Chand (NJ Bar No. 016752008)
Assistant Attorney General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
kashif.chand@law.njoag.gov
Attorneys for Plaintiff State of New Jersey

Raúl Torrez
Attorney General of the State of New Mexico

/s/ Steven Prefrement
Steven Perfrement
Senior Litigation Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
SPerfrement@nmdoj.gov
505-601-7727
Attorneys for the State of New Mexico

7

Dan Rayfield
Attorney General of Oregon

*/s/ Scott P. Kennedy*
Scott P. Kennedy
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 453-9050
Fax (971) 673-5000
Scott.Kennedy@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*

Josh Shapiro, in his official capacity as
Governor of the Commonwealth of
Pennsylvania

*/s/ Jacob B. Boyer*
Jennifer Selber
General Counsel
Jacob B. Boyer
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov
*Counsel for Governor Josh Shapiro*

Peter F. Neronha
Attorney General of Rhode Island

/s/ *Madeline R. Becker*
Madeline R. Becker (RI Bar No. 10034)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2151
mbecker@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

Nicholas W. Brown
Attorney General of Washington

*/s/ Jennifer K. Chung*
Jennifer K. Chung, WSBA #51583
William Mcginty, WSBA #41868
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
jennifer.chung@atg.wa.gov
william.mcginty@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

Joshua L. Kaul
Attorney General of Wisconsin

*/s/ Karla Z. Keckhaver*
Karla Z. Keckhaver
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-6365
karla.keckhaver@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*

8

# EXHIBIT N

**USDA**

**U.S. DEPARTMENT OF AGRICULTURE**

March 27, 2026

Governor Gavin Newsom
1021 O Street, Suite 9000
Sacramento, California 95814

Dear Governor Newsom,

Enclosed please find a revised copy of the Fourth Protocol originally transmitted to your State on March 10, 2026.  Counsel for the 21 States and the District of Columbia requested that we clarify a section of the protocol.  This protocol adheres to the text of the Food and Nutrition Act, including 7 U.S.C. § 2020(e)(8)(A), and we have clarified what that section does not authorize in new section 1.4.(iii).

Sincerely,

Chief of Staff
Food, Nutrition, and Consumer Services
U.S. Department of Agriculture

Enclosure

cc:    Maria Buxton, Deputy Attorney General

---

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an equal opportunity provider, employer, and lender.



**U.S. DEPARTMENT OF AGRICULTURE**

**Supplemental Nutrition Assistance Program (SNAP) Information Database
Fraud, Waste and Abuse Detection Protocol**

## 1. OVERVIEW

1.1. U.S. Department of Agriculture (USDA) and the Food and Nutrition Service (FNS) will use the Supplemental Nutrition Assistance Program (SNAP) recipient data to ensure the integrity of Government programs, including by verifying SNAP recipient eligibility against federally maintained databases, identifying duplicate enrollments for elimination, and performing additional eligibility and program integrity checks specified herein.

1.2. This protocol establishes a framework for State SNAP agencies to share data with the USDA/FNS for detection of fraud, waste, and abuse and program integrity purposes.

1.3. USDA represents that tThe protocol balances federal data access requirements under Executive Order 14243 and the Food and Nutrition Act of 2008 (FNA, also referred to here as the "SNAP Act") with privacy protections, minimizes unnecessary data collection, and incorporates security standards while maintaining public trust and compliance with applicable law.

1.4. Notwithstanding any other provision of this protocol, or any System of Record Notice, USDA and FNS: (a) shall not use or disclose data received under this protocol except as specified in 7 U.S.C. §§ 2020(a)(3) and (e)(8) and 7 C.F.R. § 272.1(c)(1) and (2), or any other applicable law. For the avoidance of doubt, this means that USDA and FNS (and any person or entity to whom the data is disclosed) shall not: that includes the specific requirements in 7 U.S.C § 2020(e)(8)(A), which provides that State Plans of Operation must include safeguards protecting information obtained from applicant households that shall permit

   (i)   use the data, except for administration or enforcement of the provisions of Chapter 51 of Title 7 of the U.S. Code, regulations issued pursuant to that chapter, Federal assistance programs, or federally-assisted State programs; and

   (ii)   disclose the data, except to the disclosure of such information to persons directly connected with the administration or enforcement of the provisions of this chapter, regulations issued pursuant to this chapter, Federal assistance programs, or federally-assisted State programs. and only so that such persons can subsequently use the data for such administration and enforcement; and

   (iii)   use or disclose data for purposes of investigating potential violations of civil immigration laws or enforcing civil immigration laws, including but not limited to in response to a request by the Department of Homeland Security or subagency thereof. Section 2020(e)(8)(A) does not provide USDA with authority to respond to a request from DHS for data for purpose(s) of civil immigration enforcement.

