# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
### FRANKFORT DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| v. | **Case No. 3:26-cv-51-CHB-EBA** |
| **KENTUCKY CABINET FOR HEALTH AND FAMILY SERVICES**; and **STEVEN J. STACK** in his Official Capacity as Secretary for the Kentucky Cabinet for Health and Family Services, | **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION** |
| **Defendants.** | |

PLEASE TAKE NOTICE that Plaintiff United States of America, through counsel, pursuant to Fed. R. Civ. P. 65(a), hereby moves the Court for a preliminary injunction against the Kentucky Cabinet for Health and Family Services and its Secretary, Steven J. Stack ("Defendants") to comply with a lawful demand for Supplemental Nutrition Assistance Program records made by the U.S. Department of Agriculture in its Third Records Request dated May 15, 2026.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities filed contemporaneously herewith, all files, records, and pleadings in this action, and any further evidence or argument that the Court may properly receive at or before the hearing.

Dated: July 10, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

TYLER BECKER
Counsel to the Assistant Attorney General
Civil Division

LISA K. HSIAO
Acting Director
Civil Division, Enforcement & Affirmative
Litigation Branch

*s/Colin W. Trundle*
COLIN W. TRUNDLE
CADESBY B. COOPER
DANIEL J. PETROKAS
KYU YUN KIM
Trial Attorneys
United States Department of Justice
Civil Division, Enforcement & Affirmative
Litigation Branch
450 5th Street, N.W.
Washington, DC 20001
Tel: (202) 742-7112
colin.trundle@usdoj.gov

*Counsel for Plaintiff United States of America*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
### FRANKFORT DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| v. | **Case No. 3:26-cv-51-CHB-EBA** |
| **KENTUCKY CABINET FOR HEALTH AND FAMILY SERVICES**; and **STEVEN J. STACK** in his Official Capacity as Secretary for the Kentucky Cabinet for Health and Family Services, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| **Defendants.** | |

## INTRODUCTION

This case concerns the refusal of the Kentucky Cabinet for Health and Family Services and its Secretary, Steven J. Stack ("Defendants"), to comply with a lawful records request. The Food and Nutrition Act of 2008 ("FNA") requires State Agencies administering the Supplemental Nutrition Assistance Program ("SNAP") to provide the U.S. Department of Agriculture ("USDA") with records necessary to determine whether SNAP "is being conducted in compliance with" the FNA. 7 U.S.C. § 2020(a)(3). Despite repeated requests, negotiations, revised protocols, and guidance from the U.S. District Court for the Northern District of California affirming USDA's right to obtain the records, Defendants refuse to produce them. Defendants' refusal impedes USDA from carrying out the oversight responsibilities Congress assigned to it.

Congress made USDA's access to these records mandatory to ensure effective oversight. SNAP is the nation's largest domestic food-assistance program, serving approximately 37 million people each month and costing close to $100 billion in federal funds annually. The federal government funds all SNAP benefits and reimburses State Agencies for half of their administrative

costs. In exchange, State Agencies administer the program in accordance with federal law and submit to federal oversight to safeguard taxpayer funds and program integrity.

USDA is charged with oversight. It cannot detect waste, fraud, and abuse without reviewing the records Congress requires State Agencies to provide. Nor can it evaluate compliance with federal law if State Agencies unilaterally withhold the information necessary to conduct audits and inspections. Therefore, Defendants' refusal does more than violate their statutory obligation; it prevents USDA from performing oversight Congress deemed essential to administering a program costing taxpayers nearly $100 billion annually. The United States of America ("Plaintiff") requests that this Court enter a preliminary injunction compelling Defendants to produce records Congress mandated "shall . . . be made available for inspection and audit." 7 U.S.C. § 2020(a)(3).

## STATUTORY FRAMEWORK

The FNA assigns separate administrative duties to USDA and the states. *E.g.*, 7 U.S.C. §§ 2020, 2025. USDA is primarily responsible for implementation, program integrity, and state oversight while states are primarily responsible for day-to-day operations. *Id.* §§ 2012(s), 2014(b), 2020, 2022–25; 7 C.F.R. § 271.4. States certify eligibility, calculate benefit amounts, issue benefits through Electronic Benefit Transfer ("EBT") cards, and maintain records sufficient for USDA oversight. 7 U.S.C. § 2020; 7 C.F.R. § 271.4. States may delegate these functions to designated State Agencies, which may contract with third-party processors to facilitate EBT payments to eligible households. *See* 7 U.S.C. §§ 2012(s), 2020(e), 2016; 7 C.F.R. §§ 271.4, 272.2, 273.

The FNA makes USDA the primary administrator and overseer of SNAP, granting it broad authority to implement, administer, and oversee the program. 7 U.S.C. § 2013(a)(1), (c). The statute requires USDA to carry out extensive oversight responsibilities and authorizes USDA to

2

promulgate implementing regulations. *See, e.g.*, *id.* §§ 2013(a)–(c), 2016(e), 2016a(b), 2020(a), 2020(d), 2020(e)(6)(A), 2020(h), 2020(g), 2022(b)(5), 2022(b)(5)(B)(iii), 2025(c). These provisions make clear USDA must oversee SNAP's program integrity, including supervising the State Agencies responsible for administering benefits.