1.5. USDA acknowledges that the data shared under this Protocol is subject to federal and state existing confidentiality, privacy, and information security laws and regulations. Unauthorized access to, use of, or disclosure of such data, or failure to protect such data in accordance with applicable law, may subject the responsible party and, where applicable, individual users to civil or criminal penalties under federal or state law. Notwithstanding the foregoing, this provision does not create any new rights or liabilities or waive any applicable immunities.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

**2. FRAMEWORK AND AUTHORITY**

2.1. <u>Authority</u>

2.1.1. Executive Order 14243 (March 20, 2025): "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos" directs agency heads to "take all necessary steps, to the maximum extent consistent with law," to ensure federal government has "unfettered access to comprehensive data" from state programs receiving federal funding, including data maintained in third-party databases.

2.1.2. 7 U.S.C. § 2020(a)(3) ~~that~~ requires that each State agency shall keep records as may be necessary to determine whether the program is being conducted in compliance with this chapter, and all records shall be made available for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary.

2.1.3. 7 CFR 272 stipulates use or disclosure of information obtained from SNAP applicant or recipient households shall be restricted to persons directly connected with the administration or enforcement of the provisions of the FNA or regulations, other Federal assistance programs, federally-assisted State programs providing assistance on a means-tested basis to low-income individuals, or general assistance programs which are subject to joint processing requirements.

2.2. <u>Prohibited Purposes</u>



Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

2.2.1. USDA shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals (*i.e.*, the collection of data elements spelled out in the Privacy Impact Assessment).

## 3. DATA CATEGORIES

3.1. <u>Data Definition</u>

3.1.1. All data obtained by States or their vendors ~~or their vendors~~ in administering SNAP or that otherwise may be necessary to determine whether the program is being conducted in accordance with the FNA or regulations issued under the FNA, in accordance with Attachment A of this protocol. ~~and any other state specific terms negotiated and mutually agreed to by each state and USDA based on each state's data collection and storage realities.~~

3.1.2. Data derived from third-party sources (employment verification databases, financial institution records, property records) that States use for verification but are not part of applicant-reported information are excluded.

~~3.2 Permitted Data:~~

- ~~Information that the applicant household reported on application/certification forms including but not limited to personally identifiable information in the form of names, dates of birth, personal addresses used, and Social Security numbers;~~
- ~~Direct verifications that the State conducted to confirm applicant-reported information~~
- ~~Records that the State maintains of SNAP applications, approvals, denials, certifications, and benefits issued~~
- ~~Household composition and income exactly as reported by the applicant (not third-party verified amounts)~~
- ~~retailer and transactional data necessary for fraud detection~~

## 4. LIMITED ACCESS

4.1. The SNAP Information Database and all data collected therein is accessed and used ONLY by employees of the USDA who are:

4.1.1. Designated by the Chief of Staff at Food, Nutrition, Consumer Services (FNCS)

4.1.2. Trained in SNAP Act, Privacy Act, and this protocol

4.1.3. In compliance with all information security annual recertifications

4.2. Except to the extent permitted by law, no access to, or disclosures of data from, the SNAP Information Database may be provided to:

4.2.1. Other USDA agencies (APHIS, ERS, NASS, etc.)

4.2.2. Divisions within FNS without an explicit need-to-know

4.2.3. Any other federal agency

4.2.4. Any FOIA, administrative subpoena or like external requester

4.3. Notwithstanding section 4.1, this protocol does not limit access to the SNAP Information Database and all data contained therein by USDA's Office of the Inspector General as authorized by the Inspector General's Act, 5 USC 401-424.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

~~4.3  For the reasons  explained in Section 1.4, above, no access to, or disclosures of data from, the SNAP Information Database may be provided to the Department of Homeland Security or any subagency thereof for purposes of investigating potential violations of civil immigration laws or enforcing civil immigration laws.~~

~~4.4.  USDA shall  provide each state agency, on an ongoing basis and upon request, with a list of all parties who have requested access to this data, and a list of all users who have been granted access to the provided data~~.