Recognizing that access to relevant program information is essential to USDA's oversight responsibilities, Congress expressly granted USDA authority to make broad requests for records from State Agencies. This authority is codified in Section 2020(a)(3), which provides:

> **(**a) State Responsibility
> (3) Records
> (A) In general
> Each State agency shall keep such records as may be necessary to determine whether the program is being conducted in compliance with this chapter (including regulations issued under this chapter).
> (B) Inspection and audit
> All records, and the entire information systems in which records are contained, that are covered in subparagraph (A) shall—
> > (i) be made available for inspection and audit by the Secretary, subject to data and security protocols agreed to by the State agency and Secretary; . . . (iii) be preserved for such period of not less than 3 years as may be specified in regulations.

7 U.S.C. § 2020(a)(3).

Each state must administer SNAP according to a USDA-approved plan of operation that includes safeguards that generally "prohibit the use or disclosure of information obtained from applicant households" subject to certain carveouts. 7 U.S.C. § 2020(e)(8). One such carveout permits the disclosure of certain SNAP records to USDA so that USDA can properly administer and enforce the FNA's requirements, subject to certain use and redisclosure limitations. *Id.* Specifically, Section 2020(e)(8)(A) provides that a State Agency's plan of operation shall include:

> (8) safeguards which prohibit the use or disclosure of information obtained from applicant households, except that—
> (A) the safeguards shall permit—

3

> (i) the disclosure of such information to persons directly connected with the administration or enforcement of the provisions of this chapter, regulations issued pursuant to this chapter, Federal assistance programs, or federally-assisted State programs; and
> (ii) the subsequent use of the information by persons described in clause (i) only for such administration or enforcement[.]

7 U.S.C. § 2020(e)(8)(A).

Read together, Section 2020(a)(3) requires State Agencies to provide records to USDA for inspection and audit purposes, and Section 2020(e)(8)(A) ensures that State Agencies' plans of operation include a vehicle for them to comply with USDA's requests, so long as the requests are limited to information used to administer and enforce the FNA. *See id*. § 2020(a)(3), (e)(8)(A).

A State Agency violates the FNA when it relies on an unreasonable rejection of USDA's proposed data and security protocols as a basis for refusing to comply with a Section 2020(a)(3) records request. *See id.* § 2020(a)(3), 2020(g). If USDA determines the violation is "without good cause," the FNA requires USDA to "immediately inform such State agency of such failure" and "allow the State agency a specified period of time for the correction of such failure." *Id.* § 2020(g). If the State Agency does not correct the failure within the specified time, USDA "may" refer the matter to the Attorney General "with a request that injunctive relief be sought to require compliance *forthwith*" by the State Agency. *Id.* (emphasis added).

## FACTUAL BACKGROUND

**A.    USDA requested records from Defendants in accordance with federal law.**

On March 20, 2025, President Trump issued Executive Order 14,243 to combat waste, fraud, and abuse by eliminating information silos across the federal government. *See* Stopping Waste, Fraud, and Abuse by Eliminating Information Silos, Exec. Order No. 14,243, 90 Fed. Reg. 13,681 (Mar. 20, 2025) ("EO 14,243"). EO 14,243 directed agency heads, including the Secretary of Agriculture, to "take all necessary steps, to the maximum extent consistent with law," to ensure

4

Federal officials have access to unclassified information for identifying and eliminating waste, fraud, and abuse. EO 14,243 § 3(a). It also directed agencies to ensure they have access to comprehensive data from federally funded state programs, including SNAP, and, where appropriate, data "maintained in third-party databases." EO 14,243 § 3(c).

On May 6, 2025, USDA, pursuant to the FNA and EO 14,243, sent a letter ("First Records Request") to Defendants, the SNAP agency for each of the remaining fifty states, and the SNAP agency for the District of Columbia (collectively, "State Agencies") under 7 U.S.C. § 2020(a)(3) and 2020(e)(8)(A). Compl. Ex. A ¶¶ 5, 32–33; Ex. 1. The letter requested that Defendants produce SNAP records pertaining to each household's eligibility, members, and benefit allotments over the preceding five years. Compl. Ex. 1 at 3. The letter explained that its purpose was to "consolidate SNAP data" into a centralized USDA-managed database. Compl. Ex. 1 at 2.

On June 23, 2025, USDA published a System of Records Notice ("SORN") establishing the National Supplemental Nutrition Assistance Program (SNAP) Information Database (the "Database"). 90 FR 26521–22 (June 23, 2025). The SORN explained the Database is "owned, administered, and secured" by USDA's Food and Nutrition Service and is intended "to validate the accuracy of eligibility determinations and strengthen SNAP and government program integrity." *Id.* at 26,521. The SORN identified information that USDA intended to collect from State Agencies to reposit in the Database, including information from SNAP applicants and recipients, such as records necessary to evaluate eligibility, participation, benefit payments, and EBT transactions. *Id.* at 26,522. USDA later revised the SORN to clarify the Database's privacy and security safeguards, including that records remain subject to the Privacy Act, the Food and Nutrition Act, and Section 2020(e)(8)'s restrictions on use and redisclosure. 91 FR 35948–49 (June 15, 2026).