## 5. SYSTEM OF RECORDS NOTICE (SORN) AND PRIVACY IMPACT ASSESSMENT (PIA)

5.1. <u>SORN</u>

The applicable SORN for this protocol is USDA/FNS-15 "National Supplemental Nutrition Assistance Program (SNAP) Information Database," 90 FR 26521.

The SORN location can be found here:
https://www.federalregister.gov/documents/2025/06/23/202511463/privacy-act-of-1974-system-of-records

For the avoidance of doubt, this protocol controls notwithstanding any provision of the applicable SORN <mark>that</mark> ~~conflicts with 7 U.S.C. §§ 2020(a)(3) and (e)(8)~~.

5.2. <u>Privacy Impact Assessment (PIA)</u>

The applicable Privacy Impact Assessment for the SNAP Information Database <mark>is Version 1.1 created 02/12/2025, which</mark> can be found here:
https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf

<mark>For the avoidance of doubt, this protocol controls notwithstanding any provision of the PIA.</mark>

## 6. FRAUD, WASTE, AND ABUSE DETECTION FRAMEWORK

6.1. <u>Core Fraud Detection Functions</u>

6.1.1. USDA will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program that focuses on:

- identity verification
- income and eligibility verification
- immigration status
- verification against disqualified recipients

6.2. <u>Enhanced Fraud, Waste, and Abuse Detection Techniques</u>

6.2.1. In addition to the core fraud detection functions, USDA will employ additional techniques including, but not limited to:

- Intrastate and interstate duplicate detection
- Deceased individuals' detection
- Synthetic identity patterns (new SSNs with inconsistent biographical data)
- Geographic anomalies

6.2.2. New data mining techniques will be limited to identifying <mark>data anomalies</mark> <mark>~~fraud~~</mark> with a direct nexus to SNAP.

## 7. DATA OUTPUT

7.1. <u>States</u>

7.1.1. USDA will provide flagged data back to the State agency for review, <mark>including the specific data elements flagged</mark> ~~and source of the data that generated the flag~~. States are encouraged to provide feedback to

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

USDA to refine detection logic and reduce false positives. Collaborative processes will be established to ensure accurate identification of fraud and appropriate corrective actions. ~~including processes to allow individuals to contest inaccurate information and require updates to the originating system of record where false positives are identified.~~ No presumptive results will ~~shall~~ be made public ~~prior to verification by~~ ~~State agency~~ by FNS until 30 days from the initial date that USDA provided flagged data; during that 30 days States can provide additional information related to ~~of~~ the accuracy of the detection flags.

7.2. Law Enforcement

7.2.1. The USDA may refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP. ~~in accordance with 7 U.S.C § 2020(e)(8)(A) and USDA's regulation implementing that provision, 7 C.F.R. § 272.1(c)(1).~~

7.3. USDA SNAP Retailer Operations Center (ROC)

7.3.1. The USDA may refer fraud detection leads to the ROC where, during fraud detection analysis, a compromised EBT card or terminal ID may have been identified in accordance with 7 U.S.C § 2020(e)(8)(A) and USDA's regulation implementing that provision, 7 C.F.R. § 272.1(c)(1).

## 8. DATA MINIMIZATION AND RETENTION

8.1. Retention Period

8.1.1. Until a record schedule is approved, data will be retained only as long as necessary for purposes set forth in the SORN and this protocol, and in no case longer than 3 years per the SORN.

8.2. Automatic Deletion

8.2.1. Data shall be retained for no longer than three years, consistent with the USDA/FNS-15 SORN. An automated process will be implemented to delete data upon expiration of the retention period, except for records related to ongoing audits, investigations, or litigation.

8.3. Ongoing Cases

8.3.1. Data pertaining to ongoing audit, investigation, or potential litigation retained only as long as necessary, then deleted.

## 9. DATA SECURITY AND TECHNICAL REQUIREMENTS

9.1. Infrastructure and Location

9.1.1. Primary storage location: AWS GovCloud (US) region

9.1.2. Backup/disaster recovery: Secondary AWS region

9.1.3. No storage, processing, or backup outside GovCloud or federal secure environments

9.1.4. All infrastructure must meet or exceed FedRAMP High baseline standards

9.1.5. AWS Personnel Access: Data is encrypted such that AWS personnel cannot access unencrypted data. Encryption keys are managed exclusively by federal USDA personnel and are not accessible to AWS or third-party vendors.