**B.**     **Responses to USDA's records request and other evidence reveal potential
widespread waste, fraud, and abuse.**

Twenty-nine State Agencies complied with USDA's May 2025 request and provided five
years of SNAP records covering household eligibility, benefit allotments, and EBT transactions.
Compl. Ex. A ¶ 40. Based on a preliminary analysis of those records, USDA estimated over one
million apparently ineligible recipients were certified for SNAP benefits in July 2025, based on
red flags, including deceased recipients, duplicate allotments, dummy Social Security numbers,
and previously disqualified recipients. Compl. Ex. A ¶¶ 43–44. USDA estimated potential annual
overpayments by assuming State Agencies would continue paying those benefits over a typical
twelve-month certification period. *Id.* Based on that calculation, USDA concluded that compliant
State Agencies may be issuing up to $3 billion in SNAP overpayments annually. *Id.*

USDA cannot complete its analysis of these payment errors and other systemic issues, until
it reviews the records requested from all State Agencies. *Id.* ¶ 42. For example, USDA cannot
determine the extent of potential duplicate benefit payments across State Agencies without
complete records from every jurisdiction. *Id.*

Moreover, Defendants' administration of SNAP is marked by persistently high payment
error rates. *Id.* ¶¶ 57–88. Defendants' payment error rate—the combined rate of overpayments and
underpayments— has exceeded the 6 percent tolerance threshold in five of the last seven reported
years, requiring participation in a USDA-supervised corrective action. *Id.* ¶ 57; *see* 7 U.S.C. §
2025(c)(1)(G); 7 C.F.R. § 275.16. Defendants' overpayment error rate increased from 5.05 percent
in fiscal year 2022 to 8.23 percent in fiscal year 2024 before declining to 4.02 percent in fiscal
year 2025. For perspective, Defendants issued more than $1.1 billion in federally funded SNAP
benefits in fiscal year 2024, and their overpayment rate resulted in approximately $90 million in
improper payments. *Id.* ¶ 58.

6

**C.     The U.S. District Court for the Northern District of California affirmed USDA's authority to request records.**

Twenty-two State Agencies, including Defendants, failed to provide records in response to USDA's First Records Request. *Id.* ¶ 40. On July 9, 23, and 25, 2025, USDA sent follow-up letters requesting records identified in the SORN. Compl. Ex. A ¶¶ 6–8; Exs. 2–4. The July 25th letter warned that failure to provide the requested data "may trigger noncompliance procedures codified [in] 7 U.S.C. § 2020(g)." Compl. Ex. A ¶ 8; Ex. 4 at 2.

On July 28, 2025, the Governor's Office of Kentucky and the attorneys general for the District of Columbia and twenty states ("Non-Compliant States")[1] filed suit against USDA, the Secretary of Agriculture, and USDA's Office of Inspector General in the Northern District of California (the "California Court"). *See* Compl., *California v. U.S. Dep't of Agric.*, No. 3:25-cv-06310-MMC (N.D. Cal. July 28, 2025), ECF No. 1. The Non-Compliant States alleged they withheld records based on their belief that USDA would share the records with federal immigration authorities. *See, e.g.*, ¶ 125. The Non-Compliant States' principal claim alleged that USDA's records requests violated the Administrative Procedure Act ("APA"). *See id.* ¶¶ 295–344. Among other relief, they sought declarations that USDA's records requests were unlawful and injunctions barring USDA from pursuing those requests or initiating noncompliance procedures. *Id.* at 77–78.

On October 15, 2025, the California Court narrowly granted the Non-Compliant States' motion for a preliminary injunction as to USDA's disallowance of administrative funds. *See* Prelim. Inj. Order, *California et al. v. U.S. Dep't of Agric.*, 3:25-cv-06310-MMC, (N.D. Cal.

---

[1]Pennsylvania is included among the Non-Compliant States because the Pennsylvania Governor's Office joined the lawsuit by filing an amended complaint in September 2025. *See* Amended Compl. for Declaratory and Injunctive Relief ¶¶ 25–27, *California v. U.S. Dep't of Agric.*, No. 3:25-cv-06310-MMC (N.D. Cal. Sept. 22, 2025), ECF No. 84.

Oct. 15, 2025), ECF No. 106 at 7 & n.9, 13–21. While rejecting most of the Non-Compliant States' arguments, the California Court observed that USDA's records request did not comply with Section 2020(a)(3) because USDA and the Non-Compliant States did not negotiate required data and security protocols. *Id.* at 13–21. As to Section 2020(e)(8)(A), the California Court concluded that USDA could not rely on that provision as an independent basis to obtain the requested records and that the request exceeded the scope of records and disclosures authorized by that provision. *Id.* at 13–19.