9.2. Access Controls

9.2.1. Multi-factor authentication required for all access

9.2.2. Role-based access control (RBAC) with principle of least privilege

9.2.3. Access is limited to specifically designated USDA employees engaged to assist in determining whether the program is being conducted in accordance with the FNA.

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender


**U.S. DEPARTMENT OF AGRICULTURE**

9.2.4. Access logging and audit trail maintenance (minimum period equal to data retention period, see Section V.E).

9.2.5. Quarterly access reviews by USDA

9.2.6. Immediate revocation of access upon employee termination or assignment change

9.3. Encryption Standards

9.3.1. Encrypted data at rest and in transit

9.3.2. Encryption keys managed solely by USDA federal personnel

9.3.3. No encryption keys held by commercial vendors

9.4. Data Segregation and Compartmentalization

9.4.1. SNAP data isolated in separate, dedicated AWS GovCloud environment

9.4.2. SNAP data not directly integrated with other USDA systems

9.4.3. Limiting access to individuals with specialized training and oversight

9.5. Data Transfer

9.5.1. All data transfers shall utilize secure tools that meet or exceed FedRAMP High baseline standards.

## 10. INCIDENT RESPONSE AND BREACH NOTIFICATION

10.1. Incident Response

10.1.1.Incident response procedures are aligned with FNS Handbook Chapter 10 security incident and breach notification requirements that USDA already follows internally. This protocol extends equivalent procedures to State notification.

10.2. Incident Definition

10.2.2. Unauthorized access, use, or disclosure of data

10.2.3. Security vulnerability or control failure affecting data

10.2.4. Data loss, corruption, or destruction

10.2.5. Encryption failure or key compromise

10.2.6. Failed access control or authentication mechanism

10.2.7. Any event that may reasonably be expected to compromise data security or confidentiality. ~~including any request for use of, access to, or disclosure of data outside the permitted circumstances set forth in Section 1.4~~

10.3. Incident Notification Timeline

10.3.1. Initial Notification within 12 hours

10.3.1.1.    Within 12 hours of discovery (by phone + email to State security/privacy contact and Director).

10.3.2. Preliminary Report within 24 hours

10.3.2.1.    Description of incident and timeline

10.3.2.2.    Data elements affected (specific fields and estimated number of records)

10.3.2.3.    Estimated number of individuals affected

10.3.2.4.    Preliminary assessment of whether unencrypted sensitive data may have been exposed

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender



**U.S. DEPARTMENT OF AGRICULTURE**

10.3.2.5.    Preliminary remedial actions taken

10.3.2.6.    Root cause analysis plan and timeline

10.3.3 Progress Reports and Incident Close-out

~~10.3.3.1    USDA shall provide supplemental progress updates to state agencies as material information becomes available, but in no event less frequently than every 14 days, including refinements to scope, impact, and remediation measures, until the Incident is resolved. Upon resolution, USDA shall provide a close-out report of the Incident.~~

10.3.3.1    USDA shall provide notice to affected individuals in compliance with all applicable federal breach response and notification requirements. ~~including, but not limited to FISMA and OMB Memorandum M-17-12.~~ Nothing in this protocol shall be construed to shift responsibility for individual breach notification to the state agency.

## APPENDIX A - SOURCES

- 7 U.S.C. §§ 2020(a)(3) and (e)(8).
- Privacy Impact Assessment: https://www.usda.gov/sites/default/files/documents/fns-snap-informationdatabase-pia.pdf
- SORN: https://www.federalregister.gov/documents/2025/06/23/2025-11463/privacy-act-of-1974-systemof-records
- SNAP Act: https://www.law.cornell.edu/uscode/text/7/2020
- SNAP QC Handbook
- Executive Order 14243 (March 20, 2025) "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos: https://www.govinfo.gov/content/pkg/DCPD-202500382/pdf/DCPD-202500382.pdf

Office of the Under Secretary for Food, Nutrition, and Consumer Services
1400 Independence Avenue, SW, Washington, DC 20250-9600
USDA is an Equal Opportunity Provider, Employer, and Lender

# EXHIBIT O

*Via E-mail*
Elizabeth J. Shapiro
Tyler Becker
Benjamin S. Kurland
ben.kurland@usdoj.gov
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005

*Counsel for U.S. Department of Agriculture and Secretary of Agriculture Brooke L. Rollins*

   RE:  Response to USDA's March 27, 2026 Amendment to USDA's March 10 Proposed
        Protocol

Dear Counsel:

       We write on behalf of Plaintiffs in *State of California v. USDA*, No. 3:25-cv-06310 (N.D.
Cal.), in response to USDA's March 27 Amendment to USDA's March 10 Proposed Protocol.
USDA's amendment does not address the concerns raised in Plaintiffs' March 25 letter.