Even so, the California Court recognized that Section 2020(a)(3) uses "clear, mandatory language," requiring that records "shall . . . be made available for inspection and audit." *Id.* at 15 (quoting 7 U.S.C. § 2020(a)(3)(B)). Accordingly, the California Court acknowledged that USDA is entitled to obtain records necessary to determine compliance with the FNA subject to agreed upon data and security protocols. *Id.*

On November 24, 2025, USDA sent a letter to Non-Compliant States ("Second Records Request") that requested the records under 7 U.S.C. § 2020(a)(3), provided a list of data elements, and proposed data and security protocols. Compl. Ex. A ¶ 11; Ex. 7 at 2, 5–7, 8–12. In February 2026, the California Court expanded the injunction to bar USDA from disallowing federal funds based on Non-Compliant States' refusal to comply with the Second Records Request. Order Granting in Part Mot. to Expand Prelim. Inj., *California et al. v. U.S. Dep't of Agric.*, 25-cv-06310-MMC, (N. D. Cal. Feb. 26, 2026), ECF 134. The California Court ruled that, "a State is not entitled to unreasonably decline to agree to a protocol" when USDA seeks records under Section 2020(a)(3). *Id.* at 12. However, the California Court reasoned that Section 2020(a)(3) and Section 2020(e)(8)(A) must be read together, meaning USDA's request for records and proposed protocols under Section 2020(a)(3) cannot force a State Agency to violate Section 2020(e)(8)(A)'s use and

rediscosure restrictions. *Id*. at 14. The California Court found that two sections of USDA's then-proposed protocols and the June 2025 SORN would have allowed "USDA to share the requested data with entities other than those covered by § 2020(e)(8)(A)(i), thereby effectively serving as a conduit between [Non-Compliant States] and prohibited entities." *Id.* at 14–15.

During the injunction hearing, the California Court offered guidance to USDA on how it could amend its protocols to make them comply with the use and rediscosure restrictions in Section 2020(e)(8)(A). *See* Tr. of Proceedings, *California v. U.S. Dep't of Agric.*, 3:25-cv-06310-MMC, (N.D. Cal. Feb. 13, 2026), ECF No. 131 at 32:16 to 33:12, 46:10–48:22, 89:8–89:18. The California Court identified two amendments: (1) copying verbatim the use and rediscosure limitations in 7 U.S.C. § 2020(e)(8) directly into USDA's proposed protocols; and (2) including a provision in the protocols that expressly clarified that the protocols limited any conflicting routine use in the SORN. *Id.* The Non-Compliant States agreed that those amendments would "largely address" their concerns about USDA's use and rediscosure of the records under Section 2020(e)(8)—the only claim that the California Court had found meritorious. *Id.* at 47:9–47:21.

**D.      Plaintiff States failed to negotiate in good faith in response to USDA's renewed records request and proposed data and security protocols.**

On February 17, 2026—after the preliminary injunction hearing but before the California Court issued its order—USDA sent Non-Compliant States a letter with amended data and security protocols incorporating the California Court's guidance. Compl. Ex. A ¶ 14; Ex. 10 at 2. The protocols affirmed that the data received from Non-Compliant States would be governed by and comply with Sections 2020(a)(3) and 2020(e)(8), notwithstanding any inconsistent provision of the SORN. *Id.* The protocols incorporated Section 2020(e)(8)(A)'s restrictions verbatim. *Id.*

On February 25, 2026, Non-Compliant States again rejected USDA's request and protocols based on numerous reasons, including some previously rejected by the California Court. Compl.

9

Ex. A ¶ 15; Ex. 11 at 2–3, 17–23. For example, Non-Compliant States said they were now unsatisfied with the language of Section 2020(e)(8)(A) and proposed adding new language and other rights not afforded by the statute "to make clear that 7 U.S.C. § 2020(e)(8) does not permit the use or disclosure of data for purposes of investigating potential violations of civil immigration laws or enforcing civil immigration laws." Compl. Ex. 11 at 2–3. Non-Compliant States also proposed subjecting USDA employees to state criminal penalties for protocol violations and limiting key data elements necessary for USDA to audit eligibility and benefit payments. *Id.* at 17, 28–32. These restrictions included excluding non-recipient household members, removing street and mailing address information, and construing assets and resources to mean what was reported by applicants rather than what was known to Non-Compliant States. *Id.* at 29–31.

Between March 10 and March 27, USDA attempted to negotiate in good faith with Non-Compliant States through correspondence and revised protocols. USDA accepted some proposed revisions but rejected others that imposed unlawful restrictions or prevented USDA from performing its duties under the FNA. Compl. Ex. A ¶¶ 16–19; Exs. 12–15. In a March 27th letter, USDA addressed the States' immigration-enforcement concerns by proposing protocol language stating that, "Section 2020(e)(8)(A) does not provide USDA with authority to respond to a request from DHS for data for purpose(s) of civil immigration enforcement." Compl. Ex. 15 at 3, 9.