       The amendment adds language to Section 1.4 stating that "Section 2020(e)(8)(A) does
not provide USDA with authority to respond to a request from DHS for data for purpose(s) of
civil immigration enforcement."  While Plaintiffs agree that Section 2020(e)(8)(A) does not
provide USDA with "authority" to respond to such a request, USDA's amended Section 1.4 still
provides that USDA may use or disclose the data "as specified in . . . any other applicable law."
Thus, when it comes to using and sharing the data for immigration enforcement purposes, USDA
is still not committing to abide by Section 2020(e)(8)(A); instead, USDA is maintaining the
purported right to share the data with DHS and its subagencies for immigration enforcement
purposes pursuant to some "other . . . law."  In short, USDA still refuses to provide a
straightforward response to the yes-or-no question Plaintiffs have repeatedly asked: will USDA
commit to deny an interagency request for the data from DHS or any DHS subagency (such as
the request for Medicaid data that DHS/ICE have made of CMS, citing 8 U.S.C. § 1360 and 6
U.S.C. § 122)?

       For the reasons explained in Plaintiffs' March 25 letter, USDA must commit that USDA
(and FNS and any third party to whom USDA/FNS discloses Plaintiffs' SNAP data) will not use
or disclose the data for purposes of investigating violations of immigration laws or enforcing
immigration laws.  The amended proposed protocol does not do so, and USDA still has not
provided any coherent rationale why it cannot agree to such a provision in the protocol.

       USDA's amendment also does not address the related concerns detailed in Plaintiffs'
March 25 letter, including the collection of data elements that appear useful for immigration

1

enforcement but not for the purported program integrity functions of the SNAP Information Database.  Collecting the minimum PII necessary to perform an intended task is a basic data privacy principle; if USDA does not need specific data elements to conduct the program integrity functions of the SNAP Information Database, it should not be collecting them.

As stated in our March 25 letter, Plaintiffs cannot agree to any proposed protocol that would permit USDA to amass troves of Plaintiffs' data and allow it to be used for immigration enforcement and other unauthorized purposes unrelated to the administration of SNAP or other federal benefits programs.  Therefore, while Plaintiffs welcome continued discussions of a proposed protocol, including a response that addresses the concerns raised in our March 25 letter, Plaintiffs do not agree to this revised protocol.

Dated: March 30, 2026

Rob Bonta
Attorney General of California

*/s/ Liam E. O'Connor*
Liam E. O'Connor

Paul Stein
Robin Goldfaden
Supervising Deputy Attorneys General
Andrew Z. Edelstein
Anna Rich
Jane Reilley
Sebastian Brady
William Bellamy
Maria F. Buxton
Liam E. O'Connor
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3915
Liam.OConnor@doj.ca.gov
*Attorneys for Plaintiff State of California*

Letitia James
Attorney General of New York

*/s/ Mark Ladov*
Mark Ladov
Special Counsel
Julie Dona
Special Counsel
28 Liberty St.
New York, NY 10005
(212) 416-8240
mark.ladov@ag.ny.gov
*Attorneys for Plaintiff State of New York*

Kwame Raoul
Attorney General of Illinois

*/s/ Sherief Gaber*
Harpreet K. Khera
Bureau Chief, Special Litigation
Sherief Gaber
Assistant Attorney General
115 S. LaSalle St., 35th Flr.
Chicago, Illinois 60603
(773) 590-7127
sherief.gaber@ilag.gov
*Attorneys for Plaintiff State of Illinois*

2

Kristin Mayes
Attorney General of Arizona

/s/ Luci D. Davis
Luci D. Davis (AZ No. 035347)
Hayleigh S. Crawford (AZ No. 032326)
2005 N. Central Ave. Phoenix, AZ 85004
(602) 542-3333
Luci.Davis@azag.gov
Hayleigh.Crawford@azag.gov
ACL@azag.gov
Attorneys for Plaintiff State of Arizona