On March 30, 2026, Non-Compliant States rejected USDA's records request and proposed data and security protocols. Compl. Ex. A ¶ 20; Ex. 16. Non-Compliant States asserted other federal laws could permit USDA to share records despite the protocols' restrictions. Compl. Ex. 16 at 2–3. They also claimed USDA failed to justify its need for certain data elements. *Id.*

**E.**   **Defendants refused to comply with USDA's renewed records request or accept its proposed protocols that conformed with the California Court's guidance.**

On May 15, 2026, USDA sent a letter to Defendant Kentucky Cabinet for Health and Family Services under 7 U.S.C. § 2020(a)(3), superseding its prior records requests ("Third Records Request"). Compl. Ex. A ¶ 21; Ex. 17 at 2. The letter explained USDA is conducting a SNAP inspection and audit "to ensure that it is being conducted in full compliance with the law and to identify program errors, fraud, waste and abuse." Compl. Ex. 17 at 2. The letter clarified that the request was "solely" to determine whether SNAP was being administered in compliance with the FNA and its regulations. *Id.* at 3.

USDA included a list of defined data elements and data and security protocols that incorporated the California Court's guidance, including a verbatim recitation of 7 U.S.C. § 2020(e)(8)(A)'s use and redisclosure limitations and an assurance that those limitations would govern over any conflicting routine uses provided in the SORN. *Id.* at 8. The protocols affirmed Section 2020(e)(8)(A) do not provide USDA with authority to respond to a request from DHS for records for purposes of civil immigration enforcement. *Id.*

On May 22, 2026, Non-Compliant States—not Defendants—sent USDA a letter refusing to provide the requested records or agree to USDA's proposed data and security protocols. Compl. Ex. A ¶ 22; Ex. 18 at 2. Instead, Non-Compliant States stated they would await resolution of their APA lawsuit on the merits. *Id.* They proposed no revisions to USDA's protocols and maintained their previously asserted objections remained valid. *Id.* As of the date of this filing, Defendants have not independently responded to USDA's May 15th records request, other than to acknowledge receipt. *See* Compl. Ex. A ¶ 23.

Pursuant to 7 U.S.C. § 2020(g), the Secretary of Agriculture formally requested that the Attorney General seek injunctive relief compelling Defendants to comply with the FNA and its regulations, including USDA's records request under 7 U.S.C. § 2020(a)(3). *Id.* ¶ 24.

## **ARGUMENT**

Plaintiff seeks a preliminary injunction ordering Defendants to comply with USDA's May 15, 2026, records request and produce the requested records "forthwith." 7 U.S.C. § 2020(g). Section 2020(g) authorizes the Attorney General to bring an action to compel a State Agency's compliance with the FNA and its implementing regulations. *Id*. Upon a showing of noncompliance, the statute requires the district court with jurisdiction over the State Agency to issue "appropriate injunctive relief" and order "forthwith" compliance. *Id*.

Courts consider four factors in deciding whether to grant a preliminary injunction: whether the movant is likely to (1) "succeed on the merits" (2) and "suffer irreparable harm in the absence of preliminary relief," and whether (3) the "balance of equities tips in [the movant's] favor," and (4) the "injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Courts balance these factors, but "the *existence* of an irreparable injury is mandatory." *PCC Airfoils, LLC v. Daugherty*, 176 F.4th 509, 513 (6th Cir. 2026) (emphasis in original) (internal quotation marks omitted).

Furthermore, courts do not exercise equitable discretion in a vacuum; they must give effect to Congress's policy choices. *TVA v. Hill*, 437 U.S. 153, 194–95 (1978). Once Congress establishes statutory priorities, the Executive must administer them and the Judiciary must enforce them. *Id*. Congress directed USDA to oversee State Agencies' administration of SNAP and authorized judicial enforcement when State Agencies violate the FNA or its regulations. *See, e.g.*, 7 U.S.C. §

2020. Viewed through that congressional mandate, the equitable factors support the requested injunction.

## A.     Plaintiff is likely to succeed on the merits.

To obtain a preliminary injunction, a movant must make a "clear showing that [it] is likely to succeed on the merits." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (internal quotation marks omitted). At the same time, the movant need not prove its case in full at this stage. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Plaintiff satisfies this standard.

The FNA grants USDA broad authority to oversee State Agencies' administration of SNAP. 7 U.S.C. §§ 2020, 2025. To facilitate that oversight, the FNA requires State Agencies to afford USDA access to "[a]ll records, and the entire information systems in which records are contained" for "inspection and audit . . . subject to data and security protocols agreed to by the State agency and Secretary." 7 U.S.C. § 2020(a)(3)(B)(i). Defendants refused to provide the requested records and rejected USDA's proposed protocols. Compl. Ex. A ¶¶ 20, 22; Exs. 16, 18 at 2. The dispositive question is whether Defendants may defeat USDA's statutory right of access by withholding agreement to reasonable protocols. *See* 7 U.S.C. § 2020(a)(3). They cannot.

### 1. Section 2020(a)(3) requires disclosure of covered records based on the application of the ordinary meaning canon.

As with any question of statutory interpretation, the analysis begins with the "plain language of the statute." *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009). When the statute's language is plain, courts "must enforce it according to its terms." *Id.* Unless otherwise defined, statutory terms are given their "ordinary meaning . . . at the time Congress enacted the statute." *Wis. Cent. Ltd. v. U.S.*, 585 U.S. 274, 277 (2018) (quoting *Perrin v. U.S.*, 444 U.S. 37, 42 (1979)). In doing so, courts should apply "standard English language dictionaries." *U.S. v. Ezeta*, 752 F.3d 1182, 1185 (9th Cir. 2014) (citing *Smith v. U.S.*, 508 U.S. 223, 228–29 (1993)); *U.S. v. Zabawa*,

13

719 F.3d 555, 559 (6th Cir. 2013) ("When a statute contains an undefined term, we give the term its ordinary meaning . . . . In determining that meaning, dictionaries are a good place to start.").