William Tong
Attorney General of Connecticut

/s/ Janelle R. Medeiros
Janelle R. Medeiros
Special Counsel for Civil Rights
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Janelle.Medeiros@ct.gov
Attorneys for Plaintiff State of Connecticut


Brian L. Schwalb
Attorney General for the District of Columbia

/s/ Nicole S. Hill
Nicole S. Hill
Assistant Attorney General
Office of the Attorney General for the District
of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov
Attorneys for Plaintiff District of Columbia

Philip J. Weiser
Attorney General of Colorado

/s/ David Moskowitz
David Moskowitz
Deputy Solicitor General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6000
david.moskowitz@coag.gov
Attorneys for Plaintiff State of Colorado


Kathleen Jennings
Attorney General of Delaware

/s/ Vanessa L. Kassab
Ian R. Liston
Director of Impact Litigation
Vanessa L. Kassab
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
Attorneys for Plaintiff State of Delaware


Anne E. Lopez
Attorney General of Hawaiʻi

/s/ Kalikoʻonālani D. Fernandes
David D. Day
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
Attorneys for Plaintiff State of Hawaiʻi

3

Office of The Governor *ex rel*. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky

*/s/ S. Travis Mayo*
S. Travis Mayo
General Counsel
Taylor Payne
Chief Deputy General Counsel
Laura C. Tipton
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov
*Attorneys for Plaintiff Kentucky Governors' Office*

Aaron M. Frey
Attorney General of Maine

*/s/ Brendan Kreckel*
Brendan Kreckel
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 0433-0006
Tel.:  207-626-8800
Fax:  207-287-3145
brendan.kreckel@maine.gov
*Attorneys for Plaintiff State of Maine*

Anthony G. Brown
Attorney General of Maryland

*/s/ James C. Luh*
James C. Luh
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

Andrea Joy Campbell
Attorney General of Massachusetts

*/s/ Katherine Dirks*
Katherine Dirks
Chief State Trial Counsel
Cassandra Thomson
Assistant Attorney General
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
cassandra.thomson@mass.gov
*Attorneys for Plaintiff Commonwealth of Massachusetts*

Dana Nessel
Attorney General of Michigan

*/s/ Neil Giovanatti*
Neil Giovanatti
Bryan Beach
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov
beachb@michigan.gov
*Attorneys for Plaintiff State of Michigan*

Keith Ellison
Attorney General of Minnesota

*/s/ Joseph R. Richie*
Joseph R. Richie
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

Jennifer Davenport
Attorney General of New Jersey

/s/ *Kashif T. Chand*
Kashif T. Chand (NJ Bar No. 016752008)
Assistant Attorney General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
kashif.chand@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*


Dan Rayfield
Attorney General of Oregon

/s/ *Scott P. Kennedy*
Scott P. Kennedy
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 453-9050
Fax (971) 673-5000
Scott.Kennedy@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*


Peter F. Neronha
Attorney General of Rhode Island

/s/ *Madeline R. Becker*
Madeline R. Becker (RI Bar No. 10034)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2151
mbecker@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*


Raúl Torrez
Attorney General of the State of New Mexico

/s/ *Steven Prefrement*
Steven Perfrement
Senior Litigation Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
SPerfrement@nmdoj.gov
505-601-7727
*Attorneys for the State of New Mexico*


Josh Shapiro, in his official capacity as
Governor of the Commonwealth of
Pennsylvania

/s/ *Jacob B. Boyer*
Jennifer Selber
General Counsel
Jacob B. Boyer
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov
*Counsel for Governor Josh Shapiro*


Nicholas W. Brown
Attorney General of Washington

/s/ *Jennifer K. Chung*
Jennifer K. Chung, WSBA #51583
William Mcginty, WSBA #41868
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
jennifer.chung@atg.wa.gov
william.mcginty@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

5

Joshua L. Kaul
Attorney General of Wisconsin

*/s/ Karla Z. Keckhaver*
Karla Z. Keckhaver
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-6365
karla.keckhaver@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*

6

# CERTIFICATE OF SERVICE

Case Name:  ***California, et al. v. U.S.***          Case No.   **3:25-cv-06310-MMC**
                    ***Department of Agriculture***

I hereby certify that on <u>April 3, 2026,</u> I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

- **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF with Exhibits A- O**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>April 3, 2026</u>, at San Francisco, California.


<u>M. Mendiola</u>                                    _____
Declarant                                                     Signature

SA2025302238