Section 2020(a)(3) provides that records maintained by State Agencies "*shall be* made available" for USDA's "inspection and audit . . . *subject to* data and security *protocols* agreed to by the State agency and Secretary." 7 U.S.C. § 2020(a)(3)(B)(i) (emphasis added). As a threshold matter, "shall" denotes a mandatory obligation, not discretion. *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (finding that the term "shall . . . normally creates an obligation impervious to judicial discretion."). The most natural reading of Section 2020(a)(3)(B)(i) is that it imposes a mandatory duty on Defendants to provide the Secretary access to those records for inspection and audit. *See id.*

The phrase "subject to data and security protocols" does not alter Defendants' mandatory, nondiscretionary obligation. *See* 7 U.S.C. § 2020(a)(3) (B)(i). Section 2020(a)(3)'s requirement that the data be provided "subject to data and security protocols" is most naturally understood to mean that the manner and terms of data sharing are governed by, or controlled through, protocols agreed upon by the State and USDA. *See* "Subject to", Merriam-Webster.com (last visited Jul. 10, 2026), https://www.merriam-webster.com/dictionary/subject%20to [https://perma.cc/UE5E-RKKK] ("affected by or possibly affected by (something)"). Likewise, ordinary usage of the term "protocols" supports that it refers to procedures, safeguards, and rules governing the implementation of an activity. *See* "Protocols", Merriam-Webster.com (last visited Jul. 10, 2026), https://www.merriam-webster.com/dictionary/protocols [https://perma.cc/RVZ6-XJQP] (providing definitions that include "a system of rules that explain the correct conduct and procedures to be followed in formal situations;" and "a set of conventions

14

governing the treatment and especially the formatting of data in an electronic communications system.").

Read together, the terms "*shall*," "*subject to*," and "*protocols*" in Section 2020(a)(3) establish, first, a mandatory duty of access for USDA, and second, that such access is governed by data and security protocols mutually agreed upon by State Agencies and the USDA Secretary. The "*subject to*" language incorporates those safeguards as constraints on implementation, while "*protocols*" identifies the technical and security mechanisms that structure disclosure. *See* 7 U.S.C. § 2020(a)(3)(B)(i). Nothing in these terms suggests that agreement on protocols is a condition precedent to the State's underlying obligation to permit inspection and audit. *See id.* Rather, the protocol clause regulates the manner of access but does not eliminate the obligation to provide access. *See id.*

The structure of Section 2020(a)(3) provides further context for its interpretation. *See Becerra v. Empire Health Found.*, 597 U.S. 424, 442 (2022) (looking to the "structure of the relevant statutory provisions" to determine statutory meaning). Section 2020(a)(3) first imposes a mandatory duty: that records "*shall . . .* be made available for inspection and audit by the Secretary." 7 U.S.C. § 2020(a)(3)(B)(i) (emphasis added); *In re Hill*, 81 F.4th 560, 573 (6th Cir. 2023) (Thapar, J., concurring) ("And here, the text is clear. 'Shall' means 'shall.'"). Only after imposing that mandatory duty does the statute qualify the manner of access by providing that inspection and audit are "subject to data and security protocols agreed to by the State agency and [USDA Secretary]." 7 U.S.C. § 2020(a)(3)(B)(i). Nothing in that language suggests that the parties' failure to agree on the mechanics of access extinguishes the USDA Secretary's underlying right to inspect and audit the records. *See id*.

15

Moreover, the performance in this case is simply the transfer and storage of the records and not subsequent use, redisclosure, or anything else. *See* 7 U.S.C. § 2020(a)(3)(B)(i). Indeed, Congress considered the issues of restrictions on USDA's use and redisclosure of the records after the transfer and storage under Section 2020(a)(3) occurs and provided those restrictions in a separate subsection—Section 2020(e)(8)(A). Yet the primary objection of the Commonwealth of Kentucky and the other Non-Compliant States to the protocols has been that USDA may subsequently use the data for immigration enforcement purposes in violation of Section 2020(e)(8)(A). Compl. Ex. A ¶ 20; Ex. 16 at 1. Accordingly, Defendants have violated the FNA by refusing to agree to reasonable data and security protocols as a means of avoiding their obligation to provide access to the data.

### 2. The presumption against ineffectiveness and the surplusage canon supports that Defendants may not defeat USDA's inspection authority by refusing to agree to reasonable protocols.

The presumption against ineffectiveness and surplusage canon further confirms Defendants may not refuse to agree to reasonable data and security protocols. The presumption against ineffectiveness "weighs against interpretations of a statute that would render the law in a great measure nugatory, and enable offenders to elude its provisions in the most easy manner." *Garland v. Cargill,* 602 U.S. 406, 427 (2024) (citation and internal quotation marks omitted). The presumption gives effect to the "commonsense proposition 'that Congress presumably does not enact useless laws.'" *Id.* (quoting *U.S. v. Castleman*, 572 U.S. 157, 178 (2014) (Scalia, J., concurring in part and concurring in judgment).

Likewise, courts presume that Congress does not enact language that is "superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citation and internal quotation marks omitted). Statutory provisions must therefore be interpreted "in their context and with a

16

view to their place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012); *New York State Dept. of Social Servs. v. Dublino*, 413 U.S. 405, 419–20 (1973) ("We cannot interpret federal statutes to negate their own stated purposes.").

Taking these two tools together, the qualifier, "subject to data and security protocols agreed to by the State agency and Secretary," cannot reasonably be construed to grant Defendants a unilateral veto over the Secretary's inspection authority. *See* 7 U.S.C. § 2020(a)(3)(B)(i). Otherwise, Congress's command that State Agency records "shall be made available for inspection and audit" would be rendered "useless" and "nugatory" as State Agencies could defeat federal oversight simply by refusing to agree to a protocol (as Defendants attempt to do here). *See id.*; *Garland*, 602 U.S. at 427; *Castleman*, 572 U.S. at 178.

Furthermore, construing the protocol language as a condition on whether disclosure occurs would improperly elevate the qualifier "subject to data and security protocols agreed to by the State agency and Secretary" over Congress's command that covered records shall "be made available for inspection and audit." *See* 7 U.S.C. § 2020(a)(3)(B)(i). The surplusage canon gives effect to both provisions: the inspection requirement establishes the State Agency's obligation to provide USDA access to covered records, while the protocol requirement governs the procedures for providing that access. *See Roberts*, 566 U.S. at 101; *Dublino*, 413 U.S. at 419–20. This reading preserves independent meaning for both provisions, avoids surplusage, and effectuates Congress's purpose of ensuring USDA can "inspect[] and audit" covered records. 7 U.S.C. § 2020(a)(3)(B)(i).

### 3. The legislative history confirms Congress did not create a State Agency veto over USDA's access to SNAP Records.

Even if the Court finds ambiguity in Section 2020(a)(3), legislative history confirms Congress intended to expand USDA's access to State Agencies' SNAP records, not make access contingent on its unilateral consent. *See Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011)

17

("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it.").

Congress enacted Section 2020(a)(3)(B)(i) as part of the Agriculture Improvement Act of 2018. Pub. L. No. 115-334, 132 Stat. 4490 (2018). The House and Senate conference committee managers cited "oversight and administration problems" in SNAP quality control that caused a "multi-year gap in publication of SNAP error rates." H.R. Rep. No. 115-1072, at 626 (2018) (Conf. Rep.). To remedy those problems, the managers sought "to reinforce . . . efforts to obtain statistically-valid data" and expected "States to cooperate in the [quality control] process by making data available to [USDA] when requested." *Id*. They emphasized "USDA needs sufficient access, in accordance with agreements with States, to State systems and records" and directed USDA "to access records and information systems" held by the states to improve program integrity and reduce errors and fraud. *Id*. Congress thus intended to facilitate USDA's access to state records, not permit State Agencies to unilaterally veto such access. *See id*.

Rules of statutory interpretation mandate the same conclusion. The text of Section 2020(a)(3)(B)(i) imposes a mandatory duty to provide USDA access to State Agencies' records, while the protocol requirement governs how that access is implemented. *See Becerra*, 597 U.S. at 442; *Lexecon*, 523 U.S. at 35. The presumption against ineffectiveness and the surplusage canon confirm that Congress did not intend to allow states to veto USDA's access and inspection authority. *See Garland*, 602 U.S. at 427; *Roberts*, 566 U.S. at 101; *Dublino*, 413 U.S. at 419–20. Even if the statute was ambiguous, the legislative history confirms that Congress intended to expand USDA's access to state SNAP records, not to condition that access on State Agency consent. *See* H.R. Rep. No. 115-1072, at 626.

18

**B. Defendants' ongoing violation of Section 2020(a)(3) irreparably harms the United States by thwarting USDA's congressionally mandated oversight of SNAP.**

Defendants' ongoing violation of Section 2020(a)(3) irreparably harms the United States by interfering with its interest in administering federal law and overseeing SNAP. The "government's inability to effectuat[e] statutes enacted by representatives of [the] people . . . gives rise to irreparable harm." *Somerville Pub. Sch. v. McMahon*, 139 F.4th 63, 74 (1st Cir. 2025) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (internal quotation marks omitted)); *see Online Merchs. Guild v. Cameron*, 995 F.3d 540, 560 (6th Cir. 2021) (applying *King* by finding "Kentucky would be irreparably harmed by its inability to enforce constitutional price-gouging laws").

Courts recognize that the United States suffers irreparable injury when state action undermines federal authority or prevents the federal government from carrying out its statutory responsibilities. *See, e.g., United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulation."); *United States v. South Carolina*, 840 F. Supp. 2d 898, 925 (D.S.C. 2011) (finding irreparable harm to the United States where a state-created enforcement regime conflicted with and posed an obstacle to federal immigration law), *modified in part*, 906 F. Supp. 2d 463 (D.S.C. 2012), *aff'd*, 720 F.3d 518 (4th Cir. 2013). The Supreme Court similarly recognizes that improper intrusion into the federal government's prerogatives is impermissible. *Cf. Trump v. CASA, Inc.*, 606 U.S. 831, 859 (2025) ("When a federal court enters a universal injunction against the Government, it improperly intrudes on a coordinate branch of the Government and prevents the Government from enforcing its policies against nonparties.") (cleaned up).

19

Here, Congress charged USDA with overseeing SNAP, a federally funded benefits program, and expressly authorized USDA to obtain the records necessary to perform that oversight. *See* 7 U.S.C. § 2020. Defendants' refusal to provide those records subverts Congress's chosen system of accountability and prevents USDA from carrying out its statutory duties. *See McMahon*, 139 F.4th at 74; *Cameron*, 995 F.3d at 560. The resulting harm threatens the integrity of SNAP itself. *See United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003) ("[Defendant's] false claims also harmed the government, in the form of both monetary damages and *harm to the administration and integrity* of Medicare") (emphasis added). By withholding records required under Section 2020(a)(3), Defendants have thwarted Congress's oversight scheme and have impaired the federal government's sovereign interest in administering federal law and safeguarding the integrity of SNAP. *See McMahon*, 139 F.4th at 74, *Cameron*, 995 F.3d at 560. Accordingly, Defendants' continued refusal to comply with Section 2020(a)(3) constitutes precisely the type of interference with federal authority that gives rise to irreparable harm. *See Alabama*, 691 F.3d at 1301.

## C. The balance of equities and public interest favor preliminary injunctive relief.

The final two preliminary injunction factors are the balance of equities and the public interest. *Winter*, 555 U.S. at 20. Since Defendants are government officials, the balance-of-equities and public interest factors merge. *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020) (explaining that "the harm to the opposing party and the public interest factors 'merge when the Government is the opposing party'") (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The balance of equities and public interest favor Plaintiff, which has a strong interest in ensuring SNAP is administered consistently with Congress's directives. *See Tennessee v. Dep't of Educ.*, 615 F. Supp. 3d 807, 841 (E.D. Tenn. 2022) ("[T]he public's true interest lies in the correct

20

application of the law.") (internal citation and quotation marks omitted), *aff'd.*, 104 F.4th 577 (6th Cir. 2024). By contrast, Defendants' frustration of federal statutes and prerogatives "is not in the public interest." *See Alabama*, 691 F.3d at 1301. Congress has already decided the public interest is best served by providing USDA access to the records necessary to oversee the administration and integrity of SNAP. *See* 7 U.S.C. § 2020(a)(3)(B)(i); H.R. Rep. No. 115-1072, at 626.

Thus, an injunction is in the public interest because it preserves the integrity of SNAP and enables USDA to carry out the oversight responsibilities Congress assigned to it. *See Tennessee,* 615 F. Supp. 3d at 841. By contrast, Defendants suffer no cognizable harm from an injunction requiring them to produce records they have already collected and are obligated to provide to USDA. *See* 7 U.S.C. 2020(a)(3). An injunction poses little risk to third parties. *See Winter*, 555 U.S. at 20. USDA's proposed protocols incorporated safeguards protecting Kentuckian's confidentiality and security of their personal data. Compl. Ex. A ¶ 21; Ex. 17 at 8, 10, 18–19 (noting "USDA is offering the strictest level of security available—FedRAMP High" for "data security and protections both in storage and transfer"). Accordingly, the balance of equities and public interest favor preliminary injunctive relief.

## CONCLUSION

Congress required State Agencies to provide USDA with the records necessary to determine whether SNAP is being administered in compliance with federal law. Defendants refused to provide those records despite repeated requests, extensive negotiations, revised data and security protocols, and judicial guidance confirming USDA's right of access. Their refusal obstructs USDA's congressionally mandated oversight function and undermines the administration and integrity of SNAP. Because Plaintiff has established the equitable factors

21

supporting injunctive relief, Plaintiff respectfully requests that the Court order Defendants to comply with USDA's records request "forthwith." *See* 7 U.S.C. § 2020(g).

    Dated: July 10, 2026

                Respectfully submitted,

                BRETT A. SHUMATE
                Assistant Attorney General
                Civil Division

                TYLER BECKER
                Counsel to the Assistant Attorney General
                Civil Division

                LISA K. HSIAO
                Acting Director
                Civil Division, Enforcement & Affirmative Litigation Branch

                *s/Colin W. Trundle*
                COLIN W. TRUNDLE
                CADESBY B. COOPER
                DANIEL J. PETROKAS
                KYU YUN KIM
                Trial Attorneys
                United States Department of Justice
                Civil Division, Enforcement & Affirmative Litigation Branch
                450 5th Street, N.W.
                Washington, DC 20001
                Tel: (202) 742-7112
                colin.trundle@usdoj.gov

                *Counsel for Plaintiff United States of America*